1   Kathleen L. Wieneke, Bar #011139
    Christina Retts, Bar #023798
2   Garrett Griggs, Bar #030525
    WIENEKE LAW GROUP, PLC
3   1225 West Washington Street, Suite 313
    Tempe, Arizona 85288
4   Telephone: (602) 715-1868
    Fax: (602) 455-1109
5   Email: kwieneke@wienekelawgroup.com
    Email: cretts@wienekelawgroup.com
6   Email: ggriggs@wienekelawgroup.com

7   *Attorneys for Defendants City of Mesa, Harris,*
    *Navarro, Cameron, Adair, Chuey, Goodrich,*
8   *Freeman, Thomas, Orr, Brown, and Cost*

9

10                **UNITED STATES DISTRICT COURT**

11                    **DISTRICT OF ARIZONA**

12   Christopher Gagne in his capacity as the        NO. 2:24-cv-01337-DJH
     Personal Representative of the Estate of
13   Shawn Taylor Gagne; Christopher and
     Suzette Gagne, husband and wife, as the         **DEFENDANTS' CERTIFICATE OF**
14   surviving parents of decedent Shawn Gagne,      **CONFERRAL AND MOTION TO**
                                                     **DISMISS ALL CLAIMS AGAINST**
15                          Plaintiffs,              **DEFENDANTS ORR AND COST;**
                                                     **COUNT TWO (THE *MONELL***
16   vs.                                             **CLAIM); COUNT FOUR; AND**
                                                     **COUNT FIVE**
17   City of Mesa, a political subdivision of the
     State of Arizona; Kevin Cost, Chief of Mesa
18   Police Department, individually and in his
     official capacity; Matthew Harris, in his
19   individual capacity and in his capacity as a
     police officer; Kyle Thomas, in his
20   individual capacity and in his capacity as a
     police officer; Shawn Freeman, in his
21   individual capacity and in his capacity as a
     police officer; Matt Brown, in his individual
22   capacity and in his capacity as a police
     officer; Kyle Cameron, in his individual
23   capacity and in his capacity as a police
     officer; Matthew Chuey, in his individual
24   capacity and in his capacity as a police
     officer; Robert Goodrich, in his individual
25   capacity and in his capacity as a police
     officer; Alejandro Navarro, in his individual
26   capacity and in his capacity as a police
     officer; Matthew Adair, in his individual
27   capacity and in his capacity as a police
     officer; Christopher Orr, in his individual
28   capacity and in his capacity as a police

1    officer; ABC Partnerships I-X; XYZ
2    Corporations I-X; John Does I-X and Jane
     Does I-X,
                    Defendants.
3

4        This case involves the gravest of threats posed by an un-hinged heavily armed and

5    intoxicated suspect wearing body armor—with a reported prior history of firing weapons—

6    who repeatedly expressed homicidal threats to kill responding police officers. (Doc. 63, Ex.

7    5, 911 Call, Ex. 6, CAD records at p. 15, 18-27). Police responded to the scene of a highly

8    volatile domestic violence incident, where the decedent shot off a round after threatening

9    to blow his girlfriend and a neighbor's "brains out."[1] Armed with an arsenal of weapons

10   and ammunition, the decedent made repeatedly escalating, homicidal, and threatening

11   statements to the police negotiator. (*Id.* at Ex. 3, negotiator call). The decedent never

12   expressed non-violence, never stated or suggested he would surrender (even after being

13   shot), but instead threatened to "dump shots" into officers, bragged about his ammunition

14   and firearms, told officers he was ready to start a war, and reported that there would be

15   casualties to officers. *See* A.R.S. § 13-410 (C)(2)(c) (the use of deadly force is justified

16   when an officer reasonably believes it is necessary to effect an arrest of a person who

17   "through past or present conduct…that the person is likely to endanger human life or inflict

18   serious bodily injury to another unless apprehended without delay."). Defendant Adair

19   could hear the decedent loading a firearm as he made these statements and witnesses saw

20   him armed with an AK-47. (*Id*. at Ex. 6, p. 26-28). A subsequent shooting ensued, with

21   several volleys of shots, including some fired by the decedent. (*Id.* at Ex. 10, scene photos

22   at p. 2, 25, 31; Exs. 11, helicopter video & 12, helicopter stills).

23       Pursuant to Rule 12(b)(6), Defendants move to dismiss the following claims: (1) all

24   claims against Defendants Adair (primary negotiatory) and Orr (support negotiator) as

25

26   _____

27   [1] The Officer Defendants certify conferral prior to filing this Partial Motion to
     Dismiss, in the form of meet and confer correspondence sent: multiple on July 9, 2024,
28   August 9, August 16, multiple on August 21, and August 22. While Plaintiff cured some of
     the deficiencies, this Motion addresses the deficiencies that remain.

neither officer used any force; (2) all claims against Chief Cost; (3) the *Monell* claim (Count Three) as it is boilerplate and contains no facts establishing liability; (4) the state law claim for negligence against the City of Mesa (Count Four) that is barred by A.R.S. § 12-820.05 and *Ryan v. Napier*; (3) the stand-alone loss of consortium claim (Count Five) which is barred by A.R.S. § 12-611, 14-3110, and because the decedent died within seconds to minutes of the final shots and the Plaintiffs were not present to be denied any pre-death consortium.

