Zachary E. Mushkatel (023377)
Jordan A. Brunner (035105)
**MUSHKATEL, GOBBATO & KILE, PLLC**
Attorneys at Law
15249 N 99th Avenue
Sun City, Arizona 85351
Telephone: (623) 889-0691
Facsimile: (623) 213-7282
firm@phoenixlawteam.com
*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher Gagne et al.,<br><br>　　　　　　　　Plaintiffs,<br><br>v.<br><br>City of Mesa et al.<br><br>　　　　　　　　Defendant. | No. CV-24-01337-PHX-DJH_<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**(Oral Argument Requested)** |

This case stems from the senseless and unnecessary slaying of Shawn Gagne, a 28-year-old young man. Shawn, who was scheduled to receive therapeutic assistance the day after his killing, suffered from alcoholism and depression. This information was relayed to MPD officers, but rather receive assistance from those sworn to protect and serve, Shawn was brutally and repeatedly shot and killed by MPD. This Response is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     Factual Background

On July 6, 2023, after a verbal altercation with Shawn, a neighbor called MPD alleging Shawn fired a weapon into the air from his patio. (Ex. 1, Police Reports, at PLF_MesaDR000019). At 9:33 p.m., MPD officers surrounded the apartment complex where Shawn lived. (*Id.* at PLF_MesaDR000072). Shawn was asleep inside his apartment when MPD officers arrived as seen on Cox internal surveillance video. (Ex. 2, Cox internal

1 surveillance footage, at 10:19:41–10:21:33). MPD officers deployed projectile bean bag rounds at the front door and upper windows of Shawn's residence to get his attention. (Ex. 1 at PLF_MesaDR000072, 78, 92, MESA_002281; Ex. 2 at 10:19:41-10:19:51). Shawn awoke in a drunken stupor with no context for what was happening and saw bright lights glaring into his residence. (Ex. 2 at 10:25:09-10:25:30). He retrieved a rifle but kept it at his side. (*Id.*; *see also* Ex. 1 at PLF_MesaDR000092).

At approximately 10:00 p.m., MPD SWAT officers deployed to replace MPD patrol officers on the perimeter around Shawn's residence. (Ex. 1 at PLF_MesaDR000024, 56, MESA_002281). Defendant Shawn Freeman (Badge No. 20207), a SWAT sniper, positioned himself in unit #2165 on a hidden perch. (*Id.* at PLF_MesaDR000078, MESA_002237, 2281). From this position, Defendant Freeman scouted the second story balcony of Shawn's unit. (*Id.*). MPD negotiators opened a line of communication to Shawn at around 10:31 p.m. (*Id.* at PLF_MesaDR000018, MESA_002012). At 10:41 p.m., Defendant Matthew Adair (Badge No. 18901), the primary negotiator on scene, finally informed Shawn police were present due to an "incident." (Ex. 2 at 10:42:29–10:42:37). Shawn, still confused, responded "what incident?" (*Id.*). By his own account, Defendant Freeman was aware Shawn was talking to MPD negotiators while holding his cell phone. (Ex. 3, Freeman interview, at 13:28-50). Seconds later, Defendant Freeman opened fire on Shawn. (Ex. 1 at PLF_MesaDR000019, 83, 88, 96; MESA_002013, 2281; Ex. 2 at 10:42:42-10:42:45; Ex. 3 at 15:50 – 16:52).

At the moment Defendant Freeman fired his weapon, Shawn was speaking to the negotiator and was holding his cell phone in one hand. (PLF_MesaDR000019; Ex. 2 at 10:42:29-10:42:45). Neither internal camera footage nor body camera footage depict Shawn firing his weapon, aiming his weapon, or placing his finger on the trigger prior to Defendant Freeman deploying lethal force. (Ex. 1 at MESA_002237-38; Ex. 2 at 10:41:20–10:44:09; *see also* Ex. 3 at 15:50 – 16:52). In fact, Cox surveillance footage demonstrates Shawn had placed his rifle on a nearby table when Defendant Freeman fired. (Ex. 2 at 10:42:42-

2

10:42:45). Defendant Negotiator Adair confirmed Shawn was hit and heard a second shot by Defendant Freeman. (Ex. 1 at PLF_MesaDR000019, MESA_002013, 2238; Ex. 2 at 10:42:55–10:43:10; Ex. 3 at 17:48-58). Defendant Adair failed to instruct Defendant Freeman to refrain from shooting while he negotiated with Shawn (*See* Ex. 1 at MESA_002013).

