Exhibit 1



**Mesa Police Department**

**PUBLIC RECORDS REQUEST**

**(AGGRAVATED ASSAULT)**

---

### Narrative Text

**Type** Original Narrative
**Related Person** (Suspect #1) GAGNE, SHAWN, T  (DOB: ███████████)
**Subject** GAGNE, SHAWN TAYLOR DOB: ████████████
**Author** P21423 - GUTIERREZ, J.  (21423)
**Related Date** Jul-07-2023  4:33

It should be noted during this investigation, I was wearing an on-body camera and the following is a summary of statements and observations made during the investigation and not direct quotes unless noted. Any breaks or lapse of video is due to either speaking with on scene Officers or an unintentional delayed start of the video. The digital video file was downloaded and stored at evidence.com for further information and details.

On July 6th, 2023, at approximately 2135 hours, I was dispatched to ████████████ ████████████ reference to a shots fired call. Comments to the call stated the reporting party's neighbor made verbal threats to her, and fired off a round on his patio. Additional comments stated the male threatened to "blow the reporting party's brains out". He was described as a white male in his 30's, stocky with short brown hair and a beard. He was last seen going back into his unit (████████) and he had no known vehicle access at that time.

Prior to my arrival, several Officers had arrived on scene and set up several containment and immediate action teams in the event the male exited his apartment. Also, assisting Officers K. Newby #22469 and N. Ahumada #25227 were speaking to the reporting party (verbally identified as Cindy Schramm). Officer Newby advised via radio Cindy stated a round was fired off by the male involved, but no injuries were reported. See Officers Newby and Ahumada's supplements for further details.

Additonally, other Officers on scene advised via radio the subject's girlfriend was now on scene on the west side of the building.

Upon arrival, I responded to the west side of the apartment and contacted the subject's girlfriend. She was later identified as Jordan Wirtjes and her identity was verified through her MVD photo. Immediately, I was advised by Sgt. J. George #17283 that Jordan confirmed there had been a shot fired but the male was not suicidal. Jordan informed me her boyfriend (later identified as Shawn Gagne) was not suicidal and did not have any mental issues, but would be confrontational with Officers. Jordan clarified Shawn was now alone inside the apartment and heavily intoxicated from drinking vodka. Jordan advised Shawn had an AR-15 rifle, a "45" handgun and a shotgun. Jordan informed me Shawn had been drinking all day and was supposed to be admitted into rehab the next day for it. Jordan said she believed Shawn was stressed out about rehab and was not sure what triggered him. Initially, when I asked her what happened, she stated she was standing outside talking to Cindy and Shawn was mad because she was still there after she told him she was leaving. Jordan informed me she was never threatened with a gun . When asked is she was in an argument over their dinner. When asked if there were any weapons involved during the incident, she stated there were not. Sgt. George advised Jordan she initially said Shawn shot a round off (meaning a gunshot), to which she responded she was not sure if it was a round, and claimed she just heard a loud noise.

At that time, Officer Newby advised via radio he had established probable cause to arrest Shawn for aggravated assault against Cindy.

**PLF_MesaDR000017**



**Mesa Police Department**

PUBLIC RECORDS REQUEST

(AGGRAVATED ASSAULT)

It should be noted I did not observe any injuries or signs of trauma on Jordan at that point.

When I asked for further clarification, Jordan advised she left immediately after Shawn was yelling at them while her and Cindy were outside, but said again, Shawn did not have a gun at that time. Jordan stated the incident began after she texted Cindy she could come over, then exited the apartment due to the argument with Shawn. There, as she walked out, she told Cindy they could not be there, so Jordan drove away.

While I spoke to her, Jordan provided me Shawn's phone number.

I then attempted to contact Shawn via telephone multiple times, but got no response.

After, while I stood by Jordan. Shawn contacted Jordan via telephone. There, Jordan was advised to tell Shawn to put the weapons down and exit with his hands empty, but Shawn refused to exit the residence. As she continued to speak to him, assisting Officer M. Adair #18901 arrived and assumed the conversation with Shawn. While he spoke to him, I was able to listen to the conversation and was tasked to broadcast Shawn's comments over radio.

While on the phone, Shawn sounded extremely upset over Police being there. As Officer Adair continued the conversation, Shawn made demands to Officers to back up and move away. He continued ranting and began making threats to shoot Officers if they got close. Shawn continued to say he had AR's, AK's, Shotguns, and other weapons he was willing to use against the SWAT team if they came in. He advised he did not care to die. Shawn was told Police wanted to handle the situation so he could come out of the situation safely, but he continued by saying he was not coming out and would exercise his right to bear arms. As the conversation continued, Officer Adair advised he could hear Shawn loading a weapon. Shawn then said he would shoot anyone that was by his house if they did not move.

Lastly, I spoke to Jordan and asked her to tell me what happened from start to finish. Jordan advised she was inside her apartment with Shawn and no one else, when an argument ensued over what they were going to eat. She stated the argument never escalated into something physical and no weapons were used or displayed at that point. After, she said she made the decision to leave, and as she walked outside, she met with Cindy. There, Jordan advised they both walked downstairs by the apartment while Shawn continued yelling at the door. At that point, Jordan then claimed she did not hear anything but Shawn yelling, and did not see any guns. About ten minutes later, she left the complex and went to a Food City nearby in the intersection of Mesa Dr. and Brown Rd. in Mesa, AZ. While there, she saw multiple Mesa PD patrol cars with lights and sirens activated. Jordan advised she had a bad feeling about the patrol cars heading to the complex, so she returned and met with Officers on scene.

This concluded my involvement in this case.

See all other assisting Officers' supplements for further details.

NFI.



**Mesa Police Department**

**PUBLIC RECORDS REQUEST**

**(AGGRAVATED ASSAULT)**

## Narrative Text

**Type** Supplemental Narrative

**Subject** NEGOTIATOR NARRATIVE

**Author** P19441 - ORR, C.  (19441)

**Related Date** Jul-07-2023  3:16

On 07/06/2023 at approximately 2220 hours I was working on call as a Crisis Negotiator and had just returned to Metro from an unrelated call when I overheard on the radio a criminal barricade was in progress at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ . Call comments stated a male had stated he would "blow RP's brains out" male was reported to be armed with long guns and handgun and had fired weapons into the air.

Negotiator Adair #  18901 was already responding to the scene, while I and Negotiator Ibarra #22438 began to travel to the scene from Metro. While enroute to the scene I overheard the male subject was observed at the front door of the apartment holding a rifle, and the male subject then closed the door.

Upon arrival I walked into the perimeter and located Negotiator Adair who was already on the phone with the male. I assumed the role of the Secondary Negotiator, and while preparing equipment to begin listening to the conversation between Adair and the male I heard a single gunshot fired, and a SWAT Sniper radio in that a shot had been fired.

I was able to connect my equipment with Adair and overhear the conversation between him and the male subject. The male was extremely agitated, yelling and saying he was going to shoot officers and that he "had a hole in him." While listening in I heard approximately three volleys of gunfire from the direction of the male's apartment. During the subsequent exchange of gunfire, I and Adair moved to a more advantageous position behand a Patrol vehicle and continued to try and negotiate with the male. Adair gave clear safe surrender instructions to the male, who did not respond. Sound from the male such as moving around, and labored breathing were heard from the open line. Adair maintained the open line with the male letting him know that medical personal was on scene and that they would treat him, but he needed to cooperate before medical could be brought to him.

The sounds coming from the male lasted for a few minutes, and these were relayed to command. Eventually the sounds coming from the male diminished and were not able to be heard. The open line was maintained until tactical moved up and the male was placed in custody at approximately 2317 hours.

This concluded my involvement in this case, should I have further involvement it will be documented in supplemental reports.



# Mesa Police Department

**PUBLIC RECORDS REQUEST**

**(AGGRAVATED ASSAULT)**

---

## Narrative Text

**Type** Supplemental Narrative

**Author** P22609 - CARRASCO, K. (22609)

**Related Date** Jul-07-2023  2:18

2023-141208

SUPPLEMENT

## AXON BODY CAMERA STATEMENT:

It should be noted, during this investigation, I was wearing an on-officer body camera mounted on the center of my chest and the following is a summary of statements and observations made during the investigation. Any direct quotes are not used unless noted. Any breaks or lapse of Axon footage is due to either speaking with other officers or an unintentional delayed start of the video. The digital Axon video file was downloaded and stored at evidence.com for further information and details.

## NARRATIVE:

On Thursday, July 6th, 2023 at approximately 2133 hours, Mesa Police responded to an emergency call for service in reference to shots being fired at the location ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ in Mesa, Arizona. Mesa Police dispatch comments advised the reporting party's neighbor made verbal threats and stated he fired off a round on his patio.

Upon arrival, I positioned my patrol vehicle west of ▮▮▮▮▮▮ for a visual of the subject's front door. At this time, I utilized my patrol issued rifle and held lethal coverage on the target apartment. Additional call comments stated the subject was going shot at PD if we did not leave. Moments later, the suspect opened his front door and closed it immediately after. At this time, the Special Operations Unit arrived on scene and replaced me as lethal coverage. I then poisoned myself on the rear most vehicle behind cover for containment.

It should be noted, moments later I observed the suspect open his front door and that was when the Special Operations Unit got involved in a shooting with the suspect.

I then assisted with scene security and a canvas of any nearby units for possible witnesses or cameras that may have recorded the incident.

This concludes my involvement in this case.

NFI/NFA

**PLF  MesaDR000024**



**Mesa Police Department**

**PUBLIC RECORDS REQUEST**

**(AGGRAVATED ASSAULT)**

## Narrative Text

**Type** Supplemental Narrative
**Author** P24034 - MATAIPULE, J. (24034)
**Related Date** Jul-07-2023 3:26

It should be noted, during this investigation, I was wearing an on-officer body camera and the following is summary of statements and observations made during the investigation and not direct quotes unless noted. Any breaks or lapse of the videos is due to either speaking with on scene Officers or an unintentional delayed start to the video. The digital video file was downloaded and stored at evidence.com for further information and details.

On 07/06/2023 at approximately 2149 hours, I was dispatched to ███████████████ in Mesa reference to a report of shots fired. Call comments stated a neighbor made verbal threats to the reporting party and discharged a firearm on his patio.

When I arrived on scene, I assisted in an immediate action to the south of the suspect's apartment which I was relieved and moved back away to another position to stay with the suspect's girlfriend Jordan. I stayed with Jordan for the duration of my time on scene and provided additional scene security.

This concluded my involvement in the investigation.

NFI.



**Mesa Police Department**

**PUBLIC RECORDS REQUEST**

**(AGGRAVATED ASSAULT)**

## Narrative Text

**Type** Supplemental Narrative

**Author** P21067 - ROSALES, R.  (21067)

**Related Date** Jul-07-2023  3:20

Rosales 21067

GO NO. 2023-141208

It should be noted, during this investigation, I was wearing an on-officer body camera and the following is a summary of statements and observations made during the investigation and not direct quotes unless noted. Any breaks or lapse of video is due to either speaking with on scene Officers or an unintentional delayed start of the video. The digital video file was downloaded and stored at evidence.com for further information and details.

Narrative:

On 07-07-2023 at approximately 2147 hours, I was dispatched to Moorings Apartments located at ███████████ reference a shots fired called. The call comments stated that a neighbor made threats to shoot the reporting party and fired a round on his patio.

A perimeter containment had already been set up before I arrived on scene.  I was assigned to the immediate action team (IA Team) that was set up to the south end of the target apartment which was uni██████. From our position of cover we had a clear view of the south patio door and window which was located upstairs. I was behind Officer Durham #22727 who was lethal and I was less lethal with beanbag. I remained with the IA Team and waited for further instructions.

In the meantime Officers were still trying to gather some more information about the suspect. According to the girlfriend who lives with the suspect, she said that he was intoxicated and still inside the apartment possibly passed out. She also confirmed that the suspect owns several rifles and are inside the apartment.

Contact was made with the suspect and he threatened to shoot officers if we came close to his apartment. He said he and wanted us to move our patrol cars back and threated to shoot at anyone who came close.

SWAT arrived on scene and replaced me. I was told to grab my helmet and move back to a different position of cover, which I remained there until the incident was over.

I was then assigned to scene security by the command center and stood by with the suspect's girlfriend until I was released by Sergeant Lewinson.

