Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
Garrett Griggs, Bar #030525
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: cretts@wienekelawgroup.com
Email: ggriggs@wienekelawgroup.com

*Attorneys for Defendants Harris, Navarro,
Cameron, Adair, Chuey, Goodrich, Freeman,
Thomas, Orr, Brown, and Cost*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher Gagne in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne,<br><br>Plaintiffs,<br><br>vs.<br><br>City of Mesa, a political subdivision of the State of Arizona; Kevin Cost, Chief of Mesa Police Department, individually and in his official capacity; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and in his capacity as a police officer; Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his individual capacity and in his capacity as a police officer; ABC Partnerships I-X; XYZ | NO. 2:24-cv-01337-DJH<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS ALL CLAIMS AGAINST DEFENDANTS ORR AND COST; COUNT TWO (THE *MONELL* CLAIM); COUNT FOUR; AND COUNT FIVE** |

1
2

Corporations I-X; John Does I-X and Jane
Does I-X,

                              Defendants.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

        The decedent assaulted his girlfriend, shot a round off his balcony while threatening

to kill his girlfriend and a neighbor, armed himself and walked around his apartment with a

high-powered rifle pointing it at officers while threatening to kill them, put on body armor

and ear protection, and never told anyone that he intended to surrender at any time. *See*

Interior Surveillance Video Exs. 1-15. Defendants' Motion to Dismiss should be granted

because: (1) Plaintiffs have failed to identify a single controlling Ninth Circuit case that

establishes that negotiators can be liable for a Fourth Amendment seizure where they used

no force.  Instead, Plaintiffs cite to Eighth Amendment district court jail medical cases that

do not clearly establish the law and have no relationship to a highly volatile person armed

with an arsenal of weapons and threatening to kill everyone he encounters; (2) the claims

against Chief Cost are redundant and there are no factually supported arguments as to how

the claims differ; (3) Plaintiffs offer a solitary *Monell* theory that appears for the first time

in the Response, is not supported by any facts, and is directly contradicted by their own

allegations that the negotiator was  providing real-time information on the radio, and is

based upon this sole incident; (4) Plaintiffs' state law claims fail based upon *Ryan v. Napier*

and its progeny; and (5) there is no quasi-wrongful death loss of consortium claim, that

allegedly explains why the death occurred, that is permitted to proceed given the language

of A.R.S. § 14-3110.

21
22

I.    **FACTS**

        Plaintiffs have an obligation to craft their factual allegations in a manner that is not

23
24

misleading, or intentionally omits facts that they possess.[1] *See Mayfield v. City of Mesa*,

25
26
27
28

[1] In erroneously claiming that Defendants are relying on body camera, Plaintiffs incorrectly suggest to this Court that they did not have the body camera before they filed their Amended Complaint. Yet, this Court granted a very lengthy extension for Plaintiffs to secure a Personal Representative and to provide time for Plaintiffs to review the body camera: "the extension will permit Plaintiffs' counsel to review voluminous body camera recently produced to Plaintiffs by Defendant City of Mesa." Doc. 19, dated July 19, 2024. In addition, Plaintiffs possessed all of the surveillance footage from inside the apartment

2023 U.S. Dist. LEXIS 191351, *5 (D.Ariz. Oct. 25, 2023). At the time of the filing of the Motion to Dismiss, Plaintiffs had not produced any of the interior surveillance video.[2] In the Response, Plaintiffs attach misleading and select portions of the videos and fail to admit undisputed and highly disturbing facts established by their video.[3] The decedent was not a person who was peacefully sleeping in a state of innocence; that the decedent had had his eyes closed, while sitting up, for a matter of minutes while holding an AK-47 across his lap hardly makes him non-dangerous, unaware that he had engaged in domestic violence and then aggravated assault while firing his weapon on the porch, and threatening and intimidating. Plaintiffs' approach seeks to perpetuate a false narrative that is directly contradicted by numerous unattached surveillance videos documenting the decedent's highly abusive behavior, threats, and criminal conduct that placed him at the highest severity of threat to his girlfriend, neighbors, the public, and officers:

