**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher Gagne, et al., | No. CV-24-01337-PHX-SHD |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Mesa, et al., | |
| Defendants. | |

Pending before the Court is a Motion to Dismiss filed by Defendants the City of Mesa ("Mesa"), Chief of Police Kevin Cost, and Officers Matthew Harris, Kyle Thomas, Shawn Freeman, Matt Brown, Kyle Cameron, Matthew Chuey, Robert Goodrich, Alejandro Navarro, Matthew Adair, and Christopher Orr (collectively, "Defendants"). (Doc. 71.) Defendants request dismissal of (1) all claims brought against Defendant Officers Adair and Orr and Chief Cost; (2) the *Monell* claim against Mesa; (3) the negligence claim against Mesa; and (4) the loss of consortium claim. For the reasons explained below, Defendants' motion is **granted in part and denied in part**, as follows: the claims against Defendant Officers Adair and Orr are dismissed with leave to amend, the *Monell* claim against Mesa is dismissed with leave to amend, the *Monell* claim against Chief Cost is dismissed without leave to amend, the negligence claim against Mesa is dismissed with leave to amend, and the loss of consortium claim may proceed except as against Defendant Officers Adair and Orr, which is dismissed with leave to amend.[1]

---

[1]    Plaintiffs' request for oral argument is denied because the issues are fully briefed and argument would not aid the Court's decisional process. *See* LRCiv 7.2(f).

## I.    BACKGROUND

Christopher and Suzette Gagne are the parents of Shawn Gagne, who Mesa Police fatally shot in July 2023.  (Doc. 60 ¶¶ 3–4, 19–20, 23.)[2]  Christopher, Shawn's[3] father, is also the personal representative of Shawn's estate (the "Estate," and collectively with the Gagnes, "Plaintiffs").  (*Id.* ¶ 3.)  The individual defendants are various police and SWAT officers within the Mesa Police Department (the "Department").  (*Id.* ¶¶ 6–16.)

On July 6, 2023, Shawn "engaged in a verbal confrontation with a neighbor who had knocked on his door, presumably to visit Shawn's live-in fiancée, Jordan Wirtjes."  (*Id.* ¶ 23.)  Shawn answered but "refused to allow the neighbor entry to the home."  (*Id.* ¶ 24.)  Wirtjes "stepped outside and informed the neighbor that Shawn was extremely intoxicated."  (*Id.* ¶ 25.)  During this time, Shawn "overheard their conversation and demanded [Wirtjes and the neighbor] stop talking about him and insisted they leave the area."  (*Id.* ¶ 27.)  The neighbor returned to her home and called 911, "alleging Shawn fired a weapon into the air from his patio while [Wirtjes] walked to the grocery store across from the apartment complex."  (*Id.* ¶ 28.)

Responding to the 911 call, Mesa police "surrounded Shawn's apartment unit."  (*Id.* ¶ 29.)  A non-party officer, Officer Maldonado[4] "attempted to communicate with Shawn via intercom announcements, squad car sirens and lights for fifteen (15) minutes without response."  (*Id.* ¶ 30.)  Then, non-party Officer Kurian instructed non-party Officer Freeman to "deploy projectile bean bag rounds through the westside upper windows of Shawn's unit."  (*Id.* ¶ 31.)  During these "initial efforts to communicate," Shawn was "asleep on the sofa."  (*Id.* ¶ 32.)

---

[2]    The FAC was filed as a redline, and Plaintiffs did not file a clean copy.  (*See* Doc. 60.)  The Court refers to paragraph numbers that, but for the redline, would be the operative paragraph numbers in the FAC.  Additionally, the Court omits all underlining and bolding included in the FAC used to evidence the differences between the FAC and Plaintiffs' initial complaint.

[3]    The Court refers to Christopher Gagne and Shawn Gagne by their first names to avoid confusion, not out of any disrespect.

[4]    Officer Maldonado is named as a "Defendant" in the FAC, (Doc. 60 ¶ 30), but the redline indicates that Officer Maldonado is no longer included as a defendant, (*id.* at 2).  This is also the case for several officers involved in the alleged events.  These officers are referred to as non-parties for simplicity.

Wirtjes then returned from the grocery store and informed non-party Officer Gutierrez, a secondary negotiator, that "Shawn was alone in the unit and was heavily intoxicated." (*Id.* ¶ 33.) She also stated that "Shawn routinely drank and became depressed and [she] assured [Officer] Gutierrez that Shawn would come to his senses once sober." (*Id.* ¶ 34.) Wirtjes "encouraged officers to permit Shawn adequate time for the intoxication to subside" and noted that Shawn "made statements during the day about 'not wanting to be here anymore' a[n]d that 'he could not do it anymore' while heavily intoxicated." (*Id.* ¶¶ 34–35.)

When Shawn woke up, he was "startled and confused," "stepped onto his patio to identify the source of the noise outside his unit," and "went down a short flight of stairs to the front door." (*Id.* ¶ 36.) When Shawn opened the door, he "saw officers and shouted 'what?!?,' 'get out!' and shut the door." (*Id.*) "Within minutes, Shawn returned to his front door with a rifle pointed down at his side," but Shawn "did not raise the rifle." (*Id.* ¶ 37.) After Shawn was observed at the door, Mesa police did not make any other announcements. (*Id.*)

Almost a half hour later, Mesa SWAT officers arrived at the scene, and non-party Sergeant Nicholson "instructed SWAT officers to replace [the Department's] patrol officers on the southern perimeter of Shawn's apartment." (*Id.* ¶¶ 38–39.) The SWAT officers "assembled sniper perches in other apartment units with direct lines of sight to Shawn's unit windows and glass patio doors." (*Id.* ¶ 40.) Defendant Officer Freeman, a "SWAT sniper, positioned himself in [a different unit] in a hidden perch" and "scouted the second story balcony of Shawn's unit." (*Id.*)

Next, non-party Officer Samons, a Primary Scene Supervisor, "instructed Shawn via a vehicle PA system to exit his apartment without anything in his hands." (*Id.* ¶ 41.) "Shawn responded by ranting with irrational statements, some inviting violence and others demonstrative of his altered mental state." (*Id.*) Mesa police then instructed Wirtjes to call Shawn on the phone, and Shawn answered asking "why law enforcement was present and demand[ing] that the officers leave him alone." (*Id.* ¶ 42.) Non-party Officer Maldonado

"took the phone from [Wirtjes] to explain why [Mesa police were] present and instructed Shawn to come out," but the call "was terminated." (*Id.*)

Shawn then called Wirtjes, and Wirtjes gave the phone to Defendant Officer Adair, the primary negotiator, who told Shawn "he would relay [Shawn's] request for the police to relocate to his . . . supervisors" and "encouraged Shawn to walk out the front door." (*Id.* ¶ 43.) Shawn refused to do so and "could be seen pacing in his apartment as he spoke with Defendant Adair." (*Id.* ¶¶ 43–44.)

