Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
MILLS AND WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
rmills@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Christopher Gagne, in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne, | No. CV-24-01337-PHX-DJH |
| Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| v. | |
| City of Mesa, a political subdivision of the State of Arizona; Kevin Cost, Chief of Mesa Police Department, individually and in his official capacity; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and | |

MILLS AND WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone 480.999.4556

1
2
3
4
5
6
7
8
9

in his capacity as a police officer; Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his individual capacity and in his capacity as a police officer; Treve Widmer, in their individual capacity and in their capacity as a police officer; ABC Partnerships I-X; XYZ Corporations I-X; John Does I-X and Jane Does I-X,

Defendants.

10

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

11    Plaintiffs, by and through undersigned counsel, bring suit against Defendants and

12    allege as follows:

### JURISDICTION & VENUE

13

14    1.    This Court has subject matter jurisdiction under 42 U.S.C. § 1331 because

15    this action arises under 28 U.S.C. § 1983.

16    2.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the

17    events or omissions giving rise to this action occurred in this district.

18

19    ### PARTIES

20    3.    Plaintiff Christopher Gagne is a resident of Los Angeles County, California.

21    He is the father of the decedent, Shawn Gagne. Mr. Gagne is also the Personal

22    Representative of the Estate of Shawn Taylor Gagne (the "Estate") and brings this action

23    in that capacity under A.R.S. § 14-3110, 42 U.S.C. § 1983, and *Monell v. New York City*

24    *Department of Social Services*, 436 U.S. 658 (1978).

25

26    4.    Plaintiff Suzette Gagne is a resident of Los Angeles, California. She is the

27    mother of the decedent, Shawn Gagne.

28

5.     Defendant City of Mesa is a political subdivision of the State of Arizona.

6.     Defendant Kevin Cost is the current chief of the City of Mesa Police Department ("MPD") and was the chief of the MPD at all relevant times.

7.     Upon information and belief, Defendant Lieutenant Matthew Harris is a Special Weapons and Tactics **("SWAT")** officer with MPD. His badge number is 16816. Defendant Harris oversaw the MPD SWAT officers who responded July 6, 2023 incident which gives rise to this Complaint (the "July 6th Incident"). Upon information and belief, he also fired one of the fatal shots which killed Shawn.

8.     Upon information and belief, Defendant Sergeant Kyle Thomas is a SWAT officer with MPD. His badge number is P17067.

9.     Upon information and belief, Defendant Shawn Freeman is a SWAT officer with MPD. His badge number is 20207. Defendant Freeman fired lethal munitions at Shawn twice during the July 6th Incident, hitting Shawn with at least one of his shots. Upon information and belief, Defendant Freeman had and continues to have a demonstrated history of engaging in alleged domestic violence and other alleged criminal activity which was known to the MPD at the time of the July 6th Incident through official complaints filed by accusers. Furthermore, video and pictorial evidence exists depicting some of the alleged domestic violence injuries caused by Freeman.

10.    Upon information and belief, Defendant Matt Brown is a SWAT officer with MPD. His badge number is P21421. Defendant Brown fired lethal munitions at Shawn.

11.    Upon information and belief, Defendant Kyle Cameron is a SWAT officer with MPD. His badge number is P20495. Defendant Cameron fired lethal munitions at

MILLS AND WOODS LAW,, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

Shawn.

12. Upon information and belief, Defendant Matthew Chuey is a SWAT officer with MPD. His badge number is 21315. Defendant Chuey fired lethal munitions at Shawn.

13. Upon information and belief, Defendant Robert Goodrich is a SWAT officer with MPD. His badge number is P20130. Defendant Goodrich fired lethal munitions at Shawn.

14. Upon information and belief, Defendant Alejandro Navarro is a SWAT officer with MPD. His badge number is P19827. Defendant Navarro fired lethal munitions at Shawn.

15. Upon information and belief, Defendant Matthew Adair is a patrol officer with MPD. His badge number is 18901. Defendant Adair was the Primary Negotiator on scene during the July 6th Incident. Defendant Adair was an integral participant in the allegations herein and failed to intervene.

16. Upon information and belief, Defendant ~~C.~~ Christopher Orr is a patrol officer with MPD. His badge number is 19441. Defendant Orr was a Secondary Negotiator on scene during the July 6th Incident. Upon information and belief, Defendant Orr played an active role in the July 6th Incident, including by assisting Defendant Adair in negotiating with Shawn. Orr was an integral participant in the allegations herein and failed to intervene.

17. Upon information and belief, Defendant Treve Widmer is a SWAT officer with MPD. His badge number is 19506. Widmer was present with Defendant Freeman before Freeman fired a second shot at Shawn, was an integral participant in the allegations herein and failed to intervene.

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS AND WOODS LAW,, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

18.     Defendants Thomas, Freeman, Brown, Cameron, Chuey, Goodrich, Navarro, Adair, Orr, and Widmer are collectively referred to as the "Officer Defendants".

19.     Defendants ABC Partnerships I-X, XYZ Corporations, John Does I-X, and Jane Does I-X (collectively the "Doe Defendants") are public entities, corporations, limited liability companies, limited partnerships, joint ventures, business entities—incorporated or doing business in Arizona—or legal or natural persons with liability for the actions or omissions giving rise to the cause of action described below. The names of these Doe Defendants are presently unknown to Plaintiffs, and they are therefore sued under an alias. The true names of such Doe Defendants will be submitted when they become known. Additionally, any non-party designated by a Defendant is to be deemed as one of these fictitiously named Doe Defendants.

20.     Defendant City of Mesa engaged in what appeared to be delay tactics in this case to deliberately stall the disclosure of information pertinent to the preparation of Plaintiffs' Notice of Claim under A.R.S. § 12-821.01 and this Complaint. Indeed, Plaintiffs were forced to file a Complaint for Special Action with the Maricopa County Superior Court to compel the disclosure of critical body camera footage from the July 6th Incident. Due to Defendant City of Mesa's practice of delaying the release of information in this case, Plaintiffs reserve the right to amend this Complaint to include additional information and identify additional defendants associated with the July 6th Incident as discovered.

///

///

///

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

# FACTUAL ALLEGATIONS

21.    On July 6, 2023, at approximately 10:17 p.m., MPD began blasting messages by loudspeaker from a parking lot to Shawn Gagne, who was then inside his apartment in Mesa.

22.    MPD repeatedly told Shawn that MPD would "guarantee your safety" if Shawn would simply come out of his apartment with "nothing in your hands."

23.    Approximately 24 minutes later, Shawn opened the door to his apartment and presented himself to MPD, unarmed and with nothing in his hands.

24.    MPD immediately responded by slaughtering him in a hail of bullets.

25.    Shawn Gagne died as a result of MPD officers and SWAT using unreasonable and excessive force when they shot the unarmed, wounded, and extremely intoxicated Shawn Gagne in his home as he attempted to surrender to law enforcement.

26.    Shawn was twenty-eight (28) years old when he was killed by MPD officers.

27.    At all relevant times herein, Shawn was living at Glen at Mesa Apartment Complex located at 1233 N. Mesa Dr., Mesa, AZ 85201. Shawn resided in Unit #2164.

## Shawn's Neighbor Calls MPD

28.    On July 6, 2023, at approximately 8:35 p.m., Shawn engaged in a verbal confrontation with a neighbor who had knocked on his door, presumably to visit Shawn's live-in fiancée, Jordan Wirtjes.

29.    Shawn answered the door and refused to allow the neighbor entry to the home.

30.    Jordan stepped outside and informed the neighbor that Shawn was extremely

intoxicated.

31.    Shawn was scheduled to enter an alcohol treatment facility the next day.

32.    While the two (2) women were talking outside the apartment, Shawn overheard their conversation and demanded the women stop talking about him and insisted they leave the area.

33.    The neighbor retreated to her home to call 911 alleging Shawn fired a weapon into the air from his patio while Jordan walked to the grocery store across from the apartment complex.

**MPD Responds**

34.    At approximately 9:33 p.m., MPD surrounded Shawn's apartment unit.

35.    At or around the same time, Marques Maldonado (#21682) attempted to communicate with Shawn via intercom announcements, squad car sirens and lights for fifteen (15) minutes without response.

