1 | Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
2 | Rebekah K. Browder, Bar #024992
WIENEKE LAW GROUP, PLC
3 | 1225 West Washington Street, Suite 313
Tempe, Arizona 85288
4 | Telephone: (602) 715-1868
Fax: (602) 455-1109
5 | Email: kwieneke@wienekelawgroup.com
Email: cretts@wienekelawgroup.com
6 | Email: rbrowder@wienekelawgroup.com

7 | *Attorneys for Defendants City of Mesa,
Adair, Brown, Cameron, Chuey, Freeman,*
8 | *Goodrich, Harris, Navarro, Orr, and Thomas*

9

**UNITED STATES DISTRICT COURT**

10

**DISTRICT OF ARIZONA**

11

12 | Christopher Gagne, in his capacity as the
Personal Representative of the Estate of
13 | Shawn Taylor Gagne; Christopher and
Suzette Gagne, husband and wife, as the
14 | surviving parents of decedent Shawn Gagne,

Plaintiffs,

15

vs.

16

17 | City of Mesa, a political subdivision of the
State of Arizona; Matthew Harris, in his
18 | individual capacity and in his capacity as a
police officer; Kyle Thomas, in his individual
19 | capacity and in his capacity as a police officer;
Shawn Freeman, in his individual capacity
20 | and in his capacity as a police officer; Matt
Brown, in his individual capacity and in his
21 | capacity as a police officer; Kyle Cameron, in
his individual capacity and in his capacity as
22 | a police officer; Matthew Chuey, in his
individual capacity and in his capacity as a
23 | police officer; Robert Goodrich, in his
individual capacity and in his capacity as a
24 | police officer; Alejandro Navarro, in his
individual capacity and in his capacity as a
25 | police officer; Matthew Adair, in his
individual capacity and in his capacity as a
26 | police officer; Christopher Orr, in his
individual capacity and in his capacity as a
27 | police officer; ABC Partnerships I-X; XYZ
Corporations I-X; John Does I-X and Jane
28 | Does I-X,
Defendants.

NO. 2:24-cv-01337-SHD

**DEFENDANTS ADAIR, MESA, AND ORR'S MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**

1    Although Plaintiffs filed a Third Amended Complaint ("TAC"), the deficiencies

2    related to the claims against the negotiators, Adair and Orr, and in the *Monell* claim against

3    Mesa remain. Plaintiffs now base liability on a failure to intervene claim based upon a claim

4    that negotiators failed to direct the shooting officers to "stand down." Yet, there is no

5    constitutional requirement of such a "stand down" order in a situation involving a heavily

6    armed, homicidal suspect, that repeatedly threatened to kill officers. Nothing requires a

7    negotiator to preemptively direct an officer to put their guns down—after receiving no

8    communication from the suspect even suggesting surrender—thereby putting the public and

9    officers at risk of being shot and killed. *See Chivers v. Reaves*, 2017 U.S. Dist. LEXIS

10   159397, *100-101 (D. Utah. Sept. 26, 2017) (after lengthy negotiation with a patently

11   uncooperative intoxicated suspect who refused to disarm, surrender, or reveal his location

12   in the home, noting that nothing indicated that the suspect "was no longer armed, or that he

13   was thinking rationally, or that he could not fire at any time upon officers or take his own

14   life."). As the Court noted in *Chivers,* "there was no information indicating that [the suspect]

15   was anything other than armed, unpredictable, and intent on harming himself or others." *Id*.

16   at *102-103. The case law involving failure to intervene addresses constitutional violations

17   occurring in the **presence** of the defendant that they had a reasonable opportunity to prevent,

18   not force that has not even occurred. *See Sweet v. City of Mesa*, 2022 U.S.Dist. LEXIS

19   19879, *49 (D.Ariz. Feb. 4, 2022) (rejecting liability as against bystander officers under

20   both state and federal law finding that plaintiff presented no case where officers were found

21   to have acted with reckless disregard by a failure to act).

22       Next, in amending the *Monell* claim, Plaintiffs only added allegations of prior

23   instances of dissimilar use of force. These "other instances" have no factual similarity and

24   a number of them are/were pending cases. Plaintiffs do not identify a single prior shooting

25   by SWAT officers. Instead, more than half of their cases involve non-lethal force used by

26   patrol officers. Even so, these new allegations only address one element necessary to prevail

27   on a *Monell* claim. Plaintiffs still fail to: (1) identify any specific policy or training

28

2

1   deficiency; and (2) establish that any deficiencies were the moving force behind the

2   constitutional violation.

3   **I.     FACTUAL BACKGROUND**

4          The decedent assaulted his girlfriend, shot a round off his balcony while threatening

5   to kill his girlfriend and a neighbor, armed himself and walked around his apartment with a

6   high-powered rifle pointing it at officers while threatening to kill them, put on body armor

7   and ear protection, and never told anyone that he intended to surrender at any time. *See* Doc,

8   79, Interior Surveillance Video Exs. 1-15. In the TAC, Plaintiffs rely upon and make

9   reference to internal surveillance footage, which this court previously determined was

10   incorporated by reference. (Doc. 94, at p. 9); *see* TAC ¶¶ 35, 74, 87, 164; *Khoja v. Orexigen*

11   *Therapeutics, Inc*., 899 F.3d 988, 1002 (9th Cir. 2018).

12          On July 6, 2023, at approximately 8:35 p.m., Shawn Gagne engaged in a verbal

13   confrontation with a neighbor. (Doc. 101, at ¶ 26). Gagne was confrontational, extremely

14   intoxicated, and scheduled to enter alcohol treatment the next day. (*Id*. at ¶¶ 27-31). The

15   neighbor called 911, reporting the acts of violence, including that Shawn fired a weapon

16   into the air from his patio. (*Id*. at ¶30). Internal cox surveillance confirms that Shawn choked

17   his girlfriend in an act of domestic violence, verbally threatened to kill her, and shot a round

18   off of the patio. (Doc. 79 Exs. 1-7). When officers arrived, they attempted to communicate

19   with Shawn via intercom announcements and sirens, for fifteen minutes with no response.

