**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Christopher Gagne, et al.,

Plaintiffs,

v.

City of Mesa, et al.,

Defendants.

No. CV-24-01337-PHX-SHD

**ORDER**

On September 12, 2025, Defendants City of Mesa ("City"), Matthew Adair, and Christopher Orr (together, "Defendants") moved to dismiss Plaintiffs Christopher and Suzette Gagne's (together, "Plaintiffs") § 1983 claims against them. (Doc. 102.) The motion is fully briefed, and I heard oral argument on October 6, 2026. (Docs. 111, 112, 131.) The motion to dismiss will be **granted in part** and **denied in part**.

## I. BACKGROUND

On July 6, 2023, Mesa Police Department ("MPD") officers shot and killed Shawn Gagne.[1] (*See* Doc. 101 at ¶¶ 19–23.) Plaintiffs are Shawn's parents; Chrisopher also sues as personal representative of Shawn's estate. (*Id.* at ¶¶ 3–4.) Relevant here, Plaintiffs allege that the MPD officers who shot Shawn ("Shooting Officers") used excessive force in violation of the Fourth and Fourteenth Amendments; that two negotiators on scene, Officers Adair and Orr ("Negotiating Officers," or "Officers Adair and Orr"), failed to

[1] In my prior order granting Defendants' first motion to dismiss, I summarized Plaintiffs' allegations in detail. (*See* Doc. 94.) Most of those allegations remain unchanged in Plaintiffs' Third Amended Complaint ("TAC").

intercede in that unconstitutional conduct; and that the City has a custom or practice of using deadly force when it is not necessary. (*See id.* at ¶¶ 213–58.) Only the claims brought against the Negotiating Officers and the *Monell* claim against the City are at issue here.

**A. Allegations Against Officers Adair and Orr**

On the evening of July 6, 2023, one of Shawn's neighbors called 911 and reported that Shawn had fired a weapon into the air from his patio.[2] (*Id.* at ¶ 31.) At 9:33 p.m., MPD surrounded the apartment. (*Id.* at ¶ 32.) Shawn's fiancée, Jordan, told officers he was heavily intoxicated, was depressed, had made suicidal statements, and should be given time to sober up. (*Id.* at ¶¶ 36–38.) At one point, Shawn came to his front door holding a rifle pointed down at his side and yelled at officers to "get out." (*Id.* at ¶¶ 39–40.) Around 10:00 p.m., MPD SWAT ("SWAT") arrived. (*Id.* at ¶ 41.) The SWAT officers were ordered to replace MPD patrol officers "on the southern perimeter of Shawn's apartment." (*Id.* at ¶ 42.) Several SWAT officers also set up sniper positions with "direct lines of sight to Shawn's unit windows and glass patio doors." (*Id.* at ¶ 43.) Defendant Freeman was in a sniper position. (*Id.*) He had "a clear line of sight to Shawn's apartment and could observe Shawn through a sliding glass door window." (*Id.* at ¶ 44.) At 10:19 p.m., the Primary Scene Supervisor, Officer Samons, "instructed Shawn to exit his apartment without anything in his hands" using a vehicle PA system. (*Id.* at ¶ 45.) Shawn responded with "irrational statements, some inviting violence." (*Id.*) Samons "repeatedly" told Shawn that "MPD would 'guarantee [his] safety' if Shawn came out of his apartment with 'nothing in [his] hands.'" (*Id.* at ¶ 46.)

At 10:31 p.m., Shawn called his fiancée, who handed the phone to Defendant Adair.

---

[2] I may consider documents incorporated by reference into the complaint without converting the motion to dismiss into one for summary judgment. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1002 (9th Cir. 2018). But "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* at 1003. I previously held that the Cox surveillance footage is incorporated by reference. (Doc. 94 at 9 n.5.) That video, however, sheds little light on Plaintiffs' claims against the Negotiating Officers and the City. I therefore do not rely on the Cox Surveillance video to reach my decision.

