Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
Rebekah K. Browder, Bar #024992
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: cretts@wienekelawgroup.com
Email: rbrowder@wienekelawgroup.com

*Attorneys for Defendants City of Mesa, Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, and Thomas*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Christopher Gagne, in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne,

Plaintiffs,

vs.

City of Mesa, a political subdivision of the State of Arizona; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and in his capacity as a police officer; Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his individual capacity and in his capacity as a police officer; ABC Partnerships I-X; XYZ Corporations I-X; John Does I-X and Jane Does I-X,

Defendants.

NO. 2:24-cv-01337-SHD

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On the night of July 6, 2023, Shawn Gagne got on top of his girlfriend, Jordan Wirtjes, and put his hands around her neck during a physical altercation over what she wanted for dinner. After the altercation, when Jordan was attempting to flee the apartment, he threatened to shoot her for not packing her things and leaving fast enough. When she left the apartment and met up with a neighbor outside in the parking lot, Mr. Gagne fired a gun from his second-floor balcony while shouting that he would kill both of them if they did not clear the streets around his apartment. He armed himself with an AK-47 fitted with an optic, sat down in the dark, and waited with the rifle across his lap. He was roused sometime later by police ordering him to exit the residence, but instead of doing so, he paced his apartment holding the rifle. He threatened to open fire on officers if they did not leave his house and said that he had his weapons for a reason. He promised he would shoot at the patrol cars if they did not turn off their lights. He appeared again and again at his doors and windows with the rifle while he shouted threats to use deadly force over the phone to a police negotiator, and he held the high ground over officers whose vests could not stop his ammunition. When officers used lethal force against him that night, any reasonable officer would have understood Mr. Gagne to present an immediate deadly threat, because, after all, that is what Mr. Gagne was explicitly trying to communicate when he strangled Jordan, fired a shot into the air while threatening his neighbor, and told law enforcement that he would shoot them if they persisted in investigating those crimes.

The Court's October 15 Order narrowed this case to the eight officers who fired during the shooting and to a single claim against the City, while dismissing claims against the negotiators Adair and Orr. Under § 1983, the City only faces a *Monell* claim that it has a custom of "moving to the highest level of force when it is not necessary." (Doc. 132 at 4 n.3). Now that discovery has closed and the record has been developed, the Court should dismiss the remaining claims against the Defendants. The argument addresses the Fourth and Fourteenth Amendment merits, qualified immunity on the force and failure-to-intervene claims, the City's federal liability, the state-law defenses, punitive damages, and statutory costs and attorney fees.

## I. STATEMENT OF FACTS

### A. Before The Police Arrived

During an argument over dinner, Mr. Gagne got on top of Jordan Wirtjes and put his hands around her neck. (Doc. 79, Ex. 1). He armed himself with a handgun, told Jordan and a neighbor that he would "put a bullet right through your fucking skull," and fired a shot into the air from his patio while telling them to leave "before I kill both of you." (Doc. 79, Ex. 3 at 1:00-1:06, 1:56-2:03; Ex. 4 at 1:23-1:51). He then sat down in the dark with an AK-47 rifle across his lap until officers arrived. (Ex. 1, Living Room Video 2023-07-06 09-57-52 PM). An interior surveillance system recorded all of Mr. Gagne's actions inside the apartment, but no officer knew it existed or had access to it at the time. (Doc. 101 ¶ 164).

### B. What The Officers Knew

The neighbor called 911 at 9:33 p.m. The call comments relayed to officers stated that Mr. Gagne had threatened to "blow the reporting party's brains out," was armed with long guns (three AR-15s) and a handgun, had fired a round from his patio, and had a history of firing a weapon in his unit. (Ex. 2, Gutierrez Rpt., MESA_002000; Ex. 3, Orr Supp., MESA_002303; Doc. 63, Ex. 5, 911 Call (under seal) and Ex. 6, CAD Records at pp. 15-17, 20-21).[1] At the scene she repeated her account, and Officer Newby broadcast that officers had probable cause to arrest Mr. Gagne for aggravated assault.[2] (Ex. 4, Newby Supp., MESA_002279). Jordan told officers that Mr. Gagne was alone, heavily intoxicated, armed with an AR-15, a .45 caliber handgun, and a shotgun, and would be confrontational with officers. (Ex. 2, Gutierrez Rpt., MESA_002000; Doc. 63, Ex. 8, Gutierrez Body Camera interview of Jordan (under seal) and Ex. 6, CAD at p. 19). A post incident toxicology report later confirmed that Mr. Gagne's blood alcohol content was .218. (Ex. 28, Tox. Rpt., MESA_ MESA_002299).

[1] To comply with LRCiv 7.1 (d), which prohibits the refiling of exhibits, Defendants reference the prior filings where these exhibits were attached instead of reattaching the same.

[2] Although the officers did not have the interior surveillance video at the time, the video conclusively establishes that these events did in fact occur. (*See* Doc. 79, p. 3 and Exs. 1-3).

**C. The Standoff**

At 10:16 p.m. patrol officers began public-address announcements instructing Mr. Gagne to leave the residence, and when he did not respond they fired bean bag rounds at the door and a window to try and get his attention. (Ex. 5, Timeline, MESA_002373). At 10:26 p.m. he opened the front door holding the AK-47 style rifle and closed it again. (Ex. 6, Ingram Supp., MESA_002235; Ex. 7, Chuey Depo. 48:14-49:5; Doc. 63, CAD Ex. 6, pp. 23-24; Doc. 79, Ex. 9). Officer Freeman, a SWAT precision rifle instructor and the only sniper on scene, saw him through the one uncovered window "holding an AK-47 in high port with an optic on top of it." (Ex. 8, Freeman Depo. 33:2-4). The other windows were covered with foil, and vertical blinds hung over the south sliding door. (*Id.* 30:19-31:2). Because Mr. Gagne "had the high ground on all of the patrol officers outside," Freeman set up in a darkened second-floor apartment about forty yards away. (*Id.* 33:2-34:2; 44:15-17). Freeman understood that the patrol officers' vests would not stop the AK-47's high powered round, which could also pass through the stucco walls of the complex and endanger bystanders in the surrounding apartments. (*Id.* 51:5-51:12).

At about 10:32 p.m. a crisis negotiator, Officer Adair, reached Mr. Gagne on Jordan's phone. (Ex. 9, Adair Depo. 17:13-24; Doc. 63, Ex. 3, Negotiator Call). Over the next ten minutes he threatened Adair repeatedly: "You're about to have a fucking crisis if you don't get away from my fucking house. Back the fuck up. Right now. With all your fucking SWAT and all your gear, I don't give a fuck. Get the fuck out of my fucking face before I fucking start dropping shots in them." (Ex. 6, Ingram Supp., MESA_002260; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, Interior Videos Exs. 9-13). "I got AK's, I got fucking AR's bro. I'll fucking blow a fucking hole right through your fucking head." (Ex. 6, Ingram Supp., MESA_002261; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13). "I've got my fucking armor on. I've got my fucking guns ready. You guys want a fucking full Iraq war from one person, then you better fucking get right." (Ex. 6, Ingram Supp., MESA_002262; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13). "Shine that laser in my house one more time and I'll fucking unload." (Ex. 6, Ingram Supp.,

MESA_002260; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13). "You guys want to play fucking guns? You guys want to play guns? Let's fucking play guns bro." (Ex. 6, Ingram Supp., MESA_002261; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13). "If you guys fucking come into my vicinity, there are gonna be casualties, including myself." (Ex. 6, Ingram Supp., MESA_002261; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13). Adair could hear him loading rounds into a magazine, and the threats were relayed over the radio as the call went on. (Ex. 6, Ingram Supp., MESA_002261-62; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13; Doc. 63, Ex. 6, CAD at pp. 25-28). Throughout the call Mr. Gagne said that he was not coming out and that he wanted the officers to leave. (Ex. 6, Ingram Supp., MESA_002261; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13). He never offered to surrender. (Ex. 9, Adair Depo. 77:21-78:11; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13).

Mr. Gagne repeatedly told Adair that he was not coming out and never offered to surrender—instead, he said that if officers came in he would start the next Iraq war. (Ex. 6, Ingram Supp., MESA_002261; Ex. 9, Adair Depo. 77:21-78:11; Doc 63, Ex. 3, Negotiator Call). Officer Gutierrez, standing beside Adair, updated other SWAT officers over the radio, including, after Adair reported hearing him load a weapon, that "he would shoot anyone that was by his house if they did not move." (Ex. 2, Gutierrez Rpt., MESA_002001; Doc. 63, Ex. 6, CAD pp. 25-28). Freeman, Harris, and Cameron heard the relays that Mr. Gagne would start shooting patrol cars and had chambered a round. (Ex. 8, Freeman Depo. 46:10-15; Ex. 6, Ingram Supp., MESA_002239, 002252; Doc. 63, Ex. 6 CAD at pp. 25-28). Officers could see that he was wearing body armor. (Ex. 7, Chuey Depo. 48:14-49:5).

The officers had information and believed that Gagne was armed with an AK-47, which utilizes a 7.62 X 39 cartridge that can defeat body armor, including some hard plates, penetrate multiple layers of drywall and glass, and cause substantial injury at substantial distances. (Ex. 7, Chuey Depo., 124:8-126:12; Ex. 8, Freeman Depo., 128:24-131:15). If Mr. Gagne had retreated into an unseen area of the apartment and had started firing, he

could cause significant injury or death to multiple people even without intentionally aiming at them. (Ex. 7, Chuey Depo. at 126:14-20). Had Mr. Gagne started firing, the officers would have had substantial difficulty containing the rounds, in part because the windows were obscured by objects, including foil. (*Id.* at 128:2-19).

### D. Freeman's First Shot

After hearing that Mr. Gagne had said he would start shooting at patrol cars, Freeman watched Mr. Gagne walk past the uncovered window carrying the AK-47 at high port but held his fire because Mr. Gagne was too deep in the apartment for an effective shot. (Ex. 8, Freeman Depo. 46:10-47:5). When Freeman next saw him, Mr. Gagne was at the south sliding door above the patrol officers, parting the blinds with his left hand and holding the rifle in his right. (*Id.* 47:6-9; 68:8-15). Freeman believed that Mr. Gagne was looking through the blinds to shoot at the officers below as he had threatened to Adair, so Freeman fired a round at the gap in the blinds. (*Id.* 46:10-23; 68:16-20; 49:19-24). Officer Widmer, arriving as the second sniper, saw Mr. Gagne at the slider "attempting to look at the officers on the ground level while still holding a rifle." (Ex. 10, Widmer Supp., MESA_002380). The interior camera, which officers did not have access to at the time, shows Mr. Gagne walking toward the slider with the rifle in both hands at a low ready, then moving out of frame. (Ex. 11, Living Room Video 10-41-20 at 1:10). At the moment of the shot, he cannot be seen. (*Id.* at 1:20-1:25). The camera shows only the tip of the barrel resting on the kitchen counter, "still moving as if the stock was still being held up," then dropping to the floor. (*Id.* at 1:25-1:45; Ex. 12, Handy Rpt. at 19, MESA_008939; Ex. 13, Noedel Rpt., MESA_008965, 008968). Officer Freeman was specifically concerned about the threats made, Mr. Gagne’s elevated position, the AK-47 weapon that could penetrate vehicles, the risk to civilians, the reported chambering of a round, and his belief that immediate action was necessary to stop an ambush. (Ex. 8, Freeman depo, 67:6-73:3). There is no evidence that this shot was fatal. (Doc. 63, Ex. 1, Medical Examiner’s Report, p. 2, 5-6 (atypical gunshot wound, fractures without grossly apparent penetration into the intracranial space; perforating gunshot wound to the soft tissues)).

