# EXHIBIT 1

# (Non-Electronic Exhibit)

# Living Room Video

# 09-57-52 PM

# EXHIBIT 2

**Mesa Police Department**

**NARRATIVE TEXT HARDCOPY**

**(13A-3 AGGRAVATED ASSAULT)**

**GO# ME 2023-141208**
**Active/Open**

## Narrative Text

**Type** Original Narrative
**Related Person** (Suspect #1) GAGNE, SHAWN, T (DOB: [redacted])
**Subject** GAGNE, SHAWN TAYLOR DOB: [redacted]
**Author** P21423 - GUTIERREZ, J. (21423)
**Related Date** Jul-07-2023 4:33

It should be noted during this investigation, I was wearing an on-body camera and the following is a summary of statements and observations made during the investigation and not direct quotes unless noted. Any breaks or lapse of video is due to either speaking with on scene Officers or an unintentional delayed start of the video. The digital video file was downloaded and stored at evidence.com for further information and details.

On July 6th, 2023, at approximately 2135 hours, I was dispatched to 1233 N. Mesa Dr. #2164 in Mesa, AZ reference to a shots fired call. Comments to the call stated the reporting party's neighbor made verbal threats to her, and fired off a round on his patio. Additional comments stated the male threatened to "blow the reporting party's brains out". He was described as a white male in his 30's, stocky with short brown hair and a beard. He was last seen going back into his unit (#2164) and he had no known vehicle access at that time.

Prior to my arrival, several Officers had arrived on scene and set up several containment and immediate action teams in the event the male exited his apartment. Also, assisting Officers K. Newby #22469 and N. Ahumada #25227 were speaking to the reporting party (verbally identified as Cindy Schramm). Officer Newby advised via radio Cindy stated a round was fired off by the male involved, but no injuries were reported. See Officers Newby and Ahumada's supplements for further details.

Additonally, other Officers on scene advised via radio the subject's girlfriend was now on scene on the west side of the building.

Upon arrival, I responded to the west side of the apartment and contacted the subject's girlfriend. She was later identified as Jordan Wirtjes and her identity was verified through her MVD photo. Immediately, I was advised by Sgt. J. George #17283 that Jordan confirmed there had been a shot fired but the male was not suicidal. Jordan informed me her boyfriend (later identified as Shawn Gagne) was not suicidal and did not have any mental issues, but would be confrontational with Officers. Jordan clarified Shawn was now alone inside the apartment and heavily intoxicated from drinking vodka. Jordan advised Shawn had an AR-15 rifle, a "45" handgun and a shotgun. Jordan informed me Shawn had been drinking all day and was supposed to be admitted into rehab the next day for it. Jordan said she believed Shawn was stressed out about rehab and was not sure what triggered him. Initially, when I asked her what happened, she stated she was standing outside talking to Cindy and Shawn was mad because she was still there after she told him she was leaving. Jordan informed me she was never threatened with a gun . When asked is she was in an argument over their dinner. When asked if there were any weapons involved during the incident, she stated there were not. Sgt. George advised Jordan she initially said Shawn shot a round off (meaning a gunshot), to which she responded she was not sure if it was a round, and claimed she just heard a loud noise.

At that time, Officer Newby advised via radio he had established probable cause to arrest Shawn for aggravated assault against Cindy.

**Mesa Police Department**

**NARRATIVE TEXT HARDCOPY**

**(13A-3 AGGRAVATED ASSAULT)**

**GO# ME 2023-141208**
**Active/Open**

It should be noted I did not observe any injuries or signs of trauma on Jordan at that point.

When I asked for further clarification, Jordan advised she left immediately after Shawn was yelling at them while her and Cindy were outside, but said again, Shawn did not have a gun at that time. Jordan stated the incident began after she texted Cindy she could come over, then exited the apartment due to the argument with Shawn. There, as she walked out, she told Cindy they could not be there, so Jordan drove away.

While I spoke to her, Jordan provided me Shawn's phone number.

I then attempted to contact Shawn via telephone multiple times, but got no response.

After, while I stood by Jordan. Shawn contacted Jordan via telephone. There, Jordan was advised to tell Shawn to put the weapons down and exit with his hands empty, but Shawn refused to exit the residence. As she continued to speak to him, assisting Officer M. Adair #18901 arrived and assumed the conversation with Shawn. While he spoke to him, I was able to listen to the conversation and was tasked to broadcast Shawn's comments over radio.

While on the phone, Shawn sounded extremely upset over Police being there. As Officer Adair continued the conversation, Shawn made demands to Officers to back up and move away. He continued ranting and began making threats to shoot Officers if they got close. Shawn continued to say he had AR's, AK's, Shotguns, and other weapons he was willing to use against the SWAT team if they came in. He advised he did not care to die. Shawn was told Police wanted to handle the situation so he could come out of the situation safely, but he continued by saying he was not coming out and would exercise his right to bear arms. As the conversation continued, Officer Adair advised he could hear Shawn loading a weapon. Shawn then said he would shoot anyone that was by his house if they did not move.

Lastly, I spoke to Jordan and asked her to tell me what happened from start to finish. Jordan advised she was inside her apartment with Shawn and no one else, when an argument ensued over what they were going to eat. She stated the argument never escalated into something physical and no weapons were used or displayed at that point. After, she said she made the decision to leave, and as she walked outside, she met with Cindy. There, Jordan advised they both walked downstairs by the apartment while Shawn continued yelling at the door. At that point, Jordan then claimed she did not hear anything but Shawn yelling, and did not see any guns. About ten minutes later, she left the complex and went to a Food City nearby in the intersection of Mesa Dr. and Brown Rd. in Mesa, AZ. While there, she saw multiple Mesa PD patrol cars with lights and sirens activated. Jordan advised she had a bad feeling about the patrol cars heading to the complex, so she returned and met with Officers on scene.

This concluded my involvement in this case.

See all other assisting Officers' supplements for further details.

NFI.

# EXHIBIT 3

Mesa Police Department

NARRATIVE TEXT HARDCOPY

(13A-3 AGGRAVATED ASSAULT)

GO# ME 2023-141208
Active/Open

## Narrative Text

**Type** Supplemental Narrative
**Subject** NEGOTIATOR NARRATIVE
**Author** P19441 - ORR, C. (19441)
**Related Date** Jul-07-2023 3:16

On 07/06/2023 at approximately 2220 hours I was working on call as a Crisis Negotiator and had just returned to Metro from an unrelated call when I overheard on the radio a criminal barricade was in progress at 1233 N Mesa Dr. Apt 2164. Call comments stated a male had stated he would "blow RP's brains out" male was reported to be armed with long guns and handgun and had fired weapons into the air.

Negotiator Adair # 18901 was already responding to the scene, while I and Negotiator Ibarra #22438 began to travel to the scene from Metro. While enroute to the scene I overheard the male subject was observed at the front door of the apartment holding a rifle, and the male subject then closed the door.

Upon arrival I walked into the perimeter and located Negotiator Adair who was already on the phone with the male. I assumed the role of the Secondary Negotiator, and while preparing equipment to begin listening to the conversation between Adair and the male I heard a single gunshot fired, and a SWAT Sniper radio in that a shot had been fired.

I was able to connect my equipment with Adair and overhear the conversation between him and the male subject. The male was extremely agitated, yelling and saying he was going to shoot officers and that he "had a hole in him." While listening in I heard approximately three volleys of gunfire from the direction of the male's apartment. During the subsequent exchange of gunfire, I and Adair moved to a more advantageous position behand a Patrol vehicle and continued to try and negotiate with the male. Adair gave clear safe surrender instructions to the male, who did not respond. Sound from the male such as moving around, and labored breathing were heard from the open line. Adair maintained the open line with the male letting him know that medical personal was on scene and that they would treat him, but he needed to cooperate before medical could be brought to him.

The sounds coming from the male lasted for a few minutes, and these were relayed to command. Eventually the sounds coming from the male diminished and were not able to be heard. The open line was maintained until tactical moved up and the male was placed in custody at approximately 2317 hours.

This concluded my involvement in this case, should I have further involvement it will be documented in supplemental reports.

# EXHIBIT 4

Mesa Police Department

NARRATIVE TEXT HARDCOPY

(13A-3 AGGRAVATED ASSAULT)

GO# ME 2023-141208
Active/Open

## Narrative Text

**Type** Supplemental Narrative
**Author** P22469 - NEWBY, K. (22469)
**Related Date** Jul-07-2023 2:11

It should be noted, during this investigation, I was wearing an on-officer body camera and the following is a summary of statements and observations made during the investigation and not direct quotes unless noted. Any breaks or lapse of video is due to either speaking with on scene Officers or an unintentional delayed start of the video. The digital video file was downloaded and stored at evidence.com for further information and details.

On 07/06/2023, at approximately 2133 hours, I was riding with Officer in Training Ahumada #25227 when we were dispatched to a shots fired call for service located on 1233 N. Mesa Dr. #2164 in Mesa. Call comments indicated a male neighbor made verbal threats then shot a firearm.

Upon arrival, Officer Ahumada made contact with reporting party and victim Cindy Schramm at her apartment located east of the dispatched location at apartment #1152. While Officer Ahumada spoke to Cindy I heard her state tonight she was at the dispatched location to talk to her friend Jordan. Cindy clarified she was at the dispatched location because Jordan's boyfriend Shawn was being aggressive with her and he possibly choked her. Cindy stated while at Jordan's residence, Shawn became verbal with them while they stood outside of the dispatched location on the sidewalk. Cindy stated while being verbal Shawn walked out onto the second story balcony of the dispatched location and made threats to splatter their brains. After making the threat, Cindy stated she heard Shawn rack an unknown style gun while standing on the balcony out of her sight. Cindy stated she became scared and started heading towards her apartment when she heard Shawn shoot his gun in an unknown direction. Cindy clarified she did not know where Shawn shot the gun but she was certain he shot a gun during this incident. Cindy stated when she got back to her apartment she had her boyfriend drive by the dispatched location to retrieve the apartment number so she could call PD.

After hearing Cindy's statements, I voiced what she said over the radio to inform other officers on scene. While voicing the information, I asked Officer Gutierrez #21423 to ask Jordan if she heard the gunshot. Officer Gutierrez advised over the radio that Jordan did hear a loud bang while she was in front of the dispatched location with Cindy during this incident but she was not sure what it was. Based on the facts collected, I determined there was probable cause to arrest Shawn for aggravated assault and I voiced the information over the radio.

After voicing the information over the radio, I remained on the east side containment team and had no further involvement.

NFI

# EXHIBIT 5

## Narrative Text

**Type** Detective Narrative
**Subject** TIMELINE
**Author** P13539 - INGRAM, J. (13539)
**Related Date** Aug-22-2023 15:10

**2023-141208 Timeline**
Times are approximate.

**7/6/2023**

**2133** - 911 call received from Cindy Schramm. (MPD CAD)
**2135** - Officers dispatched. (MPD CAD)
**2137** - 1st officer on scene. (MPD CAD)
**2141.32** - Jordan tells Sgt. George that Gagne fired one round into the air from a .45 (Kelly BWC)
**2149** - Jordan gives Ofc. Gutierrez the phone number to call Gagne. (Gutierrez BWC)
**2216** -Ofc. Gutierrez calls Gagne but no answer. (Gutierrez BWC)
**2217** - Jordan calls Gagne but no answer. (Gutierrez BWC)
**2216** - Ofc. Maldonado begins PA announcements. (Maldonado BWC)
**2219.36** - Beanbag rounds (3) fired at front door. (Freeman #23084 BWC)
**2223.24** - Beanbag rounds (2) fired at front window. (Freeman #23084 BWC)
**2226.23** - Gagne opens the front door with rifle in hand. (Plott BWC)
**2227.10** - Gagne calls Jordan. Initially it is on speaker phone. Shawn asks her why there are "fucking cops" in front of the house. Jordan immediately turns speaker phone off and will not hand the phone to the officer. (Gutierrez BWC)
**2229.32** - Ofc. Adair arrives with Ofc. Gutierrez. (Gutierrez BWC)
**2230.00** - Jordan asks Gagne to come out. He tells her something, she responds, "I don't want them to come in. I want you to come out." (Gutierrez BWC)
**2230.40** - Door handle moving and door opening. (Chuey BWC)
**2230.47** - Door shut. (Chuey BWC)
**2230.53** - Ofc. Adair picks up Jordan's phone. Gagne hangs up. (Gutierrez BWC)
**2231.25** - Ofc. Adair attempts call back using Jordan's phone. (Gutierrez BWC)
**2232.05** - Ofc. Adair begins speaking with Gagne. (Gutierrez BWC)
**2234** - Ofc. Freeman #20207 enters unit 2165. (Plott BWC, Radio)
**2239.16** - Ofc. Adair hears Gagne loading ammunition over the phone. (Gutierrez BWC)
**2242.38** - 1st Shot fired by Ofc. Freeman #20207.
**2243.20** - 1st shot fired by Gagne. (Widmer BWC)
**2243.21** - 2nd shot fired by Ofc. Freeman #20207. (Widmer BWC)
**2244.17** - 3-4 shots fired by Gagne toward the north. (Air Unit video)
**2244.18** - Volley of fire by officers.
**2244.36** - Volley of fire by officers.
**2245** - 4 Ferret (Gas) rounds fired into the apartment.
**2256** - Large Armored vehicle moves toward the front of the apartment providing cover for officers. (Air unit video)
**2309.43** - Diversionary device deployed to elicit response. (Air unit video, Harris BWC)
**2315.49** - First officer enters apartment. (Air unit video, Harris BWC)
**2315.55** - Taser deployed on Gagne. (Harris BWC)
**2317.05** - Sgt. Harris calls for Paramedics to respond to the apartment. (Harris BWC)

**2317.32** - Gagne brought out in front of apartment. (Air unit video)
**2318.17** - Officer removes tactical vest from Gagne. (Air unit video)
**2319** - MFMD arrives at apartment and begins lifesaving measures. (Air unit video, Fire Cad report)
**2341** - Time of Death pronounced. (MPD CAD)

**Investigation Continued.**

# EXHIBIT 6

## Narrative Text

**Type** Detective Narrative
**Subject** INVESTIGATION
**Author** P13539 - INGRAM, J. (13539)
**Related Date** Aug-22-2023 14:55

**2023-141208**

On 7/6/2023, at approximately 2315 hours, I received a call from Sgt. Clarke #14173 requesting that I respond to 1233 N. Mesa Drive #2164 reference an officer involved shooting. I arrived on scene at approximately 0015 hours.

**Briefing**
The briefing was given by Sgt. Samons #19185. Sgt. Samons reported that on 7/6/2023 at 2133 hours Mesa Police received a 911 call from Cindy Schramm. Cindy stated her friend Jordan Wirtjess called her and told her that she had been in a domestic violence incident with her boyfriend in their apartment. Jordan's boyfriend was identified as Shawn Gagne. Cindy went to Jordan's apartment and while there, Shawn threatened to kill Cindy. Cindy heard what she believed a handgun slide dropping forward and then a loud bang, believed to be a gunshot. Cindy went home and called police approximately ten minutes later. Jordan told officers that she believed Shawn was drunk and had multiple firearms in the apartment.

Responding officers set up a perimeter with Immediate Action Teams in three locations. There was a north team, a south team and an east team. Officers attempted to contact Shawn and negotiate with him through the phone number that Jordan provided but received no answer. Officers made audible announcements toward the apartment and received no answer. Officers then attempted to receive a response from Shawn by knocking on the door using a bean bag round. There was still no response. Sgt. Samons stated that most of the windows to the unit were all covered with aluminum foil. After some more time went on a bean bag round was shot through one of the windows, again to attempt to get a response from Shawn. After this, officers saw the front door open and Shawn in the doorway holding a rifle down at his side. He then closed the door and went back inside.

Officers then had Jordan call Shawn using her telephone. Jordan spoke with Shawn for some time before police negotiator Adair arrived and began speaking to Shawn using her phone. According to Sgt. Samons, Shawn told the negotiator that the police needed to go away and if he saw them, he would shoot them.

Sgt. Samons stated that SWAT officer Freeman arrived and took up a position with his rifle at apartment #2165, across from Shawn's apartment. Sgt. Samon stated that Shawn presented himself at one of the windows with the rifle and Ofc. Freeman fired a single shot. Sgt. Samons stated that Shawn returned fire through the window at officers. Officers then returned fire toward Shawn several times. Sgt. Samons stated that Shawn was later found down at the front door. Officers were concerned that Shawn was baiting them up to him. Because of this, they deployed a diversionary device as well as used a taser on Shawn as they made a cautious approach. Shawn was then detained in handcuffs and moved from the front door, down the step to an area where medical personnel could assess him. MFMD confirmed that Shawn was deceased at 2341 hours.

The officers who fired their weapons were identified as:

Ofc. Freeman #20207 - Rifle .308
Sgt. Harris #16816 - Rifle .223
Ofc. Chuey #21315 - Rifle .223
Ofc. Goodrich #20130 - Rifle .223
Ofc. Brown #21421 - Rifle .223
Ofc. Navarro #19827 - Rifle .223
Sgt. Thomas #17067 - Rifle .223
Ofc. Cameron #20495 - Rifle .223

Sgt. Clarke assigned me as the case agent, Det. Staab to conduct interviews with Cindy Schramm and Jordan Wirtjess, Det. Marquez to document the scene and collect evidence with forensic personnel. Det. Hallemeyer was assigned to author any necessary search warrants and conduct the weapon inspections. Refer to these detective's supplements for details on their involvement.

**Release of Ofc. Falconer's rifle from the scene**
While on scene I was informed that Ofc. Falconer #22430 was being relieved from the scene. Ofc. Falconer's rifle had been secured in his vehicle, unit 5214. This vehicle was not being released from the scene. Ofc. Falconer advised that after he left, his rifle would not be secure. Ofc. Falconer told me that upon his initial arrival he had deployed his rifle for use but was relieved by SWAT personnel prior to the shooting. Ofc. Falconer did not fire his rifle and it was later secured in vehicle 5214. I determined that Ofc. Falconer's rifle was not needed as evidence and could be retrieved as this was in the best interest of keeping it safe and secure. CSS Murrietta took photographs of its condition in the vehicle prior to Ofc. Falconer retrieving it and taking it with him from the scene.

**Walkthrough Interviews with Involved Officers**

**Interview with Ofc. Freeman #20207 - 7/7/2023 0507 hours**
The interview with Ofc. Freeman took place on scene. Present for the interview was Deputy County Attorney Magnus Eriksson, Attorney Kathryn Baillie and Det. Staab. The interview was captured by Axon Capture and is available for review at Evidence.com. The following is a summary of the interview. Refer to the recording for exact details.

Ofc. Freeman told me that he has been a police officer for 9 years and is a full-time member of the Mesa Police SWAT Team. Ofc. Freeman stated he is a sniper on the SWAT team. Ofc. Freeman stated that his shift began at approximately 0700 hour on 7/6/2023. He described his day for 7/6/2023 where one call he was supposed to work got cancelled, before he assisted in serving two other search warrants.

Ofc. Freeman stated that he was made aware of this incident from Sgt. Harris and another person while he was at the Metro substation. He had heard that a person had fired multiple rounds from an AK-47 and that the subject was believed to have passed out in the residence. Ofc. Freeman stated that he was asked by Sgt. Harris to respond to the scene. Ofc. Freeman told me that he did not have a radio with him as he responded and had not received any updates on the call until he arrived.

Ofc. Freeman told me that when he arrived, Ofc. Chuey told him that the suspect was observed walking around inside the residence with a rifle. At this time Ofc. Freeman stated that he grabbed his sniper pack from his vehicle so that he could deploy in this capacity. Ofc. Freeman told me that he is a primary sniper on the SWAT team and has been trained to carry out that role.

Ofc. Freeman told me that he arrived south of the scene and responded northbound through the parking lot. He stated that he met officers that were set up in the immediate action team behind some patrol cars. He stopped here and assessed the apartment. Ofc. Freeman told me that he could see the suspect in the apartment walking around carrying a rifle that had an optic on it. Ofc. Freeman said that he looked for locations where he could deploy in his role. He saw some balconies and attempted to contact the resident. While he was doing this, he could see the suspect looking out the sliding glass door on the southside of the residence. Ofc. Freeman said that he believed the suspect could see him based on how well lit the area was. He saw the resident come out onto the balcony at unit #2165. He then asked this resident if he could use his balcony and was given permission. He stated that he then entered unit #2165 and set up inside.

Ofc. Freeman stated that when he got to the apartment door, he heard over the radio that the suspect had stated, "if people didn't back off, he would start shooting it out with the police." He also heard that the suspect said, "if he saw any red and blues he would start shooting." Ofc. Freeman stated that because of these statements, he believed that the incident was escalating. Ofc. Freeman stated that he had the residents of the apartment go to the rear and he turned off all the lights. Ofc. Freeman told me that the sliding glass door to the apartment was open and provided him a view across to apartment #2164. He could see the two windows that faced both south and southwest from his elevated position.

Ofc. Freeman told me that at this time he could see the suspect talking on what appeared to him as a cellular phone. He believed this was possibly negotiators talking to the suspect and that the suspect was agitated. A few minutes later he could see the suspect walking around with a rifle that had a sling attachment to it. Ofc. Freeman told me that he observed the suspect walk over to the slider door and began peeking through the blinds. Ofc. Freeman said that he saw that the gun was in the suspect's right hand. He believed the suspect was peeking out at patrol officers down below in the parking lot. Ofc. Freeman stated that this gave the suspect a tactical advantage. Ofc. Freeman told me that this was when he took his first shot. As Ofc. Freeman told me this he was motioning with his hands. I then asked him to explain what his was motioning. Ofc. Freeman said that the rifle was in his right hand and his left hand was opening the blinds. Ofc. Freeman believed that the suspect was looking for where he wanted to shoot at patrol officers. Ofc. Freeman explained that from the suspects elevated position he had a good view of the officer's positions.

I asked Ofc. Freeman to explain what position the suspects gun was in at this time. He told me that the suspect had the gun in his right hand and that it was up but not in the low ready position at this point. Ofc. Freeman stated that this would have been a simple movement for the suspect, and he could begin firing on officers. Ofc. Freeman told me that because he had heard the suspect had already fired a round from his AK-47, he was concerned because he knew what that round can penetrate through vehicles and that the officers would not stand a chance. Ofc. Freeman told me that his first round was aimed at the suspect's head. He told me he was unsure of where he hit the suspect, but that the gun stayed in the same

positioning with the suspect disappearing from view. After firing he told me he called out on the radio, advising that he was the one who shot and not the suspect. Just after this he told me that Ofc. Widmer arrived to his location to be his second sniper. At this time, he saw the suspect grab the gun and move backward and to the south. He then saw the suspect use his hand again to look through the blinds again. It was at this time that he said he fired a second time at the suspects torso. After this Ofc. Freeman said the suspect moved to the north and deeper into the structure out of his view. Shortly after this Ofc. Freeman stated that the suspect fired multiple rounds out the same window. He could see through his optics that glass was leaving the residence. He was unsure of the direction those round went in. He stated that he later heard a volley of fire from down below. After this he heard officers say that they had him at the front door. Ofc. Freeman stated that Ofc. Widmer relieved him at his position.

I asked ofc. Freeman to describe what he meant by the tactical advantage that the suspect was gaining. He told me that the suspect had "the high ground." He told me that it's very hard to hide from someone with a powerful rifle like the suspect had when they are above you and that the rounds he would have fired would go through many items.

Ofc. Freeman identified where he was standing. This can be seen in photographs taken as a blue cone behind his rifle. He then told me that when Ofc. Widmer relieved him of his position, Ofc. Widmer did a "chamber check" and ejected the round in the chamber to ensure a round was present. Ofc. Freeman told me that he believed he fired twice.
Interview concluded.

**Interview with Sgt. Harris #16816 - 7/7/2023 0545 hours**
The interview with Sgt. Harris took place on scene. Present for the interview was Deputy County Attorney Magnus Eriksson, Attorney Kathryn Baillie and Det. Staab. The interview was captured by Axon Capture and is available for review at Evidence.com. The following is a summary of the interview. Refer to the recording for exact details.

Sgt. Harris told me that he has been a police officer for over 17 years and is a full-time member of the Mesa Police SWAT Team as a Team Leader. Sgt. Harris has been on the SWAT team for 14 years. Sgt. Harris stated that his shift began at approximately 0700 hours on 7/6/2023. He described his day for 7/6/2023 as beginning with training and then the team served two search warrants prior to coming to this location.

Sgt. Harris was advised of this call by one of the K9 handlers and was told that patrol was working a call where a subject had fired some rounds. Sgt. Harris then began listening to the call over the radio and pulled up the CAD comments. He stated that he saw that Lt. Santana was on scene and contacted him. Sgt. Harris offered his teams support, and they discussed him assisting on the call with approximately 5-6 SWAT operators.

I asked Sgt. Harris if he had heard about the call from any other sources. He told me that initially he had been told that there was a DV related incident where a subject fired from and AR15 or AK47 from a patio. He then read the initial comments on the call and confirmed that there had been shots reportedly fired from the patio. Sgt. Harris told him when he arrived that the same individual had fired off rounds on 7/4/2023. He was also told that neighbors stated the subject had 3 - 4 high powered rifles in the apartment.

Sgt. Harris told me that he parked to the south and as he was getting out of his vehicle, he was informed that the subject in the house had opened the door armed with a rifle and had engaged with them verbally before going back inside. After this he informed Sgt. Thomas to respond with additional SWAT personnel. Sgt. Harris stated that he went north through the parking lot pausing where the south immediate action team was located. Sgt. Harris saw that the apartment was illuminated. When he located where the front door was, he and another operator moved to the northwest where another immediate action team.

Sgt. Harris stated that he met with Lt. Santana at the northwest location. Sgt. Harris told me that the BAT, a large, armored vehicle that was currently parked between where the northwest team was located and the apartment, was not in that position during the incident. That vehicle was moved into place later, after the incident was over. Sgt. Harris told me that when he looked at the apartment, he noticed that from this angle the windows to the apartment were obscured by aluminum foil that had been placed over them. He said that he could see a rifle sitting on top of the north balcony. He told me at the time it was sitting on top of a chair. He told me that when the house was later cleared the rifle was knocked over.

Sgt. Harris told me that he did not stay at this location and began to look for another location due to this location leaving the officers exposed. He said that he is familiar with the ammunition that the suspect was reported to have and that the body and other armor the officers had was not rated to protect them from this ammunition. Sgt. Harris then described because of the elevated position the suspect had, this placed them in further danger.

Sgt. Harris told me that he moved east near the north wall. He told me that he continued behind a dumpster but then continued to look for a position that had a better view. He told me he went further east where he located some vehicles under a covered awning. He told me that because the lights were out at the awning, he used the dark to conceal himself behind the vehicles. From this position he could see the front door and also the north balcony. Sgt. Harris then began coordinating resources to different locations on the perimeter.

Sgt. Harris said that he could hear the suspect within the apartment yelling. He stated that negotiators were speaking with him, and he heard them relay that the suspect was saying that if officers did not back up, he would shoot them. He heard negotiators relay that they could hear the subject loading the rifle while he was making these threats. He heard negotiators say that the suspect was upset about seeing the red and blue lights. Sgt. Harris said they attempted to turn off all the red and blue lights to mitigate the aggravation that the suspect was experiencing. He told me that he could not see the suspects movements from his position, but he heard Ofc. Freeman's reports of the suspect moving around inside the unit.

Sgt. Harris told me that he was familiar with these apartments and their layouts. He stated he stayed in this position so he could see through the front door if it were opened allowing him some view inside the apartment.

Sgt. Harris told me that he heard a shot from Ofc. Freeman's position. From his experience he recognized the sound as being from one of the police departments .308 rifles. He told me that he could see a "slight splatter" of glass from the area of the second story west facing window. Sgt. Harris told me that he then heard a burst of a secondary gunshots and saw glass coming out from the inside of the unit. He told me that due to the many lights pointed

up at the unit this allowed him to see the glass falling through the air. He recognized this as shots coming from the inside being fired toward the position where Ofc. Freeman was located. Sgt. Harris stated that he spoke on the radio but did not hear from Ofc. Freeman. This made him believe that Ofc. Freeman was shot. He later learned that he had not been hit but that shots were fired in that direction.

Sgt. Harris told me that he began making preparations with Sgt. Thomas to deploy gas into the unit to disrupt the subject's ability to continue shooting. At this point Sgt. Harris admitted that he wasn't exactly sure in the timing of events and if shots occurred from the south first or if the subject fired out the north window. He told me that he would give me his perspective on those northbound shots. He told me that he recalled several rounds fired out the north balcony. He told me he could see glass "splatter" from the rounds that were exiting the apartment. He said that he did not engage because of his position and the fact that he did not hear rounds travelling past him or hitting in his area. He believed these rounds were endangering the officers either to the northeast or the northwest. Sgt. Harris stated that during the volley of fire from the south side, he could hear the distinct sound of shots coming from within, that sound differently than the suppressed shots that SWAT uses. Sgt. Harris stated that he did not know in which direction these shots were directed but knew they were from inside and not in his direction. He told me that he did hear suppressed fire from officers in response to these shots.

Sgt. Harris told me up to this point there had been shots fired out the west window, then out the north window and then out the south window. He believed that with everything he had learned up to this point, the individual inside had complete disregard for the lives of others outside the apartment and that the suspects actions needed to be stopped immediately. He told me that up to this point the subject had not been compliant with the negotiators and had only been threatening and showing agitation.

Sgt. Harris told me that sometime after this he observed the front door open and observed a male wearing a red shirt with a "plate carrier" in the doorway. He told me that the subject moved toward the north somewhat out of his view. He stated that the plate carrier is a ballistic protection that will stop rifle rounds and is the same as what SWAT wears. This concerned him knowing that the suspect had ballistic protection that protects him from the officer's rifle rounds and also had a high-powered rifle that some officers body armor will not stop. Sgt. Harris believed this was a big problem because the suspect had escalated from firing his weapon out of obscure places to an open confrontation in the doorway. Sgt. Harris said that since the subject had moved out of his view, he was unable to engage but could hear engagement from other officers. Sgt. Harris then said he saw him move across the door frame in a way that he believed the subject was concealing himself so that he could keep eyes on the team to his west. He told me that this was when he "deployed" his rifle.

While Sgt. Harris was describing how the subject was moving, he was holding his hands out in front of him as if the suspect was doing this. I asked him to explain for me verbally if the suspect was carrying something or if he saw this somewhere. Sgt. Harris told me that as the subject moved, he brought his arms up and bladed his body turning to the doorway, which concealed his movements. He told me that he saw his arms up in the same way that he would if he was holding his rifle. He told me he saw what he believed was an AR15 magazine. Sgt. Harris said that he believed the suspect was trying to use the doorway as a tactical advantage to keep eyes on or potentially attack the officers.

I told him that he mentioned seeing a magazine, so I asked him if he saw a rifle with it. He told me that because of the angle or because of the door possibly closing he did not have full view of the suspect. I then confirmed that his view was obstructed, and he saw a magazine that he recognized as going in a rifle. He believed it was for an AR15. I then asked him if by the way he was holding his hands as he was describing what happened, did it appear to him that the suspect was holding a rifle. Sgt. Harris told me that it did appear that he was holding a rifle. I then asked him in the way that he was holding it if he believed the suspect was aiming a rifle at someone. He told me that he believed the subject was pointing it at the other officers to his west. I asked him if that was when he "deployed" his rifle and if this meant he fired it. He told me that was what he meant. He stated, "At that point I engaged with him by firing my weapon." He stated that his purposeful aim was directed at his pelvic girdle and his lower body. He did this because of the body armor that he saw.

Sgt. Harris stated that he saw the subject go down as he is delivering gunfire. He told me that the subject was obscured by a pony wall as well as a door that fell down on top of him. Sgt. Harris told me that other members began deploying gas into the unit and they asked for a drone.

Sgt. Harris placed a blue cone where he believed he was standing when he fired. He also pointed out on the front of the vehicle where the dust had been moved from his forearm touching it. He told me that they then planned how to safely move up to the unit, as well as evacuate other apartments around it. Sgt. Harris told me that he deployed a diversionary device prior to going up to the residence. He told me that when he went up to the apartment, he moved past the suspect to cover other officers from any additional threats from inside the house. He told me that he did not detain him. I asked Sgt. Harris if there was anyone else located inside the house. He told me there was not.

Katherine Baillie then asked about a light that was located on the north patio. Sgt. Harris told her that he was unsure if the light was on due to the number of spotlights that were pointed at the apartment to illuminate it. She then asked if there was illumination at the front. He stated "yes" and then stated that the entire front was illuminated by the spotlights.

I asked Sgt. Harris if he recalled how many shots he fired. He estimated he fired between 4 or 5 rounds from his rifle.

Interview Concluded.

**Interview with Ofc. Chuey #21315 - 7/7/2023 0629 hours**
The interview with Ofc. Chuey took place on scene. Present for the interview was Deputy County Attorney Magnus Eriksson, Attorney Kathryn Baillie and Det. Staab. The interview was captured by Axon Capture and is available for review at Evidence.com. The following is a summary of the interview. Refer to the recording for exact details.

Ofc. Chuey told me that he has been a police officer for over 11 years and is a full-time member of the Mesa Police SWAT Team as a sniper. He told me that he has been on the SWAT team for the last 6 years. Ofc. Chuey stated that today he did not act as a sniper but as a SWAT Operator. Ofc. Chuey stated that his shift began at approximately 0700 hours on 7/6/2023. He described his day for 7/6/2023 as serving two search warrants prior to coming

to this location.

Ofc. Chuey told me that he heard the call come up over the radio. He also read the comments on his computer. I asked Ofc. Chuey to tell me the information he heard about the call prior to him arriving. He told me that he heard the suspect was highly agitated and armed. He heard that the suspect had already fired off a round from the residence and patrol was on scene attempting to contact him. He told me that he had heard that patrol had already bean bagged the front door in an attempt to contact the subject. Ofc. Chuey told me that the subject became agitated.

I asked him to tell me what he heard that led him to believe the suspect was agitated. Patrol reported that they could see the subject moving back and forth, was yelling at them and appeared to be armed. He told me that he heard that they had called the suspect and he had been yelling at them on the phone.

Ofc. Chuey told me that he parked south of the scene and walked north through the parking lot. He said that he met the south team behind the parked patrol vehicles. He told me that he met patrol officers at this location and looked for a supervisor. Ofc. Chuey stated that he and Ofc. Freeman were two of the first SWAT officers to arrive. Ofc. Chuey asked the patrolmen where the supervisor was located and was told they were on the northwest side. He told me that from this location he could see the suspect walking in front of the southwest sliding glass door. He stated that he could see the suspect was holding a rifle up in the air. He told me that it looked like an AK47 based on the shape of the magazine in the rifle. Ofc. Chuey stayed at this position briefly then moved to the northwest side until Ofc. Harris and other SWAT members arrived.

Ofc. Chuey told me that when he arrived at the northwest immediate action team, he took up a position in the front door frame by the southmost vehicle at this location. He told me that he took over Ofc. Mask's position where he could see the front door and the north side. He told me that the driver's door was open, and he used the door frame for stability. Ofc. Chuey told me that the large-armored vehicle was not present when this was occurring. He told me that at the time this was occurring there was nothing between him and the apartment.

Ofc. Chuey said that the negotiators had been speaking to the subject and relayed to officers over the radio to turn the red and blue lights off. He was also threatening to shoot and kill officers if they didn't turn off the lights. Ofc. Chuey told me that while he was watching through his magnified optic, he could see the door handle turn and the suspect open the door. He said the suspect was positioned to where he had a better angle on the officers and was at a higher elevation. He told me that he could see something dark in his arm next to him. Ofc. Chuey said he was trying to determine what that object was when the suspect closed the door. I asked Ofc. Chuey what he believed the suspect was holding. He told me he believed it was the gun he had already observed him holding.

Ofc. Chuey told me that there were several communications over the radio and assignments were given. He told me that Ofc. Freeman was covering the south side sliding door and he would cover the front door with his optic.

Ofc. Chuey told me that he heard Ofc. Freeman fire. He said that he could tell the difference between the suspects gun and the sounds of the officers suppressed guns. He told me that

he heard a sound he believed was the suspect shooting out of the house. He also stated that he saw glass "splinter." I asked him if this was after Ofc. Freeman fired and when he fired. He told me that he was not sure at this point. He said that he saw the glass was broken around the same time he heard shots being fired from inside.

Ofc. Chuey told me that he heard gun shots, and he saw muzzle flash coming from the northside of the apartment. Ofc. Chuey told me that the muzzle flash was from the area where these shots were being fired. I asked if he could tell me where these shots were aimed toward. He told me he could not tell. Ofc. Chuey told me that he fired at the muzzle flash with his rifle. I then asked him why he made the decision to shoot. He told me that he believed the suspect was shooting at officers from that position. Ofc. Chuey then placed a blue cone where he believed he was standing when he fired.

I asked Ofc. Chuey how many rounds he thought he fired. Ofc. Chuey pointed out a magazine on the ground. This magazine was a 20-round magazine that Ofc. Chuey stated was loaded with 18 rounds. Ofc. Chuey believed he fired 11 or 12 rounds at this time.

Ofc. Chuey told me after this he could see strike impacts from officers shooting at that area. He told me that the flash went away, so he stopped shooting and transitioned back to the front door. Ofc. Chuey told me the front door opened, and the suspect was immediately in the front door. He told me that he noticed the suspect was wearing a plate carrier and was standing in a position like he had a weapon. Ofc. Chuey told me that he fired directly at the suspect until his rifle went to bolt lock. After this he told me that he did a magazine exchange.

I asked him what he observed after he fired. Ofc. Chuey told me that the subject went down, and he could see his leg in the doorway. He told me that he did not fire any additional rounds. Ofc. Chuey did not think that he fired any rounds after he did his magazine exchange. He told me that he believed he fired a total of 18 rounds.

Ofc. Chuey said that they began putting gas into the house while he continued to watch the front door. He told me that the armored vehicle arrived, and he took a position in the turret of the armored vehicle. He told me that there was a belief that the subject was playing "possum" based on information obtained from the negotiators, such as them hearing him breathing and making other noises. He told me that a flash bang was deployed to see if they got a response from the subject. He told me that a K9 was sent up to make contact with the subject and there was no response. Ofc. Chuey remained in the turret until the suspect was in custody. He then went into the residence and assisted in clearing it.

Interview Concluded.

**Interview with Ofc. Goodrich #20130 - 7/7/2023 0656 hours**
The interview with Ofc. Goodrich took place on scene. Present for the interview was Deputy County Attorney Magnus Eriksson, Attorney Kathryn Baillie and Det. Staab. The interview was captured by Axon Capture and is available for review at Evidence.com. The following is a summary of the interview. Refer to the recording for exact details.

Ofc. Goodrich told me that he has been a police officer for approximately 9.5 years and is a full-time member of the Mesa Police SWAT Team as a breacher. He told me that he has been

on the SWAT team for almost 6 years. Ofc. Goodrich stated that today he did not act as a breacher but as a SWAT Operator. Ofc. Goodrich stated that his shift began at approximately 0700 hours on 7/6/2023. Ofc. Goodrich described his day for 7/6/2023 as having some administrative duties in the morning, with serving two search warrants prior to coming to this location.

Ofc. Goodrich heard a K9 officer state that there was a possible barricade call that patrol was working. He told me that Sgt. Harris then assigned him to go to this location to support patrol. I asked him what other details he heard about the call. He told me that he heard that the call may have involved domestic violence that included possible strangulation. He also heard that the male had fired rounds in the apartment. I asked him if he read the call comments prior and he told me he did not.

Ofc. Goodrich told me that he arrived south of the scene. He told me that immediately upon his arrival he heard over the radio that the male had come to the door with a rifle in his hands. He then told me that he responded with his equipment to the south side parking lot where the immediate action team was located. He told me that Sgt. Harris assigned him to go to the northside to relieve units on that side.

Ofc. Goodrich told me that he was aware of which unit the call was taking place at because he had been told that it was the apartment with the foil on the windows and because the spotlights were pointed at it. Ofc. Goodrich told me that he was familiar with the apartment complex and the general layout of the units.

When officer Goodrich showed me where he was with the northwest immediate action team, he told me that the patrol vehicle had been moved from when he had been there. He told me that they were moved 10 to 15 feet backward to allow for the BAT (Large Armored Vehicle) to get through. He told me that he was standing at the rear of the patrol vehicle on the driver's side of the northern most vehicle. Ofc. Goodrich told me from this location he took over for patrol. He said that a few minutes later he saw the door open and saw the upper torso of the suspect in the door. He had been told that the suspect had been wearing a red shirt. He noticed when he saw the subject that there was a light-colored item over the suspects chest that appeared to be body armor. I asked him if he noticed anything else about the suspect. He told me that he thought the suspect was trying to yell but he could not understand what he was saying. Ofc. Goodrich told me that he was aware that none of the other apartments had been evacuated and was concerned about that.

Ofc. Goodrich told me that negotiators began speaking to the suspect and providing updates over the radio. He told me that he didn't remember the exact quotes, but he heard that the suspect stated, "I want police back. I will shoot cops. I will kill the cops if they come any closer." He told me that at one point he heard that the suspect said to "turn the red and blue lights off or I will start shooting." He also heard discussion about the suspect being suicidal. From this he believed that the suspect may be trying to "suicide by cop but also at the same time kill officers." He told me that he heard this several times during the incident.

Ofc. Goodrich told me that he was concentrating his focus on the front door and the north facing balcony. He told me that he did not see the suspect inside but heard other officers state that they had seen the suspect moving through some blinds. He said that although he could not see the suspect through the foil covered windows, he was concerned the suspect

could see him.

Ofc. Goodrich told me that there was movement at the blinds. He said that he heard a shot from one of the suppressed rifles. After this he heard Ofc. Freeman voice over the radio that he had fired. Ofc. Goodrich said after this there was a lull. A short time later he heard a single shot come from the inside of the apartment. He told me that this was a different sound than when Ofc. Freeman had fired. Ofc. Goodrich told me that after that within a "pretty quick" time frame he heard a second sniper shot. He told me that at some point after this the suspect fires a barrage of shots, possibly 5 rounds. He stated that since he could not see the suspect, he had pre-planned focus fire to mitigate the danger to the officers on the ground. I then clarified with him what he saw when the shots were fired from inside. He told me that his attention was drawn to the northside. He told me that he could see stucco and glass "going off." He told me that he also heard rifle fire from an officer at this time and thought this was an exchange of gunfire between the officer and the suspect. He told me at this time he decided on a position to direct focus fire at. He told me the area he chose for this was the fame of the front door. He told me that he chose to utilize focus fire to provide a distraction to draw the suspects attention away from where he was firing. I asked him what his concern was in reference to the direction that the suspect was firing in. He told me that he was concerned for the officers that were on the north side of the apartment and the houses to the north. He also stated that he was concerned about the rifle that the suspect was shooting, and the bullets go through walls easily.

I then asked him why he chose the place he directed his focused fire at. He told me that he was familiar with the floor plan and that it was split and that there was a unit below this unit. He said he wanted to place his rounds up out of any danger for other residents. He believed that this location would "catch rounds." I asked him what he meant by catch rounds and what it was about that specific location. He told me that doors and windows usually have studs double stacked, providing a four-inch target that is solid and will stop bullets from travelling through them. I asked him if that was the only time, he fired his weapon. He told me it was not. I then asked him how many rounds he believed he fired while performing focused fire. He told me 3 to 4.

Ofc. Goodrich told me that after this there was a lull. He said the door swung open very quickly. He told me that he saw the suspects right side "bladed" in the doorway. He saw that the suspect was wearing body armor. He told me that he saw a door that he thought the suspect may have been trying to use as a shield. Ofc. Goodrich believed by the way the suspect's body was oriented, that he was pointing a rifle at them, trying to get shots off. Because he saw this as a threat to all the officers present, he then engaged the suspect by firing again.

I asked Ofc. Goodrich if there was anything else that led him to believe the suspect had a rifle. He told me that he thought he saw a rifle in this suspects hand in the "low port" position. He told me that he believed the suspect was going to attempt to shoot officers "like he had promised." I asked him how many rounds he fired at this time. He told me that he believed he fired 4 to 6 rounds. I then asked Ofc. Goodrich to place a blue cone where he thought he was standing.

Ofc. Goodich said after he fired, he saw the suspect drop and he lost sight of him. He told me that he was speaking to Ofc. Chuey, who stated that he could still see the suspect's leg. After

this they came up with a plan to clear the residence and provide aid. Ofc. Goodrich told me how they approached and that they deployed a diversionary device by the suspect because of the concern that the suspect might have been baiting them up to him. While they were in this position, he noticed an AR15 rifle up on the balcony to the northside of the apartment. He told me that the team sent the dog up to the suspect without a response. He told me that they eventually moved up to the suspect. At this time, another officer handed him the door that he thought the suspect used as a shield. He told me that he tossed the door outside onto the ground. He then told me that another officer used a taser on the suspect to see if there was any reaction from him. He told me that the suspect was just inside the door. He said he helped detain the suspect in handcuffs and then they removed him from the apartment. After this he assisted in clearing the apartment. Ofc. Goodrich told me that inside the apartment he observed boxes of ammunition next to the suspect, as well as an AR15 magazine that he was unsure if it was loaded or not. He then stated he saw an AK47 rifle inside. I asked him if he saw any other people in the apartment and he told me he did not.

I asked Ofc. Goodrich if there was anything else he wanted to add to his statement. He then added that when he went into the apartment, he saw an AK47 in the kitchen. He also saw a rifle in the hallway. He told me that he saw additional body armor in the bedroom that he recognized from the Army. He also saw a gas mask, helmet, and magazines and ammunition all over the apartment. He told me that he also did a magazine exchange after firing, dropping a magazine on the ground. He told me that he did not fire any rounds after his magazine exchange.

Interview Concluded.

**Interview with Ofc. Brown #21421 - 7/7/2023 0730 hours**
The interview with Ofc. Brown took place on scene. Present for the interview was Deputy County Attorney Magnus Eriksson, Attorney Kathryn Baillie and Det. Staab. The interview was captured by Axon Capture and is available for review at Evidence.com. The following is a summary of the interview. Refer to the recording for exact details.

Ofc. Brown told me that he has been a police officer for approximately 7 years and is a full-time member of the Mesa Police SWAT Team as a breacher. He told me that he has been on the SWAT team for approximately 3 years. Ofc. Brown stated that today he did not act as a breacher but as a SWAT Operator. Ofc. Brown stated that his shift began at approximately 0730 hours on 7/6/2023. Ofc. Brown described his day for 7/6/2023 as starting at the range in the morning and a "cover" that got cancelled. He then assisted in serving two search warrants prior to coming to this location.

Ofc. Brown first heard about this incident when he was called into the briefing room and told there was a subject with a gun. He told me that 6 or 7 SWAT operators responded to assist patrol. He then told me what he learned about the call before responding. He said that he read the CAD comments and learned that this originally started as a neighbor problem where someone came out and fired a gun into the air. As he responded, he heard over the radio that the suspect was stating that he was going to shoot police if they did not back up. He stated that he had rifles inside and negotiators heard him loading magazines. He told me that at one point he heard that the suspect had come to the door with a rifle in his hand and slammed the door shut. He told me that he also heard that the suspect had poked his head out the balcony window while holding a rifle.

Mesa Police Department

NARRATIVE TEXT HARDCOPY

(13A-3 AGGRAVATED ASSAULT)

GO# ME 2023-141208
Active/Open

Ofc. Brown said he arrived south of the scene and responded northbound through the lot to where the south immediate action team was located. Ofc. Brown told me that initially he was designated as less lethal with a bean bag gun. He showed me where he stood while he was positioned in this role. He told me that another SWAT officer left this location, so he put down his bean bag and took over that role. He stood at the rear passenger side of the west vehicle in this area.

I asked Ofc. Brown what observations he had while he was in this position. He told me it was difficult to see. He said that there was a pause when he heard the "crack of a suppressed .308." He told me he knew this sound because he had heard it numerous times at the range. He heard it from his left, he saw the glass shatter on the sliding door from the suspects apartment. He then heard Ofc. Freeman call out over the radio that he had shot. He told me it was quiet for a little bit. He then heard a loud bang from a rifle and saw the glass push outward from the apartment. He then heard another "crack" or shot from a suppressed rifle. After that there were multiple other shots coming from inside.

I asked Ofc. Brown about the shot that he said came from the inside. He told me that he knew it came from inside because he watched the glass blow out from the gasses coming from inside. He also said this shot was louder, indicating that it was not suppressed like the sniper rifle is. He confirmed that he heard another shot from Ofc. Freeman's direction. I asked him what occurred after that. He told me things after that were a little bit fuzzy. He knew there were several more shots from inside the apartment. He told me he was not sure how many.

I then asked him what actions he took. Ofc. Brown told me that he saw the suspect moving around. He saw him through the sliding glass door. He then saw him walk up to the window left of the west sliding glass door that faces southwest. He said that he was going to walk past this window because he knew that the stairs were in this location. He told me that the suspect stopped and turned toward him. He stated that at this time he fired his weapon because he was in fear that the suspect was going to start shooting at himself and the other officers with him.

I asked him to describe this in further detail. He told me that he could make out the suspects silhouette because he was backlit. Ofc. Brown told me that the suspect began messing with the blinds. He said that he could see something in the suspects hands but could not make out for sure if it was a gun or not. He said that he believed it was a gun based on the suspect shooting out at officers prior to this. He also considered the threats the suspect had made to shoot officers before. He said that taking all of this into account, when he saw the suspect face his direction and start moving the blinds, he thought it was the subject's rifle and he was going to start shooting them. He told me that this is why he shot. He told me that he fired center mass on the subject but did not recall how many shots he fired. He then guessed 5 or 6.

I then asked Ofc. Brown to describe what he saw in the subjects' hands. He told me that it was basically an extension to the subject's body. He told me that he was basing his belief that it was a gun on all of the information he had received prior to this. He told me that he believed the subject was going to start shooting at them. I asked him if he could tell how the subject was holding it and he told me he could not.

Ofc. Brown told me that he believed the subject walked down the stairs and then he heard an exchange of gunfire at the front door with other officers. He told me that he did not fire at this time. He told me that he stayed at this position because they were concerned about a possible ambush. He told me that he stayed in this position until after the entry team went inside. He then left his position and assisted in carrying the suspect out of the unit so that medical personnel could attend to him. I then had Ofc. Brown place a blue cone at his shooting position. I asked him if he had conducted a magazine exchange and he told me he had not.

Shortly after speaking to Ofc. Brown I was advised that he had more details to add to his account. I then began recording a second time. The interview was captured by Axon Capture and is available for review at Evidence.com. The following is a summary of the interview. Refer to the recording for exact details.

Ofc. Brown told me that when he originally saw the suspect walk past the sliding glass door before he appeared in the window, he saw the suspect holding a gun. That was why he believed that he had a rifle while at that window. I then confirmed his statements to me about this in the recording.

Interview Concluded.

**Interview with Ofc. Navarro #19827 - 7/7/2023 0754 hours**
The interview with Ofc. Navarro took place on scene. Present for the interview was Deputy County Attorney Magnus Eriksson, Attorney Kathryn Baillie and Det. Staab. The interview was captured by Axon Capture and is available for review at Evidence.com. The following is a summary of the interview. Refer to the recording for exact details.

Ofc. Navarro told me that he has been a police officer for approximately 18 years and is a full-time member of the Mesa Police SWAT Team as a breacher. He told me that he has been on the SWAT team for approximately 8 years. Ofc. Navarro stated that today he did not act as a breacher but as a SWAT Operator, assisting patrol. Ofc. Navarro stated that his shift began at approximately 0730 hours on 7/6/2023. He described his day for 7/6/2023 where he assisted in serving two search warrants prior to coming to this location.

Ofc. Navarro told me that he heard about this call from a supervisor. He stated that there was a hot call where a male had fired shots from a rifle. He told me that the male had been in an argument with his girlfriend. I asked him what he heard over the radio. Ofc. Navarro told me that he heard that the male was irritated and was not going to come out. He heard that the male had rifles and may have a shootout with police. He also heard that the suspect wanted the police cars to back away. Ofc. Navarro heard over the radio that patrol had observed the male come to the door holding a rifle before shutting the door. He told me that negotiators relayed the same information.

Ofc. Navarro told me that he responded to the scene from the south and went northbound through the parking lot. He told me that he responded to the south immediate action team and relieved a patrol officer. He told me that while he was at this location, negotiators relayed that they could hear the suspect loading a weapon. He told me that he heard the sniper fire and saw the window "crack." He told me there was a pause, he then saw the

subject walking toward the sliding glass door. He told me that he could see a head moving through the blinds. While at this position he saw that the subject had something in his hands. Ofc. Navarro believed this item was a rifle based on the length. He told me that the suspect walked toward the window left of the west sliding glass door where he saw the subject standing. He told me that he believed he was going to begin shooting out based on everything that he had heard and seen at this point. He told me that he shot and heard a volley of shots. He told me that he lost sight of the subject. He told me that the glass from the sliding door was falling, and he was not sure if the subject was kicking the glass or if it was falling on its own. He told me that he heard a second volley of fire after that.

I asked Ofc. Navarro if he heard any shots fired from within the apartment. He told me that he did. I then asked him to go back in his recollection and tell me where that occurred. He told me that the shots from within were mixed into shots that he heard from officers. I asked him if he saw the shots coming out of the apartment and he told me he did not. I asked Ofc. Navarro about the item he stated he saw the subject holding. I asked him if he believed this was a firearm. He told me that he did think it was a firearm and that it looked like one. I asked Ofc. Navarro at what point did he think the subject fired shots. Ofc. Navarro could not recall exactly when this occurred. He told me that he just remembered a volley of shots. There was a pause and then another volley of shots. I asked him if he felt there was a danger. Ofc. Navarro then told me that he believed there was a danger based on everything he had been told. He believed the suspect was going to engage with the police or other residents. I asked him what type of firearm he thought the subject had. He told me it was long, like a rifle. He told me this matched what he had heard from other sources. I asked Ofc. Navarro if he knew where other officers were in relation to his position. He told me that he knew there was officers to the north but did not know exactly where they were.

I asked ofc. Navarro to tell me from his experience what the danger was with the suspects position and the weapon he has. He told me that the suspect had the upper hand. I asked why. He told me because of his elevated position, and he was deep inside the apartment. Ofc. Navarro told me that rifle rounds can penetrate a lot of different things. He also said that the suspect had many vantage points within the apartment that he could look out at officers. I asked him specifically about the rifle and what the danger was with this. Ofc. Navarro told me that rifle rounds can penetrate body armor worn by police officers. I then asked Ofc. Navarro to place a blue cone where he thought he fired from. I asked him to estimate how many rounds he fired. He told me he fired one round.

After firing he told me that he continued to watch the apartment looking for the suspect. He told me that they fired gas inside the apartment. He told me that he did not see anything else. He said when they moved up to the house, he assisted by grabbing the drag sheet to assist loading the suspect onto it where MFDM assessed his medical needs.

Attorney Baillie then asked Ofc. Navarro when he was looking in the direction of the apartment and heard the sound of the gun shot from inside, did that sound different than rifle sounds coming from the north. He answered, "Yes." Attorney Baillie then asked if they typically shoot rifles as a team. Ofc. Navarro answered, "Yes." Attorney Baillie then asked if the SWAT rifles sound different than a regular rifle. Ofc. Navarro stated that they do sound different with a suppressor. He was then asked if the sound (shots) from the apartment sounded like they did not have a suppressor. He answered, "Yes." He was then asked on what side did the suspect carry what he believed was the rifle. Ofc. Navarro answered that he

carried it on his right side. He was asked what color the rifle appeared. Ofc. Navarro stated it was dark, but the item looked black. Attorney Baillie asked if after he saw that black item, is that when he heard that different sound of fire from the apartment. Ofc. Navarro answered, "Yes."

Interview Concluded.

**Interview with Sgt. Thomas #17067 - 7/7/2023 0814 hours**
The interview with Sgt. Thomas took place on scene. Present for the interview was Deputy County Attorney Magnus Eriksson, Attorney Kathryn Baillie and Det. Staab. The interview was captured by Axon Capture and is available for review at Evidence.com. The following is a summary of the interview. Refer to the recording for exact details.

Sgt. Thomas told me that he has been a police officer for approximately 17 years and is a full-time member of SWAT. He told me that he has been on SWAT for approximately 15 years. Sgt. Thomas stated that he is a team leader on SWAT. He told me that his shift began at approximately 0700 hours on 7/6/2023. He described his day for 7/6/2023 where he had a meeting, a cover that got cancelled, then assisted Fiesta Street Crimes with a call.

Sgt. Thomas told me that he learned about this call from one of the K9 officers. He was told there was a barricade call that was on the hot channel. Sgt. Thomas said that he listened to his radio while Sgt. Harris called the lieutenant. He said that Sgt. Harris briefed the team saying that a subject was threatening to shoot the police. He told me he had learned that negotiators had been talking to the suspect on the phone. Negotiators stated the subject was agitated and that "he was going to shoot it out with the cops." He said he heard from a source the subject had come to the front door and had a rifle.

Sgt. Thomas told me that he arrived south of the scene and walked north to the southside immediate action team. He told me that he assisted Sgt. Nicholson at this location. He showed me the covered parking structures. He told me that he and Ofc. Cochran began removing the bulbs from the lights because they were being back lit by them. He told me that when they were removed, some of the bulbs fell and broke. Around this time, Sgt. Thomas heard that the suspect had said he was going to start shooting red and blue lights and that he wanted the cops to back off. He then began taking over patrol positions with other SWAT officers. While he was at this location in the lot, he covered another SWAT officer who was trying to launch a drone. He told me that he could see the spotlights pointing at the suspect's apartment. He said he did not see any movement at that time but could see lights on inside.

Sgt. Thomas showed me where he was standing on the driver's side of the western most vehicle at this location. He told me that he deployed Ofc. Widmer to go to Ofc. Freeman's location. He said from his position he had a good view of the sliding door on the southside of the apartment. As he was watching this location, he heard a shot fired from a suppressed rifle he recognized as similar to the sniper's rifle. He told me that he observed the glass break on the sliding door he was watching. He heard Ofc. Freeman on the radio report that he had fired. He told me that shortly after this he saw smoke and glass shoot out of that same sliding door. He said he couldn't tell exactly where the shot came from inside, but knew it was from inside the structure. He said he could also see muzzle flash from inside near the blinds. He told me that he could not recall if there was a volley of gunfire back and forth. He

told me that he saw some movement from the window to the left of the west facing slider. He also saw movement from the bottom right corner of the sliding door. He thought someone was kneeling down in that corner. He told me that there were more gunshots from inside the apartment. At that time, he shot 3 to 4 rounds in the bottom right corner of the sliding door in response to the shots.

I asked him to describe what he saw when he said someone was kneeling. He told me that he believed they were using cover trying to get a position of advantage. He told me he saw them shoot from this area before, out towards the officers. I asked him further about why that gave the suspect an advantage. He told me that it is easier to shoot down than it is to shoot up. He told me that he shot 3 or 4 rounds. He said the gun fire stopped. He then verified if everyone was alright and tried to determine who fired. While this was taking place, he heard someone say over the radio that the suspect was down by the front door and that they could see his leg. At that time Sgt. Thomas thought that Ofc. Freeman had been shot, later learning he had not been. He said that he and Sgt. Harris coordinated moving up to the apartment safely. He told me that they used the drone to fly up in the apartment where they could see the suspect. He told me that he saw the suspect wearing a plate carrier. They tried to determine if the suspect was still breathing but could not tell. He told me that another officer moved up and tased the suspect. He told me that there was a muscular response only. They then moved the suspect out to where the fire department could treat him. I asked him about the medical aid provided. He told me that the fire department responded directly to the scene. He said the officers removed the plate carrier and did not see any signs of life at that time.

I confirmed that he shot 3 to 4 rounds total. He told me that he shot them all at the same time. Sgt. Thomas then set a blue cone where he was standing. Sgt. Thomas was asked if he had conducted a magazine exchange. He stated he did not. He then described in further detail how he turned the lights off behind them after he first arrived. I then asked him if he fired the gas in the apartment. He told me that another officer fired approximately 4 ferret (gas) rounds through the sliding door.

Interview Concluded.

**Interview with Ofc. Cameron #20495 - 7/7/2023 0814 hours**
The interview with Ofc. Cameron took place on scene. Present for the interview was Deputy County Attorney Magnus Eriksson, Attorney Kathryn Baillie and Det. Staab. The interview was captured by Axon Capture and is available for review at Evidence.com. The following is a summary of the interview. Refer to the recording for exact details.

Ofc. Cameron told me that he has been in law enforcement for approximately 10 years and is a full-time member of Mesa Police SWAT as a breacher. He told me that he has been on SWAT for approximately 4 years. Ofc. Cameron stated that his assignment on the team is as a breacher. He told me that today he was acting as an operator. He said that his shift began at approximately 0800 hours on 7/6/2023. He described his day for 7/6/2023 where he had training and then had three operations prior to this.

Ofc. Cameron told me that he was called into the briefing room when Sgt. Harris told him to respond to an armed criminal barricade. I asked him to tell me any of the details he heard about the call. He told me that he heard the call was a domestic violence incident where an

**Mesa Police Department**

**NARRATIVE TEXT HARDCOPY**

**(13A-3 AGGRAVATED ASSAULT)**

**GO# ME 2023-141208**
**Active/Open**

aggravated assault took place. He said he heard at least one round had been fired. He said he heard the updates on the radio as he responded that stated the suspect had multiple rifles and possibly a shotgun inside the apartment. He said that when he arrived, he heard officers state that the suspect had come to the door armed with a rifle and then went back inside. He continued to hear updates from the negotiators that the suspect was agitated.

Ofc. Cameron told me that he parked on the south side of the scene and walked around the buildings to the west and went to the team on the northwest side. I asked him if he saw or heard anything from the unit while he was on the southside before he moved. He told me that he did not. He then showed me where he responded with the northwest immediate action team. He positioned himself at the rear passenger side of the northern most patrol vehicle at this location. Ofc. Cameron told me that the vehicles had moved after the incident occurred. He also told me that the armored vehicle was not present at the time.

Ofc. Cameron told me that while he was at this location there was a lull in the action. He told me he asked about evacuations in neighboring apartments and inquired about the suspect's description. While he was waiting, he heard negotiators say the suspect wanted police to leave. He also heard that the suspect said he was going to shoot out at police if they didn't move and did not like the red and blue lights. He also heard negotiators report they heard the suspect loading a firearm.

Ofc. Cameron said that he was watching the door and the balcony. He said after a little bit he thought he saw someone peeking out of the blinds on the south balcony. About thirty seconds after this he heard the shot fired from the sniper and heard him report that he had fired. I asked him how he knew it was the sniper. He told me that it came from his right side and sound like a suppressed rifle. He told me that based on how it sounded and where it was coming from, he knew it was from the sniper. He also saw the window buckle inwards.

Ofc. Cameron told me there was a pause. After the pause he heard a distinct shot come from inside the apartment. He also saw glass blow out towards the outside. He thought he heard the impact occur on the structure to his right.

He told me that there was another pause. He then heard more rounds fired from inside the apartment. After this he performed focused fire toward the apartment. He told me that his fear was that the suspect was getting good shots on the sniper across from him.

I asked him to describe focused fire for me. He told me that focused fire is a tactic used to place rounds in a place where they do no harm and cause a distraction to the suspect. I asked him if he recalled how many rounds he fired utilizing focused fire. He told me he thought he shot 4 rounds for this purpose. He told me that he targeted the header above the west facing sliding door. I asked him if he fired any rounds after those and he told me that he did. He then told me that he heard more shots and heard Sgt. Harris state that the subject is shooting out to the north. Ofc. Cameron said that he stepped out to look at the balcony because he could not see it from his position. As he is looking at the balcony, he saw the front door open and the suspect standing in the doorway. He told me that the suspect was wearing a red shirt and a tan or camouflage carrier for body armor. He said that it looked like the suspect was holding a rifle in his right hand. At this time, he heard shots being fired and thought the suspect was taking a position of advantage on the officers. Ofc. Cameron told me that he stepped backward and to his left as he ducked. He told me that he fired one shot

toward the suspects "belly button, hip height." He told me that as he did this, he saw the round hit the spotlight on the patrol car in the direction of where the suspect had been. Ofc. Cameron told me that when he looked again, the suspect was no longer there.

I asked Ofc. Cameron about the vehicles position and he confirmed to me that the vehicle had been moved. This was important because he was trying to show me his positioning with the vehicle, but it was not in the same position as it had been during the incident.

Ofc. Cameron told me that he thought the suspect was shooting at them and that was the reason why he fired. He told me that he saw his round strike the spotlight.

After this he attempted to see the suspect, but he could not see him himself. He told me that Ofc. Chuey could see the suspects leg in the door. Ofc. Chuey kept an eye on the suspect while they waited for the armored vehicle.

I then asked Ofc. Cameron about focused fire again. I asked him specifically why he chose the area to perform his focused fire. He explained focused fire a second time. I then showed him the spot where he said he had been aiming and pointed out the marks in the wall. He confirmed this was where he was aiming. I then asked him why he chose that spot specifically. He told me that he knows that the construction of the door frame and that there is a header in this location. He also stated that with the angle that he is aiming, the bullets will carry up into the rafters. He felt this was the best place he could put these shots. I then asked him again in which direction the suspect was shooting out the window. He told me that he thought the suspect was shooting at Ofc. Freeman's position. I asked him the purpose of him shooting at that location at that particular time. He told me that this would provide a distraction to the suspect while he is shooting. I then asked Ofc. Cameron if he could see the suspect when he thought he was shooting at Ofc. Freeman. He told me that he could not see him. I asked him if he could have seen him at that point would he have shot the suspect. He told me that he would have.

I then asked Ofc. Cameron what actions he took after the shooting. He told me that he held this position for a little while. He told me that he responded with Sgt. Harris and waited for the armored vehicle. He then moved to the armored vehicle and stayed at the armored vehicle until they deployed the K9. He told me that he covered the K9 while he was deployed. He then joined the entry team as they went to the front door. He told me that he grabbed the door on top of the suspect and passed it off to another officer. He then grabbed the suspects left hand. He told me that the suspect squeezed him back. He told me that handcuffs were placed on the suspect. After this they carried him out to other units. He then entered and cleared the apartment. He told me that there was no one else in the house. I noticed that there was blood on his pants, he told me it was from the suspect.

Ofc. Cameron was given a blue cone to place where he thought he was standing when the incident happened. He placed the cone just next to the windshield on top of the vehicle. This was because the vehicle was over the spot where he thought he was standing after it was moved. I asked Ofc. Cameron if he performed any magazine exchanges. He told me that he did, leaving his magazine on the ground.

Interview Concluded.

**Interviews with Cindy Schramm and Jordan Wirtjess**
Det. Staab conducted interviews with Cindy Schramm and Jordan Wirtjess. Refer to his supplement for documentation of these interviews.

**Search Warrant - SW2023-035134**
Det. Hallemeyer authored a search warrant for 1233 N. Mesa Drive #2164 and #2165, as well as for Shawn Gagne. The warrant was assigned as SW2023-035134 by the Maricopa County Superior Court. Refer to Det. Hallemeyer's supplement for details.

**Weapons inspections/exchange**
The weapons inspections/round count for each of the officers involved was witnessed by Det. Hallemeyer. Refer to his supplement for details.

**Scene Documentation**
Refer to Det. Marquez' supplement for details on the scene as well as the evidence that was collected.

**Next of Kin Notification**
On 7/7/2023 I was notified by dispatch that Shawn Gagne's mother had been calling for an update. I then called Suzette Gagne at the phone number she provided. At the time I did not have a recorder to record this phone call. I then informed her of Shawn's death. Suzette handed the phone to Shawn's father Chris Gagne. I let Chris know that Shawn had been involved in a shooting with police and he was deceased. Chris stated, "He had mentioned he was going to do something like this."

On 7/8/2023, I spoke to Chris again. At this time the phone call was recorded. The recorded call will be uploaded to Evidence.com for review. At this time, I and asked Chris what he meant by the statement, "He had mentioned he was going to do something like this." Chris told me that Shawn had mentioned that if anybody tried to take his guns, they would have to pry them from his cold dead hands. I asked Chris if Shawn was angry at the government. He told me that Shawn was not, but he was concerned about new gun laws that were being proposed and if anyone tried to take his guns, he would not let them go. Chris told me that Shawn was supposed to go into rehab for alcoholism on 7/7/2023. Chris told me that Shawn drank daily and had an alcohol problem.

**OME Postmortem Exam - 2023-06943**
The examination took place on 7/8/2023 at 0800 hours at the Office of the Medical Examiner for Maricopa County. The exam was conducted by Dr. Bumgarner MD. After completion of the exam, Doctor Bumgarner advised me that the cause of death was determined to be from Gun Shot Wound/s. I was provided with items of evidence recovered from the body by OME staff. I turned these items over to CSS Bello to be placed into MPD Property as Evidence. Awaiting full OME Report.

**Mesa Police CAD Comments**
I received a copy of the full CAD comments for this event. These comments will be attached to this report.

**Mesa Police Radio Traffic**

I completed a request to have a copy of the radio traffic for this event preserved and attached to this case.

**Mesa Fire Medical Department reports**
I requested and received copies of both the CAD report (Mesa Fire) and the patient care report. These reports have been attached to this case.

**Criminal History Check for Shawn Gagne**
I completed a criminal history check for Shawn Gagne. The check showed criminal records in the states of California and Texas.

The California records showed several misdemeanor arrests and convictions. There were no felony convictions listed.

The Texas records showed a few arrests including involvements when he was a juvenile. There were no felony convictions listed.

These reports are attached.

**Body Worn Camera (BWC) Review for involved officers**
It should be noted there is no audio until 30 seconds after the recording begins. The following is a summary of what I can see and hear on the Axon recording and are not all inclusive. I stopped the summary after the point the OIS occurs. Refer to the AXON recordings for complete details and exact statements, including actions taken after the shooting occurs.

Ofc. Freeman #20207
Ofc. Freeman did not have a BWC video of the incident.

Sgt. Harris #16816 - Axon Body 3 Video 2023-07-06 2230 X60A1669C
Sgt. Harris' recording begins at 2230.25 hours and is 57 minutes and 20 seconds in length. At the beginning of the video Sgt. Harris is already near the north wall of the complex underneath the parking canopy. His view of the apartment is to his south/southeast.
(The first number listed below is the amount of time into the video the incident occurs. The second numbers are the time shown on this video.)

00.30, 2230.56 hours - Audio begins. Sgt. Harris is heard coordinating the response to the situation with other units.
08.56, 2239.21 hours - Sgt. Harris confirms over the radio that the negotiator heard Gagne loading a weapon. Sgt. Harris takes a position behind a vehicle. This vehicle blocks most of the cameras view after this.
12.11, 2242.36 hours - A single shot can be heard at this time. Sgt. Harris gives instructions to dispatch about not needing additional units.
12.53, 2243.19 hours - A gun shot is heard that is louder and has a different pitch than the first shot. This is immediately followed by another single shot that is not as loud and has a pitch similar to the first shot fired at 2242.36. Sgt. Harris reports "the suspect is firing out at us. The police helicopter can be heard coming into the area.
13.40, 2244.06 hours - Sgt. Harris gets on the radio and asks Sgt. Thomas to prepare a plan to deploy gas into the apartment.
13.49, 2244.15 hours - At least three loud shots. These shots are immediately followed by

other shots that are of a high pitch and are not as loud.
14.02, 2244.28 hours - Sgt. Harris gets on the radio and reports that the suspect is firing out the north side window. He then asks negotiators if they still have the suspect on the line.
14.07, 2244.33 hours - Several more shots are heard. These shots are of the higher pitch.
14.11, 2244.37 hours - Sgt. Harris appears to fire four shots toward the apartment. The view of the camera is blocked by the vehicle he is standing in front of.

Ofc. Chuey #21315 - Axon Body 3 Video 2023-07-06 2228 X60A1559B
Ofc. Chuey's recording begins at 2228.05 hours and is 59 minutes and 50 seconds in length. At the beginning of the video Ofc. Chuey can be seen moving toward the northwest immediate action team's location. At times the front door and north balcony can be seen in Ofc. Chuey's video. The door and his equipment block most of the camera's view.
(The first number listed below is the amount of time into the video the incident occurs. The second numbers are the time shown on this video.)

00.48, 2228.57 hours - Ofc. Chuey takes up a position near the driver's door of vehicle 5253.
02.34, 2230.40 hours - Ofc. Chuey tells other officers he sees the door handle on the front door moving, then opening while looking through his optic.
14.33, 2242.39 hours - A single shot can be heard at this time.
15.16, 2243.22 hours - A gun shot is heard that is louder and has a different pitch than the first shot. This is immediately followed by another single shot that is not as loud and has a pitch similar to the first shot fired.
16.12, 2244.18 hours - Loud lower pitched shots are heard again, followed by multiple higher pitched shots.
16.14, 2244.20 hours - Ofc. Chuey discharges his rifle multiple times.
16.17, 2244.23 hours - Shooting ceases.
16.30, 2244.36 hours - Ofc. Chuey fires several more shots and performs a magazine exchange allowing the empty magazine to fall to the ground.

Ofc. Goodrich #20130 - Axon Body 3 Video 2023-07-06 2229 X60A4386G
Ofc. Goodrich's recording begins at 2228.43 hours and is 58 minutes and 55 seconds in length. At the beginning of the video Ofc. Goodrich is at the northwest immediate action team's location. The vehicle blocks most of the camera's view.
(The first number listed below is the amount of time into the video the incident occurs. The second numbers are the time shown on this video.)

00.18, 2229.01 hours - Ofc. Goodrich takes up a position behind vehicle 5212 on the driver's side.
03.31, 2232.15 hours - Discussion of when and where to use "focused fire."
13.48, 2242.31 hours - A single shot can be heard at this time.
14.31, 2243.14 hours - A gun shot is heard that is louder and has a different pitch than the first shot. This is immediately followed by another single shot that is not as loud and has a pitch similar to the first shot fired.
14.58, 2243.41 hours - Ofc. Goodrich states, "Next one is getting suppressing fire." Another officer replies, "Yep."
15.27, 2244.10 hours - Loud shots are heard. Ofc. Goodrich fires approximately 4 shots.
15.45, 2244.28 hours - Ofc. Goodrich fires several more times.
15.56, 2244.39 hours - Ofc. Goodrich performs a magazine exchange.

Ofc. Brown #21421 - Axon Body 3 Video 2023-07-06 2238 X60A4749E
Ofc. Brown's recording begins at 2238.15 hours and is 47 minutes and 32 seconds in length. At the beginning of the video Ofc. Brown is at the south immediate action team's location. He is initially near the rear passenger side of vehicle 1857, but later moves to the rear passenger side of vehicle 5214. Much of the camera's view is blocked by vehicles and equipment.
(The first number listed below is the amount of time into the video the incident occurs. The second numbers are the time shown on this video.)

02.15, 2240.31 hours - Ofc. Brown stows his beanbag shotgun and replaces another officer's location at the rear passenger side of vehicle 5214.
04.21, 2242.37 hours - A single shot can be heard at this time.
05.02, 2243.17 hours - Ofc. Brown voices that he sees movement from the suspect and focusses on this area.
05.04, 2243.20 hours - A gun shot is heard that is louder and has a different pitch than the first shot. This is immediately followed by another single shot that is not as loud and has a pitch similar to the first shot fired. Ofc. Brown then states, "He's shooting out."
05.04, 2243.20 hours - Another officer is heard stating that the suspect is going to the other window. Ofc. Brown fires approximately four times.

Ofc. Navarro #19827 - Axon Body 3 Video 2023-07-06 2239 X60A4931E
Ofc. Navarro's recording begins at 2239.49 hours and is 40 minutes and 49 seconds in length. Ofc. Navarro is at the south immediate action team's location. He takes a position near the rear passenger side of vehicle 1857. The apartment can be seen but there is an overexposure from the spotlights that washes out what is happening.
(The first number listed below is the amount of time into the video the incident occurs. The second numbers are the time shown on this video.)

02.48, 2242.38 hours - A single shot can be heard at this time.
03.28, 2243.18 hours - Ofc. Navarro begins responding to something he is either seeing or hearing. He points his rifle toward the apartment and states, "He's, uh, either, I can hear the..."
03.30, 2243.20 hours - A gun shot is heard that is louder and has a different pitch than the first shot. This is immediately followed by another single shot that is not as loud and has a pitch similar to the first shot fired. Ofc. Navarro reports, "He's firing out."
04.14, 2244.04 hours - Ofc. Navarro focusses his rifle again toward the apartment and states, "He's still busting out the window. That's what he's doing, he's trying to get an eye."
04.24, 2244.14 hours - Ofc. Navarro states, "I think I see him going, he's going through the other window." A few shots are heard from the apartment, as well as from other officers.
04.24, 2244.14 hours - Ofc. Navarro fired what appears to be one shot toward the apartment. He then says, "Yep, (unintelligible) the other window." Other shots are heard.
04.45, 2244.35 hours - Several other shots are heard.

Sgt. Thomas #17067 - Axon Body 3 Video 2023-07-06 2241 X60A4317F
Sgt. Thomas' recording begins at 2241.24 hours and is 46 minutes and 30 seconds in length. At the beginning of the video Sgt. Thomas is with the south side immediate action team. His view of the apartment is to his north/northeast.
(The first number listed below is the amount of time into the video the incident occurs. The second numbers are the time shown on that video.)

01.14, 2242.38 hours - A single shot can be heard at this time.
01.57, 2243.21 hours - A gun shot is heard that is louder and has a different pitch than the first shot. This is immediately followed by another single shot that is not as loud and has a pitch similar to the first shot fired. After this, Sgt. Thomas asks, "Sean, are you good?" This is a question for Ofc. Freeman #20207.
02.53, 2244.17 hours - Sgt. Thomas is facing Ofc. Brown. Ofc. Brown is observed firing four rounds. Ofc. Navarro is in the background.
03.12, 2244.36 hours - Several more shots are heard.
03.15, 2244.39 hours - Sgt. Thomas fires what appears to be 3 rounds toward the apartment.

Ofc. Cameron #20495
Ofc. Cameron's BWC was not in operation during the OIS. Ofc. Cameron has two videos from his BWC. Both of these videos were recorded after the incident.

**Mesa Air Unit Video review - Two videos**
The following is a summary of some of the things I can see and hear on the video recorded by the police helicopter. Refer to the recordings for complete details and exact statements, including actions taken after the shooting occurs.

MESA_N505MP-2023-07-06- GO 2023-141208 421 998
This video is 39 minutes 41 seconds in duration. There is not a timestamp on it. The video includes the radio traffic with it.

01.39 - 3 to 4 shots are heard/seen exiting from the apartment out the north window towards patrol vehicles parked in N. LeSueur Circle. Glass and projectiles can be seen traveling toward the north. While these shots are being fired, Sgt. Thomas is speaking on the radio. Sgt. Thomas' microphone picks up the sound of the shots being fired that is heard on the video.
01.42 - Projectiles from shots fired by officers are observed hitting the northside balcony area.
02.42 - As the helicopter orbits the scene, a view of the open front door can be seen. What appears to be the suspects leg can be seen in the doorway.

MESA_N505MP_SCR-2023-07-06- GO 2023-141208 421 998
This video is 39 minutes 43 seconds in duration. The video starts at 2242.36 hours. The video includes the radio traffic with it.

01.41, 2244.17 hours - 3 to 4 shots are heard/seen exiting from the apartment out the north window towards patrol vehicles parked in N. LeSueur Circle. Glass and projectiles can be seen traveling toward the north. While these shots are being fired, Sgt. Thomas is speaking on the radio. Sgt. Thomas' microphone picks up the sound of the shots being fired that is heard on the video.
01.44, 2244.20 hours - Projectiles from shots fired by officers are observed hitting the northside balcony area.
02.44, 2244.22 hours - As the helicopter orbits the scene a view of the open front door can be seen. What appears to be the suspects leg can be seen in the doorway.

**Additional Witnesses to the incident**

Ofc. Crosby #21648 located the following witnesses to the incident. Refer to Ofc. Crosby's report and BWC video for details of his interviews with these witnesses.

Luis Monche
Luis told Ofc. Crosby that he saw the subject (Shawn) pacing back and forth inside his apartment carrying a rifle. Luis heard the shots fired between both the subject and police.

Samara Wickwire
Samara stated she noticed the red and blue lights outside. She noticed police outside with their guns out. She stated she heard officers giving commands for the subject to come outside. Samara stated she could see the subject inside his apartment pacing back and forth carrying a rifle. Samara stated that she saw the first shot go through the patio door. At that time, she stopped watching.

Ryan Guy
Ryan told Ofc. Crosby that he observed the subject pacing back and forth inside the apartment with an AK-47 rifle. Ryan knew it was an AK-47 because he knows guns. Ryan stated he heard the police give the subject warnings to exit the apartment unarmed. Ryan thought that he heard the commands given over the loudspeaker for approximately 20 minutes. Ryan told Ofc. Crosby that he believed the subject had fired his weapon at officers first from inside the apartment. Ryan believed the subject fired several rounds at the officers. He then observed officers as they approached the apartment.

Tamara Rant
Tamara stated Ryan had woken her up. Tamara stated that she saw the subject pacing back and forth inside his apartment carrying a large gun. Tamara heard the first shots and stopped watching.

**911 calls / Radio Traffic review**
I competed a request to receive copies of the 911 calls and radio traffic from this incident. These audio files will be attached to this case. The following are summaries of the audio recordings. Please refer to the entire audio recording for exact details.

Summary of 911 call from Cindy Schramm - 7/6/20230 2133.03 hours
Cindy calls 911 and reports that her neighbor (suspect Shawn Gagne) threatened to "blow her brains out" and then shot a firearm from the patio. Cindy reports that this occurred approximately 10 minutes earlier at apartment 2164. Cindy reported that she was there talking to the suspects girlfriend when he came out the front door and told her to get out of his "fucking area" or he would "blow her fucking brains out." Cindy stated that she was there talking to the suspects girlfriend because they had been fighting. Cindy heard the suspect "load the weapon" then fire it. She did not know if he fired it into the air or at them.

Cindy reported that the suspect was a "severe alcoholic" and that the girlfriend reported that he had fired the gun inside the apartment three times in the last week. Cindy said that the suspect had "tons" of guns in the apartment. Cindy told 911 that the girlfriend left the apartment after the suspect had just been "choking her out." Cindy stated that she believed the weapon that was fired was a handgun but stated that the suspect also possessed other weapons including a "rifle" and an "AR."

Cindy reported that the suspect made threats the other day when he was fighting with the girlfriend. Cindy said that at that time they had been in a physical altercation where the suspected ended up "breaking in her door." Cindy reported that the suspect had fired a weapon in the home on July 4th as well.

Summary of 1st call from Suzette Gagne - 7/6/2023. Entered on CAD at 2239.09 hours
Suzette called Mesa Police Dispatch. She reported that she would like to speak to officers on scene. She said that she wanted to explain what was going on with her son so that police "don't end up shooting him." Suzette gave her son's address as 1233 N. Mesa Drive and later identified her son as Shawn Gagne. She advised that Shawn's fiancé had called her and told her about the police being there. Suzette stated that she and other family members have not been able to contact Shawn. Suzette stated that Shawn was "very depressed."

Summary of 2nd call from Suzette Gagne - 7/6/2023. Entered on CAD at 2351.55 hours
Suzette Gagne calling a 2nd time. Suzette requested a "commanding officer" call her. Suzette wanted to find out what was going on with her son.

Summary of call to Jessica Loper - 7/7/2023. Entered on CAD at 0019.09 hours
Jessica is the resident of apartment #1164, Jessica Loper, who was not at home and was in the hospital. Mesa Police Radio called her to let her know that officers were required to force entry into her apartment to check her welfare.

Summary of 3rd call from Suzette Gagne - 7/7/2023. Entered on CAD at 0854.05 hours
Suzette called inquiring for information about the incident involving her son Shawn Gagne.

Summary of call from Jordan Wirtjess - 7/7/2023. Entered on CAD at 0929.08 hours
Jordan called Mesa Police Dispatch and was asking for a phone call from police when she had permission to return to the apartment. When describing the incident, Jordan stated her boyfriend was involved in a shootout with the police.

**Review of Phone Conversation Audio between Ofc. Adair and Shawn Gagne**
I reviewed the audio of Ofc. Adair's conversation with Shawn Gagne. The following comments are only observations of mine while listening to the audio. Please refer to the audio recording at Evidence.com as well as Ofc. Adair's supplement for complete details.

Ofc. Adair's conversation with Shawn begins at approximately 2232.05 hours as seen in Ofc. Gutierrez' BWC. The file uploaded by Ofc. Adair shows the date as 7/6/2021 at 2309 hours. This is obviously incorrect and appears to be an incorrect timestamp created by the device used for the recording. Many parts of the recording at times are unintelligible.

Ofc. Adair identifies himself as Matthew with the Crisis Team. Shawn responds that he himself is Matthew with the crisis team and says, "You're about to have a fucking crisis if you don't get away from my fucking house. Back the fuck up. Right now. With all your fucking SWAT and all your gear, I don't give a fuck. Get the fuck out of my fucking face before I fucking start dropping shots in them." He continues and says, "Get the fuck out of my fucking house before I fucking start dropping shots in your fucking squad cars."

Ofc. Adair tries to tell Shawn that he is trying to get people moved back. Shawn states, "Shine that laser in my house one more time and I'll fucking unload." "I'll fucking unload on

you, I don't care." Ofc. Adair says that he is working on getting officers moved back. Shawn tells him "You better work faster bro, you better fucking work faster my guy." "I'm gonna fucking start dropping shots." "You guys want to play fucking guns? You guys want to play guns? Let's fucking play guns bro."

Ofc. Adair asks Shawn what is going on. Shawn tells him that he woke up from being asleep and heard police radios in his house. He then asks Ofc. Adair if he would appreciate that happening. Ofc. Adair replies, "I'm sure it's very scary." Shawn states back, "Yeah, yeah, yeah, I'll show you fucking scary bro." Shawn continues to tell Ofc. Adair to move officers back. Ofc. Adair tells him we want everyone to be safe including himself. Shawn replies, "No, I don't give a fuck bro. Come and fucking blow a fucking hole through my fucking head bro."

Ofc. Adair asks Shawn what is going on that is making him not care at all about what happens. Shawn begins yelling to "I said get out. Right now. I just fucking, drop a fucking hole right through your fucking squad car." As Ofc. Adair tries to talk Shawn tells him, "Come to my fucking house and see what fucking happens bro. Bring your fucking SWAT team in here, I don't give a fuck, we'll see what's going, I got fucking, I got AK's, I got fucking AR's bro. I'll fucking blow a fucking hole right through your fucking head. Don't fuck with me bro."

Ofc. Adair and Shawn talk further but many word are not intelligible. Shawn then says, "That doesn't matter bro. You guys are fucking up right now." "I got my fucking shotgun; I got my fucking 12 gauge. I don't give a flying fuck bro. Get the fuck out of my house. Get, get out. Move the fuck out of my vicinity now. If you guys fucking come into my vicinity, there are gonna be casualties, including myself."

Shawn tells Ofc. Adair that he has the right to bear arms and the right to stand in his living room. Ofc. Adair then tells Shawn because of the issue that happened with Jordan and their neighbor, the police cannot leave. Ofc. Adair tells him that he wants to see him come out safely. He then begins asking Shawn to come out with his hands up when Shawn replies, "You aint gonna get me bro. I'm not coming out. I'm not coming out." Ofc. Adair asks him when he is ready, to come out with his hands up and empty. Shawn replies, "I'll fucking die (unintelligible) I ain't coming out no where bro. I got four thirty round fucking clips. If you want to come to my fucking door, I will fucking unload on all your fucking team. Get your fucking ass out of here, go, leave."

Ofc. Adair states something to Shawn that is unintelligible. Shawn replies, "It doesn't matter then. Come in and get me." Ofc. Adair tells Shawn that he doesn't want to have to come in and get him either. Shawn replies, "We'll fucking see. We'll fucking see right now bro. Come and get me. I don't give a fuck. We're coming to shoot right now, homie. Let's go. Let's go." Shawn tells Ofc. Adair to send his team through right now because he is ready. Ofc. Adair tells him that no one wants to see him get hurt. Ofc. Adair asks him again to come out with his hands up and empty. Shawn tells him, "I'm not going to." "Come and fucking get me bro."

Ofc. Adair then tells Ofc. Gutierrez that he can hear Shawn loading magazines in the background. Ofc. Adair asks Shawn what is going on with him and what is keeping him inside. Shawn then yells, "Get the fuck out of my house before I start fucking shooting squads." Ofc. Adair tells Shawn that everyone is back in the parking lot. Shawn then tells Ofc. Adair to turn the lights off "before I fucking start shooting fucking spotlights out." Ofc. Adair asks him if there is someone by his house. Shawn states, "Yeah, they're right there. You guys are right

here."

Ofc. Adair then relays this information to officers that Shawn is threatening to shoot them. Shawn tells ofc. Adair that the police are out in front of his house and that they just want a "trophy." Shawn then states, "I've got my fucking armor on. I've got my fucking guns ready." "You guys want a fucking full Iraq war from one person, then you better fucking get right. Shine fucking lights in my fucking house again, I will fucking start shooting. Put the fucking lasers down now." "If you don't fucking tell a mother fucker to stop fucking shining lights in my fucking house with lasers, I will fucking start unloading on their squad cars. They better back the fuck up dude. If they don't want to lose their fucking life, then I suggest you get the fuck away."

Ofc. Adair tells Shawn that he is telling officers what he is saying. Shawn says, "I'm asking you to leave, I'm asking you to leave and leave me alone. I'm a fucking law-abiding citizen, I fucking have my fucking guns for a God damn fucking reason, then back the fuck off. Ofc. Adair tells Shawn that police are not leaving because of the incident that occurred. Shawn asks what incident. Ofc. Adair begins explaining about the incident earlier when a sound is heard in the background. This is approximately 11 minutes and 21 seconds into the recording. Ofc. Adair asks Shawn if he is there. Shawn says something in reply. Ofc. Adair asks Shawn if he is injured. Shawn replies, "Yeah, I'm injured. (Unintelligible) through my fucking vest." Shawn then begins yelling, "I said get the fuck away, right now, right now back the fuck up." Several loud bangs are heard in the background. Ofc. Adair continues his commands to Shawn. He then asks Shawn if he can hear him. Shawn replies, "I hear you. I hear you." Ofc. Adair gives further commands. Ofc. Adair asks Shawn a question that is unintelligible. Shawns reply is unintelligible. Ofc. Adair then asks Shawn where he got hit. Several loud bangs, probably gunshots, are heard in the background. This is 13.00 minutes into the recording. After the shots Shawn is heard saying, "I'm down, I'm down, I'm down, I'm down." His voice is in the background and not near the microphone. Immediately after this a loud vehicle can be heard and there is crunch sound on the recording device. Ofc. Adair previously advised that the device fell on the ground and a vehicle ran it over, but it continued to record. Ofc. Adair then begins speaking to Shawn again. No further responses are heard.

**Inspection of Ballistic Vest and Shirt worn by Shawn Gagne during Incident**
On 8/21/2023, at approximately 0930 hours, I obtained ME164258-1 (Ballistic Vest), ME164656 (Shirt) and ME164656-10 (Shorts) for inspection. These items were worn by Shawn Gagne during this incident.

Upon inspecting the vest, I located a defect in the front left shoulder strap of the vest. This hole appears to match up to one of the holes in the shirt. These holes also match one of the entry points identified during the autopsy. While inspecting the vest I also noticed that there was a ballistic plate on the front side only. There were no defects on the plate. A sticker on the inside of the plate showed that it had a ballistic rating of "NIJ Level IIIA."

I did not inspect the shorts, leaving the package sealed. CSS Brannan #22587 took photographs during my inspection. After I completed the inspection, I resealed the items that were opened and placed them back into MPD Property as Evidence.

**Forensic Request / Reports**

I completed requests with the Mesa Police Crime Lab to conduct forensic testing on the evidence collected in this case.

These requests included:
1. Analysis of blood blot obtained from Shawn Gagne at autopsy to identify DNA typing.
2. Process items ME164258-006, ME164258-018, ME164258-026 and ME164258-028 (Firearms located in Shawn Gagne's apartment) for fingerprinting and DNA. Any prints to be analyzed and compared to Shawn's known sample.
3. Firearms examination/function testing of items ME164258-006, ME164258-018, ME164258-026 and ME164258-028. (Firearms located in Shawn Gagne's apartment). Comparison of these firearms to the fired cartridges recovered from the apartment. Items ME164258-005, ME164258-030 and ME164258-036.
4. Firearms examination/function testing of items ME164258-038, ME164200-001, ME164200-003, ME164200-005, ME164200-007, ME164200-009, ME164200-011 and ME164200-013. (Firearms from involved officers) Comparison of these firearms to the fired cartridges recovered from the scene. Items ME164247-001, ME164247-002, ME164247-003, ME164247-005 and ME164258-039.
5. Comparison of item ME164656-003, (projectiles recovered from Shawn Gagne) to test projectile evidence obtained during the examination of the officer's firearms.

As of this date, not all of the forensic testing and supplemental reports have been completed. As the reports are completed, they will be attached to this case.

**Once complete, this case will be forwarded to the Maricopa County Attorney's Office for review.**

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher Gagne, in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne,<br><br>Plaintiffs,<br><br>vs.<br><br>City of Mesa, a political subdivision of the State of Arizona; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and in his capacity as a police officer; Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his individual capacity and in his capacity as a police officer; ABC Partnerships I-X; XYZ Corporations I-X, John Does I-X and Jane Does I-X,<br><br>Defendants. | Case No.<br><br>CV-24-01337-PHX-SHD<br><br>Videoconference Deposition of<br><br>MATTHEW CHUEY<br><br>March 12, 2026<br>3:00 p.m. |

CERTIFIED TRANSCRIPT

Phoenix, Arizona
March 12, 2026
3:00 p.m.

MATTHEW CHUEY,

called as witness herein, having been first duly sworn by the Court Reporter remotely, was examined and testified as follows:

EXAMINATION

03:01:55 BY MR. WOODS:

Q. Good afternoon. Can you state your full name for the record, please?

A. My first name is Matthew, M-A-T-T-H-E-W. Last name is Chuey, C-H-U-E-Y.

03:02:09 Q. Thank you. What's your current rank?

A. I'm a police sergeant.

Q. Okay. Have you ever had your deposition taken before?

A. Yes, sir.

03:02:23 Q. How many times?

A. At least once, possibly a second. The first one was the very beginning of my career and I didn't really know the process at that time. So at least one other time, possibly a second.

03:02:41 Q. In what circumstances were you deposed?

hired by Chandler. May of 2012, I finished my degree. So I was in the police academy as a 21 year old, graduated while -- from ASU while I was in the police academy.

03:08:29 Q. You know why we're here today, right?

A. Yes, sir.

Q. Okay. So we're talking about -- today we'll be talking about the incident that occurred on July 6th, 2023, which you were an officer.

03:09:15 What was your rank at the time?

A. I was an officer.

Q. Okay. You were assigned to SWAT?

A. Yes, sir.

Q. When did you become a SWAT team member?

03:09:27 A. I came to Mesa in 2016; 2017, I tested for the team. And the beginning of 2018, around February, I became a member at that -- at that time.

Q. Did you have any specialized roles on

03:09:51 the SWAT team or were you just -- were you just an officer on the SWAT team?

A. So all of us are trained in our entry tactics and everything like that. And most of us are trained in less lethal deployment, gas

03:10:08 deployment, and those other things. The way that

our team works and the way that we split it up is there's two specialties that guys can go to, which is either being an explosive breacher or a sniper.

I joined the sniper team and was a

03:10:21 sniper on the team while I was there as an officer.

Q. Okay. How long were you a sniper or are you still a sniper?

A. I'm not a sniper anymore as a result of

03:10:34 promoting and moving out of that position. I am still on the team currently. But I was a sniper from probably 2019. I did my year of probation and then started working as a sniper, and was a sniper up until I promoted and gained the rank of

03:10:59 sergeant.

Q. And when was that?

A. I just had my year as a sergeant this past September. So that would have been September of 2025, so September of '24. Yes, September of

03:11:18 '24 was when I was officially promoted.

Q. Okay. Do you serve as a firearm instructor?

A. Yes, sir.

Q. Do you still do that?

03:11:50 A. Yes.

Q. How long have you done that?

A. I became a firearms instructor in 2016, I believe, when I came to Mesa. It was pretty quick. I was able to go to that school and get that certification.

03:12:06

Q. How -- you said you went to school. Like a course offered by the police department or what is that school?

A. AZ POST, which is the Peace Officers Standards and Training for the state, are the ones that regulate the certification of instructors for certain types of positions in law enforcement. So they house the requirements for the firearms instructor school. Which at that time, it was a two-week course.

03:12:26

03:12:42

So that is taught by the agencies in the valley that fall under AZ POST, which is everyone in the state that's a state agency. And like I said, it's a two-week course, and I went through it at that time in 2016.

03:12:56

Q. Tell me when you can see my screen.

A. Yes, sir.

Q. Okay. This document will be marked as Exhibit 1.

03:13:19

EXHIBITS:

(Deposition Exhibit No. 1 marked for identification.)

BY MR. WOODS:

Q. It's been produced. At the bottom right, you see the Bates stamp says, Mesa, underscore, 002741?

A. Yes, sir.

Q. It runs to 2752. So this document is entitled -- it was produced by your counsel and it's entitled Chuey, Matthew, your badge number and Learning Center. Do you know what Learning Center is?

A. That was a system that we used back when I started for department training. They used it for logging and documentation, and some other stuff. I don't believe that we're using it anymore. I'm not a hundred percent sure.

Q. I see the dates on here from 2012. Would that have somehow transferred from your Chandler to Mesa?

A. There's a possibility. I'm not a hundred percent sure.

Q. Okay.

A. Some of those ones that are listed on there -- if you go back to the first page. The

ones on there, that National Incident Management System, an Introduction, and those ones over that, those are FEMA classes that I had completed -- since they're dated 2012. Those are ones that I did while I was at Chandler.

03:14:52

So I don't know if I brought records of those when I came over and needed to complete those prior to when I started, but that's what those are for since I recognize the NIMS acronym and stuff like that, that are those.

03:15:05

Q. Okay. So, yeah, that would make sense then. It would just kind of transfer over to your file. Let's go to the second page.

You received Use of Force Policy Review, one hour COE; is that correct? Right here.

03:15:24

A. Yes, sir.

Q. Do you recall receiving that training?

A. That was 2016. It was a long time ago. It was probably a part of the curriculum that they put us through as lateral officers, because we did a whole bunch of training when we came over to Mesa.

03:15:40

Q. You received, it looks like, in August of 2016, Incident De-escalation and Tactics. Do you recall that?

03:15:59

A. Not specifically, no.
Q. Okay. It looks like you got eight hours in that for COE and five in Prof; is that correct?
A. Yes, sir. I'm sorry.
03:16:17 Q. That's fine. I may say something like that from time to time. I'm not trying to be mean. I'm just trying to get a record.
It looks like in February of 2017 you attended the firearms instructor school?
03:16:35 A. Yes, sir.
Q. Okay. And that was an 80-hour course; is that right?
A. Yes, sir. That's the two-week course.
Q. And then the rest of these -- I mean, I
03:16:58 won't go through each one of them, but this document looks like a record of -- at least up until 2020 -- of trainings that you had received, correct?
A. Yes, sir.
03:17:12 Q. Okay. I'll put up Exhibit 2.
EXHIBITS:
(Deposition Exhibit No. 2 marked for identification.)
BY MR. WOODS:
03:17:25 Q. Do you see that?

A. Yes, sir.

Q. And this starts at 2020 at the top here. This page is Bates stamped -- it just jumped on me -- Mesa, underscore, 002739. Do you see that?

03:17:46 A. Yes, sir.

Q. Okay. And the title of this one is similar. It says, Chuey, Matthew, PoliceOne. Is PoliceOne the system you use now for training?

A. Yes, sir.

03:18:05 Q. Are these trainings attended in person or are they virtual?

A. They can be both.

Q. How many -- how many hours a year do you have -- of training do you have to attend for
03:18:28 continuing education?

A. There's a state requirement for it through AZ POST. I don't know the number off the top of my head. So for the SWAT team, we, obviously, have to meet that state minimum since
03:18:43 we're all still officers and we're in sworn positions.

Then, obviously, from there, being on the SWAT team, we do additional training on top of that.

03:18:52 Q. Okay. Do you receive constitutional law

training?
A. I don't remember, off the top of my head, if we have specifically or anything specific related to that.
03:19:05 Q. Do you get legal update trainings?
A. Yes, legal update training.
Q. Do they include case law updates?
A. Yes, sir.
Q. Are you familiar with Graham v. Connor?
03:19:28 A. Yes, sir.
Q. Okay. And were you trained on that when -- the first time you went to the Chandler police academy?
A. So Chandler doesn't have a police 03:19:44 academy at that time. I attended the -- it was at that time the Arizona Law Enforcement Academy, which is in South Phoenix that's dual run by Phoenix and the Department of Public Safety.
At that time when I went through, I 03:20:01 think DPS, the Department of Public Safety, was the lead. So that was the academy that I attended when Chandler hired me.
Q. Do you recall when you learned about Graham v. Connor?
03:20:17 A. I'm sure there was curriculum that

covered that during the police academy.
Q. This list that you're seeing here -- I'm scrolling through it kind of quickly. I'll slow down. Does this look like a list of the trainings that you have received since 2020?
03:20:40
A. Yes, sir.
Q. On July 7th, 2023, there's an entry in here for Active Shooter #2, four-and-a-half hours of training. Do you recall attending that training?
03:21:06
MS. RETTS: Form.
A. I don't recall specifically.
BY MR. WOODS:
Q. Were you put on administrative leave the day after the incident that we're here for?
03:21:15
A. Yes, I was.
Q. Were you doing anything active -- I'm sorry. When you're on administrative leave, what does that mean?
03:21:29
A. Just putting it plainly in my language, it's -- administrative leave, you're not deployable and, usually, you'll be at home during that time.
Q. Okay. So you wouldn't be attending training classes or anything like that during that
03:21:44

especially if we're dealing with undercover officers or other things of a sensitive nature, that we have a little bit of area in there that we can deviate.

03:24:56 So while the patrol policy has its guidelines of how it's set up for -- if you're a patrol officer and you're acting in that capacity, here's the policy that you will follow. For spec ops, we have a different policy. It's pretty 03:25:13 close to the patrol one, but there is a little bit of wiggle room depending upon the operation and the circumstances of the event that we're responding to.

Q. Okay. Did you go -- did you attend a 03:25:29 sniper training course to become a sniper?

A. Yes, sir. For our sniper team, we're required to attend a basic sniper school, which is usually about 40 hours, and then we are also then required to attend a secondary school. Those are 03:25:48 usually about 40 hours.

So that satisfies the training requirement that is needed to become a primary sniper. And then on top of that, you have to have operational deployments with another primary 03:26:02 sniper to meet a certain amount in order then to

be able to gain the primary sniper designation. Until you meet that requirement, you're what's called a secondary sniper and that's -- at that time in our sniper program, that's how it was
03:26:21 lined out and it was set.
Q. Do you recall what type of firearm you were using on the day of this incident?
A. Yes. I was using an AR-15-style rifle chambered in .223 caliber or .556. They're kind
03:26:45 of interchangeable. It was a Daniel Defense rifle.
Q. Did it have a scope on it?
A. Yes, it did.
Q. Do you know what type of scope was on
03:26:54 it?
A. It was a Nightforce scope.
Q. What kind of magnification did that scope provide?
A. I believe that one, it's a 1 to 8
03:27:07 magnification.
Q. What did you do to prepare for this deposition?
A. I met with my counsel and we reviewed some things. That was yesterday.
03:27:28 Q. Just don't tell me what they said.

What -- what things did you review?
A. We reviewed the video from inside the apartment. We reviewed some of the audio that was involved, and then we looked at some photographs, and then my summary from the -- from my statement that was given to the homicide detectives during my walkthrough.
Q. How long did you meet for?
A. A couple of hours.
03:28:24 Q. Is that the only time you met to prepare?
A. Yes, sir.
Q. Okay. You talk to any of your fellow officers?
03:28:32 A. No, sir.
Q. Do you know what the term decision shoot means?
A. Yes.
Q. What is it?
03:28:53 A. For the Mesa Police Department and decision shoot, that's a term that we use for a section of training that can be conducted.
AZ POST has a requirement for us on the firearms side that you have to do a decision shoot as part of our qualifications and requirements

that need to be done.

And then the term is also kind of used kind of loosely in that you're conducting a training where that's the focus of it, that sometimes it gets labeled as that.

03:29:25

Q. Okay. Does that -- does that training teach you how to decide when to shoot?

A. From my experience of it -- with it, that's usually a component of it. It's not necessarily the testing of the actual skills related to shooting. It can be in certain areas. And I would say that more leans towards the direction of like SWAT and specialty unit training where it is the point of decision-making and then also the shooting side of it.

03:29:45

03:30:03

But, again, that word for agency kind of gets labeled and used in different ways. And there could be another unit within the department, like our training unit, that's labeling something as a decision shoot and it doesn't have any of the actual shooting part involved, either through like munitions used for live fire. It could be through videos. It could be through like role-play activities and different things like that.

03:30:18

So that's why that term is kind of a

03:30:36

little bit broad for our agency and it doesn't really have like a specific lockdown, like here's the critical elements that are involved if you're conducting a decision shoot-style training.

03:30:51
Q. Have you been trained on the use of force?

A. Yes, sir.

Q. What about the use of deadly force?

A. Yes, sir, I have.

03:31:01
Q. What about active shooter responses?

A. Yes, sir.

Q. What about search and seizure?

A. Yes, sir.

Q. When is deadly force constitutionally permitted?

03:31:37

MS. RETTS: Form. You can answer.

THE WITNESS: Okay.

A. Based on the totality of the circumstances involved in an event and whether that person poses an imminent threat to cause serious physical injury or death to either a police officer, or innocent bystander, or a hostage. There's several other categories of that that falls into it.

03:31:51

03:32:08
BY MR. WOODS:

Q. Are you trained to distinguish between a possible threat versus an immediate threat, correct?

MS. RETTS: Form.

03:32:28 A. Are you asking specifically if -- individual training on those two things?

BY MR. WOODS:

Q. Yeah. I mean, we just talked about the deadly force and constitutional, you know, law

03:32:42 related to that. And you said that deadly force requires an imminent threat of serious physical harm, correct?

A. Yes, sir.

Q. Okay. Is the possibility of a threat

03:32:56 the same thing as imminent threat?

MS. RETTS: Form.

A. So the possibility of a threat versus imminent threat, that's going to --

Q. Yeah.

03:33:07 A. -- depend upon the circumstances involved in the event. For me, imminent is that that action is possible. And that comes back to, you know, opportunity, jeopardy, ability, and some other things that we look for when those events

03:33:28 take place. So someone being a possible threat

and then them being an imminent threat without context and other information, those lines can be very, very close together.

BY MR. WOODS:

03:33:46 Q. You've heard the term sanctity of life, right?

A. Yes, sir.

Q. What does that mean to you?

A. To me, that as a -- speaking from the
03:33:58 position of a supervisor, obviously our department has principles and philosophies that we abide by because of our obligation to the community, since we're police officers and that's who we serve.

The sanctity of life portion of that is
03:34:17 that we have to make an attempt through our actions and our tactics to preserve life. And that extends everywhere from the innocent public that is out there. That includes subjects who might be involved in an event regardless of who
03:34:34 they are in that event, and then police officers, and everything else like that.

It's a term commonly referred to as the safety priorities. But we, as the police, have -- like I said before, that's kind of a pillar of our
03:34:52 agency for that. So that is something that, hey,

we need to make attempts to be able to do that, but we also have an obligation to protect the public.

Q. Would you agree with me that deadly force should typically be the last resort?

MS. RETTS: Form.

A. It depends. And because of factors involving innocent bystanders, the police proximity, the actions being taken by someone during an event -- I'm just making this very broad, you know, for it. If we have the opportunity to be able to use other means and avoid using deadly force, that's why we have training. That's why we have equipment, tools, philosophies which are then supported by tactics and techniques in order to do those things.

But, unfortunately, sometimes we don't have the opportunity to be able to do that, especially if someone's life is in danger or someone is committing active violence.

BY MR. WOODS:

Q. Do you agree with me that in a perfect world, causing the death of someone would be the last resort for a police officer, correct?

MS. RETTS: Form. Foundation.

A. So, again, I'm going to go back to what I said before with it. If the opportunity presents itself to be able to do it safely, then, yes, absolutely. Let's try to make attempts to 03:36:51 bring that situation under control. But that requires compliance or negotiation or concession by the people that are involved in that event.

And as many of these things happen across the state and the country, sometimes those 03:37:10 elements do not exist and officers have to move to that deadly force option because that is the only way that they're able to bring a situation under control for the safety of the community, innocent bystanders, or the police, and other things of 03:37:29 that nature.

THE WITNESS: He's muted. I can't hear him.

THE COURT REPORTER: You're on mute, Sean.

03:37:29 BY MR. WOODS:

Q. Have you ever heard the term "going hot"?

MS. RETTS: Foundation.

A. Can you say it again for me real quick 03:37:47 just because your mic was off so I can get all of

So the sniper is gathering information for themselves. And then also to that information can be things that are of benefit to the rest of the tactical team, from tactical command all the way down to the individual officers. So they can serve both purposes for it, but the individual decision-making of the sniper follows both of those tracks.

BY MR. WOODS:

Q. Okay. You were talking about totality of the circumstances and how situations unfold. If an imminent threat stops being an imminent threat, is deadly force reasonable?

MS. RETTS: Form. Foundation.

A. That's going to depend on the actions that are being taken and the observations of the officers involved.

BY MR. WOODS:

Q. Okay. But you said that deadly force is authorized or allowable when there's an imminent threat of physical harm, correct?

A. Yes.

Q. Okay. And so that's when deadly force is authorized, correct?

A. Correct.

Q. So in that circumstance, an officer would have to perceive an imminent threat that serious bodily harm could happen to him or her, to civilians or to a hostage, correct?

03:53:08 A. If those factors existed for that situation, those are possibilities.

Q. Okay. If at any point an officer who originally perceived an imminent threat gets new information that the person is unarmed, for

03:53:29 instance, and is in a surrendering pose, not posing an imminent threat, is deadly force authorized?

MS. RETTS: Form. Foundation.

A. Can you go back and just give that to me

03:53:44 again?

BY MR. WOODS:

Q. Sure. So an officer arrives on scene, perceives what they think is an imminent threat, but then the threat reduces because the person

03:53:57 puts their firearm down and puts their hands up.

Is that an imminent threat at that moment of physical harm to you, to bystanders, to other officers?

MS. RETTS: Form. Foundation.

03:54:09 A. So if they're still in close proximity

to a firearm and they have the opportunity, the ability and the means to be able to access it, that imminent threat can still exist at that point even though they might be standing in a position that, you know, we would call kind of a surrender position or a hands up position. They have their hands up for a reason. We usually are giving them instructions to be able to do that.

But if they can access the firearm that was previously seen or other firearms that might not be seen, that comes back to the officer being able to look at that situation. And, again, going back to the opportunity, ability, jeopardy and means of it existing, that imminent threat can still exist.

BY MR. WOODS:

Q. Okay. So I want to get this straight. If someone is in what you called a surrendering position but a firearm might be nearby, it would still be justifiable to shoot that person?

MS. RETTS: Form. Foundation.

A. Not based upon them solely standing there. I know we're being very broad about talking about this because we're missing kind of a lot of information involved with it. There --

there are other factors usually there of the observation of what that person is doing.
BY MR. WOODS:
Q. So if that person makes a move for their
03:55:43 gun, that could create an imminent threat; is that right?
A. That could be a factor.
Q. Besides you, do you know how many officers were covering the situation?
03:56:05 MS. RETTS: Form. Foundation.
A. I don't mean to answer your question with a question. Are you asking for SWAT officers?
BY MR. WOODS:
03:56:15 Q. All. Any sworn officer that had arrived. Do you know how many officers were on scene?
MS. RETTS: Form. Foundation.
A. I don't know a specific number, but
03:56:25 there were a lot of patrol officers, SWAT officers, and other units that were there.
BY MR. WOODS:
Q. Do you know how many SWAT officers were there?
03:56:31 A. I don't know a specific number. The

cars that they had setup, the apartment was still more to the north from where I was. But that sliding glass door that's kind of more on the south side of the apartment was there and that was the -- while I was back there at the patrol vehicles is one of the first times that I saw him.

Q. And then at some point, you moved your position, correct?

A. Yes, sir.

Q. Okay. And from that new position, you could not see him any longer, correct?

A. I saw him another time after that.

Q. Okay. And what time was that?

A. He came to the front door and I was able to see, with the magnified optics on my weapon, the front door start to jiggle. And so moving to that position in order to be able to cover those parts of the apartment, that kind of became my area of responsibility to be able to watch.

And he opened the door and was back away from the door, and I observed that he had a ballistic vest on, a plate carrier. And because of the lighting conditions and some other stuff that was going on, I was having difficulty making everything out and trying to determine if he had a

weapon at that point.

04:03:44

And the door is opened for a very brief amount of time that I was able to see that. And as I was trying to gather more information, he closed the door.

Q. Okay. So did you or did you not see a weapon at that time?

A. I was trying to gain that information to be able to see it, but I -- it happened very

04:03:56

quickly. And so first was able to -- again, like the way he was standing in the door was not very typical to me. When people open doors, they're usually within, you know, about an arm's length or in close proximity to the door when they open it.

04:04:11

He was back away from it and the lighting conditions that were there were making it difficult for me to be able to see. So I was trying to determine that and gain more information. But, again, that door was open for a

04:04:25

very brief amount of time, but that was the most I could see.

The way he was standing, his body language, his demeanor was not normal to me. And as I was trying to determine whether or not he had

04:04:36

a weapon, the door closed.

watching the door to see if the suspect will comply. Do you remember saying that?

A. Yes.

Q. Okay. So if the suspect is opening the door, it's important to gather information as to whether or not he is going to comply or not going to comply, right?

A. Yes.

Q. And how do you make that decision that he's going to comply or he's not going to comply?

A. So I have to take into consideration the totality of everything that had already happened. When that first time that he opened the door took place, that was prior to detective -- Officer Freeman shooting. So I had the information again that he had already fired a round off. The negotiators were actively talking to him and that whole process is taking place.

So as the door opens, you know, again, the first thing that I noticed was that he now had body armor on, which is extremely concerning. So then with that and seeing that, I'm like, okay, well, you know, he's not -- he's concealing himself in the doorway and not making it easy for me to see him. So why is he doing that?

Well, we have to look at his body language, look at what he is doing to be able to make some reasonable guess as to what's taking place at that moment. But, obviously, he's the 04:07:28 one that's in control of the door opening and closing. So he gets to decide how long that door is opened for and then closes.

So whatever information that I gather during that happening and I am, you know, 04:07:40 digesting that information, looking at it, seeing it, looking through a magnified optic, you know, and gathering that with it, as soon as that door closes, like, I -- you know, I'm kind of back to square one at that point because that's all I was 04:07:56 able to see at that time.

Q. You just mentioned that you had information that he had fired a round off, right?

A. Yes, sir.

Q. Okay. And do you know -- do you know 04:08:13 what the circumstances were regarding that firing that round?

A. At the time when I first arrived on scene or what I know now?

Q. At the time.

04:08:25 A. Just that it was related to this, the

Q. He then writes, "he stated that he could see the suspect was holding a rifle up in the air"; is that right?
A. Yes, sir.
04:12:23 Q. Is that an accurate summary of what you told Detective Ingram?
A. Yes, sir.
Q. When you say that he was holding a rifle up in the air, what do you mean by that?
04:12:32 A. I'm going to call that position a port arms, P-O-R-T, and so that is where the muzzle of the firearm is sticking straight up. And there can be a variety of positions then, the rest of the orientation of the firearm, but it's generally
04:12:52 port arms is the muzzle of the rifle is sticking straight up.
Q. Okay.
A. It can be held a variety of different ways from there depending upon how it's done. But
04:13:02 that's the more kind of specific way that I would describe it.
Q. So when you saw him with the rifle up in the air, he wasn't pointing it at anybody at that point, correct?
04:13:11 A. Not at that point, no.

handle turn and the suspect open the door."
Do I have that right?
A. Yes, sir.
Q. And that's an accurate summary of what you told Detective Ingram?
04:15:36
A. Yes, sir.
Q. Okay. And so through your optic, you could actually see the door handle move?
A. Yes, sir.
04:15:44 Q. And that's when he opened the door initially?
A. That was the first time that I saw him open the door.
Q. About how long did he keep the door open, do you recall?
04:15:54
A. I don't recall specifically. But again, that time frame was very, very short.
Q. Okay. Now, below it says, "he told me that he could see something dark in his arm next to him. Officer Chuey said he was trying to
04:16:10
determine what that object was when the suspect closed the door. I asked Officer Chuey what he believed the suspect was holding. He told me he believed it was the gun he had already observed him holding."
04:16:21

Do I have that right?
A. Yes, sir.
Q. Is that an accurate summary of what you told Detective Ingram?
04:16:28 A. Yes, sir.
Q. Okay. "Officer Chuey told me that there were several communications over the radio and assignments were given. He told me that Officer Freeman was covering the south side sliding door and he would cover the front door with his optic."
04:16:40 Do I have that right?
A. Yes, sir.
Q. Is that an accurate summary of what you told Detective Ingram?
04:16:48 A. Yes, sir.
Q. "Officer Chuey told me that he heard Officer Freeman fire. He said that he could tell the difference between the suspect's gun and the sounds of the officers' suppressed guns."
04:17:00 Do I have that right?
A. Yes, sir.
Q. Is that an accurate summary of what you told Detective Ingram?
A. Yes, sir.
04:17:05 Q. Okay. So you heard Officer Freeman fire

his weapon?
A. Yes, sir.
Q. "He told me that he heard a sound he believed was the suspect shooting out of the house."
04:17:27
Do I have that right?
A. Yes, sir.
Q. Is that an accurate summary of what you told Detective Ingram?
04:17:33
A. Yes, sir.
Q. "He also stated that he saw glass 'splinter'." Do I have that right?
A. Yes, sir.
Q. Okay. And is that an accurate summary of what you told Detective Ingram?
04:17:44
A. Yes, sir.
Q. Which glass did you see splinter?
A. That would have been the north side patio glass. So the apartment primarily faced to the west. The slider that Officer Freeman was covering was more to the south side of that.
04:17:57
On the very north side, not on the -- we will call it the primary side of the structure of where we're at and where we're facing it, where the door is and the windows and everything else.
04:18:15

But on the north side of that there was a patio and patio door, and stuff like that. That's where I saw that happen.

Q. Is that where the foil was?

04:18:28 A. I don't know specifically what was on -- what was on the -- on the door at that time. I'm sorry, the window.

Q. You didn't see any of the windows on the south side splinter, right?

04:18:41 A. I don't recall and I wasn't in a position from where I was to be able to see most of those.

Q. Then he goes on to say, "I asked him if this was after Officer Freeman fired and when he 04:19:01 fired. He told me he was not sure at this point. He said that he saw the glass was broken around the same time he heard shots being fired from inside."

Do I have that right?

04:19:09 A. Yes, sir.

Q. Is that an accurate summary of what you told Detective Ingram?

A. It's a little wordy the way that he wrote it, but it's -- it's accurate.

04:19:20 Q. Okay. You heard shots being fired from

inside?

A. Yes, sir.

Q. Okay. Multiple shots?

A. Yes, sir.

04:19:29 Q. "Officer Chuey told me that he heard gunshots, and he saw muzzle flash coming from the north side of the apartment."

Do I have that right?

A. Yes, sir.

04:19:40 Q. Is that an accurate summary of what you told Detective Ingram?

A. Yes, sir.

Q. You saw the muzzle flashes?

A. Yes, sir.

04:19:47 Q. From inside the apartment?

A. Right where the glass was and where it was breaking, and in close proximity to where the glass was for that north side patio entrance and exit.

04:20:02 Q. "Officer Chuey told me that the muzzle flash was from the area where the shots were being fired. I asked if he could tell me where these shots were aimed for. He told me he could not tell."

04:20:15 Do I have that right?

A. Yes, sir.
Q. Okay. Accurate -- is that an accurate summary of what you told Detective Ingram?
A. Yes, sir.
04:20:22 Q. How many muzzle flashes did you see?
A. I don't recall.
Q. Multiple?
A. I can't give you a definitive answer on it. With some of these firearms that are out
04:20:42 there -- and we were talking about muzzle flash earlier -- there's certain ones you can definitely modify them to be able to have muzzle flash every single time.
Again, it comes back to the ammunition,
04:20:55 firearm combo and how the firearm is set up. There can be times where the first round that is fired there can be muzzle flash and there can be other times where there's intermittent amounts to where there can or cannot be muzzle flash.
04:21:12 Q. Okay. Did you see one muzzle flash or do you remember seeing more than one muzzle flash?
A. I don't recall.
Q. "Officer Chuey told me that he fired at the muzzle flash with his rifle." Do I have that
04:21:28 right?

A. Yes, sir.
Q. Is that an accurate summary of what you told Detective Ingram?
A. Yes, sir.
04:21:34 Q. Where was that muzzle flash?
A. In close proximity to the north side patio door.
Q. I'm showing you what I want to mark as Exhibit 4.
04:22:15 EXHIBITS:
(Deposition Exhibit No. 4 marked for identification.)
BY MR. WOODS:
Q. This is a scene diagram, starts at Mesa,
04:22:20 underscore, 002315 and ends at 2349. Have you seen this document before?
A. Can you go back to the first page of it?
Q. Of course.
A. And the next page. No, I have not seen
04:22:45 this document.
Q. Okay. So overhead we see a red square that says, "suspect apartment 2nd floor." Do you see that?
A. Yes, sir.
04:22:59 Q. Does this look like an aerial photo of

the door was open and was using the door as a support for my rifle.

Q. Okay.

A. So somewhere in the vicinity of bubble 4 and bubble 3.

04:24:16

Q. Okay. And so you had -- you had a direct shot at the front door, correct?

A. Yes, sir.

Q. When you said north side balcony, are you talking about the balcony that's directly to the left of this red box?

04:24:27

A. Yes, sir.

Q. So you saw muzzle flashes coming from there?

A. Yes, sir. In close proximity to that glass door that goes from the patio into the structure.

04:24:35

Q. Okay. And so that's where you fired your initial shots?

A. So I fired just to -- I'm going to call it the right of that. And my intention at that point based upon the visual observations that I was seeing from right there, felt it reasonable to believe that he was in close proximity to that doorway. So I shot through the drywall on the --

04:24:50

04:25:09

in between -- do you see the orange arrow that says "front door"?
Q. Yes.
A. And then the roof line that goes to the left until it hits the red box?
Q. Yes.
A. So closer to the red line but along that roof line and obviously below that, I shot through the drywall because of my observations of the muzzle flash, that it felt reasonable to me that he was close to there based upon my understanding, kind of knowledge of firearms and how we talked about before with muzzle flash. I'm like, okay, I think it's reasonable to believe that he's standing in that area.
So I made the decision to fire through the drywall in attempts to get him to stop shooting from that position.
Q. Okay. Were you the first to fire when you saw the muzzle flash or did somebody else fire first?
MS. RETTS: Foundation.
A. So Officer Freeman had obviously already fired at that point, and I think that there had been possibly other officers that had fired as

conscious and deliberate about making the decision to shoot in that way.

MR. WOODS: Why don't we take a five-minute bathroom break.

04:30:31 MS. RETTS: Okay.

(Whereupon, the proceedings were in recess at 4:30 p.m. and subsequently reconvened at 4:39 p.m., and the following proceedings were held of record:)

04:39:51 BY MR. WOODS:

Q. Did Shawn ever point his weapon at you?

MS. RETTS: Foundation.

A. So from my perception of it of when he opened the door again, I had a very limited time 04:40:19 in order to be able to gather information and try to make some decisions. So in that moment when that happened and we were seeing each other, couldn't make that determination. When we talked about earlier him being at the slider, I described 04:40:35 the port arms. So that was up in the air for it.

And then the second time that I shot, when he came to the door again, you know, my observation is that he was, you know, armed with something that resembled a firearm. You know, it 04:40:57 looked like a weapon. And, you know, I can't tell

you definitively whether or not, you know, it was aimed directly at me during those instances.
Obviously, the one at the slider where the muzzle is up, like, yeah, that wasn't aimed at me at that moment.
04:41:11
BY MR. WOODS:
Q. Okay. And you're describing the door opening, what -- the first time you weren't sure whether or not he had a weapon, correct?
04:41:21
A. Right. I didn't have enough time to be able to arrive at that decision.
Q. What about the second time?
A. So the second time that the door opened, again, he was what I'll call a position of advantage of the way that the door opened. He was back away from the door and could still see that he had the body armor on, and kind of some shapes and shadows going on, however I described it in the walkthrough, that looked like he had a weapon.
04:41:38
And that, you know, he was armed at that point as the door was opening. And that there was some other kind of barriers in the way as well that I had a pretty reduced, not a full-door sized width to be able to see him. It was a pretty reduced opening to be able to see.
04:42:00
04:42:18

Q. You had -- you had your magnifying optics, right?

A. Yes, sir.

Q. So you were watching the door; is that right?

A. Yes, sir.

Q. When the door opened that second time, did you -- did you shoot right away?

A. I don't know what you would define as "right away." Obviously, again, the door is opening, and so I'm on the reactionary side of that event taking place. So I still have to gather information.

We talked about earlier that, you know, you asked, hey, were we pretty sure that there was no other people in that apartment. Yeah, we were pretty sure they had done evacuations. But as that door opens, like, I still have an obligation to know my target and know what I'm looking at, and gather that information leading up to that decision to whether or not, you know, use lethal force.

Q. You had a clear view of the door, right?

A. Yes, sir. So when we looked at the map and we were on there and that statement of, hey,

04:43:42
there was nothing in between, you know, me and the front door. It's just obviously, again, it was elevated because of the orientation of how the apartment was set up.

Q. When the door opened, you had a clear view of Shawn, right?

MS. RETTS: Form.

A. What do you define as "clear view"?

BY MR. WOODS:

04:43:55
Q. I mean, you could see him for the second time. When the door opened, you could see Shawn, correct?

MS. RETTS: Form.

04:44:04
A. Yes, sir, I could see him. But, again, like I described, like, you know, he was in this kind of position of advantage away from the door. And like I talked about, the way that the door opened and there was what looked like to me to be another door in the way.

04:44:21
And so like I said before, you know, your standard-sized door opening, it was reduced from that.

BY MR. WOODS:

04:44:33
Q. Okay. The door was wide open at that point, though, correct?

A. I don't recall.

Q. And Shawn was actually on the ground at that point, correct?

MS. RETTS: Form.

04:44:43 A. I don't recall and I don't believe so.

BY MR. WOODS:

Q. Did you verify before shooting that Shawn was holding a weapon?

A. So like I stated previously, with the

04:44:56 lighting conditions and his position from the door when it opened, saw an object that resembled a firearm -- oh, sorry, something just popped up on my screen and I can't see. There we go.

Where was I?

04:45:23 Q. I'll --

MS. RETTS: Hold on. There was a firearm.

A. Yes, sir. So I saw an object that resembled a firearm, and at that point made the

04:45:32 decision to shoot.

BY MR. WOODS:

Q. There were spotlights on that front door, correct?

A. There were lights on the house. I don't

04:45:39 remember specifically if they were like directly

aimed at the front door.

Q. So, earlier, you testified that you saw a muzzle flash from the north side balcony and you fired a shot through the drywall thinking that that would be his location, correct?

04:46:00

A. Yes, sir.

Q. Okay. And then you didn't verify when he opened the door the second time that he actually was holding a weapon, did you?

04:46:11 MS. RETTS: Form.

A. So like I said before, my observations and the lighting conditions and his position in the doorway, I saw what appeared to be a firearm. And based upon his actions and behavior that he had already exhibited, perceived that as a lethal threat to me and the positioning of the other officers that were in my team, that that firearm, and that shape of that what I believed to be a firearm, was in the direction of where our position was.

04:46:27

04:46:47

BY MR. WOODS:

Q. What -- what did the object look like to you?

A. I don't recall specifically, but that was just what I described to them. Again, we

04:46:55

the phone was still open, open line at that time with the negotiators, with the open line -- with an open line to him.

05:05:14
Q. Was there a flag on the wall of the foyer when you would enter the apartment? Do you recall seeing a flag?

A. I don't recall, sir.

(Video played, not transcribed.)

BY MR. WOODS:

05:05:32
Q. Based on the vantage point here, can you see that the door is open?

A. I can't tell completely, sir. I'm sorry.

(Video played, not transcribed.)

05:05:58
BY MR. WOODS:

Q. So that last set of shots, you were firing at Shawn in the doorway, correct?

A. Yes, sir.

05:06:22
Q. Did you warn Shawn before you started shooting at the doorway?

A. I did not.

Q. Did anybody else?

A. I don't believe anyone else did.

05:06:32
Q. Did you advise Shawn that he was under arrest?

A. I directly did not. But I'm sure during the negotiation process and the conversations that they had and the, you know, time frame that we had been out there of making announcements, that's usually something that's said during that process, is that they're under arrest, and they need to comply and come out.

Q. Do you know for sure if anybody ever told him he was under arrest?

A. I myself never specifically spoke to him or issued him any commands. So I -- I don't know.

Q. Did you know that the negotiator had told Shawn to put the gun down and walk out the front door with his hands up?

A. Did I know that?

Q. Yeah.

A. I don't recall if I knew that that night or not.

Q. Why didn't you give Shawn the opportunity to surrender when he opened that door?

A. Because when the door opened, like I described before, and the way that the door opened and the position that he was in and my perception that he was armed with a firearm, I believed him to be a danger to me and the other officers at

that point.

So I used force at that point because, you know, he's -- again, the behavior and everything that had already gone on with him and my perception at the time that he was firing out at us. And then now the door opens and he's in a position of advantage again and pulling something that I believed to be a firearm. I'm not going to give him a warning. I'm going to stop the threat at that point.

Q. Even if you are wrong?

MS. RETTS: Form.

A. Based upon what I saw at that time and what I felt was reasonable in my observations, that's -- that's what I saw at that point. I believed him to be a threat and a danger to me and the other officers that were there.

BY MR. WOODS:

Q. Did he actually have a firearm after you guys entered the place and saw him lying in the doorway?

A. When I went in and helped secure the apartment, I did not deal with the medical treatment of securing him at all. So I went past him, up the stairs and into the apartment. So I

didn't see what was right in that area.
Q. Did you -- do you know if he was found with a firearm in the doorway?
MS. RETTS: Foundation.
05:09:17 A. That night of the incident or what I know now?
BY MR. WOODS:
Q. That night of the incident after you shot at him multiple times and then entered the
05:09:27 apartment, did you know that he did not have a firearm on him?
A. Did I know that he did not have a firearm? No one had communicated that to me. Again, just going off of my observations at that
05:09:43 time and what I had seen, it appeared that he was armed with a firearm at that time.
Q. Okay. We'll mark this as Exhibit 5.
EXHIBITS:
(Deposition Exhibit No. 5 marked for
05:09:47 identification.)
BY MR. WOODS:
Q. This is an indoor Cox surveillance camera that we disclosed. It's titled living, underscore, 060, underscore, 2023-07-06, space,
05:10:31 10-44-09, space, PM.MP4.

custody, and then move on to medical aid after that.

BY MS. RETTS:

Q. In your training, experience, reviewing other SWAT calls around the country, were you made aware of incidents before this shooting where suspects had played possum and used the opportunity to attempt to ambush or attack officers?

05:52:54

A. Yes. We had several of these incidents happen at the Mesa Police Department. I was a witness involved in another shooting that we had in the City of Tempe prior to this one where a suspect was barricaded in a vehicle, and exited it, produced a firearm. Lethal and less lethal rounds were fired. And then he ran to the back of the vehicle after having been shot and then there was another exchange of lethal and less lethal rounds.

05:53:10

05:53:31

And we used the same tactics because he was in a position to where he was still in control of the gun and was not responding to any of the commands that we were giving him. And it would have been dangerous for us to just walk up to him while he was still in control of a firearm after

05:53:46

05:53:59

he had drawn it, got out of the vehicle, and was pointing it at us.

Q. Would it have been relevant to your decision-making whether or not Mr. Gagne was ever told he was under arrest?

A. In terms of my use of force?

Q. Correct.

A. No.

Q. You were asked some questions earlier about whether there was an arrest warrant or a search warrant for the residence before the shooting occurred. Is that relevant to you at all?

A. No, it is not.

Q. Why not?

A. Because his behavior and actions that he's taking are endangering the innocent community that is around there for that. And so in order for us to be able to then conduct the investigation side of that matter, the scene has to be safe first.

So having someone who we see is armed inside of a structure in an elevated position, the information that was being given through the negotiations portion of it, we have to make that

scene safe first in order to then be able to do the investigative part of that.

And so his behavior and everything that he was doing, it obviously was not safe for us to continue to investigate a portion at that point because of the danger and threat that it posed to us and the community.

05:55:14

Q. And when you arrived on scene after you were on scene for a period of time, you actually saw Mr. Gagne with a rifle, with an AK-47, what you believed, correct?

05:55:27

A. Yes.

Q. Is there any significance to you related to that specific weapons platform and the bullets that it can deliver and how that relates to the safety of the community and the surrounding officers?

05:55:41

MR. WOODS: Form.

A. So with my time on the SWAT team and my background and training experience of being a firearms instructor, the round that that weapons platform fires is -- you know, its original creation and design was as an assault rifle. So it's a larger caliber. It's a .762 by 39 cartridge, which is around the same size as the

05:55:51

05:56:09

05:56:24 05:56:41 05:56:56 05:57:09 05:57:25

round that Officer Freeman fired from his sniper rifle. So in the construction of those rounds and the way that they're made, you know, and the ammo that's domestically available in the United States that people can get ahold of, that ammo can very easily defeat most of the body armor that officers are wearing, to include some of the hard ballistic plates because they have to have a certain rating in order to be able to stop that round.

On top of that, most of the construction -- decent amount of construction in the metro areas is drywall, you know, panelling and other things like that. And because of the way that that round is designed and its construction, up to and including a round that normal civilians can buy, that has a steel rod inside of it, that is a mild steel core penetrator round that anybody can buy, it's completely legal.

That round will then penetrate multiple layers of drywall, glass, and other things like that. So the effective range of that firearm is anywhere, you know, between like pointblank range out to several hundred yards that it can cause serious physical injury to somebody, even after going through barriers.

So, like, on the criminal side, we see criminals use that weapon because it's cheap. The ammo is easy to get. And they have information that that ammo can defeat a law enforcement body 05:57:40 armor, to include a decent amount of the ballistic helmets that we have as well. We -- not all of our department has helmets that are ready to stop rifle fire.

So the innocent civilians that are 05:57:52 around and even if they are in their apartments, that round can travel for quite a distance and still cause harm.

BY MS. RETTS:

Q. So if Mr. Gagne had retreated into that 05:58:03 apartment in an area where he couldn't be seen and decided to just start shooting rounds from that AK-47, he could have caused significant injury and death to multiple individuals even if he wasn't intentionally aiming at them, would you agree?

05:58:18 A. Yes.

MR. WOODS: Form. Foundation.

BY MS. RETTS:

Q. Now, A.R.S. 13-410 is specifically the justification statute related to deadly force and 05:58:38 law enforcement. Are you aware of that?

A. Yes.
Q. Subsection C states, "the use of deadly force by a peace officer against another is justified pursuant to section 13-409 only when the 05:58:52 peace officer reasonably believes that it is necessary:"
Subsection 2, "to affect an arrest or prevent the escape from custody of a person whom the police officer reasonably believes:"
05:59:07 Subsection (c), "through past or present conduct of the person which is known by the peace officer that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay."
05:59:22 Based upon everything that you observed on the scene, did Mr. Gagne meet that criteria?
A. Yes, he did.
MR. WOODS: Form. Foundation.
BY MS. RETTS:
05:59:31 Q. Did he possess a weapon system that was capable of causing serious injury or death against the officers, against potential civilians in the area, correct?
A. Yes.
05:59:41 MR. WOODS: Form. Foundation.

05:59:52
06:00:06
06:00:19
06:00:36
06:00:57

BY MS. RETTS:
Q. And if he had fired that weapon, it would have been difficult to respond to him given the scenario that you were all present in, would you agree?
A. Yes.
MR. WOODS: Foundation.
BY MS. RETTS:
Q. You were shown some of the interior video from the Cox surveillance system today. You never had the luxury of having that viewpoint, would you agree?
A. Correct.
Q. In fact, the apartment itself created some difficulties because of the fact that the windows were obscured. Many of the windows were obscured by objects or some other type of accoutrement like foil?
A. Yes.
MR. WOODS: Form. Foundation.
BY MS. RETTS:
Q. In your experience with individuals who have weapons, such as an AK-47 that Mr. Gagne had, and also told the negotiator that he had multiple other rifles and a load of ammunition, have you

STATE OF ARIZONA )

COUNTY OF MARICOPA )

BE IT KNOWN the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Court Reporter and Notary Public of the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; notice was provided that the transcript was available for signature by the deponent; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had and adduced upon the taking of said deposition, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto, nor am I in any way interested in the outcome hereof.

DATED at Mesa, Arizona, this 23rd day of March 2026.

Debra K. Price
Court Reporter
Notary State of Arizona

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Christopher Gagne, in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne,<br><br>Plaintiffs,<br><br>vs.<br><br>City of Mesa, a political subdivision of the State of Arizona; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and in his capacity as a police officer; Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his individual capacity and in his capacity as a police officer; ABC Partnerships I-X; XYZ Corporations I-X, John Does I-X and Jane Does I-X,<br><br>Defendants. | ) | Case No.<br><br>CV-24-01337-PHX-SHD<br><br>Videoconference Deposition of<br><br>SHAWN FREEMAN<br><br>March 12, 2026<br>9:00 a.m.<br><br>CERTIFIED TRANSCRIPT |

Phoenix, Arizona
March 12, 2026
9:00 a.m.

SHAWN FREEMAN,

called as witness herein, having been first duly sworn by the Court Reporter remotely, was examined and testified as follows:

EXAMINATION

BY MR. WOODS:

Q. I'll start out with saying Mr. Freeman. But what is your current rank?

A. Detective.

Q. You're a detective, okay. I probably 09:02:18 will just ask questions. But if I address you, I'll address you as detective. Does that make sense?

A. Yeah, that sounds good. Thank you.

Q. Have you ever had your deposition taken 09:02:29 before?

A. No.

Q. Okay. Just, I guess, a couple quick ground rules. The court reporter has to take down what everybody says, so we've got to do our best 09:02:41 to not talk over each other.

And then you're nodding right now. She can't -- the court reporter can't write that down.
A. Yeah.
Q. So you may hear me from time to time or hear your attorney from time to time say, is that a yes or is that --
A. Okay.
Q. You know, we're not trying to be mean, but it just happens. If you need to take a break, just let me know. If there's a question pending, answer the question and then we can go to a break. Okay?
A. Sure thing.
Q. Will you state your full name for the record?
A. Yup. Shawn Tyler Freeman.
Q. You know that today everything that we talk about and your answers are under oath just like if we were in court, right?
A. Yes, sir.
Q. Okay. What did you do to prepare for this deposition?
A. I met with my attorney and they explained the process of --
Q. Okay.

I don't want to spend a lot of time on it. Where were you born?

A. I was born in Idaho, moved to Arizona as a kid. I pretty much grew up here. Well, I did grow up here. Graduated from Dobson with MTC, got an associate's in criminal justice, worked for In-N-Out Burger traveling with them for about six-and-a-half years, six years, and then got started in corrections.

09:04:56

In corrections, I became a sort commander for their special operations team, did that for about two years. I was total and private corrections for about five-and-a-half years, worked one year with the Bureau of Prisons. Excuse me.

09:05:12

09:05:26

I had already tested for the Mesa police department. So when I got hired by Mesa, I left the Bureau of Prisons and I got hired by Mesa in March of 2014. I graduated the police academy in 2014. And from there, got on to Mesa Police Department SWAT team in February of 2019. And I completed a basic SWAT school there, a hostage rescue school, basic sniper school, an advanced sniper school.

09:05:42

I later took over the less lethal

09:06:05

instructor, chemical munitions instructor, light sound diversionary device instructor. I taught hostage rescue, basic building searches to the academy. And I'm also a precision rifle instructor, handgun instructor, and a rifle instructor.

09:06:27

From Mesa SWAT, I left there in -- I believe it was June of '24 and, now, I'm currently assigned to our U.S. Marshals Violent Offender Unit Task Force.

09:06:49

Q. So you were assigned -- when did you become a detective?

A. June -- when I moved over to the Marshals, so that June of '24.

09:07:05

Q. Okay. Do you still do any SWAT-related tasks or anything like that?

A. Yes. I was just brought back to the SWAT team in a part-time capacity to teach and bring experience to some of the newer operators. So lately, I have been teaching newer sergeants on -- or team leaders on the SWAT team and newer operators hostage rescue.

09:07:28

Q. Okay.

A. I also teach them less lethal, chemical munitions and the bangs, flash bangs, LSDDs.

09:07:55

Q. Okay. And then there's a column over here that says "date completed"?
A. Yes.
Q. Looking at the different trainings that
09:10:37 you see here and then comparing them to the date completed, does that seem accurate?
A. Yes, it does.
Q. Okay. There's two other columns called POST hours and SEAT hours. Do you see that?
09:10:49 A. Correct. Yes.
Q. What's POST hours?
A. POST hours stands for police officer -- it's where I get my certification. It's from AZ POST. I know it's like peace officers -- I don't
09:11:05 know what the S is, and T stands for training.
Q. Okay. What about the SEAT hours?
A. SEAT hours, I'm not sure what that stands for. I believe that's the length of the class, but I'm -- I don't know exactly what that
09:11:21 stands for.
Q. Okay. So if I look down a little bit, I see 16 hours for the 2021 Mossberg Armorer Course.
A. Yes.
Q. Do you recall taking that?
09:11:36 A. Yes, I do.

Q. What is that course?
A. Our department was switching from a Remington 870 shotgun over to the Mossberg, excuse me, shotgun for less lethal.
09:11:54 And when our department was changing over, at the time I was assigned to SWAT and a less lethal instructor, so we needed to go through the armor course to know how to work on those firearms. And that is where I became certified to
09:12:09 work on that firearm.
Q. Okay. So that's a shotgun firearm?
A. Yes, sir.
Q. And what does it launch?
A. We used it. It can shoot any number of
09:12:23 munitions. In particular, we used it to fire less lethal beanbag rounds.
Q. Do you guys still use that?
A. We no longer use the Mossberg. We are back to using the Remington 870, which I'm also an
09:12:42 armorer for, but previously prior to Mesa. And that uses the same beanbag round out of a 12-gauge.
Q. Okay. So at the Mesa Police Department --
09:12:58 A. Yes.

Q. -- officers still shoot the beanbags?
A. Yes.
Q. What other less lethal options do officers use at the Mesa Police Department?
09:13:09 A. We have OC spray, a Taser, a baton, a 40-millimeter projectile. It's a rubber impact round. We have pepper ball rounds. Those are designed to break upon impact and deliver a chemical munition.
09:13:38 Less lethal options? Our hand strikes. We currently are using police jujitsu. Yeah, those are the less lethal force options.
Q. Okay. So scrolling down here, right below -- actually, right below the Mossberg one, I
09:13:59 see the 40-millimeter recertification.
A. Yes, sir.
Q. Is that the one you were talking about with the rubber munition?
A. Yes.
09:14:05 Q. Can that also fire tear gas canisters and things like that?
A. Yes. So on SWAT, we only used 40-millimeter impact rounds as less lethal munitions. It does have the ability to fire chemical
09:14:24 munitions, such as OC or CS.

We used a 37-millimeter launcher to fire our chemical munitions. So that 40-millimeter recertification is only for -- we only used it for impact munitions.

09:14:47 Q. Okay. And then you used the 37 millimeter for chemical munitions?

A. Yes, sir.

Q. Okay. And scrolling down a little bit more, I'm going to go to this line here.

09:14:59 A. Yup.

Q. Do you see the Use of Deadly Force Training?

A. Yes, sir.

Q. Okay. And there was two hours, right?

09:15:05 A. Yes.

Q. And that was on June 14, 2022?

A. Yes.

Q. What -- do you recall that training?

A. Not offhand.

09:15:17 Q. Do you -- do you -- let me ask you this. Based on your training, what -- when is deadly force acceptable?

A. Deadly force is acceptable whenever my life or somebody else's life or serious physical injury is imminent or immediate.

09:15:52

Q. Have you had constitutional law training during your time as a sworn peace officer?

A. Yes, in the basic police academy.

Q. Any training after that on that?

09:16:12 MS. RETTS: Form.

BY MR. WOODS:

Q. Sorry, any constitutional law training following your academy training?

MS. RETTS: Same objection.

09:16:21 A. Yes.

BY MR. WOODS:

Q. When? Do you recall?

A. We cover Graham v. Connor and Tennessee v. Garner in the basic SWAT school. Any time that 09:16:40 I've been training, like -- so I'm instructing the basic police academy in building searches, I teach them about Graham versus Connor and Tennessee v. Garner.

And then, again, in our violent offender 09:16:58 unit school that my unit puts on, there is another portion of that class that we cover, Graham v. Connor, Tennessee v. Garner, Scott v. Harris, NIMS.

Q. Okay. So do you still teach trainees on 09:17:27 those cases?

A. Not so much anymore. So that time has drastically reduced.
Q. When did that stop?
A. When I left SWAT full time is when I
09:17:44 took a step back from teaching the basic academy.
Q. And that was in June of '24?
A. Yes, sir.
Q. Now, you said that deadly force is okay or -- I'm sorry -- justifiable when you are facing
09:18:05 danger or civilians are facing danger in terms of imminent threats or imminent deadly force.
Is that -- do I have that right or did I misstate that?
MS. RETTS: Form.
09:18:18 A. Generally, you have that right.
BY MR. WOODS:
Q. Okay. Will you just repeat it again when it's justifiable?
A. Yeah. So the use of deadly force is
09:18:32 justifiable whenever my life or somebody else's, so another officer and/or a civilian, and the threat of serious physical injury and/or death is immediate or imminent.
Q. Okay. Is the potential of a threat
09:18:55 sufficient to use deadly force?

MS. RETTS: Form.

A. Yes.

BY MR. WOODS:

Q. Okay. What about speculation?

09:19:03 MS. RETTS: Form.

A. I need more -- more context to speculation.

BY MR. WOODS:

Q. How about the word assumption? If you

09:19:22 assume someone is going to be using deadly force against you, are you allowed to use deadly force against them?

MS. RETTS: Form. Foundation. You can answer.

09:19:32 THE WITNESS: Okay.

A. Yes.

BY MR. WOODS:

Q. In your training, are you taught de-escalation techniques?

09:19:47 A. Yes.

Q. What kind of techniques are you taught?

A. I've been taught distance. So the further away we can stay away from a subject, it allows us time to make decisions. Excuse me. So

09:20:11 time and distance help with de-escalation.

My presence helps with de-escalation, being in a marked patrol car, a marked patrol uniform. And then, in my experience, armored vehicles and SWAT men and women are a form of de-escalation.

I have used verbal commands for de-escalation, open lines of communication, just trying to talk to someone versus commands. We'll use or used light sound diversionary devices as a form of de-escalation and to announce our presence.

And then other forms as less lethal, munitions also work as de-escalation.

Q. Now, we're here today regarding the shooting death of Shawn Gagne on July 6, 2023. You understand that, correct?

A. Yes, sir.

Q. Do you know if an arrest warrant was obtained in this case for Shawn?

A. I do not.

Q. When can an officer go into a person's home to seize or arrest a person?

A. They can do that when they believe that -- well, so I think there's two parts to that question. To enter a home, I can do that during

the commission of an investigation. So reasonable suspicion that a crime has been committed.

Arresting someone inside of their home is the same, I believe, that there's probable cause to arrest that person. Depending on circumstances of that arrest, I may have to wait for a search warrant to enter the property and search that for evidence of the crime to further my investigation.

09:22:19

Consequently, the person believed to have committed those crimes would be arrested at that time. There can be an arrest warrant that I can enter a house and arrest somebody on.

09:22:43

Q. Going back to our exhibit. There's a line item here on October 21st, 2022. Do you see that?

09:23:05

A. Yes.

Q. And that's entitled Sniper Instructor School, correct?

A. Yes.

09:23:13

Q. And it was 50 hours; is that right?

A. Yes, sir.

Q. What were you taught in that training?

A. I was taught how to put together and put on a basic sniper school for any student to come

09:23:34

through. So that included how to put together PowerPoint presentations, how to present the material, how to conduct or create drills to get different teaching points across to the students.

09:24:03 I learned different -- there's -- so in optics, there's two different ways of looking through an optic or how they're measured. One of them is milliradian. The other one is MOA, minutes of angle. Those are the only way optics

09:24:29 are created. So I learned the difference in how to use those and how to teach those.

I learned about bullet flight, bullet impacts, different materials. Everything that a base -- a student that didn't know anything how to

09:24:51 get them to be a basic sniper at the end of the school, how to put together a rifle, how to zero it, everything.

Q. Okay. Were you a sniper before that training?

09:25:08 A. I was, yes. In order to get into that school, I had to be a primary sniper for, I believe, it was three years, possibly four years. I was a primary sniper on our full-time SWAT team for about four years.

09:25:23 Q. Okay. And prior to becoming a full-time

sniper, did you go through training to become a sniper?
A. Yes, sir. I attended a basic sniper school in Northern Arizona, and that was a week long. And then, in between there, I attended weekly trainings within our team and surrounding agencies. We trained every Wednesday from about 7:30 to 11:30, 8:30 to 12:30 depending on the time of year.
And then I attended an advanced urban sniper school and that's -- after attending that is when I had met the requirements to become a primary sniper.
Q. All right. On the day -- on July 6, 2023, you fired your weapon, your rifle, twice towards Shawn Gagne. Do I have that right?
A. Yes, sir.
Q. What rifle were you using that day?
A. I was using an Accuracy International, chambered in .308. It's a bolt-action rifle and it had a Nightforce optic on it with a 2.5 to 10 magnification.
Q. You mentioned that there were two different types of optics in use --
A. Yup.

Q. Okay. If an officer shoots someone in their home, is that considered a seizure or arrest?
MS. RETTS: Form. Foundation.
09:32:32 A. Yes.
BY MR. WOODS:
Q. Do you know if anybody told Shawn that he was under arrest?
A. I do not know.
09:32:52 Q. When you arrived at the scene, there were multiple other officers already there, correct?
A. Yes.
Q. Was a perimeter established?
09:33:01 A. Yes. They had a perimeter to the north and to the south. I guess it would be the northwest and the southwest of Shawn's apartment.
Q. Looking back at Exhibit 1. In March of '22, there's a training class called good tactics
09:33:22 and communication skills. Do you see that?
A. Yes.
Q. Do you recall taking a good tactics and communication skills class?
A. Vaguely.
09:33:34 Q. What -- do you recall what you were

taught in that class?
A. I remember we called it de-escalation training.
Q. Okay. So kind of how to talk to a suspect and try to calm a situation down?
09:33:49
A. Yes.
Q. Are SWAT team members -- strike that.
Do SWAT team members receive more advanced firearms training than a regular officer?
09:34:12
A. Yes. We train weekly with our firearms.
Q. Okay. What about tactical training?
A. Yes, that as well. Depending on the topic for that week or hours that are needed, we receive tactical training in multiple different areas.
09:34:35
Q. Okay. And let me ask this. Sort of establishing -- as part of establishing that perimeter when officers arrive, who -- who takes control of the situation?
09:34:54
MS. RETTS: Foundation.
A. As far as the officer's side? I'm --
BY MR. WOODS:
Q. Yeah. Does a supervisor show up? Is there a sergeant, something like that?
09:35:05
A. Yes.

MS. RETTS: Foundation.
A. So when patrol officers arrive on scene, they will establish a -- and this is depending on the call for service and why they're responding.
09:35:20 In this case, they would establish a perimeter to contain the situation. And a supervisor, at least one supervisor, would respond to assist and make leadership decisions on scene for the patrol officers.
09:35:40 BY MR. WOODS:
Q. Does an officer have to actually observe a threat before they use lethal force?
MS. RETTS: Form and foundation.
A. Yes.
09:35:56 BY MR. WOODS:
Q. Can a supervisor who did not observe a deadly threat authorize lethal force?
MS. RETTS: Form. Foundation.
A. On patrol, no. On SWAT, yes.
09:36:12 BY MR. WOODS:
Q. Do you know why that is?
MS. RETTS: Foundation.
A. Yes. In particular, as a sniper, I can be ordered to shoot somebody because the
09:36:27 supervisor on scene, which would be a team leader

or my team commander, might have more information than what I have as an operator. And based off of that information, they can tell me to shoot somebody.

09:36:46 BY MR. WOODS:

Q. Okay. We -- we already talked about perimeter being established. Was Shawn -- in your opinion, was he contained?

MS. RETTS: Form.

09:37:00 A. For the most part. I don't know what was to the east or behind his apartment. I only know what was on the west side.

BY MR. WOODS:

Q. Was he free to leave?

09:37:18 A. No.

Q. From your position, you could actually see Mr. Gagne, correct?

MS. RETTS: Form.

A. At times. He had covered his windows
09:37:46 with foil or a couple windows with foil, and then he had Acadia blinds in front of one of the sliders that faced -- like the slider patio door to the west, that had Acadia blinds.

One window north of that was open. It
09:38:10 was not covered up. The next window was covered

09:38:40
09:38:43
09:39:01
09:39:10
09:39:26

in foil. So at times, I could see him inside of his apartment.

MR. WOODS: Okay. I'll mark this as number 2.

EXHIBITS:

(Deposition Exhibit No. 2 marked for identification.)

BY MR. WOODS:

Q. Tell me when you see that.

A. Yes.

Q. Okay. So this exhibit is entitled Scene Diagram. At the bottom, it's Bates stamped Mesa, underscore, 002315. Do you see that?

A. Yes, sir.

MR. WOODS: I'm just jotting down notes so I don't forget to submit this as an exhibit to Debra. All right.

BY MR. WOODS:

Q. Have you seen this document before?

A. No, I have not.

Q. Okay. Do you recognize the second page marked 2316? Do you recognize that as being the scene and aerial overview?

A. Yes.

Q. Okay. Have you seen the aerial overview

left of that that was uncovered.

When I arrived on scene, I saw Mr. Gagne holding an AK-47 in high port with an optic on top of it. Excuse me. When I saw that, I knew I had to get to an elevated position above the patrol officers, because Shawn had the high ground on all of the patrol officers outside.

I initially tried making contact with the resident in that apartment -- I don't recall the number, but the location that is circled -- and was unable to make contact. So I was trying to go get a ladder to climb up on to his patio, which I carry in my vehicle. Excuse me.

When that resident came out to the patio to see what was going on, I asked if I could get inside, and he granted me access to his residence and let me in. That is how I entered that apartment.

Q. Okay. And once you entered that apartment, did you set yourself up as a sniper?

A. I did. I gave the resident instructions to get as far back as he can in his residence and to get low. And I darked out his apartment by turning off his TV and all of his lights, and got in position to -- with my bolt gun, my sniper

09:42:19 09:42:32 09:42:47 09:42:56 09:43:11

rifle, and a tripod so that I could get observation on Mr. Gagne.

Q. Okay. And you could do that from that location using your optic?

A. Yes, sir.

Q. Does your sniper rifle have a suppressor on it at that time?

A. It does.

Q. And even though it's a bolt-action, it still supports a suppressor, correct?

A. Yes, sir.

Q. If it didn't have a suppressor, it would make a loud noise, correct?

A. Yes. The overpressure would hurt my ears and cause permanent damage.

Q. Unless you were wearing ear protection, right?

A. Unless I was wearing ear protection, correct.

Q. When a bullet gets shot -- let me ask you this. In your experience, when a bullet is shot in kind of a smaller area, are there reverberations or like echoes from that bullet?

MS. RETTS: Form.

A. Yes. We call that overpressure. It's

A. Yes, sir.
Q. Does that give you -- have you used that type of optic before this incident?
A. Yes.
09:56:41 Q. So you're pretty familiar with it?
A. Yeah, I'm very familiar with it. I trained with it every week. Yes, I've used it many times.
Q. Okay. Does it give you a pretty good
09:56:56 view?
MS. RETTS: Form.
A. It definitely enhances my field of view, yes.
BY MR. WOODS:
09:57:03 Q. Do you know how far apart the suspect's apartment was from your sniper location?
A. Approximately 40 yards.
Q. At 40 yards, does -- does the optic that you were using -- what kind of -- take that back.
09:57:25 What kind of detail could you see using your optic that night?
A. So at night -- the way an optic is designed, it's designed to take in light. And the more light it can take in, the sharper an image
09:57:45 is. So in darker conditions, images are not as

Q. Okay. And so you saw Shawn holding the AK-47 in high port?

A. Correct.

Q. Why don't you describe to me -- well, actually, let's stop this.

09:59:55

You shot twice, correct?

A. Yes.

Q. Why don't you describe to me the 30 seconds before you shot the first shot?

10:00:05

A. Okay. As I was getting into that apartment, I had been notified via my radio from negotiators that Shawn said he was going to start shooting patrol cars if we didn't back up. And they had heard him chamber a round into a rifle in the background.

10:00:30

So as I was getting into position, I knew I didn't have a lot of time before Shawn had the potential to make good on his words. When I got into position and I observed Shawn walking with an AK-47 across that window, I knew it was a matter of time before he launched an attack on our patrol officers, shooting their patrol cars that he said he was going to do.

10:00:49

He was too far into his apartment, meaning distance between the window that was

10:01:16

uncovered and his position inside of his apartment, was too far to shoot or intervene at that time. So I didn't take the shot. It wouldn't have been an effective shot if that were the case.

10:01:43

He disappeared out of view. And the next time that I saw Shawn was at that slider to the south, the balcony to the south manipulating the blinds.

10:02:07

Q. Which -- from your perspective, what type of blinds were they?

A. I think they're called Acadia blinds. They're the blinds that they dangle from the top of the slider, kind of sway back and forth. You

10:02:26

can draw them to pull them all the way back or manipulate them to lay flat against the glass to obscure view and light, or rotate them and allow light in.

Q. Was there another window with a

10:02:44

different type of blinds on it?

A. There was another window that had foil covering it. So I don't consider those blinds, but -- and then I didn't see another set of blinds on the window that was unobscured.

10:03:05

Q. Okay. All right. I'll share my screen.

right?
A. I --
Q. They're horizontal?
A. They're horizontal, yeah. I don't know
10:04:39 the name of them. But yes, they're horizontal
blinds.
Q. And when you pull the string, they
compress upwards?
A. Correct. Yeah, that's what they look
10:04:50 like.
Q. Could you see that window from your
position?
A. Yes, I could.
Q. And that window gives some visibility,
10:04:56 doesn't it?
A. Yeah. It appears in this picture that
the blinds are open, so they're allowing light
in -- in and out of that window.
Q. Now, on the -- on the balcony with the
10:05:16 vertical blinds that we were talking about, could
you see through those? Were there some gaps or --
A. Initially, no, I could not see through
them. When I decided to shoot is when I saw the
gap. The gap was created in the blinds. Excuse
10:05:47 me.

Can we take a restroom break?
MR. WOODS: Yeah, let's do that. Five minutes.
(Whereupon, the proceedings were in recess at 10:06 a.m. and subsequently reconvened at 10:12 a.m., and the following proceedings were held of record:)
BY MR. WOODS:
Q. When you were in the apartment set up as a sniper, you had cover while you were there, correct?
A. I would not say cover. I would say concealment. We teach cover is something that can stop bullets and I'm protected from a bullet strike. And concealment is out of view.
Q. Okay. You weren't out on the balcony, correct?
A. No, I was not.
Q. But was the balcony in front of you?
A. Yes. I was recessed in the living room and I had that resident's glass slider all the way open, looking through that slider over the balcony towards Shawn's apartment.
Q. Okay. At any time if Shawn had seen you and had aimed something at you, you could have

moved behind the doorway or further into the apartment or to the side or somewhere to take cover, correct?

MS. RETTS: Form. Foundation.

10:13:48 A. No. The way -- so I've been on several calls with AK-47s. And the way that that round, the 762 by 39, performs, it would easily go through a wall. So need to have true cover, I would have had to have been behind an armored

10:14:15 vehicle or layers of cinder block, something much harder than the stucco construction of that apartment building.

BY MR. WOODS:

Q. You weren't out, though, in the parking

10:14:30 lot, right?

A. No.

Q. Did you or anybody evacuate the apartments around the scene?

A. No.

10:14:49 Q. Presumably, each of the apartments are connected in different kind of sections, right?

A. Correct. The apartment -- and I can't give you a number -- but directly south of Shawn's apartment downstairs, so the first floor, I could

10:15:15 see a woman through her slider door still inside

MS. RETTS: Form.
A. Again, I -- I couldn't see his left hand. So I don't know if his left hand was holding the rifle or if it was moving the blinds.
10:34:19 BY MR. WOODS:
Q. Okay. So after peeking through the blinds it says, "Officer Freeman said that he saw that the gun was in the suspect's right hand," correct?
10:34:33 A. Yes.
Q. "He believed the suspect was peeking out at patrol officers down below in the parking lot." Do I have that right?
A. Yes.
10:34:43 Q. "Officer Freeman stated that this gave the suspect a tactical advantage." Did I read that right?
A. Correct.
Q. "Officer Freeman told me that this was
10:34:51 when he took his first shot." Do I have that right?
A. Correct.
Q. "As Officer Freeman told me this, he was motioning with his hands"; is that correct?
10:35:02 A. Yes.

Q. "I then asked him to explain what he was motioning." Do I have that right?
A. Correct.
Q. Those sentences that we just read, are
10:35:12 those an accurate summary of what you told the investigator?
A. Yes, they are.
Q. It goes on, "Officer Freeman said that the rifle was in his right hand and his left hand
10:35:23 was opening the blinds."
Do I have that right?
A. Yes.
Q. Okay. Is that an accurate summary of what you told the investigator?
10:35:30 A. Yes, it is.
Q. "Officer Freeman believed that the suspect was looking for where he wanted to shoot at patrol officers."
Did I read that right?
10:35:40 A. Yes.
Q. "Officer Freeman explained that from the suspect's elevated position, he had a good view of the officers' positions."
Do I have that right?
10:35:48 A. That is correct.

10:35:56
10:36:14
10:36:20
10:36:40
10:37:07

Q. Okay. So everything we just read, is that -- are those an accurate summary of what you told the investigator?

A. Yes, sir.

Q. Next paragraph. "I asked Officer Freeman to explain what position the suspect's gun was in at this time. He told me that the suspect had the gun in his right hand and that it was up, but not in the low ready position at this point."

Do I have that right?

A. Correct.

Q. Is that an accurate summary of what you told the investigator?

A. Yes, it is.

Q. What's the low ready position?

A. Low ready is a carry position where the muzzle is pointed down towards the ground in a safe direction. And the stock, it would be almost vertical. So the muzzle facing down and the stock of the weapon up by the shooter's face.

Q. Is low ready a position that makes it easy to put the rifle -- or shoot a rifle?

A. Low ready is a position to safely move around, minimizing any kind of property damage and/or injury to another person. So it's a

position that is taught to move around with that rifle where if the gun does go off, there's minimal property damage and/or injury to surrounding people.

10:37:22 Q. Okay. Then it goes on to say that Officer Freeman stated that this would have been a simple movement from the suspect and he could begin firing on the officers.

Do I have that right?

10:37:52 A. Yes.

Q. Is that an accurate summary of what you told the investigator?

A. Yes.

Q. The next sentence is a longer one. It

10:38:00 says, "Officer Freeman told me that because he had heard the suspect had already fired a round from his AK-47, he was concerned because he knew what that round can penetrate through vehicles and that the officers would not stand a chance."

10:38:13 Do I have that right?

A. Yes.

Q. Is that an accurate summary of what you told the investigator?

A. Yes.

10:38:18 Q. Who told you that Shawn had already

fired a round from his AK-47?

A. That was information that I was told prior to arriving on scene, and that was what had initiated the initial call for service from patrol officers.

10:38:35

Q. And you know for sure that he had shot a round from his AK-47 before you had arrived?

MS. RETTS: Form.

A. Not from the AK-47. I don't know for sure, but I knew shots had been fired.

10:38:47

BY MR. WOODS:

Q. Okay. But you told the investigator that he had fired a round from his AK-47 or that you had heard that, correct?

10:38:57

A. Yes.

Q. But so just a second ago, you said not from the AK-47.

MS. RETTS: Form.

BY MR. WOODS:

10:39:07

Q. Do I have that right?

A. Did I -- like, are you asking if I had that right? Like, did you just say that or did I just say that?

Q. Yeah. You just said that, correct?

10:39:19

MS. RETTS: Form.

A. Correct.

BY MR. WOODS:

Q. Okay. It goes on to say that Officer Freeman told me that his first round was aimed at the suspect's head.

Do I have that right?

A. Yes.

Q. Why would you aim at the head?

A. Okay. So based off of everything that had happened, the threats that he was making where he said he was going to start shooting at officers, the -- so the totality of the circumstances, the civilians that were still inside of their apartments that had not been evacuated, the patrol officers that were behind the vehicles but outgunned and out positioned, his -- the negotiator's hearing him chamber a round, and knowing what that round does through vehicles and to people, I thought it was immediately necessary to stop him from ambushing the patrol officers. And so that is why I aimed at his head.

Q. Did you receive an order from your team lead to take a shot?

A. I did not.

Q. Did anybody relay to you that a shot was necessary?
A. No.
Q. And we talked earlier or just a few seconds ago or minutes ago that you told the investigators that he was walking around with an AK-47 in his right hand. Do I have that right?
A. Correct.
Q. And that earlier, you said that he had it in the high port position, correct?
A. Correct.
Q. And then you told the investigator that he didn't have it in the low ready position, correct?
A. Correct.
Q. Did he ever point the rifle at you?
A. At me specifically?
Q. Yeah.
A. I cannot -- I cannot answer that.
Q. Well, you were watching him, right?
MS. RETTS: Form.
A. Yes.
BY MR. WOODS:
Q. Were you --
A. At patrol officers, yes.

shoulder and use your left hand to move the blinds to look at where you're going to begin firing, or aim. So that is what I think is -- is what he was doing, was aiming where he wanted to begin shooting.

10:47:19

Q. Okay. The report goes on to say, "Officer Freeman told me that his first round was aimed at the suspect's head." We already went over that.

10:47:30

"He told me he was unsure of where he hit the suspect, but that the gun stayed in the same positioning with the suspect disappearing from view."

Do I have that right?

10:47:39

A. Yes.

Q. Okay. So was he still -- is that an accurate summary of what you told the investigator?

A. Yes.

10:47:46

Q. Okay. So was he still aiming the gun after -- after you had shot him?

A. After my first round, he went down to the ground. The rifle remained up. So, no, he was not aiming after that first round.

10:48:07

Q. Okay. It says, "just after this, he

told me that Officer Widmer arrived to his location to be his second sniper."
Do I have that right?
A. Correct.
10:48:17 Q. Is that an accurate summary of what you told the investigator?
A. Yes.
Q. "At this time, he saw the suspect grab the gun and move backwards and to the south. He
10:48:28 then saw the suspect use his hand again to look through the blinds again."
Do I have that right?
A. Yes.
Q. Is that an accurate summary of what you
10:48:35 told the investigator?
A. Yes.
Q. Okay. So you saw him use his hand again. Would that be his left hand?
A. I -- I don't remember that specific
10:48:47 movement or gesture. I remember him standing behind the Acadia glass that had not been shot through with the AK-47 in high port once again.
Q. So again in high port?
A. Yes.
10:49:08 Q. So he wasn't aiming it, right?

A. Not the second time, no.
Q. All right. It then says, "it was at this time that he said he fired a second time at the suspect's torso."
10:49:24 Do I have that right?
A. Yes.
Q. Okay. So he had the gun at high port and you told the investigator that you fired a second time at the suspect's torso; is that right?
10:49:33 A. Yes.
Q. Okay. And again, high port, that's when the gun is up -- positioned up and rested against the shoulder, correct?
A. Correct.
10:49:40 Q. And you knew he was on the phone at that time, correct?
A. I did not know.
Q. You didn't know that he was talking to the negotiator?
10:49:48 A. Not at that time, no.
Q. You didn't hear it over the radio?
A. Not that I remember, no.
Q. Now, this sentence here that we just read about firing the second time, is that an
10:50:04 accurate summary of what you told the

investigator?
A. Yes, sir.
Q. Okay. So then you say that -- it says -- I'm sorry. It says, "after this, Officer Freeman said the suspect moved to the north and deeper into the structure out of his view"; is that right?
A. Yes. Correct.
Q. Is that an accurate summary of what you told the investigator?
A. Yes.
Q. The next sentence says, "shortly after this, Officer Freeman stated that the suspect fired multiple rounds out the same window."
Did I read that right?
A. Yes.
Q. Is that an accurate summary of what you told the investigator?
A. Yes, sir.
Q. It says -- it goes on, it says, "he could see through his optics that the glass -- or that glass was leaving the residence. He was unsure of the direction those rounds went in. He stated that he later heard a volley of fire from down below."

Do I have all that right?
A. Correct, yes.
Q. Is that an accurate summary of what you told the investigator?
10:51:00 A. Yes, sir.
Q. Okay. So you said that the suspect fired multiple rounds out the window; is that right?
A. Yes.
10:51:07 Q. Did you see multiple rounds fired outside that window?
A. I heard shots and saw the glass breaking. The sound was definitively different from a suppressed rifle, which is what SWAT guys
10:51:26 were carrying, versus an unsuppressed AK-47.
Q. Okay. But you told the investigator that Shawn had fired multiple rounds out the window, correct?
A. Correct.
10:51:55 MR. WOODS: And I don't know if I said it or not, we'll mark that as Exhibit 4. I'll stop my share. I need to take one minute.
(Whereupon, the proceedings were in recess at 10:52 a.m. and subsequently reconvened at
10:52:35 10:52 a.m., and the following proceedings were

They found you in violation of DPM 1.4.1, unnecessary or improper use of force, correct?
A. Correct.
MR. WOODS: We'll go ahead and mark that as Exhibit 6.
EXHIBITS:
(Deposition Exhibit No. 6 marked for identification.)
BY MR. WOODS:
11:32:09 Q. When you shot Shawn -- when you shot Shawn, could you see him bleeding?
A. No, I could not.
Q. When you saw him with his hands up, he was walking towards the front door, correct?
11:32:28 MS. RETTS: Form. Foundation.
A. I don't know that.
BY MR. WOODS:
Q. He was passing by the window with the horizontal blinds, correct?
11:32:34 A. Yes, the unobscured window. Yes.
Q. Okay. So you could see him through that, correct?
A. For a split second, yes.
Q. And, previously, he was in the kitchen area, correct?

were covered by officers, correct?
A. Correct. I don't know the layout of that apartment. Looking at your video, yes, there's a slider to the north that had officers like standing up there.
The front door in the middle opens to the west. There was officers there. And then the slider to the south, there was officers there.
Q. Okay. So all -- what we see on the screen right now, any of the access points, the windows, the doors, those all had officers covered, correct?
A. Yes.
Q. And, again, you didn't report that you saw him with his hands up to anybody?
A. No. Well, I did to Officer Widmer who was --
Q. Sure.
A. -- in the room with me, but not via my video.
Q. Okay. Right. But as an observer, you didn't relay that to anybody over the radio, correct?
A. Correct.
Q. All right. Now let's just start at 19

Q. He had reported -- strike that.
Did you know that Shawn had reported to the negotiator that he was armed with multiple weapons and ammunition?
11:52:07 A. Yes. He said he had AKs and ARs inside of his apartment.
Q. Had Shawn been searched to see if he had a handgun on his person as he made his way toward the door?
11:52:20 A. No. It was not safe to search him yet.
Q. Had you searched the apartment to determine whether or not there were any other firearms that were hidden through that apartment, including at the front door?
11:52:31 A. No, we had not.
Q. Did you receive information on the scene, before you fired, that Shawn had come to the door on multiple occasions with the rifle in his hand?
11:52:41 A. Yes, I had.
Q. Did you know whether or not Shawn had left the rifle down at the front door?
A. No, I did not.
Q. Your use of force as a law enforcement
11:52:52 officer in Arizona is governed by A.R.S. 13-410;

is that correct?

A. Correct.

Q. And A.R.S. 13-410 states that the use of deadly -- 10(C)(2) states that the use of deadly force by a person is justified -- strike that.

11:53:10

A.R.S. 13-410(C) states, "the use of deadly force by a peace officer against another is justified pursuant to section 13-409 only when the peace officer reasonably believes that this it is necessary:"

11:53:34

Under subsection (2), "to effect an arrest or prevent the escape from custody of a person whom the peace officer reasonably believes:"

11:53:45

Subsection (c), "through past or present conduct of the person which is known by the peace officer that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay."

11:53:59

Are you familiar with that section?

A. Yes, I am.

Q. And that section doesn't specifically even require that an individual point a weapon directly at anyone if you reasonably believe that they are likely to endanger human life or inflict

11:54:09

serious bodily injury; would you agree?
A. I do agree.
Q. Based upon what you knew at the scene, given the rifles that Mr. Gagne had access to, could those weapons inflict serious injury or death upon someone?
A. Yeah. Those AK-47 rounds, it's a high-powered rifle. I have been on scenes where they will ricochet off the ground, off the cement, and go up through vehicles and they continue to travel through the undercarriage, through a trunk, through the seat, through the roof of a car. They cut through anything.
It would have gone through the walls at -- the structural walls of the apartment complex. It is a -- it is a very dangerous weapon. And that magazine that he had on it implied there was 30-plus rounds inside of that magazine. And it would have inflicted a lot -- a lot of damage.
Q. And even if he wasn't specifically aiming at anybody, that weapon, based upon the rounds that it carries, could seriously injure or kill someone?
A. Yes. It would have hurt the civilians that were still inside of their apartment or any

of the multiple patrol officers that were hiding behind vehicles.

11:55:37

Q. Those patrol officers and the ballistic helmets they had and their regular vests that they wear, are those rated to stop the ammunition from an AK-47?

MR. WOODS: Foundation.

A. A lot of them are not.

BY MS. RETTS:

11:55:43

Q. What about from an AR-15?

MR. WOODS: Foundation.

A. Possibly, depends on the type of AR round, the .556 round. So a green tip round, no, it is not going to stop. A hard ball ammunition round, possibly.

11:55:59

BY MS. RETTS:

Q. The video that you saw from the internal Cox surveillance video, that was not your perspective on the night in question, correct?

11:56:07

A. No, not at all.

Q. And your perspective was through your scope, correct?

A. Yes.

Q. And you had a limited view due to the fact that Mr. Gagne had covered a good portion of

11:56:14

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Court Reporter and Notary Public of the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; notice was provided that the transcript was available for signature by the deponent; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had and adduced upon the taking of said deposition, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto, nor am I in any way interested in the outcome hereof.

DATED at Mesa, Arizona, this 18th day of March 2026.

______________________________

Debra K. Price
Court Reporter
Notary State of Arizona

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher Gagne, in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne,<br><br>Plaintiffs,<br><br>vs.<br><br>City of Mesa, a political subdivision of the State of Arizona; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and in his capacity as a police officer; Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his individual capacity and in his capacity as a police officer; ABC Partnerships I-X; XYZ Corporations I-X, John Does I-X and Jane Does I-X,<br><br>Defendants. | Case No.<br><br>CV-24-01337-PHX-SHD<br><br>Videoconference Deposition of<br><br>MATTHEW ADAIR<br><br>March 12, 2026<br>12:20 p.m. |

CERTIFIED TRANSCRIPT

Phoenix, Arizona
March 12, 2026
12:20 p.m.

MATTHEW ADAIR,

called as witness herein, having been first duly sworn by the Court Reporter remotely, was examined and testified as follows:

EXAMINATION

BY MR. WOODS:

12:22:20

Q. Looks like good afternoon, Mr. Adair.
A. Good afternoon.
Q. What's your current rank?
A. Sergeant.
Q. Okay. I'll call you sergeant as we move forward.
A. Sure.
Q. Have you ever had your deposition taken before?

12:22:29

A. Yes, I have.
Q. Will you state your full name for the record?
A. It's Matthew Adair.
Q. How many times have you had your deposition taken?

12:22:36

A. Afterwards, yes. I had more negotiators show up.

Q. And who were they?

A. The only one I can tell you for sure was Officer -- or Detective Orr and then I believe that one of our sergeants, Sergeant Waters, was out there also.

Q. Do you know if a search warrant had been obtained when you got there?

12:34:30 A. When I had arrived?

Q. Yeah.

A. Not that I know of.

Q. Were you ever informed that a search warrant was obtained?

12:34:38 A. I don't know for sure if a search warrant at that point was ever obtained or not. I don't know.

Q. You established communication with Shawn, correct?

12:34:50 A. Correct.

Q. He stayed on the phone with you, didn't he?

A. Sorry, say that again.

Q. He stayed on the phone with you, didn't he?

12:35:01

12:37:02
12:37:12
12:37:32
12:37:44
12:37:49

Q. Okay. Is this the document you have in front of you?
A. Yes, it is.
EXHIBITS:
(Deposition Exhibit No. 1 marked for identification.)
BY MR. WOODS:
Q. Okay. I'm putting up on the screen what is titled Mesa Police Department Narrative Text hard copy. At the bottom, it's Bates stamped Mesa, underscore, 002012 and it runs to 2013. It's two pages.
In the middle here on this narrative it says, "with Officer Gutierrez, 21423, as my secondary, I attempted to call Shawn back and he did not answer. Shawn called his girlfriend phone back seconds after I hung up at approximately 2231 hours."
Do I have that right?
A. Yes.
Q. Did you write that?
A. I did.
Q. Is that accurate?
A. Yes.
Q. But Gutierrez was your secondary, what

A. Yes, but I -- when I am negotiating with somebody, I am not listening to my radio.

Q. Okay. But you have the ability to broadcast, hey, suspect saying he's down, right?

12:55:33 A. I do, but that's what my secondary's job is.

Q. Okay. So we're just punting that on to Orr?

MS. RETTS: Form.

12:55:43 A. Punting it? I wouldn't necessarily say punting it. But if it was relayed, it would have came from him.

BY MR. WOODS:

Q. So that --

12:55:51 A. Because that's not normally my job as a primary negotiator.

Q. So if Orr didn't relay that and you didn't relay that, how would the information be given to your fellow officers that a suspect is 12:56:08 yelling, he's down, he's down, he's down?

A. Then, I guess, that at that point if that wasn't relayed, then he -- they wouldn't know.

Q. What does, I'm down, I'm down, I'm down 12:56:24 mean to you?

MS. RETTS: Foundation.
A. Only thing that I thought at that point was that he was possibly shot.
BY MR. WOODS:
12:56:32 Q. Okay. Because he had told you earlier that he was hit, right?
A. Correct.
Q. Okay. So you knew that he had been shot, right?
12:56:41 A. Correct.
Q. Okay. And then you hear another volley of shots, correct?
A. A third volley, yes, later. After the second one, after he was shot, yes.
12:56:52 Q. Okay. And then you heard him yelling, I'm down, I'm down, I'm down, correct?
A. Correct.
Q. So you knew he was shot. You knew he was yelling he was down. But you didn't relay any
12:57:02 of that information to anybody, correct, you personally?
A. Me personally, no. I don't believe it was me, no.
Q. Did you tell Orr, Detective Orr? Did
12:57:14 you tell him, hey, relay this?

the front door with a rifle?
A. Correct.
Q. And as you watched that video and Shawn was in that bent over position with his hands in front of him, did you see that he still had the phone in his hands?
02:00:54
A. I couldn't tell if he had a phone in his hand or not.
Q. But he was still on the phone with you. So he had the phone somewhere on his person, would you agree?
02:01:03
A. That would -- I would believe so.
Q. Have you been on other scenes where this level of threat was connected to a person who also told you that they were wearing body armor?
02:01:22
A. I've been on scenes where people have stated they have body armor, yes.
Q. Has it been coupled with the type of homicidal threats that you heard from Shawn?
02:01:34
A. Not to the extent that this was, no.
Q. And during the course of the negotiation, Shawn told you in fact that he had multiple firearms and lots of ammunition?
A. Correct.
02:01:48
Q. Do you recall him saying that he wanted

to -- to the effect of start the next Iraq war?
A. He had stated something to the effect of, hey, come in and we can have an Iraq war, something to that effect.
02:02:00 Q. Did he repeatedly state that he was not coming out?
A. Yes.
Q. Did he ever verbally tell you that after he was shot he intended to surrender and that he
02:02:09 was going to come out?
A. No.
Q. As a negotiator, if you are simultaneously or after the fact putting information out on the radio -- during the time
02:02:33 you're putting information on the radio, you could miss vital information that was provided by the suspect?
A. Correct.
Q. And in terms of information that would
02:02:44 be communicated on the radio in your secondary, they do not communicate everything; is that true?
A. Correct.
Q. The radio channel needs to be kept clear for other important communications as well?
02:02:55 A. Correct.

that had went out over the radio, but I'm not sure.

Q. Did you advise anybody on scene that you had advised Mr. -- I'm sorry, Shawn, to put his gun down and walk out the front door with his hands up?

A. He was given surrender instructions multiple times, which I know that some of those were advised.

02:05:40
Q. Did you tell Shawn that he was under arrest?

A. No.

Q. Did you warn Shawn that lethal force was going to be used against him?

02:05:50
A. I don't recall. I don't believe so.

Q. Did you do anything to try to stop the SWAT team from initiating lethal force?

A. No. That's not my job.

MR. WOODS: Nothing further.

02:06:13
MS. RETTS: All right. We will read and sign.

STATE OF ARIZONA )

COUNTY OF MARICOPA )

BE IT KNOWN the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Court Reporter and Notary Public of the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; notice was provided that the transcript was available for signature by the deponent; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had and adduced upon the taking of said deposition, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto, nor am I in any way interested in the outcome hereof.

DATED at Mesa, Arizona, this 19th day of March 2026.

Debra K. Price
Court Reporter
Notary State of Arizona

# EXHIBIT 10

**Mesa Police Department**

**NARRATIVE TEXT HARDCOPY**

**(13A-3 AGGRAVATED ASSAULT)**

**GO# ME 2023-141208**
**Active/Open**

## Narrative Text

**Type** Original Narrative
**Author** P19506 - WIDMER, T. (19506)
**Related Date** Jul-07-2023 17:12

On 07/06/23 at approximately 2215 hours, I was working as an officer on the Mesa Full Time SWAT team and was informed that there was a call occurring where a subject strangled his girlfriend and had fired shots off in his apartment with an AK-47. Myself and approximately five other SWAT officers were asked to start headed to 1233 N Mesa Dr. in Mesa AZ reference this call in case patrol needed more bodies.

While in route to the call, patrol did their best to get the subject out of the building, however, every attempt was futile. Some attempts made where: Verbal over the PA system of a tahoe and bean bagging the front door in attempt to get the subject to wake up or comply with commands being given him.

As I arrived on scene, I heard over the radio that movement was seen in the upstairs window. Officers stated that the subject walked past the south windows and was making his way to the front. However, when officers observed the subject open the front door, it was observed that he was holding a semi-automatic rifle. He was given surrender instructions but did not comply. Instead of complying, the subject slammed the front door.

As I approached the subject's apartment, I went to the south side and supported patrol there. While assisting patrol, the subject came to the south facing windows numerous times but only held the rifle to his side.

Once there were enough SWAT officers on scene, I was tasked with going to support Officer Freeman on a sniper hide deployment. As I approached the unit where Officer Freeman was, I observed the subject at the slider glass doors. I observed him attempting to look at the officers on the ground level while still holding a rifle. Around this point, I heard Officer Freeman fire once. As I was moving inside the apartment, I observed the subject stagger to his feet and move off to the north of the structure.

The subject started shooting his rifle out at police from both sides and he was met with appropriate response of officers firing back at him to stop the threat that was presented to them. The subject collapsed near the front door with his leg visual to another SWAT officer.

A plan was put together to evacuate another unit and then move up to the subject's apartment. When the time came, the plan to move up was implemented. The building was searched without incident and the subject was placed into custody and handed over to Mesa Fire Personnel for medical attention. I had no further involvement in this case.

NFI

# EXHIBIT 11
# (Non-Electronic Exhibit)
# Living Room Video
# 10-41-20 PM

# EXHIBIT 12

Robert Handy
20118 North 67th Avenue, Suite 300-452
Glendale, Arizona 85308
Phone: (714) 916-7439

Christina Retts, Partner
Wieneke Law Group, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

July 7, 2026

**Regarding:** **Christopher Gagne in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne, et al. v. City of Mesa, et al. United States District Court, District of Arizona Civil Action No. 24-cv-01337**

Dear Ms. Retts,

The following report documents my analysis and opinions regarding the July 6, 2023, Mesa Police Department's response to a domestic violence call of an armed person who had fired a shot call which resulted in the death of Shawn Gagne.

I have reviewed the reports, documents, photographs, video recordings, audio recordings, and other materials listed below. I understand other discovery materials, such as depositions or other documents, may still be produced for review. If additional materials are provided, I reserve the right to provide a supplemental report that adds to or refines my opinions as may be necessary.

## ***Expertise***

I currently serve as the Vice President of Public Safety for Grand Canyon University (GCU) in Phoenix, Arizona. Before serving at GCU, I was the police chief in Huntington Beach and San Bernardino, California. I am a policing executive with over 35 years of comprehensive law enforcement experience. My experience includes extensive training and teaching new police officers, veteran officers, and command-level officers. In addition to reviewing thousands of use-of-force cases and hundreds of police shooting cases in my policing career, I have also been retained as a subject matter expert to review police use-of-force incidents and policing practices and procedures nationwide. Attached is my curriculum vitae for a more detailed description of my related experience.

## ***Documents Reviewed***

I have examined the following reports, documents, recordings, and photographs as part of my analysis, in reference to my opinions, attached as Schedule A.

## ***Brief Incident Summary***

On July 6, 2023, at approximately 9:33 p.m., Mesa police officers responded to a call of a person being threatened and a shot fired at an apartment at 1233 North Mesa Drive Apartment #2164. As officers arrived in the area, they set up a perimeter around the building the unit was in and began to gather intelligence by interviewing witnesses. Eventually officers were able to contact the suspect, Shawn Gagne, by telephone and attempted to negotiate his surrender. During attempts to negotiate Gagne's surrender, at approximately 10:42 p.m., an officer-involved shooting occurred, and Gagne was shot and killed by officers.

## ***Expert Opinions and Basis for Opinions***

Based on a comprehensive review of the listed materials and decades of policing experience, my opinions in this report are made to a reasonable degree of compliance with police practices/law enforcement standards and professional certainty. For organizational purposes, my main opinions are numbered and bolded, followed by the basis for each opinion. The narrative in the basis for each opinion also may include additional opinions.

### Opinion #1

**Under the presented series of facts, and to the extent a jury finds these facts credible and that they occurred as stated, officers used appropriate tactics in their approach to Gagne's apartment and initially had reasonable suspicion to detain him for further investigation into the crime of aggravated assault. During the initial investigation, the reasonable suspicion developed into probable cause to arrest Gagne for multiple crimes, including aggravated assault involving a deadly weapon.**

*Basis for Opinion*

A series of court decisions interpreting the United States Constitution governs an officer's authority to contact, detain, and arrest individuals. Officers are taught laws of arrest based on these decisions, starting with reasonable suspicion to temporarily detain a person, probable cause to arrest an individual, and the authority to use force to detain or arrest a person. Reasonable suspicion is defined as "Articulable facts to believe that a crime has occurred, is occurring, or is about to occur, and the person stopped is involved in that criminal activity." Probable cause is defined as, "Facts and circumstances must demonstrate a 'fair probability' that the person committed the crime to be arrested[1]."

On July 6, 2023, at approximately 9:33 p.m**.,** the Mesa Police Department received a 9-1-1 call from Cindy Schramm at 1233 North Mesa Drive #1152. She was calling regarding her neighbor, later identified as Shawn Gagne, who threatened her by saying he would "blow my brains out" and fired a shot from a gun. Gagne was reported to be in the unit above Schramm in Building 41, #2164. Schramm said she was talking to Gagne's girlfriend, and Gagne came out of the front door and told her to "Get out of my fucking area. If you don't get out of my area, I am going to blow your fucking brains out.[2]"

---

[1] AZPOST Laws of Arrest Outline 2.2, August 2021, AZPOST Search and Seizure Outline 2021
[2] Recording of 9-1-1 call from Cindy Schramm, Mesa 001989

Schramm reported that she heard Gagne load the weapon and then fire it. Schramm did not know if the gun was fired at her or into the air as Gagne was on the patio above her. Schramm described Gagne as a White male, approximately 30 years old, short hair, stocky build, 5 feet 7 or 8 inches tall, with access to numerous handguns and rifles, including an “AR.” Schramm reported that Gagne had also fired a gun in his apartment two days prior. She also reported that Gagne’s girlfriend told her that Gagne had choked her out before the shot was fired[3].

While the 9-1-1 operator was talking with Schramm, a dispatcher put out a radio call to officers. The dispatcher described that a caller was reporting her neighbor threatened her and fired a shot from a handgun. She also told the responding officers the suspect had access to numerous handguns and rifles, including an “AR.” As officers were arriving, one officer requested the dispatcher to start the helicopter their way and another officer asked if any other callers heard gunshots. The dispatcher indicated the air unit had been requested and said there were not any other callers but that officers in the area heard a shot/s fired in the area[4].

When officers arrived, they began establishing a perimeter around the apartment building. On one side of the unit, officers formed a contact team with Officer Crosby designated to give commands, Officer Carlton provided lethal coverage with a rifle, and Officer Horton provided less lethal coverage in the form of a PepperBall launcher[5]. Officer Kelly took up another position near the apartment with a separate group of officers. Officer Kelly deployed with a 40mm less lethal launcher. Officer Kelly’s team was close and partially relieved by SWAT personnel as they arrived and deployed. Officer Kelly was not relieved and remained with the SWAT officers as a less lethal option throughout the incident.[6]

Officer Ahumada and Officer Newby contacted the reporting person, Cindy Schramm, at her apartment. Officer Ahumada spoke to her while Officer Newby listened and transmitted some of her statements over the radio to the other officers. Schramm told the officers that she initially approached Gagne’s girlfriend, Jordan Wirtjes’s apartment to talk to Wirtjes as they were both having problems in their relationships. Schramm knocked on the window, and Gagne responded with repeated profanity and threats, saying things such as, “get the fuck away from my house, fuck you, I am gonna end up shooting you.” Schramm said Gagne threatened both her and Jordan through the door. Schramm started to leave, and Jordan came out and started walking away with Schramm. Schramm said that Gagne then opened the glass sliding door and came out onto the second story balcony, racked a gun, and fired a shot. He then said he was going to “fucking kill you guys, I am going to splatter your brains out.”[7]

Officer Gutierrez contacted Wirtjes and spoke to her in the parking lot of the apartment complex. Wirtjes told Officer Gutierrez repeatedly that Gagne was not mentally ill or suicidal, but that he was struggling with drinking. When asked, Wirtjes said she thought Gagne may be confrontational with the officers. She said Gagne had a 45-caliber handgun, an AR15 rifle and a shotgun inside the apartment. Wirtjes said she was talking to Schramm and did not see Gagne shoot a round. She indicated she heard something but said she did not believe it was a gunshot, and all she knew was Gagne was struggling

[3] Recording of 9-1-1 call from Cindy Schramm, Mesa 001989
[4] Recording of dispatch call to officers and related radio traffic, Mesa 001997
[5] MPD Report 2023-141208, MesaDR000020
[6] MPD Report 2023-141208, MesaDR000048
[7] MPD Report 2023-141208, MesaDR000044, BWC 421-23_MESA 001874

badly with drinking. Wirtjes said they were not fighting, but that he told her to "get the fuck out," and she was going to her grandma's house for the night so he could cool off[8].

The officers learned from Schramm and Wirtjes that there was a confrontation with Gagne. Gagne and Wirtjes were arguing over a former girlfriend. The argument escalated, and Gagne told Wirtjes to "get the fuck out." Wirtjes left the apartment and was talking to Schramm outside when Gagne began yelling at them both. According to Schramm, Gagne threatened to shoot them both and told them to get the "fuck away" from the apartment, or he was going to shoot them. Gagne opened the sliding glass door, and Schramm described hearing a gunshot come from where Gagne was standing inside the doorway of the sliding glass door. Wirtjes said she did not hear a gunshot, but whatever was, it was very loud. Officers on a separate call nearby described hearing what they thought was a gunshot.

When Schramm called 9-1-1, she told the operators and later confirmed that Wirtjes told her Gagne was choking her earlier in the evening. Schramm told officers he had been violent in the past including firing a gun off in the apartment around the 4th of July.[9] Schramm told officers on the phone and at the scene that Gagne had threatened them both and fired off a gunshot in conjunction with the threats. Wirtjes appeared to be evasive about a gunshot being fired when asked but did say there was something loud that happened. Officers working in the area on an unrelated matter heard what they thought was a gunshot in the area.[10]

Officer Newby conferred with Officer Gutierrez to learn what Wirtjes saw or heard during the incident. Wirtjes confirmed she was with the neighbor (Schramm) and heard a loud bang but was not certain it was a gunshot. Based on the information Officer Newby learned from Schramm directly and what Wirtjes told Officer Gutierrez, he determined there was probable cause to arrest Gagne for aggravated assault. Based on Schramm's consistent statements to 9-1-1 and the officers at the scene, along with the other information officers gathered prior to the confrontation with Gagne, confirm the officers developed probable cause to arrest Gagne. Officer Newby voiced over the police radio for the other responding officers to hear that there was probable cause to arrest Gagne for aggravated assault.[11]

As other officers arrived, they took up additional positions around the apartment and formed small teams. From the various reports and body-worn camera recordings, officers were in various perimeter positions around the apartment. Several police cars had illuminated overhead (red/blue) lights and spotlights on directed at the apartment as multiple announcements and commands given over the public address system from a police car.[12]

Based on my training and experience, there are multiple priorities for an incident such as the one these officers faced. One of the initial priorities would be establishing a perimeter to contain the suspect and keep others from being harmed. Officers also would want to locate victims and witnesses to confirm or discount initial information through firsthand accounts. As part of the perimeter, officers should be establishing a contact team that includes people assigned to lethal force, less lethal force, commands (negotiations), and hands-on (hands-free to make an arrest). Finally, officers would try to establish contact with the suspect to negotiate the suspect's surrender.

---

[8] Officer Gutierrez BWC, 421-3_Mesa 001969, 07:20 - 20:20, MPD Report 2023-141208, Mesa_DR002000-01
[9] 9-1-1 recording, MESA_001989 911 2023-141208_0108466_0001
[10] 9-1-1 recording, MESA_001997 911 2023-141208_0108466_0009
[11] MPD Report 2023-141208, MesaDR000044
[12] BWC 421-23_MESA 001874 (one example, multiple more), MPD Report 2023-141208, MesaDR000048, 54, 72

From the materials reviewed, the arriving officers simultaneously located the victims while other officers set up a perimeter around the location where the gunshot was fired. The perimeter officers formed small teams that included less lethal tools such as PepperBall and a 40mm launcher. The officers established telephone contact with Gagne and negotiations started. The officers were planning, communicating, and employing appropriate tactics and de-escalation tactics consistent with principles taught to Arizona police officers.[13]

The information the officers had while they were responding was that Gagne had threatened a neighbor, fired a round from a gun, and was back inside of his apartment. Maintaining a safe distance and containing the suspect while behind cover was a priority for the officers. Simultaneously, responding officers contacted both victims, Cindy Schramm and Jordan Wirtjes. Schramm was the original caller to 9-1-1 and Wirtjes was Gagne's girlfriend. Both victims gave statements which confirmed the circumstances on the original call, leading to the establishment of probable cause to arrest Gagne for aggravated assault.

In addition to having probable cause to arrest Gagne for aggravated assault, the officers were obligated to protect the other residents of the apartment complex. The officers learned of Gagne's previous acts of violence, including previously firing guns in the apartment. They were told of Gagne's possession of many guns, including a variety of handguns and rifles. Gagne's threats against neighbor, Cindy Schramm on the night of this incident only further informed the officers of the danger Gagne posed to his neighbors. The totality of the circumstances led to the exigency the officers were operating under, and Gagne needed to be stopped immediately to prevent serious bodily injury or death to bystanders or police officers.

The officers were acting to detain Gagne who was inside of his home. Police officers in Arizona are taught that an arrest is a seizure under the U.S. Constitution and that a normal non-dangerous arrest may require a search warrant to go into somebody's home to affect the arrest. However, there are notable exceptions to the search warrant requirement. Exigent circumstances is one of the exceptions to the requirement for a search warrant. Arizona POST defines exigent circumstances as, 1. Response to an emergency, 2. Hot pursuit, 3. Likely destruction of evidence, 4. Substantial risk of harm to persons involved, and 5. Substantial possibility of violence.[14] Clearly Gagne created exigent circumstances for the officers through his actions. The officers were lawfully present, responding to a criminal emergency where there was a substantial risk of harm to persons, and a substantial possibility of violence.

The Mesa Police Department's response to the incident involved many different parts, to include, but not limited to:

- Established a perimeter
- Set up immediate action teams with less lethal tools
- Gathered intelligence
- Evacuated some of the neighbors
- Established negotiations
- Brought in specially trained officers, including crisis negotiators

[13] Arizona Peace Officer Standards and Training Board, Basic Training Curriculum, Patrol Tactics 1, 2021, pages 1-33
[14] https://post.az.gov/sites/default/files/2022-06/2.3%20Search%20and%20Seizure%202021.docx.pdf

- Deployed contemporary specialized equipment
- Stagged medical resources

The actions of the Mesa Police officers at this scene were consistent with well-established tactics taught to law enforcement officers for managing incidents involving armed barricaded subjects. Their response reflected nationally recognized practices, including containment, communications, and the deployment of specialized resources. Requesting the SWAT Team and managing the incident as a barricaded subject were consistent with the standards and guidance of the National Tactical Officers Association (NTOA), and with the training and generally accepted practices for law enforcement officers in Arizona and throughout the United States. [15]

**Opinion #2**

**Under the presented series of facts, and to the extent a jury finds these facts credible and that they occurred as stated, the use of deadly force on Shawn Gagne by the officers was consistent with the training and standards for police officers in Arizona and across the United States.**

*Basis for Opinion*

Police officers are taught the legal authority and considerations when using deadly force. The legal authority and standards for lethal force are based on an objective reasonableness standard based on the Constitution's Fourth Amendment, as determined by the U.S. Supreme Court. Officers are also taught that they may use deadly force in accordance with Arizona law under the circumstances below (in part):

- Defend himself/herself or a third person from what the peace officer reasonably believes to be the use, or imminent use, of deadly physical force

- To affect an arrest or prevent the escape from custody of a person who the peace officer reasonably believes committed, attempted to commit, is committing, or is attempting to commit a felony involving the use, or a threatened use, of a deadly weapon

- Through past or present conduct of the person which is known by the peace officer, that person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay

- Notwithstanding any other provisions of this chapter, a peace officer is justified in threatening to use deadly physical force when, and to the extent, a reasonable officer believes it necessary to protect himself/herself against another's potential use of physical force or deadly physical force.

The force police officers use must be objectively reasonable compared to the threat, resistance, and other circumstances perceived by or known to the officer when the force was used. The courts have

[15] https://ntoa.org/pdf/swatstandards.pdf

also ruled that context matters and that all relevant facts leading up to the use of force should be considered, not just the moment of the use of force.[16]

For this incident, based on the size and scope of the incident, the use of force analysis includes a breakdown based on the overall context and each individual officer's perspective.

As previously outlined in the first opinion, officers were investigating a report of an aggravated assault where they developed probable cause that Shawn Gagne had threatened to shoot and kill his girlfriend and a neighbor with a gun, and a shot was fired in conjunction with the threats.

The officers established a perimeter around the apartment. There were several marked Mesa police vehicles with red and blue flashing lights. The officers utilized the public address system on one of the patrol SUVs to announce their presence and call Gagne out of the apartment. The various body-worn camera recordings and video reviewed from inside of Gagne's apartment confirm the reports and officer statements about their attempts to announce their presence and call Gagne out of the apartment. The video from inside of the apartment and Gagne's response to negotiators leave no doubt Gagne knew the police were outside and that he was being ordered to put down his weapons and come outside.

Multiple officers indicated in their reports and statements to investigators that they saw Gagne inside of the apartment walking around with a rifle. They also described him as opening the door with a rifle in his hand, then stepping back inside and closing the door. The officers described, and many of the photos and videos taken confirm, that the positioning of Gagne's apartment was an elevated position from the parking lot where the officers were. The first floor of the apartment was up a flight of outdoor stairs, and the living area was up another flight of indoor stairs. The door and windows where the officers were seeing Gagne with a rifle were substantially higher in elevation than where the officers were positioned in the parking lot.

Several of the officers articulated in their interviews, that the elevated position of Gagne in the apartment created a substantial tactical disadvantage for the officers. It has been my experience that an elevated position allows for a much better view of the surroundings and in many cases the high angle negates the cover the officers may be using to protect themselves. An elevated position of a suspect also limits the view of the officers and narrows their target substantially if they needed to use their firearm to defend themselves or others. Based on the photos, videos, and statements from the officers, Gagne had a significant tactical advantage over the officers based on the elevated position of his apartment. The elevated perch of Gagne increased the level of the threat to the officers and made the situation even more dangerous for the officers.

Officer Adair arrived and was assigned as the primary negotiator. Officer Adair was getting set up when he saw Gagne in the open front door of the apartment holding a rifle. Gagne closed the door and Officer Adair relocated to try and reach Gagne on the phone. Gagne initially answered the phone but quickly hung up and did not respond to Officer Adair. Gagne eventually called his girlfriend, Wirtjes, and Officer Adair was able to talk to Gagne on her phone. When Officer Adair introduced himself as Matthew from the "Crisis Team," Gagne responded he (meaning Officer Adair) was going to be the one having a crisis if he did not get the officers to move back. He then went on a profane rant threatening to

[16] Arizona POST Lesson Plan: Firearms Use of Force, https://post.az.gov/sites/default/files/2026-04/8.2%20-%209%20Firearms%2C%20Use%20of%20Force.docx%20%283%29.pdf

shoot the officers if they did not get "out of his face." Gagne described his guns and said there would be causalities if the officers came into his vicinity. He told Officer Adair he was loading his rifles and shotgun. Officer Adair could hear what sounded like ammunition being loaded. Gagne threatened to shoot officers multiple times during the conversation. He said if the officers wanted a full "Iraq War from one person", then, "you better get fuckin ready. "[17]

The threats Gagne conveyed to Officer Adair were broadcast over the radio to officers on the perimeter. In his deposition, Officer Adair was asked in detail about what parts of the negotiations were relayed to officers on the perimeter and what parts were not relayed. This was a rapidly evolving event, the full SWAT contingent was not yet in place, and many things were happening simultaneously. It has been my experience, that during these types of moments in a barricade, things are hectic and dangerous; radio discipline is critical and it would not have been possible for every detail of the negotiations or every observation from the officers to be conveyed over the radio.

Several of the officers observed Gagne walking around the apartment holding a rifle. The Ring video footage from inside the apartment confirms Gagne was walking around the inside of the apartment holding a rifle while threatening to shoot the officers.

Officer Sawn Freeman was the first officer to shoot at Gagne when Gagne presented himself in a window, holding a rifle and looking down at the officers. Officer Freeman's gunshot was the first of several fired by officers. The following paragraphs break down each officers' involvement in the overall incident and their perspective when they used deadly force directed at Gagne. The officers' perspectives were compiled from their statements to investigators and from other materials reviewed, including police reports, radio transmissions, and body-worn camera footage. Although several of the officers had their body-worn cameras activated at the time of the shooting, the distance and positioning of the officers did not provide the conditions where the body-worn cameras were able to adequately capture what the officers were seeing.

**Officer Shawn Freeman**

Officer Freeman was in position inside the apartment across the parking lot from Gagne. He fired two rounds from his .308 caliber sniper rifle. His view was a glass slider door and window of Gagne's apartment.[18] His BWC was not activated.

Officer Freeman is a member of the Mesa Police Department's SWAT Team. He responded to assist with the situation along with other team members at the direction of Sergeant Harris. Officer Freeman heard that the call involved a subject who had fired an AK47 rifle and was passed out inside the apartment. Officer Freeman did not hear radio traffic while enroute.[19]

Once he arrived, Officer Freeman heard from Officer Chuey that the subject was walking around inside the residence with a rifle. Officer Freeman grabbed his sniper equipment and deployed to a position

[17] 9-1-1 recording, MESA_001989 911 2023-141208_0108466_002012
[18] Crime Scene Diagram, MESA_002315-002349
[19] Interview with Detective Ingram, Freeman_1_2023-07-07_074528_13539_MESA 001935.m4a

from the south. He initially met up with the immediate action team, where he could see Gagne walking around the apartment with a rifle that had an optic on it.[20]

Officer Freeman could see Gagne looking out of the glass slider at the officers below. He saw the resident of apartment #2165 on the balcony and asked for permission to use it for deployment. After getting permission, Officer Freeman set up on the balcony of apartment #2165. While getting set up, Officer Freeman heard over the radio that Gagne had told negotiators that officers needed to leave or he was going to start shooting them. Officer Freeman had a visual of the two windows facing southwest where he could see Gagne walking around talking on a cell phone.[21]

After a few minutes, Officer Freeman could see Gagne in the window on his (Freeman's) left. Gagne was walking around with a rifle with some type of sling. Officer Freeman saw Gagne come to the slider window; he leaned over with the rifle in his right hand. He was peeking through the windows, and Officer Freeman realized Gagne had a tactical advantage over the officers from an elevated position. The officers were below Gagne, hiding behind police cars but were exposed because of his elevated position. The rifle was in Gagne's right hand. It was up, not lowered as if to take a shot, but Officer Freeman felt it was a very simple movement to start shooting. Officer Freeman knew what Gagne's rifle and bullets were capable of doing and felt that the officers below would not stand a chance if Gagne were to fire as he had threatened. Officer Freeman fired his first round at Gagne's head in defense of the officers below Gagne.[22]

After the shot, Gagne disappeared from his view. Just after Officer Freeman's first shot, Officer Wyndmere arrived at Officer Freeman's position as a second sniper. As Officer Wyndmere was getting set up, Officer Freeman saw Gagne come into view again, he had the rifle in his right hand, and was manipulating the blinds with his left hand. Officer Freeman fired again; Gagne retreated further into the apartment. Then he heard and saw multiple rounds fired. Officer Freeman saw through his optic the glass breaking outward as if the bullets were coming out from the inside. After Officer Freeman fired his second shot, Officer Wyndmere took over his position and Officer Freeman began assisting him by broadcasting Officer Wynmere's observations over the radio.[23]

At the end of his interview, Officer Freeman described that residents were moving around the complex and that the scene was not completely secure. He had the residents of the apartment where he was positioned still inside of their apartment and at risk if Gagne began firing again. Officer Freeman described the advantage of the high ground, particularly when the suspect is armed with a high-powered rifle. Officer Freeman described how difficult it is to get cover, even behind cars when the suspect is perched at a higher elevation and can see over objects. The suspect being armed with a rifle complicated the situation further as the rounds will travel through vehicles and many objects normally used for cover.

---

[20] Interview with Detective Ingram, Freeman_1_2023-07-07_074528_13539_MESA 001935.m4a
[21] Interview with Detective Ingram, Freeman_1_2023-07-07_074528_13539_MESA 001935.m4a
[22] Interview with Detective Ingram, Freeman_1_2023-07-07_074528_13539_MESA 001935.m4a
[23] Interview with Detective Ingram, Freeman_1_2023-07-07_074528_13539_MESA 001935.m4a

### Sergeant Kyle Thomas

Sergeant Thomas was positioned in the south parking lot on the driver's side of a police SUV. He fired 3 rounds from an AR15 rifle. Sergeant Thomas was adjacent to Officer Brown (on the other side of the SUV) and Officer Navarro (behind the SUV next to the SUV where Thomas and Brown were positioned). Sergeant Thomas' view was of the front door, three upstairs windows, and the glass slider.[24] His BWC was activated.

Sergeant Kyle Thomas is a sergeant and team leader for the Mesa Police Department's SWAT Team. He and his team responded to assist with the situation after patrol officers had arrived and called for assistance. Sergeant Thomas heard some limited information on the radio, then learned from Sergeant Harris that the officers were on a call involving a guy with a rifle who was threatening cops.[25]

On the way to the scene, Sergeant Thomas heard over the radio that negotiators were talking to him on the phone, and he was continuing to threaten to shoot officers. He also heard officers clear over the radio that the guy came to the front door with a rifle. Sergeant Thomas met up with an immediate action team with a view of the balcony. He heard over the radio that the suspect wanted the red and blue lights off and that he was going to start shooting officers.[26]

Sergeant Thomas was directing resources and setting up teams. At some point, he heard a suppressed rifle round and could see the glass breaking. Shortly later, he could hear and see gunshots that appeared to be coming from the inside (the glass was breaking outward). He could also see muzzle flash up near the blinds.[27]

After a brief time, Sergeant Thomas saw some movement in the window, then near the slider. He saw a person down low near the corner of the slider, possibly kneeling. He heard gunshots coming from the apartment and thought the suspect was firing from a kneeling tactical position down at the officers below. In response to what he thought was the suspect shooting at officers, he fired three to four rounds from his rifle. Initially, Sergeant Thomas thought Officer Freeman had been shot. Sergeant Thomas then assisted in the coordination of the team that moved up, removed Gagne form the scene, and cleared the apartment.[28]

### Sergeant Matt Harris

Sergeant Harris was positioned at the front of a resident's vehicle, under the covered parking, across from Gagne's apartment. His view was of the glass slider and a window. [29] He fired 4 rounds from an AR15 rifle.

Sergeant Matt Harris is a sergeant and team leader for the Mesa Police Department's SWAT Team. He and his team responded to assist with the situation after patrol officers had arrived and called for

[24] Crime Scene Diagram, MESA_002315-002349
[25] Interview with Detective Ingram, Thomas_1_2023-07-07_074528_13539_MESA 001935.m4a
[26] Interview with Detective Ingram, Thomas_1_2023-07-07_074528_13539_MESA 001935.m4a
[27] Interview with Detective Ingram, Thomas_1_2023-07-07_074528_13539_MESA 001935.m4a
[28] Interview with Detective Ingram, Thomas_1_2023-07-07_074528_13539_MESA 001935.m4a
[29] Crime Scene Diagram, MESA_002315-002349

assistance. Sergeant Harris initially monitored the radio traffic using the radio and call notes. Sergeant Harris spoke to a patrol lieutenant on the phone and decided he and five or six SWAT operators would respond to assist.[30]

While enroute, Sergeant Harris learned that there had been some sort of domestic violence situation and a shot had been fired. When he arrived, he learned the suspect had also fired off rounds inside of the apartment on July 4th. As he began getting set up for deployment, he learned the suspect had come to the door armed with a rifle and yelled at the officers. Once he confirmed that information, Sergeant Harris called another SWAT sergeant and asked for additional SWAT assistance.[31]

Sergeant Harris went and set up behind police vehicles in the area where the contact team as covering the front door, north and west of the apartment. He met face to face with a patrol lieutenant and had Officer Goodrich assume control of the group covering the front door. Sergeant Harris noticed the windows on the apartment were covered and that there was a rifle sitting on a chair on the balcony.[32]

Based on Sergeant Harris's experience, he knew the officers were vulnerable and that the rifle he could see on the balcony would penetrate the armor the officers were wearing or were concealed behind (ballistic door panels). He also noted the suspect's elevated position as an advantage for the suspect. Sergeant Harris moved positions to a slightly better position where he had more concealment but still lacked adequate ballistic cover. From the new position, Sergeant Harris could see the front door and the second story balcony. He began directing resources from that position.[33]

Sergeant Harris could hear the suspect yelling inside the apartment. He heard the negotiators report the threats Gagne was making. He heard that Gagne was telling the negotiators that he would shoot the officers if they did not move back. He also threatened officers over the red and blue lights. Sergeant Harris said there was an effort to turn off the lights and calm the suspect down.[34]

Sergeant Harris heard a gunshot from Officer Freeman's location and saw the bullet impact the glass and push glass inward. He then heard a burst of gunfire and saw glass breaking outward from the apartment, indicating gunshots coming from inside, coming out of the apartment. Sergeant Harris knew the gunshots coming out of the apartment were headed toward Officer Freeman's location and he initially thought Officer Freeman had been shot.[35]

While Sergeant Harris was having an operator develop a gas plan, he heard and saw a bunch of rounds fired out of the apartment toward officers. He felt the officers and residents were in danger from the gunshots. He did not believe the rounds were coming his way, but he was concerned for the other officers on the perimeter. Sergeant Harris could hear muffled gunshots coming from inside the apartment and he could hear gunfire coming from officers directed back toward the apartment. Sergeant Harris could tell the difference between the suspects gunfire and the officers' gunfire.[36]

---

30 Interview with Detective Ingram, Harris_1_2023-07-07_074528_13539_MESA 001935.m4a
31 Interview with Detective Ingram, Harris_1_2023-07-07_074528_13539_MESA 001935.m4a
32 Interview with Detective Ingram, Harris_1_2023-07-07_074528_13539_MESA 001935.m4a
33 Interview with Detective Ingram, Harris_1_2023-07-07_074528_13539_MESA 001935.m4a
34 Interview with Detective Ingram, Harris_1_2023-07-07_074528_13539_MESA 001935.m4a
35 Interview with Detective Ingram, Harris_1_2023-07-07_074528_13539_MESA 001935.m4a
36 Interview with Detective Ingram, Harris_1_2023-07-07_074528_13539_MESA 001935.m4a

Sergeant Harris believed the suspect had complete disregard for human life and that the suspect's actions needed to be stopped immediately. He said the suspect was in contact with negotiators and exhibited nothing but anger and threats. For everyone's safety, Sergeant Harris felt he needed to be stopped immediately. Sergeant Harris saw the front door open; the suspect appeared in the doorway briefly wearing a plate carrier. This development concerned Sergeant Harris even more, as the plate carrier would stop the officers' rifle rounds. The suspect had been firing obscured from inside the apartment, but now had come outside, wearing body.[37]

Sergeant Harris saw Gagne again in the doorway; this time, his body was bladed, his arms were up, as if holding a rifle, and Sergeant Harris saw what he believed to be a rifle magazine extending downward. Gagne appeared to be using the doorway as a tactical advantage to scan for officers and potentially launch an assault on the officers. Although Sergeant Harris could see what he thought was a magazine, he could not see a rifle based on the position of the door. He believed Gagne was holding his arms up as if he were holding a rifle. Sergeant Harris fired multiple rounds from his rifle at Gagne, believing he was trying to fire at other officers. He saw Gagne go down and the door fall on top of him.[38]

Sergeant Harris then coordinated the movement of the armored vehicle, the evacuation of the nearby apartments, and the approach to Gagne. Once Gagne was removed from the scene for medical treatment, the apartment was cleared.

**Officer Alejandro Navarro**

Officer Navarro was positioned in the south parking lot behind a police SUV. He fired 2 rounds from an AR15 rifle. Officer Navarro was adjacent to Officer Brown (on the passenger side of an adjacent police SUV), and Sergeant Thomas (on the driver's side of an adjacent police SUV) Officer Navarro had partial views of the front door, three upstairs windows, and the glass slider.[39] He fired 2 rounds from an AR15 rifle. His BWC was activated.

Officer Alejandro Navarro is a member of the Mesa Police Department's SWAT Team. He responded to assist with the situation after patrol officers had arrived and called for SWAT assistance. Officer Navarro heard the suspect was agitated and was demanding patrol officers move back. He heard over the radio the suspect had come to the door with a rifle in his hand. He heard the negotiators relay that the suspect was agitated and demanding officers move back.[40]

Officer Navarro arrived on scene and quickly moved up to one of the immediate action teams and relived a patrol officer. He heard the round fired from one of the snipers and saw the glass break. Officer Navarro heard additional gunfire he felt was coming from the suspect and also additional gunfire from other officers. He could see the suspect moving around inside of the apartment. He appeared to have something in his hand that was possibly a rifle. Based on Gagne saying he was going to start shooting out, and what Officer Navarro was observing, Officer Navarro fired his rifle at Gagne. He then heard a volley of rounds and lost sight of Gagne inside the apartment.[41]

---

[37] Interview with Detective Ingram, Harris_1_2023-07-07_074528_13539_MESA 001935.m4a
[38] Interview with Detective Ingram, Harris_1_2023-07-07_074528_13539_MESA 001935.m4a
[39] Crime Scene Diagram, MESA_002315-002349
[40] Interview with Detective Ingram, Navarro_1_2023-07-07_074528_13539_MESA 001935.m4a
[41] Interview with Detective Ingram, Navarro_1_2023-07-07_074528_13539_MESA 001935.m4a

Officer Navarro did not see the gunfire coming out of the apartment. He believed he heard gunfire form inside the apartment. He heard the negotiators relay Gagne's threats. Officer Navarro saw what he believed was a rifle in Gagne's hand. He heard over the radio that he had previously fired a rifle. He described the position of advantage Gagne had over the officers. He said he was fearful for the safety of all the officers. He said the rounds from Gagne's rifle could have penetrated the body armor the officers were wearing.[42]

Officer Navarro observed the rest of the incident from his position but did not see Gagne again until the officers approached and removed Gagne from the apartment.

**Officer Kyle Cameron**

Officer Cameron was positioned to the side of a police SUV north and west of Gagne's apartment. His view was of the front door, two upstairs windows, and a portion of the glass sliding door. He was adjacent to Officers Goodrich and Chuey [43] Officer Cameron fired 7 rounds from his AR15. His BWC was activated.

Officer Kyle Cameron is a member of the Mesa Police Department's SWAT Team. He responded to assist with the situation after patrol officers had arrived and called for SWAT assistance. While driving to the call and donning his gear, Officer Cameron learned it was a domestic violence situation where a shot had been fired. He heard the suspect had opened the door with a rifle in his hand, then closed it and went back inside. Officer Cameron heard negotiators were speaking with Gagne and he was agitated.[44]

Officer Cameron deployed to the front side of the apartment with a view of the front door and relieved patrol officers. Officer Cameron learned from the patrol officers that some evacuations had been made, but they were unsure of the first-floor apartments had been evacuated. Officer Cameron took up a position behind a police vehicle with Officer Chuey (SWAT Team member) near him on his right, behind another police vehicle. Officer Cameron had a clear, unobstructed view of the front of the apartment.[45]

Officer Cameron heard radio transmissions that negotiators were told Gagne was upset they were there and had stated he was going to start shooting at them if they did not leave. He heard that Gagne said he did not like the red and blue lights and that the negotiators could hear what they thought was Gagne loading a firearm. Officer Cameron saw what he thought was Gagne peeking out from the blinds behind a window in the middle of the south balcony. Officer Cameron got on the radio because he was concerned Gagne may be peeking out the window. A few seconds later, Officer Cameron heard the shot fired from the sniper. He knew it was the sniper based on the sound of the suppressed rifle and where the shot came from. He also could also see the glass breaking inward as the round went through it.[46]

After the shot was fired from the sniper, there was a brief pause, then Officer Cameron heard a distinct shot come from inside the apartment. He heard what he thought may have been a bullet impact the building near him; but he was not certain. Officer Cameron saw the glass blow outward from inside the

[42] Interview with Detective Ingram, Navarro_1_2023-07-07_074528_13539_MESA 001935.m4a
[43] Crime Scene Diagram, MESA_002315-002349
[44] Interview with Detective Ingram, Cameron_1_2023-07-07_074528_13539_MESA 001935.m4a
[45] Interview with Detective Ingram, Cameron_1_2023-07-07_074528_13539_MESA 001935.m4a
[46] Interview with Detective Ingram, Cameron_1_2023-07-07_074528_13539_MESA 001935.m4a

apartment. There was another pause. Then he heard the sniper fire a second shot, and then he heard and saw another round come out from inside the apartment. Officer Cameron then fired "focused fire" into the window as he believed Gagne may be in a good position to be firing at the sniper. Officer Cameron defined focused fire as firing in a concentrated area near the target, but into the rafters or other place where it was unlikely to hit anybody else and do the least amount of damage. He believed he fired four rounds. He was targeting the high right side of the sliding glass door where the header would be. Officer Cameron was confident his rounds would be dissipated in the header of Gagne's apartment or the header of the apartment next door. He believed his rounds would disrupt the suspect and possibly prevent him from being able to shoot somebody else. He could not see Gagne, or he would have shot Gagne, because he was a deadly threat; he just could not see him.[47]

After the volley of fire, there were more shots. Sergeant Harris got on the radio and said Gagne was shooting out of the other side of the apartment, where Officer Cameron could not see. Officer Cameron stepped out from behind cover as he thought another officer was alone and unsupported where the rounds were being fired. As Officer Cameron was out in the open trying to get a better view, the front door flew open real quick. Officer Cameron was caught out in the open, without cover, in "no man's land." He saw the suspect, wearing a red shirt, a tan or camo ballistic (rifle) vest carrier and he had what Officer Cameron thought was a rifle in his hand.[48]

Officer Cameron moved down and back toward cover of the police vehicle and fired one round at Gagne's torso, as Gagne was standing in the open doorway. Officer Cameron's round struck the mirror of the police vehicle. Officer Cameron fired because he thought Gagne was shooting at him and other people.[49]

Officer Cameron described the sequence of events that followed. The officers sent a drone up and confirmed Gagne was near the door. They were concerned he might be luring the officers into a vulnerable position. The officers wanted to be sure he was down and now planning to ambush them if they approached. They formed a tactical team with a canine and approached the door. Officer Cameron was part of the team that converged on the door, removed Gagne, and then cleared the apartment.[50]

**Officer Matt Brown**

Officer Brown was positioned in the south parking lot on the passenger side of a police SUV. Officer Brown was adjacent to Officer Navarro (behind an adjacent police SUV) and Sergeant Thomas (on the driver's side of the same police SUV) Officer Brown had partial views of the front door, three upstairs windows, and the glass slider.[51] He fired 2 rounds from an AR15 rifle. His BWC was activated.

Officer Matt Brown is a member of the Mesa Police Department's SWAT Team. He responded to assist with the situation after patrol officers had arrived and called for SWAT assistance. Officer Brown was listening to the radio and reading CAD notes while enroute to the call. He learned that a subject, later identified as Gagne, had come out of his residence threatened a neighbor and fired a gunshot into the

---

[47] Interview with Detective Ingram, Cameron_1_2023-07-07_074528_13539_MESA 001935.m4a
[48] Interview with Detective Ingram, Cameron_1_2023-07-07_074528_13539_MESA 001935.m4a
[49] Interview with Detective Ingram, Cameron_1_2023-07-07_074528_13539_MESA 001935.m4a
[50] Interview with Detective Ingram, Cameron_1_2023-07-07_074528_13539_MESA 001935.m4a
[51] Crime Scene Diagram, MESA_002315-002349

air. Officer Brown heard over the radio that Gagne said he was going to shoot officers unless they backed up. He also learned that a negotiator heard what he thought was Gagne loading bullets into magazines and had come to the door, opened it with a rifle in his hands, then retreated into the apartment. Since then, Gagne had been seen peeking out of the windows.[52]

When he arrived, Officer Brown originally deployed with his bean bag shotgun. He later moved and changed to his rifle so he could take a sniper's lethal position on a reaction team. The sniper as moving to get to a sniper position, and deploy as a sniper and Officer Brown replaced him in his position.[53]

From the new position where he deployed with his rifle, Officer Brown was looking at the apartment when he heard a round go off from what he recognized as from a suppressed 308 rifle deployed nearby to his left (same rifle used by team snipers). Officer Brown saw the sliding glass door shatter on the apartment. There was a brief pause, then he heard a loud bang from a rifle, and he could see the glass come outward. He heard another suppressed round from his left, then more rounds fired from what he believed was the inside. Officer Brown described the glass as blown outward and he could see the glass coming outward from the inside where Gagne was barricaded.[54]

Officer Brown heard on the radio that Gagne was still moving around inside the apartment. Officer Brown saw movement where the sliding glass door had been; he saw Gagne walk over to the window to the left of the sliding glass door. Officer Brown could see Gagne was holding a rifle.[55] Gagne was walking away from Officer Brown's position, stopped, faced Brown and the other officers and started fiddling with the blinds. Officer Brown saw something in Gagne's hand, but could not definitively see a rifle, but felt that because Gagne had the rifle moments before and had fired at officers earlier, combined with all Gagne's threats to shoot officers, Officer Brown believed Gagne was preparing to shoot the perimeter officers. Officer Brown fired out of fear of Gagne shooting officers or himself (Officer Brown). Officer Brown stated in his interview that he believed he fired 5-6 shots at center mass of Gagne's silhouette. He indicated the light was on inside and he was silhouetted in the window.[56]

Officer Brown heard radio traffic that Gagne was downstairs near the front door. He heard shots fired near the front door but could not see what was happening. Officer Brown waited for a while, then left his position and moved up to help members of his team remove Gagne from the apartment. [57]

**Officer Matt Chuey**

Officer Chuey was positioned between two police SUVs, north and west of Gagne's apartment. His view was of the front door, two upstairs windows, and a portion of the glass sliding door. He was adjacent to Officers Cameron and Goodrich.[58] Officer Chuey fired 20 rounds from an AR15. His BWC was activated.

---

[52] Interview with Detective Ingram, Brown_1_2023-07-07_074528_13539_MESA 001935.m4a
[53] Interview with Detective Ingram, Brown_1_2023-07-07_074528_13539_MESA 001935.m4a
[54] Interview with Detective Ingram, Brown_1_2023-07-07_074528_13539_MESA 001935.m4a
[55] Interview with Detective Ingram, Brown_2_2023-07-07_074528_13539_MESA 001935.m4a
[56] Interview with Detective Ingram, Brown_1_2023-07-07_074528_13539_MESA 001935.m4a
[57] Interview with Detective Ingram, Brown_1_2023-07-07_074528_13539_MESA 001935.m4a
[58] Crime Scene Diagram, MESA_002315-002349

Officer Chuey responded to the scene as a member of the SWAT team. Officer Chuey is a sniper on the team but was deployed as a SWAT operator during this incident, and not in a traditional sniper position. He responded to the scene with other SWAT officers. As he was monitoring and responding to the scene, Officer Chuey read/heard the suspect (Gagne) was agitated and had fired off a round inside the apartment. He heard patrol officers were in place on the perimeter. He heard patrol officers saw him moving about in the apartment armed with a rifle.[59]

Officer Chey arrived and liaised with patrol officers. He heard the officers talking to him on the phone and he could see Gagne holding what he thought was an AK-47 and pacing back and forth in front of the window.[60]

Officer Chuey changed positions and joined Sergeant Harris and some other SWAT operators. He took a position in an open door of a patrol vehicle, where a canine handler had been standing. Officer Chuey had a clear view of the apartment's front door. He heard Gagne was telling negotiators that he was going to shoot officers if they did not move back. Using his optic, Officer Chuey could see Gagne turning the doorknob and opening the front door. Gagne was angled where he had a better position on the officers (the deepest part of the door opening) and he had elevation on them. Gagne was in a position of advantage over the officers. Gagne had something in his hand that was dark, while Officer Chuey was trying to confirm it was the rifle in his hand; Gagne closed the door.[61]

There were some transmissions between Sergeant Harris, Officer Freeman, and Officer Chuey about who was covering what specific spot. Officer Freeman fired (Officer Chuey noticed the difference with suppressor) and then Officer Chuey heard what he thought was Gagne shooting out from inside of apartment. Officer Chuey saw the glass splintering about the same time he heard the gunshots. He believed the rounds were coming from inside of the apartment. Officer Chuey saw a muzzle flash near the balcony and thought it was muzzle flash from Gagne shooting at the officers. Seeing the muzzle flash was a big concern for Officer Chuey. Officer Chuey fired his rifle at the muzzle flash, believing it was coming from Gagne firing at the other officers. Officer Chuey thought he fired 11 or 12 rounds at Gagne.[62]

The muzzle flash stopped. The door flung open, Officer Chuey could immediately see Gagne in the doorway armed with a weapon, wearing a plate carrier. Officer Chuey fired the remaining rounds in his magazine directly at Gagne. He believed he fired 18 rounds total.[63]

Officer Chuey saw Gagne go down and saw his leg stationary inside the doorway. Other officers put gas into the apartment, and the armored cars arrived. The negotiators were on the phone with Gagne after he was shot, they officers were concerned that Gagne was "playing possum" and trapping the officers. They first tried to startle Gagne with a flash diversion device. He did not respond. They sent a canine up and eventually took Gagne into custody. Officer Chuey joined the team that was clearing the apartment.[64]

---

[59] Interview with Detective Ingram, Chuey_1_2023-07-07_074528_13539_MESA 001935.m4a
[60] Interview with Detective Ingram, Chuey_1_2023-07-07_074528_13539_MESA 001935.m4a
[61] Interview with Detective Ingram, Chuey_1_2023-07-07_074528_13539_MESA 001935.m4a
[62] Interview with Detective Ingram, Chuey_1_2023-07-07_074528_13539_MESA 001935.m4a
[63] Interview with Detective Ingram, Chuey_1_2023-07-07_074528_13539_MESA 001935.m4a
[64] Interview with Detective Ingram, Chuey_1_2023-07-07_074528_13539_MESA 001935.m4a

### Officer Robert Goodrich

Officer Goodrich was positioned to the driver's side of a police SUV north and west of Gagne's apartment. His view was of the front door, two upstairs windows, and a portion of the glass sliding door. He was adjacent to Officers Cameron and Chuey.[65] Officer Goodrich fired 14 rounds from his AR15 rifle. His BWC was activated.

Officer Goodrich responded to the scene with other SWAT team members after patrol officers had responded and established a perimeter. Officer Goodrich went to the scene at the direction of Sergeant Harris. He had heard that there was a domestic violence situation where the male had fired a weapon inside the apartment. Officer Goodrich did not see any call notes but heard officers say over the radio while he was enroute, that the suspect's windows were covered in aluminum foil.[66]

As Officer Goodrich arrived, he heard over the radio that the subject was at the door with a rifle. Officer Goodrich quickly deployed with his rifle and went with Sergeant Harris to relieve patrol officers with a view of the front door. Officer Goodrich was positioned off a patrol vehicle in a lethal coverage position. He saw Gagne peek out of the door a little, where he could see Gagne's upper torso, and thought Gagne was possibly wearing body armor. Officer Goodrich thought Gagne tried to yell something, but he could not understand what was said.[67]

Officer Goodrich heard that the apartment nearby had not yet been evacuated, which concerned him. Officer Goodrich heard negotiators relay over the radio that Gagne was threatening to shoot the officers outside on the perimeter. He specifically recalled Gagne demanding the red and blue lights be turned off or he would start shooting. Over approximately 10 minutes, the negotiators relayed Gagne's threats. The foil covering the windows concerned Officer Goodrich because he could not see anything behind them.[68]

Officer Goodrich saw movement at the blinds, heard a suppressed rifle round fired, then heard over the radio that Officer Freeman had fired a round. There was a slight lull, then a shot from inside the apartment. It was a different sound, kind of blunt or muffled sound, but not the sound of a suppressor. Within a few minutes, Officer Goodrich heard a second sniper shot fired from a suppressed rifle. He then heard Gagne fire five or six rounds from inside the apartment.[69]

Officer Goodrich could see stucco and glass popping off from the inside. He perceived there was an exchange of gunfire between Gagne and officers happening. Officer Goodrich decided to provide focused fire above the door frame of the front door. He chose to do that because he thought Gagne was shooting north and he thought he could draw Gagne's attention away from the officers he was firing at. Officer Goodrich knew the floor plan was a split-level plan with a second story. Officer Goodrich was confident his rounds would end up in the door frame and not penetrate the interior of the unit. He fired three to four rounds of focus fire.[70]

---

[65] Crime Scene Diagram, MESA_002315-002349
[66] Interview with Detective Ingram, Goodrich_1_2023-07-07_074528_13539_MESA 001935.m4a
[67] Interview with Detective Ingram, Goodrich_1_2023-07-07_074528_13539_MESA 001935.m4a
[68] Interview with Detective Ingram, Goodrich_1_2023-07-07_074528_13539_MESA 001935.m4a
[69] Interview with Detective Ingram, Goodrich_1_2023-07-07_074528_13539_MESA 001935.m4a
[70] Interview with Detective Ingram, Goodrich_1_2023-07-07_074528_13539_MESA 001935.m4a

There was a lull after the focus fire. The door flung open immediately. Gagne's body was bladed and there was a door that had been pulled from the hinges he appeared to be using as a shield. Officer Goodrich saw what he thought was a rifle in Gagne's hand and said, "it appeared he was trying to get shots on us". Perceiving a threat to all the officers in the vicinity of Officer Goodrich, he fired four to six rounds at Gagne. Officer Goodrich saw Gagne fall but could no longer see him.[71]

After arranging cars and using armored vehicles, they evacuated residents in an apartment nearby. They then approached Gagne as a group. On their approach, Officer Goodrich saw a rifle propped up on the balcony. As they approached Gagne, they used a flash diversion device, a canine, and a TASER. They removed the door Gagne used as a shield; they handcuffed Gagne and removed him. They then cleared the residence. Officer Goodrich could see a magazine and two rifles inside when they cleared the residence. There was body armor and a gas mask in the bedroom, and ammunition everywhere throughout the apartment.[72]

In addition to the interviewing the officers and victims, Officer Crosby also interviewed witnesses. Luis Monche observed through the window a subject pacing back and forth inside of his apartment with a rifle. The room was well lit by a colorful lamp. He saw the first gunshot through the glass door then what he thought was an exchange of gunfire between police and the subject.[73]

Ryan Guy and Tamara Rant had an unobstructed view of the apartment. Ryan saw officers talking to a female and saw a subject pacing inside of the apartment with what he recognized as an AK-47 rifle. Ryan heard the police warn the subject to exit the apartment unarmed. Ryan believed he saw the subject shoot first through the west sliding door then police exchanged gunfire with the subject. Tamara was woken up by police activity, she saw the subject pacing inside the apartment with a large gun and heard the first shots, then stopped watching for her own safety.[74]

The camera footage reviewed from the inside of the apartment taken before, during, and after the incident reveals the volatile and violent nature of Gagne. A sample of what the various video clips depict include:

- Throughout several videos, multiple violent assaults where Gagne threatened Wirtjes while holding a weapon and one instance where he pinned her down on the bed and choked her[75]

- Gagne periodically holding a handgun or rifle, yelling, swearing, and threatening to kill Wirtjes[76]

- Gagne stepping out onto the balcony and what appears to be him firing a handgun, corroborating the victim's version of events[77]

---

[71] Interview with Detective Ingram, Goodrich_1_2023-07-07_074528_13539_MESA 001935.m4a
[72] Interview with Detective Ingram, Goodrich_1_2023-07-07_074528_13539_MESA 001935.m4a
[73] MPD Report 2023-141208, MesaDR000021
[74] MPD Report 2023-141208, MesaDR000021
[75] Interior camera recording 5-24-24, and several other clips as well
[76] Interior camera recording 8-37-43
[77] Interior camera recording 8-39-47

- Gagne walked out onto the balcony holding the rifle, pointed it outward toward the location of officers and bystanders[78]

- Bean bag rounds can be heard hitting the door; PA announcements from officers can clearly be heard along with bursts of a police siren[79]

- Gagne walking around inside the apartment while holding a rifle and making threats to the officers while talking to Officer Adair[80]

- Gagne was walking around the apartment with a rifle up on his shoulder and intermittently pointing the rifle out the window while telling Officer Adair he was going to shoot officers[81]

- During the time Gagne was holding the rifle up at his shoulder in a firing position, he stopped and put on hearing protection, as if further preparing to fire at officers[82]

- Gagne was pacing inside the apartment holding the rifle up to his shoulder and telling Officer Adair he was going to shoot officers if they did not leave. Officer Adair can be heard calmly telling Gagne they cannot leave because of what happened previously[83]

- Gagne was threatening to shoot officers while on the phone with Officer Adair. He walked out of the camera view toward a window with the rifle up in a firing position (also wearing rifle-rated body armor and hearing protection) and went off camera, and approximately 8 seconds later Gagne was shot. When the shot (by Officer Freeman) was heard on the video, the barrel of Gagne's rifle could be seen resting on a counter but was still moving as if the stock was still being held up, but the other end of the rifle was out of view. Gagne and the rest of the rifle (the stock) were not in view on the video when he was shot[84]

- After Gagne had been shot the first time, Officer Adair can be heard on speaker phone, giving him instructions to walk out the door with his hands up. Gagne walked toward a window, hunched over with his hands and arms out in front of him (similar to a shooting stance); he paused briefly at the window, and multiple police rounds were fired at him through the window.[85]

The interior camera does not depict the exact moment of the first shot by Officer Freeman, as Gagne was briefly out of view. However, just prior to the shot being fired, Gagne can be seen walking toward the window holding a rifle. The shot is heard, and the camera picks up what appears to be Gagne setting the rifle down. Throughout several clips, Gagne can be seen pacing with the rifle and intermittently lifting it up to his shoulder into a shooting position. The videos depict several of the threats of death or serious bodily injury described by the officers.

---

[78] Interior camera recording 8-54-51
[79] Interior camera recording 10-25-09,
[80] Interior camera recording 10-32-09, and several other clips as well
[81] Interior camera recording 10-32-09, and several other clips as well
[82] Interior camera recording 10-39-21
[83] Interior camera recording 10-41-20
[84] Interior camera recording 10-41-20
[85] Interior camera recording 10-44-09

When Gagne was shot at the second time, the video shows red lasers and what looks possibly like muzzle flashes from police rifles bouncing around inside of the apartment. The video also shows the bullets breaking the sliding glass door on the other side of the living room.[86] Both of these observations from the video also depict what some of the officers described in their statements as reasons they fired.

Based on my review of the incident; each officer independently evaluated the threat they perceived and responded according to their individual perceptions. The volume and intensity of Gagne's actions created a tense and rapidly evolving situation for the police officers trying to stop his violence. The officers had different views of Gagne based on their angle, and in many cases, each officer saw different things at different times and reacted to what they observed and what they perceived.

Each officer in this situation appropriately had the authority to act independently based on the information they had at the time and threat they were perceiving. Based on my experience, it would not have been appropriate for the officers to have been directed at any point by the negotiators or incident commander to not respond or "stand down" to a perceived threat. There were officers who perceived the need to defend themselves and others from Gagne's deadly threat.

The same principles apply to Officer Freeman briefly seeing Gagne in a window with nothing in his hands. Officers knew Gagne had a rifle stagged on the balcony, he earlier fired a handgun, and it was reported he had many guns. It would not have been realistic to expect Officer Freeman to provide every detail of what he was observing over the radio each time he saw a glimpse of Gagne, nor would it be appropriate for Officer Freeman to declare Gagne was no longer a threat. This was a rapidly evolving event with multiple officers seeing Gagne from different angles through different windows in various stages of threatening positions. Each officer had to evaluate what they were seeing and perceiving in context with the totality of the circumstances.

It has been my experience, having participated in and managed hundreds of barricaded-subject incidents throughout my law enforcement career, that the level of threat during a barricade often ebbs and flows. However, the inherent danger posed by a barricaded suspect such as the one in this case remains consistently high. This incident involved a subject who was armed with a rifle, had already fired at least one shot, possessed multiple firearms, was wearing military-grade body armor, and repeatedly threatened both civilians and responding police officers throughout the encounter. A barricaded suspect exhibiting these characteristics presents one of the highest-risk situations law enforcement officers face. Such individuals have both the capability and the demonstrated willingness to inflict deadly force with little or no warning, requiring officers to maintain a heightened level of vigilance and tactical discipline throughout the incident.

Each of the officers in this case described their perceptions of a threat of serious bodily injury or death to themselves, other officers, and/or bystanders. The threats of serious bodily injury or death the officers perceived when they decided to deploy deadly force directed at Gagne, are confirmed by the video evidence, the statements of the victims, witnesses, other officers, and other materials reviewed. Each officers' use of deadly force in this incident was consistent with police officer training and standards in Arizona and across the United States.

---

[86] Interior camera recording 10-44-09

## Conclusion

Police officers perform an inherently dangerous job that frequently requires them to make split-second decisions under rapidly evolving, uncertain, and potentially life-threatening circumstances. Those decisions are made based on the facts and information reasonably available to the officers at the time, not on information learned after the incident or through the benefit of hindsight (including videos viewed after the fact). In many critical incidents, officers are required to make decisions with limited information and without knowing the ultimate outcome of their actions. An officer's responsibility is to assess the threat as it reasonably appears at that moment and to take actions intended to protect innocent persons, fellow officers, and themselves from the risks created by a suspect's actions.

An officer's conduct should be evaluated based on the totality of the circumstances and the information reasonably available to the officer at the time the decisions were made, rather than on facts discovered after the incident concluded. In this case, although we later learned that Gagne did not fire any shots out of the apartment while officers were present, it was understandable, based on video evidence, why the officers perceived Gagne was either preparing to shoot or had shot through the windows in the direction of officers. Some of that evidence includes the victims' statements, Gagne's threats, and the officers' observations (later confirmed by video) of Gagne pacing with a rifle and looking through windows.

It was clear throughout the incident; Gagne controlled the pace and intensity of the situation. For the responding officers, this was not a simple domestic disturbance call. Gagne had committed numerous felonies for which he would have faced decades in prison had he survived. An armed and barricaded individual, who is facing substantial prison time, is one of the most dangerous people an officer must face. And in this situation, Gagne had many tactical advantages over the officers who were required to confront him.

Throughout the review of the incident, I observed officers acting professionally and calmly, trying to deescalate Gagne and mitigate the threat he posed. I observed supervisors providing direction, moving people to better positions, etc. The overall response included the gathering of intelligence, police announcements, tactical planning, negotiations, and the use of specially trained officers and equipment. The officers directly involved in this incident were veteran officers who appeared to be well trained and disciplined.

After a thorough review of the materials from this incident, it is my opinion, the Mesa Police Department deployed well trained officers who were properly supervised to deal with a violent and dangerous person who dictated the pace and intensity of the encounter through his threatening actions. The officers' responses were appropriate and consistent with police officer training and practices in the Arizona and across the United States.

Based on my review of the listed materials and decades of policing experience, I affirm, under penalty of perjury, that my opinions in this report are made to a reasonable degree of police practices/law enforcement standards.

Respectfully Submitted,

Robert Handy
Robert Handy
Peoria, Arizona

**Deposition and Trial Testimony**

*Depositions*

1. Jasmine Williams et al., v. City of Beverly Hills et al., United States District Court, Central District of California, expert for the defense regarding wide range of police practices in a discrimination case (2023)

2. DeAnna Sullivan v. City of Buena Park et al., Superior Court, State of California, County of Orange, expert for the defense, police practices, use of force, wrongful death case (2022)

3. Lourdes Vaughn v. City of Arvin, US District Court, Eastern District of California: Expert for defense, wrongful death, excessive force, police practices (2022)

4. Gonzalez v. City of Phoenix et al., U.S. District Court, District of Arizona: Expert for police practices and excessive use of force for an in-custody death case (2022)

5. State of North Dakota v. United States of America, U.S. District Court, District of Northern Dakota, Southern Region, expert for the plaintiff, police practices, arrest, use of force, mass arrests, large incident management in a protest case (2022)

6. Dion Humphrey & William Humphrey v. City of Phoenix et al., United States District Court, District of Arizona, expert for defense on police practices, use of force case (2022)

7. May v. City of Los Angeles World Airports Police Department, Superior Court of the State of California, County of Los Angeles, expert for the defense on police practices in a discrimination case (2023)

8. Emily Garcia v. City of Tustin, United States District Court, Central District of California, expert for defense in wrongful death, officer-involved shooting case (2022)

9. Ymelda Elena et al., v. City of Los Angeles, William Jones Jr., et al., United States District Court, Central District of California, expert for the defense of the officer in a wrongful death, officer-involved shooting case (2023)

10. Frank Benavente and Nicole Ventress v. Albert Alvarado, City of Ontario, et al., United States District Court, Central District of California, expert for defense in officer-involved shooting case (2023)

11. Estate of David Pelaez Chavez et al, v County of Sonoma, et al, United States District Court, Northern District of California, an expert in an officer-involved shooting case (2023)

12. Anyka Harris et al. v City of Tulare et al., United States District Court, Eastern District of California, expert for the defense in officer-involved shooting case (2023)

13. William Colbert v City of Merced, et al, United States District Court, Eastern District of California, expert for the defense, in police practices, and use of force (2024)

14. Marylyn Rogel, as Special Administrator for the Estate of Dominga Flores Gomez v Tobias Houston, City of Chicago, et al, Circuit Court of Cook County, Illinois County Department, Law Division, expert for defense on police practices (2024)

15. The Estate of Valentina Orellna Peralta, et al., v. City of Los Angeles, William Dorsey Jones, et al., Los Angeles County Superior Court, expert for the defense of the officer in a wrongful death, officer-involved shooting case (2023)

16. Greene, et al v City of Beverly Hills et al, United States District Court, Central District of California, expert for the defense regarding wide range of police practices in discrimination case (2025)

17. Gavrila v City of Mesa, et al, Maricopa County Superior Court, Case #:CV2024-018750, expert for the defense, police use of force (2025)

*Trial Testimony*

1. Elser v. City of Huntington Beach (administrative case): Testified for defense in use of force case, qualified as expert (2021)

2. DeAnna Sullivan v. City of Buena Park et al., Superior Court, State of California, County of Orange, expert for the defense, police practices, use of force, wrongful death case (2022)

3. State of North Dakota v. United States of America, U.S. District Court, District of Northern Dakota, Southern Region, expert for the plaintiff, police practices, arrest, use of force, mass arrests, large incident management in a protest case (2022)

4. Anyka Harris et al. v City of Tulare et al., United States District Court, Eastern District of California, expert for the defense in officer-involved shooting case (2023)

5. Ymelda Elena et al., v. City of Los Angeles, William Jones Jr., et al., United States District Court, Central District of California, expert for the defense of an officer in a wrongful death, officer-involved shooting case (2023)
6. Termination appeal hearing, Officers Barragan and Bradley v City of Tulare, Use of force, officer involved shooting case, Tulare City Hall (10/14/2025)
7. Termination appeal hearing, Sergeant Joshua Evans, Antioch, California, Police Department, use of force expert, Antioch Police Department (2/19/2026)
8. Emily Garcia v. City of Tustin, United States District Court, Central District of California, expert for defense in wrongful death, officer-involved shooting case (2022)
9. The Estate of Valentina Orellna Peralta, et al., v. City of Los Angeles, William Dorsey Jones, et al., Los Angeles County Superior Court, expert for the defense in a wrongful death case (2023)

**Fees**

$300/hour for review, analysis, and report writing
$375/hour for deposition or trial testimony

**Schedule A**

| Item # | Description | Bates Range |
|---|---|---|
| 1. | PLFS RESP to DEFS 1st NUI | |
| 2. | PLFS RESP to DEFS 1st RFP | |
| 3. | PLFS SUPP RESP to DEFS 1st NUI (Email) | |
| 4. | PLFS Initial DS | |
| 5. | PLFS 1st Supp DS | |
| 6. | PLFS 2nd Supp DS | |
| 7. | Bedroom Video Folder | |
| 8. | Gagne Ring Camera Video Folder | |
| 9. | Living Room Video Folder | |
| 10. | Bedroom Video Folder | |
| 11. | Gagne Ring Camera Video Folder | |
| 12. | Living Room | |
| 13. | Shawn Gagne Photos | GAGNE_000039-000043 |
| 14. | (38) Shawn Gagne LinkedIn | GAGNE_000044-000047 |
| 15. | Resume | GAGNE_000053-000054 |
| 16. | Photo of Gagne | GAGNE_000055 |
| 17. | Photos of Gagne | GAGNE_000056-57 |

| | | |
|---|---|---|
| 18. | Second Autopsy Report of Shawn Gagne | GAGNE_000005-000031 |
| 19. | JW LinkedIn | GAGNE_000048-000052 |
| 20. | Photo of assault rifle | GAGNE_000058 |
| 21. | Text Messages between Chris Gagne & Shawnee and Bradley Gagne | GAGNE_000059-002087 |
| 22. | Text Messages – Doge | GAGNE_000320-003573 |
| 23. | Text Messages God and Patriots | GAGNE_00003574-004973 |
| 24. | Text Messages Shawnee & Justy etc. | GAGNE_004974-006594 |
| 25. | Images of Text messages | GAGNE_006595-006605 |
| 26. | STG Medical Records – Kaiser Permanente | GAGNE_006606-007168 |
| 27. | GAGNE_000003 MPD Photos | GAGNE_335-GAGNE_880 |
| 28. | GAGNE_000004 SWAT OFFICERS | GAGNE_000004 - 9 Videos |
| 29. | GAGNE_000032 Ring and Cox Videos<br>7/06/2023 – Bedroom, Gagne Ring Camera Video, Living Room | GAGNE_000032 |
| 30. | GAGNE_000032 Ring and Cox Videos<br>7/07/2023 – Bedroom, Gagne Ring Camera Video, Living Room | GAGNE_000032 |
| 31. | GAGNE_000033 Scene Photos | SCENEPHOTOS 001-007 |
| 32. | GAGNE_000034 Family Scene Photos Video | FAMILY_001-047 |
| 33. | GAGNE_000035 Social Media - Twitter Data | |
| 34. | GAGNE_000036 Neighbor's Ring | NEIGHBOR_001-003 |
| 35. | Mesa Police Report – Redacted | GAGNE_007187-007435<br>PLF_MesaDR000001-000249 |
| 36. | CIRB 2023-007 | GAGNE_007436-007440 |
| 37. | Letter to COMPD Records | GAGNE_007441-007442 |
| 38. | Fax from Mesa PD Records (Fax) | GAGNE_007443-007445 |
| 39. | Text from Canyon Vista Recovery Center | GAGNE_007446 |
| 40. | Medical Examiner Report | GAGNE_007447-007460 |
| 41. | Toxicology Report | GAGNE_007461-007463 |
| 42. | Gagne Autopsy Photos | MESA_000001-000293 |
| 43. | Gagne Scene Photos | MESA_000294-001846 |
| 44. | MPD Axon 1 Body Worn Camera videos | MESA_001847-001949 |
| 45. | MPD Azon 2 Body Worn Camera videos | MESA_001950-001966 |
| 46. | MPD Axon 3 Body Worn Camera videos | MESA_001967-001978 |
| 47. | MPD Axon 4 Body Worn Camera videos | MESA_001979-001986 |
| 48. | MPD Axon 5 Body Worn Camera videos | MESA_001978-001988 |
| 49. | 911 Calls | MESA_001989-001998 |
| 50. | CAD History Authentication from MPD Records | MESA_001999 |
| 51. | Mesa Police Report Narrative Text Copy (Gutierrez #21423) | MESA_002000-002002 |
| 52. | MPD Property Report #2023-141208 | MESA_002003-002008 |
| 53. | Investigative Summary | MESA_002009-002011 |
| 54. | Negotiator Supplement – Adair #18901 | MESA_002012-002013 |

| | | |
|---|---|---|
| 55. | Supplement to Narrative Text Report - Ahumada | MESA_002014-002015 |
| 56. | ATF T20230435593 eTrace (Confidential) | MESA_002016-002017 |
| 57. | Berthelson #24347 Supplement | MESA_002018 |
| 58. | Brennan #21462 Supplement | MESA_002019-002020 |
| 59. | Briefing Worksheet | MESA_002021-002027 |
| 60. | Bryan #25214 supplement | MESA_002028 |
| 61. | Carlton #23085 supplement | MESA_002029 |
| 62. | Carrasco #22609 supplement | MESA_002030 |
| 63. | CIRB 2023-007-Final Training Unit Review Memo (oo507036xC14DE) (Confidential) | MESA_002031-002035 |
| 64. | CIRB 2023-007 Presentation | MESA_002036-002067 |
| 65. | CIRB Commentary 2023-007 (0050703xC14DE) (Confidential) | MESA_002068-002071 |
| 66. | Clover #20541 supplement | MESA_002072-002073 |
| 67. | Cochran #12353 supplement | MESA_002074 |
| 68. | Crime Scene Log | MESA_002075-002080 |
| 69. | Crosby #21648 supplement | MESA_002081-002082 |
| 70. | Dangerfield #13529 supplement | MESA_002083 |
| 71. | Dorrell #23081 supplement | MESA_002084 |
| 72. | Duran #23529 supplement | MESA_002085 |
| 73. | Durham #22727 supplement | MESA_002086-002087 |
| 74. | Eaton #22745 supplement | MESA_002088 |
| 75. | F2023068073 MFMD CAD | MESA_002089-002091 |
| 76. | F20230680073 MF MD Patient Care Report | MESA_002092-002097 |
| 77. | Falconer #22430 supplement | MESA_002098 |
| 78. | Forrest #21468 supplement | MESA_002099-002100 |
| 79. | Freeman #23084 supplement | MESA_002101-002102 |
| 80. | FSS070723-0022-0001 | MESA_002103-002114 |
| 81. | FSS070723-0022-0002 | MESA_002115-002132 |
| 82. | FSS070723-0022-0003 | MESA_002133-002141 |
| 83. | FSS070723-0022-0004 | MESA_002142-002150 |
| 84. | FSS070723-0022-0005 | MESA_002151-002169 |
| 85. | FSS070723-0022-0006 | MESA_002170-002128 |
| 86. | FSS070723-0022-0007 | MESA_002182-002205 |
| 87. | FSS070723-0022-0008 | MESA_002206-002207 |
| 88. | FSS070723-0022-0009 | MESA_002208-002211 |
| 89. | FSS070723-0022-0010 | MESA_002212-002215 |
| 90. | FSS070723-0022-0013 | MESA_002216-002219 |
| 91. | George #17283 supplement | MESA_002220 |
| 92. | Gomez #22698 supplement | MESA_002221 |
| 93. | Gonzales #19451 supplement | MESA_002222 |
| 94. | Hallemeyer #15339 supplement | MESA_002223-002226 |
| 95. | Halter #17385 supplement | MESA_002227 |
| 96. | Hong #24475 supplement | MESA_002228-002229 |
| 97. | Ibarra #22438 supplement | MESA_002230-002231 |

| | | |
|---|---|---|
| 98. | Kelly #23422 supplement | MESA_002232 |
| 99. | Kurian #21070 supplement | MESA_002233-002234 |
| 100. | Lead Investigator Supplement #1- Investigation | MESA_002235-002263 |
| 101. | Lentz #12201 supplement | MESA_002264-002265 |
| 102. | Maldonado #21682 supplement | MESA_002266 |
| 103. | Marquez #19915 supplement | MESA_002267-002268 |
| 104. | Mask #15668 supplement | MESA_002269-002270 |
| 105. | Mataipule #24034 supplement | MESA_002271 |
| 106. | McDowell #16150 Supplement | MESA_002272 |
| 107. | McDowell #19457 supplement | MESA_002273 |
| 108. | Meicke #23520 supplement | MESA_002274 |
| 109. | Meyer #20461 supplement | MESA_002275-002276 |
| 110. | Miskin #21466 supplement | MESA_002277-002278 |
| 111. | Newby #22469 supplement | MESA_002279-002280 |
| 112. | Nicholson #19465 supplement | MESA_002281-002283 |
| 113. | O'Connell #13912 supplement | MESA_002284 |
| 114. | OME – Case File - Case 23-06943 – MEDICAL EXAMINER REPORT- PDF-FINAL-GAGNE | MESA_002285-002298 |
| 115. | OME – Case File – Case 23-06943 – TOXICOLOGY REPORT - GAGNE | MESA_002299-002301 |
| 116. | OME Info Supplement | MESA_002302 |
| 117. | Orr #19441 Negotiator supplement | MESA_002303 |
| 118. | Pareti #16656 AFIS supplement | MESA_002304 |
| 119. | OME Info Supplement | MESA_002302 |
| 120. | Orr #19441 Negotiator supplement | MESA_002303 |
| 121. | Pareti #16656 AFIS supplement | MESA_002304 |
| 122. | Perez #23528 supplement | MESA_002305 |
| 123. | Phillips #24934 supplement | MESA_002306 |
| 124. | Plott #21641 supplement | MESA_002307-002309 |
| 125. | Property Release | MESA_002310 |
| 126. | Rosales #21067 supplement | MESA_002311 |
| 127. | Ryder #23119 supplement | MESA_002312 |
| 128. | Samons #19185 supplement | MESA_002313-002314 |
| 129. | Scene Diagram | MESA_002315-002349 |
| 130. | Search warrant return | MESA_002350-002353 |
| 131. | Search warrant SW2023-035134 | MESA_002354-002361 |
| 132. | Staab #15048 supplement | MESA_002362-002368 |
| 133. | Stefick # 23461 supplement | MESA_002369 |
| 134. | T20230435598 eTrace | MESA_002370 |
| 135. | Terry #23359 supplement | MESA_002371 |
| 136. | Tewalt #23684 supplement | MESA_002372 |
| 137. | Timeline | MESA_002373-002374 |
| 138. | Voeltz #23534 supplement | MESA_002375 |
| 139. | Waits #17341 supplement | MESA_002376-002379 |
| 140. | Widmer #19506 supplement | MESA_002380-002381 |

| | | |
|---|---|---|
| 141. | 2023-141208 OIS Presentation | MESA_002382-002408 |
| 142. | Plainview ISD -Plainview Independent School District records received via subpoena | MESA_002409-002445 |
| 143. | Granada Hills Charter High School records received via subpoena | MESA_002446-002452 |
| 144. | M.H. Uyekawa, Inc. employment records received via subpoena | MESA_002453-002483 |
| 145. | BizIQ Employment Records received via subpoena | MESA_002484-002667 |
| 146. | Garden Lakes Elementary School education records received via subpoena | MESA_002668-002679 |
| 147. | Kaiser Permanente medical records received via subpoena | MESA_002680-003058 |
| 148. | Henry Mayo Newhall Hospital medical records received via subpoena | MESA_003059-003257 |
| 149. | Los Angeles Unified School District education records received via subpoena | MESA_003258-003070 |
| 150. | Injury pic.mp4 | GAGNE 007466 |
| 151. | Injury pic.mp4 | GAGNE 007467 |
| 152. | Injury pic.mp4 | GAGNE 007468 |
| 153. | Arm Knot pics.mp4 | GAGNE 007469 |
| 154. | Brusing pics.mp4 | GAGNE 007470 |
| 155. | Domestic Violence and child abuse police report.mp4 | GAGNE 007471 |
| 156. | Alleged DV injuries PD.mp4 | GAGNE 007472 |
| 157. | Freeman family Recording.mp4 | GAGNE 007473 |
| 158. | Freeman family Pics.mp4 | GAGNE 007474 |
| 159. | Freeman family Recording.mp4 | GAGNE 007475 |
| 160. | Mesa Police Officer S Freeman Domestic Battery charging worksheet.mp4 | GAGNE 007476 |
| 161. | Freeman family Recording.mp4 | GAGNE 007477 |
| 162. | Freeman family Recording.mp4 | GAGNE 007478 |
| 163. | Freeman family Recording.mp4 | GAGNE 007479 |
| 164. | Freeman family Recording.mp4 | GAGNE 007480 |
| 165. | Freeman Family pics.mp4 | GAGNE 007481 |
| 166. | Freeman family Recording.mp4 | GAGNE 007482 |
| 167. | Freeman family Recording.mp4 | GAGNE 007483 |
| 168. | Freeman family Recording.mp4 | GAGNE 007484 |
| 169. | S. Freeman Family Recording .mp4 | GAGNE 007485 |
| 170. | S Freeman Family Recording.mp4 | GAGNE 007486 |
| 171. | S Freeman Family Recording.mp4 | GAGNE 007487 |
| 172. | S Freeman Family Recording.mp4 | GAGNE 007488 |
| 173. | S. Freeman domestic Mesa Police Dept Arizona.mp4 | GAGNE 007489 |
| 174. | S. Freeman Family Recording.mp4 | GAGNE 007490 |
| 175. | S Freeman Family Recording .mp4 | GAGNE 007491 |
| 176. | S Freeman Family recording.mp4 | GAGNE 007492 |

| | | |
|---|---|---|
| 177. | S Freeman Family.mp4 | GAGNE 007493 |
| 178. | S Freeman: Family Recdording.mp4 | GAGNE 007494 |
| 179. | FC2022-220907 Verified Petition | GAGNE 007495-007505 |
| 180. | FC2022-230328 Notice Change of Judge | GAGNE 007506-007543 |
| 181. | FC2022-240304 Ruling | GAGNE 007544-007570 |
| 182. | FC2022-094055 Family Court Case Information – Case History | GAGNE 007571-007575 |
| 183. | TLOxp Comprehensive Report – S Freeman | GAGNE 007576-007609 |
| 184. | Petition for Order of Protection | GAGNE 007614-007621 |
| 185. | 0759 251001160455 | GAGNE 007610-007613 |
| 186. | Deposition Transcript of Officer Adair w/exhibits 1-6 | |
| 187. | Deposition Transcript of Officer Chuey w/exhibits 1-9 | |
| 188. | Deposition Transcript of Officer Freeman w/exhibits 1-8 | |
| 192. | Deposition Transcript of Officer Harris w/exhibits 1-5 | |
| 193. | Deposition Transcript of Officer Thomas w/exhibits 1-8 | |

# Robert Handy's
# Curriculum Vitae

Robert Handy
20118 N. 67th Avenue Suite #300-452
Glendale, Arizona 85308
(714) 916-7439 rob@trichief.com

## EXPERT WITNESS - LAW ENFORCEMENT / POLICE PRACTICES / USE OF FORCE

Law Enforcement Expert Witness with extensive experience in all levels and aspects of policing. Particular expertise in police practices, tactics, training, use of force, and accountability. Leader, facilitator or decision maker for hundreds of incident debriefings, after action reviews, post incident investigations, findings and outcomes. Over 30 years of courtroom and other testifying experience in criminal cases, civil cases, depositions and arbitrations.

### KEY COMPETENCIES

- Police Practices
- Executive Leadership / Strategic Guidance
- Case Evaluation / Program Evaluation
- Gangs / Use of Force / Training / Procedures
- SWAT / Tactical Operations
- Special Event Management / Injuries
- Organizational Assessments
- Personnel Investigation and Review
- Multi-Agency / Critical Incident Response
- Accountability / Policies / Protocol

### LAW ENFORCEMENT LEADERSHIP EXPERIENCE

**Director of Public Safety – Grand Canyon University (GCU)**
**9/2023-Present**
Responsible for the oversight and leadership of the Public Safety Department, consisting of a police chief, sworn police officers, security guards, and professional staff who provide public safety services for the University. With an expansive campus in Phoenix, Arizona, GCU is the largest private Christian University in the nation, serving more than 100,000 residential, commuter, and online students.

**Founder - TriChief Consulting Services, Huntington Beach, CA**
**5/2019-Present**
TriChief Consulting is a national consulting firm of law enforcement experts, consulting in business development, departmental assessments, performance audits, training audits, expert witness work, and more.

**Chief of Police - City of Huntington Beach, Police Department**
**12/2013 - 10/2020**

**Span of Control: 365 people, $82 million budget**
Recruited to provide executive leadership and management of this popular full-service beach city with a year-round population of 200,000 residents and millions of annual visitors.

- Implemented a variety of leadership and community-based policing principals including new standards, processes and technology systems to increase accountability, transparency and community responsiveness
- Created numerous programs and processes to engage the community and key stakeholders, and collectively identified priorities and implemented meaningful and sustainable solutions to complex challenges
- Developed regional approaches, partnerships, revenue offsets and service exchanges in key areas for substantial savings

- Oversaw planning and operations for large-scale special events with hundreds of thousands of attendees
- Conceptualized, coordinated and founded the California Police Chiefs Executive Development Institute at Drucker. The program is an intense, in-residence course for police executives held on the Drucker School's campus at Claremont Graduate University each summer with a focus on collaborating with industry and academic leaders to prepare individuals to become law enforcement executives
- Founded and created the Huntington Beach Police and Community Foundation, supporting training, officer wellness and morale-boosting initiatives, community and youth programs and lifesaving equipment.

**Chief of Police - City of San Bernardino, Police Department**
**10/2011 - 12/2013**

**Span of Control: 410 people, $55 million budget**
Delivered executive leadership of comprehensive police services to a diverse community of 211,000 residents.

- Provided stability and leadership during the City's financial crisis, political crisis and bankruptcy, which led to historic reductions in personnel and resources for the Police Department
- Increased citizen and business partnerships to raise the level of transparency and trust with the community
- Expanded resources and priorities aimed at implementing transformative community programs and services
- Dramatically reduced use of force and citizen complaints through policy changes, officer training and accountability

**City of Phoenix Police Department**
**6/1990 - 10/2011**

Assigned simultaneously as the Maryvale Precinct Commander and Training Bureau Commander due to budget reductions.

**Commander, Maryvale Precinct (5/2010 - 10/2011) - Span of Control: 176 people, $21 million budget**
Successfully innovated and implemented programs and partnerships to lower crime.

- Collaborated extensively with officers and stakeholders to architect and deploy programs relating to curfew diversion, graffiti reward, domestic violence prevention, and underage drinking programs
- Multiple programs became model programs for other jurisdictions across the city and country

**Commander, Training Bureau (5/2010 - 10/2011) - Span of Control: 68 people, $15 million budget**
Responsible for oversight of in-service training for over 4,000 employees and acting as department representative to the multi-agency basic training academy (ALEA) at The Phoenix Police Regional Academy. Department liaison with AZPOST.

- Reviewed all police shootings, significant uses of force, training, equipment, and policy changes city-wide
- Collaborated with internal teams to develop annual training curriculum for immigration enforcement, interpersonal communications and de-escalation, use of force, search and seizure, and other critical topics

**Commander, Office of Administration in the Chief's Office (7/2008 - 5/2010)**
Reported directly to the Executive Assistant Chief. Responsibilities for leading executive level projects, interacting with elected and appointed government officials and media, developing focus groups and managing labor relations. Led budget cuts +$37M.

- Oversaw construction of two new police precinct stations including the complete patrol deployment redesign of +2,000 employees based on geography, schedules, workload, and organizational priorities

**Commander, Tactical Support Bureau (3/2006 - 7/2008) - Span of Control: 145 people, $35 million budget**
Oversaw the planning and execution of tactical operations and special events throughout the city including large-scale emergencies, planned events, and detailed preparations for potential disasters. Directly responsible for day to day leadership of the SWAT, fugitive apprehension, and airborne groups.

**Lieutenant, Tactical Support Bureau (2002-2006)**
Oversaw the Canine Unit, Rapid Deployment Unit, and acted as the relief SWAT Commander. Part of a team responsible for preparing for mass casualty incidents and all other tactical emergencies. Responded to tactical emergencies throughout the City of Phoenix and was either in command or part of the command structure of emergencies, tactical and large scale crowd events.

**Supervisory, Detective, and Officer assignments (1990 - 2006)**

- Lieutenant: Patrol Area Manager and Task Force Commander

- Sergeant: Basic Training Sergeant at the Academy, Walking Beat Sergeant, Administrative Sergeant in Police Chief's Officer, Patrol Sergeant (3 different precincts)
- Officer: Gang Squad Detective, Field Training Officer, and Patrol Officer

## FACULTY POSITIONS

**Adjunct Faculty Instructor - California State University Long Beach**
**2018 - 2022**

Developed online graduate course (Managing Police Organizations). Currently teaching undergraduate courses in Policing and a graduate course in Managing Police Organizations while mentoring students in their academic and professional goals.

**Adjunct Faculty Instructor - Arizona State University**
**1998 - 2013**

Developed and taught various upper division classes in the Criminal Justice program. Worked collaboratively with faculty to expand Criminal Justice program by developing new courses and providing subject matter expertise on various topics.

- Created classes in Police Use of Force, Community Policing, Organized Crime, Gangs, and Occupational Crime

- Mentored many students throughout their educational pursuits and into careers in criminal justice

## EDUCATION AND PROFESSIONAL CERTIFICATIONS

Executive and Advanced Certificates - California POST (2011 - 2016)
FBI National Academy Graduate, Class 214 - Federal Bureau of Investigation (2003)
Master of Public Administration - Arizona State University (1996)
B.S. Public Administration – University of Arizona (1990)

## PROFESSIONAL AFFILIATIONS AND COMMUNITY LEADERSHIP

1996 - present Lifetime member, International Association Chiefs of Police
2010 - present Lifetime member, Police Executive Research Forum
2015 - present Executive Fellow, National Police Foundation
2015 - present Founder, Board Member, Huntington Beach Police and Community Foundation
2014 - present Member, First Vice President and Board Member, California Police Chiefs Association
2017 - present Founder, Faculty, California Police Chiefs Association's Executive Leadership Institute at Drucker
2013 - present President and Board Member, Boys and Girls Club of Huntington Valley
2015 - 2020 Board Member, Huntington Beach Hospital
2011 - 2020 Advisory Board Member, Anti-Defamation League
2008 - 2011 President and Board Member, Arizona Chapter of the FBI National Academy Associates
2008 - 2011 Founder and Director, Arizona Leadership Education and Development Youth Academy

## AWARDS

(partial List)

Lifetime Achievement Award - International Public Safety Leadership and Ethics Institute's (IPSLEI)
Peace Maker Award - Greater Huntington Beach Interfaith Council
Man and Youth Award, Eagle Award, Eddy Award - Boys and Girls Club
Scouting's Spurgeon Award - Boy Scouts of America
Medal of Valor (two-time recipient) and Medal of Lifesaving (two-time recipient) - Phoenix Police Dept.
Excellence Award - City of Phoenix (two-time recipient)
Distinguished Service Award, Police Chief's Unit Award (two-time recipient)
Heroism Award - Rotary Club of Phoenix
LECC Cooperative Law Enforcement Award - United States Attorney's Office, Phoenix

## Specialized Training

(partial List)

1. Police Academy/Police Officer Certification, Phoenix Police Department, 1990 (640 hours)
2. Gang Seminar, National Law Enforcement Institute, 1991 (16 hours)
3. POST General Instructor Certification course, ALEOAC (AZPOST), 1992 (40 hours)
4. Field Training Officer course, Phoenix Police Department, 1992 (20 hours)
5. Report Writing course, Phoenix Police Department, 1993 (20 hours)
6. Street Gangs and Subcultures, LA Sheriff's Department, 1994 (40 hours)
7. Survival Awareness/Police Tactics, Federal Bureau of Investigation, 1995 (40 Hours)

8. Advanced Gang course, AZ Department of Public Safety, 1995 (24 hours)
9. Advanced Gang Investigators' School, National Law Enforcement Institute, 1995 (24 hours)
10. Supervisor Development course, Phoenix Police Department, 1996 (80 hours)
11. Firearms Instructor, AZPOST, 1996 (80 hours)
12. Defensive Tactics Instructor, AZPOST, 1997 (64 hours)
13. Intermediate Tactical Handgun, American Firearms Training and Tactics, 1997
14. Physical Fitness Specialist, Cooper Institute, 1998 (40 hour)
15. Advanced Tactical Handgun, American Firearms Training and Tactics, 1998
16. Advanced Gang Conference, National Law Enforcement Institute, 1998 (16 hours)
17. Defensive Tactics Instructor development, AZPOST, 1998 (24 hours)
18. Police Bicycle certification, Phoenix Police Department, 1999 (40 hours)
19. Officer Involved Shootings/Investigations, Partners in Training Inc, (24 hours)
20. Risk Management, Gordon Graham, 2000 (8 hours)
21. Officer Involved Shootings/Investigations, Public Agency Training Council, 2000 (24 hours)
22. Peace Office Fitness Coordinator, FitForce, Inc, 2000 (40 hours)
23. Rampart Debrief/Lessons Learned, FBI National Academy Associates 2001
24. Legal Issues of Pattern and Practice, United State Department of Justice, 2001
25. Enlightened Leadership, Larry Prochazaka, 2001 (40 hours)
26. Leadership Forum, Phoenix Police Department, 2001 (40 hours)
27. Legal Issues/Labor Management, Dale Anderson, 2002 (8 hours)
28. Response to Terrorism, NYPD Emergency Services Unit, 2002 (16 hours)
29. K-9 Manager course, K9 Academy for Law Enforcement, 2002 (40 hours)
30. Officer Involved Shootings/Investigations, FBI National Academy Associates, 2003 (6 hours)
31. FBI National Academy graduate, Class 214, FBI Academy, Quantico VA, 2003 (400 hours)
32. Crisis Negotiation School, Federal Bureau of Investigation, 2003 (40 hours)
33. SWAT Supervision and Command, National Tactical Officers Association, 2004 (40 hours)
34. SWAT SCBA Tactical Deployments, Phoenix Police Department SWAT, 2004 (40 hours)
35. K-9 Manager, Eden Consulting Group, 2004, (40 hours)
36. Terrorism and Explosives class, United States Bureau of Alcohol Tobacco and Firearms, 2005
37. Trailing Service Dog Program, AZ Department of Corrections, 2005 (40 hours)
38. Ethics in Law Enforcement, FBI National Academy Associates, 2005 (8 hours)
39. Managing LEO Stress, Federal Bureau of Investigation (James Reese), 2005 (8 hours)
40. Federal Emergency Management, IS-500, 700, 2006
41. Physical Fitness Instructor, AZPOST, 2008 (40 hours)
42. Regional Media Relations, FBI National Academy Associates, 2009
43. Management Course, CA POST, 2009, (120 hours)
44. Executive Development, CA POST, 2015 (80 hours)

## Expert Experience

1. Trained thousands of police officers in use of force, firearms, tactics and police practices (1996-2011)
2. Use of Force Board Member, Phoenix Police Department (1996-2011)
3. Reviewed thousands of police use of force incidents (1996-2020)
4. Led/participated in dozens of tactical reviews and investigations of significant uses of force (2002-2020)
5. Led formal review of incident where two Phoenix Police officers were murdered (2005)
6. Outside expert team member, comprehensive evaluation of the national FBI SWAT team program (2007)
7. Outside expert team member, review of Dallas Police Department SWAT team program (2008)

8. Final decision maker on hundreds of use of force cases from minor force to deadly force (2006-2020)
9. Final decision maker on hundreds of discipline decisions from reprimands to terminations (2006-2020)
10. Barajas v. State of CA, County of San Bernardino, et al (state case): Expert for the defense, police practices, wrongful death case with a deputy involved fatal collision (2021)
11. Elser v. City of Huntington Beach (administrative case): Testified for defense in use of force case, qualified as expert (2021)
12. Alnajjar v. County of San Bernardino, et al (state case): Expert for defense, police practices, personal injury case involving emergency driving (2021)
13. Team member on organizational assessment, Little Rock, Arkansas, Police Department (2021)
14. Lead consultant on property/evidence review, Costa Mesa, California, Police Department (2021)
15. Outside expert for review of critical injury use of force, Inyo County, California (2021)
16. Team member for organizational assessment, National City, California, Police Department (2022)
17. Team member for organizational assessment, Santa Rosa, California, Police Department (2022)
18. Lead consultant for organizational assessment, Upper Arlington, Ohio, Police Division (2022)
19. Lead consultant for organizational assessment, Maricopa County, Arizona, Sheriff's Office (2022)
20. DeAnna Sullivan v. City of Buena Park et al., Superior Court, State of California, County of Orange, expert for the defense police practices, use of force, wrongful death case (2022)
21. Lourdes Vaughn v. City of Arvin, US District Court, Eastern District of California: Expert for defense, wrongful death, excessive force, police practices (2022)
22. DiDonna v. City of Reedley, Superior Court County of Fresno, expert for defense, police practices, unlawful detention, arrest etc. (2022)
23. Gonzalez v. City of Phoenix et al, US District Court, District of Arizona: Expert for police practices and excessive use of force for an in-custody death case (2022)
24. State of North Dakota v. United States of America, US District Court, District of Northern Dakota, Southern Region, expert for plaintiff, police practices, arrest, use of force, mass arrests, large incident management in a protest case (2022)
25. Dion Humphrey & William Humphrey v. City of Phoenix et al., United States District Court, District of Arizona, expert for defense on police practices, use of force, in custody death case (2022)
26. Maxima Guerrero Sanchez, et al., v. City of Phoenix et al., United States District Court, District of Arizona, expert for the defense on police practices, false arrest, mass arrest protest case (2022)
27. Calhoon v. City of South Lake Tahoe et al., United States District Court Eastern District of California, expert for defense, police practices, in a false arrest case (2022)
28. Lead consultant for organizational assessment, Battle Creek, Michigan, Police Department (2023)
29. Team member for organizational assessment, Redwood City, California, Police Department (2023)
30. Team member for organizational assessment, Kalispell, Montana, Police Department (2023)
31. Team member for organizational assessment, Pulaski County, Arkansas, Sheriff's Office (2023)
32. Lead consultant for organizational assessment, Chattanooga, Tennessee Police Department (2023)

33. Lead consultant for organizational assessment, Grand Canyon University Public Safety Department, Phoenix, Arizona (2023)
34. Team member for organizational assessment, Knoxville, Tennessee Police Department (2023)
35. Team member for organizational assessment, West Des Moines, Iowa, Police Department (2023)
36. May v. City of Los Angeles World Airports Police Department, Superior Court of the State of California, County of Los Angeles, expert for the defense on police practices in a discrimination case (2023)
37. Limon-Mendoza v. City of Corona United States District Court, Case No. 5:23-cv-00134, expert for defense, use of force, wrongful death, police practices (2023)
38. Subcontractor for New York Attorney General, conducting reviews of use of force cases from a municipal police department under investigation, 66 individual use of force incidents reviewed as of 5/2023
39. Angelo Self v. City of Palm Springs, United States District Court, Central District of California, expert for defense in false arrest and excessive force case (2023)
40. Emily Garcia v. City of Tustin, United States District Court, Central District of California, expert for defense in wrongful death, officer involved shooting case (2022)
41. Los Angeles Schools Police Department, retained as a use of force expert for an internal personnel complaint of excessive force (2023)
42. Mendez v. City of Fontana, United States District Court, Central District of California, expert for defense in wrongful death, officer involved shooting case (2023)
43. Jasmine Williams, et al, v. City of Beverly Hills, et al, United States District Court, Central District of California, expert for the defense regarding wide range of police practices in discrimination case (2023)
44. The Estate of Valentina Orellna Peralta, et al, v. City of Los Angeles, William Dorsey Jones, et al, United States District Court, Central District of California, expert for defense of officer in wrongful death, officer involved shooting case (2023)
45. Ymelda Elena, et al, v. City of Los Angeles, William Jones Jr., et al, United States District Court, Central District of California, expert for defense of officer in wrongful death, officer involved shooting case (2023)
46. Frank Benavente and Nicole Ventress v. Albert Alvarado, City of Ontario, et al, United States District Court, Central District of California, expert for defense in officer involved shooting case (2023)
47. Lott v. City of Peoria, et al, Maricopa County Superior Court, expert for defense in officer involved shooting case (2023)
48. Estate of David Pelaez Chavez, et al, v County of Sonoma, et, al, United States District Court, Northern District of California, expert in officer involved shooting case (2023)
49. Anyka Harris et, al v City of Tulare et al, United States District Court, Eastern District of California, expert for defense in officer involved shooting case (2023)
50. Evalyn Martinez v City of Los Angeles, United States District Court, Central District, expert for defense in police practices, use of force (2024)
51. Mosher, William, v City of Mesa, et al, United States District Court, District of Arizona, expert for defense in police practices, use of force (2024)
52. Zealin Bartek, et al v City of Visalia, et al, United States District Court, Eastern District of California, Fresno Division, expert for the defense, in police practices, use of force (2024)
53. William Colbert v City of Merced, et al, United states District Court, Eastern District of California, expert for the defense, in police practices, and use of force (2024)

54. Sotero Garcia Chavez v United States of America, et al, United States District Court, District of Oregon, Portland Division, expert for the plaintiff, in police practices (2024)
55. Bell, et al v City of Placentia, et al, Superior Court, State of California, County of Orange, expert for the defense, police practices (2024)
56. Marylyn Rogel, as Special Administrator for Estate of Dominga Flores Gomez v Tobias Houston, City of Chicago, et al, Circuit Court of Cook County, Illinois County Department, Law Division, expert for defense on police practices (2024)
57. Estate of Korey Unti and Hazel Unti v City of Atwater, Atwater Police Department, et al, United States District Court, Eastern District of California, Fresno Division, expert for the defense, police practices (2025).
58. Team member for organizational assessment, Fort Pierce, Florida Police Department, 2025
59. Use of force and police practice consultant for Chumash Casino Resort, Santa Ynez, California, (2025).
60. Use of force expert for California Peace Officer Standards and Training (POST), review and analysis on de-certification case (2025)
61. Use of force expert for the city of Tulare, review and analysis of officer involved shooting case involving terminated employees, Officers Barragan and Bradley (2025)
62. Use of force expert for the City of Antioch, review and analysis of use of force case involving terminated employee (2025).
63. JFG, a minor, by and through his Guardian Ad Litem, Jesse Garcia SR. and Monica Garcia v County of Tulare, City of Tulare, et al, United States District Court, Eastern District of California, #1:23-cv-01728 JLT SAB, expert for defense, use of force and police practices (2025).
64. Greene, et al v City of Beverly Hills et al, United States District Court, Central District of California, expert for the defense regarding wide range of police practices in discrimination case (2025)
65. Jose Gonzalez Special Administrator of the Estate of Jose Almanza - Martinez v City of Chicago, Officers Smiley and Careon, Circuit Court of Cook County Illinois, County Department, Law Division, #24-L-14052, expert for defense police practices (2025)
66. Susan Patten as Representative for the Estate of Mark Anthony Avila v The Town of Clayton, New Mexico, et al, United States District Court, District of New Mexico, # 1:25-CV-00245-SMD-LF, expert for the defense use of force and police practices (2025).
67. Michael Anthony Godinez as Special Administrator for the Estate of Michael O. Godinez v Travon Done and the Village of Sauk, an Illinois Corporation, #24-CV-04317, expert for the plaintiff, use of force and police practices (2025).
68. Team member for organizational assessment, Santa Monica Police Department, 2025
69. Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne v City of Mesa et al, United States District Court, District of Arizona #2:24-cv-01337-DJH, expert for the defense, use of force and police practices (2025).
70. Team member for organizational assessment, Tempe, Arizona Police Department, 2025
71. Donald Young, Lidia Aguayo, Ashley Lopez, a minor, by Donald Young, guardian ad litem v City of mosher, et al, Superior Court of the State of California, County of San Bernardino, # CIVSB2204557, expert for the defense police practices (2025)
72. Grant Gardner v City of Phoenix, et al, United states District Court, District of Arizona, #CV-23_2120-PHX-SRB (DMF), expert for the defense, police practices and use of force (2025)
73. Lucas Mullikin v City of Yuma, James Baisch, United States District Court for the District of Arizona, No. 2:25-cv-00637-ROS-JZB, expert for the defense, police practices (2025)

74. Blake Anderson v County of Los Angeles, United States District Court, Central District of California, Case# 2:23-cv-09044_DDP-E, expert for the defense, police practices, use of force (2025)
75. Amey v Patterson, (Sacramento County Sheriff's Department) et al, United States District Court, Eastern District of California, Case #:2:24-CV-022320TLN-CSK, expert for defense, police use of force (2025)
76. Gavrila v City of Mesa, et al, Maricopa County Superior Court, Case #:CV2024-018750, expert for the defense, police use of force (2025)
77. Joshua Anolick v Kevin Banister, City of Phoenix et al, Maricopa County, Arizona Superior Court, Case#CV2024-037043, expert for the defense, police practices (2025)
78. Flores v City of Phoenix, United States District Court, District of Arizona, Case No. 2:25-cv-00731-PHX-KML (ASB), expert for the defense, police practices (2025)
79. Reed, Levingston v City of Phoenix, United States District Court, District of Arizona, Case No. CV2023-000747, expert for defense, police practices (2025)
80. Carillo v City of Reedley, et al, United States District Court, Eastern District, Case No:1:24/CV/01093-JLT-EPG (2026)
81. Valentin Varela v City of Phoenix, et al, Maricopa County, Arizona Superior Court, Case#CV2024-017556, expert for the defense, police practices (2025)
82. Maria Jara, et al v County of Los Angeles, et al, United States District Court, Central District, Case No. 2:25-cv-08694-RGK-PVC, expert for the defense, police practices, (2026)
83. Team member for organizational assessment, Lexington, Massachusetts Police Department, 2026

## Case Testimony

*Depositions*

1. Jasmine Williams, et al, v. City of Beverly Hills, et al, United States District Court, Central District of California, expert for the defense regarding wide range of police practices in discrimination case (2023)
2. DeAnna Sullivan v. City of Buena Park et al., Superior Court, State of California, County of Orange, expert for the defense police practices, use of force, wrongful death case (2022)
3. Lourdes Vaughn v. City of Arvin, US District Court, Eastern District of California: Expert for defense, wrongful death, excessive force, police practices (2022)
4. Gonzalez v. City of Phoenix et al, US District Court, District of Arizona: Expert for police practices and excessive use of force for an in-custody death case (2022)
5. State of North Dakota v. United States of America, US District Court, District of Northern Dakota, Southern Region, expert for plaintiff, police practices, arrest, use of force, mass arrests, large incident management in a protest case (2022)

6. Dion Humphrey & William Humphrey v. City of Phoenix et al., United States District Court, District of Arizona, expert for defense on police practices, use of force, in custody death case (2022)

7. May v. City of Los Angeles World Airports Police Department, Superior Court of the State of California, County of Los Angeles, expert for the defense on police practices in a discrimination case (2023)

8. Emily Garcia v. City of Tustin, United States District Court, Central District of California, expert for defense in wrongful death, officer involved shooting case (2022)

9. Ymelda Elena, et al, v. City of Los Angeles, William Jones Jr., et al, United States District Court, Central District of California, expert for defense of officer in wrongful death, officer involved shooting case (2023)

10. Frank Benavente and Nicole Ventress v. Albert Alvarado, City of Ontario, et al, United States District Court, Central District of California, expert for defense in officer involved shooting case (2023)

11. Estate of David Pelaez Chavez, et al, v County of Sonoma, et, al, United States District Court, Northern District of California, expert in officer involved shooting case (2023)

12. Anyka Harris et, al v City of Tulare et al, United States District Court, Eastern District of California, expert for defense in officer involved shooting case (2023)

13. William Colbert v City of Merced, et al, United states District Court, Eastern District of California, expert for the defense, in police practices, and use of force (2024)

14. Marylyn Rogel, as Special Administrator for Estate of Dominga Flores Gomez v Tobias Houston, City of Chicago, et al, Circuit Court of Cook County, Illinois County Department, Law Division, expert for defense on police practices (2024)

15. The Estate of Valentina Orellna Peralta, et al, v. City of Los Angeles, William Dorsey Jones, et al, United States District Court, Central District of California, expert for defense of officer in wrongful death, officer involved shooting case (2023)

16. JFG, a minor, by and through his Guardian Ad Litem, Jesse Garcia SR. and Monica Garcia v County of Tulare, City of Tulare, et al, United States District Court, Eastern District of California, #1:23-cv-01728 JLT SAB, expert for defense, use of force and police practices (2025).

17. Jose Gonzalez Special Administrator of the Estate of Jose Almanza - Martinez v City of Chicago, Officers Smiley and Careon, Circuit Court of Cook County Illinois, County Department, Law Division, #24-L-14052, expert for defense police practices (2025)

*Trial/Hearing Testimony*

1. Elser v. City of Huntington Beach (administrative case): Testified for the defense of the department in use of force discipline case, qualified as expert (2021)
2. DeAnna Sullivan v. City of Buena Park et al., Superior Court, State of California, County of Orange, expert for the defense police practices, use of force, wrongful death case (2022)
3. State of North Dakota v. United States of America, US District Court, District of Northern Dakota, Southern Region, expert for plaintiff, police practices, arrest, use of force, mass arrests, large incident management in a protest case (2022)
4. Anyka Harris et, al v City of Tulare et al, United States District Court, Eastern District of California, expert for defense in officer involved shooting case (2023)
5. Ymelda Elena, et al, v. City of Los Angeles, William Jones Jr., et al, United States District Court, Central District of California, expert for defense of officer in wrongful death, officer involved shooting case (2023)
6. Termination appeal hearing, Officers Barragan and Bradley v City of Tulare, use of force expert, officer involved shooting case, Tulare City Hall (10/14/2025)
7. Termination appeal hearing, City of Antioch, appellant, Sergeant Evans, use of force expert, Antioch Police Department, (2/19/2026).
8. Emily Garcia v. City of Tustin, United States District Court, Central District of California, expert for defense in wrongful death, officer involved shooting case (4/20/2026)
9. The Estate of Valentina Orellna Peralta, et al, v. City of Los Angeles, William Dorsey Jones, et al, United States District Court, Central District of California, expert for defense of officer in wrongful death, officer involved shooting case (4/28 - 4/29/2026)

# EXHIBIT 13

Noedel Scientific

mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

On June 24, 2025, I was retained by attorney Christina Retts to evaluate, consult and review aspects of the shooting event recorded as Gagne v City of Mesa 2:24-cv-01337-DJH. Documentation was provided that included police reports, forensic reports, autopsy reports, scene photographs, witness accounts, body camera video, surveillance video, and other data connected to the event (see list at the end of this report). This report outlines the findings from the evaluations of this data.

***This assessment was conducted with the materials and information provided. Should additional relevant information or evidence become available, or if the direct examination of additional physical evidence related to this event is conducted, a supplemental report may need to be generated to incorporate the new information or evidence.***

***A current Curriculum Vitae for Matthew Noedel, the fee structure and materials relied upon are included as an appendix to this report.***

## Examination/Results

*Methodology*

Scene reconstruction relies on the analysis of the physical properties known to exist in connection with an event. Using the scientific method, a shooting scene is characterized by evaluating the available physical evidence and attempting to support or refute details such as the sequence of events, performance of firearms and projectiles, the evaluation of specific forms of bloodstains or other physical evidence and the interrelationships of these features in the physical space available. Claims made about an event can be weighed in context of the available data. Scene reconstruction may not be capable of answering every question and is limited by the quality and quantity of documentation, physical evidence collection and testing.

*Background*

On July 6, 2023, police and SWAT officers responded to 1233 North Mesa Drive, Apt 2164, Mesa AZ. A 911 caller reported that Mr. Shawn Gagne had been threatening with a firearm. During the course of this event, Mr. Gagne was reported to have fired toward police, and eight police officers were known to have fired gunshots toward Mr. Gagne during this event. Mr. Gagne was struck and fatally injured from gunshot wounds sustained during this event.

A scene map labeled with reported police officer locations was provided for examination (see figure 1). The locations provided will be considered as accurate approximations for purposes of this analysis. In addition, a floor plan consistent with the layout of apartment 2164 was acquired for further assessment (see figure 2).

Note: Red or red/brown stains visually consistent with blood seen in photographs or video will be considered as blood for this examination.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026




Figure 1: A top-down scene view with locations of police officers and apartment features noted. (From: MESA_002382-002408 CIRB 2023-007 OIS_Presentation_.ppt; slide 15).

Noedel Scientific

mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026







Figure 2: Left-A diagram acquired from the Glen at Mesa web site of the floor plan consistent with apartment #2164; Right-A line model of the apartment drawn to further evaluate the scene.

Noedel Scientific

mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

*Scene and Reconstruction*

Documentation of the inside of the residence identified the recovery of four firearms and three fired cartridge cases (see figure 3). Magazines and ammunition were located in various locations throughout the residence.

A Riley Defense RAK47, AK47 style rifle (serial number #B49517) was present on the kitchen floor. As documented, the rifle safety lever was down (in the fire position), the bolt was closed forward, and a loaded extended magazine was inserted in the magazine well. A photograph of a single unfired cartridge may be a cartridge from the chamber of this rifle.

- The ammunition depicted as having been loaded in this rifle was consistent with Russian manufactured, steel full metal jacket projectiles. The cartridges with the rifle are consistent with the cartridge boxes documented by the front door ("Wolf" brand 7.62x39 ammunition). Steel jacketed ammunition has an increased ability to penetrate hard barriers as compared to copper jacketed ammunition.

- The rifle was adjacent to a large pool of apparent blood. The collection of blood is consistent with Mr. Gagne having been stationary at that location on the kitchen floor while bleeding.

- The interior video shows Mr. Gagne with this rifle just before receiving a gunshot wound to the face. The rifle was partially set on the kitchen counter and then fell to the documented location on the kitchen floor and was not accessed by Mr. Gagne after that time.

- A fired 7.62x39 cartridge case was located on the floor adjacent to the kitchen. It is unknown when this cartridge case was discharged to arrive at this location.

A Typhoon model F12, 12 gauge semiautomatic shotgun (serial number 21D8891) was located leaning against the wall in the central hallway. The shotgun was loaded with low base shotshells visually consistent with typical birdshot loads. Numerous shotgun shells were located in the residence.

A Springfield model XD semiautomatic pistol (serial number BY428872) with a loaded magazine inserted was located in a holster documented on a couch cushion in the living room.

- A fired handgun cartridge case visually consistent with a .45 Auto caliber was located on the floor inside the bedroom door at the end of the hall. It is unknown when this cartridge case was discharged to arrive at this location.

A model M&P rifle with loaded magazine was documented on the shattered glass on the exterior deck. No further documentation of this rifle was provided for this exam.

The third documented fired cartridge case was located among the shattered glass on the porch. No additional information about this fired cartridge case was provided for this examination.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026




Figure 3: The scene map with approximate locations of firearms and fired cartridge cases documented inside the residence.

*Police Firearms*

A less lethal shotgun was discharged at least five times during this event. The five fired 12 gauge shotshells recovered were matched to each other, but no 12 gauge firearm was provided for the Mesa Police Department Forensic Services examination.

The eight police officers known to have discharged their rifles during this event are outlined below:

*Officer Shawn Freeman*

Officer Freeman was equipped with an Accuracy International England, .308 WIN caliber bolt action rifle (serial number 16 AT 24456).

- The firearms report from Mesa Police Department Forensic Services examination identified two (2) fired cartridge cases in proximity to where the rifle was discharged.

*Sergeant Kyle Thomas*

Seargeant Thomas was equipped with a Daniel Defense model DDM4, 5.56 NATO caliber rifle (serial number DDM4360271).

- The firearms report from Mesa Police Department Forensic Services examination identified two (2) fired cartridge cases in proximity to where the rifle was discharged.

*Sergeant Matt Harris*

Seargeant Harris was equipped with a Daniel Defense model DDM4, 5.56 NATO caliber rifle (serial number DDM4360281).

- The firearms report from Mesa Police Department Forensic Services examination identified four (4) fired cartridge cases in proximity to where the rifle was discharged.

*Officer Alejandro Navarro*

Officer Navarro was equipped with a Daniel Defense model DDM4, 5.56 NATO caliber rifle (serial number DDM4360275).

- The firearms report from Mesa Police Department Forensic Services examination identified one (1) fired cartridge case in proximity to where the rifle was discharged.

*Officer Kyle Cameron*

Officer Cameron was equipped with a Daniel Defense model DDM4, 5.56 NATO caliber rifle (serial number DDM4360272).

- The firearms report from Mesa Police Department Forensic Services examination identified six (6) fired cartridge cases in proximity to where the rifle was discharged.

*Officer Matt Brown*

Officer Brown was equipped with a Daniel Defense model DDM4, 5.56 NATO caliber rifle (serial number DDM4360273).

- The firearms report from Mesa Police Department Forensic Services examination identified three (3) fired cartridge cases in proximity to where the rifle was discharged.

*Officer Matt Chuey*

Officer Chuey was equipped with a Daniel Defense model DDM4, 5.56 NATO caliber rifle (serial number DDM4360269).

- The firearms report from Mesa Police Department Forensic Services examination identified eighteen (18) fired cartridge cases in proximity to where the rifle was discharged.

Noedel Scientific

mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

*Officer Robert Goodrich*

Officer Goodrich was equipped with a Daniel Defense model DDM4, 5.56 NATO caliber rifle (serial number DDM4360279).

- The firearms report from Mesa Police Department Forensic Services examination identified eleven (11) fired cartridge cases in proximity to where the rifle was discharged.

Two of the recovered 5.56 caliber fired cartridge cases could not be specifically matched (by the Mesa Police Department Forensic Services examination) to any of the submitted firearms.

*Shooting Reconstruction*

While on the phone with police negotiators, Mr. Gagne can be seen on security video from inside the residence moving through the apartment carrying the AK47 style rifle. He moved toward the sliding doors adjacent to the kitchen with the gun documented in a "low ready" position (see figure 4). Just after he moved out of camera view, he was hit with a bullet fragment from a gunshot delivered from Officer Freeman.



Figure 4: Mr. Gagne moving toward the kitchen area with the AK style rifle in a "low ready" orientation prior to the first gunshot from Officer Freeman.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

Officer Freeman delivered two gunshots when Mr. Gagne was near the kitchen area. Two fired .308 caliber cartridge cases were documented at his shooting location (on the floor of the adjacent second floor apartment #2165). His first projectile would have to go through the double pane tempered glass of the balcony sliding glass door. Double pane tempered glass can cause a fired bullet to break apart creating multiple bullet fragments and pulverized glass upon impact.

- The gunshots from Officer Freeman were delivered from an adjacent apartment where he had staged to gain a visual alignment on the second floor Gagne apartment. Two gunshots were delivered from that location through the window glass adjacent to the kitchen.

- The wounds documented in the medical examiner's report and photographs depict a small "through and through" gunshot wound that entered Mr. Gagne in his right upper lip and exited near his right jaw. This wound is the likely source of bleeding demonstrated as he moved from the kitchen area toward the stairs. The appearance of this wound path is consistent with a fragment of a fired bullet rather than a complete fired .308 caliber bullet directly striking Mr. Gagne.

- Additional bullet impacts consistent with fragments coming from the fragmentation of Officer Freeman's fired bullets hit the side wall over the dining room table, impacted the refrigerator and perforated through the kitchen wall by a microwave oven (see figures 5-9).



Figure 5: The view of the sliding door by the kitchen from the exterior. Most of the tempered glass has been shattered by fired bullet impacts from the gunshots delivered by Officer Freeman.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026




Figure 6: The view of the sliding door by the kitchen from the interior. Most of the tempered glass has been shattered from the fired bullet impacts from the gunshots delivered by Officer Freeman. The overturned chair and the chair by the blinds have fired bullet perforations.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026




Figure 7: A scene diagram showing the approximate bullet paths from Officer Freeman with at least one fragment from these gunshots having struck Mr. Gagne.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026




Figure 8: A view into the kitchen area of fired bullet fragmentation that struck the interior wall and refrigerator after perforation of the double pane sliding glass door from a gunshot by Officer Freeman.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026




Figure 9: A view into the kitchen area of fired bullet fragmentation that struck the interior wall by the microwave and continued into a cooking pot in the pantry after perforation of the double pane sliding glass door from a gunshot by Officer Freeman.

Noedel Scientific

mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

*Mr. Gagne's Movements*

The interior audio/video record (LIVING_060_2023-07-06 10-44-09 PM.mp4) captured some of the movements of Mr. Gagne and the sound of apparent gunshots after he was initially injured from a gunshot delivered by Officer Freeman. Scene processing revealed a blood pool on the kitchen floor consistent with Mr. Gagne having been stationary at that location on the kitchen floor while bleeding. Hearing protection originally worn by Mr. Gagne had been removed and placed on the counter in this area (see figure 10).

Interior video shows Mr. Gagne moving toward the stairs of the apartment with an injury to his face that was actively bleeding. The wound from his face was producing linear projections of blood that landed onto the floor with a back-and-forth pattern generally matching his cadence of walking toward the stairs (see figures 11 and 12).




Figure 10: The AK style rifle, blood pool and hearing protection in the location where Mr. Gagne had received a bleeding gunshot wound to the face.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026




Figure 11: The line diagram of the apartment showing the relative locations of the AK style rifle and the pathway Mr. Gagne took from the kitchen toward the stairs leaving the projected bloodstains onto the floor.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026



Figure 12: A screen capture from the interior video of the projected blood deposited as Mr. Gagne moved toward the stairs.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

*Ground Level Police Firearm Discharges*

After the initial gunshot to Mr. Gagne from Officer Freeman, Mr. Gagne was walking toward the steps when a collection of police gunfire was delivered as he crossed past the window at the top of the stairs. Mr. Gagne reacted to these gunshots dropping forward down the stairs and out of view of the window.

There was approximately 13 seconds between the first set of police gunshots and a second set of police gunshots. During the 13 second pause in gunfire, Mr. Gagne moved to the front door and the front door can be seen opening when the second collection of overlapping gunshots was delivered. Each set represented numerous overlapping gunshots from multiple officers shooting at the same time (see figure 13).




Figure 13: The sound profile from the audio portion of the interior video of the apartment. Two collections of overlapping multiple gunshots were delivered from outside to inside separated by approximately thirteen seconds.

Because the interior stairs create a "bump out" that protects the upper window by the stairs from gunshots from the north (left), the officers that are in the best location to deliver the initial gunshots through the upper window were officers Navarro (known to fire once), Brown (known to fire three times) and Thomas (known to fire twice). A red laser can be seen coming through the window from the area reported to be occupied by those three officers during the initial set of gunshots.

- The gunshots from the first series appear to have missed Mr. Gagne and crossed the living room to hit and shatter the opposite sliding glass door, the hanging light over the front door and other locations inside the apartment.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

- Five bullet perforations through the glass by the top of the stairs continued to perforate two unfinished packaged doors, stacked back to back that were leaning against the railing at the top of the stairs (see figure 14).

- A ground level observer toward the north may not be able to discern if the source of the fired bullets and pulverized glass that perforated and exited the balcony side sliding glass door originated from a shooter inside the apartment or originated from the shots delivered by police.

- It is not possible for this assessment to determine which specific officers delivered which specific gunshots during this set of gunshots.



Figure 14: Five of the gunshots from the initial collection perforated the window by the stairs and continued to perforate the leaning unfinished double doors at the top of the stairs.

During the thirteen second pause between gunshots, Mr. Gagne had made his way down to the front door at the bottom of the interior steps. When he opened the front door, the second collection of gunshots was delivered.

Officers Harris, Goodrich, Chuey and Cameron collectively fired at least thirty-nine times. Most (if not all) of the gunshots in the second set were likely delivered by these officers.

- Numerous bullet impacts to the interior wall behind where Mr. Gagne fell by the front door represent bullet impacts from the second set of gunshots.

- Bullet impacts were documented adjacent to the open door, but no fired bullets perforated the front door itself supporting that the door was open far enough to allow fired bullets through the opening.

Noedel Scientific

mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

Numerous bullet impacts were documented to impact the area around the north porch. These impacts may have been delivered during either set of police gunshots and represent bullets that did not strike Mr. Gagne (see figure 15).

- Collectively, a total of at least forty-seven (47) gunshots were delivered by police in these two sets of discharges. Approximately thirteen seconds elapsed between the two sets of gunshots (see figure 16).

Of the 49 total shots known to have been delivered (two from Officer Freeman, the rest from the collection of shooting officers) six bullets (or fragments of bullets) were documented to have struck Mr. Gagne. The remaining forty-three fired bullets did not strike Mr. Gagne.

Projectiles and projectile fragments from autopsy and projectiles recovered in the residence can be further examined to attempt to identify the source firearm and further reconstruct those gunshots.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026






Figure 15: Numerous gunshots struck the north side porch exterior (circled area), none of which entered the residence or struck Mr. Gagne.

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026




Figure 16: A scene diagram showing the general direction of fire for the gunshots delivered by police positioned at ground level.

Noedel Scientific

mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

**Findings**

Police officers were called to the scene and alerted that Mr. Gagne had multiple firearms in his residence and was alleged to have discharged a firearm in a prior confrontation with a neighbor.

Police attempted to encourage Mr. Gagne to surrender included shooting at least five less lethal 12 gauge shotgun rounds at his front door.

Contact was made with Mr. Gagne via cell phone, and he threatened to use force against the responding police. Security video inside the apartment shows Mr. Gagne carrying a loaded AK style semiautomatic rifle as he moved through the apartment.

Mr. Gagne moved toward the kitchen and received at least one gunshot wound. The gunshot best fits with a shot from Officer Freeman who had set up a sniper position from an adjacent upstairs apartment.

Mr. Gagne paused in the kitchen while bleeding, creating a blood pool in the kitchen.

Mr. Gagne moved from the kitchen toward the front door in a staggering, walking cadence with the wound to his face projecting blood onto the floor as he moved toward the stairs.

When Mr. Gagne moved across the window adjacent to the stairs, a collection of gunshots was delivered that went through the window glass and across the upstairs to impact and shatter the sliding glass door on the opposite side of the living room.

The shattered glass on the opposite side of the living room would appear to an outside observer as projectiles coming from inside the apartment as pulverized glass was expelled outward.

The first collection of gunshots may not have hit Mr. Gagne as he quickly moved down the stairs and out of sight through the upstairs window.

Mr. Gagne cleared obstructions by the front door and opened the door when a second collection of gunshots was delivered through the open door.

Mr. Gagne did not survive the gunshot wounds sustained during the totality of the event.

July 10, 2026

Matthew Noedel, Forensic Scientist Date

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

**Reference**

Glen at Mesa Floor Plan. Located at website: https://www.apartments.com/glen-at-mesa-mesa-az/1wvv8x7/?gclsrc=aw.ds&gad_source=1&gad_campaignid=202672380&gbraid=0AAAAD-mAW0eIZRNQpfiLiUDFURviKM2U&gclid=EAIaIQobChMI5Jyuz6e-lQMV2zYIBR3rdR7REAAYAiAAEgLGuvD_BwE#yczgp9t-2-unit Accessed July 3, 2026

**Fee Structure:**

All work conducted for this examination will be billed at the agreed upon fee of $350 per hour.

**The following materials were provided, evaluated and/or considered for this examination:**

03-12-2026 Adair, Matthew_Condensed
03-12-2026 Adair, Matthew_Full_Size_ex w/exhibits
03-12-2026 Chuey, Matthew_Full_Size_ex w/exhibits
03-12-2026 Freeman, Shawn_Condensed w/exhibits
20260519 AMD Scheduling Order
GAGNE_007725-GAGNE_007756 - 260220 - Hafkey Expert Report
GAGNE_007757-GAGNE_007761 - Mark Hafkey CV

PLFS RESP to DEFS 1st NUI
PLFS RESP to DEFS 1st RFP
PLFS SUPP RESP to DEFS 1st NUI (Email)
PLFS Initial DS
PLFS 1st Supp DS
PLFS 2nd Supp DS
Bedroom Video Folder
Gagne Ring Camera Video Folder
Living Room Video Folder
Bedroom Video Folder
Gagne Ring Camera Video Folder
Living Room
Second Autopsy Report of Shawn Gagne
JW LinkedIn
Photo of assault rifle
STG Medical Records – Kaiser Permanente
GAGNE_000003 MPD Photos
GAGNE_000004 SWAT OFFICERS
GAGNE_000032 Ring and Cox Videos
7/06/2023 – Bedroom, Gagne Ring Camera Video, Living Room
GAGNE_000032 Ring and Cox Videos
7/07/2023 – Bedroom, Gagne Ring Camera Video, Living Room
GAGNE_000033 Scene Photos

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

GAGNE_000034 Family Scene Photos Video
GAGNE_000036 Neighbor's Ring
Mesa Police Report – Redacted
CIRB 2023-007
Medical Examiner Report
Toxicology Report
Gagne Autopsy Photos
Gagne Scene Photos
MPD Axon 1 Body Worn Camera videos
MPD Axon 2 Body Worn Camera videos
MPD Axon 3 Body Worn Camera videos
MPD Axon 4 Body Worn Camera videos
MPD Axon 5 Body Worn Camera videos
911 Calls
Mesa Police Report Narrative Text Copy (Gutierrez #21423)
MPD Property Report #2023-141208
Investigative Summary
Negotiator Supplement – Adair #18901
Supplement to Narrative Text Report - Ahumada
ATF T20230435593 eTrace (Confidential)
Berthelson #24347 Supplement
Brennan #21462 Supplement
Briefing Worksheet
Bryan #25214 supplement
Carlton #23085 supplement
Carrasco #22609 supplement
CIRB 2023-007-Final Training Unit Review Memo (oo507036xC14DE) (Confidential)
CIRB 2023-007 Presentation
CIRB Commentary 2023-007 (0050703xC14DE) (Confidential)
Clover #20541 supplement
Cochran #12353 supplement
Crime Scene Log
Crosby #21648 supplement
Dangerfield #13529 supplement
Dorrell #23081 supplement
Duran #23529 supplement
Durham #22727 supplement
Eaton #22745 supplement
F2023068073 MFMD CAD
F20230680073 MF MD Patient Care Report
Falconer #22430 supplement
Forrest #21468 supplement
Freeman #23084 supplement
FSS070723-0022-0001

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

FSS070723-0022-0002
FSS070723-0022-0003
FSS070723-0022-0004
FSS070723-0022-0005
FSS070723-0022-0006
FSS070723-0022-0007
FSS070723-0022-0008
FSS070723-0022-0009
FSS070723-0022-0010
FSS070723-0022-0013
George #17283 supplement
Gomez #22698 supplement
Gonzales #19451 supplement
Hallemeyer #15339 supplement
Halter #17385 supplement
Hong #24475 supplement
Ibarra #22438 supplement
Kelly #23422 supplement
Kurian #21070 supplement
Lead Investigator Supplement #1- Investigation
Lentz #12201 supplement
Maldonado #21682 supplement
Marquez #19915 supplement
Mask #15668 supplement
Mataipule #24034 supplement
McDowell #16150 Supplement
McDowell #19457 supplement
Meicke #23520 supplement
Meyer #20461 supplement
Miskin #21466 supplement
Newby #22469 supplement
Nicholson #19465 supplement
O'Connell #13912 supplement
OME – Case File - Case 23-06943 – MEDICAL EXAMINER REPORT- PDF-FINAL-GAGNE
OME – Case File – Case 23-06943 – TOXICOLOGY REPORT - GAGNE
OME Info Supplement
Orr #19441 Negotiator supplement
Pareti #16656 AFIS supplement
OME Info Supplement
Orr #19441 Negotiator supplement
Pareti #16656 AFIS supplement
Perez #23528 supplement
Phillips #24934 supplement
Plott #21641 supplement

Noedel Scientific
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

Report

RE: Estate of Shawn Gagne vs. City of Mesa et al.
Shooting Event Reconstruction 7/10/2026

Property Release
Rosales #21067 supplement
Ryder #23119 supplement
Samons #19185 supplement
Scene Diagram
Search warrant return
Search warrant SW2023-035134
Staab #15048 supplement
Stefick # 23461 supplement
T20230435598 eTrace
Terry #23359 supplement
Tewalt #23684 supplement
Timeline
Voeltz #23534 supplement
Waits #17341 supplement
Widmer #19506 supplement
2023-141208 OIS Presentation
Deposition Transcript of Officer Adair with exhibits 1-6
Deposition Transcript of Officer Chuey with exhibits 1-9
Deposition Transcript of Officer Freeman with exhibits 1-8
Deposition Transcript of Officer Harris w/exhibits 1-5
Deposition Transcript of Officer Thomas w/exhibits 1-8
Mark R. Hafkey, M. Ed.’s expert opinion report with Axon timeline and audio video timelines.
Mark R. Hafkey, M. Ed.’s curriculum vitae.
Amended Scheduling Order

# Matthew Noedel's Curriculum Vitae

Noedel Scientific

PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com

# CURRICULUM VITAE

## MATTHEW NOEDEL, FORENSIC SCIENTIST

## EDUCATION

**University of Montana, Missoula, MT 1985**
Bachelor of Science - Microbiology
Bachelor of Science - Medical Technology
Minor in Chemistry

**California State University, Sacramento, CA 1987**
Bachelor of Science - Forensic Science
*30 Quarter units of graduate credit in Criminal Justice with Forensic Emphasis*

## PROFESSIONAL AFFILIATIONS

American Academy of Forensic Scientists (AAFS)
- Regular Member

Association of Crime Scene Reconstruction (ACSR)
- Regular Member - February 2000 - present
- Board of Directors - February 2005 - 2015
- Program Chair - Annual Meeting 2007
- Treasurer - February 2007 - February 2012
- President - February 2013 - February 2014
- Shooting Reconstruction Standardization Committee - 2012 - 2014
- Chairman of the Board - February 2014 – February 2015
- Recipient – Larry Olson Service Award 2015
- ACSR Conference Co-Host – February 2018

Association of Firearm and Tool Mark Examiners (AFTE)
- Distinguished Member - 2000 - present
- AFTE Journal Editor - 2002 - 2007
- Member of the Year - 2009
- Nominating Committee - 2009
- Assistant Conference Chair - 2010
- Conference Workshop Program Coordinator - 2014
- Conference Host Committee - 2014

International Association of Bloodstain Pattern Analysts (IABPA)
- Regular Member
- Ethics Committee - 2009 – present
- Vice President (Region 1) (Jan 2026 – present)

Northwest Association of Forensic Scientists (NWAFS)
- Member at Large - 2005
- Program Chair Annual Conference - 2000, 2011
- Vice President - 2006
- President - 2007, 2010, 2011
- Life Member - 2016

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## PROFESSIONAL AFFILIATIONS Continued

International Association of Forensic & Security Metrology (IAFSM)
Member – Private Sector

Organization of Scientific Area Committees for Forensic Science (OSAC)
Crime Scene Investigation & Reconstruction Subcommittee (Term: 10/2020 – Present)

## CERTIFICATIONS

*Certification in Firearms, Tool Marks, and Gunshot Residue Examination*
September 2002; Association of Firearm and Tool Mark Examiners (AFTE)

*Certification in Crime Scene Reconstruction (Program discontinued certification 1/16/2022)*
January 2012 – January 2022; International Association for Identification (IAI)

Certification in Basic Laser Scanning
February 2022; International Association of Forensic and Security Metrology (IAFSM)

## EMPLOYMENT

| **Nov. 7, 2005 – Present** | **Noedel Scientific LLC** |
|---|---|
| **Forensic Consultant** | *Forensic Consultation, Reconstruction, Training, Testimony, Analysis* |

Noedel Scientific LLC provides expert forensic analysis in a variety of areas including crime scene reconstruction, firearms examination, bloodstain pattern analysis, and case review. Examinations conducted are prepared with an emphasis on scientific detail for future court presentation.

| **Apr. 9, 1990 - Nov. 4, 2005** | **Washington State Patrol Crime Laboratory - Tacoma** |
|---|---|
| **Forensic Scientist III** | Crime Scene Response, Firearm and Tool Mark Exam, Bloodstain Pattern Analysis, Chemistry, Trace Evidence |

The Washington State Patrol (WSP) Crime Laboratory provides forensic examinations for all of the police, sheriff, and prosecuting attorneys in the state of Washington. Of the services offered by the Tacoma Crime Lab, I worked in Chemistry, Drug Analysis, Fire Debris, Trace Evidence, Crime Scene Response, Bloodstain Pattern Interpretation, Firearms and Tool Mark Analysis. For the WSP crime scene response team, I was a primary responder, a crime scene consultant and trainer/instructor. I received the WSP Forensic Scientist of the Year award in 2000 and participated on the WSP Firearms Review Committee.

| **April 1987 - April 1990** | **Chemwest/CompuChem Laboratories** |
|---|---|
| **Toxicologist** | Forensic Toxicology |

I was responsible for the forensic examination of biological samples for the presence of drugs, alcohol, poisons and toxins. Both screening and confirmation for these chemicals was conducted in this high volume laboratory setting.

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


# SPECIALIZED TRAINING RECEIVED

## Tours

- Nosler Bullet Factory, Bend OR
- CCI/Speer Ammunition Factory, Lewiston ID
- Arnold Arms Specialty Rifle Manufacturer, Arlington WA
- Olympic Arms Pistol and Rifle Manufacturing, Olympia WA
- Alchemy Arms Pistol Manufacturing, Auburn WA
- Ruger Firearms & Investment Casting, CT
- Marlin Rifle Factory
- Savage Arms Factory
- Wilson Arms Barrel Making Facility
- Barnes Bullet Manufacturing
- North American Arms Manufacturing
- Schneider Barrel Manufacturer, Payson AZ
- Ruger Firearms, Prescott AZ
- LAR Firearms, Jordon UT

## Factory Authorized Armory Training

| | | |
|---|---|---|
| Colt | Smith & Wesson | Ruger |
| Sig Sauer | Glock | Remington |
| Beretta | Heckler & Koch (MP-5) | Hi-Point |

## Workshops, Seminars and Courses

- Beeman Air Rifle Workshop
- “Firearms Update – Ruger” 40-hr course; Sacramento Public Safety Center; Sacramento, CA; Completed November 3, 1995
- “Law Enforcement Armorer School - Basic – 40hrs”; Lassen College; Susanville, CA; Completed May 31, 1996
- “Beretta Armorer Training Program” by Beretta USA Corp; July 15-17, 1996
- “Smith and Wesson Armorers School - Pistols” by Smith and Wesson Academy; Salt Lake City, UT; April 15-19, 1996
- ATF Arson and Accelerant Detection
- California Department of Justice Basic Forensic Hair Examination
- Restek Capillary Chromatography Seminar
- Tire Footprint Workshop
- McCrone's Advanced Microscopy
- Crime Scene Photography
- Hewlett Packard Gas Chromatography Inlet Systems
- Infra-red Technology--Bio Rad
- Advanced Crime Scene Response
- Crime Scene Response In Service Training
- Exterior Ballistics and Reloading
- Crime Scene Response-Criminal Justice Training Center
- Characterization of Projectile Performance-Yuma proving Grounds
- ATF Serial Number Restoration

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## SPECIALIZED TRAINING RECEIVED CONTINUED

### Workshops, Seminars and Courses continued

- "Basic Bloodstain Pattern Analysis" 40-hr course by Tom Bevel; Seattle, WA; May 17-21, 1999
- "FBI Gunpowder and Primer Residues School" 40-hr course by Dillon/Rosati; Monroe, WA; August 11-15, 1997
- "IBIS Operator Certification Training" Forensic Technology; Completed August 20, 1997
- "Intro to Drugfire" FBI Drugfire course by Mnemonic Systems; August 25-26, 1997
- "Intro to Digital Imaging" Course; NWAFS Meeting; Portland, OR; May 6, 1998
- "Firearms Presented by ATF" Course; NWAFS Meeting; Portland, OR; May 5,1998
- "Intro to APMS " FBI Drugfire course by Mnemonic Systems Inc; June 24, 1998
- "Smith and Wesson Armorers School - Pistols" by Smith and Wesson Academy; June 21-24, 1999
- "Identification of Human and Skeletal Remains" 24-hr course by Snohomish County Medical Examiner's Office; Completed March 15, 2000
- "Evidence Evaluation and Reconstruction at Shooting Scenes" Workshop; NWAFS Meeting; Sacramento, CA; May 5, 2000
- "Introduction to Crime Scenes: Firearms Evidence" Workshop; NWAFS Meeting; Sacramento, CA; May 16, 2000
- "Introduction to Crime Scenes: Photos and Sketching" Workshop; NWAFS Meeting; Sacramento, CA; May 16, 2000
- "Introduction to Crime Scene Processing and Reconstruction" 8-hr course; NWAFS Meeting; Sacramento, CA; May 15, 2000
- "Investigation of Occult Crime Scenes" by Lt. Randy Johnson; April 18, 2001
- "Explosion and Bombing Crime Scenes" 12-hr course by James Crippen; NWAFS/ Utah Forensic Science Association (UFSA) Joint Meeting; April 19, 2001
- "Advanced Bloodstain Pattern Analysis Workshop" 40-hr course by Toby Wolson, Metropolitan Police Institute; Miami, FL; May 7-11, 2001
- "Washington State Patrol Firearms Instructor Course" June 2001
- "Exterior Ballistics and Long Range Trajectory Workshop" July 2001
- "Crime Scene Reconstruction" 16-hr course by Tom Bevel; NWAFS Meeting; Redmond, OR; September 24-25, 2001
- "Marshall's Reagent and GSR Workshop" April 22, 2002
- "Examination of the Taser's Non Lethal Weapon Character" April 22, 2002
- "Consecutive Manufactured Knife Blade Study" April 22, 2002
- "Black Powder and Black Powder Substitute Analysis" April 23, 2002
- "Ricochet Workshop" by Lucian Haag, NWAFS/California Association for Criminalists (CAC) Joint meeting; Reno, NV; April 7, 2003
- "Colt 1911 Style Pistol Armorer Course" by Vancouver PD Rob Caunt; CAC/NWAFS Joint Meeting; Reno, NV; April 8, 2003
- "Forensic Identification Techniques" 16-hr course; Pacific Northwest Division (PWN)-IAI Conference; Tacoma, WA; May 7-9, 2003
- "Crime Zone Software Tools" NWAFS Meeting; Portland, OR; October 14, 2003
- "Utilization of Crime Zone 7.0" ACSR Conference; Oklahoma City, OK; October 24, 2003

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


# SPECIALIZED TRAINING RECEIVED CONTINUED

## Workshops, Seminars and Courses continued

- “Adobe Photoshop Techniques” ACSR Conference; Oklahoma City, OK; October 24, 2003
- “National Integrated Ballistic Information Network (NIBIN) Training” Bureau of Alcohol, Tobacco and Firearms and Forensic Technology, Inc. Completed February 7, 2003
- “Fluorescein Techniques” NWAFS Meeting; Missoula, MT; April 19-21, 2004
- “Basic Bloodstain Pattern Analysis” 40-hr course by Tom Bevel; CJTC Regional Academy; Burien, WA; February 22-26, 2004
- “Putting Power in your Point” ACSR Conference; San Jose, CA; Feb 11, 2005
- “LED/UV Macro Photography” ACSR Conference; San Jose, CA; Feb 11, 2005
- “Winning Extreme Encounters from Street to Court (Investigation of Lethal Force Encounters)” 8-hr course by Dr. Lewinski, Force Science Research Center, Mankato, MN; CJTC Burien, WA; June 10, 2005
- “Investigation of Firearms Misadventures” AFTE Conference; Indianapolis, IN; June 2005
- “Innovative Forensic Techniques” Training from casting material ‘Mikrosil’ inventor Kjell Carlson; Oregon State Police Crime Lab; August 31, 2005
- “Math, Physics and Computers in Advanced Bloodstain Pattern Analysis” Alberta Justice Staff College; Edmonton, Alberta; October 24-28, 2005
- “Beretta 90 Series Pistol Armorer Seminar” AFTE Conference; Springfield, MA; June 28, 2006
- “Life of the Body after Death” Workshop by Elayne Pope; SWAFS/NWAFS Joint Conference; Colorado Springs, CO; November 2006
- “Eagle EDXRF School” Workshop by EDAX; SWAFS/NWAFS Joint Conference; Colorado Springs, CO; November 2006
- “Wound Ballistics Workshop” 16-hr Course by Dr. Patrick Besant - Matthews; AFTE Conference; San Francisco, CA; May 27-28, 2007
- “Intro to Saw and Toolmarks on Bone: A Class Characteristics Approach” Workshop by Dr. Steven Symes; AFTE Conference; San Francisco, CA; May 29, 2007
- “Basics of Firearm Mechanisms” Workshop; AFTE Conference; Honolulu, HA; May 23, 2008
- “Firearm Sound Suppression” 16-hr Course; NWAFS Conference; Boise, ID; November 2008
- “Is it a Bullet Hole?” Workshop; AFTE Conference; Miami, FL; May 31, 2009
- “Conversion Course” Workshop; AFTE Conference; Miami, FL; June 3, 2009
- “BSPA Taxonomy” 2-hr Workshop by Michael Maloney and Ross Gardner; IABPA Conference; Portland, OR; October 6, 2009
- “Courtroom Testimony Techniques” 4-hr Workshop by Jeff Scozzafava and Todd Thorne; IABPA Conference; Portland, OR; October 7, 2009
- “Forensic Ethics” by Peter Barnett, Carolyn Gannett; ACSR Conference; San Diego, CA; February 2010
- “The Basics of Firearms Mechanisms” by Rob Caunt, Vancouver Police Crime Laboratory, NWAFS Meeting; Portland, OR; September 29, 2010

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## SPECIALIZED TRAINING RECEIVED CONTINUED

### Workshops, Seminars and Courses continued

- "Photogrammetry in Post Scene Analysis and Reconstruction Workshop" 3-hr course; ACSR Conference; Jacksonville, FL; February 9, 2011
- "Shooting Incident Reconstruction: 3D Laser Scanning, Uncertainty, and Experimental Setup" 1-day Workshop; AFTE Conference; Buffalo, NY; June 24, 2012
- "Alternate Light Source Utilization" 3.5-hr course; ACSR Conference; Atlanta, GA; February 6, 2013
- "Human Factors in CSR" 3.5-hr course; ACSR Conference; Atlanta, GA; February 6, 2013
- "Wound Ballistics for Firearm Examiners" 8-hr course; AFTE Conference; Albuquerque, NM; June 28, 2013
- "Making Black Powder" 1-day workshop; NWAFS Conference; Vancouver, WA; September 17, 2013
- "Bloodstain Documentation and Collection Methods" 1 1/3-hr Forensic Technology Center of Excellence/RTI International online course; May 19, 2014
- "Shooting Reconstruction: The 4 Elements of Trajectory" 1 ½-hr forensicED online course; RTI International; May 22, 2014
- "The Fluid Dynamics of Bloodstain Pattern Formation" Advanced 40-hr course by Dr. Mark Jermy and Dr. Michael Taylor of New Zealand's Institute of Environmental Science and Research (ESR); Seattle, WA; June 16-20, 2014
- "3D Laser Scanning for Forensic Scene Mapping" 1-day seminar by PPI Group; Seattle, WA; November 18, 2014
- "False-Positive & False-Negative Error Rates in Cartridges" 1-hr course; Forensic Technology Center of Excellence/RTI Online; March 5, 2015
- "Sam Houston State University Body Farm Tour" 1-day seminar, AFTE Conference; Dallas, TX; May 2015
- "Photographing the Blood Event Scene" 4-hr course; IAI Conference; Sacramento, CA; August 2015
- "Daytime Laser Photography" 2-hr course; IAI Conference; Sacramento, CA; August 2015
- "Buck Knives Factory Tour" 45-min tour; NWAFS Conference; Spokane, WA; September 15, 2015
- "CCI/Speer Tour" 3-hr workshop; NWAFS Conference; Spokane, WA; September 15, 2015
- "High Definition Survey (3-D Laser Scanning) of Crime Scenes: Lessons Learned and What's Next" 4-hr course; NWAFS Conference; Spokane, WA; Sept. 14, 2015
- "Impact Pattern Analysis & Visualization with Hemospat" ½-day workshop; IABPA Conference; Fort Worth, TX; September 2015
- "Limitations Associated with Bloodstain Pattern Examinations on Fabrics" 3-hr course; ACSR Conference; Clark, NJ; February 9, 2016
- "Shooting Scenes – Staged and Not Staged – Find the Red Flag Indicators" ½ day course; AFTE Conference; New Orleans, LA; June 2, 2016
- "Error and Uncertainty in Bloodstain Pattern Analysis" 1½-hr; RTI/NIJ Forensic Technology Center of Excellence; Online; Feb 28, 2017

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## SPECIALIZED TRAINING RECEIVED CONTINUED

### Workshops, Seminars and Courses continued

- "Leeds 3D Scanning of Deformed Bullets and Cartridge Cases" 2-hr course; AFTE Conference; Denver, CO; May 17, 2017
- "Bullet Trajectory Documentation with 3D Technologies" 1-day course; AFTE Conference; Denver, CO; May 19, 2017
- "Forensic Shooting Incident Reconstruction" 40-hr course; Forensic Science Consultants; Fort Collins, CO; July 24-28, 2017
- "A Close Look at 3D Microscopy for Firearms Identification" 1¼-hr course; NIJ/RTI Forensic Technology Center of Excellence; Online; January 10, 2018
- "Glock Pistols Armorer Course" 1-day course; AFTE Conference; Charleston, WV; June 5, 2018
- "Bloodstain Reconstruction" ½-day workshop; IABPA Conference; Ottawa, Ontario; October 3, 2018
- "A Proper Bloodstain Pattern Analysis: From Analysis to Courtroom" ½-day workshop; IABPA Conference; Ottawa, Ontario; October 3, 2018
- Shot Show 2019; Attended two days of convention; Las Vegas, NV; Jan 2019
- "Analysis of Shooting Reconstruction Using Mathematics" 4-hr course; ACSR Conference; Nashville, TN; February 19, 2019
- "Emerging Forensic Research Series: Firearms & Toolmarks Research" 1 ½-hr course; NIJ/RTI Forensic Technology Center of Excellence; Online; March 19, 2019
- "Bullet Deflection as a Result of Perforation" 8-hr course; AFTE Conference; Nashville, TN; May 31, 2019
- "Understanding the Four Measurements in Shooting Reconstruction and How to Use Them" – ½ day Workshop; ACSR Conference; Reno, NV; March 3, 2020
- "Examination of Trajectory Rod Mapping Methods" 4-hr Presentation; ACSR Conference; Reno, NV; March 4, 2020
- "Two-Pronged Study of Bullets Fired by Consecutively Rifled Barrels"; 1-hr course; NIJ/RTI Forensic Technology Center of Excellence; Online; December 17, 2021
- "The Effect of Time on Rusted Firearm Identification" 1-hr course; NIJ/RTI Forensic Technology Center of Excellence; Online; January 9, 2022
- "Exploration of Breech Face Subclass Characteristics" 1-hr course; NIJ/RTI Forensic Technology Center of Excellence; Online; January 9, 2022
- "Audio Forensic Analysis Procedures for User Generated Audio Recordings" 1-hr course; NIJ/RTI Forensic Technology Center of Excellence; Online; Nov 29, 2022
- "Forensic Double Casting Best Practices" 4-hr course; AFTE Conference; Austin, TX; May 26, 2023
- "LiDAR Technology" 2-hr workshop on 3D technology; ACSR Conference; Lake Conroe, TX; Feb 13, 2024
- "The Terminal Ballistics of Sheet Metal"; AFTE Conference; Anchorage, AK; May 2024
- "Using Objective Criteria for Bloodstain Pattern Classification" 1-hr course; NIJ/RTI Forensic Technology Center of Excellence; Online; September 6, 2024
- "Testimony Around the World" 2-hr workshop; AFTE Conference; Anaheim, CA; May 2025

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



# SPECIALIZED TRAINING RECEIVED CONTINUED

## Conferences

- AAFS Annual Meeting; Las Vegas, NV; February 1988
- California Association of Toxicologists (CAT) Meeting; San Diego, CA; Fall 1989
- NWAFS Meeting; Portland, OR; October 1992
- NWAFS Meeting; Spokane, WA; April 1996
- NWAFS Meeting; Missoula, MT; April 1997
- AFTE Annual Conference; Annapolis, MD; July 1997
- NWAFS Meeting; Las Vegas, NV; Fall 1997
- NWAFS Meeting; Portland, OR; May 1998
- NWAFS Meeting; Anchorage, AK; April 1999
- ACSR Annual Conference; Kansas City, MO; September 1999
- NWAFS Meeting; Sacramento, CA; May 2000
- AFTE Annual Conference; St. Louis, MO; June 2000
- NWAFS Meeting; Seattle, WA; Fall 2000
- NWAFS/Utah Forensic Science Association (UFSA) Joint Meeting; Spring 2001
- AFTE Annual Conference; Newport Beach, CA; July 2001
- NWAFS Meeting; Redmond, OR; September 2001
- NWAFS Meeting; Spokane, WA; April 2002
- NWAFS/California Assoc. for Criminalists (CAC) Meeting; Reno, NV; April 2003
- IAI Conference; Tacoma, WA; May 2003
- AFTE Annual Conference; Philadelphia, PA; May 2003
- NWAFS Meeting; Portland, OR; October 2003
- ACSR Annual Conference; Oklahoma City, OK; October 2003
- NWAFS Meeting; Missoula, MT; April 2004
- IABPA Annual Conference; Tucson AZ; October 2004
- IAI/NWAFS Joint Conference; Spokane, WA; May 2005
- AFTE Annual Conference; Indianapolis, IN; June 2005
- ACSR Annual Conference; San Jose, CA; February 2005
- ACSR Annual Conference; Albuquerque, NM; February 2006
- Scientific Working Group for Bloodstain Pattern Analysis (SWGSTAIN) Spring Meeting; FBI Academy; Quantico, VA; April 3-7, 2006
- AFTE Annual Conference; Springfield, MA; June 2006
- NWAFS/Southwest Association of Forensic Scientists (SWAFS) Joint Conference; Colorado Springs, CO; November 2006
- ACSR Annual Conference; Tacoma, WA; January 2007
- AFTE Annual Conference; San Francisco, CA; May 2007
- IABPA Conference; San Antonio, TX; October 2007
- IAI/NWAFS Joint Conference; Salt Lake, UT; November 2007
- ACSR Annual Conference; Tulsa, OK; February 2008
- AFTE Annual Conference; Honolulu, HA; May 2008
- NWAFS Annual Conference; Boise, ID; November 2008
- ACSR Annual Conference; Denver, CO; February 2009
- AFTE Annual Conference; Miami, FL; May 2009
- NWAFS Meeting; Ft. Collins, CO; September 2009

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



# SPECIALIZED TRAINING RECEIVED CONTINUED

## Conferences continued

- IABPA Conference; Portland, OR; October 2009
- ACSR Annual Conference; San Diego, CA; February 2010
- AFTE Annual Conference; Henderson, NV; May 2010
- NWAFS Meeting; Portland OR; September 2010
- ACSR Annual Conference; Jacksonville, FL; February 2011
- NWAFS Meeting; Tacoma, WA; September 2011
- ACSR Annual Conference; Monterey, CA; February 2012
- AFTE Annual Conference; Buffalo, NY; June 2012
- NWAFS Meeting; Missoula, MT; September 2012
- ACSR Annual Conference; Atlanta, GA; February 2013
- AFTE Annual Conference; Albuquerque, NM; June 2013
- NWAFS Meeting; Vancouver, WA; September 2013
- ACSR Annual Conference; Montgomery, TX; February 2014
- AFTE Annual Conference; Seattle, WA; May 2014
- ACSR Annual Conference; Oklahoma City, OK; February 2015
- AFTE Annual Conference, Dallas, TX; May 2015
- IAI Conference; Sacramento, CA; August 2015
- NWAFS Conference; Spokane, WA; September 2015
- IABPA Conference; Fort Worth, TX; September 2015
- ACSR Conference; Clark, NJ; February 2016
- AFTE Conference; New Orleans, LA; May/June 2016
- NWAFS Conference; Boise, ID; September 2016
- ACSR Conference; Black Hawk, CO; February 2017
- AFTE Conference; Denver, CO; May 2017
- NWAFS Conference; Portland, OR; September 2017
- IABPA Conference; Redondo, CA; September 2017
- Impression, Pattern and Trace Evidence Symposium 2018; Arlington, VA January 2018
- ACSR Conference; Tacoma, WA; March 2018
- AFTE Conference; Charleston, WV; May/June 2018
- NWAFS Conference; Boise, ID; September 2018
- IABPA Conference; Ottawa, Ontario; Oct 2018
- ACSR Conference; Nashville, TN; Feb 2019
- AFTE Conference; Nashville, TN; May 2019
- PNWD-IAI & NWAFS Conference; Portland, OR; August 2019
- ACSR Conference; Reno, NV; March 2020
- IABPA Conference; Online/Virtual; November 2020
- ACSR Conference; Tulsa, OK; March 2021
- NWAFS Conference; Online/Virtual; September 2021
- IABPA Conference; Online/Virtual; September/October 2021
- IAFSM/ACSR Joint Conference; Westminster, CO; Feb 2022
- AFTE Conference; Atlanta, GA; May 2022
- NWAFS Conference; Portland, OR; September 2022
- ACSR Conference; Carolina Beach, NC; Feb 2023
- AFTE Conference; Austin, TX; May 2023

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## SPECIALIZED TRAINING RECEIVED CONTINUED

**Conferences continued**

- NSSF SHOT Show 2024; Las Vegas, NV; Jan 25-26, 2024
- ACSR Conference; Lake Conroe, TX; Feb 2024
- AFTE Conference; Anchorage, AK; May 2024
- IAFSM Conference; San Diego, CA; Nov 2024
- ACSR Conference; Boise, ID; Mar 2025
- AFTE Conference; Anaheim, CA; May 2025
- IABPA Conference; Boise, ID; Oct 2025
- IAFSM/ACSR Joint Conference; Boulder, CO; Feb 2026

## PUBLICATIONS/PRESENTATIONS

Technical notes published in Microgram-An International U.S. Department of Justice, Drug Enforcement Administration publication dedicated to reporting trends and topics related to current controlled substance analysis.

"Separation of Isomers of (d/l) Amphetamine and (d/l) Methamphetamine from Urine by GC and GC/MS" Presented at the 29th Annual AAFS Meeting; Las Vegas, NV; February 1988

"Solid Phase Extraction of Morphine and Codeine" Presented at the Fall California Association of Toxicologists (CAT) Meeting; San Diego, CA; 1989

"Variations on Charcoal Strip Exposure for Absorption/Elution Recovery of Flammable Liquids" Presented at the NWAFS Meeting; Portland, OR; October 1992

"Understanding Your Mass Spectrometer" Published in 'Crime Scene—A Quarterly Newsletter of the NWAFS'; Volume 21 Number 3 p. 9, 1995

"Uses and Implementation of the Caswell Indoor Firing Range for Forensic Purposes – Firearms Round Table" Presented at the NWAFS Meeting; Spokane, WA; April 1996

"Drop Testing a .45 Auto Colt 1911" Published in 'AFTE Journal'; Volume 29 Number 2 p. 183, Spring 1997

"Persistence of Gunshot Residue on Clothing" Presented at the NWAFS Meeting; Missoula, MT; April 1997

"Velocity Drop During the Depletion of CO2 Cartridges in a Pellet Pistol" Presented at the NWAFS Meeting; Las Vegas, NV; Fall 1997

"Velocity Drop During the Depletion of CO2 Cartridges in a Pellet Pistol" Published in 'AFTE Journal'; Volume 30 Number 3 p. 435, Summer 1998

"Slam Firing Calico M-100/M-100P Firearms" Published in 'AFTE Journal'; Volume 30 Number 3 p. 527, Summer 1998

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## PUBLICATIONS/PRESENTATIONS CONTINUED

"Lead Patterns Observed in Ricochets" Presented at the NWAFS Meeting; Anchorage, AK; April 1999

"An Unusual Jennings By Bryco Model 59" Published in 'AFTE Journal'; Volume 31 Number 2 p. 147, Summer 1999

"Tap Rack No Bang" Presented at the NWAFS Meeting; Sacramento, CA; May 2000

"Examination of Unusual .22 Caliber Ammunition" Presented at the AFTE Annual Conference; St. Louis, MO; June 2000

"Examination of 12 Gauge Flare Guns" Presented at the AFTE Annual Conference; Newport Beach, CA; July 11, 2001

"Detection of Gunshot Residues on Secondary Surfaces" Presented at the NWAFS Meeting; Spokane, WA; April 25, 2002

"An Interesting Shotgun Pattern Reconstruction" Presented at the ACSR Annual Conference (Last Piece Society); Oklahoma City, OK; October 23, 2003

"Tool Marks in Bone—Evaluation of a "Sawzall" Presented at the NWAFS Meeting; Missoula, MT; April, 2004

"Evaluation of Non-Replenishing Blood Drip Trails" Presented at the IABPA Annual Conference; Tucson AZ; October 2004 (Second presentation at the request of the Scientific Working Group for Bloodstain Pattern Analysis; April 4, 2005)

"Bloodstain Pattern Analysis" Presented at the 12th Annual Criminal Justice Institute Seminar; Seattle, WA; September 9, 2005

"Shabazz v Shabazz-An Interesting Shooting Reconstruction" Presented at the ACSR Annual Conference (Last Piece Society); Albuquerque, NM; February, 2006

"The Influence of Intermediate Objects Positioned Close to the Muzzle of a Firearm" Presented at the AFTE Annual Conference; Springfield, MA; June, 2006

"Microscopic Examination of Hair Damaged by the Passage of a Fired Bullet" Co - presented at the ACSR Annual Conference; Tacoma, WA; January 22, 2007

"Using Adobe Photoshop Tools for Bloodstain Documentation" Presented at the IABPA Conference; San Antonio, Texas; October 4, 2007

"Exploring the CSI Effect" Presented for the "Inn at the Court" (a training conference for a collection of judges and attorneys); Tacoma, WA; February 9, 2009

"Life of a Bullet" Presented at the Seventh Annual Violent Crimes Investigators' Regional Training Conference; Seattle WA; November 5, 2009

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## PUBLICATIONS/PRESENTATIONS CONTINUED

"Practical Crime Scene Analysis and Reconstruction" Gardner, RM; Bevel, Tom. Contributing Author – Chapter 7 – Shooting Scene Processing and Reconstruction CRC Press, Published July 2009

"Shooting Scenes - What You Don't Know Can Hurt You" A Continuing Legal Education training session at the Snohomish County Public Defenders Association; Everett, WA; May 11, 2010

"Exploring the Limit of Gunpowder Particle Quantity for Distance Determination" Presented at the Technical Session of the NWAFS Meeting; Portland OR; October 1, 2010

"Fired Bullet Impact Site Evaluation: Tumbling Bullet versus Angled Shot" Presentation outlining how to evaluate bullet impact sites in context to a crime scene processing and reconstruction. NWAFS Meeting; Tacoma, WA; September 2011

"Examination of Bullet Defects from Test Fires Through Fabric" Noedel, Matthew; Cwiklik, Chesterene; Haakenstad; Lisa. Crime Scene, Volume 38 (Issue 2): pages 40-45 Spring, 2012

"Exploring the Limit of Gunpowder Particle Quantity for Distance Determination" presented at the AFTE Annual Conference; Buffalo, NY; June 26, 2012

Keynote Speaker: "Matthew Noedel Presents: Tales from the Private Side of Forensic Firearms Examination and Crime Scene Reconstruction" This keynote presentation discussed various experiences in working as a private forensic examiner in the current climate of forensic analysis. NWAFS Meeting; Vancouver, WA; September 18, 2013

"Review of the NWAFS Research Workshop: An Examination of Bullet Impacts to Concrete Surfaces" NWAFS Conference; Vancouver, WA; September 19, 2013

Panel Member: "CSR Officer Involved Shooting Discussion" ACSR Conference; Clark, NJ; February 11, 2016

"Evolution of Crime Scene Reconstruction" 23rd Annual Criminal Justice Institute Seminar; Burien, WA; September 23, 2016

"Special Research Workshop: Stability of Fired Cartridge Case Locations in Shooting Scenes" Presentation on results of the special research workshop conducted. NWAFS Conference; Portland, OR; September 21, 2017

"Anatomy of a Firearms Examination" Presentation at Benton County Public Defenders CLE Seminar (Skype); April 20, 2018

"Special Research Workshop: Extraction Failures from Poorly Supported Semiautomatic Pistols" Presentation on results of the special research workshop conducted. NWAFS Conference; Boise, ID; September 21, 2018

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## PUBLICATIONS/PRESENTATIONS CONTINUED

"Secondary Movement of Fired Cartridge Cases" Presentation on experiments conducted on secondary movement of cartridge cases when run over by automobile tires. AFTE Conference; Nashville, TN; May 27, 2019

"Interesting Observations from Shooting Incident Reconstruction" Presentation. ACSR Conference; Reno, NV; March 2020

"Evaluation of the Sounds of Gunshots Captured on Doorbell Cameras and Other Devices" Present preliminary results on workshop evaluating sound of gunshots from different calibers, captured on ring camera/cell phone audio. NWAFS Conference; Portland, OR; Sept 29, 2022

"The Use of 3D Scanning for Cartridge Case Ejection Patterns" Presentation. IAFSM/ACSR Joint Conference; Boulder, CO; Feb 17, 2022

"Radial Fracture Generation from Gunshots into Tempered Glass & Timing Gunshots in Conjunction with Audio Recorded Gunfire" Presentation. ACSR Conference; Carolina Beach, NC; Feb 28, 2023

"Best Practices: Crime Scene Investigation" Presentation. 2024 Eastern Idaho Symposium for Prosecutors and Law Enforcement; Idaho Falls, ID; Oct 3, 2024

"Liscio Photography Symposium" Presentation. Online. Jan 20, 2025

"I've Got a Couple of Dead Bodies Here" Co-Presenter; Presentation; ACSR Conference; Boise, ID; Mar 17, 2025.

"Basic Forensic Firearm Evaluations (What to Consider in Firearm Cases)" Presentation. 2025 Oregon Criminal Defense Lawyers Association Annual Conference; Bend, OR; June 12, 2025

"Understanding the Ballistic Tool Mark Examination (The Science of Comparison)" Presentation. 2025 Oregon Criminal Defense Lawyers Association Annual Conference; Bend, OR; June 13, 2025

"Diluted Blood or Blood Diluted" Presentation. 2025 International Association of Bloodstain Pattern Analysts; Boise, ID; October 7, 2025

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


# INSTRUCTOR

## Training Conducted for Professional Affiliations and Employers

"Full Auto Armory and Workshop" NWAFS Meeting; Seattle, WA; Fall 2000

"Forensic Black Powder Workshop" NWAFS Meeting; Spokane, WA; April 23, 2002

"Firearms in the Forensic Environment" IAI Conference; Tacoma, WA; May 7, 2003

"Semiautomatic Firearm Ejection Patterns" A 1-day workshop involving ejection patterns; NWAFS Meeting; Portland, OR; October 15, 2003

"Special Topics for Crime Scene Examination" Joint IAI/NWAFS Conference; Spokane, WA; May 18, 2005

"Trajectory Documentation Using a 360 Degree Scale" A ½ course on documenting trajectories; WSP Crime Lab Crime Scene Response Team; Tacoma, WA; July 27, 2005

"Understanding and Exploring Gunshot Residue" Two ½ day sessions involving lecture and practical examinations pertaining to GSR; ACSR Annual Conference; Tacoma, WA; January 23, 2007

"Using Lasers to Document Bullet Trajectories" Two ½ day sessions at the ACSR Annual Conference; Denver, CO; February 2009

"Preparing Reports for Shooting Crime Scenes" Two ½ day sessions at the ACSR Annual Conference; Denver, CO; February 2009

"Examination of Vehicles for Shooting Reconstruction" A 1-day workshop; NWAFS Meeting; Ft. Collins, CO; September 22, 2009

"Semiautomatic Firearm Ejection Patterns" Two ½ day sessions at the ACSR Annual Conference; San Diego, CA; February 11, 2010

"Forensic Aspects of Airsoft Replica Arms" A 1-day workshop covering the design, construction, forensic examination and importance of airsoft firearms in forensic applications. NWAFS Meeting; Portland, OR; September 29, 2010

"Omni-Car: Crime Scene Processing" Co-instructor - A 1-day workshop involving techniques to process automobiles for trajectory, bloodstains, bullet documentation and recovery, shoe print, DNA considerations and overall vehicle processing. NWAFS Meeting; Tacoma, WA; September 2011

"Special Research Workshop #2: Characterizing Bullet Damage in Clothing" Mentor - A 1-day research workshop involving the performance of various caliber and design of fired bullets through a variety of clothing items. NWAFS Meeting; Tacoma, WA; Sept 2011

"Techniques for Successful Presentations with PowerPoint™" Co-instructor for a workshop involving techniques to organize, present and enhance digital material for presentation in court or at professional settings. NWAFS Meeting; Tacoma, WA; September 2011

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## INSTRUCTOR CONTINUED

### Training Conducted for Professional Affiliations and Employers continued

"Trajectory Documentation" A 3-day class involving the proper evaluation, documentation and processing of fired bullet paths and determining horizontal and vertical trajectory values in simulated building material and vehicles. Washoe County Sheriff Office FIS Section; Reno NV; October 2011

"Terminal Ballistics: Bullet Performance in Tissue Simulant" A 4-hour course involving the theory and practical performance of various fired bullets. Lecture and live fire demonstrations of hollow-point bullet performance fired directly into ballistic gelatin, animal (beef) ribs, and through intermediate targets. ACSR Annual Conference; Monterey, CA; February, 2012

"Temperature of Ejected Cartridge Cases" Mentor - A 1-day research workshop involving attempts to evaluate the absolute temperature of cartridge cases at the moment they are ejected from a semiautomatic firearm. NWAFS Meeting; Missoula, MT; Sept. 23, 2012

"Long Range Ballistics" A ½ day workshop involving the theory of long range bullet flight, using various computer programs to determine long range flight properties of fired bullets, considering drag and ballistic coefficient for projectiles. NWAFS Meeting; Missoula, MT; September 25, 2012

"Ricochet and Impact to Concrete Surfaces" Mentor - A 1-day research workshop on the performance of projectiles and the resultant properties of bullets fired into painted concrete surfaces. NWAFS Meeting; Vancouver, WA; September 16, 2013

"Shooting Incident Reconstruction – Shotgun Pattern Reconstruction" A ½ day course involving shotgun pattern reconstruction. ACSR Meeting; Montgomery, TX; February 12, 2014

"Practical Considerations of Ammunition Reloading" A 1-day course including a lecture on reloading and hands on reloading and shooting reloaded cartridges. Cartridges reloaded during the course were test fired for velocity and the data collected and compared to factory loaded cartridges. AFTE Conference; Seattle, WA; May 11, 2014

"Make and Shoot Black Powder" Co-Instructor - A 1-day workshop covering the basics of black powder production and manufacture. Very small batches of black powder were manufactured and then loaded and test fired at a firing range. A chronograph measured the reproducibility and characteristics of the black powder loads generated. AFTE Conference; Seattle, WA; May 16, 2014

"Projectile Deflection Caused by Intermediate Targets" Co-Instructor - A 4-hour course examining the influence of intermediate barriers to bullet paths. ACSR Annual Conference; Oklahoma City; OK February 2015

"Projectile Deflection Caused by Intermediate Targets" Co-Instructor - A 4-hour course examining the influence of intermediate barriers to bullet paths. AFTE Annual Conference; Dallas, TX; May 2015

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



# INSTRUCTOR CONTINUED

## Training Conducted for Professional Affiliations and Employers continued

"Cook County Public Defender's Office Ballistic Training" – A 1-day course covering firearm related topics of interest of the Public Defender's Office. Cook County, IL; Aug, 2015

"Ammunition, Cartridges and Components" Co-Instructor - A ½ day course including examination, disassembly and evaluation of firearm components and exotic contemporary ammunition. ACSR Conference; Clark, NJ; February 11, 2016

"Fired Bullet Performance in Wood" Co-Instructor – A 1-day course examining bullet performance after impacting various wooden structures. AFTE Conference; New Orleans, LA; May 29, 2016

"Documenting Bullet Paths" Instructor – ½ day course demonstrating proper techniques in bullet path determination. NWAFS Conference; Boise, ID; September 26, 2016

"Special Research Topic: Trajectory Measurements" – Assisted with 1-day course comparing traditional hand measurements for trajectories against 3D laser scanning. NWAFS Conference; Boise, ID; September 27, 2016

"Bullet Path Analysis Without Rods" A ½ day course involving bullet path analysis without rods (two sessions). ACSR Conference; Black Hawk, CO; February 2, 2017

"Forensic Examination of Airsoft Replica Arms" Co-Instructor; A ½ day course reviewing the history, use, development and design features of Airsoft style guns. AFTE Conference; Denver, CO; May 16, 2017

"Special Research Workshop: Stability of Fired Cartridge Case Locations in Shooting Scenes" Mentor - A 1-day research workshop to examine how stable a fired cartridge case is in an environment once it has landed. NWAFS Meeting; Portland, OR; September 2017

"Bullet Holes in Clothing: Evaluation and Documentation" Instructor; A ½ day course demonstrating how to locate, identify and document the passage of a fired bullet through clothing and other common articles. ACSR Conference; Tacoma, WA; March 2018

"Understanding the Math of Bullet Path Analysis" Instructor; A ½ day course focusing on trigonometric formulas to document and solve horizontal/vertical aspects of bullet path analysis. AFTE Conference; Charleston, WA; June 3, 2018

"Special Research Workshop: Extraction Failures from Poorly Supported Semiautomatic Pistols" Mentor – A 1-day research workshop to explore methods to initiate semiautomatic jams and qualify when and how incomplete cycling occurs. NWAFS Conference; Boise, ID; September 18, 2018

"Projectile Impact Evaluation" Instructor; A 4-hr course evaluating projectile performance. ACSR Conference; Nashville, TN; February 19, 2019

"Understanding the Math of Bullet Path Analysis" Instructor; A ½ day course focusing on trigonometric formulas related to bullet path analysis. AFTE Conference; Nashville, TN; May 26, 2019

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


# INSTRUCTOR CONTINUED

## Training Conducted for Professional Affiliations and Employers continued

"Ejection Pattern Examination Revisited" Instructor; A 1-day research workshop on how to document ejection pattern observations and how to apply those observations in casework. PNWD – IAI & NWAFS Conference; Portland, OR; August 27, 2019

"Class Characteristics in Shooting Scene Reconstruction" Instructor; A ½ day course involving hands-on examination of firearm related materials to assist with on-scene evaluation of evidence. PNWD – IAI & NWAFS Conference; Portland, OR; August 28, 2019

"Gunshot Residue Examinations: Unique Perspectives" Instructor; A ½ day workshop using live fire demonstrations to conduct a deeper consideration of gunshot residue muzzle to target distance examinations. ACSR Conference; Tulsa, OK; March 2, 2021

"Bullet Impact Examination" Co-Instructor; A ½ day workshop examining bullet impacts. PNWDIAI Conference; Bend, OR; June 22, 2022

"Use of Casting Material (AccuTrans) for Tool Mark Preservation in Crime Scenes" Co-Instructor; A ½ day workshop demonstrating the use of casting material. PNWDIAI Conference; Bend, OR; June 22, 2022

"Evaluation of the Sounds of Gunshots Captured on Doorbell Cameras and Other Devices" Co-Instructor; 1 day workshop focused on evaluating sound of gunshots from different calibers, captured on ring camera/cell phone audio. NWAFS Conference; Portland, OR; Sept 27, 2022

"Sound and Cadence of Gunfire" 1 day workshop focused on how audio record of gunfire can be evaluated and determine limits and abilities of such examinations. ACSR Conference; Boise, ID; March 19, 2025

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



# INSTRUCTOR CONTINUED

## Shooting Scene Reconstruction Courses Conducted

"Processing and Reconstructing Shooting Crime Scenes" A 40-hour course on crime scene processing in shooting incidents; Olympia Police Department, Olympia, WA; July 24-28, 2006

"Processing and Reconstructing Shooting Crime Scenes" A 40-hour course on crime scene processing in shooting incidents; Seattle Police Department, Seattle, WA; December 19-23, 2006

"Processing and Reconstructing Shooting Crime Scenes" A 40-hour course on crime scene processing in shooting incidents; Olympia Police Department, Olympia, WA; November 26-30, 2007

"Processing and Reconstructing Shooting Crime Scenes" A 40-hour course on crime scene processing in shooting incidents; Norman Police Department, Norman OK; December 5-9, 2008

"Processing and Reconstructing Shooting Crime Scenes" A 40-hour course on crime scene processing in shooting incidents; Tacoma Police Department, Tacoma, WA; July 2009

"Processing and Reconstructing Shooting Crime Scenes" A 40-hour course on crime scene processing in shooting incidents; Olympia Police Department, Olympia, WA; April 2010

"Processing and Reconstructing Shooting Crime Scenes" A 40-hour course on crime scene processing in shooting incidents; Spokane County Sheriff's Office/Spokane Police Department, Spokane, WA; April 2011

"Shooting Scene Reconstruction" A 3-day course involving ammunition, trajectory and vehicle damage assessment in shooting scene processing; Michigan State Police, Frankenmuth, MI; October 2012

"Shooting Scene Reconstruction" A 3-day course involving ammunition, trajectory and vehicle damage assessment in shooting scene processing. Michigan State Police, Frankenmuth, MI; September 9-11, 2013

"Processing and Reconstructing Shooting Crime Scenes" A 40-hour course on crime scene processing in shooting incidents; Kent Police Department, Kent, WA; May 2015

"Shooting Incident Scene Reconstruction" A 3-day course involving ammunition, trajectory and vehicle damage assessment in shooting scene processing; King County Sheriff's Department; Kent, WA; October 2015

"Processing and Reconstructing Shooting and Officer Involved Scenes" A 5-day course involving ammunition, trajectory and vehicle damage assessment in shooting scene processing; Houston Forensic Science Center; Houston TX; June 2016

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## INSTRUCTOR CONTINUED

### Shooting Scene Reconstruction Courses Conducted continued

"Processing and Reconstructing Shooting Scenes" A 5-day course involving ammunition, trajectory and vehicle damage assessment in shooting scene processing; Ada County Sheriff's Department; Boise, ID; June 2018

"Shooting Incident Scene Reconstruction" A 5-day course involving ammunition, trajectory and vehicle damage assessment in shooting scene processing; Washoe County Sheriff's Office; Reno, NV; October 2018

"Techniques for Shooting Incident Reconstruction" A 2-day course (2 sessions) involving solving bullet path analysis with mathematics and traditional techniques; London Metro Forensic Office; London, England; February 3-4, 6-7, 2020

"Processing and Reconstructing Shooting Scenes" A 5-day course involving ammunition, trajectory and vehicle damage assessment in shooting scene processing; Montgomery County Sheriff's Office; Conroe, TX; January 2021

"Advanced Trajectory Analysis and Shooting Incident Reconstruction" A 5-day course involving ammunition, trajectory and vehicle damage assessment in shooting scene processing; Fontana PD; Fontana, CA March 2025

"Processing Shooting Scenes for Reconstruction" A 5-day course involving ammunition, trajectory and vehicle damage assessment in shooting scene processing; Boise PD; Boise, ID; September 2025

"Processing Shooting Scenes for Reconstruction" A 5-day course involving ammunition, trajectory and vehicle damage assessment in shooting scene processing; Boise PD; Boise, ID; November 2025

## SPECIALTY CONTRACTS

### Washington State Patrol

- Firearms Case Review: March 2007 – April 2007
- Firearms Analysis: December 2007 – December 2008

### Las Vegas Metropolitan Police Department Crime Lab

- Firearms Analysis and Firearms Examiner Trainer: March 2007 – February 2011

### Washoe County Sheriff's Office Forensic Science Division

- Firearms Analysis and Firearms Examiner Trainer: December 2010 – November 2014; January 2015 – March 2015

### Independent Commission of Investigations (INDECOM) Jamaica

- Shooting Scene Reconstruction and Training, Firearms Analysis and Firearms Analysis Training: July 2012 – January 2021, January 2023-December 2023, May 2024-April 2025

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



# TESTIMONIES/DEPOSITIONS

| The following testimonies and depositions were presented in various courts since 2005: | |
|---|---|
| **2/2005 Testimony** | **State of WA v Jerry Bartlett Jones** |
| Snohomish County Superior Court | Criminal - Prosecution |
| Homicide | Crime scene reconstruction |
| | |
| **5/2005 Testimony** | **State of WA v Trollers Takbar Fleming** |
| Pierce County Superior Court | Criminal - Prosecution Tacoma, WA |
| Homicide | Trajectory, bloodstain patterns and shooting reconstruction |
| | |
| **9/2005 Testimony** | **State of WA v Dwight C. Feeser** |
| Grays Harbor County Superior Court | Criminal - Prosecution |
| Homicide | Trajectory and distance determination |
| | |
| **12/12/05, 12/14/05 Testimony** | **State of WA v William Joice** |
| King County Superior Court | Criminal – Prosecution Seattle, WA |
| Attempted Murder 1st degree | Shooting reconstruction (trajectory and bloodstain pattern examination) |
| | |
| **2/13/06 Testimony** | **State of WA v Paul Nunn** |
| Pierce County Superior Court | Criminal - Prosecution Tacoma, WA |
| Assault/Attempted Robbery | |
| | |
| **3/1/06 Testimony** | **State of WA v Mario Sanchez** |
| Pierce County Superior Court | Criminal - Prosecution Tacoma, WA |
| Manslaughter | |
| | |
| **3/27/06 Testimony** | **State of WA v Roberta Elmore** |
| Pierce County Superior Court | Criminal - Prosecution Tacoma, WA |
| Murder | |
| | |
| **5/1/06 Testimony** | **State of MN v Larry Clark** |
| Ramsey County Superior Court | Criminal - Defense St. Paul, MN |
| Conspiracy to Commit Murder | 1970 Officer Involved shooting |
| | |
| **6/6/06 Deposition** | **State of WA v John Morimoto** |
| King County Superior Court | Criminal – Prosecution Seattle, WA |
| Homicide | |
| | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **6/12/06 Testimony** | **State of WA v Schreiber** |
| Clark County Superior Court | Criminal - Prosecution Vancouver, WA |
| | |
| **7/10/06, 7/11/06 Testimony** | **State of WA v Benjamin Asaeli et al** |
| Pierce County Superior Court | Criminal - Prosecution Tacoma, WA |
| Murder/Assault | Examination of fired bullets and gunshot residues on clothing |
| | |
| **8/7/06 Testimony** | **State of WA v Pearson** |
| Pierce County Superior Court | Criminal - Prosecution Tacoma, WA |
| | |
| **10/24/06 Deposition** | **State of WA v Tony Smith** |
| King County Superior Court | Criminal – Prosecution Seattle, WA |
| Triple Homicide | |
| | |
| **2/6/07 Testimony** | **State of WA v Nathan Brightman** |
| Pierce County Superior Court | Criminal - Prosecution Tacoma, WA |
| Murder | |
| | |
| **3/15/07 Testimony** | **State of WA v Anthony Holloway** |
| King County Superior Court | Criminal – Prosecution Seattle, WA |
| | |
| **4/9/07 Deposition** | **State of WA v Tony Smith** |
| King County Superior Court | Criminal – Prosecution Seattle, WA |
| Triple Homicide | |
| | |
| **5/23/07, 5/24/07 Testimony** | **State of WA v John Morimoto** |
| King County Superior Court | Criminal – Prosecution Seattle, WA |
| Homicide | |
| | |
| **6/7/07 Testimony** | **State of WA v Tony Rem** |
| King County Superior Court | Criminal – Prosecution Seattle, WA |
| | |
| **6/8/07 Deposition** | **Margo Lloyd v Valley Forge Life Insurance** |
| US District Court of WA, Western District | Civil - Defense Seattle, WA |
| | |
| **6/11/07 Testimony** | **State of WA v Belz** |
| Thurston County Juvenile Court | Criminal - Prosecution Olympia, WA |
| | Accidental versus unintentional discharge (drop testing) |
| | |
| **10/30/07 Testimony**<br>**11/1/07 Testimony (via Phone)** | **State of WA v Matthew Moi** |
| King County Superior Court | Criminal – Prosecution Seattle, WA |
| | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **11/7/07 Testimony** | **State of WA v Hunter** |
| Pierce County Superior Court | Criminal - Prosecution Tacoma, WA |
| | |
| **12/10/07, 12/11/07 Testimony** | **State of NV v Hartzog** |
| | Criminal – Prosecution Las Vegas, NV |
| | |
| **2/11/08 Deposition (Phone)** | **Culosi v Fairfax County VA et al** |
| | Civil - Defense |
| | |
| **5/5/08 Testimony** | **State of WA v Tony Smith** |
| King County Superior Court | Criminal – Prosecution Seattle, WA |
| Triple Homicide | |
| | |
| **5/8/08 Testimony** | **State of NV v Victor Anthony Ramos** |
| Clark County Superior Court | Criminal - Prosecution Las Vegas, NV |
| Attempted Murder | |
| | |
| **6/10/08, 6/11/08 Testimony** | **State of NV v Frank Macias** |
| Clark County Superior Court | Criminal - Prosecution Las Vegas, NV |
| Attempted Murder/Robbery | |
| | |
| **7/2/08 Deposition** | **Veronica Keith v Donald/Barbara Skewis** |
| Thurston County Superior Court | Civil - Defense |
| | |
| **7/10/08 Testimony** | **Veronica Keith v Donald/Barbara Skewis** |
| Thurston County Superior Court | Civil - Defense |
| | |
| **10/21/08 Testimony** | **State of WA v Fortier, Bryce D.** |
| Snohomish County Superior Court | Criminal – Prosecution Everett, WA |
| | GSR on white coat |
| | |
| **11/7/08 Testimony** | **State of WA v O'Reilley** |
| Snohomish County Superior Court | Criminal - Defense Snohomish County, WA |
| Officer Involved Shooting | Reconstruction |
| | |
| **5/22/09 Testimony** | **State of WA v Roy Rogers Clark** |
| Columbia County Superior Court | Criminal - Defense Walla Walla, WA |
| Officer Involved Shooting | Reconstruction |
| | |
| **10/1/09 Testimony** | **State of KS v Kimberly Hudson** |
| District 5 Judge S. R. Tatum | Civil - Defense Olathe, KS |
| Officer Involved Shooting | |
| | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **11/3/09, 11/4/09 Testimony** | **State of CA v Threats** |
| San Diego Superior Court – North County | Criminal – Defense San Diego, CA |
| Homicide (Death Penalty Case) | Tool Mark case |
| | |
| **11/19/09 Testimony** | **State of WA v Besabe** |
| King County Superior Court | Criminal - Prosecution Seattle, WA |
| Homicide | Firearm/Shooting reconstruction |
| | |
| **12/17/09 Testimony** | **State of WA v Matthew Hedgcoth** |
| Snohomish County Superior Court | Criminal – Defense Everett, WA |
| Homicide | Reconstruction/Bloodstain pattern exam |
| | |
| **2/2/10 Testimony** | **State of AL v Benjamin** |
| Houston County Superior Court | Criminal - Defense Dothan, AL |
| Homicide (Death Penalty Case) | Shooting reconstruction and distance determination |
| | |
| **3/10/10 Testimony (Pre-Trial Motions)** | **State of WA v Steele** |
| Pierce County Superior Court | Criminal - Defense Tacoma, WA |
| | Trajectory analysis and documentation |
| | |
| **3/23/10 Testimony** | **State of WA v Steele** |
| Pierce County Superior Court | Criminal - Defense Tacoma, WA |
| | Trajectory analysis and documentation |
| | |
| **3/31/10 Testimony** | **State of WA v Weens** |
| King County Superior Court | Criminal - Defense Seattle, WA |
| Robbery/FA Enhancement | Firearm operability and recognition |
| | |
| **5/10/10 Testimony** | **State of WA v Steele** |
| Pierce County Superior Court | Criminal - Defense Tacoma, WA |
| | Trajectory analysis and documentation |
| | |
| **6/15/10 Testimony** | **State of NV v Carvell Roots** |
| Clark County Superior Court | Criminal - Prosecution |
| Attempted Murder | Firearm exam and comparison |
| | |
| **8/26/10 Testimony** | **State of WA v Moore** |
| King County Superior Court | Criminal – Defense Seattle, WA |
| Assault | Case/firearm properties |
| | |
| **2/22/11 Testimony** | **Sieloff v Overson et al** |
| District Court #S35 | Civil - Defense Salt Lake City, Utah |
| | Reconstruction of a long range fired bullet trajectory |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **5/30/11, 5/31/11 Testimony (Video)** | **Western Australia v Mikhail** |
| | Criminal – Defense Australia |
| Double Homicide | Examination of shotgun components and scene reconstruction |
| | |
| **6/2/11 Testimony** | **State of TX v Charles Payne** |
| Superior Court | Criminal - Defense Dallas, TX |
| Officer Involved Shooting | |
| | |
| **6/21/11 Grand Jury Testimony** | |
| | Criminal - Prosecution Las Vegas, NV |
| | Forensic firearms examinations conducted at the Las Vegas Metro Crime Lab |
| | |
| **10/7/11 Deposition** | **Kitsap County v Kitsap Rifle and Revolver Club** |
| Pierce County Superior Court, Dept 14 | Civil - Defense |
| | Reconstruction of long range trajectories in relation to the Kitsap Rifle Club |
| | |
| **10/26/11, 10/27/11 Testimony** | **Kitsap County v Kitsap Rifle and Revolver Club** |
| Pierce County Superior Court, Dept 14 | Civil - Defense |
| | Reconstruction of long range trajectories in relation to the Kitsap Rifle Club |
| | |
| **11/22/11 Testimony** | **State of WA v Rance Cox** |
| Superior Court Judge Grant | Criminal - Prosecution Tacoma, WA |
| Drug Offense | Re-trial 1992 era examination of Cocaine |
| | |
| **1/6/12 Deposition** | **William Ostling et al v City of Bainbridge Island et al** |
| Federal-United States District Court Western Washington-Judge Leighton | Civil - Plaintiff |
| Officer Involved Shooting | Case involving officer delivering shots through a door resulting in death to the person inside |
| | |
| **3/8/12 Testimony (phone)** | **State of NV v McFarland and Hill** |
| Elko County Court | Criminal - Prosecution Elko, NV |
| Homicide | No gun-fired bullet exam |
| | |
| **5/7/12 Testimony** | **State of WA v Joshua D. Monson** |
| Snohomish County Superior Court | Criminal - Defense |
| Homicide | Defense consultation reference bloodstain patterns and shooting reconstruction single shot to victim in apartment |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **5/14/12, 5/15/12 Testimony** | **Jeremiah D. O'Sullivan v Bruce Gosnell** |
| Circuit Court State of Oregon | Civil - Plaintiff Linn County, Albany, OR |
| Wrongful Death | Wrongful death from homeowner shooting through a window at victim |
| | |
| **5/18/12, 5/21/12 Testimony** | **William Ostling et al v City of Bainbridge Island et al** |
| Federal-United States District Court Western Washington-Judge Leighton | Civil - Plaintiff |
| Officer Involved Shooting | Case involving officer delivering shots through a door resulting in death to the person inside |
| | |
| **6/20/12 Testimony** | **State of NV v Davis** |
| Second Judicial District—Washoe County | Criminal - Prosecution |
| Homicide | Shooting scene and shotgun performance evaluations in homicide case. |
| | |
| **8/2012 Testimony** | **State of NV case** |
| | Criminal – Prosecution |
| Assault | Examination of Air Soft replica pistol used in hold-ups around Reno, NV |
| | |
| **9/10/12, 9/11/12 Testimony** | **State of IL v Christopher Vaughan** |
| | Criminal – Prosecution Joliet, IL |
| Quadruple homicide | Involved trajectory, shooting scene reconstruction and other aspects of scene reconstruction |
| | |
| **9/16/12 Deposition** | **Mena v USA** |
| | Civil – Defense El Paso TX |
| Officer Involved Shooting | |
| | |
| **1/28/13 Deposition (phone)** | **State of FL v Larry Reed** |
| | Criminal - Prosecution Clearwater, Florida |
| Homicide | Indoor shooting scene reconstruction involving single shot from revolver. Trajectory and operation of Serrifile revolver with mis-matched ammunition. |
| | |
| **1/24/13 Deposition** | **Estate of Burgs v Chicago Police Dept** |
| | Civil - Plaintiff |
| Officer Involved Shooting Incident | |
| | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **2/22/13 Testimony** | **Salanitro v Beaverton Police** |
| Federal Court | Civil – Plaintiff Portland, Or |
| Officer Involved Shooting | Officer involved shooting reconstruction |
| | |
| **3/8/13 Testimony** | **State of WA v Richard Peters** |
| Snohomish County Superior Court | Criminal - Defense Snohomish County, WA |
| Death Investigation | Forensic exam and reconstruction involving unintentional discharge claim via a Colt Double Eagle 45 caliber pistol. |
| | |
| **3/21/13 Testimony** | **State of NV v Matthew Deacon** |
| Elko County District Court Judge Al Kacin | Criminal - Prosecution Elko, NV |
| Homicide | Examination and reconstruction of single shotgun wound involving firearm and distance testing. |
| | |
| **3/27/13 Testimony** | **State of IL v Blake Irby** |
| Peoria County 10th Judicial Court Judge Lyons | Criminal - Defense Peoria, IL |
| Double Homicide | Reconstruction of double homicide involving cross-fire within a mini-van |
| | |
| **5/1/13 Testimony** | **State of FL v Larry Reed** |
| | Criminal - Prosecution Clearwater, Florida |
| Homicide | Indoor shooting scene reconstruction involving single shot from revolver. Trajectory and operation of Serrifile revolver with mis-matched ammunition. |
| | |
| **6/5/13 Deposition** | **Willard et al v City of Everett** |
| | Civil - Plaintiff |
| Officer Involved Shooting | |
| | |
| **7/19/13 Deposition** | **Fleming v City of Richmond** |
| | Civil – Defense Richmond VA |
| Officer Involved Shooting | |
| | |
| **10/7/13 Testimony** | **State of WA v Michael Helmer** |
| King County Superior Court | Criminal - Defense |
| Assault | Shooting scene reconstruction |
| | |
| **10/10/13 Testimony** | **State of NV v Rodriguez, Evaristo et al** |
| | Criminal - Prosecution Reno, NV |
| Homicide | Shooting incident in a parking garage |
| | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **12/11/13 Deposition** | **Young v Federal Way** |
| | Civil – Defense Seattle, WA |
| Officer Involved Shooting | |
| | |
| **2/7/14 Testimony** | **State of NV v Arturo Bolanos Jr** |
| | Criminal - Prosecution Elko, NV |
| Homicide | |
| | |
| **3/6/14, 3/7/14 Testimony** | **State of IL v Allan Kustok** |
| Cook County Circuit Court<br>Judge John Hynes | Criminal – Defense Chicago IL |
| Homicide | Shooting scene reconstruction |
| | |
| **3/17/14 Deposition** | **Pinex/Colyer v Chicago PD, Sierra, et al** |
| | Civil – Plaintiff Chicago, IL |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **4/15/14, 4/16/14 Testimony** | **State of AZ v Maurice Holmes** |
| Superior Court Division 1 Judge Hatch | Criminal – Prosecution Flagstaff, AZ |
| Homicide | Shooting scene reconstruction |
| | |
| **6/9/14 Testimony (video)** | **State of W. Australia v Codie W. Davidson** |
| Supreme Court – Western Australia | Criminal – Defense Perth, Australia |
| Murder | Shooting scene reconstruction |
| | |
| **6/23/14 Testimony** | **State of Maryland v Michael Stahlnecker** |
| Anne Arundel County Circuit Court<br>Judge North | Criminal – Defense Annapolis MD |
| Homicide | Firearms examination |
| | |
| **6/26/14 Testimony** | **State of WA v Kevin Diltz** |
| Snohomish County Superior Court<br>Department 11 Judge Krese | Criminal – Defense Everett, WA |
| First Degree Assault | Shooting scene reconstruction |
| | |
| **8/4/14 Testimony** | **State of WA v D'Angelo Saloy** |
| King County Superior Court<br>Judge Regina Cahon (E-733) | Criminal – Defense Seattle, WA |
| Murder/Assault | Firearm/Shooting scene reconstruction |
| | |
| **8/15/14 Testimony** | **State of NV v Robert Jackson** |
| Clark County District Court<br>Dept 11 Judge Elizabeth Gonzalez | Criminal – Prosecution Las Vegas, NV |
| Attempted Murder/Assault | Firearm examination |
| | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **9/19/14 Testimony** | **Estate of Burgs v City of Chicago** |
| US District Court Judge Gottschall | Civil – Plaintiff Chicago, IL |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **10/27/14 Testimony** | **State of TX v Trinity Ringelstein** |
| Nueces County 148th District Court<br>Judge Guy Williams | Criminal – Defense Corpus Christi, TX |
| Homicide | Shooting scene reconstruction |
| | |
| **11/06/14 Testimony (Motion to Dismiss)** | **State of WA v Jaarso Ahmed Abdi** |
| King County Superior Court<br>Judge Inveen | Criminal – Defense Seattle, WA |
| Robbery/Unlawful Possession of Firearm | Firearm/Reconstruction |
| | |
| **11/26/14 Testimony (Video)** | **State of W. Australia v Robert J. Anderson** |
| Western Australia Supreme Court<br>Justice Michael Corboy | Criminal – Defense Perth Australia |
| Murder | Shooting scene reconstruction |
| | |
| **12/04/14 Testimony (Sentencing)** | **State of IL v Allan Kustok** |
| Cook County Circuit Court<br>Judge John Hynes | Criminal – Defense Chicago, IL |
| Homicide | Shooting scene reconstruction |
| | |
| **12/8/14 Deposition** | **Luis Gomez v City of Chicago** |
| | Civil – Plaintiff, Chicago, IL |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **12/12/14 Deposition** | **Schroer v Wade's Eastside Gunshop et. al.** |
| | Civil – Plaintiff Seattle, WA |
| Shooting Incident | Shooting scene evaluation |
| | |
| **1/12/15 Testimony (Trial)** | **State of WA v Jaarso Ahmed Abdi** |
| King County Superior Court<br>Judge Inveen | Criminal – Defense Seattle, WA |
| Robbery/Unlawful Possession of Firearm | Firearm/Reconstruction |
| | |
| **1/29/15, 1/30/15 Testimony** | **State of NV v Tatiana Leibel** |
| Douglas County District Court<br>Judge Tod Young | Criminal – Prosecution Minden, NV |
| Homicide | Firearm/Reconstruction |
| | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **2/26/15, 2/27/15 Testimony** | **Pinex/Colyer v Chicago PD, Sierra, et al** |
| U.S. District Judge Edmond Chang | Civil – Plaintiff Chicago, IL |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **3/10/15 Testimony** | **State of WA v Giljohn Johnson** |
| King County Superior Court<br>Judge Chun | Criminal – Defense Seattle, WA |
| Res Burg and Assault 3 | Shooting scene reconstruction |
| | |
| **4/14/15 Testimony** | **State of WA v Brian Minniear** |
| Snohomish County Superior Court<br>Judge Thomas Wynne | Criminal – Defense Everett, WA |
| Assault | Shooting scene reconstruction |
| | |
| **7/22/15 Testimony** | **Luis Gomez v City of Chicago** |
| U.S. District Judge Edmond Chang | Civil – Plaintiff, Chicago, IL |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **9/17/15 Testimony** | **State of NV v Davis** |
| Second Judicial District—Washoe Co.<br>Judge Freeman | Criminal - Prosecution |
| Homicide | Shooting scene and shotgun performance evaluations |
| | |
| **10/15/15 Deposition** | **State of FL v Alexander Richardson** |
| Sixth Judicial Circuit of Florida Pasco and Pinellas Counties | Criminal – Prosecution |
| Homicide | Shooting scene reconstruction |
| | |
| **11/4/15 Testimony** | **State of FL v Alexander Richardson** |
| Sixth Judicial Circuit of Florida Pasco and Pinellas Counties | Criminal – Prosecution |
| Homicide | Shooting scene reconstruction |
| | |
| **11/20/15 Testimony** | **State of WA v Adam Jennings** |
| Okanogan County Superior Court<br>Judge Culp | Criminal - Defense |
| Homicide | Firearm/Shooting scene reconstruction |
| | |
| **2/8/16 Testimony** | |
| West Kingston Commission of Enquiry | Witness on behalf of INDECOM |
| Tivoli Incursion | Ballistic examination/Shooting scene |
| | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **6/10/16 Deposition** | **Anderson v Hayles** |
| Franklin County Superior Court | Civil - Defense |
| Shooting Incident | Shooting scene reconstruction |
| | |
| **8/1/16 Testimony** | **Anderson v Hayles** |
| Franklin County Superior Court | Civil – Defense |
| Shooting Incident | Shooting scene reconstruction |
| | |
| **11/9/16 Testimony** | **State of WA v Sandoval-Ortiz, Alexander** |
| Snohomish County Superior Court<br>Judge Downes | Criminal – Defense |
| Homicide | Firearm/Shooting scene reconstruction |
| | |
| **11/11/16 Deposition** | **Jose German v Chris Roberts, City of Fircrest, et al** |
| US District Court – Western Division | Civil – Defense |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **11/22/16 Deposition** | **Estate of Ashley DiPiazza v City of Madison** |
| | Civil – Plaintiff |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **3/15-16/17 Testimony** | **State of WA v Michael Espinosa** |
| King County Superior Court<br>Judge Burns | Criminal – Defense |
| Homicide | Shooting scene reconstruction |
| | |
| **6/7/17 Testimony** | **State of WA v Seth Friendly** |
| Snohomish County Superior Court<br>Judge Wilson | Criminal – Defense |
| Assault | Firearm |
| | |
| **6/8/17 Deposition** | **Zambrano et. al. v City of Pasco et. al.** |
| | Civil - Defense |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **6/14/17 Deposition** | **McGee v Madison County et. al.** |
| | Civil - Plaintiff |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **7/11/17 Testimony** | **Estate of A. DiPiazza v City of Madison** |
| US District Court – Western District of WI<br>Judge Confey | Civil – Plaintiff |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **7/13/17 Testimony** | **People v Diontae Calhoun** |
| Circuit Court of Cook County, IL | Criminal – Defense |
| Homicide | Firearm/Shooting scene reconstruction |
| | |
| **7/31/17 Deposition** | **Beltran v City of Tacoma** |
| | Civil - Plaintiff |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **10/18/17 Testimony** | **State of WA v Leonard Langdon** |
| Clark County Superior Court | Criminal - Defense |
| Unlawful Possession of a Weapon | Blank firing device examination |
| | |
| **11/14/17 Testimony** | **State of WA v Brent Luyster** |
| Clark County Superior Court | Criminal – Defense |
| Homicide | Shooting scene reconstruction |
| | |
| **2/7/18 Deposition** | **Orn v City of Tacoma** |
| | Civil - Defense |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **2/28/18 Testimony** | **Govt v O. Cephas and W. Brown** |
| Kingston Circuit Court - Jamaica | Criminal – Prosecution |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **3/13-14/18 Testimony** | **State of WA v Francisco Escobedo** |
| King County Superior Court | Criminal - Defense |
| Homicide | Shooting scene reconstruction |
| | |
| **5/22/18 Testimony** | **US v W. Joseph Astarita** |
| Federal Court Oregon | Criminal - Defense |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **8/7/18 Testimony** | **US v W. Joseph Astarita** |
| Federal Court Oregon | Criminal – Defense |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **8/14/18 Testimony** | **Govt v Anthony Castelle** |
| Judge Natalie Hart-Hines<br>St James Parish Circuit Court – Jamaica | Criminal – Prosecution |
| Officer Involved Shooting | Shooting scene reconstruction |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **9/7/18 Deposition** | **Estate of Kathryn New v Alladin Bail Bonds** |
| | Civil - Plaintiff |
| Shooting Incident | Shooting scene reconstruction |
| | |
| **9/11/18 Deposition** | **Adrienne Hood v City of Columbus et al** |
| | Civil - Defense |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **9/25/18 Testimony** | **State of WA v Ronald Mitchell** |
| King County Superior Court | Criminal – Prosecution |
| Homicide | Evidence examination |
| | |
| **10/31/18 Testimony** | **State of WA v Ronald Mitchell** |
| King County Superior Court | Criminal – Defense |
| Homicide | Evidence examination |
| | |
| **1/21-22/19 Testimony** | **Vanessa Kirkland** |
| Home Circuit Court – Jamaica | Criminal – Prosecution |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **1/29/19 Deposition** | **Merritt v State of AZ** |
| | Civil - Defense |
| Shooting Incident | Shooting scene reconstruction |
| | |
| **2/26/19 Testimony** | **State of WA v Rodney Wheeler** |
| King County Superior Court | Criminal – Defense |
| Homicide | Scene reconstruction |
| | |
| **6/3/19 Testimony** | **Anthony Trought** |
| | Criminal - Prosecution |
| Officer Involved Shooting | Shooting scene reconstruction |
| | |
| **6/20/19 Testimony** | **State of WA v Kevion Alexander** |
| King County Superior Court | Criminal – Defense |
| Homicide | Shooting scene reconstruction |
| | |
| **7/16-17/19 Testimony** | **State of WA v Ruben Melegrito** |
| King County Superior Court | Criminal – Defense |
| Homicide | Shooting scene reconstruction |
| | |
| **8/29/19 Testimony** | **State of WA v Jonathan Timmen** |
| King County Superior Court | Criminal - Defense |
| Assault | Shooting scene reconstruction |
| | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **11/4-5/19 Testimony** | **State of WA v Antonio Inda** |
| King County Superior Court | Criminal – Defense |
| Homicide | Shooting scene reconstruction and evidence examination |
| | |
| **11/20/19, 11/25/19 Testimony** | **State of WA v Malik Lee** |
| King County Superior Court | Criminal – Defense |
| Homicide | Evidence examination |
| | |
| **2/11/2020 Testimony** | **Minnesota v Christopher Kruse** |
| Nobles County District Court<br>Judge Terry Vagjrt | Criminal – Defense |
| Homicide | Microscopic comparison and reconstruction |
| | |
| **5/14/2020 Deposition** | **Hayes et al v City of Portland et al** |
| US District Court Oregon Portland Div | Civil – Defense |
| Officer Involved Shooting | Shooting scene reconstruction |
| 3:18-cv-00988-AC | |
| **1/27/2021 Testimony** | **Oregon v Torrey Brumfield** |
| Washington County Superior Court | Criminal – Defense |
| Homicide | Shooting scene reconstruction |
| 19CR48151 | |
| **2/3/2021 Deposition** | **Giovonn Joseph-McDade et al v City of Kent et al** |
| US District Court Western District Seattle | Civil – Defense |
| Officer Involved Shooting | Shooting scene reconstruction |
| 2:20-cv-00771 | |
| **3/11/2021 Testimony (Inquiry)** | **Commissioner of Police v Tyrone Carty (Anguilla)** |
| Eastern Caribbean Supreme Court in the High Court of Justice Anguilla Circuit | Criminal - Prosecution |
| Homicide | Shooting scene reconstruction and evidence examination |
| | |
| **4/1/2021 Testimony** | **WA v Esmond Earl Holmes** |
| King County Superior Court | Criminal – Defense |
| Homicide | Scene reconstruction |
| 18-1-02856-2 | |
| **5/18/21 Deposition** | **Rice/Donahue v City of Roy et al** |
| US District Court Western District of WA | Civil – Plaintiff |
| Officer Involved Shooting | Shooting scene reconstruction |
| 3:20-cv-05223 | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **6/22/2021 Testimony (Franks Hearing)** | **US v Gizachew Wondie** |
| US District Court Western District of WA | Criminal - Defense |
| | Ballistic comparison |
| CR 18-315 RAJ | |
| **7/14/2021 Deposition** | **Holte v City of Eau Claire et al** |
| US District Court Western District of WI | Civil – Defense |
| Officer Involved Shooting | Shooting scene reconstruction |
| 20 cv 131 | |
| **8/5/2021 Testimony** | **WA v Caviyon McCalister** |
| King County Superior Court<br>Judge Roberts | Criminal – Defense |
| Homicide | Sound of Gunshot |
| 20-1-056134 | |
| **8/5/2021 Deposition** | **Krystal Noga-Styron et al v Forrest Lemme & Todd Mitchell** |
| Snohomish Superior Court (WA) | Civil – Plaintiff |
| Shooting | Shooting scene reconstruction and evidence examination |
| 19-03523-31 | |
| **9/8/2021, 9/9/2021 Testimony** | **Rice/Donahue v City of Roy et al** |
| US District Court Western District of WA | Civil – Plaintiff |
| Officer Involved Shooting | Shooting scene reconstruction |
| 3:20-cv-05223 | |
| **11/12/2021 Testimony** | **Adrienne Hood v City of Columbus et al** |
| US District Court Southern District – Ohio | Civil – Defense |
| Officer Involved Shooting | Shooting reconstruction and evidence exam |
| 2:17-cv-471 | |
| **12/1/2021 Deposition** | **Pursley v City of Rockford** |
| US District Court Northern District of IL | Civil – Defense |
| Shooting | Evidence examination |
| 3:18-cv-50040 | |
| **1/28/2022 Deposition** | **Sanchez v Village of Wheeling** |
| US District Court Northern District of IL | Civil - Plaintiff |
| Shooting | Ballistics and Gunshot Residue |
| 1:19-cv-02437 | |
| **3/18/2022 Deposition** | **Ibarra/Martinez v Lee/Rogers Co et al** |
| US District Court Northern District of OK | Civil – Defense |
| Shooting | Shooting reconstruction and evidence exam |
| 20-CV-00598 | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


# TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **4/21/2022 Testimony** | **Adrienne Hood v City of Columbus, et al** |
| US District Court – So. District – Ohio | Civil – Defense |
| Officer Involved Shooting | Shooting reconstruction and evidence exam |
| 2:17-cv-471 | |
| **4/28/2022 Testimony** | **Illinois v Jeremy Boshears** |
| Circuit Court of the 12th Judicial Circuit, Will County IL | Criminal – Prosecution |
| Homicide | Shooting reconstruction |
| 2017 CF 2295 | |
| **5/2/2022 Testimony** | **WA v Michael Brower** |
| Thurston County Superior Court | Criminal – Defense |
| Homicide | Evidence examination |
| 20-1-00760-34 | |
| **6/8/2022 Testimony** | **WA v Soren Olsen II** |
| Skagit County Superior Court | Criminal – Defense |
| Unlawful Possession of Firearm | Evidence examination |
| 21-1-00753-29 | |
| **6/14/2022 Testimony** | **The Queen v Tyrone Carty** |
| Eastern Caribbean Supreme Court in the High Court of Justice Anguilla Circuit | Criminal - Prosecution |
| Homicide | Shooting reconstruction and evidence exam |
| AXAHCR 2021/0014 | |
| **6/17/2022 Deposition** | **Ethan Marks v Benjamin Bauer** |
| US District Court Minnesota | Civil - Defense |
| Shooting | Shooting Reconstruction |
| 20-CV-01912 | |
| **6/21/2022 Testimony** | **WA v Peter Garrido** |
| King County Superior Court | Criminal - Defense |
| Assault | Shooting Reconstruction |
| 20-1-040262 | |
| **6/28/2022 Testimony** | **WA v Nigel Hogan** |
| King County Superior Court | Criminal – Defense |
| Homicide | Shooting Reconstruction |
| 18-1-06706-1 | |
| **6/29/2022 Deposition** | **Novak et al v City of Spokane et al** |
| US District Court Eastern WA | Civil – Defense |
| Shooting | Shooting Reconstruction |
| 21-2-00037-32 | |
| **10/12/2022 Testimony** | **USA v Lorenzo Jones** |
| Oregon District Court | Criminal - Defense |
| Homicide | Shooting reconstruction and Evidence Exam |
| 3:19-cr-333 | |
| **11/29/2022 Testimony (Retrial)** | **WA v Peter Garrido** |
| King County Superior Court | Criminal – Defense |
| Assault | Shooting Reconstruction |
| 20-1-040262 | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **12/5/2022 Testimony** | **WA v William Dudley** |
| King County Superior Court | Criminal - Defense |
| Homicide | Shooting Reconstruction and Evidence Exam |
| 20-1-05595-2 | |
| **12/14/2022 Testimony** | **Grand Jury** |
| Grand Jury | Criminal - Prosecution |
| | Shooting Reconstruction |
| | |
| **12/15-16/2022 Testimony** | **OR v Patrick Grundman** |
| Yamhill County District Court | Criminal – Defense |
| Shooting | Ballistic Examination |
| 21CR23732 | |
| **12/22/2022 Deposition** | **Smalls/Bennie Branch et al v Tacoma et al** |
| US District Court | Civil – Defense |
| Officer Involved Shooting | Shooting Reconstruction |
| 3:22-cv-05043-BJR | |
| **1/20/2023, 1/23/2023 Testimony** | **Dearrea King v City of Columbus** |
| So. District of Ohio US District Court | Civil – Defense |
| Officer Involved Shooting | Shooting Reconstruction |
| 2:18-cv-1060 | |
| **2/15/2023 Deposition** | **Alcantor/Flores v Centralia et al** |
| US District Court Western District WA | Civil – Defense |
| Officer Involved Shooting | Shooting Reconstruction |
| 3:21-cv-05458-DGE | |
| **4/28/2023 Deposition** | **Salyers v City of Tacoma** |
| US District Court Western District WA | Civil – Defense |
| Officer Involved Shooting | Shooting Reconstruction |
| 3:17:cv-05315-BHS | |
| **5/15/2023 Hearing Testimony** | **OR v Sean K. Beck** |
| Marion County Circuit Court | Criminal – Defense |
| Homicide | Shooting Reconstruction |
| 21CR36690 | |
| **6/14/2023 Testimony** | **OR v Kit Warren Wilkins** |
| Jackson County Circuit Court | Criminal – Defense |
| Homicide | Shooting Reconstruction and Evidence Exam |
| 19CR26475 | |
| **6/20/2023 Testimony** | **South Dakota v Asher Parks** |
| Minnehaha County Court | Criminal – Defense |
| Homicide | Shooting Reconstruction |
| CR21-5977 | |
| **6/21/2023 Testimony** | **OR v Austin B. Sutton** |
| Washington County Circuit Court | Criminal – Defense |
| Homicide | Shooting Reconstruction and Evidence Exam |
| 22CR21757 | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **6/26/2023 Testimony** | **Estate of Joel Nelson v Thurston County** |
| US Federal Court | **Civil - Plaintiff** |
| Officer Involved Shooting | Shooting Reconstruction |
| 3:2018cv05184 | |
| **6/27-28, 30/2023 7/3-4/2023 Testimony** | **Turks/Caicos v Syrmaderia Karioka** |
| Supreme Court, Providenciales | Criminal - Prosecution |
| Homicide | Shooting Reconstruction |
| Case Number 29 of 2020 | |
| **7/18/2023 Deposition** | **Susan Zawacky et al v Clark County et al** |
| US District Court of Western Washington | Civil – Plaintiff |
| Officer Involved Shooting | Shooting Reconstruction |
| 3:22-cv-05101 DGE | |
| **7/24/2023 Deposition** | **Gloria Black Meadows v Deptford Township** |
| US District Court New Jersey | Civil – Plaintiff |
| Officer Involved Shooting | Shooting Reconstruction |
| 1:20-cv-06951-JHR-AMD | |
| **9/14/2023 Testimony** | **Linares/Lopez v Southaven** |
| US District Court, Oxford Division MS | Civil – Defense |
| Officer Involved Shooting | Shooting Reconstruction |
| 3:19-cv-00133-NBB-RP | |
| **10/30/2023 Deposition** | **Bishop v City of Buckley** |
| US District Court of Western Washington | Civil - Defense |
| Officer Involved Shooting | Shooting Reconstruction |
| 3:22-cv-05759-KKE | |
| **10/31/2023 Testimony** | **WA v Andy Castaneda-Rodriguez** |
| King County Superior Court | Criminal – Defense |
| Homicide | Shooting Reconstruction |
| 20-C-019905 KNT | |
| **11/2/2023, 11/6/2023 Testimony** | **Washington v Eddie Lee-Lewis Sulcer** |
| King County Superior Court | Criminal – Defense |
| Homicide | Shooting Reconstruction and Evidence Exam |
| 20-1-02946-3 SEA | |
| **12/7/2023 Deposition** | **Adam Fried v Jose Garcia** |
| Ohio Northern District Court | Civil - Defense |
| Officer Involved Shooting | Shooting Reconstruction |
| 22-cv-00061 | |
| **12/11/2023 Deposition** | **Anna Lewis et al v Pima County et al** |
| US District Court of Arizona | Civil – Defense |
| Officer Involved Shooting | Shooting Reconstruction |
| 21-00557-TUC-RM | |
| **12/12/2023 Deposition** | **Julie Huff v DPS/DOC** |
| US District Court, Eastern District of OK | Civil - Plaintiff |
| Officer Involved Shooting | Shooting Reconstruction |
| CIV-18-022-RAW | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **1/9/2024 Deposition** | **Jonathan Strickland v City of Las Cruces** |
| US District Court New Mexico | Civil - Defense |
| Officer Involved Shooting | Shooting Reconstruction |
| CIV-23-00116 KG/KRS | |
| **1/24/2024 Testimony** | **Idaho v Jed Daniel Earls** |
| Ada County District Court | Criminal – Defense |
| Homicide | Shooting Reconstruction |
| CR01-22-02070 | |
| **2/6/2024 Testimony (2nd Trial)** | **Washington v Eddie Lee-Lewis Sulcer** |
| King County Superior Court | Criminal – Defense |
| Homicide | Shooting Reconstruction and Evidence Exam |
| 20-1-02946-3 SEA | |
| **4/17/24 Deposition** | **Korter/Joquin v City of Lakewood et al** |
| US District Court Western District WA | Civil – Defense |
| Officer Involved Shooting | Shooting Reconstruction |
| 3:22-cv-05647 | |
| **5/16/24 Testimony (2nd Trial)** | **Idaho v Jed Daniel Earls** |
| Ada County District Court | Criminal – Defense |
| Homicide | Shooting Reconstruction |
| CR01-22-02070 | |
| **6/20/2024 Deposition** | **Wells / Bailey v Christian County et al** |
| US District Court Western District MO | Civil - Plaintiff |
| Officer Involved Shooting | Shooting Reconstruction |
| 6:23-cv-03107-JAM | |
| **7/9 – 11, 15-16/2024 Testimony** | **Government v Odel Buckley, et al** |
| Home Circuit Court Kingston Jamaica | Criminal - Prosecution |
| Homicide (Keith Clark (v)) | Shooting Reconstruction and Evidence Exam |
| HCC 194/12 | |
| **8/1/2024 Testimony** | **Idaho v Patrick Coffey** |
| Kootenai County District Court | Criminal – Defense |
| Assault | Shooting Reconstruction |
| CR28-24-2397 | |
| **8/26/2024 Deposition** | **Sean Monterrosa et al v City of Vallejo** |
| US District Court Eastern District of CA | Civil - Plaintiff |
| Officer Involved Shooting | Shooting Reconstruction |
| 2:20-cv-01563 | |
| **10/31/2024 Deposition** | **Torres v City of St Louis** |
| US District Court Eastern District MO | Civil - Defense |
| Officer Involved Shooting | Shooting Reconstruction and Evidence Exam |
| 4:2019cv01525 | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com


# TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **11/6/2024 Testimony** | **Torres v City of St Louis** |
| US District Court Eastern District of MO | Civil - Defense |
| Officer Involved Shooting | Shooting Reconstruction and Evidence Exam |
| 4:2019cv01525 | |
| **11/12/2024 Deposition (criminal)** | **Florida v Justin Miller** |
| Sixth Judicial Circuit of Florida Pasco and Pinellas Counties | Criminal - Prosecution |
| Manslaughter | Shooting Reconstruction |
| 20-07847-CF | |
| **11/18/2024 Testimony** | **Idaho v Randy Michael Larkin** |
| Bonneville County District Court | Criminal - Prosecution |
| Murder | Shooting Reconstruction |
| CR10-22-06371 | |
| **12/5/2024 Testimony** | **Florida v Justin Miller** |
| Sixth Judicial Circuit of Florida Pasco and Pinellas Counties | Criminal – Prosecution |
| Manslaughter | Shooting Reconstruction |
| 20-07847-CF | |
| **1/24/2025 Testimony** | **California v Steven Kelly** |
| Contra Costa Superior Court | Criminal – Defense |
| Murder | Shooting Reconstruction |
| 04-24-00252 | |
| **1/29/2025 Testimony** | **Ball-Bey et al v Chandler et al** |
| US District Court, Eastern District MO | Civil - Plaintiff |
| Officer Involved Shooting | Shooting Reconstruction and Evidence Exam |
| 4:18-cv-01364 | |
| **1/30/2025 Deposition** | **Heeter et al v Bowers et al** |
| US District Court Southern District OH | Civil - Defense |
| Officer Involved Shooting | Shooting Reconstruction and Evidence Exam |
| 2:2020cv06481 | |
| **4/15/2025 Testimony** | **Texas v Mathews George** |
| 216th Judicial Dist. Kerr & Gillespie Counties | Criminal - Prosecution |
| Assault | Shooting Reconstruction |
| DC24-9222 | |
| **6/30/2025 Testimony** | **WA v Dondre Jack-Lee Butler** |
| King County Superior Court | Criminal – Defense |
| Murder | Shooting Reconstruction |
| CX22-1-012541 | |
| **7/14-15/2025 Testimony** | **Heeter v Bowers et al** |
| US District Court Southern District OH | Civil - Defense |
| Officer Involved Shooting | Shooting Reconstruction |
| 2:2020cv06481 | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **7/16/2025 Testimony** | **WA v Jocelyn Pineda-Maravilla** |
| Snohomish County Superior Court | Criminal – Defense |
| Possession of Firearm | Firearm |
| 23-1-00732-31 | |
| **7/29-30/2025 Testimony** | **Idaho v Jacob Anderson** |
| Benewah County District Court | Criminal – Defense |
| Murder | Shooting Reconstruction |
| CR05-23-0644 | |
| **8/19-20/2025 Testimony** | **WA v Richard Spoelstra** |
| Kitsap County Superior Court | Criminal – Defense |
| Assault | Shooting Reconstruction |
| 23-1-00359-18 | |
| **9/3-4/2025 Testimony** | **South Dakota v Timothy Overton** |
| Lincoln County 2nd Judicial Circuit Court | Criminal – Defense |
| Murder | Shooting Reconstruction |
| 41 CR 24-939 | |
| **9/5/2025 Testimony** | **Florida v Dylan Pascale** |
| Pinellas County 6th Judicial Circuit Court | Criminal – Prosecution |
| Homicide | Shooting Reconstruction |
| 22-09925CF | |
| **9/19/2025 Deposition** | **KC Leon v City of Walla Walla et al** |
| US District Court Eastern District of WA | Civil – Defense |
| Officer Involved Shooting | Shooting Reconstruction |
| 4:24-cv-05136-MKD | |
| **10/6/2025, 10/8/2025 Testimony** | **AZ v Ignacio Alonso Alvarez** |
| Maricopa County Superior Court | Criminal – Defense |
| Murder | Shooting Reconstruction |
| CR2023-131189 | |
| **10/14/2025 Deposition** | **Tyron Edwards v City of St Louis et al** |
| US District Court, Eastern District MO | Civil - Plaintiff |
| Officer Involved Shooting | Shooting Reconstruction |
| 4:2021cv01412 | |
| **10/16/20025, 10/20/2025 Testimony** | **WA v Jamari Webb** |
| Pierce County Superior Court | Criminal – Prosecution |
| Murder | Firearm |
| 24-1-02469-9 | |
| **10/28-29/2025 Testimony** | **MT v Skyler Griebel** |
| Park County District Court | Criminal – Defense |
| Homicide | Shooting Reconstruction |
| DC-34-2022-0000033-IN | |

Noedel Scientific
PO Box 73808, Puyallup, WA 98373
mnoedel@att.net (253) 227-5880
www.noedelscientific.com



## TESTIMONIES/DEPOSITIONS CONTINUED

| | |
|---|---|
| **1/28/2026 Testimony** | **UT v Jesse Taggart** |
| 4th Judicial District Court, Provo | Criminal – Defense |
| Attempted Murder | Shooting Reconstruction |
| 201402082 | |
| **1/29-30/2026 Testimony** | **KS v Matthew Criscenzo** |
| Sedgwick County | Criminal – Defense |
| Murder | Scene Reconstruction/Bloodstain Pattern Analysis |
| SG2025-CR-001022 | |
| | |
| **2/17/2026 Testimony** | **ID v Jim Lee Murphy** |
| Cassia County District Court | Criminal - Defense |
| Murder | Scene Reconstruction/Bloodstain Pattern Analysis |
| CR16-21-01062 | |
| | |
| **2/24/2026 Testimony** | **Jonathan Strickland v City of Las Cruces et al** |
| US District Court – New Mexico | Civil – Plaintiff |
| Officer Involved Shooting | Shooting Reconstruction |
| CIV-23-00116 KG/KRS | |
| | |
| **3/19/2026 Testimony** | **WA v Nicholas Martinell-Sterling** |
| Clark County Superior Court | Criminal - Defense |
| Murder | Shooting Reconstruction/Firearm |
| 23-1-00666-06 | |

## Testimony/Deposition Summary (From 2005)*

| Testimonies | Plaintiff/Prosecution | Defense | Totals |
|---|---|---|---|
| **Civil** | 11 | 11 | **22** |
| **Criminal** | 55 | 81 | **136** |
| | | **Total Testimonies:** | **158** |

| Depositions | Plaintiff/Prosecution | Defense | Totals |
|---|---|---|---|
| **Civil** | 18 | 31 | **49** |
| **Criminal** | 6 | 0 | **6** |
| | | **Total Depositions:** | **55** |

**West Kingston Commission of Enquiry not included in these counts.*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher Gagne, in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne,<br><br>Plaintiffs,<br><br>vs. | Case No.: CV-24-01337-PHX-SHD |
| City of Mesa, a political subdivision of the State of Arizona; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and in his capacity as a police officer; | VIDEOCONFERENCE DEPOSITION OF MATTHEW HARRIS<br><br>Tempe, Arizona<br><br>March 27, 2026 |

Prepared by:

Kathryn C. Cannon, CER
Certified Electronic Reporter
CER No. 4929

CERTIFIED TRANSCRIPT

Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his individual capacity and in his capacity as a police officer; ABC Partnerships I-X; XYZ Corporations I-X; John Does I-X and JANE DOES I-X,

Defendants.

Case No.: CV-24-01337-PHX-SHD

VIDEOCONFERENCE DEPOSITION OF
MATTHEW HARRIS

Tempe, Arizona

March 27, 2026

Prepared by:

Kathryn C. Cannon, CER
Certified Electronic Reporter
CER No. 4929

TRANSCRIPT OF PROCEEDINGS

THE COURT REPORTER: We are on the record. The date is March 27, 2026, and the time is 2:00 p.m.

14:00:46 Would counsel please state your appearance for the record, including the location from which you're appearing today?

MR. WOODS: This is Sean Woods with Mills + Woods Law. I'm at 5055 North 12th Street, Suite 101,
14:00:58 Phoenix, Arizona 85014. And I represent the plaintiffs.

MS. RETTS: Christina Retts, representing the defendants. Wieneke Law Group, 1225 West Washington, Suite 313, Tempe, Arizona.

THE COURT REPORTER: Thank you.

14:01:16 Will the witness please state and spell their full name for the record? And we know you're appearing with counsel, correct?

THE WITNESS: That's correct.

THE COURT REPORTER: Thank you.

14:01:25 THE WITNESS: My name is Matthew Harris, M-a-t-t-h-e-w H-a-r-r-i-s.

THE COURT REPORTER: And would the witness please raise their right hand to be sworn in?

Do you solemnly swear or affirm that the
14:01:37 testimony you're about to give at this time and place will

be the truth, the whole truth, and nothing but the truth, under penalty of perjury?

THE WITNESS: I do.

THE COURT REPORTER: Thank you.

14:01:48 Counsel, you may proceed.

MATTHEW HARRIS,

the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows:

EXAMINATION

BY MR. WOODS:

Q. Good afternoon, Sergeant Harris.

A. Good afternoon --

14:01:55 Q. Is it Sergeant?

A. No. I'm a lieutenant.

Q. Apologies, Lieutenant.

A. You don't need to. It's not a big deal.

Q. No. I just want to make sure I do it right.

14:02:07 Have you ever had your deposition taken before?

A. No, not in this -- not in a professional context.

Q. Okay. But it may be a civil outside of this or family or something?

14:02:19 A. Yes, I have.

A. Yes, I did.
Q. Did you have a vantage point of the balcony on the left side?
A. Yes, I did.
14:26:43 Q. Did you have a vantage point of the balcony on the right side?
A. No, I did not.
Q. Okay. And then we -- I talked about this red circle with the sniper. Do you know who was positioned
14:26:56 there?
A. It was -- I think the initial responder was Officer Shawn Freeman. And then he had a second who responded to support him, and I believe that was Officer Treve Widmer.
14:27:07 Q. Okay. Do you know who told Shawn Freeman to set up as a sniper?
A. I did.
Q. Did you direct Widmer to set up as a sniper as well?
14:27:27 A. No, I did not.
Q. You've been a member of the SWAT team for close to 16 years, correct?
A. There have been times where I have been away from the SWAT team. So I joined the SWAT team in 2008. I
14:27:57 promoted in 2016. I stayed attached to the SWAT team as a

part-time sergeant team leader until 2019, when I left and went to our motor unit where I ran our DUI motor squad for about a year and a half. After that, I was transferred back to the SWAT team where I spent another three-ish years. I promoted to lieutenant, at which point I left the SWAT team, worked as a patrol lieutenant for about a year. I went to our advanced training unit for less than a year, and then I was transferred back.

So although the generalization of 16 years is -- is more or less correct, there's -- there is some nuance to that. I think it -- I think my total is somewhere more around -- at the time that this occurred, probably shy of that. So this was 2023. I had eight, nine, ten -- I probably had about 12 -- 12 and a half years on -- attached to the team at that time.

Q. Did you receive -- let me take that back.

As an officer, when you first get hired, you go through the police academy, correct?

A. That's correct.

Q. And you receive training at the police academy?

A. Correct.

Q. Did you receive any constitutional law training at the police academy?

A. I did.

Q. Did they -- did that training include discussing

certain constitutional law cases?
A. It does.
Q. Is Graham v. Connor one of them?
A. That is one of them, yes.
14:29:53 Q. What about Tennessee v. Garner?
A. That's also included in our instruction block.
Q. Throughout your career, have you -- have you had the trainings on updated case law?
A. Yes, I have.
14:30:14 Q. Have you received use of force training throughout your career?
A. Yes, I have.
Q. What did you have to do to become a SWAT team member?
14:30:30 A. Are you -- are you asking, like, what the actual assessment process is?
Q. Yeah. If you're -- so let me -- let me just -- because I -- obviously I don't know.
You're a patrol officer and you decide you
14:30:43 want to go to -- join the SWAT team. What are the steps you have to take to join the SWAT team?
A. Okay. Okay. Yeah, that makes sense.
So we have a minimum time on requirement before you're even eligible to submit for -- submit your
14:30:59 application. Once your -- your minimum time on the

department and you are outside of that of a probationary officer, you have to have an internal affairs review completed to ensure that you're not on any kind of disciplinary probation. You're then -- I'll just speak -- 14:31:22 I'm going to say I because you're asking me how I did it.

So at that point there's a notification that comes out saying that the SWAT team's opening up for applications for new applicants. You have to fill out a transfer request form that includes all of your training, 14:31:39 experience, time-on, supervisors you've worked for, prior experience, education. It's essentially a transfer resume.

Once all the resumes are collected, prior to the closure date for the opening, they will then post for 14:31:57 the SWAT testing process. When I tested for the team, the testing process started out with a -- start with physical -- physical fitness test was first, which it has -- I don't recall exactly what we did back in 2008 for the physical fitness, but I do know that there was five or 14:32:24 six events that we had to participate in in order to meet minimum qualification physical fitness standards. From there, we had three -- yeah, three different shooting assessments. Those shooting assessments included the Arizona police officer standards and training standard for 14:32:49 qualification, which was scored. We have a shooting

facility up at our range that we refer to as our live fire house. It's essentially ballistic paneled steel that allows us to shoot frangible ammo into appropriate targets, which avoids ricochets, as well as a bunch of other things, and creates a real world live ammunition training environment.

14:33:09

We had to go through a live fire house training assessment. During that assessment, there are not only the searching tactics are tested, but the shoot and no-shoot targets that are included into that are also assessed. And then the third assessment is a moving and shooting, essentially kind of an agility course that is also -- was also graded.

14:33:32

If the culmination of your three shooting scores met the -- the minimum standard at the time, whatever that was, then you moved on to a written test. In that written test, we had a time set of parameters to respond to a couple different -- and I don't recall the number -- scenario-based questions. From -- once that was completed, you sat into -- in front of an oral board. The oral board usually consists of five different individuals. At the time, it was current full-time SWAT team members, SWAT team leaders, SWAT assistant team leaders, where you get asked anywhere from five to seven or nine world board type questions, and your oral board is then graded.

14:33:54

14:34:15

14:34:40

14:35:00 14:35:17 14:35:35 14:35:55 14:36:13

If you successfully complete all of those, peer reviews are done where your name is given to a current team member. That team member will go to your squad mates on patrol, or wherever you're working, if you're a detective or wherever, and they have a series of questions that they ask. They will seek out -- you know, if you have a squad of people and then you have -- and let's say you work the middle of the week and there's the squad of people who work the front half of the week and there's the squad that works the back half of the week, they'll ask people from all three so that they can get a holistic view of you as an officer or detective, your work ethic, your teamwork ability.

There are open-ended questions that are subjective. The SWAT team leaders will do a supervisor review. In that supervisor review, they will speak to your direct supervisor. They will look into your workstation file. And then once all of that information is collected, they will determine out of the selection group who qualifies to then go to SWAT school, because that's just the preliminary prerequisites to get to SWAT school to then go through the training for potential selection.

Would you like me to keep going in that?

Q. Sure.

A. Okay. So in my case, after all of that was complete, I got a notification that I would be going to SWAT school. I was being invited to SWAT school along with three other applicants that was whittled down from about 25 people who initially tested. Four of us went to our 80-hour SWAT -- our basic SWAT school. It runs eight days straight for a myriad of different administrative reasons.

And during our 80-hour SWAT school, you're assigned a tactical training officer who follows, observes, documents, and then also coaches and mentors you, you know, based on observations that are occurring, you know, each and every day. Once you have gone through the full eight days of SWAT school, if you successfully pass, you then go to a 40-hour hostage rescue school where the same rules apply and the same oversight and mentorship still exists. And at the conclusion of that 40-hour hostage rescue school, if -- in my case, I successfully met minimum standards or enough -- or exceeded them that they offered me a position on the team at that -- at that time.

Once you're on the team, it's -- we have a one-year probationary period. So even during your probationary period, depending on ability, teachability, responsiveness, teamwork, your position is still not

secured. There have been numerous people who've been removed in the past for various reasons, performance or otherwise. So you're not fully on the SWAT team until you have completed all of those steps, all of those trainings, and a year of probation.

14:38:23

Q. How is being on the SWAT team different than, like, not?

MS. RETTS: Form.

BY MR. WOODS:

14:38:42

Q. So from -- let me maybe be a little more clear.

From before you were a SWAT member, you were -- you were a patrol officer. Is that right?

A. That's correct.

Q. And then you became a SWAT team member?

14:38:56

A. Correct.

Q. How did your day to day change when you became a member of the SWAT team?

A. Well, when I joined the team, our team was not completely full time at the time. We had a full-time element that was supplemented with part-time team members. So my day to day was still that of a patrol officer. I worked graveyards, and I responded in full patrol uniform.

14:39:15

So, initially, the -- the changes didn't manifest as significantly as they do now, or since the team has gone completely full time. However, we were

14:39:42

required back then to train every other Tuesday for an entire 10-hour training period. That's when the entire team would come together and do what we would call or classify as full-team training. On top of that, once on the team, whether part time or full time, you had the opportunity to then look to specialize within the team.

14:40:09

So for me, the way that changed is I was asked if I would be willing to consider joining our sniper unit. So I worked patrol from 2008 until 2010, when I went to the team full time. But during that time period, I would train with the sniper unit every Monday morning, and I would train with the full team every other Tuesday for 10 hours, twice a month. It doesn't really change the day to day, but then it opens up different training opportunities, different schools, different resources, and ultimately, in a very short period of time -- back then, again, it's different now -- patrol supervision would ask routinely on emergency calls for service if there was on-duty SWAT team members who could respond to emergency calls for service. So my day to day did start to change, because routinely I would be pulled out of my district that I worked to respond to another because supervision was asking for on-duty SWAT team members to assist with whatever. And it could literally be for whatever reason they were asking us to.

14:40:31 14:40:56 14:41:19 14:41:37

So does that answer your question?

Q. Yeah, I think so.

Would you agree that as a SWAT team member, you receive more specialized training than when you were a patrol officer?

A. Yeah, I would agree to that.

Q. Would you agree that SWAT team members have access to use more advanced tools than a patrol officer would be able to use?

MS. RETTS: Form.

THE WITNESS: So the firearms and tools and equipment that we use on the SWAT team are the same that are allocated to patrol.

So, for instance, we carry pistols. We carry AR-15s, we carry TASERS, pepper ball, bean bag, all the same things that are allocated to patrol officers. Our cars don't drive any faster. They don't have anything special in them. Not all SWAT team members specialize within the SWAT team.

So if there is a SWAT operator who has not decided to join the sniper team or has decided to not become a part of our breacher unit, then they're not going to be given anything different mechanically from the vast majority of patrol officers that are on scene. However, if you choose to specialize -- similarly to patrol, not

all patrol officers operate drones, but some do. I mean, the vast majority of SWAT operators don't operate drones, but some do. So it's -- it's less about having the haves and the have-nots. It's more of about the disbursement of the tools across the city and across specialized units, dependent on what their mission and their -- and their goal is.

So do we have some different tools than patrol? Yes, we do. Does patrol have some tools different than we do? Yes, they do. And that kind of varies even within other specialized units within the city.

BY MR. WOODS:

Q. Okay. Fair. Were you ever a member of the breacher team?

A. Yes, I was.

Q. Did you use explosives ever as part of the breacher team?

A. So we have three different types of ways to breach. We have mechanical breaching, which would be, you know, we're the horsepower behind it. So that's like using just a ram or a Halligan tool. We have -- we have other breaching tools, like saws, where there's actual horsepower behind it. And then our explosive breaching does use det cord and other very specialized equipment.

And after I joined the breacher team, when I left the sniper unit, I did go and get certified -- certified in explosive breaching.

Q. You just mentioned you were on the sniper unit.
14:45:13 Is that correct?

A. I was.

Q. How long were you a sniper?

A. From 2008, when I first started deploying with them, till 2013. And then in 2014 is when I switched and
14:45:43 started working and deploying with our breaching team and went to -- I don't know what the acronym stands for off the top of my head. But when I went to FETT in order to be certified as an explosive breacher. And I remained with the breaching team until I promoted in 2016.

14:46:02 THE COURT REPORTER: I'm sorry. When you went to what?

THE WITNESS: When I --

THE COURT REPORTER: Fett?

THE WITNESS: F-E-T-T. It's an acronym. I
14:46:10 don't remember what it stands for off the top of my head.

THE COURT REPORTER: Thank you.

BY MR. WOODS:

Q. During your time as a sniper, do you recall about how many times you were deployed as a sniper?

14:46:39 A. I don't recall. If I were to softball guess it,

I would say hundreds.
Q. During your time as a sniper, did you ever have to fire your sniper rifle?
A. No.
14:47:10 Q. What kind of rifle did you use as -- during your time as a sniper?
A. We went through several different iterations. My first sniper rifle was a Remington 700 chambered in .308. I then shot an FN. We bought a couple of those new. FN
14:47:32 is the manufacturer. I don't remember the exact model because I only carried it for a very short period of time, still chambered in .308. My last rifle that I carried until I left the team was an Accuracy International bolt action .308 rifle.
14:47:48 Q. Did your rifles come equipped with optics?
A. No. We have to buy them separately.
Q. Did you have optics on your rifles?
A. Yes.
Q. What kind of magnification did those optics
14:48:06 provide you?
A. It varied depending on the -- on the user. Some snipers -- it could range.
When I was a sniper, many of the capabilities that exist today with low power variable
14:48:24 optics didn't exist back then. Those are commonly

referred to as LPVOs. LPVOs only had a four times magnification rate change. So, for instance, if you wanted it to be at one power, which is nothing, that's just what I'm seeing, the max it could go up to would be a four. Or you could pick a two power that could go up to an eight, or a three and so on and so forth. So when I -- where currently, there are LPVOs that can go from one to a 10. Well, that's, you know, two and a half times more variable power that existed back when I was deploying as a sniper.

So the limitations in the optics back in 2008, 2009, kind of limited us to a pretty set standard. I routinely ran a 3 to 12 powered scope on my optic, just for the versatility. There were some guys at the time who ran 4 to 16 or higher. However, I know currently, because of the innovation with LPVOs, there's people who run 1 to 10s, you know, 2 to 16s. It kind of just depends on what your mission is and what the individual sniper operator chooses.

Q. When the SWAT team -- as a sergeant on the SWAT team, when SWAT was called to a scene, was a sniper always deployed?

A. The short answer to that is yes, but not always in a sniper capacity. All of our snipers have to also be cross-trained as entry operators. Every member on our

incident?
MS. RETTS: Form.
THE WITNESS: In the last almost three years?
BY MR. WOODS:
Q. Related to the incident.
MS. RETTS: Form.
THE WITNESS: I have had interactions with all of the members who still work with the Mesa Police Department who were present during that shooting through the course of my normal employment, as well as my assignment currently. We have had brief discussions, especially related to the, you know, pending lawsuit litigation.
But, again, I will say we have not had discussions or debriefs about what other people saw or heard or what they did or didn't do. But I interact with those individuals all the time. Shawn Freeman, Matt Chuey, and myself currently work in the same building in special operations. When I was at the academy, sergeant Kyle Thomas, Officer Treve Widmer, Officer Adam Goodrich, and I all worked together at the academy. So I interact with these individuals on a daily basis.
BY MR. WOODS:
Q. Have you had training in use of force?

A. Yes, I have.
Q. Have you had training in deadly force?
A. Deadly force is one of the levels of use of force. So, yes, I have.
15:10:35 Q. Have you had training in critical incident supervision?
A. Yes, I have.
Q. How about tactical communications?
A. They get marketed and branded a bunch of different ways. But what do you mean by tactical communications?
15:10:49
Q. Just how -- how to handle communications on the scene of an incident?
A. I mean, yes. I'm going to say yes to your question. I mean -- so critical incident supervision and major scene supervision, a component of that will involve communications.
15:11:04
Q. Have you had training in tactical decision making?
15:11:20 A. Yes, I have.
Q. Have you had training in less lethal alternatives?
A. Yes, I have.
Q. Do you understand that use of deadly force requires an imminent threat?
15:11:28

MS. RETTS: Form.

THE WITNESS: I understand that not only under Graham versus Connor, but Tennessee v. Garner, there are several different areas where use a force -- the use of deadly force is authorized.

15:11:41

BY MR. WOODS:

Q. When you arrived on scene, was there a hostage situation?

A. No, there was not.

15:11:54

Q. Was there a perimeter established by police?

MS. RETTS: Form.

THE WITNESS: So like I talked about when we went over the map, part of my walking around to verify that there -- had resources in the appropriate area is my ability to determine not only the layout of the environment, but also our capabilities of having a perimeter. And as I articulated, there were gaps in that perimeter, one of which is one that I personally held.

15:12:11

So was that -- your question was, was there a perimeter around the scene? I would tell you that with the resources that the officers -- the patrol officers had at the time, they had the -- to the best of their ability, the perimeter that they could create. However, that's why I was asking for resources to respond to different locations. And I took up a different location because I

15:12:33

15:12:49

My question was, do you know whether or not a warrant was issued before the shooting started? That's -- that's all my question is.

A. Fair enough. No, I don't know whether or not a

16:07:39

warrant was issued, nor would it have changed my decision making.

Q. Okay. Let me jump forward just a little bit, 26:56.

(Recording was played.)

BY MR. WOODS:

Q. You said that you heard gunshots coming from inside the apartment, and they were distinct and separate from the officers' gunfire, the suppressed fire, correct?

A. That was my impression, yes.

16:09:10

Q. Okay. So at the time when you were talking to Detective Ingram, you told him that you could tell the difference in sound of the different gunshots, correct?

A. That is what I told him at the time.

Q. And you heard multiple gunshots coming from

16:09:26

inside the apartment?

A. I believe that's what I reported to him on the clip you just played, yes.

Q. Okay. Do you recall telling Detective Ingram about why you shot your weapon?

16:10:06

A. I have some independent recollection of what I --

what I told them during my walk-through. But, again, without having reviewed this prior to, it would be summary.

Q. When you saw the door open to the apartment -- walk me through that, what did you see?

16:10:25

A. From my vantage point, I saw the door rapidly and very aggressively -- it was closed, and a finger snap later it was wide open. It wasn't a normal, like, exit your house type opening. And there was no immediate view of Shawn in the doorway as the door flew open. This is really odd for me. I've watched thousands of people surrender to the police in my career, especially on SWAT calls, to include individuals that we've used force on.

16:10:54

So my attention -- I remember it very distinctively catching me -- catching my attention that the door opened in such a quick and rapid manner and that there was not an immediate picture. There was no -- not only no person immediately visible, but there were no hands extended. I've seen people open a door and just only show their hands first. I've seen people, you know, do all manner of things to indicate that they're attempting to surrender.

16:11:16

16:11:36

When the door opened, I saw an empty threshold. I saw another obstruction just inside of the door. I couldn't make out exactly what it was. However,

16:11:53

16:12:16
16:12:42
16:13:02
16:13:24
16:13:44

it was very clearly not the wall, or it was placed there. So I was trying to determine what that obstruction inside of the threshold of the landing of the door was. And as I was focusing in that area, that's when I caught a glimpse that continued to show itself, which was -- the first thing I saw was what appeared to be a rifle magazine appearing from the right side corner of the door. And then as that continued to open up, I could see Shawn, who was standing bladed using the cover of the door frame and was looking out with this AR magazine, which I couldn't tell if it was attached to a rifle at port arms, which could very well be, or whether it's the gun's pointed down and the rifle magazine sticking out.

But my observations at that time were that he was blading his body along the corner frame of the door. He was giving me no visual indicators that he was attempting to surrender. And I could see a rifle magazine protruding into my visual ability as he slowly started to -- what we would call, like, slicing a pie, which is a searching and clearing method to try to see threats prior to when threats can see you. We talk always about using available cover and concealment to work your way around it slowly so that at greater distance, those angles open up and you are able to see more and more of an area. If I move an inch to my right from the doorway 30 feet away, I

just opened up 6, 8, or 10 feet of visual ability. So what I saw him doing very much appeared like he was slicing the pie, getting a view on the officers and the positions of where the officers were in the doorway.

16:14:06 Q. You saw him standing up?

A. I don't recall whether he was standing or kneeling. It is also difficult to tell whether he was on the stairs or if he was on the landing. I don't recall the height at which he was presenting himself.

16:14:23 Q. Where was the magazine that you saw?

A. In relation to what? Like, what do you mean? Where was it?

Q. Where was it? Was it on his body? Was it on the ground? Was he holding it? Was it attached to a weapon?
16:14:35 What did you see?

A. I'm sorry. I thought I just articulated what I saw. I saw just the -- I don't know if it was attached to a weapon or if it was on his body or if it was in a plate carrier or if it was in his hand. I just could see that
16:14:51 the magazine itself was protruding out as he was appearing in the doorway.

Q. So you saw a magazine protruding out of the doorway?

MS. RETTS: Form.

16:15:06 THE WITNESS: I saw Shawn using the corner

of the doorway to slowly slice the pie is the best way that I can try and say it, just because that verbiage is in my vernacular, with no surrender or hands up or any other demeanor. And I saw a magazine that is used commonly, but not exclusively, for an AR-15 style or AK-47 style weapon. And I saw both of those things, all of those things, as he was slowly presenting himself in the doorway.

16:15:29

BY MR. WOODS:

16:15:43

Q. Okay. Where was the magazine in relation to Shawn's body?

A. Afterwards? After we removed him from the --

Q. No. When you saw him. You said -- hold on. You just -- you just said that you saw the magazine. You said it multiple times. Before --

16:16:00

A. Okay. Then I misunderstood the question. I'm sorry to step on you, but I thought you said after. So I -- can you clarify the question for me, then? I apologize.

16:16:10

Q. You told me multiple times that when you saw the door open, you saw Shawn slicing the pie, and you saw a magazine. Where was that magazine?

A. In relation to his body? Is that what you're asking?

16:16:23

Q. Yeah. I mean, you saw it, so tell me what --

tell me where you saw it?
A. Okay. It was right about center mass of his torso.
Q. Did you see a weapon?
16:16:35 A. As I already answered, I did not see whether or not it was attached to a weapon or his hand or anything else. I don't know what it was attached to.
Q. And earlier you said he was standing. But when I asked specifically whether or not he was standing, you
16:16:50 said I can't remember if he was standing or kneeling. What did you see him -- where was he? Was he standing slicing the pie? Or was he kneeling slicing the pie?
MS. RETTS: Form.
THE WITNESS: Without me being able to see
16:17:08 exactly where his legs were and in what position they were, I would only be speculating as to exactly what his posture was at the time I could see him coming into my view.
BY MR. WOODS:
16:17:20 Q. Did you see his face?
A. I don't recall if I saw his face.
Q. Did you see his body?
A. I did see his body eventually, yes.
Q. Did you see any of his arms?
16:17:42 A. I don't recall if I could see his arms. They

were not presented out to me in any -- in any position where they would have been immediately viewable to me. So I don't recall if I -- if I saw them or not.

Q. About how long -- or how much time elapsed from 16:17:56 the time you saw the door open to the time you started shooting?

A. I would have -- I have no way to be able to answer that. You know, during critical stress, time distortion is a real thing. So what may be perceived as 16:18:12 some time versus what reality is, I wouldn't be able to give you an accurate indication of what that was.

My determination is, if I see information that's actionable, that to me appears to be an imminent or immediate threat of serious physical injury or death, then 16:18:27 I take that action. What the time duration of that was, I couldn't tell you.

Q. Okay. I'm going to go to press play at 29:19.

(Recording was played.)

BY MR. WOODS:

16:19:57 Q. So you said that as the door opens, Shawn moved in a northbound movement, correct?

A. Yeah. I really -- I appreciate you playing that for me, because obviously my recollection the night of is a lot better than three years later. So that is what I 16:20:13 reported immediately after this incident, yes.

16:20:28
Q. Okay. And you said it took him -- you kind of took him out of your view for a second, correct?
A. That's what I said.
Q. Okay. And you said that you saw a plate carrier on him?
A. That's correct.
Q. And that he was wearing red?
A. That is what I said.
Q. And then you said, so now we have an individual -- well, I can see high powered rifles?

16:20:39
A. That's correct, I said that.
Q. So you saw him holding a rifle?
MS. RETTS: Form.
THE WITNESS: So in my walk-through interview, this is in conjunction with me referring to -- and I even go on to elaborate in the clip you played -- but I'm referring to the high powered rifle that I could see on the patio, and then I elaborate later that officers had seen him and reported that he was armed with high powered rifles. So that is what I'm referencing. In no point in that clip, did I say I saw him with a high powered rifle.

16:20:53

16:21:08
MR. WOODS: Let's go and take a five-minute break.

16:21:37
THE COURT REPORTER: We are off the record.

going to press play at 38 seconds.

(Recording was played.)

BY MR. WOODS:

Q. Did you see a change of lighting?

17:02:28 A. I saw a change of lighting.

Q. Okay. I'm going to represent that the door just opened. Now I'm going to press play at 40.

(Recording was played.)

BY MR. WOODS:

17:02:42 Q. Do you hear the shots?

A. I do hear them, yes.

Q. Bring it back to 40 seconds. That's right when the door opens. Tell me how much time passed before you hear gunshots?

(Recording was played.)

THE WITNESS: Roughly -- roughly two seconds.

BY MR. WOODS:

Q. Okay. And it's at 44 seconds right now when you

17:03:08 hear him go, "ahh," right?

A. I wasn't listening for that. But when you pause it, we were paused at 44 seconds, if that's when he was --

Q. And we're at 40 seconds. I'll press play one more time.

(Recording was played.)

BY MR. WOODS:
Q. Do you hear gunshots?
MS. RETTS: Form. Foundation.
THE WITNESS: So to be honest with you, I
17:03:31 was listening for his audible, but --
BY MR. WOODS:
Q. We'll try it again.
A. Okay.
Q. I'm going to play it for a second. I want you to
17:03:39 tell me if you hear gunshots?
(Recording was played.)
THE WITNESS: Prior to you pausing it, I
heard what appeared to be gunshots.
BY MR. WOODS:
17:03:49 Q. Okay. So from 40 to 41 seconds, that's one
second, right?
A. Well, from 40 until it clicks to 42. But, yeah,
I understand what you're asking. It was within the
41st second of the video clip, whether it was immediately
17:04:03 41 or -- but, yes, I understand what you're asking.
Q. Did you take your gunshots after the other --
other officers shot at the front door?
MS. RETTS: Form. Foundation.
THE WITNESS: Are you asking -- can you --
17:04:30 can you -- so did I shoot after they had stopped shooting?

said earlier, when we were -- during preparation for deposition, when it was provided to me, was the first time any of this information has come available to me. Was not known to me at the time.

17:05:47
Q. In fact, on the scene that evening, your ability to see into the apartment was obstructed by tinfoil and/or other coverings on the windows or sliding glass doors?

A. That's correct. There was obstructions placed at every opening of that building. As I said in the

17:06:08
beginning, when I started walking from -- again, using the picture -- right to left, I observed that -- that there was obstructions, you know, across that second story. So -- and from my final vantage point, it was completely obstructed by either closed doors, blinds, or some other

17:06:32
form of physical obstruction, like aluminum foil.

Q. And you had intelligence, when you first arrived on the scene, you received information that the suspect in that residence had also fired off rounds on July 4th?

MR. WOODS: Form.

17:06:52
THE WITNESS: That's correct.

I'm sorry. I didn't mean to step on you.

MR. WOODS: No, you're fine. I just said form.

THE WITNESS: Okay. Yeah, sorry about that.

17:07:00
Yeah, so when Lieutenant Santana called me

17:07:21 initially to brief me on the incident, and when I showed up on scene, I was provided information that there was a previous incident related to this individual that we were responding to, reference shots that were fired a couple of days earlier around the July 4th holiday time.

BY MS. RETTS:

Q. Did it cause you concern, based upon your training and experience, that you now had two separate incidents close in time for an individual that fired a round?

17:07:36

A. Yes. So oftentimes we will go to calls where people will make threats. They will say, "Hey, I'm going to do this. I'm not going to go to back to prison. I'm not going to do" -- and that information or intel is very important.

17:07:52

When there is history, whether prior weapons history, prior violent history, prior criminal history, et cetera, those increase our threat recognition because it is demonstrating much more significantly than in most cases that we go to, because someone has already done or has recently done and shown that with means, motive, and opportunity, they have already taken those steps above and beyond just mere verbalized threats, which happen to us routinely.

17:08:14

17:08:31 So, yes, the shorter the duration from when

the first incident occurred to when this incident is unfolding, in my experience, leads to much more volatility due to a lot of different factors. But in this case specifically, we're out here two days later for an
17:08:56 incident that provided to me was reported had just occurred two days, and now we're here two days later.

And after I got off the phone with Sergeant Santana, I immediately turned my radio over to the channel that they were working, and across the radio comes the
17:09:14 information that he had come to the front door with a weapon in his hands and was verbally confronting the immediate action teams, the officers that were on scene.

So I have to take all of that information, prior history, prior reports, distance between incidents,
17:09:33 and now information or intel that's being put out active and real time with the officers that are on scene. So given all of those things, that is a heightened level of concern.

Q. And this was also reported to be a domestic
17:09:47 violence incident. In your training and experience, can those be some of the most volatile situations that officers encounter?

A. Yes, it -- yes, to the first question. It was reported as a domestic violence incident. And yes, to
17:10:00 your second question. Those are very frequently some of

17:10:23 17:10:43 17:11:03 17:11:21 17:11:37

the most volatile. We had responded -- so in conjunction, very similar time frame to this call, to a domestic violence situation where the individual was armed with multiple weapons. He had threatened the female half. And when he fled, patrol officers went to stop him, and he came out of the car and immediately engaged with gunfire with the officers. He dropped the gun. He fell back into the car. Intel was that we knew that he had multiples, so we have a history of violence. We have close proximity between events. We have known multiple weapons. We have partial obstruction of where his body is. And in lieu of moving directly to go and secure him and give medical aid, we used other tactics, to which he responded to, ultimately demonstrating to us and where we found that second gun, which was right where he was -- his head and hands were laying. That -- it even increases the volatility when it comes to ambush and playing possum.

So all of those factors and all of that experience from those types of incidents over a decade plus and thousands of calls all have to go into that critical decision making model when we're -- when we're dealing with something like this.

Q. You have had training on perception?

A. Yes, I have.

Q. And have you received training that, you know,

once a subject fires a shot, you're always going to be behind in your reaction to that?

A. I have. The perception reaction time disparity is -- I mean, I'm not the person who's commit -- done the study or the people who's done all the -- but I know that when someone chooses an action, the people who are responding to said action are always behind, because it takes time. It's different for everyone. But the thing that's not different for everyone is you have to perceive what's happening. You have to orient yourself to what's happening. You have to go process what's happening and then take the appropriate action to what's happening. And so that all takes time dependent on the individual, their training.

And also, while I was the tactical training lieutenant, I went to specialized training on the limitations of video, the distortion that occurs in video and with frame rates. And so we -- we utilize that, like I talked about earlier, when it comes to writing our tactical response for CIRB for use of force. So even the video that we see, the way that we perceive the video, the way that there's limitations in different systems, there's so many variables, not only in what gets captured, but what's perceived, and then also the time distortion that happen across all of those.

Q. Arizona Revised Statute 13-410 is the Justification; use of deadly physical force in law enforcement.
Are you familiar with that statute?
17:13:29 A. Yes, I am.
Q. And subsection C(2) permits the use of deadly force to effect an arrest of a person who the police officer reasonably believes has committed, attempted to commit, is committing, or is attempting to commit a felony
17:13:49 involving the use or a threatened use of a deadly weapon.
Are you familiar with that section?
A. Yes, I am.
Q. Based upon all the information known to you and observed by you, did you believe that Mr. Gagne met that
17:14:05 subsection?
MR. WOODS: Form. Foundation.
THE WITNESS: So this is the benchmark that I have to use when I'm making decisions -- when I'm making a decision. It's part of the reason I talk about our
17:14:17 critical decision making model and the intel that we can get and the real time information and observations.
And based on the call that we were responding to, the previous call that was reported, the proximity of two different acts of reported violence, the
17:14:33 observations of weapons that I could personally see, the

observations of weapons that were reported by other either officers who saw them at the front door or SWAT personnel, based on the statements that he was saying to our negotiators, and what was being relayed on the radio, and
17:14:50 then his continued constant pressure to push -- push the pace of the way that this incident occurred, without hesitation, I wholeheartedly believe that it met all the requirements of that statute.

BY MS. RETTS:

17:15:07 Q. Did the fact that Mr. Gagne had what was reported to be an AK-47 within a structure where you could not specifically visualize it increase the danger that he presented?

A. The higher caliber of the weapon, the faster the
17:15:25 round, the longer the terminal ballistics, definitely increase. I've been on a shooting scene with an individual with an AK-47 who opened fire in a high-occupancy neighborhood and cars, trailers, doors, walls, did not stop those rounds.

17:15:49 So in this instance -- incident in particular, where you have a neighbor below you, you have a neighbor behind you, and you have a neighbor to the side of you, there's nothing with stick frame construction that is going to stop any of those rounds for any of the
17:16:06 immediate adjacent neighbors, added to that, vehicles that

aren't ballistically rated for an AK-47, vests that most of our patrol and supervisors wear that also are not rated for that level of ballistic coverage, as well as all the parts that even with what we carry, it's literally just that 10 by 12 plate. So the entire rest of your body, to include your helmet, which is not rated for it, puts all of those at risk. And then you add into that the terminal ballistics behind an AK-47 are effective well up to 600 meters. So take a pin and drop it on that apartment and go out 600 meters and draw a circle and those rounds can effectively deal lethal levels of force to anyone inside that 600-meter radius.

Q. And during the course of the time that you were on scene, you were aware that this particular suspect was repeatedly making threats to shoot and kill officers, correct?

A. Yes. So as our primary officers on scene, who were getting there, making announcements, which I wasn't there for, but our negotiators who then later took over, they are giving repeated warnings, "Come out. Come out with your hands up, hands high above your head. Follow the instructions of the officers." "Hey, I can't guarantee your safety." I've been on thousands of calls, and I have seen and heard the script.

Now, negotiations will go different

directions. But those -- what we consider surrender instructions, those warnings are constantly being given. And what was being reported on the radio -- and I don't know if it was Officer Adair who was doing negotiations or if it was his counterpart, but what was being reported is as negotiations were going on, there was constant threats being made from the suspect to the negotiators while -- while warnings and surrender instructions were being provided, and his threats were that we were going to -- he was going to use deadly force on -- on officers who were on scene.

17:17:59
17:18:17

Q. The subsection C allows for the use of deadly force to effect an arrest when a law enforcement officer reasonably believes that through past or present conduct of the person, which is known by the peace officer, that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.

17:18:38

Are you familiar with that section?

A. Yes, I am.

17:18:52

Q. Did you believe that Mr. Gagne met that definition during this incident?

A. Without a doubt. As I just -- I know I articulated a broad spectrum on your previous question. But I believe that there was an imminent or immediate

17:19:08

threat if we failed to apprehend him to everyone inside of that 600 meters.

17:19:25 Q. And this could have -- if Mr. Gagne started shooting from that elevated position back in the recesses of the apartment, could have been a mass casualty event. Do you agree?

17:19:43 A. I do. From experience, I've been on -- on SWAT deployments where people have moved into intermediary hallways, even if they don't have obstructions on their windows, and have opened fire, and we do not have the ability to stop them from doing what they're doing. So in this incident, with all the preparations that were done around the openings of the house, he wouldn't have had to retreat anywhere because we could not -- had he chosen to

17:20:03 open fire and follow through with the very deliberate threats he was making to the negotiators on scene, we would not have had an effective way to stop his deadly violent behavior.

17:20:18 MS. RETTS: I don't have any further questions.

FURTHER EXAMINATION

BY MR. WOODS:

17:20:36 Q. Were you ever, before the shooting started, able to confirm that he had an AK-47?

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN the foregoing proceedings were taken before me at the time and place herein set forth; that I was then and there a Certified Electronic Reporter and Notary Public in and for the County of Maricopa, State of Arizona; that the questions propounded by counsel and the answers of the witness thereto were taken by me electronically and thereafter reduced into typewritten form under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 16th day of April, 2026.

Kathryn Cannon

Kathryn C. Cannon, CER
Certified Electronic Reporter #4929
and Notary Public
My Commission Expires: October 27, 2029

**Police Expert Opinion**
**Retired Phoenix Police Lieutenant Mark R. Hafkey, M. Ed.**

Mills + Woods Law, PLLC
Sean A. Woods, Esq.s
5055 N. 12th Street, Suite 101
Phoenix, Arizona 85014

Case No: CV-01337-DJH – Shawn Gagne Matter

Dear Mr. Woods:

Pursuant to your request, I have reviewed the below listed information and material relating to the above referenced case, and I have developed opinions related to common police training, practices, policies & procedures, as well as use of force, search & seizure, crime scene management and communication in this matter.

The opinions expressed herein I genuinely hold, and I am willing to testify to them in open court, under oath. My qualifications to express these opinions are revealed in the attached *Curriculum Vitae*, which details my education, law enforcement training, and experience.

My opinions are derived from and supported by the below listed case file and research material, case law, law enforcement training and experience, and common police policies, practices, procedures supported by *Best Practices'* guidelines established by the International Association of Chiefs of Police (IACP).

**Experience as an Expert Witness:**

I retired from the Phoenix Police Department in 2012 and made myself available as a police policy, practices, and procedures' expert witness in 2015 after being recommended by former counsel for a specific case. It is not something I do fulltime. I occasionally provide my opinion on cases I feel strongly about, and I work almost exclusively by referral. To date, I have provided opinion(s) on a handful of cases, in support of both Plaintiffs and Defendants, relating to vehicular homicide, use of force, search & seizure, police policies, practices & procedures, and traffic matters.

Finally, I understand that discovery is an ongoing process and could reveal yet other information relevant to the formulation of my opinions in this matter and, therefore, I reserve the right to modify or supplement my opinions upon receipt of further documentation produced in this matter.

**Case Material Reviewed:**

- Mesa Police Department Report w/Accompanying Supplements and Attachments
- Case File and Crime Scene Material
- Investigative Summary and Timelines
- Ring Camera and Interior Surveillance Cameras
- Police Body Cams of On-Scene Officers
- CAD and Radio Dispatch Audios
- Medical Examiner's Report
- Shooting Review Board Memoranda

**Case Law Reviewed:**

- Bonivert v Clarkston, 883 F3d 865 (9th Cir. 2018)
- Brosseau v Haugen, 543 US 194 (2004)
- Bryan v McPherson, 630 F3d 805 (9th Cir. 2010)
- Deorle v Rutherford, 272 F3d 1272 (9th Cir 2001)
- Gonzalez v Anaheim, 747 F3d 789 (9th Cir 2014)
- Graham v Connor, 490 US 386 (1989)
- Harris v Roderick, et al, 126 F2d 1189 (1997)
- Kingsley v. Hendrickson, 576 U.S. 389 (2015)
- Kisela v Hughes, 138 S Ct 1148 (2018)
- Lombardo v City of St. Louis, 594 U.S. ____ (2021)
- Mincey V Arizona, 437 Us 385 (1978)
- Payton v New York, 445 US 573 (1980)
- Plumhoff v. Rickard, 572 U.S. 765 (2014) – non jurisdictional case
- San Francisco v Sheehan, 135 S Ct 1765 (2015)
- Schneckloth v Bustamonte, 412 US 218 (1973)
- Scott v Henrich, 39 F3d 912 (9th Cir 1994)
- State v Ault, 724 P2d 545 (1986)
- State v Canez, 42 P3d 564 (2000)
- State v Fisher, 686 P2d 750 (1984)
- State v Fuentes, 247 AZ 516 (2019)
- Tennessee v Garner, 471 US 1 (1985)
- Torres v Madrid, 141S. Ct. 989 (2021)
- White v Pauly, 580 US (2017)

**Opinion(s):**

1. The officers did not have a valid legal theory to enter Mr. Gagne's home and, therefore, the seizure was unreasonable under the 4th Amendment.
2. The use of force used by Mesa Police Officers on July 6, 2023 to seize Mr. Gagne, was unreasonable under the 4th Amendment.
3. Poor crime scene management and police communication were contributing factors to the excessive force used in this matter.

**Case Synopsis:**

On July 6, 2023, at about 2130 hours, Mesa police officers responded to an aggravated assault (by threats) call at 1233 N. Mesa Drive. Officers were advised that Mr. Shawn Gagne had been depressed recently and drinking heavily. During the day, Mr. Gagne drank heavily, became increasingly upset and argued with his girlfriend (Jordan), who then called her friend and neighbor (Cindy) over to their apartment. Mr. Gagne had a verbal confrontation with the neighbor as well and cursed angrily at them both to leave. While leaving, Mr. Gagne was reported to have gone outside onto the 2nd floor balcony (out of sight but not out of earshot) and fire off a round while threatening to shoot them. Cindy contacted the police. Mr. Gagne was reported to have multiple guns inside, including high powered rifles, and was likely to become confrontational with police.

Patrol officers set up containment and the Mesa PD SWAT team was called to the scene. Officers attempted to contact Mr. Gagne via a vehicle's public address (PA) system and siren but did not get a response, so they launched beanbag rounds into the front door

and continued PA announcements. When that did not elicit a response, they fired more beanbag rounds into one of the apartment windows.

**Note**, inside surveillance cameras confirm that Mr. Gagne looked to be asleep/passed out on the couch during the time the police were attempting to contact him.

Mr. Gagne was soon reported to have opened the front door with a gun in his hand before quickly closing it again. Jordan and Mr. Gagne then spoke on the phone and in no uncertain terms, Mr. Gagne demanded that the police be told to leave. A crisis team negotiator (Adair) soon established phone contact with Mr. Gagne. Mr. Gagne refused to exit his home, advised that he had numerous weapons, and repeatedly threatened to shoot at the police if they did not turn off their lights and leave. Mr. Gagne made it very clear that if the police tried to come inside, he would shoot/kill them.

**Note**, much of Mr. Gagne's conversation with the negotiator was recorded and audiotaped. Mr. Gagne appeared to be very angry and intoxicated.

SWAT team officers (and armored equipment) took over perimeter positions from patrol units. A sniper observer, Officer Freeman, set up in an apartment directly west of Mr. Gagne's west facing balcony. Other SWAT team officers set up positions to the north, northwest and southwest to cover both balconies, front door and all of the front and side-facing windows, i.e., the entire front half of Mr. Gagne's apartment, including its north, west and south sides. Patrol units remained in positions at the rear half of the apartment to maintain a complete perimeter. The air unit soon arrived overhead to provide eyes in the sky.

**Note**, radio contact was maintained between ground and air unit officers, as well as with the two negotiators who provided negotiation updates.

Utilizing optics, Officer Freeman would later report that he observed Mr. Gagne (through the window north of the slider door off the south balcony) walking around inside his apartment talking on his cell phone (presumably with the negotiator) while carrying a rifle. At approximately 2242 hours, Officer Freeman said that he "observed the suspect walk over to the slider door and began peeking through the blinds" while holding the gun in his right hand, so he took his first shot (at his head). He then saw Mr. Gagne "use his hand again to look through the blinds again." So, he fired a second time (at the suspects torso). He indicated that after that, Mr. Gagne "moved to the north and deeper into the structure out of his view." Shortly after that, "the suspect fired multiple rounds out of the same window." He described the window north of the slider door where he initially observed Mr. Gagne.

**Note**, Officer Freeman did not report that Mr. Gagne ever pointed a gun at him or anyone else before he fired the two sniper rounds, but he did describe being concerned that Mr. Gagne had a "tactical advantage" and that "he could begin firing on officers." (Ingram Report, Pgs. 2237-2238; Audio Interview w/Ingram)

According to the Mesa Police Investigative Summary,

> *Approximately 56 seconds later, Shawn shoots three to four times out the north side sliding glass door. This is in the direction of three patrol vehicles to the north in Lesueur Circle. The officers in this location are hiding behind cover nearby. It is unknown where these rounds strike. Officer(s) Chuey, Goodrich, Cameron, Navarro and Thomas return fire.* (MPD Investigative Summary, Pg. 2010)

However, audio and visual evidence clearly contradict the above stated investigative conclusion(s). Mr. Gagne did not fire through the north side sliding glass door or windows, but rather the SWAT team members had. The SWAT team had inadvertently set up a crossfire situation and while Mr. Gagne was following negotiator instructions to walk out unarmed and with his hands up, the SWAT team officers fired at Mr. Gagne through the southwest facing window opposite the north balcony. Their rounds crossed through the apartment and exited out the north side sliding glass doors and windows. Both the air and ground units erroneously reported that Mr. Gagne was firing out the north side. (Crime Scene Photo, Pg. 2317, Interior Surveillance Camera Footage, Harris Body Cam)

Also, according to the Mesa Police Investigative Summary,

> *Approximately 18 seconds later, Shawn presents himself at the front door in the same position he had previously been seen holding a rifle. Officers reported that Shawn was standing in a position as if he was holding a weapon and blading his body from them. Shawn was observed by the officers wearing body armor and having a rifle magazine in his possession. At this time Officer(s) Goodrich, Chuey, Cameron and Sergeant(s) Harris and Thomas fire their weapons at Shawn.* (MPD Investigative Summary, Pg. 2010)

Audio and visual evidence contradict some of the above stated investigative conclusions here as well. Mr. Gagne had been shot multiple times and is sent tumbling down the stairs leading to the front door. He can be heard yelling to the negotiator six times - "I'm down, I'm down, I'm down, I'm down, I'm down, I'm down." That information was not passed on to the SWAT team nor were the negotiator's instructions for Mr. Gagne to go out the front door unarmed and with hands up. An unarmed Mr. Gagne then appears to

struggle to get the door open. SWAT officers open fire again within about one second of the door opening, and Mr. Gagne goes down again.

**Note**, there were no weapons found at the front door.

The officers indicated that they could see part of Mr. Gagne's body in the doorway. Not knowing whether he was conscious or armed, they utilized a K9, diversionary device, and drone to determine if it was safe to approach. Once at the door, they tased Mr. Gagne's limp body, handcuffed and removed him from the apartment. They then performed first aid until relieved by medical personnel. Mr. Gagne was pronounced deceased at the scene. A search of the apartment revealed 2 rifles, a shotgun and a handgun in various locations within the apartment. No weapons were located at the southwest facing window or at the front door. The following three shell casings were found inside the apartment at various locations as well:

1. One in the kitchen dining room floor against its south wall, which is not consistent with a right-side ejection if shooting out the west facing slider doors.
2. One in the master bedroom. There was no evidence or reports of firing out any master bedroom windows.
3. One on the north facing balcony, which is consistent with having fired from that balcony as reported by Cindy.

**My Opinion(s) Regarding Entry into Mr. Gagne's Home:**

The officers did not have a valid legal theory to enter Mr. Gagne's home and, therefore, the seizure was unreasonable under the 4th Amendment.

**Discussion:**

The 4th Amendment protects people from unreasonable searches and seizures in places in which they have a reasonable expectation of privacy. Officers are sworn to abide by the State and U.S. Constitutions, and they receive extensive constitutional law training in the police academy, post academy, field training program, frequent continuing education training and periodic proficiency training programs. Officers are taught the four legal theories to enter a person's home, i.e., warrant, exigency, emergency, or consent. Police policies dictate that officers abide by both the State and U.S. Constitutions. Note, the Arizona Constitution is even more protective than the Federal Constitution when it comes to entering people's homes and, therefore, Arizona police departments commonly provide more training in this area. Absent a valid legal exception (theory), even if officers have PC to arrest an individual, they must still obtain an arrest warrant to enter their home (State v Ault). For officers to conduct a protective sweep, which they did in this case, they must be lawfully inside the residence and have a lawful arrest. (State v Fuentes)

Pursuant to multiple cases, including but not limited to Torres v Madrid, Harris v Roderick and the landmark Supreme Court case of Tennessee v Garner, shooting someone is considered a seizure under the 4th Amendment. Officer Freeman seized Mr. Gagne the moment he shot him. Surrounding Mr. Gagne's home and limiting his freedom would have also constituted a seizure. Mesa officers may (or may not) have had PC to arrest Mr. Gagne

at the time, but they failed to obtain an arrest warrant in accordance with the 4th Amendment.

**No Arrest Warrant**

An arrest warrant is an order from the court to enter certain private areas to search for specified persons. Officers are trained on how to obtain an arrest warrant and can usually obtain them in Mesa via telephone 24/7. The officers did not attempt to get an arrest warrant before seizing Mr. Gagne. Arrest warrants must be supported by PC and officers may not enter a suspect's home on PC alone unless they have an exigency, i.e., a legal exception. (Payton v New York) The exceptions for obtaining a warrant are exigent circumstances, an emergency or consent.

**No Exigency**

An exigency is a situation which calls for an immediate response by an officer and means that they may conduct a search without getting a warrant, e.g., because there is no time to obtain a warrant. There are many factors in determining exigency. The Arizona Supreme Court stated recently that "Though not an exhaustive list, we have recognized the following circumstances: response to an emergency, hot pursuit, potential destruction of evidence, potential violence inside, and flight." (State v Canez and Payton v New York).

In this case, the officers responded to a threats call in which both alleged victims had already vacated the home and were safe. Their suspect, Mr. Gagne, was inside his home and reported to be alone and possibly passed out. The officers had absolutely no reason to believe that anyone else was at risk inside his home. They immediately surrounded

(seized) the home to keep Mr. Gagne from fleeing. The threats Mr. Gagne made toward the police were pursuant to the manner in which the officers seized his home and to keep them from entering his home. Mr. Gagne was initially shot by the sniper (Officer Freeman) as soon as he peered outside through the blinds of his slider door. There is evidence that he was unarmed and not presenting an imminent threat to police or the public. There were no exigent circumstances justifying an immediate entry into the home to seize of Mr. Gagne without an arrest warrant.

**No Emergency**

The emergency doctrine is a well-established exception for police to enter a premises without a warrant when they "reasonably believe that a person within is in need of immediate aid." (Mincey v Arizona) Emergencies are sometimes described as exigencies where the officers' concerns are about the health or well-being of an occupant or the property itself. All Arizona officers are taught the elements of emergencies under the emergency doctrine pursuant to State v Fisher, and they utilize this warrant exception daily while responding to emergency calls.

However, this situation did not amount to an emergency requiring the officers to make unilateral and immediate entry into Mr. Gagne's home. The incident (threat to the victims) was over, Mr. Gagne was surrounded and contained, and there were no reports of injury or any potentially life-threatening issues within his residence. Therefore, when the officers arrived, there was no emergency justifying a warrantless entry into the residence under the emergency doctrine.

**No Consent**

There is no evidence that the officers ever asked for consent to enter the premises. Consent to enter a premises is simply a waiver of the 4th Amendment right requiring officers to obtain a warrant or show exigency to enter a home. Officers must obtain voluntary consent from a person or persons who have apparent authority to consent. (Schneckloth v Bustamonte)

In this case, Mr. Gagne had made it abundantly clear that he wanted the police to leave and was not, therefore, amenable to consenting. Even had the officers obtained consent from his girlfriend Jordan, the officers would have needed Mr. Gagne to consent as well. (Bonivert v Clarkston)

Suffice it to say, the officers did not have a valid legal theory to justify their seizure of Mr. Gagne. Their seizure was unlawful under the 4th Amendment and a violation of numerous police policies requiring officers to obtain an arrest warrant.

**My Opinion(s) Regarding the Use of Force Used to Seize Mr. Gagne:**

The use of force used by Mesa Police Officers Freeman, Harris, Chuey, Goodrich, Brown, Navarro, Thomas and Cameron to seize Mr. Gagne, was unreasonable under the 4th Amendment.

**Discussion:**

Use-of-force training, especially for SWAT officers, is probably the most prolific training that police officers receive. The training ranges from an officer's mere presence to deadly force, i.e., presence, verbal commands, empty-hand control techniques, less-lethal force and lethal force. These levels are sometimes classified by courts in other terms or ranges. As long as officers do not create the provocation, they need not use the least force possible, but they must use objectively reasonable force. (Scott v Henrich)

**Note**, the initial force in this case was the officers' presence (lights and perimeter) to impede Mr. Gagne's freedom and then Officer Freeman's first sniper round, which appeared to provoke Mr. Gagne.

The United States Supreme Court and the 9th Circuit has made it abundantly clear that officers can only use deadly force if the person against whom the deadly force is applied represents an imminent threat of deadly force or serious bodily injury to the officer or someone else. Deadly force is controlled by Tennessee v Garner, a case that all officers are taught in the Academy. In this landmark case, the Court of Appeals specifically stated that the use of deadly force is only justified if the officer has probable cause to believe that a suspect poses an immediate threat of serious physical harm to the officer or others. The Supreme Court further stated that for purposes of civil liability, seizures must be tested under the 4th Amendment standard, i.e., was the seizure "reasonable" (Graham v Connor)

The Supreme Court suggested several factors for courts and juries to consider when determining whether the officer used excessive or unreasonable force, i.e., the severity of the crime, the immediate threat, and whether the person was resisting arrest or trying to escape. In Lombardo v City of St. Louis, even more factors were created, e.g.,

- relationship between the need for force and the amount of force used;
- extent of the plaintiff's injury;
- effort made by the officer(s) to temper or limit the amount of force;
- severity of the security problem at issue;
- threat reasonably perceived by the officer
- Whether the plaintiff was actively resisting

While extremely intoxicated and out of sight of the victims, Mr. Gagne was alleged to have threatened to shoot them (his girlfriend and his neighbor), but he had not physically harmed anyone. There is video evidence that he was passed out during PA announcements and not formally placed under arrest, and he was clearly seized under the 4th Amendment by being surrounded and contained within his home. A reasonable person would not have believed that they were free to leave. Walking around the interior of his home while carrying guns would not substantiate an imminent threat to officers or citizens outside.

At the initial SWAT team briefing, officers can be heard discussing placement of their sniper - Officer Freeman and "going hot." Going hot generally signifies ready for immediate lethal force. Officer Freeman apparently did not have a body camera, but can be heard, via Officer Widmer's body camera (1758E), saying "I know exactly where I want to go, I can see him with the rifle like, <u>I can put him down as soon as I get up there</u>," i.e., up on the balcony directly across from Mr. Gagne's balcony. (Axon 1758E – 22:31) This statement is

indicative of a predetermined mindset that lethal force had already been authorized against Mr. Gagne. This mindset is further evidenced by Mr. Gagne being shot as soon as he peered through the blinds of the slider door, as well as when he walked by the southwest facing window unarmed.

Pursuant to Deorle v Rutherford, it is objectively unreasonable to use force on an unarmed subject. Kingsley v Hendrickson indicated that the officer's intent does not matter; only that the force used was unreasonable. Plumhoff v Rickard indicates that if an officer is justified in firing, they need not stop until the threat has ended. However, the case also implies that if the threat does stop, or the suspect is rendered incapable of continuing to pose a threat, continued force would not be justified.

**Use of Force by Officer Freeman - Sniper Rounds**

At the time of the shooting, Officer Freeman was positioned to the west of Mr. Gagne's apartment at a distance of approximately 80 feet. His position provided both cover (balcony railing and door frame) and concealment (darkness inside apartment and spotlights directed toward Mr. Gagne's apartment windows), and he was protected by advanced personal protective equipment and a high-powered rifle affixed with optics. SWAT officers receive advanced tactical and firearms training, and they train more than any other police unit, particularly sniper trained officers.

Officer Freeman had set up his sniper rifle on a tripod west of the subject apartment facing the west facing sliding glass doors of the south balcony. According to Officer Freeman's interview with Detective Ingram, et al, he indicated that prior to his arrival, he "heard that a person had fired multiple rounds from an AK-47 and that the subject was

believed to have passed out in the residence." (Ingram Interview, Pg. 2237, and Audio Interview)

**Note**, the evidence does not confirm that Mr. Gagne had fired "multiple rounds" from an AK-47. He was purported to have been heard racking an unknown weapon's slide and firing a single shot.

Once set up across from Mr. Gagne's apartment, Officer Freeman began making observations. He saw Mr. Gagne talking on a cell phone and "believed this was possibly negotiators talking to the suspect…" Mr. Gagne appeared "agitated" and was "walking around with a rifle…" He observed Mr. Gagne "walk over to the slider door and began peeking through the blinds." Officer Freeman said that he "saw that the gun was in his right hand." He believed the suspect was "peeking out at patrol officers down below…" and described Mr. Gagne as having the tactical advantage over the officers below. It was at that time that he took his first shot at Mr. Gagne. Officer Freeman then reiterated to Detective Ingram that "the rifle was in his right hand and his left hand was opening the blinds." (Ingram Report, Pg. 2237; Audio of Ingram Interview w/Officer Freeman)

However, surveillance video from inside Mr. Gagne's home and audio of the negotiator speaking with Mr. Gagne clearly contradict Officer Freeman's account. After cross referencing the audio, surveillance video and radio broadcast timelines before, during and after Officer Freeman's first shot, it is clear that Mr. Cagne had put his rifle down on the kitchen counter before peering out the blinds and being shot by Officer Freeman. In other words, Mr. Gagne did not have the rifle in his right hand (in a low ready position) as the officer described. He was clearly not an imminent threat at that moment and, therefore, the first lethal force used by Officer Freeman was not reasonable. (Surveillance Video, 1:10 –

1:38 / Audio-Visual-Radio Timeline / Axon Timeline Widmer)

Pursuant to body-cam audio, approximately 43 seconds after that first round was fired, Officer Freeman fired his second shot. Officer Freeman said he "saw the suspect use his hand again to look through the blinds again" so he "fired a second time at the suspect's torso." Officer Freeman indicated that after his second shot, Mr. Gagne moved north, deeper into the structure, and out of view. Shortly after that, Officer Freeman reported that Mr. Gagne "fired multiple rounds out the same window," which he described as the window just north of the slider door. He indicated that he could see glass "…leaving the residence." He then "heard a volley of fire from down below."

**Note**, Officer Freeman did not report to Detective Ingram that he observed Mr. Gagne with a weapon or shooting out of the slider door when he fired his second sniper round. This contradicts the Investigative Summary which indicates "Officer Freeman saw Shawn come back at the window with the firearm." Officer Freeman did not say that Mr. Gagne had returned to the slider door with a firearm at all. The "multiple rounds" Officer Freeman reported seeing "out the same window," were in fact rounds fired by his own team.

Officer Widmer had been tasked with providing support to Officer Freeman at his sniper location, but had arrived just after the first sniper shot. As Officer Widmer arrived, you can hear Officer Widmer say "he's still up." You then hear Officer Freeman say "yeah, he's still up" and then "he's punching that window out." You then hear what appears to be Officer Freeman's second shot. (Widmer Body Cam - 22:43:03) Officer Widmer later documented in his report that after he arrived, he "observed him (Mr. Gagne) attempting to look at the officers on the ground level while still holding a rifle. Around this point, I heard Officer Freeman fire once." He also stated that he observed the subject stagger to his feet

and move off to the north of the structure." Officer Widmer then wrote in his supplement that "The subject started shooting his rifle out at police from both sides and he was met with appropriate response of officers firing back at him to stop the threat that was presented to them." (Widmer Supplement)

As mentioned above, however, Officer Freeman did not report seeing Mr. Gagne holding a gun when he fired his second shot either. This contradicts Officer Widmer's account and since Officer Freeman was using optics, he would have had the best view from across the large parking lot. Furthermore, on Officer Widmer's body cam, 27 seconds after Officer Freeman's second shot, you can hear Officer Freeman say "…looks like that gun is still down right there," and then "hands are clear" and "hands are up." These statements are consistent with the surveillance video depicting Mr. Gagne's hands up and walking out of the kitchen less than a minute after the second shot. However, despite having time (approx. 10 seconds), neither Officer Freeman nor Officer Widmer communicated that critical information to their team to inform them that Mr. Gagne appeared to be surrendering. That information would have let the SWAT team know that Mr. Gagne was unarmed and headed toward the front door with his hands up as the negotiator requested. Communicating that critical information would likely have prevented the barrage of shots through the window as Mr. Gagne walked past it unarmed and with his hands raised in the air. Neither officer reported that information to investigators following the incident either, which is extremely telling. (Widmer Body Cam – 1507-1535)

**Use of Force by Officers Thomas, Brown and Navarro**

Officers Thomas, Brown and Navarro were positioned to the southwest of Mr.

Gagne's apartment at a distance of approximately 80 feet. Their positions provided both cover (SUV vehicles) and concealment (darkness, carport and spotlights directed toward apartment windows), and they were protected by advanced personal protective equipment and high-powered rifles affixed with optics and lasers. SWAT officers receive advanced tactical and firearms training, and they train more than any other police unit.

Surveillance video clearly shows Mr. Gagne following the negotiator's instructions to walk out unarmed and with his hands in the air as he walked by the southwest facing window, just north of the slider door, heading toward the front door. He made no attempt to even look out of the window when the barrage of shots was fired from the location in which SWAT Officers Thomas, Brown and Navarro had set up. Numerous rounds went through the window not only striking Mr. Gagne, but also crossing through the apartment and exiting out of the north window dangerously close to the air unit as it rounded the north side of the apartment. Those rounds, which were erroneously attributed to Mr. Gagne, were actually friendly crossfire by the SWAT team. Their rounds created a substantial risk to not only the air unit, but also the officers described in the Investigative Summary as being located "in the direction of three patrol vehicles to the north in Lesueur Circle. The officers in this location are hiding behind cover nearby."

Mr. Gagne was clearly not an imminent risk to officers Thomas, Brown and Navarro at the time they fired, and the officers exercised extremely poor firearms tactics and discipline by not having assigned a designated shooter. Designating a shooter is common police training and practices to help minimize risk (force) and to prevent unnecessary contagious fire by other officers, which appears to have occurred in this case.

**Sergeant Thomas** indicated to Detective Ingram that "he saw some movement from the window to the left of the west facing slider. He also saw movement from the bottom right corner of the sliding door. He thought someone was kneeling down in that corner." He heard "more gunshots from inside the apartment. At that time, he shot 3 to 4 rounds in the bottom right corner of the sliding door in response to the shots." Evidence proves that Sergeant Thomas was actually hearing his own team firing when he discharged his weapon. (Ingram Report, Pgs. 2250-51) Physical evidence clearly proves that Mr. Gagne was not an imminent threat to either Sergeant Thomas or anyone else at that moment and, therefore, Sergeant Thomas' use or attempted use of deadly force was not reasonable or necessary.

**Officer Brown** indicated to Detective Ingram that he also heard "several more shots from inside the apartment." He "saw him (Mr. Gagne) walk up to the window left of the west sliding glass door that faces southwest." He described knowing that "he was going to walk past this window because he knew the stairs were in this location." Officer Brown then reported erroneously that "the suspect stopped and turned toward him." So, "he fired his weapon because he was in fear that the suspect was going to start shooting at himself and the other officers with him." Officer Brown reiterated to Detective Ingram that "the suspect began messing with the blinds" and that "he could see something in the suspects hands but could not make out for sure if it was a gun or not." (Ingram Report, Pgs. 2246-47)

Officer Brown's statement that he knew Mr. Gagne was going to walk by the window is indicative of him preparing to shoot. His statements that Mr. Gagne "stopped and turned toward him" and that he "could see something in the suspect's hands" were simply not

accurate, and his stated belief that Mr. Gagne was going to start shooting was completely speculative. The physical evidence clearly contradicts Officer Brown and proves that Mr. Gagne was not an imminent threat to him or anyone else at that time and, therefore, his lethal force was not reasonable or unnecessary.

**Officer Navarro** indicated to Detective Ingram that he had seen Mr. Gagne at the slider door with "something in his hands" that he believed to be "a rifle based on the length." He then saw Mr. Gagne walk "toward the window left of the west sliding door where he saw the suspect standing." Officer Navarro said he "believed he was going to begin shooting out…" So, "he shot and heard a volley of shots." (Ingram Report, Pgs. 2248-49)

Officer Navarro's observations of Mr. Gagne at the slider door, even if correct, would not justify lethal force at the southwest facing window. Officer Navarro's stated belief that "he was going to begin shooting out…" was speculative and without means. Mr. Gagne was walking by the closed window obstructed by blinds (as opposed to standing still), was effectively blinded by bright spot lights, and was unarmed with his hands up. Physical evidence clearly shows that Mr. Gagne was not an imminent threat to Officer Navarro or anyone else at that time and, therefore, his use of deadly force was not reasonable or necessary.

**Negotiator Communication**

Negotiator Adair had been in phone contact with Mr. Gagne for approximately seven minutes before the first sniper shot. There is evidence that the SWAT team knew that the

negotiator was on the line with Mr. Gagne as some of his communication was being relayed to the team. The negotiator gave Mr. Gagne specific instructions to put his weapon down and walk out the front door with his hands up.

In barricade situations such as this case, common police practice is to slow things down by establishing a perimeter with adequate cover and/or concealment, make contact with the suspect, and allow the negotiator time to work, especially when there is no exigency. SWAT teams are often used to accomplish this as they receive specialty training, have specialty equipment and are not subject to normal radio traffic, i.e., they have plenty of time. In accordance with this practice and just after the initial sniper shot, the negotiator transmitted "I'm still on the line with him; he's still talking with me." This is a clear indicator for SWAT team members to stand down. However, none of the shooters in this case heeded the negotiator's transmission.

Surveillance video confirms that while still communicating with the negotiator (Adair), the wounded Mr. Gagne (shot in the face) was walking from the kitchen toward the front door and past the window, just north of the slider door, with his hands up when he was suddenly fired upon by Officers' Thomas, Brown and Navarro. Mr. Gagne immediately tumbled down the stairs leading to the front door and started yelling "I'm down" six times. However, that information was apparently not communicated to officers by the negotiator.

**Use of Force by Officers Harris, Goodrich, Cameron and Chuey**

Sergeant Harris was positioned north-northwest of Mr. Gagne's apartment at a distance of approximately 60 feet. His position provided both cover (vehicle) and concealment (darkness, carport and spotlights directed toward apartment windows).

Officers Goodrich, Cameron and Chuey were positioned northwest of the apartment at a distance of approximately 80-100 feet. Their positions provided both cover (SUV vehicles) and concealment (darkness and spotlights directed toward apartment windows). All officers were protected by advanced personal protective equipment and high-powered rifles affixed with optics. SWAT officers receive advanced tactical and firearms training to shoot with extreme precision, and they train more than any other police unit. With respect to firearms' instruction, Officers are specifically trained to utilize controlled bursts to allow for continual assessment of the threat as opposed to "spraying" or completely emptying a weapon's magazine.

The unarmed and severely wounded Mr. Gagne appeared to struggle to open the front door and was fired upon again with a barrage of gunshots within about one second of revealing himself. One second is the approximate minimum time required for perception-reaction time, i.e., time it takes to observe, identify and then react to a given threat. All of the officers were behind cover and none of them reported seeing a gun. All of the erroneous information about Mr. Gagne allegedly shooting at officers from the apartment likely attributed to the officers' mindset to immediately eliminate him as a threat as opposed to affording him an opportunity to surrender.

Deadly force is controlled by the landmark case of Tennessee v Garner, and non-deadly force is controlled by Graham v Connor. Pursuant to Tennessee v Garner, officers must have PC to believe a suspect poses an immediate threat of death or serious physical injury to the officer or others. Pursuant to Brosseau v Haugen, speculation that a suspect might be a threat to someone is not sufficient. Graham v Connor established an "objective reasonableness" standard for evaluating a use-of-force incident under the facts and

circumstances officers face at the time the force is executed and established factors that officers must consider before applying force, e.g., the severity of the crime, whether they are resisting arrest or if they are trying to escape.

The 9th Circuit has made it abundantly clear in numerous cases that officers, when given time, must provide warnings to suspects before implementing force, particularly deadly force. Officers are trained to give clear commands/warnings to suspects in order to gain compliance and to use only that force necessary to affect an arrest. Officers must give suspects an opportunity to surrender, and deadly force must be a last resort to preserve the sanctity of life. (Kisela v Hughes, Harris v Roderick, Gonzalez v Anaheim, Young v County of Los Angeles, Nelson v Davis, White v Pauly, Bryan v McPherson)

Mr. Gagne was not specifically warned of the officers' intentions to utilize deadly force by the SWAT team or the negotiator before he was sniped. After Mr. Gagne was shot and appearing to surrender, the SWAT team did not give him that opportunity. Based upon statements from the shooters, as well as so many rounds fired at Mr. Gagne while he did not present an imminent threat, the SWAT team appeared to have already decided that lethal force was warranted due to the threats Mr. Gagne had made while on the phone with the negotiator.

**Sgt. Harris** indicated to Detective Ingram that there "had been shots fired out the west window, then out the north window and then out the south window." He believed that Mr. Gagne "had complete disregard for the lives of others outside the apartment and that the suspects actions needed to be stopped immediately." So, when he observed Mr. Gagne wearing a plate carrier (type of ballistic protection), he "believed this was a big problem

because the suspect had escalated from firing his weapon out of obscure places to an open confrontation in the doorway." He also "could hear engagement from other officers." He "saw him (Mr. Gagne) move across the door frame in a way that he believed the subject was concealing himself so that he could keep eyes on the team to his west." He then "deployed his rifle." Sgt. Harris also described seeing "his arms up in the same way that he would if he was holding his rifle" and "saw what he believed was an AR15 magazine." (Ingram Report, Pgs. 2239-41)

There is evidence that Mr. Gagne had not fired out of several windows as Sgt. Harris believed or even one window. Sgt. Harris did not have a clear view of Mr. Gagne, did not see a weapon in Mr. Gagne's hands and could not verify that he was an imminent threat to himself or any other officers at the time he utilized deadly force. Furthermore, Mr. Gagne was surrounded, unable to escape and effectively rendered blind by spotlights. Sgt. Harris did not provide Mr. Gagne with a warning of deadly force or provide him an opportunity to surrender. Sgt. Harris' account of the incident was subjective, speculative and flawed by erroneous information. Sgt. Harris' immediate use of deadly force against Mr. Gagne when he opened the door was not reasonable or necessary.

**Officer Goodrich** indicated to Detective Ingram that at "some point after" the 2nd sniper shot, the suspect fired "…a barrage of shots, possibly 5 rounds." He believed there was an exchange of gunfire between the suspect and officers but could not see Mr. Gagne. He also observed stucco and glass "going off" on the north side, so "he chose to utilize focus fire to provide a distraction to draw the suspects attention away from where he was firing." His fire was concentrated above the front door. After "a lull" in the firing, "the door swung

open very quickly." He observed Mr. Gagne "bladed" in the doorway" and wearing body armor. He said he believed that based upon "the way the suspect's body was orientated, that he was pointing a rifle at them, trying to get shots off." He "saw this as a threat to all the officers present…" and "engaged the suspect by firing again." He further told Detective Ingram that "he thought he saw a rifle in this suspects hand in the low-port position." (Ingram Report, Pgs. 2244-45)

Like Sgt. Harris, Officer Goodrich said he believed that Mr. Gagne was firing out of the north window. He chose to fire diversionary rounds at that time. Although Officer Goodrich said he thought he saw Mr. Gagne holding a rifle at the front door, the physical evidence contradicts his statement. Unlike Sgt. Harris describing Mr. Gagne's hands being up, Officer Goodrich described them as being down holding a rifle. Officer Goodrich did not provide Mr. Gagne with a warning of deadly force or provide him an opportunity to surrender. He too speculated that Mr. Gagne was a threat to all the officers present, so he utilized lethal force. His account of the incident was subjective and flawed by erroneous information. Officer Goodrich's use of immediate deadly force against Mr. Gagne when he opened his door was not reasonable or necessary.

**Officer Cameron** indicated to Detective Ingram that after he heard multiple rounds, he too performed "focused fire" on the apartment (on header above the west facing slider door). He "heard Sgt. Harris state that the subject is shooting out to the north." He saw the "front door open and the suspect standing in the doorway." He too saw the body armor and said that "it looked like the suspect was holding a rifle in his right hand." He attempted to fire at Mr. Gagne but apparently struck his own vehicle's spotlight.

Officer Cameron did not provide Mr. Gagne with a warning of deadly force or provide him an opportunity to surrender. He told Detective Ingram that he "thought the suspect was shooting at them and that was the reason why he fired." His account of the incident indicating that Mr. Gagne was holding a rifle and shooting at them was simply not correct and speculative. Mr. Gagne was not an imminent threat to Officer Cameron or others, so his attempted use of deadly force against Mr. Gagne was not reasonable.

**Officer Chuey** described to Detective Ingram seeing the (friendly fire) gun shots coming from the northside of the apartments. He said that "he fired at the muzzle flash with his rifle" because "he believed the suspect was shooting at officers from that position." He then focused his attention back on the front door. He described Mr. Gagne opening the door wearing a plate carrier and standing "like he had a weapon." So, he fired at Mr. Gagne.

Officer Chuey did not provide Mr. Gagne with any warnings of deadly force or provide him an opportunity to surrender. He too did not see a weapon and merely speculated that Mr. Gagne was armed when he utilized deadly force by unloading his rifle at him. Officer Chuey's immediate use of deadly force when Mr. Gagne opened his front door was not reasonable or necessary.

**My Opinion(s) Regarding Scene Management and Communication:**

Poor scene management and communication were contributing factors to the excessive force used in this matter.

**Officer to Officer Communication**

After the initial sniper shots, Officer Freeman observed that Mr. Gagne's gun was down and his hands were clear and raised up when he started walking north toward the front door. Officer Freeman stated these things out loud to Officer Widmer. Despite having time, neither officer reported that critical information to the team. This was a critical communication error by both officers.

**Note**, snipers are also observers for the rest of the team, and their job is to provide the team with critical fluid observations like this.

**Team Assignments and Positioning**

Two groups of three-SWAT-officer teams were positioned on the front perimeter to cover the apartment windows and doors. When positioning teams at a barricade, it is common practice and basic training to make specific team assignments, e.g., designated shooter, observer, less-than-lethal, communicator, etc. Establishing such team assignments avoids confusion and helps prevent excessive or contagious fire situations. I have not seen any evidence that the SWAT supervisors in this case made these designations, which is evidenced by all of the officers in each team firing simultaneously from their fixed positions into the same narrow target areas, i.e., the s/w window and front door. Irrespective that

Mr. Gagne did not present an imminent threat, the sheer number of high-powered rifle rounds into the narrow targets was excessive, particularly for highly trained officers.

Officers Thomas, Brown and Navarro were positioned southwest of the apartment on a clear trajectory to the north-northeast facing slider door and window. In other words, rounds entering through the southwest window had a direct path to exit out of the north-northeast glass, which is exactly what happened. There is evidence that the SWAT team had a working knowledge of the apartment's layout, and they should have realized the crossfire (pass-through) situation when rounds were exiting the north side of the apartment, thereby, placing other officers and the public at unnecessary risk.

**Negotiator to Team Communication**

Negotiators arrived on scene and established communication with Mr. Gagne almost immediately. Supervisors should have had officers stand down during the ongoing negotiation process, which is common practice during a barricade. Mr. Gagne was contained without any hostages, and the SWAT team had plenty of time to negotiate a non-lethal and peaceful resolution. Barricade situations are often resolved peacefully with trained negotiators within a matter of hours.

The negotiator (Adair) was in communication with Mr. Gagne. Mr. Gagne told the negotiator that he had been "hit" by the sniper. The negotiator asked where he was injured and Mr. Gagne responded "in the face." This information was not passed on to the shooting teams. When Mr. Gagne walked by the window unarmed and with his hands up, presumably to surrender pursuant to the negotiator's instructions, he was immediately and unnecessarily fired upon by several officers simultaneously. He then tumbled down the

stairs and yelled six times "I'm down." This information was not passed on to the team either. When Mr. Gagne then opened the front door, presumably still trying to surrender, he was shot at again by several more officers.

Suffice it to say, Mr. Gagne was contained and essentially blinded by powerful lights. The negotiator(s) were in communication with him and had plenty of time to negotiate his surrender. The SWAT team was outfitted with protective gear, adequate weapons, and they maintained both cover and concealment to minimize risk to themselves and protect the public. Despite having several supervisors on scene, multiple tactical and communication errors were made which undoubtedly contributed to the excessive force used to seize (and ultimately kill) Mr. Gagne.

Respectfully given this 20th Day of February, 2026



Ret. Lt. Mark R. Hafkey, M. Ed.

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher Gagne, in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne,<br><br>Plaintiffs,<br><br>vs.<br><br>City of Mesa, a political subdivision of the State of Arizona; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and in his capacity as a police officer; | Case No.: CV-24-01337-PHX-SHD<br><br>VIDEOCONFERENCE DEPOSITION OF KYLE THOMAS<br><br>Tempe, Arizona<br><br>March 27, 2026 |

Prepared by:

Kathryn C. Cannon, CER
Certified Electronic Reporter
CER No. 4929

CERTIFIED TRANSCRIPT

Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his individual capacity and in his capacity as a police officer; ABC Partnerships I-X; XYZ Corporations I-X; John Does I-X and JANE DOES I-X,

Defendants.

Case No.: CV-24-01337-PHX-SHD

VIDEOCONFERENCE DEPOSITION OF
KYLE THOMAS

Tempe, Arizona

March 27, 2026

Prepared by:

Kathryn C. Cannon, CER
Certified Electronic Reporter
CER No. 4929

TRANSCRIPT OF PROCEEDINGS

10:01:34 THE COURT REPORTER: We are on the record. Today's date is March 27, 2026, and the time is 10:01 a.m.
Would counsel please state your appearance for the record, including the location from which you're appearing today?

10:01:48 MR. WOODS: Yes. This is Sean Woods from Mills Woods Law. I'm at 5055 North 12th Street, Suite 101, Phoenix, Arizona 85014, and I represent the plaintiffs in this matter.

MS. RETTS: Christina Retts with Wieneke Law Group, 1225 West Washington, Tempe, Arizona, Suite 313, for the defendants.

10:02:05 THE COURT REPORTER: Thank you. And would the witness please state and spell your full name for the record and provide the address of your current location.

10:02:20 THE WITNESS: My name is Kyle Thomas, K-y-l-e, Thomas, T-h-o-m-a-s. And I don't know what the address is. Same as --

THE COURT REPORTER: Same address?

MS. RETTS: He's at Wieneke Law Group.

THE WITNESS: Yeah.

THE COURT REPORTER: Okay. Thank you.

10:02:26 And would the witness please raise your

right hand to be sworn in?
Do you solemnly swear or affirm that the testimony you're about to give in this time and place will be the truth, the whole truth, and nothing but the truth, under penalty of perjury?
10:02:39
THE WITNESS: Yes, I do.
THE COURT REPORTER: Thank you.
Counsel, you may proceed.

KYLE THOMAS,
the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows:

EXAMINATION
10:02:47
BY MR. WOODS:
Q. What -- what's your current rank with the Mesa Police Department?
A. I'm a sergeant.
Q. Okay. I just wanted to know that so that if I address you today, I address you right -- the right title.
10:03:00
So Sergeant Thomas, have you ever had your deposition taken before?
A. It's been a long career. I think maybe once a long time ago.
10:03:16
Q. Okay. I'm sure that your counsel went over some

Q. Okay. Did you go to college?
A. I spent a couple years at ASU. I did some community college after that.
Q. Did you get any degrees?
10:04:39 A. No.
Q. Okay. When did you become a police officer?
A. May of 2006.
Q. Was that with Mesa PD?
A. Yes, sir.
10:04:59 Q. So you're almost at your 20-year anniversary?
A. Almost, about a month short there.
Q. When you were hired, were you on patrol?
A. Pardon me?
Q. I'm sorry. When you were hired, were you
10:05:12 assigned to patrol?
A. Yes. I was -- my first -- my first position was a patrol officer in the Dobson district.
Q. How long -- how long did you work that position?
A. I was on patrol till 2011, when our SWAT team
10:05:31 went full time.
Q. When did you go full time SWAT team?
A. It was 2011 -- either 2010 or 2011.
Q. And you've been on the SWAT team ever since?
A. I was on the SWAT team till the end -- I want to
10:05:58 say September or August of 2023.

A. Yes, I do.
Q. And that's accurate, that's the time you became a sergeant?
A. Yeah, that sounds accurate.
10:19:25 Q. Okay. When you became a sergeant, did you have to do additional training beyond what you had already done?
A. Yes. There's a STEP program. It's -- I don't remember the exact time. I think maybe two months that
10:19:41 you rode with two separate sergeants on the street, kind of learn the job. And there was also, I think a two-week sergeant's training class we had to attend. They taught us how to use the computer systems for the sergeant administrative function, and then timekeeping, stuff like
10:20:01 that. And then we also went over the report writing, documentation, stuff to help us keep our officers doing the right things as far as administratively.
Q. When you became a SWAT team member, did you receive training above and beyond what you had already
10:20:28 received?
A. Yes, I did.
Q. Can you describe that training?
A. Yeah. In 2008, I attended a SWAT school, which was an 80-hour course. Went over and learned a lot of
10:20:45 different techniques, use of tools, from clearing --

building clearing, hostage rescue, vehicle assaults. I'm trying to think of what else. They kind of went over job function on a SWAT team, so snipers, breachers, the equipment that was utilized. I think they did a demonstration of explosive breaching, those kind of things.

10:21:13

Q. During your time on the SWAT team, did you receive regular yearly trainings?

A. On the SWAT team, we attended weekly trainings. Every Tuesday we would train. I think for a little while we did Wednesdays, but we ran four-hour blocks of training on the full-time team. Prior to that, when we were part time, we were running -- I want to say a 10-hour day once a month.

10:21:33

Q. Outside of the SWAT team trainings that you received, did you have to attend other trainings as part of a continuing education process?

10:21:59

A. Yes. The Arizona POST, which is the governing board for law enforcement maintaining credentials and the standards, they do require a specific number of hours. I know it's changed over the years. I think initially it was maybe eight hours of continued education training. I think they're up to 12 hours now. And we did attend that every year.

10:22:14

Q. In your role with the Mesa Police Department,

10:22:34

have you ever received any constitutional law training?
A. Yes, we have.
Q. Have you received that regularly throughout your time there?
10:22:48 A. We were given initial -- I want to say a pretty thorough class in the academy. I don't remember the hours. And then I want to say every year Arizona POST would kick out legislative updates. So if there's any changes in the laws, they would go over those in depth in
10:23:10 a video that they pushed out. They don't do that anymore. And then department-wide training, I believe included Fourth Amendment training and constitutional rights training, stuff like that.
Q. Do you recall getting any training on Graham v.
10:23:37 Connor?
A. Yes, I do.
Q. I'm going to scroll down to 4476 at the bottom. Do you see that?
A. Where it says "Rater's Comments"? What are you
10:24:07 asking me?
Q. No. All the way at the bottom, all the way at the bottom right, MESA_004476.
A. Yeah, I see it.
Q. Okay. This document looks like it's from 2025.
10:24:24 Is that correct?

Q. Okay. So almost like a refresher training going into --
A. Yeah, maybe.
Q. And in 2010, you took a 40-hour course for AZ POST General Instructors Program. Is that right?
A. Yes, sir.
Q. Do you remember taking that course?
A. I do.
Q. Do you remember what that course -- the syllabus is or the information that you were taught was?
A. Yeah, that was the one I was referencing. To be an instructor, you have to go through that Arizona POST general instructor school. So they teach you how to write lesson plans. They teach you how to get in front of people and speak to a degree. And then they have you present on two things that you want to teach in front of the group. So you have to build a lesson plan on it, create a PowerPoint on it, and then actually teach the class live.
Q. So after that course in 2010, did you become an instructor with the police department?
A. I started instructing, yes.
Q. What were you instructing?
A. I was assisting with high-risk traffic stops at the academy, I want to say. I had started teaching at our

annual SWAT school, at our hostage rescue school that we hosted, and then I also participated in -- assisted in running our full-time full team training on Tuesdays or Wednesdays. I don't recall exactly what day it was then.
10:43:40 Q. Who were you training?
A. At which -- at which position? If we were helping with the academy, it was the students, the recruits in the academy. If it was on the SWAT team, it was the SWAT team members. If it was at SWAT school, it
10:43:58 was other agencies and also Mesa people that were going through our SWAT school. And same for hostage rescue school.
Q. In 2011 -- we're on page MESA_002868 -- there's a Firearms Instructor School entry, 40 hours in 2011. Do
10:44:25 you recall taking that class?
A. I don't recall it exactly specifically. But, yes, I know I did take the class.
Q. Okay. On 2869, there's an entry at the bottom called Search Warrant. Do you see that?
10:44:50 A. Yes, I do.
Q. And that was in 2011, for three hours. Do you recall taking that class?
A. I don't recall.
Q. And then it looks like in 2012, you were
10:45:06 certified on the TASER X2?

A. Not that specific one. I think I attended them for the following five years, so -- but I don't remember that one specifically.

Q. Okay. The next line item is Use of Force -- I'm sorry -- Use of Deadly Force/Contagious -- and it runs to the next page -- Fire, in November of 2015. Do I have that right?

A. That's what it looks like, yeah.

Q. What is contagious fire?

A. You could describe that as one person fires and everybody just fires, but they can't articulate why they fired. They fired because another person fired. That would -- that's how you would articulate contagious fire.

Q. Okay. What were you -- what were you trained on about contagious fire?

A. What did you ask? What were you trained on what?

Q. On contagious fire. Yeah, what were you trained on related to contagious fire?

A. Not to do it. To be able to articulate the threat. You know, kind of what the Graham v. Connor says, what's the threat they pose to the public? What's the severity of the crime? And then are they resisting arrest or attempting to flee?

Q. Is contagious fire bad?

MS. RETTS: Form.

THE WITNESS: Yes.
BY MR. WOODS:
Q. Yeah. Can you explain why you think it's bad?
MS. RETTS: Form.
10:54:50 THE WITNESS: Every officer has to make that decision based on what they perceive is a threat and be able to articulate why they used the specific level of force that they used, so . . .
BY MR. WOODS:
10:55:06 Q. Okay. The next page, 2879, looks like a 2015 Legal Update. Do you see that?
A. There it is. Yes, I see it.
Q. Towards the bottom is a basis -- Basic Crisis Intervention Training. Do you see that?
10:55:27 A. Yes, I do.
Q. Do you know what that course was about?
A. I'm guessing some kind of negotiations class, but I'm not sure exactly.
Q. On the next page, which is 2880, there's a
10:55:44 Mandatory 2017 Legal Update, two hour COE credit. Do you see that?
A. Yes, I do.
Q. Okay. Do you recall taking that course?
A. I don't recall exactly.
10:55:57 Q. The next page, which is 2881, there's a Squad

and then we'd make decisions and then implement them.
BY MR. WOODS:
Q. On the next page, 2882, in 2018, there was an AZ POST Mandatory Legal Update for 2017/2018. Do you see that?
10:57:45
A. Yes, I do.
Q. Okay. On the next page, there's an entry for Cover Entry Specialist I, which is Roman numeral I. Do you see that?
10:58:03
A. Yes. I think it's actually entered incorrectly. It should be Covert Entry Specialist. But, yeah, I did attend that training.
Q. What does "covert entry" mean?
A. It's lock picking, using surreptitious means to enter a structure.
10:58:18
Q. Okay. And then in 2018, it looks like you attended another one of those tactical officers association conferences?
A. Yes, sir.
10:58:33
Q. The next one says "ICAT Introduction." What's ICAT?
A. At the time, it's like de-escalation. That's the big push for introducing techniques to de-escalate situations. Some different methods of speaking to people, open-ended questions, stuff like that.
10:58:53

Q. Looks like another Legal Update in 2019. Is that correct?
A. That's what it looks like, yes.
Q. Then there's Rifle Instructor School for 20 hours?
A. Yes.
Q. Do you recall that?
A. Yes, I do.
Q. What -- what did that school entail?
A. It's just learning how to teach people how to fire a rifle. So how to clean it, how to operate it, you know, how to use the optics and lights and movements with it and that kind of -- that kind of teaching, so . . .
Q. Were there specific rifles that that school covered?
A. M4s, full-auto M4s, AR-15s, specifically.
Q. Okay. Anything that would have been used as a sniper rifle?
A. No.
Q. Okay. Looks like, at the end, another ICAT training for 10 hours. Do you see that?
A. Yes, I do.
Q. Do you recall that course?
A. I don't.
Q. Okay. On 2886, there's an entry in August for a

Revised Discipline Policy: Supervisor Training. Do I have that right?
A. That's what it looks like.
Q. Do you recall that course?
11:00:38 A. I don't specifically. I know we had some policy changes with the kind of the way that they were going to roll out discipline versus decisions being made. It was actually going to be a structure to how the decisions were made and what the -- based on what the violation was, what
11:01:00 the discipline would be for it, so . . .
Q. Okay. So on the next page, which is 2887, there's a course called "NTOA Supervising Patrol Critical Incidents Course" for 20 hours. Do you see that?
A. Yes, I do.
11:01:21 Q. Do you recall that course?
A. Yes, I do.
Q. What was that -- what did that course entail?
A. It was some concepts in from a patrol function as a supervisor, some techniques on how to structure your
11:01:36 response, how to take control of the scene, how to coordinate with fire. And then there was quite a few tabletop exercises where real incidents were kind of debriefed. And then we would have to figure out a plan, implement it, and then they would give us more information
11:01:58 from the call. We'd have to respond to that, come up with

a new plan or change our tactic, and that's -- until it was a code for everybody safe on scene kind of a situation so -- but it's mostly tabletop exercises.

11:02:16 Q. Okay. The next entry is for 72 hours, Supervision of Police Personnel?

A. Yes.

Q. Okay. Do you recall that course?

A. Yes. That's the supervisor school that we had to do STEP. It was a two-week class, and it was dedicated to

11:02:29 how to do the administrative functions of a sergeant.

Q. Okay. And then the next one is Advanced Patrol Tactics for six hours, and then there's four hours, so maybe a total of 10. Is that right?

A. Yeah, that's what it looks like.

11:02:47 Q. Do you remember what was taught in the Advanced Patrol Techniques class?

A. I do not recall on that one.

Q. Okay.

A. Actually, I want to say it was probably --

11:02:59 because we're doing it right now with our in-service personnel, like running immediate action teams, coming up with plans, worst case scenario responses, and then how to -- how to respond appropriately, coming up with a game plan.

11:03:26 Q. All right. Going back to that same document,

that's -- there's no more pages to scroll through. So the last entry looks like May -- I'm sorry -- April 2023 on this for 130 hours, Reasonable Suspicion Training for DOT Covered Supervisors. Do you see that?

11:03:53 A. Yes, I do.

Q. Do you recall that class?

A. I don't.

Q. And that's the last -- last page for that.

I'm going to pull up another document. And
11:04:05 Bates stamp on this document starts at MESA 2857, and it's only two pages, so it goes to 2858. Do you see that?

A. Yes, I do.

MR. WOODS: I'm going to go ahead and mark this as Exhibit 3.

11:04:23 (Deposition Exhibit 3 was marked for identification.)

BY MR. WOODS:

Q. The file name of the document as it was produced to my law firm is -- it includes the word "PoliceOne." Do
11:04:35 you know what PoliceOne is?

A. Yes, I do.

Q. What is it?

A. It's like a documentation website, and there's also training that can be prescribed out of there to
11:04:52 officers. But at the time, I think we were using it

Q. See that?
A. I do.
Q. Was there a different rifle qualification course for the SWAT team than there was for not being on SWAT?
11:15:56 A. So there's a rifle qualification that the agency requires, and then to be on SWAT and maintain your position on SWAT, you had to pass a SWAT rifle qualification as well.
Q. Okay. Is there any difference between the
11:16:12 courses? For instance, were the weapons different with SWAT than they were with non-SWAT?
A. Sometimes. For a while -- I don't remember exactly what year, but we had full auto rifles. We transitioned out of those and started to use AR-15s for a
11:16:35 while. A long long time ago, we used MP5s that were full auto. We had shotguns, Benelli semi-auto shotguns. So quals vary depending on what weapons platform you're using.
Q. Down further below, there's a Good Tactics and
11:16:55 Communications Skills in 2022. Do you see that?
A. I do see that.
Q. Do you recall that course?
A. I do not.
Q. Okay. There's an Effective Tactics and
11:17:05 Communication Skills, Part II. Do you recall that course?

A. I do not.
Q. There's a Use of Deadly Force training, two hours, in June of 2022. Do you recall that course?
A. I do not.
11:17:19 Q. Do you recall at any time being trained on the use of deadly force?
A. For SWAT, again, we trained hostage rescue, we trained building search. We were regularly using actors for live scenario-based training. So we train deadly
11:17:38 force, less lethal deployments on a routine basis.
Q. If I just said the term "use of deadly force," would you understand what I'm saying?
A. Yes, a hundred percent.
Q. What -- what does "use of deadly force" mean to
11:17:53 you?
A. Using an instrument that's created to cause serious physical injury or death on another person.
Q. Okay. If I just said "use of force," would you understand what I'm talking about?
11:18:08 A. Yes, I would.
Q. And what's your understanding of the term "use of force"?
A. Use of any kind of less lethal instruments, your hands, defensive tactics, all entail use of force,
11:18:25 articulation and use of force. The legal standards and

requirements required, Graham versus Connor, Tennessee versus Garner, there's a lot of case law involved in that as well.

Q. Are there different levels of use of force?

11:18:40 A. Yes.

Q. How do you determine, as a SWAT team member or leader, when to escalate use of force?

MS. RETTS: Form.

THE WITNESS: We decide to use force based

11:19:00 on suspect's reactions. So looking at the legal standards, if we use Graham versus Conner on our decision making, which is a model of our use of force policy, we look at the severity of the crime, whether they pose a threat to us or the public, and then what's the level of

11:19:21 resistance? Are they attempting to flee? And then we also look at Tennessee versus Garner and the use of deadly force on a violent fleeing felon.

So depending on what the situation is, you know, those are legal standards. They're verbatim in our

11:19:36 use of force policy now. And so those are the things that help us make decisions and escalate our force or try to use negotiators and time and other means if necessary.

BY MR. WOODS:

Q. Okay. In February of '23, it looks like you

11:20:01 attended Basic SWAT School for 80 hours?

A. Yes.
Q. Did your courses teach you the importance of identifying an immediate threat?
A. Yeah, immediate or imminent threat. Yes.
11:25:40 Q. Okay. You were taught communication -- or how -- how to communicate when you're involved in a multiofficer tactical scene?
MS. RETTS: Form.
THE WITNESS: Not the specific "this is how
11:25:59 to," but some methods that make it easier to understand what's going on.
BY MR. WOODS:
Q. Is a suspect's tactical positioning by itself the same as an immediate deadly threat?
11:26:36 MS. RETTS: Form. Foundation.
THE WITNESS: Can you repeat your question or restate it?
BY MR. WOODS:
Q. Yeah. If you saw a suspect taking some sort of
11:26:46 tactical position, that's not necessarily an immediate threat, correct?
MS. RETTS: Form. Foundation.
THE WITNESS: It depends on what actions were taken before that movement, if that makes sense. If
11:27:02 he was taking a tactical advantage after shooting a gun at

the police, then that would change my decision on whether force was necessary or not.

BY MR. WOODS:

11:27:26 Q. So use of force -- sorry. An officer's use of force has to be judged based on the facts that they know at that time, correct?

MS. RETTS: Form.

11:27:49 THE WITNESS: Force is judged as objectively reasonable by another officer on scene at the time with the facts that's better known, yes.

BY MR. WOODS:

Q. On -- on July 6, 2023, do you recall when you arrived on scene?

A. Specific time you're asking?

11:28:09 Q. Yeah, if you can remember.

A. No. I don't recall exactly what time.

Q. Were you the first on scene?

A. No, I was not.

Q. Were there multiple officers already on scene?

11:28:20 A. Yes, there was.

Q. Were any of your other team leaders on scene before you?

A. Did you say my team leaders? Is that what you asked?

11:28:28 Q. Yeah, that you worked with, the other sergeants?

you had a good view of the sliding door on the south side of the apartment, correct?

A. Yes.

Q. And then you said as you were watching this location that you heard a shot fired from a suppressed rifle you recognized as similar to the sniper's rifle. Is that correct?

A. That's correct.

Q. Okay. And that's accurate, you heard a suppressed shot?

A. Yes, I did.

Q. You told the investigator that you observed the glass break on the sliding door that you were watching, and then you heard Officer Freeman on the radio report that he had fired. Is that correct?

A. Yes.

Q. You said that shortly after this that you saw smoke and glass shoot out of that same sliding door. Is that accurate?

A. That is correct. There's a delay. I don't remember how much time specifically, but there's a delay. And then an audible different set of gunfire, and I could see smoke and debris, like glass coming out of the sliding glass door.

Q. Okay. You told the investigator that you

couldn't tell exactly where the shot came from inside, but knew it was from inside the structure. Is that correct?

A. Yes.

Q. You told the investigator that you could also see muzzle flash from inside near the blinds. Is that accurate?

A. Yes. I don't remember exactly where I could see the muzzle flash, if it was by the blinds. But I remember seeing like a flash that kind of lit up the room, if that makes sense.

Q. You told the investigator that you could not recall if there was a volley of gunfire back and forth. Is that accurate?

A. That's correct.

Q. Okay. You told the investigator that you saw some movement from the window to the left of the west facing slider. Is that accurate?

A. No. That's -- that's -- let me read it again, "told me that he saw . . . movement from the window to the left of the west facing slider."

Yeah, I saw some movement there. I believe Officer Navarro and Officer Brown fired when they saw that. And around the same time, I thought I saw movement at the bottom right corner of the sliding glass door, like someone was kneeling down, taking a position of advantage.

Q. Okay. And that's what it says in this document, "He thought someone was kneeling down in that corner," correct?
A. Yes.
11:53:56 Q. The next sentence says that you told the investigator that there were more gunshots from inside the apartment. Is that accurate?
A. Yeah. Yeah, I'm not -- I'm not -- I don't recall that exactly. But if that's what he wrote, that's
11:54:10 probably what I said.
Q. Do you recall more gunshots coming from the apartment?
A. I remember a lot of gunfire, but I don't remember exactly where it was coming from specifically.
11:54:39 Q. It goes on to say that "At that time, he shot three to four rounds in the bottom right corner of the sliding door in response to the shots." Did you fire shots at the bottom right corner of the sliding door?
A. Yes, I did, where I thought somebody was -- they
11:54:53 had already shot at us initially. I thought they were moving to that kind of piece of cover. Usually around doors and windows, there's heavy framing materials, three-by-fours stacked, and I thought someone was kneeling down trying to get a better shooting position. And I
11:55:15 thought I saw movement at that bottom right corner of the

window, so that's where I fired three or four rounds.
Q. After all of the shooting subsided and Shawn's body was brought outside, did you stay on scene until you were interviewed?
11:55:37 A. So I moved up -- they ended up moving up. I think they -- they deployed a TASER. They deployed a dog. They ended up pulling him out of the structure. My team that was with me moved up, and we started providing -- getting the medical team up, Mesa fire and medical. And 11:55:59 then I removed his -- his outer carrier that he had on to see if we could find wounds. And that's when the fire department got up there, so they took over medical treatment. And I was -- myself and the rest of the people that were involved were pulled to the side, and then our 11:56:18 cameras were collected by the on-scene lieutenant, which is our policy and our protocol. And then we had identified who was shooters and who was -- who was less lethal shooters, who shot gas.
So we didn't end up leaving the scene for a 11:56:38 short time, and then we went to the station. I think it was our central station. And that's where we waited until we got interviewed, saw -- talked to our attorneys.
Q. Okay. You went back to the station. Is that correct?
11:57:02 A. Yes.

focus fire, direct aim fire?

A. I felt -- I felt like there was a threat. Somebody had -- suspect had shot out at us already. I saw those smoke and the glass blowing out of the window from inside the apartment. I could tell audibly that it was a different type of round. It wasn't the suppressed rifle that Shawn had fired. And so I felt that there was a threat in that bottom right corner of the window where I had seen movement. I thought somebody was taking a position of advantage. And they had already said on the phone with negotiators they were going to shoot cops. So I took that as a threat, and I was aiming to hit the target, to hit the suspect, stop his actions.

Q. You can -- based on your testimony, you could tell the difference between a suppressed shot and a non-suppressed shot, correct?

A. Yes, I can.

Q. And you heard multiple non-suppressed shots?

A. Yes, I did.

Q. What immediate threat did you believe existed at that time?

A. I believe that the suspect inside the apartment had already shot at us. He had made verbal statements he was going to shoot at the cops and shoot cops. And so I believed that there was an imminent threat. If I did not

take action and shoot the suspect, that he was going to shoot cops, like he said he did, and he had already displayed by shooting out that window at us.
12:10:16
Q. When you say "us," who specifically?
A. I don't know where those rounds went. So the cops on the ground, civilians that are in apartments surrounding the initial target apartment, so . . .
Q. But you never actually saw Shawn until his body was removed, correct?
12:10:36
A. Correct.
Q. And you never saw a rifle pointing at any officers, correct?
A. I never saw a rifle at all.
Q. You just saw what you interpreted as movement in
12:10:50
the apartment, correct?
A. Correct.
Q. Are you familiar with Mesa Police's department policy manual?
A. For the most part. There's 3,000 policies, I
12:11:26
think, something like that. So I know quite a few of them.
Q. Do you know the use of force policy?
A. Yes, I do.
Q. Does the use of force policy get updated from
12:11:40
time to time?

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN the foregoing proceedings were taken before me at the time and place herein set forth; that I was then and there a Certified Electronic Reporter and Notary Public in and for the County of Maricopa, State of Arizona; that the questions propounded by counsel and the answers of the witness thereto were taken by me electronically and thereafter reduced into typewritten form under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 16th day of April, 2026.

Kathryn Cannon

Kathryn C. Cannon, CER
Certified Electronic Reporter #4929
and Notary Public
My Commission Expires: October 27, 2029

# EXHIBIT 17
# (Non-Electronic Exhibit)
# Living Room Video
# 10-44-09 PM

KUHLMAN
Psychology and Consulting

**Katherine Kuhlman, PsyD, ABPP**
8925 E. Pima Center Pkwy, Ste 145
Scottsdale, AZ 85258
info@drkuhlman.com
602.730.2366

Case: Gagne v City of Mesa (Case 2:24-cv-01337-SHD)

Opinion Provided at the Request of: City of Mesa

Date of Opinion: June 30, 2026

**Request for Expert Opinion**:

The present was referred for an expert evaluation and opinion by attorney Christina Retts (Wieneke Law Group), representing the City of Mesa (including defendants Adair, Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, Orr, and Thomas) in the present case. An evaluation and opinion regarding (1) Did the decedent have a documented history of aggressive and violent behaviors prior to the July 6, 2023 shooting? And (2) Did the decedent's behaviors on July 6, 2023, suggest an increased threat for violence?

As set forth in more detail herein, my opinion on each item is as follows:

1. The decedent had a documented history of aggressive and violent behaviors prior to the July 6, 2023 shooting, and
2. The decedent's behaviors on July 6, 2023, suggested an increased threat for violence.

All of the opinions that I offer in this report are given to a reasonable degree of scientific probability and/or certainty, and they are based on my education, training, knowledge, experience, and/or the materials that I have reviewed for this litigation, which are substantial and have allowed me to reach the opinions I express in this report. My curriculum vitae, which details my education and experience and includes a list of publications that I have written in the past 10 years, is attached to this report at Exhibit A. A list of the materials upon which I have considered is attached to this report as Exhibit B. I reserve the right to supplement this list, as well as to amend and supplement the opinions expressed in this report. I also reserve the right to respond to and rebut any opinions offered by Plaintiff's experts in their reports, at their depositions, or at trial.

**Expertise:**

I am a licensed psychologist in the states of Arizona, California, and Hawaii. I received my Doctor of Psychology at the University of Denver in Clinical Psychology in 2015, my Master of

Arts degree in Forensic Psychology from the University of Denver in 2011, and my Bachelor of Arts and Science in Psychology and Criminal Justice, respectively, from the University of Central Florida in 2009, with a certificate in Criminal Profiling. From 2014 through 2019, I worked at Nicoletti-Flater Associates, a firm in Colorado specializing in working with public safety professionals, as well as consultation with private, public, and governmental entities regarding workplace violence, threat assessment, and problematic employee behavior. In 2019, I relocated to Arizona and started Kuhlman Psychology & Consulting, a practice which also specializes in public safety and threat assessment. In 2021, I became board-certified in Police and Public Safety Psychology by the American Board of Professional Psychology.

Analyzing human behavior, violence and risk is an integral part of my practice. In addition to consultation and testimony in both civil and criminal cases, I maintain membership in the Association of Threat Assessment Professionals, presenting in multiple chapter meetings. Additionally, I have taught basics of behavioral risk and threat assessment to public safety agencies, including the Denver and Thornton Police Departments (CO), the Arizona Crisis Intervention Team Association, and at the Western States Hostage Negotiators Association. In 2023, I was nominated by the FBI Phoenix Division and selected to attend a two-day Mental Health Practitioners Conference at the FBI Academy in Quantico, Virginia, to further my knowledge alongside the FBI's Behavioral Analysis Unite (BAU). I am also a participant in the Arizona Statewide Threat Assessment and Management Program (AZ STAMP), a weekly meeting for consultation and case analysis among various stakeholders within the threat assessment field in Arizona, which includes prosecutors, law enforcement professionals, federal partners, and mental health professionals. I have provided consultation and expert testimony in both civil and criminal cases, including workplace violence, threats of violence and mass violence, and problematic employees, among others. I have had the distinction of testifying before the Colorado State Legislature regarding mitigating problematic behavior in students and policy regarding threat assessment teams. I have served as a consultant to the Maricopa County (AZ) Attorney's Office on mitigating violent behavior in cases revolving threats of violence and/or stalking. For additional details regarding my education and experience, my current curriculum vitae is attached as Exhibit A to this report.

**Case Summary:**

The referenced opinion is regarding Gagne vs. City of Mesa and revolves around an incident involving Shawn Gagne (referred to as 'the decedent'), who was shot and killed by Mesa Police

Department (MPD) officers. The events took place on July 6, 2023, after a neighbor reported disturbances from the decedent's apartment, leading to a police response that escalated into a fatal shooting. The incident has resulted in legal action, with the decedent's parents, Christopher and Suzette Gagne, filing a lawsuit against the City of Mesa and its police officers, alleging excessive force and a failure to intervene. The defendants have moved to dismiss the claims.

Specifically, on July 6, 2023, a series of events led to MPD surrounding the decedent's apartment. Reports describe the decedent as intoxicated, mentally distressed, and in possession of weapons. In the early evening, the decedent engaged in verbal confrontation with a neighbor and refused police entry when called. The decedent had made violent threats toward his girlfriend and neighbor, including threats to kill them. Prior to the neighbor calling, he had physically assaulted his girlfriend by choking her and continued to make specific threats and used explicit and violent language toward her and the neighbor. He reportedly fired a weapon into the air from his patio. According to the plaintiffs, the decedent was coerced out of his apartment under the pretense of safety assurances and was unarmed with his hands in the air when shot by the officers. In contrast, the defendants argue that the decedent was extremely confrontational and armed with a high-powered rifle, wearing body armor, and making violent threats toward officers. Specifically, he threatened to "put a hole right through" the officer's heads. He was also wearing ear protection. Negotiators had attempted to de-escalate the situation but reportedly faced refusals from the decedent to surrender peacefully. Following the incident, officers explained that they heard shots fired from the apartment and saw muzzle flashes, though upon a search no casings were discovered.

**Approach and Analysis:**

In order to provide an opinion on the raised questions, I reviewed the listed documents provided by counsel. Additionally, relevant policies and guidelines, as well as scientific literature, were reviewed.[1]

The opinion provided is based on the following theories and scientific literature. The field of threat assessment emerged in the late 20th century as a distinct applied area within forensic psychology, evolving from clinical violence risk work toward structured, multidisciplinary processes for identifying and managing targeted violence; early theoretical and methodological contributions from Meloy and colleagues helped define stalking and threat formulation (Meloy, 1997), while seminal empirical investigations by Fein, Vossekuil, and the U.S. Secret Service into school and workplace attackers grounded practice in case-based analysis (Fein & Vossekuil,

[1] These references are listed at the end of my report.

1999; U.S. Secret Service & Department of Education, 2002). The field consolidated through the development of structured professional judgment and actuarial tools adapted for threat contexts (Webster et al., 1997; Kropp, 2004) and the formation of professional bodies, most notably the Association of Threat Assessment Professionals, which fostered cross-disciplinary standards, training, and research translation (ATAP, 1998). Together these milestones moved threat assessment from individual clinical opinion toward evidence-informed, preventive interventions integrated across law enforcement, mental health, and organizational settings (Meloy, 2007; Fein et al., 2004). Early violence-risk research and clinical violence assessment provided the conceptual roots for targeted-violence work (Webster, Douglas, Eaves, & Hart, 1997). At the same time, clinicians and researchers studying stalking, obsessional pursuit, and homicidal ideation, most notably Reid Meloy, began to articulate constructs and case formulations that differentiated targeted, communicative, or predatory violence from more general criminal violence (Meloy, 1997 & 2001). These conceptualizations emphasized behavioral pathways, motive, and the significance of a subject's communications and approach behaviors, elements later central to threat assessment practice (Meloy, Mohandie, Knoll, & Hoffmann, 2015).

A major inflection point was the U.S. Secret Service and Department of Education Safe School Initiative and related investigations into school- and workplace-targeted attackers. Fein, Vossekuil, and colleagues (1999 & 2004) produced case-based analyses that identified common pre-attack behaviors (e.g., leakages, fixation, planning) and stressed multidisciplinary, preventive intervention over purely predictive risk labeling. Parallel work by Borum, Fein, Vossekuil, and Berglund (1999) formalized threat assessment as an approach distinct from general risk assessment and described investigative and management processes for targeted violence.

In present day, the field of threat assessment is used in a variety of contexts. Schools and universities often have multidisciplinary teams who identify, assess, and manage students who pose risks. They may coordinate interventions and implement safety plans. The practice is also relevant in the workplace, in which employees of concern are identified, often after allegations of stalking, harassment, or hostility. Law enforcement utilizes threat assessment principles for protective intelligence, crowd risk planning, and informing operational responses. Many healthcare facilities employ threat assessment professionals to assess patients' threats against staff or others and to create plans that balance treatment and safety. Corporations often have insider threat programs and infrastructure to monitor employee behaviors.

*Retrospective Assessment*

A retrospective violence/threat risk assessment evaluates past behavior and circumstances, as well as any countermeasures or interventions that have been applied, to estimate future risk and inform threat and violence risk management strategies. The approach relies on comprehensive records. This includes available medical/psychiatric records, police incident reports, employment records, prior evaluations, school records, communications (such as texts or emails), and legal documents (orders, depositions, etc.). From the available records, a timeline can be reconstructed of relevant incidents, antecedent/precipitating events, and any countermeasures or interventions that may have been initiated, as well as their efficacy.

Various factors are evaluated throughout this timeline. Static risk factors are historical, stable, and generally unchangeable characteristics that predict an individual's likelihood of violent behavior long-term. They provide prognostic information but do not indicate current fluctuation in risk or targets for short-term intervention. Examples include age at first offense, prior violent convictions, history of childhood conduct disorder, early exposure to violence, gender (male), and certain long-standing personality traits (e.g., psychopathy facets). Dynamic risk factors (also called modifiable or acute factors) are changeable characteristics, states, or circumstances that can increase or decrease short- to medium-term risk and are therefore primary targets for management and intervention. Examples include current intoxication or acute substance use, active suicidal or homicidal ideation, acute psychotic symptoms (e.g., command hallucinations, paranoid delusions), recent loss or acute stressors, current access to weapons, medication nonadherence, impulsivity under stress, sleep deprivation, and the presence/absence of protective social supports. Mitigating factors, such as treatment, social support, or deterrents (e.g. detention, arrest, incarceration), are also identified. A critical aspect of this approach is identifying the subject's response or behavior following the presence of a mitigating factor or intervention/countermeasure. Reduction or cessation of violence or concerning behavior suggests that the intervention was effective, while continued or increased violent/concerning behavior suggests that the intervention was ineffective.

In defining types of violence, there is affective (or reactive) violence and proactive violence. Each act of violence identified throughout the subject's history is coded as one or the other, if possible. Affective violence is impulsive, emotionally driven aggression that occurs in response to a perceived threat, provocation, or frustration. It is characterized by high autonomic arousal (e.g., increased heart rate, sweating), intense negative affect (such as anger), and poor impulse control, so the act often follows a rapid escalation from provocation rather than long-term planning. Psychological models emphasize hostile attribution biases and fast threat appraisal processes that trigger limbic (amygdala) activation, most commonly associated with the fight-or-flight response, with insufficient prefrontal regulation, producing a "loss of control" quality to the violence (Berkowitz, 1993; Raine, 2002).

Conversely, proactive violence is deliberate, goal-directed aggression used as a means to obtain a concrete outcome such as material gain, dominance, or intimidation, and is typically cooler and more controlled in the moment. It is associated with lower immediate autonomic arousal when compared with reactive violence, and with traits such as callousness, reduced empathic response, and greater sensitivity to reward (Blair, 2013; Raine, 2002).

In addition to identification of static and dynamic risk factors, the evaluation also identifies behaviors that signal progression on the Pathway to Violence (Calhoun & Weston, 2003). These behaviors include:

- Emergence and persistence of a grievance or fixation, which are often observed by repeated verbal or written expressions of injustice, rumination, or escalating anger toward a person or institution.
- Research and ideation, which may include searching online about targets, weapons, past attacks, or legal/administrative processes; it may also include fantasizing or rehearsing violence scenarios and generating lists of targets.
- Planning and preparation, which includes acquiring weapons or materials, creating timelines and maps, surveillance of a target and their routine(s), attempts to secure access, and rehearsing actions.
- Mobilization and leakage, which may include communicating intent indirectly or directly to others, making threatening statements (either in vivo or virtually, often considered "leakage"), gifting or will-like behaviors, and finalizing logistics.
- Approach and breach behaviors, which include finding ways to gain proximity to a target, bypassing security, and use of deception.
- Other contextual indicators, such as escalating frequency and intensity of behaviors, evidence of capability (access to means/weapons), lack of protective factors (such as social supports or treatment engagement), impulsivity or loss of inhibitory control, acute stressors (such as job loss, relationship problems, financial issues), psychosis or hallucinations, and a prior history of violence or threats.

For simplification and ease for the present opinion, I will categorize behaviors into three main categories (Bollinger et.al., 2018) and identify any countermeasures or interventions applied:

1) **Boundary Probing Behaviors-**defined as behaviors that involve pushing rules, regulations, and/or tolerance levels. The purpose is often to determine how much the subject can get away with. These behaviors often cause social and/or psychological disruption.

2) **Attack-Related Behaviors**- defined as behaviors or verbalizations that involve either desensitization toward violence, threat-making (to include, direct, veiled, and conditional threats), and dehumanization (often in the form of name-calling or objectification). They may also include skill-set building, development of an armament inventory, and development of an attack plan.
3) **Attack Behaviors**- defined as behaviors that involve real or attempted destruction of either people or property.

Attack-related and Attack behaviors can be further clarified into two types:

a. **Reactive -**defined as behaviors or verbalizations that occur in the moment as a reaction to a perceived triggering event and are directed towards either people or property. These behaviors can either be non-violent or violent. In the event the behavior is violent it will involve weapons of opportunity such as body parts or items that are available in the vicinity of the incident.
b. **Proactive -**defined as violent behaviors that are premeditated and involve weapons of choice and are directed towards either people or property.

**Opinion:**

***Opinion 1: Did the decedent have a documented history of aggressive and violent behaviors prior to the July 6, 2023 shooting?***

Yes, the decedent had a documented history of aggressive and violent behaviors prior to the July 6, 2023 shooting. The following chart illustrates, chronologically (starting with the most recent events), behaviors of concern gleaned from the data provided.

| Date | Description | Type of Behavior | Countermeasure or Intervention Initiated |
|---|---|---|---|
| **7/4/2023**[2,3] | A neighbor remarked that on this date, the decedent commented “I will not be arrested.” Another neighbor commented that the decedent commented that he would “go on a high-speed chase” and “go out like a [gangster].” He was “constantly messing with his guns” according to her and allegedly said “I’m gonna fire this off. I don’t give a fuck.”<br><br>A neighbor noted that the decedent and his girlfriend, Jordan, were “in a | Attack-Related Behavior (proactive) | None noted |

[2] 421-21_MESA 001872.mp4
[3] 421-23_ MESA 001874.mp4

| | | | |
|---|---|---|---|
| | domestic" and he "choked her and the cat out." | Attack and Attack-Related Behavior | |
| **5/30/2023**[4] | The decedent had an hour gap with no tasks being worked on; he remained inactive and did not answer manager's calls. | Boundary Probing | None noted |
| **5/23/2023**[4] | The decedent told his manager that he was leaving the proper voicemail each day, yet the manager listened to calls and he did not. | Boundary Probing | Decedent asked to correct behavior |
| **05/02/2023**[4] | At work, there was a time gap in the decedent's work. He told his manager that that he had completed a task, yet records show that he had not done any work at the time he reported. | Boundary Probing | 1:1 with manager |
| **09/09/2016**[5] | The decedent was transported to the hospital from the jail for a blood alcohol and drug test. | Boundary Probing | Released back into jail custody |
| **2/16/2016**[5] | The decedent was transported to the hospital from jail for a suspected seizure; he was described as "agitated" and uncooperative and refused any treatment or lab work. He told the doctor, "I fucking had a seizure." He left against medical advice (AMA). | Boundary Probing | Released back into jail custody |
| **12/12/2015**[5] | The decedent was involved in a motor vehicle accident and reported taking Xanax earlier in the day | Boundary Probing | Released into the custody of the Los Angeles Sheriff's Department |
| **11/15/2010**[6] | During a random search at Granada Hills Charter School, the decedent was in possession of a tobacco roller, three lighters, and a Kush Magazine.<br><br>After being sent to the Dean's office, he threatened to kill another student. "He was angry because he blamed the | Boundary Probing<br><br>Reactive Attack -Related Behaviors | Detention |

[4] MESA_002484-002667 BizIQ Employment Recs Gagne Shawn_2025.06.30_Redacted
[5] MESA_003059-003257 Henry NewBill Records_2465417_262647621 (1)_Redacted
[6] MESA_ 002446-002452 Granada Hills Charter High School SDT - Shawn Gagne_Redacted

| | | | |
|---|---|---|---|
| | student for getting him caught with the items. | | |
| **11/12/2010**[6] | The decedent ordered a pizza during a break in school and was collecting money during class; he walked out of school to meet the delivery person. He was acting out and grabbed part of the referral and refused to go to the Dean's office on his own. | Boundary Probing | Detention |
| **11/12/2010**[6] | The decedent used profanity when complaining to a classmate about their class. He threw the pink copy of the detention form on the floor and said, "I didn't do shit." His teacher asked him to move a seat away from the other student and he refused, saying, "This is bullshit." | Boundary Probing<br><br>Attack Behaviors- Reactive | Detention |
| **10/14/2010**[6] | The decedent walked into the class and started cussing at another student, saying "You better run." | Attack-Related Behaviors | Detention |
| **11/13/2008**[6] | The decedent did not work on a school assignment he was given and chose to sleep instead.<br><br>The decedent refused to comply with teacher instructions; when the teacher took a drawing away from him that she had asked to put away, he said, "what the fuck was that about" and called the teacher a "son of a bitch."<br><br>Tardy to school on 11/5, 11/7, 11/11, 11/13 | Boundary Probing<br><br>Attack-Related Behavior-Reactive<br><br>Boundary Probing | One day added to his suspension; parent notified<br><br>One-day added to suspension<br><br>One-day added to suspension |
| **11/11/2008**[7] | The decedent disturbed class and did not complete assigned work. | Boundary Probing | In school suspension, parents notified |
| **11/05/2008**[7] | The decedent refused to do assigned work; he talks out loud and disturbed class. | Boundary Probing | In-school suspension; parents notified |

[6] MESA_ 002446-002452 Granada Hills Charter High School SDT - Shawn Gagne_Redacted

[7] MESA_002409-002445 Gagne -Plainview ISD Independent School District Redacted

| | | | |
|---|---|---|---|
| **11/04/2008**[7] | The decedent was disturbing class, off-task, refused to do assignments, and was disrespectful to another student and cursing. | Boundary Probing<br><br>Attack-Related Behaviors | In-school suspension; parents notified |
| **10/30/2008**[7] | The decedent was standing outside the door, opening it and talking disrespectfully to a teacher and attempting to get the attention of other students. When he was asked to leave due to his disruptive behavior, he refused to do so. He was escorted out of the building and said things like, "she's gay," "she's stupid," and "fuck you." | Boundary Probing<br><br>Attack-Related Behaviors-Reactive | In- and out- of school suspension; parents notified |
| **10/16/2008**[7] | During detention, the decedent was up out of his seat, throwing imaginary punches instead of working on his paper.<br><br>The decedent had to stay late at school to make up for his absences. He threw a fit, flipped over a chair, and stormed out of the building cussing and yelling.<br><br>Earlier in the day, when told he had to stay, he said "Hell no! They can suck my balls." | Boundary Probing<br><br>Attack Behaviors- Reactive<br><br>Attack-Related Behaviors-Reactive | In-school suspension; voicemail left for mother<br><br>In-school suspension<br><br>In-school suspension; voicemail left for mother |
| **10/10/2008**[7] | The decedent talked back to a substitute. | Boundary Probing | None noted |
| **10/08/2008**[7] | The decedent had to borrow a book and sign the teacher's notebook. He argued with the teacher and threw a tantrum, which kept the class from starting. | Boundary Probing | Another teacher asked to come and talk to him |
| **09/24/2008**[7] | The decedent disrupted class and refused to write his name, saying it was "gay." When asked to stand in the hall, he peered through the door and wandered up and down the hall, disturbing other students and teachers. | Boundary Probing | Parent conference with mother; corporal punishment (one swat) |
| **09/11/2008**[7] | The decedent was disruptive during in-school suspension and brought to the office. During a discussion, he became enraged and stormed out of the office and building. Upon return to | Boundary Probing | Removed from ISS; mother called; six days of out-of-school suspension |

[7] MESA_002409-002445 Gagne -Plainview ISD Independent School District Redacted

| | | | |
|---|---|---|---|
| | suspension, he became disruptive again. | | Mother told him earlier in the day that he would get himself suspended because he did not want to come to school. |
| **09/08/2008[7]** | The decedent used profanity with his bus driver and her supervisor. | Boundary Probing | Two days in-school suspension; mother notified |
| **09/05/2008[7]** | The decedent said "This is gay. Fuck this" in response to having to run extra in PE (he was late getting out of the dressing room). | Attack-related behaviors-reactive | Detention |
| **02/22/2008[7]** | The decedent was truant on 2/20 and 2/22 | Boundary Probing | Five days in-school suspension |
| **02/21/2008[7]** | The decedent was late to class and forgotten his work. He was reminded that he needed to make up his work or points would be taken away from his score. He said, "I hate you…you are so rude!" and was asked to wait outside the classroom. Outside, he was screaming at the top of his lungs. | Boundary Probing | Sent to the office; in-school suspension |
| **01/14/2008[7]** | The decedent had previously left campus and was coming back on, which was against school rules. When confronted, he said, "Don't fuckin' worry about it." He was asked to not speak like that, and he refused. He said that he had gotten kicked off the bus.<br><br>During a parent conference on 1/16 related to this, the decedent became angry and stormed out of the building | Boundary Probing<br><br>Boundary Probing | Parent conference; in-school suspension<br><br>Out-of-school suspension |
| **01/10/2008[7]** | The decedent disrupted class by blurting out and walking around. He was asked to leave. He then entered the cafeteria and yelled loudly. When asked to move, he yelled, "Man I hate this school" and was escorted to the office. | Boundary Probing | In-school suspension; request for parent conference with mother (she did not have time to meet due to work and requested to meet another day) |
| **10/29/2007[7]** | The decedent asked what would happen if he shot a teacher. He then drew a picture of a stick figure shooting another in the head. | Attack-related behavior; proactive | In-school suspension; spoke with parent |

[7] MESA_002409-002445 Gagne -Plainview ISD Independent School District Redacted

| | | | |
|---|---|---|---|
| **10/24/2007**[7] | The decedent told a teacher she was "gay" because he was asked to sit down in PE. | Attack-related; reactive | Corporal punishment |
| **09/20/2007**[7] | The decedent began singing a song with inappropriate words and was asked to stop. Then, he sang a song about how he shot a teacher then took grenades to her grave. | Attack-related behavior; both reactive and proactive | Detention |
| **09/07/2007**[7] | The decedent punched another student in the nose while on the bus. | Attack behavior | In-school suspension |
| **12/07/2007**[7] | The decedent made a gun out of paper during class and acted like he was shooting the class. When escorted to the office, he said "I wish they would all die." | Attack-related behavior | In-school suspension; spoke with parent |
| **10/12/2007**[7] | The decedent slapped a female student on the buttocks on the bus | Attack behavior | In-school suspension; spoke with parent |

The decedent was hired at BizIQ in February 2023 and worked there until his death; during this time the decedent did receive some commendations and monetary awards due to performance and positive interactions with others. However, as noted by the records, there were also instances in which his integrity was questioned. In contrast, his parents wrote that the decedent "was a very hard worker at EVERYTHING he did. He had high work ethics and gave 110% to his jobs he worked."[7]

Other risk factors identified upon review include the following. During a hospital admission at Henry New Bill in 2015 he reported a history of anxiety and panic disorders; he carried a prescription for Xanax. He also experienced a Traumatic Brain Injury in October 2015 after being hit by his brother. A 2014 hospital admission indicates that the decedent began using marijuana (both smoking then in wax form) shortly after moving to Arizona at the age of ten. At this time, he was smoking five per day and reported smoking "as much as he can get." The note indicates that both his father and brother used marijuana as well. He was diagnosed with Cannabis Hyperemesis Syndrome and told to stop using marijuana. Of note, he was brought to the hospital multiple times in 2014 due to side effects (vomiting) from excessive marijuana use and was told on each occasion to cease use.[8]

Of note, there are some gaps in the data. As a result, the above chart may not include every concerning action or intervention. For example, there is no indication of behaviors that

[7] MESA_002409-002445 Gagne -Plainview ISD Independent School District Redacted
[7] 20250328 - PLFS RESP to DEFS 1st NUI.pdf, p. 13, 9-10.w

[8] MESA_003059-003257 Henry NewBill Records_2465417_262647621 (1)_Redacted

occurred at home or consequences that may have been initiated by the decedent's parents. Despite numerous aforementioned concerning incidents, in which his parents were reportedly contacted by the school, the decedent "was always polite and cordial…he never picked fights…he had no malice towards anyone. He treated people the way he wanted to be treated with respect."[9] This directly contradicts objectively documented behavior. There are also no records between 2010 and 2015, 2016 and 2023, and 2008 and 2010. That being said, the data outlined above indicates that the decedent engaged in repeated concerning behaviors over the course of time. The data reviewed includes 26 incidents of boundary-probing behaviors, which by definition are behaviors that create social or psychological disruption. In this case, the majority of the behavior occurred in school and was often met with consequences including detention, parents being contacted, or suspension. The data reviewed also includes 13 incidents of attack-related behaviors; this includes threat-making, dehumanization (often name-calling), or desensitization to violence. Similarly, these behaviors were often met with consequences such as detention, suspension, or parental contact. There were four incidents of Attack Behaviors, which includes physical violence toward people or property. These behaviors were also met with consequences. The data indicates that despite the implementation of various countermeasures/interventions, the decedent continued to engage in boundary probing, attack-related behavior, and attack behaviors. This suggests that he either did not have control over his impulses, and/or chose to disregard rules when it suited him.

***Opinion 2: Did the decedent's behaviors on July 6, 2023, suggest an increased threat for violence?***

Yes, it is my opinion that the behaviors (including verbalizations) on July 6, 2023, suggest an increased threat for violence. The following chart identifies a timeline of notable concerning verbalizations and behaviors, and the intervention/countermeasure applied.

| Time on July 6, 2023 | Description | Type of Behavior | Countermeasure or Intervention Initiated |
|---|---|---|---|
| **18:50-19:20** | The decedent and girlfriend (Jordan) are at their apartment. Jordan is working on the computer and the decedent is sitting on the couch, drinking. The decedent comments to Jordan, "quit dragging your ass…you're sending me to fucking hell." [10] [11] [12] | Boundary probing; attack-related behavior | None |

[9] 20250328 - PLFS RESP to DEFS 1st NUI.pdf , p. 13-14
[10] Living Room Video 2023-07-06 06-50-14 PM
[11] Living Room Video 2023-07-06 06-53-32 PM
[12] Living Room Video 2023-07-06 06-56-59 PM

| | | | |
|---|---|---|---|
| **19:21-20:00** | The decedent and Jordan are on the couch; Jordan occasionally goes back to the computer. The decedent is drinking, and they occasionally laugh together. The decedent tells Jordan, "You're always angry," then begins cursing and yelling at her, saying "I'm fucking sick of it…shut the fuck up." [13] [14] [15] | Attack-related behavior | None |
| **20:21-20:33** | Decedent is yelling "is that what you want? You want money you mother fucker? Answer my goddamn question! What do you want to eat? Answer my fucking question." And is yelling and cursing at Jordan while she is working on the computer. Jordan walks away into the bedroom. He yells, "fucking goddamn fucking idiot." "What do you want? Or I'll fucking break your fucking goddamn bitch neck." He walks into the bedroom and continues to yell at her. Jordan asks him to leave her alone and he screams at her to "get in order" and "what do you fuckin' want?" [16]<br><br>Jordan then walks into the bedroom crying. The decedent walks into bedroom and begins screaming, then cursing at Jordan. He asks her to decide what to eat and says, "stop being a dumbass bitch." He climbs on top of her and begins to choke her and scream "look at me."[17]<br><br>The decedent then throws a chair and is yelling at their cat to "get the fuck out of here… lay there you fucking bitch" after kicking it. He screams "fuck you" then drinks from two different bottles, slamming one down before throwing the other across the room. Jordan begins to pack, and he continues to yell and curse at her. He says, "I'll fucking kill you" and tells her to "watch your fucking step." [18] | Attack-related behavior<br><br>Attack behavior and attack-related behavior<br><br>Attack behavior and attack-related behavior | Jordan asked to be left alone and begins packing to leave. |

[13] Living Room Video 2023-07-06 07-21-27 PM
[14] Living Room Video 2023-07-06 07-38-34 PM
[15] Living Room Video 2023-07-06 07-47-18 PM
[16] Living Room Video 2023-07-06 08-21-25 PM
[17] Bedroom Video Jul 24 2023, 5 24 24 PM
[18] Living Room Video 2023-07-06 08-31-09 PM

| | | | |
|---|---|---|---|
| **20:33-20:39** | Jordan continues to pack her bags while the decedent curses at her and watches television. He tells her to "get the fuck out of here" and to "beat it." [19]<br><br>A neighbor knocks on the door and the decedent yells - "fuck off...don't fucking knock on my door like that... fucking get out of here! I'll shatter your fucking skull!" He then gets up from the couch and begins to yell, "get gone! Hurry the fuck up!" He then yells at the neighbor at the door "I'll fucking kill you and your fucking boyfriend!" He walks to the door, throws a swiffer, and then yells at Jordan as she is leaving, "who the fuck do you think you are...shut the fuck up bitch...I'll put a bullet right through your fucking skull you fat prick," and yells about them knocking on his door. He walks downstairs and tells them to "get the fuck out of here." He grabs a handgun and begins to walk around the apartment. [20] [21] [22] [23] | Attack-related behavior<br><br>Attack-related behavior<br><br>Attack behavior | <br><br>Neighbor approaches the door; decedent appears to escalate |
| **20:40-20:45** | The decedent is pacing with a handgun. He begins to gather multiple firearms. He exits a patio door and fires a shot and yells "get the fuck out of here or I'll put a bullet in both of your fucking heads." He continues to yell at the neighbors to "get the fuck out of my area...you want a fucking goddamn scene?" and fires a round into the air. [24]<br><br>He threatens to "drop fucking clips in your fucking mouth bitch." He returns to the patio and continues to yell "get the fuck out of here." He is pacing back and forth cursing. He grabs a handgun and is walking around the apartment saying, "let's go, come on...I'm done...I'm going to fucking kill someone." [25] | Attack-related behavior (proactive- gathering firearms)<br><br>Attack behavior<br><br>Attack-related behavior | None |

[19] Living Room Video 2023-07-06 08-33-31 PM
[20] Living Room Video 2023-07-06 08-35-37 PM
[21] Gagne Ring Video Camera Video Jul 24 2023, 5 17 45 PM
[22] Gagne Ring Video Camera Video Jul 24 2023, 5 17 53 PM
[23] Living Room Video 2023-07-06 08-37-43 PM
[24] Living Room Video 2023-07-06 08-39-47 PM
[25] Living Room Video 2023-07-06 08-42-09 PM

| | | | |
|---|---|---|---|
| | He then grabs long gun (AR15) and is walking around saying, "I'll fucking kill you." He straps the rifle around him and tightens the strap. He grabs another long gun and appears to check the clip. He continues to curse and pace back and forth. He says, "I'll fucking blow a hole through your head." He has one firearm laying on the bed, one rifle he is carrying around, and a handgun. [26] [27] [28] | Attack-related behavior | |
| **20:49-20:53** | The decedent is walking around with his rifle and calls Jordan to ask him where his AK47 is. He says, "don't fuck with me, where's my fucking shit? Where's my fucking AK?" [29]<br><br>The decedent continues to say "where's my AK" repeatedly. He calls her a "stupid cunt" and "bitch." He again slings his rifle over his shoulder and says "I will fucking kill you bro...I'm gonna kill you." [30] | Attack-related behavior; proactive<br><br>Attack-related behavior; proactive and reactive | Jordan appears to try to verbally de-escalate him. |
| **20:52** | The decedent's girlfriend texted "dad"; she stated she would be staying at her grandmother's home because she did not feel safe around the decedent. She wrote he had been "saying out of hand remarks" and had "put his hands around [her] neck and acted like he was going to choke [her] out and threatened that if [she] thought this was a joke he would do it." Their neighbor wanted to chat and "he threatened her and her family. Then came into the porch and shot his 45 into the air." The decedent's girlfriend asked the neighbor not to call law enforcement because he was going to rebab soon. She wrote, "I honestly think he will kill himself or get himself killed if the coos (sic) come...he keeps calling me asking for his AK."[31][32] | Reactive attack and attack-related behavior | Jordan did not want police called; attempted escape by notifying "dad" |

[26] Living Room Video 2023-07-06 08-44-37 PM
[27] Living Room Video 2023-07-06 08-46-37 PM
[28] Bedroom Video Video Jul 24 2023, 5 24 49 PM
[29] Living Room Video 2023-07-06 08-49-33 PM
[30] Living Room Video 2023-07-06 08-52-04 PM
[31] GAGNE_006595-GAGNE_006595 - IMG_0318
[32] GAGNE_007446-GAGNE_007446 - Canyon Vista Recovery Center

| | | | |
|---|---|---|---|
| | In response (time unknown), she also wrote that the decedent had been drinking. [33] She also noted that he is "really unpredictable." [34]<br><br>She noted that the decedent's drinking has "only gotten worse" everyday" and that he "explodes" when he drinks.<br><br>"Dad" wrote that "he didn't even last four hours and he left" regarding the last treatment center he was sent to. [35]<br><br>She then texted "Cindy" (time unknown) and wrote, "if you call the cops he's going to kill himself or get himself killed."[36] She also stated that "as long as I am around he is going to have a reason to be like this…he's out of his fucking mind."[37] | Boundary probing | |
| **20:54-22:19** | The decedent continues to pace with his rifle. He exits onto the patio. He can be seen pointing the rifle and neck cocked, looking through the scope. He continues to pace, point his rifle, and look through the scope. [38] [39]<br><br>At around 21:57, the decedent can be seen asleep on the couch while sitting up. [40] | Attack-related behavior | |
| **21:33** | Call for service received; neighbors reported the decedent had made threats and fired a gun on his patio. [41]<br><br>BWC footage with the caller shows the caller saying that the decedent threatened to kill her and Jordan. She said, "he has a fluent amount of firearms in that house and he does not care." He also threatened to "fucking kill you guys…I'm going to splatter your brains everywhere." She noted the | Reactive attack-related and attack behaviors | Officers responded |

[33] GAGNE_006596-GAGNE_006596 - IMG_0319
[34] GAGNE_006597-GAGNE_006597 - IMG_0320
[35] GAGNE_006598-GAGNE_006598 - IMG_0321
[36] GAGNE_006601-GAGNE_006601 - IMG_0313
[37] GAGNE_006602-GAGNE_006602 - IMG_0314
[38] Living Room Video 2023-07-06 08-54-51 PM
[39] Living Room Video 2023-07-06 09-14-48 PM
[40] Living Room Video 2023-07-06 09-57-52 PM
[41] MESA_002382-002408 CIRB 2023-007 OIS_Presentation_

| | | | |
|---|---|---|---|
| | decedent has fired his gun in the home before.[42] | | |
| **22:19-22:27** | Mesa Police respond to the call and use a bean bag to knock on his door about five times; they also initiate their siren. [43]<br><br>After a few minutes, the decedent wakes up and grabs his rifle. He says, “why you over here making commands, nigga?” He is walking around with his rifle and peeking through windows. Officers notice his firearm is in a high port position. [44]<br><br>He says, “I’ll fucking show you nigga.” He walks to the front door. He comes back upstairs and is mumbling and cursing “you want to play?” [45] | Attack-related behavior<br><br>Attack-related behavior | Mesa PD tell decedent the house is surrounded<br><br>Mesa PD commands him to come out with nothing in his hands. Decedent does not comply. |
| **Time unknown** | The decedent’s girlfriend texted with “Cindy,” and stated, “there’s a zillion cops and helicopters and everyone has ARs.”[46] | | Law enforcement response |
| **22:27-22:32** | The decedent calls Jordan and asks “why are there fuckin cops at my fuckin house?” He tells her “lets go” and stands up with his rifle “You wanna fuckin go? Let’s go?...I don’t give a fuck homie.” “I got my own fuckin Army.” He points his rifle at the front door and says, “Let’s go…I don’t give a flying fuck bitch…you’re about to get lit up homie…fuck I don’t care who they is…I’ll fucking shoot this motherfucker up right now bro…I’ll fuckin kill a motherfucker…” He is pacing back and forth between windows and pointing his firearm at the front door. “I’m not coming out.” [47] Lt. Harris confirmed he saw a rifle magazine protruding from the decedent’s doorway which he believed to be an AK-47. [48] | Attack-related behaviors<br><br>Attack-related behaviors (reactive and proactive) | Jordan hands phone to negotiator |

[42] 421-23_ MESA 001874.mp4
[43] Living Room Video 2023-07-06 10-19-41 PM
[44] 03-12-2026 Freeman, Shawn, p. 33, 2-4
[45] Living Room Video 2023-07-06 10-25-30 PM
[46] GAGNE_006603-GAGNE_006603 - IMG_0315
[47] Living Room Video 2023-07-06 10-27-23 PM
[48] 20260327 - DEPO Transcript Harris, Matthew, p. 80, 7-13; p. 116-117

| | | | |
|---|---|---|---|
| | He tells Jordan, "tell them to fucking go" multiple times. He is pacing with his rifle. "If they come to my fuckin house, there's going to be consequences." He goes to the front door with his firearm and screams "leave!" "If they come through my fuckin house I'll blow a hole right through their fuckin head." [49] | | |
| **22:32-22:40** | The decedent is on the phone with the negotiator while Mesa PD continues to surround the house. Sgt. Adair noted that he introduced himself to the decedent as Matthew from the Crisis Team, and the decedent parroted back, "No I'm Matthew."[50] He is pacing with his rifle. He says, "You're about to have a fuckin crisis if you don't get away from my fuckin house...back the fuck up...get the fuck out of my fuckin face before I start dropping shots in you...before I start dropping fucking shots in your fucking squad car..." He continues to look through the scope and pace between windows. "I don't care dog I'm going to start dropping shots... you want to play guns? Let's fucking play guns... Let's fuckin go" [51] [52]<br><br>He continues, "I'll show you fuckin scary...I said move out...I don't care what you got...I will fucking drop a hole right through your fucking squad car...come to my fuckin house and see what fuckin happens bro...get your fuckin SWAT team in here I don't give a fuck...I got fuckin AKs and I got an AR... I don't fuckin care I'll blow a fuckin hole right in your fuckin head. Don't fuck with me bro...I got a fuckin shot gun and a 12 gauge...If you fuckin come into my vicinity there's going to be casualties. I do not give a fuck." [53]<br><br>The decedent remains on the phone with the negotiator and is walking around with his firearm. He says, "you | Attack-related behavior<br><br>Attack-related behavior | Continued negotiation. Decedent's noncompliance continues. |

[49] Living Room Video 2023-07-06 10-29-35 PM
[50] 03-12-2026 Adair, Matthew_Condensed.pdf
[51] Living Room Video 2023-07-06 10-32-09 PM
[52] HNT_Audio_MESA 001942 (negotiator call)
[53] Living Room Video 2023-07-06 10-34-36 PM

| | | | |
|---|---|---|---|
| | ain't gonna get me bro…I ain't coming out of nowhere….if you come to my fuckin door I will unload on all your fuckin team. Get your fuckin ass out of here…I'm not playing no fuckin games." He then puts on body armor around 22:38. [54] Sgt. Chuey confirmed that officer recognized he was wearing a ballistic vest with a plate carrier. [55]<br><br>He continues, "come and get me bro…you think I'm stupid? Move the fuckin squad back before I stop fuckin decimating life…get the fuck out of my house before I start shooting shots…I'll start shooting fuckin lights out…I'm not fuckin with you." He then puts headphones on "I got my fuckin gun loaded." [56] | Attack-related behavior; proactive (body armor)<br><br>Attack-related behavior; proactive (headphones) | |
| **22:41-22:45** | The decedent is walking around with his firearm, body armor, and headphones. He says, "you wanna play fuckin Iraq war… fucking shine lights in my house again I will fucking start shooting…I'm not playing no games…I will start fucking unloading on that fucking squad car…if they don't want to lose their fuckin life, then I suggest you get the fuck away…" he is out of frame when a shot is fired. [57] Sgt. Adair confirmed that the decedent repeatedly said he was not coming out. [58] Officer Freeman noted that the decedent had a good view of the officer's positions given his elevated position [59] and testified that the decedent had pointed his rifle in the direction of officers [60]. Following the first round, the decedent went to the ground but his rifle remained up. [61] | Attack-related behavior<br><br>Attack behavior | Mesa PD fires a shot through the window; Mesa PD tells him to come out with his hands up. Officer Thomas heard someone yell "he's down," and immediately thought another officer was shot. [67] |

[54] Living Room Video 2023-07-06 10-37-05 PM
[55] 03-12-2026 Chuey, Matthew_Condensed.pdf
[56] Living Room Video 2023-07-06 10-39-21 PM
[57] Living Room Video 2023-07-06 10-41-20 PM
[58] 03-12-2026 Adair, Matthew_Condensed.pdf
[59] 03-12-2026 Freeman, Shawn, p. 68, 16-25
[60] 03-12-2026 Freeman, Shawn, p. 74, 1-13
[61] 03-12-2026 Freeman, Shawn, p. 78
[67] 20260327 - DEPO Transcript Thomas, Kyle, p.84

| | | | |
|---|---|---|---|
| | The decedent continues to walk toward the front door, hands up. [62] Sgt. Chuey and Officer Freeman noted that officers believed they had seen a muzzle flash from inside the apartment; they believed he had fired at officers. [63] [64] Officer Thomas and Lt. Harris confirmed that they saw a muzzle flash from inside, that it appeared rounds were fired out both the south and north sliding doors, and that the gunfire from inside the apartment was distinct from officers' fire. [65] [66] | | Additional shots fired by Mesa PD. |

After Mesa police fired their final shots at the decedent, they entered and cleared the apartment [68] and rendered aid to the decedent outside[69]. Upon searching, the decedent had acquired multiple weapons and shared posts on social media, including one with a long-barreled rifle with the caption "God Bless the USA."[70] In June 2023, he was part of a group text message in which another person shared a belly band holster. [71]

The data reviewed indicate the decedent was a threat for both reactive and proactive attack behaviors.

*Threat for Reactive and Proactive Attack Behaviors*

At the beginning of the evening, it appeared that the decedent was having a reaction to his plans on going to residential treatment the following day, as he told Jordan she is sending him to "hell." He was also under the influence of alcohol, which likely contributed to his volatile mood. Initially, while Jordan is working on a computer and the decedent is drinking on the couch, tension arose as the decedent told Jordan to stop dragging her feet, showcasing initial signs of boundary probing (disruption) and irritation. Jordan's lack of response at this stage suggests either an attempt to ignore or diffuse the potential conflict by not engaging, though this passivity may also indicate a pattern of enduring verbal aggression in their interactions.

As the evening progressed, the decedent's behavior escalated notably. He aggressively questioned and accused Jordan, intertwining threats with his demands, further heightening the

[62] Living Room Video 2023-07-06 10-44-09 PM
[63] 03-12-2026 Chuey, Matthew_Condensed.pdf
[64] 03-12-2026 Freeman, Shawn, p. 81
[65] 20260327 - DEPO Transcript Thomas, Kyle, p.75-76, 80
[66] 20260327 - DEPO Transcript Harris, Matthew, p. 70, 92
[68] Living Room Video 2023-07-06 11-16-26 PM
[69] MESA_002382-002408 CIRB 2023-007 OIS_Presentation_
[70] GAGNE_000058-GAGNE_000058 - 306375784_837401667431042_8338369869021897481_n
[71] GAGNE_000070-GAGNE_000070 - Messages - Chris Gagné & Ace & Justy & SHAWNEE & Br

situation's tension. His walk into the bedroom, where Jordan had gone, while continuing to yell underscores a refusal to de-escalate the conflict. He continued verbal attacks until the situation turned physically violent, as he began choking her (attack behavior). This escalation from verbal to physical violence is a critical indicator of a high-risk situation for significant harm or lethality.

Throughout these interactions, Jordan displayed attempts to deescalate the situation by requesting to be left alone and attempting to leave, which contrasted with the decedent's increasingly aggressive and violent behavior.

From approximately 18:50 to 20:40, the decedent routinely engaged in attack-related behavior, including at least five instances of dehumanization (name-calling) toward Jordan, with additional instances toward their neighbor, and seven threats (including five threats to kill). He also engaged in additional attack behaviors, including throwing a bottle across the room, and throwing their Swiffer mop.

From approximately 20:40, around when Jordan left, to 22:19, when Mesa Police showed up, the decedent continued to escalate. During this time, he continued to yell, threaten, and dehumanize his neighbor. He made six threats, most of which were threats to kill, before calling Jordan to ask where his AK47 was located; at this time, he had already grabbed another firearm and fired a shot into the air (attack behavior). Gathering of an armament inventory in this moment is especially indicative of proactive attack behavior. He continued to dehumanize Jordan and subsequently responding law enforcement officers. During this time, he was pacing around his apartment with a rifle slung over his shoulder, looking out the windows and often looking through the scope of his rifle out the window. His continued dehumanization and threat-making is notable, given that verbal threats, violent rhetoric, and dehumanizing language is connected to escalation toward physical aggression, as it normalizes harm and erodes inhibitions (Cornell & Sheras, 2006). While on the phone with Jordan, and subsequently the negotiator from Mesa Police, he made 16 threats before putting on body armor. Of note, body armor is primarily used for protection against gunfire and other physical attacks. In situations outside of law enforcement or military operations, wearing body armor can indicate anticipation of a firefight or violent encounter. The decedent's decision to put on body armor is another indication of proactive attack-related behavior, as it suggests readiness to use force if necessary. Officer Thomas commented that the decedent putting on body armor "means they're not messing around… it's an indicator that they're going to fight it out with the cops." [72] When law enforcement arrived at the scene, the decedent exhibited non-compliant behavior, refusing to follow direct commands. This defiance of authority is often a critical factor in escalating tensions and increasing the perceived threat level. The decedent's interactions suggest a heightened state of agitation and resistance, both of which are key indicators of a

[72] 20260327 - DEPO Transcript Thomas, Kyle, p. 123, 9-12

potential for further violence. He made three additional threats to kill law enforcement officers before placing headphones over his ears. Such verbal aggression indicates a psychological readiness to engage in confrontation, highlighting his lack of regard for consequences and a sense of desperation or anger. These threats included direct statements of intent to harm and resistance, signaling increased hostility. Officer Thomas testified that this scene was in the top 10% of dangerous scenes and suspects he had encountered in SWAT situations. [73] Given the repeated threats toward police, pointing a rifle at them and aiming through his scope, firing a weapon into the air earlier in the evening, engaging in domestic violence against Jordan, and lack of compliance with attempts at de-escalation, it is clear that the decedent's concerning behavior was escalating, increasing the threat for violence. Because of this, it is assumed that the decedent's decision to put on headphones at this point was done with the intent to prevent hearing damage in the event of a shootout, as indoor shooting environments amplify sound.

The decedent's behavior during the aforementioned interactions can be categorized into several concerning indicators: a lack of respect for authority, elevated aggression when challenged, and an apparent lack of fear of repercussion. This combination not only elevates the immediate risk of violence but also demonstrates an entrenched pattern of behavior that undermines peaceful resolution efforts. This explains why law enforcement de-escalation and negotiation efforts proved unsuccessful. The decedent's escalating attack-related behaviors, including serious threats, and attack behaviors, resulted in him being an increased risk for violence.

**Conclusion**

Based on my review of the materials and my education and experience as a forensic psychologist and Board-Certified Police and Public Safety Psychology, and to a reasonable degree of scientific certainty, I offer the following opinions:

- The decedent has a history of engaging in violent behaviors, including dehumanizing others and attack behaviors toward people and property.
- The decedent's behavior continued despite the application of countermeasures.
- The decedent engaged in attack-related behaviors and verbalizations, as well as attack behaviors, on July 6, 2023.
- Despite attempts at de-escalation, the decedent's behavior continued to escalate on July 6, 2023, resulting in a significant threat for violence.

[73] 20260327 - DEPO Transcript Thomas, Kyle, p. 121, 11-19

I reserve the right to modify this report as additional information is provided to me, including but not limited to expert reports and expert depositions.

**Compensation**

I am being paid for this matter at the following rates:

Rate: 400.00 per hour, billed in 20-minute increments, door-to-door (in the case of in-person deposition or testimony)

**Exhibits**

I may use any of the following exhibits as a summary or in support of any of my opinions: (1) any of the materials, or excerpts there from, identified in this report and attachments, including the materials considered list; (2) excerpts from scientific articles or literature; (3) exhibits used by defense experts, or any witnesses; and (4) any exhibit used in or identified at any deposition taken in this litigation.

**I have provided expert testimony in deposition or at trial in the following cases in the past five years:**

Jose Aguilar Delgado vs. Installed Building Production DBA Marshall Installation & Zurich American Insurance Co. (2021)- *ALJ0009742*

North Dakota vs. United States of America (2024) 1:19-cv-150-DMT-ARS.

Dated: June 30, 2026



Katherine Kuhlman, Psy.D., ABPP
Board Certified in Police and Public Safety Psychology
Arizona Licensed Psychologist #5161

California Licensed Psychologist #32651
Hawaii Licensed Psychologist #1865

**References**

Association of Threat Assessment Professionals (ATAP). (n.d.). *Founding and organizational materials*.

Berkowitz, L. (1993). *Aggression: Its causes, consequences, and control*. American Psychological Association.

Blair, R. J. R. (2013). The neurobiology of psychopathic traits in youths. *Nature Reviews Neuroscience, 14*(11), 786–799

Bollinger, C., Flintoft, R., Nicoletti, J., Spencer-Thomas, S., & Dvoskina, M. (2018). *Violence Goes to College: The Authoritative Guide to Prevention, Intervention, and Response*. Charles C Thomas Publisher.

Borum, R., Fein, R., Vossekuil, B., & Berglund, J. (1999). Threat assessment: Defining an approach to assessing risk for targeted violence. *Behavioral Sciences & the Law*, 17(3), 323–337.

Calhoun, F. S., & Weston, S. W. (2003). *Contemporary threat management: A guide for identifying, assessing, and managing individuals of violent concern*. Special Workforce Analysis Section, National Threat Assessment Center, United States Secret Service.

Calhoun, F., & Weston, S. (2003). *Threat assessment and management strategies: Identifying and managing individuals of concern*. Federal Bureau of Investigation.

Cornell, D., & Sheras, P. (2006). *School Threat Assessment and Response Systems.* Education Law & Policy Review.

Fein, R., & Vossekuil, B. (1998). Protective intelligence and threat assessment investigations: A guide for state and local law enforcement officials. U.S. Department of Justice.

Fein, R., Vossekuil, B., Pollack, W., Borum, R., Modzeleski, W., & Reddy, M. (2004). *Threat assessment in schools: A guide to managing threats of targeted violence*. U.S. Secret Service & U.S. Department of Education.

Kropp, P. R. (2004). *Operational threat assessment instruments and training*.

Meloy, J. R. (1997). *The psychology of stalking: Clinical and forensic perspectives*. Academic Press.

Meloy, J. R. (2001). *Violence risk and threat assessment: A practical guide for mental health and criminal justice professionals*. Specialized Publishing.

Meloy, J. R., Mohandie, K., Knoll, J. L., & Hoffmann, J. (2015). The concept of identification in threat assessment. *Behavioral Sciences & the Law*, 33(2-3), 260–280.

Meloy, J. R., & Hoffmann, J. (Eds.). (2021). *International handbook of threat assessment* (2nd ed.). Oxford University Press.

Raine, A. (2002). Biosocial studies of antisocial and violent behavior in children and adults: A review. *Journal of Abnormal Child Psychology, 30*(4), 311–326

Vossekuil, B., Fein, R., Reddy, M., Borum, R., & Modzeleski, W. (2004). The final report and findings of the Safe School Initiative: Implications for the prevention of school attacks in the United States. U.S. Secret Service & U.S. Department of Education.

Webster, C. D., Douglas, K. S., Eaves, D., & Hart, S. D. (1997). HCR-20: Assessment of risk for violence — A structured professional judgment approach. *Mental Health, Crime and Community*, 6(1), 11-20.

# EXHIBIT A

# Curriculum Vitae

**Katherine E. Kuhlman, Psy.D., ABPP**
Licensed Psychologist (AZ): 5161
Licensed Psychologist (CA): 32651
Licensed Psychologist (HI): 1865
Board-Certified in Police and Public Safety Psychology
PsyPact E-Passport #5406
National Register Health Service Psychologist

8925 E. Pima Center Pkwy, Suite 145
Scottsdale, AZ 85258
Ph: (602) 730-2366
Email: Katherine@drkuhlman.com

## Education

**Psy.D., Clinical Psychology**
University of Denver, Graduate School of Professional Psychology (APA Accredited)
Specialty Focus Tool: Psychological Assessment
Doctoral Paper: *Apples and Oranges: Psychopathy as a Formal DSM-5 Diagnosis*

**M.A., Forensic Psychology**
University of Denver, Graduate School of Professional Psychology

**B.A., Psychology**
**B.S., Criminal Justice**
**Certificate, Criminal Profiling**
University of Central Florida

## Professional Experience

**ClearancePsych**
Senior Consulting Psychologist, Southwest Region
November 2023-present

- Conduct psychological evaluations related to security clearances and military waivers

**Kuhlman Psychology & Consulting, PLLC**
Owner, Clinical/ Police and Public Safety Psychologist
October 2019- present

- Provide threat assessment and management, including consultation, to numerous agencies to include federal, state, and local government, school districts, and private corporations. Some threat assessments also include fitness-for-duty evaluations.
- Conduct Preemployment Psychological Evaluations for public safety agencies both in- and out-of-state. Current clients include (but are not limited to): Arizona Department of Public Safety (AZDPS), Kingman Police Department, Sedona Police Department, Mesa Police Department,

Maricopa County Sheriff's Office (MCSO), Drug Enforcement Administration (DEA), Kauai Police Department, and Maui Police Department.
- Conduct Fitness-for-Duty and Fitness-to-Return Evaluations for public safety agencies, government organizations, and private corporations.
- Provide critical incident debriefings to multiple public safety agencies to include officer-involved shootings, officer suicides, child deaths, and line-of-duty deaths.
- Provide psychotherapy to individuals from high trauma-impacted occupations, specializing in treatment of PTSD.
- Conduct psychological evaluations for diagnostic clarification, as well as other forensic evaluations including Independent Medical Examinations (IME), disability, impaired professionals, and more.
- As a contractor, conduct psychological evaluations for TS and TS/SCI clearance for Department of Defense (DoD contractors) and the Federal Aviation Administration (FAA).
- Provide in-service trainings to public safety organizations on trauma, stress, and other topics as requested.
- Oversee all employees and contractors.

**Alium Health**
Behavioral Health Director
July 2020- December 2023
- Provide supervision to behavioral health providers, including case consultation and review of progress notes.
- Consult with Medical and Clinical Directors, as well as CEO, regarding clinical issues, ethical issues, and training.

**Colorado State University Global Campus (CSU Global)**
Content Expert
July 2020- October 2020
- Created all content for Responder and Military Assessment course in CSU Global's MA in First Responder and Military Psychology Program.

**Nicoletti-Flater Associates, PLLP**
Police and Public Safety Psychologist
August 2014-September 2019
- Provide threat assessment and management, including consultation, to numerous agencies to include federal, state, and local government, school districts, and private corporations. Some threat assessments also include fitness-for-duty.
- Conduct pre-employment screenings and psychological evaluations to over 75 local, state, and federal public safety agencies (over 2000 conducted in 2017 and 2018).
- Conduct Fitness-for-Duty and Fitness-to-Return Evaluations for public safety agencies and universities.
- Provide critical incident debriefings to multiple public safety agencies to include officer-involved shootings, officer suicides, child deaths, and line-of-duty deaths.
- Conduct trainings, to include Academy, In-Service, CIT, Peer Support, and Workplace Violence/Threat Assessment to multiple public safety and private agencies (see page 2 for list).

- Serve as the Clinical Supervisor for the Arvada Police Department and Colorado Bureau of Investigation Peer Support Teams.
- Provide psychotherapy through Employee-Assistance Program for multiple public safety agencies, specializing in trauma.

## Selected Workshops and Publications:

**Publications:**

Cipriano, R.J., Rodriguez, S., Kuhlman, K. (2023). The Benefits of Eye Movement Desensitization Reprocessing in a Law Enforcement Population. In: Bourke, M.L., Van Hasselt, V.B., Buser, S.J. (eds) First Responder Mental Health. Springer, Cham. https://doi.org/10.1007/978-3-031-38149-2_12

Rodriguez, S., Ferrell, B., Cipriano, R. J., Jr., Van Hasselt, V. B., Falzone, L., Kuhlman, K., Acosta, W., & Miller, M. V. (2024). Law enforcement mental health: Strategies and issues in prevention and treatment. *Practice Innovations, 9*(1), 52–64.

**Professional Conferences/Workshops:**

Healing and Hiring: The Vital Role of Police Psychologists in Addressing Military and Veteran Issues in Assessment and Intervention. With Stephanie Salisbury, PsyD. International Association of Chiefs of Police. Denver, CO. October 2025.

Updates on Police Officer Wellness Initiatives. With Gina Gallivan, PhD, ABPP, Kiela Bolden, PsyD, Michelle Hoy-Watkins, PsyD, ABPP, Brian Mangan, PsyD, ABPP, and Lewis Schlosser, PhD, ABPP. International Association of Chiefs of Police. Denver, CO. October 2025.

Effective Use of Police Psychologists in Assessment, Consultation and Intervention: Guiding Principles for Police Administrators. With Michael Bricker, PhD, Zachary Cohen, PsyD, Lisa Judge, JD, Jeni McCutcheon, PsyD, ABPP, and Troy Rodgers, PsyD. International Association of Chiefs of Police. Denver, CO. October 2025.

Law Enforcement Stress, Trauma, and Resiliency for Leadership. Kentucky Sheriff's Association Annual Conference. Bowling Green, KY. September 2025.

From Reaction to Resilience: Proactive Approaches to Mental Health in Law Enforcement. Axon Week. Phoenix, AZ.

Are you Operating a Practice or Running a Business? With Thomas Coghlan, PsyD. National Fraternal Order of Police Annual Wellness Symposium. Nashville, TN. February 2025.

Officer Wellness and the Law: How Mandates and Legal Decisions Have Impacted Services and Support for Law Enforcement Employees. With Sherri Martin, Thomas Coghlan, PsyD, and Joseph King. International Association of Chiefs of Police. Boston, MA. October 2024.

Force Science Conference. Fortifying Resilience: Science-Backed Strategies for Police Officers' Trauma Prevention and Recovery. September 2024.

Ethical, Legal, and Clinical Issues in Critical Incident Debriefings. With Anthony Polse, JD. Arizona Association of Chiefs of Police. Flagstaff, AZ. July 2024.

Clinical, Ethical, and Legal Issues in Police Psychology. With Medina Baumgart, PsyD, ABPP and Anthony Pulse, JD. International Association of Chiefs of Police. San Diego, CA. October 2023

First Responders and PTSD. Presented to the Annual Conference of the Workers Injury Law and Advocacy Group (WILG). Scottsdale, AZ. October 2022.

Police Officer Stress and Resiliency. Presented to the Scottsdale Police Department. Scottsdale, AZ. September 2022.

First Responder Mental Health Panel. Presented at Workers' Compensation Institute. Orlando, FL. August 2022.

Officer Wellness: Considerations for Law Enforcement Executives. Arizona Association of Chiefs of Police Annual Conference. Laughlin, NV. October 2021.

PTSD: What is it and how do we determine injury? With Amy White. Presented to the Arizona State Bar Workers' Compensation annual conference. Flagstaff, Arizona. October 2021.

Betrayal Trauma: The Hidden Threat in Law Enforcement. Presented at the 2nd Annual International Law Enforcement Training Summit. Online. September 2021.

Threat Assessment for Officers. Presented to the East Valley CIT. Mesa, AZ. June 2021.

Trauma and Recovery from an Officer-Involved Shooting. 100 Club of Arizona. April 2021.

Stress, Trauma, and PTSD in First Responders. Presented at the Arizona First Responders Wellness Conference at Arizona State University. March 2020.

Psychological, Physiological, Performance, and PR Issues Related to OIS. With John Nicoletti, AJ DeAndrea, and Bobby Waidler. International Association of Chiefs of Police Annual Convention. Chicago, IL. October 2019.

Contemporary Issues in Police Psychology. With Gina Gallivan. International Association of Chiefs of Police Annual Convention. Chicago, IL. October 2019.

20 Years After Columbine: Understanding Anniversary Reactions to Traumatic Events. With John Nicoletti. Society for Police and Criminal Psychology Annual Conference. Scottsdale, AZ. September 2019.

The Vortex in Threat Assessment: Inter-agency Collaboration and Communication. Colorado Chapter of the Association of Threat Assessment Professionals Quarterly Meeting. Broomfield, CO. September 2018.

Law Enforcement Suicide. 3rd Annual Tribal Governments Summit. Denver, CO. September 2018.

Extreme Incidents in Healthcare: What Healthcare Can Learn from Law Enforcement. With John Nicoletti. Colorado Hospital Association Critical Incident Safety Summit. Denver, CO. August 8, 2018.

Stress, Critical Incident Stress and Post-Traumatic Stress Effects on the Crime Scene Investigator/Firearms Examiner. With Alan Hammond. Association of Firearm and Toolmark Examiners Annual Conference. Denver, CO. May 18, 2017.

Mental Health Evaluations of Violence Risk Assessment in Schools: What Law Enforcement and Mental Health Professionals Need to Know. With John Nicoletti, Sara Garrido, and David Quinones. International Association of Chiefs of Police Annual Convention. San Diego, CA. October 15, 2016.

**Selected In-Service and Other Ongoing Trainings:**

Trauma, Stress and Resiliency for Police Leaders. Kentucky Department of Criminal Justice Training: Current Leadership Issues for Mid-Level Executives and Police Executive Command Course. Bowling Green and Richmond, KY. Five trainings in 2025.

Trauma, Stress and Resiliency in Public Health. Maricopa County Public Health Service. Phoenix, AZ. October 2024.

Washington, D.C. Police Leadership Academy (DCPLA). Serve as core faculty since March 2023 and teach a course on the Neurobiology of Stress and Trauma.

Concerns of Police Survivors, Trauma in Law Enforcement training. Grand Rapids. MI. July 2022, Boise, ID. June 2024. Billings, MT. June 2025.

Stress, Trauma and Resiliency (8-hours). First Responder Symposium. Dickinson, ND. April 2023.

Basic Peer Support Training: Taught Death Notifications, Suicide and Grief, High Risk Relationships, Family and Child Issues, Anger Management, Substance Abuse Issues, and Counseling and Listening Skills to first responders taking a 40-Hour Basic Peer Support Training.

Crisis Intervention Training: Taught Mental Health Issues, Suicide and Suicide by Cop, and Verbal De-Escalation Techniques, Officer Mental Health as well as evaluated roleplays, for the following agencies since 2014: Arapahoe County Sheriff's Office, Aurora Police Department, Denver Police Department, Denver Sheriff Department, Denver Communications, and Douglas County Sheriff's Office.

Officer-Involved Shootings- Psychological and Physiological Variables: In Service Training for the Arvada Police Department in January 2019.

The Psychology of Domestic Violence Calls: Academy Training for the Denver Police Department in October 2015.

Resiliency and Wellness in Law Enforcement: In Service Training for the Greeley Police Department in October 2014.

Risk Assessment in Law Enforcement: In Service Training for the Denver Police Department (February 2015) and Thornton Police Department (September 2015)

Risk Assessment in Schools: Training for the Jefferson County School District in March 2015.

Stress and Trauma in Law Enforcement: Police Academy training to the Denver Police Department in May 2018.

Stress and Trauma in Law Enforcement: Citizen's Academy training presented annually since 2015 to the Thornton Police Department and Lafayette Police Department.

Substance Abuse in the Fire Service: Training for the Castle Rock Fire Department in June 2016.

Surviving and Thriving in the Fire Service: Academy Training for the Denver Fire Department in August 2017.

Too Much, Too Ugly- Taking Care of Your Own: Keynote presented to SCL Health Train the Trainer Summit in November 2018.

Verbal De-Escalation: In-Service Training to the Jefferson County Sheriff's Office in 2016.

Verbal Tactics for Hostage Negotiation: In Service Training for the Colorado Department of Corrections Denver Complex CRT Team in November 2015.

Workplace Violence: Training for the Arapahoe County Department of Human Services in October 2017.

## Pre-Doctoral Internship

**University of Denver Graduate School of Professional Psychology, Internship Consortium (APA-Accredited); Nicoletti-Flater Associates**

Responsibilities:

Psychotherapy caseload including police officers, firefighters, and their spouses and children, for individual psychotherapy, child/adolescent psychotherapy, family psychotherapy, and couples psychotherapy. Conduct Indirect Risk Assessments for schools, courts, and businesses. Teach trainings for law enforcement and other agencies including Stress Management, Introduction to Mental Heath, Family Survival Tactics, and Violence Risk Assessment. Travel to Antarctica to conduct pre-

deployment screenings for winter-over candidates. Consult with various law enforcement agencies on working with mentally ill populations and difficult cases.

## Supervised Clinical Practica

**Colorado Department of Corrections-Denver Reception and Diagnostic Center**
Responsibilities:
Conduct rapid intakes to assess for presence of mental illness, make appropriate referrals for psychological services, conduct psychotherapy, conducting infirmary rounds and triage, conducting risk assessment and crisis interventions, consulting with psychiatrists, in-depth clinical interviewing, psychological assessment for diagnostic clarification and malingering, conducting segregation rounds, and report writing. Beginning in March 2014, helped supervise new doctoral student in psychological assessment and general CDOC practices.

**Colorado Assessment and Treatment Center**
Responsibilities:
Conducting court-ordered individual and group psychotherapy, general mental health screening, and case management and communication with parole officers.

**University of Denver Professional Psychology Clinic**
Responsibilities:
Conduct individual psychotherapy with adult clients suffering from mood disorders, PTSD, and other life stressors. Conduct, score, and interpret cognitive psychological assessments for learning disabilities and ADHD, personality, and forensic assessments.

**Mental Health Center of Denver (MHCD)**
Responsibilities:
Conducted psychological assessments, including cognitive, personality, and neuropsychological tests, on MHCD consumers referred by psychiatrists, therapists, and case managers. Examples of referral questions include: ADHD, learning disabilities, cognitive functioning, diagnostic clarification, presence of psychosis, and malingering. The testing process included a clinical interview, selection of tests, administration of tests, scoring, interpretation, and writing of integrative assessment reports. Collaboration and communication between a consumer's treatment team was integral in the assessment process.

**Sexual Offense Resource Services, LLC**
Responsibilities:
Conducted individual psychotherapy and case management with male sex offenders, communicated regarding cases with the SORS treatment team and probation officers, co-facilitated offense-specific group therapy, conducted cognitive, neuropsychological, and personality testing to assist other team members in progressing therapy with clients, provided monthly progress reports to probation on client's progress in treatment.

**Denver County Jail**
Responsibilities:

Conducted individual psychotherapy with men housed in the mental health (transition) unit and women housed in the mental health (transition) unit. Facilitated drug and alcohol group therapy, women's empowerment psycho-educational group, and completed bi-weekly community corrections risk assessment evaluations, which consisted of a thorough clinical interview and Mini Mental Status Exam (MMSE), for inmates being released to community corrections.

**City and County of Denver Juvenile Probation- Juvenile Justice and Family Integrated TASC Project**

Responsibilities:

Case management of juveniles on probation for drug charges, conducted and analyzed drug tests, met weekly with juveniles in office, school, or home, collaborated with the courts, police, and probation officers, attended court weekly to report on progress of the juvenile, and co-facilitated psychotherapy group for adult women with dual diagnosis PTSD and substance abuse.

## Selected Continued Education

Advanced Threat Assessment and Management, Two-day training with Dr. Reid Meloy

Association of Threat Assessment Professionals, Threat Management Conference (2018 and 2019)

Federal Bureau of Investigation, Mental Health Practitioners Conference, FBI Academy, Quantico Virginia, 16 hours (2023)

Force Science Annual Conference. Chicago, IL (2024)

International Association of Chiefs of Police Annual Convention, Police Psychological Services Section, attended annually since October 2014.

- The 6 Critical Psychological Factors to Consider in Determining When to do an OIS interview
- The Advantages of Using a Police Psychologist in a CIT Academy: A Practical Guide for Chiefs and Police Psychologists
- Assessment Protocols, Procedures and Pass Rates for Psychological Evaluations of Police Candidates: A Contemporary National Survey
- Building Resiliency Before Mass Casualty Events
- Culturally Competent Assessment in Police and Public Safety Psychology
- A Current Perspective on the Utility of Post-Shooting Interventions (PSI) For LEOs
- Enhancing the Efficacy and Science of Pre-employment Psychological Screening Through Research and Collaboration
- Differences Between Law Enforcement Candidates With and Without Prior Military Service as Seen in the Results of Pre-Employment Psychological Evaluation on the MMPI-2 and PAI
- Ethical Standards: Fitness for Duty Evaluations and Pre-Employment Psychological Evaluation Guidelines
- Impact of Legalized and Medical Marijuana on the Selection of Police Applicants
- The Importance of Assessing Executive Functioning in Police & Fire Applicants
- The Influence of Psychological Inner Perimeter Inflation on a High-Profile SWAT Operation

- Law Enforcement Families- The Forgotten Community: How to Support Law Enforcement Families During times of Community Outrage
- Leadership in the Midst of a Crisis Following the 2012 Tragedy in Sanford, Florida
- Medications use: What do police psychologists need to know?
- Mental Health Interventions in the Aftermath of a Mass Casualty Event
- The Multi-Variant Roles of a Psychologist in Crisis/Hostage Negotiation: 70 Years of Insights
- The Perils of Overcontrolled Behavior in Police Officer Recruits
- Police Officer's Attentional Process in an Officer-Involved Shooting or Force Encounter
- Preparing for the Unimaginable: How Chiefs Can Safeguard Officer Mental Health Before and After Mass Casualty Events
- Psychological Perspectives on Police Reform
- The Psychology of Police Deadly Force Encounters
- The RENEW Program: A Collaborative Approach to Diverting Violent Extremism
- Roles and Responsibilities of Law Enforcement Agencies and Police Psychologists in Responding to a Variety of Community-Based Critical Incidents
- The Smart Detective: An Innovative Multi-Disciplinary Approach to Building Organizational Resilience and Promoting Wellness
- Threat Assessment: Evaluating Risk of Targeted Violence
- Tools to Increase Diversity & Validity in Hiring Police Officers
- Current Issues in Fitness-for-Duty Evaluations

Johnson and Roberts User's Conference on Innovations in Pre-Employment Evaluations, annually since October 2015

Society of Police and Criminal Psychology, Annual Conference, August 2017, September 2019, and September 2022

## Professional Memberships

American Psychological Association (APA), Division 18
Association of Threat Assessment Professionals (ATAP)
Society for Police and Criminal Psychology (SPCP)
Fire Service Psychology Association (FSPA)
International Association of Chiefs of Police, Psychological Services Section
    Chair: Preemployment Evaluation Guidelines Revision Committee, 2019-2020
    Committee-member: Education Committee, 2017-2021; Education Vice Chair 2018-2019 and 2020-2021
    Committee-member: Ethics Committee 2018-present
    Committee-member: Welcoming Committee, 2018 and 2019
    Committee-member: Officer-Involved Shooting Guidelines Revisions, 2018
    Committee-member: Peer Support Guidelines Revisions, 2022
National Center for the Prevention of Community Violence (NCPCV), Executive Board Member
National Sheriff's Association (NSA)

University of Central Florida Alumni Association, Denver Chapter- Founder and Chair from July 2011 – June 2013

# EXHIBIT B

**_Gagne v. City of Mesa, et al._**
**United States District Court, Case No. 2:24-cv-01337-DJH**

Materials provided to Katherine Kuhlman

| Doc Date | Description | Bates Range |
|---|---|---|
| 3/28/2025 | PLFS RESP to DEFS 1st NUI | |
| 3/28/2025 | PLFS RESP to DEFS 1st RFP | |
| 5/23/2025 | PLFS SUPP RESP to DEFS 1st NUI | |
| 10/07/2024 | PLFS Initial DS | |
| 3/21/2025 | PLFS 1st Supp DS | |
| 3/28/2025 | PLFS 2nd Supp DS | |
| 7/07/2023 | Bedroom Video Folder | |
| 7/07/2023 | Gagne Ring Camera Video Folder | |
| 7/07/2023 | Living Room Video Folder | |
| 7/06/2023 | Bedroom Video Folder | |
| 7/06/2023 | Gagne Ring Camera Video Folder | |
| 7/06/2023 | Living Room | |
| 3/21/2025 | Shawn Gagne Photos | GAGNE_000039-000043 |
| 3/21/2025 | (38) Shawn Gagne LinkedIn | GAGNE_000044-000047 |
| 3/21/2025 | Resume | GAGNE_000053-000054 |
| 3/21/2025 | Photo of Gagne | GAGNE_000055 |
| 3/21/2025 | Photos of Gagne | GAGNE_000056-57 |
| 7/06/2023 | Second Autopsy Report of Shawn Gagne | GAGNE_000005-000031 |
| 3/21/2025 | JW LinkedIn | GAGNE_000048-000052 |
| 3/21/2025 | Photo of assault rifle | GAGNE_000058 |
| 3/21/2025 | Text Messages between Chris Gagne & Shawnee and Bradley Gagne | GAGNE_000059-002087 |
| 3/21/2025 | Text Messages – Doge | GAGNE_000320-003573 |
| 3/21/2025 | Text Messages God and Patriots | GAGNE_00003574-004973 |
| 3/21/2025 | Text Messages Shawnee & Justy etc. | GAGNE_004974-006594 |
| 7/06/2023 | Images of Text messages | GAGNE_006595-006605 |
| 4/18/2018 – 9/21/2022 | STG Medical Records – Kaiser Permanente | GAGNE_006606-007168 |
| 07/07/023 | GAGNE_000003 MPD Photos | GAGNE_335-GAGNE_880 |
| 7/07/2023 | GAGNE_000004 SWAT OFFICERS | GAGNE_000004 - 9 Videos |
| 7/06/2023 | GAGNE_000032 Ring and Cox Videos<br>7/06/2023 – Bedroom, Gagne Ring Camera Video, Living Room | GAGNE_000032 |
| 7/07/2023 | GAGNE_000032 Ring and Cox Videos<br>7/07/2023 – Bedroom, Gagne Ring Camera Video, Living Room | GAGNE_000032 |
| 7/07/2023 | GAGNE_000033 Scene Photos | SCENEPHOTOS 001-007 |
| 7/09/2023 | GAGNE_000034 Family Scene Photos Video | FAMILY_001-047 |
| | GAGNE_000035 Social Media - Twitter Data | |
| | GAGNE_000036 Neighbor's Ring | NEIGHBOR_001-003 |
| 7/06/2023 | Mesa Police Report – Redacted | GAGNE_007187-007435<br>PLF_MesaDR000001-000249 |
| 08/28/2023 | CIRB 2023-007 | GAGNE_007436-007440 |

***Gagne v. City of Mesa, et al.***
**United States District Court, Case No. 2:24-cv-01337-DJH**

Materials provided to Katherine Kuhlman

| Doc Date | Description | Bates Range |
|---|---|---|
| 03/26/2024 | Letter to COMPD Records | GAGNE_007441-007442 |
| 3/26/2024 | Fax from Mesa PD Records (Fax) | GAGNE_007443-007445 |
| 7/06/2023 | Text from Canyon Vista Recovery Center | GAGNE_007446 |
| 7/08/2023 | Medical Examiner Report | GAGNE_007447-007460 |
| 7/24/2023 | Toxicology Report | GAGNE_007461-007463 |
| 7/07/2023 | Gagne Autopsy Photos | MESA_000001-000293 |
| 7/06/2023 | Gagne Scene Photos | MESA_000294-001846 |
| 7/06/2023 | MPD Axon 1 Body Worn Camera videos | MESA_001847-001949 |
| 7/06/2023 | MPD Azon 2 Body Worn Camera videos | MESA_001950-001966 |
| 7/06/2023 | MPD Axon 3 Body Worn Camera videos | MESA_001967-001978 |
| 7/06/2023 | MPD Axon 4 Body Worn Camera videos | MESA_001979-001986 |
| 7/06/2023 | MPD Axon 5 Body Worn Camera videos | MESA_001978-001988 |
| 7/06/2023 | 911 Calls | MESA_001989-001998 |
| 7/06/2023 | CAD History Authentication from MPD Records | MESA_001999 |
| 7/07/2023 | Mesa Police Report Narrative Text Copy (Gutierrez #21423) | MESA_002000-002002 |
| 7/07/2023 | MPD Property Report #2023-141208 | MESA_002003-002008 |
| 7/06/2023 | Investigative Summary | MESA_002009-002011 |
| 7/06/2023 | Negotiator Supplement – Adair #18901 | MESA_002012-002013 |
| 7/07/2023 | Supplement to Narrative Text Report - Ahumada | MESA_002014-002015 |
| 8/22/2023 | ATF T20230435593 eTrace (Confidential) | MESA_002016-002017 |
| 7/07/2023 | Berthelson #24347 Supplement | MESA_002018 |
| 7/07/2023 | Brennan #21462 Supplement | MESA_002019-002020 |
| | Briefing Worksheet | MESA_002021-002027 |
| 7/07/2023 | Bryan #25214 supplement | MESA_002028 |
| 7/07/2023 | Carlton #23085 supplement | MESA_002029 |
| | Carrasco #22609 supplement | MESA_002030 |
| | CIRB 2023-007-Final Training Unit Review Memo (oo507036xC14DE) (Confidential) | MESA_002031-002035 |
| | CIRB 2023-007 Presentation | MESA_002036-002067 |
| | CIRB Commentary 2023-007 (0050703xC14DE) (Confidential) | MESA_002068-002071 |
| | Clover #20541 supplement | MESA_002072-002073 |
| | Cochran #12353 supplement | MESA_002074 |
| | Crime Scene Log | MESA_002075-002080 |
| 7/07/2023 | Crosby #21648 supplement | MESA_002081-002082 |
| 7/07/2023 | Dangerfield #13529 supplement | MESA_002083 |
| 7/07/2023 | Dorrell #23081 supplement | MESA_002084 |
| 7/07/2023 | Duran #23529 supplement | MESA_002085 |
| 7/07/2023 | Durham #22727 supplement | MESA_002086-002087 |
| 7/07/2023 | Eaton #22745 supplement | MESA_002088 |
| 7/06/2023 | F2023068073 MFMD CAD | MESA_002089-002091 |
| 7/06/2023 | F20230680073 MF MD Patient Care Report | MESA_002092-002097 |
| 7/07/2023 | Falconer #22430 supplement | MESA_002098 |
| 7/07/2023 | Forrest #21468 supplement | MESA_002099-002100 |
| 7/07/2023 | Freeman #23084 supplement | MESA_002101-002102 |

***Gagne v. City of Mesa, et al.***
**United States District Court, Case No. 2:24-cv-01337-DJH**

Materials provided to Katherine Kuhlman

| Doc Date | Description | Bates Range |
|---|---|---|
| 7/07/2023 | FSS070723-0022-0001 | MESA_002103-002114 |
| 7/07/2023 | FSS070723-0022-0002 | MESA_002115-002132 |
| 7/07/2023 | FSS070723-0022-0003 | MESA_002133-002141 |
| 7/08/2023 | FSS070723-0022-0004 | MESA_002142-002150 |
| 9/05/2023 | FSS070723-0022-0005 | MESA_002151-002169 |
| 8/17/2023 | FSS070723-0022-0006 | MESA_002170-002128 |
| 7/26/2023 | FSS070723-0022-0007 | MESA_002182-002205 |
| 7/20/2023 | FSS070723-0022-0008 | MESA_002206-002207 |
| 8/01/2023 | FSS070723-0022-0009 | MESA_002208-002211 |
| 8/15/2023 | FSS070723-0022-0010 | MESA_002212-002215 |
| 8/21/2023 | FSS070723-0022-0013 | MESA_002216-002219 |
| 7/07/2023 | George #17283 supplement | MESA_002220 |
| 7/07/2023 | Gomez #22698 supplement | MESA_002221 |
| 7/10/2023 | Gonzales #19451 supplement | MESA_002222 |
| 7/10/2023 | Hallemeyer #15339 supplement | MESA_002223-002226 |
| 7/07/2023 | Halter #17385 supplement | MESA_002227 |
| 7/07/2023 | Hong #24475 supplement | MESA_002228-002229 |
| 7/07/2023 | Ibarra #22438 supplement | MESA_002230-002231 |
| 7/07/2023 | Kelly #23422 supplement | MESA_002232 |
| 7/07/2023 | Kurian #21070 supplement | MESA_002233-002234 |
| 8/22/2023 | Lead Investigator Supplement #1- Investigation | MESA_002235-002263 |
| 7/07/2023 | Lentz #12201 supplement | MESA_002264-002265 |
| 7/07/2023 | Maldonado #21682 supplement | MESA_002266 |
| 8/15/2023 | Marquez #19915 supplement | MESA_002267-002268 |
| 7/07/2023 | Mask #15668 supplement | MESA_002269-002270 |
| 7/07/2023 | Mataipule #24034 supplement | MESA_002271 |
| 7/07/2023 | McDowell #16150 Supplement | MESA_002272 |
| 7/07/2023 | McDowell #19457 supplement | MESA_002273 |
| 7/07/2023 | Meicke #23520 supplement | MESA_002274 |
| 7/08/2023 | Meyer #20461 supplement | MESA_002275-002276 |
| 7/07/2023 | Miskin #21466 supplement | MESA_002277-002278 |
| 7/07/2023 | Newby #22469 supplement | MESA_002279-002280 |
| 7/08/2023 | Nicholson #19465 supplement | MESA_002281-002283 |
| 7/07/2023 | O’Connell #13912 supplement | MESA_002284 |
| 7/08/2023 | OME – Case File - Case 23-06943 – MEDICAL EXAMINER REPORT- PDF-FINAL-GAGNE | MESA_002285-002298 |
| 7/24/2023 | OME – Case File – Case 23-06943 – TOXICOLOGY REPORT - GAGNE | MESA_002299-002301 |
| 10/27/2023 | OME Info Supplement | MESA_002302 |
| 7/07/2023 | Orr #19441 Negotiator supplement | MESA_002303 |
| 8/08/2023 | Pareti #16656 AFIS supplement | MESA_002304 |
| 7/07/2023 | OME Info Supplement | MESA_002302 |
| 7/07/2023 | Orr #19441 Negotiator supplement | MESA_002303 |
| 7/07/2023 | Pareti #16656 AFIS supplement | MESA_002304 |
| 7/07/2023 | Perez #23528 supplement | MESA_002305 |

***Gagne v. City of Mesa, et al.***
**United States District Court, Case No. 2:24-cv-01337-DJH**

Materials provided to Katherine Kuhlman

| Doc Date | Description | Bates Range |
|---|---|---|
| 7/07/2023 | Phillips #24934 supplement | MESA_002306 |
| 7/07/2023 | Plott #21641 supplement | MESA_002307-002309 |
| 7/19/2023 | Property Release | MESA_002310 |
| 7/07/2023 | Rosales #21067 supplement | MESA_002311 |
| 7/07/2023 | Ryder #23119 supplement | MESA_002312 |
| 7/07/2023 | Samons #19185 supplement | MESA_002313-002314 |
| | Scene Diagram | MESA_002315-002349 |
| 7/07/2023 | Search warrant return | MESA_002350-002353 |
| 7/07/2023 | Search warrant SW2023-035134 | MESA_002354-002361 |
| 7/20/2023 | Staab #15048 supplement | MESA_002362-002368 |
| 7/11/2023 | Stefick # 23461 supplement | MESA_002369 |
| 8/22/2023 | T20230435598 eTrace | MESA_002370 |
| 7/07/2023 | Terry #23359 supplement | MESA_002371 |
| 7/07/2023 | Tewalt #23684 supplement | MESA_002372 |
| 8/22/2023 | Timeline | MESA_002373-002374 |
| 7/07/2023 | Voeltz #23534 supplement | MESA_002375 |
| 7/07/2023 | Waits #17341 supplement | MESA_002376-002379 |
| 7/07/2023 | Widmer #19506 supplement | MESA_002380-002381 |
| 7/06/2023 | 2023-141208 OIS Presentation | MESA_002382-002408 |
| 7/08/2025 | Plainview ISD -Plainview Independent School District records received via subpoena | MESA_002409-002445 |
| 7/08/2025 | Granada Hills Charter High School records received via subpoena | MESA_002446-002452 |
| 7/08/2025 | M.H. Uyekawa, Inc. employment records received via subpoena | MESA_002453-002483 |
| 7/08/2025 | BizIQ Employment Records received via subpoena | MESA_002484-002667 |
| | Garden Lakes Elementary School education records received via subpoena | MESA_002668-002679 |
| | Kaiser Permanente medical records received via subpoena | MESA_002680-003058 |
| | Henry Mayo Newhall Hospital medical records received via subpoena | MESA_003059-003257 |
| | Los Angeles Unified School District education records received via subpoena | MESA_003258-003070 |
| 10/01/2025 | Another bruise from Mesa PD officer Shawn Freeman – Officer Involved Domestic Violence.mp4 | GAGNE 007466 |
| 10/01/2025 | Another injury from abuser S Freeman Mesa Police Dept.mp4 | GAGNE 007467 |
| 10/01/2025 | Another injury from S Freeman, SWAT operator w MesaPD.mp4 | GAGNE 007468 |
| 10/01/2025 | Arm Knot and bruising S Freeman Mesa PD – Police Brutality-Domestic Violence.mp4 | GAGNE 007469 |
| 10/01/2025 | Brusing from another domestic violence incident w/Mesa Officer S Freeman.mp4 | GAGNE 007470 |
| 10/01/2025 | Domestic Violence and child abuse police report with S Freeman as suspect.mp4 | GAGNE 007471 |
| 10/01/2025 | Domestic violence injuries from S Freeman Mesa PD.mp4 | GAGNE 007472 |
| 10/01/2025 | Mesa Officer S Freeman assaults girlfriend while holding their baby.mp4 | GAGNE 007473 |
| 10/01/2025 | Mesa PD S Freeman assaults victim's injuries- Mesa Police Officer involved domestic violence.mp4 | GAGNE 007474 |
| 10/01/2025 | Mesa PD S Freeman promoting suicide telling girlfriend to kill herself.mp4 | GAGNE 007475 |

***Gagne v. City of Mesa, et al.***
**United States District Court, Case No. 2:24-cv-01337-DJH**

Materials provided to Katherine Kuhlman

| Doc Date | Description | Bates Range |
|---|---|---|
| 10/01/2025 | Mesa Police Officer S Freeman Domestic Battery charging worksheet.mp4 | GAGNE 007476 |
| 10/01/2025 | Mesa Police Officer S Freeman intimidating his girlfriend and baby.mp4 | GAGNE 007477 |
| 10/01/2025 | Mesa Police Office S Freeman mocking his domestic violence victim.mp4 | GAGNE 007478 |
| 10/01/2025 | Mesa PD S Freeman throwing hot food on his family.mp4 | GAGNE 007479 |
| 10/01/2025 | Mesa Police SWAT operator S Freeman screaming at his girlfriend while holding child.mp4 | GAGNE 007480 |
| 10/01/2025 | More bruises from domestic abuser S Freeman, Mesa PD.mp4 | GAGNE 007481 |
| 10/01/2025 | More bruises from Mesa PD S Freeman, SWAT operator, Mesa AZ domestic violence perpetrator.mp4 | GAGNE 007482 |
| 10/01/2025 | More DV injuries from Mesa PD SWAT Operator S Freeman City of Mesa PD.mp4 | GAGNE 007483 |
| 10/01/2025 | More injuries from Mesa SWAT operator S Freeman during another DV incident.mp4 | GAGNE 007484 |
| 10/01/2025 | Screaming for help while being abused by Mesa PD officer S. Freeman.mp4 | GAGNE 007485 |
| 10/01/2025 | S Freeman blames his victim for abusing her, S Freeman mental, psychological manipulation.mp4 | GAGNE 007486 |
| 10/01/2025 | S Freeman demolishing his girlfriend and babies' property. S Freeman is Mesa police officer.mp4 | GAGNE 007487 |
| 10/01/2025 | S Freeman destruction of property- officer involved domestic violence.mp4 | GAGNE 007488 |
| 10/01/2025 | S. Freeman domestic Mesa Police Dept Arizona.mp4 | GAGNE 007489 |
| 10/01/2025 | S. Freeman hitting girlfriend with door while holding their child.mp4 | GAGNE 007490 |
| 10/01/2025 | S Freeman intimidating his victims again MPD officer call 911, I dare you.mp4 | GAGNE 007491 |
| 10/01/2025 | S Freeman passed out drunk at dinner time while his girlfriend feeds their child.mp4 | GAGNE 007492 |
| 10/01/2025 | S Freeman screaming at his family after attacking them, Mesa SWAT.mp4 | GAGNE 007493 |
| 10/01/2025 | S Freeman committing domestic violence again – DV victim injuries.mp4 | GAGNE 007494 |
| 10/01/2025 | FC2022-220907 Verified Petition | GAGNE 007495-007505 |
| 10/01/2025 | FC2022-230328 Notice Change of Judge | GAGNE 007506-007543 |
| 10/01/2025 | FC2022-240304 Ruling | GAGNE 007544-007570 |
| 10/01/2025 | FC2022-094055 Family Court Case Information – Case History | GAGNE 007571-007575 |
| 10/01/2025 | TLOxp Comprehensive Report – S Freeman | GAGNE 007576-007609 |
| 10/01/2025 | Petition for Order of Protection | GAGNE 007614-007621 |
| 10/01/2025 | 0759 251001160455 | GAGNE 007610-007613 |
| | Folder – Dr. Kuhlman Core Documents | |
| | 421-21_ (start at 10 mins he won't be arrested) | Mesa 001872 |
| | 421-23_(start at 8 min) | Mesa_001874 |
| 3/12/2026 | Deposition Transcript of Officer Adair w/exhibits 1-6 | |
| 3/12/2026 | Deposition Transcript of Officer Chuey w/exhibits 1-9 | |
| 3/12/2026 | Deposition Transcript of Officer Freeman w/exhibits 1-8 | |
| 3/27/2026 | Deposition Transcript of Officer Harris w/exhibits 1-5 | |
| 3/27/2026 | Deposition Transcript of Officer Thomas w/exhibits 1-8 | |
| 5/27/26 | Paul Peter Shakola's expert opinion report. | GAGNE_007622-007651 |
| July 2025 | "Blue Collar Booms and American Mortality: Evidence from the Fracking Revolution," by Vivek S. Moorthy and Paul Shaloka. | GAGNE_007652-007722 |

***Gagne v. City of Mesa, et al.***
**United States District Court, Case No. 2:24-cv-01337-DJH**

Materials provided to Katherine Kuhlman

| Doc Date | Description | Bates Range |
|---|---|---|
| | Paul Shakola's curriculum vitae. | GAGNE_007723-007724 |
| 2/20/26 | Mark R. Hafkey, M. Ed.'s expert opinion report with Axon timeline and audio video timelines. | GAGNE_007725-007756 |
| | Mark R. Hafkey, M. Ed.'s curriculum vitae. | GAGNE_007757-007761 |
| 5/19/26 | Amended Scheduling Order | |
| 2018 | Shawn Gagne's 2018 tax records. | GAGNE_007763-007781 |
| 2019 | Shawn Gagne's 2019 tax records. | GAGNE_007782-007825 |
| 2020 | Shawn Gagne's 2020 tax records. | GAGNE_007826-007883 |
| 2021 | Shawn Gagne's 2021 tax records. | GAGNE_007884-007957 |
| 2022 | Shawn Gagne's 2022 tax records. | GAGNE_007958-007988 |

| Full Name | Badge # | Course Title | Date Completed | POST Hours | SEAT Hours |
|---|---|---|---|---|---|
| Adair, Matthew | 18901 | RETIRED P1A Tutorials: Basic User Overview | 11/16/2020 | | 0.25 |
| Adair, Matthew | 18901 | BOUNDING OVER WATCH AND FOCUSED FIRE | 04/30/2020 | 1 | |
| Adair, Matthew | 18901 | BOUNDING OVER WATCH AND FOCUSED FIRE | 04/30/2020 | 3 | |
| Adair, Matthew | 18901 | MOBILE FIELD FORCE FFAST TEAM - VEHICLE SIDE DEPLOYMENT AND STATIC VEHICLE CONTAINM | 01/22/2020 | 1 | |
| Adair, Matthew | 18901 | MOBILE FIELD FORCE FFAST TEAM - VEHICLE SIDE DEPLOYMENT AND STATIC VEHICLE CONTAINM | 01/22/2020 | 3 | |
| Adair, Matthew | 18901 | TASER X2 USER CERTIFICATION COURSE | 12/09/2020 | 1 | |
| Adair, Matthew | 18901 | DUTY TO INTERVENE | 09/24/2020 | 1 | |
| Adair, Matthew | 18901 | RIFLE OPERATOR | 09/29/2020 | 4 | |
| Adair, Matthew | 18901 | Investigating Hate/Bias Crimes | 04/27/2021 | | |
| Adair, Matthew | 18901 | Hate Crimes Training For Law Enforcement | 04/27/2021 | | 1 |
| Adair, Matthew | 18901 | E-Ticket Training | 05/18/2021 | | 0.25 |
| Adair, Matthew | 18901 | Versaterm RMS 8.1 Update | 06/01/2021 | | |
| Adair, Matthew | 18901 | Mobile Field Force Refresher for Patrol | 04/08/2021 | | 1 |
| Adair, Matthew | 18901 | Officer/Victim Follow Up | 08/18/2021 | | |
| Adair, Matthew | 18901 | Decision Shoot | 09/29/2021 | 1 | |
| Adair, Matthew | 18901 | 2021 3rd Quarter Rifle Standard | 10/31/2021 | 4 | |
| Adair, Matthew | 18901 | 2021 2nd Quarter Rifle - Bounding Overwatch/Focus Fire | 06/30/2021 | 4 | |
| Adair, Matthew | 18901 | 2021 4th Quarter Rifle | 11/23/2021 | 4 | |
| Adair, Matthew | 18901 | Defensive Tactics Instructor | 11/07/2021 | 10 | |
| Adair, Matthew | 18901 | 2021 Bean Bag Recertification | 12/22/2021 | 1 | |
| Adair, Matthew | 18901 | Defensive Tactics Instructor | 11/14/2021 | 10 | |
| Adair, Matthew | 18901 | Defensive Tactics Instructor | 11/21/2021 | 10 | |
| Adair, Matthew | 18901 | Taser 7 Transition Course | 09/30/2021 | 3 | |
| Adair, Matthew | 18901 | 2nd Quarter Combat Pistol Decision Shoot | 06/30/2021 | 2 | |
| Adair, Matthew | 18901 | RETIRED 911 Call of El Paso Police Patrolman Angel Barcena Answering A Domestic Disturbance | 02/28/2022 | | 0.25 |
| Adair, Matthew | 18901 | Code 4 Concepts Police Jiu Jitsu | 03/22/2021 | | 40 |
| Adair, Matthew | 18901 | Good Tactics and Communications Skills | 03/22/2022 | | 0.25 |
| Adair, Matthew | 18901 | Preventing Harassment and Discrimination | 03/22/2022 | | 0.5 |
| Adair, Matthew | 18901 | Mobile Field Force FFAST Training | 03/16/2022 | | 6 |
| Adair, Matthew | 18901 | 2022 RDS Transition Course | 10/19/2022 | 16 | |
| Adair, Matthew | 18901 | 2022 1st Quarter Rifle | 03/21/2022 | 4 | |
| Adair, Matthew | 18901 | Accountability Bulletin, 1st Quarter 2022 | 05/30/2022 | | |
| Adair, Matthew | 18901 | Active Shooter Response Training Bulletin | 06/28/2022 | | 0.5 |
| Adair, Matthew | 18901 | RETIRED Active Shooter: Recognition and Basic Response | 06/28/2022 | | 1 |
| Adair, Matthew | 18901 | Crisis Intervention Team School | 05/20/2022 | 40 | |
| Adair, Matthew | 18901 | Use of Deadly Force Training | 08/02/2022 | 2 | |
| Adair, Matthew | 18901 | Traffic Stops #1 | 05/03/2022 | 2 | |
| Adair, Matthew | 18901 | 2022 2nd Qtr Rifle | 05/31/2022 | 4 | |
| Adair, Matthew | 18901 | 2022 3rd Qtr Rifle | 09/30/2022 | 4 | |
| Adair, Matthew | 18901 | Decision Shoot | 08/25/2022 | 1 | |
| Adair, Matthew | 18901 | Mobile Field Force FFAST Training | 08/09/2022 | 6 | |
| Adair, Matthew | 18901 | Mobile Field Force FFAST Training | 12/01/2022 | 4 | |
| Adair, Matthew | 18901 | Fire Extinguisher (Mandatory Training) | 12/09/2022 | | 0.25 |
| Adair, Matthew | 18901 | Pepperball Operator | 12/01/2022 | 3 | |
| Adair, Matthew | 18901 | 2022 Bean Bag Recertification | 12/29/2022 | 2 | |
| Adair, Matthew | 18901 | Admin Per Se Affidavit Update (Mandatory Training) | 01/20/2023 | | 0.25 |
| Adair, Matthew | 18901 | 2023 1st Qtr Rifle | 02/13/2023 | 4 | |
| Adair, Matthew | 18901 | Search & Seizure | 02/09/2023 | | 2 |
| Adair, Matthew | 18901 | Water Rescue (Throw Bag) Training | 03/24/2023 | | 1 |
| Adair, Matthew | 18901 | Street Racing Bulletin | 03/24/2023 | | 0.5 |
| Adair, Matthew | 18901 | 2023 AZPOST Qualification | 03/06/2023 | 1 | |
| Adair, Matthew | 18901 | Drug Impaired Driver Informational Training (DIDIT) | 05/24/2023 | | 3.5 |
| Adair, Matthew | 18901 | Cop Link X | 03/14/2023 | | 2 |
| Adair, Matthew | 18901 | 2022 AZPOST Qualification | 12/31/2022 | 1 | |
| Adair, Matthew | 18901 | New RMS Function *Mandatory* | 05/06/2023 | | 0.5 |
| Adair, Matthew | 18901 | Active Shooter #1 | 05/12/2023 | 2 | |
| Adair, Matthew | 18901 | Fatal and Serious Injury Training Bulletin | 06/09/2023 | | 0.5 |
| Adair, Matthew | 18901 | Active Shooter #2 | 06/10/2023 | 4.5 | |
| Adair, Matthew | 18901 | 2023 2nd Qtr Pistol - Dry Fire | 06/27/2023 | 2 | |
| Adair, Matthew | 18901 | 2023 2nd Qtr Rifle - Bounding Over Watch and Focus Fire | 04/11/2023 | 4 | |
| Adair, Matthew | 18901 | Versaterm vMobile 2.0 | 08/01/2023 | | |
| Adair, Matthew | 18901 | Submitting Property/Evidence | 08/04/2023 | | 0.25 |
| Adair, Matthew | 18901 | 2023 3rd Qtr Rifle/Inspections | 08/29/2023 | 4 | |
| Adair, Matthew | 18901 | Police Jiu-Jitsu | 09/07/2023 | | 2 |
| Adair, Matthew | 18901 | RMS Refresher Training | 10/05/2023 | 21.5 | |
| Adair, Matthew | 18901 | 2023 4th Quarter Rifle | 10/31/2023 | 4 | |
| Adair, Matthew | 18901 | Mobile Field Force Grenadier Certification | 11/07/2023 | 20 | |
| Adair, Matthew | 18901 | 2023 4th Quarter - Range/Training | 10/27/2023 | 4 | |
| Adair, Matthew | 18901 | Decision Shoot | 11/14/2023 | 2 | |
| Adair, Matthew | 18901 | Indian Country Jurisdiction | 12/28/2023 | | |
| Adair, Matthew | 18901 | Fire Extinguisher (Mandatory Training) | 12/28/2023 | | 0.25 |
| Adair, Matthew | 18901 | High Risk Vehicle Stops HRVS (24-031) | 01/23/2024 | 4 | |
| Adair, Matthew | 18901 | 2024 AZPOST | 01/23/2024 | 2 | |
| Adair, Matthew | 18901 | 2024 Beanbag ReCertifications | 01/23/2024 | 2 | |
| Adair, Matthew | 18901 | Basic SWAT School | 02/22/2024 | 80 | |

| | | | | | |
|---|---|---|---|---|---|
| Adair, Matthew | 18901 | 2024 Pepperball - 24-040 | 04/22/2024 | 4 | |
| Adair, Matthew | 18901 | Police Jiu-Jitsu | 04/04/2022 | | 1 |
| Adair, Matthew | 18901 | Police Jiu-Jitsu | 08/20/2022 | | 2 |
| Adair, Matthew | 18901 | 2024 2nd Quarter Rifle | 05/06/2024 | 4 | |
| Adair, Matthew | 18901 | 2024 2nd Qtr Bounding/Peels (24-036) | 05/24/2024 | 4 | |
| Adair, Matthew | 18901 | THE EAST VALLEY CRITICAL INCIDENT RESPONSE TEAM | 06/20/2024 | | 0.25 |
| Adair, Matthew | 18901 | STOP STICKS Refresher | 06/29/2024 | | 0.5 |
| Adair, Matthew | 18901 | 2024 Grappler - 24-038 | 07/02/2024 | 6 | |
| Adair, Matthew | 18901 | Tactical Drivers Instructor School | 06/20/2024 | 76 | |
| Adair, Matthew | 18901 | 2024 2nd Quarter Pistol | 06/21/2024 | 2 | |
| Adair, Matthew | 18901 | Phoenix Machine Gun Conversion | 08/03/2024 | | 0.25 |
| Adair, Matthew | 18901 | Airborne and Bloodborne Pathogens | 09/06/2024 | | 1 |
| Adair, Matthew | 18901 | 2024 PJJ ABC Certification 3rd Qtr (24-037) | 08/23/2024 | 4 | |
| Adair, Matthew | 18901 | 2024 - 4th Qtr Building Searches/AZPOST Decision Shoot/Taser 10 Upgrade (24-032) | 10/21/2024 | 10 | |
| Adair, Matthew | 18901 | High Risk Traffic Stops on Stolen Vehicles | 11/07/2024 | | 0.5 |
| Adair, Matthew | 18901 | Crime Gun Training Bulletin | 11/07/2024 | | 0.5 |
| Adair, Matthew | 18901 | 2024 4th Quarter Pistol | 11/20/2024 | 2.5 | |
| Adair, Matthew | 18901 | 2024 4th Quarter Wellness Training (24-030) | 10/18/2024 | 1 | |
| Adair, Matthew | 18901 | 2024 PIT Certification - 24-039 | 08/07/2024 | 2 | |
| Adair, Matthew | 18901 | 2024 4th Quarter Rifle - Bounding Overwatch Focused Fire | 11/19/2024 | 4 | |
| Adair, Matthew | 18901 | Sergeant's Academy | 01/16/2025 | 40 | |
| Adair, Matthew | 18901 | 2025 1st Qtr Rifle (AZ Post #25-004) | 02/05/2025 | 4 | |
| Adair, Matthew | 18901 | 2025 1st Quarter Training - IA/Building Searches/HRVS (AZPOST 25-010) | 02/26/2025 | 4 | |
| Adair, Matthew | 18901 | 2025 1st Qtr Pistol (AZ Post #25-003) | 03/07/2025 | 1 | |
| Adair, Matthew | 18901 | 2025 2nd Quarter Training - DT/PJJ-ABC Refresher & Combatives/Weapon Retention/Protection ( | 04/01/2025 | 4 | |
| Adair, Matthew | 18901 | 2025 Bean Bag ReCert (AZ Post #25-021) | 04/01/2025 | 2 | |
| Adair, Matthew | 18901 | 2025 AZ Post Quals - 2nd Qtr (AZ Post #25-011) | 04/01/2025 | 2 | |
| Adair, Matthew | 18901 | Fiesta Patrol Booking | 04/05/2025 | | 0.5 |
| Adair, Matthew | 18901 | Pepperball - 25-031 | 02/04/2025 | 2 | |
| Adair, Matthew | 18901 | DOU Grenadler Recertification | 04/09/2025 | 8 | |
| Adair, Matthew | 18901 | Six Layer Concepts | 05/29/2025 | | 8 |
| Adair, Matthew | 18901 | 2025 3rd Quarter Training - Active Assailant AZPOST 25-012 | 06/16/2025 | 4 | |
| Adair, Matthew | 18901 | Fire Extinguisher (Mandatory Training) | 06/21/2025 | | 0.25 |
| Adair, Matthew | 18901 | Electronic Workstation Files System | 06/21/2025 | | 0.5 |
| Adair, Matthew | 18901 | 2025 2nd Qtr Rifle (AZ Post #25-021) | 05/20/2025 | 4 | |
| **1 users in total** | | | | **507.5** | **79.25** |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00649 | (Employee) Preventing Discrimination and Harassment | | 0001 | | 3/5/2019 7:40:44 AM | 0.0 | 0.0 | 0.75 | $0.00 | | LC |
| S00031 | Bloodborne Pathogens | | 0257 | 5/2/2011 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00166 | Respiratory Protection Refresh | | 0254 | 5/2/2011 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| C00303 | New Employee Orientation | | 0686 | 5/2/2011 12:00:00 AM | | 0.0 | 0.00 | 4.0 | $0.00 | | PS |
| S00001 | EDG-All About Backs | | 0755 | 5/2/2011 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00002 | Great Driver--EDG | | 0365 | 5/2/2011 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00003 | General Safety--EDG | | 0231 | 5/2/2011 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00004 | Haz Com Right To Know--EDG | | 0703 | 5/2/2011 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00122 | Heat Stress | | 0211 | 5/2/2011 | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 12:00:00 AM | | | | | | | |
| S00096 | Fire Extinguisher Safety | | 0066 | 5/2/2011 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| C00483 | Wrkplce Harassment & Discrimin | | 0158 | 7/26/2011 12:00:00 AM | | 0.0 | 0.00 | 2.0 | $0.00 | | PS |
| C00510 | NEO-Mesa Overview & Cust Svce | | 0004 | 7/26/2011 12:00:00 AM | | 0.0 | 0.00 | 4.0 | $0.00 | | PS |
| PD5970 | Telephonic Search Warrants | 11-057 | 0002 | 9/19/2011 2:00:00 AM | 9/19/2011 2:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5661 | Low Light Handgun Manipulation | 11-011 | 0103 | 11/14/2011 9:30:00 PM | 11/14/2011 9:30:00 PM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD6470 | Career Survival | 12-006 | 0028 | 2/20/2012 5:00:00 PM | 2/20/2012 5:00:00 PM | 4.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7354 | One Hand Survival Skills Refresher | 12-067 | 0035 | 4/23/2012 4:00:00 PM | 4/23/2012 4:00:00 PM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7340 | Diversity, Workplace Civility and Equal | 12-064 | 0016 | 5/2/2012 3:30:00 PM | 5/2/2012 3:30:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Employment | | | | | | | | | | |
| PD1944 | K9 Agitator Class (Basic) | 12-097 | 0017 | 8/8/2012 10:00:00 PM | 8/8/2012 10:00:00 PM | 4.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD6480 | Alien Victim WitnessAssistance | 11-136 | 0080 | 9/2/2012 2:00:00 AM | 9/2/2012 2:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2961 | Photography for Sworn Members - Digital | 12-074 | 0045 | 9/24/2012 8:00:00 AM | 9/24/2012 8:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5805 | Using DIMS to Download Digital Photos | 12-075 | 0004 | 9/24/2012 8:30:00 AM | 9/24/2012 8:30:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7622 | 2012 AZ POST Legal Update (DVD) | 12-441 | 0005 | 10/15/2012 1:00:00 AM | 10/15/2012 1:00:00 AM | 1.50 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7700 | Basic Handgun Manipulation in Low Light | 12-115 | 0005 | 11/5/2012 6:00:00 AM | 11/5/2012 6:00:00 AM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7656 | Control Holds and | 12-112 | 0005 | 11/5/2012 7:00:00 AM | 11/5/2012 7:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Handcuffing Refresher | | | | | | | | | | |
| PD7719 | Patrol Awareness of Under Cover Operations / Narcotic Trends | 12-106 | 0005 | 11/19/2012 8:00:00 AM | 11/19/2012 8:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7655 | Backing with Mirrors | 12-108 | 0021 | 11/25/2012 8:00:00 AM | 11/25/2012 8:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7718 | 4th Quarter Rifle Shoot / Bounding Over Watch | 12-114 | 0033 | 12/19/2012 10:00:00 AM | 12/19/2012 10:00:00 AM | 0.00 | 4.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7728 | 1st Quarter Rifle-Low Light Manipulation | 13--001 | 0004 | 1/7/2013 10:00:00 AM | 1/7/2013 10:00:00 AM | 0.00 | 4.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7727 | Drills to Prepare for the New POST Hndgun Qualificaiton | 13-009 | 0035 | 2/5/2013 8:00:00 AM | 2/5/2013 8:00:00 AM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7750 | Excited Delirium | 13-062 | 0004 | 3/28/2013 8:00:00 AM | 3/28/2013 8:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (COE 2013) | | | | | | | | | | |
| PD7751 | PTSD / TBI First Responder Program (COE 2013) | 13-064 | 0004 | 3/28/2013 9:00:00 AM | 3/28/2013 9:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7752 | COEUse of Force, Pursuit Policy and PIT Technique Policy Review (COE 2013) | 13-041 | 0004 | 3/28/2013 11:00:00 AM | 3/28/2013 11:00:00 AM | 2 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD5525 | Expandable Baton Recertification | 13-052 | 0061 | 3/28/2013 12:00:00 PM | 3/28/2013 12:00:00 PM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4210 | CPR Refresher | 13-069 | 0134 | 3/28/2013 2:00:00 PM | 3/28/2013 2:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7753 | Use of Force / Carotid Control Tecnhique Review | 13-051 | 0004 | 3/28/2013 3:00:00 PM | 3/28/2013 3:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7754 | Taser | 13-081 | 0004 | 3/28/2013 | 3/28/2013 | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Recertification | | | 5:00:00 PM | 5:00:00 PM | | | | | | |
| PD7782 | 2nd Quarter Rifle Shoot / Malfunction Clearance | 13-056 | 34 | 6/7/2013 10:00:00 AM | 6/7/2013 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD7808 | MPD E-Citation Training for Patrol | 13-112 | 0001 | 10/10/2013 5:00:00 PM | 10/10/2013 5:00:00 PM | 8 | 0.0 | 0.0 | $0.00 | | LC |
| S00004 | Hazard Communication (GHS) (SDS) | | 1 | 10/13/2013 6:18:05 AM | 10/13/2013 6:18:05 AM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD7807 | Rifle Qual / Malfunction Clearance Under Pressure | 13-107 | 0027 | 10/15/2013 10:00:00 AM | 10/15/2013 10:00:00 AM | 0.0 | 4 | 0.0 | $0.00 | | LC |
| PD7786 | Close-Quarter Crisis Edged Weapon Defense Refresher | 13-108 | 0032 | 10/29/2013 7:00:00 AM | 10/29/2013 7:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD7991 | Mind Armor for the Warrior and | 12-453 | 0001 | 11/9/2013 4:30:00 PM | 11/9/2013 4:30:00 PM | 8 | 0 | 0.0 | $50.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Family | | | | | | | | | | |
| PD7864 | Engaging Suspects Inside a Structure | 13-115 | 0018 | 12/2/2013 1:00:00 PM | 12/2/2013 1:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD7809 | Mental Conditioning for Lethal Force Encounters | 13-117 | 0033 | 12/17/2013 6:00:00 AM | 12/17/2013 6:00:00 AM | 2 | 0.0 | 0.0 | $0.00 | | LC |
| PD7880 | Patrol Rifle-Flanking Maneuvers | 14-022 | 0003 | 1/14/2014 9:30:00 AM | 1/14/2014 9:30:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD7765 | Crowd Control Formations and Tactics | 14-075 | 0004 | 3/21/2014 1:00:00 PM | 3/21/2014 1:00:00 PM | 4 | 0.0 | 0.0 | $0.00 | | LC |
| PD7867 | 2013 Legal Update | 13-377 | 0033 | 3/26/2014 12:00:00 AM | 3/26/2014 12:00:00 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| PD7865 | Metal Theft / MC Profiling / ADOT 3-Day Permits | 13-378 | 0036 | 3/26/2014 1:30:00 PM | 3/26/2014 1:30:00 PM | 1.5 | 0.0 | 0.0 | $0.00 | | LC |
| PD7883 | First Shot | 14-090 | 0032 | 4/11/2014 | 4/11/2014 | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Accuracy | | | 2:00:00 PM | 2:00:00 PM | | | | | | |
| PD7935 | SIU School | 14-116 | 0001 | 4/25/2014 5:00:00 PM | 4/25/2014 5:00:00 PM | 37 | 6 | 0.0 | $0.00 | | LC |
| PD7938 | Unconventional Shooting Positions-Failure to Chamber Malfunction | 14-074 | 0035 | 5/6/2014 10:00:00 AM | 5/6/2014 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD8146 | Gang Liason Officer School | 14-110 | 0001 | 5/8/2014 5:00:00 PM | 5/8/2014 5:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD7873 | Below 100 Basic | 14-092 | 0012 | 5/26/2014 9:00:00 AM | 5/26/2014 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7874 | Use of Force Policy Review with Scenarios | 14-093 | 0012 | 5/26/2014 10:00:00 AM | 5/26/2014 10:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 14-094 | 0042 | 5/26/2014 12:00:00 PM | 5/26/2014 12:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7875 | Early Intervention & Member Resources | 14-095 | 0012 | 5/26/2014 2:00:00 PM | 5/26/2014 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7876 | Missing Persons | 14-096 | 0012 | 5/26/2014 3:00:00 PM | 5/26/2014 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | with Alzheimer's & Related Dementias | | | | | | | | | | |
| PD7877 | Hate Crimes: A Law Enforcement Guide to Investigations and Reporting | 14-097 | 0012 | 5/26/2014 4:00:00 PM | 5/26/2014 4:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7878 | Social Media in Law Enforcement | 14-091 | 0012 | 5/26/2014 5:00:00 PM | 5/26/2014 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8181 | One Hand Survival Skills-Low Light | 14-137 | 0018 | 10/9/2014 7:00:00 AM | 10/9/2014 7:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD8245 | Qualification-Class 3 Malfunction Clearance-Distance Basics | 14-136 | 0020 | 10/9/2014 2:00:00 PM | 10/9/2014 2:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD5412 | Less Lethal-Bean Bag | 15-002 | 0052 | 1/14/2015 9:00:00 AM | 1/14/2015 9:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Recertification | | | | | | | | | | |
| PD8276 | Carotid Control Technique Refresher | 15-003 | 0044 | 2/5/2015 8:00:00 AM | 2/5/2015 8:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD8305 | Low Light Malfunction Clearance, Transition and Qualification | 15-065 | 0020 | 2/12/2015 8:30:00 PM | 2/12/2015 9:30:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD7744 | Constitutional Criminal Procedure of Arizona Officer | 13-042 | 0003 | 2/26/2015 5:00:00 PM | 2/26/2015 5:00:00 PM | 24 | 0 | 0.0 | $0.00 | | LC |
| PD8300 | Moving Radar Qualification | 15-056 | 0001 | 3/18/2015 3:00:00 PM | 3/18/2015 5:00:00 PM | 6 | 0 | 0.0 | $0.00 | | LC |
| PD8323 | Rifle Drills and Skill Builders | 15-072 | 0013 | 4/9/2015 10:00:00 AM | 4/9/2015 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 15-055 | 0050 | 4/17/2015 7:00:00 AM | 4/17/2015 7:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD8301 | Pursuit and | 15-069 | 0024 | 9/8/2015 | 9/8/2015 | 1.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Stopsticks Review | | | 8:00:00 AM | 8:00:00 AM | | | | | | |
| PD7754 | Taser Recertification | 15-064 | 0084 | 9/8/2015 9:00:00 AM | 9/8/2015 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD9877 | Tactical Decision Making Scenarios | 15-095 | 0025 | 9/8/2015 10:30:00 AM | 9/8/2015 10:30:00 AM | 0.0 | 1.5 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 15-066 | 0185 | 9/8/2015 2:00:00 PM | 9/8/2015 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8302 | Top 10 Constitutional Law Cases Every Officer Should Know | 15-016 | 0025 | 9/8/2015 3:00:00 PM | 9/8/2015 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8303 | Domestic Violence Law Enforcement Refresher | 15-060 | 0024 | 9/8/2015 4:00:00 PM | 9/8/2015 4:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8304 | Mental Illness Refresher | 15-068 | 0024 | 9/8/2015 5:00:00 PM | 9/8/2015 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD5193 | Immediate Action | 15-106 | 0061 | 10/20/2015 3:00:00 PM | 10/20/2015 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Teams for Patrol | | | | | | | | | | |
| PD9879 | Use of Deadly Force / Contagious Fire | 15-098 | 0019 | 10/21/2015 8:00:00 AM | 10/21/2015 8:00:00 AM | 1 | 1 | 0.0 | $0.00 | | LC |
| PD9888 | Modified Navy Qualification | 15-093 | 0019 | 10/28/2015 10:00:00 AM | 10/27/2015 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD5848 | Precision Immobilization Technique (P.I.T.) | 15-008 | 0018 | 11/5/2015 5:00:00 PM | 11/5/2015 5:00:00 PM | 1 | 9 | 0.0 | $0.00 | | LC |
| PD5412 | Less Lethal-Bean Bag Recertification | 16-003 | 0075 | 1/20/2016 9:00:00 AM | 1/20/2016 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10078 | POST Rifle Instructor Qualification / Malfunction Clearance / Instructor Qualification | 16-050 | 0014 | 2/1/2016 11:00:00 AM | 2/1/2016 11:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable | 16-004 | 0064 | 2/3/2016 | 2/3/2016 | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Baton Refresher | | | 7:00:00 AM | 7:00:00 AM | | | | | | |
| PD10082 | Low Light Tactics and Flashlight Techniques Refresher | 16-061 | 0003 | 3/9/2016 7:00:00 AM | 3/9/2016 7:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10121 | Bounding Over Watch | 16-059 | 0017 | 4/4/2016 1:00:00 PM | 4/4/2016 1:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD9875 | Sovereign Citizen Extremists (With CA POST DVD) | 15-119 | 0029 | 4/6/2016 12:00:00 AM | 4/6/2016 12:00:00 AM | 4 | 0.0 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 16-102 | 0093 | 6/27/2016 9:00:00 AM | 6/27/2016 9:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10089 | Basic Crisis Intervention Training | 16-073 | 0017 | 6/27/2016 4:00:00 PM | 6/27/2016 4:00:00 PM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 16-088 | 0113 | 6/27/2016 6:00:00 PM | 6/27/2016 6:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10120 | Incident De-Escalation and Tactics | 16-087 | 0019 | 6/28/2016 4:00:00 PM | 6/28/2016 4:00:00 PM | 3 | 5 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD10118 | Heart Fit for Duty | 15-478 | 0016 | 7/20/2016 12:00:00 AM | 7/20/2016 12:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10135 | First Response Resiliency Skills | 16-092 | 0011 | 7/20/2016 12:00:00 AM | 7/13/2016 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10230 | AZ Pawn Property Recovery Law Enforcement Personnel Association Training | 16-10.01 | 0001 | 10/19/2016 4:00:00 PM | 10/16/2016 4:00:00 PM | 5.5 | 0 | 0.0 | $0.00 | | LC |
| PD10235 | Qualification Course, Basic Marksmanship and Malfunction Course | 16-110 | 0032 | 10/25/2016 1:00:00 PM | 10/25/2016 1:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD7880 | Patrol Rifle-Flanking Maneuvers | 16-138 | 0061 | 12/7/2016 1:00:00 PM | 12/7/2016 1:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD5358 | P.I.T. Recertification | 16-010 | 0039 | 12/8/2016 3:00:00 PM | 12/8/2016 3:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00483 | Workplace Harassment and Discrimination Refresher Video | | 0166 | 1/13/2017 11:31:33 AM | 1/13/2017 11:31:33 AM | 0.0 | 0.0 | 0.25 | $0.00 | | LC |
| PD10369 | The Value of POP / Community Prosecution & Community Policing Part 1 | | 0001 | 3/7/2017 12:00:00 AM | 3/7/2017 12:00:00 AM | 0 | 0 | 9 | $0.00 | | LC |
| PD10390 | Low Light Malfunction Clearances, Qualification and Flashlight Techniques Using Cover | 17-073 | 0035 | 3/14/2017 9:00:00 PM | 3/14/2017 9:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10261 | Mandatory 2017 Legal Update, 2-hours COE credit | 16-113P | 0001 | 4/25/2017 9:17:25 PM | 4/25/2017 9:17:25 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8202 | Understanding | 17-V015 | 0002 | 5/18/2017 | 5/18/2017 | 24 | 0 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | the Threat | | | 12:00:00 AM | 12:00:00 AM | | | | | | |
| PD10524 | Use of Cover and Movement Refresher | 17-080 | 0053 | 5/23/2017 3:00:00 PM | 5/23/2017 3:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10420 | 1-5, Half and Half, Chaos and Set it Off Drills | 17-056 | 0042 | 5/24/2017 3:00:00 PM | 5/24/2017 3:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD5412 | Less Lethal-Bean Bag Recertification | 17-053 | 0094 | 6/22/2017 2:00:00 PM | 6/22/2017 2:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10471 | Taser X2 Transition Course | 17-089 | 0014 | 8/31/2017 3:00:00 PM | 8/31/2017 3:00:00 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 17-093 | 0208 | 8/31/2017 3:00:00 PM | 8/31/2017 3:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 17-093 | 0213 | 8/31/2017 3:00:00 PM | 8/31/2017 3:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10469 | VirTra V-300 Familiarization and Training | 17-091 | 0002 | 8/31/2017 5:00:00 PM | 8/31/2017 5:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Capability | | | | | | | | | | |
| PD10471 | Taser X2 Transition Course | 17-089 | 0027 | 8/31/2017 5:00:00 PM | 8/31/2017 5:00:00 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| KUV-EN | 01 - Employee Navigator - Video | | 0001 | 9/20/2017 7:46:07 PM | 9/20/2017 7:46:07 PM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| KUV-MC | 05 - Request and View Time Off - Video | | 0001 | 9/21/2017 7:56:43 PM | 9/21/2017 7:56:43 PM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| PD10372 | Squad Operations Tactics Training | 17-059 | 0060 | 10/19/2017 12:00:00 PM | 10/19/2017 12:00:00 PM | 2 | 3 | 0.0 | $0.00 | | LC |
| PD10608 | Confirmation of Zero with Federal Ammo, Distance Shooting Qualification | 17-101 | 0029 | 10/24/2017 3:00:00 PM | 10/24/2017 3:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10525 | Tactical Building Search Refresher | 17-098 | 0054 | 11/21/2017 4:00:00 PM | 11/21/2017 4:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | and Live Firehouse | | | | | | | | | | |
| PD10527 | 4th Quarter Rifle Response to Rapid Deployment Scenario | 17-097 | 0018 | 11/28/2017 6:00:00 PM | 11/28/2017 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD5001 | AZPOST General Instructors Program | 17-048 | 0213 | 12/15/2017 12:00:00 AM | 12/15/2017 12:00:00 AM | 40 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD10479 | Use of Naloxone (Narcan) Nasal Spray by Law Enforcement for Opioid Overdose | 17-096 | 0001 | 2/1/2018 2:38:47 PM | 2/1/2018 2:38:47 PM | 1.5 | 0 | 1.5 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 18-006 | 0130 | 2/13/2018 2:00:00 PM | 2/13/2018 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10535 | AZPOST Mandatory Legal Update | 17-84 | 0001 | 2/16/2018 3:39:28 PM | 2/16/2018 3:39:28 PM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 / 2018 | | | | | | | | | | |
| PD10569 | Patrol Rifle Response to Personnel Bourne Improvised Explosive Devices 1st Quarter Rifle Shoot | 18-021 | 0039 | 3/14/2018 2:00:00 PM | 3/14/2018 2:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10603 | Patrol Rifle Response to Rapid Deployment Scenario | 18-057 | 0013 | 4/12/2018 6:00:00 PM | 4/12/2018 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10605 | Individual First Aid Kit Use | 18-010 | 0044 | 5/29/2018 3:00:00 PM | 5/29/2018 3:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 18-060 | 0115 | 5/29/2018 4:00:00 PM | 5/29/2018 4:00:00 PM | 0 | 3 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable Baton Refresher | 18-054 | 0146 | 5/29/2018 4:00:00 PM | 5/29/2018 4:00:00 PM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| PD1759 | Rapid Deployment | 18-052 | 0211 | 8/23/2018 12:00:00 | 8/23/2018 12:00:00 | 3.5 | 6.5 | 0.0 | $0.00 | | PeopleSoft |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | AM | AM | | | | | | |
| PD10754 | Patrol Rifle Skills Improvement | 18-068 | 0012 | 10/18/2018 5:00:00 PM | 10/18/2018 5:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10777 | ICAT Introduction | 18-089 | 0001 | 10/22/2018 9:50:11 AM | 10/22/2018 9:50:11 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10709 | ICAT | 18-089 | 0002 | 10/23/2018 5:00:00 PM | 10/23/2018 5:00:00 PM | 10 | 0 | 0.0 | $0.00 | | LC |
| PD10778 | One-Handed Survival Skills and Use of Cover in Low Light | 18-072 | 0028 | 11/7/2018 9:00:00 PM | 11/7/2018 9:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10121 | Bounding Over Watch | 18-092 | 0077 | 12/14/2018 11:00:00 AM | 12/14/2018 11:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10809 | 2018 Legal Update | 18-91 | 0001 | 1/29/2019 2:46:20 AM | 1/29/2019 2:46:20 AM | 1.25 | 0 | 0.0 | $0.00 | | LC |
| PD10870 | Mass Casualty Response | 19-050 | 0001 | 2/6/2019 12:00:00 AM | 2/6/2019 12:00:00 AM | 4 | 4 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 19-013 | 0220 | 2/6/2019 11:00:00 AM | 2/6/2019 11:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10835 | Blocking | 19-008 | 0016 | 2/14/2019 | 2/14/2019 | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Impaired Driver | | | 7:00:00 AM | 7:00:00 AM | | | | | | |
| PD10874 | 1st Quarter Rifle | 19-005 | 0005 | 3/7/2019 10:00:00 AM | 3/7/2019 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10829 | Know Your Authority | V19-001 | 0011 | 5/2/2019 12:00:00 PM | 5/2/2019 12:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10876 | 2nd Quarter Rifle | 19-057 | 0012 | 5/3/2019 12:00:00 PM | 5/3/2019 12:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10524 | Use of Cover and Movement Refresher | 19-049 | 0119 | 5/8/2019 8:00:00 AM | 5/8/2019 8:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10980 | Close Quarters Shooting Techniques | 19-046 | 0020 | 5/29/2019 8:00:00 AM | 5/29/2019 8:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10963 | House Bill 2502 | 19-065 | 0022 | 6/26/2019 8:00:00 AM | 6/26/2019 8:00:00 AM | 0.5 | 0 | 0.0 | $0.00 | | LC |
| PD5021 | Defensive Tactics Instructor | 19-054 | 0031 | 7/18/2019 12:00:00 AM | 7/18/2019 12:00:00 AM | 0 | 80 | 0.0 | $0.00 | | PeopleSoft |
| PD10956 | 2019 3rd Quarter Training: | 19-064 | 0182 | 8/12/2019 7:00:00 AM | 8/12/2019 7:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Decision Shoot, Gas Mask Fit Test & Handgun Inspection | | | | | | | | | | |
| PD10968 | 2019 Rifle and Shotgun Inspection | | 0009 | 8/20/2019 7:00:00 AM | 8/20/2019 7:00:00 AM | 0 | 0 | 1 | $0.00 | | LC |
| PD11044 | MPD 2019 Suicide Awareness | 19-061 | 0001 | 9/15/2019 7:38:48 AM | 9/15/2019 7:38:48 AM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD10887 | Fair and Impartial Policing | V19-002 | 0033 | 9/30/2019 12:00:00 AM | 9/30/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10975 | 2019 3rd Quarter Rifle Shoot | 19-066 | 0031 | 10/16/2019 11:00:00 AM | 10/16/2019 11:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD8060 | Tactical Driving Instructor | 19-175 | 0004 | 11/21/2019 12:00:00 AM | 11/21/2019 12:00:00 AM | 0 | 76 | 0.0 | $0.00 | | LC |
| PD11079 | FFAST Protester Arrest Tactics | 19-084 | 0003 | 11/25/2019 4:00:00 PM | 11/25/2019 4:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10982 | Shooting From and | 19-047 | 0047 | 11/26/2019 9:00:00 AM | 11/26/2019 9:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Around Vehicles | | | | | | | | | | |
| PD11079 | FFAST Protester Arrest Tactics | 19-084 | 0001 | 12/4/2019 4:00:00 PM | 12/4/2019 4:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD11074 | Zero Confirmation, Distance Shooting, Box Drills and Chaos 31 | 19-079 | 0028 | 12/5/2019 12:00:00 PM | 12/5/2019 12:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD11118 | Mobile Field Force FFAST Team - Vehicle Side Deployment and Static Vehicle Containment Arrests | 20-011 | 0002 | 1/22/2020 9:00:00 PM | 1/22/2020 9:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD11116 | New Order of Protection Process | | 0001 | 2/4/2020 10:46:53 AM | 2/4/2020 10:46:53 AM | 0.25 | 0.0 | 0.25 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD11076 | Gender - Diverse Cultures | 19-132 | 0001 | 2/24/2020 6:01:23 AM | 2/24/2020 6:01:23 AM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10121 | Bounding Over Watch and Focused Fire | 20-015 | 0081 | 4/30/2020 11:00:00 AM | 4/30/2020 11:00:00 AM | 1 | 3 | 0.0 | $0.00 | | LC |
| | Versaterm MDT 7.7 Training | | | 8/12/2020 4:04:36 AM | 8/12/2020 4:04:36 AM | 0.0 | 0.0 | 0.5 | $0.00 | | LC |
| PD11203 | Duty to Intervene | 20-032 | 0018 | 9/24/2020 7:00:00 AM | 9/24/2020 12:00:00 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| PD7784 | Rifle Operator | 20-023 | 0021 | 9/29/2020 11:00:00 AM | 9/29/2020 12:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| | Mobile Field Force Refresher for Patrol | | | 10/30/2020 3:57:38 AM | 10/30/2020 3:57:38 AM | 0.5 | 0.0 | 0.0 | $0.00 | | LC |
| PD11233 | 2020 - 4th Quarter Distance Shoot | | 0001 | 11/1/2020 12:00:00 AM | 11/1/2020 12:00:00 AM | 0.0 | 4 | 0.0 | $0.00 | | LC |
| PD11237 | Alternate Methods of Carry | | 0001 | 12/9/2020 12:00:00 AM | 12/9/2020 12:00:00 AM | 0.0 | 3 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Adair, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD11150 | Taser X2 User Re-Certification Course | 20-017 | 0030 | 12/9/2020 9:00:00 AM | 12/9/2020 9:00:00 AM | 1 | 1 | 0.0 | $0.00 | | LC |
| PD11259 | Code 4 Concepts Police Ju Jitsu | 21-006 | 0002 | 3/15/2021 5:00:00 PM | 3/15/2021 12:00:00 AM | 0.0 | 40 | 0.0 | $0.00 | | LC |
| PD5871 | Mobile Field Force | 20-040 | 0027 | 4/8/2021 7:00:00 AM | 4/8/2021 12:00:00 AM | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD10121 | Bounding Over Watch | 20-015 | 0139 | 5/21/2021 4:00:00 PM | 5/21/2021 12:00:00 AM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD11258 | Advanced Patrol Tactics | 21-010 | 0031 | 6/23/2021 4:00:00 AM | 6/22/2021 12:00:00 AM | 6 | 4 | 0.0 | $0.00 | | LC |
| Count: 165 | | | | | | Total: 332.00 | Total: 403.00 | Total: 35.25 | $50.00 | | |

| Full Name | Badge # | Course Title | Date Completed | POST Hours | SEAT Hours |
|---|---|---|---|---|---|
| Brown, Matthew | 21421 | RETIRED P1A Tutorials: Basic User Overview | 11/23/2020 | | 0.25 |
| Brown, Matthew | 21421 | DUTY TO INTERVENE | 09/29/2020 | | 1 |
| Brown, Matthew | 21421 | 40MM LESS LETHAL CERTIFICATION | 10/02/2020 | 10 | |
| Brown, Matthew | 21421 | SABRE RED MARK 9 FAMILIARIZATION | 09/27/2020 | 1 | |
| Brown, Matthew | 21421 | RIFLE OPERATOR | 10/16/2020 | 4 | |
| Brown, Matthew | 21421 | 1ST QUARTER RIFLE QUALIFICATION - 2020 | 02/28/2020 | 4 | |
| Brown, Matthew | 21421 | Investigating Hate/Bias Crimes | 05/02/2021 | | |
| Brown, Matthew | 21421 | Hate Crimes Training For Law Enforcement | 05/02/2021 | | 1 |
| Brown, Matthew | 21421 | Training Bulletin 2021-07 New Behavioral Health-Related Radio Codes | 07/26/2021 | | |
| Brown, Matthew | 21421 | Officer/Victim Follow Up | 08/19/2021 | | |
| Brown, Matthew | 21421 | Training Bulletin 2021-10 Tactical Awareness In and Around Facilities | 08/19/2021 | | |
| Brown, Matthew | 21421 | Versaterm RMS 8.1 Update | 08/19/2021 | | |
| Brown, Matthew | 21421 | E-Ticket Training | 01/03/2024 | | 0.5 |
| Brown, Matthew | 21421 | Decision Shoot | 08/31/2021 | 1 | |
| Brown, Matthew | 21421 | Decision Shoot | 09/24/2021 | 1 | |
| Brown, Matthew | 21421 | 2021 3rd Quarter Rifle Standard | 10/31/2021 | 4 | |
| Brown, Matthew | 21421 | 2021 40mm Recertification | 11/10/2021 | 1 | |
| Brown, Matthew | 21421 | Basic SWAT Slow and Deliberate Searching | 06/15/2021 | 4 | |
| Brown, Matthew | 21421 | 2021 SWAT Rifle Qualification | 03/02/2021 | 1 | |
| Brown, Matthew | 21421 | 2021 Bean Bag Recertification | 12/22/2021 | 1 | |
| Brown, Matthew | 21421 | Taser 7 Transition Course | 09/30/2021 | 3 | |
| Brown, Matthew | 21421 | 2nd Quarter Combat Pistol Decision Shoot | 06/30/2021 | 2 | |
| Brown, Matthew | 21421 | General Instructor School | 03/04/2022 | 40 | |
| Brown, Matthew | 21421 | Good Tactics and Communications Skills | 03/17/2022 | | 0.25 |
| Brown, Matthew | 21421 | Preventing Harassment and Discrimination | 03/17/2022 | | 0.5 |
| Brown, Matthew | 21421 | 2022 1st Quarter Rifle | 03/21/2022 | 4 | |
| Brown, Matthew | 21421 | FTO School | 11/03/2021 | 9.5 | |
| Brown, Matthew | 21421 | 2021-15 Asset Forfeiture Legal Update | 04/07/2022 | | 0.25 |
| Brown, Matthew | 21421 | Accountability Bulletin, 1st Quarter 2022 | 04/19/2022 | | |
| Brown, Matthew | 21421 | Active Shooter Response Training Bulletin | 06/09/2022 | | 0.5 |
| Brown, Matthew | 21421 | RETIRED Active Shooter: Recognition and Basic Response | 06/28/2022 | | 1 |
| Brown, Matthew | 21421 | Use of Deadly Force Training | 06/14/2022 | 2 | |
| Brown, Matthew | 21421 | Taser Recertification | 06/21/2022 | 2 | |
| Brown, Matthew | 21421 | 2022 AZPOST Qualification | 12/31/2022 | 1 | |
| Brown, Matthew | 21421 | 2022 Firearms Instructor School | 06/24/2022 | 80 | |
| Brown, Matthew | 21421 | Decision Shoot | 11/09/2022 | 1 | |
| Brown, Matthew | 21421 | Fire Extinguisher (Mandatory Training) | 12/14/2022 | | 0.25 |
| Brown, Matthew | 21421 | Less Lethal Recert Bean Bag 40mm | 01/17/2023 | 4 | |
| Brown, Matthew | 21421 | 2023 40mm RE-certification | 01/17/2023 | 2 | |
| Brown, Matthew | 21421 | 2023 Bean Bag Recertification | 01/17/2023 | 2 | |
| Brown, Matthew | 21421 | Violent Offender Unit School | 01/20/2023 | 40 | |
| Brown, Matthew | 21421 | Drug Impaired Driver Informational Training (DIDIT) | 05/02/2023 | 3.5 | |
| Brown, Matthew | 21421 | Basic SWAT School | 02/23/2023 | 80 | |
| Brown, Matthew | 21421 | Admin Per Se Affidavit Update (Mandatory Training) | 05/02/2023 | | 0.25 |
| Brown, Matthew | 21421 | PepperBall 2023 | 05/30/2023 | 10 | |
| Brown, Matthew | 21421 | Search & Seizure | 05/31/2023 | 2 | |
| Brown, Matthew | 21421 | 2023 2nd Qtr Pistol - Dry Fire | 06/27/2023 | 2 | |
| Brown, Matthew | 21421 | Active Shooter #2 | 07/07/2023 | 4.5 | |
| Brown, Matthew | 21421 | Decision Shoot | 11/28/2023 | 2 | |
| Brown, Matthew | 21421 | Airborne and Bloodborne Pathogens | 12/19/2023 | | 1 |
| Brown, Matthew | 21421 | Accountability Bulletin, 3rd Quarter 2023 | 01/03/2024 | | |
| Brown, Matthew | 21421 | COM 2022 Initiatives in Mental Illness & Policing | 01/03/2024 | | |
| Brown, Matthew | 21421 | Risk Management Bulletin | 01/03/2024 | | 0.5 |
| Brown, Matthew | 21421 | Resource Guide for Elder Abuse | 01/03/2024 | | 0.25 |
| Brown, Matthew | 21421 | Water Rescue (Throw Bag) Training | 01/03/2024 | | 1 |
| Brown, Matthew | 21421 | 2024 Beanbag ReCertifications | 02/21/2024 | 2 | |
| Brown, Matthew | 21421 | 2024 40mm ReCertification | 01/23/2024 | 2 | |
| Brown, Matthew | 21421 | Basic SWAT School | 02/22/2024 | 80 | |
| Brown, Matthew | 21421 | Physical Trainer Instructor | 09/14/2023 | 40 | |
| **1 users in total** | | | | **452.5** | **8.5** |

HMS 171a - PD Report - Student Training Hours Matthew C Brown, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00649 | (Employee) Preventing Discrimination and Harassment | | 0001 | | 2/25/2019 5:00:09 AM | 0.0 | 0.0 | 0.75 | $0.00 | | LC |
| C00303 | New Employee Orientation Training for New Hires (POR) | | 050 | 7/12/2016 12:00:00 PM | 7/12/2016 12:00:00 PM | 0.0 | 0.0 | 3.75 | $0.00 | | LC |
| SNEOPD | New Employee Orientation (Police Safety Training) | | 0025 | 7/12/2016 5:00:00 PM | 7/12/2016 5:00:00 PM | 3 | 0.0 | 3 | $0.00 | | LC |
| C00541 | New Emp Orientation~CS & Harass / Discrim & Values (Police Recruits) | | 0068 | 7/13/2016 5:00:00 PM | 7/13/2016 5:00:00 PM | 0.0 | 0.0 | 3.75 | $0.00 | | LC |
| PD7348 | Taser X2 User Certification | 13-088 | 0023 | 9/8/2016 12:00:00 AM | 9/8/2016 12:00:00 AM | 10 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD1500 | Academy | | 0045 | 12/15/2016 | 12/15/2016 | 0 | 0 | 870 | $0.00 | | PeopleSoft |
| Count: 57 | | | | | | Total: 128.50 | Total: 138.5 | Total: 894.50 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew C Brown, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 12:00:00 AM | 12:00:00 AM | | | | | | |
| PD6473 | IS-100.C: Introduction to Incident Command System | | | 12/27/2016 1:51:07 PM | 12/27/2016 1:51:07 PM | 0 | 0 | 3 | $0.00 | | LC |
| PD4613 | IS-700.A: National Incident Management System (NIMS) An Introduction | | | 12/27/2016 3:16:07 PM | 12/27/2016 3:16:07 PM | 0 | 0 | 3 | $0.00 | | LC |
| PD8164 | Survival Spanish | 17-049 | 0006 | 3/20/2017 12:00:00 PM | 3/20/2017 12:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10135 | First Response Resiliency Skills | 17-062 | 0043 | 4/24/2017 12:00:00 AM | 4/24/2017 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10261 | Mandatory 2017 Legal Update, 2-hours COE credit | 16-113P | 0001 | 4/29/2017 12:13:20 PM | 4/29/2017 12:13:20 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10524 | Use of | 17-080 | 0008 | 6/1/2017 | 6/1/2017 | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 57 | | | | | | Total: 128.50 | Total: 138.5 | Total: 894.50 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew C Brown, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cover and Movement Refresher | | | 3:00:00 PM | 3:00:00 PM | | | | | | |
| KUV-MC | 05 - Request and View Time Off - Video | | 0001 | 9/30/2017 7:46:27 AM | 9/30/2017 7:46:27 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| KUV-EN | 01 - Employee Navigator - Video | | 0001 | 10/6/2017 10:20:52 PM | 10/6/2017 10:20:52 PM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| PD10471 | Taser X2 Transition Course | 17-089 | 0022 | 11/3/2017 12:00:00 AM | 11/3/2017 12:00:00 AM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD10525 | Tactical Building Search Refresher and Live Firehouse | 17-098 | 0047 | 11/15/2017 4:00:00 PM | 11/15/2017 4:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10480 | Asset Forfeiture Annual Training | | 0001 | 1/19/2018 7:48:04 AM | 1/19/2018 7:48:04 AM | 0 | 0 | 1 | $0.00 | | LC |
| PD10479 | Use of Naloxone (Narcan) | 17-096 | 0001 | 1/26/2018 7:38:16 AM | 1/26/2018 7:38:16 AM | 1.5 | 0 | 1.5 | $0.00 | | LC |
| Count: 57 | | | | | | Total: 128.50 | Total: 138.5 | Total: 894.50 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew C Brown, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nasal Spray by Law Enforcement for Opioid Overdose | | | | | | | | | | |
| PD8276 | Carotid Control Technique Refresher | 18-006 | 0176 | 3/26/2018 7:00:00 AM | 3/22/2018 7:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10605 | Individual First Aid Kit Use | 18-010 | 0025 | 5/21/2018 8:00:00 AM | 5/21/2018 8:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable Baton Refresher | 18-054 | 0124 | 5/21/2018 9:00:00 AM | 5/21/2018 9:00:00 AM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| PD8306 | Basic Weapon Manipulation Refresher | 18-060 | 0101 | 5/21/2018 9:00:00 AM | 5/21/2018 9:00:00 AM | 0 | 3 | 0.0 | $0.00 | | LC |
| PD1759 | Rapid Deployment | 18-052 | 0203 | 6/28/2018 12:00:00 AM | 6/28/2018 12:00:00 AM | 3.5 | 6.5 | 0.0 | $0.00 | | PeopleSoft |
| PD10644 | Precision Immobilization Technique-Role of The Support | 18-065 | 0001 | 7/1/2018 7:12:47 AM | 7/1/2018 7:12:47 AM | 0.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 57 | | | | | | Total: 128.50 | Total: 138.5 | Total: 894.50 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew C Brown, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Officer | | | | | | | | | | |
| PD10778 | One-Handed Survival Skills and Use of Cover in Low Light | 18-072 | 0006 | 10/22/2018 8:00:00 AM | 10/22/2018 8:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10709 | ICAT | 18-089 | 0012 | 11/6/2018 5:00:00 PM | 11/6/2018 5:00:00 PM | 10 | 0 | 0.0 | $0.00 | | LC |
| PD10777 | ICAT Introduction | 18-089 | 0001 | 12/16/2018 7:34:30 AM | 12/16/2018 7:34:30 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10806 | Animal Cruelty Investigations and Prosecution and the Link to Human Violence | 18-073 | 0001 | 1/8/2019 7:54:24 AM | 1/8/2019 7:54:24 AM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10809 | 2018 Legal Update | 18-91 | 0001 | 1/27/2019 7:54:32 AM | 1/27/2019 7:54:32 AM | 1.25 | 0 | 0.0 | $0.00 | | LC |
| PD6046 | Basic SWAT School | 20-009 | 55 | 2/13/2019 12:00:00 AM | 2/13/2020 12:00:00 AM | 33 | 47 | 0.0 | $0.00 | | LC |
| PD2410 | Patrol Rifle Operator | 19-063 | 0062 | 3/29/2019 12:00:00 AM | 3/29/2019 12:00:00 AM | 8 | 32 | 0.0 | $0.00 | | LC |
| Count: 57 | | | | | | Total: 128.50 | Total: 138.5 | Total: 894.50 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew C Brown, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD10870 | Mass Casualty Response | 19-050 | 0022 | 5/8/2019 12:00:00 AM | 5/8/2019 12:00:00 AM | 4 | 4 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 19-013 | 0235 | 5/8/2019 11:00:00 AM | 5/8/2019 11:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10884 | House Bill 2502 | 19-065 | 0001 | 6/3/2019 5:59:51 AM | 6/3/2019 5:59:51 AM | 0.5 | 0 | 0.0 | $0.00 | | LC |
| PD10829 | Know Your Authority | V19-001 | 0021 | 6/3/2019 12:00:00 PM | 6/3/2019 12:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10876 | 2nd Quarter Rifle | 19-057 | 0039 | 6/12/2019 10:00:00 AM | 6/12/2019 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10963 | House Bill 2502 | 19-065 | 0010 | 6/17/2019 8:00:00 AM | 6/17/2019 8:00:00 AM | 0.5 | 0 | 0.0 | $0.00 | | LC |
| PD10887 | Fair and Impartial Policing | V19-002 | 0011 | 7/22/2019 12:00:00 AM | 7/22/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10956 | 2019 3rd Quarter Training: Decision Shoot, Gas Mask Fit Test & Handgun | 19-064 | 0152 | 8/5/2019 7:00:00 AM | 8/5/2019 7:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| Count: 57 | | | | | | Total: 128.50 | Total: 138.5 | Total: 894.50 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew C Brown, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Inspection | | | | | | | | | | |
| PD10975 | 2019 3rd Quarter Rifle Shoot | 19-066 | 0003 | 8/30/2019 10:00:00 AM | 8/30/2019 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10968 | 2019 Rifle and Shotgun Inspection | | 0060 | 9/3/2019 10:00:00 AM | 9/3/2019 10:00:00 AM | 0 | 0 | 1 | $0.00 | | LC |
| PD11044 | MPD 2019 Suicide Awareness | 19-061 | 0001 | 9/15/2019 4:54:13 AM | 9/15/2019 4:54:13 AM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD10981 | Basic Handgun Manipulation Refresher | 19-048 | 0043 | 10/28/2019 9:00:00 AM | 10/28/2019 9:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD11071 | 2019 Legal Update - Mandatory Training | 19-95 | 0001 | 11/16/2019 8:09:53 AM | 11/16/2019 8:09:53 AM | 1.25 | 0 | 0.0 | $0.00 | | LC |
| PD11074 | Zero Confirmation, Distance Shooting, Box Drills and Chaos 31 | 19-079 | 0038 | 12/13/2019 12:00:00 PM | 12/13/2019 12:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD11117 | 1st Quarter 2020 Mesa | 20-006 | 0020 | 2/28/2020 11:00:00 | 2/28/2020 11:00:00 | 0 | 4 | 0.0 | $0.00 | | LC |
| Count: 57 | | | | | | Total: 128.50 | Total: 138.5 | Total: 894.50 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew C Brown, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | PD Rifle Qualification course | | | AM | AM | | | | | | |
| | Versaterm MDT 7.7 Training | | | 8/9/2020 11:30:58 PM | 8/9/2020 11:30:58 PM | 0.0 | 0.0 | 0.5 | $0.00 | | LC |
| PD4653 | Sabre Red Mark 9 Familiarization | 20-007 | 0034 | 9/27/2020 11:00:00 PM | 9/27/2020 12:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD11203 | Duty to Intervene | 20-032 | 0023 | 9/29/2020 7:00:00 AM | 9/29/2020 12:00:00 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| PD11224 | 40mm Less Lethal Certification Course | 20-043 | 0002 | 10/2/2020 12:00:00 AM | 10/2/2020 12:00:00 AM | 0.0 | 10 | 0.0 | $0.00 | | LC |
| PD7784 | Rifle Operator | 20-023 | 0033 | 10/16/2020 11:00:00 AM | 10/16/2020 12:00:00 AM | 0.0 | 4 | 0.0 | $0.00 | | LC |
| PD11258 | Advanced Patrol Tactics | 21-010 | 0025 | 6/5/2021 4:00:00 AM | 6/4/2021 12:00:00 AM | 6 | 4 | 0.0 | $0.00 | | LC |
| 18-075 | Intro to FTO | | | 10/23/2021 7:31:42 AM | 10/23/2021 7:31:42 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| 18-076 | FTO Legal Considerations | | | 10/23/2021 7:44:53 AM | 10/23/2021 7:44:53 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| Count: 57 | | | | | | Total: 128.50 | Total: 138.5 | Total: 894.50 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew C Brown, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 18-080 | FTO Adult Learning & Training for Success | | | 10/27/2021 6:59:52 AM | 10/27/2021 6:59:52 AM | 2 | 0.0 | 0.25 | $0.00 | | LC |
| 18-078 | FTO Program Policy and OIT Checklist | | | 10/27/2021 7:29:25 AM | 10/27/2021 7:29:25 AM | 1.5 | 0.0 | 0.0 | $0.00 | | LC |
| 18-085 | FTO Ethics and Apathy | | | 11/2/2021 7:53:58 AM | 11/2/2021 7:53:58 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| Count: 57 | | | | | | Total: 128.50 | Total: 138.5 | Total: 894.50 | $0.00 | | |

| Full Name | Badge # | Course Title | Date Completed | POST Hours | SEAT Hours |
|---|---|---|---|---|---|
| Cameron, Kyle | 20495 | FN303 LESS LETHAL LAUNCHER OPERATOR COURSE | 02/27/2020 | | 4 |
| Cameron, Kyle | 20495 | Taser 7 Transition Course | 04/18/2022 | 2 | |
| Cameron, Kyle | 20495 | Accountability Bulletin, 1st Quarter 2022 | 06/01/2022 | | |
| Cameron, Kyle | 20495 | Preventing Harassment and Discrimination | 06/01/2022 | | 0.5 |
| Cameron, Kyle | 20495 | Airborne and Bloodborne Pathogens | 06/02/2022 | | 1 |
| Cameron, Kyle | 20495 | RETIRED Active Shooter: Recognition and Basic Response | 06/25/2022 | | 1 |
| Cameron, Kyle | 20495 | Active Shooter Response Training Bulletin | 06/25/2022 | | 0.5 |
| Cameron, Kyle | 20495 | Use of Deadly Force Training | 06/28/2022 | | 2 |
| Cameron, Kyle | 20495 | 2022 AZPOST Qualification | 12/31/2022 | 1 | |
| Cameron, Kyle | 20495 | Decision Shoot | 07/27/2022 | 1 | |
| Cameron, Kyle | 20495 | K9 Operations Refresher | 08/04/2022 | | |
| Cameron, Kyle | 20495 | COM 2022 Initiatives in Mental Illness & Policing | 08/04/2022 | | |
| Cameron, Kyle | 20495 | Indian Country Jurisdiction | 08/04/2022 | | |
| Cameron, Kyle | 20495 | Accountability Bulletin, 2nd Quarter 2022 | 08/04/2022 | | |
| Cameron, Kyle | 20495 | 2021-15 Asset Forfeiture Legal Update | 08/16/2022 | | |
| Cameron, Kyle | 20495 | 2022 2nd Qtr Rifle | 05/31/2022 | 4 | |
| Cameron, Kyle | 20495 | 2022 3rd Qtr Rifle | 09/30/2022 | 4 | |
| Cameron, Kyle | 20495 | Versaterm RMS 8.1 Update | 08/29/2022 | | |
| Cameron, Kyle | 20495 | Fire Extinguisher (Mandatory Training) | 10/24/2022 | | 0.25 |
| Cameron, Kyle | 20495 | Risk Management Bulletin | 10/24/2022 | | 0.5 |
| Cameron, Kyle | 20495 | Utilizing Drug Recognition Experts | 11/07/2022 | | 0.25 |
| Cameron, Kyle | 20495 | Good Tactics and Communications Skills | 11/09/2022 | | 0.25 |
| Cameron, Kyle | 20495 | Training Bulletin 2021-10 Tactical Awareness In and Around Facilities | 11/09/2022 | | |
| Cameron, Kyle | 20495 | Training Bulletin 2021-07 New Behavioral Health-Related Radio Codes | 11/09/2022 | | |
| Cameron, Kyle | 20495 | Officer/Victim Follow Up | 11/27/2022 | | |
| Cameron, Kyle | 20495 | Basic Firearm Safety | 12/13/2022 | 1 | |
| Cameron, Kyle | 20495 | Basic SWAT School | 10/13/2022 | 80 | |
| Cameron, Kyle | 20495 | Explosive Breacher Refresher & Requalification | 12/07/2022 | 24 | |
| Cameron, Kyle | 20495 | Accountability Bulletin, 3rd Quarter 2022 | 01/16/2023 | | |
| Cameron, Kyle | 20495 | 2023 Bean Bag Recertification | 01/17/2023 | 2 | |
| Cameron, Kyle | 20495 | 2023 40mm RE-certification | 01/17/2023 | 2 | |
| Cameron, Kyle | 20495 | Less Lethal Recert Bean Bag 40mm | 01/17/2023 | 4 | |
| Cameron, Kyle | 20495 | 2023 AZPOST Qualification | 03/06/2023 | 1 | |
| Cameron, Kyle | 20495 | 2023-01 Burglary Investigations at Gun Stores Training Bulletin | 03/17/2023 | | 0.25 |
| Cameron, Kyle | 20495 | Pistol Mounted Optics Instructor | 03/03/2023 | 16 | |
| Cameron, Kyle | 20495 | Basic SWAT School | 02/23/2023 | 80 | |
| Cameron, Kyle | 20495 | Drug Impaired Driver Informational Training (DIDIT) | 05/18/2023 | | 3.5 |
| Cameron, Kyle | 20495 | Street Racing Bulletin | 03/30/2023 | | 0.5 |
| Cameron, Kyle | 20495 | Admin Per Se Affidavit Update (Mandatory Training) | 03/30/2023 | | 0.25 |
| Cameron, Kyle | 20495 | Resource Guide for Elder Abuse | 03/30/2023 | | 0.25 |
| Cameron, Kyle | 20495 | Water Rescue (Throw Bag) Training | 03/30/2023 | | 1 |
| Cameron, Kyle | 20495 | E-Ticket Training | 03/30/2023 | | 0.5 |
| Cameron, Kyle | 20495 | Ballistic and Manual Train the Trainer Certification | 03/24/2023 | | 40 |
| Cameron, Kyle | 20495 | New RMS Function *Mandatory* | 05/17/2023 | | 0.5 |
| Cameron, Kyle | 20495 | Fatal and Serious Injury Training Bulletin | 05/17/2023 | | 0.5 |
| Cameron, Kyle | 20495 | PepperBall 2023 | 05/30/2023 | 10 | |
| Cameron, Kyle | 20495 | Search & Seizure | 05/31/2023 | 2 | |
| Cameron, Kyle | 20495 | RETIRED P1A Tutorials: Basic User Overview | 06/09/2023 | | 0.25 |
| Cameron, Kyle | 20495 | Investigating Hate/Bias Crimes | 06/09/2023 | | |
| Cameron, Kyle | 20495 | Hate Crimes Training For Law Enforcement | 06/09/2023 | | 1 |
| Cameron, Kyle | 20495 | Submitting Property/Evidence | 07/04/2023 | | 0.25 |
| Cameron, Kyle | 20495 | 2023 2nd Qtr Pistol - Dry Fire | 06/27/2023 | 2 | |
| Cameron, Kyle | 20495 | Active Shooter #2 | 07/07/2023 | 4.5 | |
| Cameron, Kyle | 20495 | CrimeTracer (Coplink X) | 08/11/2023 | | 0.5 |
| Cameron, Kyle | 20495 | Decision Shoot | 11/28/2023 | 2 | |
| Cameron, Kyle | 20495 | Accountability Bulletin, 3rd Quarter 2023 | 01/26/2024 | | |
| Cameron, Kyle | 20495 | Indian Country Jurisdiction | 01/26/2024 | | |
| Cameron, Kyle | 20495 | 2024 Beanbag ReCertifications | 02/21/2024 | 2 | |
| Cameron, Kyle | 20495 | 2024 40mm ReCertification | 01/23/2024 | 2 | |
| Cameron, Kyle | 20495 | SAU - Close Quarters Battle School | 03/13/2024 | 40 | |
| Cameron, Kyle | 20495 | Basic SWAT School | 02/22/2024 | 80 | |
| Cameron, Kyle | 20495 | 2024 AZPOST | 03/22/2024 | 2 | |
| Cameron, Kyle | 20495 | Basic Gang Liaison School 2024 | 03/15/2024 | 16 | |
| Cameron, Kyle | 20495 | Physical Trainer Instructor | 09/14/2023 | 40 | |
| Cameron, Kyle | 20495 | RMS Refresher Training | 06/06/2024 | 21.5 | |
| Cameron, Kyle | 20495 | 2024 2nd Qtr Bounding/Peels (24-036) | 05/14/2024 | 4 | |
| Cameron, Kyle | 20495 | THE EAST VALLEY CRITICAL INCIDENT RESPONSE TEAM | 06/26/2024 | | 0.25 |
| Cameron, Kyle | 20495 | STOP STICKS Refresher | 06/26/2024 | | 0.5 |

| | | | | | |
|---|---|---|---|---|---|
| Cameron, Kyle | 20495 | Phoenix Machine Gun Conversion | 06/26/2024 | | 0.25 |
| Cameron, Kyle | 20495 | 2024 Rifle Instructor School | 06/03/2024 | 40 | |
| **1 users in total** | | | | **490** | **60.5** |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00649 | (Employee) Preventing Discrimination and Harassment | | 0001 | | 3/19/2019 6:04:02 PM | 0.0 | 0.0 | 0.75 | $0.00 | | LC |
| C00303 | New Employee Orientation Training for New Hires (PD) | | 0736 | 10/15/2014 12:00:00 PM | 10/15/2014 12:00:00 PM | 0.0 | 0.0 | 4 | $0.00 | | LC |
| NEO 1 HW01 | NEO Health and Wellness (PD) | | 0010 | 10/15/2014 2:00:00 PM | 10/15/2014 2:00:00 PM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| SNEOPD | New Employee Orientation for Police Officers (Safety Training) | | 0003 | 10/15/2014 5:00:00 PM | 10/15/2014 5:00:00 PM | 3 | 0.0 | 3 | $0.00 | | LC |
| PD4464 | ICS100 - Incident Command System - Introduction to | | 0079 | 10/27/2014 12:00:00 AM | 10/27/2014 12:00:00 AM | 0 | 0 | 3 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD4613 | National Incident Management System - Introduction | | 0047 | 10/27/2014 12:00:00 AM | 10/27/2014 12:00:00 AM | 0 | 0 | 3 | $0.00 | | LC |
| C00541 | New Employee Orientation (Customer Service & Workplace Harassment / Discrimination) | | 0034 | 10/28/2014 5:00:00 PM | 10/28/2014 5:00:00 PM | 0.0 | 0.0 | 3.75 | $0.00 | | LC |
| PD7348 | Taser X2 User Certification | 14-101 | 0014 | 11/4/2014 3:00:00 PM | 11/4/2014 3:00:00 PM | 6 | 0 | 0.0 | $0.00 | | LC |
| PD8164 | Survival Spanish | 14-098 | 0002 | 12/22/2014 4:00:00 PM | 12/22/2014 4:00:00 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 15-003 | 0034 | 2/2/2015 8:00:00 AM | 2/2/2015 8:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 15-055 | 0028 | 4/6/2015 7:00:00 AM | 4/6/2015 7:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD8301 | Pursuit and Stopsticks Review | 15-069 | 0007 | 6/3/2015 8:00:00 AM | 6/3/2015 8:00:00 AM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 15-064 | 0067 | 6/3/2015 9:00:00 AM | 6/3/2015 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD9877 | Tactical Decision Making Scenarios | 15-095 | 0008 | 6/3/2015 10:30:00 AM | 6/3/2015 10:30:00 AM | 0.0 | 1.5 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 15-066 | 161 | 6/3/2015 2:00:00 PM | 6/3/2015 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8302 | Top 10 Constitutional Law Cases Every Officer Should Know | 15-016 | 0007 | 6/3/2015 3:00:00 PM | 6/3/2015 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8303 | Domestic Violence Law Enforcement Refresher | 15-060 | 0007 | 6/3/2015 4:00:00 PM | 6/3/2015 4:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8304 | Mental Illness Refresher | 15-068 | 0007 | 6/3/2015 5:00:00 PM | 6/3/2015 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD9875 | Sovereign | 15-119 | 0012 | 7/30/2015 | 7/30/2015 | 4 | 0.0 | 0.0 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Citizen Extremists (With CA POST DVD) | | | 12:00:00 AM | 12:00:00 AM | | | | | | |
| PD9886 | Light Rail Safety Certification | | 0002 | 8/24/2015 7:00:00 AM | 8/24/2015 7:00:00 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| PD2410 | Patrol Rifle Operator | 15-100 | 0050 | 10/2/2015 2:00:00 PM | 10/2/2015 2:00:00 PM | 8 | 32 | 0.0 | $0.00 | | LC |
| PD10067 | Tactical Mindset and Options on Traffic Stops-Refresher | 15-105 | 0001 | 10/30/2015 10:00:00 AM | 10/30/2015 10:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD5193 | Immediate Action Teams for Patrol | 15-106 | 0077 | 11/2/2015 6:00:00 AM | 11/2/2015 6:00:00 AM | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD9879 | Use of Deadly Force / Contagious Fire | 15-098 | 0036 | 11/2/2015 8:00:00 AM | 11/2/2015 8:00:00 AM | 1 | 1 | 0.0 | $0.00 | | LC |
| PD9888 | Modified Navy Qualification | 15-093 | 0031 | 11/9/2015 1:00:00 PM | 11/9/2015 1:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD5848 | Precision Immobilization Technique (P.I.T.) | 15-008 | 0018 | 11/11/2015 5:00:00 PM | 11/11/2015 5:00:00 PM | 1 | 9 | 0.0 | $0.00 | | LC |
| PD9890 | Malfunction Clearance Drills | 15-101 | 0007 | 11/30/2015 10:00:00 AM | 11/30/2015 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD9878 | 2015 Legal Update | 15-327 | 0004 | 12/31/2015 12:00:00 AM | 12/31/2015 12:00:00 AM | 2 | 0.0 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable Baton Refresher | 16-004 | 0028 | 1/11/2016 9:30:00 AM | 1/11/2016 9:30:00 AM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| PD10078 | POST Rifle Instructor Qualification / Malfunction Clearance / Instructor Qualification | 16-050 | 0032 | 2/17/2016 1:00:00 PM | 2/17/2016 1:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10079 | F.I.T. Certification | 0717 | 0001 | 2/19/2016 12:00:00 AM | 2/19/2016 12:00:00 AM | 5 | 10 | 0.0 | $0.00 | | LC |
| PD10082 | Low Light Tactics and Flashlight | 16-061 | 0012 | 3/1/2016 6:30:00 AM | 3/1/2016 6:30:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Techniques Refresher | | | | | | | | | | |
| PD9892 | Tactics for the Street: Beat Level, "Boots on the Ground" Police Work | 14-447 | 0002 | 3/11/2016 12:00:00 AM | 3/11/2016 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10121 | Bounding Over Watch | 16-059 | 0031 | 4/18/2016 1:00:00 PM | 4/18/2016 1:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10120 | Incident De-Escalation and Tactics | 16-087 | 0014 | 6/13/2016 4:00:00 PM | 6/13/2016 4:00:00 PM | 3 | 5 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 16-088 | 0108 | 6/13/2016 6:00:00 PM | 6/13/2016 6:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 16-102 | 0092 | 6/14/2016 9:00:00 AM | 6/14/2016 9:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10162 | Armed Career Criminal | 16-V009 | 0001 | 7/7/2016 12:00:00 AM | 7/7/2016 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10171 | Pillars of Narcotic Enforcement | ANOA 2016-001 | 0001 | 7/18/2016 6:00:00 PM | 7/18/2016 6:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD3715 | Street Development | ANOA 2016-004 | 0008 | 7/19/2016 12:00:00 | 7/19/2016 12:00:00 | 4 | 0 | 0.0 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | AM | AM | | | | | | |
| PD8043 | Social Media | ANOA 2016-007 | 0005 | 7/19/2016 5:00:00 PM | 7/19/2016 5:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10179 | Investigative Techniques for Undercover Officers | 2016-011 | 0001 | 7/20/2016 12:00:00 AM | 7/20/2016 12:00:00 AM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD3881 | Consensual Encounters | ANOA 2016-008 | 0004 | 7/20/2016 5:00:00 PM | 7/20/2016 5:00:00 PM | 4 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD10178 | Medical Marijuana / Legalization | ANOA 2016-006 | 0001 | 7/21/2016 12:00:00 AM | 7/21/2016 12:00:00 AM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10135 | First Response Resiliency Skills | 16-092 | 0017 | 9/21/2016 12:00:00 AM | 9/21/2016 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10118 | Heart Fit for Duty | 15-478 | 0022 | 9/21/2016 12:00:00 AM | 9/21/2016 12:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10235 | Qualification Course, Basic Marksmanship and Malfunction Course | 16-110 | 0014 | 10/10/2016 6:00:00 PM | 10/10/2016 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD7880 | Patrol Rifle-Flanking Maneuvers | 16-138 | 0040 | 11/15/2016 10:30:00 AM | 11/15/2016 10:30:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| C00483 | Workplace Harassment and Discrimination Refresher Video | | 0166 | 1/15/2017 11:10:00 PM | 1/15/2017 11:10:00 PM | 0.0 | 0.0 | 0.25 | $0.00 | | LC |
| PD10390 | Low Light Malfunction Clearances, Qualification and Flashlight Techniques Using Cover | 17-073 | 0031 | 3/7/2017 9:00:00 PM | 3/7/2017 9:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10420 | 1-5, Half and Half, Chaos and Set it Off Drills | 17-056 | 0010 | 4/12/2017 10:00:00 AM | 4/12/2017 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD1402 | Tactical Operations in Hazardous Environments, SCBA Use, | | 0001 | 5/5/2017 12:00:00 AM | 5/5/2017 12:00:00 AM | 0 | 0 | 40 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | and Tactical Deployment | | | | | | | | | | |
| PD10261 | Mandatory 2017 Legal Update, 2-hours COE credit | 16-113P | 0001 | 5/8/2017 7:45:40 AM | 5/8/2017 7:45:40 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10372 | Squad Operations Tactics Training | 17-059 | 0043 | 6/19/2017 3:00:00 AM | 6/19/2017 3:00:00 AM | 2 | 3 | 0.0 | $0.00 | | LC |
| KUV-MC | 05 - Request and View Time Off - Video | | 0001 | 9/18/2017 7:09:44 AM | 9/18/2017 7:09:44 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| KUV-EN | 01 - Employee Navigator - Video | | 0001 | 9/18/2017 7:35:37 AM | 9/18/2017 7:35:37 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| PD10608 | Confirmation of Zero with Federal Ammo, Distance Shooting Qualification | 17-101 | 0003 | 9/25/2017 1:00:00 PM | 9/25/2017 1:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10524 | Use of | 17-080 | 0091 | 10/15/2017 | 10/15/2017 | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cover and Movement Refresher | | | 8:00:00 AM | 8:00:00 AM | | | | | | |
| PD10479 | Use of Naloxone (Narcan) Nasal Spray by Law Enforcement for Opioid Overdose | 17-096 | 0001 | 11/21/2017 10:49:06 AM | 11/21/2017 10:49:06 AM | 1.5 | 0 | 1.5 | $0.00 | | LC |
| PD10471 | Taser X2 Transition Course | 17-089 | 0063 | 12/20/2017 4:00:00 PM | 12/20/2017 4:00:00 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD1944 | K-9 Agitator Course | 18-005 | 0022 | 1/10/2018 11:00:00 PM | 1/10/2018 11:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10535 | AZPOST Mandatory Legal Update 2017 / 2018 | 17-84 | 0001 | 3/7/2018 12:52:48 PM | 3/7/2018 12:52:48 PM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 18-006 | 0195 | 3/20/2018 1:00:00 PM | 3/20/2018 1:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable | 18-054 | 0133 | 5/15/2018 | 5/15/2018 | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Baton Refresher | | | 1:00:00 PM | 1:00:00 PM | | | | | | |
| PD10605 | Individual First Aid Kit Use | 18-010 | 0034 | 6/5/2018 10:00:00 AM | 6/5/2018 10:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 18-060 | 0159 | 6/5/2018 12:00:00 PM | 6/5/2018 12:00:00 PM | 0 | 3 | 0.0 | $0.00 | | LC |
| PD1759 | Rapid Deployment | 18-052 | 0203 | 6/28/2018 12:00:00 AM | 6/28/2018 12:00:00 AM | 3.5 | 6.5 | 0.0 | $0.00 | | PeopleSoft |
| | Tuition Assistance Program Orientation | | | 9/20/2018 9:05:51 PM | 9/20/2018 9:05:51 PM | 0.0 | 0.0 | 0.15 | $0.00 | | LC |
| PD10777 | ICAT Introduction | 18-089 | 0001 | 10/11/2018 1:02:31 PM | 10/11/2018 1:02:31 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10778 | One-Handed Survival Skills and Use of Cover in Low Light | 18-072 | 0049 | 10/30/2018 10:00:00 PM | 10/30/2018 10:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD2965 | General Instructors School | 18-098 | 0030 | 12/14/2018 12:00:00 AM | 12/14/2018 12:00:00 AM | 40 | 0 | 0.0 | $0.00 | | PeopleSoft |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD10806 | Animal Cruelty Investigations and Prosecution and the Link to Human Violence | 18-073 | 0001 | 12/19/2018 11:11:48 AM | 12/19/2018 11:11:48 AM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD5076 | Firearms Instructor School | 19-1 | 0048 | 1/18/2019 12:00:00 AM | 1/18/2019 12:00:00 AM | 0 | 80 | 0.0 | $0.00 | | LC |
| PD10870 | Mass Casualty Response | 19-050 | 0026 | 5/22/2019 12:00:00 AM | 5/22/2019 12:00:00 AM | 4 | 4 | 0.0 | $0.00 | | LC |
| PD10981 | Basic Handgun Manipulation Refresher | 19-048 | 0014 | 5/29/2019 12:00:00 AM | 5/29/2019 12:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10829 | Know Your Authority | V19-001 | 0020 | 5/31/2019 5:00:00 PM | 5/31/2019 5:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10709 | ICAT | 19-039 | 0037 | 6/18/2019 12:00:00 AM | 6/18/2019 12:00:00 AM | 10 | 0 | 0.0 | $0.00 | | LC |
| PD10887 | Fair and Impartial Policing | V19-002 | 0007 | 6/18/2019 12:00:00 AM | 6/18/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10956 | 2019 3rd | 19-064 | 0085 | 7/11/2019 | 7/11/2019 | 0 | 1 | 0.0 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Quarter Training: Decision Shoot, Gas Mask Fit Test & Handgun Inspection | | | 1:00:00 PM | 1:00:00 PM | | | | | | |
| PD10984 | Power Hour Training for Patrol | 19-062 | 0001 | 7/31/2019 9:37:38 AM | 7/31/2019 9:37:38 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10968 | 2019 Rifle and Shotgun Inspection | | 0069 | 9/5/2019 11:00:00 AM | 9/5/2019 11:00:00 AM | 0 | 0 | 1 | $0.00 | | LC |
| PD11044 | MPD 2019 Suicide Awareness | 19-061 | 0001 | 9/26/2019 3:26:10 PM | 9/26/2019 3:26:10 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD10162 | Armed Career Criminal | V19-003 | 0004 | 10/22/2019 12:00:00 AM | 10/22/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10849 | Tactical Training for Supervisors | 19-002 | 0003 | 10/22/2019 12:00:00 AM | 10/22/2019 12:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD11071 | 2019 Legal Update - Mandatory Training | 19-95 | 0001 | 11/20/2019 1:44:51 PM | 11/20/2019 1:44:51 PM | 1.25 | 0 | 0.0 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD7701 | FN303 Less Lethal Launcher Operator Course | 20-025 | 0006 | 2/27/2020 12:00:00 PM | 2/27/2020 12:00:00 AM | 4 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD11076 | Gender - Diverse Cultures | 19-132 | 0001 | 3/4/2020 12:18:16 PM | 3/4/2020 12:18:16 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| | COVID 19 Infection Control and Personal Protective Equipment (PPE) Guidance | | 0001 | 4/7/2020 11:09:11 AM | 4/7/2020 11:09:11 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| | Versaterm MDT 7.7 Training | | | 8/12/2020 1:58:24 PM | 8/12/2020 1:58:24 PM | 0.0 | 0.0 | 0.5 | $0.00 | | LC |
| | Mobile Field Force Refresher for Patrol | | | 10/29/2020 12:32:36 PM | 10/29/2020 12:32:36 PM | 0.5 | 0.0 | 0.0 | $0.00 | | LC |
| PD10412 | Active Shooter Incident Response Part 1 | 16-117-1 | 0001 | 12/21/2020 11:29:59 AM | 12/21/2020 11:29:59 AM | 3 | 0 | 0.0 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle C Cameron, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD10413 | Active Shooter Incident Response Part 2 | 16-117-2 | 0001 | 12/21/2020 11:34:12 AM | 12/21/2020 11:34:12 AM | 3.5 | 0 | 0.0 | $0.00 | | LC |
| PD10414 | Active Shooter Incident Response Part 3 | 16-117-3 | 0001 | 12/21/2020 11:35:33 AM | 12/21/2020 11:35:33 AM | 2.5 | 0 | 0.0 | $0.00 | | LC |
| C00541 | New Employee Orientation~Cust Svce & Harassment / Discrimination & Values (Police Recruits) | | 0170 | 4/27/2022 11:00:00 AM | 4/27/2022 11:00:00 AM | 0.0 | 0.0 | 3.75 | $0.00 | | LC |
| Count: 94 | | | | | | Total: 223.75 | Total: 202.0 | Total: 70.65 | $0.00 | | |

| Full Name | Badge # | Course Title | Date Completed | POST Hours | SEAT Hours |
|---|---|---|---|---|---|
| Chuey, Matthew | 21315 | RETIRED P1A Tutorials: Basic User Overview | 11/17/2020 | | 0.25 |
| Chuey, Matthew | 21315 | Versaterm RMS 8.1 Update | 03/09/2021 | | |
| Chuey, Matthew | 21315 | Hate Crimes Training For Law Enforcement | 04/13/2021 | | 1 |
| Chuey, Matthew | 21315 | E-Ticket Training | 05/18/2021 | | 0.25 |
| Chuey, Matthew | 21315 | Investigating Hate/Bias Crimes | 05/18/2021 | | |
| Chuey, Matthew | 21315 | Training Bulletin 2021-07 New Behavioral Health-Related Radio Codes | 07/22/2021 | | |
| Chuey, Matthew | 21315 | Training Bulletin 2021-10 Tactical Awareness In and Around Facilities | 08/17/2021 | | |
| Chuey, Matthew | 21315 | Officer/Victim Follow Up | 08/17/2021 | | |
| Chuey, Matthew | 21315 | Decision Shoot | 08/31/2021 | 1 | |
| Chuey, Matthew | 21315 | 2021-15 Asset Forfeiture Legal Update | 10/21/2021 | | 0.25 |
| Chuey, Matthew | 21315 | 2021 40mm Recertification | 11/10/2021 | 1 | |
| Chuey, Matthew | 21315 | Basic SWAT Slow and Deliberate Searching | 06/15/2021 | 4 | |
| Chuey, Matthew | 21315 | 2021 SWAT Rifle Qualification | 03/02/2021 | 1 | |
| Chuey, Matthew | 21315 | 2021 Bean Bag Recertification | 12/22/2021 | 1 | |
| Chuey, Matthew | 21315 | 2021 Firearm Instructors COE | 10/20/2021 | 1 | |
| Chuey, Matthew | 21315 | Taser 7 Transition Course | 09/30/2021 | 3 | |
| Chuey, Matthew | 21315 | Violent Offender Unit School | 01/14/2022 | 40 | |
| Chuey, Matthew | 21315 | K9 Agitator Course | 12/08/2021 | 4 | |
| Chuey, Matthew | 21315 | Good Tactics and Communications Skills | 03/10/2022 | | 0.25 |
| Chuey, Matthew | 21315 | Preventing Harassment and Discrimination | 03/22/2022 | | 0.5 |
| Chuey, Matthew | 21315 | Accountability Bulletin, 1st Quarter 2022 | 04/19/2022 | | |
| Chuey, Matthew | 21315 | Airborne and Bloodborne Pathogens | 06/09/2022 | | 1 |
| Chuey, Matthew | 21315 | RETIRED Active Shooter: Recognition and Basic Response | 06/07/2022 | | 1 |
| Chuey, Matthew | 21315 | Active Shooter Response Training Bulletin | 06/09/2022 | | 0.5 |
| Chuey, Matthew | 21315 | Use of Deadly Force Training | 06/14/2022 | 2 | |
| Chuey, Matthew | 21315 | Taser Recertification | 06/21/2022 | 2 | |
| Chuey, Matthew | 21315 | 2022 AZPOST Qualification | 12/31/2022 | 1 | |
| Chuey, Matthew | 21315 | K9 Operations Refresher | 08/03/2022 | | |
| Chuey, Matthew | 21315 | Accountability Bulletin, 2nd Quarter 2022 | 08/03/2022 | | |
| Chuey, Matthew | 21315 | 2022 Life Fire Instructor School | 08/23/2022 | 16 | |
| Chuey, Matthew | 21315 | Fire Extinguisher (Mandatory Training) | 10/25/2022 | | 0.25 |
| Chuey, Matthew | 21315 | Risk Management Bulletin | 10/25/2022 | | 0.5 |
| Chuey, Matthew | 21315 | Decision Shoot | 11/09/2022 | 1 | |
| Chuey, Matthew | 21315 | Utilizing Drug Recognition Experts | 11/29/2022 | | 0.25 |
| Chuey, Matthew | 21315 | Accountability Bulletin, 3rd Quarter 2022 | 12/13/2022 | | |
| Chuey, Matthew | 21315 | COM 2022 Initiatives in Mental Illness & Policing | 12/13/2022 | | |
| Chuey, Matthew | 21315 | Admin Per Se Affidavit Update (Mandatory Training) | 12/29/2022 | | 0.25 |
| Chuey, Matthew | 21315 | 2023 Bean Bag Recertification | 01/17/2023 | 2 | |
| Chuey, Matthew | 21315 | 2023 40mm RE-certification | 01/17/2023 | 2 | |
| Chuey, Matthew | 21315 | Less Lethal Recert Bean Bag 40mm | 01/17/2023 | 4 | |
| Chuey, Matthew | 21315 | 2023-01 Burglary Investigations at Gun Stores Training Bulletin | 02/17/2023 | | 0.25 |
| Chuey, Matthew | 21315 | 2023 AZPOST Qualification | 03/06/2023 | 1 | |
| Chuey, Matthew | 21315 | Resource Guide for Elder Abuse | 03/01/2023 | | 0.25 |
| Chuey, Matthew | 21315 | Basic SWAT School | 02/23/2023 | 80 | |
| Chuey, Matthew | 21315 | Street Racing Bulletin | 04/06/2023 | | 0.5 |
| Chuey, Matthew | 21315 | Water Rescue (Throw Bag) Training | 04/06/2023 | | 1 |
| Chuey, Matthew | 21315 | New RMS Function *Mandatory* | 05/17/2023 | | 0.5 |
| Chuey, Matthew | 21315 | PepperBall 2023 | 05/30/2023 | 10 | |
| Chuey, Matthew | 21315 | Search & Seizure | 05/31/2023 | 2 | |
| Chuey, Matthew | 21315 | Fatal and Serious Injury Training Bulletin | 06/21/2023 | | 0.5 |
| Chuey, Matthew | 21315 | Submitting Property/Evidence | 07/05/2023 | | 0.25 |
| Chuey, Matthew | 21315 | 2023 2nd Qtr Pistol - Dry Fire | 06/27/2023 | 2 | |
| Chuey, Matthew | 21315 | Active Shooter #2 | 07/07/2023 | 4.5 | |
| Chuey, Matthew | 21315 | Versaterm vMobile 2.0 | 08/01/2023 | | |
| Chuey, Matthew | 21315 | Critical Incident Leadership for Field Supervisors | 10/24/2023 | 16 | |
| Chuey, Matthew | 21315 | Decision Shoot | 11/28/2023 | 2 | |
| Chuey, Matthew | 21315 | Accountability Bulletin, 3rd Quarter 2023 | 12/19/2023 | | |
| Chuey, Matthew | 21315 | Fire Extinguisher (Mandatory Training) | 12/19/2023 | | 0.25 |
| Chuey, Matthew | 21315 | Airborne and Bloodborne Pathogens | 12/26/2023 | | 1 |
| Chuey, Matthew | 21315 | 2024 Beanbag ReCertifications | 02/21/2024 | 2 | |
| Chuey, Matthew | 21315 | 2024 40mm ReCertification | 01/23/2024 | 2 | |
| Chuey, Matthew | 21315 | High Risk Vehicle Stops HRVS (24-031) | 03/05/2024 | 4 | |
| Chuey, Matthew | 21315 | Basic SWAT School | 02/22/2024 | 80 | |
| Chuey, Matthew | 21315 | 2024 AZPOST | 03/18/2024 | 2 | |
| Chuey, Matthew | 21315 | STOP STICKS Refresher | 05/09/2024 | | 0.5 |
| Chuey, Matthew | 21315 | THE EAST VALLEY CRITICAL INCIDENT RESPONSE TEAM | 06/07/2024 | | 0.25 |
| Chuey, Matthew | 21315 | RMS Refresher Training | 06/06/2024 | 21.5 | |
| Chuey, Matthew | 21315 | 2024 2nd Qtr Bounding/Peels (24-036) | 05/14/2024 | 4 | |
| Chuey, Matthew | 21315 | Phoenix Machine Gun Conversion | 06/12/2024 | | 0.25 |
| Chuey, Matthew | 21315 | Ethics and Professionalism | 07/03/2024 | | 0.5 |
| Chuey, Matthew | 21315 | 2024 2nd Quarter Pistol | 05/03/2024 | 2 | |
| Chuey, Matthew | 21315 | IFAK Training | 07/26/2024 | | 0.5 |
| Chuey, Matthew | 21315 | Fire Extinguisher (Mandatory Training) | 09/30/2024 | | 0.25 |
| Chuey, Matthew | 21315 | 2024 PJJ ABC Certification 3rd Qtr (24-037) | 08/23/2024 | 4 | |
| Chuey, Matthew | 21315 | Crime Gun Training Bulletin | 09/16/2024 | | 0.5 |
| Chuey, Matthew | 21315 | 2024 - 4th Qtr Building Searches/AZPOST Decision Shoot/Taser 10 Upgrade (24-032) | 10/31/2024 | 10 | |
| Chuey, Matthew | 21315 | High Risk Traffic Stops on Stolen Vehicles | 11/11/2024 | | 0.5 |
| Chuey, Matthew | 21315 | 2024 4th Quarter Pistol | 11/25/2024 | 2.5 | |
| Chuey, Matthew | 21315 | 2024 4th Quarter Rifle - Bounding Overwatch Focused Fire | 11/18/2024 | 4 | |
| Chuey, Matthew | 21315 | 2025 1st Quarter Training - IA/Building Searches/HRVS (AZPOST 25-010) | 02/28/2025 | 4 | |
| Chuey, Matthew | 21315 | 2025 1st Qtr Pistol (AZ Post #25-003) | 02/28/2025 | 1 | |
| Chuey, Matthew | 21315 | Fiesta Patrol Booking | 03/24/2025 | | 0.5 |
| Chuey, Matthew | 21315 | 2025 1st Qtr Rifle (AZ Post #25-004) | 03/19/2025 | 4 | |

| | | | | | |
|---|---|---|---|---|---|
| Chuey, Matthew | 21315 | 2025 2nd Qtr Rifle (AZ Post #25-021) | 04/07/2025 | 4 | |
| Chuey, Matthew | 21315 | 2025 Bean Bag ReCert (AZ Post #25-021) | 04/09/2025 | 2 | |
| Chuey, Matthew | 21315 | 2025 AZ Post Quals - 2nd Qtr (AZ Post #25-011) | 04/09/2025 | 2 | |
| Chuey, Matthew | 21315 | 2025 2nd Quarter Training - DT/PJJ-ABC Refresher & Combatives/Weapon Retention/Protection (AZPOST 25-011) | 04/08/2025 | 4 | |
| Chuey, Matthew | 21315 | SWAT Team Leader Development Course | 03/14/2025 | 40 | |
| Chuey, Matthew | 21315 | Six Layer Concepts | 04/28/2025 | | 8 |
| Chuey, Matthew | 21315 | 2025 3rd Quarter Training - Active Assailant AZPOST 25-012 | 06/11/2025 | 4 | |
| Chuey, Matthew | 21315 | Electronic Workstation Files System | 06/17/2025 | | 0.5 |
| Chuey, Matthew | 21315 | New Axon Products | 06/17/2025 | | 0.25 |
| Chuey, Matthew | 21315 | Fire Extinguisher (Mandatory Training) | 06/17/2025 | | 0.25 |
| Chuey, Matthew | 21315 | 2025 3rd Qtr Rifle (AZ Post #25-005) | 07/07/2025 | 4 | |
| **1 users in total** | | | | **410.5** | **23.5** |

HMS 171a - PD Report - Student Training Hours Matthew Chuey, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00649 | (Employee) Preventing Discrimination and Harassment | | 0001 | | 3/27/2019 12:20:37 PM | 0.0 | 0.0 | 0.75 | $0.00 | | LC |
| PD4613 | National Incident Management System An Introduction | | 0069 | 7/5/2012 12:00:00 AM | 7/5/2012 12:00:00 AM | 3 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD8262 | Introduction to the Incident Command System for Law Enforcement | | 0006 | 12/31/2012 12:00:00 AM | 7/5/2012 12:00:00 AM | 0 | 0 | 3 | $0.00 | | LC |
| C00303 | New Employee Orientation Training for New Hires (LAT Police) | | 047 | 5/10/2016 12:00:00 PM | 5/10/2016 12:00:00 PM | 0.0 | 0.0 | 3.75 | $0.00 | | LC |
| SNEO | New Employee Orientation (Police | | 0023 | 5/10/2016 5:00:00 PM | 5/10/2016 5:00:00 PM | 3 | 0.0 | 3 | $0.00 | | LC |
| Count: 68 | | | | | | Total: 164.75 | Total: 254.5 | Total: 64.50 | $400.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Chuey, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Safety Training) | | | | | | | | | | |
| PD10125 | Collision avoidance, road course, pursuits and Mesa Policy- pd | 16-013 | 0001 | 5/11/2016 3:00:00 PM | 5/11/2016 3:00:00 PM | 2 | 6 | 0.0 | $0.00 | | LC |
| PD10137 | Use of Force Policy Review | 16-100 | 0001 | 5/18/2016 8:00:00 AM | 5/18/2016 8:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| C00541 | New Emp Orientation~CS & Harass / Discrim & Values | | 0058 | 5/31/2016 5:00:00 PM | 5/31/2016 5:00:00 PM | 0.0 | 0.0 | 3.75 | $0.00 | | LC |
| TE2016 | PD Recruits - Timekeeping: Managing Your Time | | PD01 | 6/2/2016 10:00:00 AM | 6/2/2016 10:00:00 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 16-102 | 0108 | 8/15/2016 9:00:00 AM | 8/15/2016 9:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10089 | Basic Crisis Intervention | 16-073 | 0030 | 8/15/2016 6:00:00 PM | 8/15/2016 6:00:00 PM | 8 | 0 | 0.0 | $0.00 | | LC |
| Count: 68 | | | | | | Total: 164.75 | Total: 254.5 | Total: 64.50 | $400.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Chuey, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Training | | | | | | | | | | |
| PD10120 | Incident De-Escalation and Tactics | 16-087 | 0032 | 8/16/2016 4:00:00 PM | 8/16/2016 4:00:00 PM | 3 | 5 | 0.0 | $0.00 | | LC |
| PD10235 | Qualification Course, Basic Marksmanship and Malfunction Course | 16-110 | 0031 | 10/24/2016 6:00:00 PM | 10/24/2016 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD7880 | Patrol Rifle-Flanking Maneuvers | 16-138 | 0050 | 11/28/2016 6:00:00 PM | 11/28/2016 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10135 | First Response Resiliency Skills | 16-092 | 0029 | 12/14/2016 12:00:00 AM | 12/14/2016 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10118 | Heart Fit for Duty | | 0031 | 12/14/2016 12:00:00 AM | 12/14/2016 12:00:00 AM | 0 | 0 | 2 | $0.00 | | LC |
| PD5076 | Firearms Instructor School | 17-01 | 0046 | 2/17/2017 12:00:00 AM | 2/17/2017 12:00:00 AM | 0 | 80 | 0.0 | $0.00 | | LC |
| PD10390 | Low Light Malfunction Clearances, | 17-073 | 0026 | 2/27/2017 9:00:00 PM | 2/27/2017 9:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| Count: 68 | | | | | | Total: 164.75 | Total: 254.5 | Total: 64.50 | $400.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Chuey, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Qualification and Flashlight Techniques Using Cover | | | | | | | | | | |
| PD10372 | Squad Operations Tactics Training | 17-059 | 0006 | 3/14/2017 11:00:00 AM | 3/14/2017 11:00:00 AM | 2 | 3 | 0.0 | $0.00 | | LC |
| C00483 | Workplace Harassment and Discrimination Refresher Video | | 0166 | 3/25/2017 2:44:33 AM | 3/25/2017 2:44:33 AM | 0.0 | 0.0 | 0.25 | $0.00 | | LC |
| PD10420 | 1-5, Half and Half, Chaos and Set it Off Drills | 17-056 | 0012 | 4/17/2017 10:00:00 AM | 4/17/2017 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10524 | Use of Cover and Movement Refresher | 17-080 | 0006 | 5/15/2017 3:00:00 PM | 5/15/2017 3:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD5412 | Less Lethal-Bean Bag Recertification | 17-053 | 0090 | 6/20/2017 8:00:00 AM | 6/20/2017 8:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| Count: 68 | | | | | | Total: 164.75 | Total: 254.5 | Total: 64.50 | $400.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Chuey, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| KUV-EN | 01 - Employee Navigator - Video | | 0001 | 9/17/2017 10:46:48 AM | 9/17/2017 10:46:48 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| KUV-MC | 05 - Request and View Time Off - Video | | 0001 | 9/17/2017 11:03:30 AM | 9/17/2017 11:03:30 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| PD8315 | Less Lethal-12 Gauge Bean Bag | 17-054 | 0005 | 9/25/2017 4:00:00 PM | 9/25/2017 4:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10469 | VirTra V-300 Familiarization and Training Capability | 17-091 | 0018 | 10/16/2017 8:30:00 AM | 10/16/2017 8:30:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10608 | Confirmation of Zero with Federal Ammo, Distance Shooting Qualification | 17-101 | 0018 | 10/16/2017 1:00:00 PM | 10/16/2017 1:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10261 | Mandatory 2017 Legal Update, 2-hours | 16-113P | 0001 | 10/16/2017 4:16:55 PM | 10/16/2017 4:16:55 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| Count: 68 | | | | | | Total: 164.75 | Total: 254.5 | Total: 64.50 | $400.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Chuey, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | COE credit | | | | | | | | | | |
| PD10525 | Tactical Building Search Refresher and Live Firehouse | 17-098 | 0019 | 10/20/2017 10:00:00 AM | 10/20/2017 10:00:00 AM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10412 | Active Shooter Incident Response Part 1 | 16-117-1 | 0001 | 11/10/2017 11:24:08 AM | 11/10/2017 11:24:08 AM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD10413 | Active Shooter Incident Response Part 2 | 16-117-2 | 0001 | 11/10/2017 3:28:45 PM | 11/10/2017 3:28:45 PM | 3.5 | 0 | 0.0 | $0.00 | | LC |
| PD10527 | 4th Quarter Rifle Response to Rapid Deployment Scenario | 17-097 | 0014 | 11/22/2017 6:00:00 PM | 11/22/2017 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10480 | Asset Forfeiture Annual Training | | 0001 | 12/20/2017 11:47:19 PM | 12/20/2017 11:47:19 PM | 0 | 0 | 1 | $0.00 | | LC |
| Count: 68 | | | | | | Total: 164.75 | Total: 254.5 | Total: 64.50 | $400.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Chuey, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD10471 | Taser X2 Transition Course | 17-089 | 0069 | 12/27/2017 5:00:00 PM | 12/27/2017 5:00:00 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD6451 | 1911 Pistol Transition | 18-001 | 0014 | 1/3/2018 12:00:00 AM | 1/3/2018 12:00:00 AM | 2 | 14 | 0.0 | $0.00 | | LC |
| PD8662 | Rifle Instructor School | 18-008 | 0009 | 1/26/2018 12:00:00 AM | 1/26/2018 12:00:00 AM | 20 | 20 | 0.0 | $0.00 | | PeopleSoft |
| PD10479 | Use of Naloxone (Narcan) Nasal Spray by Law Enforcement for Opioid Overdose | 17-096 | 0001 | 2/4/2018 5:52:34 PM | 2/4/2018 5:52:34 PM | 1.5 | 0 | 1.5 | $0.00 | | LC |
| PD10569 | Patrol Rifle Response to Personnel Bourne Improvised Explosive Devices 1st Quarter Rifle Shoot | 18-021 | 0021 | 2/26/2018 2:00:00 PM | 2/26/2018 2:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10535 | AZPOST Mandatory | 17-84 | 0001 | 3/4/2018 5:57:28 PM | 3/4/2018 5:57:28 PM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 68 | | | | | | Total: 164.75 | Total: 254.5 | Total: 64.50 | $400.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Chuey, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Legal Update 2017 / 2018 | | | | | | | | | | |
| PD10067 | Tactical Mindset and Options on Traffic Stops-Refresher | 18-007 | 0021 | 3/7/2018 4:00:00 PM | 3/7/2018 4:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 18-006 | 0195 | 3/20/2018 1:00:00 PM | 3/20/2018 1:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10605 | Individual First Aid Kit Use | 18-010 | 0023 | 5/14/2018 3:00:00 PM | 5/14/2018 3:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 18-060 | 0099 | 5/14/2018 4:00:00 PM | 5/14/2018 4:00:00 PM | 0 | 3 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable Baton Refresher | 18-054 | 0133 | 5/15/2018 1:00:00 PM | 5/15/2018 1:00:00 PM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| PD1759 | Rapid Deployment | 18-052 | 0203 | 6/28/2018 12:00:00 AM | 6/28/2018 12:00:00 AM | 3.5 | 6.5 | 0.0 | $0.00 | | PeopleSoft |
| PD10778 | One-Handed Survival | 18-072 | 0049 | 10/30/2018 10:00:00 | 10/30/2018 10:00:00 | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 68 | | | | | | Total: 164.75 | Total: 254.5 | Total: 64.50 | $400.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Chuey, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Skills and Use of Cover in Low Light | | | PM | PM | | | | | | |
| PD10162 | Armed Career Criminal | 17-002 | 0002 | 11/14/2018 12:00:00 AM | 11/14/2018 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD5603 | Arizona Tactical Officers Association Conference | 18-1102 | 0004 | 11/16/2018 12:00:00 AM | 11/16/2018 12:00:00 AM | 13.5 | 0 | 0.0 | $0.00 | | LC |
| PD10806 | Animal Cruelty Investigations and Prosecution and the Link to Human Violence | 18-073 | 0001 | 12/12/2018 10:52:36 AM | 12/12/2018 10:52:36 AM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10829 | Know Your Authority | V19-001 | 0005 | 4/11/2019 5:00:00 PM | 4/11/2019 5:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10870 | Mass Casualty Response | 19-050 | 0023 | 5/13/2019 12:00:00 AM | 5/13/2019 12:00:00 AM | 4 | 4 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 19-013 | 0236 | 5/13/2019 11:00:00 | 5/13/2019 11:00:00 | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 68 | | | | | | Total: 164.75 | Total: 254.5 | Total: 64.50 | $400.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Chuey, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | AM | AM | | | | | | |
| PD10981 | Basic Handgun Manipulation Refresher | 19-048 | 0014 | 5/29/2019 12:00:00 AM | 5/29/2019 12:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10709 | ICAT | 19-039 | 0037 | 6/18/2019 12:00:00 AM | 6/18/2019 12:00:00 AM | 10 | 0 | 0.0 | $0.00 | | LC |
| PD10887 | Fair and Impartial Policing | V19-002 | 0007 | 6/18/2019 12:00:00 AM | 6/18/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10956 | 2019 3rd Quarter Training: Decision Shoot, Gas Mask Fit Test & Handgun Inspection | 19-064 | 0017 | 6/26/2019 8:00:00 AM | 6/26/2019 8:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD11020 | ATOA Basic Sniper Course | 16-009 | 0001 | 8/16/2019 12:00:00 AM | 8/16/2019 12:00:00 AM | 10 | 30 | 0.0 | $0.00 | | LC |
| PD10968 | 2019 Rifle and Shotgun Inspection | | 0023 | 8/21/2019 2:00:00 PM | 8/21/2019 2:00:00 PM | 0 | 0 | 1 | $0.00 | | LC |
| PD10162 | Armed | V19-003 | 0004 | 10/22/2019 | 10/22/2019 | 8 | 0 | 0.0 | $0.00 | | LC |
| Count: 68 | | | | | | Total: 164.75 | Total: 254.5 | Total: 64.50 | $400.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Chuey, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Career Criminal | | | 12:00:00 AM | 12:00:00 AM | | | | | | |
| PD10849 | Tactical Training for Supervisors | 19-002 | 0003 | 10/22/2019 12:00:00 AM | 10/22/2019 12:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD11071 | 2019 Legal Update - Mandatory Training | 19-95 | 0001 | 11/19/2019 2:30:14 PM | 11/19/2019 2:30:14 PM | 1.25 | 0 | 0.0 | $0.00 | | LC |
| PD11044 | MPD 2019 Suicide Awareness | 19-061 | 0001 | 11/26/2019 4:02:25 PM | 11/26/2019 4:02:25 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD11076 | Gender - Diverse Cultures | 19-132 | 0001 | 1/31/2020 5:04:40 PM | 1/31/2020 5:04:40 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| | Versaterm MDT 7.7 Training | | | 8/11/2020 7:23:17 AM | 8/11/2020 7:23:17 AM | 0.0 | 0.0 | 0.5 | $0.00 | | LC |
| PD11241 | Close Quarters Battle / Night Vision School | | 0001 | 12/18/2020 12:00:00 AM | 12/18/2020 12:00:00 AM | 0.0 | 40 | 40 | $400.00 | | LC |
| PD10414 | Active Shooter Incident | 16-117-3 | 0001 | 12/21/2020 3:35:48 PM | 12/21/2020 3:35:48 PM | 2.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 68 | | | | | | Total: 164.75 | Total: 254.5 | Total: 64.50 | $400.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Chuey, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Response Part 3 | | | | | | | | | | |
| PD10477 | Human Trafficking | 14-444 | 0001 | 12/21/2020 5:55:31 PM | 12/21/2020 5:55:31 PM | 2.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 68 | | | | | | Total: 164.75 | Total: 254.5 | Total: 64.50 | $400.00 | | |

## Members Report from OPEN DATE to OPEN DATE on PoliceOne Academy

| Full Name | Badge # | Course Title | Date Completed | POST Hours | SEAT Hours |
|---|---|---|---|---|---|
| Freeman, Shawn T | 20207 | Hate Crimes Training For Law Enforcement | 04/14/2021 | | 1 |
| Freeman, Shawn T | 20207 | Versaterm RMS 8.1 Update | 04/14/2021 | | |
| Freeman, Shawn T | 20207 | Investigating Hate/Bias Crimes | 05/18/2021 | | |
| Freeman, Shawn T | 20207 | E-Ticket Training | 05/18/2021 | | 0.25 |
| Freeman, Shawn T | 20207 | Training Bulletin 2021-07 New Behavioral Health-Related Radio Codes | 07/22/2021 | | |
| Freeman, Shawn T | 20207 | Training Bulletin 2021-10 Tactical Awareness In and Around Facilities | 08/24/2021 | | |
| Freeman, Shawn T | 20207 | Decision Shoot | 08/31/2021 | | 1 |
| Freeman, Shawn T | 20207 | RETIRED P1A Tutorials: Basic User Overview | 09/07/2021 | | 0.25 |
| Freeman, Shawn T | 20207 | Mesa Police Department Professional Staff Survey | 11/09/2021 | | 0.25 |
| Freeman, Shawn T | 20207 | 2021Mossberg Armorer Course | 10/06/2021 | 16 | |
| Freeman, Shawn T | 20207 | 2021 40mm Recertification | 11/10/2021 | 1 | |
| Freeman, Shawn T | 20207 | Basic SWAT Slow and Deliberate Searching | 06/15/2021 | 4 | |
| Freeman, Shawn T | 20207 | 2021 SWAT Rifle Qualification | 03/02/2021 | 1 | |
| Freeman, Shawn T | 20207 | Officer/Victim Follow Up | 12/07/2021 | | |
| Freeman, Shawn T | 20207 | Advanced Firearm Instructor | 10/28/2021 | 24 | |
| Freeman, Shawn T | 20207 | Less Lethal, FSDD, Chemical Agent Instructor Certification Course | 11/05/2021 | 40 | |
| Freeman, Shawn T | 20207 | 2021 Bean Bag Recertification | 12/22/2021 | 1 | |
| Freeman, Shawn T | 20207 | Sig Sauer Academy | 04/06/2021 | | 20 |
| Freeman, Shawn T | 20207 | 2021 Firearm Instructors COE | 10/20/2021 | 1 | |
| Freeman, Shawn T | 20207 | First Responder Medical Training & Officer Tourniquet Application | 01/18/2022 | 2 | |
| Freeman, Shawn T | 20207 | Taser 7 Transition Course | 09/30/2021 | 3 | |
| Freeman, Shawn T | 20207 | K9 Agitator Course | 12/08/2021 | | 4 |
| Freeman, Shawn T | 20207 | Preventing Harassment and Discrimination | 03/22/2022 | | 0.5 |
| Freeman, Shawn T | 20207 | Good Tactics and Communications Skills | 03/31/2022 | | 0.25 |
| Freeman, Shawn T | 20207 | Accountability Bulletin, 1st Quarter 2022 | 05/19/2022 | | |
| Freeman, Shawn T | 20207 | Use of Deadly Force Training | 06/14/2022 | 2 | |
| Freeman, Shawn T | 20207 | Taser Recertification | 06/21/2022 | 2 | |
| Freeman, Shawn T | 20207 | 2022 AZPOST Qualification | 12/31/2022 | 1 | |
| Freeman, Shawn T | 20207 | Fire Extinguisher (Mandatory Training) | 10/25/2022 | | 0.25 |
| Freeman, Shawn T | 20207 | Decision Shoot | 11/09/2022 | 1 | |
| Freeman, Shawn T | 20207 | Sniper Instructor School | 10/21/2022 | 50 | |
| Freeman, Shawn T | 20207 | 2023 Bean Bag Recertification | 01/17/2023 | 2 | |
| Freeman, Shawn T | 20207 | 2023 40mm RE-certification | 01/17/2023 | 2 | |
| Freeman, Shawn T | 20207 | Less Lethal Recert Bean Bag 40mm | 01/17/2023 | 4 | |
| Freeman, Shawn T | 20207 | 2023 AZPOST Qualification | 03/06/2023 | 1 | |
| Freeman, Shawn T | 20207 | Drug Impaired Driver Informational Training (DIDIT) | 03/09/2023 | 3.5 | |
| Freeman, Shawn T | 20207 | Basic SWAT School | 02/23/2023 | 80 | |
| Freeman, Shawn T | 20207 | Search & Seizure | 04/13/2023 | | 2 |
| Freeman, Shawn T | 20207 | 2023 Live Fire House Instructor School | 04/24/2023 | 8 | |
| Freeman, Shawn T | 20207 | PepperBall 2023 | 05/30/2023 | 10 | |
| Freeman, Shawn T | 20207 | Search & Seizure | 05/31/2023 | | 2 |
| Freeman, Shawn T | 20207 | 2023 2nd Qtr Pistol - Dry Fire | 06/27/2023 | 2 | |
| Freeman, Shawn T | 20207 | Active Shooter #2 | 07/07/2023 | 4.5 | |
| Freeman, Shawn T | 20207 | 2024 Struggle Well - 24-042 | 02/02/2023 | 40 | |
| Freeman, Shawn T | 20207 | 2023 Livefire House Instructor | 04/24/2023 | 16 | |
| Freeman, Shawn T | 20207 | Decision Shoot | 11/28/2023 | 2 | |
| Freeman, Shawn T | 20207 | RMS Refresher Training | 12/15/2023 | 21.5 | |
| Freeman, Shawn T | 20207 | 2024 Beanbag ReCertifications | 02/21/2024 | 2 | |
| Freeman, Shawn T | 20207 | 2024 40mm ReCertification | 01/23/2024 | 2 | |
| Freeman, Shawn T | 20207 | High Risk Vehicle Stops HRVS (24-031) | 03/05/2024 | 4 | |
| Freeman, Shawn T | 20207 | Basic SWAT School | 02/22/2024 | 80 | |
| Freeman, Shawn T | 20207 | 2024 AZPOST | 03/18/2024 | 2 | |
| Freeman, Shawn T | 20207 | 2024 2nd Qtr Bounding/Peels (24-036) | 05/14/2024 | 4 | |
| Freeman, Shawn T | 20207 | Phoenix Machine Gun Conversion | 07/10/2024 | | 0.25 |
| Freeman, Shawn T | 20207 | THE EAST VALLEY CRITICAL INCIDENT RESPONSE TEAM | 06/12/2024 | | 0.25 |
| Freeman, Shawn T | 20207 | 2024 2nd Qtr Bounding/Peels (24-036) | 06/18/2024 | 4 | |
| Freeman, Shawn T | 20207 | 2024 Rifle Instructor School | 06/03/2024 | 40 | |
| Freeman, Shawn T | 20207 | Building Searches | 08/05/2024 | 4 | |
| Freeman, Shawn T | 20207 | Surround & Call | 06/14/2024 | | 4 |
| Freeman, Shawn T | 20207 | 2024 PJJ ABC Certification 3rd Qtr (24-037) | 08/06/2024 | 4 | |
| Freeman, Shawn T | 20207 | Containments | 08/01/2024 | | 4 |
| Freeman, Shawn T | 20207 | Open Area Apprehension | 09/13/2024 | | 4 |
| Freeman, Shawn T | 20207 | Containments | 09/06/2024 | | 4 |
| Freeman, Shawn T | 20207 | WRAP Restraint | 09/06/2024 | | 4 |
| Freeman, Shawn T | 20207 | 2024 PIT Certification - 24-039 | 08/08/2024 | 4 | |
| Freeman, Shawn T | 20207 | Water Rescue (Throw Bag) Training | 12/13/2024 | | 1 |
| Freeman, Shawn T | 20207 | High Risk Traffic Stops on Stolen Vehicles | 12/13/2024 | | 4 |
| Freeman, Shawn T | 20207 | Surround & Call | 11/01/2024 | | 4 |
| Freeman, Shawn T | 20207 | 2024 - 4th Qtr Building Searches/AZPOST Decision Shoot/Taser 10 Upgrade (24-032) | 08/27/2024 | 5 | |

| | | | | | |
|---|---|---|---|---|---|
| Freeman, Shawn T | 20207 | Violent Offender Unit School | 02/07/2025 | 40 | |
| Freeman, Shawn T | 20207 | 2025 Bean Bag ReCert (AZ Post #25-021) | 03/14/2025 | 2 | |
| Freeman, Shawn T | 20207 | 2025 40mm ReCertification (AZ Post #) | 03/14/2025 | 2 | |
| Freeman, Shawn T | 20207 | Pepperball - 25-031 | 03/14/2025 | 2 | |
| Freeman, Shawn T | 20207 | Building Searches | 01/10/2025 | 4 | |
| Freeman, Shawn T | 20207 | Building Searches | 03/14/2025 | 2 | |
| Freeman, Shawn T | 20207 | Containments | 01/17/2025 | | 4 |
| Freeman, Shawn T | 20207 | Axon VR Facilitator | 05/05/2025 | | 8 |
| Freeman, Shawn T | 20207 | Axon VR Facilitator | 05/06/2025 | | 3 |
| Freeman, Shawn T | 20207 | 2025 3rd Quarter Training - Active Assailant AZPOST 25-012 | 06/11/2025 | 4 | |
| Freeman, Shawn T | 20207 | Active Shooter Response Training Bulletin | 08/14/2025 | | 0.5 |
| Freeman, Shawn T | 20207 | Airborne and Bloodborne Pathogens | 08/18/2025 | | 1 |
| **1 users in total** | | | | **556.5** | **77.75** |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00649 | (Employee) Preventing Discrimination and Harassment | | 0001 | | 4/11/2019 3:12:34 PM | 0.0 | 0.0 | 0.75 | $0.00 | | LC |
| C00541 | New Employee Orientation (Customer Service & Workplace Harassment / Discrimination) | | 0028 | 4/29/2014 5:00:00 PM | 4/29/2014 5:00:00 PM | 0.0 | 0.0 | 3.75 | $0.00 | | LC |
| C00303 | New Employee Orientation | | 721 | 5/8/2014 12:00:00 PM | 5/8/2014 12:00:00 PM | 0.0 | 0.0 | 4 | $0.00 | | LC |
| C00303 | New Employee Orientation Training for New Hires | | 0724 | 7/22/2014 12:00:00 PM | 7/22/2014 12:00:00 PM | 0.0 | 0.0 | 4 | $0.00 | | LC |
| SNEOPD | New Employee Orientation for Police Officers (Safety | | 0002 | 7/22/2014 5:00:00 PM | 7/22/2014 5:00:00 PM | 3 | 0.0 | 3 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Training) | | | | | | | | | | |
| C00541 | PD New Employee Orientation (Customer Service & Workplace Harassment / Discrimination) | | 0037 | 7/23/2014 5:00:00 PM | 7/23/2014 5:00:00 PM | 0.0 | 0.0 | 3.75 | $0.00 | | LC |
| PD10135 | First Response Resiliency Skills | | 0045 | 12/4/2014 12:00:00 AM | 12/4/2014 12:00:00 AM | 0 | 0 | 8 | $0.00 | | LC |
| PD1500 | Academy | | 0042 | 12/18/2014 12:00:00 AM | 12/18/2014 12:00:00 AM | 0 | 0 | 840 | $0.00 | | PeopleSoft |
| PD7348 | Taser X2 User Certification | 14-101 | 0015 | 12/24/2014 1:00:00 PM | 12/24/2014 1:00:00 PM | 6 | 0 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 15-003 | 0024 | 1/26/2015 3:00:00 PM | 1/26/2015 3:00:00 PM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD7653 | The Nobility of Policing | | 0002 | 3/23/2015 12:00:00 PM | 3/23/2015 12:00:00 PM | 0 | 0 | 5 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD8306 | Basic Weapon Manipulation Refresher | 15-055 | 0041 | 4/10/2015 10:00:00 AM | 4/10/2015 10:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD8164 | Survival Spanish | 15-022 | 0003 | 4/27/2015 11:30:00 AM | 4/27/2015 11:30:00 AM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD8301 | Pursuit and Stopsticks Review | 15-069 | 0013 | 6/17/2015 8:00:00 AM | 6/17/2015 8:00:00 AM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 15-064 | 0073 | 6/17/2015 9:00:00 AM | 6/17/2015 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD9877 | Tactical Decision Making Scenarios | 15-095 | 0014 | 6/17/2015 10:30:00 AM | 6/17/2015 10:30:00 AM | 0.0 | 1.5 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 15-066 | 175 | 6/17/2015 2:00:00 PM | 6/17/2015 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8302 | Top 10 Constitutional Law Cases Every Officer Should Know | 15-016 | 0013 | 6/17/2015 3:00:00 PM | 6/17/2015 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8303 | Domestic Violence | 15-060 | 0013 | 6/17/2015 4:00:00 PM | 6/17/2015 4:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Law Enforcement Refresher | | | | | | | | | | |
| PD8304 | Mental Illness Refresher | 15-068 | 0013 | 6/17/2015 5:00:00 PM | 6/17/2015 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8272 | SFST / HGN School | 8200.02 | 0002 | 8/7/2015 11:00:00 PM | 8/7/2015 11:00:00 PM | 24 | 0 | 0.0 | $0.00 | | LC |
| PD9886 | Light Rail Safety Certification | | 0018 | 10/26/2015 7:00:00 AM | 10/26/2015 7:00:00 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| PD10067 | Tactical Mindset and Options on Traffic Stops-Refresher | 15-105 | 0001 | 10/30/2015 10:00:00 AM | 10/30/2015 10:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD5193 | Immediate Action Teams for Patrol | 15-106 | 0080 | 11/3/2015 6:00:00 AM | 11/3/2015 6:00:00 AM | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD9879 | Use of Deadly Force / Contagious Fire | 15-098 | 0040 | 11/3/2015 8:00:00 AM | 11/3/2015 8:00:00 AM | 1 | 1 | 0.0 | $0.00 | | LC |
| PD2410 | Patrol Rifle | 15-100 | 0051 | 11/20/2015 | 11/20/2015 | 8 | 32 | 0.0 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Operator | | | 3:00:00 PM | 3:00:00 PM | | | | | | |
| PD9890 | Malfunction Clearance Drills | 15-101 | 0036 | 12/23/2015 10:00:00 AM | 12/23/2015 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD4464 | ICS100 - Incident Command System - Introduction to | | 0095 | 12/31/2015 12:00:00 AM | 12/31/2015 12:00:00 AM | 0 | 0 | 3 | $0.00 | | LC |
| PD9878 | 2015 Legal Update | 15-327 | 0004 | 12/31/2015 12:00:00 AM | 12/31/2015 12:00:00 AM | 2 | 0.0 | 0.0 | $0.00 | | LC |
| PD10078 | POST Rifle Instructor Qualification / Malfunction Clearance / Instructor Qualification | 16-050 | 0008 | 1/26/2016 11:00:00 AM | 1/26/2016 11:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable Baton Refresher | 16-004 | 0082 | 2/16/2016 7:00:00 AM | 2/16/2016 7:00:00 AM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| PD10082 | Low Light Tactics and Flashlight | 16-061 | 0007 | 3/15/2016 7:00:00 AM | 3/15/2016 7:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Techniques Refresher | | | | | | | | | | |
| PD10121 | Bounding Over Watch | 16-059 | 0005 | 3/23/2016 10:00:00 AM | 3/23/2016 10:00:00 AM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD5240 | Undercover Operations | 16-068 | 0005 | 3/28/2016 10:15:00 AM | 3/28/2016 10:15:00 AM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD8308 | Operations Plans and BIO Sheets | 16-062 | 0002 | 3/28/2016 2:45:00 PM | 3/28/2016 2:45:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8316 | Informant / Source of Information Management / Control Buys | 16-063 | 0002 | 3/28/2016 5:15:00 PM | 3/28/2016 5:15:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7872 | Small Team Covers / Rescues-Revised | 16-056 | 0005 | 3/29/2016 5:00:00 PM | 3/29/2016 5:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD2914 | Surveillance | 16-071 | 0027 | 3/29/2016 5:30:00 PM | 3/29/2016 5:30:00 PM | 5 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD8314 | Condensed Search and Seizure | 16-005 | 0004 | 3/30/2016 7:00:00 AM | 3/30/2016 12:00:00 AM | 5 | 0 | 0.0 | $0.00 | | LC |
| PD8246 | Scouting | 16-055 | 0004 | 3/30/2016 3:00:00 PM | 3/30/2016 3:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD10136 | Basic Cell Phone Investigations | 16-004 | 0001 | 3/30/2016 4:30:00 PM | 3/30/2016 4:30:00 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD5742 | Comprehensive Search Warrant Writing Class | 16-077 | 0002 | 3/31/2016 11:30:00 AM | 3/31/2016 11:30:00 AM | 3 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD8313 | Knock and Talk Investigations | 16-076 | 0004 | 3/31/2016 11:30:00 AM | 3/31/2016 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD6706 | Gang Liaison School | 16-069 | 0015 | 4/29/2016 12:00:00 AM | 4/29/2016 12:00:00 AM | 4 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD8276 | Carotid Control Technique Refresher | 16-102 | 0093 | 6/27/2016 9:00:00 AM | 6/27/2016 9:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10089 | Basic Crisis Intervention Training | 16-073 | 0017 | 6/27/2016 4:00:00 PM | 6/27/2016 4:00:00 PM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 16-088 | 0113 | 6/27/2016 6:00:00 PM | 6/27/2016 6:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10120 | Incident De-Escalation and Tactics | 16-087 | 0019 | 6/28/2016 4:00:00 PM | 6/28/2016 4:00:00 PM | 3 | 5 | 0.0 | $0.00 | | LC |
| PD1136 | Outlaw | 16-105 | 0055 | 7/28/2016 | 7/28/2016 | 4 | 0 | 0.0 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Motorcycle Gangs | | | 12:00:00 AM | 12:00:00 AM | | | | | | |
| PD10118 | Heart Fit for Duty | 15-478 | 0022 | 9/21/2016 12:00:00 AM | 9/21/2016 12:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10235 | Qualification Course, Basic Marksmanship and Malfunction Course | 16-110 | 0016 | 10/11/2016 6:00:00 PM | 10/11/2016 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD7880 | Patrol Rifle-Flanking Maneuvers | 16-138 | 0068 | 12/13/2016 6:00:00 PM | 12/13/2016 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| C00483 | Workplace Harassment and Discrimination Refresher Video | | 0166 | 1/7/2017 11:13:47 PM | 1/7/2017 11:13:47 PM | 0.0 | 0.0 | 0.25 | $0.00 | | LC |
| PD10390 | Low Light Malfunction Clearances, Qualification and Flashlight Techniques | 17-073 | 0020 | 2/14/2017 9:00:00 PM | 2/14/2017 9:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Using Cover | | | | | | | | | | |
| PD10524 | Use of Cover and Movement Refresher | 17-080 | 0018 | 4/17/2017 3:00:00 PM | 4/17/2017 3:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10420 | 1-5, Half and Half, Chaos and Set it Off Drills | 17-056 | 0017 | 4/24/2017 3:00:00 PM | 4/24/2017 3:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10261 | Mandatory 2017 Legal Update, 2-hours COE credit | 16-113P | 0001 | 5/1/2017 10:35:14 PM | 5/1/2017 10:35:14 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10372 | Squad Operations Tactics Training | 17-059 | 0027 | 5/9/2017 7:00:00 PM | 5/9/2017 7:00:00 PM | 2 | 3 | 0.0 | $0.00 | | LC |
| PD10608 | Confirmation of Zero with Federal Ammo, Distance Shooting Qualification | 17-101 | 0005 | 9/26/2017 6:00:00 PM | 9/26/2017 6:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD8315 | Less Lethal- | 17-054 | 0006 | 9/28/2017 | 9/28/2017 | 0 | 4 | 0.0 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12 Gauge Bean Bag | | | 4:00:00 PM | 4:00:00 PM | | | | | | |
| KUV-EN | 01 - Employee Navigator - Video | | 0001 | 9/30/2017 4:43:50 PM | 9/30/2017 4:43:50 PM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| PD10525 | Tactical Building Search Refresher and Live Firehouse | 17-098 | 0037 | 11/7/2017 4:00:00 PM | 11/7/2017 4:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10476 | Law Enforcement in Indian Country: Update | 16-106 | 0001 | 11/13/2017 3:56:17 PM | 11/13/2017 3:56:17 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10471 | Taser X2 Transition Course | 17-089 | 0049 | 11/13/2017 5:00:00 PM | 11/13/2017 5:00:00 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD10527 | 4th Quarter Rifle Response to Rapid Deployment Scenario | 17-097 | 0004 | 11/14/2017 6:00:00 PM | 11/14/2017 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10480 | Asset | | 0001 | 11/28/2017 | 11/28/2017 | 0 | 0 | 1 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forfeiture Annual Training | | | 5:31:28 PM | 5:31:28 PM | | | | | | |
| PD8276 | Carotid Control Technique Refresher | 18-006 | 0117 | 2/5/2018 2:00:00 PM | 2/5/2018 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10569 | Patrol Rifle Response to Personnel Bourne Improvised Explosive Devices 1st Quarter Rifle Shoot | 18-021 | 0027 | 3/5/2018 5:00:00 PM | 3/5/2018 5:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10535 | AZPOST Mandatory Legal Update 2017 / 2018 | 17-84 | 0001 | 3/6/2018 4:18:41 PM | 3/6/2018 4:18:41 PM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| PD10479 | Use of Naloxone (Narcan) Nasal Spray by Law Enforcement for Opioid | 17-096 | 0001 | 3/26/2018 2:53:58 PM | 3/26/2018 2:53:58 PM | 1.5 | 0 | 1.5 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Overdose | | | | | | | | | | |
| PD10603 | Patrol Rifle Response to Rapid Deployment Scenario | 18-057 | 0021 | 3/27/2018 6:00:00 PM | 3/27/2018 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD9037 | Search Warrants | 2018-03 | 0018 | 5/10/2018 12:00:00 AM | 5/10/2018 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD1759 | Rapid Deployment | 18-052 | 0196 | 5/11/2018 12:00:00 AM | 5/11/2018 12:00:00 AM | 3.5 | 6.5 | 0.0 | $0.00 | | PeopleSoft |
| PD4423 | Ballistic Shields - Downed Officer Rescues | 18-064 | 0037 | 5/14/2018 3:00:00 PM | 5/14/2018 3:00:00 PM | 0.5 | 0.5 | 0.0 | $0.00 | | PeopleSoft |
| PD10605 | Individual First Aid Kit Use | 18-010 | 0035 | 5/22/2018 3:00:00 PM | 5/22/2018 3:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 18-060 | 0106 | 5/22/2018 4:00:00 PM | 5/22/2018 4:00:00 PM | 0 | 3 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable Baton Refresher | 18-054 | 0137 | 5/22/2018 4:00:00 PM | 5/22/2018 4:00:00 PM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD10779 | Police Technical-Internet Anonymity | 2018-15 | 0001 | 10/19/2018 12:00:00 AM | 10/19/2018 12:00:00 AM | 16 | 0 | 0.0 | $0.00 | | LC |
| PD10754 | Patrol Rifle Skills Improvement | 18-068 | 0016 | 10/26/2018 5:00:00 PM | 10/26/2018 5:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10778 | One-Handed Survival Skills and Use of Cover in Low Light | 18-072 | 0029 | 11/8/2018 9:00:00 PM | 11/8/2018 9:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10709 | ICAT | 18-089 | 0005 | 11/16/2018 12:00:00 AM | 11/16/2018 12:00:00 AM | 10 | 0 | 0.0 | $0.00 | | LC |
| PD10121 | Bounding Over Watch | 18-092 | 0068 | 12/6/2018 4:00:00 PM | 12/6/2018 4:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10777 | ICAT Introduction | 18-089 | 0001 | 12/6/2018 8:34:50 PM | 12/6/2018 8:34:50 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 19-013 | 0218 | 2/20/2019 11:00:00 AM | 2/20/2019 11:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10874 | 1st Quarter Rifle | 19-005 | 0002 | 3/1/2019 5:00:00 PM | 3/1/2019 5:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10835 | Blocking Impaired | 19-008 | 0040 | 3/23/2019 3:00:00 PM | 3/23/2019 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Driver | | | | | | | | | | |
| PD10887 | Fair and Impartial Policing | V19-002 | 0001 | 4/12/2019 12:00:00 AM | 4/12/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10829 | Know Your Authority | V19-001 | 0010 | 4/18/2019 5:00:00 PM | 4/18/2019 5:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10524 | Use of Cover and Movement Refresher | 19-049 | 0117 | 5/2/2019 3:00:00 PM | 5/2/2019 3:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10982 | Shooting From and Around Vehicles | 19-047 | 0013 | 5/23/2019 3:00:00 PM | 5/23/2019 3:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10876 | 2nd Quarter Rifle | 19-057 | 0035 | 6/6/2019 3:00:00 PM | 6/6/2019 3:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10709 | ICAT | 19-039 | 0037 | 6/18/2019 12:00:00 AM | 6/18/2019 12:00:00 AM | 10 | 0 | 0.0 | $0.00 | | LC |
| PD10963 | House Bill 2502 | 19-065 | 0023 | 6/26/2019 3:00:00 PM | 6/26/2019 3:00:00 PM | 0.5 | 0 | 0.0 | $0.00 | | LC |
| PD10956 | 2019 3rd Quarter Training: Decision Shoot, Gas Mask Fit | 19-064 | 0085 | 7/11/2019 1:00:00 PM | 7/11/2019 1:00:00 PM | 0 | 1 | 0.0 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Test & Handgun Inspection | | | | | | | | | | |
| PD10984 | Power Hour Training for Patrol | 19-062 | 0001 | 7/18/2019 3:05:30 PM | 7/18/2019 3:05:30 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10968 | 2019 Rifle and Shotgun Inspection | | 0032 | 8/22/2019 3:00:00 PM | 8/22/2019 3:00:00 PM | 0 | 0 | 1 | $0.00 | | LC |
| PD11044 | MPD 2019 Suicide Awareness | 19-061 | 0001 | 9/12/2019 6:25:24 PM | 9/12/2019 6:25:24 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD10162 | Armed Career Criminal | V19-003 | 0004 | 10/22/2019 12:00:00 AM | 10/22/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10849 | Tactical Training for Supervisors | 19-002 | 0003 | 10/22/2019 12:00:00 AM | 10/22/2019 12:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD11116 | New Order of Protection Process | | 0001 | 1/2/2020 9:12:49 AM | 1/2/2020 9:12:49 AM | 0.25 | 0.0 | 0.25 | $0.00 | | LC |
| PD11076 | Gender - Diverse Cultures | 19-132 | 0001 | 1/21/2020 5:03:37 PM | 1/21/2020 5:03:37 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| | COVID 19 Infection | | 0001 | 4/9/2020 2:34:43 PM | 4/9/2020 2:34:43 PM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Shawn T Freeman, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Control and Personal Protective Equipment (PPE) Guidance | | | | | | | | | | |
| PD2965 | General Instructors School | 20-019 | 0032 | 6/12/2020 12:00:00 AM | 6/12/2020 12:00:00 AM | 40 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD11020 | ATOA Basic Sniper Course | 16-009 | 0002 | 9/11/2020 12:00:00 AM | 8/11/2020 12:00:00 AM | 10 | 30 | 0.0 | $0.00 | | LC |
| | Mobile Field Force Refresher for Patrol | | | 10/29/2020 2:32:40 PM | 10/29/2020 2:32:40 PM | 0.5 | 0.0 | 0.0 | $0.00 | | LC |
| PD6045 | SWAT Sniper School | | 0017 | 1/8/2021 12:00:00 AM | 1/8/2021 12:00:00 AM | 6 | 34 | 0.0 | $0.00 | | PeopleSoft |
| PD5076 | Firearms Instructor School | 12-010 | 0052 | 4/2/2021 12:00:00 AM | 4/2/2021 12:00:00 AM | 40 | 40 | 0.0 | $0.00 | | LC |
| Count: 107 | | | | | | Total: 310.75 | Total: 235.5 | Total: 883.25 | $0.00 | | |

| Full Name | Badge # | Course Title | Date Completed | POST Hours | SEAT Hours |
|---|---|---|---|---|---|
| Goodrich, Robert | 20130 | RETIRED P1A Tutorials: Basic User Overview | 11/17/2020 | | 0.25 |
| Goodrich, Robert | 20130 | Versaterm RMS 8.1 Update | 03/17/2021 | | |
| Goodrich, Robert | 20130 | Hate Crimes Training For Law Enforcement | 04/13/2021 | | 1 |
| Goodrich, Robert | 20130 | Investigating Hate/Bias Crimes | 04/13/2021 | | |
| Goodrich, Robert | 20130 | E-Ticket Training | 05/06/2021 | | 0.25 |
| Goodrich, Robert | 20130 | Training Bulletin 2021-07 New Behavioral Health-Related Radio Codes | 07/30/2021 | | |
| Goodrich, Robert | 20130 | Decision Shoot | 08/31/2021 | 1 | |
| Goodrich, Robert | 20130 | 2021 40mm Recertification | 11/10/2021 | 1 | |
| Goodrich, Robert | 20130 | Basic SWAT Slow and Deliberate Searching | 06/15/2021 | 4 | |
| Goodrich, Robert | 20130 | 2021 SWAT Rifle Qualification | 03/02/2021 | 1 | |
| Goodrich, Robert | 20130 | Electrical and Fire Safety | 12/09/2021 | | 1 |
| Goodrich, Robert | 20130 | 2021-15 Asset Forfeiture Legal Update | 12/09/2021 | | 0.25 |
| Goodrich, Robert | 20130 | Training Bulletin 2021-10 Tactical Awareness In and Around Facilities | 12/09/2021 | | |
| Goodrich, Robert | 20130 | 2021 Bean Bag Recertification | 12/22/2021 | 1 | |
| Goodrich, Robert | 20130 | 2021 Firearm Instructors COE | 10/20/2021 | 1 | |
| Goodrich, Robert | 20130 | Taser 7 Transition Course | 09/30/2021 | 3 | |
| Goodrich, Robert | 20130 | Good Tactics and Communications Skills | 03/24/2022 | | 0.25 |
| Goodrich, Robert | 20130 | Preventing Harassment and Discrimination | 04/05/2022 | | 0.5 |
| Goodrich, Robert | 20130 | Accountability Bulletin, 1st Quarter 2022 | 04/20/2022 | | |
| Goodrich, Robert | 20130 | Officer/Victim Follow Up | 05/17/2022 | | |
| Goodrich, Robert | 20130 | Airborne and Bloodborne Pathogens | 06/01/2022 | | 1 |
| Goodrich, Robert | 20130 | Active Shooter Response Training Bulletin | 06/16/2022 | | 0.5 |
| Goodrich, Robert | 20130 | RETIRED Active Shooter: Recognition and Basic Response | 06/16/2022 | 1 | |
| Goodrich, Robert | 20130 | Taser Recertification | 06/21/2022 | 2 | |
| Goodrich, Robert | 20130 | 2022 AZPOST Qualification | 12/31/2022 | 1 | |
| Goodrich, Robert | 20130 | K9 Operations Refresher | 07/26/2022 | | |
| Goodrich, Robert | 20130 | Accountability Bulletin, 2nd Quarter 2022 | 07/28/2022 | | |
| Goodrich, Robert | 20130 | 2022 Life Fire Instructor School | 08/23/2022 | 16 | |
| Goodrich, Robert | 20130 | Advanced Defensive Driving Techniques | 08/24/2022 | 1 | |
| Goodrich, Robert | 20130 | Fire Extinguisher (Mandatory Training) | 10/25/2022 | | 0.25 |
| Goodrich, Robert | 20130 | Decision Shoot | 11/09/2022 | 1 | |
| Goodrich, Robert | 20130 | Utilizing Drug Recognition Experts | 11/16/2022 | | 0.25 |
| Goodrich, Robert | 20130 | Risk Management Bulletin | 11/16/2022 | | 0.5 |
| Goodrich, Robert | 20130 | Defensive Driving Principles | 12/13/2022 | 1 | |
| Goodrich, Robert | 20130 | RETIRED Terrorism 1 | 12/14/2022 | | 1 |
| Goodrich, Robert | 20130 | RETIRED Terrorism 2 | 12/14/2022 | | 1 |
| Goodrich, Robert | 20130 | RETIRED Terrorism 3 | 12/15/2022 | | 1 |
| Goodrich, Robert | 20130 | Accountability Bulletin, 3rd Quarter 2022 | 01/03/2023 | | |
| Goodrich, Robert | 20130 | Less Lethal Recert Bean Bag 40mm | 01/17/2023 | 4 | |
| Goodrich, Robert | 20130 | 2023 40mm RE-certification | 01/17/2023 | 2 | |
| Goodrich, Robert | 20130 | 2023 Bean Bag Recertification | 01/17/2023 | 2 | |
| Goodrich, Robert | 20130 | 2023 AZPOST Qualification | 03/06/2023 | 1 | |
| Goodrich, Robert | 20130 | Admin Per Se Affidavit Update (Mandatory Training) | 02/28/2023 | | 0.25 |
| Goodrich, Robert | 20130 | Resource Guide for Elder Abuse | 02/28/2023 | | 0.25 |
| Goodrich, Robert | 20130 | 2023-01 Burglary Investigations at Gun Stores Training Bulletin | 02/28/2023 | | 0.25 |
| Goodrich, Robert | 20130 | Drug Impaired Driver Informational Training (DIDIT) | 04/06/2023 | | 3.5 |
| Goodrich, Robert | 20130 | Basic SWAT School | 02/23/2023 | 80 | |
| Goodrich, Robert | 20130 | Street Racing Bulletin | 03/28/2023 | | 0.5 |
| Goodrich, Robert | 20130 | New RMS Function *Mandatory* | 05/17/2023 | | 0.5 |
| Goodrich, Robert | 20130 | Fatal and Serious Injury Training Bulletin | 05/17/2023 | | 0.5 |
| Goodrich, Robert | 20130 | Water Rescue (Throw Bag) Training | 05/17/2023 | | 1 |
| Goodrich, Robert | 20130 | PepperBall 2023 | 05/30/2023 | 10 | |
| Goodrich, Robert | 20130 | Search & Seizure | 05/31/2023 | 2 | |
| Goodrich, Robert | 20130 | 2023 2nd Qtr Pistol - Dry Fire | 06/27/2023 | 2 | |
| Goodrich, Robert | 20130 | Submitting Property/Evidence | 07/18/2023 | | 0.25 |
| Goodrich, Robert | 20130 | Versaterm vMobile 2.0 | 08/01/2023 | | |
| Goodrich, Robert | 20130 | Active Shooter #2 | 06/24/2023 | 4.5 | |
| Goodrich, Robert | 20130 | Decision Shoot | 11/28/2023 | 2 | |
| Goodrich, Robert | 20130 | Fire Extinguisher (Mandatory Training) | 12/20/2023 | | 0.25 |
| Goodrich, Robert | 20130 | Airborne and Bloodborne Pathogens | 12/20/2023 | | 1 |
| Goodrich, Robert | 20130 | Indian Country Jurisdiction | 01/02/2024 | | |
| Goodrich, Robert | 20130 | Accountability Bulletin, 3rd Quarter 2023 | 01/02/2024 | | |
| Goodrich, Robert | 20130 | 2024 Beanbag ReCertifications | 02/21/2024 | 2 | |
| Goodrich, Robert | 20130 | 2024 40mm ReCertification | 01/23/2024 | 2 | |
| Goodrich, Robert | 20130 | High Risk Vehicle Stops HRVS (24-031) | 03/05/2024 | 4 | |
| Goodrich, Robert | 20130 | RMS Refresher Training | 03/13/2024 | 21.5 | |
| Goodrich, Robert | 20130 | High Risk Vehicle Stops Instructor | 12/20/2023 | 30 | |
| Goodrich, Robert | 20130 | Basic SWAT School | 02/22/2024 | 80 | |
| Goodrich, Robert | 20130 | 2024 AZPOST | 03/22/2024 | 2 | |
| Goodrich, Robert | 20130 | Police Jiu-Jitsu | 06/04/2024 | | 1 |
| Goodrich, Robert | 20130 | STOP STICKS Refresher | 06/05/2024 | | 0.5 |
| Goodrich, Robert | 20130 | THE EAST VALLEY CRITICAL INCIDENT RESPONSE TEAM | 06/05/2024 | | 0.25 |
| Goodrich, Robert | 20130 | 2024 2nd Qtr Bounding/Peels (24-036) | 05/14/2024 | 4 | |
| Goodrich, Robert | 20130 | Phoenix Machine Gun Conversion | 06/12/2024 | | 0.25 |
| Goodrich, Robert | 20130 | Ethics and Professionalism | 07/03/2024 | | 0.5 |
| Goodrich, Robert | 20130 | IFAK Training | 08/14/2024 | | 0.5 |
| Goodrich, Robert | 20130 | Fire Extinguisher (Mandatory Training) | 08/14/2024 | | 0.25 |
| Goodrich, Robert | 20130 | Airborne and Bloodborne Pathogens | 08/22/2024 | | 1 |
| Goodrich, Robert | 20130 | 2024 PIT Certification - 24-039 | 08/21/2024 | 4 | |

| | | | | | |
|---|---|---|---|---|---|
| Goodrich, Robert | 20130 | Crime Gun Training Bulletin | 10/29/2024 | | 0.5 |
| Goodrich, Robert | 20130 | High Risk Traffic Stops on Stolen Vehicles | 11/21/2024 | | 0.5 |
| Goodrich, Robert | 20130 | Police Jiu Jitsu Level 1 Instructor Course | 02/05/2025 | 3 | |
| Goodrich, Robert | 20130 | 2025 1st Quarter Training - IA/Building Searches/HRVS (AZPOST 25-010) | 02/11/2025 | 4 | |
| Goodrich, Robert | 20130 | Fiesta Patrol Booking | 03/21/2025 | | 0.5 |
| Goodrich, Robert | 20130 | 2025 1st Qtr Rifle (AZ Post #25-004) | 03/25/2025 | 4 | |
| Goodrich, Robert | 20130 | 2025 1st Qtr Pistol (AZ Post #25-003) | 03/20/2025 | 1 | |
| Goodrich, Robert | 20130 | 2025 AZ Post Quals - 2nd Qtr (AZ Post #25-011) | 04/24/2025 | 2 | |
| Goodrich, Robert | 20130 | Diabetic Emergencies | 05/02/2025 | | 1 |
| Goodrich, Robert | 20130 | Dealing with Heat Stress | 05/06/2025 | | 1 |
| Goodrich, Robert | 20130 | Dealing with Cold Stress | 05/07/2025 | | 1 |
| Goodrich, Robert | 20130 | Understanding Behavior, Burnout, and Depression | 05/07/2025 | | 1 |
| Goodrich, Robert | 20130 | 2025 2nd Quarter Training - DT/PJJ-ABC Refresher & Combatives/Weapon Retention/Protection (AZPOST : | 05/20/2025 | 4 | |
| Goodrich, Robert | 20130 | New Axon Products | 05/28/2025 | | 0.25 |
| Goodrich, Robert | 20130 | 2025 2nd Qtr Rifle (AZ Post #25-021) | 06/24/2025 | 4 | |
| Goodrich, Robert | 20130 | Fire Extinguisher (Mandatory Training) | 06/30/2025 | | 0.25 |
| Goodrich, Robert | 20130 | 2025 3rd Quarter Training - Active Assailant AZPOST 25-012 | 07/15/2025 | 4 | |
| Goodrich, Robert | 20130 | 2025 2nd Quarter Training - DT/PJJ-ABC Refresher & Combatives/Weapon Retention/Protection (AZPOST : | 08/20/2025 | 4 | |
| **1 users in total** | | | | **324** | **27.5** |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00649 | (Employee) Preventing Discrimination and Harassment | | 0001 | | 2/18/2019 12:08:54 PM | 0.0 | 0.0 | 0.75 | $0.00 | | LC |
| SNEOPD | New Employee Orientation for Police Officers (Safety Training) | | 0001 | 1/22/2014 5:00:00 PM | 1/22/2014 5:00:00 PM | 4 | 0.0 | 4 | $0.00 | | LC |
| PD1500 | Academy | | 0041 | 6/19/2014 12:00:00 AM | 6/19/2014 12:00:00 AM | 0 | 0 | 840 | $0.00 | | PeopleSoft |
| PD4810 | RMS Academy Training | 14-122 | 0006 | 6/26/2014 5:00:00 PM | 6/26/2014 5:00:00 PM | 30 | 0 | 0.0 | $0.00 | | LC |
| PD7348 | Taser X2 User Certification | 14-101 | 0013 | 7/1/2014 5:00:00 PM | 7/1/2014 5:00:00 PM | 6 | 0 | 0.0 | $0.00 | | LC |
| PD8164 | Survival Spanish | 14-098 | 0001 | 9/22/2014 10:30:00 AM | 9/22/2014 10:30:00 AM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD4464 | ICS100 - Incident Command | | 0079 | 10/27/2014 12:00:00 AM | 10/27/2014 12:00:00 AM | 0 | 0 | 3 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | System - Introduction to | | | | | | | | | | |
| PD4613 | National Incident Management System - Introduction | | 0047 | 10/27/2014 12:00:00 AM | 10/27/2014 12:00:00 AM | 0 | 0 | 3 | $0.00 | | LC |
| PD7867 | 2013 Legal Update | 13-377 | 0059 | 10/28/2014 12:00:00 AM | 10/28/2014 12:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8181 | One Hand Survival Skills-Low Light | 14-137 | 0033 | 11/6/2014 8:00:00 PM | 11/6/2014 8:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| C00541 | New Employee Orientation (Customer Service & Workplace Harassment / Discrimination) | | 0036 | 12/16/2014 5:00:00 PM | 12/16/2014 5:00:00 PM | 0.0 | 0.0 | 3.75 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 15-003 | 0059 | 2/17/2015 8:00:00 AM | 2/17/2015 8:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD5529 | Basic Digital Camera Operation for Law Enforcement | 15-048 | 0015 | 2/24/2015 4:00:00 PM | 2/24/2015 4:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8155 | Transition Class for New Patrol Vehicles | 15-005 | 0013 | 2/26/2015 10:00:00 AM | 2/26/2015 10:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD3858 | Crisis Intervention Training | 15-120 | 0046 | 4/10/2015 5:00:00 PM | 4/10/2015 5:00:00 PM | 40 | 0.0 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 15-055 | 0046 | 4/14/2015 7:00:00 AM | 4/14/2015 7:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD8301 | Pursuit and Stopsticks Review | 15-069 | 0010 | 6/10/2015 8:00:00 AM | 6/10/2015 8:00:00 AM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 15-064 | 0070 | 6/10/2015 9:00:00 AM | 6/10/2015 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD9877 | Tactical Decision Making Scenarios | 15-095 | 0011 | 6/10/2015 10:30:00 AM | 6/10/2015 10:30:00 AM | 0.0 | 1.5 | 0.0 | $0.00 | | LC |
| PD4210 | CPR | 15-066 | 172 | 6/10/2015 | 6/10/2015 | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Refresher | | | 2:00:00 PM | 2:00:00 PM | | | | | | |
| PD8302 | Top 10 Constitutional Law Cases Every Officer Should Know | 15-016 | 0010 | 6/10/2015 3:00:00 PM | 6/10/2015 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8303 | Domestic Violence Law Enforcement Refresher | 15-060 | 0010 | 6/10/2015 4:00:00 PM | 6/10/2015 4:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8304 | Mental Illness Refresher | 15-068 | 0010 | 6/10/2015 5:00:00 PM | 6/10/2015 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8272 | SFST / HGN School | 8200.02 | 0002 | 8/7/2015 11:00:00 PM | 8/7/2015 11:00:00 PM | 24 | 0 | 0.0 | $0.00 | | LC |
| PD2410 | Patrol Rifle Operator | 15-100 | 0050 | 10/2/2015 2:00:00 PM | 10/2/2015 2:00:00 PM | 8 | 32 | 0.0 | $0.00 | | LC |
| PD5193 | Immediate Action Teams for Patrol | 15-106 | 0066 | 10/26/2015 6:00:00 AM | 10/26/2015 6:00:00 AM | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD9879 | Use of Deadly | 15-098 | 0025 | 10/26/2015 8:00:00 AM | 10/26/2015 8:00:00 AM | 1 | 1 | 0.0 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Force / Contagious Fire | | | | | | | | | | |
| PD9888 | Modified Navy Qualification | 15-093 | 0033 | 11/10/2015 1:00:00 PM | 11/10/2015 1:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD9887 | Use of Force Briefing Training | 15-102 | 0002 | 12/8/2015 6:30:00 AM | 12/8/2015 6:30:00 AM | 0.5 | 0 | 0.0 | $0.00 | | LC |
| PD9890 | Malfunction Clearance Drills | 15-101 | 0032 | 12/21/2015 10:00:00 AM | 12/21/2015 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10078 | POST Rifle Instructor Qualification / Malfunction Clearance / Instructor Qualification | 16-050 | 0024 | 2/9/2016 1:00:00 PM | 2/9/2016 1:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable Baton Refresher | 16-004 | 0094 | 2/23/2016 7:00:00 AM | 2/23/2016 7:00:00 AM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| PD10082 | Low Light Tactics and Flashlight | 16-061 | 0012 | 3/1/2016 6:30:00 AM | 3/1/2016 6:30:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Techniques Refresher | | | | | | | | | | |
| PD10121 | Bounding Over Watch | 16-059 | 0003 | 3/22/2016 10:00:00 AM | 3/22/2016 10:00:00 AM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 16-102 | 0086 | 5/2/2016 9:00:00 AM | 5/2/2016 9:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10089 | Basic Crisis Intervention Training | 16-073 | 0007 | 5/2/2016 6:00:00 PM | 5/2/2016 6:00:00 PM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10120 | Incident De-Escalation and Tactics | 16-087 | 0008 | 5/3/2016 4:00:00 PM | 5/3/2016 4:00:00 PM | 3 | 5 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 16-088 | 0102 | 5/3/2016 6:00:00 PM | 5/3/2016 6:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10118 | Heart Fit for Duty | 15-478 | 0016 | 7/20/2016 12:00:00 AM | 7/20/2016 12:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10135 | First Response Resiliency Skills | 16-092 | 0011 | 7/20/2016 12:00:00 AM | 7/13/2016 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10235 | Qualification Course, Basic | 16-110 | 0017 | 10/12/2016 1:00:00 PM | 10/12/2016 1:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Marksmanship and Malfunction Course | | | | | | | | | | |
| PD7880 | Patrol Rifle-Flanking Maneuvers | 16-138 | 0072 | 12/15/2016 1:00:00 PM | 12/15/2016 1:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| C00483 | Workplace Harassment and Discrimination Refresher Video | | 0166 | 1/15/2017 7:34:41 AM | 1/15/2017 7:34:41 AM | 0.0 | 0.0 | 0.25 | $0.00 | | LC |
| PD10390 | Low Light Malfunction Clearances, Qualification and Flashlight Techniques Using Cover | 17-073 | 0017 | 2/8/2017 9:00:00 AM | 2/8/2017 9:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10261 | Mandatory 2017 Legal Update, 2-hours COE credit | 16-113P | 0001 | 3/7/2017 4:55:16 AM | 3/7/2017 4:55:16 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10372 | Squad Operations | 17-059 | 0017 | 4/28/2017 3:00:00 AM | 4/11/2017 7:00:00 PM | 2 | 3 | 0.0 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tactics Training | | | | | | | | | | |
| PD10524 | Use of Cover and Movement Refresher | 17-080 | 0043 | 5/17/2017 8:00:00 AM | 5/17/2017 8:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10420 | 1-5, Half and Half, Chaos and Set it Off Drills | 17-056 | 0033 | 5/17/2017 1:00:00 PM | 5/17/2017 1:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD5412 | Less Lethal-Bean Bag Recertification | 17-053 | 0102 | 6/27/2017 10:00:00 AM | 6/27/2017 10:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD2965 | General Instructors School | 17-048 | 0027 | 7/21/2017 12:00:00 AM | 7/21/2017 12:00:00 AM | 40 | 0 | 0.0 | $0.00 | | PeopleSoft |
| KUV-MC | 05 - Request and View Time Off - Video | | 0001 | 9/18/2017 7:09:38 AM | 9/18/2017 7:09:38 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| KUV-EN | 01 - Employee Navigator - Video | | 0001 | 9/18/2017 7:28:57 AM | 9/18/2017 7:28:57 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| PD10608 | Confirmation | 17-101 | 0028 | 10/24/2017 | 10/24/2017 | 1 | 3 | 0.0 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | of Zero with Federal Ammo, Distance Shooting Qualification | | | 10:00:00 AM | 10:00:00 AM | | | | | | |
| PD10479 | Use of Naloxone (Narcan) Nasal Spray by Law Enforcement for Opioid Overdose | 17-096 | 0001 | 11/21/2017 10:45:45 AM | 11/21/2017 10:45:45 AM | 1.5 | 0 | 1.5 | $0.00 | | LC |
| PD10525 | Tactical Building Search Refresher and Live Firehouse | 17-098 | 0058 | 11/27/2017 4:00:00 PM | 11/27/2017 4:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD8060 | Tactical Driving Instructor | 12-008 | 0003 | 12/14/2017 12:00:00 AM | 12/14/2017 12:00:00 AM | 0 | 76 | 0.0 | $0.00 | | LC |
| PD10471 | Taser X2 Transition Course | 17-089 | 0063 | 12/20/2017 4:00:00 PM | 12/20/2017 4:00:00 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD1944 | K-9 Agitator | 18-005 | 0022 | 1/10/2018 11:00:00 | 1/10/2018 11:00:00 | 4 | 0 | 0.0 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Course | | | PM | PM | | | | | | |
| PD8276 | Carotid Control Technique Refresher | 18-006 | 0195 | 3/20/2018 1:00:00 PM | 3/20/2018 1:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable Baton Refresher | 18-054 | 0133 | 5/15/2018 1:00:00 PM | 5/15/2018 1:00:00 PM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| PD10605 | Individual First Aid Kit Use | 18-010 | 0034 | 6/5/2018 10:00:00 AM | 6/5/2018 10:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 18-060 | 0159 | 6/5/2018 12:00:00 PM | 6/5/2018 12:00:00 PM | 0 | 3 | 0.0 | $0.00 | | LC |
| PD1759 | Rapid Deployment | 18-052 | 0203 | 6/28/2018 12:00:00 AM | 6/28/2018 12:00:00 AM | 3.5 | 6.5 | 0.0 | $0.00 | | PeopleSoft |
| PD10778 | One-Handed Survival Skills and Use of Cover in Low Light | 18-072 | 0049 | 10/30/2018 10:00:00 PM | 10/30/2018 10:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10806 | Animal Cruelty Investigations | 18-073 | 0001 | 12/17/2018 8:03:00 AM | 12/17/2018 8:03:00 AM | 4 | 0 | 0.0 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | and Prosecution and the Link to Human Violence | | | | | | | | | | |
| PD10777 | ICAT Introduction | 18-089 | 0001 | 12/17/2018 8:42:29 AM | 12/17/2018 8:42:29 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10809 | 2018 Legal Update | 18-91 | 0001 | 1/15/2019 3:48:28 PM | 1/15/2019 3:48:28 PM | 1.25 | 0 | 0.0 | $0.00 | | LC |
| PD10833 | Mesa Wellness 360 Overview | 19-011 | 0021 | 2/19/2019 3:00:00 PM | 2/19/2019 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10829 | Know Your Authority | V19-001 | 0011 | 5/2/2019 12:00:00 PM | 5/2/2019 12:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10870 | Mass Casualty Response | 19-050 | 0023 | 5/13/2019 12:00:00 AM | 5/13/2019 12:00:00 AM | 4 | 4 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 19-013 | 0236 | 5/13/2019 11:00:00 AM | 5/13/2019 11:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10981 | Basic Handgun Manipulation Refresher | 19-048 | 0014 | 5/29/2019 12:00:00 AM | 5/29/2019 12:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10709 | ICAT | 19-039 | 0040 | 6/26/2019 | 6/26/2019 | 10 | 0 | 0.0 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 12:00:00 AM | 12:00:00 AM | | | | | | |
| PD10956 | 2019 3rd Quarter Training: Decision Shoot, Gas Mask Fit Test & Handgun Inspection | 19-064 | 0037 | 7/1/2019 1:00:00 PM | 7/1/2019 1:00:00 PM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD10887 | Fair and Impartial Policing | V19-002 | 0017 | 8/12/2019 12:00:00 AM | 8/12/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| | Tuition Assistance Program Orientation | | | 8/13/2019 3:22:15 PM | 8/13/2019 3:22:15 PM | 0.0 | 0.0 | 0.15 | $0.00 | | LC |
| PD11024 | Manual and Shotgun Breaching | | 0001 | 8/29/2019 7:13:39 AM | 8/29/2019 7:13:39 AM | 0 | 0 | 24 | $0.00 | | LC |
| PD11044 | MPD 2019 Suicide Awareness | 19-061 | 0001 | 9/11/2019 5:04:48 PM | 9/11/2019 5:04:48 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD10162 | Armed Career Criminal | V19-003 | 0004 | 10/22/2019 12:00:00 AM | 10/22/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD10849 | Tactical Training for Supervisors | 19-002 | 0003 | 10/22/2019 12:00:00 AM | 10/22/2019 12:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD11071 | 2019 Legal Update - Mandatory Training | 19-95 | 0001 | 11/20/2019 12:53:41 PM | 11/20/2019 12:53:41 PM | 1.25 | 0 | 0.0 | $0.00 | | LC |
| PD11116 | New Order of Protection Process | | 0001 | 1/2/2020 3:16:58 PM | 1/2/2020 3:16:58 PM | 0.25 | 0.0 | 0.25 | $0.00 | | LC |
| PD11076 | Gender - Diverse Cultures | 19-132 | 0001 | 1/21/2020 5:56:22 PM | 1/21/2020 5:56:22 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| | COVID 19 Infection Control and Personal Protective Equipment (PPE) Guidance | | 0001 | 4/9/2020 9:18:52 AM | 4/9/2020 9:18:52 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| | Versaterm MDT 7.7 Training | | | 8/5/2020 2:42:32 PM | 8/5/2020 2:42:32 PM | 0.0 | 0.0 | 0.5 | $0.00 | | LC |
| PD11192 | Master Tactical | | 0001 | 8/21/2020 12:00:00 | 8/21/2020 12:00:00 | 0 | 0.0 | 88 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Robert Goodrich, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Breacher | | | AM | AM | | | | | | |
| | Mobile Field Force Refresher for Patrol | | | 10/30/2020 11:34:19 AM | 10/30/2020 11:34:19 AM | 0.5 | 0.0 | 0.0 | $0.00 | | LC |
| PD10412 | Active Shooter Incident Response Part 1 | 16-117-1 | 0001 | 12/21/2020 6:28:14 PM | 12/21/2020 6:28:14 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD10413 | Active Shooter Incident Response Part 2 | 16-117-2 | 0001 | 12/29/2020 4:57:25 PM | 12/29/2020 4:57:25 PM | 3.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 89 | | | | | | Total: 273.75 | Total: 186.0 | Total: 973.15 | $0.00 | | |

| Full Name | Badge # | Course Title | Date Completed | POST Hours | SEAT Hours |
|---|---|---|---|---|---|
| Harris, Matthew | 16816 | RETIRED P1A Tutorials: Basic User Overview | 11/24/2020 | | 0.25 |
| Harris, Matthew | 16816 | BALANCE SPEED & ACCURACY DRILLS | 06/15/2020 | | 2 |
| Harris, Matthew | 16816 | Versaterm RMS 8.1 Update | 03/17/2021 | | |
| Harris, Matthew | 16816 | Hate Crimes Training For Law Enforcement | 04/13/2021 | | 1 |
| Harris, Matthew | 16816 | Investigating Hate/Bias Crimes | 05/07/2021 | | |
| Harris, Matthew | 16816 | Blue Team NextGen | 07/14/2021 | | 0.25 |
| Harris, Matthew | 16816 | Decision Shoot | 08/31/2021 | 1 | |
| Harris, Matthew | 16816 | 2021 40mm Recertification | 11/10/2021 | 1 | |
| Harris, Matthew | 16816 | Basic SWAT Slow and Deliberate Searching | 06/15/2021 | 4 | |
| Harris, Matthew | 16816 | 2021 SWAT Rifle Qualification | 03/02/2021 | 1 | |
| Harris, Matthew | 16816 | 2021 Bean Bag Recertification | 12/22/2021 | 1 | |
| Harris, Matthew | 16816 | 2021 Firearm Instructors COE | 11/17/2021 | 1 | |
| Harris, Matthew | 16816 | Taser 7 Transition Course | 09/30/2021 | 3 | |
| Harris, Matthew | 16816 | Good Tactics and Communications Skills | 03/24/2022 | | 0.25 |
| Harris, Matthew | 16816 | Preventing Harassment and Discrimination | 04/06/2022 | | 0.5 |
| Harris, Matthew | 16816 | Effective Tactics and Communications Skills, Part II | 05/11/2022 | | 0.5 |
| Harris, Matthew | 16816 | Use of Deadly Force Training | 06/14/2022 | | 2 |
| Harris, Matthew | 16816 | Taser Recertification | 06/21/2022 | 2 | |
| Harris, Matthew | 16816 | 2022 AZPOST Qualification | 12/31/2022 | 1 | |
| Harris, Matthew | 16816 | Accountability Bulletin, 2nd Quarter 2022 | 08/10/2022 | | |
| Harris, Matthew | 16816 | Decision Shoot | 11/09/2022 | 1 | |
| Harris, Matthew | 16816 | Admin Per Se Affidavit Update (Mandatory Training) | 01/06/2023 | | 0.25 |
| Harris, Matthew | 16816 | 2023 Bean Bag Recertification | 01/17/2023 | 2 | |
| Harris, Matthew | 16816 | 2023 40mm RE-certification | 01/17/2023 | 2 | |
| Harris, Matthew | 16816 | Less Lethal Recert Bean Bag 40mm | 01/17/2023 | 4 | |
| Harris, Matthew | 16816 | 2023 AZPOST Qualification | 03/06/2023 | 1 | |
| Harris, Matthew | 16816 | Reporting a Police Service Dog (PSD) Bite in Blue Team | 03/01/2023 | | |
| Harris, Matthew | 16816 | Active Shooter Response Training Bulletin | 03/01/2023 | | 0.5 |
| Harris, Matthew | 16816 | RETIRED Active Shooter: Recognition and Basic Response | 03/01/2023 | | 1 |
| Harris, Matthew | 16816 | K9 Operations Refresher | 03/01/2023 | | |
| Harris, Matthew | 16816 | Utilizing Drug Recognition Experts | 03/01/2023 | | 0.25 |
| Harris, Matthew | 16816 | COM 2022 Initiatives in Mental Illness & Policing | 03/01/2023 | | |
| Harris, Matthew | 16816 | Risk Management Bulletin | 03/01/2023 | | 0.5 |
| Harris, Matthew | 16816 | Resource Guide for Elder Abuse | 03/01/2023 | | 0.25 |
| Harris, Matthew | 16816 | Absorbents and Spills | 03/01/2023 | | 1 |
| Harris, Matthew | 16816 | RETIRED Active Shooter: Phases and Prevention | 03/03/2023 | | 1 |
| Harris, Matthew | 16816 | Active Shooter Preparation and Response for Schools | 03/03/2023 | | 1 |
| Harris, Matthew | 16816 | Basic Firearm Safety | 03/03/2023 | | 1 |
| Harris, Matthew | 16816 | Basic SWAT School | 02/23/2023 | 80 | |
| Harris, Matthew | 16816 | Street Racing Bulletin | 03/24/2023 | | 0.5 |
| Harris, Matthew | 16816 | Drug Impaired Driver Informational Training (DIDIT) | 03/30/2023 | | 3.5 |
| Harris, Matthew | 16816 | New RMS Function *Mandatory* | 05/04/2023 | | 0.5 |
| Harris, Matthew | 16816 | PepperBall 2023 | 05/30/2023 | | 10 |
| Harris, Matthew | 16816 | Search & Seizure | 05/31/2023 | | 2 |
| Harris, Matthew | 16816 | 2023 2nd Qtr Pistol - Dry Fire | 06/27/2023 | 2 | |
| Harris, Matthew | 16816 | Active Shooter #2 | 07/07/2023 | 4.5 | |
| Harris, Matthew | 16816 | Versaterm vMobile 2.0 | 08/02/2023 | | |
| Harris, Matthew | 16816 | Decision Shoot | 11/17/2023 | 2 | |
| Harris, Matthew | 16816 | Accountability Bulletin, 3rd Quarter 2023 | 12/08/2023 | | |
| Harris, Matthew | 16816 | High Risk Vehicle Stops HRVS (24-031) | 03/05/2024 | 9 | |
| Harris, Matthew | 16816 | 2024 AZPOST | 03/05/2024 | 2 | |
| Harris, Matthew | 16816 | RMS Refresher Training | 03/27/2024 | 21.5 | |
| Harris, Matthew | 16816 | 2024 2nd Quarter Rifle | 06/11/2024 | 4 | |
| Harris, Matthew | 16816 | 2024 2nd Qtr Bounding/Peels (24-036) | 06/19/2024 | 4 | |
| Harris, Matthew | 16816 | STOP STICKS Refresher | 06/28/2024 | | 0.5 |
| Harris, Matthew | 16816 | 2024 2nd Quarter Pistol | 06/12/2024 | 2 | |
| Harris, Matthew | 16816 | 2024 PJJ ABC Certification 3rd Qtr (24-037) | 08/29/2024 | 4 | |
| Harris, Matthew | 16816 | Ethics and Professionalism | 09/16/2024 | | 0.5 |
| Harris, Matthew | 16816 | Fire Extinguisher (Mandatory Training) | 09/18/2024 | | 0.25 |
| Harris, Matthew | 16816 | Crime Gun Training Bulletin | 09/18/2024 | | 0.5 |
| Harris, Matthew | 16816 | 2024 - 4th Qtr Building Searches/AZPOST Decision Shoot/Taser 10 Upgrade (24-032) | 10/24/2024 | 10 | |
| Harris, Matthew | 16816 | High Risk Traffic Stops on Stolen Vehicles | 12/16/2024 | | 0.5 |
| Harris, Matthew | 16816 | THE EAST VALLEY CRITICAL INCIDENT RESPONSE TEAM | 12/16/2024 | | 0.25 |
| Harris, Matthew | 16816 | 2024 4th Quarter Wellness Training (24-030) | 10/22/2024 | 1 | |
| Harris, Matthew | 16816 | 2024 4th Quarter Pistol | 12/31/2024 | 2.5 | |
| Harris, Matthew | 16816 | 2024 4th Quarter Rifle - Bounding Overwatch Focused Fire | 12/31/2024 | 4 | |
| Harris, Matthew | 16816 | 2025 1st Quarter Training - IA/Building Searches/HRVS (AZPOST 25-010) | 01/13/2025 | 4 | |
| Harris, Matthew | 16816 | 2025 1st Qtr Pistol (AZ Post #25-003) | 01/17/2025 | 1 | |
| Harris, Matthew | 16816 | 2025 1st Qtr Rifle (AZ Post #25-004) | 02/04/2025 | 4 | |
| Harris, Matthew | 16816 | 2025 2nd Quarter Training - DT/PJJ-ABC Refresher & Combatives/Weapon Retention/Protection (AZPOST 25-011) | 05/12/2025 | 4 | |
| Harris, Matthew | 16816 | Indian Country Jurisdiction | 06/10/2025 | | |
| Harris, Matthew | 16816 | Airborne and Bloodborne Pathogens | 06/10/2025 | | 1 |
| Harris, Matthew | 16816 | Fire Extinguisher (Mandatory Training) | 06/10/2025 | | 0.25 |
| Harris, Matthew | 16816 | 2025 AZ Post Quals - 2nd Qtr (AZ Post #25-011) | 05/21/2025 | 2 | |
| Harris, Matthew | 16816 | 2025 3rd Quarter Training - Active Assailant AZPOST 25-012 | 06/17/2025 | 4 | |
| Harris, Matthew | 16816 | 2025 Bean Bag ReCert (AZ Post #25-021) | 05/21/2025 | 4 | |
| Harris, Matthew | 16816 | Electronic Workstation Files System | 06/30/2025 | | 0.5 |
| **1 users in total** | | | | **200.5** | **34.25** |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00650 | (Supervisor) Preventing Discrimination and Harassment | | 0001 | | 3/27/2019 7:01:47 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| C00209 | Sexual Harassment | | 0250 | 10/13/2005 12:00:00 AM | | 0.0 | 0.00 | 2.8 | $0.00 | | PS |
| S00002 | Great Driver--EDG | | 0270 | 10/14/2005 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00003 | General Safety--EDG | | 0158 | 10/14/2005 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00004 | Haz Com Right To Know--EDG | | 0615 | 10/14/2005 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00001 | EDG-All About Backs | | 0656 | 10/14/2005 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00031 | Bloodborne Pathogens | | 0164 | 10/14/2005 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00069 | Respirator Protection Initial | | 0010 | 2/13/2006 12:00:00 AM | | 0.0 | 0.00 | 1.5 | $0.00 | | PS |
| PD3874 | Records | | 0053 | 3/24/2006 | 3/24/2006 | 0.00 | 0.00 | 40 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mgmt System (RMS) Training | | | 4:00:00 PM | 4:00:00 PM | | | | | | |
| PD1500 | Academy | | 0031 | 4/5/2006 8:00:00 AM | 4/5/2006 8:00:00 AM | 0.00 | 0.00 | 800 | $0.00 | | PeopleSoft |
| PD8715 | Tactical Building Search Refresher | 06-0119 | 0004 | 4/17/2006 2:00:00 AM | 4/17/2006 2:00:00 AM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD3798 | Pit Training | | 0019 | 9/4/2006 12:00:00 AM | 9/4/2006 12:00:00 AM | 0.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2954 | Shooting at Moving Vehicles | | 0003 | 10/27/2006 12:00:00 AM | 10/27/2006 12:00:00 AM | 0.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2959 | Enforcing The Disruptive Party Ordinance | 06-0211 | 0007 | 11/5/2006 1:00:00 AM | 11/5/2006 1:00:00 AM | 0.50 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD1420 | Cite and Release for Drug Paraphernalia | 07-009 | 0031 | 1/8/2007 7:00:00 AM | 1/8/2007 7:00:00 AM | 0.50 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD3658 | Robbery / Homicide / | 06-137 | 0001 | 4/10/2007 5:00:00 PM | 4/10/2007 5:00:00 PM | 8.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Assaults-Spanish Refresher | | | | | | | | | | |
| PD3652 | First Shot Accuracy | 07-079 | 0058 | 4/24/2007 4:30:00 PM | 4/24/2007 4:30:00 PM | 0.50 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7055 | Horizontal Gaze Nystagmus | 07-053 | 0060 | 5/24/2007 11:00:00 PM | 5/24/2007 11:00:00 PM | 24.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD6816 | Drugs That Impair | 07-122 | 0017 | 6/20/2007 2:00:00 PM | 6/20/2007 2:00:00 PM | 8.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD1469 | Bloodborne Pathogen Training | 07-092 | 0047 | 7/2/2007 4:00:00 PM | 7/2/2007 4:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD1759 | Rapid Deployment | 07-144 | 0171 | 7/16/2007 9:00:00 PM | 7/16/2007 9:00:00 PM | 2.00 | 3.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4464 | ICS100 Incident Command System | 07-121 | 0010 | 8/7/2007 4:00:00 PM | 8/7/2007 4:00:00 PM | 3.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2963 | Taser Recertification - X26 | 07-033 | 0024 | 9/10/2007 8:00:00 AM | 9/10/2007 8:00:00 AM | 1.50 | 0.50 | 0.0 | $0.00 | | PeopleSoft |
| PD4585 | Human Trafficking - Response to | 07-023 | 0010 | 9/14/2007 11:59:00 PM | 9/14/2007 11:59:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD4578 | Legal Update 2006 | 06-242 | 0039 | 9/23/2007 11:59:00 PM | 9/23/2007 11:59:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4631 | Legal Update 2007 | 07-244 | 0010 | 12/7/2007 11:59:00 PM | 12/7/2007 11:59:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2410 | Patrol Rifle | | 0026 | 2/1/2008 1:00:00 AM | 2/1/2008 1:00:00 AM | 8.00 | 32.00 | 0.0 | $0.00 | | PeopleSoft |
| PD6046 | Basic SWAT School | 08-0124 | 0041 | 2/28/2008 5:00:00 PM | 2/28/2008 5:00:00 PM | 25.75 | 57.25 | 0.0 | $0.00 | | PeopleSoft |
| PD4740 | Low Light and Flashlight Techniques Refresher | 08-0146 | 0001 | 3/6/2008 7:30:00 AM | 3/6/2008 7:30:00 AM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2921 | Hit & Run Investigation Training (Update) | 08-011 | 0057 | 4/10/2008 11:00:00 PM | 4/10/2008 11:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7571 | ASP Baton Recertification COE | 08-014 | 0100 | 7/24/2008 9:00:00 AM | 7/24/2008 9:00:00 AM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD1473 | High Risk Vehicle Stops Refresher | 08-0205 | 0093 | 8/14/2008 9:00:00 AM | 8/14/2008 9:00:00 AM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD2963 | Taser Recertification - X26 | 08-009 | 0090 | 8/29/2008 8:00:00 AM | 8/29/2008 8:00:00 AM | 1.50 | 0.50 | 0.0 | $0.00 | | PeopleSoft |
| PD4912 | Preventing Law Enforcement Suicide | 08-0256 | 0083 | 10/23/2008 4:00:00 AM | 10/23/2008 4:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4939 | Observer / Sniper Course-Basic | 08-315 | 0001 | 11/6/2008 5:00:00 PM | 11/6/2008 5:00:00 PM | 80.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4905 | Immigration Enforcement (Field Order 441) | 08-0258 | 0040 | 11/15/2008 11:59:00 PM | 11/15/2008 11:59:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD8715 | Tactical Building Search Refresher | 08-02770 | 0035 | 12/22/2008 1:00:00 AM | 12/22/2008 1:00:00 AM | 0.50 | 1.50 | 0.0 | $0.00 | | PeopleSoft |
| PD4970 | ADOT Traffic Accident Report Training | 09-068 | 0115 | 1/5/2009 11:00:00 PM | 1/5/2009 11:00:00 PM | 0.50 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5160 | NAPD Backing | 09-031 | 0004 | 3/2/2009 2:30:00 PM | 3/2/2009 2:30:00 PM | 0.00 | 0.50 | 0.0 | $0.00 | | PeopleSoft |
| PD5193 | Immediate Action | 09-092 | 0022 | 3/2/2009 4:00:00 PM | 3/2/2009 4:00:00 PM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Teams for Patrol | | | | | | | | | | |
| PD5208 | Entry Weapon Operator Course | 09-093 | 0001 | 4/23/2009 6:00:00 PM | 4/23/2009 6:00:00 PM | 10.00 | 30.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4953 | Semi-Automatic Shotgun Training | 09-014 | 0005 | 5/28/2009 4:30:00 PM | 5/28/2009 4:30:00 PM | 4.00 | 16.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2895 | Gang Investigation (Basic) | 09-124 | 0034 | 6/10/2009 12:00:00 PM | 6/10/2009 12:00:00 PM | 4.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5215 | Rapid Deployment 2009 | 09-151 | 0040 | 7/13/2009 8:00:00 AM | 7/13/2009 8:00:00 AM | 1.00 | 3.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2963 | Taser Recertification - X26 | 09-006 | 0180 | 8/11/2009 3:30:00 PM | 8/11/2009 3:30:00 PM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5293 | Children Of Incarcerated Parents | 09-199 | 0006 | 8/31/2009 1:00:00 AM | 8/31/2009 1:00:00 AM | 1.50 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5372 | Carotid Control Technique Refresher-Use of Force | 09-184 | 0001 | 10/5/2009 1:00:00 AM | 10/5/2009 1:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5343 | One Handed | 09-181 | 0002 | 10/5/2009 | 10/5/2009 | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Survival Skills / 2009 4th Quarter Shoot | | | 1:00:00 AM | 1:00:00 AM | | | | | | |
| PD5371 | Terrorism Watch List Training | 09-183 | 0001 | 10/5/2009 7:00:00 AM | 10/5/2009 7:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5219 | Coplink Implementation Training | 09-149 | 0060 | 10/26/2009 10:00:00 AM | 10/26/2009 10:00:00 AM | 3.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| C00483 | Wrkplce Harassment & Discrimin | | 0036 | 12/15/2009 12:00:00 AM | | 0.0 | 0.00 | 0.0 | $0.00 | | PS |
| PD5400 | Live Fire Building Search Techniques for Patrol | 10-002 | 0011 | 1/19/2010 4:00:00 AM | 1/19/2010 4:00:00 AM | 1.00 | 3.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5414 | Sage Gun-37mm Multi-Role Projectile Lauchers (SL-6 & SL-1) | 10-003 | 0001 | 1/19/2010 2:00:00 PM | 1/19/2010 2:00:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5412 | Less Lethal Bean Bag | 10-009 | 0002 | 1/19/2010 4:00:00 PM | 1/19/2010 4:00:00 PM | 1.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Recertificaiton | | | | | | | | | | |
| PD5393 | Legal Update 2009-AZPOST Video | 10-001 | 0046 | 3/23/2010 6:00:00 AM | 3/23/2010 6:00:00 AM | 3.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD1318 | Auto Theft (Advanced) | 10-090 | 0025 | 4/29/2010 5:00:00 PM | 4/29/2010 5:00:00 PM | 4.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5541 | Tactical Decision Making with Simunitions | 10-128 | 0022 | 7/20/2010 8:00:00 AM | 7/20/2010 8:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5607 | Taser Recertification 2010 with Scenarios | 10-141 | 0017 | 8/17/2010 2:30:00 PM | 8/17/2010 2:30:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2809 | Flying Armed - Law Enforcement Officers | 10-139 | 0036 | 9/17/2010 3:00:00 PM | 9/17/2010 3:00:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5240 | Undercover Operations | 10-145 | 0002 | 10/4/2010 11:00:00 AM | 10/4/2010 11:00:00 AM | 3.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5534 | Informant / Source of Information | 10-130 | 0002 | 10/4/2010 4:00:00 PM | 10/4/2010 4:00:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD8718 | Buy Bust Procedure | 10-148 | 0004 | 10/4/2010 4:00:00 PM | 10/4/2010 4:00:00 PM | 1.00 | 3.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4430 | Controlled Purchases Of Drugs / Contraband | 10-146 | 0004 | 10/4/2010 6:00:00 PM | 10/4/2010 6:00:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD3767 | Vehicle Containment | 10-151 | 0016 | 10/5/2010 12:00:00 PM | 10/5/2010 12:00:00 PM | 2.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2914 | Surveillance | 10-100 | 0018 | 10/5/2010 5:00:00 PM | 10/5/2010 5:00:00 PM | 4.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2875 | Conspiracy Investigations | 10-144 | 0006 | 10/6/2010 1:00:00 PM | 10/6/2010 1:00:00 PM | 4.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5489 | Street Contacts and Debriefs (Gangs) | 10-089 | 0003 | 10/6/2010 4:00:00 PM | 10/6/2010 4:00:00 PM | 4.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5491 | Asset Forfeiture | 10-102 | 0003 | 10/6/2010 5:00:00 PM | 10/6/2010 5:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2544 | Plain Clothes Off Duty Tactical Handgun | 10-147 | 0004 | 10/7/2010 12:00:00 PM | 10/7/2010 12:00:00 PM | 0.00 | 4.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5205 | Undercover Officer | 10-150 | 0004 | 10/7/2010 5:00:00 PM | 10/7/2010 5:00:00 PM | 1.00 | 3.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rescue | | | | | | | | | | |
| PD5241 | Tactical Scouting | 10-149 | 0002 | 10/8/2010 8:00:00 AM | 10/8/2010 8:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5742 | Comprehensive Search Warrant Writing Class | 10-164 | 0001 | 10/8/2010 5:00:00 PM | 10/8/2010 5:00:00 PM | 8.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5657 | 2010 CPR Refresher | 10-152 | 0034 | 10/28/2010 2:00:00 PM | 10/28/2010 2:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5661 | Low Light Handgun Manipulation | 10-140 | 0020 | 10/28/2010 8:00:00 PM | 10/28/2010 8:00:00 PM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2965 | General Instructors School | 3003.09 | 0008 | 11/19/2010 5:00:00 PM | 11/19/2010 5:00:00 PM | 40.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5076 | Firearms Instructor School | 11-036 | 0035 | 1/28/2011 3:00:00 PM | 1/28/2011 3:00:00 PM | 40.00 | 40.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5804 | Use of Force Documentation Review | 11-033 | 0012 | 2/3/2011 1:30:00 PM | 2/3/2011 1:30:00 PM | 0.50 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5806 | Use of Force-Carotid Control Technique | 11-052 | 0015 | 2/3/2011 2:00:00 PM | 2/3/2011 2:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Review | | | | | | | | | | |
| PD5412 | Less Lethal Bean Bag Recertificaiton | 11-045 | 0004 | 2/3/2011 3:00:00 PM | 2/3/2011 3:00:00 PM | 1.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4653 | Sabre Red Mark 9 Familiarization | 11-112 | 0012 | 3/29/2011 11:00:00 AM | 3/29/2011 11:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5892 | Multi Assault Counter Terror Capability (MACTAC) Concepts for MPD | 11-092 | 0013 | 5/5/2011 7:00:00 PM | 5/5/2011 7:00:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD6470 | Career Survival | 11-117 | 0007 | 12/7/2011 7:00:00 PM | 12/7/2011 7:00:00 PM | 4.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD6451 | 1911 Pistol Transition | 11-127 | 0004 | 12/20/2011 4:00:00 PM | 12/20/2011 4:00:00 PM | 6.00 | 14.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7171 | Sage and Penn Arms Less Lethal Launcher Recertification | 12-014 | 0001 | 1/4/2012 2:00:00 PM | 1/4/2012 2:00:00 PM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5412 | Less Lethal Bean Bag Recertificaiton | 12-048 | 0019 | 1/4/2012 4:00:00 PM | 1/4/2012 4:00:00 PM | 1.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD5370 | Live Fire House Instructor School | 12-008 | 0002 | 1/12/2012 5:00:00 PM | 1/12/2012 5:00:00 PM | 10.00 | 20.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5848 | Precision Immobilization Technique (P.I.T.) | 12-024 | 0015 | 2/23/2012 4:00:00 PM | 2/23/2012 4:00:00 PM | 1.00 | 9.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7354 | One Hand Survival Skills Refresher | 12-067 | 0061 | 5/24/2012 12:00:00 PM | 5/24/2012 12:00:00 PM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7340 | Diversity, Workplace Civility and Equal Employment | 12-064 | 0025 | 6/20/2012 11:00:00 AM | 6/20/2012 11:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7420 | People In Crisis | 12-171 | 0016 | 8/2/2012 1:00:00 AM | 8/2/2012 1:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5899 | Arizona Medical Marijuana Act | 11-165 | 0133 | 10/1/2012 1:00:00 AM | 10/1/2012 1:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7655 | Backing with Mirrors | 12-108 | 0004 | 10/3/2012 1:00:00 AM | 10/3/2012 1:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5412 | Less Lethal Bean Bag | 12-048 | 0033 | 11/7/2012 3:00:00 PM | 11/7/2012 3:00:00 PM | 1.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Recertificaiton | | | | | | | | | | |
| PD7672 | Sage & Penn Arms Less Lethal Launchers Initial Certification (SL-6, SL-1, PGL-65, GL-1) | 12-015 | 0002 | 11/7/2012 4:00:00 PM | 11/7/2012 4:00:00 PM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7700 | Basic Handgun Manipulation in Low Light | 12-115 | 0046 | 11/7/2012 9:00:00 PM | 11/7/2012 9:00:00 PM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7656 | Control Holds and Handcuffing Refresher | 12-112 | 0024 | 11/28/2012 2:00:00 PM | 11/28/2012 2:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7622 | 2012 AZ POST Legal Update (DVD) | 12-441 | 0049 | 12/17/2012 1:00:00 AM | 12/17/2012 1:00:00 AM | 1.50 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5822 | Search Warrant Writing Class | 12-119 | 0004 | 12/19/2012 11:00:00 AM | 12/19/2012 11:00:00 AM | 3.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD7750 | Excited Delirium (COE 2013) | 13-062 | 0002 | 3/21/2013 8:00:00 AM | 3/21/2013 8:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7751 | PTSD / TBI First Responder Program (COE 2013) | 13-064 | 0002 | 3/21/2013 9:00:00 AM | 3/21/2013 9:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7752 | COEUse of Force, Pursuit Policy and PIT Technique Policy Review (COE 2013) | 13-041 | 0002 | 3/21/2013 11:00:00 AM | 3/21/2013 11:00:00 AM | 2 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD5525 | Expandable Baton Recertification | 13-052 | 0059 | 3/21/2013 12:00:00 PM | 3/21/2013 12:00:00 PM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4210 | CPR Refresher | 13-069 | 0132 | 3/21/2013 2:00:00 PM | 3/21/2013 2:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7753 | Use of Force / Carotid Control Tecnhique Review | 13-051 | 0002 | 3/21/2013 3:00:00 PM | 3/21/2013 3:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD7754 | Taser Recertification | 13-081 | 0002 | 3/21/2013 5:00:00 PM | 3/21/2013 5:00:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD3767 | Vehicle Containment | 13-071 | 0028 | 7/17/2013 10:00:00 PM | 7/17/2013 10:00:00 PM | 2 | 2 | 0.0 | $0.00 | | LC |
| PD5358 | P.I.T. Recertification | 13-093 | 0012 | 10/31/2013 9:00:00 AM | 10/31/2013 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7809 | Mental Conditioning for Lethal Force Encounters | 13-117 | 0025 | 12/11/2013 3:00:00 PM | 12/11/2013 3:00:00 PM | 2 | 0.0 | 0.0 | $0.00 | | LC |
| S00004 | Hazard Communication (GHS) (SDS) | | 1 | 1/14/2014 1:26:33 PM | 1/14/2014 1:26:33 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD7867 | 2013 Legal Update | 13-377 | 0002 | 1/23/2014 12:00:00 AM | 1/23/2014 12:00:00 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| PD7865 | Metal Theft / MC Profiling / ADOT 3-Day Permits | 13-378 | 0003 | 1/23/2014 1:30:00 PM | 1/23/2014 1:30:00 PM | 1.5 | 0.0 | 0.0 | $0.00 | | LC |
| PD7883 | First Shot Accuracy | 14-090 | 0021 | 4/8/2014 4:00:00 PM | 4/8/2014 4:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD3658 | Robbery / Homicide / Serious Assaults-Spanish Program | 06-137 | 0009 | 5/5/2014 5:00:00 PM | 5/5/2014 5:00:00 PM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD7873 | Below 100 Basic | 14-092 | 0029 | 7/16/2014 9:00:00 AM | 7/16/2014 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7874 | Use of Force Policy Review with Scenarios | 14-093 | 0029 | 7/16/2014 10:00:00 AM | 7/16/2014 10:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 14-094 | 0059 | 7/16/2014 12:00:00 PM | 7/16/2014 12:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7875 | Early Intervention & Member Resources | 14-095 | 0029 | 7/16/2014 2:00:00 PM | 7/16/2014 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7876 | Missing Persons with Alzheimer's & Related Dementias | 14-096 | 0029 | 7/16/2014 3:00:00 PM | 7/16/2014 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7877 | Hate Crimes: A | 14-097 | 0029 | 7/16/2014 4:00:00 PM | 7/16/2014 4:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Law Enforcement Guide to Investigations and Reporting | | | | | | | | | | |
| PD7878 | Social Media in Law Enforcement | 14-091 | 0029 | 7/16/2014 5:00:00 PM | 7/16/2014 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD5412 | Less Lethal-Bean Bag Recertification | 15-002 | 0058 | 1/6/2015 10:00:00 AM | 1/6/2015 10:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD7171 | Sage & Penn Arms Less Lethal Launchers Recertification | 15-087 | 0003 | 1/6/2015 11:00:00 AM | 1/6/2015 11:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 15-003 | 0005 | 1/13/2015 9:00:00 AM | 1/13/2015 9:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 15-055 | 0072 | 5/8/2015 3:00:00 PM | 5/8/2015 3:00:00 PM | 0 | 1 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD8301 | Pursuit and Stopsticks Review | 15-069 | 0016 | 6/24/2015 8:00:00 AM | 6/24/2015 8:00:00 AM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 15-064 | 0076 | 6/24/2015 9:00:00 AM | 6/24/2015 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD9877 | Tactical Decision Making Scenarios | 15-095 | 0017 | 6/24/2015 10:30:00 AM | 6/24/2015 10:30:00 AM | 0.0 | 1.5 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 15-066 | 178 | 6/24/2015 2:00:00 PM | 6/24/2015 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8302 | Top 10 Constitutional Law Cases Every Officer Should Know | 15-016 | 0016 | 6/24/2015 3:00:00 PM | 6/24/2015 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8303 | Domestic Violence Law Enforcement Refresher | 15-060 | 0016 | 6/24/2015 4:00:00 PM | 6/24/2015 4:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8304 | Mental Illness Refresher | 15-068 | 0016 | 6/24/2015 5:00:00 PM | 6/24/2015 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD6348 | SWAT | | 0003 | 9/4/2015 | 9/4/2015 | 0 | 0 | 40 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Team Leader Development | | | 12:00:00 AM | 12:00:00 AM | | | | | | |
| PD9879 | Use of Deadly Force / Contagious Fire | 15-098 | 0061 | 11/19/2015 5:00:00 PM | 11/19/2015 5:00:00 PM | 1 | 1 | 0.0 | $0.00 | | LC |
| PD9878 | 2015 Legal Update | 15-327 | 0004 | 12/31/2015 12:00:00 AM | 12/31/2015 12:00:00 AM | 2 | 0.0 | 0.0 | $0.00 | | LC |
| PD5412 | Less Lethal-Bean Bag Recertification | 16-003 | 0064 | 1/5/2016 12:00:00 AM | 1/5/2016 12:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| C00008 | UPS: Understanding the Personnel System | | 0275 | 1/11/2016 3:30:00 PM | 1/11/2016 3:30:00 PM | 0.0 | 0.0 | 6 | $0.00 | | LC |
| C00006 | FETM: Fair and Ethical Treatment for Managers | | 0141 | 1/12/2016 12:00:00 PM | 1/12/2016 12:00:00 PM | 0.0 | 0.0 | 3.75 | $0.00 | | LC |
| PD10118 | Heart Fit for Duty | 15-478 | 0006 | 1/12/2016 1:00:00 PM | 1/12/2016 1:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00007 | Taking Corrective Action and Discipline | | 0122 | 1/12/2016 4:00:00 PM | 1/12/2016 4:00:00 PM | 0.0 | 0.0 | 2.75 | $0.00 | | LC |
| PD8314 | Condensed Search and Seizure | 16-005 | 0003 | 1/14/2016 12:00:00 PM | 1/14/2016 12:00:00 PM | 5 | 0 | 0.0 | $0.00 | | LC |
| PD8187 | MPD Supervisor School | | 0006 | 1/14/2016 5:00:00 PM | 1/14/2016 5:00:00 PM | 0 | 0 | 36 | $0.00 | | LC |
| PD1473 | High Risk Vehicle Stops Refresher | 06-0055 | 0032 | 3/13/2016 1:00:00 AM | 3/13/2016 1:00:00 AM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| C00622 | 5 Levels of Leadership (required for supervisors) | | 0005 | 4/6/2016 4:30:00 PM | 4/6/2016 4:30:00 PM | 0.0 | 0.0 | 2.25 | $0.00 | | LC |
| PD10135 | First Response Resiliency Skills | 16-092 | 0004 | 4/20/2016 12:00:00 AM | 4/20/2016 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10118 | Heart Fit for Duty | | 0001 | 4/20/2016 6:00:00 PM | 4/20/2016 6:00:00 PM | 0 | 0 | 2 | $0.00 | | LC |
| PD10082 | Low Light Tactics and Flashlight | 16-061 | 0044 | 4/22/2016 9:00:00 PM | 4/22/2016 9:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Techniques Refresher | | | | | | | | | | |
| PD8276 | Carotid Control Technique Refresher | 16-102 | 0104 | 8/1/2016 9:00:00 AM | 8/11/2016 9:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10089 | Basic Crisis Intervention Training | 16-073 | 0026 | 8/1/2016 6:00:00 PM | 8/1/2016 6:00:00 PM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10120 | Incident De-Escalation and Tactics | 16-087 | 0028 | 8/2/2016 4:00:00 PM | 8/2/2016 4:00:00 PM | 3 | 5 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 16-088 | 0120 | 8/2/2016 6:00:00 PM | 8/2/2016 6:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD5358 | P.I.T. Recertification | 16-010 | 0035 | 12/1/2016 11:30:00 AM | 12/1/2016 11:30:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD7672 | Sage & Penn Arms Less Lethal Launchers Initial Certification (SL-6, SL-1, PGL-65, GL-1) | 17-046 | 0003 | 1/3/2017 11:00:00 AM | 1/3/2017 11:00:00 AM | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| C00483 | Workplace | | 0166 | 1/16/2017 | 1/16/2017 | 0.0 | 0.0 | 0.25 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Harassment and Discrimination Refresher Video | | | 6:11:09 AM | 6:11:09 AM | | | | | | |
| PD10261 | Mandatory 2017 Legal Update, 2-hours COE credit | 16-113P | 0001 | 3/14/2017 6:19:34 AM | 3/14/2017 6:19:34 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD5529 | Basic Digital Camera Operation for Law Enforcement | 17-017 | 0019 | 5/5/2017 10:00:00 AM | 5/5/2017 10:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD4617 | Spanish Refresher (Intermediate) | | 0005 | 5/26/2017 12:00:00 AM | 5/26/2017 12:00:00 AM | 0 | 0 | 8 | $0.00 | | PeopleSoft |
| PD10372 | Squad Operations Tactics Training | 17-059 | 0043 | 6/19/2017 3:00:00 AM | 6/19/2017 3:00:00 AM | 2 | 3 | 0.0 | $0.00 | | LC |
| C00638 | Leadership Lesson Setting S.M.A.R.T. Goals Video | | 0002 | 8/21/2017 3:50:53 AM | 8/21/2017 3:50:53 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| KUV-SN | 07 - Supervisor Navigator Video | | 0001 | 10/2/2017 7:12:39 AM | 10/2/2017 7:12:39 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| KUV-MC | 05 - Request and View Time Off - Video | | 0001 | 10/2/2017 7:15:37 AM | 10/2/2017 7:15:37 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| KUA | **Police Only** Kronos Upgrade - Accelerated Supervisor Training | | 0026 | 10/3/2017 7:00:00 AM | 10/3/2017 7:00:00 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| PD10524 | Use of Cover and Movement Refresher | 17-080 | 0091 | 10/15/2017 8:00:00 AM | 10/15/2017 8:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10480 | Asset Forfeiture Annual Training | | 0001 | 11/27/2017 10:04:03 PM | 11/27/2017 10:04:03 PM | 0 | 0 | 1 | $0.00 | | LC |
| PD10471 | Taser X2 Transition Course | 17-089 | 0044 | 12/2/2017 12:00:00 AM | 12/2/2017 12:00:00 AM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD10535 | AZPOST | 17-84 | 0001 | 2/25/2018 | 2/25/2018 | 1.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mandatory Legal Update 2017 / 2018 | | | 3:27:22 AM | 3:27:22 AM | | | | | | |
| PD8276 | Carotid Control Technique Refresher | 18-006 | 0154 | 3/6/2018 7:00:00 AM | 3/6/2018 7:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10604 | Downed Officer / Citizen Rescue | 18-038 | 0001 | 4/16/2018 8:00:00 AM | 4/16/2018 8:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD1759 | Rapid Deployment | 18-052 | 0194 | 4/27/2018 12:00:00 AM | 4/27/2018 12:00:00 AM | 3.5 | 6.5 | 0.0 | $0.00 | | PeopleSoft |
| PD10530 | TruNarc and NARK II | | 0004 | 5/22/2018 11:06:23 AM | 5/22/2018 11:06:23 AM | 0 | 0 | 10 | $0.00 | | LC |
| PD10605 | Individual First Aid Kit Use | 18-010 | 0054 | 6/5/2018 8:00:00 AM | 6/5/2018 8:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 18-060 | 0126 | 6/5/2018 9:00:00 AM | 6/5/2018 9:00:00 AM | 0 | 3 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable Baton | 18-054 | 0156 | 6/5/2018 9:00:00 AM | 6/5/2018 9:00:00 AM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Refresher | | | | | | | | | | |
| PD10671 | RAMPART | 18-PSA022 | 0001 | 7/30/2018 12:00:00 AM | 7/30/2018 12:00:00 AM | 7.5 | 0 | 0.0 | $0.00 | | LC |
| PD10834 | ICAT - Supervisor | | 0001 | 8/7/2018 12:00:00 PM | 8/7/2018 12:00:00 PM | 0 | 0 | 4 | $0.00 | | LC |
| PD10648 | Tactical Refresher for Supervisors | 18-067 | 0009 | 8/22/2018 12:00:00 AM | 8/22/2018 12:00:00 AM | 3.5 | 0 | 0.0 | $0.00 | | LC |
| PD6197 | Gordon Graham | | 0002 | 8/30/2018 12:00:00 AM | 8/30/2018 12:00:00 AM | 0 | 0 | 10 | $0.00 | | PeopleSoft |
| PD10738 | Fundamentals of Risk Management for Law Enforcement | | 0001 | 9/18/2018 12:00:00 PM | 9/18/2018 12:00:00 PM | 0 | 0 | 5 | $0.00 | | LC |
| PD10778 | One-Handed Survival Skills and Use of Cover in Low Light | 18-072 | 0001 | 10/3/2018 8:00:00 AM | 10/3/2018 8:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10778 | One-Handed Survival | 18-072 | 0049 | 10/30/2018 10:00:00 | 10/30/2018 10:00:00 | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Skills and Use of Cover in Low Light | | | PM | PM | | | | | | |
| PD10835 | Blocking Impaired Driver | 19-008 | 0032 | 2/27/2019 7:30:00 AM | 2/27/2019 7:30:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10870 | Mass Casualty Response | 19-050 | 0006 | 3/6/2019 12:00:00 AM | 3/6/2019 12:00:00 AM | 4 | 4 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 19-013 | 0222 | 3/6/2019 11:00:00 AM | 3/6/2019 11:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10847 | Fair and Impartial Policing (Supervisors) | V19-002 | 0007 | 3/14/2019 12:00:00 AM | 3/14/2019 12:00:00 AM | 10 | 0 | 0.0 | $0.00 | | LC |
| PD10884 | House Bill 2502 | 19-065 | 0001 | 5/27/2019 2:05:30 AM | 5/27/2019 2:05:30 AM | 0.5 | 0 | 0.0 | $0.00 | | LC |
| PD10829 | Know Your Authority | V19-001 | 0021 | 6/3/2019 12:00:00 PM | 6/3/2019 12:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD4773 | LIDAR Qualification | 19-068 | 0011 | 8/14/2019 12:00:00 AM | 8/14/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10956 | 2019 3rd Quarter | 19-064 | 0210 | 8/15/2019 2:00:00 PM | 8/15/2019 2:00:00 PM | 0 | 1 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Training: Decision Shoot, Gas Mask Fit Test & Handgun Inspection | | | | | | | | | | |
| PD11044 | MPD 2019 Suicide Awareness | 19-061 | 0001 | 9/11/2019 9:11:41 PM | 9/11/2019 9:11:41 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD10975 | 2019 3rd Quarter Rifle Shoot | 19-066 | 0034 | 10/18/2019 5:00:00 PM | 10/18/2019 5:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD11071 | 2019 Legal Update - Mandatory Training | 19-95 | 0001 | 11/11/2019 4:13:43 PM | 11/11/2019 4:13:43 PM | 1.25 | 0 | 0.0 | $0.00 | | LC |
| PD11074 | Zero Confirmation, Distance Shooting, Box Drills and Chaos 31 | 19-079 | 0012 | 11/15/2019 3:00:00 PM | 11/15/2019 3:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10981 | Basic Handgun Manipulation Refresher | 19-048 | 0063 | 12/10/2019 9:00:00 AM | 12/10/2019 9:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PC0001 | Procurement Card Training | | 0484 | 1/29/2020 12:00:00 PM | | 0.0 | 0.0 | 1 | $0.00 | | LC |
| PD11076 | Gender - Diverse Cultures | 19-132 | 0001 | 2/12/2020 5:47:57 PM | 2/12/2020 5:47:57 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD11148 | Balance Speed & Accuracy Drills | 20-020 | 0023 | 6/15/2020 11:00:00 AM | 6/15/2020 11:00:00 AM | 0.0 | 2 | 0.0 | $0.00 | | LC |
| | Versaterm MDT 7.7 Training | | | 8/13/2020 5:55:37 PM | 8/13/2020 5:55:37 PM | 0.0 | 0.0 | 0.5 | $0.00 | | LC |
| | 2020 Taser Annual User Update | | | 10/15/2020 10:06:02 PM | 10/15/2020 10:06:02 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| | Mobile Field Force Refresher for Patrol | | | 10/29/2020 4:57:22 PM | 10/29/2020 4:57:22 PM | 0.5 | 0.0 | 0.0 | $0.00 | | LC |
| PD10412 | Active Shooter Incident Response Part 1 | 16-117-1 | 0001 | 12/24/2020 1:41:10 PM | 12/24/2020 1:41:10 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD10413 | Active Shooter | 16-117-2 | 0001 | 12/24/2020 1:44:20 PM | 12/24/2020 1:44:20 PM | 3.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Matthew Harris, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Incident Response Part 2 | | | | | | | | | | |
| PD10414 | Active Shooter Incident Response Part 3 | 16-117-3 | 0001 | 12/24/2020 1:49:12 PM | 12/24/2020 1:49:12 PM | 2.5 | 0 | 0.0 | $0.00 | | LC |
| PD10572 | Making It Safer (Lieutenants Only) | | 0001 | 12/31/2020 12:00:00 AM | 12/31/2020 12:00:00 AM | 0 | 0 | 3 | $0.00 | | LC |
| | Tuition Assistance Program Orientation | | | 4/6/2022 5:17:33 PM | 4/6/2022 5:17:33 PM | 0.0 | 0.0 | 0.15 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 526.00 | Total: 325.25 | Total: 992.95 | $0.00 | | |

| Full Name | Badge # | Course Title | Date Completed | POST Hours | SEAT Hours |
|---|---|---|---|---|---|
| Navarro, Alejandro | 19827 | RETIRED P1A Tutorials: Basic User Overview | 11/17/2020 | | 0.25 |
| Navarro, Alejandro | 19827 | Versaterm RMS 8.1 Update | 04/01/2021 | | |
| Navarro, Alejandro | 19827 | Hate Crimes Training For Law Enforcement | 04/13/2021 | | 1 |
| Navarro, Alejandro | 19827 | Investigating Hate/Bias Crimes | 04/13/2021 | | |
| Navarro, Alejandro | 19827 | E-Ticket Training | 05/13/2021 | | 0.25 |
| Navarro, Alejandro | 19827 | Training Bulletin 2021-07 New Behavioral Health-Related Radio Codes | 07/06/2021 | | |
| Navarro, Alejandro | 19827 | Officer/Victim Follow Up | 08/17/2021 | | |
| Navarro, Alejandro | 19827 | Training Bulletin 2021-10 Tactical Awareness In and Around Facilities | 08/17/2021 | | |
| Navarro, Alejandro | 19827 | Decision Shoot | 08/31/2021 | 1 | |
| Navarro, Alejandro | 19827 | 2021-15 Asset Forfeiture Legal Update | 11/02/2021 | | 0.25 |
| Navarro, Alejandro | 19827 | 2021 40mm Recertification | 11/10/2021 | 1 | |
| Navarro, Alejandro | 19827 | Basic SWAT Slow and Deliberate Searching | 06/15/2021 | 4 | |
| Navarro, Alejandro | 19827 | 2021 SWAT  Rifle Qualification | 03/02/2021 | 1 | |
| Navarro, Alejandro | 19827 | Electrical and Fire Safety | 12/09/2021 | | 1 |
| Navarro, Alejandro | 19827 | Indian Country Jurisdiction | 12/09/2021 | | |
| Navarro, Alejandro | 19827 | RETIRED Active Shooter 1 | 12/13/2021 | 1 | |
| Navarro, Alejandro | 19827 | RETIRED Active Shooter 2 | 12/14/2021 | 1 | |
| Navarro, Alejandro | 19827 | RETIRED Active Shooter 3 | 12/14/2021 | 1 | |
| Navarro, Alejandro | 19827 | RETIRED Active Shooter 4 | 12/14/2021 | 1 | |
| Navarro, Alejandro | 19827 | Campus Policing | 12/14/2021 | | 1 |
| Navarro, Alejandro | 19827 | Children and Law Enforcement | 12/14/2021 | | 1 |
| Navarro, Alejandro | 19827 | RETIRED Communication Skills 1 | 12/14/2021 | | 1 |
| Navarro, Alejandro | 19827 | RETIRED Communication Skills 2 | 12/15/2021 | | 1 |
| Navarro, Alejandro | 19827 | RETIRED Communication Skills 3 | 12/15/2021 | | 1 |
| Navarro, Alejandro | 19827 | 2021 Bean Bag Recertification | 12/22/2021 | 1 | |
| Navarro, Alejandro | 19827 | Taser 7 Transition Course | 09/30/2021 | 3 | |
| Navarro, Alejandro | 19827 | Airborne and Bloodborne Pathogens | 02/23/2022 | | 1 |
| Navarro, Alejandro | 19827 | Good Tactics and Communications Skills | 03/15/2022 | | 0.25 |
| Navarro, Alejandro | 19827 | Preventing Harassment and Discrimination | 03/17/2022 | | 0.5 |
| Navarro, Alejandro | 19827 | Accountability Bulletin, 1st Quarter 2022 | 04/19/2022 | | |
| Navarro, Alejandro | 19827 | Use of Deadly Force Training | 05/31/2022 | | 2 |
| Navarro, Alejandro | 19827 | Active Shooter Response Training Bulletin | 06/21/2022 | | 0.5 |
| Navarro, Alejandro | 19827 | RETIRED Active Shooter: Recognition and Basic Response | 06/21/2022 | | 1 |
| Navarro, Alejandro | 19827 | Taser Recertification | 06/21/2022 | 2 | |
| Navarro, Alejandro | 19827 | COM 2022 Initiatives in Mental Illness & Policing | 07/15/2022 | | 0.5 |
| Navarro, Alejandro | 19827 | 2022 AZPOST Qualification | 12/31/2022 | | 1 |
| Navarro, Alejandro | 19827 | K9 Operations Refresher | 08/09/2022 | | |
| Navarro, Alejandro | 19827 | Accountability Bulletin, 2nd Quarter 2022 | 08/09/2022 | | |
| Navarro, Alejandro | 19827 | RETIRED Best Practices in Dangerous Canine Encounters | 09/02/2022 | | 1 |
| Navarro, Alejandro | 19827 | Basic Firearm Safety | 09/02/2022 | | 1 |
| Navarro, Alejandro | 19827 | Bomb Threats in Schools | 09/07/2022 | | 1 |
| Navarro, Alejandro | 19827 | Absorbents and Spills | 09/08/2022 | | 1 |
| Navarro, Alejandro | 19827 | Defensive Driving Basics | 09/08/2022 | | 1 |
| Navarro, Alejandro | 19827 | Utilizing Drug Recognition Experts | 11/09/2022 | | 0.25 |
| Navarro, Alejandro | 19827 | Fire Extinguisher (Mandatory Training) | 11/09/2022 | | 0.25 |
| Navarro, Alejandro | 19827 | Risk Management Bulletin | 11/09/2022 | | 0.5 |
| Navarro, Alejandro | 19827 | Decision Shoot | 11/09/2022 | 1 | |
| Navarro, Alejandro | 19827 | Accountability Bulletin, 3rd Quarter 2022 | 12/13/2022 | | |
| Navarro, Alejandro | 19827 | Admin Per Se Affidavit Update (Mandatory Training) | 12/29/2022 | | 0.25 |
| Navarro, Alejandro | 19827 | 2023 Bean Bag Recertification | 01/17/2023 | 2 | |
| Navarro, Alejandro | 19827 | 2023 40mm RE-certification | 01/17/2023 | 2 | |
| Navarro, Alejandro | 19827 | Less Lethal Recert Bean Bag 40mm | 01/17/2023 | 4 | |
| Navarro, Alejandro | 19827 | 2023-01 Burglary Investigations at Gun Stores Training Bulletin | 02/16/2023 | | 0.25 |
| Navarro, Alejandro | 19827 | 2023 AZPOST Qualification | 03/06/2023 | 1 | |
| Navarro, Alejandro | 19827 | Resource Guide for Elder Abuse | 02/27/2023 | | 0.25 |
| Navarro, Alejandro | 19827 | Drug Impaired Driver Informational Training (DIDIT) | 03/16/2023 | | 3.5 |
| Navarro, Alejandro | 19827 | Basic SWAT School | 02/23/2023 | 80 | |
| Navarro, Alejandro | 19827 | Street Racing Bulletin | 04/06/2023 | | 0.5 |
| Navarro, Alejandro | 19827 | Water Rescue (Throw Bag) Training | 04/06/2023 | | 1 |
| Navarro, Alejandro | 19827 | New RMS Function *Mandatory* | 05/04/2023 | | 0.5 |
| Navarro, Alejandro | 19827 | PepperBall 2023 | 05/30/2023 | 10 | |
| Navarro, Alejandro | 19827 | Search & Seizure | 05/31/2023 | | 2 |
| Navarro, Alejandro | 19827 | Fatal and Serious Injury Training Bulletin | 06/19/2023 | | 0.5 |
| Navarro, Alejandro | 19827 | Submitting Property/Evidence | 07/03/2023 | | 0.25 |
| Navarro, Alejandro | 19827 | 2023 2nd Qtr Pistol - Dry Fire | 06/27/2023 | 2 | |
| Navarro, Alejandro | 19827 | Active Shooter #2 | 07/07/2023 | 4.5 | |
| Navarro, Alejandro | 19827 | RMS Refresher Training | 10/19/2023 | 21.5 | |
| Navarro, Alejandro | 19827 | Decision Shoot | 11/28/2023 | 2 | |
| Navarro, Alejandro | 19827 | Accountability Bulletin, 3rd Quarter 2023 | 12/19/2023 | | |
| Navarro, Alejandro | 19827 | Fire Extinguisher (Mandatory Training) | 12/19/2023 | | 0.25 |
| Navarro, Alejandro | 19827 | Airborne and Bloodborne Pathogens | 12/20/2023 | | 1 |
| Navarro, Alejandro | 19827 | Indian Country Jurisdiction | 12/20/2023 | | |
| Navarro, Alejandro | 19827 | 2024 Beanbag ReCertifications | 02/21/2024 | 2 | |
| Navarro, Alejandro | 19827 | 2024 40mm ReCertification | 01/23/2024 | 2 | |
| Navarro, Alejandro | 19827 | Basic SWAT School | 02/22/2024 | 80 | |
| Navarro, Alejandro | 19827 | 2024 AZPOST | 02/28/2024 | 2 | |
| Navarro, Alejandro | 19827 | STOP STICKS Refresher | 05/10/2024 | | 0.5 |
| Navarro, Alejandro | 19827 | Police Jiu-Jitsu | 06/04/2024 | | 1 |
| Navarro, Alejandro | 19827 | THE EAST VALLEY CRITICAL INCIDENT RESPONSE TEAM | 06/05/2024 | | 0.25 |
| Navarro, Alejandro | 19827 | 2024 2nd Qtr Bounding/Peels (24-036) | 05/14/2024 | 4 | |
| Navarro, Alejandro | 19827 | Phoenix Machine Gun Conversion | 06/13/2024 | | 0.25 |
| Navarro, Alejandro | 19827 | Ethics and Professionalism | 07/03/2024 | | 0.5 |
| Navarro, Alejandro | 19827 | Airborne and Bloodborne Pathogens | 08/14/2024 | | 1 |
| Navarro, Alejandro | 19827 | Fire Extinguisher (Mandatory Training) | 08/14/2024 | | 0.25 |
| Navarro, Alejandro | 19827 | IFAK Training | 08/14/2024 | | 0.5 |
| Navarro, Alejandro | 19827 | Crime Gun Training Bulletin | 10/30/2024 | | 0.5 |
| Navarro, Alejandro | 19827 | High Risk Traffic Stops on Stolen Vehicles | 11/07/2024 | | 0.5 |
| Navarro, Alejandro | 19827 | 2024 4th Quarter Wellness Training (24-030) | 10/07/2024 | 1 | |
| Navarro, Alejandro | 19827 | 2024 PIT Certification - 24-039 | 07/24/2024 | 4 | |

| | | | | | |
|---|---|---|---|---|---|
| Navarro, Alejandro | 19827 | 2024 - 4th Qtr Building Searches/AZPOST Decision Shoot/Taser 10 Upgrade (24-032) | 08/27/2024 | 5 | |
| Navarro, Alejandro | 19827 | 2025 AZ Post Quals - 2nd Qtr (AZ Post #25-011) | 01/30/2025 | 2 | |
| Navarro, Alejandro | 19827 | Fiesta Patrol Booking | 04/08/2025 | | 0.5 |
| Navarro, Alejandro | 19827 | 2025 2nd Quarter Training - DT/PJJ-ABC Refresher & Combatives/Weapon Retention/Protection (AZPOST 25-011) | 04/08/2025 | 4 | |
| Navarro, Alejandro | 19827 | New Axon Products | 05/29/2025 | | 0.25 |
| Navarro, Alejandro | 19827 | 2025 AZ Post Quals - 2nd Qtr (AZ Post #25-011) | 05/29/2025 | 2 | |
| Navarro, Alejandro | 19827 | Airborne and Bloodborne Pathogens | 06/19/2025 | | 1 |
| Navarro, Alejandro | 19827 | Fire Extinguisher (Mandatory Training) | 06/19/2025 | | 0.25 |
| Navarro, Alejandro | 19827 | Indian Country Jurisdiction | 06/19/2025 | | |
| Navarro, Alejandro | 19827 | 2025 3rd Quarter Training - Active Assailant AZPOST 25-012 | 07/16/2025 | 4 | |
| **1 users in total** | | | | **259** | **38** |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00649 | (Employee) Preventing Discrimination and Harassment | | 0001 | | 2/21/2019 10:05:18 AM | 0.0 | 0.0 | 0.75 | $0.00 | | LC |
| PD7348 | Taser X2 User Certification | 13-088 | 0007 | 6/11/2013 4:00:00 PM | 6/11/2013 4:00:00 PM | 6 | 0 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 13-069 | 155 | 6/12/2013 2:00:00 PM | 6/12/2013 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7753 | Use of Force-Carotid Control Technique Review | 13-051 | 0025 | 6/12/2013 3:00:00 PM | 6/12/2013 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| | New Employee Orientation Part I | | | 6/13/2013 12:00:00 PM | 6/13/2013 12:00:00 PM | 0.0 | 0.0 | 4.00 | $0.00 | | LC |
| SNEO | New Employee Orientation Part I (Safety Training) | | 0001 | 6/13/2013 5:00:00 PM | 6/13/2013 5:00:00 PM | 4.00 | 0.0 | 4 | $0.00 | | LC |
| PD5413 | Practical Search and | 13-095 | 0016 | 6/17/2013 12:00:00 | 6/17/2013 12:00:00 | 5 | 0 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Seizure | | | PM | PM | | | | | | |
| C00541 | New Employee Orientation (Customer Service & Workplace Harassment / Discrimination) | | 0019 | 7/30/2013 5:00:00 PM | 7/30/2013 5:00:00 PM | 0.0 | 0.0 | 3.75 | $0.00 | | LC |
| PD7786 | Close-Quarter Crisis Edged Weapon Defense Refresher | 13-108 | 0007 | 9/24/2013 3:00:00 PM | 9/24/2013 3:00:00 PM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD7809 | Mental Conditioning for Lethal Force Encounters | 13-117 | 0017 | 12/9/2013 8:00:00 AM | 12/9/2013 8:00:00 AM | 2 | 0.0 | 0.0 | $0.00 | | LC |
| S00004 | Hazard Communication (GHS) (SDS) | | 1 | 1/14/2014 3:53:43 PM | 1/14/2014 3:53:43 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD7867 | 2013 Legal Update | 13-377 | 0013 | 2/3/2014 12:00:00 AM | 2/3/2014 12:00:00 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD7865 | Metal Theft / MC Profiling / ADOT 3-Day Permits | 13-378 | 0013 | 2/3/2014 1:30:00 PM | 2/3/2014 1:30:00 PM | 1.5 | 0.0 | 0.0 | $0.00 | | LC |
| PD7873 | Below 100 Basic | 14-092 | 0002 | 3/18/2014 9:00:00 AM | 3/18/2014 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7874 | Use of Force Policy Review with Scenarios | 14-093 | 0002 | 3/18/2014 10:00:00 AM | 3/18/2014 10:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 14-094 | 0032 | 3/18/2014 12:00:00 PM | 3/18/2014 12:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7875 | Early Intervention & Member Resources | 14-095 | 0002 | 3/18/2014 2:00:00 PM | 3/18/2014 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7876 | Missing Persons with Alzheimer's & Related Dementias | 14-096 | 0002 | 3/18/2014 3:00:00 PM | 3/18/2014 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7877 | Hate Crimes: A | 14-097 | 0002 | 3/18/2014 4:00:00 PM | 3/18/2014 4:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Law Enforcement Guide to Investigations and Reporting | | | | | | | | | | |
| PD7878 | Social Media in Law Enforcement | 14-091 | 0002 | 3/18/2014 5:00:00 PM | 3/18/2014 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7883 | First Shot Accuracy | 14-090 | 0019 | 4/8/2014 10:00:00 AM | 4/8/2014 10:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD7938 | Unconventional Shooting Positions-Failure to Chamber Malfunction | 14-074 | 0035 | 5/6/2014 10:00:00 AM | 5/6/2014 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD8181 | One Hand Survival Skills-Low Light | 14-137 | 0006 | 9/29/2014 6:30:00 AM | 9/29/2014 6:30:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD8245 | Qualification-Class 3 Malfunction Clearance-Distance Basics | 14-136 | 0016 | 10/4/2014 2:00:00 PM | 10/4/2014 2:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD8165 | Law Enforcement CPR | 14-021 | 0007 | 10/28/2014 12:00:00 AM | 10/28/2014 12:00:00 AM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| PD8305 | Low Light Malfunction Clearance, Transition and Qualification | 15-065 | 0005 | 1/12/2015 9:30:00 AM | 1/12/2015 9:30:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 15-003 | 0047 | 2/9/2015 8:00:00 AM | 2/9/2015 8:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 15-055 | 0016 | 3/30/2015 7:00:00 AM | 3/30/2015 7:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD8323 | Rifle Drills and Skill Builders | 15-072 | 0029 | 5/4/2015 1:00:00 PM | 5/4/2015 1:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD8301 | Pursuit and Stopsticks Review | 15-069 | 0016 | 6/24/2015 8:00:00 AM | 6/24/2015 8:00:00 AM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 15-064 | 0076 | 6/24/2015 9:00:00 AM | 6/24/2015 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD9877 | Tactical Decision | 15-095 | 0017 | 6/24/2015 10:30:00 | 6/24/2015 10:30:00 | 0.0 | 1.5 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

MESA_002823

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Making Scenarios | | | AM | AM | | | | | | |
| PD4210 | CPR Refresher | 15-066 | 178 | 6/24/2015 2:00:00 PM | 6/24/2015 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8302 | Top 10 Constitutional Law Cases Every Officer Should Know | 15-016 | 0016 | 6/24/2015 3:00:00 PM | 6/24/2015 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8303 | Domestic Violence Law Enforcement Refresher | 15-060 | 0016 | 6/24/2015 4:00:00 PM | 6/24/2015 4:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8304 | Mental Illness Refresher | 15-068 | 0016 | 6/24/2015 5:00:00 PM | 6/24/2015 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD9875 | Sovereign Citizen Extremists (With CA POST DVD) | 15-119 | 0010 | 7/23/2015 12:00:00 AM | 7/23/2015 12:00:00 AM | 4 | 0.0 | 0.0 | $0.00 | | LC |
| PD8325 | Specialty Vehicle | 15-089 | 0002 | 8/27/2015 4:00:00 PM | 8/27/2015 4:00:00 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Driving Course | | | | | | | | | | |
| PD5603 | Arizona Tactical Officers Association Conference | 15-376 | 0003 | 10/23/2015 5:00:00 PM | 10/23/2015 5:00:00 PM | 14 | 0 | 0.0 | $0.00 | | LC |
| PD5193 | Immediate Action Teams for Patrol | 15-106 | 0088 | 11/5/2015 3:00:00 PM | 11/5/2015 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD9879 | Use of Deadly Force / Contagious Fire | 15-098 | 0052 | 11/10/2015 11:30:00 AM | 11/10/2015 11:30:00 AM | 1 | 1 | 0.0 | $0.00 | | LC |
| PD9878 | 2015 Legal Update | 15-327 | 0004 | 12/31/2015 12:00:00 AM | 12/31/2015 12:00:00 AM | 2 | 0.0 | 0.0 | $0.00 | | LC |
| PD10118 | Heart Fit for Duty | 15-478 | 0006 | 1/12/2016 1:00:00 PM | 1/12/2016 1:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD5848 | Precision Immobilization Technique (P.I.T.) | 16-011 | 0034 | 1/23/2016 12:00:00 AM | 1/23/2016 12:00:00 AM | 1 | 9 | 0.0 | $0.00 | | LC |
| PD1944 | K-9 Agitator | 16-067 | 0020 | 3/16/2016 10:00:00 | 3/16/2016 10:00:00 | 4 | 0 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Course | | | PM | PM | | | | | | |
| PD10135 | First Response Resiliency Skills | 16-092 | 0003 | 4/13/2016 12:00:00 AM | 4/13/2016 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10082 | Low Light Tactics and Flashlight Techniques Refresher | 16-061 | 0045 | 4/26/2016 9:00:00 PM | 4/26/2016 9:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10120 | Incident De-Escalation and Tactics | 16-087 | 0013 | 5/16/2016 4:00:00 PM | 5/16/2016 4:00:00 PM | 3 | 5 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 16-088 | 0107 | 5/16/2016 6:00:00 PM | 5/16/2016 6:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD5660 | Basic Spanish Refresher | 16-064 | 0010 | 11/18/2016 5:00:00 PM | 11/18/2016 5:00:00 PM | 4 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD10089 | Basic Crisis Intervention Training | 16-073 | 0035 | 12/6/2016 12:00:00 AM | 12/6/2016 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD7672 | Sage & Penn Arms Less Lethal Launchers Initial Certification | 17-046 | 0003 | 1/3/2017 11:00:00 AM | 1/3/2017 11:00:00 AM | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (SL-6, SL-1, PGL-65, GL-1) | | | | | | | | | | |
| C00483 | Workplace Harassment and Discrimination Refresher Video | | 0166 | 1/4/2017 5:08:04 PM | 1/4/2017 5:08:04 PM | 0.0 | 0.0 | 0.25 | $0.00 | | LC |
| PD10261 | Mandatory 2017 Legal Update, 2-hours COE credit | 16-113P | 0001 | 3/1/2017 8:22:36 PM | 3/1/2017 8:22:36 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10524 | Use of Cover and Movement Refresher | 17-080 | 0095 | 5/16/2017 5:00:00 PM | 5/16/2017 5:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10372 | Squad Operations Tactics Training | 17-059 | 0057 | 10/5/2017 12:00:00 PM | 10/5/2017 12:00:00 PM | 2 | 3 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 17-093 | 0207 | 10/12/2017 3:00:00 PM | 10/12/2017 3:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10469 | VirTra V-300 Familiarization | 17-091 | 0017 | 10/12/2017 5:00:00 PM | 10/12/2017 5:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | and Training Capability | | | | | | | | | | |
| PD10412 | Active Shooter Incident Response Part 1 | 16-117-1 | 0001 | 10/13/2017 4:56:52 PM | 10/13/2017 4:56:52 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD10479 | Use of Naloxone (Narcan) Nasal Spray by Law Enforcement for Opioid Overdose | 17-096 | 0001 | 11/21/2017 10:46:51 AM | 11/21/2017 10:46:51 AM | 1.5 | 0 | 1.5 | $0.00 | | LC |
| PD10471 | Taser X2 Transition Course | 17-089 | 0052 | 12/12/2017 4:30:00 PM | 12/12/2017 4:30:00 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD10480 | Asset Forfeiture Annual Training | | 0001 | 1/23/2018 12:41:18 PM | 1/23/2018 12:41:18 PM | 0 | 0 | 1 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 18-006 | 0195 | 3/20/2018 1:00:00 PM | 3/20/2018 1:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD2863 | Expandable Baton Refresher | 18-054 | 0133 | 5/15/2018 1:00:00 PM | 5/15/2018 1:00:00 PM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| PD10605 | Individual First Aid Kit Use | 18-010 | 0034 | 6/5/2018 10:00:00 AM | 6/5/2018 10:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 18-060 | 0159 | 6/5/2018 12:00:00 PM | 6/5/2018 12:00:00 PM | 0 | 3 | 0.0 | $0.00 | | LC |
| PD1759 | Rapid Deployment | 18-052 | 0203 | 6/28/2018 12:00:00 AM | 6/28/2018 12:00:00 AM | 3.5 | 6.5 | 0.0 | $0.00 | | PeopleSoft |
| PD10778 | One-Handed Survival Skills and Use of Cover in Low Light | 18-072 | 0049 | 10/30/2018 10:00:00 PM | 10/30/2018 10:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10535 | AZPOST Mandatory Legal Update 2017 / 2018 | 17-84 | 0001 | 12/4/2018 3:40:33 PM | 12/4/2018 3:40:33 PM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| PD10411 | Credit Card Skimming Devices: | 16-138 | 0001 | 12/5/2018 4:20:34 PM | 12/5/2018 4:20:34 PM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | AZPOST 1.5-hour Webinar for MPD Sworn Personnel. | | | | | | | | | | |
| PD10477 | Human Trafficking | 14-444 | 0001 | 12/6/2018 1:27:13 PM | 12/6/2018 1:27:13 PM | 2.5 | 0 | 0.0 | $0.00 | | LC |
| PD10806 | Animal Cruelty Investigations and Prosecution and the Link to Human Violence | 18-073 | 0001 | 12/14/2018 4:51:47 PM | 12/14/2018 4:51:47 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10777 | ICAT Introduction | 18-089 | 0001 | 12/18/2018 2:55:04 PM | 12/18/2018 2:55:04 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10809 | 2018 Legal Update | 18-91 | 0001 | 1/15/2019 2:02:57 PM | 1/15/2019 2:02:57 PM | 1.25 | 0 | 0.0 | $0.00 | | LC |
| PD5370 | Live Fire House Instructor School | 19-007 | 0004 | 1/24/2019 12:00:00 AM | 1/24/2019 12:00:00 AM | 10 | 10 | 0.0 | $0.00 | | PeopleSoft |
| PD10833 | Mesa Wellness 360 Overview | 19-011 | 0021 | 2/19/2019 3:00:00 PM | 2/19/2019 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD10981 | Basic Handgun Manipulation Refresher | 19-048 | 0014 | 5/29/2019 12:00:00 AM | 5/29/2019 12:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10709 | ICAT | 19-039 | 0037 | 6/18/2019 12:00:00 AM | 6/18/2019 12:00:00 AM | 10 | 0 | 0.0 | $0.00 | | LC |
| PD10887 | Fair and Impartial Policing | V19-002 | 0007 | 6/18/2019 12:00:00 AM | 6/18/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10956 | 2019 3rd Quarter Training: Decision Shoot, Gas Mask Fit Test & Handgun Inspection | 19-064 | 0085 | 7/11/2019 1:00:00 PM | 7/11/2019 1:00:00 PM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD10968 | 2019 Rifle and Shotgun Inspection | | 0069 | 9/5/2019 11:00:00 AM | 9/5/2019 11:00:00 AM | 0 | 0 | 1 | $0.00 | | LC |
| PD11071 | 2019 Legal Update - Mandatory Training | 19-95 | 0001 | 11/21/2019 8:36:04 AM | 11/21/2019 8:36:04 AM | 1.25 | 0 | 0.0 | $0.00 | | LC |
| PD11064 | Commercial | 19-073 | 0002 | 12/6/2019 | 12/6/2019 | 20 | 20 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Vehicle Operations-CDL | | | 12:00:00 AM | 12:00:00 AM | | | | | | |
| PD11044 | MPD 2019 Suicide Awareness | 19-061 | 0001 | 12/6/2019 2:54:44 PM | 12/6/2019 2:54:44 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD11076 | Gender - Diverse Cultures | 19-132 | 0001 | 1/29/2020 2:56:17 PM | 1/29/2020 2:56:17 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| | COVID 19 Infection Control and Personal Protective Equipment (PPE) Guidance | | 0001 | 4/7/2020 12:25:55 PM | 4/7/2020 12:25:55 PM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| | Versaterm MDT 7.7 Training | | | 8/27/2020 4:29:54 PM | 8/27/2020 4:29:54 PM | 0.0 | 0.0 | 0.5 | $0.00 | | LC |
| | Mobile Field Force Refresher for Patrol | | | 10/29/2020 3:58:06 PM | 10/29/2020 3:58:06 PM | 0.5 | 0.0 | 0.0 | $0.00 | | LC |
| PD10413 | Active Shooter Incident Response | 16-117-2 | 0001 | 12/29/2020 11:51:12 AM | 12/29/2020 11:51:12 AM | 3.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

HMS 171a - PD Report - Student Training Hours Alejandro Navarro, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Part 2 | | | | | | | | | | |
| PD10414 | Active Shooter Incident Response Part 3 | 16-117-3 | 0001 | 12/29/2020 4:43:32 PM | 12/29/2020 4:43:32 PM | 2.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 90 | | | | | | Total: 192.00 | Total: 94.0 | Total: 19.75 | $0.00 | | |

| Full Name | Badge # | Course Title | Date Completed | POST Hours | SEAT Hours |
|---|---|---|---|---|---|
| Orr, Christopher | 19441 | RETIRED P1A Tutorials: Basic User Overview | 11/18/2020 | | 0.25 |
| Orr, Christopher | 19441 | RETIRED Active Shooter: Recognition and Basic Response | 12/30/2020 | 1 | |
| Orr, Christopher | 19441 | RETIRED Active Shooter 1 | 12/31/2020 | 1 | |
| Orr, Christopher | 19441 | RETIRED Active Shooter 2 | 12/31/2020 | 1 | |
| Orr, Christopher | 19441 | COMMERCIAL VEHICLE OPERATIONS CDL | 01/31/2020 | 40 | |
| Orr, Christopher | 19441 | MINIATRURIZED RED DOT SIGHT EQUIPPED HANDGUN TRANSITION SCHOOL | 05/19/2020 | 2 | |
| Orr, Christopher | 19441 | MINIATRURIZED RED DOT SIGHT EQUIPPED HANDGUN TRANSITION SCHOOL | 05/19/2020 | 14 | |
| Orr, Christopher | 19441 | TASER X2 USER CERTIFICATION COURSE | 12/07/2020 | 1 | |
| Orr, Christopher | 19441 | Hate Crimes Training For Law Enforcement | 04/26/2021 | | 1 |
| Orr, Christopher | 19441 | Investigating Hate/Bias Crimes | 04/26/2021 | | |
| Orr, Christopher | 19441 | Threat Recognition Speed Drills | 06/14/2021 | | 1 |
| Orr, Christopher | 19441 | Training Bulletin 2021-07 New Behavioral Health-Related Radio Codes | 07/21/2021 | | |
| Orr, Christopher | 19441 | 2021 1st Quarter Rifle Qualification | 02/16/2021 | 4 | |
| Orr, Christopher | 19441 | Mobile Field Force Refresher for Patrol | 04/12/2021 | 1 | |
| Orr, Christopher | 19441 | 2021 3rd Quarter Rifle Standard | 10/31/2021 | 4 | |
| Orr, Christopher | 19441 | Electrical and Fire Safety | 11/10/2021 | | 1 |
| Orr, Christopher | 19441 | Decision Shoot | 11/01/2021 | 1 | |
| Orr, Christopher | 19441 | EBI Core | 09/10/2021 | | 1 |
| Orr, Christopher | 19441 | Preventing Harassment and Discrimination | 03/16/2022 | | 0.5 |
| Orr, Christopher | 19441 | Good Tactics and Communications Skills | 03/16/2022 | | 0.25 |
| Orr, Christopher | 19441 | Civil Rights | 03/16/2022 | | 4 |
| Orr, Christopher | 19441 | Accountability Bulletin, 1st Quarter 2022 | 04/19/2022 | | |
| Orr, Christopher | 19441 | Airborne and Bloodborne Pathogens | 05/18/2022 | | 1 |
| Orr, Christopher | 19441 | 2021-15 Asset Forfeiture Legal Update | 05/18/2022 | | 0.25 |
| Orr, Christopher | 19441 | Training Bulletin 2021-10 Tactical Awareness In and Around Facilities | 05/18/2022 | | |
| Orr, Christopher | 19441 | Officer/Victim Follow Up | 05/18/2022 | | |
| Orr, Christopher | 19441 | Versaterm RMS 8.1 Update | 05/18/2022 | | |
| Orr, Christopher | 19441 | Indian Country Jurisdiction | 05/18/2022 | | |
| Orr, Christopher | 19441 | E-Ticket Training | 05/18/2022 | | 0.25 |
| Orr, Christopher | 19441 | RETIRED Communication Skills 1 | 05/19/2022 | 1 | |
| Orr, Christopher | 19441 | RETIRED Communication Skills 2 | 05/25/2022 | 1 | |
| Orr, Christopher | 19441 | RETIRED Communication Skills 3 | 05/25/2022 | 1 | |
| Orr, Christopher | 19441 | Active Shooter Response Training Bulletin | 06/27/2022 | | 0.5 |
| Orr, Christopher | 19441 | RETIRED Active Shooter: Recognition and Basic Response | 06/27/2022 | 1 | |
| Orr, Christopher | 19441 | 2022 AZPOST Qualification | 12/31/2022 | 1 | |
| Orr, Christopher | 19441 | K9 Operations Refresher | 07/26/2022 | | |
| Orr, Christopher | 19441 | COM 2022 Initiatives in Mental Illness & Policing | 07/26/2022 | | 0.5 |
| Orr, Christopher | 19441 | Mesa Police Basic Detective School | 06/08/2022 | 10 | |
| Orr, Christopher | 19441 | Mesa Police Basic Detective School | 06/15/2022 | 10 | |
| Orr, Christopher | 19441 | Accountability Bulletin, 2nd Quarter 2022 | 07/28/2022 | | |
| Orr, Christopher | 19441 | Defensive Tactics 2nd Quarter | 09/12/2022 | 3 | |
| Orr, Christopher | 19441 | 2022 3rd Qtr Rifle | 09/30/2022 | 4 | |
| Orr, Christopher | 19441 | Use of Deadly Force Training | 10/03/2022 | 2 | |
| Orr, Christopher | 19441 | Mesa Police Basic Detective School | 06/22/2022 | 10 | |
| Orr, Christopher | 19441 | Mesa Police Basic Detective School | 06/29/2022 | 10 | |
| Orr, Christopher | 19441 | Fire Extinguisher (Mandatory Training) | 10/20/2022 | | 0.25 |
| Orr, Christopher | 19441 | Utilizing Drug Recognition Experts | 10/26/2022 | | 0.25 |
| Orr, Christopher | 19441 | Risk Management Bulletin | 10/26/2022 | | 0.5 |
| Orr, Christopher | 19441 | Accountability Bulletin, 3rd Quarter 2022 | 01/09/2023 | | |
| Orr, Christopher | 19441 | Admin Per Se Affidavit Update (Mandatory Training) | 01/09/2023 | | 0.25 |
| Orr, Christopher | 19441 | 2023 AZPOST Qualification | 03/06/2023 | 1 | |
| Orr, Christopher | 19441 | 2023-01 Burglary Investigations at Gun Stores Training Bulletin | 02/22/2023 | | 0.25 |
| Orr, Christopher | 19441 | Decision Shoot | 09/21/2022 | 2 | |
| Orr, Christopher | 19441 | Water Rescue (Throw Bag) Training | 03/22/2023 | | 1 |
| Orr, Christopher | 19441 | Street Racing Bulletin | 03/22/2023 | | 0.5 |
| Orr, Christopher | 19441 | 2023 1st Qtr Rifle | 02/13/2023 | 4 | |
| Orr, Christopher | 19441 | New RMS Function *Mandatory* | 05/17/2023 | | 0.5 |
| Orr, Christopher | 19441 | Active Shooter #1 | 05/22/2023 | 2 | |
| Orr, Christopher | 19441 | Fatal and Serious Injury Training Bulletin | 06/15/2023 | | 0.5 |
| Orr, Christopher | 19441 | Active Shooter #2 | 07/19/2023 | 4.5 | |
| Orr, Christopher | 19441 | Drug Impaired Driver Informational Training (DIDIT) | 09/18/2023 | | 3.5 |
| Orr, Christopher | 19441 | Submitting Property/Evidence | 09/18/2023 | | 0.25 |
| Orr, Christopher | 19441 | Accountability Bulletin, 3rd Quarter 2023 | 12/11/2023 | | |
| Orr, Christopher | 19441 | Resource Guide for Elder Abuse | 12/30/2023 | | 0.25 |
| Orr, Christopher | 19441 | Indian Country Jurisdiction | 12/30/2023 | | |
| Orr, Christopher | 19441 | Fire Extinguisher (Mandatory Training) | 12/30/2023 | | 0.25 |
| Orr, Christopher | 19441 | Airborne and Bloodborne Pathogens | 12/30/2023 | | 1 |
| Orr, Christopher | 19441 | 2024 1st Qtr Rifle | 01/16/2024 | 4 | |
| Orr, Christopher | 19441 | Taser 7 Transition Course | 10/06/2021 | 3 | |
| Orr, Christopher | 19441 | High Risk Vehicle Stops HRVS (24-031) | 02/29/2024 | 4 | |
| Orr, Christopher | 19441 | 2024 AZPOST | 02/29/2024 | 2 | |
| Orr, Christopher | 19441 | RMS Refresher Training | 02/23/2024 | 21.5 | |
| Orr, Christopher | 19441 | Decision Shoot | 04/05/2024 | 1 | |
| Orr, Christopher | 19441 | 2024 2nd Quarter Pistol | 04/16/2024 | 2 | |

| | | | | | |
|---|---|---|---|---|---|
| Orr, Christopher | 19441 | Phoenix Machine Gun Conversion | 06/30/2024 | | 0.25 |
| Orr, Christopher | 19441 | 2024 2nd Quarter Rifle | 06/12/2024 | 4 | |
| Orr, Christopher | 19441 | 2024 2nd Qtr Bounding/Peels (24-036) | 06/25/2024 | 4 | |
| Orr, Christopher | 19441 | STOP STICKS Refresher | 06/30/2024 | | 0.5 |
| Orr, Christopher | 19441 | THE EAST VALLEY CRITICAL INCIDENT RESPONSE TEAM | 06/30/2024 | | 0.25 |
| Orr, Christopher | 19441 | 2024 PJJ ABC Certification 3rd Qtr (24-037) | 09/23/2024 | 4 | |
| Orr, Christopher | 19441 | Crime Gun Training Bulletin | 10/29/2024 | | 0.5 |
| Orr, Christopher | 19441 | IFAK Training | 10/29/2024 | | 0.5 |
| Orr, Christopher | 19441 | High Risk Traffic Stops on Stolen Vehicles | 11/09/2024 | 0.5 | |
| Orr, Christopher | 19441 | 2024 - 4th Qtr Building Searches/AZPOST Decision Shoot/Taser 10 Upgrade (24-032) | 11/08/2024 | 5 | |
| Orr, Christopher | 19441 | 2024 - 4th Qtr Building Searches/AZPOST Decision Shoot/Taser 10 Upgrade (24-032) | 11/08/2024 | 5 | |
| Orr, Christopher | 19441 | 2024 4th Quarter Pistol | 12/31/2024 | 2.5 | |
| Orr, Christopher | 19441 | 2024 4th Quarter Rifle - Bounding Overwatch Focused Fire | 12/26/2024 | 4 | |
| Orr, Christopher | 19441 | 2025 1st Qtr Rifle (AZ Post #25-004) | 02/25/2025 | 4 | |
| Orr, Christopher | 19441 | 2025 1st Qtr Pistol (AZ Post #25-003) | 02/20/2025 | 1 | |
| Orr, Christopher | 19441 | 2025 1st Quarter Training - IA/Building Searches/HRVS (AZPOST 25-010) | 03/20/2025 | 4 | |
| Orr, Christopher | 19441 | Fiesta Patrol Booking | 04/07/2025 | | 0.5 |
| Orr, Christopher | 19441 | Ethics and Professionalism | 04/07/2025 | | 0.5 |
| Orr, Christopher | 19441 | 2025 AZ Post Quals - 2nd Qtr (AZ Post #25-011) | 05/20/2025 | 2 | |
| Orr, Christopher | 19441 | 2025 3rd Quarter Training - Active Assailant AZPOST 25-012 | 07/15/2025 | 4 | |
| Orr, Christopher | 19441 | Sergeant's Academy | 07/28/2025 | 10 | |
| Orr, Christopher | 19441 | Sergeant's Academy | 07/29/2025 | 10 | |
| Orr, Christopher | 19441 | Sergeant's Academy | 07/30/2025 | 10 | |
| Orr, Christopher | 19441 | Sergeant's Academy | 07/31/2025 | 10 | |
| **1 users in total** | | | | **259** | **23.75** |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00649 | (Employee) Preventing Discrimination and Harassment | | 0001 | | 2/23/2019 8:31:10 AM | 0.0 | 0.0 | 0.75 | $0.00 | | LC |
| PD6473 | IS-00100.b Introduction to Incident Command System ICS-100 | | 0004 | 9/11/2012 1:00:00 AM | 9/11/2012 1:00:00 AM | 0.00 | 0.00 | 3 | $0.00 | | PeopleSoft |
| PD6474 | IS-00700.a Incident Command | | 0005 | 9/11/2012 1:00:00 AM | 9/11/2012 1:00:00 AM | 0.00 | 0.00 | 3 | $0.00 | | PeopleSoft |
| C00303 | New Employee Orientation | | 0696 | 9/13/2012 12:00:00 AM | | 0.0 | 0.00 | 0.0 | $0.00 | | PS |
| S00001 | EDG-All About Backs | | 0777 | 9/13/2012 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00002 | Great Driver--EDG | | 0390 | 9/13/2012 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00003 | General Safety--EDG | | 0250 | 9/13/2012 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00004 | Haz Com | | 0722 | 9/13/2012 | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Right To Know--EDG | | | 12:00:00 AM | | | | | | | |
| S00096 | Fire Extinguisher Safety | | 0087 | 9/13/2012 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00122 | Heat Stress | | 0238 | 9/13/2012 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00031 | Bloodborne Pathogens | | 0272 | 9/13/2012 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00166 | Respiratory Protection Refresh | | 0264 | 9/13/2012 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| PD4810 | Records Management System - Academy Training | 12-103 | 0003 | 9/19/2012 4:00:00 PM | 9/19/2012 4:00:00 PM | 24.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7348 | Taser X2 User Certification | 12-022 | 0003 | 9/26/2012 3:00:00 PM | 9/26/2012 3:00:00 PM | 6.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| C00541 | WrkplcHarassmnt / Disc & CustSvc | | 0011 | 10/30/2012 12:00:00 AM | | 0.0 | 0.00 | 4.0 | $0.00 | | PS |
| | New Employee | | | 10/30/2012 5:00:00 PM | 10/30/2012 5:00:00 PM | 0.0 | 0.0 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Orientation (Customer Service & Workplace Harassment / Discrimination) | | | | | | | | | | |
| PD7622 | 2012 AZ POST Legal Update (DVD) | 12-441 | 0034 | 11/7/2012 1:00:00 AM | 11/7/2012 1:00:00 AM | 1.50 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7727 | Drills to Prepare for the New POST Hndgun Qualificaiton | 13-009 | 0040 | 2/18/2013 4:00:00 PM | 2/18/2013 4:00:00 PM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7613 | Revolver Tactics | 13-089 | 0003 | 4/5/2013 3:30:00 PM | 4/5/2013 3:30:00 PM | 0.00 | 4.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7750 | Excited Delirium (COE 2013) | 13-062 | 0016 | 5/10/2013 8:00:00 AM | 5/10/2013 8:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7751 | PTSD / TBI First Responder Program (COE 2013) | 13-064 | 16 | 5/10/2013 9:00:00 AM | 5/10/2013 9:00:00 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD7752 | COEUse of Force, Pursuit Policy and PIT Technique Policy Review (COE 2013) | 13-041 | 16 | 5/10/2013 11:00:00 AM | 5/10/2013 11:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD5525 | Expandable Baton Recertification | 13-052 | 73 | 5/10/2013 12:00:00 PM | 5/10/2013 12:00:00 PM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD7753 | Use of Force-Carotid Control Technique Review | 13-051 | 16 | 5/10/2013 3:00:00 PM | 5/10/2013 3:00:00 PM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 13-063 | 146 | 5/10/2013 3:00:00 PM | 5/10/2013 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 13-081 | 0016 | 5/10/2013 5:00:00 PM | 5/10/2013 5:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7786 | Close-Quarter Crisis Edged Weapon Defense Refresher | 13-108 | 0035 | 11/1/2013 3:00:00 PM | 11/1/2013 3:00:00 PM | 0 | 1 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S00004 | Hazard Communication (GHS) (SDS) | | 1 | 11/18/2013 3:05:54 PM | 11/18/2013 3:05:54 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD7958 | Intermediate Spanish Speaker Non-Native | 12-587 | 0001 | 12/3/2013 5:00:00 PM | 12/3/2013 5:00:00 PM | 20 | 0 | 0.0 | $0.00 | | LC |
| PD7957 | Intermediate Spanish Speaker Native | 12-586 | 0001 | 12/5/2013 5:00:00 PM | 12/5/2013 5:00:00 PM | 20 | 0 | 0.0 | $0.00 | | LC |
| PD7809 | Mental Conditioning for Lethal Force Encounters | 13-117 | 0031 | 12/16/2013 12:30:00 PM | 12/16/2013 12:30:00 PM | 2 | 0.0 | 0.0 | $0.00 | | LC |
| PD3387 | Stationary Radar Operator | 14-035 | 0020 | 1/22/2014 6:00:00 PM | 1/22/2014 6:00:00 PM | 20 | 0 | 0.0 | $0.00 | | LC |
| PD7867 | 2013 Legal Update | 13-377 | 0017 | 2/10/2014 12:00:00 AM | 2/10/2014 12:00:00 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| PD7865 | Metal Theft / MC Profiling / ADOT | 13-378 | 0017 | 2/10/2014 1:30:00 PM | 2/10/2014 1:30:00 PM | 1.5 | 0.0 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3-Day Permits | | | | | | | | | | |
| PD7883 | First Shot Accuracy | 14-090 | 0005 | 3/31/2014 4:00:00 PM | 3/31/2014 4:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD7875 | Early Intervention & Member Resources | 14-095 | 0009 | 4/15/2014 2:00:00 PM | 4/15/2014 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7873 | Below 100 Basic | 14-092 | 0009 | 4/25/2014 9:00:00 AM | 4/25/2014 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7874 | Use of Force Policy Review with Scenarios | 14-093 | 0009 | 4/25/2014 10:00:00 AM | 4/22/2014 10:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 14-094 | 0039 | 4/25/2014 12:00:00 PM | 4/25/2014 12:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7876 | Missing Persons with Alzheimer's & Related Dementias | 14-096 | 0009 | 4/25/2014 3:00:00 PM | 4/25/2014 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7877 | Hate Crimes: A Law Enforcement | 14-097 | 0009 | 4/25/2014 4:00:00 PM | 4/25/2014 4:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Guide to Investigations and Reporting | | | | | | | | | | |
| PD7878 | Social Media in Law Enforcement | 14-091 | 0009 | 4/25/2014 5:00:00 PM | 4/25/2014 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD5001 | General Instructor Certification | 98-030C | 0204 | 10/25/2014 12:00:00 AM | 10/25/2014 12:00:00 AM | 40 | 0 | 0.0 | $268.00 | | LC |
| PD8181 | One Hand Survival Skills-Low Light | 14-137 | 0037 | 11/14/2014 8:00:00 PM | 11/14/2014 8:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD5412 | Less Lethal-Bean Bag Recertification | 15-002 | 0048 | 1/9/2015 5:00:00 PM | 1/9/2015 5:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 15-003 | 0033 | 1/29/2015 3:00:00 PM | 1/29/2015 3:00:00 PM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 15-055 | 0059 | 4/24/2015 3:00:00 PM | 4/24/2015 3:00:00 PM | 0 | 1 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD8301 | Pursuit and Stopsticks Review | 15-069 | 0019 | 7/1/2015 8:00:00 AM | 7/1/2015 8:00:00 AM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 15-064 | 0079 | 7/1/2015 9:00:00 AM | 7/1/2015 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD9877 | Tactical Decision Making Scenarios | 15-095 | 0020 | 7/1/2015 10:30:00 AM | 7/1/2015 10:30:00 AM | 0.0 | 1.5 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 15-066 | 0180 | 7/1/2015 2:00:00 PM | 7/1/2015 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8302 | Top 10 Constitutional Law Cases Every Officer Should Know | 15-016 | 0019 | 7/1/2015 3:00:00 PM | 7/1/2015 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8303 | Domestic Violence Law Enforcement Refresher | 15-060 | 0019 | 7/1/2015 4:00:00 PM | 7/1/2015 4:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8304 | Mental Illness Refresher | 15-068 | 0019 | 7/1/2015 5:00:00 PM | 7/1/2015 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10460 | Crisis | | 0003 | 8/21/2015 | 8/21/2015 | 0 | 0 | 40 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Intervention Team Program | | | 12:00:00 AM | 12:00:00 AM | | | | | | |
| PD2410 | Patrol Rifle Operator | 15-100 | 0050 | 10/2/2015 2:00:00 PM | 10/2/2015 2:00:00 PM | 8 | 32 | 0.0 | $0.00 | | LC |
| PD5193 | Immediate Action Teams for Patrol | 15-106 | 0058 | 10/19/2015 3:00:00 PM | 10/19/2015 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD9879 | Use of Deadly Force / Contagious Fire | 15-098 | 0015 | 10/19/2015 5:00:00 PM | 10/19/2015 5:00:00 PM | 1 | 1 | 0.0 | $0.00 | | LC |
| PD9888 | Modified Navy Qualification | 15-093 | 0032 | 11/9/2015 6:00:00 PM | 11/9/2015 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD9890 | Malfunction Clearance Drills | 15-101 | 0002 | 11/23/2015 2:00:00 PM | 11/23/2015 2:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable Baton Refresher | 16-004 | 0060 | 2/1/2016 2:00:00 PM | 2/1/2016 2:00:00 PM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| PD10078 | POST Rifle Instructor Qualification / | 16-050 | 0037 | 2/22/2016 6:00:00 PM | 2/22/2016 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Malfunction Clearance / Instructor Qualification | | | | | | | | | | |
| PD10121 | Bounding Over Watch | 16-059 | 0010 | 3/28/2016 3:00:00 PM | 3/28/2016 3:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD8315 | Less Lethal-12 Gauge Bean Bag | 16-113 | 0003 | 4/7/2016 11:00:00 AM | 4/7/2016 11:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10082 | Low Light Tactics and Flashlight Techniques Refresher | 16-061 | 0039 | 4/18/2016 9:00:00 PM | 4/18/2016 9:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 16-102 | 0086 | 5/2/2016 9:00:00 AM | 5/2/2016 9:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10089 | Basic Crisis Intervention Training | 16-073 | 0007 | 5/2/2016 6:00:00 PM | 5/2/2016 6:00:00 PM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10120 | Incident De-Escalation and Tactics | 16-087 | 0008 | 5/3/2016 4:00:00 PM | 5/3/2016 4:00:00 PM | 3 | 5 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 16-088 | 0102 | 5/3/2016 6:00:00 PM | 5/3/2016 6:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10118 | Heart Fit for | 15-478 | 0015 | 7/6/2016 | 7/6/2016 | 2 | 0 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Duty | | | 12:00:00 AM | 12:00:00 AM | | | | | | |
| PD10135 | First Response Resiliency Skills | 16-092 | 0012 | 7/6/2016 12:00:00 AM | 7/6/2016 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10235 | Qualification Course, Basic Marksmanship and Malfunction Course | 16-110 | 0027 | 10/19/2016 6:00:00 PM | 10/19/2016 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD7880 | Patrol Rifle-Flanking Maneuvers | 16-138 | 0064 | 12/8/2016 6:00:00 PM | 12/8/2016 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| C00483 | Workplace Harassment and Discrimination Refresher Video | | 0166 | 1/4/2017 11:45:21 PM | 1/4/2017 11:45:21 PM | 0.0 | 0.0 | 0.25 | $0.00 | | LC |
| PD10390 | Low Light Malfunction Clearances, Qualification and Flashlight | 17-073 | 0025 | 2/23/2017 9:00:00 PM | 2/23/2017 9:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Techniques Using Cover | | | | | | | | | | |
| PD10372 | Squad Operations Tactics Training | 17-059 | 0018 | 4/13/2017 7:00:00 PM | 4/13/2017 7:00:00 PM | 2 | 3 | 0.0 | $0.00 | | LC |
| PD10420 | 1-5, Half and Half, Chaos and Set it Off Drills | 17-056 | 0025 | 5/10/2017 6:00:00 PM | 5/10/2017 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10524 | Use of Cover and Movement Refresher | 17-080 | 0074 | 6/7/2017 3:00:00 PM | 6/7/2017 3:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD5412 | Less Lethal-Bean Bag Recertification | 17-053 | 0092 | 6/21/2017 2:00:00 PM | 6/21/2017 2:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10608 | Confirmation of Zero with Federal Ammo, Distance Shooting Qualification | 17-101 | 0033 | 10/26/2017 3:00:00 PM | 10/26/2017 3:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10525 | Tactical | 17-098 | 0041 | 11/8/2017 | 11/8/2017 | 1 | 3 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Building Search Refresher and Live Firehouse | | | 4:00:00 PM | 4:00:00 PM | | | | | | |
| PD10471 | Taser X2 Transition Course | 17-089 | 0033 | 11/9/2017 5:00:00 PM | 11/9/2017 5:00:00 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD10527 | 4th Quarter Rifle Response to Rapid Deployment Scenario | 17-097 | 0036 | 12/13/2017 3:00:00 PM | 12/13/2017 3:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10479 | Use of Naloxone (Narcan) Nasal Spray by Law Enforcement for Opioid Overdose | 17-096 | 0001 | 1/25/2018 12:52:01 PM | 1/25/2018 12:52:01 PM | 1.5 | 0 | 1.5 | $0.00 | | LC |
| PD10569 | Patrol Rifle Response to Personnel Bourne Improvised Explosive | 18-021 | 0006 | 2/7/2018 6:00:00 PM | 2/7/2018 6:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Devices 1st Quarter Rifle Shoot | | | | | | | | | | |
| PD8276 | Carotid Control Technique Refresher | 18-006 | 0132 | 2/14/2018 3:00:00 PM | 2/14/2018 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10597 | Crisis and Hostage Negotiations Level 1 | 18-V016 | 0001 | 3/9/2018 12:00:00 AM | 3/9/2018 12:00:00 AM | 32 | 0 | 0.0 | $0.00 | | LC |
| PD10603 | Patrol Rifle Response to Rapid Deployment Scenario | 18-057 | 0015 | 4/13/2018 6:00:00 PM | 4/13/2018 6:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable Baton Refresher | 18-054 | 0152 | 5/31/2018 2:00:00 PM | 5/31/2018 2:00:00 PM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| PD10605 | Individual First Aid Kit Use | 18-010 | 0050 | 5/31/2018 3:00:00 PM | 5/31/2018 3:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 18-060 | 0122 | 5/31/2018 4:00:00 PM | 5/31/2018 4:00:00 PM | 0 | 3 | 0.0 | $0.00 | | LC |
| PD1759 | Rapid | 18-052 | 0206 | 7/18/2018 | 8/8/2018 | 3.5 | 6.5 | 0.0 | $0.00 | | PeopleSoft |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Deployment / Mass Casualty | | | 12:00:00 AM | 12:00:00 AM | | | | | | |
| PD10778 | One-Handed Survival Skills and Use of Cover in Low Light | 18-072 | 0013 | 9/12/2018 8:00:00 AM | 9/12/2018 8:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10754 | Patrol Rifle Skills Improvement | 18-068 | 0022 | 9/14/2018 10:00:00 AM | 9/14/2018 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10121 | Bounding Over Watch | 18-092 | 0062 | 11/30/2018 12:00:00 PM | 11/30/2018 12:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10777 | ICAT Introduction | 18-089 | 0001 | 12/16/2018 9:29:01 PM | 12/16/2018 9:29:01 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10806 | Animal Cruelty Investigations and Prosecution and the Link to Human Violence | 18-073 | 0001 | 12/16/2018 10:18:42 PM | 12/16/2018 10:18:42 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10709 | ICAT | 18-089 | 0019 | 12/18/2018 5:00:00 PM | 12/18/2018 5:00:00 PM | 10 | 0 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD10835 | Blocking Impaired Driver | 19-008 | 0013 | 2/14/2019 7:00:00 AM | 2/14/2019 7:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10874 | 1st Quarter Rifle | 19-005 | 0021 | 4/5/2019 10:00:00 AM | 4/5/2019 10:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10887 | Fair and Impartial Policing | V19-002 | 0001 | 4/12/2019 12:00:00 AM | 4/12/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10876 | 2nd Quarter Rifle | 19-057 | 0004 | 4/19/2019 12:00:00 PM | 4/19/2019 12:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10870 | Mass Casualty Response | 19-050 | 0025 | 5/20/2019 12:00:00 AM | 5/20/2019 12:00:00 AM | 4 | 4 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 19-013 | 0237 | 5/20/2019 11:00:00 AM | 5/20/2019 11:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10829 | Know Your Authority | V19-001 | 0020 | 5/31/2019 5:00:00 PM | 5/31/2019 5:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10121 | Bounding Over Watch and Focused Fire | 20-015 | 0103 | 6/11/2019 11:00:00 AM | 6/11/2019 11:00:00 AM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10524 | Use of Cover and Movement | 19-049 | 0135 | 6/13/2019 10:00:00 AM | 6/13/2019 10:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Refresher | | | | | | | | | | |
| PD10984 | Power Hour Training for Patrol | 19-062 | 0001 | 7/20/2019 4:09:44 PM | 7/20/2019 4:09:44 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10968 | 2019 Rifle and Shotgun Inspection | | 0067 | 9/5/2019 9:00:00 AM | 9/5/2019 9:00:00 AM | 0 | 0 | 1 | $0.00 | | LC |
| PD11044 | MPD 2019 Suicide Awareness | 19-061 | 0001 | 10/5/2019 3:59:41 PM | 10/5/2019 3:59:41 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD10975 | 2019 3rd Quarter Rifle Shoot | 19-066 | 0028 | 10/11/2019 12:00:00 PM | 10/11/2019 12:00:00 PM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD10982 | Shooting From and Around Vehicles | 19-047 | 0041 | 11/14/2019 9:00:00 AM | 11/14/2019 9:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD11074 | Zero Confirmation, Distance Shooting, Box Drills and Chaos 31 | 19-079 | 0011 | 11/15/2019 11:00:00 AM | 11/15/2019 11:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| 18-076 | FTO Legal Considerations | | | 11/20/2019 9:35:48 AM | 11/20/2019 9:35:48 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| 18-080 | FTO Adult | | | 11/20/2019 | 11/20/2019 | 2 | 0.0 | 0.25 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Learning & Training for Success | | | 11:26:36 AM | 11:26:36 AM | | | | | | |
| 18-078 | FTO Program Policy and OIT Checklist | | | 11/20/2019 11:58:54 AM | 11/20/2019 11:58:54 AM | 1.5 | 0.0 | 0.0 | $0.00 | | LC |
| 18-085 | FTO Ethics and Apathy | | | 11/20/2019 2:25:21 PM | 11/20/2019 2:25:21 PM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| PD11071 | 2019 Legal Update - Mandatory Training | 19-95 | 0001 | 11/20/2019 4:09:18 PM | 11/20/2019 4:09:18 PM | 1.25 | 0 | 0.0 | $0.00 | | LC |
| PD11116 | New Order of Protection Process | | 0001 | 12/31/2019 4:30:46 PM | 12/31/2019 4:30:46 PM | 0.25 | 0.0 | 0.25 | $0.00 | | LC |
| PD11076 | Gender - Diverse Cultures | 19-132 | 0001 | 1/9/2020 8:31:03 AM | 1/9/2020 8:31:03 AM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10427 | Commercial Vehicle Operations CDL | 20-031 | 0004 | 1/31/2020 12:00:00 AM | 1/31/2020 12:00:00 AM | 0 | 40 | 0.0 | $0.00 | | LC |
| | COVID 19 Infection | | 0001 | 4/14/2020 4:10:21 PM | 4/14/2020 4:10:21 PM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Control and Personal Protective Equipment (PPE) Guidance | | | | | | | | | | |
| PD11147 | Miniaturized Red Dot Sight Equipped Handgun Transition School | 20-016 | 0004 | 5/19/2020 3:00:00 PM | 5/19/2020 12:00:00 AM | 2 | 14 | 0.0 | $0.00 | | LC |
| | Versaterm MDT 7.7 Training | | | 7/24/2020 5:01:41 PM | 7/24/2020 5:01:41 PM | 0.0 | 0.0 | 0.5 | $0.00 | | LC |
| | Mobile Field Force Refresher for Patrol | | | 10/29/2020 12:44:29 PM | 10/29/2020 12:44:29 PM | 0.5 | 0.0 | 0.0 | $0.00 | | LC |
| PD5412 | Less Lethal-Bean Bag Recertification | 20-012 | 0116 | 11/30/2020 12:00:00 AM | 11/30/2020 12:00:00 AM | 1 | 2 | 0.0 | $0.00 | | LC |
| PD11233 | 2020 - 4th Quarter Distance Shoot | | 0001 | 12/2/2020 12:00:00 AM | 12/2/2020 12:00:00 AM | 0.0 | 4 | 0.0 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD11237 | Alternate Methods of Carry | | 0001 | 12/7/2020 12:00:00 AM | 12/7/2020 12:00:00 AM | 0.0 | 3 | 0.0 | $0.00 | | LC |
| PD11150 | Taser X2 User Re-Certification Course | 20-017 | 0048 | 12/7/2020 7:00:00 AM | 12/7/2020 12:00:00 AM | 1 | 1 | 0.0 | $0.00 | | LC |
| | Active Shooter Recognition & Basic Response | 20-115 | | 12/30/2020 12:00:00 AM | 12/30/2020 12:00:00 AM | 1 | 0.0 | 1 | $0.00 | | LC |
| | Active Shooter 1 | 20-116 | | 12/31/2020 12:00:00 AM | 12/31/2020 12:00:00 AM | 1 | 0.0 | 1 | $0.00 | | LC |
| | Active Shooter 2 | 20-117 | | 12/31/2020 12:00:00 AM | 12/31/2020 12:00:00 AM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD11117 | 1st Quarter 2021 Mesa PD Rifle Qualification | 21-001 | 0047 | 2/16/2021 11:00:00 AM | 2/16/2021 12:00:00 AM | 0 | 4 | 0.0 | $0.00 | | LC |
| PD11258 | Advanced Patrol Tactics | 21-010 | 0006 | 4/6/2021 7:00:00 PM | 4/6/2021 12:00:00 AM | 6 | 4 | 0.0 | $0.00 | | LC |
| PD5871 | Mobile Field Force | 20-040 | 0030 | 4/12/2021 7:00:00 AM | 4/12/2021 12:00:00 | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

HMS 171a - PD Report - Student Training Hours Christopher Orr, 1/1/2000 to 9/2/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | AM | | | | | | |
| | Tuition Assistance Program Orientation | | | 8/17/2022 6:44:46 PM | 8/17/2022 6:44:46 PM | 0.0 | 0.0 | 0.15 | $0.00 | | LC |
| WLN174 | Archive / Recording: Understanding High Blood Pressure (2 / 8 9am) | | 0005 | 2/8/2024 1:49:10 PM | 2/8/2024 1:49:10 PM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| WLN342 | Archive / March Spotlight: Insulin Resistance - The Role of Nutrition | | 0002 | 4/1/2025 9:36:45 AM | 4/1/2025 9:36:45 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| WLN334 | Archive / Recording: Am I Hungry? (AIH) Intro Class (3 / 6 9am) | | 0002 | 4/7/2025 8:39:23 AM | 4/7/2025 8:39:23 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| Count: 139 | | | | | | Total: 308.00 | Total: 234.00 | Total: 71.65 | $268.00 | | |

| Full Name | Badge # | Course Title | Date Completed | POST Hours | SEAT Hours |
|---|---|---|---|---|---|
| Thomas, Kyle | 17067 | RETIRED P1A Tutorials: Basic User Overview | 11/26/2020 | | 0.25 |
| Thomas, Kyle | 17067 | TASER X2 USER CERTIFICATION COURSE | 11/05/2020 | | 1 |
| Thomas, Kyle | 17067 | WRAP RESTRAINT | 08/04/2020 | | 1 |
| Thomas, Kyle | 17067 | Becoming a Leader in Law Enforcement | 03/02/2021 | | 1 |
| Thomas, Kyle | 17067 | Versaterm RMS 8.1 Update | 03/11/2021 | | |
| Thomas, Kyle | 17067 | Hate Crimes Training For Law Enforcement | 04/27/2021 | | 1 |
| Thomas, Kyle | 17067 | Investigating Hate/Bias Crimes | 04/27/2021 | | |
| Thomas, Kyle | 17067 | E-Ticket Training | 05/11/2021 | | 0.25 |
| Thomas, Kyle | 17067 | Threat Recognition Speed Drills | 05/10/2021 | | 1 |
| Thomas, Kyle | 17067 | Blue Team NextGen | 07/13/2021 | | 0.25 |
| Thomas, Kyle | 17067 | Training Bulletin 2021-07 New Behavioral Health-Related Radio Codes | 07/13/2021 | | |
| Thomas, Kyle | 17067 | NTOA Supervising Patrol Critical Incidents | 02/23/2021 | | 20 |
| Thomas, Kyle | 17067 | Supervision of Police Personnel | 04/22/2021 | | 72 |
| Thomas, Kyle | 17067 | Training Bulletin 2021-10 Tactical Awareness In and Around Facilities | 08/20/2021 | | |
| Thomas, Kyle | 17067 | Officer/Victim Follow Up | 08/20/2021 | | |
| Thomas, Kyle | 17067 | Decision Shoot | 08/31/2021 | 1 | |
| Thomas, Kyle | 17067 | 2021-15 Asset Forfeiture Legal Update | 11/03/2021 | | 0.25 |
| Thomas, Kyle | 17067 | 2021 40mm Recertification | 11/10/2021 | 1 | |
| Thomas, Kyle | 17067 | Mesa Police Department Professional Staff Survey | 11/12/2021 | | 0.25 |
| Thomas, Kyle | 17067 | Basic SWAT Slow and Deliberate Searching | 06/15/2021 | 4 | |
| Thomas, Kyle | 17067 | 2021 SWAT  Rifle Qualification | 03/02/2021 | 1 | |
| Thomas, Kyle | 17067 | Indian Country Jurisdiction | 12/02/2021 | | |
| Thomas, Kyle | 17067 | 2021 Bean Bag Recertification | 12/22/2021 | 1 | |
| Thomas, Kyle | 17067 | 2021 Firearm Instructors COE | 10/20/2021 | 1 | |
| Thomas, Kyle | 17067 | Taser 7 Transition Course | 09/30/2021 | 3 | |
| Thomas, Kyle | 17067 | 2nd Quarter Combat Pistol Decision Shoot | 06/30/2021 | 2 | |
| Thomas, Kyle | 17067 | Good Tactics and Communications Skills | 03/17/2022 | | 0.5 |
| Thomas, Kyle | 17067 | Preventing Harassment and Discrimination | 03/17/2022 | | 0.5 |
| Thomas, Kyle | 17067 | Effective Tactics and Communications Skills, Part II | 05/12/2022 | | 0.5 |
| Thomas, Kyle | 17067 | Accountability Bulletin, 1st Quarter 2022 | 05/12/2022 | | |
| Thomas, Kyle | 17067 | Awards Policy | 05/12/2022 | | 0.5 |
| Thomas, Kyle | 17067 | Use of Deadly Force Training | 06/09/2022 | | 2 |
| Thomas, Kyle | 17067 | Taser Recertification | 06/21/2022 | 2 | |
| Thomas, Kyle | 17067 | RETIRED Active Shooter: Recognition and Basic Response | 07/17/2022 | | 1 |
| Thomas, Kyle | 17067 | COM 2022 Initiatives in Mental Illness & Policing | 07/17/2022 | | 0.5 |
| Thomas, Kyle | 17067 | Reporting a Police Service Dog (PSD) Bite in Blue Team | 07/17/2022 | | 0.5 |
| Thomas, Kyle | 17067 | Active Shooter Response Training Bulletin | 07/17/2022 | | 0.5 |
| Thomas, Kyle | 17067 | 2022 AZPOST Qualification | 12/31/2022 | 1 | |
| Thomas, Kyle | 17067 | K9 Operations Refresher | 07/26/2022 | | |
| Thomas, Kyle | 17067 | Accountability Bulletin, 2nd Quarter 2022 | 08/30/2022 | | |
| Thomas, Kyle | 17067 | Fire Extinguisher (Mandatory Training) | 10/25/2022 | | 0.25 |
| Thomas, Kyle | 17067 | Risk Management Bulletin | 10/25/2022 | | 0.5 |
| Thomas, Kyle | 17067 | Decision Shoot | 11/09/2022 | 1 | |
| Thomas, Kyle | 17067 | Utilizing Drug Recognition Experts | 12/28/2022 | | 0.25 |
| Thomas, Kyle | 17067 | Accountability Bulletin, 3rd Quarter 2022 | 12/28/2022 | | |
| Thomas, Kyle | 17067 | Admin Per Se Affidavit Update (Mandatory Training) | 12/28/2022 | | 0.25 |
| Thomas, Kyle | 17067 | Less Lethal Recert Bean Bag 40mm | 01/17/2023 | 4 | |
| Thomas, Kyle | 17067 | 2023 40mm RE-certification | 01/17/2023 | 2 | |
| Thomas, Kyle | 17067 | 2023 Bean Bag Recertification | 01/17/2023 | 2 | |
| Thomas, Kyle | 17067 | 2023 AZPOST Qualification | 03/06/2023 | 1 | |
| Thomas, Kyle | 17067 | Drug Impaired Driver Informational Training (DIDIT) | 03/20/2023 | | 3.5 |
| Thomas, Kyle | 17067 | 2023-01 Burglary Investigations at Gun Stores Training Bulletin | 03/17/2023 | | 0.25 |
| Thomas, Kyle | 17067 | Street Racing Bulletin | 03/20/2023 | | 0.5 |
| Thomas, Kyle | 17067 | Resource Guide for Elder Abuse | 03/20/2023 | | 0.25 |
| Thomas, Kyle | 17067 | Basic SWAT School | 02/23/2023 | 80 | |
| Thomas, Kyle | 17067 | Water Rescue (Throw Bag) Training | 03/22/2023 | | 1 |
| Thomas, Kyle | 17067 | New RMS Function *Mandatory* | 05/17/2023 | | 0.5 |
| Thomas, Kyle | 17067 | Fatal and Serious Injury Training Bulletin | 05/17/2023 | | 0.5 |
| Thomas, Kyle | 17067 | PepperBall 2023 | 05/30/2023 | 10 | |
| Thomas, Kyle | 17067 | Search & Seizure | 05/31/2023 | 2 | |
| Thomas, Kyle | 17067 | 2023 2nd Qtr Pistol - Dry Fire | 06/27/2023 | 2 | |
| Thomas, Kyle | 17067 | Active Shooter #2 | 07/07/2023 | 4.5 | |
| Thomas, Kyle | 17067 | Submitting Property/Evidence | 07/25/2023 | | 0.25 |
| Thomas, Kyle | 17067 | Versaterm vMobile 2.0 | 09/04/2023 | | |
| Thomas, Kyle | 17067 | Police Jiu-Jitsu - Striking | 09/27/2023 | 2 | |
| Thomas, Kyle | 17067 | Decision Shoot | 11/06/2023 | 2 | |
| Thomas, Kyle | 17067 | 2023 4th Quarter - Range/Training | 10/04/2023 | 4 | |
| Thomas, Kyle | 17067 | Fire Extinguisher (Mandatory Training) | 12/18/2023 | | 0.25 |
| Thomas, Kyle | 17067 | Accountability Bulletin, 3rd Quarter 2023 | 12/18/2023 | | |
| Thomas, Kyle | 17067 | High Risk Vehicle Stops HRVS (24-031) | 01/05/2024 | 4 | |

| | | | | | |
|---|---|---|---|---|---|
| Thomas, Kyle | 17067 | RMS Refresher Training | 01/26/2024 | 21.5 | |
| Thomas, Kyle | 17067 | Police Jiu-Jitsu | 04/08/2024 | | 1.5 |
| Thomas, Kyle | 17067 | High Risk Vehicle Stops Instructor | 12/20/2023 | 30 | |
| Thomas, Kyle | 17067 | 2024 AZPOST | 01/31/2024 | 2 | |
| Thomas, Kyle | 17067 | Police Jiu-Jitsu | 04/01/2024 | | 1 |
| Thomas, Kyle | 17067 | Police Jiu-Jitsu | 05/13/2024 | | 1.5 |
| Thomas, Kyle | 17067 | Defensive Tactics and Impact Weapons Instructor | 04/25/2024 | 80 | |
| Thomas, Kyle | 17067 | Police Jiu-Jitsu | 06/03/2024 | | 1 |
| Thomas, Kyle | 17067 | THE EAST VALLEY CRITICAL INCIDENT RESPONSE TEAM | 06/27/2024 | | 0.25 |
| Thomas, Kyle | 17067 | STOP STICKS Refresher | 06/27/2024 | | 0.5 |
| Thomas, Kyle | 17067 | Phoenix Machine Gun Conversion | 06/27/2024 | | 0.25 |
| Thomas, Kyle | 17067 | 2024 PJJ ABC Certification 3rd Qtr (24-037) | 07/10/2024 | 4 | |
| Thomas, Kyle | 17067 | 2024 2nd Quarter Pistol | 05/29/2024 | 2 | |
| Thomas, Kyle | 17067 | 2024 2nd Quarter Rifle | 06/24/2024 | 4 | |
| Thomas, Kyle | 17067 | IFAK Training | 08/16/2024 | | 0.5 |
| Thomas, Kyle | 17067 | Fire Extinguisher (Mandatory Training) | 08/16/2024 | | 0.25 |
| Thomas, Kyle | 17067 | Ethics and Professionalism | 08/16/2024 | | 0.5 |
| Thomas, Kyle | 17067 | Airborne and Bloodborne Pathogens | 11/08/2024 | | 1 |
| Thomas, Kyle | 17067 | 2024 PIT Certification - 24-039 | 08/29/2024 | 2 | |
| Thomas, Kyle | 17067 | 2024 - 4th Qtr Building Searches/AZPOST Decision Shoot/Taser 10 Upgrade (24-032) | 10/14/2024 | 10 | |
| Thomas, Kyle | 17067 | Crime Gun Training Bulletin | 10/30/2024 | | 0.5 |
| Thomas, Kyle | 17067 | High Risk Traffic Stops on Stolen Vehicles | 11/06/2024 | | 0.5 |
| Thomas, Kyle | 17067 | 2024 4th Quarter Pistol | 11/19/2024 | 2.5 | |
| Thomas, Kyle | 17067 | 2024 4th Quarter Rifle - Bounding Overwatch Focused Fire | 11/19/2024 | 4 | |
| Thomas, Kyle | 17067 | 2025 1st Quarter Training - IA/Building Searches/HRVS (AZPOST 25-010) | 01/06/2025 | 4 | |
| Thomas, Kyle | 17067 | 2025 1st Qtr Pistol (AZ Post #25-003) | 02/06/2025 | 1 | |
| Thomas, Kyle | 17067 | 2025 2nd Qtr Rifle (AZ Post #25-021) | 04/07/2025 | 4 | |
| Thomas, Kyle | 17067 | 2025 1st Qtr Rifle (AZ Post #25-004) | 04/07/2025 | 4 | |
| Thomas, Kyle | 17067 | 2025 3rd Quarter Training - Active Assailant AZPOST 25-012 | 05/30/2025 | 4 | |
| Thomas, Kyle | 17067 | Electronic Workstation Files System | 06/30/2025 | | 0.5 |
| Thomas, Kyle | 17067 | Airborne and Bloodborne Pathogens | 06/30/2025 | | 1 |
| Thomas, Kyle | 17067 | Fiesta Patrol Booking | 06/30/2025 | | 0.5 |
| Thomas, Kyle | 17067 | Fire Extinguisher (Mandatory Training) | 06/30/2025 | | 0.25 |
| Thomas, Kyle | 17067 | 2025 3rd Qtr Rifle (AZ Post #25-005) | 07/24/2025 | 4 | |
| **1 users in total** | | | | **320.5** | **124.5** |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00649 | (Employee) Preventing Discrimination and Harassment | | 0001 | | 2/12/2019 6:18:09 PM | 0.0 | 0.0 | 0.75 | $0.00 | | LC |
| C00303 | New Employee Orientation | | 0608 | 4/27/2006 12:00:00 AM | | 0.0 | 0.00 | 3.8 | $0.00 | | PS |
| C00347 | Sexual Harassment Review | | 0002 | 4/27/2006 12:00:00 AM | | 0.0 | 0.00 | 2.0 | $0.00 | | PS |
| S00031 | Bloodborne Pathogens | | 0200 | 4/28/2006 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00001 | EDG-All About Backs | | 0669 | 4/28/2006 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00002 | Great Driver--EDG | | 0282 | 4/28/2006 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00003 | General Safety--EDG | | 0169 | 4/28/2006 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00004 | Haz Com Right To Know--EDG | | 0627 | 4/28/2006 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| S00069 | Respirator | | 0020 | 9/8/2006 | | 0.0 | 0.00 | 1.5 | $0.00 | | PS |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Protection Initial | | | 12:00:00 AM | | | | | | | |
| PD1500 | Academy | | 0032 | 9/15/2006 3:00:00 PM | 9/15/2006 3:00:00 PM | 0.00 | 0.00 | 800 | $0.00 | | PeopleSoft |
| PD2954 | Shooting at Moving Vehicles | | 0006 | 10/30/2006 12:00:00 AM | 10/30/2006 12:00:00 AM | 0.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2962 | Skills Enhancement | 06-0180 | 0015 | 11/10/2006 2:00:00 AM | 11/10/2006 2:00:00 AM | 0.50 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD1420 | Cite and Release for Drug Paraphernalia | 07-009 | 0055 | 1/11/2007 7:00:00 AM | 1/11/2007 7:00:00 AM | 0.50 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2964 | Taser Certification - X26 | 07-032 | 0015 | 1/30/2007 5:00:00 PM | 1/30/2007 5:00:00 PM | 5.00 | 5.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7055 | Horizontal Gaze Nystagmus | 07-053 | 0056 | 2/2/2007 5:00:00 PM | 2/2/2007 5:00:00 PM | 24.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD3652 | First Shot Accuracy | 07-079 | 0033 | 4/16/2007 7:30:00 AM | 4/16/2007 7:30:00 AM | 0.50 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD1469 | Bloodborne Pathogen Training | 07-092 | 0017 | 6/22/2007 11:00:00 PM | 6/22/2007 11:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD1759 | Rapid Deployment | 07-144 | 0156 | 6/27/2007 9:00:00 PM | 6/27/2007 9:00:00 PM | 2.00 | 3.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD4464 | ICS100 Incident Command System | 07-121 | 0013 | 7/17/2007 10:00:00 AM | 7/17/2007 10:00:00 AM | 3.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2963 | Taser Recertification - X26 | 07-033 | 0035 | 9/18/2007 8:00:00 AM | 9/18/2007 8:00:00 AM | 1.50 | 0.50 | 0.0 | $0.00 | | PeopleSoft |
| PD4578 | Legal Update 2006 | 06-242 | 0121 | 9/19/2007 2:00:00 AM | 9/19/2007 2:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4585 | Human Trafficking - Response to | 07-023 | 0106 | 9/20/2007 5:00:00 AM | 9/20/2007 5:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4597 | Steroids | 07-237 | 0112 | 10/8/2007 1:00:00 AM | 10/8/2007 1:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4631 | Legal Update 2007 | 07-244 | 0061 | 12/24/2007 3:30:00 AM | 12/24/2007 3:30:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2895 | Gang Investigation (Basic) | 07-295 | 0021 | 1/12/2008 2:00:00 AM | 1/12/2008 2:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2410 | Patrol Rifle | 08-016 | 0024 | 2/19/2008 4:00:00 PM | 2/19/2008 4:00:00 PM | 8.00 | 32.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4210 | CPR Refresher | 08-0252 | 0057 | 6/16/2008 11:30:00 PM | 6/16/2008 11:30:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD7571 | ASP Baton Recertification COE | 08-014 | 0007 | 6/17/2008 6:00:00 AM | 6/17/2008 6:00:00 AM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD1473 | High Risk Vehicle Stops Refresher | 08-0205 | 0062 | 7/28/2008 7:00:00 AM | 7/28/2008 7:00:00 AM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2963 | Taser Recertification - X26 | 08-009 | 0090 | 8/29/2008 8:00:00 AM | 8/29/2008 8:00:00 AM | 1.50 | 0.50 | 0.0 | $0.00 | | PeopleSoft |
| PD4912 | Preventing Law Enforcement Suicide | 08-0256 | 0063 | 10/9/2008 11:59:00 PM | 10/9/2008 11:59:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4905 | Immigration Enforcement (Field Order 441) | 08-0258 | 0031 | 10/23/2008 12:30:00 AM | 10/23/2008 12:30:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4912 | Preventing Law Enforcement Suicide | 08-0256 | 0024 | 10/23/2008 11:59:00 PM | 10/23/2008 11:59:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD8715 | Tactical Building Search Refresher | 08-0270 | 0029 | 12/18/2008 1:00:00 AM | 12/18/2008 1:00:00 AM | 0.50 | 1.50 | 0.0 | $0.00 | | PeopleSoft |
| PD4954 | Legal | 08-381 | 0021 | 12/20/2008 | 12/20/2008 | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Update 2008 | | | 5:00:00 PM | 5:00:00 PM | | | | | | |
| PD4970 | ADOT Traffic Accident Report Training | 09-068 | 0073 | 12/25/2008 10:30:00 PM | 12/25/2008 10:30:00 PM | 0.50 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5160 | NAPD Backing | 09-031 | 0011 | 3/12/2009 8:00:00 AM | 3/12/2009 8:00:00 AM | 0.00 | 0.50 | 0.0 | $0.00 | | PeopleSoft |
| PD5193 | Immediate Action Teams for Patrol | 09-092 | 0036 | 3/12/2009 8:00:00 AM | 3/12/2009 8:00:00 AM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4522 | Weapon Mounted Light Introduction - Handgun | 09-011 | 0015 | 4/14/2009 12:00:00 PM | 4/14/2009 12:00:00 PM | 1.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5208 | Entry Weapon Operator Course | 09-093 | 0001 | 4/23/2009 6:00:00 PM | 4/23/2009 6:00:00 PM | 10.00 | 30.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5219 | Coplink Implementation Training | 09-149 | 0006 | 6/19/2009 10:00:00 AM | 6/19/2009 10:00:00 AM | 3.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5215 | Rapid Deployment | 09-151 | 0043 | 7/10/2009 11:00:00 | 7/10/2009 11:00:00 | 1.00 | 3.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2009 | | | AM | AM | | | | | | |
| PD2963 | Taser Recertification - X26 | 09-006 | 0180 | 8/11/2009 3:30:00 PM | 8/11/2009 3:30:00 PM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD4638 | Prevention and Response to Suicide Bombing Incidents | 09-372 | 0007 | 8/25/2009 12:00:00 PM | 8/25/2009 12:00:00 PM | 4.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD3197 | Incident Response To Terrorist Bombing | 09-373 | 0007 | 8/25/2009 5:00:00 PM | 8/25/2009 5:00:00 PM | 4.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5291 | Initial Law Enforcement Respoinse to Suicide Bombing Attacks (ILERSBA) | 09-374 | 0001 | 8/26/2009 5:00:00 PM | 8/26/2009 5:00:00 PM | 8.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5238 | Rifle and Shotgun Weapon Retention | 09-162 | 0033 | 9/4/2009 7:00:00 AM | 9/4/2009 7:00:00 AM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5239 | Redaction-AZPOST X Video | 09-167 | 0059 | 9/17/2009 1:00:00 AM | 9/17/2009 1:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C00491 | EmrgncyMgt / Influenza | FamilyPrep | 0007 | 10/15/2009 12:00:00 AM | | 0.0 | 0.00 | 1.0 | $0.00 | | PS |
| PD5343 | One Handed Survival Skills / 2009 4th Quarter Shoot | 09-181 | 0017 | 10/30/2009 1:00:00 AM | 10/30/2009 1:00:00 AM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5371 | Terrorism Watch List Training | 09-183 | 0059 | 10/30/2009 7:00:00 AM | 10/30/2009 7:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5372 | Carotid Control Technique Refresher-Use of Force | 09-184 | 0059 | 10/30/2009 8:00:00 AM | 10/30/2009 8:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| C00483 | Wrkplce Harassment & Discrimin | | 0035 | 12/14/2009 12:00:00 AM | | 0.0 | 0.00 | 0.0 | $0.00 | | PS |
| PD5432 | Suppression Fire & Bounding Over Watch With A Patrol Rifle | 10-020 | 0002 | 1/19/2010 2:00:00 AM | 1/19/2010 2:00:00 AM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5400 | Live Fire Building | 10-002 | 0011 | 1/19/2010 4:00:00 AM | 1/19/2010 4:00:00 AM | 1.00 | 3.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Search Techniques for Patrol | | | | | | | | | | |
| PD5414 | Sage Gun-37mm Multi-Role Projectile Lauchers (SL-6 & SL-1) | 10-003 | 0002 | 1/19/2010 4:00:00 PM | 1/19/2010 4:00:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD6292 | Prisoner Search | | 0010 | 2/6/2010 12:00:00 AM | 2/6/2010 12:00:00 AM | 0 | 0 | 0.25 | $0.00 | | PeopleSoft |
| PD5393 | Legal Update 2009-AZPOST Video | 10-001 | 0065 | 2/11/2010 3:00:00 AM | 2/11/2010 3:00:00 AM | 3.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5519 | High Risk Vehicle Stops with Simunitions | 10-125 | 0006 | 4/15/2010 11:00:00 PM | 4/15/2010 11:00:00 PM | 1.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5525 | Expandable Baton Recertification | 10-071 | 0006 | 4/16/2010 12:00:00 AM | 4/16/2010 12:00:00 AM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5541 | Tactical Decision Making | 10-128 | 0016 | 7/15/2010 8:00:00 AM | 7/15/2010 8:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | with Simunitions | | | | | | | | | | |
| PD5607 | Taser Recertification 2010 with Scenarios | 10-141 | 0017 | 8/17/2010 2:30:00 PM | 8/17/2010 2:30:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2809 | Flying Armed - Law Enforcement Officers | 10-139 | 0037 | 9/28/2010 2:30:00 PM | 9/28/2010 2:30:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5657 | 2010 CPR Refresher | 10-152 | 0034 | 10/28/2010 2:00:00 PM | 10/28/2010 2:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5661 | Low Light Handgun Manipulation | 10-140 | 0020 | 10/28/2010 8:00:00 PM | 10/28/2010 8:00:00 PM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5662 | 2010 Legal Update | 10-258 | 0019 | 11/29/2010 1:00:00 AM | 11/29/2010 1:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5001 | AZPOST General Instructors Program | 10-410 | 0190 | 12/13/2010 1:00:00 AM | 12/13/2010 1:00:00 AM | 40.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5676 | FMLA / ADAA Video | | 0142 | 12/21/2010 1:00:00 AM | 12/21/2010 1:00:00 AM | 0.00 | 0.00 | 1 | $0.00 | | PeopleSoft |
| PD5771 | The Rita Leaf Story | | 0099 | 1/6/2011 1:00:00 AM | 1/6/2011 1:00:00 AM | 0.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD5076 | Firearms Instructor School | 11-036 | 0035 | 1/28/2011 3:00:00 PM | 1/28/2011 3:00:00 PM | 40.00 | 40.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5876 | New Instructor Certification Course | 11-021 | 0001 | 3/15/2011 1:00:00 AM | 3/15/2011 1:00:00 AM | 16.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5806 | Use of Force-Carotid Control Technique Review | 11-052 | 0057 | 4/6/2011 1:30:00 PM | 4/6/2011 1:30:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5881 | First Shot Accuracy 2011 | 11-090 | 0013 | 4/11/2011 10:00:00 AM | 4/11/2011 10:00:00 AM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5879 | The Wrong Arm of the Law | 11-096 | 0020 | 4/18/2011 1:00:00 AM | 4/18/2011 1:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5892 | Multi Assault Counter Terror Capability (MACTAC) Concepts for MPD | 11-092 | 0041 | 5/18/2011 4:00:00 PM | 5/18/2011 4:00:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5899 | Arizona | 11-165 | 0060 | 6/9/2011 | 6/9/2011 | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Medical Marijuana Act | | | 1:00:00 AM | 1:00:00 AM | | | | | | |
| PD5898 | Eye Witness Identification / False Confession / DV Call Response Update | 1-098 | 0065 | 6/9/2011 2:30:00 AM | 6/9/2011 2:30:00 AM | 2.50 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5991 | 2011LglUpd | 11-108 | 0075 | 10/15/2011 1:00:00 AM | 10/15/2011 1:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5240 | Undercover Operations | 11-123 | 0003 | 11/7/2011 11:00:00 AM | 11/7/2011 11:00:00 AM | 3.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD8718 | Buy Bust Procedure | 11-137 | 0005 | 11/7/2011 2:00:00 PM | 11/7/2011 2:00:00 PM | 1.00 | 3.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5534 | Informant / Source of Information | 11-001 | 0005 | 11/7/2011 4:00:00 PM | 11/7/2011 4:00:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD3767 | Vehicle Containment | 11-071 | 0023 | 11/8/2011 12:00:00 PM | 11/8/2011 12:00:00 PM | 2.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD2914 | Surveillance | 11-070 | 0022 | 11/8/2011 1:00:00 PM | 11/8/2011 1:00:00 PM | 5.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5822 | Search Warrant | 11-058 | 0002 | 11/11/2011 12:00:00 | 11/11/2011 12:00:00 | 3.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Writing Class | | | PM | PM | | | | | | |
| PD6470 | Career Survival | 11-117 | 0007 | 12/7/2011 7:00:00 PM | 12/7/2011 7:00:00 PM | 4.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7171 | Sage and Penn Arms Less Lethal Launcher Recertification | 12-014 | 0001 | 1/4/2012 2:00:00 PM | 1/4/2012 2:00:00 PM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5412 | Less Lethal Bean Bag Recertificaiton | 12-048 | 0019 | 1/4/2012 4:00:00 PM | 1/4/2012 4:00:00 PM | 1.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5370 | Live Fire House Instructor School | 12-008 | 0002 | 1/12/2012 5:00:00 PM | 1/12/2012 5:00:00 PM | 10.00 | 20.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7348 | Taser X2 User Certification | 12-022 | 0001 | 3/22/2012 5:00:00 PM | 3/22/2012 5:00:00 PM | 6.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7349 | Taser X2 Instructor Certification | 12-023 | 0001 | 3/22/2012 5:00:00 PM | 3/22/2012 5:00:00 PM | 1.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7340 | Diversity, Workplace Civility and Equal Employment | 12-064 | 0015 | 5/2/2012 11:00:00 AM | 5/2/2012 11:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD7354 | One Hand Survival Skills Refresher | 12-067 | 0059 | 5/21/2012 2:30:00 PM | 5/21/2012 2:30:00 PM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7420 | People In Crisis | 12-171 | 0016 | 8/2/2012 1:00:00 AM | 8/2/2012 1:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD6480 | Alien Victim WitnessAssistance | 11-136 | 0077 | 8/15/2012 2:00:00 AM | 8/15/2012 2:00:00 AM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7655 | Backing with Mirrors | 12-108 | 0004 | 10/3/2012 1:00:00 AM | 10/3/2012 1:00:00 AM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD5412 | Less Lethal Bean Bag Recertificaiton | 12-048 | 0033 | 11/7/2012 3:00:00 PM | 11/7/2012 3:00:00 PM | 1.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7672 | Sage & Penn Arms Less Lethal Launchers Initial Certification (SL-6, SL-1, PGL-65, GL-1) | 12-015 | 0002 | 11/7/2012 4:00:00 PM | 11/7/2012 4:00:00 PM | 0.00 | 2.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7700 | Basic Handgun Manipulation in Low | 12-115 | 0032 | 11/7/2012 6:00:00 PM | 11/7/2012 6:00:00 PM | 0.00 | 1.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Light | | | | | | | | | | |
| PD6418 | Mesa PD Gang Update for Patrol | 11-120 | 0002 | 11/9/2012 4:00:00 PM | 11/9/2012 4:00:00 PM | 2.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| PD7656 | Control Holds and Handcuffing Refresher | 12-112 | 0024 | 11/28/2012 2:00:00 PM | 11/28/2012 2:00:00 PM | 1.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| C00557 | Leadership Pickles! | | 0007 | 11/29/2012 12:00:00 AM | | 0.0 | 0.00 | 3.0 | $0.00 | | PS |
| | "Leadership Pickles!" | | | 11/29/2012 5:00:00 PM | 11/29/2012 5:00:00 PM | 0.0 | 0.0 | 0.0 | $0.00 | | LC |
| C00555 | Working with You is Killing Me | | 0009 | 12/3/2012 12:00:00 AM | | 0.0 | 0.00 | 4.0 | $0.00 | | PS |
| | "Working with You is Killing Me: Freeing Yourself from Emotional Traps at Work" | | | 12/3/2012 12:00:00 PM | 12/3/2012 12:00:00 PM | 0.0 | 0.0 | 0.0 | $0.00 | | LC |
| PD2522 | Physical | 13-102 | 0011 | 4/12/2013 | 4/12/2013 | 40.00 | 0.00 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fitness - Instructor | | | 5:00:00 PM | 5:00:00 PM | | | | | | |
| PD7750 | Excited Delirium (COE 2013) | 13-062 | 0018 | 5/15/2013 8:00:00 AM | 5/15/2013 8:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7751 | PTSD / TBI First Responder Program (COE 2013) | 13-064 | 18 | 5/15/2013 9:00:00 AM | 5/15/2013 9:00:00 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| PD7752 | COEUse of Force, Pursuit Policy and PIT Technique Policy Review (COE 2013) | 13-041 | 18 | 5/15/2013 11:00:00 AM | 5/15/2013 11:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD5525 | Expandable Baton Recertification | 13-052 | 75 | 5/15/2013 12:00:00 PM | 5/15/2013 12:00:00 PM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 13-069 | 148 | 5/15/2013 2:00:00 PM | 5/15/2013 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7753 | Use of Force-Carotid Control | 13-051 | 18 | 5/15/2013 3:00:00 PM | 5/15/2013 3:00:00 PM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Technique Review | | | | | | | | | | |
| PD7754 | Taser Recertification | 13-081 | 0018 | 5/15/2013 5:00:00 PM | 5/15/2013 5:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7940 | High-Risk Dignitary Protection Course | 11-341 | 0001 | 11/15/2013 6:00:00 PM | 11/15/2013 6:00:00 PM | 40 | 0 | 0.0 | $1,150.00 | | LC |
| PD7809 | Mental Conditioning for Lethal Force Encounters | 13-117 | 0023 | 12/11/2013 8:00:00 AM | 12/11/2013 8:00:00 AM | 2 | 0.0 | 0.0 | $0.00 | | LC |
| PD7867 | 2013 Legal Update | 13-377 | 0006 | 1/27/2014 12:00:00 AM | 1/27/2014 12:00:00 AM | 1 | 0.0 | 0.0 | $0.00 | | LC |
| PD7865 | Metal Theft / MC Profiling / ADOT 3-Day Permits | 13-378 | 0006 | 1/27/2014 1:30:00 PM | 1/27/2014 1:30:00 PM | 1.5 | 0.0 | 0.0 | $0.00 | | LC |
| S00004 | Hazard Communication (GHS) (SDS) | | 1 | 2/6/2014 6:08:43 PM | 2/6/2014 6:08:43 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD7883 | First Shot | 14-090 | 0073 | 2/25/2014 | 2/25/2014 | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Accuracy | | | 2:00:00 PM | 2:00:00 PM | | | | | | |
| PD7904 | Blue Angel Leadership: "The Power of Trust" | 14-008 | 0001 | 3/12/2014 5:00:00 PM | 3/12/2014 5:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD8111 | Dignitary Protection | 13-276 | 0001 | 5/22/2014 5:00:00 PM | 5/22/2014 5:00:00 PM | 24 | 0 | 0.0 | $0.00 | | LC |
| PD7873 | Below 100 Basic | 14-092 | 0014 | 6/4/2014 9:00:00 AM | 6/4/2014 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7874 | Use of Force Policy Review with Scenarios | 14-093 | 0014 | 6/4/2014 10:00:00 AM | 6/4/2014 10:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 14-094 | 0044 | 6/4/2014 12:00:00 PM | 6/4/2014 12:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD7875 | Early Intervention & Member Resources | 14-095 | 0014 | 6/4/2014 2:00:00 PM | 6/4/2014 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7876 | Missing Persons with Alzheimer's & Related Dementias | 14-096 | 0014 | 6/4/2014 3:00:00 PM | 6/4/2014 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD7877 | Hate | 14-097 | 0014 | 6/4/2014 | 6/4/2014 | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Crimes: A Law Enforcement Guide to Investigations and Reporting | | | 4:00:00 PM | 4:00:00 PM | | | | | | |
| PD7878 | Social Media in Law Enforcement | 14-091 | 0014 | 6/4/2014 5:00:00 PM | 6/4/2014 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD3306 | Taser Instructor Recertification | 14-128 | 0005 | 8/19/2014 5:00:00 PM | 8/19/2014 5:00:00 PM | 8 | 2 | 0.0 | $0.00 | | LC |
| PD8210 | Critical Protective Analysis Group | 14-282 | 0001 | 9/3/2014 12:00:00 AM | 9/3/2014 12:00:00 AM | 5 | 0 | 0.0 | $0.00 | | LC |
| PD8155 | Transition Class for New Patrol Vehicles | 14-125 | 0009 | 9/3/2014 9:00:00 AM | 9/3/2014 9:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD8181 | One Hand Survival Skills-Low Light | 14-137 | 0038 | 11/24/2014 7:00:00 AM | 11/24/2014 7:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD5412 | Less | 15-002 | 0058 | 1/6/2015 | 1/6/2015 | 0 | 2 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Lethal-Bean Bag Recertification | | | 10:00:00 AM | 10:00:00 AM | | | | | | |
| PD7171 | Sage & Penn Arms Less Lethal Launchers Recertification | 15-087 | 0003 | 1/6/2015 11:00:00 AM | 1/6/2015 11:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 15-003 | 0005 | 1/13/2015 9:00:00 AM | 1/13/2015 9:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation Refresher | 15-055 | 0062 | 5/4/2015 10:00:00 AM | 5/4/2015 10:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD8301 | Pursuit and Stopsticks Review | 15-069 | 0016 | 6/24/2015 8:00:00 AM | 6/24/2015 8:00:00 AM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| PD7754 | Taser Recertification | 15-064 | 0076 | 6/24/2015 9:00:00 AM | 6/24/2015 9:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD9877 | Tactical Decision Making Scenarios | 15-095 | 0017 | 6/24/2015 10:30:00 AM | 6/24/2015 10:30:00 AM | 0.0 | 1.5 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 15-066 | 178 | 6/24/2015 2:00:00 PM | 6/24/2015 2:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD8302 | Top 10 Constitutional Law Cases Every Officer Should Know | 15-016 | 0016 | 6/24/2015 3:00:00 PM | 6/24/2015 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8303 | Domestic Violence Law Enforcement Refresher | 15-060 | 0016 | 6/24/2015 4:00:00 PM | 6/24/2015 4:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD8304 | Mental Illness Refresher | 15-068 | 0016 | 6/24/2015 5:00:00 PM | 6/24/2015 5:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD5193 | Immediate Action Teams for Patrol | 15-106 | 0053 | 10/14/2015 3:00:00 PM | 10/14/2015 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD5603 | Arizona Tactical Officers Association Conference | 15-376 | 0003 | 10/23/2015 5:00:00 PM | 10/23/2015 5:00:00 PM | 14 | 0 | 0.0 | $0.00 | | LC |
| PD9879 | Use of Deadly Force / Contagious | 15-098 | 0039 | 11/2/2015 4:00:00 PM | 11/2/2015 4:00:00 PM | 1 | 1 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fire | | | | | | | | | | |
| PD9878 | 2015 Legal Update | 15-327 | 0014 | 1/4/2016 12:00:00 AM | 1/4/2016 12:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD5412 | Less Lethal-Bean Bag Recertification | 16-003 | 0064 | 1/5/2016 12:00:00 AM | 1/5/2016 12:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10118 | Heart Fit for Duty | 15-478 | 0006 | 1/12/2016 1:00:00 PM | 1/12/2016 1:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10135 | First Response Resiliency Skills | 16-092 | 0003 | 4/13/2016 12:00:00 AM | 4/13/2016 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10082 | Low Light Tactics and Flashlight Techniques Refresher | 16-061 | 0045 | 4/26/2016 9:00:00 PM | 4/26/2016 9:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10310 | NVG Operators Course | | 0001 | 10/27/2016 12:00:00 AM | 10/27/2016 12:00:00 AM | 0 | 0 | 24 | $0.00 | | LC |
| PD10089 | Basic Crisis Intervention Training | 16-073 | 0037 | 12/14/2016 12:00:00 AM | 12/14/2016 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD7672 | Sage & Penn Arms | 17-046 | 0003 | 1/3/2017 11:00:00 | 1/3/2017 11:00:00 | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Less Lethal Launchers Initial Certification (SL-6, SL-1, PGL-65, GL-1) | | | AM | AM | | | | | | |
| C00483 | Workplace Harassment and Discrimination Refresher Video | | 0166 | 1/5/2017 10:37:18 AM | 1/5/2017 10:37:18 AM | 0.0 | 0.0 | 0.25 | $0.00 | | LC |
| PD10261 | Mandatory 2017 Legal Update, 2-hours COE credit | 16-113P | 0001 | 4/24/2017 5:19:24 PM | 4/24/2017 5:19:24 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10524 | Use of Cover and Movement Refresher | 17-080 | 0033 | 5/8/2017 3:00:00 PM | 5/8/2017 3:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| | Advanced Tactical Explosive Breacher | | 0001 | 7/14/2017 12:00:00 AM | 7/14/2017 12:00:00 AM | 0 | 0 | 40 | $0.00 | | LC |
| KUV-MC | 05 - Request and View | | 0001 | 9/19/2017 1:45:40 PM | 9/19/2017 1:45:40 PM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Time Off - Video | | | | | | | | | | |
| PD4210 | CPR Refresher | 17-093 | 0205 | 10/5/2017 3:00:00 PM | 10/5/2017 3:00:00 PM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD10469 | VirTra V-300 Familiarization and Training Capability | 17-091 | 0016 | 10/11/2017 5:00:00 PM | 10/11/2017 5:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10372 | Squad Operations Tactics Training | 17-059 | 0059 | 10/12/2017 12:00:00 PM | 10/12/2017 12:00:00 PM | 2 | 3 | 0.0 | $0.00 | | LC |
| PD10525 | Tactical Building Search Refresher and Live Firehouse | 17-098 | 0068 | 12/5/2017 5:00:00 PM | 12/5/2017 5:00:00 PM | 1 | 3 | 0.0 | $0.00 | | LC |
| PD10411 | Credit Card Skimming Devices: AZPOST 1.5-hour Webinar for MPD Sworn Personnel. | 16-138 | 0001 | 12/12/2017 2:48:54 PM | 12/12/2017 2:48:54 PM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD10471 | Taser X2 Transition Course | 17-089 | 0052 | 12/12/2017 4:30:00 PM | 12/12/2017 4:30:00 PM | 3 | 0 | 0.0 | $0.00 | | LC |
| PD10566 | Manual, Mechanical, Ballistic, Thermal and Hydraulic Breaching | | 0001 | 3/2/2018 12:00:00 AM | 3/2/2018 12:00:00 AM | 0 | 0 | 40 | $0.00 | | LC |
| PD10535 | AZPOST Mandatory Legal Update 2017 / 2018 | 17-84 | 0001 | 3/12/2018 8:15:56 AM | 3/12/2018 8:15:56 AM | 1.5 | 0 | 0.0 | $0.00 | | LC |
| PD8276 | Carotid Control Technique Refresher | 18-006 | 0192 | 4/3/2018 10:00:00 AM | 4/3/2018 10:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD2863 | Expandable Baton Refresher | 18-054 | 0133 | 5/15/2018 1:00:00 PM | 5/15/2018 1:00:00 PM | 0 | 1 | 0.0 | $0.00 | | PeopleSoft |
| PD10605 | Individual First Aid Kit Use | 18-010 | 0034 | 6/5/2018 10:00:00 AM | 6/5/2018 10:00:00 AM | 2 | 0 | 0.0 | $0.00 | | LC |
| PD8306 | Basic Weapon Manipulation | 18-060 | 0159 | 6/5/2018 12:00:00 PM | 6/5/2018 12:00:00 PM | 0 | 3 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Refresher | | | | | | | | | | |
| PD10680 | Cover Entry Specialist I | | 0001 | 6/19/2018 12:00:00 AM | 6/19/2018 12:00:00 AM | 0 | 0 | 20 | $0.00 | | LC |
| PD1759 | Rapid Deployment | 18-052 | 0203 | 6/28/2018 12:00:00 AM | 6/28/2018 12:00:00 AM | 3.5 | 6.5 | 0.0 | $0.00 | | PeopleSoft |
| PD10778 | One-Handed Survival Skills and Use of Cover in Low Light | 18-072 | 0049 | 10/30/2018 10:00:00 PM | 10/30/2018 10:00:00 PM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD5603 | Arizona Tactical Officers Association Conference | 18-1102 | 0004 | 11/16/2018 12:00:00 AM | 11/16/2018 12:00:00 AM | 13.5 | 0 | 0.0 | $0.00 | | LC |
| PD10777 | ICAT Introduction | 18-089 | 0001 | 12/17/2018 8:52:51 AM | 12/17/2018 8:52:51 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10806 | Animal Cruelty Investigations and Prosecution and the Link to Human | 18-073 | 0001 | 12/17/2018 9:41:49 AM | 12/17/2018 9:41:49 AM | 4 | 0 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Violence | | | | | | | | | | |
| PD10809 | 2018 Legal Update | 18-91 | 0001 | 1/21/2019 8:29:49 AM | 1/21/2019 8:29:49 AM | 1.25 | 0 | 0.0 | $0.00 | | LC |
| PD8662 | Rifle Instructor School | 19-009 | 0010 | 2/8/2019 12:00:00 AM | 2/8/2019 12:00:00 AM | 20 | 20 | 0.0 | $0.00 | | PeopleSoft |
| PD10833 | Mesa Wellness 360 Overview | 19-011 | 0021 | 2/19/2019 3:00:00 PM | 2/19/2019 3:00:00 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10829 | Know Your Authority | V19-001 | 0011 | 5/2/2019 12:00:00 PM | 5/2/2019 12:00:00 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| PD10870 | Mass Casualty Response | 19-050 | 0023 | 5/13/2019 12:00:00 AM | 5/13/2019 12:00:00 AM | 4 | 4 | 0.0 | $0.00 | | LC |
| PD4210 | CPR Refresher | 19-013 | 0236 | 5/13/2019 11:00:00 AM | 5/13/2019 11:00:00 AM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD10981 | Basic Handgun Manipulation Refresher | 19-048 | 0014 | 5/29/2019 12:00:00 AM | 5/29/2019 12:00:00 AM | 0 | 2 | 0.0 | $0.00 | | LC |
| PD10709 | ICAT | 19-039 | 0037 | 6/18/2019 12:00:00 AM | 6/18/2019 12:00:00 AM | 10 | 0 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PD10887 | Fair and Impartial Policing | V19-002 | 0007 | 6/18/2019 12:00:00 AM | 6/18/2019 12:00:00 AM | 8 | 0 | 0.0 | $0.00 | | LC |
| PD10956 | 2019 3rd Quarter Training: Decision Shoot, Gas Mask Fit Test & Handgun Inspection | 19-064 | 0060 | 7/8/2019 11:00:00 AM | 7/8/2019 11:00:00 AM | 0 | 1 | 0.0 | $0.00 | | LC |
| PD10968 | 2019 Rifle and Shotgun Inspection | | 0036 | 8/26/2019 10:00:00 AM | 8/26/2019 10:00:00 AM | 0 | 0 | 1 | $0.00 | | LC |
| PD10984 | Power Hour Training for Patrol | 19-062 | 0001 | 12/30/2019 2:48:35 PM | 12/30/2019 2:48:35 PM | 1 | 0 | 0.0 | $0.00 | | LC |
| PD11044 | MPD 2019 Suicide Awareness | 19-061 | 0001 | 12/30/2019 3:00:15 PM | 12/30/2019 3:00:15 PM | 1 | 0.0 | 1 | $0.00 | | LC |
| PD11076 | Gender - Diverse Cultures | 19-132 | 0001 | 1/8/2020 3:20:09 PM | 1/8/2020 3:20:09 PM | 4 | 0 | 0.0 | $0.00 | | LC |
| | COVID 19 Infection Control and | | 0001 | 4/7/2020 11:20:24 AM | 4/7/2020 11:20:24 AM | 0.0 | 0.0 | 1 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Personal Protective Equipment (PPE) Guidance | | | | | | | | | | |
| | Versaterm MDT 7.7 Training | | | 7/23/2020 3:25:40 AM | 7/23/2020 3:25:40 AM | 0.0 | 0.0 | 0.5 | $0.00 | | LC |
| PD11193 | WRAP Restraint | 20-028 | 0003 | 8/4/2020 11:00:00 PM | 8/4/2020 11:00:00 PM | 0.0 | 1 | 0.0 | $0.00 | | LC |
| PD11152 | Revised Discipline Policy: Supervisor Training | | 00001 | 8/11/2020 2:57:07 AM | 8/11/2020 2:57:07 AM | 0 | 0.0 | 1 | $0.00 | | LC |
| | Human Trafficking 2020 | 20-65 | | 8/18/2020 5:06:25 AM | 8/18/2020 5:06:25 AM | 2.5 | 0.0 | 1 | $0.00 | | LC |
| | 2020 Taser Annual User Update | | | 10/8/2020 1:06:29 AM | 10/8/2020 1:06:29 AM | 1 | 0.0 | 1 | $0.00 | | LC |
| | Mobile Field Force Refresher for Patrol | | | 10/31/2020 4:17:54 AM | 10/31/2020 4:17:54 AM | 0.5 | 0.0 | 0.0 | $0.00 | | LC |
| PD11150 | Taser X2 | 20-017 | 0010 | 11/5/2020 | 11/5/2020 | 1 | 1 | 0.0 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

HMS 171a - PD Report - Student Training Hours Kyle Thomas, 1/1/2000 to 8/28/2025

| Course # | Course Title | AZ Post | Session # | Course End | Completed | COE | Prof | Trn | Cost | Vendor | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | User Re-Certification Course | | | 7:00:00 AM | 12:00:00 AM | | | | | | |
| PD5871 | Mobile Field Force | 20-040 | 0012 | 11/20/2020 7:00:00 AM | 11/20/2020 12:00:00 AM | 1 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD11198 | NTOA Supervising Patrol Critical Incidents Course | 21-004 | 0002 | 2/23/2021 12:00:00 AM | 2/23/2021 12:00:00 AM | 20 | 0.0 | 0.0 | $0.00 | | LC |
| PD1738 | Supervision of Police Personnel | 21-164 | 0003 | 4/22/2021 12:00:00 AM | 4/22/2021 12:00:00 AM | 72 | 0 | 0.0 | $0.00 | | PeopleSoft |
| PD11258 | Advanced Patrol Tactics | 21-010 | 0032 | 6/29/2021 4:00:00 AM | 6/29/2021 4:00:00 AM | 6 | 4 | 0.0 | $0.00 | | LC |
| DOTSUPV | Reasonable Suspicion Training for DOT Covered Supervisors | | | 4/1/2023 12:00:00 AM | 11/13/2023 6:43:23 AM | 0.0 | 0.0 | 130 | $0.00 | | LC |
| Count: 203 | | | | | | Total: 657.25 | Total: 248.00 | Total: 1085.05 | $1,150.00 | | |

sRobert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Christopher Gagne, in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne,<br><br>Plaintiffs,<br><br>vs.<br><br>City of Mesa, a political subdivision of the State of Arizona; Kevin Cost, Chief of Mesa Police Department, individually and in his official capacity; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and in his capacity as a police officer; Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his | Case No.: CV-24-01337-PHX-SHD<br><br>**PLAINTIFFS' FIFTH SUPPLEMENTAL DISCLOSURE STATEMENT**<br><br>(Assigned to the Honorable Sharad H. Desai) |

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

individual capacity and in his capacity as a police officer; Treve Widmer, in their individual capacity and in their capacity as a police officer; ABC Partnerships I-X; XYZ Corporations I-X; John Does I-X and Jane Does I-X,

Defendants.

Pursuant to Federal Rules of Civil Procedure 26(a)(1), Plaintiffs, Christopher Gagne and Suzette Gagne make the following ~~Fourth~~ ***Fifth*** Supplemental Disclosures related to this action. All additions are underlined and marked in bold and italics**.** All deletions or changes from the previous disclosures are marked with strike-through. These disclosures will continue to be supplemented and/or amended as the discovery and disclosure process ensues and additional information is discovered.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## I. INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION.

The following individuals are believed to have discoverable information regarding the event that is the subject of Plaintiffs' Complaint:

1. **Christopher Gagne**
   c/o Mills and Woods Law, PLLC
   5055 N. 12th st., suite 101, Phoenix, Arizona 85014

Plaintiff Christopher Gagne is the surviving father of Shawn Gagne ("Shawn"). He will testify about the psychological grief and trauma he sustained as a result of Shawn's death, as well as the trauma he sustained from losing his son. He will testify about his son's character, personality, and the close relationship he had with Shawn. He will also testify about the psychological grief and trauma sustained by other members of the Gagne family as a result of Shawn's death.

2. **Suzette Gagne**
   c/o Mills and Woods Law, PLLC
   5055 N. 12th st., suite 101, Phoenix, Arizona 85014

Plaintiff Suzette Gagne is the surviving mother of Shawn Gagne. She will testify about the psychological grief and trauma she sustained caused by Shawn's death, as well

as the trauma she sustained. She will testify about her son's character, personality, and the close relationship she had with Shawn. She will also testify about the psychological grief and trauma sustained by other members of the Gagne family resulting from Shawn's death.

**3. <u>Jordan Wirtjes</u>**
Address to be supplemented
(480) 202-9884

Jordan Wirtjes was Shawn's fiancé. Ms. Wirtjes is expected to testify that she informed MPD personnel that Shawn was alone in the apartment unit during the July 6th Incident and was heavily intoxicated after drinking a half gallon of vodka throughout the day. She is also expected to testify that she informed MPD personnel that Shawn routinely drank and became depressed and assured them that Shawn would come to his senses once sober. Ms. Wirtjes is further expected to testify that she encouraged MPD officers to permit time for Shawn's intoxication to subside. Ms. Wirtjes is expected to testify concerning her relationship with the other parties in this matter, her observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**4. <u>City of Mesa</u>**
c/o Wieneke Law Group, PLC
Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Defendant City of Mesa is a political subdivision of the State of Arizona. Defendant City of Mesa is responsible for training and supervising City of Mesa Police Department ("MPD") officers about reasonable use of force. Defendant City of Mesa failed to properly train and supervise its officers regarding reasonable use of force. The City of Mesa's policy, custom, or practice of training and allowing officers to utilize unreasonable force (such as firing upon unarmed citizens) is demonstrative of a pattern of reckless and wanton disregard of its citizens. Defendant City of Mesa and/or their representative is expected to testify concerning the hiring, training, retention, and supervision of MPD officers. Additionally, the City or its representative is expected to speak to any and all policies,

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

customs, and practices designed to prevent excessive force incidents, and their relationship with the other parties in this matter.

**5. Kevin Cost, Chief of Mesa Police Department**
c/o Wieneke Law Group, PLC
Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Defendant Kevin Cost is the Chief of MPD. Defendant Cost is expected to testify concerning the hiring, training, retention, and supervision of MPD officers; any and all policies, customs, and practices designed to prevent excessive force incidents; his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**6. Matthew Harris**
c/o Wieneke Law Group, PLC
Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Defendant Mathew Harris is a Defendant in his matter. It is anticipated that Defendant Mathew Harris is a Lieutenant and Special Weapons and Tactics ("SWAT") officer with the MPD. His badge number is 16816. Defendant Harris oversaw the MPD SWAT officers who responded to the July 6, 2024 incident which gives rise to the Complaint in this matter. Upon information and belief, Defendant Harris fired one of the fatal shots which killed Shawn. Defendant Harris is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**7. Kyle Thomas**
c/o Wieneke Law Group, PLC

Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Defendant Kyle Thomas is a Sergeant and SWAT officer with the MPD. His badge number is 17067. Defendant Thomas fired lethal munitions at Shawn. Defendant Thomas is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action

8. **Shawn Freeman**
c/o Wieneke Law Group, PLC
Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Defendant Shawn Freeman is a SWAT officer with the MPD. His badge number is 20207. Defendant Freeman fired lethal munitions at Shawn twice during the July 6th Incident, hitting Shawn with at least one of his shots. Defendant Freeman has and continues to have a demonstrated history of engaging in domestic violence and other criminal activity which was known to MPD at the time of the July 6th Incident. Defendant Freeman is expected to testify concerning his unprovoked firing of his weapon at Shawn from a sniper's perch during the July 6th Incident. Defendant Freeman is also expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

9. **Matt Brown**
c/o Wieneke Law Group, PLC
Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Defendant Matt Brown is a SWAT officer with the MPD. His badge number is 21421. Defendant Brown fired lethal munitions at Shawn. Defendant Brown is expected to

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**10. <u>Kyle Cameron</u>**
c/o Wieneke Law Group, PLC
Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Defendant Kyle Cameron is a SWAT officer with the MPD. His badge number is 20495. Defendant Cameron fired lethal munitions at Shawn. Defendant Cameron is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**11. <u>Matthew Chuey</u>**
c/o Wieneke Law Group, PLC
Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Defendant Matthew Chuey is a SWAT officer with the MPD. His badge number is 21315. Defendant Chuey fired lethal munitions at Shawn. Defendant Chuey is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**12. <u>Robert Goodrich</u>**
c/o Wieneke Law Group, PLC
Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Defendant Robert Goodrich is a SWAT officer with the MPD. His badge number is 20130. Defendant Goodrich fired lethal munitions at Shawn. Defendant Goodrich is

expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**13. Alejandro Navarro**
c/o Wieneke Law Group, PLC
Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Defendant Navarro is a SWAT officer with the MPD. His badge number is 19827. Defendant Navarro fired lethal munitions at Shawn. Defendant Navarro is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**14. Matthew Adair**
c/o Wieneke Law Group, PLC
Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Defendant Adair is a patrol officer with the MPD. His badge number is 18901. Defendant Adair was the Primary Negotiator on scene during the July 6th Incident. Defendant Adair is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**15. Christopher Orr**
c/o Wieneke Law Group, PLC
Kathleen L. Wieneke
Christina Retts
Garrett Griggs
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Defendant Orr is a patrol officer with the MPD. His badge number is 19441. Defendant Orr was a Secondary Negotiator on scene during the July 6th Incident. Upon

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

information and belief, Defendant Orr played an active role in the July 6th Incident, including by assisting Defendant Adair in negotiating with Shawn. Defendant Orr is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

16. **<u>Lee Rankin, Assistant Chief</u>**
Investigations Bureau
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Rankin is the Assistant Chief of the Investigations Bureau of the MPD. Mr. Rankin is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

17. **<u>Dan Butler, Assistant Chief</u>**
Patrol Operations
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Butler is the Assistant Chief for Patrol Operations with the MPD. Mr. Butler is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

18. **<u>Jeff Cutler, Executive Commander</u>**
Patrol Operations
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Cutler is the Executive Commander for Patrol Operations with the MPD. Mr. Cutler is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

19. **<u>James McCormick, Commander</u>**

Special Operations Division
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. McCormick is the Commander of the Special Operations Division with the MPD. Mr. McCormick is expected to testify concerning his oversight and supervision of SWAT officers, including the hiring and retention of Defendant Shawn Freeman as a SWAT officer. Mr. McCormick is also expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**20. <u>T. Intrieri, District Commander</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Intrieri is a district commander with the MPD. Mr. Intrieri is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**21. <u>Jess Nicholson</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Ms. Nicholson is a Sergeant and patrol officer with the MPD. Her badge number is 19465. Ms. Nicholson is expected to testify concerning her relationship with the other parties in this matter, her observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**22. <u>J. George</u>**
Mesa Police Department 130 N. Robson
Mesa, AZ 85201

Mr. George is a Sergeant and patrol officer with the MPD. His badge number is 17283. Mr. George is expected to testify concerning his relationship with the other parties

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**23. <u>FNU Lewinson</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Lewinson is a Sergeant and a patrol officer with the MPD. His badge number is 20138. Mr. Lewinson is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**24. <u>Mark Mask</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Mask is a SWAT officer with the MPD. His badge number is 15668. Mr. Mask is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**25. <u>A. Stefick</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Stefick is a SWAT officer with the MPD. His badge number is 23461. Mr. Stefick fired ferret gas munitions into Shawn's apartment, tased Shawn, and handcuffed him—all after Shawn was already dead. Mr. Stefick is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**26. <u>Andrew Gonzalez</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mr. Gonzalez is a SWAT officer with the MPD. His badge number is 19451. Mr. Gonzalez is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**27. <u>Bryant Clover</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Clover is a SWAT officer with the MPD. His badge number is 20541. Mr. Clover is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**28. <u>Daryl Woodward</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Woodward is a SWAT officer with the MPD. His badge number is 15726. Mr. Woodward is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**29. <u>Shawn Kurian</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Kurian is a patrol officer with the MPD. His badge number is 21070. Mr. Kurian gave orders to shoot bean bag rounds at and into Shawn's apartment during the July 6th incident. He also recorded Shawn's time of death. Mr. Kurian is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**30. <u>Kade Carrasco</u>**
Mesa Police Department

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

130 N. Robson
Mesa, AZ 85201

Mr. Carrasco is a patrol officer with the MPD. His badge number is 22609. Mr. Carrasco is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action

**31. <u>Scott Freeman</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Freeman is a patrol officer with the MPD. His badge number is 23084. Mr. Freeman shot bean bag rounds at and into Shawn's apartment unit. Mr. Freeman is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**32. <u>Nicholas Plott</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Plott is a patrol officer with the MPD. His badge number is 321641. Mr. Plott is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**33. <u>Casey Ibarra</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Ibarra is a patrol officer with the MPD. His badge number is 22438. Mr. Ibarra is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**34. <u>D. Samons</u>**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Samons is a patrol officer with the MPD. His badge number is 19185. Mr. Samons was the Primary Scene Supervisor during the July 6th Incident. Mr. Samons is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**35. J. Gutierrez**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Gutierrez is a patrol officer with the MPD. His badge number is 21423. Mr. Gutierrez spoke with Shawn's live-in fiancée, Jordan Wirtjes, about Shawn's mental state and intoxication after MPD officers arrived on scene. Mr. Gutierrez is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**36. Madison Kelly**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Ms. Kelly is a patrol officer with the MPD. Her badge number is 23422. Ms. Kelly is expected to testify concerning her relationship with the other parties in this matter, her observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**37. Treve Widmer**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Widmer is a patrol officer with the MPD. His badge number is 19506. Mr. Widmer is expected to testify concerning his relationship with the other parties in this

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**38. <u>Kayla Hong</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Ms. Hong is a patrol officer with the MPD. Her badge number is 24475. Ms. Hong is expected to testify concerning her relationship with the other parties in this matter, her observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**39. <u>Marques Maldonado</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Maldonado is a patrol officer with the MPD. His badge number is 21682. Mr. Maldonado attempted to communicate with Shawn via intercom and through Jordan Wirtjes' cell phone during the July 6th Incident. Mr. Maldonado is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**40. <u>FNU Gangawere</u>**
Mesa Police Department
130 N. Robson
Mesa, AZ 85201

Mr. Gangawere is a patrol officer with the MPD. His badge number is 20437. Mr. Gangawere is expected to testify concerning his relationship with the other parties in this matter, his observations and experiences and the facts surrounding this matter, as well as any conversations or communications, written and/or oral, regarding this action.

**41. <u>Mark Hafkey</u>**
c/o Mills + Woods Law, PLLC
5055 N 12th St., Ste. 101
Phoenix, AZ 85014

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mr. Hafkey is Plaintiffs' police practices expert. He is anticipated to testify in accordance with his expert report, disclosed as GAGNE_007725-GAGNE_007754.

**42. Paul Shaloka**
c/o Mills + Woods Law, PLLC
5055 N 12th St., Ste. 101
Phoenix, AZ 85014

Mr. Shaloka is Plaintiffs' financial expert. He is anticipated to testify in accordance with his expert report, disclosed as GAGNE_007622-GAGNE_007651.

43. [Reserved]

Plaintiffs also hereby incorporate as if fully stated herein the name and accompanying description of any individual or class of individual disclosed by Defendants formally or informally in this action as having discoverable information. Plaintiffs reserve the right to amend as discovery continues.

## II. LIST THE DOCUMENTS, ELECTRONICALLY STORED INFORMATION ("ESI"), TANGIBLE THINGS, LAND, OR OTHER PROPERTY KNOWN TO EXIST THAT MAY BE RELEVANT TO ANY PARTY'S CLAIMS OR DEFENSES.

Without waiving objections or stipulating to relevance or admissibility, Plaintiffs may use the following exhibits and information at trial:

(a) Any and all tangible things or property recovered from the scene of the incident.

(b) Any and all demonstrative exhibits, including photographs, diagrams, or charts, as needed;

(c) Any and all depositions taken in this matter and all exhibits attached thereto;

(d) All discovery exchanged in this case, including interrogatories and responses, requests for admission and responses, and requests for production and responses;

(e) All documents discovered from not until the time of trial or alternate resolution of the case;

(f) All documents and tangible things produced in response to subpoenas or letter requests issued or sent in this action; and

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

(g) Without waiving objections, any and all exhibits listed by any other party

Additionally:

1. GAGNE_000001 (raw folder) - 911 calls

    a. 911_000001 - 2023-141208a_T.wav
    b. 911_000002 - 2023-141208b_T.wav
    c. 911_000003 - 2023-141208c_T.wav
    d. 911_000004 - 2023-141208d_T.wav
    e. 911_000005 - 2023-141208e_T.wav
    f. 911_000006 - 2023-141208f_T.wav
    g. 911_000007 - 2023-141208g_R.wav
    h. 911_000008 - 2023-141208h_R.wav

2. GAGNE_000002 (raw folder) - Body-worn camera (BWC) footage
    a. BODYCAM_001_998-8.mp4
    b. BODYCAM_002_Axon_Body_3_Video_2023-07-06_1703_X60A4773E.mp4
    c. BODYCAM_003_Axon_Body_3_Video_2023-07-06_2217_X60A4962A.mp4
    d. BODYCAM_004_Axon_Body_3_Video_2023-07-06_2227_X60A1813G.mp4
    e. BODYCAM_005_Axon_Body_3_Video_2023-07-06_2228_X60A1559B.mp4
    f. BODYCAM_006_Axon_Body_3_Video_2023-07-06_2229_X60A1758E.mp4
    g. BODYCAM_007_Axon_Body_3_Video_2023-07-06_2229_X60A3266S.mp4
    h. BODYCAM_008_Axon_Body_3_Video_2023-07-06_2229_X60A3266S-2.mp4
    i. BODYCAM_009_Axon_Body_3_Video_2023-07-06_2229_X60A4386G.mp4
    j. BODYCAM_010_Axon_Body_3_Video_2023-07-06_2230_X60A1669C.mp4
    k. BODYCAM_011_Axon_Body_3_Video_2023-07-06_2231_X60A1813G.mp4
    l. BODYCAM_012_Axon_Body_3_Video_2023-07-06_2232_X60A3266S.mp4
    m. BODYCAM_013_Axon_Body_3_Video_2023-07-06_2236_X60A3266S.mp4
    n. BODYCAM_014_Axon_Body_3_Video_2023-07-06_2237_X60A4014G.mp4
    o. BODYCAM_015_Axon_Body_3_Video_2023-07-06_2238_X60A4749E.mp4
    p. BODYCAM_016_Axon_Body_3_Video_2023-07-06_2239_X60A4017E.mp4
    q. BODYCAM_017_Axon_Body_3_Video_2023-07-06_2239_X60A4931E.mp4

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

r. BODYCAM_018_Axon_Body_3_Video_2023-07-06_2241_X60A4317F.mp4
s. BODYCAM_019_Axon_Body_3_Video_2023-07-06_2242_X60A1260G.mp4
t. BODYCAM_020_Axon_Body_3_Video_2023-07-06_2243_X60A4663N.mp4
u. BODYCAM_021_Axon_Body_3_Video_2023-07-06_2243_X60A4773E.mp4
v. BODYCAM_022_Axon_Body_3_Video_2023-07-06_2243_X60A4773E-2.mp4
w. BODYCAM_023_Axon_Body_3_Video_2023-07-06_2243_X60A4779D.mp4
x. BODYCAM_024_Axon_Body_3_Video_2023-07-06_2244_X60A4938E.mp4
y. BODYCAM_025_Axon_Body_3_Video_2023-07-06_2246_X60A1649G.mp4
z. BODYCAM_026_Axon_Body_3_Video_2023-07-06_2248_X60A4011F.mp4
aa. BODYCAM_027_Axon_Body_3_Video_2023-07-06_2256_X60A4663N.mp4
bb. BODYCAM_028_Axon_Body_3_Video_2023-07-06_2256_X60A4670G.mp4
cc. BODYCAM_029_Axon_Body_3_Video_2023-07-06_2306_X60A1260G.mp4
dd. BODYCAM_030_Axon_Body_3_Video_2023-07-06_2312_X60A1150A.mp4
ee. BODYCAM_031_Axon_Body_3_Video_2023-07-06_2312_X60A3214X.mp4
ff. BODYCAM_032_Axon_Body_3_Video_2023-07-06_2313_X60A4663N.mp4
gg. BODYCAM_033_Axon_Body_3_Video_2023-07-06_2313_X60A4962A.mp4
hh. BODYCAM_034_Axon_Body_3_Video_2023-07-06_2314_X60A4014G.mp4
ii. BODYCAM_035_Axon_Body_3_Video_2023-07-06_2315_X60A3214X.mp4
jj. BODYCAM_036_Axon_Body_3_Video_2023-07-06_2315_X60A3214X-2.mp4
kk. BODYCAM_037_Axon_Body_3_Video_2023-07-06_2315_X60A4017E.mp4
ll. BODYCAM_038_Axon_Body_3_Video_2023-07-06_2315_X60A4663N.mp4
mm. BODYCAM_039_Axon_Body_3_Video_2023-07-06_2315_X60A4663N-2.mp4
nn. BODYCAM_040_Axon_Body_3_Video_2023-07-06_2315_X60A4773E.mp4
oo. BODYCAM_041_Axon_Body_3_Video_2023-07-06_2315_X60A4773E-2.mp4
pp. BODYCAM_042_Axon_Body_3_Video_2023-07-06_2315_X60A4880G.mp4

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

qq. BODYCAM_043_Axon_Body_3_Video_2023-07-06_2323_X60A4011F.mp4
rr. BODYCAM_044_Axon_Body_3_Video_2023-07-06_2327_X60A4749E.mp4
ss. BODYCAM_045_Axon_Body_3_Video_2023-07-06_2332_X60A1813G.mp4
tt. BODYCAM_046_Axon_Body_3_Video_2023-07-06_2332_X60A4670G.mp4
uu. BODYCAM_047_Axon_Body_3_Video_2023-07-06_2340_X60A4282D.mp4
vv. BODYCAM_048_Axon_Body_3_Video_2023-07-07_0003_X60A4017E.mp4
ww. BODYCAM_049_Axon_Body_3_Video_2023-07-07_0005_X60A3214X.mp4
xx. BODYCAM_050_Axon_Body_3_Video_2023-07-07_0758_X60A4014G.mp4

3. GAGNE_000003 (raw folder) - MPD photographs

1) MPDPHOTOS_001_2023-141208_0108103_0001_AA.JPG
2) MPDPHOTOS_002_2023-141208_0108103_0014_AA.JPG
3) MPDPHOTOS_003_2023-141208_0108103_0015_AA.JPG
4) MPDPHOTOS_004_2023-141208_0108103_0016_AA.JPG
5) MPDPHOTOS_005_2023-141208_0108103_0017_AA.JPG
6) MPDPHOTOS_006_2023-141208_0108103_0018_AA.JPG
7) MPDPHOTOS_007_2023-141208_0108103_0019_AA.JPG
8) MPDPHOTOS_008_2023-141208_0108103_0020_AA.JPG
9) MPDPHOTOS_009_2023-141208_0108103_0021_AA.JPG
10) MPDPHOTOS_010_2023-141208_0108103_0022_AA.JPG
11) MPDPHOTOS_011_2023-141208_0108103_0023_AA.JPG
12) MPDPHOTOS_012_2023-141208_0108103_0024_AA.JPG
13) MPDPHOTOS_013_2023-141208_0108103_0025_AA.JPG
14) MPDPHOTOS_014_2023-141208_0108103_0026_AA.JPG
15) MPDPHOTOS_015_2023-141208_0108103_0027_AA.JPG
16) MPDPHOTOS_016_2023-141208_0108103_0028_AA.JPG
17) MPDPHOTOS_017_2023-141208_0108103_0029_AA.JPG
18) MPDPHOTOS_018_2023-141208_0108103_0043_AA.JPG
19) MPDPHOTOS_019_2023-141208_0108103_0044_AA.JPG
20) MPDPHOTOS_020_2023-141208_0108103_0045_AA.JPG
21) MPDPHOTOS_021_2023-141208_0108103_0046_AA.JPG
22) MPDPHOTOS_022_2023-141208_0108103_0047_AA.JPG
23) MPDPHOTOS_023_2023-141208_0108103_0048_AA.JPG
24) MPDPHOTOS_024_2023-141208_0108103_0049_AA.JPG
25) MPDPHOTOS_025_2023-141208_0108103_0050_AA.JPG
26) MPDPHOTOS_026_2023-141208_0108103_0051_AA.JPG
27) MPDPHOTOS_027_2023-141208_0108103_0052_AA.JPG
28) MPDPHOTOS_028_2023-141208_0108103_0053_AA.JPG
29) MPDPHOTOS_029_2023-141208_0108103_0068_AA.JPG
30) MPDPHOTOS_030_2023-141208_0108103_0069_AA.JPG
31) MPDPHOTOS_031_2023-141208_0108103_0070_AA.JPG
32) MPDPHOTOS_032_2023-141208_0108103_0071_AA.JPG

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

33)MPDPHOTOS_033_2023-141208_0108103_0072_AA.JPG
34)MPDPHOTOS_034_2023-141208_0108103_0073_AA.JPG
35)MPDPHOTOS_035_2023-141208_0108103_0074_AA.JPG
36)MPDPHOTOS_036_2023-141208_0108103_0075_AA.JPG
37)MPDPHOTOS_037_2023-141208_0108103_0076_AA.JPG
38)MPDPHOTOS_038_2023-141208_0108103_0077_AA.JPG
39)MPDPHOTOS_039_2023-141208_0108103_0078_AA.JPG
40)MPDPHOTOS_040_2023-141208_0108103_0079_AA.JPG
41)MPDPHOTOS_041_2023-141208_0108103_0080_AA.JPG
42)MPDPHOTOS_042_2023-141208_0108103_0093_AA.JPG
43)MPDPHOTOS_043_2023-141208_0108103_0094_AA.JPG
44)MPDPHOTOS_044_2023-141208_0108103_0095_AA.JPG
45)MPDPHOTOS_045_2023-141208_0108103_0096_AA.JPG
46)MPDPHOTOS_046_2023-141208_0108103_0097_AA.JPG
47)MPDPHOTOS_047_2023-141208_0108103_0098_AA.JPG
48)MPDPHOTOS_048_2023-141208_0108103_0099_AA.JPG
49)MPDPHOTOS_049_2023-141208_0108103_0100_AA.JPG
50)MPDPHOTOS_050_2023-141208_0108103_0101_AA.JPG
51)MPDPHOTOS_051_2023-141208_0108103_0102_AA.JPG
52)MPDPHOTOS_052_2023-141208_0108103_0103_AA.JPG
53)MPDPHOTOS_053_2023-141208_0108103_0104_AA.JPG
54)MPDPHOTOS_054_2023-141208_0108103_0117_AA.JPG
55)MPDPHOTOS_055_2023-141208_0108103_0118_AA.JPG
56)MPDPHOTOS_056_2023-141208_0108103_0119_AA.JPG
57)MPDPHOTOS_057_2023-141208_0108103_0120_AA.JPG
58)MPDPHOTOS_058_2023-141208_0108103_0121_AA.JPG
59)MPDPHOTOS_059_2023-141208_0108103_0122_AA.JPG
60)MPDPHOTOS_060_2023-141208_0108103_0123_AA.JPG
61)MPDPHOTOS_061_2023-141208_0108103_0124_AA.JPG
62)MPDPHOTOS_062_2023-141208_0108103_0125_AA.JPG
63)MPDPHOTOS_063_2023-141208_0108103_0126_AA.JPG
64)MPDPHOTOS_064_2023-141208_0108103_0127_AA.JPG
65)MPDPHOTOS_065_2023-141208_0108103_0128_AA.JPG
66)MPDPHOTOS_066_2023-141208_0108103_0141_AA.JPG
67)MPDPHOTOS_067_2023-141208_0108103_0142_AA.JPG
68)MPDPHOTOS_068_2023-141208_0108103_0143_AA.JPG
69)MPDPHOTOS_069_2023-141208_0108103_0144_AA.JPG
70)MPDPHOTOS_070_2023-141208_0108103_0145_AA.JPG
71)MPDPHOTOS_071_2023-141208_0108103_0146_AA.JPG
72)MPDPHOTOS_072_2023-141208_0108103_0147_AA.JPG
73)MPDPHOTOS_073_2023-141208_0108103_0148_AA.JPG
74)MPDPHOTOS_074_2023-141208_0108103_0149_AA.JPG
75)MPDPHOTOS_075_2023-141208_0108103_0150_AA.JPG
76)MPDPHOTOS_076_2023-141208_0108103_0151_AA.JPG
77)MPDPHOTOS_077_2023-141208_0108103_0152_AA.JPG
78)MPDPHOTOS_078_2023-141208_0108103_0153_AA.JPG
79)MPDPHOTOS_079_2023-141208_0108103_0154_AA.JPG
80)MPDPHOTOS_080_2023-141208_0108103_0155_AA.JPG
81)MPDPHOTOS_081_2023-141208_0108103_0168_AA.JPG
82)MPDPHOTOS_082_2023-141208_0108103_0169_AA.JPG
83)MPDPHOTOS_083_2023-141208_0108103_0170_AA.JPG

84)MPDPHOTOS_084_2023-141208_0108103_0171_AA.JPG
85)MPDPHOTOS_085_2023-141208_0108103_0172_AA.JPG
86)MPDPHOTOS_086_2023-141208_0108103_0173_AA.JPG
87)MPDPHOTOS_087_2023-141208_0108103_0174_AA.JPG
88)MPDPHOTOS_088_2023-141208_0108647_0001_AA.JPG
89)MPDPHOTOS_089_2023-141208_0108647_0079_AA.JPG
90)MPDPHOTOS_090_2023-141208_0108647_0080_AA.JPG
91)MPDPHOTOS_091_2023-141208_0108647_0081_AA.JPG
92)MPDPHOTOS_092_2023-141208_0108647_0082_AA.JPG
93)MPDPHOTOS_093_2023-141208_0108647_0083_AA.JPG
94)MPDPHOTOS_094_2023-141208_0108647_0084_AA.JPG
95)MPDPHOTOS_095_2023-141208_0108647_0085_AA.JPG
96)MPDPHOTOS_096_2023-141208_0108647_0086_AA.JPG
97)MPDPHOTOS_097_2023-141208_0108647_0087_AA.JPG
98)MPDPHOTOS_098_2023-141208_0108647_0091_AA.JPG
99)MPDPHOTOS_099_2023-141208_0108647_0092_AA.JPG
100) MPDPHOTOS_100_2023-141208_0108647_0099_AA.JPG
101) MPDPHOTOS_101_2023-141208_0108647_0104_AA.JPG
102) MPDPHOTOS_102_2023-141208_0108647_0105_AA.JPG
103) MPDPHOTOS_103_2023-141208_0108647_0110_AA.JPG
104) MPDPHOTOS_104_2023-141208_0108647_0112_AA.JPG
105) MPDPHOTOS_105_2023-141208_0108647_0113_AA.JPG
106) MPDPHOTOS_106_2023-141208_0108647_0115_AA.JPG
107) MPDPHOTOS_107_2023-141208_0108647_0116_AA.JPG
108) MPDPHOTOS_108_2023-141208_0108647_0117_AA.JPG
109) MPDPHOTOS_109_2023-141208_0108647_0119_AA.JPG
110) MPDPHOTOS_110_2023-141208_0108647_0120_AA.JPG
111) MPDPHOTOS_111_2023-141208_0108647_0123_AA.JPG
112) MPDPHOTOS_112_2023-141208_0108647_0124_AA.JPG
113) MPDPHOTOS_113_2023-141208_0108647_0125_AA.JPG
114) MPDPHOTOS_114_2023-141208_0108647_0127_AA.JPG
115) MPDPHOTOS_115_2023-141208_0108647_0128_AA.JPG
116) MPDPHOTOS_116_2023-141208_0108647_0130_AA.JPG
117) MPDPHOTOS_117_2023-141208_0108647_0132_AA.JPG
118) MPDPHOTOS_118_2023-141208_0108647_0133_AA.JPG
119) MPDPHOTOS_119_2023-141208_0108647_0134_AA.JPG
120) MPDPHOTOS_120_2023-141208_0108647_0140_AA.JPG
121) MPDPHOTOS_121_2023-141208_0108647_0141_AA.JPG
122) MPDPHOTOS_122_2023-141208_0108647_0143_AA.JPG
123) MPDPHOTOS_123_2023-141208_0108647_0144_AA.JPG
124) MPDPHOTOS_124_2023-141208_0108647_0145_AA.JPG
125) MPDPHOTOS_125_2023-141208_0108647_0147_AA.JPG
126) MPDPHOTOS_126_2023-141208_0108647_0152_AA.JPG
127) MPDPHOTOS_127_2023-141208_0108647_0153_AA.JPG
128) MPDPHOTOS_128_2023-141208_0108647_0154_AA.JPG
129) MPDPHOTOS_129_2023-141208_0108647_0155_AA.JPG
130) MPDPHOTOS_130_2023-141208_0108647_0156_AA.JPG
131) MPDPHOTOS_131_2023-141208_0108647_0158_AA.JPG
132) MPDPHOTOS_132_2023-141208_0108647_0159_AA.JPG
133) MPDPHOTOS_133_2023-141208_0108647_0160_AA.JPG
134) MPDPHOTOS_134_2023-141208_0108647_0161_AA.JPG

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

135) MPDPHOTOS_135_2023-141208_0108647_0163_AA.JPG
136) MPDPHOTOS_136_2023-141208_0108647_0164_AA.JPG
137) MPDPHOTOS_137_2023-141208_0108647_0165_AA.JPG
138) MPDPHOTOS_138_2023-141208_0108647_0166_AA.JPG
139) MPDPHOTOS_139_2023-141208_0108647_0167_AA.JPG
140) MPDPHOTOS_140_2023-141208_0108647_0168_AA.JPG
141) MPDPHOTOS_141_2023-141208_0108647_0170_AA.JPG
142) MPDPHOTOS_142_2023-141208_0108647_0171_AA.JPG
143) MPDPHOTOS_143_2023-141208_0108647_0174_AA.JPG
144) MPDPHOTOS_144_2023-141208_0108647_0175_AA.JPG
145) MPDPHOTOS_145_2023-141208_0108647_0176_AA.JPG
146) MPDPHOTOS_146_2023-141208_0108647_0177_AA.JPG
147) MPDPHOTOS_147_2023-141208_0108647_0178_AA.JPG
148) MPDPHOTOS_148_2023-141208_0108647_0181_AA.JPG
149) MPDPHOTOS_149_2023-141208_0108647_0182_AA.JPG
150) MPDPHOTOS_150_2023-141208_0108647_0183_AA.JPG
151) MPDPHOTOS_151_2023-141208_0108647_0184_AA.JPG
152) MPDPHOTOS_152_2023-141208_0108647_0187_AA.JPG
153) MPDPHOTOS_153_2023-141208_0108647_0188_AA.JPG
154) MPDPHOTOS_154_2023-141208_0108647_0189_AA.JPG
155) MPDPHOTOS_155_2023-141208_0108647_0190_AA.JPG
156) MPDPHOTOS_156_2023-141208_0108647_0191_AA.JPG
157) MPDPHOTOS_157_2023-141208_0108647_0196_AA.JPG
158) MPDPHOTOS_158_2023-141208_0108647_0197_AA.JPG
159) MPDPHOTOS_159_2023-141208_0108647_0203_AA.JPG
160) MPDPHOTOS_160_2023-141208_0108647_0207_AA.JPG
161) MPDPHOTOS_161_2023-141208_0108647_0212_AA.JPG
162) MPDPHOTOS_162_2023-141208_0108647_0216_AA.JPG
163) MPDPHOTOS_163_2023-141208_0108647_0218_AA.JPG
164) MPDPHOTOS_164_2023-141208_0108647_0220_AA.JPG
165) MPDPHOTOS_165_2023-141208_0108647_0221_AA.JPG
166) MPDPHOTOS_166_2023-141208_0108647_0222_AA.JPG
167) MPDPHOTOS_167_2023-141208_0108647_0225_AA.JPG
168) MPDPHOTOS_168_2023-141208_0108647_0226_AA.JPG
169) MPDPHOTOS_169_2023-141208_0108647_0227_AA.JPG
170) MPDPHOTOS_170_2023-141208_0108647_0228_AA.JPG
171) MPDPHOTOS_171_2023-141208_0108647_0229_AA.JPG
172) MPDPHOTOS_172_2023-141208_0108647_0230_AA.JPG
173) MPDPHOTOS_173_2023-141208_0108647_0231_AA.JPG
174) MPDPHOTOS_174_2023-141208_0108647_0232_AA.JPG
175) MPDPHOTOS_175_2023-141208_0108647_0233_AA.JPG
176) MPDPHOTOS_176_2023-141208_0108647_0234_AA.JPG
177) MPDPHOTOS_177_2023-141208_0108647_0240_AA.JPG
178) MPDPHOTOS_178_2023-141208_0108647_0241_AA.JPG
179) MPDPHOTOS_179_2023-141208_0108647_0242_AA.JPG
180) MPDPHOTOS_180_2023-141208_0108647_0243_AA.JPG
181) MPDPHOTOS_181_2023-141208_0108647_0244_AA.JPG
182) MPDPHOTOS_182_2023-141208_0108647_0245_AA.JPG
183) MPDPHOTOS_183_2023-141208_0108647_0246_AA.JPG
184) MPDPHOTOS_184_2023-141208_0108647_0247_AA.JPG
185) MPDPHOTOS_185_2023-141208_0108647_0248_AA.JPG

186) MPDPHOTOS_186_2023-141208_0108647_0249_AA.JPG
187) MPDPHOTOS_187_2023-141208_0108647_0250_AA.JPG
188) MPDPHOTOS_188_2023-141208_0108647_0251_AA.JPG
189) MPDPHOTOS_189_2023-141208_0108647_0252_AA.JPG
190) MPDPHOTOS_190_2023-141208_0108647_0253_AA.JPG
191) MPDPHOTOS_191_2023-141208_0108647_0254_AA.JPG
192) MPDPHOTOS_192_2023-141208_0108647_0255_AA.JPG
193) MPDPHOTOS_193_2023-141208_0108647_0256_AA.JPG
194) MPDPHOTOS_194_2023-141208_0108647_0257_AA.JPG
195) MPDPHOTOS_195_2023-141208_0108647_0258_AA.JPG
196) MPDPHOTOS_196_2023-141208_0108647_0259_AA.JPG
197) MPDPHOTOS_197_2023-141208_0108647_0260_AA.JPG
198) MPDPHOTOS_198_2023-141208_0108647_0261_AA.JPG
199) MPDPHOTOS_199_2023-141208_0108647_0262_AA.JPG
200) MPDPHOTOS_200_2023-141208_0108647_0263_AA.JPG
201) MPDPHOTOS_201_2023-141208_0108647_0264_AA.JPG
202) MPDPHOTOS_202_2023-141208_0108647_0265_AA.JPG
203) MPDPHOTOS_203_2023-141208_0108647_0266_AA.JPG
204) MPDPHOTOS_204_2023-141208_0108647_0267_AA.JPG
205) MPDPHOTOS_205_2023-141208_0108647_0268_AA.JPG
206) MPDPHOTOS_206_2023-141208_0108647_0269_AA.JPG
207) MPDPHOTOS_207_2023-141208_0108647_0270_AA.JPG
208) MPDPHOTOS_208_2023-141208_0108647_0271_AA.JPG
209) MPDPHOTOS_209_2023-141208_0108647_0272_AA.JPG
210) MPDPHOTOS_210_2023-141208_0108647_0273_AA.JPG
211) MPDPHOTOS_211_2023-141208_0108647_0274_AA.JPG
212) MPDPHOTOS_212_2023-141208_0108647_0275_AA.JPG
213) MPDPHOTOS_213_2023-141208_0108647_0286_AA.JPG
214) MPDPHOTOS_214_2023-141208_0108647_0287_AA.JPG
215) MPDPHOTOS_215_2023-141208_0108647_0288_AA.JPG
216) MPDPHOTOS_216_2023-141208_0108647_0289_AA.JPG
217) MPDPHOTOS_217_2023-141208_0108647_0290_AA.JPG
218) MPDPHOTOS_218_2023-141208_0108647_0291_AA.JPG
219) MPDPHOTOS_219_2023-141208_0108647_0292_AA.JPG
220) MPDPHOTOS_220_2023-141208_0108647_0293_AA.JPG
221) MPDPHOTOS_221_2023-141208_0108647_0294_AA.JPG
222) MPDPHOTOS_222_2023-141208_0108647_0295_AA.JPG
223) MPDPHOTOS_223_2023-141208_0108647_0296_AA.JPG
224) MPDPHOTOS_224_2023-141208_0108647_0297_AA.JPG
225) MPDPHOTOS_225_2023-141208_0108647_0298_AA.JPG
226) MPDPHOTOS_226_2023-141208_0108647_0299_AA.JPG
227) MPDPHOTOS_227_2023-141208_0108647_0302_AA.JPG
228) MPDPHOTOS_228_2023-141208_0108647_0303_AA.JPG
229) MPDPHOTOS_229_2023-141208_0108647_0306_AA.JPG
230) MPDPHOTOS_230_2023-141208_0108647_0307_AA.JPG
231) MPDPHOTOS_231_2023-141208_0108647_0308_AA.JPG
232) MPDPHOTOS_232_2023-141208_0108647_0310_AA.JPG
233) MPDPHOTOS_233_2023-141208_0108647_0311_AA.JPG
234) MPDPHOTOS_234_2023-141208_0108647_0312_AA.JPG
235) MPDPHOTOS_235_2023-141208_0108647_0313_AA.JPG
236) MPDPHOTOS_236_2023-141208_0108647_0314_AA.JPG

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

237) MPDPHOTOS_237_2023-141208_0108647_0318_AA.JPG
238) MPDPHOTOS_238_2023-141208_0108647_0319_AA.JPG
239) MPDPHOTOS_239_2023-141208_0108647_0320_AA.JPG
240) MPDPHOTOS_240_2023-141208_0108647_0321_AA.JPG
241) MPDPHOTOS_241_2023-141208_0108647_0322_AA.JPG
242) MPDPHOTOS_242_2023-141208_0108647_0323_AA.JPG
243) MPDPHOTOS_243_2023-141208_0108647_0324_AA.JPG
244) MPDPHOTOS_244_2023-141208_0108647_0326_AA.JPG
245) MPDPHOTOS_245_2023-141208_0108647_0327_AA.JPG
246) MPDPHOTOS_246_2023-141208_0108647_0336_AA.JPG
247) MPDPHOTOS_247_2023-141208_0108647_0339_AA.JPG
248) MPDPHOTOS_248_2023-141208_0108647_0351_AA.JPG
249) MPDPHOTOS_249_2023-141208_0108647_0352_AA.JPG
250) MPDPHOTOS_250_2023-141208_0108647_0353_AA.JPG
251) MPDPHOTOS_251_2023-141208_0108647_0355_AA.JPG
252) MPDPHOTOS_252_2023-141208_0108647_0356_AA.JPG
253) MPDPHOTOS_253_2023-141208_0108647_0357_AA.JPG
254) MPDPHOTOS_254_2023-141208_0108647_0358_AA.JPG
255) MPDPHOTOS_255_2023-141208_0108647_0359_AA.JPG
256) MPDPHOTOS_256_2023-141208_0108647_0361_AA.JPG
257) MPDPHOTOS_257_2023-141208_0108647_0365_AA.JPG
258) MPDPHOTOS_258_2023-141208_0108647_0374_AA.JPG
259) MPDPHOTOS_259_2023-141208_0108647_0375_AA.JPG
260) MPDPHOTOS_260_2023-141208_0108647_0376_AA.JPG
261) MPDPHOTOS_261_2023-141208_0108647_0378_AA.JPG
262) MPDPHOTOS_262_2023-141208_0108647_0379_AA.JPG
263) MPDPHOTOS_263_2023-141208_0108647_0380_AA.JPG
264) MPDPHOTOS_264_2023-141208_0108647_0381_AA.JPG
265) MPDPHOTOS_265_2023-141208_0108647_0382_AA.JPG
266) MPDPHOTOS_266_2023-141208_0108647_0390_AA.JPG
267) MPDPHOTOS_267_2023-141208_0108647_0391_AA.JPG
268) MPDPHOTOS_268_2023-141208_0108647_0392_AA.JPG
269) MPDPHOTOS_269_2023-141208_0108647_0400_AA.JPG
270) MPDPHOTOS_270_2023-141208_0108647_0401_AA.JPG
271) MPDPHOTOS_271_2023-141208_0108647_0402_AA.JPG
272) MPDPHOTOS_272_2023-141208_0108647_0403_AA.JPG
273) MPDPHOTOS_273_2023-141208_0108647_0405_AA.JPG
274) MPDPHOTOS_274_2023-141208_0108647_0406_AA.JPG
275) MPDPHOTOS_275_2023-141208_0108647_0412_AA.JPG
276) MPDPHOTOS_276_2023-141208_0108647_0413_AA.JPG
277) MPDPHOTOS_277_2023-141208_0108647_0414_AA.JPG
278) MPDPHOTOS_278_2023-141208_0108647_0415_AA.JPG
279) MPDPHOTOS_279_2023-141208_0108647_0416_AA.JPG
280) MPDPHOTOS_280_2023-141208_0108647_0420_AA.JPG
281) MPDPHOTOS_281_2023-141208_0108647_0422_AA.JPG
282) MPDPHOTOS_282_2023-141208_0108647_0423_AA.JPG
283) MPDPHOTOS_283_2023-141208_0108647_0424_AA.JPG
284) MPDPHOTOS_284_2023-141208_0108647_0425_AA.JPG
285) MPDPHOTOS_285_2023-141208_0108647_0426_AA.JPG
286) MPDPHOTOS_286_2023-141208_0108647_0427_AA.JPG
287) MPDPHOTOS_287_2023-141208_0108647_0428_AA.JPG

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

288) MPDPHOTOS_288_2023-141208_0108647_0429_AA.JPG
289) MPDPHOTOS_289_2023-141208_0108647_0430_AA.JPG
290) MPDPHOTOS_290_2023-141208_0108647_0431_AA.JPG
291) MPDPHOTOS_291_2023-141208_0108647_0432_AA.JPG
292) MPDPHOTOS_292_2023-141208_0108647_0433_AA.JPG
293) MPDPHOTOS_293_2023-141208_0108647_0434_AA.JPG
294) MPDPHOTOS_294_2023-141208_0108647_0435_AA.JPG
295) MPDPHOTOS_295_2023-141208_0108647_0436_AA.JPG
296) MPDPHOTOS_296_2023-141208_0108647_0437_AA.JPG
297) MPDPHOTOS_297_2023-141208_0108647_0438_AA.JPG
298) MPDPHOTOS_298_2023-141208_0108647_0439_AA.JPG
299) MPDPHOTOS_299_2023-141208_0108647_0440_AA.JPG
300) MPDPHOTOS_300_2023-141208_0108647_0442_AA.JPG
301) MPDPHOTOS_301_2023-141208_0108647_0443_AA.JPG
302) MPDPHOTOS_302_2023-141208_0108647_0444_AA.JPG
303) MPDPHOTOS_303_2023-141208_0108647_0445_AA.JPG
304) MPDPHOTOS_304_2023-141208_0108647_0446_AA.JPG
305) MPDPHOTOS_305_2023-141208_0108647_0447_AA.JPG
306) MPDPHOTOS_306_2023-141208_0108647_0448_AA.JPG
307) MPDPHOTOS_307_2023-141208_0108647_0449_AA.JPG
308) MPDPHOTOS_308_2023-141208_0108647_0450_AA.JPG
309) MPDPHOTOS_309_2023-141208_0108647_0451_AA.JPG
310) MPDPHOTOS_310_2023-141208_0108647_0452_AA.JPG
311) MPDPHOTOS_311_2023-141208_0108647_0453_AA.JPG
312) MPDPHOTOS_312_2023-141208_0108647_0454_AA.JPG
313) MPDPHOTOS_313_2023-141208_0108647_0455_AA.JPG
314) MPDPHOTOS_314_2023-141208_0108647_0456_AA.JPG
315) MPDPHOTOS_315_2023-141208_0108647_0457_AA.JPG
316) MPDPHOTOS_316_2023-141208_0108647_0458_AA.JPG
317) MPDPHOTOS_317_2023-141208_0108647_0459_AA.JPG
318) MPDPHOTOS_318_2023-141208_0108647_0460_AA.JPG
319) MPDPHOTOS_319_2023-141208_0108647_0461_AA.JPG
320) MPDPHOTOS_320_2023-141208_0108647_0463_AA.JPG
321) MPDPHOTOS_321_2023-141208_0108647_0464_AA.JPG
322) MPDPHOTOS_322_2023-141208_0108647_0465_AA.JPG
323) MPDPHOTOS_323_2023-141208_0108647_0466_AA.JPG
324) MPDPHOTOS_324_2023-141208_0108647_0467_AA.JPG
325) MPDPHOTOS_325_2023-141208_0108647_0468_AA.JPG
326) MPDPHOTOS_326_2023-141208_0108647_0469_AA.JPG
327) MPDPHOTOS_327_2023-141208_0108647_0470_AA.JPG
328) MPDPHOTOS_328_2023-141208_0108647_0473_AA.JPG
329) MPDPHOTOS_329_2023-141208_0108647_0475_AA.JPG
330) MPDPHOTOS_330_2023-141208_0108647_0476_AA.JPG
331) MPDPHOTOS_331_2023-141208_0108647_0477_AA.JPG
332) MPDPHOTOS_332_2023-141208_0108647_0478_AA.JPG
333) MPDPHOTOS_333_2023-141208_0108647_0479_AA.JPG
334) MPDPHOTOS_334_2023-141208_0108647_0483_AA.JPG
335) MPDPHOTOS_335_2023-141208_0108647_0484_AA.JPG
336) MPDPHOTOS_336_2023-141208_0108647_0486_AA.JPG
337) MPDPHOTOS_337_2023-141208_0108647_0487_AA.JPG
338) MPDPHOTOS_338_2023-141208_0108647_0488_AA.JPG

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

339) MPDPHOTOS_339_2023-141208_0108647_0489_AA.JPG
340) MPDPHOTOS_340_2023-141208_0108647_0490_AA.JPG
341) MPDPHOTOS_341_2023-141208_0108647_0491_AA.JPG
342) MPDPHOTOS_342_2023-141208_0108647_0492_AA.JPG
343) MPDPHOTOS_343_2023-141208_0108647_0493_AA.JPG
344) MPDPHOTOS_344_2023-141208_0108647_0494_AA.JPG
345) MPDPHOTOS_345_2023-141208_0108647_0497_AA.JPG
346) MPDPHOTOS_346_2023-141208_0108647_0502_AA.JPG
347) MPDPHOTOS_347_2023-141208_0108647_0503_AA.JPG
348) MPDPHOTOS_348_2023-141208_0108647_0504_AA.JPG
349) MPDPHOTOS_349_2023-141208_0108647_0505_AA.JPG
350) MPDPHOTOS_350_2023-141208_0108647_0506_AA.JPG
351) MPDPHOTOS_351_2023-141208_0108647_0507_AA.JPG
352) MPDPHOTOS_352_2023-141208_0108647_0508_AA.JPG
353) MPDPHOTOS_353_2023-141208_0108647_0509_AA.JPG
354) MPDPHOTOS_354_2023-141208_0108647_0510_AA.JPG
355) MPDPHOTOS_355_2023-141208_0108647_0515_AA.JPG
356) MPDPHOTOS_356_2023-141208_0108647_0516_AA.JPG
357) MPDPHOTOS_357_2023-141208_0108647_0517_AA.JPG
358) MPDPHOTOS_358_2023-141208_0108647_0518_AA.JPG
359) MPDPHOTOS_359_2023-141208_0108647_0519_AA.JPG
360) MPDPHOTOS_360_2023-141208_0108647_0520_AA.JPG
361) MPDPHOTOS_361_2023-141208_0108647_0521_AA.JPG
362) MPDPHOTOS_362_2023-141208_0108647_0522_AA.JPG
363) MPDPHOTOS_363_2023-141208_0108647_0523_AA.JPG
364) MPDPHOTOS_364_2023-141208_0108647_0524_AA.JPG
365) MPDPHOTOS_365_2023-141208_0108647_0525_AA.JPG
366) MPDPHOTOS_366_2023-141208_0108647_0526_AA.JPG
367) MPDPHOTOS_367_2023-141208_0108647_0528_AA.JPG
368) MPDPHOTOS_368_2023-141208_0108647_0529_AA.JPG
369) MPDPHOTOS_369_2023-141208_0108647_0534_AA.JPG
370) MPDPHOTOS_370_2023-141208_0108647_0535_AA.JPG
371) MPDPHOTOS_371_2023-141208_0108647_0536_AA.JPG
372) MPDPHOTOS_372_2023-141208_0108647_0537_AA.JPG
373) MPDPHOTOS_373_2023-141208_0108647_0538_AA.JPG
374) MPDPHOTOS_374_2023-141208_0108647_0539_AA.JPG
375) MPDPHOTOS_375_2023-141208_0108647_0540_AA.JPG
376) MPDPHOTOS_376_2023-141208_0108647_0544_AA.JPG
377) MPDPHOTOS_377_2023-141208_0108647_0545_AA.JPG
378) MPDPHOTOS_378_2023-141208_0108647_0546_AA.JPG
379) MPDPHOTOS_379_2023-141208_0108647_0547_AA.JPG
380) MPDPHOTOS_380_2023-141208_0108647_0548_AA.JPG
381) MPDPHOTOS_381_2023-141208_0108647_0549_AA.JPG
382) MPDPHOTOS_382_2023-141208_0108647_0550_AA.JPG
383) MPDPHOTOS_383_2023-141208_0108647_0555_AA.JPG
384) MPDPHOTOS_384_2023-141208_0108647_0557_AA.JPG
385) MPDPHOTOS_385_2023-141208_0108647_0559_AA.JPG
386) MPDPHOTOS_386_2023-141208_0108647_0560_AA.JPG
387) MPDPHOTOS_387_2023-141208_0108647_0562_AA.JPG
388) MPDPHOTOS_388_2023-141208_0108647_0563_AA.JPG
389) MPDPHOTOS_389_2023-141208_0108647_0564_AA.JPG

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

390) MPDPHOTOS_390_2023-141208_0108647_0566_AA.JPG
391) MPDPHOTOS_391_2023-141208_0108647_0567_AA.JPG
392) MPDPHOTOS_392_2023-141208_0108647_0570_AA.JPG
393) MPDPHOTOS_393_2023-141208_0108647_0572_AA.JPG
394) MPDPHOTOS_394_2023-141208_0108647_0574_AA.JPG
395) MPDPHOTOS_395_2023-141208_0108647_0576_AA.JPG
396) MPDPHOTOS_396_2023-141208_0108647_0577_AA.JPG
397) MPDPHOTOS_397_2023-141208_0108647_0579_AA.JPG
398) MPDPHOTOS_398_2023-141208_0108647_0580_AA.JPG
399) MPDPHOTOS_399_2023-141208_0108647_0581_AA.JPG
400) MPDPHOTOS_400_2023-141208_0108647_0582_AA.JPG
401) MPDPHOTOS_401_2023-141208_0108647_0583_AA.JPG
402) MPDPHOTOS_402_2023-141208_0108647_0585_AA.JPG
403) MPDPHOTOS_403_2023-141208_0108647_0588_AA.JPG
404) MPDPHOTOS_404_2023-141208_0108647_0589_AA.JPG
405) MPDPHOTOS_405_2023-141208_0108647_0591_AA.JPG
406) MPDPHOTOS_406_2023-141208_0108647_0592_AA.JPG
407) MPDPHOTOS_407_2023-141208_0108647_0593_AA.JPG
408) MPDPHOTOS_408_2023-141208_0108647_0594_AA.JPG
409) MPDPHOTOS_409_2023-141208_0108647_0595_AA.JPG
410) MPDPHOTOS_410_2023-141208_0108647_0596_AA.JPG
411) MPDPHOTOS_411_2023-141208_0108647_0597_AA.JPG
412) MPDPHOTOS_412_2023-141208_0108647_0598_AA.JPG
413) MPDPHOTOS_413_2023-141208_0108647_0599_AA.JPG
414) MPDPHOTOS_414_2023-141208_0108647_0601_AA.JPG
415) MPDPHOTOS_415_2023-141208_0108647_0602_AA.JPG
416) MPDPHOTOS_416_2023-141208_0108647_0603_AA.JPG
417) MPDPHOTOS_417_2023-141208_0108647_0604_AA.JPG
418) MPDPHOTOS_418_2023-141208_0108647_0605_AA.JPG
419) MPDPHOTOS_419_2023-141208_0108647_0608_AA.JPG
420) MPDPHOTOS_420_2023-141208_0108647_0609_AA.JPG
421) MPDPHOTOS_421_2023-141208_0108647_0610_AA.JPG
422) MPDPHOTOS_422_2023-141208_0108647_0611_AA.JPG
423) MPDPHOTOS_423_2023-141208_0108647_0613_AA.JPG
424) MPDPHOTOS_424_2023-141208_0108647_0614_AA.JPG
425) MPDPHOTOS_425_2023-141208_0108647_0615_AA.JPG
426) MPDPHOTOS_426_2023-141208_0108647_0616_AA.JPG
427) MPDPHOTOS_427_2023-141208_0108647_0617_AA.JPG
428) MPDPHOTOS_428_2023-141208_0108647_0618_AA.JPG
429) MPDPHOTOS_429_2023-141208_0108647_0619_AA.JPG
430) MPDPHOTOS_430_2023-141208_0108647_0620_AA.JPG
431) MPDPHOTOS_431_2023-141208_0108647_0621_AA.JPG
432) MPDPHOTOS_432_2023-141208_0108647_0622_AA.JPG
433) MPDPHOTOS_433_2023-141208_0108647_0623_AA.JPG
434) MPDPHOTOS_434_2023-141208_0108647_0624_AA.JPG
435) MPDPHOTOS_435_2023-141208_0108647_0625_AA.JPG
436) MPDPHOTOS_436_2023-141208_0108647_0626_AA.JPG
437) MPDPHOTOS_437_2023-141208_0108647_0627_AA.JPG
438) MPDPHOTOS_438_2023-141208_0108647_0628_AA.JPG
439) MPDPHOTOS_439_2023-141208_0108647_0629_AA.JPG
440) MPDPHOTOS_440_2023-141208_0108647_0630_AA.JPG

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

441) MPDPHOTOS_441_2023-141208_0108647_0631_AA.JPG
442) MPDPHOTOS_442_2023-141208_0108647_0632_AA.JPG
443) MPDPHOTOS_443_2023-141208_0108647_0633_AA.JPG
444) MPDPHOTOS_444_2023-141208_0108647_0634_AA.JPG
445) MPDPHOTOS_445_2023-141208_0108647_0635_AA.JPG
446) MPDPHOTOS_446_2023-141208_0108647_0636_AA.JPG
447) MPDPHOTOS_447_2023-141208_0108647_0637_AA.JPG
448) MPDPHOTOS_448_2023-141208_0108647_0638_AA.JPG
449) MPDPHOTOS_449_2023-141208_0108647_0639_AA.JPG
450) MPDPHOTOS_450_2023-141208_0108647_0643_AA.JPG
451) MPDPHOTOS_451_2023-141208_0108647_0644_AA.JPG
452) MPDPHOTOS_452_2023-141208_0108647_0645_AA.JPG
453) MPDPHOTOS_453_2023-141208_0108647_0646_AA.JPG
454) MPDPHOTOS_454_2023-141208_0108734_0003_AA.JPG
455) MPDPHOTOS_455_2023-141208_0108734_0007_AA.JPG
456) MPDPHOTOS_456_2023-141208_0108734_0011_AA.JPG
457) MPDPHOTOS_457_2023-141208_0108734_0012_AA.JPG
458) MPDPHOTOS_458_2023-141208_0108734_0014_AA.JPG
459) MPDPHOTOS_459_2023-141208_0108734_0017_AA.JPG
460) MPDPHOTOS_460_2023-141208_0108734_0018_AA.JPG
461) MPDPHOTOS_461_2023-141208_0108734_0020_AA.JPG
462) MPDPHOTOS_462_2023-141208_0108734_0028_AA.JPG
463) MPDPHOTOS_463_2023-141208_0108734_0029_AA.JPG
464) MPDPHOTOS_464_2023-141208_0108734_0030_AA.JPG
465) MPDPHOTOS_465_2023-141208_0108734_0051_AA.JPG
466) MPDPHOTOS_466_2023-141208_0108734_0052_AA.JPG
467) MPDPHOTOS_467_2023-141208_0108734_0053_AA.JPG
468) MPDPHOTOS_468_2023-141208_0108734_0054_AA.JPG
469) MPDPHOTOS_469_2023-141208_0108734_0063_AA.JPG
470) MPDPHOTOS_470_2023-141208_0108734_0066_AA.JPG
471) MPDPHOTOS_471_2023-141208_0108734_0067_AA.JPG
472) MPDPHOTOS_472_2023-141208_0108734_0068_AA.JPG
473) MPDPHOTOS_473_2023-141208_0108734_0072_AA.JPG
474) MPDPHOTOS_474_2023-141208_0108734_0076_AA.JPG
475) MPDPHOTOS_475_2023-141208_0108734_0077_AA.JPG
476) MPDPHOTOS_476_2023-141208_0108734_0078_AA.JPG
477) MPDPHOTOS_477_2023-141208_0108734_0079_AA.JPG
478) MPDPHOTOS_478_2023-141208_0108734_0080_AA.JPG
479) MPDPHOTOS_479_2023-141208_0108734_0081_AA.JPG
480) MPDPHOTOS_480_2023-141208_0108734_0082_AA.JPG
481) MPDPHOTOS_481_2023-141208_0108734_0083_AA.JPG
482) MPDPHOTOS_482_2023-141208_0108734_0084_AA.JPG
483) MPDPHOTOS_483_2023-141208_0108734_0085_AA.JPG
484) MPDPHOTOS_484_2023-141208_0108734_0086_AA.JPG
485) MPDPHOTOS_485_2023-141208_0108734_0087_AA.JPG
486) MPDPHOTOS_486_2023-141208_0108734_0088_AA.JPG
487) MPDPHOTOS_487_2023-141208_0108734_0089_AA.JPG
488) MPDPHOTOS_488_2023-141208_0108734_0094_AA.JPG
489) MPDPHOTOS_489_2023-141208_0108734_0095_AA.JPG
490) MPDPHOTOS_490_2023-141208_0108734_0097_AA.JPG
491) MPDPHOTOS_491_2023-141208_0108734_0100_AA.JPG

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

492) MPDPHOTOS_492_2023-141208_0108734_0101_AA.JPG
493) MPDPHOTOS_493_2023-141208_0108734_0104_AA.JPG
494) MPDPHOTOS_494_2023-141208_0108734_0105_AA.JPG
495) MPDPHOTOS_495_2023-141208_0108734_0106_AA.JPG
496) MPDPHOTOS_496_2023-141208_0108734_0107_AA.JPG
497) MPDPHOTOS_497_2023-141208_0108734_0108_AA.JPG
498) MPDPHOTOS_498_2023-141208_0108734_0109_AA.JPG
499) MPDPHOTOS_499_2023-141208_0108734_0110_AA.JPG
500) MPDPHOTOS_500_2023-141208_0108734_0111_AA.JPG
501) MPDPHOTOS_501_2023-141208_0108734_0112_AA.JPG
502) MPDPHOTOS_502_2023-141208_0108734_0113_AA.JPG
503) MPDPHOTOS_503_2023-141208_0108734_0114_AA.JPG
504) MPDPHOTOS_504_2023-141208_0108734_0115_AA.JPG
505) MPDPHOTOS_505_2023-141208_0108734_0116_AA.JPG
506) MPDPHOTOS_506_2023-141208_0108734_0117_AA.JPG
507) MPDPHOTOS_507_2023-141208_0108734_0118_AA.JPG
508) MPDPHOTOS_508_2023-141208_0108734_0119_AA.JPG
509) MPDPHOTOS_509_2023-141208_0108734_0120_AA.JPG
510) MPDPHOTOS_510_2023-141208_0108734_0121_AA.JPG
511) MPDPHOTOS_511_2023-141208_0108734_0122_AA.JPG
512) MPDPHOTOS_512_2023-141208_0108734_0123_AA.JPG
513) MPDPHOTOS_513_2023-141208_0108734_0124_AA.JPG
514) MPDPHOTOS_514_2023-141208_0108734_0125_AA.JPG
515) MPDPHOTOS_515_2023-141208_0108734_0126_AA.JPG
516) MPDPHOTOS_516_2023-141208_0108734_0127_AA.JPG
517) MPDPHOTOS_517_2023-141208_0108734_0128_AA.JPG
518) MPDPHOTOS_518_2023-141208_0108734_0129_AA.JPG
519) MPDPHOTOS_519_2023-141208_0108734_0130_AA.JPG
520) MPDPHOTOS_520_2023-141208_0108734_0131_AA.JPG
521) MPDPHOTOS_521_2023-141208_0108734_0132_AA.JPG
522) MPDPHOTOS_522_2023-141208_0108734_0133_AA.JPG
523) MPDPHOTOS_523_2023-141208_0108734_0134_AA.JPG
524) MPDPHOTOS_524_2023-141208_0108734_0135_AA.JPG
525) MPDPHOTOS_525_2023-141208_0108734_0136_AA.JPG
526) MPDPHOTOS_526_2023-141208_0108734_0137_AA.JPG
527) MPDPHOTOS_527_2023-141208_0108734_0138_AA.JPG
528) MPDPHOTOS_528_2023-141208_0108734_0139_AA.JPG
529) MPDPHOTOS_529_2023-141208_0108734_0140_AA.JPG
530) MPDPHOTOS_530_2023-141208_0108734_0141_AA.JPG
531) MPDPHOTOS_531_2023-141208_0108734_0142_AA.JPG
532) MPDPHOTOS_532_2023-141208_0108734_0143_AA.JPG
533) MPDPHOTOS_533_2023-141208_0108734_0144_AA.JPG
534) MPDPHOTOS_534_2023-141208_0108734_0145_AA.JPG
535) MPDPHOTOS_535_2023-141208_0108734_0146_AA.JPG
536) MPDPHOTOS_536_2023-141208_0108734_0147_AA.JPG
537) MPDPHOTOS_537_2023-141208_0108734_0148_AA.JPG
538) MPDPHOTOS_538_2023-141208_0108734_0149_AA.JPG
539) MPDPHOTOS_539_2023-141208_0108734_0150_AA.JPG
540) MPDPHOTOS_540_2023-141208_0108734_0151_AA.JPG
541) MPDPHOTOS_541_2023-141208_0108734_0152_AA.JPG
542) MPDPHOTOS_542_2023-141208_0108734_0153_AA.JPG

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

543) MPDPHOTOS_543_2023-141208_0108734_0156_AA.JPG
544) MPDPHOTOS_544_2023-141208_0108734_0162_AA.JPG
545) MPDPHOTOS_545_2023-141208_0108734_0167_AA.JPG
546) MPDPHOTOS_546_2023-141208_0108734_0170_AA.JPG
547) MPDPHOTOS_547_2023-141208_0108734_0171_AA.JPG
548) MPDPHOTOS_548_2023-141208_0108734_0173_AA.JPG
549) MPDPHOTOS_549_2023-141208_0108734_0174_AA.JPG
550) MPDPHOTOS_550_2023-141208_0108734_0175_AA.JPG
551) MPDPHOTOS_551_2023-141208_0108734_0176_AA.JPG
552) MPDPHOTOS_552_2023-141208_0108734_0177_AA.JPG
553) MPDPHOTOS_553_2023-141208_0108734_0179_AA.JPG
554) MPDPHOTOS_554_2023-141208_0108734_0180_AA.JPG
555) MPDPHOTOS_555_2023-141208_0108734_0181_AA.JPG
556) MPDPHOTOS_556_2023-141208_0108734_0182_AA.JPG
557) MPDPHOTOS_557_2023-141208_0108734_0183_AA.JPG
558) MPDPHOTOS_558_2023-141208_0108734_0184_AA.JPG
559) MPDPHOTOS_559_2023-141208_0108734_0185_AA.JPG
560) MPDPHOTOS_560_2023-141208_0108734_0186_AA.JPG
561) MPDPHOTOS_561_2023-141208_0108734_0187_AA.JPG
562) MPDPHOTOS_562_2023-141208_0108734_0188_AA.JPG
563) MPDPHOTOS_563_2023-141208_0108734_0189_AA.JPG
564) MPDPHOTOS_564_2023-141208_0108734_0190_AA.JPG
565) MPDPHOTOS_565_2023-141208_0108734_0191_AA.JPG
566) MPDPHOTOS_566_2023-141208_0108734_0192_AA.JPG
567) MPDPHOTOS_567_2023-141208_0108734_0193_AA.JPG
568) MPDPHOTOS_568_2023-141208_0108734_0198_AA.JPG
569) MPDPHOTOS_569_2023-141208_0108734_0203_AA.JPG
570) MPDPHOTOS_570_2023-141208_0108734_0204_AA.JPG
571) MPDPHOTOS_571_2023-141208_0108734_0205_AA.JPG
572) MPDPHOTOS_572_2023-141208_0108734_0206_AA.JPG
573) MPDPHOTOS_573_2023-141208_0108734_0207_AA.JPG
574) MPDPHOTOS_574_2023-141208_0108734_0209_AA.JPG
575) MPDPHOTOS_575_2023-141208_0108734_0210_AA.JPG
576) MPDPHOTOS_576_2023-141208_0108734_0211_AA.JPG
577) MPDPHOTOS_577_2023-141208_0108734_0212_AA.JPG
578) MPDPHOTOS_578_2023-141208_0108734_0213_AA.JPG
579) MPDPHOTOS_579_2023-141208_0108734_0216_AA.JPG
580) MPDPHOTOS_580_2023-141208_0108734_0217_AA.JPG
581) MPDPHOTOS_581_2023-141208_0108734_0218_AA.JPG
582) MPDPHOTOS_582_2023-141208_0108734_0223_AA.JPG
583) MPDPHOTOS_583_2023-141208_0108734_0227_AA.JPG
584) MPDPHOTOS_584_2023-141208_0108734_0231_AA.JPG
585) MPDPHOTOS_585_2023-141208_0108734_0232_AA.JPG
586) MPDPHOTOS_586_2023-141208_0108734_0233_AA.JPG
587) MPDPHOTOS_587_2023-141208_0108734_0234_AA.JPG
588) MPDPHOTOS_588_2023-141208_0108734_0235_AA.JPG
589) MPDPHOTOS_589_2023-141208_0108734_0236_AA.JPG
590) MPDPHOTOS_590_2023-141208_0108734_0239_AA.JPG
591) MPDPHOTOS_591_2023-141208_0108734_0240_AA.JPG
592) MPDPHOTOS_592_2023-141208_0108734_0241_AA.JPG
593) MPDPHOTOS_593_2023-141208_0108734_0242_AA.JPG

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

594) MPDPHOTOS_594_2023-141208_0108734_0245_AA.JPG
595) MPDPHOTOS_595_2023-141208_0108734_0246_AA.JPG
596) MPDPHOTOS_596_2023-141208_0108734_0247_AA.JPG
597) MPDPHOTOS_597_2023-141208_0108734_0248_AA.JPG
598) MPDPHOTOS_598_2023-141208_0108734_0249_AA.JPG
599) MPDPHOTOS_599_2023-141208_0108734_0250_AA.JPG
600) MPDPHOTOS_600_2023-141208_0108734_0251_AA.JPG
601) MPDPHOTOS_601_2023-141208_0108734_0252_AA.JPG
602) MPDPHOTOS_602_2023-141208_0108734_0253_AA.JPG
603) MPDPHOTOS_603_2023-141208_0108734_0256_AA.JPG
604) MPDPHOTOS_604_2023-141208_0108734_0257_AA.JPG
605) MPDPHOTOS_605_2023-141208_0108734_0258_AA.JPG
606) MPDPHOTOS_606_2023-141208_0108734_0259_AA.JPG
607) MPDPHOTOS_607_2023-141208_0108734_0260_AA.JPG
608) MPDPHOTOS_608_2023-141208_0108734_0261_AA.JPG
609) MPDPHOTOS_609_2023-141208_0108734_0262_AA.JPG
610) MPDPHOTOS_610_2023-141208_0108734_0263_AA.JPG
611) MPDPHOTOS_611_2023-141208_0108734_0268_AA.JPG
612) MPDPHOTOS_612_2023-141208_0108734_0269_AA.JPG
613) MPDPHOTOS_613_2023-141208_0108734_0275_AA.JPG
614) MPDPHOTOS_614_2023-141208_0108734_0281_AA.JPG
615) MPDPHOTOS_615_2023-141208_0108734_0283_AA.JPG
616) MPDPHOTOS_616_2023-141208_0108734_0284_AA.JPG
617) MPDPHOTOS_617_2023-141208_0108734_0288_AA.JPG
618) MPDPHOTOS_618_2023-141208_0108734_0289_AA.JPG
619) MPDPHOTOS_619_2023-141208_0108734_0293_AA.JPG
620) MPDPHOTOS_620_2023-141208_0108734_0296_AA.JPG
621) MPDPHOTOS_621_2023-141208_0108734_0297_AA.JPG
622) MPDPHOTOS_622_2023-141208_0108734_0301_AA.JPG
623) MPDPHOTOS_623_2023-141208_0108734_0302_AA.JPG
624) MPDPHOTOS_624_2023-141208_0108734_0311_AA.JPG
625) MPDPHOTOS_625_2023-141208_0108734_0312_AA.JPG
626) MPDPHOTOS_626_2023-141208_0108734_0319_AA.JPG
627) MPDPHOTOS_627_2023-141208_0108734_0320_AA.JPG
628) MPDPHOTOS_628_2023-141208_0108734_0321_AA.JPG
629) MPDPHOTOS_629_2023-141208_0108734_0325_AA.JPG
630) MPDPHOTOS_630_2023-141208_0108734_0326_AA.JPG
631) MPDPHOTOS_631_2023-141208_0108734_0329_AA.JPG
632) MPDPHOTOS_632_2023-141208_0108734_0331_AA.JPG
633) MPDPHOTOS_633_2023-141208_0108734_0338_AA.JPG
634) MPDPHOTOS_634_2023-141208_0108734_0339_AA.JPG
635) MPDPHOTOS_635_2023-141208_0108734_0340_AA.JPG
636) MPDPHOTOS_636_2023-141208_0108734_0342_AA.JPG
637) MPDPHOTOS_637_2023-141208_0108734_0343_AA.JPG
638) MPDPHOTOS_638_2023-141208_0108734_0348_AA.JPG
639) MPDPHOTOS_639_2023-141208_0108734_0349_AA.JPG
640) MPDPHOTOS_640_2023-141208_0108734_0350_AA.JPG
641) MPDPHOTOS_641_2023-141208_0108734_0351_AA.JPG
642) MPDPHOTOS_642_2023-141208_0108734_0354_AA.JPG
643) MPDPHOTOS_643_2023-141208_0108734_0356_AA.JPG
644) MPDPHOTOS_644_2023-141208_0108734_0357_AA.JPG

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

645) MPDPHOTOS_645_2023-141208_0108734_0359_AA.JPG
646) MPDPHOTOS_646_2023-141208_0108734_0360_AA.JPG
647) MPDPHOTOS_647_2023-141208_0108734_0361_AA.JPG
648) MPDPHOTOS_648_2023-141208_0108734_0365_AA.JPG
649) MPDPHOTOS_649_2023-141208_0108734_0366_AA.JPG
650) MPDPHOTOS_650_2023-141208_0108734_0367_AA.JPG
651) MPDPHOTOS_651_2023-141208_0108734_0368_AA.JPG
652) MPDPHOTOS_652_2023-141208_0108734_0369_AA.JPG
653) MPDPHOTOS_653_2023-141208_0108734_0370_AA.JPG
654) MPDPHOTOS_654_2023-141208_0108734_0371_AA.JPG
655) MPDPHOTOS_655_2023-141208_0108734_0372_AA.JPG
656) MPDPHOTOS_656_2023-141208_0108734_0373_AA.JPG
657) MPDPHOTOS_657_2023-141208_0108734_0379_AA.JPG
658) MPDPHOTOS_658_2023-141208_0108734_0380_AA.JPG
659) MPDPHOTOS_659_2023-141208_0108734_0381_AA.JPG
660) MPDPHOTOS_660_2023-141208_0108734_0387_AA.JPG
661) MPDPHOTOS_661_2023-141208_0108734_0389_AA.JPG
662) MPDPHOTOS_662_2023-141208_0108734_0390_AA.JPG
663) MPDPHOTOS_663_2023-141208_0108734_0391_AA.JPG
664) MPDPHOTOS_664_2023-141208_0108734_0392_AA.JPG
665) MPDPHOTOS_665_2023-141208_0108734_0395_AA.JPG
666) MPDPHOTOS_666_2023-141208_0108734_0398_AA.JPG
667) MPDPHOTOS_667_2023-141208_0108734_0401_AA.JPG
668) MPDPHOTOS_668_2023-141208_0108734_0402_AA.JPG
669) MPDPHOTOS_669_2023-141208_0108734_0412_AA.JPG
670) MPDPHOTOS_670_2023-141208_0108734_0413_AA.JPG
671) MPDPHOTOS_671_2023-141208_0108734_0414_AA.JPG
672) MPDPHOTOS_672_2023-141208_0108734_0417_AA.JPG
673) MPDPHOTOS_673_2023-141208_0108734_0418_AA.JPG
674) MPDPHOTOS_674_2023-141208_0108734_0419_AA.JPG
675) MPDPHOTOS_675_2023-141208_0108734_0421_AA.JPG
676) MPDPHOTOS_676_2023-141208_0108734_0424_AA.JPG
677) MPDPHOTOS_677_2023-141208_0108734_0425_AA.JPG
678) MPDPHOTOS_678_2023-141208_0108734_0426_AA.JPG
679) MPDPHOTOS_679_2023-141208_0108734_0428_AA.JPG
680) MPDPHOTOS_680_2023-141208_0108734_0429_AA.JPG
681) MPDPHOTOS_681_2023-141208_0108734_0430_AA.JPG
682) MPDPHOTOS_682_2023-141208_0108734_0431_AA.JPG
683) MPDPHOTOS_683_2023-141208_0108734_0432_AA.JPG
684) MPDPHOTOS_684_2023-141208_0108734_0434_AA.JPG
685) MPDPHOTOS_685_2023-141208_0108734_0435_AA.JPG
686) MPDPHOTOS_686_2023-141208_0108734_0436_AA.JPG
687) MPDPHOTOS_687_2023-141208_0108734_0439_AA.JPG
688) MPDPHOTOS_688_2023-141208_0108734_0440_AA.JPG
689) MPDPHOTOS_689_2023-141208_0108734_0442_AA.JPG
690) MPDPHOTOS_690_2023-141208_0108734_0443_AA.JPG
691) MPDPHOTOS_691_2023-141208_0108734_0446_AA.JPG
692) MPDPHOTOS_692_2023-141208_0108734_0447_AA.JPG
693) MPDPHOTOS_693_2023-141208_0108734_0448_AA.JPG
694) MPDPHOTOS_694_2023-141208_0108734_0449_AA.JPG
695) MPDPHOTOS_695_2023-141208_0108734_0450_AA.JPG

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

696) MPDPHOTOS_696_2023-141208_0108734_0451_AA.JPG
697) MPDPHOTOS_697_2023-141208_0108734_0455_AA.JPG
698) MPDPHOTOS_698_2023-141208_0108734_0456_AA.JPG
699) MPDPHOTOS_699_2023-141208_0108734_0457_AA.JPG
700) MPDPHOTOS_700_2023-141208_0108734_0459_AA.JPG
701) MPDPHOTOS_701_2023-141208_0108734_0460_AA.JPG
702) MPDPHOTOS_702_2023-141208_0108734_0461_AA.JPG
703) MPDPHOTOS_703_2023-141208_0108734_0462_AA.JPG
704) MPDPHOTOS_704_2023-141208_0108734_0463_AA.JPG
705) MPDPHOTOS_705_2023-141208_0108734_0464_AA.JPG
706) MPDPHOTOS_706_2023-141208_0108734_0465_AA.JPG
707) MPDPHOTOS_707_2023-141208_0108734_0466_AA.JPG
708) MPDPHOTOS_708_2023-141208_0108734_0470_AA.JPG
709) MPDPHOTOS_709_2023-141208_0108734_0474_AA.JPG
710) MPDPHOTOS_710_2023-141208_0108734_0475_AA.JPG
711) MPDPHOTOS_711_2023-141208_0108734_0479_AA.JPG
712) MPDPHOTOS_712_2023-141208_0108734_0480_AA.JPG
713) MPDPHOTOS_713_2023-141208_0108734_0481_AA.JPG
714) MPDPHOTOS_714_2023-141208_0108734_0482_AA.JPG
715) MPDPHOTOS_715_2023-141208_0108734_0483_AA.JPG
716) MPDPHOTOS_716_2023-141208_0108734_0489_AA.JPG
717) MPDPHOTOS_717_2023-141208_0108734_0490_AA.JPG
718) MPDPHOTOS_718_2023-141208_0108734_0492_AA.JPG
719) MPDPHOTOS_719_2023-141208_0108734_0498_AA.JPG
720) MPDPHOTOS_720_2023-141208_0108734_0504_AA.JPG
721) MPDPHOTOS_721_2023-141208_0108734_0505_AA.JPG
722) MPDPHOTOS_722_2023-141208_0108734_0507_AA.JPG
723) MPDPHOTOS_723_2023-141208_0108734_0508_AA.JPG
724) MPDPHOTOS_724_2023-141208_0108734_0510_AA.JPG
725) MPDPHOTOS_725_2023-141208_0108734_0512_AA.JPG
726) MPDPHOTOS_726_2023-141208_0108734_0515_AA.JPG
727) MPDPHOTOS_727_2023-141208_0108734_0516_AA.JPG
728) MPDPHOTOS_728_2023-141208_0108734_0517_AA.JPG
729) MPDPHOTOS_729_2023-141208_0108734_0518_AA.JPG
730) MPDPHOTOS_730_2023-141208_0108734_0519_AA.JPG
731) MPDPHOTOS_731_2023-141208_0108734_0520_AA.JPG
732) MPDPHOTOS_732_2023-141208_0108734_0525_AA.JPG
733) MPDPHOTOS_733_2023-141208_0108734_0526_AA.JPG
734) MPDPHOTOS_734_2023-141208_0108734_0528_AA.JPG
735) MPDPHOTOS_735_2023-141208_0108734_0535_AA.JPG
736) MPDPHOTOS_736_2023-141208_0108734_0536_AA.JPG
737) MPDPHOTOS_737_2023-141208_0108734_0539_AA.JPG
738) MPDPHOTOS_738_2023-141208_0108734_0542_AA.JPG
739) MPDPHOTOS_739_2023-141208_0108734_0549_AA.JPG
740) MPDPHOTOS_740_2023-141208_0108734_0552_AA.JPG
741) MPDPHOTOS_741_2023-141208_0108734_0554_AA.JPG
742) MPDPHOTOS_742_2023-141208_0108734_0556_AA.JPG
743) MPDPHOTOS_743_2023-141208_0108734_0557_AA.JPG
744) MPDPHOTOS_744_2023-141208_0108734_0558_AA.JPG
745) MPDPHOTOS_745_2023-141208_0108734_0562_AA.JPG
746) MPDPHOTOS_746_2023-141208_0108734_0563_AA.JPG

747) MPDPHOTOS_747_2023-141208_0108734_0565_AA.JPG
748) MPDPHOTOS_748_2023-141208_0108734_0566_AA.JPG
749) MPDPHOTOS_749_2023-141208_0108734_0567_AA.JPG
750) MPDPHOTOS_750_2023-141208_0108734_0568_AA.JPG
751) MPDPHOTOS_751_2023-141208_0108734_0571_AA.JPG
752) MPDPHOTOS_752_2023-141208_0108734_0572_AA.JPG
753) MPDPHOTOS_753_2023-141208_0108734_0573_AA.JPG
754) MPDPHOTOS_754_2023-141208_0108734_0574_AA.JPG
755) MPDPHOTOS_755_2023-141208_0108734_0576_AA.JPG
756) MPDPHOTOS_756_2023-141208_0108734_0577_AA.JPG
757) MPDPHOTOS_757_2023-141208_0108734_0578_AA.JPG
758) MPDPHOTOS_758_2023-141208_0108734_0579_AA.JPG
759) MPDPHOTOS_759_2023-141208_0108734_0580_AA.JPG
760) MPDPHOTOS_760_2023-141208_0108734_0581_AA.JPG
761) MPDPHOTOS_761_2023-141208_0108734_0582_AA.JPG
762) MPDPHOTOS_762_2023-141208_0108734_0583_AA.JPG
763) MPDPHOTOS_763_2023-141208_0108734_0584_AA.JPG
764) MPDPHOTOS_764_2023-141208_0108734_0585_AA.JPG
765) MPDPHOTOS_765_2023-141208_0108734_0586_AA.JPG
766) MPDPHOTOS_766_2023-141208_0108734_0587_AA.JPG
767) MPDPHOTOS_767_2023-141208_0108734_0588_AA.JPG
768) MPDPHOTOS_768_2023-141208_0108734_0589_AA.JPG
769) MPDPHOTOS_769_2023-141208_0108734_0590_AA.JPG
770) MPDPHOTOS_770_2023-141208_0108734_0591_AA.JPG
771) MPDPHOTOS_771_2023-141208_0108734_0593_AA.JPG
772) MPDPHOTOS_772_2023-141208_0108734_0594_AA.JPG
773) MPDPHOTOS_773_2023-141208_0108734_0596_AA.JPG
774) MPDPHOTOS_774_2023-141208_0108734_0599_AA.JPG
775) MPDPHOTOS_775_2023-141208_0108734_0600_AA.JPG
776) MPDPHOTOS_776_2023-141208_0108734_0601_AA.JPG
777) MPDPHOTOS_777_2023-141208_0108734_0602_AA.JPG
778) MPDPHOTOS_778_2023-141208_0108734_0603_AA.JPG
779) MPDPHOTOS_779_2023-141208_0108734_0604_AA.JPG
780) MPDPHOTOS_780_2023-141208_0108734_0605_AA.JPG
781) MPDPHOTOS_781_2023-141208_0108734_0606_AA.JPG
782) MPDPHOTOS_782_2023-141208_0108734_0607_AA.JPG
783) MPDPHOTOS_783_2023-141208_0108734_0608_AA.JPG
784) MPDPHOTOS_784_2023-141208_0108734_0609_AA.JPG
785) MPDPHOTOS_785_2023-141208_0108734_0610_AA.JPG
786) MPDPHOTOS_786_2023-141208_0108734_0611_AA.JPG
787) MPDPHOTOS_787_2023-141208_0108734_0612_AA.JPG
788) MPDPHOTOS_788_2023-141208_0108734_0613_AA.JPG
789) MPDPHOTOS_789_2023-141208_0108734_0614_AA.JPG
790) MPDPHOTOS_790_2023-141208_0108734_0615_AA.JPG
791) MPDPHOTOS_791_2023-141208_0108734_0616_AA.JPG
792) MPDPHOTOS_792_2023-141208_0108734_0617_AA.JPG
793) MPDPHOTOS_793_2023-141208_0108734_0618_AA.JPG
794) MPDPHOTOS_794_2023-141208_0108734_0619_AA.JPG
795) MPDPHOTOS_795_2023-141208_0108734_0620_AA.JPG
796) MPDPHOTOS_796_2023-141208_0108734_0621_AA.JPG
797) MPDPHOTOS_797_2023-141208_0108734_0622_AA.JPG

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

798) MPDPHOTOS_798_2023-141208_0108734_0623_AA.JPG
799) MPDPHOTOS_799_2023-141208_0108734_0624_AA.JPG
800) MPDPHOTOS_800_2023-141208_0108734_0625_AA.JPG
801) MPDPHOTOS_801_2023-141208_0108734_0626_AA.JPG
802) MPDPHOTOS_802_2023-141208_0108734_0627_AA.JPG
803) MPDPHOTOS_803_2023-141208_0108734_0628_AA.JPG
804) MPDPHOTOS_804_2023-141208_0108734_0629_AA.JPG
805) MPDPHOTOS_805_2023-141208_0108734_0630_AA.JPG
806) MPDPHOTOS_806_2023-141208_0108734_0631_AA.JPG
807) MPDPHOTOS_807_2023-141208_0108734_0632_AA.JPG
808) MPDPHOTOS_808_2023-141208_0108734_0633_AA.JPG
809) MPDPHOTOS_809_2023-141208_0108734_0634_AA.JPG
810) MPDPHOTOS_810_2023-141208_0108734_0635_AA.JPG
811) MPDPHOTOS_811_2023-141208_0108734_0636_AA.JPG
812) MPDPHOTOS_812_2023-141208_0108734_0637_AA.JPG
813) MPDPHOTOS_813_2023-141208_0108734_0638_AA.JPG
814) MPDPHOTOS_814_2023-141208_0108734_0639_AA.JPG
815) MPDPHOTOS_815_2023-141208_0108734_0640_AA.JPG
816) MPDPHOTOS_816_2023-141208_0108734_0641_AA.JPG
817) MPDPHOTOS_817_2023-141208_0108734_0642_AA.JPG
818) MPDPHOTOS_818_2023-141208_0108734_0643_AA.JPG
819) MPDPHOTOS_819_2023-141208_0108734_0644_AA.JPG
820) MPDPHOTOS_820_2023-141208_0108734_0645_AA.JPG
821) MPDPHOTOS_821_2023-141208_0108734_0646_AA.JPG
822) MPDPHOTOS_822_2023-141208_0108734_0647_AA.JPG
823) MPDPHOTOS_823_2023-141208_0108734_0648_AA.JPG
824) MPDPHOTOS_824_2023-141208_0108734_0649_AA.JPG
825) MPDPHOTOS_825_2023-141208_0108734_0650_AA.JPG
826) MPDPHOTOS_826_2023-141208_0108734_0651_AA.JPG
827) MPDPHOTOS_827_2023-141208_0108734_0652_AA.JPG
828) MPDPHOTOS_828_2023-141208_0108734_0653_AA.JPG
829) MPDPHOTOS_829_2023-141208_0108734_0658_AA.JPG
830) MPDPHOTOS_830_2023-141208_0108734_0659_AA.JPG
831) MPDPHOTOS_831_2023-141208_0108734_0660_AA.JPG
832) MPDPHOTOS_832_2023-141208_0108734_0661_AA.JPG
833) MPDPHOTOS_833_2023-141208_0108734_0662_AA.JPG
834) MPDPHOTOS_834_2023-141208_0108734_0663_AA.JPG
835) MPDPHOTOS_835_2023-141208_0108734_0664_AA.JPG
836) MPDPHOTOS_836_2023-141208_0108734_0665_AA.JPG
837) MPDPHOTOS_837_2023-141208_0108734_0666_AA.JPG
838) MPDPHOTOS_838_2023-141208_0108734_0667_AA.JPG
839) MPDPHOTOS_839_2023-141208_0108734_0668_AA.JPG
840) MPDPHOTOS_840_2023-141208_0108734_0669_AA.JPG
841) MPDPHOTOS_841_2023-141208_0108734_0670_AA.JPG
842) MPDPHOTOS_842_2023-141208_0108734_0671_AA.JPG
843) MPDPHOTOS_843_2023-141208_0109916_0001_AA.CR2
844) MPDPHOTOS_844_2023-141208_0109916_0002_AA.CR2
845) MPDPHOTOS_845_2023-141208_0109916_0003_AA.CR2
846) MPDPHOTOS_846_2023-141208_0109916_0004_AA.CR2
847) MPDPHOTOS_847_2023-141208_0109916_0005_AA.CR2
848) MPDPHOTOS_848_2023-141208_0109916_0006_AA.CR2

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

849) MPDPHOTOS_849_2023-141208_0109916_0007_AA.CR2
850) MPDPHOTOS_850_2023-141208_0109916_0008_AA.CR2
851) MPDPHOTOS_851_2023-141208_0109916_0009_AA.CR2
852) MPDPHOTOS_852_2023-141208_0109916_0010_AA.CR2
853) MPDPHOTOS_853_2023-141208_0109916_0011_AA.CR2
854) MPDPHOTOS_854_2023-141208_0109916_0012_AA.CR2
855) MPDPHOTOS_855_2023-141208_0109916_0013_AA.CR2
856) MPDPHOTOS_856_2023-141208_0109916_0014_AA.CR2
857) MPDPHOTOS_857_2023-141208_0109916_0015_AA.CR2
858) MPDPHOTOS_858_2023-141208_0113284_0001_AA.JPG
859) MPDPHOTOS_859_2023-141208_0113284_0002_AA.JPG
860) MPDPHOTOS_860_2023-141208_0113284_0003_AA.JPG
861) MPDPHOTOS_861_2023-141208_0113284_0004_AA.JPG
862) MPDPHOTOS_862_2023-141208_0113284_0005_AA.JPG
863) MPDPHOTOS_863_2023-141208_0113284_0006_AA.JPG
864) MPDPHOTOS_864_2023-141208_0113284_0007_AA.JPG
865) MPDPHOTOS_865_2023-141208_0113284_0008_AA.JPG
866) MPDPHOTOS_866_2023-141208_0113284_0009_AA.JPG
867) MPDPHOTOS_867_2023-141208_0113284_0010_AA.JPG
868) MPDPHOTOS_868_2023-141208_0113284_0011_AA.JPG
869) MPDPHOTOS_869_2023-141208_0113284_0012_AA.JPG
870) MPDPHOTOS_870_2023-141208_0113284_0013_AA.JPG
871) MPDPHOTOS_871_2023-141208_0113284_0014_AA.JPG
872) MPDPHOTOS_872_2023-141208_0113284_0015_AA.JPG
873) MPDPHOTOS_873_2023-141208_0113284_0016_AA.JPG
874) MPDPHOTOS_874_2023-141208_0113284_0017_AA.JPG
875) MPDPHOTOS_875_2023-141208_0113284_0018_AA.JPG
876) MPDPHOTOS_876_2023-141208_0113284_0019_AA.JPG
877) MPDPHOTOS_877_2023-141208_0113284_0020_AA.JPG
878) MPDPHOTOS_878_2023-141208_0113284_0021_AA.JPG
879) MPDPHOTOS_879_2023-141208_0113284_0022_AA.JPG
880) MPDPHOTOS_880_2023-141208_0113284_0023_AA.JPG

4. GAGNE_000004 (raw folder) - Swat Officers Interviews
   a. SWATINT_001_Brown_1_2023-07-07_074528_13539.m4a
   b. SWATINT_002_Brown_2_2023-07-07_075259_13539.m4a
   c. SWATINT_003_Cameron_2023-07-07_090737_13539.m4a
   d. SWATINT_004_Chuey_2023-07-07_065217_13539.m4a
   e. SWATINT_005_Freeman_2023-07-07_052959_13539.m4a
   f. SWATINT_006_Goodrich_2023-07-07_072425_13539.m4a
   g. SWATINT_007_Harris_2023-07-07_062440_13539.m4a
   h. SWATINT_008_Navarro_2023-07-07_081231_13539.m4a
   ***i.*** SWATINT_009_Thomas_2023-07-07_083234_13539.m4a

5. GAGNE_000005-GAGNE_000031 - AUTOPSY REPORT, BOP23-025, SHAWN-TAYLOR-GAGNE - Autopsy Report of Shawn

6. GAGNE_000032 (raw folder) - Shawn Gagne Ring and COX Camera Videos

   (a) Bedroom – 7/6/2023
   a. BEDROOM_001_Video Jul 06 2023, 20-21-48 PM.mp4

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

b. BEDROOM_002_Video Jul 06 2023, 20-22-49 PM.mp4
c. BEDROOM_003_Video Jul 06 2023, 20-43-12 PM.mp4
d. BEDROOM_004_Video Jul 06 2023, 20-44-13 PM.mp4
e. BEDROOM_005_Video Jul 06 2023, 20-49-35 PM.mp4
f. BEDROOM_006_Video Jul 06 2023, 21-14-49 PM.mp4
g. BEDROOM_007_Video Jul 06 2023, 21-15-50 PM.mp4
h. BEDROOM_008_Video Jul 06 2023, 22-31-00 PM.mp4
i. BEDROOM_009_Video Jul 06 2023, 22-36-01 PM.mp4
j. BEDROOM_010_Video Jul 06 2023, 22-49-26 PM.mp4
k. BEDROOM_011_Video Jul 06 2023, 23-18-32 PM.mp4
l. BEDROOM_012_Video Jul 06 2023, 23-19-34 PM.mp4

(b) Living Room – 7/6/2023
1) LIVING_001_2023-07-06 06-02-03 PM.mp4
2) LIVING_002_2023-07-06 06-04-47 PM.mp4
3) LIVING_003_2023-07-06 06-06-57 PM.mp4
4) LIVING_004_2023-07-06 06-11-02 PM.mp4
5) LIVING_005_2023-07-06 06-13-02 PM.mp4
6) LIVING_006_2023-07-06 06-15-54 PM.mp4
7) LIVING_007_2023-07-06 06-18-19 PM.mp4
8) LIVING_008_2023-07-06 06-21-53 PM.mp4
9) LIVING_009_2023-07-06 06-28-54 PM.mp4
10) LIVING_010_2023-07-06 06-31-54 PM.mp4
11) LIVING_011_2023-07-06 06-34-46 PM.mp4
12) LIVING_012_2023-07-06 06-36-50 PM.mp4
13) LIVING_013_2023-07-06 06-39-38 PM.mp4
14) LIVING_014_2023-07-06 06-41-54 PM.mp4
15) LIVING_015_2023-07-06 06-46-29 PM.mp4
16) LIVING_016_2023-07-06 06-50-14 PM.mp4
17) LIVING_017_2023-07-06 06-53-32 PM.mp4
18) LIVING_018_2023-07-06 06-56-59 PM.mp4
19) LIVING_019_2023-07-06 06-59-36 PM.mp4
20) LIVING_020_2023-07-06 07-04-31 PM.mp4
21) LIVING_021_2023-07-06 07-11-18 PM.mp4
22) LIVING_022_2023-07-06 07-21-27 PM.mp4
23) LIVING_023_2023-07-06 07-33-30 PM.mp4
24) LIVING_024_2023-07-06 07-36-27 PM.mp4
25) LIVING_025_2023-07-06 07-38-34 PM.mp4
26) LIVING_026_2023-07-06 07-41-01 PM.mp4
27) LIVING_027_2023-07-06 07-44-55 PM.mp4
28) LIVING_028_2023-07-06 07-47-18 PM.mp4
29) LIVING_029_2023-07-06 07-49-34 PM.mp4
30) LIVING_030_2023-07-06 07-54-31 PM.mp4
31) LIVING_031_2023-07-06 08-08-21 PM.mp4
32) LIVING_032_2023-07-06 08-10-41 PM.mp4
33) LIVING_033_2023-07-06 08-15-01 PM.mp4
34) LIVING_034_2023-07-06 08-21-25 PM.mp4
35) LIVING_035_2023-07-06 08-31-09 PM.mp4
36) LIVING_036_2023-07-06 08-33-31 PM.mp4
37) LIVING_037_2023-07-06 08-35-37 PM.mp4
38) LIVING_038_2023-07-06 08-37-43 PM.mp4
39) LIVING_039_2023-07-06 08-39-47 PM.mp4
40) LIVING_040_2023-07-06 08-42-09 PM.mp4
41) LIVING_041_2023-07-06 08-44-37 PM.mp4
42) LIVING_042_2023-07-06 08-46-37 PM.mp4

43) LIVING_043_2023-07-06 08-49-33 PM.mp4
44) LIVING_044_2023-07-06 08-52-04 PM.mp4
45) LIVING_045_2023-07-06 08-54-51 PM.mp4
46) LIVING_046_2023-07-06 09-14-48 PM.mp4
47) LIVING_047_2023-07-06 09-57-52 PM.mp4
48) LIVING_048_2023-07-06 10-06-16 PM.mp4
49) LIVING_049_2023-07-06 10-09-34 PM.mp4
50) LIVING_050_2023-07-06 10-19-41 PM.mp4
51) LIVING_051_2023-07-06 10-25-09 PM.mp4
52) LIVING_052_2023-07-06 10-25-30 PM.mp4
53) LIVING_053_2023-07-06 10-27-23 PM.mp4
54) LIVING_054_2023-07-06 10-29-35 PM.mp4
55) LIVING_055_2023-07-06 10-32-09 PM.mp4
56) LIVING_056_2023-07-06 10-34-36 PM.mp4
57) LIVING_057_2023-07-06 10-37-05 PM.mp4
58) LIVING_058_2023-07-06 10-39-21 PM.mp4
59) LIVING_059_2023-07-06 10-41-20 PM.mp4
60) LIVING_060_2023-07-06 10-44-09 PM.mp4
61) LIVING_061_2023-07-06 11-02-09 PM.mp4
62) LIVING_062_2023-07-06 11-16-26 PM.mp4
63) LIVING_063_2023-07-06 11-18-28 PM.mp4
64) LIVING_064_2023-07-06 11-22-33 PM.mp4

(c) Bedroom – 7/7/2023

a. BEDROOM_013_Video Jul 07 2023, 04-51-35 PM.mp4
b. BEDROOM_014_Video Jul 07 2023, 04-57-52 PM.mp4
c. BEDROOM_015_Video Jul 07 2023, 04-58-53 PM.mp4
d. BEDROOM_016_Video Jul 07 2023, 05-03-54 PM.mp4
e. BEDROOM_017_Video Jul 07 2023, 05-19-03 PM.mp4
f. BEDROOM_018_Video Jul 07 2023, 05-34-05 PM.mp4
g. BEDROOM_019_Video Jul 07 2023, 06-34-46 PM.mp4
h. BEDROOM_020_Video Jul 07 2023, 06-35-51 PM.mp4
i. BEDROOM_021_Video Jul 07 2023, 06-54-52 PM.mp4
j. BEDROOM_022_Video Jul 07 2023, 07-02-05 PM.mp4
k. BEDROOM_023_Video Jul 07 2023, 07-20-15 PM.mp4
l. BEDROOM_024_Video Jul 07 2023, 07-21-27 PM.mp4

(d) Living Room – 7/7/23

1) LIVING_079_2023-07-07 05-18-25 AM.mp4
2) LIVING_080_2023-07-07 05-20-30 AM.mp4
3) LIVING_081_2023-07-07 05-22-39 AM.mp4
4) LIVING_082_2023-07-07 05-25-03 AM.mp4
5) LIVING_083_2023-07-07 05-27-54 AM.mp4
6) LIVING_084_2023-07-07 05-36-39 AM.mp4
7) LIVING_085_2023-07-07 05-40-23 AM.mp4
8) LIVING_086_2023-07-07 05-42-22 AM.mp4
9) LIVING_087_2023-07-07 05-45-28 AM.mp4
10) LIVING_088_2023-07-07 05-56-11 AM.mp4
11) LIVING_089_2023-07-07 06-26-39 AM.mp4
12) LIVING_090_2023-07-07 06-28-54 AM.mp4
13) LIVING_091_2023-07-07 06-30-54 AM.mp4
14) LIVING_092_2023-07-07 06-33-04 AM.mp4
15) LIVING_093_2023-07-07 06-36-48 AM.mp4
16) LIVING_094_2023-07-07 06-38-58 AM.mp4
17) LIVING_095_2023-07-07 06-41-11 AM.mp4

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

18) LIVING_096_2023-07-07 06-43-22 AM.mp4
19) LIVING_097_2023-07-07 06-45-30 AM.mp4
20) LIVING_098_2023-07-07 06-47-36 AM.mp4
21) LIVING_065_2023-07-07 03-31-04 AM.mp4
22) LIVING_066_2023-07-07 04-49-25 AM.mp4
23) LIVING_067_2023-07-07 04-51-25 AM.mp4
24) LIVING_068_2023-07-07 04-53-41 AM.mp4
25) LIVING_069_2023-07-07 04-55-48 AM.mp4
26) LIVING_070_2023-07-07 04-57-57 AM.mp4
27) LIVING_071_2023-07-07 04-59-57 AM.mp4
28) LIVING_072_2023-07-07 05-02-09 AM.mp4
29) LIVING_073_2023-07-07 05-04-38 AM.mp4
30) LIVING_074_2023-07-07 05-07-46 AM.mp4
31) LIVING_075_2023-07-07 05-10-02 AM.mp4
32) LIVING_076_2023-07-07 05-11-55 AM.mp4
33) LIVING_077_2023-07-07 05-14-14 AM.mp4
34) LIVING_078_2023-07-07 05-16-25 AM.mp4

(e) Other Ring Camera Footage (7/6/23)
a. OTHER_001_IMG_0324.jpg
b. OTHER_002_Video Jul 06 2023, 20-37-48 PM.mp4
c. OTHER_003_Video Jul 06 2023, 20-41-44 PM.mp4
d. OTHER_004_Video Jul 06 2023, 23-09-44 PM.mp4
e. OTHER_005_Video Jul 06 2023, 23-15-26 PM.mp4
f. OTHER_006_Video Jul 06 2023, 23-17-28 PM.mp4
g. OTHER_007_Video Jul 06 2023, 23-27-30 PM.mp4

(f) Other Ring Camera Footage (7/7/23)
a. OTHER_008_Video Jul 07 2023, 02-03-34 AM.mp4
b. OTHER_009_Video Jul 07 2023, 03-34-55 AM.mp4
c. OTHER_010_Video Jul 07 2023, 04-46-49 AM.mp4
d. OTHER_011_Video Jul 07 2023, 04-48-54 AM.mp4
e. OTHER_012_Video Jul 07 2023, 05-02-57 AM.mp4
f. OTHER_013_Video Jul 07 2023, 05-05-28 AM.mp4
g. OTHER_014_Video Jul 07 2023, 05-17-27 AM.mp4
h. OTHER_015_Video Jul 07 2023, 05-55-58 AM.mp4
i. OTHER_016_Video Jul 07 2023, 06-01-12 AM.mp4
j. OTHER_017_Video Jul 07 2023, 06-03-14 AM.mp4
k. OTHER_018_Video Jul 07 2023, 06-25-08 AM.mp4
l. OTHER_019_Video Jul 07 2023, 06-33-14 AM.mp4
m. OTHER_020_Video Jul 07 2023, 06-37-20 AM.mp4
n. OTHER_021_Video Jul 07 2023, 06-43-16 AM.mp4
o. OTHER_022_Video Jul 07 2023, 06-45-45 AM.mp4
p. OTHER_023_Video Jul 07 2023, 07-00-39 AM.mp4
q. OTHER_024_Video Jul 07 2023, 07-03-56 AM.mp4
r. OTHER_025_Video Jul 07 2023, 07-14-09 AM.mp4
s. OTHER_026_Video Jul 07 2023, 07-44-54 AM.mp4

7. GAGNE_000033 (raw folder) - Scene Photographs – 7/7/2023
   a. SCENEPHOTOS_001_Photo Jul 07 2023, 7 37 37 AM.jpg
   b. SCENEPHOTOS_002_Photo Jul 07 2023, 7 37 44 AM.jpg
   c. SCENEPHOTOS_003_Photo Jul 07 2023, 7 37 52 AM.jpg
   d. SCENEPHOTOS_004_Photo Jul 07 2023, 7 40 05 AM.jpg
   e. SCENEPHOTOS_005_Photo Jul 07 2023, 8 05 45 AM.jpg
   f. SCENEPHOTOS_006_Photo Jul 07 2023, 8 06 40 AM.jpg

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

g. SCENEPHOTOS_007_Photo Jul 07 2023, 8 09 39 AM.jpg

8. GAGNE_000034 (raw folder) - Family scene photographs and video – 7/9/2023
   1) FAMILY_001_Photo Jul 09 2023, 2 51 45 PM.jpg
   2) FAMILY_002_Photo Jul 09 2023, 2 51 50 PM.jpg
   3) FAMILY_003_Photo Jul 09 2023, 3 05 49 PM.jpg
   4) FAMILY_004_Photo Jul 09 2023, 3 06 30 PM.jpg
   5) FAMILY_005_Photo Jul 09 2023, 3 07 31 PM.jpg
   6) FAMILY_006_Photo Jul 09 2023, 3 07 41 PM.jpg
   7) FAMILY_007_Photo Jul 09 2023, 3 07 48 PM.jpg
   8) FAMILY_008_Photo Jul 09 2023, 3 08 17 PM.jpg
   9) FAMILY_009_Photo Jul 09 2023, 3 08 27 PM.jpg
   10) FAMILY_010_Photo Jul 09 2023, 3 09 06 PM.jpg
   11) FAMILY_011_Photo Jul 09 2023, 3 09 13 PM.jpg
   12) FAMILY_012_Photo Jul 09 2023, 3 22 02 PM.jpg
   13) FAMILY_013_Photo Jul 09 2023, 3 22 06 PM.jpg
   14) FAMILY_014_Photo Jul 09 2023, 3 30 27 PM.jpg
   15) FAMILY_015_Photo Jul 09 2023, 3 30 36 PM.jpg
   16) FAMILY_016_Photo Jul 09 2023, 3 57 47 PM.jpg
   17) FAMILY_017_Photo Jul 09 2023, 4 24 39 PM.jpg
   18) FAMILY_018_Photo Jul 09 2023, 4 24 45 PM.jpg
   19) FAMILY_019_Photo Jul 09 2023, 4 25 25 PM.jpg
   20) FAMILY_020_Photo Jul 09 2023, 4 25 46 PM.jpg
   21) FAMILY_021_Photo Jul 09 2023, 4 44 13 PM.jpg
   22) FAMILY_022_Photo Jul 09 2023, 4 44 20 PM.jpg
   23) FAMILY_023_Photo Jul 09 2023, 4 59 15 PM.jpg
   24) FAMILY_024_Photo Jul 09 2023, 5 04 10 PM.jpg
   25) FAMILY_025_Photo Jul 09 2023, 5 05 25 PM.jpg
   26) FAMILY_026_Photo Jul 09 2023, 6 13 43 PM.jpg
   27) FAMILY_027_Photo Jul 09 2023, 6 13 49 PM.jpg
   28) FAMILY_028_Photo Jul 09 2023, 6 16 18 PM.jpg
   29) FAMILY_029_Photo Jul 09 2023, 8 14 23 PM.jpg
   30) FAMILY_030_Photo Jul 09 2023, 8 14 29 PM.jpg
   31) FAMILY_031_Photo Jul 09 2023, 8 14 36 PM.jpg
   32) FAMILY_032_Photo Jul 09 2023, 8 19 04 PM.jpg
   33) FAMILY_033_Photo Jul 09 2023, 8 19 42 PM.jpg
   34) FAMILY_034_Photo Jul 09 2023, 8 20 04 PM.jpg
   35) FAMILY_035_Photo Jul 09 2023, 8 22 27 PM.jpg
   36) FAMILY_036_Photo Jul 09 2023, 8 22 49 PM.jpg
   37) FAMILY_037_Photo Jul 09 2023, 8 23 07 PM.jpg
   38) FAMILY_038_Photo Jul 09 2023, 8 23 37 PM.jpg
   39) FAMILY_039_Photo Jul 09 2023, 8 23 49 PM.jpg
   40) FAMILY_040_Photo Jul 09 2023, 8 24 23 PM.jpg
   41) FAMILY_041_Photo Jul 09 2023, 8 28 08 PM.jpg
   42) FAMILY_042_Video Jul 09 2023, 10 51 31 PM.mov
   43) FAMILY_043_Video Jul 09 2023, 10 51 49 PM.mov
   44) FAMILY_044_Video Jul 09 2023, 10 52 24 PM.mov
   45) FAMILY_045_Video Jul 09 2023, 3 22 12 PM.mov
   46) FAMILY_046_Video Jul 09 2023, 3 22 21 PM.mov
   47) FAMILY_047_Video Jul 09 2023, 6 16 37 PM.mov

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

48)FAMILY_048_Video Jul 09 2023, 6 23 23 PM.mov
49)FAMILY_049_Video Jul 09 2023, 6 41 51 PM.mov
50)FAMILY_050_Video Jul 09 2023, 8 29 02 PM.mov

GAGNE_000035 - Social Media Raw Folder

a. SOCIAL_000001 – TIKTOK [TO BE PRODUCED UPON A PROTECTIVE ORDER]
b. SOCIAL_000002 – TWITTER
c. SOCIAL_000003 – SNAPCHAT [TO BE PRODUCED UPON A PROTECTIVE ORDER]

9. GAGNE_000036 (raw folder) - Ring Video of Neighbor camera (to be supplemented

a. NEIGHBOR_001_Video Jul 06 2023, 10 25 46 PM.mov
b. NEIGHBOR_002_Video Jul 06 2023, 10 44 55 PM.mov
c. NEIGHBOR_003_Video Jul 06 2023, 10 46 12 PM.mov

10. GAGNE_000039-GAGNE_000043 - Shawn Gagne Photos.pdf
11. GAGNE_000044-GAGNE_000047 - (38) Shawn Gagne _ LinkedIn.pdf
12. GAGNE_000048-GAGNE_000052 - JW LinkedIn.pdf
13. GAGNE_000053-GAGNE_000054 - Resume.pdf
14. GAGNE_000055-GAGNE_000055 - 65805727_2691084387585961_2431446948373331968_n.pdf
15. GAGNE_000056-GAGNE_000056 - 305983952_1300064037470272_462352208824501419_n.pdf
16. GAGNE_000057-GAGNE_000057 - 306335968_881348026527616_905096894309612215_n.pdf
17. GAGNE_000058-GAGNE_000058 - 306375784_837401667431042_8338369869021897481_n.pdf
18. GAGNE_000059-GAGNE_000062 - Messages - Ace & SHAWNEE.pdf
19. GAGNE_000063-GAGNE_000069 - Messages - Bradley Gagné & +16612080508 & SHAWNEE.pdf
20. GAGNE_000070-GAGNE_000070 - Messages - Chris Gagné & Ace & Justy & SHAWNEE & Br.pdf
21. GAGNE_000071-GAGNE_000072 - Messages - Chris Gagné & Ace & SHAWNEE & Justy.pdf

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

22. GAGNE_000073-GAGNE_000089 - Messages - Chris Gagné & Ace & SHAWNEE.pdf
23. GAGNE_000090-GAGNE_000096 - Messages - Chris Gagné & SHAWNEE & +18184222684 & J-1.pdf
24. GAGNE_000097-GAGNE_000150 - Messages - Chris Gagné & SHAWNEE & +18184222684 & J-4.pdf
25. GAGNE_000151-GAGNE_000151 - Messages - Chris Gagné & SHAWNEE & Bradley Gagné.pdf
26. GAGNE_000152-GAGNE_000154 - Messages - Chris Gagné & SHAWNEE & Justy & +1661208-1.pdf
27. GAGNE_000155-GAGNE_000233 - Messages - Chris Gagné & SHAWNEE & Justy & Bradley.pdf
28. GAGNE_000234-GAGNE_000235 - Messages - Chris Gagné & SHAWNEE & Justy & Karen Ga.pdf
29. GAGNE_000236-GAGNE_000237 - Messages - Chris Gagné & SHAWNEE & Justy.pdf
30. GAGNE_000238-GAGNE_000260 - Messages - Chris Gagné & SHAWNEE & Kylie Bess & Jus.pdf
31. GAGNE_000261-GAGNE_000263 - Messages - Chris Gagné & SHAWNEE & Kylie Bess & Jus-1.pdf
32. GAGNE_000264-GAGNE_000295 - Messages - Chris Gagné & SHAWNEE & Kylie Bess.pdf
33. GAGNE_000296-GAGNE_000299 - Messages - Chris Gagné & SHAWNEE & Kylie Bess-1.pdf
34. GAGNE_000300-GAGNE_000319 - Messages - Chris Gagné & SHAWNEE.pdf
35. GAGNE_000320-GAGNE_002087 - Messages - Chris Gagné.Suzett to Chris.pdf
36. GAGNE_002088-GAGNE_003573 - Messages - Doge.pdf

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

37. GAGNE_003574-GAGNE_004366 - Messages - God and Patriots.add2textsShawn.pdf
38. GAGNE_004367-GAGNE_004973 - Messages - God and Patriots.pdf
39. GAGNE_004974-GAGNE_004976 - Messages - Justy & +14255983492 & +16612080508 & SH.pdf
40. GAGNE_004977-GAGNE_004977 - Messages - Shawn Gagne & Portia Franklin.pdf
41. GAGNE_004978-GAGNE_005001 - Messages - Shawn Gagne.pdf
42. GAGNE_005002-GAGNE_005015 - Messages - SHAWNEE & +16612080508.pdf
43. GAGNE_005016-GAGNE_005018 - Messages - SHAWNEE & +16612080508-1.pdf
44. GAGNE_005019-GAGNE_005021 - Messages - SHAWNEE & darreng1116@yahoo.com.pdf
45. GAGNE_005022-GAGNE_005022 - Messages - SHAWNEE & Jordy Gagné.pdf
46. GAGNE_005023-GAGNE_005035 - Messages - SHAWNEE & Justy & Ace.pdf
47. GAGNE_005036-GAGNE_005046 - Messages - SHAWNEE & Justy & Karen Gagne & Bradley.pdf
48. GAGNE_005047-GAGNE_005051 - Messages - SHAWNEE & Kylie Bess.pdf
49. GAGNE_005052-GAGNE_005053 - Messages - SHAWNEE & Kylie Bess-1.pdf
50. GAGNE_005054-GAGNE_006379 - Messages - SHAWNEE.pdf
51. GAGNE_006380-GAGNE_006389 - Messages - SUZETTE GAGNE & Darren Gagne & Shawn Gag.pdf
52. GAGNE_006390-GAGNE_006390 - Messages - SUZETTE GAGNE & Shawn Gagne.pdf

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

53. GAGNE_006391-GAGNE_006594 - Messages - SUZETTE GAGNE.Chris to Suzett.pdf
54. GAGNE_006595-GAGNE_006595 - IMG_0318.pdf
55. GAGNE_006596-GAGNE_006596 - IMG_0319.pdf
56. GAGNE_006597-GAGNE_006597 - IMG_0320.pdf
57. GAGNE_006598-GAGNE_006598 - IMG_0321.pdf
58. GAGNE_006599-GAGNE_006599 - IMG_0322.pdf
59. GAGNE_006600-GAGNE_006600 - IMG_0323.pdf
60. GAGNE_006601-GAGNE_006601 - IMG_0313.pdf
61. GAGNE_006602-GAGNE_006602 - IMG_0314.pdf
62. GAGNE_006603-GAGNE_006603 - IMG_0315.pdf
63. GAGNE_006604-GAGNE_006604 - IMG_0316.pdf
64. GAGNE_006605-GAGNE_006605 - IMG_0317.pdf
65. GAGNE_006606-GAGNE_007168 - STG MedRecords 139548083-2_GAGNE_SHAWN_08_23_23.pdf
66. GAGNE_007169-GAGNE_007186 - kylie-d-bess_10-07-2021.pdf
67. GAGNE_007187-GAGNE_007435 - PLF_MesaDR000001 - 249 - 2023-141208_Police Report_Redacted.pdf
68. GAGNE_007436-GAGNE_007440 - CIRB 2023-007 - Obtained by Jason Reed.pdf
69. GAGNE_007441-GAGNE_007442 - Gagne - 03.26.2024 Letter to COMPD Records.pdf
70. GAGNE_007443-GAGNE_007445 - Mesa PD Fax re records request.pdf
71. GAGNE_007446-GAGNE_007446 - Canyon Vista Recovery Center.pdf
72. GAGNE_007447-GAGNE_007460 - OME - Case File - Case 23-06943 - MEDICAL EXAMINER REPORT - PDF - FINAL - GAGNE.pdf
73. GAGNE_007461-GAGNE_007463 - OME - Case File - Case 23-06943 - TOXICOLOGY REPORT - GAGNE.pdf

74. GAGNE_007464-GAGNE_007465 - 250328 - EMPLOYMENT AUTH.pdf
75. GAGNE_007466-another bruise from mesa police officer Shawn freeman - Officer Involved domestic violence.mp4
76. GAGNE_007467-another injury from abuser Shawn Freeman Mesa Police officer - Mesa Police Department.mp4
77. GAGNE_007468-another injury from Shawn T Freeman, SWAT operator with Mesa Police Department, Mesa Arizona.mp4
78. GAGNE_007469-Arm knot and bruising from Shawn Freeman, Mesa PD - Police Brutality - Domestic Violence.mp4
79. GAGNE_007470-Bruising from another domestic violence incident with mesa officer Shawn Freeman.mp4
80. GAGNE_007471-Domestic Violence and Child abuse Police report with Shawn Tyler Freeman as the suspect, Mesa AZ.mp4
81. GAGNE_007472-Domestic Violence injuries from Shawn Freeman, Mesa Police Officer, Mesa Arizona.mp4
82. GAGNE_007473-mesa officer Shawn freeman assaults his girlfriend while holding their baby.mp4
83. GAGNE_007474-Mesa PD Shawn Freeman assault victims injuries - Mesa Police Officer involved domestic violence.mp4
84. GAGNE_007475-Mesa Police Department Shawn Freeman promoting suicide telling girlfriend to kill herself - dv.mp4
85. GAGNE_007476-Mesa Police Officer Shawn Freeman Domestic Battery charging worksheet.mp4
86. GAGNE_007477-Mesa Police Officer Shawn Freeman intimidating his girlfriend and baby.mp4
87. GAGNE_007478-Mesa Police Officer Shawn Freeman mocking his domestic violence victim.mp4
88. GAGNE_007479-Mesa Police Officer Shawn T Freeman throwing hot food on his family.mp4

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

89. GAGNE_007480-Mesa Police SWAT operator Shawn Freeman screaming at girlfriend while holding child.mp4
90. GAGNE_007481-More bruises from Domestic abuser Shawn Freeman, Mesa Police Officer.mp4
91. GAGNE_007482-More bruises from Mesa PD Shawn Freeman, SWAT operator Mesa Arizona, Domestic Violence perpetrator.mp4
92. GAGNE_007483-More DV injuries from Mesa PD Swat operator Shawn Tyler Freeman, City of Mesa Police Department.mp4
93. GAGNE_007484-more injuries from Mesa Swat operator Shawn T Freeman during another dv incident.mp4
94. GAGNE_007485-screaming for help while being abused by Mesa Police Officer Shawn Tyler Freeman.mp4
95. GAGNE_007486-Shawn Freeman blames his victim for abusing her. Shawn Freeman mental, psychological manipulation.mp4
96. GAGNE_007487-Shawn freeman demolishing his girlfriend and babies property. Shawn Freeman is a mesa police officer.mp4
97. GAGNE_007488-Shawn Freeman destruction of property - officer involved domestic violence - mesa police.mp4
98. GAGNE_007489-Shawn Freeman domestic violence mesa police department Arizona.mp4
99. GAGNE_007490-Shawn Freeman hitting girlfriend with door while holding their child.mp4
100. GAGNE_007491-Shawn Freeman intimidating his victims again - Mesa Police Officer call 911, I dare you.mp4
101. GAGNE_007492-Shawn Freeman passed out drunk at dinner time while his girlfriend feeds their child.mp4
102. GAGNE_007493-Shawn Freeman screaming at his family after attaching them, mesa swat, Mesa Police mesa arizona.mp4
103. GAGNE_007494-Shawn Tyler Freeman committing Domestic violence again - DV Victim injuries.mp4

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

104. GAGNE_007495-GAGNE_007505 - FC2022-220907 - Verified Petition.pdf
105. GAGNE_007506-GAGNE_007543 - FC2022-230328 - Not Change of Judge Erin.pdf
106. GAGNE_007544-GAGNE_007570 - FC2022-240304 - Ruling.pdf
107. GAGNE_007571-GAGNE_007575 - FC2022-094055 - Family Court Case Information - Case History.pdf
108. GAGNE_007576-GAGNE_007609 - TLOxp - Comprehensive Report - Shawn Freeman.pdf
109. GAGNE_007610-GAGNE_007613 - 0759_251001160455_001.pdf
110. GAGNE_007614-GAGNE_007621 - 2025.03.21 Petition for Order of Protection.pdf
111. GAGNE_007622-GANE_007724 – Paul Shaloka Expert Report and accompanying documents
112. GAGNE_007725-GAGNE_007762 – Mark Hafkey Expert Report and accompanying documents
113. ***GAGNE_007763-GAGNE_007988 – Gagne 2018-2022 taxes***

## III. COMPUTATION AND MEASURE OF DAMAGES

Plaintiffs seeks compensation from Defendants for all damages to which Plaintiffs may be entitled under the law in an amount to be determined, including, but not limited to:

1. General damages in an amount to be proven at trial, including for the loss of love, affection, companionship, care, protection, and guidance since the death and in the future, as well as the pain, grief, sorrow, anguish, stress, shock, and mental suffering already experienced, and reasonably probable to be experienced in the future;
2. Special damages in an amount to be proven at trial;
3. Economic and financial damages in an amount to be proven at trial;
4. Reasonable expenses of funeral and burial;
5. Punitive damages in an amount sufficient to punish Defendants for their conduct, and deter others from the same;

6. Pre-judgment and post-judgment interest at the statutory rate; and

7. Plaintiffs' attorneys' fees and taxable costs.

8. Such other damages or relief as is just and proper under the circumstances.

**RESPECTFULLY SUBMITTED** this 9th day of June 2026.

**MILLS + WOODS LAW, PLLC**

By *<u>/s/ Sean A. Woods</u>*
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
*Attorneys for Plaintiffs*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2026, I electronically transmitted the foregoing document to the following via email:

Kathleen L. Wieneke
kwieneke@wienekelawgroup.com
lrasmussen@wienekelawgroup.com
sneily@wienekelawgroup.com
Christina Retts
cretts@wienekelawgroup.com
Rebekah K. Browder
rbrowder@wienekelawgroup.com
**WIENEKE LAW GROUP, PLC**
1225 W Washington St., Ste. 313
Tempe, AZ 85288
(602) 715-1868
*Attorneys for Defendants Harris, Navarro, Cameron, Adair, Chuey, Goodrich, Freeman, Thomas, Orr, Brown, and Cost*

*/s/ Ben Dangerfield*

Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Christopher Gagne et al.,<br>Plaintiffs,<br>v.<br>City of Mesa et al.<br>Defendant. | No. CV-24-01337-PHX-DJH_<br>**PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF NON-UNIFORM INTERROGATORIES TO PLAINTIFFS** |

Plaintiffs, by and through undersigned counsel, hereby submit their responses to Defendants' First Set of Non-Uniform Interrogatories to Plaintiffs. Plaintiffs reserve the right to supplement their responses as appropriate.

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose of, and in relation to, this action. Each response is given subject to all appropriate objections (including, but not limited to, objections concerning competency, relevancy, materiality, propriety and admissibility), which would require the exclusion of any statement contained herein if the admission were asked of, or any statement contained herein where made by, a witness present and testifying in Court. All such objections are reserved and may be interposed at the time of trial.

Plaintiffs have not yet completed their investigation of the facts relating to this action, have not yet completed discovery in this action, and have not yet completed their

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

preparation for trial. Consequently, the following responses are given without prejudice to Plaintiffs' right to produce, at time of trial, subsequently discovered material.

Except for the facts explicitly admitted to herein, no admission of any nature whatsoever is to be implied or inferred. The fact that any Interrogatory herein is answered should not be taken as an admission, or a concession, of the existence of any fact(s) set forth or assumed by such Interrogatory, or that such answer constitutes evidence of any fact thus set forth or assumed.

## GENERAL OBJECTIONS

Plaintiffs submit the following general objections to Defendants' Interrogatories addressed herein:

A. Plaintiffs object to the Interrogatories to the extent they seek information or documents subject to the attorney-client privilege and/or work product doctrine.

B. Plaintiffs object to the Interrogatories to the extent they seek information or documents protected or otherwise exempted from disclosure by applicable Federal Rules of Civil Procedure and/or any other applicable statutory or common law privilege.

C. The inadvertent disclosure of any privileged information is not a waiver of Plaintiffs' right to assert any applicable privilege with respect to any such information.

D. Plaintiffs object to the Interrogatories to the extent they seek Plaintiffs' confidential information.

E. Plaintiffs object to the Interrogatories to the extent they seek information or documents that are neither relevant nor reasonably likely to lead to the discovery of admissible evidence.

F. Plaintiffs object to the Interrogatories to the extent they seek information or documents not within Plaintiffs' possession, custody, or control.

G. Plaintiffs object to the Interrogatories to the extent they are harassing or unduly burdensome to Plaintiffs. This includes, but is not limited to, interrogatories that are duplicative of information or documents covered by other discovery, or that are duplicative of information or documents already in Defendants' possession, custody or

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

control, or that are available to Defendants from other sources that are less burdensome.

H. Plaintiffs object to the Interrogatories to the extent they are not proportional to the needs of the case.

I. These General Objections are hereby incorporated into and made a part of each and every response to the Interrogatories set forth below. Plaintiffs further reserve the right to modify, amend, or add to these objections in each response.

J. Plaintiffs reserve the right to supplement these responses when, and if, additional information is discovered.

K. Subject to these and without waiving any other objections, Plaintiffs respond to Defendants' Interrogatories as follows:

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

## INTERROGATORIES

**INTERROGATORY NO. 1:**

For DECEDENT and each of the Plaintiffs, identify any and all user-names and email address(es) associated with each account and the approximate date of membership for any and all social media platforms maintain(ed) by DECEDENT and each of the Plaintiffs in the five (5) years preceding July 6, 2023, including but not limited to, Facebook, Twitter, MySpace, Instagram, Snapchat, OnlyFans, Twitch, Triller, HouseParty, Soundcloud, Vimeo, WhatsApp, Tumblr, Twitter, Google+, LinkedIn, Reddit, Foursquare, Nextdoor, YouTube, Flickr, TikTok, Lemon8, BlueSky, Quora, WeChat, Friendster, Telegram, Discord, Clubhouse, Kwai, Linktree, Valence, Shorby, Triller, and/or any other personal interaction/friendship, business, dating, photo/video sharing, blog, entertainment and/or communications social media platform. Pursuant to Fed. R. Civ. P. 26, 34, and your obligation to preserve all electronically stored information, you were required to preserve, as is, all information contained within your social media internet accounts and profiles, and to not change or make additions or deletions to the same. If the profiles and/or content no longer exist, identify the date it was disabled/deleted, why, and at whose direction.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**<u>OBJECTION & RESPONSE</u>**:

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, and disproportionate to the claims in this case. Plaintiffs further object because Defendants are not entitled to all content associated with the entire history of Plaintiffs' social media accounts or decedent's accounts. Subject to and without waiving the foregoing objections, Plaintiffs respond as follows:**

- **X (formerly known as Twitter):**
  - **Shawn:**
    - **Username: @gagne_shawn**
    - **Email: unknown at this time**
- **Facebook:**
  - **Shawn:**
    - **Username: shawn.gagne.564**
    - **Email address:** [redacted]
  - **Chris:**
    - **Username: chris.gagne.165**
    - **Email:** [redacted]
  - **Suzette:**
    - **Username: onebzyb**
    - **Email:** [redacted]
- **Instagram:**
  - **Shawn:**
    - **Username: @Shawng_428, @Taylorsg_95, @the_futures_past888, @love_freedom_365**
    - **Email address:** [redacted]
- **Snapchat**
  - **Shawn:**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

        - **Username: @Shawng428**
        - **Email** [redacted]
- **TikTok**
    - **Shawn:**
        - **@Shawng_428**
        - **Email Address: None**

**Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**<u>INTERROGATORY NO. 2</u>:**

Identify each address where DECEDENT and each of the Plaintiffs resided during the past 15 years to and through the response date.

**<u>OBJECTION & RESPONSE</u>**:

**Plaintiffs object to the above Interrogatory as overly broad, disproportionate to the claims in this case, and irrelevant. Subject to and without waiving the foregoing objections, Plaintiffs respond as follows:**

- **18400 Kingsbury St., Porter Ranch, CA 91326 (3/1/09-12/1/13) <u>[WITH PARENTS]</u>**
- **29446 Abelia Rd., Canyon Country, CA 91387 (12/1/13-4/1/15) <u>[WITH PARENTS]</u>**
- **37610 Ruby Ln., Palmdale, CA 93552 (4/1/15-10/7/21) <u>[WITH PARENTS]</u>**
- **28021 Sarabande Ln., #1207, Canyon Country, CA 91387 (10/7/21-1/12/23)**
- **37610 Ruby Ln., Palmdale, CA 93552 (1/12/23-2/24/23) <u>[WITH PARENTS]</u>**
- **1233 N. Mesa Dr., #2164, Mesa, AZ 85201 (2/24/23-7/6/23)**

**Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**<u>INTERROGATORY NO. 3</u>:**

Are you claiming any economic losses, lost wages, or any other form of economic damages on behalf of the Estate? YES or NO. If YES, describe with particularity each category of damages, the calculation for each category of damages, and identify all of the DECEDENT's past employers by name, address, and telephone number, the dates of employment, and rate of pay.

**<u>OBJECTION & RESPONSE</u>**:

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, and impermissibly vague. Furthermore, this Interrogatory is a compound Interrogatory that requests three (3) separate sets of responses including 1) whether the estate is claiming economic damages; 2) a list of economic damages and calculation; and 3) a list of decedent's former employers. *<u>Plaintiffs will count this as three separate non-uniform interrogatories.</u>* Subject to and without waiving the foregoing objections, Plaintiffs respond that they are making an economic losses claim.**

**<u>Categories of damages</u>:**

- **Property damage**
- **Funeral expenses**
- **Lost earning capacity**

**<u>Past Employers</u>:**

- **TGI Friday's (2013 – 2014)**
- **BJ's Restaurant & Brewhouse (2016- 2018)**
- **Honest Tax (2019 – 2020)**
- **M.H. Uyekawa, Inc. (2020 – Death)**
- **BizIQ (2023 – Death)**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**Plaintiffs also provide Shawn's resume as part of their response to this Interrogatory. [*See* GAGNE_000053-GAGNE_000054 – Resume] Plaintiffs will produce calculations for each category of damages when appropriate. The deadline for Plaintiffs to provide full and complete expert disclosure pursuant to the Rule 16 Scheduling Order issued by the Court is March 2, 2026. Plaintiffs will provide full and complete expert disclosure consistent with their obligations under Fed. R. Civ. P. 26(a)(2) on or before that date, at a time and place of Plaintiffs' own choosing. Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**INTERROGATORY NO. 4:**

List the name, address, and telephone number of all medical, substance abuse, and mental health care providers with whom each of the DECEDENT treated with or planned to treat with in the ten (10) years preceding the response date. This request includes, but is not limited to, any and all physicians, physician's assistants, nurse practitioners, nurses, chiropractors, hospitals, urgent care centers, psychiatrist, psychologists, therapists, counselors, addiction counselors/physicians, school therapists, physical therapists, occupational therapists, vocational rehabilitation specialists, or social workers. Provide the dates of service and description of the condition for which examination, evaluation or treatment was sought. This request specifically includes the substance abuse treatment that the DECEDENT was going to enter around the time of the incident.

**OBJECTION & RESPONSE:**

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, and disproportionate to the claims in this case. Subject to and without waiving the foregoing objections, Plaintiffs respond as follows:**

- **Kaiser Permanente**

- **Addresses:**
  - **4502 E. Avenue S, Palmdale, CA 93552**
  - **43112 15th St. West, Lancaster, CA 93534**
  - **615 W. Ave. L, Lancaster, CA 93534**
  - **13651 Willard St., Panorama City, CA 91402**
- **Phone: (833) 574-2273**
- **Providers:**
  - **Benjamin Domingo Dacula, MD**
  - **Sydra Molina, LVN**
  - **Sadhana Panduranga Kamath, MD**
  - **Benham Farahdel, MD**
  - **Daniel Bruce Harker, OD**
  - **Sonya Ann Soto, LVN**
  - **Sarkis Yarwant Malkhassian, MD**
  - **Carla Yanira Arredondo, LVN**
  - **Tina Kevorkian, OD**
  - **Yan Shlimak, MD**
  - **Gurcharn Singh, MD**
  - **Elizabeth Hernandez, LVN**
  - **Robert Armando Manriquez, PA**
  - **Brandon Paul Endo, MD**
  - **Francisco Camarillo, RN**
  - **Telsa Bossalis, NP**
  - **Shanna Rutty Beyah, PA**
  - **Daniel Rajaratnam, PA**
  - **Eusebio Dan Lopez, NP**
  - **Delaram Ghadishah, MD**
  - **Joshua Ireland, MD**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

- **Juan Manual Oliva, MD**
- **Carla Arrendondo, LVN**
- **Bertha Uribe**
- **Athena Lonich, LCSW**
- **Patricia Tirado, LVN**
- **Lina Cadena, LVN**
- **Alexander Chokler, MD**
- **Lee-Jiuan Luque, OD**
- **Tracy Thompson, LVN**
- **Prashant Mistry, MD**
- **Luiz Rique Souza-Filho, MD**
- **Stephanie Smith, NP**
- **Jennifer Garnier, LVN**
- **Liliana Camacho, LVN**
- **Maral Yaghmourian, LVN**
- **Sheila Bhardwaj, RN**
- **Hengky Lim, NP**
- **Liliana Camacho, LVN**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

- **Henry Mayo Newhall Hospital**
  - **Address: 23845 McBean Pkwy, Valencia, CA 91355**
  - **Phone: (661) 200-2000**
  - **Providers: UNK**

**The treatment facility Shawn was scheduled to enter is Canyon Vista Recovery Center.**

**Plaintiffs are also disclosing the set of medical records that Plaintiffs have been able to obtain. [*See* GAGNE_006606-GAGNE_007168 - STG MedRecords 139548083-2_GAGNE_SHAWN_08_23_23]. Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**INTERROGATORY NO. 5:**

Describe DECEDENT's substance abuse (alcohol, illegal drugs, prescription drugs, and other chemical substances) use throughout his lifetime, to include identification of the substances, the age when DECEDENT began using such substances, the frequency of use and the treatment received.

**OBJECTION & RESPONSE:**

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, disproportionate to the claims in this case, and inflammatory. Subject to and without waiving the foregoing objections, Plaintiffs respond that Shawn occasionally smoked marijuana and wax starting when he was nineteen (19) years old. Shawn began consuming alcohol in his late teens and into adulthood. Shawn also used to take Xanax. Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**INTERROGATORY NO. 6:**

State whether DECEDENT and/or each of the Plaintiffs ever applied for social security insurance, social security disability insurance, long-term disability, and/or short-term disability, and if so, for each such application, specifically identify the agency, the date of approval or denial, the related insurance card number and/or insurance claim number, and the amount received and/or disbursed.

**OBJECTION & RESPONSE:**

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, disproportionate to the claims in this case, and irrelevant. Subject to and without waiving the foregoing objections, Plaintiffs respond NO to the entirety of the above**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**Interrogatory. Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**INTERROGATORY NO. 7:**

State the full name, address, and phone numbers for any schools, educational facilities, universities, colleges, trade schools, certification school and/or any other educational institution attended by the DECEDENT.

**OBJECTION & RESPONSE:**

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, and disproportionate to the claims in this case. Plaintiffs further object to this Interrogatory because it provides no time frame for responsive documentation. Subject to and without waiving the foregoing objections, Plaintiffs respond as follows:**

- Avondale Elementary, (ISD) / 623-772-5000
- Planview ISD / (806) 293-6145 (Direct-Rosie)
- Sierra Vista Middle School / 661-252-3113
- Granda Charter High School / 818-360-2361
- Grover Cleveland / 818-885-2230
- GED.
- 2 years of Church Seminary as well
- **See also Resume produced as GAGNE_000053-GAGNE_000054 – Resume**

**Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**INTERROGATORY NO. 8:**

Identify all assets and liabilities of the DECEDENT including but not limited to: bank accounts and balances; credit cards and balances; property owned; rental agreements and payments for rent; vehicles owned and/or payments for the same; child support monthly payments; stocks; bonds; mutual funds; and 401(k) balances. If you contend that

you are not claiming economic damages or loss of economic support, please state as such.

**OBJECTION & RESPONSE**:

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, and impermissibly vague. Subject to and without waiving the foregoing objections, see rental agreement and produced as GAGNE_007169-GAGNE_007186 - kylie-d-bess_10-07-2021 Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**INTERROGATORY NO. 9:**

For the ten (10) years preceding DECEDENT's death, describe DECEDENT's relationship with each Plaintiff, to include whether and when they lived at the same address with Decedent, how they communicated and when, and any financial support they provided.

**OBJECTION & RESPONSE**:

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, and disproportionate to the claims in this case. Subject to and without waiving the foregoing objections, Plaintiffs respond:**

**See answers to ROG #2.**

**Plaintiffs and Shawn communicated via all normal methods of communication including social media, text messages, and phone calls. They communicated often. [*See generally* GAGNE_000059 – 006594]. They were extremely close and had a loving relationship with each other. He was a Loving Son who doted on his family when he could. Plaintiffs were especially close to Shawn as he nearly died twice. At birth, both he and his mother nearly perished. Then, at age 11, Shawn contracted the West Nile Virus. He was born via caesarean section. It was discovered during labor that his**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**mother had Placenta Previa, a condition where both mother and baby could die in childbirth. He was born in Utah and the family then moved to Avondale, AZ.**

**Thereafter, the family moved to Plainview, TX. During that time Shawn contracted the West Nile virus from several mosquito bites and nearly died. He was listed in the CDC for the worst case in Hale County for West Nile virus that year.**

**In 2008 the family moved back to California. They lived in Santa Clarita initially and moved to Porter Ranch thereafter.**

**Shawn received his GED and thereafter attended 2 years of Church Seminary. He had normal jobs that kids do. He was a very hard worker at "EVERYTHING" he did. He had high work ethics and gave 110% to his jobs he worked. He worked Fast Food, worked construction, and he worked at several restaurants. His last job allowed him to work from home. He excelled at doing his jobs. It was important for him to be able to work and earn his own way. He worked hard to earn his own way so as not to ask for help, build his credit, and become credit worthy.**

**As Shawn grew up, he was very sweet. Plaintiffs never had any trouble out of him. He was always polite and cordial. He would be the one who held the door for everyone, while he entered or exited last. He would be the one to take the shirt off his back so another person could have what they needed. He was great with animals, the elderly and the handicapped. They all gravitated to him because of his sweet personality and nature. He never picked fights nor harmed animals of any kind. He was trusted by all, because he did not betray friendships or relationships. He was a deeply family-oriented man. He would help the homeless and the elderly. He befriended those who other people shun or made fun of. There have been many occasions where he would defend them. He had straight friends and gay friends. Color did not matter to him because he grew up with gay, Black and Mexican relatives. He was taught to love all mankind, which he did. He had many friends of different races and ethnic backgrounds. He didn't care what religion a person practiced. He had no malice towards anyone. He treated people the way he wanted to be treated with**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**respect.**

**He loved his country and stood by the flag with great respect. He had one in his home even to the day he died. He believed in the Constitution and the Bill of Rights. He believed in the second amendment and the right to bare arms. Even though he did not attend church, he was a firm believer in his Savior, Jesus Christ, and his Heavenly Father. He believed in good work ethics.**

**Shawn loved the military and ever since he was a little boy he wanted to serve. However, because of the West Nile Virus he was not able to enlist. He was devastated, but maintained his love and respect for the Military. He loved Military planes and could tell the name and type of a plane with no hesitation as he knew them all. His favorite thing was watching history shows on WWII. Plaintiffs home was in the flight path of Military planes and watching them was a favorite pastime for Shawn.**

**As far as the Police, Shawn was taught at an early age to respect them, which he did. This is why he was never in serious trouble with the law. As political challenges occurred against the police, he was an ardent defender in backing the Blue. He even talked about applying with the Mesa Police Dept. at one time. Shawn has Nnever had any felonies or been to prison.**

**Even up to the day of his murder, his brother and his family came to see Shawn. They were on their way out to California from Texas for the summer break where the entire family has a reunion on the 4th of July every year. It was also special because two of Shawn's nieces have a birthday on the 5th of July. A pool/birthday party was planned for them on that Saturday. They stayed the weekend with Shawn and his fiancé, Jordan. They took pictures and video of Shawn horsing around with his nieces and nephews. Shawn being there for his family was a source of pride for Plaintiffs. Knowing that he was providing and being present for key quality family time was worth more than anything. It is impossible to quantify in dollar amounts how much this meant to Plaintiffs. Shawn was always there for Plaintiffs. Whether it was a shoulder to cry on or being a sounding board for ideas, Plaintiffs relied on**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**Shawn.**

**Shawn was a great host to anyone who visited. He went out of his way to make sure they felt at home. He went to the store and made them dinner. He always thought of other people first and to make sure they were taken care of. He made many delicious meals. He was an excellent cook. He cooked when he lived at Plaintiffs' home. He always, always made his mother a plate first to make sure she had something to eat, because he knows his mother always prioritized others before herself. He also did the same for his father.**

**Shawn loved to be around his family and could hardly bare it when it was time for his brothers family to leave. He wanted to follow them out to California, but he and Jordan had to work and could not come. It hurt Plaintiffs tremendously knowing that he would not be a part of the festivities, and Plaintiffs know that it hurt him as well. Plaintiffs never thought they would never see Shawn again. His murder crushed Plaintiffs. The grief, the toll it has taken, and the knowing that they will never see him again is nearly too much for Plaintiffs to bear**

**Additionally, Shawn was very loving and had an exceptional relationship with all the children (nieces/nephews/etc) in the family. He was still a boy at heart and doted on all his nieces and nephews – of which there are twelve. They in turn loved him too. Their bonds of love will be forever forged. They still mourn his loss as though it was yesterday. They know how he died. His brothers still grieve deeply as well as they were all very close to each other.**

**Shawn was due to go into rehab the next day. He knew it was time as he was wanting to start a family and become a father. This was another factor why he wasn't able to go to the reunion.**

**Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**<u>INTERROGATORY NO. 10</u>:**

Were you and/or DECEDENT ever a party to and/or the subject of any court action, including but not limited to civil cases, mental health petitions for involuntary commitment, family court cases for child support, divorce proceedings, criminal cases? If so, please identify each and every action, including the jurisdiction, dates, report or case numbers, whether you were the plaintiff or defendant, the circumstances surrounding each action, names of all parties and results of each action.

**<u>OBJECTION & RESPONSE</u>:**

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, and disproportionate to the claims in this case. Plaintiffs further object to this Interrogatory because it provides no time frame for responsive documentation. Subject to and without waiving the foregoing objections, Plaintiffs respond that Shawn received a reckless driving charge in 2017. Plaintiffs are unaware of the jurisdiction, case number, or other information associated with the charge. Plaintiffs are unaware of any other information responsive to this Interrogatory. Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**<u>INTERROGATORY NO. 11</u>:**

Give a detailed account of your knowledge and understanding of the DECEDENT's activities during the 72-hour period immediately preceding his death, including, but not limited to, his whereabouts, all contacts with him, all phone calls or voice messages exchanged with him, all text messages exchanged with him, and providing any information relative to whether the DECEDENT ingested any drugs or alcohol.

**<u>OBJECTION & RESPONSE</u>:**

**Plaintiffs object to the above Interrogatory as overly broad, unduly**

**burdensome with any likely benefit outweighed by such burden, impermissibly vague, and disproportionate to the claims in this case. Subject to and without waiving the foregoing objections, Plaintiffs are still piecing together their recollections and memories from the days prior to Shawn's murder. *See Also* Response to ROG # 9.**

**Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**INTERROGATORY NO. 12:**

Identify all impeachment evidence you have access to, or that you may utilize at trial, including the name and address, and a description of any and all testimony to be provided by impeachment witnesses at trial.

**OBJECTION & RESPONSE:**

**Plaintiffs object to the above Interrogatory as overly broad and premature. No substantive discovery has been completed in this matter, and no trial has been scheduled. As such, testimony does not exist in this case and likely will not for some time.**

**Plaintiffs further object to this Interrogatories on the grounds that they are not required to disclose impeachment testimony (or identify impeachment witnesses) prior to trial:**

> **[FRCP 26(a)(3)] imposes an additional duty to disclose, without any request, information customarily needed in final preparation for trial. These disclosures are to be made in accordance with schedules adopted by the court under Rule 16(b) or by special order. *If no such schedule is directed by the court, the disclosures are to be made at least 30 days before commencement of the trial. By its terms, rule 26(a)(3) does not require disclosure of evidence to be used solely for impeachment purposes; however, disclosure of such evidence—as well as other items relating to conduct of trial—may be required by local rule or a pretrial order*.**

**Notes of Advisory Committee to 1993 Amendment of Civil Rules (emphasis added);**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

***see also*** **Notes of Advisory Committee to 2000 Amendment of Civil Rules ("Subdivision (a)(3) presently excuses pretrial disclosure of information solely for impeachment. Impeachment information is similarly excluded from the initial disclosure requirement.").**

**Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**INTERROGATORY NO. 13:**

Was the DECEDENT ever the subject of any police contact, arrest, police investigation, or court action including, but not limited to, any criminal or civil matters, child protective services investigations, restraining orders (whether temporary or permanent), orders of protection, divorce actions, separation, disability actions, paternity actions, custody actions, child support petitions, California 5150 process, involuntary mental health temporary hold, involuntary mental health evaluation process, or mental health commitment? If so, please identify each and every contact and/or action, regardless of whether charges were filed or not, including the jurisdiction, dates, report or case numbers, whether DECEDENT was the plaintiff or defendant, the circumstances surrounding each action, names of all parties and the disposition of each action.

**OBJECTION & RESPONSE**:

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, disproportionate to the claims in this case, irrelevant, and duplicative. Subject to and without waiving the foregoing objections, Plaintiffs respond that Shawn received a reckless driving charge in 2017. Plaintiffs are unaware of the jurisdiction, case number, or other information associated with the charge. Plaintiffs are unaware of any other information responsive to this Interrogatory. Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**INTERROGATORY NO. 14:**

Do you possess any video and/or audio recordings of the DECEDENT, such as voice mail recordings, cell phone audio recordings utilizing any type of cell phone application or function of the phone, and/or digital or analog recordings, which relate to the DECEDENT'S: mental health; mental health status; mental health diagnosis; were recorded for the potential of being utilized for the DECEDENT's mental health treatment and/or an involuntary commitment process; were used as evidence in any legal matter-civil, criminal, or mental health process; relate to or discuss the DECEDENT's employment, employment history and/or economic status; relate to or discuss any physical condition suffered by the DECEDENT; discuss DECEDENT's economic status; and/or captured evidence of the DECEDENT's mental health status and/or diagnosis? If so, identify the type of recording (audio, video, etc.), the device utilized to capture the recording, the date that the recording was made, and the device that is currently being utilized to store the recording.

**OBJECTION & RESPONSE**:

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague and convoluted, and disproportionate to the claims in this case. Subject to and without waiving the foregoing objections, Plaintiffs respond that they are unable to identify or locate any information responsive to this Interrogatory at this time. Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**INTERROGATORY NO. 15:**

Was the DECEDENT ever suicidal and/or had the DECEDENT ever attempted suicide? If so, fully describe why you believe DECEDENT was suicidal, including any

statements made by DECEDENT, and/or identify the date, the events surrounding each incident, where DECEDENT was hospitalized, treatment received for each incident and any follow up care received for each incident.

**<u>OBJECTION & RESPONSE</u>**:

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, disproportionate to the claims in this case, and inflammatory. Plaintiffs further object to this Interrogatory because it provides no time frame for responsive documentation. Subject to and without waiving the foregoing objections, Plaintiffs respond NO to the entirety of the above Interrogatory. Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**<u>INTERROGATORY NO. 16</u>:**

State the full name, current address, and phone number for all witnesses, individuals, businesses, corporations, investigators, bloggers, non-profit organizations, journalists, media, etc. who you have spoken with, emailed, and/or corresponded with, about any aspect of the incident, including the City of Mesa's contacts with the DECEDENT, investigation, and/or any other discussion related to the claims in this LAWSUIT.

**<u>OBJECTION & RESPONSE</u>**:

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, and disproportionate to the claims in this case. Subject to and without waiving the foregoing objections, Plaintiffs respond that the only contact responsive to this Interrogatory is Plaintiffs' contact with Detective Ingram, who called Plaintiffs to inform them that Shawn had been killed by Mesa Police Department officers and an**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**autopsy was being performed. Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**<u>INTERROGATORY NO. 17</u>:**

Identify each and every cell phone number and land line owned or operated by the DECEDENT from April 2023 until July 7, 2024, to include the name of the service provider, account number, name of the account holder, address of the account holder and whether the phone is still in your possession.

**<u>OBJECTION & RESPONSE</u>:**

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, and disproportionate to the claims in this case. Plaintiffs further object that they cannot identify with any level of certainty each and every cell phone number and land line owned or operated by Shawn from April 2023 until July 7, 2024, nor any information associated with those cell phone numbers or land lines. Subject to and without waiving the foregoing objections, Plaintiffs respond that they are aware of two (2) phone numbers owned or operated by Decedent during the specified time frame: (818) 442-2303 (Verizon) and (661) 753-6190 (Spectrum). Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**<u>INTERROGATORY NO. 18</u>:**

Do you know of any person who is skilled in any particular field of science, including the field of medicine and police practices, whom you may call as a witness upon the trial of this action and who has expressed an opinion upon any issue of this action? If so, list all items provided to the expert(s) by you and your attorney, all items and/or facts relied upon by the expert(s) in rendering opinions, each opinion, the date of any report(s) prepared by the expert(s).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**<u>OBJECTION & RESPONSE</u>**:

**Plaintiffs object to the above Request as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, disproportionate to the claims in this case, premature, and duplicative. Plaintiffs further object on the grounds that this Request implicates attorney-client privilege and work product. The deadline for Plaintiffs to provide full and complete expert disclosure pursuant to the Rule 16 Scheduling Order issued by the Court is March 2, 2026. Plaintiffs will provide full and complete expert disclosure consistent with their obligations under Fed. R. Civ. P. 26(a)(2) on or before that date, at a time and place of Plaintiffs' own choosing. Plaintiffs reserve the right to supplement their response to this Request as discovery continues.**

**<u>INTERROGATORY NO. 19</u>:**

Do you or your experts intend to use or refer to any text, learned treatise textbook, periodical, standard, policy, poster, diagram, procedure or other publication during the direct or cross examination of any witness? If so, please list each textbook, periodical, standard, policy, poster, diagram or other publication as well as with which witness you intend to use same.

**<u>OBJECTION & RESPONSE</u>**:

**Plaintiffs object to the above Request as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, disproportionate to the claims in this case, premature, and duplicative. Plaintiffs further object on the grounds that this Request implicates attorney-client privilege and work product. Subject to and without waiving the foregoing objections, Plaintiffs respond that they will timely provide full and complete disclosure of materials consistent with their obligations under Fed. R. Civ. P. 26(e). Plaintiffs reserve the right to supplement their**

**response to this Request as discovery continues.**

**<u>INTERROGATORY NO. 20</u>:**

Please identify any statements or admissions Plaintiffs intend to introduce or use at trial under 801(d)(2), Fed. R. Evid., by any City employee or former employee, including the name of the person who made the statement, the date/time of the statement, and all persons present when the statement was made.

**<u>OBJECTION & RESPONSE</u>**:

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, disproportionate to the claims in this case, and premature. Plaintiffs further object on the ground that Fed. R. Evid. 801(d)(2) addresses whether a statement offered into evidence constitutes hearsay based on the identity of the declarant. No trial has been scheduled in this matter, and thus Plaintiffs have not offered any statements into evidence, nor will they for some time. Indeed, substantive discovery has yet to commence. Plaintiffs are still reviewing initial disclosures from Defendants. As such, Fed. R. Evid. 801(d)(2) is inapplicable at this time and Plaintiffs cannot produce any such statements. Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**<u>INTERROGATORY NO. 21</u>:**

List the name, address, and telephone number of all medical, substance abuse, and mental health care providers with whom each of the Plaintiffs' treated with or planned to treat with in the ten (5) years preceding the response date. This request includes, but is not limited to, any and all physicians, physician's assistants, nurse practitioners, nurses, chiropractors, hospitals, urgent care centers, psychiatrist, psychologists, therapists, counselors, addiction counselors/physicians, school therapists, physical therapists,

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

occupational therapists, vocational rehabilitation specialists, or social workers. Provide the dates of service and description of the condition for which examination, evaluation or treatment was sought.

**OBJECTION & RESPONSE**:

**Plaintiffs object to the above Interrogatory as overly broad, unduly burdensome with any likely benefit outweighed by such burden, impermissibly vague, disproportionate to the claims in this case, and duplicative. Subject to and without waiving the foregoing objections, Plaintiffs respond that they are unaware of any other providers responsive to this Interrogatory currently other than those medical records produced as GAGNE_006606-GAGNE_007168 - STG MedRecords 139548083-2_GAGNE_SHAWN_08_23_23. Plaintiffs reserve the right to supplement their response to this Interrogatory as discovery continues.**

**RESPECTFULLY SUBMITTED** this 28th day of March 2025.

**MILLS + WOODS LAW, PLLC**

By */s/ Sean A. Woods*
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiff/Counterdefendant*

**ORIGINAL** emailed March 28, 2025 to:

Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
Garrett Griggs, Bar #030525
**WIENEKE LAW GROUP, PLC**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

1225 West Washington Street, Suite 313
Tempe, Arizona 85288
kwieneke@wienekelawgroup.com
cretts@wienekelawgroup.com
ggriggs@wienekelawgroup.com
*Attorneys for Defendants*

By: */s/ Benjamin Dangerfield*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

# EXHIBIT 22
# (Non-Electronic Exhibit)
# Brown
# Body Worn Camera

# EXHIBIT 23
# (Non-Electronic Exhibit)
# Chuey
# Body Worn Camera

# EXHIBIT 24
# (Non-Electronic Exhibit)
# Goodrich
# Body Worn Camera

# EXHIBIT 25
# (Non-Electronic Exhibit)
# Harris
# Body Worn Camera

# EXHIBIT 26
# (Non-Electronic Exhibit)
# Navarro
# Body Worn Camera

# EXHIBIT 27
# (Non-Electronic Exhibit)
# Thomas
# Body Worn Camera

Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
Rebekah K. Browder, Bar #024992
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: cretts@wienekelawgroup.com
Email: rbrowder@wienekelawgroup.com

*Attorneys for Defendants City of Mesa, Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, and Thomas*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Christopher Gagne, in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne,

Plaintiffs,

vs.

City of Mesa, a political subdivision of the State of Arizona; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and in his capacity as a police officer; Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his individual capacity and in his capacity as a police officer; ABC Partnerships I-X; XYZ Corporations I-X; John Does I-X and Jane Does I-X,

Defendants.

NO. 2:24-cv-01337-SHD

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On the night of July 6, 2023, Shawn Gagne got on top of his girlfriend, Jordan Wirtjes, and put his hands around her neck during a physical altercation over what she wanted for dinner. After the altercation, when Jordan was attempting to flee the apartment, he threatened to shoot her for not packing her things and leaving fast enough. When she left the apartment and met up with a neighbor outside in the parking lot, Mr. Gagne fired a gun from his second-floor balcony while shouting that he would kill both of them if they did not clear the streets around his apartment. He armed himself with an AK-47 fitted with an optic, sat down in the dark, and waited with the rifle across his lap. He was roused sometime later by police ordering him to exit the residence, but instead of doing so, he paced his apartment holding the rifle. He threatened to open fire on officers if they did not leave his house and said that he had his weapons for a reason. He promised he would shoot at the patrol cars if they did not turn off their lights. He appeared again and again at his doors and windows with the rifle while he shouted threats to use deadly force over the phone to a police negotiator, and he held the high ground over officers whose vests could not stop his ammunition. When officers used lethal force against him that night, any reasonable officer would have understood Mr. Gagne to present an immediate deadly threat, because, after all, that is what Mr. Gagne was explicitly trying to communicate when he strangled Jordan, fired a shot into the air while threatening his neighbor, and told law enforcement that he would shoot them if they persisted in investigating those crimes.

The Court's October 15 Order narrowed this case to the eight officers who fired during the shooting and to a single claim against the City, while dismissing claims against the negotiators Adair and Orr. Under § 1983, the City only faces a *Monell* claim that it has a custom of "moving to the highest level of force when it is not necessary." (Doc. 132 at 4 n.3). Now that discovery has closed and the record has been developed, the Court should dismiss the remaining claims against the Defendants. The argument addresses the Fourth and Fourteenth Amendment merits, qualified immunity on the force and failure-to-intervene claims, the City's federal liability, the state-law defenses, punitive damages, and statutory costs and attorney fees.

# I. STATEMENT OF FACTS

## A. Before The Police Arrived

During an argument over dinner, Mr. Gagne got on top of Jordan Wirtjes and put his hands around her neck. (Doc. 79, Ex. 1). He armed himself with a handgun, told Jordan and a neighbor that he would "put a bullet right through your fucking skull," and fired a shot into the air from his patio while telling them to leave "before I kill both of you." (Doc. 79, Ex. 3 at 1:00-1:06, 1:56-2:03; Ex. 4 at 1:23-1:51). He then sat down in the dark with an AK-47 rifle across his lap until officers arrived. (Ex. 1, Living Room Video 2023-07-06 09-57-52 PM). An interior surveillance system recorded all of Mr. Gagne's actions inside the apartment, but no officer knew it existed or had access to it at the time. (Doc. 101 ¶ 164).

## B. What The Officers Knew

The neighbor called 911 at 9:33 p.m. The call comments relayed to officers stated that Mr. Gagne had threatened to "blow the reporting party's brains out," was armed with long guns (three AR-15s) and a handgun, had fired a round from his patio, and had a history of firing a weapon in his unit. (Ex. 2, Gutierrez Rpt., MESA_002000; Ex. 3, Orr Supp., MESA_002303; Doc. 63, Ex. 5, 911 Call (under seal) and Ex. 6, CAD Records at pp. 15-17, 20-21).[1] At the scene she repeated her account, and Officer Newby broadcast that officers had probable cause to arrest Mr. Gagne for aggravated assault.[2] (Ex. 4, Newby Supp., MESA_002279). Jordan told officers that Mr. Gagne was alone, heavily intoxicated, armed with an AR-15, a .45 caliber handgun, and a shotgun, and would be confrontational with officers. (Ex. 2, Gutierrez Rpt., MESA_002000; Doc. 63, Ex. 8, Gutierrez Body Camera interview of Jordan (under seal) and Ex. 6, CAD at p. 19). A post incident toxicology report later confirmed that Mr. Gagne's blood alcohol content was .218. (Ex. 28, Tox. Rpt., MESA_ MESA_002299).

---

[1] To comply with LRCiv 7.1 (d), which prohibits the refiling of exhibits, Defendants reference the prior filings where these exhibits were attached instead of reattaching the same.

[2] Although the officers did not have the interior surveillance video at the time, the video conclusively establishes that these events did in fact occur. (*See* Doc. 79, p. 3 and Exs. 1-3).

**C. The Standoff**

At 10:16 p.m. patrol officers began public-address announcements instructing Mr. Gagne to leave the residence, and when he did not respond they fired bean bag rounds at the door and a window to try and get his attention. (Ex. 5, Timeline, MESA_002373). At 10:26 p.m. he opened the front door holding the AK-47 style rifle and closed it again. (Ex. 6, Ingram Supp., MESA_002235; Ex. 7, Chuey Depo. 48:14-49:5; Doc. 63, CAD Ex. 6, pp. 23-24; Doc. 79, Ex. 9). Officer Freeman, a SWAT precision rifle instructor and the only sniper on scene, saw him through the one uncovered window “holding an AK-47 in high port with an optic on top of it.” (Ex. 8, Freeman Depo. 33:2-4). The other windows were covered with foil, and vertical blinds hung over the south sliding door. (*Id.* 30:19-31:2). Because Mr. Gagne “had the high ground on all of the patrol officers outside,” Freeman set up in a darkened second-floor apartment about forty yards away. (*Id.* 33:2-34:2; 44:15-17). Freeman understood that the patrol officers’ vests would not stop the AK-47’s high powered round, which could also pass through the stucco walls of the complex and endanger bystanders in the surrounding apartments. (*Id.* 51:5-51:12).

At about 10:32 p.m. a crisis negotiator, Officer Adair, reached Mr. Gagne on Jordan's phone. (Ex. 9, Adair Depo. 17:13-24; Doc. 63, Ex. 3, Negotiator Call). Over the next ten minutes he threatened Adair repeatedly: “You're about to have a fucking crisis if you don't get away from my fucking house. Back the fuck up. Right now. With all your fucking SWAT and all your gear, I don't give a fuck. Get the fuck out of my fucking face before I fucking start dropping shots in them." (Ex. 6, Ingram Supp., MESA_002260; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, Interior Videos Exs. 9-13). "I got AK's, I got fucking AR's bro. I'll fucking blow a fucking hole right through your fucking head." (Ex. 6, Ingram Supp., MESA_002261; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13). "I've got my fucking armor on. I've got my fucking guns ready. You guys want a fucking full Iraq war from one person, then you better fucking get right." (Ex. 6, Ingram Supp., MESA_002262; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13). "Shine that laser in my house one more time and I'll fucking unload." (Ex. 6, Ingram Supp.,

MESA_002260; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13). "You guys want to play fucking guns? You guys want to play guns? Let's fucking play guns bro." (Ex. 6, Ingram Supp., MESA_002261; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13). "If you guys fucking come into my vicinity, there are gonna be casualties, including myself." (Ex. 6, Ingram Supp., MESA_002261; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13). Adair could hear him loading rounds into a magazine, and the threats were relayed over the radio as the call went on. (Ex. 6, Ingram Supp., MESA_002261-62; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13; Doc. 63, Ex. 6, CAD at pp. 25-28). Throughout the call Mr. Gagne said that he was not coming out and that he wanted the officers to leave. (Ex. 6, Ingram Supp., MESA_002261; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13). He never offered to surrender. (Ex. 9, Adair Depo. 77:21-78:11; Doc. 63, Ex. 3, Negotiator Call; Doc. 79, pp. 3-4 summarizing Exs. 9-13).

Mr. Gagne repeatedly told Adair that he was not coming out and never offered to surrender—instead, he said that if officers came in he would start the next Iraq war. (Ex. 6, Ingram Supp., MESA_002261; Ex. 9, Adair Depo. 77:21-78:11; Doc 63, Ex. 3, Negotiator Call). Officer Gutierrez, standing beside Adair, updated other SWAT officers over the radio, including, after Adair reported hearing him load a weapon, that "he would shoot anyone that was by his house if they did not move." (Ex. 2, Gutierrez Rpt., MESA_002001; Doc. 63, Ex. 6, CAD pp. 25-28). Freeman, Harris, and Cameron heard the relays that Mr. Gagne would start shooting patrol cars and had chambered a round. (Ex. 8, Freeman Depo. 46:10-15; Ex. 6, Ingram Supp., MESA_002239, 002252; Doc. 63, Ex. 6 CAD at pp. 25-28). Officers could see that he was wearing body armor. (Ex. 7, Chuey Depo. 48:14-49:5).

The officers had information and believed that Gagne was armed with an AK-47, which utilizes a 7.62 X 39 cartridge that can defeat body armor, including some hard plates, penetrate multiple layers of drywall and glass, and cause substantial injury at substantial distances. (Ex. 7, Chuey Depo., 124:8-126:12; Ex. 8, Freeman Depo., 128:24-131:15). If Mr. Gagne had retreated into an unseen area of the apartment and had started firing, he

could cause significant injury or death to multiple people even without intentionally aiming at them. (Ex. 7, Chuey Depo. at 126:14-20). Had Mr. Gagne started firing, the officers would have had substantial difficulty containing the rounds, in part because the windows were obscured by objects, including foil. (*Id.* at 128:2-19).

**D. Freeman's First Shot**

After hearing that Mr. Gagne had said he would start shooting at patrol cars, Freeman watched Mr. Gagne walk past the uncovered window carrying the AK-47 at high port but held his fire because Mr. Gagne was too deep in the apartment for an effective shot. (Ex. 8, Freeman Depo. 46:10-47:5). When Freeman next saw him, Mr. Gagne was at the south sliding door above the patrol officers, parting the blinds with his left hand and holding the rifle in his right. (*Id.* 47:6-9; 68:8-15). Freeman believed that Mr. Gagne was looking through the blinds to shoot at the officers below as he had threatened to Adair, so Freeman fired a round at the gap in the blinds. (*Id.* 46:10-23; 68:16-20; 49:19-24). Officer Widmer, arriving as the second sniper, saw Mr. Gagne at the slider "attempting to look at the officers on the ground level while still holding a rifle." (Ex. 10, Widmer Supp., MESA_002380). The interior camera, which officers did not have access to at the time, shows Mr. Gagne walking toward the slider with the rifle in both hands at a low ready, then moving out of frame. (Ex. 11, Living Room Video 10-41-20 at 1:10). At the moment of the shot, he cannot be seen. (*Id.* at 1:20-1:25). The camera shows only the tip of the barrel resting on the kitchen counter, "still moving as if the stock was still being held up," then dropping to the floor. (*Id.* at 1:25-1:45; Ex. 12, Handy Rpt. at 19, MESA_008939; Ex. 13, Noedel Rpt., MESA_008965, 008968). Officer Freeman was specifically concerned about the threats made, Mr. Gagne's elevated position, the AK-47 weapon that could penetrate vehicles, the risk to civilians, the reported chambering of a round, and his belief that immediate action was necessary to stop an ambush. (Ex. 8, Freeman depo, 67:6-73:3). There is no evidence that this shot was fatal. (Doc. 63, Ex. 1, Medical Examiner's Report, p. 2, 5-6 (atypical gunshot wound, fractures without grossly apparent penetration into the intracranial space; perforating gunshot wound to the soft tissues)).

### E. The Perceived Return Fire and The Second Shot

Forty-three seconds later, at 10:43:20 p.m., officers around the perimeter heard a second gunshot. (Ex. 5, Timeline, MESA_002373; Doc. 63, Ex.6 CAD at 27; Doc. 63, Ex. 11, Helicopter Video). It sounded loud and unsuppressed, unlike the suppressed rifles used by the SWAT officers, including Freeman. (Ex. 14, Harris Depo. 78:11-22). Harris radioed, "the suspect is firing out at us," and Brown said, "He's shooting out." (Ex. 6, Ingram Supp., MESA_002255, 002257; Doc. 63, Ex. 6 CAD at 27). Freeman had watched Mr. Gagne go down after the first shot, get back up, and return to the slider with the rifle at high port. (Ex. 8, Freeman Depo. 78:22-24; 79:17-22). One second after the unsuppressed shot, Freeman fired a second round at Mr. Gagne. (*Id.* 80:2-10; Ex. 5, Timeline, MESA_002373). Mr. Gagne then moved north, out of Freeman's view. (Ex. 8, Freeman Depo. 81:3-8).

Ater the fact analysis by Defendants' reconstruction expert explains that the rounds fired by police crossed the living room and shattered the far sliding door to the north patio, so that "[t]he shattered glass on the opposite side of the living room would appear to an outside observer as projectiles coming from inside the apartment." (Ex. 13, Noedel Rpt., MESA_008982; Doc. 63, Ex. 11, Helicopter Video). Defendants' police practices expert concludes that "it was understandable, based on video evidence, why the officers' perceived Gagne was either preparing to shoot or had shot through the windows in the direction of officers." (Ex. 12, Handy Rpt. at 21). Plaintiffs' expert describes the same events as "friendly crossfire by the SWAT team" whose rounds "were erroneously attributed to Mr. Gagne." (Ex. 15, Hafkey Rpt. at 19, GAGNE_007743).

### F. The First Volley

At 10:44:17 p.m. Harris, thirty-five feet from the north patio, heard a second set of shots and saw glass leaving the north slider, which he understood as rounds coming out. He radioed that the suspect was firing out the north window. (Ex. 14, Harris Depo. 67:10-71:8; 75:7-76:17; Ex. 6, Ingram Supp., MESA_002255-58; Ex. 5, Timeline, MESA_002373; Doc. 63, Ex. 11, Helicopter Video). Thomas heard "an audible different set of gunfire," saw smoke and glass come out of the south slider and muzzle flash light the room, saw

movement low in the slider consistent with someone kneeling, and fired three to four rounds at that spot. (Ex. 16, Thomas Depo. 75:17-78:1). Chuey heard shots from inside, saw glass splinter on the north patio and muzzle flash, and fired through the drywall at the flash. (Ex. 7, Chuey Depo. 60:16-65:7). Brown and Navarro each believed they saw Mr. Gagne at the window beside the west slider holding what they took to be a rifle and fired. (Ex. 6, Ingram Supp., MESA_002247-49).

The interior camera shows that as the volley began, Mr. Gagne was crossing the living room toward that window, hunched forward, with his hands beside his head, his elbows out in a manner that could have been reasonably mistaken for a firearm. (Ex. 17, Living Room Video 10-44-09 at 0:13-0:20; Ex. 12, Handy Rpt. at 19). He fell down the stairs toward the front door, and shouted "I'm down," though he had left his phone in the living room, so his voice was only distantly audible, and he was no longer in direct communication with negotiators. (Ex. 17, Living Room Video 10-44-09 at 0:16-0:30; Ex. 6, Ingram Supp., MESA_002262). As a result of Mr. Gagne's movements and his blocking of the windows with tin foil and blinds, no officer had a clear view inside the apartment. (Ex. 6, Ingram Supp., MESA_002235, 002239; Ex. 8, Freeman Depo. 30:16-31:2).

### G. The Doorway Volley

After a pause of about thirteen seconds, the front door "flew open." (Ex. 14, Harris Depo. 79:4-84:3; Ex. 13, Noedel Rpt., MESA_008977-78). Chuey, watching through magnified optics, saw an object that "resembled a firearm" pointed toward the team. (Ex. 7, Chuey Depo. 76:7-77:20). Goodrich saw Mr. Gagne's right side bladed in the doorway, his body armor, and what he thought was a rifle at "low port." Cameron said, "it looked like the suspect was holding a rifle in his right hand." (Ex. 6, Ingram Supp., MESA_002245, 002252). Harris said he saw a rifle magazine and the suspect had no hands visible and exhibited no sign of surrender. He ultimately fired because he perceived an imminent or immediate threat of serious physical injury or death. (Ex. 14, Harris Depo. 81:25-85:22). One to two seconds passed between the door opening and the shots. (Ex. 14, Harris Depo. 107:6-108:20). Harris, Goodrich, Chuey, and Cameron fired. (Ex. 13, Noedel Rpt.,

MESA_008978). Officer Chuey believed that, under A.R.S. § 13-410, Gagne met the statutory criteria of likely endangering human life or inflicting serious bodily injury unless apprehended without delay; Mr. Gagne possessed a weapon system capable of causing serious injury or death to officers and civilians. (Ex. 7, Chuey Depo., 126:14-128:19). He did not provide a warning because his perception was that Mr. Gagne was armed, he had engaged in previous dangerous and threatening behavior, had body armor, and when he opened the door, he was partially obstructed and was in a position of advantage. (*Id.* at 74:1-76:5, 76:7-77:20, 92:16-95:16).

When he fired, Sgt. Harris knew that Mr. Gagne was reported to have fired shots days earlier, on July 4, which was significant as recent weapons, violence, or criminal history heightens the threat recognition because it supplies more than a verbal threat: It reflects prior conduct, means, motive and opportunity. (Ex. 14, Harris Depo., 110:16-112:18). In addition, domestic violence incidents are routinely volatile and Mr. Gagne's possession of the AK-47 weapons platform, coupled with his repeated threats, posed an imminent danger. (*Id.* at 112:23-118:25). Had Mr. Gagne started firing, at any point, this incident could have become a mass-casualty event and officers could not have effectively prevented such lethal violence if Mr. Gagne had followed through on the threats. (*Id.* at 119:1-18).

Later, when officers were able to safely approach, they found Mr. Gagne was wearing a plate carrier, and an AR-15 magazine and boxes of ammunition lay beside him at the door. (Ex. 6, Ingram Supp., MESA_002246, 002251). The AK-47 lay upstairs on the kitchen floor. (Ex. 13, Noedel Rpt., MESA_008965).

Adair took "I'm down" to mean that Mr. Gagne might have been hit. He did not understand the words as a surrender, because Mr. Gagne had said nothing about coming out and had said the opposite throughout the call. (Ex. 9, Adair Depo. 33:2-3; 77:21-78:11). The last shots were fired at about 10:44:39 p.m., and shortly afterward Adair called "weapons down." (Ex. 6, Ingram Supp., MESA_002256-58; Doc. 76, Ex. 2 at 10:44:50-58; Ex. 9, Adair Depo. 81:16-18). After the volley, Chuey could see Mr. Gagne's leg in the

doorway, and Thomas heard over the radio that the suspect was down by the front door. (Ex. 6, Ingram Supp., MESA_002243, 002251).

### H. Ballistic Reconstruction

Not all of the shots fired hit Gagne or were even directed at him. The Medical Examiner's report identifies six distinct shots. (Doc. 63, Ex. 1). Expert Noedel's report contains a scene diagram, positions of the officers, and their distances from Gagne (ranging from 70 feet to 115 feet). (Ex. 13, Noedel Rpt., MESA_008963). A total of 49 gunshots were discharged from police weapons, but 43 of the fired bullets did not strike Mr. Gagne. (*Id.* at MESA_008979). There were multiple firearms and ammunition located in the Gagne residence including: (1) a Riley Defense RAK47, AK47 style rifle containing steel full metal jacket projectiles, the rifle safety lever was down (in the fire position), and there was an extended magazine. There was a 7.62 fired cartridge case nearby; (2) a Typhoon model F12, 12 gauge semiautomatic shotgun, loaded with low base shotshells and there were numerous shotgun shells in the residence; (3) a Springfield model XD semiautomatic pistol with a loaded magazine. A fired handgun cartridge was located on the floor inside the bedroom door; (4) a M&P rifle with loaded magazine was documented on the shattered glass on the exterior deck; and (5) a third documented fired cartridge case was located on the shattered glass of the porch. (*Id.* at MESA_008965-66).

**Officer Freeman**: Fired two rounds. (*Id.* at MESA_008969). The first projectile traveled through the double pane tempered glass, which can cause a fired bullet to break apart creating multiple fragments. *(Id.)* The wound to Mr. Gagne's face, the small "through and through" gunshot wound that entered his right upper lip and exited near his jaw, is consistent with the fragment of a fired bullet hitting Mr. Gagne rather than a complete fired .308 bullet directly striking him. *(Id.)* The additional impacts were consistent with fragments coming from the fragmentation of Officer Freeman's bullet that hit the side wall over the dining room table, impacted the refrigerator and perforated through the kitchen wall. (*Id.* MESA_008969-008973).

***Officers Navarro, Brown and Sgt. Thomas***: After Freeman's shots, Officer Navarro fired once, Brown fired three times, and Thomas fired two times. (*Id*. at MESA_008977). Sgt. Thomas directed his gunfire at the lower corner of the kitchen window, as he saw the blinds moving there. (Ex. 16, Thomas Depo. 75:17-78:1). Sgt. Thomas believed that an imminent threat existed because he thought the subject had fired toward officers, threatened to shoot police and was moving near the slider. (*Id.* at 86:20-87:16). These gunshots all appear to have missed Mr. Gagne and several crossed the living room to hit and shatter the opposite sliding glass door, hanging light over the front door and other locations inside the apartment. (Ex. 13, Noedel Report, MESA_008977; Doc. 63, Ex. 11, Helicopter Video at 1:40-45 (three shots exit)).

After rounds exited the slider glass door, the officers reasonably believed that Mr. Gagne was firing and delivered multiple rounds toward the structure of the patio, which are visible as flashes of light hitting the railing and stucco. (Doc. 63, Ex. 11, Helicopter Video at 1:44-47). Officer Chuey had previously seen Mr. Gagne wearing a ballistic vest/plate carrier, knew about the events that caused the call, and had seen Mr. Gagne holding a rifle. (Ex. 7, Chuey Depo., 51:9-52:15, 56:8-16). Chuey also previously saw Mr. Gagne come to the front door with a dark object and believed it was the gun he had previously seen Mr. Gagne holding. (*Id*. at 59:18-60:5, 72:11-73:25). He later heard Freeman's gunfire and what sounded like a round from inside the apartment. (*Id.* at 60:6-61:16). Chuey then saw glass splinter on the north-side patio door and he fired toward the direction of the glass splintering. (*Id*. at 61:17-65:7). Chuey specifically aimed at the drywall to the right of the sliding door because he reasonably believed that Mr. Gagne was near that location and intended to stop him from shooting. (*Id*. at 67:9-68:18). Unknown to Officer Chuey and the other officers firing toward this location, Mr. Gagne was not at this location but had gone down to the front door. (Ex. 13, Noedel Rpt. at MESA_008978).

**I. After The Shooting**

The last volley left Mr. Gagne down in the doorway, partly hidden by a pony wall and by the door that had fallen across him, and the officers could not tell whether he was

dead, unconscious, or lying in wait to ambush them. (Ex. 6, Ingram Supp., MESA_002241, 002251). To determine whether it was safe to approach, officers deployed gas, a drone, and a canine into the apartment, which did not generate a hostile response. (Ex. 5, Timeline, MESA_002373; Ex. 6, Ingram Supp., MESA_002251, 002243; Ex. 7, Chuey Depo., 122:4-123:2). Meanwhile Adair was still on the phone, trying to communicate that medical personnel were on scene but could not come to him until he had surrendered and it was safe to do so. (Ex. 3, Orr Supp., MESA_002303). Adair received no response and heard only what he believed to be sounds of movement and labored breathing. *(Id.)* At 11:15 p.m., an officer approached and deployed a Taser to ensure that Mr. Gagne was incapacitated, but it produced only a muscular response. (Ex. 5, Timeline, MESA_002373; Ex. 6, Ingram Supp., MESA_002251). The entry team pulled Mr. Gagne from the residence to the waiting paramedics, who began lifesaving measures at 11:19 p.m. (Ex. 6, Ingram Supp., MESA_002251; Ex. 5, Timeline, MESA_002374). Mr. Gagne was pronounced dead at 11:41 p.m. (Ex. 5, Timeline, MESA_002374).

**J. Psychological Assessment-Analysis of Violence**

Dr. Katherine Kuhlman conducted a threat assessment addressing: (1) the decedent's aggressive and violent behaviors prior to the July 6, 2023 shooting; and (2) the decedent's behaviors on July 6, 2023, which suggested an increased threat for violence. (Ex. 18, Kuhlman Report at MESA_008876). The historical records evidence multiple instances of aggressive and violent behavior and that, "despite the implementation of various countermeasures/interventions, the decedent continued to engage in boundary probing, attack-related behavior, and attack behaviors. This suggests that he either did not have control over his impulses, and/or chose to disregard rules when it suited him." (*Id.* at MESA_008888). The behaviors on July 6, 2023, likewise, suggested an increased threat of violence. *(Id.)* The "decedent was a threat for both reactive and proactive attack behaviors." (*Id.* at MESA_008896). "From approximately 18:50 to 20:40, the decedent routinely engaged in attack-related behavior, including at least five instances of dehumanization (name-calling) toward Jordan, with additional instances toward their neighbor, and seven

threats (including five threats to kill). He also engaged in additional attack behaviors, including throwing a bottle across the room, and throwing their Swiffer mop." (*Id.* at MESA_008897). The decedent continued to escalate from 20:40, around when Jordan left, to 22:19, when Mesa Police arrived. *(Id.)* He continued to threaten and dehumanize the neighbor and made six threats--most of which were to kill, before calling Jordan to ask where his AK47 was located. *(Id.)* "His continued dehumanization and threat-making is notable, given that verbal threats, violent rhetoric, and dehumanizing language is connected to escalation toward physical aggression, as it normalizes harm and erodes inhibitions (Cornell & Sheras, 2006)." *(Id.)* While on the phone with Jordan and subsequently the negotiator from Mesa, he made 16 threats before putting on body armor. *(Id.)* "In situations outside of law enforcement or military operations, wearing body armor can indicate anticipation of a firefight or violent encounter. The decedent's decision to put on body armor is another indication of proactive attack-related behavior, as it suggests readiness to use force if necessary." *(Id.)* As Sgt. Thomas noted, putting on body armor "means they're not messing around…it's an indicator that they're going to fight it out with the cops." *(Id.)* Dr. Kuhlman noted that "this defiance of authority is often a critical factor in escalating tensions and increasing the perceived threat level. The decedent's interactions suggest a heightened state of agitation and resistance, both of which are key indicators of a potential for further violence." (*Id.* at MESA_008897-98). Mr. Gagne made three additional threats to kill law enforcement before putting on ear protection, "such verbal aggression indicates a psychological readiness to engage in confrontation, highlighting his lack of regard for consequences and a sense of desperation or anger." (*Id.* at MESA_008898). As Sgt. Thomas noted, this scene was in the top 10% of dangerous scenes and suspects that he had encountered. *(Id.)* As Dr. Kuhlman opined:

> The decedent's behavior during the aforementioned interactions can be categorized into several concerning indicators: a lack of respect for authority, elevated aggression when challenged, and an apparent lack of fear of repercussion. This combination not only elevates the immediate risk of violence but also demonstrates an entrenched pattern of behavior that

> undermines peaceful resolution efforts. This explains why law enforcement de-escalation and negotiation efforts proved unsuccessful. The decedent's escalating attack-related behaviors, including serious threats, and attack behaviors, resulted in him being an increased risk for violence.

*(Id.)*

**K. The Body Camera Footage**

The officers' body camera footage in this case is of limited value given the visual obstructions caused by Mr. Gagne's elevated position, the tin foil covering his windows, and the officers' stances in holding their firearms in front of them while responding to the mortal threat. None of the officers' footage captures a clear image of Mr. Gagne or his activities in the apartment, and in that respect, they reflect the limited view the officers themselves had of the apartment during the incident. However, the videos are attached in full as Exs. 22 through 27 for the Court's perusal, because they corroborate the officers' accounts of the facts known to them, identifies their relative positions and the visual challenges they faced, and provides the backdrop for the threat that Mr. Gagne posed to them and to the civilians who could not be evacuated from their residences.

**L. The City**

***1. Training and Review***

Freeman, a SWAT precision rifle instructor, testified that he trained on the Fourth Amendment standards of *Graham v. Connor*, *Tennessee v. Garner*, and *Scott v. Harris*. (Ex. 8, Freeman Depo. 8:19-9:25, 16:13-23; 28:8-15; 39:14-19). Freeman completed basic SWAT training, hostage rescue training, and training on multiple different less-lethal platforms. (*Id.* at 12:21-15:7). He was trained that deadly force is acceptable when his or another person's life is in danger, or serious physical injury is imminent or immediate. (*Id.* at 15:11-25). He was trained on de-escalation techniques, including time, distance, officer presence, marked vehicles/uniforms, armored vehicles, SWAT presence, verbal commands, communications, and less-lethal munitions. (*Id.* at 17:24-19:13). He attended a 50-hour sniper-instructor school, which taught him to develop and teach basic sniper curriculum, optics, bullet flight and impacts. (*Id.* at 20:14-21:24). Freeman's basic sniper school was

conducted in Northern Arizona; he also attended advanced urban sniper school, as well as weekly team/agency trainings. (*Id.* at 21:25-22:13). SWAT members receive advanced firearms and tactical training, including weekly firearms training. (*Id.* 27:18-29:9). As a result of this more advanced training, on a scene, patrol officers ordinarily will establish a perimeter, and a supervisor responds to make on-scene leadership decisions. (*Id.* at 27:18-29:9). The City of Mesa has a use of force policy that echoes the training and requires objective reasonableness. (Doc. 76-2, Ex. 5, Use of Force DPM 2.1.1).

Defendant Chuey testified that SWAT members receive extensive training, that he was trained as a sniper having completed a 40-hour sniper school, and is a firearms instructor having completed the 80-hour AZPOST instructor course. (Ex. 7, Chuey Depo., 10:19-18:1, 21:14-22:5). Part of Mesa's firearms training also includes a "decision shoot," in which officers are assessed on their decision-making using live fire, videos, or role play. (*Id.* at 23:16-25:13). Officers are trained on the Graham standard, imminent threat, a suspect's opportunity, jeopardy, ability, and sanctity-of-life. (*Id.* at 25:14-29:15, 40:10-43:7).

At the time of this incident, Sgt. Harris had been with SWAT for approximately 12 years. (Ex. 14, Harris depo, 22:21-23:15). He was trained on *Graham v. Connor*, *Tennessee v. Garner*, and *Scott v. Harris*, and he also attended the 80-hour SWAT school, 40-hour hostage-rescue school, and specialized weapons training that is different from patrol officers. (*Id.* at 23:17-32:12, 48:25-50:5). Sgt. Harris was also trained as a sniper, serving in that position from 2008-2013, where he was deployed as a sniper hundreds of times, but never fired his rifle. (*Id.* at 32:12-35:19).

Sgt. Thomas started as a full-time SWAT member sometime in 2010 to 2011 and attended the same type of training as the other officers, including the 80-hour SWAT school. (Ex. 16, Thomas Depo., 8:6-22,16:18-17:24). In addition to all of the department training, SWAT trained weekly in four-hour blocks. *(Id.)* The department provided annual training, and he received constitutional-law training, periodic legal updates, and department training on Fourth Amendment and constitutional-rights issues. (*Id.* at 17:15-18:16). In 2010 Sgt.

Thomas completed the Arizona POST general instructor program and thereafter taught SWAT school, hostage-rescue school, and recurring SWAT-team training. (*Id*. at 30:4-31:12). Training topics included avoiding "contagious fire" (i.e. firing simply because another officer is firing without independently articulating a reason) and also how to articulate the threat and force decision. (*Id*. at 38:4-39:8). The Department's training also includes the ICAT model and de-escalation training. (*Id*. at 41:20-45:8). SWAT team members must pass the AZ POST annual decision shooting analysis (scenario-based shoot/no-shoot/less-lethal decision making) and also separate SWAT rifle qualifications. (*Id*. at 49:3-18). SWAT trained routinely on deadly-force and less-lethal scenarios. (*Id*. at 50:5-17). Force decisions are based upon the crime severity, threat to officers or the public, resistance and flight; officers may use negotiators, time and other means as circumstances warrant. (*Id*. at 51:6-22, 56:2-57:10).

The training records of all involved officers, attached as Ex. 19, document extensive and consistent training.[3]

Plaintiffs' police practices expert acknowledges that use-of-force training, "especially for SWAT officers, is probably the most prolific training that police officers receive," and that SWAT officers "receive advanced tactical and firearms training, and they train more than any other police unit, particularly sniper trained officers." (Ex. 15, Hafkey Rpt. at GAGNE_007737, 007739). He offers no opinion that any officer's training was deficient.

### 2. *The Four Prior Incidents That Remain in the Case*

Plaintiffs' custom theory rested on sixteen incidents pleaded in the Third Amended Complaint. (Doc. 101 ¶¶ 186-211). In ruling on the City's motion to dismiss, the Court disregarded the incidents that did not involve an officer shooting an unarmed individual and the incidents that carried no indication that the force was unconstitutional, which excluded

---

[3] All of the involved officers' and sergeants' training records have been combined into a single exhibit as otherwise there would be twenty separate exhibits of the training records.

every non-lethal use of force, every shooting of an armed suspect, and the December 2023 shooting of David Dimas. (Doc. 132 at 12-13 & n.8). Four incidents remained: the January 2016 shooting of Daniel Shaver, the April 2017 shooting of Sariah Lane, the December 2019 shooting of Randy Sewell, and the September 2020 shooting of Angel Benitez. (*Id.* at 13).

Everything Plaintiffs have offered about those four incidents is contained in four paragraphs of their complaint. They allege that Shaver was shot "as he crawled unarmed toward [officers] at their request" and that the City paid approximately $9,500,000 in settlements; that Lane "was not armed and not suspected of any crime" and that the City paid $2.45 million to settle; that Sewell "was unarmed and not suspected of a serious crime," was acquitted of resisting arrest, and that the City paid $1.75 million to settle; and that Benitez "was unarmed and shot by multiple officers as he was following their instructions to exit the vehicle he was in" and that the City paid $250,000 to settle. (Doc. 101 ¶¶ 201-02, 205-06). The complaint does not allege that any of the four involved a barricaded subject, a SWAT deployment, a subject armed with a firearm while wearing body armor, or a subject who had directly threatened to kill officers if they did not meet his demands. *(Id.)* It does not allege that any court, jury, or other adjudicator found that the force used in any of the four was unconstitutional. *(Id.)* The Court observed, on the City's showing at the pleading stage, that "the prior shootings involved patrol officers in different settings, and . . . none involved a SWAT callout." (Doc. 132 at 13).

The facts of the Shaver/Sweet case and related facts are set forth in the following published court decision: *Sweet v. City of Mesa*, 2022 U.S. Dist. LEXIS 20743 (D.Ariz. Feb. 4, 2022). On January 18, 2016, Mr. Shaver was called out of his hotel room by patrol officers after there was a report of a rifle being pointed out of a window. *Id.* at *4. When he exited the hallway, he was unarmed and given commands to crawl toward the officers. *Id.* at *7. Prior to crawling, he lay on the ground where his shorts revealed “his entire lower back and the tops of his buttocks.” *Id.* The Sergeant yelled numerous commands and told him he would be shot if he did not comply. *Id.* at *8. As he was crawling, he moved his

hand to the back of his waistband and Officer Brailsford fired shots. *Id*. The Court found that Shaver was both unarmed at the time he was shot and that the crime he allegedly committed was not severe and that thirty minutes had elapsed since the original 911 call. *Id.* at *17. He was also not resisting arrest or attempting to evade arrest, instead he was crawling on his hands and knees toward police while sobbing. *Id*. at *18, 20. Notably, the Court also dismissed the *Monell* claim against Mesa, finding that there was no evidence of any claimed unofficial custom or practice of sanctioning the use of excessive force based upon news articles and one prior incident involving Officer Brailsford. *Id*. at 36-38. Officer Brailsford was also fired by the City of Mesa and was criminally charged, but acquitted. *See* Maricopa County Superior Court case CR2016-004743. *See Sweet v. City of Mesa*, 2019 U.S. Dist. LEXIS 129362, *6, *18 (D.Ariz. Aug. 2, 2019) (Officer Brailsford was terminated from the department). Contrary to Plaintiffs' allegations, it is false that there was no discipline or resulting consequences for the involved officer.

The facts of *Lane v. City of Mesa* are set forth in the District Court's Summary Judgment ruling. 2021 U.S. Dist. LEXIS 266707 (D.Ariz. Nov. 8, 2021). On April 10, 2017, officers—who were part of the USMS Violent Offenders Task Force—were attempting to locate a suspect, who had a lengthy criminal gang history and a probation violation. *Id*. at *2-7. Due to violence and reports that the suspect was armed, the officers used a vehicle containment to stop the vehicle, which also contained the suspect's girlfriend. *Id.* at *7-8. As the officers approached and the subject appeared to be digging around in the console, officers fired rounds toward the suspect. The back-seat passenger was also hit by gunfire and killed. *Id*. at *10. In ruling on the summary judgment, the Court found a dispute of fact as to whether the force was excessive due to hitting the unintended passenger. *Id*. at *31. The court found that the law was clearly established that "shooting unarmed vehicle occupants in a stationary vehicle, who were complying with officer commands and posing no risk or harm to officers or others, violated the Fourth Amendment prohibition on unreasonable seizures and excessive force." *Id*. at *35-36. The Court also dismissed the *Monell* claim, finding no prior similar excessive force claims, no prior finding of a

constitutional violation in the alleged prior force incidents, and the prior three federal cases that plaintiff relied upon "did not put the Mesa Police Department on notice of a training problem." *Id*. at *44. USMS Task force actors should be considered federal actors, not state actors. *Van Loo v. United States*, No. 3:23-cv-05618-DGE, 2025 WL 692484 (W.D.Wash. March 4, 2025) ("[s]pecifically as to USMS Fugitive Task Forces, every court to have considered the issue has held that these Task Forces and their members (including deputized local or state law enforcement) are acting pursuant to federal law and federal authority.").

The *Sewell* case was filed in federal court, case 2:21-cv-02036-DJH-MHB. Plaintiff alleged that on December 6, 2019, Randy Sewell was at a bar and was asked to leave. (Doc. 1, ¶¶ 10-12). The manager called the police requesting that Sewell be placed on a trespass log. (*Id*. at 13). Officers allegedly moved to arrest plaintiff without stating he was under arrest and without advising him of the reason. (*Id*. at 22). The officers then deployed Tasers and strikes. (*Id*. at 24). Officer Chisler then shot plaintiff, shattering his femur. (*Id*. at 26). Officer Chisler was fired by the City of Mesa on June 25, 2020 and he was criminally charged with aggravated assault in Maricopa County Superior Court case CR2020-00275. Once again, Plaintiffs' allegation that there were no consequences or discipline is wrong.

The shooting involving Angel Benitez occurred on September 25, 2020, during a standoff with police in a parking lot. (TAC ¶ 206). The Notice of Claim served by the family is publicly available and it specifically alleges that Mr. Benitez was unarmed at the time he was shot in a parking lot and that he was compliant. *See* https://www.scribd.com/document/500168342/Sandoval-benitez-notice-of-Claim-final. The criminal investigation into the shooting was conducted by Tempe Police, not the Mesa Police Department.

Plaintiffs' Fifth Supplemental Disclosure Statement, served June 9, 2026, identifies no witness with knowledge of any of the four incidents and does not disclose documents relating to the case. (Ex. 20, Pls.' Fifth Supp. Disclosure). Their police practices expert does not even mention them. (Ex. 15, Hafkey Rpt., GAGNE_007725-54).

Count IV alleges that the City "made the affirmative choice to not use any of the use of force incidents detailed herein to train its police officers on impermissible uses of force," and "did not showcase these incidents within the Police Department as officer involved shootings where the employment of lethal force violated policies and procedures and officer training and expectations." (Doc. 101 ¶ 273). These are bald allegations unsupported by facts. Plaintiffs did not ask any of the deposed officers about their knowledge of these shooting incidents. Moreover, each officer testified to extensive training on all aspects of use of force, such that Plaintiffs cannot prove that these four prior isolated instances, involving fundamentally different facts, were the “moving force” behind the violation such that it was both the proximate cause and cause in fact.

Count IV does not allege that the City knew of any Shooting Officer's propensity to use unjustified deadly force. (*Id.* ¶¶ 269-75). Plaintiffs' disclosure statement does not identify a witness, document, or standard describing the training they contend the City was required to give, and no witness or document concerning any officer's propensity. (Ex. 20, Pls.' Fifth Supp. Disclosure). Their police practices expert offers no opinion on either subject, instead criticizing the specific decisions by supervisors on the scene. (Ex. 15, Hafkey Rpt. at 28-30, GAGNE_007752-54).

## II. LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," and the nonmovant must answer with admissible evidence, not allegations. Fed. R. Civ. P. 56(a), (c)(1)(A), (c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Where video exists, the Court views the facts "in the light depicted by the videotape," and once the facts are settled, the reasonableness of force "is a pure question of law." *Scott v. Harris*, 550 U.S. 372, 380-81 & n.8 (2007).

///

///

///

## III. THE SHOOTING OFFICERS ARE ENTITLED TO JUDGMENT ON THE CONSTITUTIONAL MERITS

### A. The Shooting Officers Did Not Violate the Fourth Amendment

Force used in a seizure is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," with "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Deadly force is permitted "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). As this Court has observed, "[t]here are many scenarios in which shooting at an armed suspect is constitutional." (Doc. 132 at 8 (citing *Scott v. Henrich*, 39 F.3d 912, 915-16 (9th Cir. 1994))).

The analysis is not isolated to the moment the shot was fired but based on the totality of the circumstances that the officers were confronted with. *Barnes v. Felix*, 605 U.S. 73, 80 (2025). The totality of the circumstances "has no time limit," and "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *(Id.)* Those circumstances are based on what a reasonable officer would have perceived from their perspective and does not require that officers be perfect observers: “Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of" a threat, and "in those situations courts will not hold that they have violated the Constitution." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). The analysis is focused not on whether the mistake of fact occurred, but "whether a reasonable officer would have or should have accurately perceived" the true fact. *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). It follows then that in an armed standoff, whether the suspect actually fired is "immaterial" when officers reasonably believed he had. *Long v. City & County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007); *Sabbe v. Washington County Board of Commissioners*, 84 F.4th 807, 827 (9th Cir. 2023). And the Fourth Amendment does not require officers to "delay their fire until a suspect turns his weapon on them. If the person

is armed — or reasonably suspected of being armed — a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). While the interior surveillance footage provides additional context to the shooting and corroborates the officers' account that he was armed and making violent threats, "[T]he analysis focuses on what the officers knew in the moment, not what became known hours, days, or weeks later," *Ochoa v. City of Mesa*, 26 F.4th 1050, 1058 (9th Cir. 2022). And an expert's criticism of an officer's tactics does not, by itself, defeat qualified immunity where a reasonable officer could have believed the conduct was justified. *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1777 (2015) (quoting *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002)).

***Severity of the Crime at Issue***: *Barnes* directs the Court to consider the totality of the circumstances, which includes what officers knew of Mr. Gagne's conduct before the first shot was fired. By then the officers knew that Mr. Gagne had fired a gun from his balcony while threatening to kill two women, that he was wearing body armor, that he had an AK-47 with an optic and that both he and a witness said he had additional weapons in the home.

The decedent committed dozens of felonies and misdemeanors before any force was used:

- Multiple counts of aggravated assault and/or domestic violence against his girlfriend, choking her on the bed while she was restrained then threatening to kill her while discharging a weapon. A.R.S. § 13-1203-1204 (A)(2)(4) & (B)(1)(2); A.R.S. § 13-3601 (A)(1). When the domestic violence involves the discharge of a weapon or threatened use of a weapon, a peace officer "shall" arrest. *See* A.R.S. § 13-3601 (B)(1). An officer may seize all involved firearms pursuant to subsection (C).
- Aggravated assault against the neighbor (threatening and shooting his firearm off of the patio). A.R.S. § 13-1204.
- Multiple counts of aggravated assault against all police officers present, including the Defendants, when Mr. Gagne verbally threatened to kill them, dump shots in

them, while pointing a firearm on multiple different occasions. A.R.S. § 13-1203 (intentionally placing another person in reasonable apprehension of imminent physical injury) & A.R.S. 13-1204 (A)(2) & (8)(a).

- Multiple counts of resisting arrest, pursuant to A.R.S. §13-2508(A)(1) & (2), by threatening to use physical force against a police officer and using any other means creating a substantial risk of causing physical injury. Violations of subsections 1 and 2, which both occurred, are class 6 felonies.
- Criminal negligence in violation of Shannon's law by discharging a firearm on the patio of his apartment, a class 6 felony. *See* A.R.S. § 13-3107.
- Knowingly wearing or using body armor while committing a felony offense. *See* A.R.S. § 13-3116.
- Multiple counts of disorderly conduct with a firearm, several misdemeanors (violent or seriously disruptive behavior and uses abusive or offensive language) and a felony (recklessly handles, displays or discharges a deadly weapon). *See* A.R.S. § 13-2904(A)(1)(3), (6). Where Plaintiffs admit that the decedent was highly intoxicated, he was necessarily "reckless" in all actions he took related to the firearms.

Mr. Gagne was a deadly threat to his girlfriend and their neighbors before police ever arrived, and his actions upon making contact with police did nothing to communicate that the threat had abated at all. Instead, he escalated his threats and presented as an individual with homicidal intent who wanted to start his own personal war, while donning ear protection and body armor. Adair heard him chamber a round and promise to shoot officers and patrol cars, and Mr. Gagne responded to Adair's request for him to surrender with more threats of violence and a promise that he would not leave without a fight. (Section I, above). Those threats to bystanders and the officers themselves informed the officers' tactics and subsequent conduct, and are circumstances bearing on reasonableness despite occurring prior to the first shot being fired. *See Zorn v. Linton*, 607 U.S. 568, 572 (2026) (per curiam). These were not misinterpretations on behalf of police: Mr. Gagne intended to communicate that he had the capacity and willingness to use deadly force against those around him who

did not submit to his demands, and the message was received loud and clear. The severity of the crime at issue weighs in favor of the officers.

***Actively Resisting Arrest or Attempting to Flee**:* Mr. Gagne was resisting arrest as a result of his refusal to exit the residence and repeated statements that he would not do so without violence. The original patrol officers gave Mr. Gagne clear and multiple commands to exit the residence, which he disregarded. *See Howell v. Mun. of Anchorage*, 646 F.Supp. 3d 1047 (D.Alaska. Dec. 16, 2022) (considering a barricade as resisting arrest as it was a location that prevented immediate law enforcement access and the suspect refused to follow numerous commands); *Applegate v. Ritchie*, 2024 U.S. Dist. LEXIS 205069 (D.Or. Nov. 12, 2024) (suspect who remained on the roof and refused to come down was resisting arrest, which weighed in the Defendants' favor). Under no set of circumstances could the Defendants simply leave the area without arresting the decedent, given his access to weapons, discharge of a weapon, and threats. This factor weighs in favor of the officers.

***Threat to Officers*:** The most important factor is the threat that Mr. Gagne posed to officers. *See Quinn v. Zerkle*, 111 F.4th 281 (4th Cir. August 1, 2024) (affirming summary judgment on the shooting of an individual who previously led officers on a high speed pursuit and then jumped out of his bedroom window while holding an AR-15 and noting that an officer need not wait until a gun is pointed at him to act); *Ryburn v. Huff*, 132 S.Ct. 987, 991-92 (2012) (per curiam) ("judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation."). The decedent had motive, opportunity, and access to carry out his threats. He was barricaded in an apartment that provided low visibility to officers because the windows were largely covered by tinfoil. Before he opened the door and was shot, he had previously come to the door with a rifle in hand while making threats. He was armed with a weapon that would have caused a mass-casualty event if he started firing and the officers would have been extremely limited in their ability to stop him. *Sabbe v. Wash. Cnty. Bd. Of Comm'rs*, 84 F.4th 807, 812 (9th Cir. 2023) (it was reasonable to perceive the decedent as an immediate threat because they had multiple reports that he might be armed and intoxicated, he was

behaving erratically and hostile, officer saw him with a rifle, and the officers believed that the suspect was shooting or going to shoot).

The Ninth Circuit's recent decision in *Handy v. Jones,* 2026 U.S.App. LEXIS 28183 (9th Cir. Sept. 15, 2026), is instructive. On May 13, 2024, officers responded to a 911 call reporting domestic violence, what sounded like two shots fired in the house, and the suspect standing in his driveway holding a shotgun "waiting for the cops to come around the corner." *Id*. at *4. The suspect refused commands to put his hands in the air and stop and instead waved the shotgun over his head and responded "fuck you." *Id*. at *5. As soon as he stepped off the curb, he was shot nine times. *Id.* Important to the analysis was that "[w]hen officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning." *Id*. at *6, citing *United States v. Martinez,* 406 F.3d 1160, 1164 (9th Cir. 2005). In denying qualified immunity, the District Court incorrectly determined that there was no threat because the decedent was walking at a "casual pace," the neighbor never saw the suspect raise his gun and never felt anyone was in imminent danger, and there was not necessarily any threatening or aggressive action. *Id.* at *7-8. The Ninth Circuit found that, in assessing the "immediate threat," the district court misconstrued the applicable standard. *Id*. at *13. "The test is not whether a reasonable factfinder could find that Handy did not pose an immediate threat, but whether 'it would be objectively reasonable for the officer to believe that the amount of force employed was required by the situation he confronted.'" *Id.*, citing *Napouk v. Las Vegas Metropolitan Police Department*, 123 F.4th 906, 912 (9th Cir. 2024). Thus, "the determination of reasonableness on a motion to dismiss or for summary judgment does not mean that the officer could not have taken some other action." *Id.* Applying this standard, the Ninth Circuit ruled that:

> Handy posed an immediate threat to the officers and that the officers acted reasonably in shooting him. First, the Defendants reasonably believed that Handy may have committed a violent crime. It was reported that he had assaulted his girlfriend and that he possessed a shotgun during the incident. In addition, Defendants had been informed that Handy had earlier been waiting for their arrival armed with a shotgun. Second, although Handy had

> exited the apartment he refused to drop his weapon, instead waving it over his head and cursing when repeatedly instructed to drop the shotgun. Thus, a reasonable officer could think he was resisting arrest. Third, and most importantly, the evidence, particularly the camera footage, shows that Handy 'posed an immediate threat to the safety of officers[.]"…None of the factors cited by the district court reduced Handy's dangerousness. Although it appears that he did not point his shotgun at the officers as he stepped off the stairs, he could have instantly fired the shotgun from the hip…He may have been advancing at a 'casual pace,' but he remained armed, agitated, and capable of immediately firing at officers.

*Id*. at *15-16. In addition to finding that there was no constitutional violation, the Court found that the officers were entitled to qualified immunity. The Court distinguished George because the suspect there was not suspected of any crime and "had not displayed any animosity to the police." *Id*. at *16. The Court also determined that the Curnow decision, 952 F.2d 321, did not stand for the proposition that "an officer must wait to be targeted by a suspect before he or she can shoot in self-defense." *Id.* Instead, as the Supreme Court noted in Barnes, the Court must consider the totality of the circumstances, not the "moment of the threat, including "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id*. at *17. That the suspect had assaulted his girlfriend, awaited the arrival of officers armed with his shotgun, did not drop the weapon, moved toward officers and was belligerent, and "could fire the shotgun from his hip, constitute a 'totality of the circumstances' that show that Handy was dangerous regardless of where his shotgun was pointed." *Id*. at *18. The Court further noted that it had affirmed summary judgment in *Napouk* (where a suspect was shot within nine feet of officers while armed with a machete) and Blanford (where the suspect was shot when armed with a sword) and neither of the cases involved the "immediate threat such as that posed by Handy." "Our sister circuits agree that an armed belligerent suspect may pose an immediate threat even when the firearm is not pointed at an officer." *Id*. at *19. As fully discussed below, Mr. Gagne had committed a nearly identical crime of domestic violence while firing shots, but went further by repeatedly threatening the neighbor, staging his AR-15 on the patio, and repeatedly threatening to kill officers while in an elevated apartment while armed

with a weapons platform capable of maximum destruction. He is the party that exclusively created the dangerous situation, created the need to use force, and failed to comply with repeated commands and warnings to peaceably exit the residence. *See* Ninth Cir. Model Instruction, Use of Force, 9.27.

***1. Freeman's Shots***

Seconds after walking with his AK-47 across the apartment, Mr. Gagne stepped to the sliding door above the patrol officers, parted the blinds, and looked down at their positions. Freeman saw the rifle in Mr. Gagne's right hand and concluded that Mr. Gagne was choosing a place from which to shoot, just as he had threatened to do only moments before. An armed man who has threatened to shoot officers, chambers a round, and then takes a position at a window overlooking the officers he threatened, clearly poses "a threat of serious physical harm." *Garner*, 471 U.S. at 11. Freeman did not have to wait until Mr. Gagne shouldered the rifle, and had he done so, it may have been too late to prevent him from opening fire. *George*, 736 F.3d at 838.

The interior camera footage corroborates Freeman’s account. It shows Mr. Gagne walking to the slider with the rifle in both hands at a low ready. At the instant of the shot, Mr. Gagne is out of frame and only the rifle’s barrel is visible, resting on the counter and moving as if a hand were still on the stock. The Third Amended Complaint alleges that Freeman observed Shawn's weapon still down and his hands up (Doc. 101 ¶¶ 59-63), but there is no indication on video that his hand ever left the rifle regardless of the direction it was pointed. Freeman was forty yards away, at night, looking through a scope into a darkened apartment through a gap that opened as Mr. Gagne parted the blinds. The question under *Torres* is whether a reasonable officer in that position ‘would have or should have accurately perceived’ whether the rifle was in Mr. Gagne’s hand or propped on the counter in front of him. 648 F.3d at 1124. A man does not stop being an immediate threat during the seconds his rifle rests within reach while he picks his target, and then suddenly become a threat again when he opens fire. *Barnes* forbids isolating those seconds from the hour that

gave them meaning and based on the totality of the circumstances he remained a threat even while the firearm was not pointed outside. 605 U.S. at 80.

Forty-three seconds later, officers heard an unsuppressed gunshot, and Harris radioed that the suspect was firing at them. Freeman had watched Mr. Gagne go down after the first shot and get back up. He now saw him return to the slider with the rifle at high port. One second after the gunshot, Freeman fired again. Nothing that justified the first shot had changed for the better. Mr. Gagne was still armed, was still at the window, and he had not surrendered. "[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014). The Ninth Circuit applies the same rule to a second volley where "[n]othing . . . in the balance of factors already present" to justify the first "had changed when [the officer] fired again." *Blanford v. Sacramento County*, 406 F.3d 1110, 1118 (9th Cir. 2005).

Plaintiffs will argue that the gunshot the officers heard was not Mr. Gagne's, but ultimately that does not change the analysis. In *Long v. City & County of Honolulu*, 511 F.3d 901 (Ninth Cir. 2007), the Ninth Circuit affirmed summary judgment on the basis that there was no constitutional violation in the shooting death of an armed barricaded suspect. Police were summoned to the suspect's residence after he fired shots at several partygoers. *Id.* at 904. Patrol officers arrived and were later replaced by a SWAT team, who maintained a perimeter, and made telephone contact with the suspect who was asked to surrender, but he did not. *Id.* Throughout the night, the suspect walked around in an agitated state and shouted threats to get the "fuck out of his yard," and was threatening to shoot the lights the police were shining on the property. *Id.* After it was reported that the suspect fired shots, officers shot the suspect. *Id.* at 905. No shell casings were recovered from the suspect's residence. *Id.* The force was determined to be objectively reasonable because the shooting officer had observed the behavior, heard the suspect's threats to shoot police, saw the suspect with a rifle, knew the suspect previously fired shots, and it was reported over the radio that the suspect was shooting. *Id.* at 906. Whether or not "Long actually fired his rifle

at these officers is also immaterial. It is enough that [the shooting officer] heard the radio transmission and observed Long point the rifle in the officers' direction." *Id.*

In *Sabbe*, the court assumed that officers fired the first shot at the suspect, but held regardless that "In our circuit, 'the relevant question for purposes of qualified immunity' is not whether Sabbe actually threatened the officers, but whether they 'could reasonably have believed that [he] posed such a threat.'" 84 F.4th at 827-828 (quoting *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016)). Like the sniper in *Long*, Freeman had heard the relays of Mr. Gagne's threats and heard what he thought was an unsuppressed rifle shot that did not come from a SWAT officer. (Ex. 8, Freeman Depo. 82:12-15). He had heard Harris radio that the suspect was firing. He could see Mr. Gagne back at the window with the rifle. Whether that gunshot came from Mr. Gagne's rifle or, as Plaintiffs contend, from police rounds crossing the apartment, a reasonable officer in Freeman's position would have believed that Mr. Gagne had fired and was about to fire again, just as he promised he would. Moreover, the decedent was far more dangerous and hostile than the mentally ill suspect that was armed with a fake gun in *Estate of Strickland v. Nevada Cnty*, 69 F.4th 614, 621 (9th Cir. 2023). The Ninth Circuit, in finding the shooting reasonable, noted that an officer should not have to wait "until a gun is pointed at [them] before [they are] entitled to take action." *Id.* at 620.

### ***2. The First Volley***

The four officers who fired in the first volley did so in response to what each took to be gunfire from the apartment. Thomas, Chuey, Brown, and Navarro each heard a report that did not sound like a suppressed SWAT rifle. Thomas and Chuey saw muzzle flash and glass leaving the sliders. Brown and Navarro saw Mr. Gagne at a window holding what they took to be a rifle. Harris had just radioed that the suspect was firing out the north window. Each fired at the place he perceived the shooter to be. In *Long*, when "fellow officers radioed that Long was yelling threats at them and then radioed that Long was shooting at them," the sniper "had probable cause to believe that Long posed an immediate danger to these officers." 511 F.3d at 906. So did the Shooting Officers. There is no evidence, however,

that these shots hit the decedent or caused his death. There is no constitutional violation for shots that miss.

The reconstruction evidence shows that the sound and the glass came from police rounds that crossed the living room and exited the far slider, and that an observer outside could not have distinguished that from rounds coming out of the apartment. (Ex. 13, Noedel Rpt., MESA_008978, 008982). Plaintiffs' expert agrees that the rounds leaving the north side of the apartment were police rounds that had passed through it. (Ex. 15, Hafkey Rpt. at 19, GAGNE_007743). Under *Torres*, the question is not whether the rounds were Mr. Gagne's but whether a reasonable officer "would have or should have accurately perceived" that they were not. 648 F.3d at 1124. It is not reasonable to hear gunfire and witness glass blow out of the windows of an apartment occupied by a rifle-armed man who has made threats to open fire and conclude that the shots were not from him but had actually passed straight through the apartment and out the other side. The interior camera does not change that analysis. The Fourth Amendment only asks what a reasonable officer should have perceived, and none of the officers outside could see what the camera saw. (Ex. 6, Ingram Supp., MESA_002235, 002239).

***3. The Doorway Volley.***

Thirteen seconds after the first volley, the front door flew open. Harris, Chuey, Goodrich and Cameron all saw Mr. Gagne and something that looked like a firearm, and opened fire. Under the circumstances, a reasonable officer would have perceived an armed man, believed to have been shooting at officers seconds earlier, suddenly emerging from cover while wearing body armor and possessing a rifle as an imminent deadly threat. Mr. Gagne did not ever tell anyone he was surrendering. He did not slowly open the door making sure that his open hands were visible in a position of surrender. Instead, the door flung open, after he had previously come to the door with a rifle and after repeatedly threatening to kill officers and warning that he would not allow officers to come arrest him.

In *George v. Morris*, deputies shot a terminally ill man who walked onto his patio holding a pistol pointed at the ground, and on the plaintiff's account he never raised it. 736

F.3d at 838. The Ninth Circuit held that the deputies were not entitled to summary judgment, because being armed is not by itself an immediate threat, but clarified: “This is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed — or reasonably suspected of being armed — a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.” *Id.* Here, Mr. Gagne had made serious verbal threats to shoot the officers for the better part of an hour. He was reasonably suspected of being armed, because he repeatedly told them he was armed, witnesses stated he was armed, he had carried a rifle to his windows and door all night and had just been heard, as the officers perceived it, firing it. His sudden emergence from the door during these events without clearly communicating a desire to surrender is precisely the sort of furtive movement or harrowing gesture contemplated in *George*.

In *Plumhoff*, the Supreme Court addressed when officers may continue to use deadly force after their initial shots are fired. The Court held that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." 572 U.S. at 777. In *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017), and *Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790 (9th Cir. 2025) (en banc), the Ninth Circuit applied this principle and held that an officer who fires again at a suspect who is already incapacitated may be liable, because “terminating a threat doesn’t necessarily mean terminating the suspect. If the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting.” *Zion*, 874 F.3d at 1076; see *Hernandez*, 139 F.4th at 803 (threat abated “when Hernandez was curled up on the ground and rolling away from McBride”). But the court also noted that this was “particularly true when the suspect wields a knife rather than a firearm.” *Zion*, 874 F.3d at 1076. While a knife presents a threat only at close range, a firearm can be wielded from the ground to hit anyone within line of sight.

Not only was Mr. Gagne armed with a firearm, officers had no evidence that he was actually incapacitated or had surrendered, or that he was not armed. Officers knew that Mr.

Gagne was armed not only with multiple rifles, but with handguns. While Mr. Gagne may have called out that he was "down," he never communicated an attempt to surrender, and whatever wounds he suffered did not stop him from opening his front door. Once the second volley ended and the officers had a chance to assess the situation, they did not use additional deadly force. (Ex. 6, Ingram Supp., MESA_002241, 002243). The Supreme Court drew the same line in *Plumhoff*: "This would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated Rickard and had ended any threat of continued flight, or if Rickard had clearly given himself up. But that is not what happened." 572 U.S. at 777. It is not what happened here either. These officers held their fire after the first volley, fired at the door only when it opened on what they took to be an armed man, and did not fire again once he was down.

***4. Failure To Intervene***

Count I also alleges that the Shooting Officers, and Freeman in particular, failed to intervene to stop one another from firing. (Doc. 101 ¶¶ 64-68, 226-28). A failure to intervene claim requires an underlying violation, knowledge of the violation, a "realistic opportunity to intercede," and inaction that caused the injury. (Doc. 132 at 7 (citing *Tobias v. Arteaga*, 996 F.3d 571, 582-84 (9th Cir. 2021), and *Ting v. United States*, 927 F.2d 1504, 1511-12 (9th Cir. 1991))). None of those elements have been met. There was no underlying violation, as discussed above. Each officer had knowledge of the threat that Mr. Gagne posed to bystanders, the threats that he had made to them specifically, and had seen him carrying or in the vicinity of a firearm. Each volley "transpire[d] in a matter of seconds," *Ting*, 927 F.2d at 1511-12, and even officers that are in the vicinity and equipped with radios have no realistic opportunity to intercede in the seconds between the decision to fire and the end of the volleys. *Waller v. City of Nogales*, 2023 WL 3863655, at *7 (D. Ariz. June 7, 2023). (Doc. 132 at 10).

Seconds before the first volley, Freeman saw Mr. Gagne pass the uncovered window with his hands near his head, which he communicated to Officer Widmer, who was beside him. (Ex. 8, Freeman Depo. 108:18-23; 118:14-20). Freeman himself did not fire in the first

volley, but there is no evidence that Freeman and Widmer had a reasonable opportunity to intervene. Even if he was capable of broadcasting the information to the other officers quicker than their own impulse to fire, there is no reason to believe broadcast of what he saw through his scope for a split second would have prevented the volley. (Doc. 132 at 9 n.6). Thomas and Chuey fired at perceived gunfire and muzzle flash, and Brown and Navarro at a perceived rifle at the window. They were reacting to their own independent observations, not at the direction of Freeman, and nothing he could have said about Mr. Gagne's hand position seen a second earlier would have changed what they heard, saw, and were reacting to. *Kirk v. City of Phoenix*, 2025 WL 1952677, at *4-7 (D. Ariz. July 16, 2025) (no duty to intervene where officers who could radio the shooting officer should have told him the suspect was unarmed). (Doc. 132 at 10). This Court previously dismissed the failure to intervene claim when faced with a similar argument with respect to negotiators Orr and Adair, and just like them, he had no time or authority to prevent the other officers from opening fire.

### B. Alternatively, the Shooting Officers Are Entitled to Qualified Immunity on the Force and Failure-to-Intervene Claims

Qualified immunity protects officers "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted). The Court asks whether the facts show a constitutional violation and whether the right was clearly established at the time. *Id.* at 232, 242. (Doc. 132 at 6). To overcome qualified immunity, Plaintiffs must show that "existing precedent must have placed the statutory or constitutional question beyond debate." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021) (quotation marks omitted). "To find that a right is clearly established, courts generally need to identify a case where an officer acting under similar circumstances was held to have violated the Constitution." *Zorn v. Linton*, 607 U.S. 568, 572 (2026) (per curiam) (citation modified). Although general standards can clearly establish the law in "the rare obvious case," *City of Escondido v. Emmons*, 586 U.S. 38, 44 (2019) (per curiam) (quotation marks

omitted), "[t]he relevant precedent" must "define the right with a high degree of specificity," and "[p]rinciples stated generally, such as that an officer may not use unreasonable and excessive force, do not suffice." *Zorn*, 607 U.S. at 572 (citation modified). *Zorn* applied those rules at summary judgment to reverse a denial of immunity, and the Supreme Court has repeatedly reversed the Ninth Circuit for the same error in deadly force cases. *Kisela v. Hughes*, 584 U.S. 100, 104-05 (2018) (per curiam); *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam).

The rights at issue must be stated at the level of specificity the Supreme Court demands. Defendants searched for but could not find a single similar case to the facts present here. There is not a single case addressing the rights of a man armed with a loaded AK-47, which if fired can pierce body armor and vehicles, and readily kill officers and the occupants of nearby apartments. This same man dons body armor, later puts on hearing protection and refuses every command to come out. Instead, he responds repeatedly with threats to shoot law enforcement officers. There is no case that establishes that, when a sniper sees him and believes that he is going to fire, that the sniper cannot take action to stop the threat. There is case law standing for the proposition that dangerous fleeing felons can be shot, in the back, due to the serious threat that they pose. That serious threat in this case is even greater where the suspect has covered his windows with foil and is in an elevated perch.

There is no case addressing the right of that man not to have officers return fire toward what they reasonably believe is the man shooting (as he has told them repeatedly, he would do) seconds after they believe he is making good on the threat. Nor is there a case addressing the right of that man not to be fired upon when, seconds after the perceived gunfire, he opens his door while wearing body armor and in possession of what the officers took to be a rifle or a rifle magazine at center mass. Plaintiffs bear the burden of identifying a case that would have told these officers that each of those acts was unlawful, and the closest cases on point—albeit quite far away from the facts of this case and the threat posed— do the opposite. *See Long*, 511 F.3d at 906-07 (immunity for sniper who shot rifle-

armed, barricaded man after officers radioed that he was shooting, though whether he had fired was "a closer question"); *Sabbe*, 84 F.4th at 827-828 (immunity where drunk suspect was doing donuts in a field, was reported to be drunk and armed, and officers believed he was reaching toward a weapon); *Strickland*, 69 F.4th at 621 (reasonable mistaken belief that replica gun was real); *Scott v. Henrich*, 39 F.3d at 915-16 (armed man at apartment door); *Blanford*, 406 F.3d at 1118 (second volley reasonable where nothing had changed); *Wilkinson v. Torres*, 610 F.3d 546, 551-53 (9th Cir. 2010) (continued fire where perception of ongoing threat was “uncontradicted by any evidence in the record”). No case holds that an officer violates the Fourth Amendment by firing at an armed, armored, barricaded subject who has threatened to shoot police when that subject appears at a window above the officers with his rifle, by returning fire toward the perceived source of gunfire from that subject's apartment, or by firing when that subject throws open his door in a bladed stance seconds after the perceived gunfire.

Plaintiffs’ candidates for cases are *Zion* and *Hernandez*, and both establish a rule about a suspect the officer can see: one who is on the ground, appears wounded, and shows no signs of getting up, and who “wields a knife rather than a firearm.” *Hernandez*, 139 F.4th at 803**.** Even on the facts of *Hernandez* itself, Judge Collins, joined by four other judges, wrote separately to explain that *Zion* “makes clear, on its face, that it is materially distinguishable from this case in multiple respects” and “can hardly be said to have clearly established a broad general rule that places the outcome of this case beyond debate.” *Id.* at 824 (Collins, J., concurring in part, concurring in the judgment in part, and dissenting in part). If *Zion* did not clearly govern an officer standing over a wounded man with a knife, it cannot have clearly governed officers who had no clear view of a rifle-armed man behind a door and foil-covered windows. Under *Zorn*, a circuit decision that a reasonable jury “could” find a use of force excessive on one set of facts does not place the lawfulness of different conduct, in different circumstances, “beyond debate.” 607 U.S. at 568.

Nor is this an “obvious case” under *Hope v. Pelzer*, 536 U.S. 730 (2002). That exception reaches officers who shoot a person who plainly poses no threat. Every officer

here fired at what he perceived as a man who had threatened to kill them who was armed with an AK-47. The Court's own description of the law suggests that these officers could not have known their conduct was unlawful, writing that "[t]here are many scenarios in which shooting at an armed suspect is constitutional." (Doc. 132 at 8). Indeed, there would be grave public policy concerns involved with finding this an "obvious case," given the unfortunate state of the gun violence in this country. Mr. Gagne presented a threat that no time, distance, or cover could solve. If he had started shooting uncontrollably and killed nearby civilians, this would be a different lawsuit by a different set of individuals. Mr. Gagne was in control of his own behavior and actions and chose to escalate to the highest possible threat available.

## IV. THE FOURTEENTH AMENDMENT CLAIM FAILS

Plaintiffs' substantive due process claim requires conduct that "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Where officers must "make a snap judgment," plaintiffs must show "a purpose to harm [the decedent] for reasons unrelated to legitimate law enforcement objectives," which include "arrest, self-protection, and protection of the public." *Ochoa*, 26 F.4th at 1058 (quoting *Porter* and *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018)). Each shot here was a reaction measured in seconds to a perceived rifle, perceived gunfire, or a door thrown open, and no evidence shows that any officer had any purpose beyond the objectives *Ochoa* recognized in a comparable Mesa standoff. The hour before the shots shows a perimeter, announcements, bean bags, a negotiator, and a sniper who held his fire the first time he saw the rifle. The interval after them shows officers who had not searched a man claiming multiple rifles using gas, a drone, a flash-bang, and a canine before approaching him, and calling paramedics forward within two minutes of entry. "[A] police officer who promptly summons the necessary medical assistance has acted reasonably," *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006), and Plaintiffs have no evidence that an earlier entry would have changed the outcome.

## V. THE CITY IS ENTITLED TO JUDGMENT ON THE FEDERAL CLAIMS ADDRESSED IN COUNTS I AND II

Count I is pleaded against "All Named Defendants" but alleges only that "[a]ll Officer Defendants acted under the color of state law." (Doc. 101 ¶ 214). A municipality is liable under § 1983 only for its own policy or custom, *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), as the Court informed Plaintiffs before they amended their complaint. (Doc. 94 at 12 (citing *United States v. Town of Colorado City*, 935 F.3d 804, 808 (9th Cir. 2019))). The City is entitled to judgment on Count I.

Count II survived the Motion to Dismiss only as a custom claim. (Doc. 132 at 4 n.3). It fails first because there was no underlying violation. "If no constitutional violation occurred, the municipality cannot be held liable." *Long*, 511 F.3d at 907 (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). It fails on its own terms as well. In *Trevino v. Gates*, the Ninth Circuit held that “[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.” 99 F.3d 911, 918 (9th Cir. 1996). This Court applied that rule to the prior incidents Plaintiffs pleaded and stated the test it would use: “The prior incidents must be similar, and a ‘raw number of police shootings,’ without facts suggesting they were unjustified, is not enough.” (Doc. 132 at 12 (quoting *Andrich v. Kostas*, 470 F. Supp. 3d 1048, 1064 (D. Ariz. 2020), aff’d, 2023 WL 6157407 (9th Cir. Sept. 21, 2023))). The Court allowed four incidents to proceed on the pleadings, but it identified the two arguments that it expected to decide the question on a full record. As to similarity, the Court wrote: “Defendants argue that the prior shootings involved patrol officers in different settings, and that none involved a SWAT callout. Those differences may matter at summary judgment or at trial, but they do not defeat the similarity of the conduct alleged at this stage.” (*Id.* at 13 (citation omitted)). As to frequency, it wrote: “Defendants also argue that four shootings of unarmed individuals over five years is statistically insignificant given the number of use-of-force incidents MPD officers face. This too, is an argument better suited to summary judgment

or trial." *(Id.)* The Court then added: "I acknowledge, however, that this is a close question. Four incidents over five years are not a large number, and the most recent incident preceded Shawn's death by nearly three years." *(Id.)*

Plaintiffs can add nothing to the four paragraphs of their complaint, which related to four incidents occurring over a seven-year period (2016, 2017, 2019, and 2020). They have disclosed no witness, document, or expert establishing that these incidents were unjustified or that they have any similarity at all to Mr. Gagne's case. And, critically, their claim that there was no reprimand or other consequences for alleged excessive force is flatly wrong. In two of the four incidents, the officers were both fired and criminally charged (*Sweet* and *Sewell).*

As it relates to the alleged similarity of the incidents, on Plaintiffs' *own description* and as confirmed by various court rulings and pleadings, each was a patrol encounter with an unarmed person, and none involved a SWAT team or a barricade situation involving an armed individual who had been actively making threats to officers. None of these cases involved a heavily armed body wearing individual barricaded in a residence who was repeatedly threatening to kill officers. Moreover, the involved Defendants had fundamentally different and far more comprehensive training than the patrol officers. There is no tie between the four shootings and the Defendants in this case.

Nor have any of those cases been found to be an unconstitutional use of force. A settlement is not such an adjudication. Fed. R. Evid. 408(a). In the *Lane* and *Sweet* cases, the District Court found a question of fact as to whether the force used was reasonable, which is not a finding of a constitutional violation. There was no judicial finding in Benitez or Sewell. Like in *Warren v. Penzone*, 2023 U.S. Dist. LEXIS 204376 (D.Ariz. Nov. 15, 2023) and *Andrich*, four dissimilar shootings from 2016 to 2020, in a city of half a million people, followed by nearly three years with none, are exactly the sort of isolated or sporadic incidents that *Trevino* holds insufficient. 99 F.3d at 918, 920. Nor can Plaintiffs show that a custom was the "moving force" behind the shots, *Board of County Commissioners v. Brown*, 520 U.S. 397, 404 (1997). Plaintiffs have failed to provide any evidence at all to

address the Court's concerns in the Motion to Dismiss. Now that those issues are ripe and have been found to have rotted on the vine, Plaintiffs' custom claim should be dismissed.

## VI. DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE STATE-LAW CLAIMS

### A. Count III is Barred by Arizona's Justification Statutes

A.R.S. § 13-409 governs the use of physical force by a law enforcement officer, while A.R.S. § 13-410 governs the use of deadly physical force by a law enforcement officer. Section 13-410(C) states that the use of deadly force by a police officer against another is justified under Section 13-409 if the officer "reasonably believes that it is necessary:"

> 1. To defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force.
>
> 2. To effect an arrest or prevent the escape from custody of a person whom the peace officer reasonably believes:
>
> (a) Has committed, attempted to commit, is committing or is attempting to commit a felony involving the use or a threatened use of a deadly weapon.
>
> (b) Is attempting to escape by use of a deadly weapon.
>
> (c) Through past or present conduct of the person which is known by the peace officer that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.

A.R.S. § 13-410(C). *See also Marquez v. City of Phoenix*, 693 F.3d 1167, 1176 (9th Cir. 2012) ("The use of deadly force is permissible under Arizona law if an officer reasonably believes it is necessary to effect an arrest or prevent the escape from custody of a person whom the peace officer reasonably believes … is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.") (internal quotations omitted). If the officer's use of force is justified under Section 13-409, the officer is immune from civil liability under Arizona law. *Ryan v. Napier*, 425 P.3d 230, 239 (Ariz. 2018). Here, each officer present was attempting to effectuate the arrest of Mr. Gagne for aggravated assault using a firearm, as reported by Jordan and her neighbor, and Mr. Gagne's threats and actions entitled them to the reasonable belief of the imminent use of deadly

force. The use of force was justified under Section 13-410(C)(2) because the officers reasonably believed that Gagne had committed felonies involving the use of a deadly weapon.

A statutory presumption applies as well. When the plaintiff, defined to include "the heir or estate of a deceased person," was harmed while committing a felony or under the influence of intoxicating liquor, a peace officer who used force to protect himself or another or to effect an arrest "is presumed to be acting reasonably." A.R.S. § 12-716(A)(1), (C)(2); *See also Ryan*, 425 P.3d at 237 ("[S]tatutory presumptions are triggered when a law enforcement officer intentionally uses physical force to arrest or capture a suspect and the suspect is injured. The officer is 'presumed to [have been] acting reasonably' in using physical force."). A court need only make such a finding by a preponderance of the evidence. A.R.S. § 12-716(A). *See also Valdez v. City of Phoenix*, No. CV-18-0921-PHX-DGC, 2019 U.S. Dist. LEXIS 182312 at *5-7 (D. Ariz. Oct. 21, 2019).

There is no genuine issue of material fact that the presumption applies here. Mr. Gagne was committing aggravated assault with a deadly weapon, A.R.S. § 13-1204(A)(2), disorderly conduct by recklessly displaying a deadly weapon, A.R.S. § 13-2904(A)(6), and misconduct involving body armor, A.R.S. § 13-3116(A), with a blood alcohol of .218. Plaintiffs cannot rebut that presumption.

The Court's decision in *Harris v. Bertz*, 2022 U.S. Dist. LEXIS 153272 (D.Ariz. Aug. 25, 2022), 2021 WL 4942662 (D.Ariz. Oct. 22, 2021) *aff'd Harris v. Bertz*, 2023 U.S. App. LEXIS 27086 (9th Cir. Oct. 12, 2023), is instructive. In *Harris*, a suspect—who was believed to be part of an armed robbery crew—conducted an armed robbery using a black handgun and then fled in a getaway car. *Id.* at *2. Officers used a Grappler device to stop the vehicle, deployed a flash bang, but the rear passenger occupant exited and ran away toward a Circle K. *Id.* at *3.  Officer Bertz fired seven shots, hitting decedent in the back with two of them. *Id.* The Court found that the officer was justified, pursuant to A.R.S. § 13-410(C)(2)(a), in shooting the decedent given that he had just committed felony armed robbery, he was attempting to escape, and he presented a risk to the public. *Id.* at *6. Here,

Mr. Gagne was far more dangerous than the suspect in *Harri*s. Mr. Gagne actively choked his girlfriend, threatened to kill her and the neighbor, actually shot a round in the air, barricaded himself in his apartment near innocent civilians, while armed with multiple firearms which had the potential for causing a mass-casualty event. It was not merely the potential that the shooting could occur, but that Mr. Gagne repeatedly told the negotiator that he intended that it would occur and he would dump shots in officers, desiccate officers, and create the next Iraq war. Plaintiffs simply cannot overcome the presumption of reasonableness that applies.

**B. Count IV: Negligent Training and Alternative City Immunity**

Count IV alleges that the City was negligent because it did not use the prior incidents to train its officers, without any support for the same. (Doc. 101 ¶ 273). The claim fails for three reasons. First, an employer cannot be liable for negligent training or retention unless the employee committed a tort, *Kuehn v. Stanley*, 208 Ariz. 124, ¶ 21 (App. 2004), and justified force is not one. A.R.S. § 13-413. Second, no duty supports the claim. Determining the existence of a duty is a question of law. *Gipson v. Kasey*, 214 Ariz. 141, ¶ 9 (2007). Arizona presumes that the City "reasonably hired and trained its peace officers," A.R.S. § 12-716(A)(2). Plaintiffs have not identified any statute, regulation, or standard of care that imposes a duty on a police department to train officers on every prior force incident that the department is involved in. Plaintiffs' expert did not provide any testimony that doing so represents the standard of care. Plaintiffs have not articulated why these particular cases should be used for training as opposed to any others. Do they require an adjudication of unconstitutionality? Plaintiffs' named cases do not. Instead, they appear to be an arbitrary list of instances where the Plaintiffs disagree with the City's conduct. No duty requires the City to train officers based on the personal preferences of a single group of plaintiffs.

But, in addition, Plaintiffs never questioned any of the officers regarding their knowledge of the other shootings and whether they received training related to the same. The City provides training to officers regarding the constitutional use of force, including

scenario-based shoot/no-shoot training. The SWAT officers also train weekly using scenario-based training.

Even if a duty existed, Plaintiffs' argument fails the Court's causation test, which asks whether the training Plaintiffs describe would have prevented the injury. (Doc. 132 at 9 n.6). No evidence suggests that a lesson drawn from four patrol shootings of unarmed people would have changed how the SWAT team dealt with a heavily armed and violent barricade situation. There is nothing about the four prior shootings that has any similarity to this case such that the officers allegedly were unaware of some different tactic that should have been used. Mr. Gagne was not unarmed and crawling down the hallway like Mr. Shaver, this was not a high-risk felony vehicle stop where the uninvolved passenger was accidentally shot, this was not a shooting in a parking lot like in Sewell and Benitez where the subjects were unarmed. This case is not about an unarmed suspect, it is about a suspect who was armed to the highest degree, wearing body-armor, and repeatedly threatening to kill police.

Finally, the City is immune under A.R.S. § 12-820.05(B), which bars liability for losses "directly attributable to an act or omission determined by a court to be a criminal felony by a public employee unless the public entity knew of the public employee's propensity for that action." The Court deferred the immunity question to "a complete evidentiary record." (Doc. 94 at 23). The record is now complete. Either the shooting was justified and every claim fails, or it was not, in which case intentionally shooting Mr. Gagne was a felony, A.R.S. § 13-1204. A formal felony conviction in a court is not required. *Garcia v. Garibay*, 2013 WL 1442505, at *3 (D. Ariz. Apr. 9, 2013). (Doc. 94 at 21). Plaintiffs have disclosed no evidence of actual knowledge of propensity to overcome the City's statutory immunity. *Harris v. City of Phoenix*, 2021 WL 4942662, at *2 (D. Ariz. 2021); *Tucson Unified School District v. Borek*, 322 P.3d 181, 185 (Ariz. Ct. App. 2014). (Doc. 94 at 22). And to the extent Count IV rests on the interval before medical contact, Plaintiffs have provided no expert to prove that the delay caused or contributed to Mr.

Gagne's death. *Salica v. Tucson Heart Hospital-Carondelet, L.L.C.*, 224 Ariz. 414, 419, ¶ 16 (App. 2010).

## VII. COUNT V: LOSS OF CONSORTIUM

Loss of consortium is a derivative claim that requires proof of the underlying cause, *Barnes v. Outlaw*, 192 Ariz. 283, 286, ¶ 8 (1998), and the Court previously doubted that Plaintiffs could "prove that they suffered any harm in the time between when Shawn was severely injured and when he succumbed." (Doc. 94 at 24). They have not. Their interrogatory answers claim property damage, funeral expenses, and lost earning capacity, and nothing more. (Ex. 21, Pls.' Resp. to Defs.' First NUI No. 3). There is no dispute that Plaintiffs were not present on the scene but were in California at the time.

## VIII. PUNITIVE DAMAGES ARE UNAVAILABLE

Punitive damages are unavailable against the City, A.R.S. § 12-820.04; *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Instead of taking him at his word that he meant them harm, the officers attempted to negotiate with Mr. Gagne for 10 minutes to get him to leave peacefully all the while enduring his threats to kill them. This forecloses the "evil motive" or "reckless or callous indifference" that punitive damages against the officers require. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

## IX. CONCLUSION

The Shooting Officers reasonably responded to the threats they perceived during each phase of the encounter, had no realistic opportunity to prevent unconstitutional force, and acted without a purpose to harm unrelated to legitimate law enforcement objectives. Alternatively, they are entitled to qualified immunity on the force and failure-to-intervene claims because no clearly established law placed the unlawfulness of their conduct beyond debate. The federal claims against the City fail both for lack of an underlying constitutional violation and for lack of evidence that a municipal custom caused the shooting. Arizona's justification statutes and statutory presumptions independently support judgment on Count III; the absence of evidence supporting negligent training and causation, together with the City's alternative immunity defense, defeats Count IV; and the derivative loss-of-

consortium claim in Count V lacks an underlying basis and proof of the claimed loss. The record also provides no basis for punitive damages. Defendants therefore request summary judgment on all remaining claims and rejection of Plaintiffs' request for punitive damages. Should this Court grant summary judgment, Defendants will separately apply for an award of costs and attorney fees under A.R.S. §§ 12-716(B) and 13-420.

DATED this 10th day of November, 2026.

WIENEKE LAW GROUP, PLC

By: */s/ Christina Retts*

Kathleen L. Wieneke
Christina Retts
Rebekah K. Browder
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
*Attorneys for Defendants City of Mesa, Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, and Thomas*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Sean A. Woods
Robert T. Mills
Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

By: */s/ Lauren Rasmussen*