Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
Rebekah K. Browder, Bar #024992
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: cretts@wienekelawgroup.com
Email: rbrowder@wienekelawgroup.com

*Attorneys for Defendants City of Mesa, Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, and Thomas*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Christopher Gagne, in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne,

Plaintiffs,

vs.

City of Mesa, a political subdivision of the State of Arizona; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and in his capacity as a police officer; Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his individual capacity and in his capacity as a police officer; ABC Partnerships I-X; XYZ Corporations I-X; John Does I-X and Jane Does I-X,

Defendants.

NO. 2:24-cv-01337-SHD

**DEFENDANTS' *DAUBERT* MOTION REGARDING PLAINTIFFS' POLICE PROCEDURES EXPERT MARK HAFKEY**

Defendants City of Mesa, Freeman, Thomas, Brown, Navarro, Harris, Chuey, Cameron, and Goodrich move under Rules 702 and 403 of the Federal Rules of Evidence to preclude Plaintiffs' retained police practices expert, Mark Hafkey, from offering opinions or testimony in opposition to summary judgment or at trial. Mr. Hafkey is a retired Phoenix Police Department lieutenant whose career ran from 1989 to 2012 and consisted of patrol and traffic assignments, followed by seven and a half years as president of the police union. Since leaving the Department he has worked for a decade as an airline flight attendant and, on a handful of cases, as a testifying expert. He has never served on a SWAT team, trained as a sniper or a crisis negotiator, or trained in shooting reconstruction, and he is not an attorney. He nonetheless offers opinions on when a SWAT sniper may fire, on how a tactical team should organize itself and communicate with its negotiators, on which officers' rounds traveled where inside the apartment, and on whether each use of force satisfied the Fourth Amendment. Rule 702 requires Plaintiffs to show that he is qualified, by knowledge, skill, experience, training, or education, to give each of those opinions, and they cannot.

Instead of identifying a professional standard and explaining how the officers' conduct measured against it, Mr. Hafkey announces constitutional verdicts, narrates surveillance and body-camera footage that the jury can watch for itself, and grades the officers' honesty. He judges each officer by what Gagne's interior cameras later revealed through hindsight rather than by what the officer could perceive at the time. And he builds his central conclusion, that Gagne was unarmed and no threat, on a single moment where Gagne is off camera, while ignoring the two hours of the same footage in which Gagne fires a gun from his balcony, gathers rifles, puts on body armor, aims a scoped rifle out his window, and tells a police negotiator that he will kill officers. That is advocacy in the guise of an expert, and the Court should exclude it in its entirety or, in the alternative, limit any testimony to admissible, disclosed opinions.

## I. LEGAL STANDARD

Rule 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to offer opinion testimony only "if the proponent

demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

The proponent bears the burden of establishing each element by a preponderance of the evidence. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993); *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). The Court performs a gatekeeping function, *Daubert*, 509 U.S. at 597, and that function applies with full force to experience-based testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999). The purpose of the inquiry "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. A court need not accept an expert's say-so: "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The 2023 amendment to the Rule, effective December 1, 2023, corrected a line of decisions that had treated the sufficiency of the basis and methodology for the expert's conclusions as questions for the jury rather than an application of the Court's gatekeeping function. As the Advisory Committee explained, "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

Two further limits govern police practices testimony. An expert may not give legal conclusions, *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002), or otherwise “attempt to instruct the jury on the law, or how to apply the law to the facts of the case.” *Hyer v. City & County of Honolul*u, 118 F.4th 1044, 1059 (9th Cir. 2024) (quoting *United States v. Diaz*, 876 F.3d 1194, 1199 (9th Cir. 2017)). And expert testimony must “address an issue beyond the common knowledge of the average layman.” *Mukhtar*, 299 F.3d at 1066 n.9 (quoting *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001)). Exclusion is proper where the record does not reveal “any specific evidence that was so technical or complex that a jury could not have grasped it without the aid of experts.” *Torres v. Johnson Lines*, 932 F.2d 748, 751 (9th Cir. 1991).