## I.    FACTUAL BACKGROUND

On July 6, 2023, at approximately 8:35 p.m., Shawn Gagne engaged in a verbal confrontation with a neighbor. (Doc. 60, at ¶ 23). Gagne was confrontational, extremely intoxicated, and scheduled to enter alcohol treatment the next day. (*Id*. at ¶24-27).  The neighbor called 911, reporting: (1) Shawn threatened to "blow her brains out" and then shot his firearm from the patio (she did not know if it was up in the air or at the victims); (2) after making the threat said "he didn't give a fuck;" (3) Shawn previously shot his firearm in the apartment around three times; (4) Shawn has "tons of guns"—a rifle, a handgun, an AR; (5) Shawn had just finished "choking [his girlfriend] out.;" and (6) Shawn made these types of threats before when he was fighting with his girlfriend, previously broke the door and things in the apartment, previously choked the girlfriend, and previously threatened the neighbor.[2] (Doc. , Ex. 5, 911 call). When officers arrived, they attempted to communicate with Shawn via intercom announcements and sirens, for fifteen minutes with no response. (Doc. 60, at ¶ 30). Officers then attempted to use a beanbag shotgun to "knock" on the front door.[3] (*Id.* at ¶ 31). The decedent's girlfriend communicated to officers that he had

---

[2] In the Complaint, the Plaintiffs bizarrely try to victim blame by claiming that the victim women "provoked" Shawn to engage in this violence: "Shawn's Neighbor Provokes MPD Response." (Doc. 60, p. 12, ln. 17).

[3] Plaintiffs' Complaint references "Defendant S. Freeman" and "Defendant Kurian," as well as multiple other "Defendants" who have been removed from the Caption following the filing of the Amended Complaint. Removed Defendant Scott Freeman, who deployed bean bag rounds at the door, is a different officer than Defendant Shawn Freeman (a SWAT officer who remains in this case).

previously made suicidal statements. (*Id*. at ¶35). Shawn eventually came to the door, screamed at officers to "get out," and was armed with a rifle that he held by his side. (*Id*. at ¶¶ 36-37).

When MPD requested, by PA system that Shawn exit his apartment with nothing in his hands, "Shawn responded by ranting with irrational statements, some inviting violence and others demonstrative of his altered mental state." (*Id*. at ¶ 41). Patrol officers on scene were not wearing body armor sufficient to stop rounds from the decedent's high-powered weapons.  Due to the mortal threat posed by the decedent, responding police officers were not able to clear the nearby apartments of their occupants either. At 10:31 p.m.—around an hour after officers had arrived on scene—Shawn called his girlfriend, who handed the phone to negotiator Adair who "broadcast" the conversation "over MPD radio while officers monitored Shawn's movements." (*Id*. at ¶¶ 29, 44).  Shawn "demanded that officers turn off their sirens, put down their lasers, back away from the apartment and leave." (*Id*.). While citing to some of the conversation recorded with the negotiators, Plaintiffs conveniently omit the decedent's threats: "**don't shine the fucking lasers in my fucking house bitch…shine a laser in my house one more time and I'll fucking unload. Shine a fucking laser in my house one more time I will fucking unload on you. I don't care**" (Doc. 63, at Ex. 3, 1:49-2:00). During the negotiator call, Shawn made the following homicidal statements, while touting the fact that he was wearing body armor:

- You are about to have a fucking crisis if you don't get away from my fucking house. Back the fuck up. Right now. With all your fucking SWAT with all your gear. I don't give a fuck. Get the fuck out of my fucking face before I fucking start dumping shots in em. Get the fuck out. Back the fuck up; (55 sec-1:15)

- Get the fuck out of my fucking house before I fucking start dumping shots in your fucking squad cars; (1:15-1:25)

- I'm going to start dumping shots. You guys want to play fucking guns. You guys want to play guns. Let's play fucking guns, bro; (2:17-22)

- I'll show you fucking scary, bro…get the fuck out of my fucking place. Get the fuck out. I don't care, bro. I don't care. I am about to fucking send the jaws of hell upon you people. Don't fuck with me dude. (3:00-3:16)

- I don't give a fuck bro. Come and blow a fucking hole through my head bro. (3:32-3:39)

- I will fucking dump a hole right through your fucking squad car. (3:47-4:00)

- Come to my fucking house and see what fucking happens, bro. Bring the fucking SWAT team in here. I don't give a fuck. I got AKs, I got fucking ARs, I will fucking blow a fucking hole right through your fucking head. Don't fuck with me, bro; (4:15-4:32)

- You guys are fucking up right now…You guys aren't going to take nothing, bro. I got my fucking shotgun, I got my fucking 12 gauge, I don't give a flying fuck, bro.  (4:34-4:55)

- If you guys fucking come into my vicinity there are going to be casualties, including yourself. I don't not give a fuck; (5:00-5:12)

- You ain't going to get me bro. I'm not coming out. (5:49-54)

- I will fucking unload on all your fucking team…Come in and get me. (6:10-40).

- We're coming to shoot right now, homie..I'm getting my fucking shit ready right now. I ain't playing no fucking games; (6:31-6:50)

- Get the fuck out of my house before I fucking start shooting shots; (8:28-8:32)

- I have my fucking armor on…I have my fucking guns loaded… Get the fuck out of here. I don't play no fucking games bro. You guys want a fucking full Iraq war from one person and you better fucking get ready. Shine fucking lights in my house again I will fucking start shooting. Put the fucking lasers down now; (9:52-10:15)

- Stop fucking shining lights in my fucking house with lasers. I will fucking start unloading on the squad car. They better back the fuck up, dude. If they don't want to lose their fucking lives, then I suggest you get the fuck away; (10:28-10:39)

(Doc. 63, Ex. 3, start to 11:50). Plaintiffs claim that Defendant SWAT officer Shawn Freeman ignored the status of negotiations and fired the first shot, yet no negotiations resulted in any success or de-escalation. Instead, shortly before the first shot was fired, the decedent told officers to back the fuck up "if they don't want to lose their fucking lives then I suggest you get the fuck away." (Doc. 63, Ex. 3, at 10:25-11:40). After being "shot through his vest," the decedent continued to scream hostilities at officers to "get the fuck away…right now. Back the fuck up" as he fired shots at officers and they returned fire, with

1    multiple of the officers' shots hitting the structure of the building. (*Id*. at 11:42-12:18; Ex.