After the second shot, Defendant Christopher Orr (Badge No. 19441), a secondary negotiator, purportedly advised Defendant Adair of an officer-involved shooting. (*Id.*). Defendant Adair instructed Shawn to walk out the front door with his hands up. (*Id.*; *see also,* Ex. 2 at 10:44:09-10:44:12). Surveillance video shows Shawn (1) placed his weapon on the kitchen counter, (2) raised both of his empty hands in the air, and (3) began slowly walking towards the landing leading down to his front door. (Ex. 2 at 10:44:20-10:44:24). As Shawn walked out of the kitchen towards the front door landing stairs, Defendant Adair asked Shawn if he was hurt and where he had been hit. (*Id.* at 10:44:24-10:44:27). Shawn relayed that he was struck in the face. (*Id.*). Defendant Adair again requested Shawn make his way towards the front door exit with his empty hands raised. (*Id.* at 10:44:24-10:44:30). Shawn attempted to comply. (*Id.*).

Shawn was visible from the landing windows and glass patio doors on either side of the apartment as he slowly walked towards the stairway landing with his empty hands in the air. (*Id.*). Camera footage verifies Shawn followed commands, leaving a trail of blood from the kitchen as he walked. (*Id.*).

As Shawn neared the stairway landing, MPD officers, including SWAT officers, unleashed a barrage of gunfire from both sides of the apartment unit. (*Id.* at 10:44:30-10:44:38). Defendant Freeman described these gunshots as coming out of one of the landing windows and confused the crossfire as Shawn firing rounds at MPD officers.. (Ex. 1 at MESA_002238; Ex. 3 at 18:05-20). Infrared footage from a surveillance helicopter depicts rounds entering and exiting that window. (*See* Doc. 63, Ex. 11, Helicopter video, at 1:40–1:47; *see also id.* at Ex. 12, Screenshots from helicopter video).

Shawn tumbled down the stairs, severely wounded, shouting "I'm down, I'm down, I'm down!" (Ex. 1 at MESA_002013; Ex. 2 at 10:44:38-10:44:43). His breathing was "labored" and "agonal." (Ex. 1 at PLF_MesaDR000019, MESA_002013). The front door was open when Shawn was again fired upon by Defendant Sergeant Matthew Harris (#16816) and likely other officers. (Ex. 1 at MESA_002241). Defendant Adair then shouted, "weapons down!" after hearing Shawn cry out in pain after the second volley of shots. (Ex. 2 at 10:44:50-10:44:58).

## II.   Governing Law & Argument

Complaints filed pursuant to the Civil Rules need not provide "detailed factual allegations," and are not bound by the "hypertechnical, code-pleading regime of a prior era." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, a complaint need only contain "a short and plain statement of the claim," which demonstrates the "pleader is entitled to relief," and "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it exists." FRCP 8(a)(2); *see also Twombly*, 550 U.S. at 555. A claim has "facial plausibility" if its factual allegations allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When evaluating a complaint subject to attack by a Rule 12(b)(6) motion, all allegations of material fact must be taken as true and construed in the light most favorable to the non-moving party. *Fed. of African Am. Contrs. v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996). A dismissal cannot be based on a judge's disbelief of the complaint's factual allegations. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). Only if no relief can be granted under any set of facts consistent with the allegations may a claim be dismissed. *Id.*

Additionally, if amendment will cure deficiencies existing within a complaint, the district court must freely grant leave to amend. FRCP 15(a). This policy of amendment must be applied "with extreme liberality" whenever "justice so requires." *E.g.*, *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001). Only when amendment causes

1 undue delay, is sought in bad faith, or is futile should it be denied. *E.g.*, *DCD Programs, Ltd., v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987).

Here, Defendants attack the Complaint as "doomed" by body worn camera footage, the doctrine of qualified immunity, and a lack of factual allegations establishing the liability of specific Defendants. (*See* Doc. 71 at P. 8-10, 15-17). Defendants claim Adair and Orr cannot be held liable for their negligence during the incident on July 6th. (*Id.* at P. 9). Additionally, Defendants claim the claims against City of Mesa Chief of Police Kevin Cost are legally baseless and the *Monell* claims against the City of Mesa are an irrelevant "copy-and-paste" job. (*Id.* at P. 13 & 15). Lastly, Defendants assert that Plaintiffs' state law claims are *ultra vires*. (*Id.* at P. 19-22). In reality, Defendants' attacks on the Complaint are misleading, premature, and unsupported by current federal precedent.