NFI



**Mesa Police Department**

GO# ME 2023-141208
Active/Open

PUBLIC RECORDS REQUEST

(AGGRAVATED ASSAULT)

## Narrative Text

**Type** Supplemental Narrative
**Author** P21682 - MALDONADO, M.  (21682)
**Related Date** Jul-07-2023  2:48

On Thursday July 6, 2023 at approximately 2133 hours I responded to ███████████
██████ reference a shots fired call. I arrived on the West side of the listed unit and set up
with an immediate action team. I assisted by giving announcements to the suspect, verbally
identified as Shawn Gagne DOB ██████████ as we were advised he was currently inside of
his unit. During the first 15 minutes of announcements, there was no movement or response
from Gagne. After Officers deploying bean bag rounds, Gagne suddenly appeared in the east
patio window. Shortly after, I observed Gagne open the front (west) door wearing a red t-shirt
and light colored shorts holding a rifle in his left hand. Gagne looked over to where our fully
marked Patrol vehicles were located and then slammed the door. At this time, no further
announcements were made due to tactical positioning and it was apparent Gagne knew
Police were present. A short time later, I observed Gagne open the front door again and this
time, I observed Gagne holding what appeared to be an AR-15 style rifle at a "low ready"
position and then closed the door. Gagne made verbal threats to shoot at Police if we did not
retreat. During a lull, I was tasked to set up crime scene tape on the furthest West side of the
parking lot. While doing so, I heard a gunshot come from the listed unit and almost
simultaneously heard a bulled fly over my head. There were citizens on the far west side in
the line of fire and I advised them to move. As I made my way back to the immediate action
team, gunfire was exchanged between our Officer's and Gagne. During the gunfire, I
observed the front door swing open from inside the listed unit and observed Gagne go down
in the front doorway.


After Gagne was pronounced deceased on scene and the scene was safe. I was tasked to
canvas for possible witnesses or possible victims of gun fire and contacted Margaret Neely
DOB ██████████ in unit ██████. Neely stated that just prior to Police arriving on scene, she
was sitting outside on her patio and heard an argument at ██████████. She has a direct view
of ██████████ and stated the arguing caught her attention and when she looked over, she
observed a male yelling at a female and then heard what sounded like a single gunshot but
was 100% if it was a gunshot. She saw two females run out of the apartment and one female
run one way and another run towards a white vehicle parked near the unit and leave. She
observed the occupant of the unit wearing a red or orange shirt walk outside and then walk
back inside. She said minutes later, Police had arrived. I checked Neely's apartment for
possible gunshot holes and did not find any. Neely stated she would be willing to answer
more questions if Detectives needed more information in the future.


This concludes my involvement in this case. NFI.

**PLF_MesaDR000072**



**Mesa Police Department**

PUBLIC RECORDS REQUEST

(AGGRAVATED ASSAULT)

## Narrative Text

**Type** Original Narrative
**Author** P19506 - WIDMER, T. (19506)
**Related Date** Jul-07-2023 17:12

On 07/06/23 at approximately 2215 hours, I was working as an officer on the Mesa Full Time SWAT team and was informed that there was a call occurring where a subject strangled his girlfriend and had fired shots off in his apartment with an AK-47. Myself and approximately five other SWAT officers were asked to start headed to ███████████████████████ reference this call in case patrol needed more bodies.

While in route to the call, patrol did their best to get the subject out of the building, however, every attempt was futile. Some attempts made where: Verbal over the PA system of a tahoe and bean bagging the front door in attempt to get the subject to wake up or comply with commands being given him.

As I arrived on scene, I heard over the radio that movement was seen in the upstairs window. Officers stated that the subject walked past the south windows and was making his way to the front. However, when officers observed the subject open the front door, it was observed that he was holding a semi-automatic rifle. He was given surrender instructions but did not comply. Instead of complying, the subject slammed the front door.

As I approached the subject's apartment, I went to the south side and supported patrol there. While assisting patrol, the subject came to the south facing windows numerous times but only held the rifle to his side.

Once there were enough SWAT officers on scene, I was tasked with going to support Officer Freeman on a sniper hide deployment. As I approached the unit where Officer Freeman was, I observed the subject at the slider glass doors. I observed him attempting to look at the officers on the ground level while still holding a rifle. Around this point, I heard Officer Freeman fire once. As I was moving inside the apartment, I observed the subject stagger to his feet and move off to the north of the structure.

The subject started shooting his rifle out at police from both sides and he was met with appropriate response of officers firing back at him to stop the threat that was presented to them. The subject collapsed near the front door with his leg visual to another SWAT officer.

A plan was put together to evacuate another unit and then move up to the subject's apartment. When the time came, the plan to move up was implemented. The building was searched without incident and the subject was placed into custody and handed over to Mesa Fire Personnel for medical attention. I had no further involvement in this case.



**Mesa Police Department**

PUBLIC RECORDS REQUEST

(AGGRAVATED ASSAULT)

## Narrative Text

**Type** Supplemental Narrative

**Author** P20461 - MEYER, K.  (20461)

**Related Date** Jul-08-2023  1:20

**Mesa Police Air Support Unit**

Aircraft: MD500E

Tail Number: N505MP

Call Sign: Falcon 5

Pilot: K. Flake #25381

TFO: K. Meyer #20461

Video of Incident: Yes

**Equipment:**

L3 Wescam MX-10 FLIR Camera

Canon 12 x 36 Binoculars with Image Stabilizer

Nightsun Spotlight (50 million candlepower)

**Narrative:**

On July 6, 2023, I was working as a Tactical Flight Officer (TFO) with the Mesa Police Department Air Support Unit. At approximately 2237 hours, the aircrew responded to the area of ████████████████████████ after hearing a reported shots fired call. Further comments stated the suspect had possibly fired a round on his patio. When officers arrived on the scene it was advised that the suspect had opened the door with a firearm and then closed the door.

The aircrew responded to the area just north of the dispatched location to provide an aerial perimeter. Shortly after the aircrew arrived the aircrew heard an officer announce 998 (officer-involved shooting) with this the aircrew moved directly overhead. Once on scene, the aircrew observed units on the ground outside of the dispatched location to the south, west, and north. Shortly after arriving overhead the aircrew heard an officer on the radio talking and could hear what sounded like gunshots over the radio, at this time the aircrew observed what appeared to be bullets exiting the north patio door in the direction of units that were setup north of the dispatched location. Shortly after this, the aircrew observed rounds that appeared to be returning fire back towards the patio door. A short while later the aircrew heard a ground unit announce that a leg of the suspect could be seen through the front door, and it did not appear the suspect was moving.



**Mesa Police Department**

PUBLIC RECORDS REQUEST

(AGGRAVATED ASSAULT)

## Narrative Text

     **Type** Detective Narrative

    **Subject** INVESTIGATION

     **Author** P15339 - HALLEMEYER, D.  (15339)

 **Related Date** Jul-10-2023 14:42

2023-141208


On July 6, 2023, at approximately 2215 hours, Homicide Sergeant Clarke asked for my assistance in the investigation of an Officer Involved Shooting (OIS) that had just occurred at ███████████████████████. I attended the briefing provided by patrol Sergeant Samons #19185 with information up to that point.

Officers were dispatched to █████████████ 164 after the reporting party, Cindy Schramm, went over to apartment ██████ to check on her friend Jordan Wirtjess. While at the apartment, Jordan's live-in boyfriend, Shawn Gagne, threatened them with a gun and they heard a gunshot. Officers and SWAT members arrived and surrounded apartment ██████. SWAT negotiators were able to make phone contact with Shwan and attempted to get him to comply and exit the apartment without any weapons. Shawn made verbal threats that he would shoot the officers if they did not retreat and Shawn could be seen walking inside the apartment with a rifle in hand. At some point in the negotiation, Shawn was at the door and pointed the rifle in the direction of officers and SWAT officer Freeman fired his sniper rifle at Shawn. SWAT officer Freeman was across the parking lot on the balcony of apartment ██████.  Shawn retreated into the apartment and additional shots were fired by multiple SWAT officers and they advised Shawn was firing out the apartment windows. Shawn was found inside the apartment and pronounced deceased at the scene.  See Detective J.H. Ingram's supplement for further details.

At the end of the briefing, Detective J.H. Ingram #13539 was assigned case agent, Detective Marquez #19915 was asked to document the scene and I was asked to author a search warrant for the apartment and assist with the officers weapon's ammunition count.

On July 7, 2023, I authored a search warrant for apartments ██████ and ██████. The warrant was approved by the Honorable Tara Prochko with the Maricopa County Superior Court and given # SW2023-035134. I provided the signed search warrant to Detective Marquez to be served at the apartments. I was provided the completed search warrant returns for both apartments ███████████████. I returned these search warrant returns on July 7, 2023, to the Maricopa County Superior Court.


### Weapons Count - SWAT Sergeant Harris #16816

After Sergeant Harris completed his walk-thru interview, he came into the Mesa Police command van for photos and a weapons count.  Crime Scene Specialist (CSS) Bello #21189 took photos and collected the AR rifle after Mesa Police Range Staff member Waits #17341 counted the ammunition in Sergeant Harris's rifle and any additional magazines.

When asked, Sergeant Harris advised he did not fire his duty handgun during this incident.

Rifle: Daniel Defense DDM4 in caliber .556



# Mesa Police Department

**PUBLIC RECORDS REQUEST**

**(AGGRAVATED ASSAULT)**

Serial number 4360281

There was (1) live round in the chamber

The inserted magazine had (23) live rounds

Sergeant Harris had one additional magazine which had (28) live rounds


**Weapons Count - SWAT Sergeant Thomas #17067**

After Sergeant Thomas completed his walk-thru interview, he came into the Mesa Police command van for photos and a weapons count. Crime Scene Specialist (CSS) Bello #21189 took photos and collected the AR rifle after Mesa Police Range Staff member Waits #17341 counted the ammunition in Sergeant Thomas' rifle and any additional magazines.

When asked, Sergeant Thomas advised he did not fire his duty handgun during this incident.

Rifle: Daniel Defense DDM4 in caliber .556

Serial number 360271

There was (1) live round in the chamber

The inserted magazine had (26) live rounds

Sergeant Thomas had two additional magazines which had (28) and (29) live rounds.


**Weapons Count - SWAT Officer Cameron #20495**

After Officer Cameron completed his walk-thru interview, he came into the Mesa Police command van for photos and a weapons count. Crime Scene Specialist (CSS) Bello #21189 took photos and collected the AR rifle after Mesa Police Range Staff member Waits #17341 counted the ammunition in Officer Cameron's rifle and any additional magazines.

When asked, Officer Cameron advised he did not fire his duty handgun during this incident.

Rifle: Daniel Defense DDM4 in caliber .556

Serial number 360272

There was (1) live round in the chamber

The inserted magazine had (28) live rounds

Officer Cameron advised he dropped one additional magazine out at the scene which was located and marked by CSS Murrietta #23702 as placard 28, which had (20) live rounds.


**Weapons Count - SWAT Officer Goodrich #20130**

After Officer Goodrich completed his walk-thru interview, he came into the Mesa Police command van for photos and a weapons count. Crime Scene Specialist (CSS) Bello #21189 took photos and collected the AR rifle after Mesa Police Range Staff member Waits #17341



**Mesa Police Department**

**PUBLIC RECORDS REQUEST**

**(AGGRAVATED ASSAULT)**

counted the ammunition in Officer Goodrich's rifle and any additional magazines.

When asked, Officer Goodrich advised he did not fire his duty handgun during this incident.

Rifle: Daniel Defense DDM4 in caliber .556

Serial number 360279

There was (1) live round in the chamber

The inserted magazine had (28) live rounds

Officer Goodrich had one additional magazine which had (28) live rounds

Officer Goodrich advised he dropped one additional magazine out at the scene which was located and marked by CSS Murrietta #23702 as placard 29, which had (13) live rounds.


**Weapons Count - SWAT Officer Brown #21421**

After Officer Brown completed his walk-thru interview, he came into the Mesa Police command van for photos and a weapons count.  Crime Scene Specialist (CSS) Bello #21189 took photos and collected the AR rifle after Mesa Police Range Staff member Waits #17341 counted the ammunition in Officer Brown's rifle and any additional magazines.

When asked, Officer Brown advised he did not fire his duty handgun during this incident.

Rifle: Daniel Defense DDM4 in caliber .556

Serial number 360273

There was (1) live round in the chamber

The inserted magazine had (25) live rounds

Officer Brown had one additional magazine which had (29) live rounds.


**Weapons Count - SWAT Officer Chuey #21315**

After Officer Chuey completed his walk-thru interview, he came into the Mesa Police command van for photos and a weapons count.  Crime Scene Specialist (CSS) Bello #21189 took photos and collected the AR rifle after Mesa Police Range Staff member Waits #17341 counted the ammunition in Officer Chuey's rifle and any additional magazines.

When asked, Officer Chuey advised he did not fire his duty handgun during this incident.

Rifle: Daniel Defense DDM4 in caliber .556

Serial number 360269

There was (1) live round in the chamber

The inserted magazine had (26) live rounds

Officer Chuey had one additional magazine which had (28) live rounds



**Mesa Police Department**

DR# ME 2023-141208
Active/Open

PUBLIC RECORDS REQUEST
(AGGRAVATED ASSAULT)

Officer Chuey advised he dropped one additional magazine out at the scene which was located and marked by CSS Murrietta #23702 as placard 18, which had (0) live rounds.