- Domestic violence, threats, verbal and physical assault of girlfriend. Ex. 1.
- Talking to his girlfriend: "don't fucking shut no doors on me, I will fucking kick that motherfucker too. Fucking better open that fucking bitch;" "I will kill you. Watch your fucking step." Ex. 2, at 1:00-18, 1:30-35.
- Threats to his neighbor and girlfriend: "fucking shatter your fucking skull, get the fuck out of here…Fucking kill you and your fucking boyfriend;" "Put a bullet right through your fucking skull you fucking fat prick;" "Fucking kill both you fucking bitches (while arming himself with a handgun)." Ex. 3, 00-45, 1:00-1:06, 1:56-2:03. *Cf.* Doc. 60, p. 12, ln. 17 ("Shawn's Neighbor Provokes MPD Response.").
- Threats to his neighbor and girlfriend while gathering his weapons and on the patio: "both you get out of here before I put a hole in both of your fucking heads;" waving a gun around at Jordan and the neighbor, while yelling "get the fuck out of my area…before I fucking decide to take a shot;" then <u>firing a shot into the air</u> "get out, be gone…get out of my fucking area before I kill both of you." Ex. 4, 00:40-54, 1:23-30, 1:32-51. *Cf.* Plaintiffs' First Amended Complaint, ¶28 ("neighbor retreated to her home…**alleging** Shawn fired a weapon.")
- "(inaudible) before I drop clips in your fucking mouth bitch (armed with handgun)." Ex. 5, 00-21.
- While gathering weapons, making multiple threats: "I will fucking kill you;" pointing rifle at the front door: "I will fucking put a hole right through your fucking head." Ex. 6, 00-59; 1:48-54.
- On the phone with girlfriend, demanding to know where his AK is, "you fucking stupid cunt, fucking dumbass bitch…stupid bitch"; "I will fucking kill you bro…I'm gonna kill you;" Ex. 7, 00-49, 58-1:02.

---

(which Defendants did not have) and had knowledge of the undisputed facts present on this video.

[2] For purposes of shots being fired, the viewpoint is not the view of the officers who fired shots.

[3] Plaintiffs' Response makes much about the fact that the surveillance footage is repeatedly referenced in the Amended Complaint and therefore incorporated by reference.

- Rifle aimed forward and looking through the scope. Ex. 8, 1:28-1:51.
- Mesa PD on scene and the decedent is armed with and walking around with a rifle: "…fucking make commands over here ni**a;" while raising rifle up by window "get this shit out of my home;" while being asked to come out with nothing in his hands- "guarantee this bitch…I'll fucking show you ni**a," then opens door with rifle and tells officers to "get out." Ex. 9, 00-03, 10-19, 39-1:29.
- Calling Jordan while holding the rifle and talking about the cops: "they want to fucking go, lets go…open up the door…I got my own fucking army. I will blast a whole through your fucking head homie;" rifle aimed and pointed at the door multiple times followed by threats "I will fucking shoot this motherfucker up…I will show you fucking scary;" yelling "I'm not coming out" while pointing and aiming rifle. Ex. 10, 00-1:00; 1:02-53; 2:00-08.
- Pointing gun repeatedly and threatening: "they come to my fucking house there is going to be consequences…tell them to come through now I got my fucking shit loaded;" opening door with rifle and yelling at officers to "leave;" "they come through my house I am going to blow a hole right through their fucking head…you want to play a fucking game, lets play." Ex. 11, 00-50; 1:00-1:16; 1:25-38.