Around ten minutes later, "SWAT officers began aiming rifle lasers through the windows into the apartment while Shawn [was] still on the phone with Defendant Adair." (*Id.* ¶ 45.) Shawn "demanded the officers turn off their sirens, put down their lasers, back away from the apartment and leave," but Defendant Officer Adair responded that Mesa police were "there because of the 'incident,'" to which Shawn replied, "what incident?" (*Id.*)

While Shawn was still communicating with Defendant Officer Adair, Defendant Officer Freeman "ignored the status of the negotiations and Shawn's mental state by opening fire, hitting Shawn." (*Id.* ¶ 46.) "After Defendant Adair confirmed Shawn was hit, he heard a second shot by Defendant Freeman." (*Id.* ¶ 47.) Defendant Officer Orr, a secondary negotiator, "advised Defendant Adair of an officer-involved shooting," and Defendant Officer Adair instructed Shawn to walk out the front door with his hands up." (*Id.* ¶ 48.)

"Shawn placed his weapon on the kitchen counter, raised both of his empty hands in the air, and began slowly walking towards the landing leading down to his front door." (*Id.* ¶ 49.) As he did so, Defendant Officer Adair "asked Shawn if he was hurt and where had been hit," and Shawn responded that he was "struck in the face." (*Id.* ¶ 50.) Defendant Officer Adair "informed Shawn that emergency medical personnel were on scene to render him aid once he exited his apartment" and "again requested Shawn make his way towards the front door exit with his empty hands raised." (*Id.*)

"Shawn attempted to comply" and was "visible from the landing windows and glass

patio doors on either side of the apartment as he slowly walked towards the stairway landing with his empty hands in the air." (*Id.* ¶¶ 50–51.) "As Shawn neared the stairway landing, [Mesa police] officers, including SWAT officers, opened fire *en mass* from both sides of the apartment unit." (*Id.* ¶ 52.) "Shawn tumbled down the stairs, severely wounded" and with labored breathing. (*Id.* ¶ 53.) During a pause in the shooting, Shawn shouted, "I'm down! I'm down! I'm down!" (*Id.* (quotation marks omitted).) But "Shawn was again fired upon by" Defendant Lieutenant Harris "and possibly other officers." (*Id.* ¶¶ 7, 53.) Defendant Officer Adair shouted "weapons down!" (*Id.* ¶ 53.)

Non-party Officer Woodward then flew a drone "through the open front door," and Shawn's "leg could be seen through the open front door as he lay underneath an unhinged door in front of the entry of the apartment." (*Id.* ¶ 54.) Non-party Officer Stefick shot four rounds of "ferret gas munitions into Shawn's apartment through the eastside patio," and Defendant Lieutenant Harris "requested more officers to the north side of the building to assist with entry into Shawn's apartment." (*Id.*)

Non-party Officer Mask "deployed K9 Rico to assess Shawn," and the SWAT officers entered the apartment through the open front door. (*Id.* ¶ 55.) Officer Stefick "deployed a taser into Shawn's neck and right calf before handcuffing him behind his back," and SWAT officers "dragged Shawn's lifeless body down the front steps." (*Id.*) A doctor pronounced Shawn dead at the scene, and Shawn was "left at the bottom of the stairs as [Officer] Kurian . . . informed scene supervisors of Shawn's time of death." (*Id.* ¶ 56.)

## II.    PROCEDURAL HISTORY

On June 4, 2024, the Gagnes filed their Complaint. (Doc. 1.)

On August 23, 2024, Plaintiffs filed a First Amended Complaint ("FAC"). (Doc. 60.) Plaintiffs assert (1) a civil rights claim under 42 U.S.C. § 1983 against all defendants for violations of Shawn's constitutional rights; (2) a municipal liability claim under *Monell* against Mesa and Chief Cost; (3) a state-law assault and wrongful death claim against Defendant Officers Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, and Thomas; (4) a negligent hiring, training, and supervision claim against Mesa; and (5) a loss

of consortium claim against all defendants.  (*Id.* ¶¶ 57–130.)

On September 6, 2024, Defendants filed a partial answer to the FAC.  (Doc. 63.) Defendants also lodged and later filed a partial motion to dismiss.  (Docs. 66, 67, 71.)  On October 21, 2024, Plaintiffs filed a response, (Doc. 76), and on November 15, 2024, Defendants filed a reply, (Doc. 79).

## III.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true" and construed in a light most favorable to the plaintiff, "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  A claim is plausible if the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In making this determination, the Court does not accept legal conclusions as true, nor does the Court consider "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.*; *see also id.* ("Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." (alteration in original) (quotation marks omitted)).  That said, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need *detailed* factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis added).  A "well-pleaded complaint may proceed even if" actual proof of those facts "is improbable[] and . . . a recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

## IV.    DISCUSSION

Defendants move to dismiss (1) all claims against Defendant Officers Adair and Orr; (2) all claims against Chief Cost; (3) the *Monell* claim against Mesa; (4) the state-law negligence claim against Mesa; and (5) the loss of consortium claim.  (Doc. 71 at 2–3.) Each argument is considered in turn.

### A.    Consideration of Body Worn Camera Footage and Recorded Calls

Before addressing the merits of the motion, the first question is whether the body

camera footage and other recorded communications referenced by Defendants in and submitted with the motion may be considered.  (*See* Doc. 71 at 8 n.6.)  Defendants argue this evidence may be considered because it is "central to" the complaint and therefore incorporated by reference.  (*Id.* at 7–8.)