36.    Shawn Kurian (#21070) then instructed S. Freeman (#23084) to deploy projectile bean bag rounds at the front door to get Shawn's attention. Shawn did not respond after several minutes. Kurian then instructed S. Freeman to deploy bean bag rounds through the westside upper windows of Shawn's unit.

37.    Cox internal surveillance video confirms Shawn was asleep on the sofa during these initial efforts to communicate.

**Shawn's Cognitive Impairment Made Known to MPD**

38.    When Jordan returned from the grocery store, she was met by MPD. She informed J. Gutierrez (#21423), a Secondary Negotiator on scene, that Shawn was alone

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

7

in the unit and was heavily intoxicated after drinking a half gallon of vodka off and on throughout the day.

39.    Jordan also informed J. Gutierrez that Shawn routinely drank and became depressed and assured J. Gutierrez that Shawn would come to his senses once sober. She also encouraged officers to permit Shawn adequate time for the intoxication to subside.

40.    Jordan also conveyed that Shawn made statements during the day about "not wanting to be here anymore" ad that "he could not do it anymore" while heavily intoxicated.

41.    Eventually, Shawn awoke from sleep startled and confused, stepped onto his patio to identify the source of the noise outside his unit, then went down a short flight of stairs to the front door. As he opened the door, Shawn saw officers and shouted "what?!?," "get out!" and shut the door.

42.    Within minutes, Shawn returned to his front door with a rifle pointed down at his side. Shawn did not raise the rifle. No further announcements were made once Shawn was observed at the door.

**MPD Escalates Confrontation**

43.    At around 10:00 p.m., MPD SWAT officers responded to the scene as radio traffic escalated.

44.    Upon arriving at the scene, Sergeant Jess Nicholson (#19465) instructed SWAT officers to replace MPD patrol officers on the southern perimeter of Shawn's apartment.

45.    MPD SWAT assembled sniper perches in other apartment units with direct

MILLS AND WOODS LAW,, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

8

lines of sight to Shawn's unit windows and glass patio doors. Defendant Shawn Freeman (#20207), a SWAT sniper, positioned himself in unit #2165 in a hidden perch. From this position, Defendant Freeman scouted the second story balcony of Shawn's unit.

46.    Freeman had a clear line of sight to Shawn's apartment and could observe Shawn through a sliding glass door window.

47.    At approximately 10:19 p.m., D. Samons (#19185), the Primary Scene Supervisor, instructed Shawn via a vehicle PA system to exit his apartment without anything in his hands. Shawn responded by ranting with irrational statements, some inviting violence and others demonstrative of his altered mental state.

48.    Samons began to repeatedly tell Shawn that MPD would "guarantee your safety" if Shawn would simply come out of his apartment with "nothing in your hands."

49.    At approximately 10:25 p.m., MPD instructed Jordan to call Shawn's cell phone. Upon answering, Shawn asked Jordan why law enforcement was present and demanded that the officers leave him alone. Marques Maldonado (#21682), who had attempted to communicate with Shawn when MPD first arrived, took the phone from Jordan to explain why MPD was present and instructed Shawn to come out. The call was terminated.

50.    At 10:31 p.m., Shawn called Jordan, who handed the phone to Defendant Matthew Adair (#18901), the Primary Negotiator on scene. Defendant Adair, after telling Shawn he would relay his request for the police to relocate to his MPD supervisors, encouraged Shawn to walk out the front door.

51.    The conversation was broadcast over MPD radio while officers monitored

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

Shawn's movements through the windows and glass patio doors on either side of the upstairs room. Shawn could be seen pacing in his apartment as he spoke with Defendant Adair.

52.    At approximately 10:41 p.m., SWAT officers began aiming rifle lasers through the windows into the apartment while Shawn still on the phone with Defendant Adair. Shawn demanded the officers turn off their sirens, put down their lasers, back away from the apartment and leave. Defendant Adair then informed Shawn they were there because of the "incident." Shawn responded, "what incident?"

53.    At approximately 10:42 p.m., Shawn laid his rifle down on his kitchen counter.

### MPD SWAT Opens Fire on Shawn

### *Freeman and Widmer*

54.    After Shawn laid his rifle down, at approximately 10:42 p.m., while Shawn was speaking with Defendant Adair, Defendant Shawn Freeman (#20207) ignored the status of the negotiations and Shawn's mental status by opening fire, hitting Shawn.

55.    Approximately 27 seconds after Freeman fired a round at Shawn, Widmer joined Freeman at Freeman's sniper position.

56.    Defendant Widmer could clearly see Shawn from his vantage point.

57.    At approximately 10:43 p.m., 16 seconds after Widmer joined Freeman, Freeman fired a second round at Shawn.

58.    Defendant Widmer's bodycam footage captured the second shot by Freeman.

59.    After Freeman fired his second round at Shawn there was a lull, with no

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

gunfire.

60.    Freeman and Widmer continued to observe Shawn.

61.    Approximately 28 seconds after Freeman fired his second round at Shawn, Freeman stated that "It looks like that gun is still down right there."

62.    Defendants Freeman and Widmer observed Shawn moving through his apartment in the direction of the stairway leading down to the front door.

63.    Defendant Freeman verbally and audibly stated that Shawn's weapon was "still down", and that Shawn's hands were clear and they were "up".

64.    Defendants Freeman and Widmer clearly observed that Shawn was attempting to surrender as directed by the MPD negotiators.

65.    As demonstrated on the Cox footage, Shawn was in fact walking through his apartment unarmed and with his hands up in order to surrender. He was bleeding profusely.

66.    Freeman made no effort whatsoever to inform other MPD officers to stand down or that Shawn was unarmed with his hands clear and in the air.

67.    Widmer similarly made no effort to tell other MPD officers to stand down or that Shawn was unarmed with his hands in the air.

68.    Defendants Freeman and Widmer would have also seen that Shawn was bleeding profusely from his wound.

69.    Neither Defendant Freeman nor Defendant Widmer did anything to relay these facts to other officers or supervisors.

70.    Instead, they stayed silent on the radio channels and failed to intervene to stop any other officer from firing upon Shawn.

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

11

1    71.    They are complicit with the actions of their fellow officers.

2                                    ***Adair and Orr***

3    72.    After Freeman fired his first shot, Defendant C. Orr (#19441), a Secondary

4  Negotiator, advised Defendant Adair of an officer-involved shooting. Defendant Adair

5  then instructed Shawn to walk out the front door with his hands up.

6    73.    Shawn informed Adair that he had in fact been hit. Shawn also told Adair

7  that "I'm injured."

8    74.    After Defendant Adair confirmed Shawn was hit, he heard the second shot

9  by Defendant Freeman.

10    75.    At any point forward from the time that Shawn was first hit by Defendant

11  Freeman's bullet, Adair and Orr could have and absolutely should have announced

12  weapons down to allow Shawn to surrender and obtain needed medical treatment to save

13  his life.

14    76.    They did not intervene.

15    77.    Surveillance video shows Shawn left his weapon on the kitchen floor, raised

16  both of his empty hands in the air, and began slowly walking toward the landing leading

17  down to his front door. Prior to any gunfire, Jordan advised officers that Shawn's vest was

18  designed to hold armor but did not have any ballistic plates inserted.

19    78.    As Shawn walked out of the kitchen toward the front door, Defendant Adair

20  asked Shawn if he was hurt and where he had been hit. Shawn relayed that he was struck

21  in the face. Defendant Adair informed Shawn that emergency medical personnel were on

22  scene to render him aid once he exited his apartment. Defendant Adair again requested

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

Shawn make his way towards the front door exit with his empty hands raised. Shawn attempted to comply.

79. Defendant Adair and Orr were on the phone with Shawn the entire time.

80. In fact, Orr was integral to the negotiations.

81. Adair at one point yells to him that he needs a secondary.

82. Orr was the secondary.

83. Adair specifically told Shawn to walk out with his hands up but failed to instruct any of his fellow officers to keep their weapons down or to stop shooting or that Shawn was not a threat.

84. As Shawn approached the stairway landing, he was subjected to a barrage of gunfire from MPD. Adair and Orr heard this gunfire as they were talking to Shawn.

85. Shawn cried out "I'm down! I'm down! I'm down!"

86. Defendants Adair and Orr, who were still on the phone with Shawn, heard Shawn cry out "I'm down! I'm down! I'm down!"