20   (Doc. 101, at ¶ 33). Officers then attempted to use a beanbag shotgun to "knock" on the

21   front door. (*Id.* at ¶ 34). The decedent's girlfriend communicated to officers that he had

22   previously made suicidal statements and was extremely intoxicated. (*Id*. at ¶ 36-38). Shawn

23   eventually came to the door, screamed at officers to "get out," and was armed with a rifle

24   that he held by his side. (*Id*. at ¶¶ 39). Plaintiff falsely claims that "Shawn awoke from sleep

25   startled and confused," yet the internal surveillance footage documents otherwise as

26   described below.

27          When MPD requested, by PA system that Shawn exit his apartment with nothing in

28   his hands, "Shawn responded by ranting with irrational statements, some inviting violence

1  and others demonstrative of his altered mental state." (*Id*. at ¶ 45). Patrol officers on scene

2  were not wearing body armor sufficient to stop rounds from the decedent's high-powered

3  weapons.  Due to the mortal threat posed by the decedent, responding police officers were

4  not able to clear the nearby apartments of their occupants either. At 10:31 p.m.—around an

5  hour after officers had arrived on scene—Shawn called his girlfriend, who handed the phone

6  to negotiator Adair who "broadcast" the conversation "over MPD radio while officers

7  monitored Shawn's movements." (*Id*. at ¶¶ 47-50).  Shawn "demanded that officers turn off

8  their sirens, put down their lasers, back away from the apartment and leave." (*Id*.).

9        The cox video surveillance documenting the decedent's highly abusive behavior,

10  threats, and criminal conduct that placed him at the highest severity of threat to his

11  girlfriend, neighbors, the public, and officers:

12  - Domestic violence, threats, verbal/physical assault of Jordan. Doc. 79, Ex. 1.
13  - Talking to Jordan: "don't fucking shut no doors on me, I will fucking kick that motherfucker too. Fucking better open that fucking bitch;" "I will kill you. Watch your fucking step." *Id*. at Ex. 2, at 1:00-18, 1:30-35.
14
15  - Threats to his neighbor and Jordan: "fucking shatter your fucking skull, get the fuck out of here…Fucking kill you and your fucking boyfriend;" "Put a bullet right through your fucking skull you fucking fat prick;" "Fucking kill both you fucking bitches (while arming himself with a handgun)." *Id*. Ex. 3, 00-45, 1:00-1:06, 1:56-2:03.
16
17  - Threats to his neighbor and Jordan while gathering his weapons and on the patio: "both you get out of here before I put a hole in both of your fucking heads;" waving a gun around at Jordan and the neighbor, while yelling "get the fuck out of my area…before I fucking decide to take a shot;" then <u>firing a shot into the air</u> "get out, be gone…get out of my fucking area before I kill both of you."  *Id*. at Ex. 4, 00:40-54, 1:23-30, 1:32-51. *Cf*. Doc. 101, ¶ 31 ("neighbor retreated to her home…**alleging** Shawn fired a weapon.")
18
19
20  - "(inaudible) before I drop clips in your fucking mouth bitch (armed with handgun)." Doc. 79, at Ex. 5, 00-21.
21
22  - While gathering weapons, making multiple threats: "I will fucking kill you;" pointing rifle at the front door: "I will fucking put a hole right through your fucking head." *Id*. at Ex. 6, 00-59; 1:48-54.
23
24  - On the phone with Jordan, demanding to know where his AK is, "you fucking stupid cunt, fucking dumbass bitch…stupid bitch"; "I will fucking kill you bro…I'm gonna kill you;" *Id*. at Ex. 7, 00-49, 58-1:02.
25
26  - Rifle aimed forward and looking through the scope. *Id*. Ex. 8, 1:28-1:51.
27  - Mesa PD on scene and the decedent is armed with and walking around with a rifle: "…fucking make commands over here ni**a;" while raising rifle up by window "get this shit out of my home;" while being asked to come out with nothing in his hands-
28

4

"guarantee this bitch…I'll fucking show you ni\*\*a," then opens door with rifle and tells officers to "get out." *Id.* Ex. 9, 00-03, 10-19, 39-1:29.

- Calling Jordan while holding the rifle and talking about the cops: "they want to fucking go, lets go…open up the door…I got my own fucking army. I will blast a whole through your fucking head homie;" rifle aimed and pointed at the door multiple times followed by threats "I will fucking shoot this motherfucker up…I will show you fucking scary;" yelling "I'm not coming out" while pointing and aiming rifle. *Id.* Ex. 10, 00-1:00; 1:02-53; 2:00-08.

- Pointing gun repeatedly and threatening: "they come to my fucking house there is going to be consequences…tell them to come through now I got my fucking shit loaded;" opening door with rifle and yelling at officers to "leave;" "they come through my house I am going to blow a hole right through their fucking head…you want to play a fucking game, lets play." *Id.* at Ex. 11, 00-50; 1:00-1:16; 1:25-38.

- Rifle up and pointed while on the phone with negotiator; numerous threats to negotiator regarding "dumping shots," rifle raised and pointed at windows while threatening officers "get the fuck out of my fucking house before I start dumping shots in your fucking squad cars;" while weapon is aimed and pointed at officers "shine that fucking laser in my house one more time and I will fucking unload;" "lets fucking play guns bro" and pointing rifle at window. *Id.* at Ex. 12, 00-1:09, 1:10-34; 1:39-51.