(*Id.* at ¶ 48.) Adair told Shawn that he would "relay [Shawn's] request for the police to relocate" and "encouraged Shawn to walk out the front door." (*Id.*) Adair's conversation with Shawn "was broadcast over MPD radio while officers monitored Shawn's movements through the windows and glass patio doors." (*Id.* at ¶ 49.)

At 10:41 p.m., "SWAT officers began aiming rifle lasers through the windows into the apartment." (*Id.* at ¶ 50.) Shawn was still on the phone with Adair. (*Id.*) At 10:42 p.m., "Shawn laid his rifle down on his kitchen counter." (*Id.* at ¶ 51.)

After Shawn put down his rifle, Defendant Freeman "open[ed] fire, hitting Shawn." (*Id.* at ¶ 52.) Defendant Orr, a Secondary Negotiator, informed Adair that there had been "an officer-involved shooting." (*Id.* at ¶ 69.) Adair again instructed Shawn to "walk out the front door with his hands up." (*Id.*) Shawn told Adair that he had been hit and was injured. (*Id.* at ¶ 70.) Forty-three seconds after his first shot, "Freeman fired a second round at Shawn." (*Id.* at ¶¶ 53, 55.) Adair heard Freeman's second shot. (*Id.* at ¶ 71.)

Freeman saw Shawn begin to move through the apartment towards the front door. (*Id.* at ¶¶ 59–62.) Shawn was unarmed and had his hands raised. (*Id.*) "As Shawn walked out of the kitchen toward the front door, Adair asked Shawn if he was hurt and where he had been hit." (*Id.* at ¶ 75.) Shawn replied that he was "struck in the face." (*Id.*) Adair told Shawn that "emergency personnel were on scene to render him aid once he exited his apartment," and "again requested [that] Shawn make his way towards the front door exit with his empty hands raised." (*Id.*)

As Shawn approached the stairway landing leading to his front door, "he was subjected to a barrage of gunfire from MPD." (*Id.* at ¶ 81.) Adair and Orr heard the gunfire, and then heard Shawn cry out "I'm down! I'm down! I'm down!" (*Id.* at ¶¶ 81–83.) Neither Adair nor Orr told the Shooting Officers to stand down or relayed that Shawn was "down" or injured. (*Id.* at ¶ 84.)

About 15 seconds later, Shawn opened his front door. (*Id.* at ¶¶ 85, 121.) He "presented himself, unarmed and with nothing in his hands." (*Id.* at ¶ 122.) MPD Officers "unleashed . . . another hail of bullets on Shawn." (*Id.*) Shawn fell face down in the

doorway. (*Id.* at ¶¶ 124, 126.) It was only after "at least 84 bullets were fired" that Adair shouted, "weapons down!" (*Id.* at ¶ 127.) MPD "fired explosive devices into the apartment," "tazed Shawn's body," handcuffed him, and "dragged him into the front of the apartment." (*Id.* at ¶¶ 125–26.) Shawn was pronounced dead at 11:41 p.m. (*Id.* at ¶ 128.) Plaintiffs allege that Adair and Orr "could have and absolutely should have announced weapons down" at any point after Freeman's first shot. (*Id.* at ¶ 72.)

**B. Allegations Against the City**

Plaintiffs assert that the City has a custom or practice of moving to the highest level of force when it is not necessary.[3] To support this claim, Plaintiffs allege that within "the first six months of 2022 alone, the City of Mesa paid out $5,444,000 to settle 10 claims against its officers, with payments ranging from $4,000 to $2,450,000." (Doc. 101 at ¶ 195.) Plaintiffs also list sixteen excessive force incidents involving MPD officers. (*Id.* at ¶¶ 186–211.) Of these, ten incidents are officer-involved shootings, and of those ten, five are shootings of unarmed individuals. (*See id.*; *see also* Doc. 102 at 16–17.) In January 2016, an officer shot and killed Daniel Shaver as he "crawled unarmed toward [officers] at their request." (Doc. 101 at ¶ 201.) The City ultimately paid $9,500,000 in settlements related to the incident. (*See id.*) In April 2017, officers shot and killed Sariah Lane, who "was not armed and not suspected of any crime." (*Id.* at ¶ 202.) The City settled the resulting excessive force lawsuit for $2.45 million. (*Id.*) In December 2019, an officer shot Randy Sewell, who "was unarmed and not suspected of a serious crime." (*Id.* at ¶ 205.) That suit settled for $1.75 million. (*Id.*) And in September 2020, officers shot and killed Angel Benitez, who "was unarmed and shot by multiple officers" even though he was complying with their instructions. (*Id.* at ¶ 206.) The City paid $250,000 to settle the