### E. The Perceived Return Fire and The Second Shot

Forty-three seconds later, at 10:43:20 p.m., officers around the perimeter heard a second gunshot. (Ex. 5, Timeline, MESA_002373; Doc. 63, Ex.6 CAD at 27; Doc. 63, Ex. 11, Helicopter Video). It sounded loud and unsuppressed, unlike the suppressed rifles used by the SWAT officers, including Freeman. (Ex. 14, Harris Depo. 78:11-22). Harris radioed, "the suspect is firing out at us," and Brown said, "He's shooting out." (Ex. 6, Ingram Supp., MESA_002255, 002257; Doc. 63, Ex. 6 CAD at 27). Freeman had watched Mr. Gagne go down after the first shot, get back up, and return to the slider with the rifle at high port. (Ex. 8, Freeman Depo. 78:22-24; 79:17-22). One second after the unsuppressed shot, Freeman fired a second round at Mr. Gagne. (*Id.* 80:2-10; Ex. 5, Timeline, MESA_002373). Mr. Gagne then moved north, out of Freeman's view. (Ex. 8, Freeman Depo. 81:3-8).

Ater the fact analysis by Defendants' reconstruction expert explains that the rounds fired by police crossed the living room and shattered the far sliding door to the north patio, so that "[t]he shattered glass on the opposite side of the living room would appear to an outside observer as projectiles coming from inside the apartment." (Ex. 13, Noedel Rpt., MESA_008982; Doc. 63, Ex. 11, Helicopter Video). Defendants' police practices expert concludes that "it was understandable, based on video evidence, why the officers' perceived Gagne was either preparing to shoot or had shot through the windows in the direction of officers." (Ex. 12, Handy Rpt. at 21). Plaintiffs' expert describes the same events as "friendly crossfire by the SWAT team" whose rounds "were erroneously attributed to Mr. Gagne." (Ex. 15, Hafkey Rpt. at 19, GAGNE_007743).

### F. The First Volley

At 10:44:17 p.m. Harris, thirty-five feet from the north patio, heard a second set of shots and saw glass leaving the north slider, which he understood as rounds coming out. He radioed that the suspect was firing out the north window. (Ex. 14, Harris Depo. 67:10-71:8; 75:7-76:17; Ex. 6, Ingram Supp., MESA_002255-58; Ex. 5, Timeline, MESA_002373; Doc. 63, Ex. 11, Helicopter Video). Thomas heard "an audible different set of gunfire," saw smoke and glass come out of the south slider and muzzle flash light the room, saw

movement low in the slider consistent with someone kneeling, and fired three to four rounds at that spot. (Ex. 16, Thomas Depo. 75:17-78:1). Chuey heard shots from inside, saw glass splinter on the north patio and muzzle flash, and fired through the drywall at the flash. (Ex. 7, Chuey Depo. 60:16-65:7). Brown and Navarro each believed they saw Mr. Gagne at the window beside the west slider holding what they took to be a rifle and fired. (Ex. 6, Ingram Supp., MESA_002247-49).

The interior camera shows that as the volley began, Mr. Gagne was crossing the living room toward that window, hunched forward, with his hands beside his head, his elbows out in a manner that could have been reasonably mistaken for a firearm. (Ex. 17, Living Room Video 10-44-09 at 0:13-0:20; Ex. 12, Handy Rpt. at 19). He fell down the stairs toward the front door, and shouted "I'm down," though he had left his phone in the living room, so his voice was only distantly audible, and he was no longer in direct communication with negotiators. (Ex. 17, Living Room Video 10-44-09 at 0:16-0:30; Ex. 6, Ingram Supp., MESA_002262). As a result of Mr. Gagne's movements and his blocking of the windows with tin foil and blinds, no officer had a clear view inside the apartment. (Ex. 6, Ingram Supp., MESA_002235, 002239; Ex. 8, Freeman Depo. 30:16-31:2).

**G. The Doorway Volley**

After a pause of about thirteen seconds, the front door "flew open." (Ex. 14, Harris Depo. 79:4-84:3; Ex. 13, Noedel Rpt., MESA_008977-78). Chuey, watching through magnified optics, saw an object that "resembled a firearm" pointed toward the team. (Ex. 7, Chuey Depo. 76:7-77:20). Goodrich saw Mr. Gagne's right side bladed in the doorway, his body armor, and what he thought was a rifle at "low port." Cameron said, "it looked like the suspect was holding a rifle in his right hand." (Ex. 6, Ingram Supp., MESA_002245, 002252). Harris said he saw a rifle magazine and the suspect had no hands visible and exhibited no sign of surrender. He ultimately fired because he perceived an imminent or immediate threat of serious physical injury or death. (Ex. 14, Harris Depo. 81:25-85:22). One to two seconds passed between the door opening and the shots. (Ex. 14, Harris Depo. 107:6-108:20). Harris, Goodrich, Chuey, and Cameron fired. (Ex. 13, Noedel Rpt.,

MESA_008978). Officer Chuey believed that, under A.R.S. § 13-410, Gagne met the statutory criteria of likely endangering human life or inflicting serious bodily injury unless apprehended without delay; Mr. Gagne possessed a weapon system capable of causing serious injury or death to officers and civilians. (Ex. 7, Chuey Depo., 126:14-128:19). He did not provide a warning because his perception was that Mr. Gagne was armed, he had engaged in previous dangerous and threatening behavior, had body armor, and when he opened the door, he was partially obstructed and was in a position of advantage. (*Id*. at 74:1-76:5, 76:7-77:20, 92:16-95:16).

When he fired, Sgt. Harris knew that Mr. Gagne was reported to have fired shots days earlier, on July 4, which was significant as recent weapons, violence, or criminal history heightens the threat recognition because it supplies more than a verbal threat: It reflects prior conduct, means, motive and opportunity. (Ex. 14, Harris Depo., 110:16-112:18). In addition, domestic violence incidents are routinely volatile and Mr. Gagne's possession of the AK-47 weapons platform, coupled with his repeated threats, posed an imminent danger. (*Id.* at 112:23-118:25). Had Mr. Gagne started firing, at any point, this incident could have become a mass-casualty event and officers could not have effectively prevented such lethal violence if Mr. Gagne had followed through on the threats. (*Id*. at 119:1-18).

Later, when officers were able to safely approach, they found Mr. Gagne was wearing a plate carrier, and an AR-15 magazine and boxes of ammunition lay beside him at the door. (Ex. 6, Ingram Supp., MESA_002246, 002251). The AK-47 lay upstairs on the kitchen floor. (Ex. 13, Noedel Rpt., MESA_008965).

Adair took "I'm down" to mean that Mr. Gagne might have been hit. He did not understand the words as a surrender, because Mr. Gagne had said nothing about coming out and had said the opposite throughout the call. (Ex. 9, Adair Depo. 33:2-3; 77:21-78:11). The last shots were fired at about 10:44:39 p.m., and shortly afterward Adair called "weapons down." (Ex. 6, Ingram Supp., MESA_002256-58; Doc. 76, Ex. 2 at 10:44:50-58; Ex. 9, Adair Depo. 81:16-18). After the volley, Chuey could see Mr. Gagne's leg in the

doorway, and Thomas heard over the radio that the suspect was down by the front door. (Ex. 6, Ingram Supp., MESA_002243, 002251).

### H. Ballistic Reconstruction

Not all of the shots fired hit Gagne or were even directed at him. The Medical Examiner's report identifies six distinct shots. (Doc. 63, Ex. 1). Expert Noedel's report contains a scene diagram, positions of the officers, and their distances from Gagne (ranging from 70 feet to 115 feet). (Ex. 13, Noedel Rpt., MESA_008963). A total of 49 gunshots were discharged from police weapons, but 43 of the fired bullets did not strike Mr. Gagne. (*Id*. at MESA_008979). There were multiple firearms and ammunition located in the Gagne residence including: (1) a Riley Defense RAK47, AK47 style rifle containing steel full metal jacket projectiles, the rifle safety lever was down (in the fire position), and there was an extended magazine. There was a 7.62 fired cartridge case nearby; (2) a Typhoon model F12, 12 gauge semiautomatic shotgun, loaded with low base shotshells and there were numerous shotgun shells in the residence; (3) a Springfield model XD semiautomatic pistol with a loaded magazine. A fired handgun cartridge was located on the floor inside the bedroom door; (4) a M&P rifle with loaded magazine was documented on the shattered glass on the exterior deck; and (5) a third documented fired cartridge case was located on the shattered glass of the porch. (*Id*. at MESA_008965-66).

**Officer Freeman**: Fired two rounds. (*Id*. at MESA_008969). The first projectile traveled through the double pane tempered glass, which can cause a fired bullet to break apart creating multiple fragments. *(Id.)* The wound to Mr. Gagne's face, the small "through and through" gunshot wound that entered his right upper lip and exited near his jaw, is consistent with the fragment of a fired bullet hitting Mr. Gagne rather than a complete fired .308 bullet directly striking him. *(Id.)* The additional impacts were consistent with fragments coming from the fragmentation of Officer Freeman's bullet that hit the side wall over the dining room table, impacted the refrigerator and perforated through the kitchen wall. (*Id.* MESA_008969-008973).

***Officers Navarro, Brown and Sgt. Thomas***: After Freeman's shots, Officer Navarro fired once, Brown fired three times, and Thomas fired two times. (*Id*. at MESA_008977). Sgt. Thomas directed his gunfire at the lower corner of the kitchen window, as he saw the blinds moving there. (Ex. 16, Thomas Depo. 75:17-78:1). Sgt. Thomas believed that an imminent threat existed because he thought the subject had fired toward officers, threatened to shoot police and was moving near the slider. (*Id.* at 86:20-87:16). These gunshots all appear to have missed Mr. Gagne and several crossed the living room to hit and shatter the opposite sliding glass door, hanging light over the front door and other locations inside the apartment. (Ex. 13, Noedel Report, MESA_008977; Doc. 63, Ex. 11, Helicopter Video at 1:40-45 (three shots exit)).