## II. FACTUAL BACKGROUND

### A. What The Officers Knew on July 6, 2023

At 9:33 p.m., Shawn Gagne’s neighbor called 911 from the apartment complex where they lived. She told the dispatcher that Gagne had threatened to shoot her and that she had heard him load a weapon and fire it. (Ex. 6, Ingram Supp., MESA_002259). She described him as a severe alcoholic who kept a large number of guns in the apartment and had fired inside it several times in the preceding week. *Id.* She also reported that he had just been choking his girlfriend, Jordan Wirtjes. *Id.* Responding officers spoke to Jordan in the parking lot, who told them that Gagne was alone and heavily intoxicated and that he had fired a round earlier that evening. (Ex. 7, Gutierrez Report, MESA_002000). He was armed, she said, with an AR-15, a .45 caliber handgun, and a shotgun. *Id.* Officers broadcast that they had probable cause for aggravated assault. (Ex. 8, Newby Supp., MESA_002279).

Officers began public-address announcements instructing Gagne to leave the residence at 10:16 p.m., and fired bean-bag rounds at the door and a window to get his attention. (Ex. 9, MESA_002373). At 10:26 p.m., Gagne opened his front door while holding a rifle and closed it again. (Ex. 6 at MESA_002235*)*. A negotiator, Sergeant Adair, reached Gagne by phone at 10:32 p.m. (Ex. 9, MESA_002373). Over the next ten minutes Gagne threatened him repeatedly: “You're about to have a fucking crisis if you don't get

away from my fucking house. Back the fuck up. Right now. With all your fucking SWAT and all your gear, I don't give a fuck. Get the fuck out of my fucking face before I fucking start dropping shots in them." (Ex. 6, MESA_002260). "I got AK's, I got fucking AR's bro. I'll fucking blow a fucking hole right through your fucking head." (*Id.* at MESA_002261). "I've got my fucking armor on. I've got my fucking guns ready. You guys want a fucking full Iraq war from one person, then you better fucking get right." (*Id.* at MESA_002262). "Shine that laser in my house one more time and I'll fucking unload." (*Id.* at MESA_002260). "You guys want to play fucking guns? You guys want to play guns? Let's fucking play guns bro." (*Id.* at MESA_002261). "If you guys fucking come into my vicinity, there are gonna be casualties, including myself." *Id.* Adair heard Gagne loading rounds into a magazine and relayed the threats over the radio. (*Id.* at MESA_002261–002262). Gagne repeatedly said he was not coming out and that he wanted the officers to leave. (*Id.* at MESA_002261). All of Gagne's criminal behavior (choking of his girlfriend, firing of a round on the patio) and repeated homicidal threats toward law enforcement were captured on the interior surveillance video from the apartment.[1] (*See* Doc. 79, Exs. 1-15).

No officer had a clear and unobstructed view into the apartment. Gagne had covered several windows with foil, and blinds hung over the sliding doors. (Ex. 6, MESA_002235, 002239; Ex. 10, Freeman Depo. 30:16–31:2). Officer Freeman, a SWAT sniper, set up in a neighboring second-floor apartment to get a better vantage. (*Id.* at 32:22-33:7). He watched Gagne pace inside with an AK-47 style rifle fitted with an optic. *Id.* He then saw Gagne walk to a sliding window that overlooked the patrol officers below and part the blinds with his left hand while holding the rifle in his right, in a position Freeman described as up but not at the low ready. (*Id.* at 68:8-69:14). Freeman believed that Gagne was looking for where he wanted to shoot at the patrol officers from a dangerous elevated position, and he fired one round that struck Mr. Gagne at 10:42 p.m. (Ex. 6, MESA_002237; Ex. 10,

---

[1] The specific video segments, time stamps, and content of the threats were detailed in Defendant Adair, Orr and Mesa's Motion to Dismiss the Third Amended Complaint (Doc. 102, pp. 4-5).

Freeman Depo. 68:8–25; Ex. 9, MESA_002373). Mr. Gagne continued to move through the apartment, and believing that he was shooting from within the apartment, officers on the ground fired two volleys about thirteen seconds apart, some of which struck Gagne, who fell just inside his front door. (Ex. 9, MESA_002373–002374).

Gagne's apartment contained interior surveillance cameras, and Plaintiffs plead that the officers did not know those cameras existed. (Doc. 101 ¶ 164). Investigators recovered the interior footage only after the shooting. (*See* Doc. 79, Exs. 1-15).