2    11, helicopter video at 1:40-1:45; Ex. 12, Screenshots from helicopter video).

3        Shawn reported "I hear you," as the negotiator told him to put his hands in the air,

4    but never communicated that he intended to surrender. (Doc. 63, Ex. 3, at 12:20-13:00).

5    Additional shots are heard at 13:00 in the recording, after the last round of shots, Shawn

6    yelled "I'm down."[4] (*Id*.at 13:07). While Plaintiffs make allegations about what interior

7    surveillance camera allegedly shows (Plaintiffs have not produced this footage to

8    Defendants), this footage is irrelevant as there is no allegation that any of the Defendants

9    had access to the footage, or that the viewpoint represents what they could see from ground.[5]

10   (Doc. 60 at ¶¶ 32, 49). Curiously, Plaintiffs contend that Shawn, at some point, placed one

11   of his weapons on the "kitchen counter," but such an admission confirms that he did have a

12   weapon in hand when shot by SWAT operator Freeman. (*Id*. at 49). Only six of the shots

13   fired by the Defendant Officers hit the decedent. (*See* Doc, _____, Ex. 1, Medical Examiner's

14   Report).

15       Plaintiffs sues Defendant Orr, a patrol officer who Plaintiffs allege was a "secondary

16   negotiator on scene" and "played an active role in the July 6th Incident, including by

17   assisting Defendant Adair in negotiating with Sean." (Doc. 60, ¶ 16). Plaintiffs make no

18   allegation that Defendant Orr used any force against Sean (he did not), or that he directed

19   or communicated anyone to use force against Sean (he did not), nor do they explain what

20   this supposed "active role" consisted of. Hooking up communication equipment to hear

21   primary Negotiator Adair's conversations with the decedent is not an "active role." (*See*

22   Doc. 63, Ex. 4, Orr Negotiator Supplement). Plaintiff identifies no statements from the

23   Defendant Adair's negotiator's phone call, or communications over the radio made by Adair

24

25       [4] In the Complaint, Plaintiffs incorrectly claim that Shawn was shot after he shouted

26   "I'm down." (Doc. 60 at ¶ 53). The negotiator call records all shots occurring before Shawn
     shouted that he was down.

27       [5] Multiple of the windows were also covered with tin foil, obstructing the view to

28   only some windows and hiding the decedent's actions from the officers, which gravely
     increased the danger that he could begin shooting hundreds of rounds at any point.

or Orr, or that form any basis for liability. Plaintiffs set forth no facts that can support liability against Defendants Orr and Adair.

## II.      LAW AND ARGUMENT

Fed. R. Civ. P. 8(a) requires that pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A claim must be stated clearly enough to provide each defendant fair opportunity to frame a responsive pleading. *McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996) (complaint that is so lengthy, rambling, confusing, and disorganized that "one cannot determine…who is being sued, for what relief, and on what theory" violates Rule 8). As the court noted in *Knowlton v. City of Wauwatosa*, "[a] federal court is not obligated to sift through a complaint to extract some merit when the attorney who drafted it has failed to do so himself. 'Rule 8(a) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud.'" 2022 U.S. Dist. LEXIS 17620, *11 (W.D.Wi. 2022).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 570). Plausibility is more than a "sheer possibility that a defendant has acted unlawfully." *Id*. If the allegations in a complaint "are so general that they encompass a wide swath of conduct, much of it innocent," they are not plausible. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). In reviewing a Rule 12(b)(6) motion, a court need not accept as true "conclusory statements" or "legal conclusions," *Iqbal*, 556 U.S. at 678, nor must it draw "unreasonable inferences" or "unwarranted deductions of fact," *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

The court need not accept as true conclusory allegations that are contradicted by documents referenced in the complaint, by exhibit, or by matters subject to judicial notice. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1999). Videos, not attached to a complaint but central to it, have been considered by courts in ruling on Fed.R.Civ.Pro. 12(b) pleadings, particularly where a party selectively states facts omitting

those that harm their case. *See Muhaymin v. City of Phoenix*, 2019 WL 699170, at *3 (D.Ariz. Feb. 20, 2019) (considering body worn camera footage attached to motion to dismiss). As the court noted in *Mayfield v. City of Mesa,* 2023 U.S. Dist. LEIS 191351, *5 (D.Ariz. Oct. 25, 2023), a court "is not required to accept as true allegations that contradict documents that are incorporated into the complaint." This prevents "plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom their claims."[6] *Id*. at *13.

### A. Defendants Adair (Negotiating) and Orr (Assisting with Negotiation Logistics) Cannot Be Liable for Excessive Force Because They Did Not Use or Direct the Use of Force (Count I).

Although named in the introductory section of the Motion to Dismiss, Plaintiffs' do not name Defendants Adair and Orr specifically in any claims. Instead, Plaintiffs' lump all Defendants together in claiming that excessive force was used against the decedent under the Fourth Amendment. The Fourth Amendment standard is one of objective reasonableness, and thus requires the use of force to "be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and must take into account that officers "are often forced to make split-second judgments…about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In determining whether **the force** used was reasonable, courts should give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 388. As the Ninth Circuit held in *Ames v. King County, Washington*, 846 F.3d 340, 348 (9th Cir. 2017), the first *Graham* factor should not focus too narrowly on the severity of the crime, but rather on the nature of the ongoing emergency exacerbated by a suspect's resistance. *Id.*

---

[6] Plaintiffs reference body camera, the negotiator call, girlfriend Jordan's contact with police (best recorded on the actual body camera of the officer at issue), Officer Maldanado's announcements (best recorded on his body camera), the negotiator's phone call, the 911 call, radio traffic, (Doc. 60, at ¶ 22, 28, 30-35, 38, 41, 43-44, 46, 50, 53).