**A.   *The Motion Should Be Treated as a Premature Request for Summary Judgment***

Defendants open by claiming the Complaint's allegations are "contradicted" and "doomed" by MPD body worn camera (BWC) footage. (*See* Doc. 71 at P. 7-8). But the BWC footage does nothing to contradict the fact pattern outlined in Part I of the Response. Indeed, Defendants fail to explain what contradictions exist between the BWC footage and the Complaint's allegations. Defendants also seek to avoid converting the Motion into a request for summary judgment by alleging that MPD body worn camera (BWC) footage is "referenced" and "incorporated" into the Complaint. (*See id.*). This latter claim is, at best, misleading.

The Complaint makes no mention of the BWC footage except to detail Defendants' delay tactics in providing it. (*See* Doc. 60 at ¶¶ 18, 22 (*detailing* City of Mesa's delay tactics in producing documents and other information in this case)). The only footage the Complaint relies on is the Cox internal surveillance footage, which is all Plaintiffs were able to meaningfully review in advance of filing the Complaint due to Defendants' delay tactics.

The other information referenced in the Complaint ("the negotiator call, girlfriend Jordan's contact with police . . . Office Maldonado's announcements . . . the negotiator's

5

1  phone call, the 911 call [and] radio traffic") are all described in the police reports which
2  Plaintiffs used as a basis for their Complaint. (*See* Ex. 1; *see also* Doc. 71 at P. 8, n.6
3  (outlining references in the Complaint). Accordingly, BWC is not "incorporated" into or
4  "relied on" by the Complaint and should not prevent the Court from converting the Motion
5  into a premature request for summary judgment. *See, e.g.*, *Lee v. City of Los Angeles*, 250
6  F.3d 668, 688 (9th Cir. 2001) (*explaining* that a district court must treat a 12(b)(6) motion
7  as a summary judgment motion when "matters outside the pleading are presented to" in the
8  motion, unless the complaint "necessarily relies" on the extrinsic material).

         **B.** *Dismissal of Officers Adair and Orr is Not Appropriate*

10        Defendants continue their attack by suggesting the Complaint alleges Defendants
11  Adair and Orr engaged in excessive force. (*See* Doc. 71 at P. 8). This is false. At no point
12  does the Complaint allege Adair and Orr used excessive force, as Defendants themselves
13  later acknowledge. (*See* Doc. 60 at ¶¶ 103-112; *see also* Doc. 71 at P. 9 ("Here, there is no
14  allegation that Defendants Adair and Orr used **any force**") (emphasis original)).

15        Instead, Plaintiffs named all Defendants (including Adair and Orr) as having violated
16  Shawn's civil rights under 42 U.S.C. § 1983. (*See* Doc. 60 at ¶¶ 57-71). The Complaint
17  outlines how, despite being aware that Shawn was surrendering and was already wounded,
18  Defendants Adair and Orr failed to communicate these facts to SWAT officers so as to
19  prevent firing upon Shawn unnecessarily. (*See id.* at ¶¶ 49-53).

20        Defendants next argue Adair and Orr are entitled to qualified immunity. Said
21  argument is premature at this juncture. *See, e.g.*, *Wong v. United States INS*, 373 F.3d 952,
22  957 (9th Cir. 2004) (*explaining* that determinations of qualified immunity at the motion to
23  dismiss stage are generally disfavored). To try to succeed in their hasty action, Defendants
24  conflate the two (2) pronged analysis outlined in *Pearson v. Callahan*, 555 U.S. 223 (2009)
25  in an attempt suggest the issue to be resolved is legal rather than factual.

26        The *Pearson* factors address whether (a) the facts demonstrate an official's conduct
27  violated a constitutional right; and (b) the right was "clearly established" at the time of the
28

1  alleged violation. *Id.* at 232; *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)
2  (*explaining* that a right is clearly established if, at the time of the challenged conduct, "'the
3  contours of [the] right are sufficiently clear' that every 'reasonable official would have
4  understood that what he is doing violates that right.'") (internal citations omitted). District
5  courts have broad discretion to decide which of the above prongs should be addressed first.
6  *Pearson*, 555 U.S. at 236.