**Weapons Count - SWAT Officer Navarro #19827**

After Officer Navarro completed his walk-thru interview, he came into the Mesa Police command van for photos and a weapons count. Crime Scene Specialist (CSS) Bello #21189 took photos and collected the AR rifle after Mesa Police Range Staff member Waits #17341 counted the ammunition in Officer Navarro's rifle and any additional magazines.

When asked, Officer Navarro advised he did not fire his duty handgun during this incident.

Rifle: Daniel Defense DDM4 in caliber .556

Serial number 360275

There was (1) live round in the chamber

The inserted magazine had (27) live rounds

Officer Navarro had one additional magazine which had (26) live rounds.

**Weapons Count - SWAT Officer Freeman #20207**

After Officer Freeman completed his walk-thru interview, he came into the Mesa Police command van for photos and a weapons count. Crime Scene Specialist (CSS) Kurtz #19461 took photos and collected the rifle after Mesa Police Range Staff member Waits #17341 counted the ammunition in Officer Freeman's rifle and any additional magazines.

When asked, Officer Freeman advised he did not fire his duty handgun during this incident.

Rifle: Accuracy International model AT .308 caliber sniper rifle

Serial number 24456

There was (1) live round in the chamber

The inserted magazine had (6) live rounds

Officer Freeman had no additional magazines.

DRONE PHOTOS:

Detective Marquez asked for my assistance with documenting the scene by taking photos from the Homicide Unit's drone. I took 15 overhead photos and later uploaded them to Mesa PD TraQ as evidence.

This ended my part of the investigation.

**PLF_MesaDR000091**



**PUBLIC RECORDS REQUEST**

**(AGGRAVATED ASSAULT)**

---

## Narrative Text

**Type** Supplemental Narrative

**Author** P21462 - BRENNAN, T.  (21462)

**Related Date** Jul-10-2023 14:39

On 07/06/23 while working at the metro substation, I was informed by other officers about a possible barricade situation occurring at ▉▉▉▉▉▉▉▉ I was also informed that the call for service was related to a shots fired and possible DV situation. I began to listen to the call over the radio and heard comments voiced about patrol units using bean bag rounds in an attempt to get the suspect out of the apartment and that the suspect approached the front door with a rifle.

I knew that SWAT units were already enroute to this location and upon hearing that the suspect opened the front door with a rifle the remaining SWAT operators that were at the metro station responded along with armored vehicles. While enroute to the scene further comments over the radio included that the suspect could be seen moving about through his home and that the suspect had several AR style rifles inside. Another comment from an on scene negotiator stated that he could hear that suspect loading his weapons.

Once on scene with the armored vehicle at approximately 2242 hours, I began to approach the immediate action team on the southwest side of the location. While approaching I could hear what I thought was gunfire coming from the apartment and from the area of the immediate action team. I began running towards the team with CS gas capabilities. Upon arrival to the team the gunfire from this team had ended but gunfire could still be heard from the north side. Due to the distance and angles of the windows, I was unable to deploy a CS canister into the windows. However, Officer Stefick was able to deliver several ferret gas rounds into the slider window, see his supplement for further details.

Once the gunfire ended, Sgt. Harris requested more officers to the north side to assist with entry and taking the suspect into custody, once that time came. I immediately responded to the north side, where Sgt. Harris was located, and took a perimeter position directly north of the suspects apartment door. I could see what appeared to be a human leg laying in the front entry area with what appeared to be a door on top of something.

After several minutes of moving armored vehicles and drone operations, a plan was developed to move up on the door from the north side. I was a part of this team that would be moving up and maneuvered my way to the north side the apartment. Due to how the suspect was laying in the door with a door over him there was a fear and concern that the suspect was trying to bait officers in closer to again fire upon them. To see if the suspect would react to stimulus, the team I was with moved up just close enough to deploy a LSDD while the drone watched the suspect. Once the LSDD went off, there was no movement seen.

Due to no movement seen, the team moved up towards the front of the apartment. A police



**Mesa Police Department**

PUBLIC RECORDS REQUEST

(AGGRAVATED ASSAULT)

K9 attempted to deploy to the suspect but was unsuccessful. The entry team moved up to the front door. Upon approaching the front door, I could see the suspect laying on the ground with a door over top of him. As we approached, I could tell that the suspects head was facing away from us and that he was laying face down. I remained focused on the suspect as we approached and made entry into the home. Once inside I could see what appeared to be blood on the ground next to the suspect and leading up the stairs into the kitchen area. A taser was deployed and a muscular response from the suspect occurred causing him to arch his back and move. I held lethal cover on the suspect due to the fact that an officer said he felt the suspect move as he grabbed onto him. I held coverage until he was taken into custody.

Once the suspect was in custody, I assisted with clearing the residence. While clearing the residence I could see multiple firearms throughout the apartment. I could also see what appeared to be blood throughout the home, as if the suspect had been struck by gunfire and continued to walk around his home. I also noticed that there were several rifle or shotgun magazines on his coffee table and ammunition throughout the home. After clearing the apartment, I responded back to the exterior of the apartment where Mesa Fire and Medical was performing medical care on the suspect. I remained there until I was relieved by patrol.

This concluded my involvement in this case.



# Mesa Police Department
## PUBLIC RECORDS REQUEST
## (AGGRAVATED ASSAULT)

## Narrative Text

**Type** Supplemental Narrative
**Author** P20541 - CLOVER, B. (20541)
**Related Date** Jul-19-2023 14:30

On July 6, 2023 at approximately 2210 hours, I was working as an operator with the Mesa PD SWAT team, when we were deployed to an armed barricaded subject at ▮▮▮▮▮▮▮▮▮▮. I loaded up in the Bearcat armored vehicle with Ofcs Workman, Gonzalez, Brennan, and Stefick, and responded from Metro to bring armor and equipment to units on scene.

As the Bearcat arrived at the apartment complex, I heard on the radio that the suspect stated he would shoot at the first red and blue lights he saw. I stood in the turret of the Bearcat to provide overwatch from an elevated position, and within seconds of lifting the hatch, I heard the sound of a suppressed rifle shot, followed by Ofc Freeman advising "998" over the radio, indicating that he had fired a round. As the Bearcat attempted to navigate the apartment complex parking lot, which was extremely congested with patrol cars stopped and parked haphazardly everywhere, I heard an extended volley of unsuppressed automatic rifle fire, interspersed with the quieter sounds of suppressed rifle fire, which told me that my team was currently in an active gunfight with the suspect. The Bearcat was able to get to within about fifty yards south of the suspect apartment before being completely blocked by patrol cars, so I offloaded and made my way to the north side of the parking lot to link up with Sgt Harris and his team.

Once the gunfire had been stopped for a few minutes, and we could see the suspect down just inside the front door, the team leaders began making a plan to move up and take the suspect into custody. The decision was made to bring the BATT armored vehicle up to provide cover for Sgt Harris' crew while we moved to a position just north and east of the apartment. Once we were in place, the BATT pulled back a little to allow Ofc Chuey to maintain a visual on the suspect from the turret. When all respective teams were in place, a K9 was deployed to try to bring the suspect out of the doorway and down the stairs to us, but the K9 was unsuccessful. At this point, Sgt Harris' team pushed up to the doorway. As I got to the top of the stairs, I could see the suspect laying on the ground with his feet to the northeast and head to the southwest. He appeared to be wearing body armor, and had an interior door off of its hinges partially obscuring his torso. There was a significant amount of blood both on his body and nearby. The entry team was able to deploy a Taser into the suspect while we closed on him to place him in handcuffs. As this was occurring, Sgt Harris and I pushed past the suspect to provide cover for the team from a position on the interior stairs, in the event there was a second suspect still inside. Once the suspect was cuffed, I assisted with clearing the remainder of the apartment. During the clearing, I noticed a red AK-47 style rifle on the kitchen floor, along with a large amount of blood, another rifle in the hallway near the bedrooms, and a third rifle on the upstairs balcony, along with magazines and ammunition placed throughout. All of the weapons and ammunition I noticed had been staged in a manner to provide a tactical advantage to the suspect as he fired on officers below. I also noticed that the interior of the windows had been blacked out with what appeared to be tin foil and masking tape, and there were numerous duffel bags and military style indicia throughout the apartment.



**Mesa Police Department**

**PUBLIC RECORDS REQUEST**
**(AGGRAVATED ASSAULT)**

Once the apartment had been cleared, I remained at the doorway until relieved by patrol. Upon being relieved, I reconnected with the rest of my team in the parking lot and was told to relocate to the Central Station, where I remained for the duration of the evening.

This ended my involvement.



## Mesa Police Department
### NARRATIVE TEXT HARDCOPY
**(13A-3 AGGRAVATED ASSAULT)**

GO# ME 2023-141208
Active/Open

---

## Narrative Text

**Type** Supplemental Narrative
**Author** P18901 - ADAIR, M. (18901)
**Related Date** Jul-07-2023  4:53

On 07/06/2023 I responded to 1233 N Mesa Dr #2164 Mesa, AZ reference a criminal barricade as a Crisis Negotiator. I arrived scene took the role as the primary negotiator. I received a brief that the male Shawn had an incident with his girlfriend and a neighbor had contacted the girlfriend and a Shawn had pulled a gun on them. Shawn's girlfriend and neighbor ran away, and they hear a gunshot go off. While I was getting ready to move to announcements on the PA Shawn was seen at the front door with a rifle (which I observed) and moved back in and closed the door. I was told that Sgt. George had a phone number for the male on the south side and I moved to the south to attempt to call Shawn.

I moved to the south side and located officers with Shawn's girlfriend and found that she was on the phone with Shawn. I introduced myself and asked if I could speak to Shawn and she handed me the phone (my conversation was recorded on my digital recorder). Shawn hung the phone before I could speak to him. With Officer Gutierrez 21423 as my secondary I attempted to call Shawn back and he did not answer, Shawn called his Girlfriend phone back seconds after I hung up at approximately 2231 hours. I introduced myself as Matthew and with the Crisis Team and Shawn told me that he was Matthew with the Crisis Team. Shawn immediately told me that I (Officer Adair) was going to have a Crisis if I didn't move the officers back. Shawn said it didn't matter if it was SWAT or who it was, he wanted them out of his "fuckin face" before he started dropping shots onto them. Shawn also said to get "the fuck" out of his house before he started dropping rounds on squad cars. Shawn then said if we shined lasers in his house 1 more time he would "fuckin" on load. I told Shawn that I was giving his request to the supervisors to move officers back.

Shawn continued to yell and use profanities while I tried to speak to him. At approximately 2 minutes and 20 seconds on my recording Shawn said you guys want to play guns let's play "fukin" gun games. Shawn told me at approximately 4 minutes and 55 seconds Shawn tells me that he has his shotgun, and his 12 gauge and officers better stay out of his house and move from his vicinity. Shawn continued that if we came into his vicinity there would be casualties including himself. I explained to Shawn that it concerns me when he makes comments like that. I explained to Shawn that we were not going anywhere because of the incident. I gave Shawn surrender instructions at approximately 5 minutes and 55 seconds into my recording. At one point Shawn tells me that he has AK's, Ar's, and shotguns and he was loading them. I could hear Shawn doing what sounded like loading ammunition.

I gave Shawn more surrender instructions at approximately 7 minutes and 40 seconds, and he told me that he was not going. Shawn started telling me he could hear officers next to his house and he was going to start shooting. I explained to Shawn multiple times that I didn't want to see anybody get hurt including him and that I wanted to see him come out safely. At approximately 10 minutes and 5 seconds Shawn says if you want a full Iraq war from one person then you better get "fuckin" ready. Shawn continued to yell about the lights being shined on his house and how officers better back up. At approximately 10 minutes and 10 seconds Shawn stated that if we shined lights in his house again, he was going to start

---

MESA_002012



**Mesa Police Department**
**NARRATIVE TEXT HARDCOPY**
**(13A-3 AGGRAVATED ASSAULT)**

GO#  ME  2023-141208
Active/Open

shooting. Shawn was also yelling about lasers and that officers needed to stop unless they wanted to lose their lives. I told Shawn that I was telling my boss's what he was asking for. Shawn told me that he wanted us to leave because he was a law-abiding citizen.

Detective Orr #19441 became my secondary negotiator and immediately advised me of an officer involved shooting at approximately 11 minutes and 41 seconds. I told Shawn I didn't want anybody hurt and I wanted him to walk out the door. I asked Shawn if he was injured at all, and he said he was injured had a hole through his vest. Shawn started yelling I said get away back the "fuck" up and then I heard more gun shots. I told Shawn at approximately 12 minutes and 15 seconds to drop the weapons and raise his hands with nothing in his hands. Shawn continued answering me and I gave him more surrender instructions at approximately 12 minutes and 35 seconds. I then heard more shots fired and Shawn say I'm down I'm down I'm down at approximately 13 minutes and 3 seconds.