- Rifle up and pointed while on the phone with negotiator; numerous threats to negotiator regarding "dumping shots," rifle raised and pointed at windows while threatening officers "get the fuck out of my fucking house before I start dumping shots in your fucking squad cars;" while weapon is aimed and pointed at officers "shine that fucking laser in my house one more time and I will fucking unload;" "lets fucking play guns bro" and pointing rifle at window. Ex. 12, 00-1:09, 1:10-34; 1:39-51.
- With rifle raised at points, "I will show you fucking scary bro…I am about to fucking descend the gods of fucking hell upon you people…move the fuck out of my vicinity, I said move out;" repeated threats of violence when asked to come out—"I will fucking dump a hole right through your fucking squad car (with rifle raised and pointed straight at windows); "if you fucking come into my vicinity there is going to be casualties including myself, I do not give a fuck." Ex. 13, 00-32; 32-59; 2:00-2:08.
- Pacing with rifle in hand, "I am not coming out, on God…you can stay out there all god damn fucking year…I have full thirty round fucking clips. You want to come to my fucking door I will fucking unload on all of your fucking team;" "Come in and

get me;" "I'm getting shit ready right now…I ain't playing no fucking games. I got my armor on, fuck this (putting body armor on)." Ex. 14, 00-43; 1:00-1-25.

- With rifle in hand: "I ain't going to go with you mother fuckers, you think I am stupid. Move your squad back before I fucking start desiccating lives out of your squad;" while pointing his rifle, "I am fucking mentally insane, get the fuck out of my house before I start fucking shooting shots," then putting on ear protection, aiming the rifle: "let's see right now, I have my fucking armor on, I have my fucking gun loaded." Ex. 15, 10-1:18; 1:58-2:08.

In their Response, Plaintiffs admit that they cited to the interior surveillance camera multiple times in their FAC and that it is central to their claims. As a result, the Court should consider all of it, not Plaintiffs' selective citations. Next, Plaintiffs **erroneously**, however, claim that Defendants "open by claiming that the Complaint's allegations are 'contradicted' and 'doomed' by MPD body worn camera (BWC) footage," yet Defendants did not attach, or cite to BWC to support their arguments.[4] Doc. 76, p. 5, lns. 12-13. Plaintiffs' entire argument regarding unattached BWC misses the mark. Instead, Defendants' cited evidence that Plaintiffs admit was central to and that they used in crafting the Complaint (911 call, negotiator call, Officer Maldanado's announcements, radio traffic). Doc. 76, p. 5-6. Thus, the facts included in these sources are not outside the FAC and do not make the Motion to Dismiss a Motion for Summary Judgment.

## II.    Qualified Immunity Applies.

### A.    Plaintiffs Fail to Offer a Viable Fourth Amendment Theory Against the Negotiator Defendants.

In Count One, Plaintiffs assert a Fourth Amendment excessive force seizure claim against all Defendants, including the negotiator Defendants. Plaintiffs argue that they do not claim that the negotiator Defendants used force, but they are included in Count One. The negotiator Defendants cannot be sued for "apprehension by use of excessive and/or deadly force" or "unreasonable seizure of his person" when they never seized the decedent and used no force against him. Doc. 60, at ¶67-68 Listening to the other end of the decedent's homicidal tirade is not a seizure, nor is seeking to have the Plaintiff surrender, which he never verbally agreed to do. Plaintiffs FAC offers no facts relating to Defendants

---

[4] Defendants attached a number of exhibits, including video, to their Answer, but did not rely upon all of the documents attached to the Answer for the Motion to Dismiss arguments.

1   Adair and Orr in Count One. And, in arguing against dismissal of the federal claims against

2   Defendants Adair and Orr, they do not explain what legal basis they have for including

3   Defendants Adair and Orr in their "excessive force" seizure claim.

4       Plaintiffs provide this court with no legal authority for the proposition that a

5   negotiator can instruct another officer not to make their own independent decision on

6   whether force is justified, based upon what they personally perceive, because a one-sided

7   negotiation is occurring with the negotiators receiving no feedback from the decedent. The

8   Plaintiffs' video makes clear that the decedent never told anyone he was surrendering, and

9   his only verbal statements were homicidal, threatening, and defiant. Moreover, Adair and

10  Orr's communications have nothing to do with the two shots fired by Defendant Freeman,

11  as they were not made in any proximity to the later request that the decedent come out

12  unarmed with nothing in his hands. The decedent's statement that he had been shot by

13  Freeman did nothing to ensure that he would not shoot at officers as he had threatened to

14  do repeatedly, which was coupled with repeated refusals to surrender.