Plaintiffs dispute that this footage was incorporated by reference in the FAC because the FAC "makes no mention of [this] footage except to detail Defendants' delay tactics in providing it." (Doc. 76 at 5.)  Plaintiffs argue that the referenced footage and calls are "all described in the police reports which Plaintiffs used as a basis for [the FAC]."  (*Id.* at 6.)  Accordingly, Plaintiffs argue, if the footage and recorded communications are considered, Defendants' motion to dismiss must be converted into a motion for summary judgment.  (*Id.*)

"When matters outside the pleading are presented to and not excluded by the court, the 12(b)(6) motion converts into a motion for summary judgment under Rule 56," at which point "both parties must have the opportunity to present all the material that is pertinent to the motion." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (citation modified).  One exception to this rule is the doctrine of "incorporation by reference," which "treats certain documents as though they are part of the complaint itself." *Id.* at 1002.  "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.*  However, "the mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Id.* (citation modified).  Further, "if the [proffered] document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint," and therefore is not subject to incorporation by reference. *Id.*  "Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims." *Id.*  Even if extrinsic evidence is incorporated by reference, though, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* at 1003.

The footage and recorded communications may not be considered because they are not extensively referenced in the FAC, nor do they form the basis of Plaintiffs' claims. The FAC does not reference the contents of the body camera footage or the recordings at all, and it only minimally mentions the communications that were recorded. (Doc. 60 ¶¶ 28, (911 call), 30, 32 (announcements while Shawn was sleeping), 33–35 (Wirtjes' communications with police), 42 (Wirtjes' call to Shawn), 43, 45 (call between Defendant Officer Adair and Shawn), 48, 50 (post-shooting call between Defendant Officer Adair and Shawn).) The FAC does not refer to the communications "extensively" enough to be incorporated by reference. *See Khoja*, 899 F.3d at 1003 (holding document was not incorporated by reference in a complaint because "the quotation [from the document] comprise[d] only a few lines in a footnote of a 67-page complaint" and gave "only basic historic facts" and was therefore "not sufficiently extensive"); *Wexler v. City of San Diego*, 2024 WL 4668152, at *4 (S.D. Cal. 2024) (declining to consider body camera footage because it was only referenced twice "briefly," and therefore was not referred to extensively, in the complaint); *Baeza v. Grundowicz*, 2024 WL 4611446, at *2 (S.D. Cal. 2024) (declining to incorporate body camera footage and written transcript of the footage by reference "because Plaintiff's single reference to the body camera footage was brief," so "the Court did not find that Plaintiff referred extensively" to this evidence (citation modified)).

Nor do the footage and recordings form the basis of Plaintiff's claims. As in *Khoja*, Defendants attempt to introduce this footage to "insert their own version of events into the complaint" and to "create[] a defense." *Khoja*, 899 F.3d at 1002. This is not an appropriate use of the incorporation-by-reference doctrine. *Baier v. City of San Diego*, 2025 WL 674575, at *3 (S.D. Cal. 2025) (declining to consider videos and transcripts of events alleged in the complaint because "[t]hey are merely evidence of the incident alleged in the Complaint," and "Plaintiff would have cause to bring this action regardless of their existence"); *R.P. v. City & County of San Francisco*, 2025 WL 416363, at *3 (N.D. Cal. 2025) ("[A]lthough the video footage might provide *evidence* to support or undermine

R.P.'s excessive force claim, it is not integral to that claim in the same sense as the materials courts have found to be incorporated by reference. R.P.'s claim rests on the conduct that actually occurred, not the video that captured it."); *Greenstone v. L.V. Metro. Police Dep't*, 2024 WL 385213, at \*4 (D. Nev. 2024) ("Plaintiffs' claims are based on the events surrounding his incapacitation. The FAC does not refer to [the officer's] body camera footage, and while this footage—like witness statements and other evidence—are important in helping the trier of fact understand the circumstances, Plaintiffs' claims are not based on the body camera footage." (citation modified)); *Keith v. City of San Diego*, 2023 WL 5618941, at \*2 (S.D. Cal. 2023) (declining to consider body camera footage under the incorporation by reference doctrine, noting "the majority of courts . . . have declined to either accept or consider such evidence in resolving motion[s] to dismiss" and collecting cases); *Est. of Smith by Smith v. City of San Diego*, 2018 WL 3706842, at \*3 (S.D. Cal. 2018) (declining to consider body camera footage because "[a] complaint does not necessarily rely on every piece of evidence that depicts the events forming the basis of the claims in the complaint" and "neither the Videos nor the Transcripts [were] an indispensable part of Plaintiffs' claims" but were instead "evidence of the events underlying Plaintiffs claims"). Accordingly, the body camera footage and recorded communications will not be considered in resolving Defendants' motion to dismiss.[5]

### B.    Claims Against Defendant Officers Adair and Orr

Defendants argue Plaintiffs "do not name Defendants Adair and Orr specifically in any claims" but instead "lump all Defendants together in claiming that excessive force was used against the decedent," and there are no allegations Officers Adair and Orr used any force against Shawn, so the claims against them should be dismissed. (Doc. 71 at 8–9.) Plaintiffs agree the FAC does not include allegations of excessive force by Defendant

---

[5]    In their reply, Defendants appear to request consideration of "all of" the interior surveillance camera footage captured in Shawn's apartment which Defendants argue is necessary to counter the "false narrative" in the FAC. (Doc. 79 at 3–5.) To the extent Defendants argue that the interior surveillance camera footage may be considered through the incorporation-by-reference doctrine, Defendants are correct because the FAC relies on this footage, as Plaintiffs acknowledge. (Doc. 76 at 5 (admitting the FAC "relies on . . . the Cox internal surveillance footage").)

Officers Adair and Orr, but argue that the FAC alleges these defendants violated Shawn's civil rights by, "despite being aware that Shawn was surrendering and was already wounded," failing "to communicate these facts to SWAT officers so as to prevent firing upon Shawn unnecessarily." (Doc. 76 at 6.)

Plaintiffs' Section 1983 claim is framed as an excessive force claim. (Doc. 60 ¶¶ 67–70.) Indeed, Plaintiffs allege Mesa police's "use of force against Shawn directly and proximately caused his death," and the Estate's "damages stem[] from [the] use of force against Shawn." (*Id.* ¶¶ 69–71.)Thus, the remaining issue is whether the Section 1983 claim can proceed against Defendant Officers Adair and Orr, notwithstanding the lack of allegations against them specifically.