87. Neither Adair nor Orr told MPD officers to stand down or informed them that Shawn reported he was down.

88. Approximately 15 seconds after Shawn reported he was down, another volley of shots were fired into the front doorway hitting Shawn multiple times.

## MPD Opens Fire On Shawn On Stairway Landing

### *Navarro, Thomas, Goodrich, Chuey, Cameron and Brown*

89. At 10:44 p.m. Shawn approached the window at the top of the interior stairs to the front door.

13

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

90.    Shawn was visible from the landing windows and glass patio doors on either side of the apartment as he slowly walked towards the stairway landing with his empty hands in the air. Camera footage verifies Shawn followed commands, leaving a trail of blood from the kitchen as he walked.

91.    As Shawn neared the stairway landing, MPD officers, including SWAT officers, opened fire *en masse* from both sides of the apartment unit.

92.    Despite the fact that Shawn was completely unarmed and clearly attempting to surrender MPD officers, including at least Navarro, Thomas, Goodrich, Chuey, Cameron, and Brown, opened fire on Shawn.

93.    Shawn was caught in a hail of bullets and began to run and then fall down the stairs.

### *Chuey*

94.    Chuey fired multiple lethal rounds at Shawn while Shawn was unarmed, had his hands in the air, and was approaching the landing at the top of the interiors stairs on his way to surrender. At least one of these rounds struck Shawn.

95.    At the time Defendant Chuey opened fire on Shawn, Chuey acted with deliberate indifference to the constitutional rights of Shawn.

96.    Chuey knew that MPD negotiations for Shawn's surrender were still ongoing -- negotiators were still in communication with Shawn and Shawn was speaking to them.

97.    From Chuey's position on the scene, any visualization of Shawn that could have provided a reasonable basis for the decision whether to open fire would have shown that Shawn was unarmed and was attempting to surrender.

14

98.    Chuey could clearly see from his vantage point that Shawn was unarmed before opening fire at Shawn.

### *Goodrich*

99.    Goodrich fired multiple lethal rounds at Shawn while Shawn was unarmed, had his hands in the air, and was approaching the landing at the top of the interiors stairs on his way to surrender. At least one of these rounds struck Shawn.

100.    At the time Defendant Goodrich opened fire on Shawn, Goodrich acted with deliberate indifference to the constitutional rights of Shawn.

101.    Goodrich knew that MPD negotiations for Shawn's surrender were still ongoing -- negotiators were still in communication with Shawn and Shawn was speaking to them.

102.    From Goodrich's position on the scene, any visualization of Shawn that could have provided a reasonable basis for the decision whether to open fire would have shown that Shawn was unarmed and was attempting to surrender.

103.    Goodrich could clearly see from his vantage point that Shawn was unarmed before opening fire at Shawn.

### *Thomas*

104.    Thomas, fired multiple lethal rounds at Shawn while Shawn was unarmed, had his hands in the air, and was approaching the landing at the top of the interiors stairs on his way to surrender. At least one of these rounds struck Shawn.

105.    At the time Defendant Thomas opened fire on Shawn, Thomas acted with deliberate indifference to the constitutional rights of Shawn.

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

15

106.    Thomas knew that MPD negotiations for Shawn's surrender were still ongoing -- negotiators were still in communication with Shawn and Shawn was speaking to them.

107.    From Thomas's position on the scene, any visualization of Shawn that could have provided a reasonable basis for the decision whether to open fire would have shown that Shawn was unarmed and was attempting to surrender.

108.    Thomas could clearly see from his vantage point that Shawn was unarmed before opening fire at Shawn.

### *Cameron*

109.    Cameron fired multiple lethal rounds at Shawn while Shawn was unarmed, had his hands in the air, and was approaching the landing at the top of the interiors stairs on his way to surrender. At least one of these rounds struck Shawn

110.    At the time Defendant Cameron opened fire on Shawn, Cameron acted with deliberate indifference to the constitutional rights of Shawn.

111.    Cameron knew that MPD negotiations for Shawn's surrender were still ongoing -- negotiators were still in communication with Shawn and Shawn was speaking to them.

112.    From Cameron's position on the scene, any visualization of Shawn that could have provided a reasonable basis for the decision whether to open fire would have shown that Shawn was unarmed and was attempting to surrender.

113.    Cameron could clearly see from his vantage point that Shawn was unarmed before opening fire at Shawn.

MILLS AND WOODS LAW,, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

*Brown*

114.    Brown fired multiple lethal rounds at Shawn while Shawn was unarmed, had his hands in the air, and was approaching the landing at the top pf the interiors stairs on his way to surrender. At least one of these rounds struck Shawn

115.    At the time Defendant Brown opened fire on Shawn, Brown acted with deliberate indifference to the constitutional rights of Shawn.

116.    Brown knew that MPD negotiations for Shawn's surrender were still ongoing -- negotiators were still in communication with Shawn and Shawn was speaking to them.

117.    From Brown's position on the scene, any visualization of Shawn that could have provided a reasonable basis for the decision whether to open fire would have shown that Shawn was unarmed and was attempting to surrender.

118.    Brown could clearly see from his vantage point that Shawn was unarmed before opening fire at Shawn.

*Navarro*

119.    Navarro fired at least one lethal round at Shawn while Shawn was unarmed, had his hands in the air, and was approaching the landing at the top pf the interiors stairs on his way to surrender. This round struck Shawn.

120.    At the time Defendant Navarro opened fire on Shawn, Navarro acted with deliberate indifference to the constitutional rights of Shawn.

121.    Navarro knew that MPD negotiations for Shawn's surrender were still ongoing -- negotiators were still in communication with Shawn and Shawn was speaking to them.

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

122.    From Navarro's position on the scene, any visualization of Shawn that could have provided a reasonable basis for the decision whether to open fire would have shown that Shawn was unarmed and was attempting to surrender.

123.    Navarro could clearly see from his vantage point that Shawn was unarmed before opening fire at Shawn.

**MPD Officers Again Open Fire On Shawn In His Doorway**

***Chuey, Cameron, Goodrich and Harris***

124.    When Shawn reached the bottom of the stairs, he managed to unlock two deadbolts and open the door latch.

125.    He then opened the door and presented himself, unarmed and with nothing in his hands to MPD in order to surrender to their custody as directed by negotiators.

126.    Despite the fact that Shawn was completely unarmed and offering to surrender, MPD officers, including at least Chuey, Cameron, Goodrich and Harris unleashed yet another hail of bullets on Shawn.

127.    Mortally wounded, Shawn fell in the doorway of the apartment.

128.    MPD then fired explosive devices into the apartment and even tazed Shawn's body in order to make sure he was immobilized.

129.    As Shawn lay face down in the doorway in a pool of blood MPD officers then placed him in handcuffs and dragged him into the front of the apartment.

130.    It was only at this time – after at least 84 bullets were fired – that Defendant Adair then shouted "weapons down!"

131.    Shawn was later pronounced dead at 11:41 p.m.

18

132.     Following the ordeal there were no less than 84 bullet holes from MPD fire inside and on the exterior walls of Shawn's apartment.

133.     During the entire ordeal with MPD, Shawn did not fire a single round.

### *Chuey*

134.     Defendant Chuey had a clear view of Shawn as Shawn opened the front door.

135.     Chuey saw that Shawn was unarmed. Chuey saw that Shawn was offering himself up to surrender to MPD.

136.     Chuey saw that Shawn was. seriously wounded, and in need of medical attention.

137.     Chuey opened fire on Shawn.

138.     Chuey fired multiple lethal rounds at Shawn while Shawn stood in his doorway. One or more of these rounds struck Shawn.

139.     Chuey acted with deliberate indifference to the constitutional rights of Shawn.

### *Harris*

140.     Defendant Harris had a clear view of Shawn as Shawn opened the front door.

141.     Harris saw that Shawn was unarmed.

142.     Harris saw that Shawn was offering himself up to surrender to MPD.

143.     Harris saw that Shawn was seriously wounded, and in need of medical attention.

144.     Harris opened fire on Shawn.

145.     Harris fired multiple lethal rounds at Shawn while Shawn stood in his

19

doorway. One or more of these rounds struck Shawn.