- With rifle raised at points, "I will show you fucking scary bro…I am about to fucking descend the gods of fucking hell upon you people…move the fuck out of my vicinity, I said move out;" repeated threats of violence when asked to come out—"I will fucking dump a hole right through your fucking squad car (with rifle raised and pointed straight at windows); "if you fucking come into my vicinity there is going to be casualties including myself, I do not give a fuck." *Id.* at Ex. 13, 00-32; 32-59; 2:00-2:08.

- Pacing with rifle in hand, "I am not coming out, on God…you can stay out there all god damn fucking year…I have full thirty round fucking clips. You want to come to my fucking door I will fucking unload on all of your fucking team;" "Come in and get me;" "I'm getting shit ready right now…I ain't playing no fucking games. I got my armor on, fuck this (putting body armor on)." *Id.* at Ex. 14, 00-43; 1:00-1-25.

- With rifle in hand: "I ain't going to go with you mother fuckers, you think I am stupid. Move your squad back before I fucking start desiccating lives out of your squad;" while pointing his rifle, "I am fucking mentally insane, get the fuck out of my house before I start fucking shooting shots," then putting on ear protection, aiming the rifle: "let's see right now, I have my fucking armor on, I have my fucking gun loaded." *Id.* at Ex. 15, 10-1:18; 1:58-2:08.

The decedent committed dozens of felonies during this interaction: (1) multiple counts of aggravated assault and/or domestic violence, choking Jordan while she was restrained and threatening to kill her while discharging a weapon. A.R.S. § 13-1203-1204 (A)(2) & (4), (B)(1) & (2); A.R.S. § 13-3601 (A)(1). Arrest is mandatory. A.R.S. § 13-3601 (B)(1). Firearms may be seized pursuant to subsection (C); (2) aggravated assault against the neighbor. A.R.S. § 13-1204; (3) multiple counts of aggravated assault against all police officers present, including the Defendants, when Plaintiff verbally threatened to kill them

1    while pointing a firearm. A.R.S. § 13-1203 (intentionally placing another person in

2    reasonable apprehension of imminent physical injury) & A.R.S. 13-1204 (A)(2) & (8)(a);

3    (4) multiple counts of resisting arrest, pursuant to A.R.S. §13-2508(A)(1) & (2), by

4    threatening to use physical force against a police officer and using any other means creating

5    a substantial risk of causing physical injury. Violations of subsections 1 and 2 are felonies;

6    (5) criminal negligence by discharging a firearm on the patio of his apartment, a class 6

7    felony. *See* A.R.S. § 13-3107; (6) knowingly wearing or using body armor while

8    committing a felony offense. A.R.S. § 13-3116; and (7) multiple counts of disorderly

9    conduct with a firearm, several misdemeanors (violent or seriously disruptive behavior and

10   uses abusive or offensive language) and a felony (recklessly handles, displays or discharges

11   a deadly weapon). A.R.S. § 13-2904(A)(1), (3) & (6). Where Plaintiffs admit that the

12   decedent was highly intoxicated, he was necessarily "reckless" in all actions he took related

13   to the firearms. Pursuant to *Tennessee v. Garner*, 471 U.S. 1 (1985), the decedent's criminal

14   activities and behavior justified the shooting regardless of whether he had a weapon in his

15   hand when he was shot.

16   **II.    LAW AND ARGUMENT**
         **A.    Plaintiffs' Failure to Intervene Claim Against the Negotiators Fails and**
17            **Qualified Immunity Applies (Count I)[1].**

18   **The Failure to Intervene Claim Fails:** Fourth Amendment standard is one of objective

19   reasonableness, and thus requires the use of force to "be judged from the perspective of a

20   reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and must

21   take into account that officers "are often forced to make split-second judgments…about the

22   amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S.

23   386, 396 (1989). In determining whether **the force** used was reasonable, courts should give

24   "careful attention to the facts and circumstances of each particular case, including the

25

26        [1] The state law claim, Count III, is asserted against all "officer Defendants," but
     Adair and Orr are not referenced.  To the extent that Plaintiffs claim they are included, Rules
     8 & 10 have been violated. In addition, there is no case law in Arizona recognizing a "failure
27   to intervene" claim under state law. Qualified immunity also applies under *Spooner v. City
     of Phoenix*, 246 Ariz. 119, 123 (Ct. App. 2018); *Sweet,* 2022 U.S. Dist. LEXIS 20743
28   (D.Ariz. 2022).

1  severity of the crime at issue, whether the suspect poses an immediate threat to the safety

2  of the officers or others, and whether he is actively resisting arrest or attempting to evade

3  arrest by flight." *Graham,* 490 U.S. at 388. As the Ninth Circuit held in *Ames v. King*

4  *County, Washington*, 846 F.3d 340, 348 (9th Cir. 2017), the first *Graham* factor should not

5  focus too narrowly on the severity of the crime, but rather on the nature of the ongoing

6  emergency exacerbated by a suspect's resistance. *Id.* Because Orr and Adair did not use

7  force, Plaintiffs' theory against them is for failure to intervene in the force that was used,

8  which is a derivative claim that requires that Plaintiffs first establish that each officer's

9  decision to shoot was unconstitutional.

10  In addressing the intervention itself, Plaintiffs do not offer any facts establishing that

11  the negotiators had any realistic opportunity to intervene in any alleged unconstitutional

12  force, were physically capable of preventing the shooting, or even knew conclusively that

13  the officers were going to shoot in the future. There is no constitutional obligation for the

14  negotiators to give any commands to other officers to lower their weapons in the face of

15  receiving no communication from the decedent that he was in fact surrendering and given

16  that he had not been searched. Faced with the decedent's violent actions and verbal tirade,

17  no one on the scene was under any obligation to disarm themselves in the hopes that

18  decedent was not going to kill someone. Such a proposition would only serve to increase

19  the risk to officers and the public and give non-compliant violent suspects an incentive to

20  maintain an extensive period of non-compliance. Under Plaintiffs' theory, as long as a

21  negotiator told a suspect to come out with their hands up and asked for them to surrender,

22  police would then be neutralized, would have to drop their weapons, and then hope that the

23  suspect that they could not even see was going to suddenly follow the law. No case law

24  stands for this proposition.