---

[3] Plaintiffs' TAC invokes several different types of *Monell* claims. (*See* Doc. 101 at ¶¶ 233–58 (alleging variously that "upon information and belief" the City "has a policy," has "failed to properly train and supervise" its officers, and has created a "culture of impunity" by "permitting officers to use excessive and unnecessary force without fear of discipline or oversight").) At oral argument, Plaintiffs' counsel clarified that they bring only a "custom" claim against the City and described that custom as "moving to the highest level of force when it is not necessary."

suit arising from that incident. (*Id.*) Finally, on December 15, 2023, officers shot David Dimas, who "was self-harming himself and experiencing a behavior health crisis." (*Id.* at ¶ 211.) Plaintiffs do not allege that this incident resulted in any lawsuit or settlement. (*See id.*)

### C. Procedural History

Plaintiffs filed this action on June 4, 2024. (Doc. 1.) On August 23, 2024, they filed a First Amended Complaint ("FAC"). (Doc. 60.) Defendants filed a partial answer on September 6, 2024, and a partial motion to dismiss. (Docs. 63, 66, 67, 71.) Relevant here, I granted Defendants' motion to dismiss Plaintiffs' § 1983 claim against the Negotiating Officers because Plaintiffs did not identify what constitutional right the Negotiating Officers had allegedly violated. (Doc. 94 at 10–11.) I declined to reach qualified immunity without that necessary clarification, and granted Plaintiffs leave to amend. (*Id.*) I also dismissed Plaintiffs' *Monell* claim against the City because it turned on conclusory allegations, and, with respect to their custom and practice theory, Plaintiffs had "only offered Shawn's shooting by Mesa police as an instance of constitutional violations stemming from Mesa's alleged custom." (*Id.* at 14–15.) Plaintiffs filed a Second Amended Complaint on August 20, 2025, and nine days later filed the operative TAC by stipulation. (Docs. 96, 99, 100, 101.) The Shooting Officers answered, (Doc. 103), and the City and the Negotiating Officers filed this motion, (Doc. 102). The motion is fully briefed, (Docs. 111, 112), and I heard oral argument on October 6, 2026, (Doc. 131).

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). A claim is plausible if the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Well-pleaded factual allegations are accepted as true and construed in the light most favorable to the plaintiff. *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144–45 (9th Cir. 2013). I do not, however, accept

legal conclusions as true, nor must I consider "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. That said, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A "well-pleaded complaint may proceed even if" actual proof of those facts "is improbable[] and . . . a recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

## III. DISCUSSION

### A. Negotiating Officers

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted). To determine whether an official is entitled to qualified immunity, courts ask (1) whether the facts alleged show a constitutional violation, and (2) whether the right was "clearly established" at the time of the violation. *Id.* at 232. Courts may take the prongs in either order. *Id.* at 242. At the pleading stage, the question is whether the complaint alleges facts that, taken as true, show the officers "violated clearly established constitutional rights of which a reasonable officer would be aware in light of the specific context of the case." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) (quotation marks omitted).

Plaintiffs allege that the Negotiating Officers violated a clearly established constitutional right when they failed to intercede in Shawn's shooting by failing to (1) relay their conversation with Shawn to the Shooting Officers, and (2) tell the Shooting Officers to stand down.[4]

#### 1. Failure to Intercede

Police officers "have a duty to intercede when their fellow officers violate the

---

[4] At oral argument, Plaintiffs clarified that their only claim against the Negotiating Officers is the § 1983 claim for failure to intercede (Count 1). They do not bring their state-law claims (Counts 3 and 5) against the Negotiating Officers. (*Id.*)

constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996)). "If an officer fails to intercede, the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who performed the offending action." *Tobias v. Arteaga*, 996 F.3d 571, 584 (9th Cir. 2021).