After rounds exited the slider glass door, the officers reasonably believed that Mr. Gagne was firing and delivered multiple rounds toward the structure of the patio, which are visible as flashes of light hitting the railing and stucco. (Doc. 63, Ex. 11, Helicopter Video at 1:44-47). Officer Chuey had previously seen Mr. Gagne wearing a ballistic vest/plate carrier, knew about the events that caused the call, and had seen Mr. Gagne holding a rifle. (Ex. 7, Chuey Depo., 51:9-52:15, 56:8-16). Chuey also previously saw Mr. Gagne come to the front door with a dark object and believed it was the gun he had previously seen Mr. Gagne holding. (*Id*. at 59:18-60:5, 72:11-73:25). He later heard Freeman's gunfire and what sounded like a round from inside the apartment. (*Id.* at 60:6-61:16). Chuey then saw glass splinter on the north-side patio door and he fired toward the direction of the glass splintering. (*Id*. at 61:17-65:7). Chuey specifically aimed at the drywall to the right of the sliding door because he reasonably believed that Mr. Gagne was near that location and intended to stop him from shooting. (*Id*. at 67:9-68:18). Unknown to Officer Chuey and the other officers firing toward this location, Mr. Gagne was not at this location but had gone down to the front door. (Ex. 13, Noedel Rpt. at MESA_008978).

**I. After The Shooting**

The last volley left Mr. Gagne down in the doorway, partly hidden by a pony wall and by the door that had fallen across him, and the officers could not tell whether he was

dead, unconscious, or lying in wait to ambush them. (Ex. 6, Ingram Supp., MESA_002241, 002251). To determine whether it was safe to approach, officers deployed gas, a drone, and a canine into the apartment, which did not generate a hostile response. (Ex. 5, Timeline, MESA_002373; Ex. 6, Ingram Supp., MESA_002251, 002243; Ex. 7, Chuey Depo., 122:4-123:2). Meanwhile Adair was still on the phone, trying to communicate that medical personnel were on scene but could not come to him until he had surrendered and it was safe to do so. (Ex. 3, Orr Supp., MESA_002303). Adair received no response and heard only what he believed to be sounds of movement and labored breathing. *(Id.)* At 11:15 p.m., an officer approached and deployed a Taser to ensure that Mr. Gagne was incapacitated, but it produced only a muscular response. (Ex. 5, Timeline, MESA_002373; Ex. 6, Ingram Supp., MESA_002251). The entry team pulled Mr. Gagne from the residence to the waiting paramedics, who began lifesaving measures at 11:19 p.m. (Ex. 6, Ingram Supp., MESA_002251; Ex. 5, Timeline, MESA_002374). Mr. Gagne was pronounced dead at 11:41 p.m. (Ex. 5, Timeline, MESA_002374).

**J. Psychological Assessment-Analysis of Violence**

Dr. Katherine Kuhlman conducted a threat assessment addressing: (1) the decedent's aggressive and violent behaviors prior to the July 6, 2023 shooting; and (2) the decedent's behaviors on July 6, 2023, which suggested an increased threat for violence. (Ex. 18, Kuhlman Report at MESA_008876). The historical records evidence multiple instances of aggressive and violent behavior and that, "despite the implementation of various countermeasures/interventions, the decedent continued to engage in boundary probing, attack-related behavior, and attack behaviors. This suggests that he either did not have control over his impulses, and/or chose to disregard rules when it suited him." (*Id.* at MESA_008888). The behaviors on July 6, 2023, likewise, suggested an increased threat of violence. *(Id.)* The "decedent was a threat for both reactive and proactive attack behaviors." (*Id.* at MESA_008896). "From approximately 18:50 to 20:40, the decedent routinely engaged in attack-related behavior, including at least five instances of dehumanization (name-calling) toward Jordan, with additional instances toward their neighbor, and seven

threats (including five threats to kill). He also engaged in additional attack behaviors, including throwing a bottle across the room, and throwing their Swiffer mop." (*Id.* at MESA_008897). The decedent continued to escalate from 20:40, around when Jordan left, to 22:19, when Mesa Police arrived. *(Id.)* He continued to threaten and dehumanize the neighbor and made six threats--most of which were to kill, before calling Jordan to ask where his AK47 was located. *(Id.)* "His continued dehumanization and threat-making is notable, given that verbal threats, violent rhetoric, and dehumanizing language is connected to escalation toward physical aggression, as it normalizes harm and erodes inhibitions (Cornell & Sheras, 2006)." *(Id.)* While on the phone with Jordan and subsequently the negotiator from Mesa, he made 16 threats before putting on body armor. *(Id.)* "In situations outside of law enforcement or military operations, wearing body armor can indicate anticipation of a firefight or violent encounter. The decedent's decision to put on body armor is another indication of proactive attack-related behavior, as it suggests readiness to use force if necessary." *(Id.)* As Sgt. Thomas noted, putting on body armor "means they're not messing around…it's an indicator that they're going to fight it out with the cops." *(Id.)* Dr. Kuhlman noted that "this defiance of authority is often a critical factor in escalating tensions and increasing the perceived threat level. The decedent's interactions suggest a heightened state of agitation and resistance, both of which are key indicators of a potential for further violence." (*Id.* at MESA_008897-98). Mr. Gagne made three additional threats to kill law enforcement before putting on ear protection, "such verbal aggression indicates a psychological readiness to engage in confrontation, highlighting his lack of regard for consequences and a sense of desperation or anger." (*Id.* at MESA_008898). As Sgt. Thomas noted, this scene was in the top 10% of dangerous scenes and suspects that he had encountered. *(Id.)* As Dr. Kuhlman opined:

> The decedent's behavior during the aforementioned interactions can be categorized into several concerning indicators: a lack of respect for authority, elevated aggression when challenged, and an apparent lack of fear of repercussion. This combination not only elevates the immediate risk of violence but also demonstrates an entrenched pattern of behavior that

> undermines peaceful resolution efforts. This explains why law enforcement de-escalation and negotiation efforts proved unsuccessful. The decedent's escalating attack-related behaviors, including serious threats, and attack behaviors, resulted in him being an increased risk for violence.

*(Id.)*

### K. The Body Camera Footage

The officers' body camera footage in this case is of limited value given the visual obstructions caused by Mr. Gagne's elevated position, the tin foil covering his windows, and the officers' stances in holding their firearms in front of them while responding to the mortal threat. None of the officers' footage captures a clear image of Mr. Gagne or his activities in the apartment, and in that respect, they reflect the limited view the officers themselves had of the apartment during the incident. However, the videos are attached in full as Exs. 22 through 27 for the Court's perusal, because they corroborate the officers' accounts of the facts known to them, identifies their relative positions and the visual challenges they faced, and provides the backdrop for the threat that Mr. Gagne posed to them and to the civilians who could not be evacuated from their residences.

### L. The City

#### *1. Training and Review*

Freeman, a SWAT precision rifle instructor, testified that he trained on the Fourth Amendment standards of *Graham v. Connor*, *Tennessee v. Garner*, and *Scott v. Harris*. (Ex. 8, Freeman Depo. 8:19-9:25, 16:13-23; 28:8-15; 39:14-19). Freeman completed basic SWAT training, hostage rescue training, and training on multiple different less-lethal platforms. (*Id.* at 12:21-15:7). He was trained that deadly force is acceptable when his or another person's life is in danger, or serious physical injury is imminent or immediate. (*Id.* at 15:11-25). He was trained on de-escalation techniques, including time, distance, officer presence, marked vehicles/uniforms, armored vehicles, SWAT presence, verbal commands, communications, and less-lethal munitions. (*Id.* at 17:24-19:13). He attended a 50-hour sniper-instructor school, which taught him to develop and teach basic sniper curriculum, optics, bullet flight and impacts. (*Id.* at 20:14-21:24). Freeman's basic sniper school was

conducted in Northern Arizona; he also attended advanced urban sniper school, as well as weekly team/agency trainings. (*Id.* at 21:25-22:13). SWAT members receive advanced firearms and tactical training, including weekly firearms training. (*Id.* 27:18-29:9). As a result of this more advanced training, on a scene, patrol officers ordinarily will establish a perimeter, and a supervisor responds to make on-scene leadership decisions. (*Id*. at 27:18-29:9). The City of Mesa has a use of force policy that echoes the training and requires objective reasonableness. (Doc. 76-2, Ex. 5, Use of Force DPM 2.1.1).

Defendant Chuey testified that SWAT members receive extensive training, that he was trained as a sniper having completed a 40-hour sniper school, and is a firearms instructor having completed the 80-hour AZPOST instructor course. (Ex. 7, Chuey Depo., 10:19-18:1, 21:14-22:5). Part of Mesa's firearms training also includes a "decision shoot," in which officers are assessed on their decision-making using live fire, videos, or role play. (*Id.* at 23:16-25:13). Officers are trained on the Graham standard, imminent threat, a suspect's opportunity, jeopardy, ability, and sanctity-of-life. (*Id*. at 25:14-29:15, 40:10-43:7).

At the time of this incident, Sgt. Harris had been with SWAT for approximately 12 years. (Ex. 14, Harris depo, 22:21-23:15). He was trained on *Graham v. Connor*, *Tennessee v. Garner*, and *Scott v. Harris*, and he also attended the 80-hour SWAT school, 40-hour hostage-rescue school, and specialized weapons training that is different from patrol officers. (*Id.* at 23:17-32:12, 48:25-50:5). Sgt. Harris was also trained as a sniper, serving in that position from 2008-2013, where he was deployed as a sniper hundreds of times, but never fired his rifle. (*Id*. at 32:12-35:19).

Sgt. Thomas started as a full-time SWAT member sometime in 2010 to 2011 and attended the same type of training as the other officers, including the 80-hour SWAT school. (Ex. 16, Thomas Depo., 8:6-22,16:18-17:24). In addition to all of the department training, SWAT trained weekly in four-hour blocks. *(Id.)* The department provided annual training, and he received constitutional-law training, periodic legal updates, and department training on Fourth Amendment and constitutional-rights issues. (*Id.* at 17:15-18:16). In 2010 Sgt.

Thomas completed the Arizona POST general instructor program and thereafter taught SWAT school, hostage-rescue school, and recurring SWAT-team training. (*Id.* at 30:4-31:12). Training topics included avoiding "contagious fire" (i.e. firing simply because another officer is firing without independently articulating a reason) and also how to articulate the threat and force decision. (*Id.* at 38:4-39:8). The Department's training also includes the ICAT model and de-escalation training. (*Id.* at 41:20-45:8). SWAT team members must pass the AZ POST annual decision shooting analysis (scenario-based shoot/no-shoot/less-lethal decision making) and also separate SWAT rifle qualifications. (*Id.* at 49:3-18). SWAT trained routinely on deadly-force and less-lethal scenarios. (*Id.* at 50:5-17). Force decisions are based upon the crime severity, threat to officers or the public, resistance and flight; officers may use negotiators, time and other means as circumstances warrant. (*Id.* at 51:6-22, 56:2-57:10).