**B. Mr. Hafkey's Report and Opinions**

Mr. Hafkey signed his report on February 20, 2026. (Ex. 1, Hafkey Report at 30). He offers three opinions. Opinion 1: "The officers did not have a valid legal theory to enter Mr. Gagne's home and, therefore, the seizure was unreasonable under the 4th Amendment."[2] (*Id.* at 4). Opinion 2: "The use of force used by Mesa Police Officers on July 6, 2023 to seize Mr. Gagne, was unreasonable under the 4th Amendment." *Id.* Opinion 3: "Poor crime scene management and police communication were contributing factors to the excessive force used in this matter." *Id.* The body of the report applies Fourth Amendment doctrine officer by officer and concludes, for each, that the force used was not reasonable. (*Id.* at 13–27). His only cited source for the standards he applies is the Best Practices guidelines established by the International Association of Chiefs of Police. (*Id.* at 1). The report cites no IACP model policy, no National Tactical Officers Association standard, no AZPOST lesson plan, and no Mesa Police Department policy.

**C. Mr. Hafkey's Background**

Mr. Hafkey holds a bachelor's degree in political science and a master's degree in educational leadership. (Ex. 4, CV at 1). He joined the Phoenix Police Department in 1989 and served in patrol and traffic assignments as an officer, sergeant, and lieutenant until July 2004. (*Id.* at 2). From then until he left the Department in February 2012, he served as president of the Phoenix Police Sergeants and Lieutenants Association. *Id.* He has provided

[2] The complaint does not allege the theory that Mr. Gagne's Fourth Amendment Rights were violated by a warrantless entry of the home.

no police training and no service as a law enforcement officer since his retirement. (Ex. 5, Hafkey Depo. 18:13–18).[3] He worked as a flight attendant from 2012 to 2023. (Ex. 4 at 1; Ex. 5 at 17:17–20). He has worked part time as an expert on "a handful of cases" since about 2015, stating that "I occasionally provide my opinion on cases I feel strongly about." (Ex. 1 at 2). Prior to this case his only officer-involved-shooting engagement was *Kirk v. City of Phoenix*. (Ex. 5 at 32:24–33:14). He describes himself as a police policy and practices expert only "[i]n part." The other part, he testified, is "[u]se of force, constitutional law, case law and personal experience." (Ex. 5 at 16:15–20). He is not an attorney. (*Id.* at 100:9-14).

## III. ARGUMENT

### A. Mr. Hafkey Is Not Qualified to Give the Opinions in His Report

Rule 702 asks whether the witness is qualified, "by knowledge, skill, experience, training, or education," to give the particular opinions he offers. Fed. R. Evid. 702. The question is specific to the opinion. A witness qualified in one area of police work is not qualified in another because both are police work, and a general law-enforcement background does not qualify a witness in a distinct specialty. In *Krause*, Judge Brnovich excluded the trajectory opinions of a police practices expert with decades of experience as an officer, a competitive shooter, and a gunsmith, explaining that "that experience simply does not bear on his expertise to assess ballistic evidence or judge bullet trajectories." *Krause v. County of Mohave*, 459 F. Supp. 3d 1258, 1266 (D. Ariz. 2020). His experience "cannot replace qualifications in ballistic forensics and do not qualify him to opine on the highly technical area of bullet path reconstruction or ballistics." *Id.*

This case involves a specialized subset of law enforcement officers who are called upon to support regular police units in high-risk scenarios: the Special Weapons and Tactics

---

[3] Exhibit 5 is the transcript of Mr. Hafkey's April 24, 2026 deposition in *Obregon v. Lamb*, No. 2:24-cv-01510-PHX-KML (D. Ariz.), in which he testified about his background, training, and qualifications. Defendants cite it for that testimony and for one exchange in which Mr. Hafkey testified about Mr. Gagne's case by name. (Ex. 5 at 35:7–18).