Here, there is no allegation that Defendants Adair and Orr used **any force**, nor could there be, as Adair talked to the decedent on the phone and Orr arrived later to assist with logistics. (Doc. 63, Ex. 3, negotiator call; Ex. 4, Orr supplement).   There can be no constitutional violation for excessive force where no force was used. *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, *615 (2015) ("Indeed, even if Reynolds and Holder misjudged the situation, Sheehan cannot 'establish a Fourth Amendment violation based merely on bad tactics that might result in a deadly confrontation that could have been avoided."). Negotiating is not force. Defendant Adair attempted to communicate with the decedent and was met with threats, aggression, and homicidal ideation. (*Id.* at Ex. 3). *See Estate of Taylor v. Salt Lake City*, 16 F.4th 744, *762-764 (10th Cir. Oct. 26, 2021) (noting that where officer reasonably believed that the subject was making a hostile movement that presented a mortal threat, *Graham's* second factor is determinative, even though the suspect was later found to be unarmed).

### 1.    Defendants Adair and Orr are Entitled to Qualified Immunity Related to Allegations of Assisting with Negotiations.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (citation omitted). The qualified immunity inquiry is two-fold: (1) whether the facts as alleged show that the official's conduct violated a constitutional right; and (2) if so, whether the right violated was "clearly established." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009). Courts have "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. To deny qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021). "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was

unlawful in the situation he confronted.'" *City of Tahlequah v. Bond*, 142 S.Ct. 9, 12 (2021) (noting that an unpublished decision and other factually dissimilar cases were insufficient, and granting qualified immunity in a case where officers shot a suspect who raised a hammer). In excessive force cases, "specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

Plaintiff bears the burden of proving that Supreme Court case law, or at the bare minimum controlling circuit precedent clearly establishes the law. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) ("Neither [the plaintiff] nor the Court of Appeals identified any Supreme Court case that addresses facts like the ones at issue here…Even assuming that Circuit precedent can clearly establish the law for purposes of § 1983, LaDonde is materially distinguishable and thus do not govern the facts of this case.").

Defendants could locate no Supreme Court or Ninth Circuit case law standing for the proposition that an excessive force claim can be made against officers who do not use force and whose only contact with the decedent is through negotiation (Adair), or assistance with that negotiation (Orr). There are no facts alleged that Orr and Adair were in physical proximity to any of the shooters and, in fact, Plaintiffs expressly claim that Defendant Freeman was in a different position. Plaintiffs' theory of liability effectively seeks to make the negotiators liable for the shooting officers' decisions under a theory of either *respondeat superior*, or by virtue of the Ninth Circuit's defunct provocation theory.

At most, the existing case law only addresses the shooting officers, not negotiators, and none of the cases involve the level of verbally expressed threats of homicidal actions and risk posed by the decedent. The decedent's alcohol intoxication made him far more dangerous, not less, and being drunk is not equivalent to mental illness. The decedent's girlfriend told officers he had no mental illness. As the Court noted in *Isayeva v. Sacramento Sheriff's Dep't,* 878 F.3d 938 (9th Cir. 2017), in addressing the shooting of a mentally ill man, under the influence, and hearing homicidal voices:

the deputies had information that made Tereschenko more threatening…[h]e was likely under the influence of methamphetamine or some other drugs, and so was possibly less able to control himself…the government interest in using force is usually less strong when an individual is mentally ill, *see Doerle*, 272 F.3d at 1283, but her Tereshenko's apparent mental condition led him to recount homicidal voices, and the knowledge of that fact would increase the perceived threat to any reasonable officer.

*Id.* at 952. The Supreme Court and Ninth Circuit have never ruled that the police are obligated to place themselves in danger so long as the person threatening them is allegedly mentally ill. *See Lal v. California*, 746 F.3d 1112 (2014) (granting qualified immunity based upon a fatal shooting where it was clear that the decedent was attempting to provoke officers into shooting him and he finally advanced on the officers with a large rock over his head).

While not addressing claims against negotiators, two cases addressing the lack of liability for shooting officers are instructive because if liability is absent for the shooting officers, the law is not clearly established that negotiators who use no force could face liability. First, in *Long v. City & County of Honolulu*, 511 F.3d 901 (Ninth Cir. 2007), the Ninth Circuit affirmed summary judgment on the basis that there was no constitutional violation in the shooting death of an armed barricaded suspect. Police were summoned to the suspect's residence after he fired shots at several partygoers. *Id*. at 904. Patrol officers arrived and were later replaced by a SWAT team, who maintained a perimeter, and made telephone contact with the suspect who was asked to surrender, but he did not. *Id.* Throughout the night, the suspect walked around in an agitated state and shouted threats to get the "fuck out of his yard," and was threatening to shoot the lights the police were shining on the property. *Id.* After it was reported that the suspect fired shots, officers shot the suspect. *Id*. at 905. No shell casings were recovered from the suspect's residence. *Id.* The force was determined to be objectively reasonable because the shooting officer had observed the behavior, heard the suspect's threats to shoot police, saw the suspect with a rifle, knew the suspect previously fired shots, and it was reported over the radio that that the suspect was shooting. *Id.* at 906. Whether or not "Long actually fired his rifle at these officers is also immaterial. It is enough that [the shooting officer] heard the radio transmission and observed Long point the rifle in the officers' direction." *Id.*