7    The nature of the prongs explains why. Whether a constitutional right is "clearly
8  established" is a question of law. *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017) (*quoting*
9  *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2017)). By contrast,
10 whether that right has been violated is a question of fact for the jury. *Id.*

11   Tort law helps illustrate the distinction. To prove tortious negligence, a claimant must
12 prove duty, breach of that duty, and damages proximately caused by any breach of that duty.
13 *See Gamble v. State Farm Mut. Auto. Ins. Co.*, 2020 U.S. Dist. LEXIS 199984, *7 (W.D.
14 Wash. Oct. 27, 2020). Whether a duty exists is a question of law. *See, e.g.*, *Robbins v. Circle*
15 *K Stores, Inc.*, 2024 U.S. Dist. LEXIS 16704, at *5 (D. Ariz. Jan. 31, 2024). By contrast, the
16 existence of a breach is a question of fact. *See Ochoa v. Indus. Ventilation*, 2021 U.S. Dist.
17 LEXIS 223298, at *19 (E.D. Wash. Nov. 18, 2021). If no duty exists, no negligence can be
18 alleged. *See Robbins*, 2024 U.S. Dist. LEXIS 16704, at *1 (*explaining* that a negligence
19 action "may be maintained ***only*** if there is a duty or obligation, recognized by law")
20 (emphasis added).

21   Similarly, if a right is not clearly established prior to the alleged violation under §
22 1983, no "duty" exists by an officer to uphold the right. *See Shooter v. Arizona*, 4 F.4th 955,
23 961 (9th Cir. 2021). Thus, a district court need not look beyond the "clearly established"
24 prong in that instance, because if no notice exists to the officer of a clearly established right
25 (duty), then no violation of the right (breach) can be alleged.

26   Here, the law is clear. Shawn possessed a constitutional right to his life. *See, e.g.*,
27 U.S. CONST. amend. XIV; *Wash v. Glucksberg*, 521 U.S. 702, 714 (1997) ("The right to life
28

and to personal security is not only sacred in the estimation of the common law, but it is inalienable") (internal citations omitted); *Pleasant v. Zamieski*, 895 F.2d 272, 276 n.2 (6th Cir. 1990). This fact is legally inescapable.

Adair and Orr also had sufficient notice that their conduct was likely to violate Shawn's right to life. Claimants alleging a violation of 42 U.S.C. § 1983 need not demonstrate the violation was intentional to be successful—demonstrating negligence is enough. *See, e.g.*, *Monroe v. Pape*, 365 U.S. 167, 187 (1961) (*opining* that a "willful" or "specific intent" requirement should not be read into § 1983) (overruled on other grounds); *see also Whirl v. Kern*, 407 F.2d 781, 788 (5th Cir. 1968) (*explaining* that § 1983 was intended to protect federal rights from "prejudice, passion, **neglect**, [and] intolerance") (emphasis added) (internal citations omitted); *Navarette v. Procunier*, 536 F.2d 277, 281 (9th Cir. 1976) (*clarifying* that "a deprivation of rights need not be purposeful to be actionable under § 1983") (rev'd on other grounds). At most, claimants must demonstrate a "reckless disregard" for their constitutional rights by the alleged tortfeasor. *See, e.g.*, *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016).

More importantly, a failure to communicate or coordinate between officials can constitute a basis for liability under 42 U.S.C. § 1983. *See, e.g.*, *Greer v. Cty. of San Diego*, 2019 U.S. Dist. LEXIS 185092, at *24 (S.D. Cal. Oct. 24, 2019) (*finding* that the failure to communicate critical information constituted a constitutional violation); *Lopez v. Nevada ex rel. Nev. Dep't Corr.*, 2023 U.S. Dist. LEXIS 89714, at *7 (D. Nev. May 22, 2023) (*indicating* a failure to convey essential information would evidence "conscious disregard" for an individual's safety); *M.H. v. Cnty. of Alameda*, 90 F.Supp.3d 889, 901 (N.D. Cal. Apr. 17, 2013) (*permitting* a claim under § 1983 to proceed based in part on a "failure to coordinate" between officials); *Cf. Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (*clarifying* that a constitutional right can be clearly established "even without a body of relevant case law" in an "obvious case.").

While the aforementioned precedent largely focuses on claims of inadequate care

under the Eighth Amendment, the same duty to communicate applies in the context of the Fourth and Fourteenth Amendment. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (*indicating* a plaintiff need not find "a case directly on point" to succeed). Indeed, the duty is heightened in those latter contexts because of the higher stakes. *See Estate of Aguirre*, 29 F.4th at 628 ("Deadly force is the most severe intrusion on Fourth Amendment interests because an individual has a 'fundamental interest in his own life'").

Adair and Orr's actions violated federal law under the reckless disregard standard articulated above. The Complaint specifically outlines facts demonstrating Adair and Orr's conduct amounted to a reckless disregard for Shawn's safety and their duty to safeguard his constitutional rights. (*See, e.g.*, Doc. 60 at ¶¶ 49-53, 75, 85, 123). Plaintiffs do not suggest that Adair and Orr were obligated to place themselves in harm's way, as Defendants imply. (*See* Doc. 71 at P. 11). But Adair and Orr *were* required to communicate effectively in their roles.