I did not hear anything else from Shawn after that point but continued to hear what sounded like labored or agonal breathing. I continued to give Shawn surrender instructions and advising him that we had medical on scene for him. I continued trying to get Shawn to move or make a noise to know that he could hear me while give him instructions and letting him know that we had medical for him once we could make sure it was safe. I stopped my recording at approximately 2317 hours after the tactical team gave an in custody over the radio. My audio was uploaded to evidence.com.

NFI

MESA_002013



**Mesa Police Department**

**NARRATIVE TEXT HARDCOPY**

**(13A-3 AGGRAVATED ASSAULT)**

GO# ME 2023-141208
Active/Open

---

# Narrative Text

**Type** Detective Narrative
**Subject** INVESTIGATION
**Author** P13539 - INGRAM, J. (13539)
**Related Date** Aug-22-2023 14:55

**2023-141208**

On 7/6/2023, at approximately 2315 hours, I received a call from Sgt. Clarke #14173 requesting that I respond to 1233 N. Mesa Drive #2164 reference an officer involved shooting. I arrived on scene at approximately 0015 hours.

**Briefing**
The briefing was given by Sgt. Samons #19185. Sgt. Samons reported that on 7/6/2023 at 2133 hours Mesa Police received a 911 call from Cindy Schramm. Cindy stated her friend Jordan Wirtjess called her and told her that she had been in a domestic violence incident with her boyfriend in their apartment. Jordan's boyfriend was identified as Shawn Gagne. Cindy went to Jordan's apartment and while there, Shawn threatened to kill Cindy. Cindy heard what she believed a handgun slide dropping forward and then a loud bang, believed to be a gunshot. Cindy went home and called police approximately ten minutes later. Jordan told officers that she believed Shawn was drunk and had multiple firearms in the apartment.

Responding officers set up a perimeter with Immediate Action Teams in three locations. There was a north team, a south team and an east team. Officers attempted to contact Shawn and negotiate with him through the phone number that Jordan provided but received no answer. Officers made audible announcements toward the apartment and received no answer. Officers then attempted to receive a response from Shawn by knocking on the door using a bean bag round. There was still no response. Sgt. Samons stated that most of the windows to the unit were all covered with aluminum foil. After some more time went on a bean bag round was shot through one of the windows, again to attempt to get a response from Shawn. After this, officers saw the front door open and Shawn in the doorway holding a rifle down at his side. He then closed the door and went back inside.

Officers then had Jordan call Shawn using her telephone. Jordan spoke with Shawn for some time before police negotiator Adair arrived and began speaking to Shawn using her phone. According to Sgt. Samons, Shawn told the negotiator that the police needed to go away and if he saw them, he would shoot them.

Sgt. Samons stated that SWAT officer Freeman arrived and took up a position with his rifle at apartment #2165, across from Shawn's apartment. Sgt. Samon stated that Shawn presented himself at one of the windows with the rifle and Ofc. Freeman fired a single shot. Sgt. Samons stated that Shawn returned fire through the window at officers. Officers then returned fire toward Shawn several times. Sgt. Samons stated that Shawn was later found down at the front door. Officers were concerned that Shawn was baiting them up to him. Because of this, they deployed a diversionary device as well as used a taser on Shawn as they made a cautious approach. Shawn was then detained in handcuffs and moved from the front door, down the step to an area where medical personnel could assess him. MFMD confirmed that Shawn was deceased at 2341 hours.

---

MESA_002235



# Mesa Police Department
## NARRATIVE TEXT HARDCOPY
### (13A-3 AGGRAVATED ASSAULT)

GO# ME 2023-141208
Active/Open

The officers who fired their weapons were identified as:

Ofc. Freeman #20207 - Rifle .308
Sgt. Harris #16816 - Rifle .223
Ofc. Chuey #21315 - Rifle .223
Ofc. Goodrich #20130 - Rifle .223
Ofc. Brown #21421 - Rifle .223
Ofc. Navarro #19827 - Rifle .223
Sgt. Thomas #17067 - Rifle .223
Ofc. Cameron #20495 - Rifle .223

Sgt. Clarke assigned me as the case agent, Det. Staab to conduct interviews with Cindy Schramm and Jordan Wirtjess, Det. Marquez to document the scene and collect evidence with forensic personnel. Det. Hallemeyer was assigned to author any necessary search warrants and conduct the weapon inspections. Refer to these detective's supplements for details on their involvement.

**Release of Ofc. Falconer's rifle from the scene**
While on scene I was informed that Ofc. Falconer #22430 was being relieved from the scene. Ofc. Falconer's rifle had been secured in his vehicle, unit 5214. This vehicle was not being released from the scene. Ofc. Falconer advised that after he left, his rifle would not be secure. Ofc. Falconer told me that upon his initial arrival he had deployed his rifle for use but was relieved by SWAT personnel prior to the shooting. Ofc. Falconer did not fire his rifle and it was later secured in vehicle 5214. I determined that Ofc. Falconer's rifle was not needed as evidence and could be retrieved as this was in the best interest of keeping it safe and secure. CSS Murrietta took photographs of its condition in the vehicle prior to Ofc. Falconer retrieving it and taking it with him from the scene.

**Walkthrough Interviews with Involved Officers**

**Interview with Ofc. Freeman #20207 - 7/7/2023 0507 hours**
The interview with Ofc. Freeman took place on scene. Present for the interview was Deputy County Attorney Magnus Eriksson, Attorney Kathryn Baillie and Det. Staab. The interview was captured by Axon Capture and is available for review at Evidence.com. The following is a summary of the interview. Refer to the recording for exact details.

Ofc. Freeman told me that he has been a police officer for 9 years and is a full-time member of the Mesa Police SWAT Team. Ofc. Freeman stated he is a sniper on the SWAT team. Ofc. Freeman stated that his shift began at approximately 0700 hour on 7/6/2023. He described his day for 7/6/2023 where one call he was supposed to work got cancelled, before he assisted in serving two other search warrants.

Ofc. Freeman stated that he was made aware of this incident from Sgt. Harris and another person while he was at the Metro substation. He had heard that a person had fired multiple rounds from an AK-47 and that the subject was believed to have passed out in the residence. Ofc. Freeman stated that he was asked by Sgt. Harris to respond to the scene. Ofc. Freeman told me that he did not have a radio with him as he responded and had not received any updates on the call until he arrived.

**Mesa Police Department**

GO# ME 2023-141208
Active/Open

NARRATIVE TEXT HARDCOPY

(13A-3 AGGRAVATED ASSAULT)

Ofc. Freeman told me that when he arrived, Ofc. Chuey told him that the suspect was observed walking around inside the residence with a rifle. At this time Ofc. Freeman stated that he grabbed his sniper pack from his vehicle so that he could deploy in this capacity. Ofc. Freeman told me that he is a primary sniper on the SWAT team and has been trained to carry out that role.

Ofc. Freeman told me that he arrived south of the scene and responded northbound through the parking lot. He stated that he met officers that were set up in the immediate action team behind some patrol cars. He stopped here and assessed the apartment. Ofc. Freeman told me that he could see the suspect in the apartment walking around carrying a rifle that had an optic on it. Ofc. Freeman said that he looked for locations where he could deploy in his role. He saw some balconies and attempted to contact the resident. While he was doing this, he could see the suspect looking out the sliding glass door on the southside of the residence. Ofc. Freeman said that he believed the suspect could see him based on how well lit the area was. He saw the resident come out onto the balcony at unit #2165. He then asked this resident if he could use his balcony and was given permission. He stated that he then entered unit #2165 and set up inside.

Ofc. Freeman stated that when he got to the apartment door, he heard over the radio that the suspect had stated, "if people didn't back off, he would start shooting it out with the police." He also heard that the suspect said, "if he saw any red and blues he would start shooting." Ofc. Freeman stated that because of these statements, he believed that the incident was escalating. Ofc. Freeman stated that he had the residents of the apartment go to the rear and he turned off all the lights. Ofc. Freeman told me that the sliding glass door to the apartment was open and provided him a view across to apartment #2164. He could see the two windows that faced both south and southwest from his elevated position.

Ofc. Freeman told me that at this time he could see the suspect talking on what appeared to him as a cellular phone. He believed this was possibly negotiators talking to the suspect and that the suspect was agitated. A few minutes later he could see the suspect walking around with a rifle that had a sling attachment to it. Ofc. Freeman told me that he observed the suspect walk over to the slider door and began peeking through the blinds. Ofc. Freeman said that he saw that the gun was in the suspect's right hand. He believed the suspect was peeking out at patrol officers down below in the parking lot. Ofc. Freeman stated that this gave the suspect a tactical advantage. Ofc. Freeman told me that this was when he took his first shot. As Ofc. Freeman told me this he was motioning with his hands. I then asked him to explain what his was motioning. Ofc. Freeman said that the rifle was in his right hand and his left hand was opening the blinds. Ofc. Freeman believed that the suspect was looking for where he wanted to shoot at patrol officers. Ofc. Freeman explained that from the suspects elevated position he had a good view of the officer's positions.

I asked Ofc. Freeman to explain what position the suspects gun was in at this time. He told me that the suspect had the gun in his right hand and that it was up but not in the low ready position at this point. Ofc. Freeman stated that this would have been a simple movement for the suspect, and he could begin firing on officers. Ofc. Freeman told me that because he had heard the suspect had already fired a round from his AK-47, he was concerned because he knew what that round can penetrate through vehicles and that the officers would not stand a chance. Ofc. Freeman told me that his first round was aimed at the suspect's head. He told me he was unsure of where he hit the suspect, but that the gun stayed in the same

MESA_002237



positioning with the suspect disappearing from view. After firing he told m e he called out on the radio, advising that he was the one who shot and not the suspect. Just after this he told m e that Ofc. Widmer arrived to his location to be his second sniper. At this time, he saw the suspect grab the gun and move backward and to the south. He then saw the suspect use his hand again to look through the blinds again. It was at this time that he said he fired a second time at the suspects torso. After this Ofc. Freeman said the suspect moved to the north and deeper into the structure out of his view. Shortly after this Ofc. Freeman stated that the suspect fired multiple rounds out the same window. He could see through his optics that glass was leaving the residence. He was unsure of the direction those round went in. He stated that he later heard a volley of fire from down below. After this he heard officers say that they had him at the front door. Ofc. Freeman stated that Ofc. Widmer relieved him at his position.

I asked ofc. Freeman to describe what he meant by the tactical advantage that the suspect was gaining. He told m e that the suspect had "the high ground." He told m e that it's very hard to hide from someone with a powerful rifle like the suspect had when they are above you and that the rounds he would have fired would go through many items.

Ofc. Freeman identified where he was standing. This can be seen in photographs taken as a blue cone behind his rifle. He then told m e that when Ofc. Widmer relieved him of his position, Ofc. Widmer did a "chamber check" and ejected the round in the chamber to ensure a round was present. Ofc. Freeman told m e that he believed he fired twice.
Interview concluded.

### Interview with Sgt. Harris #16816 - 7/7/2023 0545 hours
The interview with Sgt. Harris took place on scene. Present for the interview was Deputy County Attorney Magnus Eriksson, Attorney Kathryn Baillie and Det. Staab. The interview was captured by Axon Capture and is available for review at Evidence.com. The following is a summary of the interview. Refer to the recording for exact details.

Sgt. Harris told m e that he has been a police officer for over 17 years and is a full-time member of the Mesa Police SWAT Team as a Team Leader. Sgt. Harris has been on the SWAT team for 14 years. Sgt. Harris stated that his shift began at approximately 0700 hours on 7/6/2023. He described his day for 7/6/2023 as beginning with training and then the team served two search warrants prior to coming to this location.

Sgt. Harris was advised of this call by one of the K9 handlers and was told that patrol was working a call where a subject had fired some rounds. Sgt. Harris then began listening to the call over the radio and pulled up the CAD comments. He stated that he saw that Lt. Santana was on scene and contacted him. Sgt. Harris offered his teams support, and they discussed him assisting on the call with approximately 5-6 SWAT operators.

I asked Sgt. Harris if he had heard about the call from any other sources. He told m e that initially he had been told that there was a DV related incident where a subject fired from and AR15 or AK47 from a patio. He then read the initial comments on the call and confirmed that there had been shots reportedly fired from the patio. Sgt. Harris told him when he arrived that the same individual had fired off rounds on 7/4/2023. He was also told that neighbors stated the subject had 3 - 4 high powered rifles in the apartment.

## Mesa Police Department
### NARRATIVE TEXT HARDCOPY
#### (13A-3 AGGRAVATED ASSAULT)

GO# ME 2023-141208
Active/Open

---

Sgt. Harris told me that he parked to the south and as he was getting out of his vehicle, he was informed that the subject in the house had opened the door armed with a rifle and had engaged with them verbally before going back inside. After this he informed Sgt. Thomas to respond with additional SWAT personnel. Sgt. Harris stated that he went north through the parking lot pausing where the south immediate action team was located. Sgt. Harris saw that the apartment was illuminated. When he located where the front door was, he and another operator moved to the northwest where another immediate action team.