15  **B.**    **Claiming that the Law is Clearly Established at the Level of "Right to**

16      **Life" Runs Afoul of Supreme Court Case Law Instructing Courts Not to Define the Right at a General Level.**

17      Plaintiffs' qualified immunity analysis improperly conflates general tort law with the

18  Fourth Amendment standard and fails to meet their burden of identifying any clearly

19  established law applying to negotiator Defendants Adair and Orr. Plaintiffs argue that the

20  law is clearly established because "Shawn possessed a constitutional right to his life," but

21  this is hardly sufficient and defined at the *highest* level of generality possible (even higher

22  than the "right to be free of excessive force."). *See City of Escondito v. Emmons*, 586 U.S.

23  38 (2019) ("this court has repeatedly told courts…not to define clearly established law at a

24  high level of generality…This is particularly important in excessive force cases…").

25      Instead of looking at case law in the excessive force context and applying the

26  *Graham* factors, or addressing and seeking to distinguish Defendants' case law, Plaintiffs

27  cites to district court cases from California addressing the communication of medical

28  information in a jail/prison setting: *Greer v. Cty. of San Diego*, 2019 U.S. Dist. LEXIS

6

185092, at *24 (S.D. Cal. Oct. 24, 2019) (deliberate indifference Fourteenth Amendment claim made by a detainee with a seizure condition that was not assigned to a lower bunk and fell); *Lopez v. Nevada ex. Rel. Nev. Dep't Corr.*, 2023 U.S. Dist. LEXIS 89714, at *7 (D. Nev. May 22, 2023) (Eighth Amendment deliberate indifference claim relating to medical care of a detainee who hung herself at a correctional facility); *M.H. v. Cnty. of Alameda*, 90 F.Supp. 3d 889, 901 (N.D. Cal. Apr. 17, 2013) (Eighth and Fourteenth Amendment deliberate indifference related to death of a detainee who was withdrawing from alcohol). District Court case law does not clearly establish the law, nor does case law in a jail setting that addresses completely different constitutional amendments and factual settings. *See Pearson v. California*, 2024 U.S.App. LEXIS 25651, *4-5 (9th Cir. Oct. 11, 2024) (unpublished) (qualified immunity could not be established where plaintiffs cited Fourth Amendment law to attempt to establish an Eighth Amendment violation).

Without citing to any case law involving similar factual circumstances—a highly armed suspect, who committed domestic violence, threatened to kill his girlfriend and neighbor, shot a round off his porch, and then repeatedly made homicidal statements to a negotiator—Plaintiffs baldly claim that the "duty" to communicate in a jail setting is the same as in a highly volatile police encounter. This is wrong. In a jail, the inmates are not armed, communicating information about medical needs does not involve a threat of death or bodily injury to any officers or third party, and there is no exigency.  Plaintiffs have failed to meet their burden of identifying a single case clearly establishing the law for negotiator communications with a suspect who repeatedly expresses direct threats to engage in homicidal conduct, while armed. *See Rice v. City of N. Las Vegas*, 2024 U.S.App. LEXIS 27525 (9th Cir. Oct. 30, 2024) (in shooting of an individual armed with a rifle, finding the shooting objectively reasonable, noting that the decedent's mental state "did not change the danger he posed in resisting the officers while holding a deadly weapon that he pointed in the officers' direction."). As the Ninth Circuit noted in Rice, in refusing to define the right at a high level of generality, "Rice has identified no authority that would have put Jameson on notice that he would violate the Fourth Amendment by using lethal force against an

individual who had repeatedly refused officers' commands to give up his gun and raised it multiple times in the direction of officers." *Id*. at *6-7; *Kisela v. Hughes*, 584 U.S. 100 , 105-06 (2018) (finding it "far from an obvious case in which any competent officer would have know that [the use of deadly force] would violate the Fourth Amendment" where an armed individual "refused [police] commands to drop his weapon" and "the police believed (perhaps mistakenly) [] that the man posed an immediate threat to others.")