In asserting a claim under Section 1983, "the plaintiff must assert the violation of a federal right." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989). To that end, "a plaintiff cannot sue under just § 1983; a plaintiff must also allege a statutory or constitutional right that has been violated." *Ellar v. City of Mesa*, 2023 WL 6539874, at *3 (D. Ariz. 2023). And a Section 1983 claim cannot use state law as its anchor. *Mitchel v. City of Santa Rosa*, 695 F. Supp. 2d 1001, 1007 (N.D. Cal. 2010). That said, a plaintiff need not even "invoke § 1983 expressly in order to state a claim," so long as the plaintiff alleges sufficient facts under Rule 8. *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam). Accordingly, the FAC's lack of allegations of excessive force by Officers Adair and Orr is not necessarily fatal to Plaintiffs' claim against them.

On balance, Plaintiffs fail to sufficiently allege their Section 1983 claim against Defendant Officers Adair and Orr. Because this claim is framed as an excessive force claim, it is unclear what specific constitutional right Plaintiffs claim Defendant Officers Adair and Orr violated. Although Plaintiffs argue in their response that the FAC "outlines how, despite being aware that Shawn was surrendering and was already wounded, Defendants Adair and Orr failed to communicate these facts to SWAT officers," (Doc. 76 at 6), these allegations are not in the FAC. Accordingly, the lack of specific allegations against Defendants Adair and Orr require dismissal of the claim against them. *See Molina*

*v. Allison*, 2022 WL 3013179, at *4 (C.D. Cal. 2022) (dismissing complaint where "none of the individual 'claims' specified the Defendants or legal grounds at issue – *i.e.*, *which* specific constitutional right is *each* Defendant alleged to have violated, and what did each Defendant do to violate such rights," because it did "not provide Defendants with fair notice of the particular claims being asserted *and* the grounds upon which each claim rest[ed], as required by Rule 8" (citation modified)).

In addition to asserting that the FAC does not contain sufficient allegations to state a claim against Defendant Officers Adair and Orr, those defendants assert qualified immunity as a basis for dismissal, which the parties fully briefed.  (Doc. 71 at 9–13; Doc. 76 at 6–10; Doc. 79 at 6–8.)  Because of the lack of clarity in the FAC concerning Plaintiffs' claims against Defendant Officers Adair and Orr, however, it would be inappropriate at this time to assess qualified immunity.  Put another way, because it is unclear what specific conduct by Defendant Officers Adair and Orr is at issue, it is not possible to analyze whether a reasonable person would have known the conduct violated clearly established law.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (stating that government officials are immune from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (citation omitted)).   Defendants may reassert qualified immunity in response to any Second Amended Complaint filed by Plaintiffs.  *See, e.g.*, *Taylor v. Wash. State Dep't of Corrs.*, 2024 WL 2209684, at *7 (W.D. Wash. 2024) ("The Court declines to reach the issue of qualified immunity at this time because Plaintiffs' claims are insufficiently defined.  It is difficult to discern whether Defendants' conduct violated clearly established law when it is unclear what conduct Plaintiffs allege Defendants engaged in."); *Cornfield v. Pickens*, 2016 WL 6584928, at *6 n.9 (D. Ariz. 2016) ("Because the complaint does not contain enough factual information to identify the precise basis for each theory, the Court cannot conduct a meaningful qualified immunity analysis.  Should Plaintiffs amend their complaint . . . Defendants may renew their request for qualified immunity.").

Accordingly, Plaintiffs' Section 1983 claim against Defendant Officers Adair and

1    Orr is dismissed with leave to amend.  *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection*

2    *Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) ("[A] district court should grant leave to

3    amend even if no request to amend the pleading was made, unless it determines that the

4    pleading could not possibly be cured by the allegation of other facts.").

## C.    *Monell* Claim Against Mesa

6    Defendants argue Plaintiffs' claim for municipal liability under *Monell* should be

7    dismissed because Plaintiffs have only made boilerplate allegations about what training,

8    policies, or customs were engaged in by Mesa, despite the availability of the policies on

9    Mesa's website.  (Doc. 71 at 15–18.)  Defendants also argue that the FAC, at most, alleges

10   an isolated incident that cannot form the basis of a claim for municipality liability.  (*Id.* at

11   15, 18; Doc. 79 at 9–10.)

12   A "municipality may not be held liable pursuant to 42 U.S.C. § 1983 for the actions

13   of its subordinates."  *United States v. Town of Colorado City*, 935 F.3d 804, 808 (9th Cir.

14   2019).  "Instead, to establish municipal liability, a plaintiff must show that a local

15   government's 'policy or custom' led to the plaintiff's injury."  *Id.* (citation omitted).  In

16   other words, Section 1983 only holds municipalities responsible "for their *own* illegal

17   acts."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quotation marks omitted).

18   "Establishing municipal liability based on a *Monell* theory of liability is difficult."  *Bell v.

19   Williams*, 108 F.4th 809, 824 (9th Cir. 2024).  The Ninth Circuit has "identified three ways

20   in which a plaintiff can satisfy *Monell*'s policy requirement":

21   (1)    when the municipality "acts pursuant to an expressly adopted official
22          policy";

23   (2)    when the municipality has a "longstanding practice or custom"; or

24   (3)    when "the individual who committed the constitutional tort was an
25          official with final policy-making authority or such an official ratified
26          a subordinate's unconstitutional decision or action and the basis for
             it."

27   *Hartzell v. Marana Unified Sch. Dist.*, 130 F.4th 722, 734 (9th Cir. 2025) (citation

28   modified).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983," but this "failure to train" "must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Connick*, 563 U.S. at 61 (citation modified).  In the Ninth Circuit, to sufficiently plead a failure-to-train theory of *Monell* liability, "a plaintiff must include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153–54 (9th Cir. 2021).  "A showing of simple or even heightened negligence will not suffice." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997); *see also Perez v. City of Fresno*, 98 F.4th 919, 931 (9th Cir. 2024) ("Merely negligent training is insufficient to support a *Monell* claim.").

If a municipality is "on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61.  To that end, a "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (quotation marks omitted); *see also Bd. of Cnty. Comm'rs*, 520 U.S. at 407–08 ("[T]he existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training . . . is the moving force behind the plaintiff's injury." (quotation marks omitted)).  But ultimately, a plaintiff must "show the need for more or different action is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 829 (9th Cir. 2023) (quotation marks omitted).  This theory is considered the "most tenuous theory of *Monell*

liability." *Bell*, 108 F.4th at 826 (quotation marks omitted).