146.    Harris acted with deliberate indifference to the constitutional rights of Shawn.

### *Goodrich*

147.    Defendant Goodrich had a clear view of Shawn as Shawn opened the front door.

148.    Goodrich saw that Shawn was unarmed.

149.    Goodrich saw that Shawn was offering himself up to surrender to MPD.

150.    Goodrich saw that Shawn was. seriously wounded, and in need of medical attention.

151.    Goodrich opened fire on Shawn.

152.    Goodrich fired multiple lethal rounds at Shawn while Shawn stood in his doorway. One or more of these rounds struck Shawn.

153.    Goodrich acted with deliberate indifference to the constitutional rights of Shawn.

### *Cameron*

154.    Defendant Cameron had a clear view of Shawn as Shawn opened the front door.

155.    Cameron saw that Shawn was unarmed.

156.    Cameron saw that Shawn was offering himself up to surrender to MPD.

157.    Cameron saw that Shawn was. seriously wounded, and in need of medical attention.

158.    Cameron opened fire on Shawn.

159.    Cameron fired multiple lethal rounds at Shawn while Shawn stood in his doorway. One or more of these rounds struck Shawn.

160.    Cameron acted with deliberate indifference to the constitutional rights of Shawn.

### MPD Conduct After Excessive Force and Killing of Shawn

161.    At approximately 11:02 p.m., MPD entered the apartment by having Defendant Woodward (#15726) fly a drone through the open front door. Shawn's leg could be seen through the open front door as he lay underneath an unhinged door in front of the entry of the apartment. Defendant A. Stefick (#23461) then delivered four (4) rounds of ferret gas munitions into Shawn's apartment through the eastside patio. Defendant Lieutenant Matthew Harris (#16816) (then a SWAT sergeant) requested more officers to the north side of the building to assist with entry into Shawn's apartment.

162.    At approximately 11:15 a.m., Defendant M. Mask (#15668) deployed K9 Rico to assess Shawn. MPD SWAT officers entered Shawn's apartment through the front door. Defendant A. Stefick (#23461) deployed a taser into Shawn's neck and right calf before handcuffing him behind his back. MPD SWAT officers then dragged Shawn's lifeless body down the front steps.

163.    At 11:41 p.m., a Mesa Fire Department leader advised that a Banner Desert Medical Center doctor who was monitoring their equipment pronounced Shawn deceased at the scene. Shawn was left at the bottom of the stairs as Defendant Shawn Kurian (#21070) informed scene supervisors of Shawn's time of death.

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

21

1

**THE COVER-UP BEGINS**

164.    In the morning on July 7, 2023, MPD Detective Jay Ingram obtained recorded statements from each of the MPD SWAT officers who reported to have discharged a weapon during the encounter with Shawn.

165.    These officers were Defendants Freeman, Brown, Cameron, Chuey, Goodrich, Harris, Navarro and Thomas.

166.    Each of the officers was separately represented by counsel while making the statement.

167.    Upon information and belief, at that time, none of these officers were aware of the existence of the internal cox cam or the footage it recorded.

168.    During these statements, each of these officers grossly misrepresented the events of the previous night.

169.    Defendant Freeman stated that after he had fired two rounds at Shawn, "multiple rounds" were fired out of the apartment through the sliding glass door. He said he then heard a volley of rounds from MPD and eventually heard that Shawn was down.

170.    In fact, ***no rounds*** were fired from Shawn's apartment during the ordeal.

171.    Also, despite the fact that the interviewer invited Defendant Freeman to relay any information Freeman thought he should know, Defendant Freeman did not even mention that he had seen Shawn moving through the apartment unarmed and with his hands up to surrender.

172.    Defendant Chuey stated that he heard shots and even saw muzzle flashes from inside the apartment and fired 11 or 12 rounds at the muzzle flashes.

Mills and Woods Law., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

173.    There were no shots or muzzle flashes from the apartment.

174.    Defendant Goodrich stated that Shawn had unleashed a "barrage" of fire from his apartment, and that when Shawn appeared at the front door, he thought he saw a rifle in his hand from the way he was standing.

175.    Defendant Harris stated that he saw and heard a "bunch of rounds" exiting through glass from within Shawn's apartment. He insisted that these were "distinct" gunshots from within the apartment, and that they were not from police rifles because police use suppressors. Defendant Harris claimed that he knew "100%" that Shawn had complete disregard for the sanctity of life.

176.    Defendant Harris also stated that when Shawn appeared at the front door, he saw Shawn move across the doorway "as if to conceal his movements." Defendant Harris said that he saw a magazine but did not see a rifle. Because it "appeared to him" that Shawn was holding a rifle (despite admittedly not seeing one) and pointing it at officers to his west, Defendant Harris fired four or five rounds at Shawn.

177.    Defendant Navarro also stated that he heard "rifle sounds" from inside Shawn's apartment that were different from SWAT team suppressed rifles.

178.    Defendant Thomas stated that he saw smoke and glass coming out of the sliding glass door at Shawn's apartment, and also that he saw a "muzzle flash" where the glass came out.

179.    Defendant Brown also stated that he had seen and heard a shot fired through glass from inside the apartment.

180.    Defendant Cameron stated that he heard multiple shots from inside the apartment.

181.    Defendant Cameron also stated that when Shawn opened the front door, it 'looked like' he had a rifle in his right hand.

182.    Shawn was unarmed and had nothing in his hands when he emerged from the apartment.

183.    Widmer, who was standing near Freeman when Freeman fired his second shot at Shawn, wrote an official report of the incident for MPD.

184.    In his report, Widmer stated that: "Around this point, I heard Officer Freeman fire once. As I was moving inside the apartment, I observed the subject stagger to his feet and move off to the north of the structure. The subject started shooting his rifle out at police from both sides and he was met with appropriate response of officers firing back at him to stop the threat that was presented to them."

185.    This is false and Widmer knew it was false at the time he prepared his report.

186.    At no point during the ordeal did Shawn start "shooting his rifle out at police from both sides."

187.    In addition, Widmer's own bodycam recorded Freeman's description of Shawn being unarmed, with hands clear and up. Widmer's report makes no mention of this. The omission constitutes a material falsification of an official record.

188.    Widmer heard Freeman's description and likely saw himself that Shawn was attempting to surrender.

Mills And Woods Law., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

189.    Widmer did nothing to alert other MPD officers to stand down, that Shawn was attempting to surrender, or that Shawn was unarmed with his hands up.

## MESA POLICE DEPARTMENT HAS A LONG HISTORY OF CIVIL SUITS AND SETTLEMENTS FOR CONSTITUTIONAL VIOLATIONS

190.    In the District Court of Arizona, the City of Mesa has been sued countless times for allegations of Constitutional Violations.

191.    There are at least two cases running concurrently to this case:

    a.  CV-24-02181-PHX-KML (Wherein the Plaintiff alleges Wrongful Death Claims and 42 U.S.C. § 1983 claims for excessive force).

    b.  Carter *v.* Lawrence (2:24-cv-00670) – excessive force, Monell liability

192.    Other cases against the City of Mesa in this District Court have settled, including:

    a.  CV-24-00832-SMM-CDB (Wherein the Plaintiff – a woman who was not in custody – was violently pushed to the ground and suffered injuries. Plaintiff alleged Constitutional violations under 42 U.S.C. § 1983);

    b.  CV-24-00642-KML (Wherein Plaintiff brought a Wrongful Death suit also alleging Constitutional violations for the killing of her son at the hands of Mesa Police Officers);

    c.  CV-18-02434-SMB (Wherein an 84-year-old Plaintiff alleging excessive force and failure to intervene claims under 42 U.S.C. § 1983. Officer C. Orr #19441 who is also a Defendant in this case was a listed defendant);

MILLS AND WOODS LAW,, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

d. CV-17-00152-PHX-GMS (Lawsuit alleging excessive force and wrongful death claims for violation of Plaintiffs' Spouse/Son's Constitutional Rights).

e. Valdez v. Mesa, City of (2:24-cv-00642) excessive force and wrongful death. Notice of Settlement February 24, 2025.

193.   A review of a docket search for the City of Mesa as a party returns many other suits over the years have been filed against the City of Mesa alleging Constitutional Violations including those for excessive force that have been dismissed by the Court, by the parties via stipulation, or by voluntary dismissal including a recent case wherein the Plaintiff alleged he was beaten by Police Officers at a quincenera (CV-23-02436 -KML-ASB) and a case that had been pending for years alleging excessive force against officers for kneeing Plaintiff in the head, smashing his head into the ground, and having an officer wrap his hands tightly around Plaintiff's neck (2:20-cv-00385-DGC Spencer v. Pew et al).