25  Plaintiffs' claim is even less compelling than those barred in *Fernandez*, 651 F.

26  App'x 692, 693-94, *Ting v. United States*, 927 F.2d 1504 (9th Cir. 1991) (summary judgment

27  proper for non-shooting SWAT officers when officer several feet away positioned all

28  around the room suddenly used force and the incident "transpired in a matter of seconds."),

1   *Burns*, 2017 U.S. Dist. LEXIS 195389 (N.D.Cal. 2017), and *Nelson v. City of Los Angeles*,

2   2018 U.S.Dist. LEXIS 114651 (C.D.Cal. 2018).

3          *Fernandez* involved two officers, one of whom initially pointed a gun at the head of

4   the suspect, but withdrew it, and then ultimately shot the decedent after a further struggle,

5   and another who deployed a Taser and was claimed to have failed to intervene in the

6   subsequent shooting that occurred in a matter of seconds. 2014 U.S.Dist. LEXIS 88745

7   (D.Ariz. 2014). The Ninth Circuit upheld the dismissal on the basis that the non-shooting

8   officer, who did not intercede during the "period of seconds" in which colleague "re-

9   escalated" situation and shot suspect, lacked any "realistic opportunity . . . to intercede in a

10  meaningful way." *Fernandez*, 651 Fed.Appx. at 694.  The Court further noted that qualified

11  immunity was also appropriate because there was no "authority clearly establishing that he

12  needed to intervene in some other manner…"

13         Similarly, in *Nelson*, 2018 U.S.Dist. LEXIS 114651, relying on *Fernandez*, the court

14  rejected a claim that two bystander officers failed to intervene in an encounter, lasting one

15  minute, noting that:

16         At most [the officers] had 30 to 60 seconds during which they could have
           alerted [officers] Nolte and Ramirez that they did not perceive any threat.
17         But they could not have known what Ramirez and Nolte saw from their
           vantage point…Plaintiff has not adduced any evidence that [officers] Herron
18         or Friedrich would or should have anticipated that [officers] Nolte or
           Ramierez would engage in an unprovoked second volley of gunfire or could
19         have done anything to prevent it in the course of less than one minute. . .In
           any event, even if Herron and Friedrich could have intervened, they would
20         nonetheless be entitled to qualified immunity.

21  *Id.*  Here is no evidence of any realistic opportunity for Orr and Adair to intervene in a

22  manner that was safe or appropriate. Plaintiffs offer no support for the contention that any

23  of the shooting officers would have listened, or were even required to listen, to any "order"

24  by negotiators to disarm or "stand down."  There is no evidence that Defendants Orr and

25  Adair knew that further shots would be fired, or even that they had a vantage point to see

26  what was going to occur based upon their position away from the primary scene with the

27  decedent's girlfriend.

28

**Qualified Immunity Applies Because the Law Was Not Clearly Established:** "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (citation omitted). The qualified immunity inquiry is two-fold: (1) whether the facts as alleged show that the official's conduct violated a constitutional right; and (2) if so, whether the right violated was "clearly established." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009). Courts have "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. To deny qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021). "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *City of Tahlequah v. Bond*, 142 S.Ct. 9, 12 (2021) (noting that an unpublished decision and other factually dissimilar cases were insufficient, and granting qualified immunity in a case where officers shot a suspect who raised a hammer). In excessive force cases, "specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

Plaintiffs bear the burden of proving that Supreme Court case law, or at the bare minimum controlling circuit precedent clearly establishes the law. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) ("Neither [the plaintiff] nor the Court of Appeals identified any Supreme Court case that addresses facts like the ones at issue here…Even assuming that Circuit precedent can clearly establish the law for purposes of § 1983, *LaDonde* is materially distinguishable and thus do not govern the facts of this case.").

1    Defendants could locate no Supreme Court or Ninth Circuit case law standing for

2    the proposition that a failure to intervene claim can be made against officers who do not use

3    force and whose only contact with the decedent is through negotiation (Adair), or assistance

4    with that negotiation (Orr). There are no facts alleged that Orr and Adair were in physical

5    proximity to any of the shooters and, in fact, Plaintiffs expressly claim that Defendant

6    Freeman was in a different position. Plaintiffs' theory of liability effectively seeks to make

7    the negotiators liable for the shooting officers' decisions under a theory of either *respondeat*

8    superior, or by virtue of the Ninth Circuit's defunct provocation theory.

9    At most, the existing case law only addresses the shooting officers, not negotiators,

10    and none of the cases involve the level of verbally expressed threats of homicidal actions

11    and risk posed by the decedent. The decedent's alcohol intoxication made him far more

12    dangerous, not less, and being drunk is not equivalent to mental illness. The decedent's

13    girlfriend told officers he had no mental illness. As the Court noted in *Isayeva v. Sacramento*

14    *Sheriff's Dep't,* 878 F.3d 938 (9th Cir. 2017), in addressing the shooting of a mentally ill

15    man, under the influence, and hearing homicidal voices:

16    the deputies had information that made Tereschenko more threatening…[h]e
      was likely under the influence of methamphetamine or some other drugs, and
17    so was possibly less able to control himself…the government interest in
      using force is usually less strong when an individual is mentally ill, *see*
18    *Doerle*, 272 F.3d at 1283, but here Tereshenko's apparent mental condition
      led him to recount homicidal voices, and the knowledge of that fact would
19    increase the perceived threat to any reasonable officer.