There are four components to a failure to intercede claim. First, there must be an underlying constitutional violation. *See id.* at 582–84. Second, the officers who do not intercede must have knowledge of the underlying violation. *See Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1029 (9th Cir. 2002) (holding that line officers had no duty to intercede in the execution of an unconstitutional warrant because they did not know that the warrant was defective). Third, those officers must have a "realistic opportunity to intercede." *Cunningham*, 229 F.3d at 1290. *Ting v. United States*, 927 F.2d 1504, 1511–12 (9th Cir. 1991) (holding that when officers are "physically incapable of preventing" the force and events "transpire[] in a matter of seconds" they do not have a realistic opportunity to intercede); *see also Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (officers who were "on the other side of the home" and who were not dog handlers, could not have intervened in beating and dog attack of suspect "during the rapidly unfolding chaos of the physical struggle to apprehend" him). Fourth, and finally, the officers' inaction must have been "the cause in fact of [the plaintiff's] injuries." *Ting*, 927 F.2d at 1511.

I will assume, for the purposes of this motion, that Plaintiffs have adequately alleged an underlying constitutional violation: that the Shooting Officers used excessive force when they shot Shawn, who was unarmed and attempting to surrender.[5] Even so, Plaintiffs' claim against the Negotiating Officers fails because they have not alleged either that (1)

---

[5] The Shooting Officers answered the TAC and did not challenge the adequacy of its allegations on this point. (Doc. 103.) The Negotiating Officers, however, argue that the TAC fails to allege that the Shooting Officers use of force was unconstitutional. (*See* Doc. 102 at 6; Doc. 112 at 3–4.) I decline to address this argument because it is not necessary to the analysis.

the Negotiating Officers had knowledge of an ongoing or imminent constitutional violation, or (2) the Negotiating Officers' failure to intervene caused Shawn's death.

a. Knowledge

Plaintiffs allege that, after Freeman's first shot, Orr told Adair that there had been an officer-involved shooting. (Doc. 101 at ¶ 69.) Adair and Orr then heard Shawn say that he was hit and injured. (*Id.* at ¶ 70.) Forty-three seconds passed, during which Adair and Orr continued to encourage Shawn to surrender and to leave the house with his hands raised. (*Id.* at ¶¶ 53, 55, 69.) Adair and Orr then heard Freeman's second shot. (*Id.* at ¶ 71.) Shawn told Adair that he had been hit in the face. (*Id.* at ¶ 75.) Adair continued to urge Shawn to come outside. (*Id.*) Adair and Orr next heard a volley of shots, and then Shawn say "I'm down! I'm down! I'm down!" (*Id.* at ¶¶ 81–83.) Fifteen seconds later, Shawn opened the door and the Shooting Officers opened fire. (*Id.* at ¶ 85.)

Plaintiffs do not allege, however, that Adair and Orr could see Shawn, or the Shooting Officers, at any point during the incident. Adair and Orr did not see Shawn put down his gun or move to the front door with his hands raised. Shawn did not tell Adair that he was prepared to surrender, or that he was unarmed, or that he was coming outside. Nor do Plaintiffs allege that Adair and Orr saw Shawn open the front door, or could see, at that point, that he no longer posed a threat. Thus, according to the allegations in the TAC, Adair and Orr only knew that Shawn was armed, shots were fired, and Shawn was hit and injured.