The training records of all involved officers, attached as Ex. 19, document extensive and consistent training.[3]

Plaintiffs' police practices expert acknowledges that use-of-force training, "especially for SWAT officers, is probably the most prolific training that police officers receive," and that SWAT officers "receive advanced tactical and firearms training, and they train more than any other police unit, particularly sniper trained officers." (Ex. 15, Hafkey Rpt. at GAGNE_007737, 007739). He offers no opinion that any officer's training was deficient.

### ***2. The Four Prior Incidents That Remain in the Case***

Plaintiffs' custom theory rested on sixteen incidents pleaded in the Third Amended Complaint. (Doc. 101 ¶¶ 186-211). In ruling on the City's motion to dismiss, the Court disregarded the incidents that did not involve an officer shooting an unarmed individual and the incidents that carried no indication that the force was unconstitutional, which excluded

---

[3] All of the involved officers' and sergeants' training records have been combined into a single exhibit as otherwise there would be twenty separate exhibits of the training records.

every non-lethal use of force, every shooting of an armed suspect, and the December 2023 shooting of David Dimas. (Doc. 132 at 12-13 & n.8). Four incidents remained: the January 2016 shooting of Daniel Shaver, the April 2017 shooting of Sariah Lane, the December 2019 shooting of Randy Sewell, and the September 2020 shooting of Angel Benitez. (*Id.* at 13).

Everything Plaintiffs have offered about those four incidents is contained in four paragraphs of their complaint. They allege that Shaver was shot "as he crawled unarmed toward [officers] at their request" and that the City paid approximately $9,500,000 in settlements; that Lane "was not armed and not suspected of any crime" and that the City paid $2.45 million to settle; that Sewell "was unarmed and not suspected of a serious crime," was acquitted of resisting arrest, and that the City paid $1.75 million to settle; and that Benitez "was unarmed and shot by multiple officers as he was following their instructions to exit the vehicle he was in" and that the City paid $250,000 to settle. (Doc. 101 ¶¶ 201-02, 205-06). The complaint does not allege that any of the four involved a barricaded subject, a SWAT deployment, a subject armed with a firearm while wearing body armor, or a subject who had directly threatened to kill officers if they did not meet his demands. *(Id.)* It does not allege that any court, jury, or other adjudicator found that the force used in any of the four was unconstitutional. *(Id.)* The Court observed, on the City's showing at the pleading stage, that "the prior shootings involved patrol officers in different settings, and . . . none involved a SWAT callout." (Doc. 132 at 13).

The facts of the Shaver/Sweet case and related facts are set forth in the following published court decision: *Sweet v. City of Mesa*, 2022 U.S. Dist. LEXIS 20743 (D.Ariz. Feb. 4, 2022). On January 18, 2016, Mr. Shaver was called out of his hotel room by patrol officers after there was a report of a rifle being pointed out of a window. *Id.* at *4. When he exited the hallway, he was unarmed and given commands to crawl toward the officers. *Id.* at *7. Prior to crawling, he lay on the ground where his shorts revealed “his entire lower back and the tops of his buttocks.” *Id.* The Sergeant yelled numerous commands and told him he would be shot if he did not comply. *Id.* at *8. As he was crawling, he moved his

hand to the back of his waistband and Officer Brailsford fired shots. *Id*. The Court found that Shaver was both unarmed at the time he was shot and that the crime he allegedly committed was not severe and that thirty minutes had elapsed since the original 911 call. *Id.* at *17. He was also not resisting arrest or attempting to evade arrest, instead he was crawling on his hands and knees toward police while sobbing. *Id*. at *18, 20. Notably, the Court also dismissed the *Monell* claim against Mesa, finding that there was no evidence of any claimed unofficial custom or practice of sanctioning the use of excessive force based upon news articles and one prior incident involving Officer Brailsford. *Id*. at 36-38. Officer Brailsford was also fired by the City of Mesa and was criminally charged, but acquitted. *See* Maricopa County Superior Court case CR2016-004743. *See Sweet v. City of Mesa*, 2019 U.S. Dist. LEXIS 129362, *6, *18 (D.Ariz. Aug. 2, 2019) (Officer Brailsford was terminated from the department). Contrary to Plaintiffs' allegations, it is false that there was no discipline or resulting consequences for the involved officer.

The facts of *Lane v. City of Mesa* are set forth in the District Court's Summary Judgment ruling. 2021 U.S. Dist. LEXIS 266707 (D.Ariz. Nov. 8, 2021). On April 10, 2017, officers—who were part of the USMS Violent Offenders Task Force—were attempting to locate a suspect, who had a lengthy criminal gang history and a probation violation. *Id*. at *2-7. Due to violence and reports that the suspect was armed, the officers used a vehicle containment to stop the vehicle, which also contained the suspect's girlfriend. *Id.* at *7-8. As the officers approached and the subject appeared to be digging around in the console, officers fired rounds toward the suspect. The back-seat passenger was also hit by gunfire and killed. *Id*. at *10. In ruling on the summary judgment, the Court found a dispute of fact as to whether the force was excessive due to hitting the unintended passenger. *Id*. at *31. The court found that the law was clearly established that "shooting unarmed vehicle occupants in a stationary vehicle, who were complying with officer commands and posing no risk or harm to officers or others, violated the Fourth Amendment prohibition on unreasonable seizures and excessive force." *Id*. at *35-36. The Court also dismissed the *Monell* claim, finding no prior similar excessive force claims, no prior finding of a

constitutional violation in the alleged prior force incidents, and the prior three federal cases that plaintiff relied upon "did not put the Mesa Police Department on notice of a training problem." *Id*. at *44. USMS Task force actors should be considered federal actors, not state actors. *Van Loo v. United States*, No. 3:23-cv-05618-DGE, 2025 WL 692484 (W.D.Wash. March 4, 2025) ("[s]pecifically as to USMS Fugitive Task Forces, every court to have considered the issue has held that these Task Forces and their members (including deputized local or state law enforcement) are acting pursuant to federal law and federal authority.").

The *Sewell* case was filed in federal court, case 2:21-cv-02036-DJH-MHB. Plaintiff alleged that on December 6, 2019, Randy Sewell was at a bar and was asked to leave. (Doc. 1, ¶¶ 10-12). The manager called the police requesting that Sewell be placed on a trespass log. (*Id*. at 13). Officers allegedly moved to arrest plaintiff without stating he was under arrest and without advising him of the reason. (*Id*. at 22). The officers then deployed Tasers and strikes. (*Id*. at 24). Officer Chisler then shot plaintiff, shattering his femur. (*Id*. at 26). Officer Chisler was fired by the City of Mesa on June 25, 2020 and he was criminally charged with aggravated assault in Maricopa County Superior Court case CR2020-00275. Once again, Plaintiffs' allegation that there were no consequences or discipline is wrong.

The shooting involving Angel Benitez occurred on September 25, 2020, during a standoff with police in a parking lot. (TAC ¶ 206). The Notice of Claim served by the family is publicly available and it specifically alleges that Mr. Benitez was unarmed at the time he was shot in a parking lot and that he was compliant. *See* https://www.scribd.com/document/500168342/Sandoval-benitez-notice-of-Claim-final. The criminal investigation into the shooting was conducted by Tempe Police, not the Mesa Police Department.

Plaintiffs' Fifth Supplemental Disclosure Statement, served June 9, 2026, identifies no witness with knowledge of any of the four incidents and does not disclose documents relating to the case. (Ex. 20, Pls.' Fifth Supp. Disclosure). Their police practices expert does not even mention them. (Ex. 15, Hafkey Rpt., GAGNE_007725-54).

Count IV alleges that the City "made the affirmative choice to not use any of the use of force incidents detailed herein to train its police officers on impermissible uses of force," and "did not showcase these incidents within the Police Department as officer involved shootings where the employment of lethal force violated policies and procedures and officer training and expectations." (Doc. 101 ¶ 273). These are bald allegations unsupported by facts. Plaintiffs did not ask any of the deposed officers about their knowledge of these shooting incidents. Moreover, each officer testified to extensive training on all aspects of use of force, such that Plaintiffs cannot prove that these four prior isolated instances, involving fundamentally different facts, were the “moving force” behind the violation such that it was both the proximate cause and cause in fact.

Count IV does not allege that the City knew of any Shooting Officer's propensity to use unjustified deadly force. (*Id.* ¶¶ 269-75). Plaintiffs' disclosure statement does not identify a witness, document, or standard describing the training they contend the City was required to give, and no witness or document concerning any officer's propensity. (Ex. 20, Pls.' Fifth Supp. Disclosure). Their police practices expert offers no opinion on either subject, instead criticizing the specific decisions by supervisors on the scene. (Ex. 15, Hafkey Rpt. at 28-30, GAGNE_007752-54).

## II. LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," and the nonmovant must answer with admissible evidence, not allegations. Fed. R. Civ. P. 56(a), (c)(1)(A), (c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Where video exists, the Court views the facts "in the light depicted by the videotape," and once the facts are settled, the reasonableness of force "is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 380-81 & n.8 (2007).

///

///

///

## III. THE SHOOTING OFFICERS ARE ENTITLED TO JUDGMENT ON THE CONSTITUTIONAL MERITS

### A. The Shooting Officers Did Not Violate the Fourth Amendment

Force used in a seizure is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," with "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Deadly force is permitted "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). As this Court has observed, "[t]here are many scenarios in which shooting at an armed suspect is constitutional." (Doc. 132 at 8 (citing *Scott v. Henrich*, 39 F.3d 912, 915-16 (9th Cir. 1994))).

The analysis is not isolated to the moment the shot was fired but based on the totality of the circumstances that the officers were confronted with. *Barnes v. Felix*, 605 U.S. 73, 80 (2025). The totality of the circumstances "has no time limit," and "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *(Id.)* Those circumstances are based on what a reasonable officer would have perceived from their perspective and does not require that officers be perfect observers: "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of" a threat, and "in those situations courts will not hold that they have violated the Constitution." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). The analysis is focused not on whether the mistake of fact occurred, but "whether a reasonable officer would have or should have accurately perceived" the true fact. *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). It follows then that in an armed standoff, whether the suspect actually fired is "immaterial" when officers reasonably believed he had. *Long v. City & County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007); *Sabbe v. Washington County Board of Commissioners*, 84 F.4th 807, 827 (9th Cir. 2023). And the Fourth Amendment does not require officers to "delay their fire until a suspect turns his weapon on them. If the person

is armed — or reasonably suspected of being armed — a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). While the interior surveillance footage provides additional context to the shooting and corroborates the officers' account that he was armed and making violent threats, "[T]he analysis focuses on what the officers knew in the moment, not what became known hours, days, or weeks later," *Ochoa v. City of Mesa*, 26 F.4th 1050, 1058 (9th Cir. 2022). And an expert's criticism of an officer's tactics does not, by itself, defeat qualified immunity where a reasonable officer could have believed the conduct was justified. *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1777 (2015) (quoting *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002)).