(SWAT) team. Its members are selected and trained for the situations that patrol officers are trained to contain and hand off, among them an armed subject barricaded inside a residence. The team works through assigned roles based on their specialties. Snipers observe from elevated or concealed positions and deliver fire when needed. (Ex. 10, Freeman Depo. 83:13–84:4). Other operators hold covering positions and open fire if necessary, while crisis negotiators attempt to deescalate the situation by phone. Each role requires its own dedicated training. Officer Freeman, for example, completed basic SWAT, hostage rescue, basic sniper, and advanced urban sniper schools. (Ex. 10, Freeman Depo. 8:19–9:6, 20:14–22:13). He trained with his team and surrounding agencies every week. *Id.*

In his twenty-three-year law enforcement career, Mr. Hafkey was never assigned to a SWAT team as a sniper, operator, or a negotiator. (Ex. 4 at 1–3). He has never been trained or certified as a sniper or in hostage rescue. *Id.* His instructor certifications, the courses he developed, and the roughly three dozen trainings he lists concern driving, drug recognition, defensive tactics, supervision, media relations, legal updates, and office software. (*Id.* at 2–4). He spent the final seven and a half years of his career as a union president. (Ex. 4 at 2). Following his retirement, he was employed for a decade as a flight attendant, and he has not received any law enforcement training since 2012. (Ex. 4 at 1; Ex. 5 at 17:17–20, 18:13–18). Nothing in that record qualifies him to tell a jury how a negotiator should communicate with their team or how a sniper chooses their shots in a high-risk tactical scenario.

But Opinion 3 then reaches past police work altogether and into shooting reconstruction (which officers' rounds exited the north glass "dangerously close to the air unit") and human-factors research ("[o]ne second is the approximate minimum time required for perception-reaction time"). (Ex. 1 at 19, 23). He has no training or education in determining bullet trajectories. (Ex. 5 at 29:16–18). His forensic pathology training was "[v]ery general, nothing very advanced," and his ballistics training as a firearms instructor was "not from a forensic level" but "more of an identification level." (*Id.* at 27:22–24, 29:3–11). He never held a detective position and never reconstructed a shooting as part of his

duties. (*Id.* at 25:2–8). He has no peer-reviewed publications and has never published on reconstructing a shooting or on bullet trajectories. (*Id.* at 36:3–9, 37:10–18). His report does not cite a source to support his assumption of the specific minimum human perception reaction time, and nothing on his curriculum vitae reflects training in human factors. (Ex. 1 at 23; Ex. 4). *Krause* excluded trajectory opinions from a witness with far more firearms experience than this. 459 F. Supp. 3d at 1266, 1271.

Furthermore, Mr. Hafkey purports to have the expertise to interpret body camera and surveillance video, despite them not being in regular use until after his retirement from law enforcement. While body cameras are increasingly common today, his operational service ended when, in his words, "Axon videos were fairly new." (Ex. 5 at 83:6–7). He has never worked, supervised, or reviewed a police operation in the era of body-worn cameras, and prior to his engagement as an expert in Gagne he had only reviewed one other officer involved shooting case. (*Id.* at 32:24–33:14).

Finally, Mr. Hafkey holds himself out as an expert witness in "constitutional law, case law." (Ex. 5 at 16:15–20). He organizes his report around a list of cases and purports to analyze them to render conclusions about the constitutionality of the officers' actions. (Ex. 1 at 3, 9–13, 23–24). Mr. Hafkey is not an attorney. (Ex. 5 at 100:11). A retired police lieutenant with a political science degree is not qualified to instruct the jury on the law, and the Court does not need his help to do so. *Mukhtar*, 299 F.3d at 1066 n.10. His opinions nonetheless consist of little else.

**B. Each Of Mr. Hafkey's Opinions Is a Legal Conclusion**

Mr. Hafkey phrases all three of his numbered opinions as constitutional verdicts. The first two declare that the seizure and the use of force were "unreasonable under the 4th Amendment." The third attributes "excessive force" to poor crime-scene management and communication. (Ex. 1 at 4). For each individual officer that he assessed, Mr. Hafkey concluded his analysis by saying that the officer's "use or attempted use of deadly force was not reasonable or necessary." (*Id.* at 20, 21, 25, 26, 27). Mr. Hafkey does not purport to instruct the jury on police practice and procedure, but the objective reasonableness of the