Second, in *Sabbe v. Wash. Cnty. Bd. Of Comm'rs*, 84 F.4th 807, 812 (9th Cir. 2023), officers received a report that a suspect was "solid drunk," "belligerent," driving in a field, and may have shot a gun. Within an hour 30 patrol cars arrived, an armored truck arrived that attempted to execute a PIT maneuver, and then officers shot the suspect eighteen times. *Id.* The officers were told that the suspect had a gun, did not like the police, and would protect his property. *Id.* at 814. After the armored vehicle collided with the truck in an attempt to disable it, an officer thought he heard a shot and believed that the suspect was "maneuvering the rifle to point it out the passenger side." *Id.* at 815. An AR-15 rifle was found in the truck. In addressing qualified immunity relating to the shooting, the Court found it to be immaterial as to whether the suspect actually fired his weapon as "the relevant question for purposes of qualified immunity" is not whether Sabbe actually threatened the officers, but whether they 'could reasonably have believed that [h]e posed such a threat." *Id.* at 828. "Our case law is clear that when a suspect reaches for a gun or aims a weapon at officers, responding with deadly force does not violate the constitution." *Id.* When a suspect is armed, "even a furtive movement" can "create an immediate threat" sufficient to justify the use of deadly force. *Id.* The court found that it was reasonable to perceive the decedent as an immediate threat because they had multiple reports that he might be armed and intoxicated, he was behaving erratically and hostile, officer saw him with a rifle, and the officers believed that the suspect was shooting or going to shoot. *Id.*

Here, Defendants Adair and Orr responded to the scene of a reported domestic violence incident where the decedent shot a firearm, threatened the neighbor and his girlfriend, came to the door with a rifle in his hand, repeatedly threatened to kill officers, and Defendant Adair could hear the decedent loading a weapon. (Doc. 63, Exs. 4, 5, 6 at p. 18-19, 23, 25-26). It was reported at 22:43:33 that Gagne shot at officers. (Exs. 6, at 27). At 22:44:36 it was reported that the decedent was firing out the north side window. (*Id.* at 28; Exs. 11-12). As the Court noted in, *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013), "[t]his is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed — or reasonably suspected

of being armed — a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." The decedent was seen armed by third-parties and officers, shot a weapon previously, came to the door armed, touted the number of weapons and ammunition he possessed, was heard loading a firearm, made serious and repeated homicidal threats, and then fired his weapon.  Here, the decedent was far more dangerous and hostile than the mentally-ill suspect that was armed with a fake gun in *Estate of Strickland v. Nevada Cnty,* 69 F.4th 614, 621 (9th Cir. 2023). The Ninth Circuit, in finding the shooting reasonable, noted that an officer should not have to wait "until a gun is pointed at [them] before [they are] entitled to take action." *Id.* at 620. Nothing in the facts of these cases supports the proposition that the shooting is reasonable, but the negotiation somehow is not.  Qualified immunity bars the claims against Adair and Orr.

### B.    The Claims Against Chief Cost are Official Capacity Claims that Are Redundant of the *Monell* Claims.

An official capacity suit is not a suit against a particular defendant, but rather against the governmental entity they purport to represent. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding an official capacity suit is to be "treated as a suit against the entity."). Naming an individual and asserting official capacity claims against the City under *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658 (1978), is redundant. Plaintiffs' claims against Chief Cost are official capacity claims based upon his role as a "policy maker."

Plaintiffs' assumption that Chief Cost is a policy maker, however, is not entitled to any deference. Mesa City Charter, Article II, Section 204 ("Policy making and all other powers of the City shall be vested in the Council, except as otherwise provided by law or in this Charter, and the Council shall provide for the exercise thereof and for the performance of all duties and obligations imposed on the City by law."); *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) ("Whether an official has final policymaking authority is a question for the court to decide based on state law."); *Puente v. City of Phoenix*, 2022 U.S. Dist. LEXIS 21489, *49 (D.Ariz. 2022) (Chief Williams, of the City of Phoenix was not the final policy maker; the City Council and City Manager are). Because there are no

facts supporting individual liability, Chief Cost was not present at the scene, Chief Cost is not a policymaker, and the claims against him are redundant of the claims against the City of Mesa, he should be dismissed.

### C.    The *Monell* Claim (Count Two) is Boilerplate and Insufficient.

"[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). The court noted several factors supporting the dangerousness of the suspect: (1) a high caliber weapon poses a specific risk of penetration and injury; (2) "officers had reason to believe that he was drunk and angry"; (3) he may have fired a weapon or pointed one toward an intersection before the police contact.  Id. 832.  The Court did not discount the dangerousness because of the decedent's drinking, nor did it equate drunkenness to being "emotionally disturbed."

To prevail on a *Monell* claim based upon a purported policy and custom, Plaintiff must prove that the alleged constitutional violations were committed pursuant to a formal governmental policy, or a longstanding practice or custom which is the City's standard operating procedure. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Such a practice or custom must be so persistent, widespread, and repeated as to amount to deliberate indifference to the rights of persons with whom the police come into contact. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also Trevino*, 99 F.3d at 918 (liability may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy).

Training claims can only be successful in "limited circumstances" where the failure to train evidences "deliberate indifference" such that the shortcoming can properly be

thought of as a "policy or custom." *See City of Canton*, 489 U.S. at 387. Plaintiff must also establish that the deficiency was (1) the cause in fact and (2) the proximate cause of the constitutional deprivation. The Supreme Court has recognized several important principles applicable to this case: (1) "that a particular officer may be unsatisfactorily training will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than the faulty training program;" (2) liability will not lie where an otherwise sound program has "occasionally been negligently administered;" (3) liability will not attach if it can be proven that an injury could have been avoided if an officer had better or more training because "[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program…;" (4) "…plainly adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or legal basis for holding the city liable." *Id*. at 390-91. Isolated instances of alleged training deficiencies, not program wide, may not support liability. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