Adair and Orr served as the connective tissue between SWAT officers and Shawn. They knew or should have known that real-time updates to the SWAT team were critical to a successful resolution of the standoff between Shawn and MPD. This duty to communicate is an obvious component of a negotiator's job. Adair and Orr's failure to timely relay information to officers even after Shawn started to surrender (having already been shot) directly led to the confusion and disorientation among MPD officers. This confusion resulted in the deadly crossfire which killed Shawn. Accordingly, an action against Adair and Orr may be sustained under 42 U.S.C. § 1983.

Defendants cite two (2) cases to argue that negotiators cannot face liability in excessive force cases. (Doc. 71 at P. 11-12). But neither of those cases address failures to coordinate amongst officials. Moreover, both cases were decided on summary judgment with a fully developed factual record, rather than through Rule 12(b)(6) motion practice. Here, the factual record is entirely undeveloped. As such, the Court must leave the question of whether Shawn's rights were violated for summary judgment or the jury. *See, e.g.*,

*Morales v. Fry*, 873 F.3d 817, 823-24 (9th Cir. 2017) (*indicating* that questions of fact and disputed factual issues are the province of the jury).

If the Court is dissatisfied with the way in which the allegations against Adair and Orr are postured in the Complaint, amendment is the proper remedy—not dismissal. *See Gomper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002) ("Dismissal without leave to amend is improper unless it is clear . . . that the complaint could not be saved by any amendment.") (citation and internal quotations omitted).

### C. *The Claims Against Chief Cost are Not Redundant*

Defendants seek dismissal of Mesa Chief of Police Kevin Cost on the basis that the claims against him are "redundant" of the *Monell* claim against the City of Mesa articulated in Count II of the Complaint. (Doc. 71 at P. 13-14). Defendants further argue that Chief Cost is not a policymaker capable of binding the City. (*Id.* at 13). These arguments are neither supported by federal precedent nor the Complaint's specific allegations.

Under FRCP 8, a plaintiff "need not use particular words to plead in the alternative" so long as "it can be reasonably inferred that this is what they [are] doing." *Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000). Three (3) scenarios exist under which a municipality may be held liable under § 1983. First, when a municipality's official policies or established customs "inflict[] . . . constitutional injury," liability is appropriate. *Clouthier v. Cnty of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010). Liability can also attach due to a municipality's "pervasive failure to train its employees" when that omission "amount[s] to the local government's own official policy." *Id.* Finally, liability is appropriate where an individual with "final policy-making authority" chooses to ratify "a subordinate's unconstitutional decision or action and the basis for it." *Gilette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992).

The claims articulated against Chief Cost are not redundant of the *Monell* claim against the City of Mesa because the claims rely on alternate avenues of liability. Plaintiffs do claim the City of Mesa is liable for Shawn's death. But one route to liability runs through

the City of Mesa's policies and customs, while the other route runs through Chief Cost's past decision-making. More specifically, Plaintiffs allege the City of Mesa has failed to adopt proper policies and/or training regimens to ensure adequate communication and coordination between officers. *See* discussion *infra* at P. 12-15. This lack of coordination led directly to Shawn's death.

Separately, Chief Cost's decision to retain Defendant Shawn Freeman on the SWAT team indirectly led to Shawn's death.[1] Chief Cost is responsible for periodically reviewing, evaluating, and approving the composition of SWAT team members. Despite being aware of Defendant Freeman's inappropriate behavior both before and after Shawn's killing, Chief Cost certified his fitness to serve on the SWAT team, and thus ratified Defendant Freeman's unconstitutional actions.[2]

Additionally, Chief Cost is a policymaker whose actions are attributable to the City of Mesa, despite Defendants' claims otherwise. *See, e.g.*, *Nunez v. Driver*, 2006 U.S. Dist. LEXIS 85749, at *8 (D. Ariz. Nov. 22, 2006) (*recognizing* the Mesa Chief of Police as a "final policy maker for the City of Mesa" for purposes of a motion to dismiss); *Topete v. Mesa Police Dep't*, 2019 U.S. Dist. LEXIS 237184, at *7-10 (D. Ariz. July 18, 2019) (*permitting* a claim against Mesa Chief of Police under *Monell* to proceed); *see also* MESA CITY CHARTER, Title 3, Chapter 1, Section 3 (*explaining* that the Chief of Police "shall have such other powers and perform such other duties as are now or may hereafter be prescribed."); *see also* **Ex. 4** (listing one of the Chief's responsibilities as "formulating policies and regulations governing activities" of the MPD). Indeed, the MPD's most recent

---

[1] All allegations against Defendant Freeman must be taken as true for purposes of a Motion to Dismiss. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A good faith basis exists for all allegations outlined in the Complaint.