Sgt. Harris stated that he met with Lt. Santana at the northwest location. Sgt. Harris told me that the BAT, a large, armored vehicle that was currently parked between where the northwest team was located and the apartment, was not in that position during the incident. That vehicle was moved into place later, after the incident was over. Sgt. Harris told me that when he looked at the apartment, he noticed that from this angle the windows to the apartment were obscured by aluminum foil that had been placed over them. He said that he could see a rifle sitting on top of the north balcony. He told me at the time it was sitting on top of a chair. He told me that when the house was later cleared the rifle was knocked over.

Sgt. Harris told me that he did not stay at this location and began to look for another location due to this location leaving the officers exposed. He said that he is familiar with the ammunition that the suspect was reported to have and that the body and other armor the officers had was not rated to protect them from this ammunition. Sgt. Harris then described because of the elevated position the suspect had, this placed them in further danger.

Sgt. Harris told me that he moved east near the north wall. He told me that he continued behind a dumpster but then continued to look for a position that had a better view. He told me he went further east where he located some vehicles under a covered awning. He told me that because the lights were out at the awning, he used the dark to conceal himself behind the vehicles. From this position he could see the front door and also the north balcony. Sgt. Harris then began coordinating resources to different locations on the perimeter.

Sgt. Harris said that he could hear the suspect within the apartment yelling. He stated that negotiators were speaking with him, and he heard them relay that the suspect was saying that if officers did not back up, he would shoot them. He heard negotiators relay that they could hear the suspect loading the rifle while he was making these threats. He heard negotiators say that the suspect was upset about seeing the red and blue lights. Sgt. Harris said they attempted to turn off all the red and blue lights to mitigate the aggravation that the suspect was experiencing. He told me that he could not see the suspects movements from his position, but he heard Ofc. Freeman's reports of the suspect moving around inside the unit.

Sgt. Harris told me that he was familiar with these apartments and their layouts. He stated he stayed in this position so he could see through the front door if it were opened allowing him some view inside the apartment.

Sgt. Harris told me that he heard a shot from Ofc. Freeman's position. From his experience he recognized the sound as being from one of the police departments .308 rifles. He told me that he could see a "slight splatter" of glass from the area of the second story west facing window. Sgt. Harris told me that he then heard a burst of a secondary gunshots and saw glass coming out from the inside of the unit. He told me that due to the many lights pointed



**Mesa Police Department**

NARRATIVE TEXT HARDCOPY

(13A-3 AGGRAVATED ASSAULT)

up at the unit this allowed him to see the glass falling through the air. He recognized this as shots coming from the inside being fired toward the position where Ofc. Freeman was located. Sgt. Harris stated that he spoke on the radio but did not hear from Ofc. Freeman. This made him believe that Ofc. Freeman was shot. He later learned that he had not been hit but that shots were fired in that direction.

Sgt. Harris told me that he began making preparations with Sgt. Thomas to deploy gas into the unit to disrupt the subject's ability to continue shooting. At this point Sgt. Harris admitted that he wasn't exactly sure in the timing of events and if shots occurred from the south first or if the subject fired out the north window. He told me that he would give me his perspective on those northbound shots. He told me that he recalled several rounds fired out the north balcony. He told me he could see glass "splatter" from the rounds that were exiting the apartment. He said that he did not engage because of his position and the fact that he did not hear rounds travelling past him or hitting in his area. He believed these rounds were endangering the officers either to the northeast or the northwest. Sgt. Harris stated that during the volley of fire from the south side, he could hear the distinct sound of shots coming from within, that sound differently than the suppressed shots that SWAT uses. Sgt. Harris stated that he did not know in which direction these shots were directed but knew they were from inside and not in his direction. He told me that he did hear suppressed fire from officers in response to these shots.

Sgt. Harris told me up to this point there had been shots fired out the west window, then out the north window and then out the south window. He believed that with everything he had learned up to this point, the individual inside had complete disregard for the lives of others outside the apartment and that the suspects actions needed to be stopped immediately. He told me that up to this point the subject had not been compliant with the negotiators and had only been threatening and showing agitation.

Sgt. Harris told me that sometime after this he observed the front door open and observed a male wearing a red shirt with a "plate carrier" in the doorway. He told me that the subject moved toward the north somewhat out of his view. He stated that the plate carrier is a ballistic protection that will stop rifle rounds and is the same as what SWAT wears. This concerned him knowing that the suspect had ballistic protection that protects him from the officer's rifle rounds and also had a high-powered rifle that some officers body armor will not stop. Sgt. Harris believed this was a big problem because the suspect had escalated from firing his weapon out of obscure places to an open confrontation in the doorway. Sgt. Harris said that since the subject had moved out of his view, he was unable to engage but could hear engagement from other officers. Sgt. Harris then said he saw him move across the door frame in a way that he believed the subject was concealing himself so that he could keep eyes on the team to his west. He told me that this was when he "deployed" his rifle.

While Sgt. Harris was describing how the subject was moving, he was holding his hands out in front of him as if the suspect was doing this. I asked him to explain for me verbally if the suspect was carrying something or if he saw this somewhere. Sgt. Harris told me that as the subject moved, he brought his arms up and bladed his body turning to the doorway, which concealed his movements. He told me that he saw his arms up in the same way that he would if he was holding his rifle. He told me he saw what he believed was an AR15 magazine. Sgt. Harris said that he believed the suspect was trying to use the doorway as a tactical advantage to keep eyes on or potentially attack the officers.

MESA_002240



**Mesa Police Department**
NARRATIVE TEXT HARDCOPY
(13A-3 AGGRAVATED ASSAULT)

GO# ME 2023-141208
Active/Open

---

I told him that he mentioned seeing a magazine, so I asked him if he saw a rifle with it. He told me that because of the angle or because of the door possibly closing he did not have full view of the suspect. I then confirmed that his view was obstructed, and he saw a magazine that he recognized as going in a rifle. He believed it was for an AR15. I then asked him if by the way he was holding his hands as he was describing what happened, did it appear to him that the suspect was holding a rifle. Sgt. Harris told me that it did appear that he was holding a rifle. I then asked him in the way that he was holding it if he believed the suspect was aiming a rifle at someone. He told me that he believed the subject was pointing it at the other officers to his west. I asked him if that was when he "deployed" his rifle and if this meant he fired it. He told me that was what he meant. He stated, "At that point I engaged with him by firing my weapon." He stated that his purposeful aim was directed at his pelvic girdle and his lower body. He did this because of the body armor that he saw.

Sgt. Harris stated that he saw the subject go down as he is delivering gunfire. He told me that the subject was obscured by a pony wall as well as a door that fell down on top of him. Sgt. Harris told me that other members began deploying gas into the unit and they asked for a drone.

Sgt. Harris placed a blue cone where he believed he was standing when he fired. He also pointed out on the front of the vehicle where the dust had been moved from his forearm touching it. He told me that they then planned how to safely move up to the unit, as well as evacuate other apartments around it. Sgt. Harris told me that he deployed a diversionary device prior to going up to the residence. He told me that when he went up to the apartment, he moved past the suspect to cover other officers from any additional threats from inside the house. He told me that he did not detain him. I asked Sgt. Harris if there was anyone else located inside the house. He told me there was not.

Katherine Baillie then asked about a light that was located on the north patio. Sgt. Harris told her that he was unsure if the light was on due to the number of spotlights that were pointed at the apartment to illuminate it. She then asked if there was illumination at the front. He stated "yes" and then stated that the entire front was illuminated by the spotlights.

I asked Sgt. Harris if he recalled how many shots he fired. He estimated he fired between 4 or 5 rounds from his rifle.

Interview Concluded.

### Interview with Ofc. Chuey #21315 - 7/7/2023 0629 hours
The interview with Ofc. Chuey took place on scene. Present for the interview was Deputy County Attorney Magnus Eriksson, Attorney Kathryn Baillie and Det. Staab. The interview was captured by Axon Capture and is available for review at Evidence.com. The following is a summary of the interview. Refer to the recording for exact details.

Ofc. Chuey told me that he has been a police officer for over 11 years and is a full-time member of the Mesa Police SWAT Team as a sniper. He told me that he has been on the SWAT team for the last 6 years. Ofc. Chuey stated that today he did not act as a sniper but as a SWAT Operator. Ofc. Chuey stated that his shift began at approximately 0700 hours on 7/6/2023. He described his day for 7/6/2023 as serving two search warrants prior to coming

---

MESA_002241



GO# ME 2023-141208
Active/Open

# Mesa Police Department
## NARRATIVE TEXT HARDCOPY
### (13A-3 AGGRAVATED ASSAULT)

## Narrative Text

**Type** Supplemental Narrative
**Subject** 1233 N MESA DR
**Author** P19465 - NICHOLSON, J. (19465)
**Related Date** Jul-08-2023 16:02

On 7/6/2023 at about 2133 hours, Mesa Police Dispatch entered a call for service regarding a potential shots fired and a domestic dispute which occurred at 1233 N Mesa Dr #2164 Mesa, AZ. The reporting party for this call stated the suspect had access to multiple rifles, handguns and ammunition. At the time of this call for service I was working in a capacity with the Mesa Police Swat team and we were actively monitoring the radio traffic. Around 2200 hours, due to the call and radio traffic escalating the Mesa Police Swat Team began to respond to the incident location.

An on duty Mesa Police Department Negotiator had been communicating with the suspect reference this incident and had yet to be successful in having him surrender. The suspect could be seen through apartment windows with a rifle. Decisions were made to give commands via Police intercom however were met with negative results. Additionally, bean bag rounds were fired at the front door to the residence in order to gain the suspects attention however this was also met with negative results. During negotiations the suspect was demanding Police leave, turn their red and blue lights off and also stated he would lay rounds down and shoot officers. The suspect later told negotiators he had ARs and AKs and did not care if the Swat team came. While on the phone with negotiators the suspect could be heard loading firearm magazines with ammunition, this was relayed to all officer so scene by negotiators.

Once I arrived on scene I began to have Swat Operators replace Mesa Police Patrol Officers from their duties from a southern perimeter location. From this location we utilized two Mesa Police Tahoe's for cover and concealment as we were in an open parking lot. I had a partial visual of unit #2164, I could see the balcony, a glass slider and one window at the target location. From this position Officer Freeman scouted a second story balcony he could use for a Sniper hide and he deployed into unit number #2165 as a sniper for the Mesa Police Swat Team.

The suspect was seen coming to the front door of his residence with a rifle in his hands and yelling at officer to "leave" multiple times before closing the door. The suspect could be seen through the window and slider multiple times pacing in the apartment with the rifle in hand.

At this time I started evacuations for all of the units immediately surrounding the suspects location, to include ground lever and upper levels. I was assisted by Officer Durham #22727 and Officer Stewart #19448.

At about 2245 multiple Officers on scene to include myself could see the suspect at the slider

MESA_002281



**Mesa Police Department**

**NARRATIVE TEXT HARDCOPY**

**(13A-3 AGGRAVATED ASSAULT)**

GO# ME 2023-141208
Active/Open

and window manipulating the blinds with a rifle in his hand. A short time later, Mesa Swat Operator Freeman #20207 advised "998" over the radio indicating he had fired his rifle at the suspect. Immediately following the first shot fired, the suspect was seen and heard firing his rifle back out of the apartment window toward officers. Multiple officers on scene and this time were involved in an exchange of gun fire with the suspect. While the suspect was moving through his residence a gas plan was initiated and gas was introduced into his residence. The gas was met with negative results. The suspect was seen moving through his apartment to multiple positions of advantage as he was elevated over officers on the ground. There were additional exchanges of gun fire from the suspect and officers on scene until he moved to the front door of the residence and he fell to the ground and was motion less. No Mesa Police personnel were immediately injured during the gunfire from the suspect.

Once the suspect ceased movement, Mesa Swat Operator Woodward #15726 deployed an aerial drone to see if the suspect would respond to any outside devices. The suspect was observed motion less and never responded to the drone or diversionary devices.

Mesa Swat Operators and I then moved toward the residence to secure the suspect and clear the residence. Once at the entrance to the apartment the suspect was tased as he was believed to be armed and to elicit a response however it was met with a negative response. The suspect was carried out of the residence by Mesa Swat Operators and life saving measure were started on the suspect by Mesa Fire personnel who were already on scene.

Next, we began clearing the residence from the front door which immediately turn into a set of stairs to the main living area. The floor where the suspect was found, the stairs, the kitchen and living area were all covered with a copious amounts of blood. There was shattered glass throughout from the windows and sliders being broken by gunfire. Inside the apartment was what appeared to be rooms staged with weaponry and ammunition. There were handguns and rifles staged through the apartment with ammunition and magazines by each firearm. The residence was cleared for any other suspects, victims or hostages at this time.

Immediately following this incident, I acted as the Mesa Swat Team Leader liaison for Patrol and Command as there were multiple Mesa Swat Operators whom were involved in this incident. Axon cameras were turned over to Lieutenant Bellows #10543. I collected vehicle keys from each Swat Operator involved to turn over to the Mesa Police Homicide Unit. I provided pertinent information requested to Sgt Samons #19185 who would provide an incident brief to the Homicide unit once they arrive don scene.