**III.    The Claims against Chief Cost are Official Capacity Claims that Are Redundant of the *Monell* Claims.**

Plaintiffs argue that the claims against Chief Cost are not redundant of the *Monell* claims because they rely upon "alternate avenues of liability," but each of these supposed alternative avenues are *Monell* theories. Indeed, Chief Cost is only named in Count Two, which is a *Monell* claim. Claiming that the Chief failed, in the past, to adopt proper policies/training regarding "communication" is a *Monell* theory (albeit an insufficiently pled one). Plaintiffs allege no facts establishing a separate independent basis of liability— such as Chief Cost personally participating in the SWAT response, being present on scene, or directing any actions of the officers present.

While Plaintiff claims a "failure to supervise" as it relates to SWAT officer Freeman, Plaintiffs identify no personal participation of Chief Cost in that decision either. *See Kraus v. Cty. of Mohave*, 2020 U.S. Dist. LEXIS 87739 (D.Ariz. May 18, 2020) (dismissing claims against the Sheriff as redundant of *Monell* claims as there were no facts showing any personal involvement in the events giving rise to the action). Plaintiff cites to *Nunes v. Driver*, 2006 U.S. Dist. LEXIS 85749 (D.Ariz. Nov. 22, 2006), but that case bears no factual resemblance to the allegations in this case. In *Nunes*, the Chief was sued on the basis of a claim that he was specifically aware that an officer was committing sexual assaults prior to the alleged assault against plaintiff and turned a blind eye to the sexual assaults that were previously committed. The Court did not address the Mesa City Charter's language regarding policy maker status and merely concluded, without analysis, that the Chief was the final policy maker. Here, there is no allegation that Defendant Freeman was convicted

of any crimes prior to this shooting, or that he previously engaged in any shooting with any citizen. Plaintiffs' allegations are impermissible Rule 404(b) allegations that are factually unsupported and are not tied to the direct threat posed by the decedent and the shots fired by Defendant Freeman.

**IV.    The *Monell* Claim (Count Two) is Boilerplate and Insufficient.**

In addressing the *Monell* claim, the Plaintiffs address only one of their conclusory *Monell* theories: that Mesa failed to properly train and supervise MPD officers to ensure "real-time" communication between negotiators and SWAT <u>in this instance only</u>. As an initial matter, Plaintiffs do not explain what is meant by "real-time" communication and how this theory ties to the decision-making process of each shooting officer (i.e. the threat they perceived based upon the decedent's prior actions and threats and the limited view through his foil covered windows). Plaintiffs do not dispute that the negotiators were broadcasting information over the radio regarding their contact with the decedent, so their theory appears to be that the negotiator should have been simultaneously negotiating and reporting the results of those negotiations to officers, which is physically impossible. Most importantly, however, Plaintiffs identify no prior similar instances of alleged failure to communicate to establish any wide-spread deficiency in training or policy. A *Monell* theory cannot be based upon this isolated contact with the decedent. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (liability may not be predicated on isolated or sporadic incidents).