Plaintiffs have failed to state a claim under *Monell*. As for Plaintiffs' allegations regarding Mesa's policies, Plaintiffs merely allege that Mesa "promulgated or adopted" vaguely described policies. (S*ee* Doc. 60 ¶¶ 81–82, 86.) There are no details offered about these supposed policies nor how they caused the alleged constitutional violations. Thus, Plaintiffs do not plausibly plead a *Monell* claim. *See Warren v. Penzone*, 2023 WL 7686666, at *6 (D. Ariz. 2023) ("[I]t is now well established in the Ninth Circuit that a plaintiff seeking to assert [a *Monell* claim] must allege *facts* that would support the existence of the alleged policy, practice, or custom.").

As for Plaintiffs' allegations of a Mesa custom or practice, (*see* Doc. 60 ¶¶ 83–84), Plaintiffs have not "provided any allegations of similar incidents . . . to allow the conclusion that the conduct has become a traditional method of carrying out policy." *Drew v. County of Yavapai*, 2025 WL 1576709, at *7 (D. Ariz. 2025) (quotation marks omitted). Tragic though it may be, Plaintiffs have only offered Shawn's shooting by Mesa police as an instance of constitutional violations stemming from Mesa's alleged custom. This is not enough to attach liability to Mesa. *See, e.g.*, *Jackson v. FBI*, — F. Supp. 3d —, 2025 WL 1466242, at *5–6 (D. Ariz. 2025) (dismissing *Monell* claim because the "Ninth Circuit and district courts within this Circuit have repeatedly declined to infer a custom of constitutional violations based on two unconstitutional incidents alone").

Further, although Plaintiffs allege a list of supposed "policies, customs, or practices" that create a "culture of impunity," (Doc. 60 ¶ 84), these allegations suffer from the same deficiency as the allegations regarding Mesa's policies—the allegations are "just the sort of fact-free conclusions that the Ninth Circuit has deemed insufficient to support a *Monell* claim." *Warren*, 2023 WL 7686666, at *8.

The same is true for Plaintiffs' allegations that Mesa failed to properly train or supervise its officers. (Doc. 60 ¶¶ 73–75, 78–80.) *See Connick*, 563 U.S. at 62; *Bd. of Cnty. Comm'rs*, 520 U.S. at 407–08; *see also Drew*, 2025 WL 1576709, at *8 (dismissing *Monell* claim where the plaintiff's "only specific allegations [we]re those involving his

own treatment," which "fail[ed] to meet the stringent standard of fault necessary to put the County on notice that it had deliberately chosen a training program that would cause violations of constitutional rights").  Put another way, Plaintiffs have not alleged anything from which it could be reasonably inferred that the lack of training or supervision created a need for more or different training that was "so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights," that Mesa could "reasonably be said to have been deliberately indifferent to [such] need."  *See Sabbe*, 84 F.4th at 829 (quotation marks omitted); *see also Benally v. Coconino County*, 2025 WL 842719, at *11 (D. Ariz. 2025) (dismissing *Monell* claim where the plaintiff "fail[ed] to allege facts to support the existence of a pattern of similar incidents that would make the need for more or different training obvious").  "Simply alleging facts showing [Mesa] was aware of the need to provide proper training to [police] . . . and then alleging in conclusory terms that [Mesa] failed to provide such training, is too conclusory to make the required showing."  *See Warren v. Penzone*, 2024 WL 2246257, at *4 (D. Ariz. 2024); *see also Benavidez*, 993 F.3d at 1154 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." (citation modified)).

Plaintiffs argue they need not show such a pattern where the "unconstitutional consequences of failing to train are 'patently obvious.'"  (Doc. 76 at 12 (citation omitted).)  "Single acts may trigger municipal liability where fault and causation were clearly traceable to a municipality's legislative body or some other authorized decisionmaker," for example, where a "city has armed its officers with firearms, the need to train officers in the constitutional limitations on the use of deadly force can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights."  *Benavidez*, 993 F.3d at 1154 (citation modified).  But the FAC does not compel the conclusion—and Plaintiffs have failed to persuasively argue otherwise—that the alleged lack of training in this case is one of those "rare case[s] where the unconstitutional consequences of failing to train are patently obvious," as opposed to being, at most,

"[m]erely negligent training."  *Perez*, 98 F.4th at 931 (quotation marks omitted); *see also Hein v. City of Chandler*, 2016 WL 11530432, at *7 (D. Ariz. 2016) (finding allegations of a failure to "provide adequate and reasonable training and supervision to . . . officers about proper methodologies in using force, conducting arrests and detentions, and asserting criminal charges against citizens" "woefully lacking").

Thus, Plaintiffs have not sufficiently pled their *Monell* claim and it will be dismissed.  Because Plaintiffs could theoretically allege additional facts to cure these deficiencies, and because it is not clear that leave to amend would be futile, Plaintiffs are granted leave to amend this claim.  *Cook, Perkiss & Liehe*, 911 F.2d at 247.[6]

### D.    Claims Against Chief Cost

Defendants next argue the claims against Chief Cost are redundant because claims brought against a defendant in his official capacity are a suit "against the governmental entity [he] purport[s] to represent."  (Doc. 71 at 13.)  Defendants also argue Plaintiffs' "assumption that Chief Cost is a policy maker . . . is not entitled to any deference."  (*Id.*)

Plaintiffs argue the claims against Chief Cost are not redundant because they "rely on alternate avenues of liability," and the avenue against Chief Cost is through his "past decision-making" to retain Defendant Officer Freeman, despite his alleged awareness of "inappropriate behavior both before and after Shawn's killing."  (Doc. 76 at 10–11.) Plaintiffs also argue "Chief Cost is a policymaker whose actions are attributable to the City of Mesa," citing several decisions from this court that have so held.  (*Id.* at 11.)  Plaintiffs additionally note Mesa's most recent "Use of Force" policy was approved by Chief Cost. (*Id.* at 11–12.)

In reply, Defendants argue Plaintiffs "identify no personal participation of Chief Cost" in the decision to retain or supervise Defendant Officer Freeman, who was the first

---

[6]    The parties quibble about whether a reasonable basis exists for Plaintiffs' allegedly "defamatory" allegations about Defendant Officer Freeman in the FAC.  (Doc. 71 at 18–19 & nn. 8–9; Doc. 76 at 11 nn. 1–2; Doc. 79 at 8–9.)  There is no Rule 11 or Rule 12(f) motion before the Court, nor have Defendants argued they have met the requirements for such motions, so the parties' arguments on this point will not be addressed.  *Cf. Surgical Instrument Serv. Co. v. Intuitive Surgical, Inc.*, 571 F. Supp. 3d 1133, 1140 (N.D. Cal. 2021) (stating that, in resolving a motion to dismiss, a "court dismisses claims, not allegations").