194.   The media has picked up on the patterns, customs, and practices of the Mesa Police Department as well.

195.   In August 2, 2018 KJZZ released an article titled "Mesa Police Sued for Excessive Force by 84-Year-Old", referring to CV-18-02434-SMB that ended up settling. Retrieved August 20, 2025 from https://www.kjzz.org/2018-08-02/content-679564-mesa-police-sued-excessive-force-84-year-old .

196.   On February 21, 2024, 12news.com released an article titled "Lawsuit: Mesa man claims police officers assaulted him while trying to report a crime at quinceañera party". Retrieved August 20, 2025 from:

https://www.12news.com/article/news/local/valley/mesa-man-suing-police-officers-violent-brawl-quinceaera-party/75-610841a1-0b2c-4fd8-9964-cbbec85ff866 .

197.    ABC15.com released an article on September 17, 2024 titled "No 'immunity' for Mesa officer in 2018 excessive force case" referencing 2:20-cv-00385-DGC Spencer v. Pew et al. Retrieved August 20, 2025 from: https://www.abc15.com/news/local-news/investigations/no-immunity-for-mesa-officer-in-2018-excessive-force-case .

198.    These lawsuits are nothing new to the City of Mesa, because the use of excessive force is constant within its Police Force.

199.    In the first six months of 2022 alone, the City of Mesa paid out $5,444,000 to settle 10 claims against its officers, with payments ranging from $4,000 to $2,450,000.

200.    In 2023, the City of Mesa paid an $8,000,000 settlement to the spouse of decedent Daniel Shaver who died at the hands of Mesa Police Officers in 2016.

201.    This settlement – according to reports – is the highest settlement Mesa has paid to date for police misconduct.

202.    The City of Mesa also settled the claims for Mr. Shaver's parents for approximately $1,500,000.

203.    The City of Mesa clearly has not learned from its mistakes, nor has it addressed the rampant culture of violence that it has adopted, ratified, and allowed to promulgate throughout the Mesa Police Department.

204.    As discussed, the City of Mesa has established history of its officers using lethal force on individuals.

205.    On January 18, 2016, a City of Mesa police officer shot and killed Daniel Shaver. Shaver was crying and begging for officers not to shoot him as he crawled unarmed toward them at their request. The City of Mesa paid approximately $9,500,000 in settlements.

206.    On April 20, 2017, City of Mesa police officers shot and killed Sariah Lane who was 17 years old. She was not armed and not suspected of any crime. The City of Mesa paid 2.45 million dollars to settle an excessive force lawsuit against it and the officers involved with respect to that incident.

207.    On April 1, 2018, City of Mesa police officers physically assaulted and beat James Wright for refusing to provide his identification. Wright was unarmed at the time and not suspected of any serious crimes. The City of Mesa paid $175,000 to settle an excessive force lawsuit against the officers involved with respect to that incident.

208.    On May 23, 2018, City of Mesa police officers physically assaulted and beat Robert Johnson. Johnson was compliant with the commands given by officers and was not suspected of any serious crimes. The City of Mesa paid $350,000 to settle an excessive force lawsuit against it and the officers involved with respect to that incident.

209.    On December 6, 2019, a City of Mesa police officer shot Randy Sewell in the buttocks and shattered his femur. Sewell was unarmed and not suspected of a serious crime. Sewell was charged with resisting arrest because of the recommendation of City of Mesa officers. A jury found him not guilty of that charge. The City of Mesa paid 1.75 million dollars to settle an excessive force lawsuit against it and the officers involved with respect to that incident.

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

210. On September 25, 2020, City of Mesa police officers shot and killed Angel Benitez who was 20 years old at the time. Benitez was unarmed and shot by multiple officers as he was following their instructions to exit the vehicle he was in. The City of Mesa paid $250,000 to settle an excessive force lawsuit against it and the officers involved with respect to that incident.

211. On September 5, 2021, a City of Mesa police officer employed lethal force on Diego Varela. Varela attempted to evade the officer causing his vehicle to brush the officer's patrol unit. After Varela and his vehicle passed the officer, and was no longer a threat to his safety, the officer discharged multiple rounds from his firearm at Varela.

212. On July 2, 2022, a City of Mesa police officer employed lethal force on an eighteen-year-old who was pulled over on a routine traffic stop. The officer did not activate his body worn camera as required by Department policy. As the officer asked the teenager to exit his vehicle, the teenager began driving away. As the vehicle was leaving, the officer discharged two rounds from his firearm at the teen and his vehicle. At the point the shots were fired, the officer was approximately 20-30 feet away from the vehicle and it did not pose a safety threat.

213. On October 2, 2022, City of Mesa police officers physically assaulted and beat Daniel Barraza until he was unconscious. Barraza was unarmed, compliant with the officers' commands and not suspected of any serious crimes. An excessive force lawsuit is currently pending against the City of Mesa and the officers involved with respect to that incident.

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

214.     On September 29, 2023, City of Mesa police officers shot and killed Thomas McGinty who was suicidal and experiencing a behavioral health crisis. Officers failed to de-escalate the situation and chose not to employ less lethal force. The family of McGinty has retained an attorney to advance a claim for excessive force.

215.     On December 15, 2023, City of Mesa police officers shot David Dimas. Dimas was self-harming himself and experiencing a behavioral health crisis. Two officers employed less-lethal force while a third employed lethal force discharging multiple rounds from his firearm into Dimas.

216.     Upon information and belief, the City of Mesa did not adequately punish or discharge any of the officers listed in any of the cases above.

### COUNT I
### EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983
*(All Named Defendants)*

217.     Plaintiffs reallege and incorporate by reference all preceding allegations.

218.     All Officer Defendants acted under the color of state law to deprive Plaintiffs and Shawn of their rights, privileges, or immunities secured by the laws of the United States.

219.     Shawn had the greatest possible interest in and right to his life.

220.     Shawn was intoxicated when he was shot by MPD officers, including Defendants Freeman (#20207) and Harris (#16816).

221.     Shawn was severely outnumbered and outgunned when he was shot by MPD officers, including Defendants Freeman (#20207) and Harris (#16816).

222.     Shawn complied with MPD commands to drop his weapon before he was

shot by MPD officers, including Defendant Harris (#16816).

223.   Shawn was unarmed when he was shot by MPD officers, including Defendant Harris (#16816).

224.   Shawn was not within close proximity to police or the public when he was shot by MPD officers, including Defendants Freeman (#20207) and Harris (#16816).

225.   Shawn was not attempting to escape nor was he advancing towards police or the public when he was shot by MPD officers, including Defendants Freeman (#20207) and Harris (#16816).

226.   Shawn posed no immediate threat to police or the public when he was shot by MPD officers, including Defendants Freeman (#20207) and Harris (#16816).

227.   Apprehension by use of excessive and/or deadly force is recognized as a seizure subject to the reasonableness requirement of the Fourth and Fourteenth Amendments.

228.   MPD's use of force against Shawn constituted an unreasonable seizure of his person and was willful, malicious, intentional, reckless, and with deliberate indifference to Shawn's constitutional rights.

229.   MPD's use of force against Shawn directly and proximately caused his death.

230.   As a result of MPD's use of force against Shawn, Shawn was deprived of his relationship with his parents.

231.   The Estate brings this claim requesting full and fair compensation for damages stemming from MPD's use of force against Shawn, including for loss of love, affection, companionship, care, protection, and guidance, and the pain, grief, sorrow,

anguish, stress, shock, and mental suffering from the loss.

## COUNT II

### EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983 – *Monell* – POLICY, CUSTOM, PATTERN, AND PRACTICE
*(Defendant City of Mesa)*

232.    Plaintiffs reallege and incorporate by reference all preceding allegations.

233.    Defendant City of Mesa is responsible for training and supervising MPD officers regarding the exercise of restraint in using of force against residents of Mesa, Arizona.

234.    Defendant City of Mesa is responsible for training and supervising MPD officers regarding methods and techniques to de-escalate and stabilize chaotic and potentially violent scenes.