20    *Id.* at 952. Police are not obligated to place themselves in danger simply because the person

21    threatening them is intoxicated, or mentally unstable. *See Lal v. California*, 746 F.3d 1112

22    (2014) (qualified immunity granted where it was clear that the decedent was attempting to

23    provoke officers to shoot him and he advanced with a large rock over his head).

24    While not directly addressing negotiator claims (because no such law exists), two

25    cases addressing the lack of liability for shooting officers are instructive; if the law is not

26    clearly established for the shooting officers, it follows that that negotiators who use no force

27    could not face liability for failing to intervene. First, in *Long v. City & County of Honolulu*,

28    511 F.3d 901 (Ninth Cir. 2007), the Ninth Circuit affirmed summary judgment finding no

constitutional violation in the shooting death of an armed barricaded suspect. Police were summoned to the suspect's residence after he fired shots at several partygoers. *Id*. at 904. Patrol officers arrived and were later replaced by a SWAT team, who maintained a perimeter, and made telephone contact with the suspect who was asked to surrender, but he did not. *Id.* Throughout the night, the suspect walked around in an agitated state and shouted threats to get the "fuck out of his yard," and was threatening to shoot the lights the police were shining on the property. *Id.* After it was reported that the suspect fired shots, officers shot the suspect. *Id*. at 905. No shell casings were recovered from the suspect's residence. *Id.* The force was determined to be objectively reasonable because the shooting officer had observed the behavior, heard the suspect's threats to shoot police, saw the suspect with a rifle, knew the suspect previously fired shots, and it was reported over the radio that that the suspect was shooting. *Id.* at 906. Whether or not "Long actually fired his rifle at these officers is also immaterial. It is enough that [the shooting officer] heard the radio transmission and observed Long point the rifle in the officers' direction." *Id*.

Second, in *Sabbe v. Wash. Cnty. Bd. Of Comm'rs*, 84 F.4th 807, 812 (9th Cir. 2023), officers received a report that a suspect was "solid drunk," "belligerent," driving in a field, and may have shot a gun. Within an hour 30 patrol cars arrived, an armored truck arrived that attempted to execute a PIT maneuver, and then officers shot the suspect eighteen times. *Id.* The officers were told that the suspect had a gun, did not like the police, and would protect his property. *Id*. at 814. After the armored vehicle collided with the truck in an attempt to disable it, an officer thought he heard a shot and believed that the suspect was "maneuvering the rifle to point it out the passenger side." *Id*. at 815. An AR-15 rifle was found in the truck. In addressing qualified immunity relating to the shooting, the Court found it to be immaterial as to whether the suspect actually fired his weapon as "the relevant question for purposes of qualified immunity" is not whether Sabbe actually threatened the officers, but whether they 'could reasonably have believed that [h]e posed such a threat." *Id*. at 828. "Our case law is clear that when a suspect reaches for a gun or aims a weapon at officers, responding with deadly force does not violate the constitution." *Id*. When a suspect

11

1    is armed, "even a furtive movement" can "create an immediate threat" sufficient to justify

2    the use of deadly force. *Id.* The court found that it was reasonable to perceive the decedent

3    as an immediate threat because they had multiple reports that he might be armed and

4    intoxicated, he was behaving erratically and hostile, officer saw him with a rifle, and the

5    officers believed that the suspect was shooting or going to shoot. *Id.*

6        Here, Defendants Adair and Orr responded to the scene of a reported domestic

7    violence incident where the decedent shot a firearm, threatened the neighbor and his

8    girlfriend, came to the door with a rifle in his hand, repeatedly threatened to kill officers,

9    was wearing body armor, and was repeatedly pointing the firearm at officers while yelling

10   threats. (Doc. 79, Exs. 1-15). As the Court noted in, *George v. Morris*, 736 F.3d 829, 838

11   (9th Cir. 2013), "[t]his is not to say that the Fourth Amendment always requires officers to

12   delay their fire until a suspect turns his weapon on them. If the person is armed — or

13   reasonably suspected of being armed — a furtive movement, harrowing gesture, or serious

14   verbal threat might create an immediate threat." The decedent was seen armed by third-

15   parties and officers, shot a weapon previously, came to the door armed, touted the number

16   of weapons and ammunition he possessed, was heard loading a firearm, and made serious

17   and repeated homicidal threats. The decedent was far more dangerous and hostile than the

18   mentally-ill suspect that was armed with a fake gun in *Estate of Strickland v. Nevada Cnty,*

19   69 F.4th 614, 621 (9th Cir. 2023). The Ninth Circuit, in finding the shooting reasonable,

20   noted that an officer should not have to wait "until a gun is pointed at [them] before [they

21   are] entitled to take action." *Id.* at 620. Nothing in the facts of these cases supports the

22   proposition that negotiators breached some duty to intervene in a shooting that was

23   reasonable. Qualified immunity bars the claims against Adair and Orr.