These allegations do not trigger a duty to intercede. There are many scenarios in which shooting at an armed suspect is constitutional. *See, e.g.*, *Scott v. Henrich*, 39 F.3d 912, 915–16 (9th Cir. 1994) (holding that officers who shot and killed an armed man in his apartment acted reasonably). Based on the limited information Adair and Orr possessed during the incident, they could not have known whether their fellow officers were using reasonable or unreasonable force. Indeed, Adair and Orr lacked any of the information necessary to determine whether shooting at Shawn was appropriate under the circumstances. Without knowledge of an underlying constitutional violation, Adair and

Orr had no duty to intercede. *See Ramirez*, 298 F.3d at 1030 (holding that an officer "cannot be held liable for failing to stop a search he did not know was illegal").

b. Realistic Opportunity to Intercede and Causation

Plaintiffs also fail to allege facts supporting the inference that Adair and Orr could have prevented the shooting. Although Plaintiffs have arguably alleged that Adair and Orr had a realistic opportunity to intercede, they have not alleged the requisite causal connection.[6]

To begin, the parties disagree about whether close physical proximity is required to establish a realistic opportunity to intercede. Defendants assert that physical proximity is required, and argue that because Adair and Orr were nowhere near the Shooting Officers, they did not have an opportunity to intercede. (*Id.*; *see* Doc. 112 at 6.) It is true that, in many instances, an officer will need to use physical force to stop unconstitutional conduct, for example, by physically restraining a fellow officer to prevent his or her use of excessive force. In such cases, physical proximity is required. *See Ting*, 927 F.2d at 1511–12. But there may be situations in which an officer could intervene in unconstitutional conduct *without* physical proximity—for instance, a superior may be able to intervene by giving a command to cease unconstitutional behavior. Thus, physical proximity is not necessary if the plaintiff's theory of intervention does not require it.

Here, Plaintiffs' theory is that Officers Adair and Orr should have interceded by using the MPD radio (1) to communicate critical information to the Shooting Officers, or (2) command the Shooting Officers to stand down. It is plausible that Officers Adair and Orr could have radioed the Shooting Officers in the period between Freeman's first shot

---

[6] The "realistic opportunity" and "causation" analyses are closely tied. As I see it, whether officers had a realistic opportunity to intercede asks whether the officers had the time and means to do so. *See, e.g.*, *Ting*, 927 F.2d at 1512. The question of "causation" asks whether a plaintiff's theory of intervention would have been effective—that is, assuming the officers had done precisely what the plaintiff claims they should have done, would that action have prevented the plaintiff's injuries? If officers lack the time and means to intervene, "it cannot be said that [their] failure to intervene was the cause in fact of [the plaintiff's] injuries." *Id.*

and the final volley at the front door. I will therefore assume that they had an opportunity to intercede. *But see Waller v. City of Nogales*, 2023 WL 3863655, at *7 (D. Ariz. June 7, 2023) (holding that there was no "realistic opportunity to intervene" when the officers "were in the vicinity and equipped with radios").

Regardless, Plaintiffs offer no allegations supporting a reasonable inference that Adair and Orr's failure to communicate with the Shooting Officers caused Shawn's death. Put another way, Plaintiffs fail to allege that the Shooting Officers would have behaved differently if Adair and Orr had interceded by radio. Plaintiffs do not allege, for example, that Adair and Orr had the authority to order the Shooting Officers to stand down, or that the Shooting Officers would have followed such a command absent that authority. Nor do they allege any facts suggesting that the Shooting Officers would have behaved differently had they known that Shawn had told the Negotiating Officers that he was injured and was down, or that Adair was telling Shawn to surrender. *See Kirk v. City of Phoenix*, 2025 WL 1952677, *4–7 (D. Ariz. July 16, 2025) (finding no duty to intervene where the plaintiff's theory was that officers who could communicate with the shooting officer by radio should have informed the shooting officer that the suspect was unarmed).