***Severity of the Crime at Issue*: *Barnes*** directs the Court to consider the totality of the circumstances, which includes what officers knew of Mr. Gagne's conduct before the first shot was fired. By then the officers knew that Mr. Gagne had fired a gun from his balcony while threatening to kill two women, that he was wearing body armor, that he had an AK-47 with an optic and that both he and a witness said he had additional weapons in the home.

The decedent committed dozens of felonies and misdemeanors before any force was used:

- Multiple counts of aggravated assault and/or domestic violence against his girlfriend, choking her on the bed while she was restrained then threatening to kill her while discharging a weapon. A.R.S. § 13-1203-1204 (A)(2)(4) & (B)(1)(2); A.R.S. § 13-3601 (A)(1). When the domestic violence involves the discharge of a weapon or threatened use of a weapon, a peace officer "shall" arrest. *See* A.R.S. § 13-3601 (B)(1). An officer may seize all involved firearms pursuant to subsection (C).
- Aggravated assault against the neighbor (threatening and shooting his firearm off of the patio). A.R.S. § 13-1204.
- Multiple counts of aggravated assault against all police officers present, including the Defendants, when Mr. Gagne verbally threatened to kill them, dump shots in

them, while pointing a firearm on multiple different occasions. A.R.S. § 13-1203 (intentionally placing another person in reasonable apprehension of imminent physical injury) & A.R.S. 13-1204 (A)(2) & (8)(a).

- Multiple counts of resisting arrest, pursuant to A.R.S. §13-2508(A)(1) & (2), by threatening to use physical force against a police officer and using any other means creating a substantial risk of causing physical injury. Violations of subsections 1 and 2, which both occurred, are class 6 felonies.
- Criminal negligence in violation of Shannon's law by discharging a firearm on the patio of his apartment, a class 6 felony. *See* A.R.S. § 13-3107.
- Knowingly wearing or using body armor while committing a felony offense. *See* A.R.S. § 13-3116.
- Multiple counts of disorderly conduct with a firearm, several misdemeanors (violent or seriously disruptive behavior and uses abusive or offensive language) and a felony (recklessly handles, displays or discharges a deadly weapon). *See* A.R.S. § 13-2904(A)(1)(3), (6). Where Plaintiffs admit that the decedent was highly intoxicated, he was necessarily "reckless" in all actions he took related to the firearms.

Mr. Gagne was a deadly threat to his girlfriend and their neighbors before police ever arrived, and his actions upon making contact with police did nothing to communicate that the threat had abated at all. Instead, he escalated his threats and presented as an individual with homicidal intent who wanted to start his own personal war, while donning ear protection and body armor. Adair heard him chamber a round and promise to shoot officers and patrol cars, and Mr. Gagne responded to Adair's request for him to surrender with more threats of violence and a promise that he would not leave without a fight. (Section I, above). Those threats to bystanders and the officers themselves informed the officers' tactics and subsequent conduct, and are circumstances bearing on reasonableness despite occurring prior to the first shot being fired. *See Zorn v. Linton*, 607 U.S. 568, 572 (2026) (per curiam). These were not misinterpretations on behalf of police: Mr. Gagne intended to communicate that he had the capacity and willingness to use deadly force against those around him who

did not submit to his demands, and the message was received loud and clear. The severity of the crime at issue weighs in favor of the officers.

***Actively Resisting Arrest or Attempting to Flee****:* Mr. Gagne was resisting arrest as a result of his refusal to exit the residence and repeated statements that he would not do so without violence. The original patrol officers gave Mr. Gagne clear and multiple commands to exit the residence, which he disregarded. *See Howell v. Mun. of Anchorage*, 646 F.Supp. 3d 1047 (D.Alaska. Dec. 16, 2022) (considering a barricade as resisting arrest as it was a location that prevented immediate law enforcement access and the suspect refused to follow numerous commands); *Applegate v. Ritchie*, 2024 U.S. Dist. LEXIS 205069 (D.Or. Nov. 12, 2024) (suspect who remained on the roof and refused to come down was resisting arrest, which weighed in the Defendants' favor). Under no set of circumstances could the Defendants simply leave the area without arresting the decedent, given his access to weapons, discharge of a weapon, and threats. This factor weighs in favor of the officers.

***Threat to Officers*****:** The most important factor is the threat that Mr. Gagne posed to officers. *See Quinn v. Zerkle*, 111 F.4th 281 (4th Cir. August 1, 2024) (affirming summary judgment on the shooting of an individual who previously led officers on a high speed pursuit and then jumped out of his bedroom window while holding an AR-15 and noting that an officer need not wait until a gun is pointed at him to act); *Ryburn v. Huff*, 132 S.Ct. 987, 991-92 (2012) (per curiam) ("judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation."). The decedent had motive, opportunity, and access to carry out his threats. He was barricaded in an apartment that provided low visibility to officers because the windows were largely covered by tinfoil. Before he opened the door and was shot, he had previously come to the door with a rifle in hand while making threats. He was armed with a weapon that would have caused a mass-casualty event if he started firing and the officers would have been extremely limited in their ability to stop him. *Sabbe v. Wash. Cnty. Bd. Of Comm'rs*, 84 F.4th 807, 812 (9th Cir. 2023) (it was reasonable to perceive the decedent as an immediate threat because they had multiple reports that he might be armed and intoxicated, he was

behaving erratically and hostile, officer saw him with a rifle, and the officers believed that the suspect was shooting or going to shoot).

The Ninth Circuit's recent decision in *Handy v. Jones*, 2026 U.S.App. LEXIS 28183 (9th Cir. Sept. 15, 2026), is instructive. On May 13, 2024, officers responded to a 911 call reporting domestic violence, what sounded like two shots fired in the house, and the suspect standing in his driveway holding a shotgun "waiting for the cops to come around the corner." *Id*. at *4. The suspect refused commands to put his hands in the air and stop and instead waved the shotgun over his head and responded "fuck you." *Id*. at *5. As soon as he stepped off the curb, he was shot nine times. *Id.* Important to the analysis was that "[w]hen officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning." *Id*. at *6, citing *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). In denying qualified immunity, the District Court incorrectly determined that there was no threat because the decedent was walking at a "casual pace," the neighbor never saw the suspect raise his gun and never felt anyone was in imminent danger, and there was not necessarily any threatening or aggressive action. *Id.* at *7-8. The Ninth Circuit found that, in assessing the "immediate threat," the district court misconstrued the applicable standard. *Id.* at *13. "The test is not whether a reasonable factfinder could find that Handy did not pose an immediate threat, but whether 'it would be objectively reasonable for the officer to believe that the amount of force employed was required by the situation he confronted.'" *Id.*, citing *Napouk v. Las Vegas Metropolitan Police Department*, 123 F.4th 906, 912 (9th Cir. 2024). Thus, "the determination of reasonableness on a motion to dismiss or for summary judgment does not mean that the officer could not have taken some other action." *Id.* Applying this standard, the Ninth Circuit ruled that:

> Handy posed an immediate threat to the officers and that the officers acted reasonably in shooting him. First, the Defendants reasonably believed that Handy may have committed a violent crime. It was reported that he had assaulted his girlfriend and that he possessed a shotgun during the incident. In addition, Defendants had been informed that Handy had earlier been waiting for their arrival armed with a shotgun. Second, although Handy had

> exited the apartment he refused to drop his weapon, instead waving it over his head and cursing when repeatedly instructed to drop the shotgun. Thus, a reasonable officer could think he was resisting arrest. Third, and most importantly, the evidence, particularly the camera footage, shows that Handy 'posed an immediate threat to the safety of officers[.]"…None of the factors cited by the district court reduced Handy's dangerousness. Although it appears that he did not point his shotgun at the officers as he stepped off the stairs, he could have instantly fired the shotgun from the hip…He may have been advancing at a 'casual pace,' but he remained armed, agitated, and capable of immediately firing at officers.

*Id*. at *15-16. In addition to finding that there was no constitutional violation, the Court found that the officers were entitled to qualified immunity. The Court distinguished George because the suspect there was not suspected of any crime and "had not displayed any animosity to the police." *Id*. at *16. The Court also determined that the Curnow decision, 952 F.2d 321, did not stand for the proposition that "an officer must wait to be targeted by a suspect before he or she can shoot in self-defense." *Id.* Instead, as the Supreme Court noted in Barnes, the Court must consider the totality of the circumstances, not the "moment of the threat, including "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id*. at *17. That the suspect had assaulted his girlfriend, awaited the arrival of officers armed with his shotgun, did not drop the weapon, moved toward officers and was belligerent, and "could fire the shotgun from his hip, constitute a 'totality of the circumstances' that show that Handy was dangerous regardless of where his shotgun was pointed." *Id*. at *18. The Court further noted that it had affirmed summary judgment in *Napouk* (where a suspect was shot within nine feet of officers while armed with a machete) and Blanford (where the suspect was shot when armed with a sword) and neither of the cases involved the "immediate threat such as that posed by Handy." "Our sister circuits agree that an armed belligerent suspect may pose an immediate threat even when the firearm is not pointed at an officer." *Id*. at *19. As fully discussed below, Mr. Gagne had committed a nearly identical crime of domestic violence while firing shots, but went further by repeatedly threatening the neighbor, staging his AR-15 on the patio, and repeatedly threatening to kill officers while in an elevated apartment while armed

with a weapons platform capable of maximum destruction. He is the party that exclusively created the dangerous situation, created the need to use force, and failed to comply with repeated commands and warnings to peaceably exit the residence. *See* Ninth Cir. Model Instruction, Use of Force, 9.27.

***1. Freeman's Shots***

Seconds after walking with his AK-47 across the apartment, Mr. Gagne stepped to the sliding door above the patrol officers, parted the blinds, and looked down at their positions. Freeman saw the rifle in Mr. Gagne's right hand and concluded that Mr. Gagne was choosing a place from which to shoot, just as he had threatened to do only moments before. An armed man who has threatened to shoot officers, chambers a round, and then takes a position at a window overlooking the officers he threatened, clearly poses "a threat of serious physical harm." *Garner*, 471 U.S. at 11. Freeman did not have to wait until Mr. Gagne shouldered the rifle, and had he done so, it may have been too late to prevent him from opening fire. *George*, 736 F.3d at 838.