officers' conduct. This language is nearly identical to the language the court excluded in *Krause*. There, the expert "repeatedly opine[d] that the use of force 'was not objectively reasonable,'" and the court held that he "may not offer opinion testimony in the form of legal conclusions that presume the success of Plaintiff's arguments on specific claims." 459 F. Supp. 3d at 1264. The Ninth Circuit applies the same rule: expert testimony that "would have served 'to do nothing more than tell the jury what result it should reach'" is properly excluded. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.,* 523 F.3d 1051, 1060 (9th Cir. 2008) (quoting *Kostelecky v. NL Acme Tool/NL Indus., Inc.*, 837 F.2d 828, 830 (8th Cir. 1988)). *See also Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (police practices expert's testimony that officer's conduct was not "justified under the circumstances" was "totally improper" and "merely [told] the jury what result to reach").

The report does more than tell the jury what conclusion they should reach. It also purports to explain the law to the jury. It recites and applies *Payton*, *Mincey*, *Schneckloth*, *Torres v. Madrid*, *Garner*, *Graham*, *Deorle*, *Kingsley*, *Plumhoff*, *Brosseau*, and *Kisela*, among others. (Ex. 1 at 9–15, 23–24). Under *Diaz*, testimony that "represent[s] an attempt to instruct the jury on the law, or how to apply the law to the facts of the case" is inadmissible. *Hyer, 118 F.4th at 1059 (*quoting *Diaz*, 876 F.3d at 1199). The exclusion of such testimony is proper "even if [the expert's] statement of the law had been correct." *Nationwide Transp., 523 F.3d at 1058–59*.

Mr. Hafkey's statements of the law, however, are not correct. He writes: "Pursuant to *Deorle v Rutherford*, it is objectively unreasonable to use force on an unarmed subject." (Ex. 1 at 15). *Deorle* held no such thing. It held that it is objectively unreasonable to shoot "an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals," and it distinguished "law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." 272 F.3d 1272, 1285 (9th Cir. 2001); *Id.* at 1282–83. Mr. Hafkey also informs the jury that the law

is that “deadly force must be a last resort.” (Ex. 1 at 24). The Ninth Circuit has held otherwise: “Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable.” *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Mr. Hafkey lists *Scott v. Henrich* among the cases he reviewed to prepare his report. (Ex. 1 at 3). Finally, Mr. Hafkey also writes that “officers can only use deadly force if the person against whom the deadly force is applied represents an imminent threat of deadly force or serious bodily injury to the officer or someone else.” (Ex. 1 at 13). That formulation leaves no room for a reasonable mistake about the quantum of the threat and ignores the Supreme Court’s holding that the reasonableness of an officer’s conduct is judged by what they reasonably perceived, even if their perception turns out to be inaccurate. As the Supreme Court reasoned, “If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.” *Saucier v. Katz*, 533 U.S. 194, 205 (2001). These misstatements of the law will unfairly prejudice the jury and cause confusion as they try to reconcile Mr. Hafkey’s claims with the Court’s jury instructions. As the Ninth Circuit has observed of an expert whose legal conclusions “not only invaded the province of the trial judge, but constituted erroneous statements of law,” in such a case “[e]xpert testimony . . . would have been not only superfluous but mischievous.” *Nationwide Transp., 523 F.3d at 1058–59* (quoting *United States v. Brodie*, 858 F.2d 492, 497 (9th Cir. 1988)).

In *Hyer v. City & County of Honolulu*, the Ninth Circuit reversed the wholesale exclusion of three expert reports because the experts could offer some permissible testimony without veering into improper legal opinion. 118 F.4th at 1058–59. But unlike the reports in *Hyer*, Mr. Hafkey’s opinions cannot be separated from his legal conclusions – opinions one and two literally purport to analyze whether the officers’ conduct violated the Fourth Amendment, and opinion three presupposes that the officers used “excessive force.” But even if the Court could separate the legal conclusions from the rest of his report, when his caselaw analysis is stripped away, all that remains would be descriptions of the

camera recordings and credibility assessments of the officers' accounts, which the jury is entitled to make for itself.