In *Fernandez v. City of Phoenix,* Judge Martone carefully analyzed *Monell* allegations of the same type asserted by the Plaintiffs in this case and dismissed them, without leave to amend, after a 12(c) Motion was filed. *See* 2012 U.S. Dist. LEXIS 85268 (D.Ariz. 2012). Like this case, the *Fernandez* plaintiffs made training, custom and policy claims, which were boilerplate, conclusory, and not supported by sufficient facts, which the court dismissed. *Id*. at 5-6. As it related to a supervision claim, the court noted that there were no facts that would plausibly show that the officer was "prone to pepper spray, tase, and shoot an unarmed man without provocation." *Id*. at p. 5. Notably, the plaintiffs in *Fernandez* alleged far more facts than Plaintiffs do in their kitchen sink recitation of conclusory allegations that purport to assert *Monell* claims. Plaintiffs have failed to allege any facts showing how Mesa's alleged training, customs, or policies were the moving force behind or substantially contributed to each of the Defendants' actions. Instead, Plaintiffs make conclusory statements about alleged failures to communicate, deescalate, and a

supposed culture of impunity.[7] Plaintiffs do not set forth any facts supporting these theories, describe what the City's training and policies specifically state, what is deficient in the policies that caused the alleged violations, nor do they point to any prior instances unrelated to this litigation. *See Ellar v. City of Mesa*, 2023 U.S. Dist. LEXIS 1080556, *8 (D.Ariz. 2023). Plaintiffs had the ability to assert facts by using the City's website, but instead rests upon conclusory and inaccurate allegations. *See Johnson v. City of Mesa*, 2021 U.S. Dist. LEXIS 170355 (D. Ariz) (granting summary judgment on a *Monell* claim against the City of Mesa and addressing the City's de-escalation training, Use of Force Policy, record retention policy, and tracking of complaints through IAPro); www.mesaazpolice.gov/community/transparency-in-policing (publicly available reports, policies, accreditation, training, community briefings, use of force and data, mental health, and Critical Incident Review). Plaintiffs' own allegations establish that there was an attempt to deescalate over almost two hours, that officers tried presence, verbal commands, knocking with a bean bag, and negotiation, all with no success due to the decedent's homicidal ideation. (Doc. 63, Exs. 3, 6, 7-9, 11).

As the Court noted in *Martinez v. Hain*, 2016 U.S.Dist. LEXIS 171726 (N.D.Ill. 2016), in dismissing boilerplate *Monell* allegations:

> '[t]he bulk of [Plaintiffs'] "facts" are just conclusion statements—catch phrases exhumed from other successful *Monell* cases, strung together in a kitchen-sink pleading approach—that have become all too common in *Monell* claims raised in non-pro-se § 1983 cases.' *Maglaya v. Kumiga*, 2015 U.S. Dist. LEXIS 101217 (N.D.Ill. 2015). A plaintiff cannot allege a single transgression, add vague boilerplate that this transgression resulted from a 'widespread practice,' and then proceed to discovery in the hopes of finding factual support for a *Monell* claim. *Id.* see also *Falk*, 973 F.Supp. 2d at 863 ('Plaintiff names the wrongs she suffered and alleges that they resulted from a policy or custom. These bare allegations of a policy or custom are not

---

[7] Defendants' counsel believes that Plaintiffs engaged in a cut-and-paste of allegations from other lawsuits against different entities. (Doc. 60, at ¶¶ 83-84). Undersigned counsel has seen these same allegations, in some cases word for word, in other cases defended for other agencies. Plaintiffs do not cite to any policy from the City of Mesa that allows purging, argue that the named Defendants or anyone else associated with this call had prior discipline that they purged.

entitled to the presumption of truth.')…Here, there are no factual allegations about, for example, what specific 'aggressive techniques' Sheriff Kramer 'trains and encourages its employees to use' (other than 'illegal' ones), whether these specific 'techniques' have resulted in similar complaints against Kane County Sheriff's officers, or whether any of those 'techniques' were actually employed during the incidents involving Plaintiffs…

*Id*. at 21. Similarly, in *Andrich v. Kostas*, the court dismissed *Monell* claims alleging a policy and custom of excessive force in the form of officer involved shootings, based upon the alleged facts that: (1) there was a rise in fatal shootings; (2) the police department led the nation in fatal shootings that resulted in the death of 23 citizens; (3) the department failed to provide training on how to respond to individuals with schizophrenia; and (4) the department failed to require its officers to document incidents where they pointed guns at citizens. 470 F.Supp. 3d 1048, 1064 (D.Ariz. June 30, 2020). The court held:

> Here, although the SAC asserts in conclusory fashion that the City maintained certain policies—including a policy of refusing to discipline officers who committed acts of misconduct, a policy of refusing to investigate allegations of unlawful force, a policy of sanctioning a code of silence to conceal wrongdoing, and a policy fostering an atmosphere of lawlessness (Doc. 31 ¶ 53)—it fails to allege any facts to support those assertions. Cf. *Cf. Moore v. City of Orange*, 2017 U.S. Dist. LEXIS 224304, 2017 WL 10518114, *3 (C.D. Cal. 2017) (concluding that a similar list of policies lacked allegations of underlying facts and failed to meet the Iqbal pleading standard).

*Id*. The court similarly rejected the bald claim that the individual officers involved had "committed similar acts of unlawful force, falsifying reports, suppressing evidence, dishonesty and abuse, thereby enabling [them] to continue to violate the constitutional rights of the Decedent" finding that there were not facts to support this conclusory assertion. *Id.* at 1065. Although the deadline to amend had not yet passed, this court refused to permit amendment given the fact that Plaintiff had multiple prior opportunities to amend. *Id.* at 1066. The Ninth Circuit agreed and affirmed dismissal of the *Monell* claims and the denial of leave to amend, holding that the operative complaint failed to include any facts to give fair notice of liability. *Andrich v. Kostas*, 2023 U.S. App. LEXIS 25002 (9th Cir. Sept. 21, 2023).