[2] Defendants assert that Plaintiffs fail to allege Defendant Freeman "fired a fatal shot." (Doc. 71 at P. 18). To clarify, this is untrue. Plaintiffs specifically allege Defendant Freeman fired lethal munitions at Shawn. (Doc. 60 at ¶ 9). Plaintiffs also name Defendant Freeman as one of the officers whose actions were the "proximate cause of Shawn's wrongful and unnecessary death." (*Id.* at ¶¶ 108-09).

11

1  "Use of Force" policy was approved by the Chief of Police. *See* **Ex. 5** at P. 1. Thus, the
2  request to dismiss Chief Cost from this matter is unsupported when viewing the facts alleged
3  in the light most favorable to Plaintiffs.

### D. *Plaintiffs'* Monell *Claim is Valid*

Defendants allege the allegations in Count II of the Complaint are "boilerplate, conclusory, and not supported by sufficient facts." (Doc. 71 at P. 15). Defendants also claim that Plaintiffs fail to "describe what the City's training and policies specifically state, what is deficient in the policies that caused the alleged violations, nor do they point to any prior instances unrelated to this litigation." (*Id.* at P. 16). As demonstrated below, Defendants are incorrect in each instance. To the extent the Court agrees with Defendants' assessment of the Complaint, Plaintiffs seek leave to amend the Complaint to better articulate the bases for liability against the City of Mesa under *Monell*.

As previously outlined, liability may attach to a municipality when its "pervasive failure to train its employees" is "the local government's own official policy." *Clouthier v. Cnty of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010). The question presented in cases involving training is "whether that training program is adequate, and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'" *Cty. of Canton v. Harris*, 489 U.S. 378, 390 (1989). Additionally, for liability to attach due to lack of adequate training, the "identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 391.

Whether a municipality has a policy of deliberate indifference based on their training program is generally a jury question. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1194-95 (9th Cir. 2002) (overruled on other grounds). To succeed in proving the inadequacy of a training program claimants generally must demonstrate a "pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). However, where the unconstitutional consequences of failing to train are "patently obvious," a municipality may be held liable under § 1983 "without proof of a pre-existing pattern of

1  violations." *Id.* at 64.

2  Here, the City of Mesa has no policy or set of training materials which requires real-
3  time communications between negotiators and SWAT officers. The Complaint contains this
4  specific allegation. (*See* Doc. 60 at ¶ 85). While the City of Mesa's "Use of Force" policy
5  addresses matters such as reassessing the level of force needed in particular circumstances
6  and prohibited uses of force, no specific policy exists for coordination, communication, and
7  exchange of information between or among officers to prevent **unnecessary** uses of force.
8  *See generally* **Ex. 5**.

9  The consequence of this lack of policy and training is clear: without sufficient real-
10  time communications between or among negotiators and SWAT officers, chaos ensues. In
11  this instance, MPD's failure is also directly linked to the alleged violation of Shawn's
12  constitutional rights. That is, the MPD negotiators' and SWAT officers' failure to coordinate
13  and communicate prompted the crossfire which killed Shawn in violation of federal law.

14  Defendants suggest Plaintiffs "had the ability to assert facts by using the City's
15  website, but instead rest[] upon conclusory and inaccurate allegations." (Doc. 71 at P. 16).
16  This claim is not only incorrect, but its underlying premise is, at best, disingenuous. The
17  Complaint makes specific allegations based on the limited information available to
18  Plaintiffs, especially given Defendants' previous delay tactics. (*See* Doc. 60 at ¶ 18).

19  More importantly, perusal of MPD's website reveals **no** policy on communications
20  between negotiators and SWAT officers. Similarly, training materials for negotiators are not
21  provided on the referenced website. Indeed, the opinion in *Johnson v. Cty. of Mesa*, 2021
22  U.S. Dist. LEXIS 170355 (D. Ariz. Sept. 8, 2021)—which Defendants cite as "addressing
23  the City's de-escalation training, Use of Force policy, record retention policy, and tracking
24  of complaints"—was only possible because the record was fully developed—a state of play
25  absent here. Furthermore, the Court in *Johnson* recognized that the lack of a policy or
26  training on a critical issue "could . . . result in officers using force in situations where it is
27  not warranted," as happened here. 2021 U.S. Dist. LEXIS 170355, at *46-47.