I then responded to the Mesa Police Station located at 130 N Robson Mesa, AZ, to stand by with Swat Operators whom were involved in this incident. I remained at this location until approximately 0900 hours when I responded back to the scene. Once on scene I waited for Swat Operators to conclude their duties with the Homicide unit and to collect Mesa Swat equipment left on scene from the incident.

MESA_002282



**Mesa Police Department**
**NARRATIVE TEXT HARDCOPY**
(13A-3 AGGRAVATED ASSAULT)

This concluded m y involvement reference this incident.

MESA_002283

Exhibit 2
(Non-Electronic Exhibit)

Exhibit 3
(Non-Electronic Exhibit)

Exhibit 4

City of Mesa - Police - Chief of Police

## POLICE CHIEF

## JOB DESCRIPTION

**Classification Responsibilities:**  The Police Chief provides administrative direction for the Police Department functions, operations, and personnel through supervision of subordinate staff and review of their activities.  Responsibilities include formulating policies and regulations governing activities, and preparing or directing the preparation of proposals concerning department activities for consideration by the City Manager.  Work involves the selection, training, assignment, and discipline of all departmental personnel.  Administrative duties include:  directing the preparation of annual budget estimates and controlling the expenditures of departmental appropriations; developing short- and long-range plans and objectives to improve department services; directing the development of in-service training programs to increase department efficiency and prepare employees for advancement; resolving citizen complaints which cannot be handled by division managers; and coordinating department activities with those of other City departments and law enforcement agencies.  The incumbent serves as the primary City authority on matters pertaining to department programs and law enforcement, and speaks before public groups on the plans, programs and goals of the Police Department.  This class performs other related duties as required or assigned.

**Distinguishing Features:**  This class has been designated as a non-classified, non-merit system, at-will position.  The Police Chief is appointed by the City Manager with approval by the City Council.  This employee reports to, and may consult with the City Manager in determining plans and policies to be observed in police operations, but works independently in overseeing and carrying out the functions of the Police Department.  This class is FLSA exempt-executive.

## QUALIFICATIONS

**Employee Values**:  All employees of the City of Mesa are expected to uphold and exhibit the City's shared employee values of Knowledge, Respect, and Integrity.

**Minimum Qualifications Required.**  Graduation from an accredited college or university with a Bachelor's Degree in Criminal Justice, Public or Business Administration, or a related field.  Ten plus years of progressively responsible management experience in law enforcement at the rank of Police Lieutenant or higher.

**Special Requirements.**  Must be certified as an Arizona Police Officer and continue to meet all Arizona Peace Officer's and Standard Training (AZ POST) standards.  Must possess a valid Class D Arizona Driver's License by hire date.  Must meet the qualifications to wear a tight fitting respirator by passing a medical evaluation in accordance with Code of Federal Regulations (CFR) 1910.134 by hire or promotion date and must maintain certification.  Because of the confidential, sensitive nature of information handled, successful completion of a background investigation and polygraph is required.

**Substance Abuse Testing.**  Due to the safety and/or security sensitive nature of this classification, individuals shall be subject to pre-employment/pre-placement and random alcohol, drug and/or controlled substance testing as outlined in City policy and procedures.

Police Chief
Page 2

**Preferred/Desirable Qualification.**  Graduation from an accredited college or university with a Master's Degree is preferred.

**ESSENTIAL FUNCTIONS**

**Communication:**  Communicates with the general public, staff, City officials, City employees, law enforcement agencies, and community organizations.  Makes effective oral and written presentations. Speaks before public groups on the plans, programs, and goals of the Police Department.  Provides information, gives instructions, and responds to questions from the general public and City employees in order to enhance public relations and employee morale.  Directs the preparation of the budget for the Police Department, develops plans and objectives to improve departmental services, directs the development of in-service training programs, and resolves citizen complaints.

**Manual/Physical:**  Attends meetings and observes, inspects, or monitors the behavior of office personnel to determine and maintain compliance with departmental policies and procedures.  Operates a motor vehicle requiring a valid Class D Arizona Driver's License to attend meetings and conduct presentations, respond to crime scenes, and travel to stations.  May be required to use a respirator when performing duties requiring exposure to hazardous chemicals and evidence that may be biohazardous and carcinogenic.

**Mental:**  Comprehends and makes inferences from written material including:  department policies and procedures, federal and state laws, City codes, City Personnel Rules, police reports, and administrative studies in order to resolve complex operational and procedural problems; to formulate programs and plans to maintain departmental efficiency and responsiveness; and to make fair and consistent recommendations on performance ratings, disciplinary actions, and other personnel matters.  Analyzes information, statistics, and reports on department activities in order to determine police service needs, availability of resources, and if existing programs meet the needs of the public.

**Knowledge and Abilities:**

Knowledge of:

the theories, principles, and practices of effective police administration with particular attention to planning and organizing police services and operations;
the theories, principles, and practices of effective public administration, with special reference to department policies, personnel, and budget administration;
modern management techniques, supervisory practices, and evaluation methods;
governmental organization and management;
the principles and practices of effective administration with particular attention to short- and long-range strategic planning;
the principles and methods of budget preparation and monitoring;
the activities, objectives, and ideals of police services and operations;
the facilities, equipment, and personnel needed to provide police services and operations; and
the laws and court decisions affecting police departments.

Police Chief
Page 3


Ability to:

plan, organize, and direct the range of activities commonly found in a progressive municipal police department;
organize and direct the activities of a large staff engaged in providing police services;
plan, organize, coordinate, prepare, administer, and monitor the department's budget;
effectively analyze and resolve operational and procedural problems;
analyze information, statistics and reports on departmental activities;
analyze police service needs, availability of resources, existing programs and other related factors in developing departmental programs to meet needs;
resolve complex problems involving diverse functional areas;
develop plans designed to maintain departmental efficiency and responsiveness;
make effective oral and written presentations;
deal effectively with the general public and representatives from other law enforcement agencies, City departments, state, county, and federal governments, and private agencies in coordinating activities and resolving problems;
establish and maintain effective working relationships with staff, City officials, community organizations, and the general public; and
maintain a high level of discipline and morale.


The duties listed above are intended only as general illustrations of the various types of work that may be performed.  Specific statements of duties not included does not exclude them from the position if the work is similar, related, or a logical assignment to the position.  Job descriptions are subject to change by the City as the needs of the City and requirements of the job change.




Revised 6/24
TR/sb/th
CS6606.DOC                      PAY RANGE:  E20
EEO-O/A                         IND-7720
JOB FCTN-PUB                    SWORN-Y
Non-DOT Safety and Security-Y   Non-DOT Random-Y
CDL-N                           DOT-N
RESP-Y                          PAY PLAN E08-E21

Exhibit 5



| MESA POLICE | Use of Force | DPM 2.1.1 |
| --- | --- | --- |
| **Department Policy Manual** | | Effective 03/10/2021 Reviewed 10/16/2023 Revised 07/08/2024 |
| Approved by: **Chief of Police** | Chapter: Use of Force | Page: **1 of 16** |

## 1. PURPOSE

This order sets forth Mesa Police Department (MPD) policy and procedures for the use of force, guided by and consistent with applicable state and federal law, the Arizona Constitution, the U.S. Constitution, and U.S. Supreme Court precedent.

## 2. PHILOSOPHY

### 2.1 Sanctity of Life

The Department's highest priority is the sanctity of life. In all aspects of their conduct, Department members will act with the foremost regard for the preservation of life and the safety of all persons involved, human rights, the dignity of every individual, and the Constitution of the United States and the State of Arizona.

### 2.2 Public Cooperation

A strong partnership with the public is essential for effective law enforcement. Inappropriate or excessive uses of force damage that partnership and diminish the public trust that is a cornerstone of policing in a free society. Department members will act:

    A. With a high degree of ethics, professionalism, and respect for the public; and
    B. In a manner that promotes trust between the Department and the community it serves.

### 2.3 De-escalation

The goal of de-escalation is to increase voluntary compliance, slow down the situation so that the subject can be guided toward a course of action that will not necessitate the use of force, reduce the level of force necessary, and allow time for additional personnel or resources to arrive.

When reasonable under the totality of the circumstances, members should gather information about the incident, assess the risks, assemble resources, and coordinate a response. In their interaction with subjects, members should use warnings, verbal persuasion, and employ proper tactics. Members should recognize that they may withdraw to a position that is tactically more secure or allows them greater distance in order to consider or deploy a greater variety of force options. Members shall perform their work in a manner that avoids unduly jeopardizing their own safety or the safety of others.

| **MESA POLICE**<br><br>**Department<br>Policy Manual** | **Use of Force** | **DPM 2.1.1**<br>Effective<br>03/10/2021<br>Reviewed<br>10/16/2023<br>Revised<br>07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**2 of 16** |

## 3. DEFINITIONS

**Deadly Force**:  Any application of force that is used with the purpose of causing death or serious physical injury or in the manner of its use or intended use creates a substantial risk of causing death or serious physical injury.

**Focused Fire (formerly Suppression Fire)**:  A controlled volume of weapons fire directed toward a suspect, allowing a member to move. This tactic can be deployed against a target specific threat (i.e., active shooter) or toward a specific threat area (i.e., known area occupied by the suspect).

**Immediate or Imminent Non-Deadly Threat**:  When it is objectively reasonable to believe that:

- A subject's actions are immediately likely to cause physical injury to the member or others unless action is taken;
- The subject has the means or instruments to cause physical injury; and
- The subject has the opportunity and ability to cause physical injury.

**Immediate Deadly Threat or Imminent Deadly Threat**:  When it is objectively reasonable to believe that:

- The subject's actions are immediately likely to cause serious physical injury or death to the member or others unless action is taken; and
- The subject has the means or instruments to cause serious physical injury or death; and
- The subject has the opportunity and ability to cause serious physical injury or death.

**Less Lethal Force**:  Force, other than deadly force, which by design and application is less likely to cause serious physical injury or death than deadly force. Less lethal force has the possibility of causing death or serious physical injury in rare circumstances.

**Non-Involved Supervisor**: A supervisor who may be at the scene and witnessed the incident but was not directly involved in the application of force.

**Objectively Reasonable**: Reasonableness is not capable of precise definition or mechanical application. The main issue in evaluating every use of force is whether the amount of force used by the member was objectively reasonable in light of the totality of the circumstances faced by the member on the scene. Factors to be considered by the member include but are not limited to: [ALEAP 1.3A]

- The nature of the offense, including the severity of the crime and the level of violence;
- The immediate threat posed by the suspect to the safety of officers or others;

| MESA POLICE<br><br>**Department<br>Policy Manual** | **Use of Force** | **DPM 2.1.1**<br>Effective<br>03/10/2021<br>Reviewed<br>10/16/2023<br>Revised<br>07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**3 of 16** |

    ○  This is the most important factor to be considered.

- Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

**Physical Force**: Force used upon or directly toward the body of another person and includes confinement but does not include deadly physical force.

**Physical Injury:** The impairment of physical condition (ARS 13-105.33).

    **Serious Physical Injury:** Includes physical injury that creates a reasonable risk of death, or that causes serious and permanent disfigurement, serious impairment of health or loss or protracted impairment of the function of any bodily organ or limb (ARS 13-105.39).

**Resistance**: A subject's failure to comply with a member's attempt to establish control.

**Weapons & Control Methods**: Equipment and verbal or physical techniques, used by members when objectively reasonable based on the totality of the circumstances, to control a non-compliant or actively resistant subject. These include but are not limited to:

    **Carotid Control Technique**: Bilateral vascular restraint where pressure is applied to the sides of the neck, resulting in diminished oxygenated blood flow to the brain without compressing or restricting the airway. [ALEAP 1.3E]

    **Chemical Agents**: Substances that cause a physiological response to the eyes and/or respiratory passages, including OC Spray and SWAT chemical munitions.

    **Control Holds**: Techniques used to control a subject that have a minimal chance of injury. These include the O'Donnell Continuous Control System (OCCS), pressure points, empty-hand escort controls, takedowns, and firm grips.

    **Dangerous Instrument**: Anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury (ARS 13-105.12).

    **Deadly Weapon**: Anything designed for lethal use, including a firearm (ARS 13-105.15).

    **Impact Weapon**: Instrument by design used to apply force through physical contact. Impact weapons can include the expandable baton, side-handle baton, less lethal shotgun (bean bag shotgun) and 40mm Specialty Impact Weapons.

    **Less Lethal Weapon**: Device which by design is less likely to cause serious physical injury or death than a deadly weapon.

| **MESA POLICE**<br><br>**Department<br>Policy Manual** | **Use of Force** | **DPM 2.1.1**<br>Effective<br>03/10/2021<br>Reviewed<br>10/16/2023<br>Revised<br>07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**4 of 16** |

**Police Service Dog (PSD)**: A dog trained to assist members of law enforcement. PSDs are operated by PSD handlers and may be deployed in limited situations defined by policy. All dog bites, whether intentional or unintentional, are reportable uses of force. PSDs used as force are considered a less lethal force option.