Like in *Warren v. Penzone,* 2024 U.S. Dist. LEXIS 89121 (D.Ariz. May 17, 2024) and *Andrich v. Kostas,* 470 F.Supp. 3d 1048, 1064 (D.Ariz. June 30, 2020), the Plaintiffs do not make any attempt to identify any previous SWAT negotiations, resulting in shootings, involving a barricaded heavily armed individual making threats to kill officers and civilians. *See Harris v. Bertz*, 2022 U.S. Dist. LEXIS 153272 (D.Ariz. August 25, 2022) (recognizing that under A.R.S. § 13-410(c), an officer is justified in using deadly force when the police officer believes that it is necessary to effect an arrest or prevent escape of an individual who has committed a felony involving the use of a deadly weapon). Using this incident as the sole basis for their *Monell* theory is insufficient.

1    Plaintiffs then turn to attempting to blame Defendants for their inability to marshal
2 facts prior to filing suit, but do not explain how body camera (that they possessed for the
3 purposes of drafting the amended complaint) informs their *Monell* theories. Plaintiffs'
4 *Monell* theories are boilerplate, not based upon any facts, are speculative, and are disjointed
5 from the facts. For example, Plaintiffs throw around allegations of failure to deescalate, but
6 do not identify what the supposed failure to deescalate is. The officers did deescalate:
7 officers did not force entry into the decedent's residence, gave repeated commands to exit,
8 and used a negotiator to try to secure compliance. Despite being met with repeated threats
9 and the decedent repeatedly pointing his weapon at the window, he was not immediately
10 shot. And, once again, the Plaintiffs' do not identify any prior instances of failures to
11 deescalate that were similar in nature. Instead, the Plaintiffs make conclusory allegations of
12 failure to train, and of insufficient policies, without identifying any prior incidents putting
13 the City on notice of any purported deficiencies.

14 **V.    Count Four is Barred by *Ryan v. Napier* and A.R.S. § 12-820.05.**

15    Plaintiffs' Response is based upon circular reasoning that attempts to creatively
16 plead around *Ryan* and the statutory bar of A.R.S. § 12-820.05. Plaintiffs concede that they
17 may not sue the City for the intentional conduct of the shooting officers, but then claim that
18 the shooting was not the sole result of the intentional conduct because of the factually
19 unsupported allegations related to failure to train and in communication by the negotiators.
20 Yet, this is the precise type of claim that was rejected in *Ryan*, *Davis v. City of Glendale*,
21 2023 U.S. Dist. LEXIS 145672, *16-17 (D.Ariz. August 18, 2023), and the reasoning is
22 later extended in *Torres v. Maricopa Cnty.*, 2024 Ariz. App. Unpub. LEXIS 865, *6
23 (October 8, 2024).

24    *Torres* is persuasive as it continues to reaffirm and carry forward the same reasoning
25 a number of District Court and state court cases addressing pre-shooting tactics. In *Torres,*
26 the plaintiffs claimed that the pre-shooting negligent mishandling of the domestic violence
27 call "set the stage for the later preventable intentional shooting and that permitting a
28 separate negligence claim for the pre-shooting conduct does not run afoul of the principles

set forth in *Ryan*." *Id.* The alleged negligent pre-shooting conduct was failing to "defuse and de-escalate," wait for backup, wait for nearby K-9 units, clear space to take cover, and control the suspect with non-fatal means. *Id*. at *7.  *Torres,* however, noted that even if these alleged "negligent acts and omissions were true," they are "not 'independent of the intentional use of force,' *id*., because they led directly to that intentional use of force.'" *Id.* The court further noted that "appellants provide no case law supporting their position that Arizona permits a separate, actionable claim for negligent acts or omissions that later contributed to an actionable intentional battery." *Id.* at *8. The court went on to hold that the wrongful death statute also supports the conclusion:

> Appellants' two-phase framing of this case removes the negligence claim from the reach of damages under the under the wrongful death act because they make no argument that Juan, had he lived, could have pursued a personal injury action for the discrete alleged negligent acts preceding the deputies' intentional use of force. The deputies' pre-shooting conduct here did not constitute negligence separable from the immediately-ensuing intentional shooting. The record in this case only supports a claim for intentional battery.