1    to shoot Shawn.  (Doc. 79 at 8.)  Defendants also dispute whether Plaintiffs' cited cases
2    establish that Chief Cost is a final policymaker.  (*Id.*)

### 1.    Official Capacity Claim

4    Because a *Monell* claim can only be brought against an individual defendant in his
5    official capacity, *Shadd v. County of Sacramento*, 2013 WL 6389132, at *5 (E.D. Cal.
6    2013), Chief Cost's inclusion in the *Monell* claim is in his official capacity only.  "An
7    official-capacity suit is, in all respects other than name, to be treated as a suit against the
8    entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  "When both a municipal officer
9    and a local government entity are named, and the officer is named only in an official
10   capacity, the court may dismiss the officer as a redundant defendant." *Ctr. for Bio-Ethical*
11   *Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008).  Accordingly,
12   the Court dismisses Chief Cost from the *Monell* claim.

### 2.    Final Policymaker Theory

14   The Court construes the parties' other arguments about whether Chief Cost is a final
15   policymaker as concerning whether Mesa is liable for his actions.  Plaintiffs allege Chief
16   Cost has "final policy-making authority" to approve Mesa police policies and trainings and
17   to hire, assign, and retain SWAT officers, including Defendant Officer Freeman.  (Doc. 60
18   ¶¶ 76–77, 90, 96.)  Where an individual policymaker is implicated in a *Monell* claim, a
19   "court's task is to identify those officials or governmental bodies who speak with final
20   policymaking authority for the local governmental actor concerning the action alleged to
21   have caused the particular constitutional or statutory violation at issue." *McMillian v.*
22   *Monroe County*, 520 U.S. 781, 784–85 (1997) (quotation marks omitted).  This theory—
23   the "final policymaker theory"—is a separate legal theory from the *Monell* policy theory.
24   *See Hartzell*, 130 F.4th at 735.

25   "Whether a particular official has final policy-making authority is a question of state
26   law." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992).  The Court must assess
27   "the particular area or issue for which the official is alleged to be the final policymaker"
28   and "to what degree the municipality has control over the official's performance of the

particular function and, thus, whether the municipality can be held liable for the official's actions." *Cortez v. County of Los Angeles*, 294 F.3d 1186, 1189 (9th Cir. 2002). "In doing so, courts look to state laws, county charters and codes, and city charters," but courts "cannot assume that policymaking authority lies somewhere other than where the applicable law purports to put it." *Chung v. County of Santa Clara*, 614 F. Supp. 3d 709, 724–25 (N.D. Cal. 2022) (quotation marks omitted). "The fact that a particular official— even a policy-making official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Gillette*, 979 F.2d at 1349 (citation omitted). Furthermore, "authority to exercise discretion while performing certain functions does not make the official a final policymaker unless the decisions are final, unreviewable, and not constrained by the official policies of superiors." *Chung v. County of Santa Clara*, 2022 WL 6768204, at *5 (N.D. Cal. 2022).

Defendants argue that, based on Mesa's City Charter, policymaking is vested in Mesa's City Council. (Doc. 71 at 13.) Defendants are correct: "Policy making and all other powers of the City shall be vested in the [City] Council, except as otherwise provided by law or in this Charter." Mesa City Charter, art. II, § 204. Moreover, "each department, office, and agency shall be under the direction and supervision of the [City] Manager." *Id.* art. IV, § 402(B). As for personnel, a "Personnel Director, appointed by the [City] Manager . . . administer[s] the personnel system of the City" and, along with the Merit System Board and the City Manager, proposes personnel rules to the City Council. *Id.* § 403(B), (D).

Accordingly, under Mesa's City Charter, Chief Cost's authority to exercise discretion cannot be said to be "final, unreviewable, and not constrained by the official policies of superiors," *Chung*, 2022 WL 6768204, at *5, because the authority to make policy is vested in the City Council; the Police Department is a department under the supervision of the City Manager; and personnel rules are proposed by the Personnel Director, Merit System Board, and the City Manager and set by the City Council. *See* Mesa Code of Ordinances, tit. III, ch. 1, § 3-1-3 ("The Chief of Police shall be the head of

the Police Department *under the direction of the City Manager and Council*." (emphasis added)); *id.* § 3-1-2 ("The City Manager shall . . . when necessary remove[] all other officers and members of the Police Department, except as the City Manager may authorize the Chief of Police to appoint and remove officers and employees in the Department.").

Plaintiffs do not dispute this but instead argue that other courts in this District have held that the Mesa Chief of Police is a final policymaker, so the same is true here. (Doc. 76 at 11.)  As Defendants note, (Doc. 79 at 8), those courts did not analyze whether the Mesa Chief of Police was the final policymaker, particularly in light of the Mesa City Charter and Ordinances, nor is it clear whether the defendants even made arguments based on the Mesa City Charter and Ordinances to those courts.  *Topete v. Mesa Police Dep't*, 2019 WL 11851136, at *2–3 (D. Ariz. 2019); *Nunes v. Driver*, 2006 WL 3390318, at *3 (D. Ariz. 2006).  Accordingly, Plaintiffs cannot rely on these decisions as establishing as a matter of law that Chief Cost is a final policymaker.  *See, e.g.*, *Sorosky v. Burroughs Corp.*, 826 F.2d 794, 799 (9th Cir. 1987) ("When . . . the Court fails explicitly to address an issue, we cannot assume that the Court implicitly addressed the issue and made a determination on the merits.").

At bottom, Plaintiffs do not identify any law or provision of the Mesa City Charter that vests *policymaking* authority in Chief Cost.  And although Plaintiffs point to Chief Cost's responsibility for "formulating policies and regulations governing activities" of the Mesa police and his approval of the "Use of Force" policy, (Doc. 76 at 11–12), this does nothing to show that Chief Cost was the *final* policymaker for those items—as opposed to merely a delegated policymaker—which is necessary to attach municipal liability to Mesa for his actions.  *See Weiner v. San Diego County*, 210 F.3d 1025, 1028 (9th Cir. 2000) ("To hold a local government liable for an official's conduct, a plaintiff must first establish that the official (1) had *final* policymaking authority . . . and (2) was the policymaker for the local governing body for the purposes of the particular act." (emphasis added)); *Gillette*, 979 F.2d at 1349.  Plaintiffs do not allege that the City Council, City Manager, or other officials with authority delegated final policymaking authority to Chief Cost, *see Nguyen*

*v. City of San Jose*, 2022 WL 912891, at *11 (N.D. Cal. 2022) ("To state a *Monell* claim through delegation, a plaintiff must plead that an official with policymaking authority delegated final policymaking authority over the decisions at issue as opposed to merely delegating discretion to act." (quotation marks omitted)), or that Chief Cost's decisions are not "constrained by policies not of that official's making and not subject to review by the municipality's authorized policymakers," *see id.* (citation modified).