235.    Defendant City of Mesa is responsible for training and supervising MPD officers regarding adequate communication and coordination between on-scene negotiators and SWAT officers to ensure unnecessary force is not used in response to behavior exhibited by suspects, victims, or the broader public.

236.    Upon information and belief, the City of Mesa through the City Council possesses final policy-making authority to approve and ratify all MPD policies and training materials.

237.    Upon information and belief, the City of Mesa through the City Council possesses final decision-making authority regarding the assignment and retention of all SWAT officers.

238.    Defendant City of Mesa is responsible for training and supervising MPD

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

officers regarding interactions with mentally ill, intoxicated and/or emotionally disturbed citizens.

239.    Defendant City of Mesa failed to properly train and supervise MPD officers to ensure they exercise necessary restraint when using lethal force against residents of Mesa, Arizona.

240.    Defendant City of Mesa failed to properly train and supervise MPD officers to ensure they employ de-escalation methods and techniques to de-escalate and stabilize chaotic and potentially violent situations.

241.    Upon information and belief, Defendant City of Mesa has promulgated or adopted policies and training materials which permit and/or encourage MPD officers, including MPD SWAT, to prioritize their own safety rather than the safety of residents of Mesa, Arizona in employing lethal force.

242.    Upon information and belief, Defendant City of Mesa has promulgated or adopted policies and training materials which encourage MPD officers, including MPD SWAT, to use force before taking adequate measures to de-escalating chaotic and potentially violent situations.

243.    As discussed herein, Defendant City of Mesa has created a culture of impunity permitting officers to use excessive and unnecessary force without fear of discipline or oversight.

244.    As discussed herein, the lawsuits and settlements keep piling up against the City of Mesa for violations of Constitutional Rights by its officers, including those for excessive force.

33

245. This has been a constant issue for the City of Mesa Police Department since at least 2016.

246. Defendant City of Mesa created this culture of impunity by:

    a. Failing to track officer uses of force to identify officers who use force more than other officers and failing to initiate an early warning system regarding such officers;

    b. Adopting a policy, custom, or practice of delaying the release of information relating to incidents involving officer uses of force to prevent the public and the victims of police violence from learning about the real facts involved in police uses of force;

    c. Adopting a policy, custom, or practice of "purging" Officer discipline records so that officers who are the subject of repeated complaints and investigations cannot be identified, and the victims of police violence will have difficulty demonstrating the City of Mesa's custom, pattern, and practice of using excessive force;

    d. Adopting a policy, custom and practice of failing to fully investigate incidents involving officer uses of force deaths; and

    e. Adopting a policy, custom and practice of failing to discipline, terminate, and/or retrain officers who use excessive force.

247. Defendant City of Mesa failed to properly train and supervise MPD officers to ensure adequate communication and coordination exist between negotiators and SWAT.

248. Upon information and belief, Defendant City of Mesa has promulgated or adopted policies and training materials which encourage SWAT officers to ignore or overlook the recommendations or directives of on-scene negotiators in favor of employing force against suspects.

249. Upon information and belief, Defendant City of Mesa exercised its final policy-making authority to approve MPD policies and training materials which permit and/or encourage MPD officers, including MPD SWAT, to prioritize their own safety

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

34

rather than the safety of residents of Mesa, Arizona in employing lethal force.

250.    Upon information and belief, Defendant City of Mesa exercised its final policy-making authority to approve MPD policies and training materials which permit and/or encourage MPD officers, including MPD SWAT, to use force before taking adequate measures to de-escalating chaotic and potentially violent situations.

251.    Upon information and belief, Defendant City of Mesa exercised its final policy-making authority to approve MPD policies and training materials which permit and/or encourage SWAT officers to ignore or overlook the recommendations or directives of on-scene negotiators in favor of employing force against suspects.

252.    Upon information and belief, Defendant City of Mesa exercised its final decision-making authority to approve the selection and retention of Defendant Freeman (#20207) onto MPD SWAT.

253.    Upon information and belief, Defendant Freeman (#20207) had a history of violence and inappropriate behavior prior to his selection by MPD employees for MPD SWAT.

254.    Upon information and belief, Defendant Freeman (#20207)'s prior violence and inappropriate behavior was or should have been known to MPD officers and the City of Mesa.

255.    Upon information and belief, Defendant Freeman (#20207)'s prior violence and inappropriate behavior did or should have placed Defendant City of Mesa on notice such that he should not have been selected to serve on MPD SWAT.

256.    Defendant Freeman (#20207)'s criminal activity has direct relation to his

decision to use unnecessary force against Shawn, without justification, and thus to violate his clearly established constitutional rights.

257.    Defendant Freeman (#20207)'s conduct during the July 6th Incident set events in motion which directly led to Shawn's death and the deprivation of his clearly established constitutional rights.

258.    Defendant Cost made a conscious, affirmative choice to approve the selection and retention of Defendant Freeman by his subordinates.

259.    Defendant Cost's decision is not required to govern future selection of SWAT officers to constitute ratification of the excessive use of force employed by MPD in this matter.

260.     Defendant City of Mesa failed to properly train and supervise MPD officers regarding interaction with the mentally ill, intoxicated and/or emotionally disturbed citizens.

261.    By their policies and practices, Defendant City of Mesa subjected Shawn to a substantial risk of serious harm and injury. These policies and practices were implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the deprivation of Shawn's right secured by the United States Constitution.

262.    Defendant City of Mesa directed subordinates and/or set in motion a series of acts by subordinates and/or knew or reasonably should have known of all of the deprivation complained of herein and have condoned or been deliberately indifferent to

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

such conduct consistent with the standard outlined in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), resulting in injury and death.

263.    These acts, omissions, and the deliberate indifference to Shawn's rights directly and proximately caused pain, suffering, and death to Shawn, and directly and proximately caused Plaintiffs' injuries and damages.

264.    The Estate seek**s** punitive damages as Defendants wrongful actions and omissions were compelled by evil motive and/or were intentional and/or malicious and involved reckless and callous indifference to Shawn's federally protected rights.

## COUNT III

### *MONELL* LIABILITY FOR ACTS OF FINAL POLICYMAKER (42 U.S.C. § 1983)
*(City of Mesa)*

265.    Plaintiffs reallege and incorporate by reference all preceding allegations.

266.    The current Chief of Police for the City of Mesa Police Department is Ken Cost.

267.    Chief Cost succeeded to the title after previous Chief of Police, Ramon Batista, abruptly resigned.

268.    Former Chief of Police Batista was critical of the rampant use of excessive force in the City of Mesa Police Department and sought to implement changes in policies and procedures governing the use of force by City of Mesa police officers.

269.    Former Chief of Police Batista was critical of the excessive force used on Robert Johnson by City of Mesa police officers in 2018. He publicly condemned the actions of the officers and changed the Department's use of force policy in response.

270.    Batista's efforts to right the culture at the City of Mesa Police Department

37

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

were not embraced by the officers who worked there. The Mesa Fraternal Order of Police and Mesa Police Association issued a vote of "no confidence" against him.

271.    The President of the Mesa Police Association at the time, Nate Gafvert, was quoted as saying "throwing our officers under the bus and making dramatic changes to how things are done overnight does nothing but cause [officers] to hesitate, and hesitation gets officers and citizens hurt and killed."

272.    Ken Cost assumed responsibility as the Chief of Police for the City of Mesa Police Department starting in November 2019 after Batista left.

273.    Chief Cost was in power when a City of Mesa police officer employed lethal force and discharged his firearm at Diego Varela on September 5, 2021, as set forth above.

274.    The officer was not investigated, terminated or punished by Chief Cost for his actions.

275.    Chief Cost was in power when a City of Mesa police officer employed lethal force and discharged his firearm at a teenager who drove away from a routine traffic stop on July 2, 2022.

276.    The officer was not investigated, terminated or punished by Chief Cost for his actions.

277.    Starting in November 2019 and at all times relevant to this Complaint, Chief Cost was the highest-ranking member in charge of the City of Mesa Police Department and its final policymaker. In this role, he had the power, responsibility and duty to oversee all officers of the City of Mesa Police Department. This included the power and responsibility to train officers, reprimand officers, terminate officers, investigate excessive use of force

incidents, investigate incidents where lethal force was employed, and implement policies and procedures, among other things.

278.    Chief Cost, in performing his duties for the City of Mesa Police Department, acted under the color of state law and had final policymaking authority from the City of Mesa.