24        **B.    The *Monell* Claim Remains Deficient.**

25        In its ruling on the first Motion to Dismiss, the Court identified the three ways in

26   which a plaintiff could satisfy *Monell's* policy requirement: (1) acting pursuant to an

27   expressly adopted official policy; (2) when there is a longstanding practice or custom; or

28   (3) when a policy maker ratified a subordinate's unconstitutional decision or action and the

1    basis for it. (Doc. 94, at p. 12). For failure to train allegations, plaintiff must establish a

2    constitutional violation, a training policy that amounts to deliberate indifference, and a

3    constitutional injury that would not have resulted if the municipality properly trained their

4    employees. This Court noted that "'…a pattern of similar constitutional violations by

5    untrained employees is ordinarily necessary to demonstrate deliberate indifference for

6    purposes of failure to train." *Id.* at 62.' (Doc. 94, at p. 13).  This Court held:

7           As for Plaintiffs' allegations regarding Mesa's policies, Plaintiffs merely
            allege that Mesa 'promulgated or adopted' vaguely described policies. (*See*
8           Doc. 60 ¶¶ 81-82, 86.) There are no details offered about these supposed
            policies nor how they caused the alleged constitutional violations…As for
9           Plaintiffs' allegations of a Mesa custom or practice, (see Doc. 60 ¶¶ 83-84),
            Plaintiffs have not 'provided any allegations of similar incidents…to allow
10          the conclusion that the conduct has become a traditional method of carrying
            out policy'…Further, although Plaintiffs allege a list of supposed 'policies,
11          customs, or practices' that create a 'culture of impunity,' (Doc. 60 ¶ 84),
            these allegations suffer from the same deficiency as the allegations regarding
12          Mesa's policies—the allegations are 'just the sort of fact-free conclusions
            that the Ninth Circuit has deemed insufficient to support a Monell claim.'
13          *Warren*, 2023 WL 7686666, at *8.  The same is true for Plaintiff's allegations
            that Mesa failed to properly train or supervise its officers.

14   (Doc. 94, pp 14-15). Plaintiffs TAC, however, makes no attempt to remedy the majority of

15   these deficiencies. Plaintiffs repeat the same conclusory allegations in the *Monell* count,

16   without offering any facts establishing any deficiency in the policies or training.[2] *See J.K.J.*

17   *v. City of San Diego*, 17 F. 4th 1247, 2021 U.S. App. LEXIS 33778 at *15-16 (9th Cir. Nov.

18   15, 2021) ("[J.K.J.] appears to argue that the officers' alleged deviation from training

19   indicated the need for more or different training. But the amended complaint never

20   identified what additional training was required beyond what Taub and Durbin received.

21   Nor did it allege facts indicating that his supposed failure to enhance officer training wat

22   the moving force behind Jenkins' injuries.")

23          The only "facts" that were added involve pending, settled, or past litigation, which

24   has no similarity to this case and offers no evidence that the conduct at issue was a

25

26

27          [2] Mesa pointed out the existence of its policies on its website in the first Motion to
28   Dismiss. Plaintiff did not take any facts from the policies and add them into the TAC.

1  traditional method of carrying out policy.[3] *See Johnson v. City of Vallejo*, 99 F. Supp. 3d

2  1212, 1220 (E.D. Cal. 2015) ("[Defendants] also specifically contend that evidence of

3  Kenney's involvement in three of the shootings in 2012 has no nexus with a failure to train,

4  let alone a nexus to wrongdoing. This argument is persuasive in light of Plaintiffs' inability

5  to affirmatively show each of these shootings constituted excessive force or a constitutional

6  violation of some sort."). Pending or settled cases do not involve any judicial determination

7  of unconstitutional force. Plaintiffs were on notice of the need for specificity of actual prior

8  constitutional violations of a similar nature by the Defendants' previous citation to *Andrich*

9  and *Warren*.

10         In *Andrich v. Kostas*, the court dismissed plaintiff's *Monell* claims alleging a policy

11  and custom of excessive force in the form of officer involved shootings ruling "[t]he raw

12  number of police shootings by PPD in 2018 doesn't show that PPD had notice of a pattern

13  of 'similar constitutional violations'—the SAC does not allege any facts concerning the

14  other shootings, let alone facts suggesting the other shootings involved individuals with

15  schizophrenia and/or were unjustified." 470 F.Supp. 3d 1048, 1064 (D.Ariz. June 30, 2020).

16  Although the deadline to amend had not yet passed, this court refused to permit amendment

17  given the fact that plaintiff had multiple prior opportunities to amend. *Id.* at 1066. The Ninth

18  Circuit agreed and affirmed dismissal of the *Monell* claims and the denial of leave to amend,

19  holding that the operative complaint failed to include any facts to give fair notice of liability.

20  *Andrich v. Kostas*, 2023 U.S. App. LEXIS 25002 (9th Cir. Sept. 21, 2023).

21         Much like in *Andrich*—but relying on even more dissimilar cases, many of which

22  are not even shootings—Plaintiffs' allegations fail. Specifically, Plaintiffs rely upon sixteen

23  cases of "excessive force" that occurred during an eight year period between 2016 to 2023.

24  Three of these cases occurred after the Gagne shooting. Of the thirteen other incidents that

25  occurred before Gagne, only eight are shootings. Not a single one of the eight shootings

26

27      [3] Plaintiffs cite to news articles regarding cases and settlements. News articles,
   however, are not the proper subject for judicial notice for proving the truth of their contents,
28  nor do settlements of disputed claims establish liability.

involved a SWAT callout with an armed suspect who repeatedly threatened to kill officers.

Instead, six of the cases involved shootings during, or following, a traffic stop. None of the

shooting cases are similar and are insufficient to establish any unconstitutional pattern,

policy, or training deficiency:

- *Gavrila v. City of Mesa*, 2:24-cv-02181-KML, Doc. 14 (pending litigation non-shooting), date of incident July 17, 2023, traffic stop of a felony suspect who fled on foot. Deployment of less-lethal bean bag shotgun, pepperball, and Taser. The suspect fell after an impact push and died. This incident occurred after the Gagne shooting and is therefore also irrelevant. *See* TAC, ¶ 187a. *See* https://www.youtube.com/watch?v=80sXQHkCJlg&list=PLodB8qVlDE3b4BaBnn kuwqfuQbyFFzabU&index=13. No factual similarity.