Indeed, Plaintiffs' allegations cut *against* them in this regard because they allege that the Shooting Officers could see into the apartment—which Adair and Orr could not—and that at least one of the Shooting Officers, Officer Freeman, saw Shawn put down his gun and saw that he had been injured by the first shot. (Doc. 101 at ¶¶ 60–63.) Further, Plaintiffs allege that when Shawn opened the door all the Shooting Officers could see he was not armed. (*See id.* at ¶¶ 94–152.) Thus, despite Plaintiffs' arguments that Adair and Orr had critical information about Shawn that the Shooting Officers lacked, the TAC demonstrates that it was the Shooting Officers who possessed the relevant facts, not Adair and Orr.[7]

---

[7] Plaintiffs also allege that Adair's conversation with Shawn "was broadcast over MPD radio while officers monitored Shawn's movements." (Doc. 101 at ¶ 49.) At oral argument, Plaintiffs explained that it is not clear whether the Shooting Officers could hear the broadcast or were operating on a different channel. I therefore do not construe this

Plaintiffs have failed to allege that Officers Adair and Orr had knowledge of any underlying constitutional violation, or that their failure to intervene caused Shawn's death. They thus cannot satisfy the first prong of the qualified immunity analysis.

**2. Clearly Established**

To overcome qualified immunity, Plaintiffs must show that the constitutional right violated was clearly established, that is, that "existing precedent must have placed the statutory or constitutional question beyond debate." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021) (quotation marks omitted). "To find that a right is clearly established, courts generally need to identify a case where an officer acting under similar circumstances was held to have violated the Constitution." *Zorn v. Linton*, 607 U.S. 568, 572 (2026) (per curiam) (citation modified). Although general standards can clearly establish the law only in "the rare obvious case," *City of Escondido v. Emmons*, 586 U.S. 38, 44 (2019) (per curiam) (quotation marks omitted), the Supreme Court increasingly requires that "[t]he relevant precedent . . . define the right with a high degree of specificity," and emphasizes that "[p]rinciples stated generally, such as that an officer may not use unreasonable and excessive force, do not suffice," *Zorn*, 607 U.S. at 572 (citation modified).

Plaintiffs concede that there is no case directly on point and I have found none. Plaintiffs thus rely on the argument that this is "the rare obvious case" in which a general standard can clearly establish the law. It is not. As described above, Plaintiffs have failed to allege that the Negotiating Officers committed any constitutional violation, let alone an "obvious" one. Officers Adair and Orr are entitled to qualified immunity.

**3. Leave to Amend**

Leave to amend will be denied. Plaintiffs have amended their complaint three times. (Docs. 60, 96, 101.) More importantly, at oral argument, and in their briefing, Plaintiffs offered no additional facts they could plead to bolster their claim against the Negotiating Officers. (Doc. 111 at 17.) I therefore find that further amendment would be futile. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself,

---

allegation against them.

justify the denial of a motion for leave to amend.").

### B. *Monell* Claim

A municipality may not be held liable under § 1983 for the actions of its subordinates. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To establish municipal liability, a plaintiff must show that a municipality's "policy or custom" led to the injury. *Id.* A "longstanding practice or custom" can satisfy that requirement. *Hartzell v. Marana Unified Sch. Dist.*, 130 F.4th 722, 734 (9th Cir. 2025) (quotation marks omitted). The plaintiff "must allege *facts* that would support the existence of the alleged policy, practice, or custom." *Warren v. Penzone*, 2023 WL 7686666, at *6 (D. Ariz. 2023). Conclusory allegations are insufficient. *Id.* "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). One or two incidents will not suffice, but there is no minimum number. *See id.*; *see also Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017). The prior incidents must be similar, and a "raw number of police shootings," without facts suggesting they were unjustified, is not enough. *Andrich v. Kostas*, 470 F. Supp. 3d 1048, 1064 (D. Ariz. 2020), *aff'd*, 2023 WL 6157407 (9th Cir. Sept. 21, 2023).