The interior camera footage corroborates Freeman's account. It shows Mr. Gagne walking to the slider with the rifle in both hands at a low ready. At the instant of the shot, Mr. Gagne is out of frame and only the rifle's barrel is visible, resting on the counter and moving as if a hand were still on the stock. The Third Amended Complaint alleges that Freeman observed Shawn's weapon still down and his hands up (Doc. 101 ¶¶ 59-63), but there is no indication on video that his hand ever left the rifle regardless of the direction it was pointed. Freeman was forty yards away, at night, looking through a scope into a darkened apartment through a gap that opened as Mr. Gagne parted the blinds. The question under *Torres* is whether a reasonable officer in that position 'would have or should have accurately perceived' whether the rifle was in Mr. Gagne's hand or propped on the counter in front of him. 648 F.3d at 1124. A man does not stop being an immediate threat during the seconds his rifle rests within reach while he picks his target, and then suddenly become a threat again when he opens fire. *Barnes* forbids isolating those seconds from the hour that

gave them meaning and based on the totality of the circumstances he remained a threat even while the firearm was not pointed outside. 605 U.S. at 80.

Forty-three seconds later, officers heard an unsuppressed gunshot, and Harris radioed that the suspect was firing at them. Freeman had watched Mr. Gagne go down after the first shot and get back up. He now saw him return to the slider with the rifle at high port. One second after the gunshot, Freeman fired again. Nothing that justified the first shot had changed for the better. Mr. Gagne was still armed, was still at the window, and he had not surrendered. "[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014). The Ninth Circuit applies the same rule to a second volley where "[n]othing . . . in the balance of factors already present" to justify the first "had changed when [the officer] fired again." *Blanford v. Sacramento County*, 406 F.3d 1110, 1118 (9th Cir. 2005).

Plaintiffs will argue that the gunshot the officers heard was not Mr. Gagne's, but ultimately that does not change the analysis. In *Long v. City & County of Honolulu*, 511 F.3d 901 (Ninth Cir. 2007), the Ninth Circuit affirmed summary judgment on the basis that there was no constitutional violation in the shooting death of an armed barricaded suspect. Police were summoned to the suspect's residence after he fired shots at several partygoers. *Id*. at 904. Patrol officers arrived and were later replaced by a SWAT team, who maintained a perimeter, and made telephone contact with the suspect who was asked to surrender, but he did not. *Id.* Throughout the night, the suspect walked around in an agitated state and shouted threats to get the "fuck out of his yard," and was threatening to shoot the lights the police were shining on the property. *Id.* After it was reported that the suspect fired shots, officers shot the suspect. *Id*. at 905. No shell casings were recovered from the suspect's residence. *Id.* The force was determined to be objectively reasonable because the shooting officer had observed the behavior, heard the suspect's threats to shoot police, saw the suspect with a rifle, knew the suspect previously fired shots, and it was reported over the radio that the suspect was shooting. *Id.* at 906. Whether or not "Long actually fired his rifle

at these officers is also immaterial. It is enough that [the shooting officer] heard the radio transmission and observed Long point the rifle in the officers' direction." *Id.*

In *Sabbe*, the court assumed that officers fired the first shot at the suspect, but held regardless that "In our circuit, 'the relevant question for purposes of qualified immunity' is not whether Sabbe actually threatened the officers, but whether they 'could reasonably have believed that [he] posed such a threat.'" 84 F.4th at 827-828 (quoting *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016)). Like the sniper in *Long*, Freeman had heard the relays of Mr. Gagne's threats and heard what he thought was an unsuppressed rifle shot that did not come from a SWAT officer. (Ex. 8, Freeman Depo. 82:12-15). He had heard Harris radio that the suspect was firing. He could see Mr. Gagne back at the window with the rifle. Whether that gunshot came from Mr. Gagne's rifle or, as Plaintiffs contend, from police rounds crossing the apartment, a reasonable officer in Freeman's position would have believed that Mr. Gagne had fired and was about to fire again, just as he promised he would. Moreover, the decedent was far more dangerous and hostile than the mentally ill suspect that was armed with a fake gun in *Estate of Strickland v. Nevada Cnty,* 69 F.4th 614, 621 (9th Cir. 2023). The Ninth Circuit, in finding the shooting reasonable, noted that an officer should not have to wait "until a gun is pointed at [them] before [they are] entitled to take action." *Id.* at 620.

### *2. The First Volley*

The four officers who fired in the first volley did so in response to what each took to be gunfire from the apartment. Thomas, Chuey, Brown, and Navarro each heard a report that did not sound like a suppressed SWAT rifle. Thomas and Chuey saw muzzle flash and glass leaving the sliders. Brown and Navarro saw Mr. Gagne at a window holding what they took to be a rifle. Harris had just radioed that the suspect was firing out the north window. Each fired at the place he perceived the shooter to be. In *Long*, when "fellow officers radioed that Long was yelling threats at them and then radioed that Long was shooting at them," the sniper "had probable cause to believe that Long posed an immediate danger to these officers." 511 F.3d at 906. So did the Shooting Officers. There is no evidence, however,

that these shots hit the decedent or caused his death. There is no constitutional violation for shots that miss.

The reconstruction evidence shows that the sound and the glass came from police rounds that crossed the living room and exited the far slider, and that an observer outside could not have distinguished that from rounds coming out of the apartment. (Ex. 13, Noedel Rpt., MESA_008978, 008982). Plaintiffs' expert agrees that the rounds leaving the north side of the apartment were police rounds that had passed through it. (Ex. 15, Hafkey Rpt. at 19, GAGNE_007743). Under *Torres*, the question is not whether the rounds were Mr. Gagne's but whether a reasonable officer "would have or should have accurately perceived" that they were not. 648 F.3d at 1124. It is not reasonable to hear gunfire and witness glass blow out of the windows of an apartment occupied by a rifle-armed man who has made threats to open fire and conclude that the shots were not from him but had actually passed straight through the apartment and out the other side. The interior camera does not change that analysis. The Fourth Amendment only asks what a reasonable officer should have perceived, and none of the officers outside could see what the camera saw. (Ex. 6, Ingram Supp., MESA_002235, 002239).

***3. The Doorway Volley.***

Thirteen seconds after the first volley, the front door flew open. Harris, Chuey, Goodrich and Cameron all saw Mr. Gagne and something that looked like a firearm, and opened fire. Under the circumstances, a reasonable officer would have perceived an armed man, believed to have been shooting at officers seconds earlier, suddenly emerging from cover while wearing body armor and possessing a rifle as an imminent deadly threat. Mr. Gagne did not ever tell anyone he was surrendering. He did not slowly open the door making sure that his open hands were visible in a position of surrender. Instead, the door flung open, after he had previously come to the door with a rifle and after repeatedly threatening to kill officers and warning that he would not allow officers to come arrest him.

In *George v. Morris*, deputies shot a terminally ill man who walked onto his patio holding a pistol pointed at the ground, and on the plaintiff's account he never raised it. 736

F.3d at 838. The Ninth Circuit held that the deputies were not entitled to summary judgment, because being armed is not by itself an immediate threat, but clarified: “This is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed — or reasonably suspected of being armed — a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.” *Id.* Here, Mr. Gagne had made serious verbal threats to shoot the officers for the better part of an hour. He was reasonably suspected of being armed, because he repeatedly told them he was armed, witnesses stated he was armed, he had carried a rifle to his windows and door all night and had just been heard, as the officers perceived it, firing it. His sudden emergence from the door during these events without clearly communicating a desire to surrender is precisely the sort of furtive movement or harrowing gesture contemplated in *George*.

In *Plumhoff*, the Supreme Court addressed when officers may continue to use deadly force after their initial shots are fired. The Court held that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." 572 U.S. at 777. In *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017), and *Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790 (9th Cir. 2025) (en banc), the Ninth Circuit applied this principle and held that an officer who fires again at a suspect who is already incapacitated may be liable, because “terminating a threat doesn’t necessarily mean terminating the suspect. If the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting.” *Zion*, 874 F.3d at 1076; see *Hernandez*, 139 F.4th at 803 (threat abated “when Hernandez was curled up on the ground and rolling away from McBride”). But the court also noted that this was “particularly true when the suspect wields a knife rather than a firearm.” *Zion*, 874 F.3d at 1076. While a knife presents a threat only at close range, a firearm can be wielded from the ground to hit anyone within line of sight.

Not only was Mr. Gagne armed with a firearm, officers had no evidence that he was actually incapacitated or had surrendered, or that he was not armed. Officers knew that Mr.

Gagne was armed not only with multiple rifles, but with handguns. While Mr. Gagne may have called out that he was "down," he never communicated an attempt to surrender, and whatever wounds he suffered did not stop him from opening his front door. Once the second volley ended and the officers had a chance to assess the situation, they did not use additional deadly force. (Ex. 6, Ingram Supp., MESA_002241, 002243). The Supreme Court drew the same line in *Plumhoff*: "This would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated Rickard and had ended any threat of continued flight, or if Rickard had clearly given himself up. But that is not what happened." 572 U.S. at 777. It is not what happened here either. These officers held their fire after the first volley, fired at the door only when it opened on what they took to be an armed man, and did not fire again once he was down.

***4. Failure To Intervene***

Count I also alleges that the Shooting Officers, and Freeman in particular, failed to intervene to stop one another from firing. (Doc. 101 ¶¶ 64-68, 226-28). A failure to intervene claim requires an underlying violation, knowledge of the violation, a "realistic opportunity to intercede," and inaction that caused the injury. (Doc. 132 at 7 (citing *Tobias v. Arteaga*, 996 F.3d 571, 582-84 (9th Cir. 2021), and *Ting v. United States*, 927 F.2d 1504, 1511-12 (9th Cir. 1991))). None of those elements have been met. There was no underlying violation, as discussed above. Each officer had knowledge of the threat that Mr. Gagne posed to bystanders, the threats that he had made to them specifically, and had seen him carrying or in the vicinity of a firearm. Each volley "transpire[d] in a matter of seconds," *Ting*, 927 F.2d at 1511-12, and even officers that are in the vicinity and equipped with radios have no realistic opportunity to intercede in the seconds between the decision to fire and the end of the volleys. *Waller v. City of Nogales*, 2023 WL 3863655, at *7 (D. Ariz. June 7, 2023). (Doc. 132 at 10).

Seconds before the first volley, Freeman saw Mr. Gagne pass the uncovered window with his hands near his head, which he communicated to Officer Widmer, who was beside him. (Ex. 8, Freeman Depo. 108:18-23; 118:14-20). Freeman himself did not fire in the first

volley, but there is no evidence that Freeman and Widmer had a reasonable opportunity to intervene. Even if he was capable of broadcasting the information to the other officers quicker than their own impulse to fire, there is no reason to believe broadcast of what he saw through his scope for a split second would have prevented the volley. (Doc. 132 at 9 n.6). Thomas and Chuey fired at perceived gunfire and muzzle flash, and Brown and Navarro at a perceived rifle at the window. They were reacting to their own independent observations, not at the direction of Freeman, and nothing he could have said about Mr. Gagne's hand position seen a second earlier would have changed what they heard, saw, and were reacting to. *Kirk v. City of Phoenix*, 2025 WL 1952677, at *4-7 (D. Ariz. July 16, 2025) (no duty to intervene where officers who could radio the shooting officer should have told him the suspect was unarmed). (Doc. 132 at 10). This Court previously dismissed the failure to intervene claim when faced with a similar argument with respect to negotiators Orr and Adair, and just like them, he had no time or authority to prevent the other officers from opening fire.