**C. What Remains Is Narration of Recordings the Jury Can Watch, Together with Commentary on the Officers' Credibility**

Mr. Hafkey describes his own method as watching recordings and reporting what they show. His central finding on Officer Freeman begins: "After cross referencing the audio, surveillance video and radio broadcast timelines before, during and after Officer Freeman's first shot, it is clear that Mr. Cagne [sic] had put his rifle down on the kitchen counter before peering out the blinds and being shot by Officer Freeman." (Ex. 1 at 16). Mr. Hafkey not only describes what he claims the evidence shows, but speculates and assumes Mr. Gagne's intent to comply with instructions: "Surveillance video clearly shows Mr. Gagne following the negotiator's instructions to walk out unarmed and with his hands in the air as he walked by the southwest facing window, just north of the slider door, heading toward the front door." (*Id.* at 19).

Along with his report, Plaintiffs disclosed two appendixes prepared by Mr. Hafkey. One is a log of what can be heard on three body cameras, by time stamp. The other is a log of the negotiation audio, the interior video, and the air unit's video. (Exs. 2–3). The logs purport to transcribe the recordings, but they insert Mr. Hafkey's characterization of what they show. For example, in the crucial moment before the shot, Mr. Hafkey transcribed "Gagne puts gun down," but in the video Gagne is not in frame at all and only a small part of the gun can be seen. (Ex. 3; MSJ Ex. 11 at 1:19). Watching a recording and reporting what one sees requires no "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). The word "knowledge" in the rule "connotes more than subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590, and expert testimony must "address an issue beyond the common knowledge of the average layman," *Mukhtar*, 299 F.3d at 1066 n.9. Nothing in these recordings is "so technical or complex that a jury could not have grasped it without the aid of experts." *Torres v. Johnson Lines*, 932 F.2d at 751. The jury

can watch the same footage, listen to the same audio, and decide for itself whether Gagne set the rifle down.

In *Lee v. Andersen*, the plaintiff's video expert enhanced surveillance frames from a police shooting and opined that the decedent "did not have a firearm in his right hand during the moments before the shooting incident." 616 F.3d 803, 808 (8th Cir. 2010). The district court allowed him to explain how he enhanced the footage and excluded his opinion about what it showed, and the Eighth Circuit affirmed: "Although Dierks testified that his experience and training allow him to look at an image more critically than a lay person, the jury was entirely capable of analyzing the images and determining whether Fong Lee had anything in his hands." *Id.* at 809. The opinion "would not have assisted the jury but rather would have told it what result to reach." *Id.* Mr. Hafkey's opinion that Gagne "had put his rifle down on the kitchen counter before peering out the blinds" is essentially identical to the opinion in *Lee*, but he has even less qualifications: he is a police procedures expert and has no expertise in analyzing video. District courts in this Circuit have applied the same rule to police practices experts who narrate body-worn camera footage. *See Johnson v. City of San Jose*, No. 21-cv-01849-BLF, 2023 U.S. Dist. LEXIS 227978, at *8 (N.D. Cal. Dec. 21, 2023) (nothing showed that police practices expert was qualified "as an expert on video interpretation," and "the jury does not need the assistance of an expert to tell them what they can see for themselves in the videos").

The remainder of the report is commentary on the officers' honesty. Of Sergeant Harris: "Sgt. Harris' account of the incident was subjective, speculative and flawed by erroneous information." (Ex. 1 at 25). Of the team: "Based upon statements from the shooters, as well as so many rounds fired at Mr. Gagne while he did not present an imminent threat, the SWAT team appeared to have already decided that lethal force was warranted due to the threats Mr. Gagne had made while on the phone with the negotiator." (*Id.* at 24). Of Officers Freeman and Widmer, Mr. Hafkey went so far as to speculatively imply perfidy: "Neither officer reported that information to investigators following the incident either, which is extremely telling." (Ex. 1 at 18). Credibility belongs to the jury. "Weighing the

credibility of witnesses and resolving factual matters is not outside the common ability and knowledge of a layperson; it is the precise role that the law assigns solely to a layperson as juror." *Krause*, 459 F. Supp. 3d at 1265 (quoting *Quinn v. Fresno Cnty. Sheriff*, No. 1:10-cv-01617, 2012 WL 2995477, at *3 (E.D. Cal. 2012) (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005))). *See also Johnson v. City of San Jose*, No. 21-cv-01849-BLF, 2023 U.S. Dist. LEXIS 227978, at *9 (N.D. Cal. Dec. 21, 2023) (police practices expert's opinions on an officer's "credibility, intentions, or state of mind" held inadmissible).