Similar to *Andrich*, the court granted a Motion to Dismiss a *Monell* claim in *Warren v. Penzone*, 2024 U.S. Dist. LEXIS 89121 (D.Ariz. May 17, 2024). The court found that the Plaintiff failed to allege sufficient facts to support the *Monell* theories. Unlike in *Warren*, Plaintiffs have not even attempted to allege that there were any prior factually specific shootings from which it could be inferred that there was a pattern of prior constitutional violations related to improper force, training, and/or supervision. *Id.* at *16-17. Plaintiffs make no attempt to provide any facts about the City's training, supervision, policies, or customs, despite easy access to the City's information through its website.

### 1.    The Irresponsibly Pled Defamatory Claim of Failure to Supervise Officer Shawn Freeman.[8]

Although broadly claiming that the City is liable under *Monell* for failure to supervise all Defendants, the only Defendant addressed specifically is Officer Freeman and Plaintiffs do not even allege he fired a fatal shot.  Despite making defamatory claims of "domestic violence" and "criminal conduct," Plaintiffs have not identified a single criminal case where Officer Freeman was convicted of any crime.[9] Plaintiffs similarly do not tie their inflammatory allegations to the constitutional violation in this case—a shooting of a homicidal suspect who reportedly choked his girlfriend, fired a shot, threatened that he would blow her and the neighbor's brains out, and then repeatedly threatened to kill officers. (Doc. 63, Exs. 3, 5, 7-9). Witnesses other than Freeman saw Plaintiff pacing back and forth holding an AK-47, and the helicopter footage recorded the decedent firing at officers. (*Id.* at Ex. 9). Plaintiffs do not allege that Officer Freeman was previously involved in any inappropriate on-duty use of force, or shooting. Nor do they identify any date of these

---

[8] Defendant Freeman does not waive any rights to pursue any available claims and remedies to address these allegations. Because Plaintiffs reside out of state, they should be required to post a Cost Bond, pursuant to LR54.1, to ensure recovery of costs relative to any non-meritorious claims in this case.

[9] Defendants requested that Plaintiffs remove all such references in meet and confer correspondence, challenging the factual basis for such assertions. As a result, Plaintiffs modified some of the allegations, but left these allegations in Paragraph 9. They should be stricken under Rule 8 as harassment. Defendants dispute that there is a good faith factual basis for making such allegations.

purported off-duty "inappropriate" incidents either. Instead, Plaintiffs merely attempt to smear Defendant Freeman, using inadmissible and non-specific Rule 404(b) barred "bad act" evidence, to make an illogical claim: that Defendant Freeman shot the decedent because he allegedly was, at some unidentified time, engaged in a domestic dispute, and that the City of Mesa was deliberately indifferent in allowing Freeman to operate as a police officer.

### D.    Count Four is Barred by *Ryan v. Napier* and A.R.S. § 12-820.05.

At the Motion to Dismiss stage and <u>for the purposes of this motion only</u>, the Court must accept as true Plaintiffs' allegations that force at issue constituted felony acts. Where the theory of liability is an assault and battery based upon an intentional use of force, a *respondeat superior* claim against the employer is barred. *See Liberti v. City of Scottsdale,* 816 Fed.Appx. 89, 91 (9th Cir. 2020); *See* A.R.S. §12-820.05 (immunizing employing government entities from allegations of felony conduct); *Link v. Pima County*, 193 Ariz. 336, 972 P.2d 669 (Ariz.Ct.App. 1998) (the applicability of A.R.S. §12-820.05 "should be resolved by the court 'at the earliest possible stage in litigation.'"). As the court noted in *Harris v. City of Phoenix,* 2021 U.S. Dist. LEXIS 204452 (D.Ariz. October 22, 2021):

> A municipality is not vicariously liable for all actions taken by its employees. *See, e.g., Ryan v. Napier*, 245 Ariz. 54, 425 P.3d 230, 236-37 (Ariz. 2018). As relevant here, a municipality cannot be held liable for its employee's intentional use of force unless it actually knows of the employee's propensity to commit that particular act. *Id.; see also* A.R.S. § 12-820.05(B)…And, in cases advancing claims based "solely on an officer's intentional use of physical force," a plaintiff may only advance a theory of intentional use of force. *Napier*, 425 P.3d at 236-237; *see also Liberti v. City of Scottsdale*, 816 F.App'x 89, 91 (9th Cir. 2020) (applying *Napier* to wrongful-death actions). Here, Claim One hinges entirely on allegations that Officer Bertz unjustifiably shot Decedent as he fled (Doc. 5 at 4-5), which is a theory of intentional use of force akin to aggravated assault. The City therefore is immune from vicarious liability for those actions unless it actually knew that Officer Bertz had a propensity to wrongfully shoot fleeing suspects.

*Id.* at *4-5. In this case, Plaintiffs do not allege any facts establishing that any officer had a propensity to "wrongfully shoot" barricaded, heavily armed, aggravated assault suspects who verbally threaten to kill officers. Plaintiffs' negligent training, supervision, and

19

1  ratification claims are an artful way to plead around *Ryan v. Napier* and the cases preceding

2  it. As noted in *Ryan v. Napier*, claims of ratification, supervision, and training are tied to

3  "losses that arise out of and are directly attributable to an act…by a public employee" such

4  that claims of negligent training and supervision should be dismissed. *See also Fernan*dez,

5  2012 U.S. Dist. LEXIS 85268, *13-14; *Doe v. Dickenson*, 615 F. Supp. 2d 1002, 1015 n.8

6  (D. Ariz. 2009) (because city entitled to immunity under A.R.S. § 12-820.05, court did not

7  need to reach insufficiency of evidence arguments on negligent training and supervision

8  claims before granting summary judgment on all state law claims).