28

1   The remaining cases cited by Defendants are similarly unpersuasive. Defendants claim the plaintiffs in *Fernandez v. City of Phoenix*, 2012 U.S. Dist. LEXIS 85268 (D. Ariz. June 20, 2012) alleged "far more facts than Plaintiffs do" to support their ultimately dismissed *Monell* claim. (Doc. 71 at P. 15). But the *Fernandez* Court pointedly stated that those plaintiffs made only one non-specific allegation, and had "not alleged **any** facts concerning the City's particular policies, practices, or customs surrounding excessive force." 2012 U.S. Dist. LEXIS 85268, at * 5 (emphasis added). The instant matter's underlying Complaint alleges several specific facts about City of Mesa's policies, procedures, customs, and lack of training on excessive force. (*See, e.g.*, Doc. 60 at ¶¶ 82, 85-89).

Unlike the claimants in *Martinez v. Hain*, 2016 U.S. Dist. LEXIS 171726 (N.D. Ill. Dec. 13, 2016) (which invokes inapplicable Seventh Circuit and Illinois precedent) and *Andrich v. Kostas*, 470 F.Supp.3d 1048 (D. Ariz. June 30, 2020), Plaintiffs do not make disjointed allegations disconnected from the complained of harm. The *Martinez* plaintiffs sought to attribute *Monell* liability to Kane County based on County activities unrelated to the unconstitutional practices of the non-County employees. *See* 2016 U.S. Dist. LEXIS 171726, at *13 (*explaining* that none of the County's activities raised by plaintiffs "relate to strip-searches, arrests, police station detentions, the right to counsel, the right to remain to silent, or investigative holds" practiced by non-County law enforcement officers).

Similarly, in *Andrich* the Court opined that the plaintiffs failed to connect their assertions about City of Phoenix policies to specific factual allegations. *See* 470 F.Supp.3d at 1064. The *Andrich* claimants also failed to demonstrate that the alleged policies were the "moving force behind Mr. Andrich's injuries." *Id.* The complaint in *Warren v. Penzone*, 2024 U.S. Dist. LEXIS 89121 (D. Ariz. May 17, 2024) suffered from a similar failure to connect the allegations to the complained of constitutional violations and establish these violations were the cause of the deaths involved.

Plaintiffs, by contrast, unambiguously highlight the absence of MPD training and the existence of MPD policies which are directly attributable to the City of Mesa before

14

specifically connecting them to the harm suffered by Shawn. To the extent the Court finds that the allegations currently outlined in the Complaint are insufficient to support a *Monell* claim, Plaintiffs respectfully request the Court grant leave to amend the Complaint so that they may further buttress the factual foundation upon which their claims rest.

### E. *Count Four of the Complaint is not Barred by Existing Law*

Defendants correctly clarify that government entities are immunized from *respondeat superior* liability for intentional employee misconduct pursuant to *Ryan v. Napier*, 245 Ariz. 54 (2018) and A.R.S. § 12-820.05(B). (*See* Doc. 71 at P. 19). Defendants then characterize Plaintiffs' claims of "negligent hiring, training, and supervision" as an "artful way to plead around *Ryan v. Napier*" before claiming that *Napier* serves to preclude the claim. (Doc. 71 at P. 20). Again, Defendants are incorrect.

Arizona municipal entities are liable for the negligent or reckless conduct of their employees. *See, e.g.*, *Fleming v. State Dep't of Pub. Safety*, 237 Ariz. 414, 416 (2015) (*noting* that public entities are generally "liable for injuries they negligently cause"). This general liability for tortious conduct is limited by certain statutory exceptions. *See id.*; *see also Clouse ex rel. Clouse v. State*, 199 Ariz. 196, 199 ¶ 13 (2001) (*describing* the enactment of the Actions Against Public Entities or Public Employees Act). Notably, claims against a municipality based "solely on an officer's intentional use of physical force" are precluded. *Ryan v. Napier*, 245 Ariz. 54, 57 (2018).