**Strike**: Techniques that have more than a minimal chance of injury. Examples include kicks, elbow, palm or knee strikes, and punches. The officer will consider the totality of circumstances in evaluating which area of the body to strike.

> **Limited Strike**: Impact push or strike applied to limited target areas, including the brachial plexus tie-in, radial, medial, femoral, common peroneal, and tibial nerves, and major muscle groups.

**TASER Conducted Energy Weapon (CEW)**: An electro-muscular disruption device that disrupts the body's ability to communicate messages from the brain to the muscles causing temporary motor dysfunction to a subject. Synonymous with TASER, Electronic Control Device (ECD), and Electronic Control Weapon (ECW).

## 4. USE OF FORCE

### 4.1  Authorized Force [ALEAP 1.3B]

Officers may use **objectively reasonable** force to:

    A.  Protect themselves;
    B.  Protect others;
    C.  Effect a lawful detention;
    D.  Effect a lawful arrest;
    E.  Conduct a lawful search.

### 4.2  Use of Force Guidance [ALEAP 1.3A,B]

    A.  Officers shall use only the force that is **objectively reasonable** to effectively bring an incident under control, while protecting the safety of the officer and others. Officers shall use force only when no reasonably effective alternative appears to exist and shall use only the level of force which a reasonably prudent officer would use under the same or similar circumstances.
    B.  The decision to use force requires careful attention to the facts and circumstances of each particular case, to include the nature of the offense, including the **severity of the crime** and the level of violence, whether the suspect poses an **immediate threat** to the safety of the officer or others (*the*

| **MESA POLICE**<br><br>**Department Policy Manual** | **Use of Force** | **DPM 2.1.1**<br>Effective 03/10/2021<br>Reviewed 10/16/2023<br>Revised 07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**5 of 16** |

*most important factor*), and whether he is **actively resisting arrest** or attempting to **evade arrest** by flight.

C. In addition, "*the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight…the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them.*" (*Graham v Connor*, 490 U.S. 386 (1989))

## 5. FORCE & DEADLY FORCE

### 5.1  Force

When de-escalation techniques are not effective or appropriate and force is authorized, members may use force to control a non-compliant, actively resistant, or actively aggressive subject using Department approved control methods and equipment.

    A. Once a subject no longer resists, the member will reassess the level of force used and apply only the level of force objectively reasonable to maintain control. [ALEAP 1.3H]

       1. Both the need for and the level of force that would be reasonable are dictated by the subject's actions and may increase or decrease based on compliance or non-compliance from moment to moment. When the subject is under full control, force must terminate.

    B. When feasible, members shall make every reasonable effort to identify themselves as law enforcement and give commands and warnings before resorting to force. [ALEAP 1.3I]

### 5.2  Deadly Force [ALEAP 1.3B]

A member is authorized to use deadly force when the member perceives it as objectively reasonable under the totality of the circumstances:

    A. In defense of life; or

    B. When necessary to prevent the escape of a dangerous fleeing felon and the member has **probable cause** to believe that: [ALEAP 1.3C]

       1. The subject has committed a felony involving the infliction or threatened infliction of serious physical injury or death; and

       2. The escape of the subject would pose an imminent threat of death or serious physical injury to the officer or to another person.

    C. When feasible, members shall make every reasonable effort to identify themselves as law enforcement and give commands and warnings before resorting to deadly force. [ALEAP 1.3I]



| **MESA POLICE**<br><br>**Department Policy Manual** | **Use of Force** | **DPM 2.1.1**<br>Effective 03/10/2021<br>Reviewed 10/16/2023<br>Revised 07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**6 of 16** |

D. Whenever a firearm is discharged, exercise reasonable caution for the protection of the lives of innocent persons and for the protection of property.

## 6. LEVELS OF RESISTANCE

It is important for members to consider that a subject may be resisting a Fourth Amendment seizure or may be unresponsive for many reasons. The subject may not be capable of understanding the gravity of the situation. Officers must consider several factors when dealing with a non-compliant subject. Non-compliance may be due to a medical condition, mental, physical, or hearing impairment, language barrier, drug interaction, or emotional crisis and have no criminal intent. These situations may require a change in tactics that will be more effective while maintaining officer safety or to protect the public. Levels of resistance include:

A. **Compliant:** A person contacted by an officer who acknowledges direction or lawful orders given and offers no resistance or aggression.
B. **Passive Resistance:** Physical actions that do not prevent an officer's attempt at control; may include verbal responses, going limp, but does not include attempts by the subject to actively resist.
C. **Active Resistance:** Physical actions on the part of a subject who is not complying with verbal commands and actively attempting to prevent the officer's control, but do not constitute an assault (e.g., pulling away, pinning arms under the body, thrashing around, and/or body going rigid).
D. **Danger to Self:** Physical actions on the part of a subject resulting in self-inflicted injuries or that indicate intent to harm oneself or commit suicide.
E. **Active Aggression:** Assault or attempted assault with non-deadly physical force. The aggression may manifest itself through a subject taking a fighting stance, punching, kicking, striking, or other actions which present an immediate threat of physical harm to the officer or another.
F. **Aggravated Active Aggression:** Assault or imminent assault with deadly force. The subject's actions are likely to result in the death or serious physical injury to the officer or another. These actions may include a firearm, use of blunt or bladed weapon, and physical force likely to result in serious physical injury, physical incapacitation, unconsciousness, or death.

## 7. FORCE PROHIBITIONS

### 7.1 General Prohibitions

| **MESA POLICE**<br><br>**Department<br>Policy Manual** | **Use of Force** | **DPM 2.1.1**<br>Effective<br>03/10/2021<br>Reviewed<br>10/16/2023<br>Revised<br>07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**7 of 16** |

A. The use of **excessive** or **unlawful** force by a Department member is prohibited.

B. Department members are prohibited from using force based on **bias** or any other legally protected characteristics. Refer to DPM 1.4.75 Biased Based Profiling.

C. Force used as **punishment** or **retaliation** is prohibited.

D. Force used in response to a person's mere lawful exercise of First Amendment rights (e.g., protected speech, lawful demonstrations, observing or filming police activity, or criticizing a Department member or conduct) is prohibited. [ALEAP 17.12]

E. Physical force on a **restrained** subject is generally unjustified, except in circumstances when the subject's actions must be immediately stopped to prevent injury, active aggression or aggravated active aggression, escape, or destruction of property and doing such is objectively reasonable.

   1. Subjects who are refusing to get out of a Department vehicle may be forcibly/physically removed after reasonable attempts to gain voluntary compliance have failed.

F. **Face**, **head** and **neck** strikes are prohibited absent active aggression/aggravated active aggression.

G. The **Carotid Control Technique** is prohibited absent aggravated active aggression. [ALEAP 1.3E]

H. Deadly force may not be used against a person who is only a danger to self.

## 7.2  Firearm Use Prohibitions

A. Warning shots are prohibited as they may prompt a suspect to return fire and may endanger innocent bystanders. [ALEAP 1.3F]

B. Focused fire is prohibited except under exigent circumstances when the member reasonably believes the subject poses an immediate threat of death or serious physical injury to the member or another person, and the subject has demonstrated the ability to cause death or serious physical injury to others (e.g., downed officer or citizen rescue).

   1. This tactic shall not be employed if it would place innocent bystanders or victims in greater harm than the actions of the suspect.

## 7.3  Shooting at or from Moving Vehicles [ALEAP 1.3J]

Shots fired at or from a moving vehicle are rarely effective at immediately halting the progress of a vehicle. The potential harm to others within the vehicle and surrounding area may outweigh the need to immediately apprehend the suspect. Such action may produce unintended consequences. A moving vehicle may become an uncontrolled deadly weapon that could seriously injure or kill the occupants of the vehicle and/or subjects in its path.

| **MESA POLICE**<br><br>**Department<br>Policy Manual** | **Use of Force** | **DPM 2.1.1**<br>Effective<br>03/10/2021<br>Reviewed<br>10/16/2023<br>Revised<br>07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**8 of 16** |

A. Members must consider whether the threat to the member or other persons is increased by incapacitating the operator with deadly force, considering that, if the operator is incapacitated, the vehicle may still be a threat to anyone in the vehicle's path. This threat must be weighed against the threat posed by the suspect continuing in control of the vehicle.

B. The use of deadly force against the operator/occupant of a motor vehicle is only authorized when it is reasonably necessary to:

1. Defend the member or another person against the vehicle operator/occupant's imminent threat of death or serious bodily injury by means other than the vehicle; OR

2. Defend the member or another person against the vehicle operator's use of the vehicle to cause death or serious bodily injury and the member or other person has no reasonable avenue of protection or escape.

C. Members must avoid positioning themselves in a location vulnerable to vehicular attack;

1. A member should attempt to move out of the way of the vehicle instead of discharging a firearm at the operator/occupant.

D. Members shall not discharge a firearm at the operator/occupant of the vehicle when the vehicle has passed and is attempting to escape.

E. Firearms shall not be discharged under the following circumstances:

1. As a warning;

2. At a moving vehicle except as defined in Part B. above; or

3. From a moving vehicle.

F. Units within the Special Operations Division may deviate from this section of policy based on the seriousness of the crime, the suspect's actions, and in compliance with approved tactics and training.

## 8. DUTY TO INTERVENE [ALEAP 1.3D]

Any officer present and observing another officer using force clearly beyond what is objectively reasonable under the circumstances shall, when there is a realistic opportunity and means to do so, safely intercede to prevent the use of such excessive force. Officers shall promptly report these observations to a supervisor.

## 9. MEDICAL ATTENTION [ALEAP 1.10]

A. Once the scene is safe and as soon as practical, ensure appropriate medical aid whenever:

1. An individual has sustained visible injury, complains of injury or continuing pain, or requests medical attention;

| **MESA POLICE**<br><br>**Department<br>Policy Manual** | **Use of Force** | **DPM 2.1.1**<br>Effective<br>03/10/2021<br>Reviewed<br>10/16/2023<br>Revised<br>07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**9 of 16** |

2. A subject has been rendered unconscious; and/or
3. A conducted energy weapon (CEW), impact weapon, and/or the Carotid Control Technique has/have been deployed on a subject.

B. In every incident in which a person has been bitten by a PSD:
1. If there is a visible injury have:
   a. The Mesa Fire & Medical Department (MFMD) respond; and
   b. Photographs taken of the injury.
2. If there is no visible injury, ask the person if medical treatment is desired, and if so, request the MFMD respond.
   a. If the person refuses medical treatment, ensure a witness is present and document.
   b. Ensure photographs are taken to document lack of visible injury.
3. If the visible injuries are significant, requiring additional medical treatment, the suspect will be transported to the nearest hospital:
   a. At the recommendation of the MFMD.
   b. At the request of the person.

## 10. INITIAL RESPONSIBILITIES AFTER USE OF FORCE [ALEAP 1.6A-D]

The following protocols will be followed by involved members and supervisors when force is used:

### 10.1 Involved Member

A. Apprehend suspect(s) and secure the scene.
B. Request/provide appropriate medical aid, if necessary.
C. Notify a supervisor.
D. Identify witnesses to include their information in related reports.
E. Request a Crime Scene Specialist (CSS) to take photographs of injuries sustained by the subject, or complained areas of injury, as well as overall photographs. [ALEAP 1.10]
   1. If a CSS is not available for an extended period, members should take initial photographs and request CSS follow-up photographs as soon as practical. See DPM 3.4.15 Evidentiary Recordings.
F. Each member that uses reportable force will complete an incident report or supplemental report, unless directed not to by a lieutenant or Homicide supervisor. See **Section 11, Use of Force Reporting** for definitions of reportable force and reporting guidelines.

### 10.2 On-Scene Response by a Supervisor

A. A non-involved supervisor is required to respond to all incidents involving:

| MESA POLICE | Use of Force | DPM 2.1.1 |
|---|---|---|
| **Department Policy Manual** | | Effective 03/10/2021 Reviewed 10/16/2023 Revised 07/08/2024 |
| Approved by: **Chief of Police** | Chapter: Use of Force | Page: **10 of 16** |

1. Strikes to the face, head, or neck; and/or
2. Deployment/use of:
   a. Conducted Energy Weapon (CEW);
   b. Impact Weapon;
   c. Police Service Dog (PSD) which results in an intentional or unintentional bite;
   d. Carotid Control Technique; and/or
3. Any other use of force causing the subject to be treated at the hospital for a physical injury, as defined in policy.