*Id*. at *10. Here, the Plaintiffs' purported negligence claims are not separable from the intentional shooting. If there had been no shooting, the decedent would have no separate negligence claim against the negotiator Defendants, nor against the City.

Plaintiffs then fail to address the multiple cases, cited by Defendants, standing for the proposition that claims of ratification, supervision, and training are tied directly to the claims of an alleged intentional and unlawful shooting, such that they cannot proceed.  *See Doe v. Dickenson*, 615 F.Supp. 3d 1002, 1015 n. 8 (D. Ariz. 2009) (because the city is entitled to immunity under A.R.S. § 12-820.05, the court did not need to reach the insufficiency of the evidence arguments on negligent training and supervision); *Gallagher v. Tucson Unified Sch. Dist.*, 237 Ariz. 254 (App.Div. 2 2015) (city could not be liable for negligent hiring, retention, and supervision for the alleged felony conduct as the losses arose out of and were directly attributable to the felony actor's conduct).

## VI.    There is No Standalone Pre-Death Loss of Consortium Claim That Survives the Decedent's Death.

As this is a case where the decedent died, the only viable claims are for wrongful

death. Plaintiffs assert that Count IV is "not a 'wrongful death claim' *per se*," and this is the problem. A stand-alone loss of consortium claim is derivative of success on another claim. The only other state law claims are for wrongful death; A.R.S. § 14-3110, provides that "loss of consortium," "pain and suffering," and "pre-death economic" damages suffered by the decedent do not survive. Plaintiffs do not address the statutory language of A.R.S. § 14-3110, at all. A.R.S. § 14-3110 bars the pre-death loss of consortium claim.

Plaintiffs' remaining arguments regarding the viability of this claim are extremely hard to decipher. Plaintiffs seem to be replicating the same arguments advanced under Counts III and IV, which are not permitted pursuant to *Ryan v. Napier.* And, unlike in *Martin v. Staheli*, 248 Ariz. 87, 93-94 (App. 2019), there is no independent negligence allegedly existing unrelated to the death.

Next, Plaintiffs claim that "Count IV is an independent claim for negligence and/or recklessness which helps explain why Shawn's wrongful death happened—it is not the wrongful death claim itself." Doc. 76, p. 16.  But, this argument makes little logical sense as a loss of consortium claim is not a stand alone claim. There are not any facts in this claim that explain why the wrongful death happened, nor is explaining why the wrongful death happened distinct from a wrongful death claim. And, the decedent's parent's loss of consortium—allegedly experienced from California when they had no contemporaneous knowledge that the decedent was shot—has nothing to do with his cause of death. Instead, this claim appears to be a creative attempt to either avoid the language of A.R.S. § 14-3110, or to avoid the elements of a negligent infliction of emotional distress claim (that would neve prevent recover for a non-bystander parent that was never in the zone of danger). To the extent that this claim relates to the decedent's loss of consortium, he cannot lose consortium with himself.  There is no legal logic to permit this loss of consortium claim to survive.

## VII.    CONCLUSION

Defendants' Motion to Dismiss should be granted, without leave to amend.  The only claim that may be subject to amendment is the *Monell* claim. Plaintiffs had one opportunity

12

already to amend their Complaint and did not cure any of the deficiencies, despite being put on notice by Defendants.

DATED this 15th day of November, 2024.

WIENEKE LAW GROUP, PLC

By:    /s/ Christina Retts
       Kathleen L. Wieneke
       Christina Retts
       Garrett Griggs
       1225 West Washington Street, Suite 313
       Tempe, Arizona 85288
       *Attorneys for Defendants Harris, Navarro, Cameron, Adair, Chuey, Goodrich, Freeman, Thomas, Orr, Brown, and Cost*

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Zachary Mushkatel
Jordan A. Brunner
MUSHKATEL, ROBBINS & BECKER, PLLC
15249 North 99th Avenue
Sun City, Arizona 85351-1964
*Attorneys for Plaintiffs*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

By:   */s/ Lauren Rasmussen*