Defendants are therefore correct that Plaintiffs have not sufficiently pled that Chief Cost was a final policymaker such that his actions can implicate Mesa's liability. Therefore, any *Monell* claim is dismissed to the extent it is based on a final policymaker theory involving Chief Cost. Given the language of the Mesa City Charter and Ordinances, it is unclear whether Plaintiffs can allege any facts from which it could be inferred that Chief Cost was given final policymaking authority sufficient to make Mesa liable. Plaintiffs might be able to allege other facts to establish policymaking authority by Chief Cost, however, so Plaintiffs are given leave to amend this theory. *Cook, Perkiss & Liehe*, 911 F.2d at 247.[7]

Defendants do not expressly address Plaintiffs' Section 1983 claim as it pertains to Chief Cost, however, and their arguments concerning his status as a "policy maker" able to implicate Mesa's liability do not necessarily apply to whether Chief Cost violated Shawn's constitutional rights in his individual capacity. *Hafer v. Melo*, 502 U.S. 21, 23, 26–27 (1991) (explaining differences between official-capacity suits and personal-capacity suits under § 1983). Accordingly, the Court does not dismiss the Section 1983 claim against Chief Cost in his personal capacity. *Kuhl v. McDonough*, 2024 WL 3463350, at *10 (N.D. Cal. 2024) ("Rule 12(b)(6) places the burden of persuasion on the moving party, meaning that the party who files a motion to dismiss must explain why dismissal is warranted.").

---

[7] Because a *Monell* claim based on a final policymaker theory will proceed against Mesa, if at all—not against Chief Cost—Chief Cost remains dismissed from the *Monell* claim.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### E.   Negligence Claim Against Mesa

Defendants argue the negligent hiring, training, and supervision claim against Mesa should be dismissed because, under Arizona statute and interpreting case law, a claim against a municipal employer is barred if based on intentional use of force by an employee. (Doc. 71 at 19.)  They argue none of the defendants "had a propensity to 'wrongfully shoot' barricaded, heavily armed, aggravated assault suspects who verbally threaten to kill officers," so a claim against Mesa cannot proceed.  (*Id.* at 19–20.)  Plaintiffs respond that their claim for negligent hiring, training, and supervision is not "based *solely* on intentional misconduct by SWAT officers," but instead concerns "the lack of adequate policies and training around communication between negotiators and SWAT officers."  (Doc. 76 at 15.)

Arizona law provides that a "public entity is not liable for losses that arise out of and are directly attributable to an act or omission determined by a court to be a criminal felony by a public employee unless the public entity knew of the public employee's propensity for that action."  Ariz. Rev. Stat. § 12-820.05(B).  "The conduct need not result in a felony conviction"; rather, "[a]ll that matters is that a court determined that the act constituted a criminal felony."  *Garcia v. Garibay*, 2013 WL 1442505, at *3 (D. Ariz. 2013).  "According to the statute itself, any court may make the requisite determination."  *Al-Asadi v. City of Phoenix*, 2010 WL 3419728, at *5 (D. Ariz. 2010).  The Arizona Supreme Court has held that this "legislatively mandated immunity . . . provision[] should not depend on clever pleading."  *Ryan v. Napier*, 425 P.3d 230, 237 (Ariz. 2018).  However, "plaintiffs may plead a negligence claim for conduct that is independent of the intentional use of force or plead negligence and battery as alternate theories if the evidence supports each theory."  *Id.* at 238.

Courts have found *Ryan* inapplicable to cases in which the plaintiff has asserted separate claims for battery and for negligent hiring/training/supervision against a municipality, as is the case here.  *See, e.g.*, *Mosher v. City of Mesa*, 2024 WL 5046436, at *6 (D. Ariz. 2024).  Accordingly, *Ryan* does not require dismissal of Plaintiffs' negligent hiring, training, and supervision claim against Mesa.

1    The immunity provision in Section 12-820.05 might still bar the negligent

2  hiring/training/supervision claim against Mesa, however. *See Mosher*, 2024 WL 5046436,

3  at *7; *see also Fernandez v. City of Phoenix*, 2012 WL 2343621, at *4 (D. Ariz. 2012)

4  (noting that the statute "immunizes an entity from liability, not just indemnification"

5  regardless of whether the entity "is directly or merely vicariously liable"). The analysis in

6  *Harris v. City of Phoenix*, 2021 WL 4942662 (D. Ariz. 2021) is instructive. There, the

7  claim against the municipality hinged "on allegations that [an officer] unjustifiably shot

8  Decedent as he fled, which is a theory of intentional use of force akin to aggravated

9  assault." *Id.* at *2 (citation omitted). The municipality was "therefore . . . immune from

10  vicarious liability for those actions unless [the municipality] actually knew that [the officer]

11  had a propensity to wrongfully shoot fleeing suspects." *Id.* Because the plaintiffs did not

12  allege facts—as opposed to conclusory assertions of unconstitutional shootings in the

13  past—that "would plausibly show that the [municipality] was on notice that the [officer]

14  specifically had a propensity to wrongfully shoot fleeing suspects," the defendants were

15  entitled to judgment on the pleadings. *Id.*

16    Here, although Plaintiffs allude to Defendant Officer Freeman's "prior violence and

17  inappropriate behavior [which] was or should have been known to [Mesa police] officers,

18  including Defendant Cost," and allege that this "criminal activity has direct relation to his

19  decision to use unnecessary force against Shawn, without justification," (Doc. 60 ¶¶ 117,

20  120), Plaintiffs do not allege any facts to support this conclusory allegation. This is not

21  enough to survive a motion to dismiss. *Harris*, 2021 WL 4942662, at *2. Furthermore,

22  Plaintiffs' claim rests in part on the allegation that Mesa "knew *or should have known of*"

23  Defendant Officer Freeman's alleged history, (Doc. 60 ¶ 118 (emphasis added)), but

24  constructive knowledge is not enough to overcome immunity under Section 12-820.05.