279.    By failing to investigate and punish officers for their excessive uses of force, including the employment of lethal force when not warranted, Chief Cost established that his officers, including Officer Lawrence, could use excessive force with impunity. These were deliberate decisions by Chief Cost that were politically motivated and because he did not want to lose the support of the officers that he was in charge of overseeing like former Chief Batista.

280.    By doing so, Chief Cost knew that a substantial risk of serious harm could result when his officers used unreasonable force and of the likelihood that constitutional violations would occur. As such, he made a conscious choice to disregard the consequences of his acts and omissions.

281.    The conduct of Chief Cost was the moving force behind the constitutional violation that Shawn suffered when the Officer Defendants used excessive force against Shawn in violation of his Fourth Amendment rights. As such, Chief Cost deprived Shawn of his right to be free from the use of excessive force by the officers who he was controlling and as guaranteed to Shawn by the Fourth Amendment.

///

///

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

## COUNT IV

### *MONELL* LIABILITY AGAINST CITY OF MESA FOR RATIFICATION BY FINAL POLICYMAKER (42 U.S.C. § 1983)
*(City of Mesa)*

282.    265.    Plaintiffs reallege and incorporate by reference all preceding allegations.

283.    Officer Defendants acted under color of state law when they used excessive force on Shawn in violation of his Fourth Amendment rights.

284.    Chief Cost, in performing his duties for the City of Mesa Police Department, acted under the color of state law and had final policymaking authority from the City of Mesa with respect to all policies and procedures that controlled the Officer Defendants' conduct as City of Mesa police officers.

285.    As Chief of Police for the City of Mesa Police Department, Chief Cost has, and had, the power, responsibility and duty to oversee all officers of the City of Mesa Police Department. He was also the final policymaker with respect to all policies and procedures promulgated by the Department. Chief Cost was the final policymaker with respect to all policies involving: hiring officers, officer training, reprimanding officers, terminating officers, investigating excessive use of force incidents by officers, investigating incidents where lethal force was employed by officers, among other things.

286.    After Officer Defendants used excessive force on Shawn, Chief Cost had the choice of punishing them or not punishing them for their actions. Upon information and belief, Chief Cost made the deliberate choice to not punish the Officer Defendants and in so doing approved their actions with respect to the incident with Shawn.

287. After the Officer Defendants used excessive force on Shawn, Chief Cost had the choice of terminating them or not terminating them for their actions. Chief Cost made the deliberate choice to not terminate any of the Officer Defendants and in so doing approved their actions with respect to the incident with Shawn.

288. Chief Cost ratified the unconstitutional actions of the Officer Defendants with respect to the incident with Shawn by deliberately choosing not to punish or terminate any of them and affirmatively ratified their conduct.

289. Chief Cost also made deliberate choices to not punish or terminate other officers responsible for other excessive force incidents since November 2019. This includes the incidents on September 5, 2021 and July 2, 2022 wherein lethal force was employed against unarmed fleeing individuals without warning who did not pose a safety threat to the officers who utilized the force.

290. Chief Cost made the affirmative choice to not use any of these three incidents – or any of the others detailed herein – to train his police officers on impermissible uses of force. Specifically, he did not showcase these incidents within his Department as officer involved shootings where the employment of lethal force violated policies and procedures and officer training and expectations.

291. Unlike Chief Batista, who changed the Department's policies and procedures in response to the excessive force used on Robert Johnson, Chief Cost did not even use the above excessive force incidents as training and teaching moments at the Department. By so doing, Chief Cost and the City of Mesa made the deliberate choice to ratify the unconstitutional use of lethal force by their officers on fleeing individuals who posed no

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

immediate safety threat to officers or the public in general.

292.    These were deliberate decisions by Chief Cost that were politically motivated and because he did not want to lose the support of the officers that he was in charge of overseeing like former Chief Batista.

293.    The acts and decisions of the City of Mesa and Chief Cost caused the deprivation of Shawn's Fourth Amendment rights by the Officer Defendants and was a substantial factor in causing Shawn's injuries, death, and damages.

## COUNT V

## ASSAULT/AGGRAVATED ASSAULT/WRONGFUL DEATH
### *(Officer Defendants, Mesa)*

294.    Plaintiffs reallege and incorporate by reference all preceding allegations.

295.    A surviving parent of a child who dies through the tortious or criminal actions of another may bring a claim in wrongful death for the death of the child pursuant to Arizona's Wrongful Death Act, A.R.S. § 12-611, 612, and *Reed v. Frey*, 458 P.2d 386 (1969).

296.    A person commits the crime of assault when they "[i]ntentionally, knowingly or recklessly causing any physical injury to another person." A.R.S. § 13-1203(A)(1).

297.    A person commits the crime of aggravated assault when they commit the crime of assault under A.R.S. § 13-1203(A) using "a deadly weapon or dangerous instrument." A.R.S. § 13-1204(A)(2).

298.    Defendants Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, and Thomas committed assault and aggravated assault.

MILLS AND WOODS LAW,, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

299.    Defendants Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, and Thomas, in firing lethal munitions at Shawn using a deadly weapon, intentionally, knowingly, or recklessly caused physical injury to Shawn.

300.    The physical injury caused by Defendants Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, and Thomas was the proximate cause of Shawn's wrongful and unnecessary death.

301.    As a direct and proximate result of Defendants' intentional, knowing, or reckless behavior, Plaintiffs Chris and Suzette Gagne have suffered and will continue to suffer immeasurable mental and physical pain and suffering.

302.    As a direct and proximate cause of Defendants' intentional, knowing, or reckless behavior, Plaintiffs Chris and Suzette Gagne have been deprived of the care, support, companionship, and love of decedent.

303.    As a direct and proximate cause of Defendants' intentional, knowing, or reckless behavior, Plaintiffs Chris and Suzette Gagne have suffered and will continue to suffer financial and economic damages in an amount to be proven at trial.

304.    Because of the City of Mesa's knowledge and Freeman's superiors' knowledge of his propensity for violence, but their failure to act to prevent Freeman from continuing his pattern of violence, Mesa is liable for the actions of Freeman under the theory of *respondeat superior.*

## COUNT VI

## NEGLIGENT HIRING, TRAINING, AND SUPERVISION
*(Defendant City of Mesa)*

305.    Plaintiffs reallege and incorporate by reference all preceding allegations,

43

specifically the allegations set forth in Paragraphs 72-102 of this First Amended Complaint.

306.    Chief of Police Cost's conduct and/or ratification of conduct by others is imputable to Defendant City of Mesa.

307.    Upon information and belief, Defendant Cost exercised his final decision-making authority to approve the selection and retention of Defendant Freeman (#20207) onto MPD SWAT.

308.    Upon information and belief, Defendant Freeman (#20207) had a history of violence and inappropriate behavior prior to his selection by MPD employees for MPD SWAT.

309.    Upon information and belief, Defendant Freeman (#20207)'s prior violence and inappropriate behavior was or should have been known to MPD officers, including Defendant Cost.

310.    Upon information and belief, Defendants City of Mesa and Cost knew or should have known of Defendant Freeman (#20207)'s propensity to commit violent acts against others, including Shawn.

311.    Upon information and belief, Defendant Freeman (#20207)'s prior violence and inappropriate behavior did or should have placed Defendant City of Mesa on notice such that he should not have been selected to serve on MPD SWAT.

312.    Defendant Freeman (#20207)'s criminal activity has direct relation to his decision to use unnecessary force against Shawn, without justification, and thus to violate his clearly established constitutional rights.

313.    Defendant Freeman (#20207)'s conduct during the July 6th Incident set

events in motion which directly led to Shawn's death and the deprivation of his clearly established constitutional rights.

314.    Defendant Cost made a conscious, affirmative choice to approve the selection and retention of Defendant Freeman by his subordinates.

315.    Defendant City of Mesa failed to exercise adequate hiring, training and supervision of MPD officers and are liable to Plaintiffs for their deliberate indifference with the lack of adequate hiring, training, and supervision.

316.    As discussed herein, the City of Mesa has a long history of excessive force incidents.

317.    As further discussed herein, the City of Mesa has made the affirmative choice to not use any use of the use of force incidents detailed herein to train its police officers on impermissible uses of force. Specifically, the City did not showcase these incidents within the Police Department as officer involved shootings where the employment of lethal force violated policies and procedures and officer training and expectations

318.    Defendant City of Mesa knew or should have known that the lack of training and supervision was likely to result in a constitutional violation and a deprivation of rights.