- *Carter v. Lawrence,* 2:24-cv-00670 (pending litigation, shooting), date of incident July 7, 2022. Plaintiff, in her vehicle, followed a patrol officer for a distance, then rammed into the officer's *vehicle* as it was entering a secured parking lot. The officer jumped out of the moving vehicle and fired at the suspect. The officer fired a second time as the suspect fled. One gunshot wound that was non-life threatening. https://www.youtube.com/watch?v=SCc5e7ISA_4. *See* TAC ¶ 187b. No factual similarity.

- *Hodges v. Mesa*, 2:24-cv-00832-SMM-CDB (Doc. 1-1) (settlement, non-shooting), date of incident November 26, 2021. *See* TAC at ¶ 188a. Female alleged she was approached by patrol officers and told to sit on curb while they investigated a property issue. The plaintiff claimed that she needed to stretch and stood up and officers shoved her down by her shoulder and it was bruised. She claimed that her husband was in jail and officers had been on the property before and associated her with the bad conduct of her husband. No factual similarity.

- *Valdez v. City of Mesa*, 2:24-cv-00642 (Doc. 1)- decedent Alberto Noriega, date of incident March 22, 2022 (settlement, shooting). The decedent was riding a stolen motorcycle, followed by patrol officers and the air unit and fled. Officers fired a less lethal bean bag round, and deployed a Taser. Noriega then reached into his waistband to grab what appeared to be a handgun, was given multiple commands not to reach to his waistband, and was shot. https://www.youtube.com/watch?v=U22VOe-ztt8&list=PLodB8qVlDE3b4BaBnnkuwqfuQbyFFzabU&index=25. Plaintiffs list this incident twice, as if it were two separate instances in TAC ¶ 188b & 188e. No factual similarity.

- *Virginia Archer v. Mesa*, et. al, 2:18-cv-02434 (non-shooting, settlement). *See* TAC ¶¶ 188c & 191 (describing the same incident in two separate paragraphs). Plaintiffs cite to a news article alleging that officers used excessive physical force against her while doing a welfare check on her suicidal grandson. No factual similarity.

- *Shaver v. City of Mesa*, 2:17-cv-00152-PHX-GMS (settlement, shooting), date of incident January 18, 2016. This case involved a patrol response to an individual at a hotel who was reported to be armed with a gun. The facts of the incident are set in the Ninth Circuit's decision at *Sweet v. Langley*, 798 Fed. Appx. 135 (9th Cir. Mar. 13, 2020). The shooting officer, Brailsford, was criminally charged and, therefore, this incident does not represent any ratification by Mesa. *See* Maricopa County Superior Court Case No. CR2016-004743. Plaintiffs allege that "Shaver was crying and begging for officers not to shoot him as he crawled unarmed toward them at their request." *See* TAC ¶ 201. Plaintiffs describe this one single incident in multiple paragraphs as if it were separate incidents. *Id*. TAC at ¶¶ 188d, 196-198, 200-201. There is no factual similarity between *Shaver* and Gagne. Unlike *Shaver*, Gagne was

armed, wearing body armor, and made repeated homicidal threats. SWAT officers took over the scene after patrol formed a perimeter, gave multiple commands to exit, and tried to gain Gagne's compliance through negotiation. There was never any outward indicia of compliance by Gagne.

- *Spencer v. Pew*, 2:20-cv-00385 (non, shooting, settlement), date of incident March 21, 2018. The Ninth Circuit granted qualified immunity for strikes, "smashing" plaintiff's head in the ground, "having an officer wrap his hands tightly around Plaintiff's neck," and Taser. *See* Spencer v. Pew, 117 F.4th 1130 (9th Cir. Sept. 15, 2024). The Ninth Circuit found a question of fact only as to the use of a knee to pin the plaintiff after he was placed in handcuffs.  There is no allegation that officers used force on Gagne's back or neck to pin him to the ground after he was shot. Plaintiffs also describe this incident twice as if it represented two separate incidents. *See* TAC ¶ 189,193; *See Rodriguez v. City of Phoenix*, 2:23-cv-02232 (Doc. 22, p. 20) (granting Motion to Dismiss on a *Monell* claim and noting that plaintiff misrepresented and misdescribed prior lawsuits that had no similarity).

- *Barraza v. City of Phoenix*, 2:23-cv-02436 (Docs 4 & 38), (non-shooting, settlement) date of incident October 2, 2022. Patrol officers responded to a call of an assault at a Quinceanera where plaintiff was the suspect (adjudicated guilty following a bench trial in Mesa Municipal case 2022059516). Officers struggled to get plaintiff into custody and fist strikes, knee strikes, and a Taser were deployed. This was not a shooting case and has no factual similarity. Plaintiffs describe this incident three times as if it were a different incident in Paragraphs 189, 192, and 209.

- *Lane v. City of Mesa*, CV-19-00852, date of incident April 20, 2017 (shooting, settlement). The facts are set forth in *Lane v. City of Mesa*, 2021 U.S. Dist. LEXIS 266707 (D.Ariz. Nov. 9, 2021). The decedent was a passenger in a vehicle that was being driven by a dangerous criminal suspect. Mesa's Violent Offender USMS Task Force were involved in locating the suspect and the vehicle. A vehicle containment was utilized and officers fired at the suspect when he reached around in the vehicle and struck a passenger, who was unarmed and had her hands in the air, killing her. Unlike in *Lane*, Gagne was not an unarmed innocent bystander. He was a violent felon who had choked his girlfriend, shot a round in the air while threatening to kill his girlfriend and a neighbor, was armed with high powered weapons, and threatened to kill officers.

- *Johnson v. City of Mesa*, 19-cv-02827-PHX-JAT (non-shooting, settlement), date of incident May 23, 2018. The undisputed facts of this physical only struggle, involving fist strikes, are set forth in *Johnson v. City of Mesa*, 2021 U.S. Dist. LEXIS 170355 (D. Ariz. Sept. 8, 2021). Johnson was not armed with a firearm, or body armor, and did not make repeated threats to shoot and kill officers as Gagne did.