At oral argument, Plaintiffs characterized their *Monell* claim as follows: MPD has a custom of moving to the highest level of force when it is not necessary. Plaintiffs' amendments to the TAC include a list of incidents in which MPD officers were accused of excessive force. (*See* Doc. 101 at ¶¶ 186–211.) Many of these incidents are not similar enough to this case to warrant consideration. At bottom, Plaintiffs allege that the Shooting Officers used excessive force when they shot an unarmed individual who was no longer a threat. I will therefore disregard the incidents that (1) do not involve an officer shooting at an unarmed individual, and (2) do not include any indication that the use of force was unconstitutional. This excludes all the incidents involving non-lethal force, the shootings

of armed suspects, and the shooting of David Dimas.[8] Plaintiffs thus allege four incidents between 2016 and 2020 that are relevant to the analysis because they involved MPD officers who shot unarmed individuals and the City paid significant settlements to resolve each. (*Id.* at ¶¶ 201–202, 205–206.) These incidents are similar enough to the present case to plausibly allege—at this stage of the case—that the City has a custom of using deadly force when it is not necessary.

Defendants argue that the prior shootings involved patrol officers in different settings, and that none involved a SWAT callout. (Doc. 102 at 14–17.) Those differences may matter at summary judgment or at trial, but they do not defeat the similarity of the conduct alleged at this stage. And although settlements are not admissions of liability, the significant sums paid by the City indicate that the claims had some merit. *Est. of Osuna v. County of Stanislaus*, 392 F. Supp. 3d 1162, 1173 (E.D. Cal. 2019) (holding that a *Monell* claim was adequately plead when the plaintiff pointed to "numerous prior cases in which defendants were either found liable or agreed to pay a substantial monetary sum to resolve excessive use of force claims"). Defendants also argue that four shootings of unarmed individuals over five years is statistically insignificant given the number of use-of-force incidents MPD officers face. This too, is an argument better suited to summary judgment or trial. I will not find, at this early stage, that four shootings of unarmed individuals cannot, as a matter of law, demonstrate a custom of using deadly force when it is not warranted.

I acknowledge, however, that this is a close question. Four incidents over five years is not a large number, and the most recent incident preceded Shawn's death by nearly three years. But it is more than the "one or two" incidents the Ninth Circuit has found insufficient. *Oyenik*, 696 F. App'x at 794. Additionally, whether a custom exists is normally a question of fact for the jury. *Trevino*, 99 F.3d at 920. Plaintiffs will ultimately have to show that a custom existed and that it was the "moving force" behind Shawn's

---

[8] Although Dimas appears to have been unarmed, Plaintiffs do not offer any allegation that the force used against him was determined to be unconstitutional—by a court, or by a significant settlement. (*See* Doc. 101 at ¶ 211.)

death. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). At the pleading stage, the present allegations suffice. *See Twombly*, 550 U.S. at 556; *see also Est. of Osuna*, 392 F. Supp. 3d at 1175 (holding that a complaint that "pair[s] general averments of a policy or custom with particular examples" can survive the pleading stage). I will therefore deny Defendants' motion as to the *Monell* claim and allow Plaintiffs to proceed on their custom theory.

## IV. CONCLUSION

Plaintiffs have not plausibly alleged that Officers Adair and Orr knew the Shooting Officers were violating Shawn's constitutional rights, or that their failure to communicate with the Shooting Officers caused his death. Nor have Plaintiffs identified clearly established law that would have put Officers Adair and Orr on notice that their conduct was unlawful. Adair and Orr are therefore entitled to qualified immunity, and because further amendment would be futile, the claim against them will be dismissed with prejudice. With respect to the *Monell* claim, Plaintiffs' allegations of four prior shootings of unarmed individuals by MPD officers are enough, at this stage, to state a custom claim against the City.

Accordingly,

**IT IS ORDERED** granting in part and denying in part Defendants' Motion to Dismiss (Doc. 102) as follows: Plaintiffs' claim against Defendants Adair and Orr (Count 1) is dismissed with prejudice. Plaintiffs' *Monell* claim against the City (Count 2) may proceed.

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate Defendants Matthew Adair and Christopher Orr as parties.

**IT IS FURTHER ORDERED** directing the City of Mesa to answer Count 2 within 14 days of this Order. *See* Fed. R. Civ. P. 12(a)(4)(A).

Dated this 15th day of October, 2026.

Honorable Sharad H. Desai
United States District Judge