**B. Alternatively, the Shooting Officers Are Entitled to Qualified Immunity on the Force and Failure-to-Intervene Claims**

Qualified immunity protects officers "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted). The Court asks whether the facts show a constitutional violation and whether the right was clearly established at the time. *Id.* at 232, 242. (Doc. 132 at 6). To overcome qualified immunity, Plaintiffs must show that "existing precedent must have placed the statutory or constitutional question beyond debate." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021) (quotation marks omitted). "To find that a right is clearly established, courts generally need to identify a case where an officer acting under similar circumstances was held to have violated the Constitution." *Zorn v. Linton*, 607 U.S. 568, 572 (2026) (per curiam) (citation modified). Although general standards can clearly establish the law in "the rare obvious case," *City of Escondido v. Emmons*, 586 U.S. 38, 44 (2019) (per curiam) (quotation marks

omitted), "[t]he relevant precedent" must "define the right with a high degree of specificity," and "[p]rinciples stated generally, such as that an officer may not use unreasonable and excessive force, do not suffice." *Zorn*, 607 U.S. at 572 (citation modified). *Zorn* applied those rules at summary judgment to reverse a denial of immunity, and the Supreme Court has repeatedly reversed the Ninth Circuit for the same error in deadly force cases. *Kisela v. Hughes*, 584 U.S. 100, 104-05 (2018) (per curiam); *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam).

The rights at issue must be stated at the level of specificity the Supreme Court demands. Defendants searched for but could not find a single similar case to the facts present here. There is not a single case addressing the rights of a man armed with a loaded AK-47, which if fired can pierce body armor and vehicles, and readily kill officers and the occupants of nearby apartments. This same man dons body armor, later puts on hearing protection and refuses every command to come out. Instead, he responds repeatedly with threats to shoot law enforcement officers. There is no case that establishes that, when a sniper sees him and believes that he is going to fire, that the sniper cannot take action to stop the threat. There is case law standing for the proposition that dangerous fleeing felons can be shot, in the back, due to the serious threat that they pose. That serious threat in this case is even greater where the suspect has covered his windows with foil and is in an elevated perch.

There is no case addressing the right of that man not to have officers return fire toward what they reasonably believe is the man shooting (as he has told them repeatedly, he would do) seconds after they believe he is making good on the threat. Nor is there a case addressing the right of that man not to be fired upon when, seconds after the perceived gunfire, he opens his door while wearing body armor and in possession of what the officers took to be a rifle or a rifle magazine at center mass. Plaintiffs bear the burden of identifying a case that would have told these officers that each of those acts was unlawful, and the closest cases on point—albeit quite far away from the facts of this case and the threat posed— do the opposite. *See Long*, 511 F.3d at 906-07 (immunity for sniper who shot rifle-

armed, barricaded man after officers radioed that he was shooting, though whether he had fired was "a closer question"); *Sabbe*, 84 F.4th at 827-828 (immunity where drunk suspect was doing donuts in a field, was reported to be drunk and armed, and officers believed he was reaching toward a weapon); *Strickland*, 69 F.4th at 621 (reasonable mistaken belief that replica gun was real); *Scott v. Henrich*, 39 F.3d at 915-16 (armed man at apartment door); *Blanford*, 406 F.3d at 1118 (second volley reasonable where nothing had changed); *Wilkinson v. Torres*, 610 F.3d 546, 551-53 (9th Cir. 2010) (continued fire where perception of ongoing threat was "uncontradicted by any evidence in the record"). No case holds that an officer violates the Fourth Amendment by firing at an armed, armored, barricaded subject who has threatened to shoot police when that subject appears at a window above the officers with his rifle, by returning fire toward the perceived source of gunfire from that subject's apartment, or by firing when that subject throws open his door in a bladed stance seconds after the perceived gunfire.

Plaintiffs' candidates for cases are *Zion* and *Hernandez*, and both establish a rule about a suspect the officer can see: one who is on the ground, appears wounded, and shows no signs of getting up, and who "wields a knife rather than a firearm." *Hernandez*, 139 F.4th at 803**.** Even on the facts of *Hernandez* itself, Judge Collins, joined by four other judges, wrote separately to explain that *Zion* "makes clear, on its face, that it is materially distinguishable from this case in multiple respects" and "can hardly be said to have clearly established a broad general rule that places the outcome of this case beyond debate." *Id.* at 824 (Collins, J., concurring in part, concurring in the judgment in part, and dissenting in part). If *Zion* did not clearly govern an officer standing over a wounded man with a knife, it cannot have clearly governed officers who had no clear view of a rifle-armed man behind a door and foil-covered windows. Under *Zorn*, a circuit decision that a reasonable jury "could" find a use of force excessive on one set of facts does not place the lawfulness of different conduct, in different circumstances, "beyond debate." 607 U.S. at 568.

Nor is this an "obvious case" under *Hope v. Pelzer*, 536 U.S. 730 (2002). That exception reaches officers who shoot a person who plainly poses no threat. Every officer

here fired at what he perceived as a man who had threatened to kill them who was armed with an AK-47. The Court's own description of the law suggests that these officers could not have known their conduct was unlawful, writing that “[t]here are many scenarios in which shooting at an armed suspect is constitutional.” (Doc. 132 at 8). Indeed, there would be grave public policy concerns involved with finding this an “obvious case,” given the unfortunate state of the gun violence in this country. Mr. Gagne presented a threat that no time, distance, or cover could solve. If he had started shooting uncontrollably and killed nearby civilians, this would be a different lawsuit by a different set of individuals. Mr. Gagne was in control of his own behavior and actions and chose to escalate to the highest possible threat available.

## IV. THE FOURTEENTH AMENDMENT CLAIM FAILS

Plaintiffs’ substantive due process claim requires conduct that "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Where officers must "make a snap judgment," plaintiffs must show "a purpose to harm [the decedent] for reasons unrelated to legitimate law enforcement objectives," which include "arrest, self-protection, and protection of the public." *Ochoa*, 26 F.4th at 1058 (quoting *Porter* and *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018)). Each shot here was a reaction measured in seconds to a perceived rifle, perceived gunfire, or a door thrown open, and no evidence shows that any officer had any purpose beyond the objectives *Ochoa* recognized in a comparable Mesa standoff. The hour before the shots shows a perimeter, announcements, bean bags, a negotiator, and a sniper who held his fire the first time he saw the rifle. The interval after them shows officers who had not searched a man claiming multiple rifles using gas, a drone, a flash-bang, and a canine before approaching him, and calling paramedics forward within two minutes of entry. "[A] police officer who promptly summons the necessary medical assistance has acted reasonably," *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006), and Plaintiffs have no evidence that an earlier entry would have changed the outcome.

## V. THE CITY IS ENTITLED TO JUDGMENT ON THE FEDERAL CLAIMS ADDRESSED IN COUNTS I AND II

Count I is pleaded against "All Named Defendants" but alleges only that "[a]ll Officer Defendants acted under the color of state law." (Doc. 101 ¶ 214). A municipality is liable under § 1983 only for its own policy or custom, *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), as the Court informed Plaintiffs before they amended their complaint. (Doc. 94 at 12 (citing *United States v. Town of Colorado City*, 935 F.3d 804, 808 (9th Cir. 2019))). The City is entitled to judgment on Count I.

Count II survived the Motion to Dismiss only as a custom claim. (Doc. 132 at 4 n.3). It fails first because there was no underlying violation. "If no constitutional violation occurred, the municipality cannot be held liable." *Long*, 511 F.3d at 907 (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). It fails on its own terms as well. In *Trevino v. Gates*, the Ninth Circuit held that "[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." 99 F.3d 911, 918 (9th Cir. 1996). This Court applied that rule to the prior incidents Plaintiffs pleaded and stated the test it would use: "The prior incidents must be similar, and a 'raw number of police shootings,' without facts suggesting they were unjustified, is not enough." (Doc. 132 at 12 (quoting *Andrich v. Kostas*, 470 F. Supp. 3d 1048, 1064 (D. Ariz. 2020), aff'd, 2023 WL 6157407 (9th Cir. Sept. 21, 2023))). The Court allowed four incidents to proceed on the pleadings, but it identified the two arguments that it expected to decide the question on a full record. As to similarity, the Court wrote: "Defendants argue that the prior shootings involved patrol officers in different settings, and that none involved a SWAT callout. Those differences may matter at summary judgment or at trial, but they do not defeat the similarity of the conduct alleged at this stage." (*Id.* at 13 (citation omitted)). As to frequency, it wrote: "Defendants also argue that four shootings of unarmed individuals over five years is statistically insignificant given the number of use-of-force incidents MPD officers face. This too, is an argument better suited to summary judgment

or trial." *(Id.)* The Court then added: "I acknowledge, however, that this is a close question. Four incidents over five years are not a large number, and the most recent incident preceded Shawn's death by nearly three years." *(Id.)*

Plaintiffs can add nothing to the four paragraphs of their complaint, which related to four incidents occurring over a seven-year period (2016, 2017, 2019, and 2020). They have disclosed no witness, document, or expert establishing that these incidents were unjustified or that they have any similarity at all to Mr. Gagne's case. And, critically, their claim that there was no reprimand or other consequences for alleged excessive force is flatly wrong. In two of the four incidents, the officers were both fired and criminally charged (*Sweet* and *Sewell).*

As it relates to the alleged similarity of the incidents, on Plaintiffs' *own description* and as confirmed by various court rulings and pleadings, each was a patrol encounter with an unarmed person, and none involved a SWAT team or a barricade situation involving an armed individual who had been actively making threats to officers. None of these cases involved a heavily armed body wearing individual barricaded in a residence who was repeatedly threatening to kill officers. Moreover, the involved Defendants had fundamentally different and far more comprehensive training than the patrol officers. There is no tie between the four shootings and the Defendants in this case.

Nor have any of those cases been found to be an unconstitutional use of force. A settlement is not such an adjudication. Fed. R. Evid. 408(a). In the *Lane* and *Sweet* cases, the District Court found a question of fact as to whether the force used was reasonable, which is not a finding of a constitutional violation. There was no judicial finding in Benitez or Sewell. Like in *Warren v. Penzone*, 2023 U.S. Dist. LEXIS 204376 (D.Ariz. Nov. 15, 2023) and *Andrich,* four dissimilar shootings from 2016 to 2020, in a city of half a million people, followed by nearly three years with none, are exactly the sort of isolated or sporadic incidents that *Trevino* holds insufficient. 99 F.3d at 918, 920. Nor can Plaintiffs show that a custom was the "moving force" behind the shots, *Board of County Commissioners v. Brown*, 520 U.S. 397, 404 (1997). Plaintiffs have failed to provide any evidence at all to

address the Court's concerns in the Motion to Dismiss. Now that those issues are ripe and have been found to have rotted on the vine, Plaintiffs' custom claim should be dismissed.