What a police practices expert may properly do is help a jury "understand the options available to officers in similar situations." *Hyer, 118 F.4th at 1059 (citing Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc)). Mr. Hafkey's report does not. It mentions "Best Practices' guidelines established by the International Association of Chiefs of Police" once, on its first page, but only refers to "common police practice" in general terms everywhere else. (Ex. 1 at 1, 19, 22). Hafkey never identifies a model policy, a National Tactical Officers Association standard, an AZPOST curriculum, or specific Mesa Police Department policies he is using to assess the case. He never explains what any such standard requires or how the standard applies to the facts. He uses terms like "designated shooter," "contagious fire," and "controlled bursts" without citing a source and with no relevant training or qualifications. (Ex. 1 at 19, 23, 28). An expert "must explain precisely how they went about reaching their conclusions and point to some objective source." *Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*), 43 F.3d 1311, 1319 (9th Cir. 1995). Stripped of its legal verdicts, its narration, and its credibility commentary, the report has nothing left to offer, and what it does offer measures the officers by a standard the law forbids.

### D. Mr. Hafkey Judged the Officers by Footage They Never Saw, Using A Standard the Supreme Court Has Rejected

The Fourth Amendment judges force from the officer's perspective at the time. "The 'reasonableness' of a particular use of force must be judged from the perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. And the inquiry cannot be confined to a single instant. Last year the Supreme Court held that "a court cannot thus 'narrow' the totality-of-the-circumstances inquiry, to focus on only a single moment. It must look too, in this and all excessive-force cases, at any relevant events coming before." *Barnes v. Felix, 605 U.S. 73, 83 (2025)*.

*Graham* and *Barnes* ask whether a reasonable officer, knowing what these officers knew and based on the totality of the circumstances including all that Gagne had done and said, would have perceived him as presenting an imminent threat of deadly harm. But Mr. Hafkey's report answers a different question: Was the officers' conduct reasonable based on what Gagne was doing inside the apartment **at the moment** each officer fired, relying on footage not available to the officers at the time?

Mr. Hafkey's report rests on evidence the officers did not have and ignores most of the evidence that they had already observed. It concludes that Gagne "was clearly not an imminent threat **at that moment** and, therefore, the first lethal force used by Officer Freeman was not reasonable," and that "[t]here is evidence that he was **unarmed** and not presenting an imminent threat to police or the public." (Ex. 1 at 11, 16 (emphasis added).) Every factual premise for Mr. Hafkey's conclusions comes from one source: what "inside surveillance cameras confirm," what "surveillance video" showed about the rifle on the counter, what "[s]urveillance video clearly shows," and what "[s]urveillance video confirms." (*Id.* at 5, 16, 19, 22). Plaintiffs plead that the officers did not know the cameras existed, let alone have access to the real time video, but nevertheless concludes that the a reasonable officer would not have used lethal force based on what the videos show at the very moment the shot was fired. (Doc. 101 ¶ 164).

That approach disregards the officers' perspective, including that the windows were largely obstructed and the officers were making split second decisions with limited information. It is the officer's perspective which *Graham* makes the measure of reasonableness, not what later video revealed. Hafkey also discards the totality of the circumstances that formed that perspective, which *Barnes* requires the jury to weigh, instead focusing on a brief second where his rifle was on the counter during a lengthy armed standoff. In the hour before the shooting, Gagne threatened to kill officers and told the negotiator that he had his armor on and his guns ready. (Ex. 6, MESA_002260–002262; Doc. 79, Exs. 8-15[4]). The negotiator heard him loading magazines. (*Id.* at MESA_002261–002262). He opened his front door holding a rifle at the start of the barricade, and he looked out windows with a rifle in his hand while the standoff was under way. (Ex. 9, MESA_002373; Ex. 6, MESA_002237; Ex. 10, 68:8–20). Before police arrived, he had threatened to shoot his neighbor and choked his girlfriend, and he had fired a round from the apartment balcony. (Ex. 6, MESA_002259; Ex. 7, MESA_002000). Mr. Gagne told law enforcement he would shoot them and had the means to do so. In that context it is reasonable for officers to conclude that his appearance at the window was the final step before Mr. Gagne made good on his promises. His volitional conduct escalated the situation and ensured its violent character.