9      In *Gallagher v. Tucson Unified Sch. Dist.*, 237 Ariz. 254 (App.Div. 2 2015), the

10  Court addressed whether an entity could be held liable, on a negligent hiring, retention, and

11  supervision claim for the alleged felony conduct of an employee in molesting a student.  In

12  concluding that the entity could not, the Court noted that the "losses" that the plaintiff

13  sought to recover through their vicarious and direct liability claims "arose out of and are

14  directly attributable to" the felony actor's conduct.  *Gallagher* was cited, with approval, in

15  *Ryan v. Napier*.  Here, Plaintiff's training, supervision, and ratification theories arise out of

16  and are directly attributable to the officers and, as a result, the theories are barred.

17      **E.**    **There is No Standalone Claim Available to the Decedent's Parents for**

18                **Loss of Consortium (Count Five) Separate from the Assault and Battery Wrongful Death Theory of Liability.**

19      There is no common law right of action for wrongful death. *See Halenar v. Superior*

20  *Court*, 109 Ariz. 27, 504 P.2d 928, 930 (Ariz. 1972). Instead, the right to recovery for

21  wrongful death is purely statutory.  *See Ericson v. City of Phoenix*, 2014 U.S. Dist. LEXIS

22  176172, *5-6 (D. Ariz. 2014). A.R.S. § 12-611 confers "an original and distinct claim for

23  damages sustained by named beneficiaries," with damages including the "loss of love,

24  affection, companionship, consortium, personal anguish, and suffering." *Id*.

25      A stand-alone loss of consortium is a derivative claim that is dependent on the

26  success of another claim.[10] *Tavilla v. City of Phoenix*, No. 1 CA-CV 10-0429, 2011 Ariz.

27

28          [10] Plaintiffs assert that this claim is made against "all Defendants," but there is no state law claim where Defendants Adair and Orr are named. Count Three, the Wrongful

App. Unpub. LEXIS 1260, 2011 WL 4794940, at *9, ¶ 37 (Ariz. Ct. App. Oct. 11, 2011).[11]

Here, by operation of A.R.S. § 14-3110, A.R.S. § 12-612, and *Ryan v. Napier*, the only state law claims that survive are for wrongful death based upon a theory of assault and battery (Counts Three and Four). *See* A.R.S. § 12-612 (wrongful death action shall be brought by and in the name of the "personal representative of the deceased person for and behalf of the surviving…parents, or if none of these survive on behalf of the decedent's estate."). In Arizona, while a surviving parent has a right to share in the distribution of wrongful death proceeds, "a personal representative of the estate may only recover if none of the statutory beneficiaries survive." *See Sweet v. City of Mesa*, 2022 U.S. Dist. LEXIS 20743, *42 (D.Ariz. 2022). Under Arizona's survival statute, "loss of consortium," "pain and suffering," and "pre-death economic" damages suffered by the decedent do not survive. *See Matus v. Kustom US, Inc*., 2024 U.S.App. LEXIS 19771 (9th Cir. 2024). Like in *Ericson*, Counts Three and Four are wrongful death claims—that the Defendants negligence caused the decedent's death, but "in Arizona, however, damages for the negligent killing of a human being may not be brought under a common law negligence claim. Instead, the Arizona wrongful death act, A.R.S. §§ 12-611-13, provides the exclusive remedy for wrongful death claims." 2014 U.S. Dist. LEXIS 176172 at *6.

Plaintiffs' reliance on *Martin v. Staheli*, 248 Ariz. 87, 93-94 (App. 2019) to support their claim is misplaced. *Martin* permitted a claim for loss of consortium related to a parent child relationship where the decedent alleged medical negligence relating to a back injury that occurred in 2014. *Id.* at 89. Four years after the injury, the injured party died suddenly from cancer and wholly unrelated to the medical negligence. *Id.* There was no viable wrongful death claim that survived. *Id.* The court ruled that the children's pre-death loss of consortium claims related to the medical negligence were not extinguished because the

---

Death Claim, specifically excludes Adair and Orr.  As there is no underlying tort asserted against Adair and Orr, this loss of consortium claim fails.

[11] Plaintiffs cannot attempt to assert a "negligent and intentional acts and omissions" theory within the consortium claim. Notably, in Arizona, there can be no negligent use of force.

21

claims stemmed from prior medical negligence, which the Estate was still pursuing. *Id*. at 94. Here, however and in direct contrast to Martin, the theory of liability is that the decedent died as a result of the assault and battery, not that there was some independent negligence existing for years prior and unrelated to the death. Plaintiffs cannot assert a derivative loss of consortium claim based upon a theory of wrongful death; it is duplicative.

Moreover, Plaintiffs were not present at the scene of the incident, lived in California, and the decedent was declared deceased at the scene. Plaintiffs do not include any facts establishing that they had contemporaneous knowledge that decedent was shot and survived for an extremely limited (verses learning after the fact that he had died). Indeed, the measure of damages sought by Plaintiffs in this count are long term future damages, the same as they seek to recover for wrongful death: (1) "have been permanently deprived of the society and companionship of their son, Shawn, and have been permanently deprived of his contribution to their household." (Doc. 60 at ¶ 129); and (2) "have been deprived of the support they would have expected from their son in their elder years." (*Id*. at ¶ 130).

## III.    CONCLUSION

For the foregoing reasons, all claims against Adair, Cost, and Orr and Counts Two, Four, and Five should be dismissed.

DATED this 6th day of September, 2024.

**WIENEKE LAW GROUP, PLC**

By:    */s/ Christina Retts*
Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
*Attorneys for Defendants City of Mesa, Harris, Navarro, Cameron, Adair, Chuey, Goodrich, Freeman, Thomas, Orr, Brown, and Cost*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 6, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Zachary Mushkatel
Jordan A. Brunner
MUSHKATEL, ROBBINS & BECKER, PLLC
15249 North 99th Avenue
Sun City, Arizona 85351-1964
*Attorneys for Plaintiffs*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

By:    */s/ Lauren Rasmussen*