Here, Plaintiffs' claims do not fall within the specific statutory exceptions and are not based **solely** on intentional misconduct by SWAT officers. Instead, Count IV addresses (in part) the lack of adequate policies and training around communication between negotiators and SWAT officers. (*See, e.g.*, Doc. 60 at ¶¶ 123-24). The reckless actions of Defendants Adair and Orr, coupled with MPD's failure to properly train their negotiators and SWAT officers in real-time communications, are *prima facie* evidence of negligent training and supervision. Accordingly, Count IV is not precluded by *Napier* nor by A.R.S. § 12-820.05(B).

|   |   |
|---|---|
| 1 | **F.** *The Loss of Consortium Claim is Distinct from the Wrongful Death Claim* |

Defendants conclude by claiming the loss of consortium claim outlined in Count V of the Complaint fails because "the only state claims that survive are for wrongful death based upon a theory of assault and battery (Counts Three and Four)." (Doc. 71 at P. 21). Defendants also contend that there is "no state law claim where Defendants Adair and Orr are named," and "[a]s there is no underlying tort asserted against Adair and Orr, this loss of consortium claim fails." (*Id.* at P. 20-21). Additionally, in an effort to defeat Plaintiffs reliance on *Martin v. Staheli*, 248 Ariz. 87, 93-94 (App. 2019), Defendants broadly claim that "the theory of liability [here] is that the decedent died as a result of . . . assault and battery, not that there was some independent negligence existing for years prior and unrelated to the death." (*Id.* at 22). Defendants' arguments fail for the following reasons.

First, two (2) state claims are viably advanced against Defendants: (a) intentional and excessive use of force by SWAT officers (Count III), and (b) negligent hiring, training, and supervision by the City of Mesa (Count IV). These claims, while proceeding along parallel tracks based on their common elements, are separate and distinct. The latter claim implicates the systemic failures by the City of Mesa and MPD, while the former addresses how those failures played out in this particular case.

Accordingly, Count IV is not a "wrongful death claim" *per se*. While the *direct cause* of Shawn's death was the intentional misconduct described in Count III, the reckless conduct outlined in Count IV was a *contributing factor* to that death. Put simply, Count IV is an independent claim for negligence and/or recklessness which helps explain *why* Shawn's wrongful death happened—it is not the wrongful death claim itself. (*See* Doc. 60 at ¶ 104 (*anchoring* the wrongful death claim under A.R.S. 12-611, -612 to Count III, not Count IV)).

Second, as detailed previously, the claim in Count IV encompasses behavior by Defendants Adair and Orr. Their failure to timely communicate with SWAT officers was the cause of the confusion and disorientation between MPD officers which resulted in deadly crossfire. *See* discussion *supra* at P. 8-9. No requirement exists mandating that Plaintiffs

specifically name Adair and Orr in Count IV before a loss of consortium claim becomes viable, nor do Defendants cite one.

Third, Defendants artful attempts to distinguish *Martin v. Staheli* from this case fall flat. Defendants correctly recount the factual and procedural history outlined in *Martin*. But Plaintiffs' theories of liability against the Defendants are not narrowly focused on the intentional misconduct of SWAT officers. They encompass "independent negligence existing for years prior" in the form of MPD's negligent training. (Doc. 71 at P. 22). Indeed, Defendants tacitly concede this point by attempting to have the *Monell* claim against the City of Mesa dismissed.

Plaintiffs are not required to provide a hyper technical sketch of their allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That said, Plaintiffs are aware that further refinement and enhancement of the Complaint is possible. As with their other claims, Plaintiffs respectfully request the Court's leave to amend the Complaint to the extent the Court finds that the allegations currently outlined in the Complaint inadequate.

## III.  Conclusion

Plaintiffs brought several claims against Defendants to rectify the senseless and entirely avoidable slaying of Shawn Gagne. Defendants' attacks on the viability of the Complaint are insufficient to warrant dismissal. Accordingly, the Court should deny the Motion. Alternatively, Defendants request the Court hold any ruling on the Motion in abeyance and permit Plaintiffs to amend the Complaint to provide further factual allegations in support of their claims concerning Defendants Adair, Cost, and Orr and Counts Two, Four, and Five of the Complaint.

**RESPECTFULLY SUBMITTED** on this 21st day of October, 2024.

**MUSHKATEL, GOBBATO & KILE, PLLC**

By: */s/ Jordan Brunner*
 Zachary E. Mushkatel
 Jordan A. Brunner
 15249 N. 99th Ave.
 Phoenix, AZ 85351
 *Attorneys for Plaintiffs*

17

# CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

> Kathleen L. Wieneke, Bar #011139
> Christina Retts, Bar #023798
> Garrett Griggs, Bar #030525
> WIENEKE LAW GROUP, PLC
> 1225 West Washington Street, Suite 313
> Tempe, Arizona 85288
> kwieneke@wienekelawgroup.com
> cretts@wienekelawgroup.com
> ggriggs@wienekelawgroup.com
> *Attorneys for Defendants*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System: N/A

By: */s/ Jordan Brunner*