B. For all other incidents, it is optional for a supervisor to respond to the scene.

## 10.3 Supervisor Investigatory & Notification Responsibilities

A. Obtain basic facts from the involved officer(s).
B. Ensure appropriate medical aid has been/is provided/requested, if necessary.
   [ALEAP 1.10]
C. Conduct initial review of the use of force.
   1. If there is an allegation of **excessive force**:
      a. Obtain the subject's statement to include clarification of the allegations being made related to the use of force.
      b. Conduct preliminary review of available facts, on-officer body camera video and/or witness statement(s).
      c. Immediate notification by phone to the on-duty patrol or specialty unit lieutenant is required if the subject is transported to the hospital for a serious physical injury or is complaining of serious physical injury.
      d. The on-duty patrol or specialty unit lieutenant will immediately notify the affected Division Commander or Duty Commander.
   2. If force meets the definition of a **Category 1** or **Category 2 Critical Incident**, including **excessive force**, follow the protocols described in DPM 2.1.11 Concurrent Investigations.
   3. For police incidents involving death/serious injury, officer involved shootings, or in-custody death, see DPM 2.1.10 Police Incidents Involving Death/Serious Injury, Officer Involved Shootings, and In-Custody Death Investigations for additional responsibilities regarding on-officer body cameras, public safety statements, etc.
D. Ensure:
   1. Overall photographs are/have been taken, as well as areas involving visible injury or complaint of pain;
   2. All necessary evidence has been/is collected; and
   3. All members who used force complete an incident report and/or supplemental report(s) prior to the end of shift and are approved by a supervisor.

| **MESA POLICE**<br><br>**Department Policy Manual** | **Use of Force** | **DPM 2.1.1**<br>Effective 03/10/2021<br>Reviewed 10/16/2023<br>Revised 07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**11 of 16** |

E. Complete MPANS when required. See DPM 2.8.100 Mesa Police Activity Notification System (MPANS).

## 11. USE OF FORCE REPORTING [ALEAP 1.6A-D]

### 11.1 Reportable Uses of Force

A. All **uses of force,** including takedowns and pressure points, are reportable.
   1. Exceptions which **do not** require reporting unless a subject is injured, thought to be injured, or the person complains of injury and requests medical aid include:
      a. Verbal commands;
      b. Handcuffing (including OCCS holds);
      c. Empty-hand escort control holds; and/or
      d. Police Jiu Jitsu Segmenting Technique.

### 11.2 Notification

A. Members shall verbally report all uses of force to an immediate or functional supervisor as soon as practicable.

### 11.3 Documentation

A. Member:
   1. Each member shall document the use of force in an incident report or supplemental report, as soon as possible but prior to the end of shift, unless directed not to by a lieutenant or Homicide supervisor.
      a. Articulate the specific facts and circumstances to explain the member's own decision to employ the particular use of force.
B. Non-Involved Supervisor/Internal Affairs (IA):
   1. A non-involved supervisor shall complete the Use of Force Report for all reportable uses of force, with the exception that IA will complete the Use of Force Report for all officer involved shooting (OIS) incidents.
   2. For **uses of force**, one BlueTeam Use of Force Report shall be completed per incident.
      a. In the report, include:
         • All involved officers who applied reportable force;
         • Subject(s) on which reportable force was used;
         • Circumstances surrounding the use of force;
         • Results of the use of force;
         • Supervisor's actions taken in the investigative process;
         • Who was interviewed;

| MESA POLICE<br><br>Department<br>Policy Manual | **Use of Force** | **DPM 2.1.1**<br>Effective<br>03/10/2021<br>Reviewed<br>10/16/2023<br>Revised<br>07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**12 of 16** |

- Name or description of materials reviewed; and
- Justification for not speaking with any subject alleging excessive force.

3. For uses of force involving a Police Service Dog (PSD), the PSD Sergeant when available, or a non-involved supervisor when the PSD Sergeant is unavailable, shall complete the **Service Dog Utilization** module in BlueTeam in accordance with PSD 2.3 Police Service Dog Incidents Involving Bites, Injuries or Property Damage.
   a. The Incident Summary will include:
      - Time of announcement;
      - Time of deployment;
      - Duration of bite; and
      - A brief summary of the incident.
   b. If completed by a non-involved supervisor, the Service Dog Utilization module will be forwarded to the PSD Sergeant.
      - The PSD use of force review will be completed by the PSD chain of command, following use of force review protocols.
4. All PSD bites will be documented via the Service Dog Utilization module. All other uses of force during the incident will be documented in a single Use of Force Report in BlueTeam.

## 12. OFF-DUTY OR WHEN NOT ON DUTY USE OF FORCE REPORTING [ALEAP 1.6A-D]

### 12.1 Off-Duty (Includes Off-Duty Employment) or When Not On Duty Incidents

A. Any member who uses reportable force in an off-duty or when not on duty incident **within or outside** the City of Mesa (COM) shall:
   1. Immediately notify the appropriate local authorities.
   2. Immediately notify an on-duty supervisor (via radio, 911, etc.).
   3. Notify the chain of command when practical.
   4. Follow documentation procedures outlined above.
B. See DPM 1.2.115 Off-Duty & Outside Employment Protocols and DPM 2.5.60 Police Action When Not On Duty.

## 13. REVIEW OF USE OF FORCE [ALEAP 1.6A-D]

### 13.1 Sergeant Review in BlueTeam

A. Complete **within two shifts** but prior to regular days off.

| **MESA POLICE**<br><br>**Department<br>Policy Manual** | **Use of Force** | **DPM 2.1.1**<br>Effective<br>03/10/2021<br>Reviewed<br>10/16/2023<br>Revised<br>07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**13 of 16** |

1. If additional time is needed for review, an extension request must be approved by the Division Commander and documented in BlueTeam.

B. Review all applicable on-officer body camera (OBC) footage, reports, and materials related to the use of force incident, to include OBC footage of members present who did not utilize reportable force (i.e., uninvolved perimeter units, etc.).

1. Sergeants will review a reasonable amount of OBC footage for all members on scene (i.e., approximately 10 minutes before and after the use of force incident; possibly longer if the scene is still elevated or less if the incident has concluded and been de-escalated).

   a. If any issues are discovered during the review for any member (i.e., tactical concerns, discourtesy, legal issues, vulgarity, other policy violations, etc.) that doesn't result in a Notice of Investigation (NOI) but requires corrective action (such as training or counseling), the sergeant shall document in the Use of Force Report comments in BlueTeam and include documentation detailing what actions were taken to remedy the issue.

      • This may include, but not be limited to, oral counselling, training, memorandum of understanding, written counselling, or a corrective action plan. See DPM 1.4.10 Disciplinary Process.

      • Every effort should be made to complete the corrective action before routing the report to the next level in the chain of command; otherwise, it can be added to the BlueTeam entry at a later time.

      • **Note**: If the member with discovered performance issues did **not** apply reportable force during the incident, only document their name in BlueTeam routing notes; do **not** add their name to the BlueTeam Use of Force Report names module.

   b. Any actions that are observed to be more serious in nature (i.e., egregious or repetitive; an IA disciplinary history report may be requested though IA) and require further investigation, an inquiry or a formal investigation shall be completed. See DPM 1.4.5 Administrative Investigations.

   c. If exemplary performance is identified, supervisors are encouraged to recognize the member following procedures in DPM 1.11.30 Awards.

C. Indicate the appropriate determination in the "instructions" box when forwarding the incident to the next level in the chain of command:

1. "No issues identified"; or

2. "Additional review required".

   a. Other identified performance issues outside of the reportable use of force shall also warrant additional review by the lieutenant.

| MESA POLICE | Use of Force | DPM 2.1.1 |
|---|---|---|
| **Department Policy Manual** | | Effective 03/10/2021<br>Reviewed 10/16/2023<br>Revised 07/08/2024 |
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**14 of 16** |

D. Forward the completed Use of Force Report to the member's lieutenant, or an equivalent lieutenant in the Division if the chain of command is unavailable for an extended period, and copy (cc) the Division Commander.

**13.2  Lieutenant Review in BlueTeam**

A. Completion dates:
   1. If marked "Additional review required" during the first level review, complete by the **next shift**.
   2. If marked "No issues identified" after initial review, complete within **four shifts** but prior to regular days off.
   3. Any deviation from the time requirement will be approved by a commander and documented in BlueTeam.

B. Conduct a second-level review of all applicable reports and OBC footage. If applicable, ensure appropriate comments and documentation have been added for any corrective action in BlueTeam.

C. Complete "enter policy outcome" for each involved member to include selecting the appropriate policy review outcome (e.g., within policy, not within policy, etc.).

D. Any actions that are observed to be more serious in nature (i.e., egregious or repetitive; an IA disciplinary history report may be requested though IA) and require further investigation, an inquiry or a formal investigation shall be completed. See DPM 1.4.5 Administrative Investigations.

E. Indicate the appropriate determination in the "instructions" box when forwarding the incident to the next level in the chain of command:
   1. If determined "No issues identified":
      a. Provide final comments and forward to **PDUseofForce** in BlueTeam;
      b. Copy (cc) the Division Commander.
   2. If determined "Additional review required":
      a. Forward the completed Use of Force Report via BlueTeam to the Division Commander;
      b. Copy (cc) **PDUseofForce** in BlueTeam.

**13.3  Commander Review in BlueTeam**

A. Completion dates:
   1. Complete within **two business days** but prior to regular days off.
      a. Any deviation from the time requirement will be documented in the BlueTeam review.

B. For all Use of Force Reports designated as "Additional review required", conduct a third-level review of all applicable reports and on-officer body camera footage.

| **MESA POLICE**<br><br>**Department Policy Manual** | **Use of Force** | **DPM 2.1.1**<br>Effective<br>03/10/2021<br>Reviewed<br>10/16/2023<br>Revised<br>07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**15 of 16** |

C. Consult with the sergeant and lieutenant regarding recommendations for additional actions to be taken such as:
1. Tactical debriefing;
2. Officer training;
3. Squad training;
4. Supervisor training;
5. Counseling/Work Station File (WSF) entry;
6. Corrective Action Plan (CAP); and/or
7. Formal Administrative Investigation.

D. Provide final comments in the "instructions" box when forwarding the use of force incident in BlueTeam to **PDUseofForce**.

E. If a determination is made to conduct an Administrative Investigation, notify the:
1. IA Lieutenant; and
2. Affected Bureau Chief.

## 13.4  Advanced Training Unit

A. The Advanced Training Unit receives each completed Use of Force Report sent to the **PDUseofForce** inbox.
1. If the information is incomplete, route the report to the originating supervisor for corrections.
2. If the information is complete, forward to IA for closure.

## 13.5  Internal Affairs Unit

A. Responsibilities:
1. Report will be assigned a file number (e.g., "UOF2024-178").
2. Change the report disposition to "completed" in IAPro.
3. Move BlueTeam report into IAPro.

## 14. TRAINING DIVISION RESPONSIBILITIES

The Training Division will monitor trends and emerging issues by tracking data found in Use of Force Reports. Specifically, the Training Division will monitor the types of force being used and the reasons for use of force. This review will allow instructors to identify needs for future training sessions.

## 14.1  Advanced Training Lieutenant Responsibilities

A. Assist Division Commanders as requested with:
1. Tactical debriefing;
2. Officer training;

| MESA POLICE<br><br>**Department<br>Policy Manual** | **Use of Force** | **DPM 2.1.1**<br>Effective<br>03/10/2021<br>Reviewed<br>10/16/2023<br>Revised<br>07/08/2024 |
|---|---|---|
| Approved by:<br>**Chief of Police** | Chapter:<br>Use of Force | Page:<br>**16 of 16** |

3. Squad training;
4. Supervisor training; and/or
5. Corrective Actions Plans (CAPs).

B. Review Department use of force.

C. Provide to Executive Staff:

1. Quarterly reports reference:
   a. Department overview of use of force.
   b. Identified use of force trends.
2. Recommendations for Department training to include:
   a. Officer specific training;
   b. Supervisor specific training; and
   c. All sworn member training.

## REFERENCES

- ARS 13.105.12, 13,105.15, 13-105.33 & 13-105.39
- DPM 1.2.115 Off-Duty & Outside Employment Protocols
- DPM 1.4.5 Administrative Investigations
- DPM 1.4.10 Disciplinary Process
- DPM 1.4.75 Biased-Based Profiling
- DPM 1.11.30 Awards
- DPM 2.1.10 Police Incidents Involving Death/Serious Injury, Officer Involved Shootings, and In-Custody Death Investigations
- DPM 2.1.11 Concurrent Investigations
- DPM 2.1.20 Firearms Use
- DPM 2.1.25 Impact Weapons
- DPM 2.1.30 Chemical Agents
- DPM 2.1.35 Conducted Energy Weapon (CEW) Protocols
- DPM 2.1.60 40mm Specialty Impact Weapon
- DPM 2.5.60 Police Action When Not On Duty
- DPM 2.8.100 Mesa Police Activity Notification System (MPANS)
- DPM 2.10.30 Police Service Dog (PSD)
- DPM 3.4.15 Evidentiary Recordings
- *Graham v Connor*, 490 U.S. 386 (1989)
- PSD 2.3 Police Service Dog Incidents Involving Bites, Injuries or Property Damage