25  *Tucson Unified Sch. Dist. v. Borek ex rel. Cnty. of Pima*, 322 P.3d 181, 185 (Ariz. Ct. App.

26  2014) (rejecting argument that constructive knowledge was sufficient in "light of the

27  unambiguous meaning of the term 'knew,'" which "means exactly what it says—that

28  immunity applies unless the public entity actually knew of the employee's propensity for

that action" (quotation marks omitted)).

Plaintiffs' negligence claim against Mesa is thus dismissed, but Plaintiffs are granted leave to amend because it is not clear that amendment would be futile. *Cook, Perkiss & Liehe*, 911 F.2d at 247. This is because Plaintiffs could possibly allege additional facts relating to Defendant Officer Freeman's history and Mesa's knowledge of it. Additionally, to the extent Defendants argue Plaintiffs could not bring their negligence claim against Mesa even if Plaintiffs sufficiently pled propensity, (Doc. 71 at 20), the Court "declines [at this time] to decide whether [the relevant] conduct was a 'felony' based solely on [Plaintiffs'] allegations" because "[w]hether the shooting was justified, especially in light of the fact that [Shawn] possessed a firearm, is more properly considered upon a complete evidentiary record." *See Nees v. City of Phoenix*, 2022 WL 17976322, at *6 (D. Ariz. 2022); *see also Dominguez v. Denny*, 2011 WL 905812, at *5 (D. Ariz. 2011) ("Whether the alleged acts or omissions committed . . . constitute a felony such that the City would be immune under the statute cannot be determined at [the motion to dismiss] stage in the litigation so Defendants' request that the City be immunized from these claims is premature . . . .").[8]

### F.    Loss of Consortium Claim

Finally, Defendants argue the loss of consortium claim should be dismissed because a "stand-alone loss of consortium [claim] is a derivative claim that is dependent on the success of another claim" and Arizona's wrongful death statute "provides the exclusive remedy." (Doc. 71 at 20–21.) In other words, they argue "Plaintiffs cannot assert a derivative loss of consortium claim based upon a theory of wrongful death" because "it is duplicative." (*Id.* at 22.) Plaintiffs argue in response that their negligence claim against Mesa is not a wrongful death claim, so the loss of consortium claim is not improperly derivative or duplicative. (Doc. 76 at 16–17.)

---

[8]    Although Plaintiffs argue in their response that their negligence claim is based "(in part) [on] the lack of adequate policies and training around communication between negotiators and SWAT officers," (Doc. 76 at 15), this is not sufficiently pled in the FAC, which instead focuses the negligence claim against Mesa on the retention of Defendant Officer Freeman, (*see* Doc. 60 ¶¶ 114–22).

"Loss of filial consortium is a recognized cause of action in Arizona" if a "severe and permanent injury reduced the individual's ability to exchange love, affection, companionship, comfort, care, and society." *Pierce v. Casas Adobes Baptist Church*, 782 P.2d 1162, 1164 (Ariz. 1989). But a loss of consortium claim "is a derivative claim," so "all elements of the underlying cause must be proven before the claim can exist." *Barnes v. Outlaw*, 964 P.2d 484, 487 (Ariz. 1998); *see also Martin v. Staheli*, 457 P.3d 53, 58 (Ariz. Ct. App. 2019) ("[T]he success of a loss-of-consortium claim is dependent on the success of another claim.").

Defendants do not cite any authority providing that Arizona does not permit the surviving parents of a slain child to bring a separate claim for loss of consortium if they have also brought a statutory wrongful death claim, (Doc. 71 at 22), and the Court has not identified any such authority in its independent research. Moreover, to the extent Plaintiffs seek pre-mortem consortium loss, (*see* Doc. 60 ¶ 128), Defendants have not persuasively argued that Arizona law forecloses this remedy. *See Martin*, 457 P.3d at 60 ("[T]hat recovery for post-mortem consortium loss is available within a wrongful-death action does not mean that a claim for premortem consortium loss by a family member is barred in another action.") It may be that Plaintiffs will be unable to prove that they suffered any harm in the time between when Shawn was severely injured and when he succumbed to his injuries, but this is not the stage of litigation to make such determinations. *Twombly*, 550 U.S. at 556 (stating that a "well-pleaded complaint may proceed even if" actual proof of those facts "is improbable[] and . . . a recovery is very remote and unlikely" (quotation marks omitted)); *Rat Pack Filmproduktion GMBH v. RatPac Ent., LLC*, 2024 WL 4452483, at 5 (C.D. Cal. 2024) ("The motion to dismiss stage . . . is not the time to dive into the merits of a claim or make other fact-intensive inquiries."). Plaintiffs' loss of consortium claim is thus not dismissed in its entirety on this ground. *Kuhl*, 2024 WL 3463350, at *10; *In re Feature Realty Litig.*, 2006 WL 2350178, at *4 (E.D. Wash. 2006) ("It is not this Court's obligation to research and construct legal arguments for the parties.").

That said, Defendants are correct that the loss of consortium claim should be dismissed as against Defendant Officers Adair and Orr because the underlying claim against them was dismissed. *Martin*, 457 P.3d at 58 ("[T]he success of a loss-of-consortium claim is dependent on the success of another claim."). Because Plaintiffs were given leave to amend their claims against Defendant Officers Adair and Orr, however, Plaintiffs are granted leave to amend their loss of consortium claim as to Defendant Officers Adair and Orr. *Cook, Perkiss & Liehe*, 911 F.2d at 247.

Accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss (Doc. 71) is **granted in part and denied in part**:

    (1)    Counts One and Five against Defendant Officers Adair and Orr are dismissed with leave to amend;

    (2)    Count Two against Mesa is dismissed with leave to amend;

    (3)    Count Two against Chief Cost is dismissed without leave to amend;

    (4)    Count Four is dismissed with leave to amend; and

    (5)    Count Five may proceed against the remaining defendants besides Defendant Officers Adair and Orr.

**IT IS FURTHER ORDERED** that Plaintiffs may have **14 days** to file a Second Amended Complaint. Consistent with LRCiv 15.1, Plaintiffs shall file, concurrently with any Second Amended Complaint, a notice of filing the amended pleading that attaches a copy of the amended pleading indicating in what respect it differs from the FAC.

Dated this 6th day of August, 2025.

Honorable Sharad H. Desai
United States District Judge