319.    These acts and omissions directly and proximately caused pain, suffering, and death to Shawn, and directly and proximately caused Plaintiffs' injuries and damages.

## **COUNT VII**

### **LOSS OF CONSORTIUM**
*(All Named Defendants Caused Plaintiffs' Loss of Consortium)*

320.    Plaintiffs reallege and incorporate by reference all preceding allegations.

321.    A loss of consortium claim is a separate claim which is derivative of an

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

45

Mills and Woods Law., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

underlying claim for tortious conduct. *Martin v. Staheli*, 248 Ariz. 87, 93-94 (App. 2019).

322.    Shawn did not immediately die after suffering multiple potentially fatal wounds from lethal munitions fired by Defendants Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, and Thomas. Upon information and belief, MPD officers, including Defendant Orr, described Shawn as "moving around" and his breathing as "heavy" just after he was shot. Only after being tased, stepped over, and handcuffed did Shawn expire.

323.    As a result of the negligent and intentional acts and omissions of all named and Doe Defendants, Plaintiffs Chris and Suzette Gagne have been permanently deprived of the society and companionship of their son, Shawn, and have been permanently deprived of his contribution to their household.

324.    As a result of the negligent and intentional acts and omissions of all named and Doe Defendants, Plaintiffs Chris and Suzette Gagne have been deprived of the support they would have expected from their son in their elder years.

## COUNT VIII

## DUTY AND FAILURE TO INTERVENE
*(All Officer Defendants)*

325.    Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

326.    "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham*, 229 F.3d at 1289 (quotations omitted) (quoting *United States v. Koon*, 34 F.3d 1416, 1447, n.25 (9th Cir. 1994)). "Importantly, however, officers can be held liable for failing to intercede only if

they had an opportunity to intercede." *Id*. (citation omitted).

327.    Law enforcement officers who have a realistic opportunity to prevent a fellow officer from violating a citizen's Constitutional rights have a duty to intervene to protect the victim from the unconstitutional retaliation, use of force or violation of due process of law.

328.    As set forth herein, at no time did any of the Officer Defendants make any affirmative step to intervene to protect Shawn's Constitutional rights.

329.    The acts and/or omissions of Officer Defendants were willful, wanton, reckless, malicious, oppressive and/or done with a conscious or reckless disregard for the rights of Plaintiffs. Plaintiffs, therefore, prays for an award of punitive and exemplary damages against these individual defendants in an amount to be determined according to proof.

330.    Plaintiffs suffered damages as a direct and proximate result of the illegal acts of the Officer Defendants.

## COUNT IX

### GROSS NEGLIGENCE
*(Officer Defendants, City of Mesa)*

331.    Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

332.    Under Arizona Revised Statute § 12-820.02(A) a public employee acting within the scope of the public employee's employment can be liable for damages and injuries if the employee was grossly negligent.

333.    The basic elements of actionable negligence are a duty owed to the plaintiff,

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

a breach thereof and an injury proximately caused by the breach. *Ballesteros v. State*, 161 Ariz. 625, 627, 780 P.2d 458, 460 (App. 1989).

334.    "A duty is a matter of 'the relation between individuals which imposes upon one a legal obligation for the benefit of another.'" *Id.* (internal citations omitted). A duty is breached when the defendant fails to conform to the standard of care reasonable under the circumstances. *Ballesteros*, 161 Ariz. at 627.

335.    At all relevant times, Freeman, Widmer, Adair, and Orr had a duty to exercise ordinary care for the safety of Shawn Gagne.

336.    This includes taking certain actions and refraining from other actions such that the safety from harm to Shawn was preserved.

337.    They breached that duty systematically and repeatedly, including their acts and omissions set forth above, resulting in the death of Shawn.

338.    They had every opportunity to recognize that Shawn was surrendering or to relay critical required tactical information to each other. It is clear that Freeman and Widmer had a clear line of sight on Shawn after Freeman shot two rounds at Shawn, hitting him both times.

339.    Freeman discusses vividly with Widmer that Shawn's weapon was down and his hands were up, yet neither Freeman or Widmer relayed that critical information to their fellow officers.

340.    Adair and Orr both knew that they had given Shawn clear direction to walk with his hands up – after Freeman had fired his two shots – yet they did nothing to relay that information to their fellow officers.

MILLS AND WOODS LAW,, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

341.    Freeman's, Widmer's, Adair's, and Orr's actions were willful and wanton with reckless indifference to Shawn's life and safety.

342.    Freeman's, Widmer's, Adair's, and Orr's actions created an unreasonable risk of harm to Shawn and that risk was so great that it was highly probable that harm would have resulted.

343.    Freeman, Widmer, Adair, and Orr systematically and repeatedly acted with reckless indifference towards Shawn's life and safety, including their acts and omissions set forth above, resulting in the wrongful death of Shawn.

344.    Defendant City of Mesa is vicariously liable under *respondeat superior* for the actions of any employee, agent, or servant of the City of Mesa, including that of the other named Defendants in this case.

345.    Defendant Freeman was grossly negligent and acted with reckless indifference to Shawn's life and safety by failing to relay critical information regarding Shawn's surrendering status.

346.    Defendant Widmer was grossly negligent and acted with reckless indifference to Shawn's life and safety by failing to relay critical information regarding Shawn's surrendering status.

347.    Defendant Adair was grossly negligent and acted with reckless indifference to Shawn's life and safety by failing to relay critical information regarding Shawn's surrendering status.

348.    Defendant Orr was grossly negligent and acted with reckless indifference to Shawn's life and safety by failing to relay critical information regarding Shawn's

surrendering status.

349. Freeman, Widmer, Adair, and Orr, while acting as agents and employees for the Mesa Police Department, owed a duty to Shawn to perform their responsibilities as officers of the law without reckless indifference to Shawn's life and safety.

350. Freeman, Widmer, Adair, and Orr, while acting as agents and employees for Mesa Police Department, owed a duty to Shawn to act objectively reasonably and without reckless indifference to Shawn's life and safety.

351. Freeman's, Widmer's, Adair's, and Orr's acts and omissions constitute reckless indifference to Shawn's life and safety and gross negligence for which they are individually liable.

352. As a direct and proximate result of Defendants' breach, Shawn Gagne sustained severe and permanent injuries, suffered extreme pain and suffering, lost the ability to have and maintain meaningful familial relationships, lost the ability to provide for his family, and lost his life.

353. Defendants' acts and omissions set forth above, also demonstrate gross and wanton negligence in that each of them knew or had reason to know that their acts individually and collectively created an unreasonable risk of bodily harm to Shawn and a high probability that substantial harm would result.

**WHEREFORE**, Plaintiffs respectfully request judgment against named and Doe Defendants as follows:

A.  For Plaintiffs' general damages in an amount to be proven at trial;

B.  For Plaintiffs' special damages;

C.    For Plaintiffs' economic and financial damages in an amount to be proven at trial;

D.    For punitive damages in an amount sufficient to punish Defendants for their conduct, and deter others from the same;

E.    For pre-judgment and post-judgment interest at the statutory rate;

F.    For Plaintiffs' attorneys' fees and taxable costs; and

G.    For such other relief and further relief as the Court deems just and proper under the circumstances.

**RESPECTFULLY SUBMITTED** this 20th day of August, 2025.

**MILLS AND WOODS LAW, PLLC**

By  */s/ Sean A. Woods*
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 100
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

Mills and Woods Law., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2025, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Kathleen L. Wieneke
kwieneke@wienekelawgroup.com
lrasmussen@wienekelawgroup.com
mmahler@wienekelawgroup.com
Christina Retts
cretts@wienekelawgroup.com
Rebekah K. Browder
rbrowder@wienekelawgroup.com
**WIENEKE LAW GROUP, PLC**
1225 W Washington St., Ste. 313
Tempe, AZ 85288
(602) 715-1868
*Attorneys for Defendants Harris, Navarro, Cameron, Adair, Chuey, Goodrich, Freeman, Thomas, Orr, Brown, and Cost*

_____*/s/ Ben Dangerfield*_____

MILLS AND WOODS LAW., PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

52