- *Sewell v. City of Mesa*, 2:21-02036- PHX-DJH (shooting, settlement) (Doc. 1), date of incident December 6, 2019. Patrol officers responded to a bar requesting that plaintiff be trespassed. Plaintiff attempted to walk away from officers and a struggle ensued.  Plaintiff alleged that he was non-threatening, unarmed, and not resisting was shot in the buttocks by one of the officers at point blank range.

- *Angel Benitez*- September 25, 2021 (shooting, settlement). Plaintiffs allege that "Benitez was unarmed and shot by multiple officers as he was following their instructions to exit the vehicle he was in." *See* TAC ¶ 206. Gagne, however, was armed, wearing body camera, refused to follow commands for an exceptionally long period, was barricaded in his residence, came to the door with a rifle, threatened to kill officers, and was a violent felon.

- *Diego Varela*, September 5, 2021 (shooting, traffic stop) *See* TAC ¶ 207. https://www.youtube.com/watch?v=mAaVWXuaK_I&list=PLodB8qVlDE3b4BaB

16

nnkuwqfuQbyFFzabU&index=30. Officers responded to a running vehicle with a person slumped over the seat. Officers arrived and found a driver and passenger slumped over. The man woke up and put his vehicle into reverse, hit an officer's vehicle, and then drove forward over the curb. Two officers began running after the truck and another got into his vehicle to follow. The suspect then drove toward a patrol vehicle, hit it, and the officer fired shots (missing the suspect and the passenger). Varela was charged in Maricopa County Superior Court case CR2021-133658 and pled guilty to endangerment of the of the officer.

- July 2, 2022 (shooting, traffic stop). *See* TAC ¶ 208. A patrol officer conducted a traffic stop after seeing a vehicle swerving. As he opened the door, the vehicle sped off and he fired two rounds at the fleeing vehicle. The driver was not hit by any shots. *See*https://www.youtube.com/watch?v=zT6GTxGhyKk&list=PLodB8qVlDE3b4BaBnnkuwqfuQbyFFzabU&index=22. A traffic stop and flight therefrom is not similar to the Gagne shooting.

- *McGinty v. City of Mesa*, Maricopa County Superior Court Cv2024-026476 (pending- Motion to Dismiss granted, shooting), date of incident: September 29, 2023. *See* TAC ¶ 210. This incident is irrelevant as it occurred six months after the Gagne shooting. Patrol officers responded to a call of a suspect trying to kill himself. He armed himself with a large hunting knife, disregarded commands to stop advancing on officers, and was shot. https://www.youtube.com/watch?v=mOVkBEKFhAs&rco=1. This shooting is factually dissimilar.

- David Dimas (shooting)- date of incident: December 15, 2023. Patrol officers responded to a 911 call of a family fight where the suspect had been physical, locked himself in a shed, and was burning things. The suspect exited a shed, with his hands concealed, ignored commands to stop, quickly raised his concealed hands in a threatening manner, and was shot with a beanbag, Taser, and lethal force. This incident is irrelevant as it occurred six months after the Gagne shooting. *See* https://www.youtube.com/watch?v=IncDC3QcJOM&list=PLodB8qVlDE3b4BaBnnkuwqfuQbyFFzabU&index=9. *See* TAC ¶ 211. This shooting is factually dissimilar.

Just as in *Warren v. Penzone*, 2024 U.S. Dist. LEXIS 89121, *15-17 (D.Ariz. May 17, 2024), Plaintiffs have failed to identify any prior similar incidents, involving the same type of force and similar facts. This is particularly problematic where this case involves a specialty unit with members that receive far more specialized training than patrol officers, yet Plaintiffs rely exclusively on incidents that do not involve SWAT officers. At most, during an eight-year period, Plaintiff identify eight shootings. This number, in a large metropolitan city, is hardly enough even on its own to suggest that any unconstitutionality is afoot.

Moreover, while Plaintiffs attempt to use the mere existence of these incidents to also support a failure to discipline, the Ninth Circuit has held that the mere failure to discipline individual officers accused of unconstitutional conduct does not amount to

ratification. *See Haugen v. Brousseau,* 351 F.3d 372, 393 (9th Cir. 2013), *vacated on other grounds sub nom, Brousseau v. Hagan,* 543 U.S. 194, 201 (2004). Thus, a plaintiff must show that the City made a deliberate choice to endorse the officer's actions *and* the bases for them as its own policy. *Gillette v. Delmore,* 979 F.2d 1342, 1348 (9th Cir. 1992)*; See, e.g., Booke v. Cty. of Fresno*, 98 F. Supp. 3d 1103, 1129 (E.D. Cal. 2015) (no ratification where police chief relied on review board's finding that force was justified); *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1186-91 (D. Haw. 2003) (ratification requires something more than the failure to reprimand; otherwise, "counties might as well never conduct internal investigations and might as well always admit liability."). The bald allegation that the officers in these prior incidents were not disciplined is insufficient to first show that there was misconduct and then to establish that a policymaker endorsed the officers' conduct and the basis therefor as their own policy.

## III.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be granted. As Plaintiffs have already amended once and not cured the deficiencies and the Rule 16 deadline has long passed, further amendment should not be granted.

DATED this 12th day of September, 2025.

**WIENEKE LAW GROUP, PLC**

By:    */s/ Christina Retts*
Kathleen L. Wieneke
Christina Retts
Rebekah K. Browder
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
*Attorneys for Defendants City of Mesa, Adair, Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, Orr, and Thomas*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Sean A. Woods
Robert T. Mills
Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

By:   */s/ Lauren Rasmussen*

19