## VI. DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE STATE-LAW CLAIMS

### A. Count III is Barred by Arizona's Justification Statutes

A.R.S. § 13-409 governs the use of physical force by a law enforcement officer, while A.R.S. § 13-410 governs the use of deadly physical force by a law enforcement officer. Section 13-410(C) states that the use of deadly force by a police officer against another is justified under Section 13-409 if the officer "reasonably believes that it is necessary:"

> 1. To defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force.
>
> 2. To effect an arrest or prevent the escape from custody of a person whom the peace officer reasonably believes:
>
> (a) Has committed, attempted to commit, is committing or is attempting to commit a felony involving the use or a threatened use of a deadly weapon.
>
> (b) Is attempting to escape by use of a deadly weapon.
>
> (c) Through past or present conduct of the person which is known by the peace officer that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.

A.R.S. § 13-410(C). *See also Marquez v. City of Phoenix*, 693 F.3d 1167, 1176 (9th Cir. 2012) ("The use of deadly force is permissible under Arizona law if an officer reasonably believes it is necessary to effect an arrest or prevent the escape from custody of a person whom the peace officer reasonably believes … is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.") (internal quotations omitted). If the officer's use of force is justified under Section 13-409, the officer is immune from civil liability under Arizona law. *Ryan v. Napier*, 425 P.3d 230, 239 (Ariz. 2018). Here, each officer present was attempting to effectuate the arrest of Mr. Gagne for aggravated assault using a firearm, as reported by Jordan and her neighbor, and Mr. Gagne's threats and actions entitled them to the reasonable belief of the imminent use of deadly

force. The use of force was justified under Section 13-410(C)(2) because the officers reasonably believed that Gagne had committed felonies involving the use of a deadly weapon.

A statutory presumption applies as well. When the plaintiff, defined to include "the heir or estate of a deceased person," was harmed while committing a felony or under the influence of intoxicating liquor, a peace officer who used force to protect himself or another or to effect an arrest "is presumed to be acting reasonably." A.R.S. § 12-716(A)(1), (C)(2); *See also Ryan*, 425 P.3d at 237 ("[S]tatutory presumptions are triggered when a law enforcement officer intentionally uses physical force to arrest or capture a suspect and the suspect is injured. The officer is 'presumed to [have been] acting reasonably' in using physical force."). A court need only make such a finding by a preponderance of the evidence. A.R.S. § 12-716(A). *See also Valdez v. City of Phoenix*, No. CV-18-0921-PHX-DGC, 2019 U.S. Dist. LEXIS 182312 at *5-7 (D. Ariz. Oct. 21, 2019).

There is no genuine issue of material fact that the presumption applies here. Mr. Gagne was committing aggravated assault with a deadly weapon, A.R.S. § 13-1204(A)(2), disorderly conduct by recklessly displaying a deadly weapon, A.R.S. § 13-2904(A)(6), and misconduct involving body armor, A.R.S. § 13-3116(A), with a blood alcohol of .218. Plaintiffs cannot rebut that presumption.

The Court's decision in *Harris v. Bertz*, 2022 U.S. Dist. LEXIS 153272 (D.Ariz. Aug. 25, 2022), 2021 WL 4942662 (D.Ariz. Oct. 22, 2021) *aff'd Harris v. Bertz*, 2023 U.S. App. LEXIS 27086 (9th Cir. Oct. 12, 2023), is instructive. In *Harris*, a suspect—who was believed to be part of an armed robbery crew—conducted an armed robbery using a black handgun and then fled in a getaway car. *Id*. at *2. Officers used a Grappler device to stop the vehicle, deployed a flash bang, but the rear passenger occupant exited and ran away toward a Circle K. *Id.* at *3. Officer Bertz fired seven shots, hitting decedent in the back with two of them. *Id.* The Court found that the officer was justified, pursuant to A.R.S. § 13-410(C)(2)(a), in shooting the decedent given that he had just committed felony armed robbery, he was attempting to escape, and he presented a risk to the public. *Id*. at *6. Here,

Mr. Gagne was far more dangerous than the suspect in *Harri*s. Mr. Gagne actively choked his girlfriend, threatened to kill her and the neighbor, actually shot a round in the air, barricaded himself in his apartment near innocent civilians, while armed with multiple firearms which had the potential for causing a mass-casualty event. It was not merely the potential that the shooting could occur, but that Mr. Gagne repeatedly told the negotiator that he intended that it would occur and he would dump shots in officers, desiccate officers, and create the next Iraq war. Plaintiffs simply cannot overcome the presumption of reasonableness that applies.

**B. Count IV: Negligent Training and Alternative City Immunity**

Count IV alleges that the City was negligent because it did not use the prior incidents to train its officers, without any support for the same. (Doc. 101 ¶ 273). The claim fails for three reasons. First, an employer cannot be liable for negligent training or retention unless the employee committed a tort, *Kuehn v. Stanley*, 208 Ariz. 124, ¶ 21 (App. 2004), and justified force is not one. A.R.S. § 13-413. Second, no duty supports the claim. Determining the existence of a duty is a question of law. *Gipson v. Kasey,* 214 Ariz. 141, ¶ 9 (2007). Arizona presumes that the City "reasonably hired and trained its peace officers," A.R.S. § 12-716(A)(2). Plaintiffs have not identified any statute, regulation, or standard of care that imposes a duty on a police department to train officers on every prior force incident that the department is involved in. Plaintiffs' expert did not provide any testimony that doing so represents the standard of care. Plaintiffs have not articulated why these particular cases should be used for training as opposed to any others. Do they require an adjudication of unconstitutionality? Plaintiffs' named cases do not. Instead, they appear to be an arbitrary list of instances where the Plaintiffs disagree with the City's conduct. No duty requires the City to train officers based on the personal preferences of a single group of plaintiffs.

But, in addition, Plaintiffs never questioned any of the officers regarding their knowledge of the other shootings and whether they received training related to the same. The City provides training to officers regarding the constitutional use of force, including

scenario-based shoot/no-shoot training. The SWAT officers also train weekly using scenario-based training.

Even if a duty existed, Plaintiffs' argument fails the Court's causation test, which asks whether the training Plaintiffs describe would have prevented the injury. (Doc. 132 at 9 n.6). No evidence suggests that a lesson drawn from four patrol shootings of unarmed people would have changed how the SWAT team dealt with a heavily armed and violent barricade situation. There is nothing about the four prior shootings that has any similarity to this case such that the officers allegedly were unaware of some different tactic that should have been used. Mr. Gagne was not unarmed and crawling down the hallway like Mr. Shaver, this was not a high-risk felony vehicle stop where the uninvolved passenger was accidentally shot, this was not a shooting in a parking lot like in Sewell and Benitez where the subjects were unarmed. This case is not about an unarmed suspect, it is about a suspect who was armed to the highest degree, wearing body-armor, and repeatedly threatening to kill police.

Finally, the City is immune under A.R.S. § 12-820.05(B), which bars liability for losses "directly attributable to an act or omission determined by a court to be a criminal felony by a public employee unless the public entity knew of the public employee's propensity for that action." The Court deferred the immunity question to "a complete evidentiary record." (Doc. 94 at 23). The record is now complete. Either the shooting was justified and every claim fails, or it was not, in which case intentionally shooting Mr. Gagne was a felony, A.R.S. § 13-1204. A formal felony conviction in a court is not required. *Garcia v. Garibay*, 2013 WL 1442505, at *3 (D. Ariz. Apr. 9, 2013). (Doc. 94 at 21). Plaintiffs have disclosed no evidence of actual knowledge of propensity to overcome the City's statutory immunity. *Harris v. City of Phoenix*, 2021 WL 4942662, at *2 (D. Ariz. 2021); *Tucson Unified School District v. Borek*, 322 P.3d 181, 185 (Ariz. Ct. App. 2014). (Doc. 94 at 22). And to the extent Count IV rests on the interval before medical contact, Plaintiffs have provided no expert to prove that the delay caused or contributed to Mr.

Gagne's death. *Salica v. Tucson Heart Hospital-Carondelet, L.L.C.*, 224 Ariz. 414, 419, ¶ 16 (App. 2010).

## VII. COUNT V: LOSS OF CONSORTIUM

Loss of consortium is a derivative claim that requires proof of the underlying cause, *Barnes v. Outlaw*, 192 Ariz. 283, 286, ¶ 8 (1998), and the Court previously doubted that Plaintiffs could "prove that they suffered any harm in the time between when Shawn was severely injured and when he succumbed." (Doc. 94 at 24). They have not. Their interrogatory answers claim property damage, funeral expenses, and lost earning capacity, and nothing more. (Ex. 21, Pls.' Resp. to Defs.' First NUI No. 3). There is no dispute that Plaintiffs were not present on the scene but were in California at the time.

## VIII. PUNITIVE DAMAGES ARE UNAVAILABLE

Punitive damages are unavailable against the City, A.R.S. § 12-820.04; *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Instead of taking him at his word that he meant them harm, the officers attempted to negotiate with Mr. Gagne for 10 minutes to get him to leave peacefully all the while enduring his threats to kill them. This forecloses the "evil motive" or "reckless or callous indifference" that punitive damages against the officers require. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

## IX. CONCLUSION

The Shooting Officers reasonably responded to the threats they perceived during each phase of the encounter, had no realistic opportunity to prevent unconstitutional force, and acted without a purpose to harm unrelated to legitimate law enforcement objectives. Alternatively, they are entitled to qualified immunity on the force and failure-to-intervene claims because no clearly established law placed the unlawfulness of their conduct beyond debate. The federal claims against the City fail both for lack of an underlying constitutional violation and for lack of evidence that a municipal custom caused the shooting. Arizona's justification statutes and statutory presumptions independently support judgment on Count III; the absence of evidence supporting negligent training and causation, together with the City's alternative immunity defense, defeats Count IV; and the derivative loss-of-

consortium claim in Count V lacks an underlying basis and proof of the claimed loss. The record also provides no basis for punitive damages. Defendants therefore request summary judgment on all remaining claims and rejection of Plaintiffs' request for punitive damages. Should this Court grant summary judgment, Defendants will separately apply for an award of costs and attorney fees under A.R.S. §§ 12-716(B) and 13-420.

DATED this 10th day of November, 2026.

WIENEKE LAW GROUP, PLC

By: */s/ Christina Retts*

Kathleen L. Wieneke
Christina Retts
Rebekah K. Browder
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
*Attorneys for Defendants City of Mesa, Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, and Thomas*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Sean A. Woods
Robert T. Mills
Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

By: */s/ Lauren Rasmussen*