---

[4] While his firearm was raised up threatening that "they come to my fucking house there is going to be consequences…tell them to come through now I got my fucking shit loaded; opening door with rifle and yelling at officers to "leave;" "they come through my house I am going to blow a hole right through their fucking head..you want to play a fuching game, lets play." (Doc. 79, Ex. 11, 00-50; 1:00-1:16, 1:25-38). Rifle up and pointed while telling the negotiator that he would be "dumping shots," "get the fuck out of my fucking house before I start dumping shots in your fucking squad cars," "shine that fucking laser in my house one more time and I will fucking unload," "let's fucking play guns bro." (*Id.* at Ex. 12, 00-1:09, 1:10-34, 1:39-51). With rifle raised, "I will show you fucking scary bro..I am about to fucking descend the gods of fucking hell upon you people…move the fuck out of my vicinity, I said move out;" "I will fucking dump a hole right through your fucking squad car (with rifle raised and pointed straight at windows)," "if you fucking come into my vicinity there is going to be casualties including myself, I don't give a fuck." (*Id.* at Ex. 13, 00-32; 32-59; 2:00-2:08). Pacing with rifle: "I am not coming out, on God…you can stay out there all god damn fucking year..i have full thirty round fucking clips. You want to come to my fucking door I will fucking unload on all of your fucking team." (*Id.* at Ex. 14, 00-43; 1:00-1:25).

But by considering only the narrow moment where Gagne may have placed his gun on the counter, Mr. Hafkey does more than undermine his conclusion. Setting aside the context that informed the officers' perceptions and actions and considering only the moment force was used is the exact approach the Supreme Court rejected in *Barnes*. His testimony invites the jury to narrow their excessive force analysis only to the very moment of threat, and expert testimony that presents a legal conclusion based on an unconstitutional legal standard cannot "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The Court should exclude Opinions 2 and 3 on that ground alone.

*Graham* and *Barnes* require a use of force to be judged on the totality of the circumstances as the officers on the scene perceived them. 490 U.S. at 396; 605 U.S. at 83. By disregarding all of Gagne's violent and escalating conduct in favor of a few seconds of video that no officer could see, Mr. Hafkey applies an incorrect legal standard in a way that would mislead the jury.

**E. Opinion 1 Does Not Respond to Any Claim in The Third Amended Complaint**

The Third Amended Complaint pleads no claim for unlawful entry or unreasonable seizure of the home. (Doc. 101). Opinion 1 nonetheless asks whether the officers had "a valid legal theory to enter Mr. Gagne's home" under the doctrines of "warrant, exigency, emergency, or consent." (Ex. 1 at 4, 9). Those doctrines govern warrantless entry, and officers did not enter until after the shooting had concluded. Mr. Hafkey also argues that Gagne "was clearly seized under the 4th Amendment by being surrounded and contained within his home," for which he cites no authority. (*Id.* at 14). But prior to his seizure via the application of physical force, Mr. Gagne was not seized by law enforcement: "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254 (2007). Gagne was quite clear that he did not submit to being detained. (Ex. 6,

MESA_002261). "I'm not coming out. I'm not coming out."; Doc. 79, Ex. 14 "I am not coming out, on God," and Ex. 15 "I ain't going to go with you mother fuckers."). Opinion 1 is not relevant to any claim alleged, and as such should be excluded pursuant to Rule 401 and Rule 403.

## IV. CONCLUSION

Plaintiffs cannot carry their burden under Rule 702, and whatever slight probative value remains in Mr. Hafkey's testimony is substantially outweighed by the danger of unfair prejudice and jury confusion. Fed. R. Evid. 403. Defendants respectfully request that the Court exclude Mr. Hafkey's opinions and testimony in their entirety.

DATED this 10th day of November, 2026.

WIENEKE LAW GROUP, PLC

By: */s/ Christina Retts*

Kathleen L. Wieneke
Christina Retts
Rebekah K. Browder
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
*Attorneys for Defendants City of Mesa, Brown, Cameron, Chuey, Freeman, Goodrich, Harris, Navarro, and Thomas*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Sean A. Woods
Robert T. Mills
Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

By: */s/ Lauren Rasmussen*