# EXHIBIT 1

**Police Expert Opinion**
**Retired Phoenix Police Lieutenant Mark R. Hafkey, M. Ed.**

Mills + Woods Law, PLLC
Sean A. Woods, Esq.s
5055 N. 12th Street, Suite 101
Phoenix, Arizona 85014

Case No: CV-01337-DJH – Shawn Gagne Matter

Dear Mr. Woods:

Pursuant to your request, I have reviewed the below listed information and material relating to the above referenced case, and I have developed opinions related to common police training, practices, policies & procedures, as well as use of force, search & seizure, crime scene management and communication in this matter.

The opinions expressed herein I genuinely hold, and I am willing to testify to them in open court, under oath. My qualifications to express these opinions are revealed in the attached *Curriculum Vitae*, which details my education, law enforcement training, and experience.

My opinions are derived from and supported by the below listed case file and research material, case law, law enforcement training and experience, and common police policies, practices, procedures supported by *Best Practices'* guidelines established by the International Association of Chiefs of Police (IACP).

**Experience as an Expert Witness:**

I retired from the Phoenix Police Department in 2012 and made myself available as a police policy, practices, and procedures' expert witness in 2015 after being recommended by former counsel for a specific case. It is not something I do fulltime. I occasionally provide my opinion on cases I feel strongly about, and I work almost exclusively by referral. To date, I have provided opinion(s) on a handful of cases, in support of both Plaintiffs and Defendants, relating to vehicular homicide, use of force, search & seizure, police policies, practices & procedures, and traffic matters.

Finally, I understand that discovery is an ongoing process and could reveal yet other information relevant to the formulation of my opinions in this matter and, therefore, I reserve the right to modify or supplement my opinions upon receipt of further documentation produced in this matter.

**Case Material Reviewed:**

- Mesa Police Department Report w/Accompanying Supplements and Attachments
- Case File and Crime Scene Material
- Investigative Summary and Timelines
- Ring Camera and Interior Surveillance Cameras
- Police Body Cams of On-Scene Officers
- CAD and Radio Dispatch Audios
- Medical Examiner's Report
- Shooting Review Board Memoranda

**Case Law Reviewed:**

- Bonivert v Clarkston, 883 F3d 865 (9th Cir. 2018)
- Brosseau v Haugen, 543 US 194 (2004)
- Bryan v McPherson, 630 F3d 805 (9th Cir. 2010)
- Deorle v Rutherford, 272 F3d 1272 (9th Cir 2001)
- Gonzalez v Anaheim, 747 F3d 789 (9th Cir 2014)
- Graham v Connor, 490 US 386 (1989)
- Harris v Roderick, et al, 126 F2d 1189 (1997)
- Kingsley v. Hendrickson, 576 U.S. 389 (2015)
- Kisela v Hughes, 138 S Ct 1148 (2018)
- Lombardo v City of St. Louis, 594 U.S. ____ (2021)
- Mincey V Arizona, 437 Us 385 (1978)
- Payton v New York, 445 US 573 (1980)
- Plumhoff v. Rickard, 572 U.S. 765 (2014) – non jurisdictional case
- San Francisco v Sheehan, 135 S Ct 1765 (2015)
- Schneckloth v Bustamonte, 412 US 218 (1973)
- Scott v Henrich, 39 F3d 912 (9th Cir 1994)
- State v Ault, 724 P2d 545 (1986)
- State v Canez, 42 P3d 564 (2000)
- State v Fisher, 686 P2d 750 (1984)
- State v Fuentes, 247 AZ 516 (2019)
- Tennessee v Garner, 471 US 1 (1985)
- Torres v Madrid, 141S. Ct. 989 (2021)
- White v Pauly, 580 US (2017)

**Opinion(s):**

1. The officers did not have a valid legal theory to enter Mr. Gagne's home and, therefore, the seizure was unreasonable under the 4th Amendment.
2. The use of force used by Mesa Police Officers on July 6, 2023 to seize Mr. Gagne, was unreasonable under the 4th Amendment.
3. Poor crime scene management and police communication were contributing factors to the excessive force used in this matter.

**Case Synopsis:**

On July 6, 2023, at about 2130 hours, Mesa police officers responded to an aggravated assault (by threats) call at 1233 N. Mesa Drive. Officers were advised that Mr. Shawn Gagne had been depressed recently and drinking heavily. During the day, Mr. Gagne drank heavily, became increasingly upset and argued with his girlfriend (Jordan), who then called her friend and neighbor (Cindy) over to their apartment. Mr. Gagne had a verbal confrontation with the neighbor as well and cursed angrily at them both to leave. While leaving, Mr. Gagne was reported to have gone outside onto the 2nd floor balcony (out of sight but not out of earshot) and fire off a round while threatening to shoot them. Cindy contacted the police. Mr. Gagne was reported to have multiple guns inside, including high powered rifles, and was likely to become confrontational with police.

Patrol officers set up containment and the Mesa PD SWAT team was called to the scene. Officers attempted to contact Mr. Gagne via a vehicle's public address (PA) system and siren but did not get a response, so they launched beanbag rounds into the front door

and continued PA announcements. When that did not elicit a response, they fired more beanbag rounds into one of the apartment windows.

**Note**, inside surveillance cameras confirm that Mr. Gagne looked to be asleep/passed out on the couch during the time the police were attempting to contact him.

Mr. Gagne was soon reported to have opened the front door with a gun in his hand before quickly closing it again. Jordan and Mr. Gagne then spoke on the phone and in no uncertain terms, Mr. Gagne demanded that the police be told to leave. A crisis team negotiator (Adair) soon established phone contact with Mr. Gagne. Mr. Gagne refused to exit his home, advised that he had numerous weapons, and repeatedly threatened to shoot at the police if they did not turn off their lights and leave. Mr. Gagne made it very clear that if the police tried to come inside, he would shoot/kill them.

**Note**, much of Mr. Gagne's conversation with the negotiator was recorded and audiotaped. Mr. Gagne appeared to be very angry and intoxicated.

SWAT team officers (and armored equipment) took over perimeter positions from patrol units. A sniper observer, Officer Freeman, set up in an apartment directly west of Mr. Gagne's west facing balcony. Other SWAT team officers set up positions to the north, northwest and southwest to cover both balconies, front door and all of the front and side-facing windows, i.e., the entire front half of Mr. Gagne's apartment, including its north, west and south sides. Patrol units remained in positions at the rear half of the apartment to maintain a complete perimeter. The air unit soon arrived overhead to provide eyes in the sky.

**Note**, radio contact was maintained between ground and air unit officers, as well as with the two negotiators who provided negotiation updates.

Utilizing optics, Officer Freeman would later report that he observed Mr. Gagne (through the window north of the slider door off the south balcony) walking around inside his apartment talking on his cell phone (presumably with the negotiator) while carrying a rifle. At approximately 2242 hours, Officer Freeman said that he "observed the suspect walk over to the slider door and began peeking through the blinds" while holding the gun in his right hand, so he took his first shot (at his head). He then saw Mr. Gagne "use his hand again to look through the blinds again." So, he fired a second time (at the suspects torso). He indicated that after that, Mr. Gagne "moved to the north and deeper into the structure out of his view." Shortly after that, "the suspect fired multiple rounds out of the same window." He described the window north of the slider door where he initially observed Mr. Gagne.

**Note**, Officer Freeman did not report that Mr. Gagne ever pointed a gun at him or anyone else before he fired the two sniper rounds, but he did describe being concerned that Mr. Gagne had a "tactical advantage" and that "he could begin firing on officers." (Ingram Report, Pgs. 2237-2238; Audio Interview w/Ingram)

According to the Mesa Police Investigative Summary,

> *Approximately 56 seconds later, Shawn shoots three to four times out the north side sliding glass door. This is in the direction of three patrol vehicles to the north in Lesueur Circle. The officers in this location are hiding behind cover nearby. It is unknown where these rounds strike. Officer(s) Chuey, Goodrich, Cameron, Navarro and Thomas return fire.* (MPD Investigative Summary, Pg. 2010)

However, audio and visual evidence clearly contradict the above stated investigative conclusion(s). Mr. Gagne did not fire through the north side sliding glass door or windows, but rather the SWAT team members had. The SWAT team had inadvertently set up a crossfire situation and while Mr. Gagne was following negotiator instructions to walk out unarmed and with his hands up, the SWAT team officers fired at Mr. Gagne through the southwest facing window opposite the north balcony. Their rounds crossed through the apartment and exited out the north side sliding glass doors and windows. Both the air and ground units erroneously reported that Mr. Gagne was firing out the north side. (Crime Scene Photo, Pg. 2317, Interior Surveillance Camera Footage, Harris Body Cam)

Also, according to the Mesa Police Investigative Summary,

> *Approximately 18 seconds later, Shawn presents himself at the front door in the same position he had previously been seen holding a rifle. Officers reported that Shawn was standing in a position as if he was holding a weapon and blading his body from them. Shawn was observed by the officers wearing body armor and having a rifle magazine in his possession. At this time Officer(s) Goodrich, Chuey, Cameron and Sergeant(s) Harris and Thomas fire their weapons at Shawn.* (MPD Investigative Summary, Pg. 2010)

Audio and visual evidence contradict some of the above stated investigative conclusions here as well. Mr. Gagne had been shot multiple times and is sent tumbling down the stairs leading to the front door. He can be heard yelling to the negotiator six times - “I’m down, I’m down, I’m down, I’m down, I’m down, I’m down.” That information was not passed on to the SWAT team nor were the negotiator’s instructions for Mr. Gagne to go out the front door unarmed and with hands up. An unarmed Mr. Gagne then appears to

struggle to get the door open. SWAT officers open fire again within about one second of the door opening, and Mr. Gagne goes down again.

**Note**, there were no weapons found at the front door.

The officers indicated that they could see part of Mr. Gagne's body in the doorway. Not knowing whether he was conscious or armed, they utilized a K9, diversionary device, and drone to determine if it was safe to approach. Once at the door, they tased Mr. Gagne's limp body, handcuffed and removed him from the apartment. They then performed first aid until relieved by medical personnel. Mr. Gagne was pronounced deceased at the scene. A search of the apartment revealed 2 rifles, a shotgun and a handgun in various locations within the apartment. No weapons were located at the southwest facing window or at the front door. The following three shell casings were found inside the apartment at various locations as well:

1. One in the kitchen dining room floor against its south wall, which is <u>not consistent</u> with a right-side ejection if shooting out the west facing slider doors.
2. One in the master bedroom. There was no evidence or reports of firing out any master bedroom windows.
3. One on the north facing balcony, which is <u>consistent</u> with having fired from that balcony as reported by Cindy.

**My Opinion(s) Regarding Entry into Mr. Gagne's Home:**

The officers did not have a valid legal theory to enter Mr. Gagne's home and, therefore, the seizure was unreasonable under the 4th Amendment.

**Discussion:**

The 4th Amendment protects people from unreasonable searches and seizures in places in which they have a reasonable expectation of privacy. Officers are sworn to abide by the State and U.S. Constitutions, and they receive extensive constitutional law training in the police academy, post academy, field training program, frequent continuing education training and periodic proficiency training programs. Officers are taught the four legal theories to enter a person's home, i.e., warrant, exigency, emergency, or consent. Police policies dictate that officers abide by both the State and U.S. Constitutions. Note, the Arizona Constitution is even more protective than the Federal Constitution when it comes to entering people's homes and, therefore, Arizona police departments commonly provide more training in this area. Absent a valid legal exception (theory), even if officers have PC to arrest an individual, they must still obtain an arrest warrant to enter their home (State v Ault). For officers to conduct a protective sweep, which they did in this case, they must be lawfully inside the residence and have a lawful arrest. (State v Fuentes)

Pursuant to multiple cases, including but not limited to Torres v Madrid, Harris v Roderick and the landmark Supreme Court case of Tennessee v Garner, shooting someone is considered a seizure under the 4th Amendment. Officer Freeman seized Mr. Gagne the moment he shot him. Surrounding Mr. Gagne's home and limiting his freedom would have also constituted a seizure. Mesa officers may (or may not) have had PC to arrest Mr. Gagne

at the time, but they failed to obtain an arrest warrant in accordance with the 4th Amendment.

**No Arrest Warrant**

An arrest warrant is an order from the court to enter certain private areas to search for specified persons. Officers are trained on how to obtain an arrest warrant and can usually obtain them in Mesa via telephone 24/7. The officers did not attempt to get an arrest warrant before seizing Mr. Gagne. Arrest warrants must be supported by PC and officers may not enter a suspect's home on PC alone unless they have an exigency, i.e., a legal exception. (Payton v New York) The exceptions for obtaining a warrant are exigent circumstances, an emergency or consent.

**No Exigency**

An exigency is a situation which calls for an immediate response by an officer and means that they may conduct a search without getting a warrant, e.g., because there is no time to obtain a warrant. There are many factors in determining exigency. The Arizona Supreme Court stated recently that "Though not an exhaustive list, we have recognized the following circumstances: response to an emergency, hot pursuit, potential destruction of evidence, potential violence inside, and flight." (State v Canez and Payton v New York).

In this case, the officers responded to a threats call in which both alleged victims had already vacated the home and were safe. Their suspect, Mr. Gagne, was inside his home and reported to be alone and possibly passed out. The officers had absolutely no reason to believe that anyone else was at risk inside his home. They immediately surrounded

(seized) the home to keep Mr. Gagne from fleeing. The threats Mr. Gagne made toward the police were pursuant to the manner in which the officers seized his home and to keep them from entering his home. Mr. Gagne was initially shot by the sniper (Officer Freeman) as soon as he peered outside through the blinds of his slider door. There is evidence that he was unarmed and not presenting an imminent threat to police or the public. There were no exigent circumstances justifying an immediate entry into the home to seize of Mr. Gagne without an arrest warrant.

**No Emergency**

The emergency doctrine is a well-established exception for police to enter a premises without a warrant when they "reasonably believe that a person within is in need of immediate aid." (Mincey v Arizona) Emergencies are sometimes described as exigencies where the officers' concerns are about the health or well-being of an occupant or the property itself. All Arizona officers are taught the elements of emergencies under the emergency doctrine pursuant to State v Fisher, and they utilize this warrant exception daily while responding to emergency calls.

However, this situation did not amount to an emergency requiring the officers to make unilateral and immediate entry into Mr. Gagne's home. The incident (threat to the victims) was over, Mr. Gagne was surrounded and contained, and there were no reports of injury or any potentially life-threatening issues within his residence. Therefore, when the officers arrived, there was no emergency justifying a warrantless entry into the residence under the emergency doctrine.

**No Consent**

There is no evidence that the officers ever asked for consent to enter the premises. Consent to enter a premises is simply a waiver of the 4th Amendment right requiring officers to obtain a warrant or show exigency to enter a home. Officers must obtain voluntary consent from a person or persons who have apparent authority to consent. (Schneckloth v Bustamonte)

In this case, Mr. Gagne had made it abundantly clear that he wanted the police to leave and was not, therefore, amenable to consenting. Even had the officers obtained consent from his girlfriend Jordan, the officers would have needed Mr. Gagne to consent as well. (Bonivert v Clarkston)

Suffice it to say, the officers did not have a valid legal theory to justify their seizure of Mr. Gagne. Their seizure was unlawful under the 4th Amendment and a violation of numerous police policies requiring officers to obtain an arrest warrant.

**My Opinion(s) Regarding the Use of Force Used to Seize Mr. Gagne:**

The use of force used by Mesa Police Officers Freeman, Harris, Chuey, Goodrich, Brown, Navarro, Thomas and Cameron to seize Mr. Gagne, was unreasonable under the 4th Amendment.

**Discussion:**

Use-of-force training, especially for SWAT officers, is probably the most prolific training that police officers receive. The training ranges from an officer's mere presence to deadly force, i.e., presence, verbal commands, empty-hand control techniques, less-lethal force and lethal force. These levels are sometimes classified by courts in other terms or ranges. As long as officers do not create the provocation, they need not use the least force possible, but they must use objectively reasonable force. (Scott v Henrich)

**Note**, the initial force in this case was the officers' presence (lights and perimeter) to impede Mr. Gagne's freedom and then Officer Freeman's first sniper round, which appeared to provoke Mr. Gagne.

The United States Supreme Court and the 9th Circuit has made it abundantly clear that officers can only use deadly force if the person against whom the deadly force is applied represents an imminent threat of deadly force or serious bodily injury to the officer or someone else. Deadly force is controlled by Tennessee v Garner, a case that all officers are taught in the Academy. In this landmark case, the Court of Appeals specifically stated that the use of deadly force is only justified if the officer has probable cause to believe that a suspect poses an immediate threat of serious physical harm to the officer or others. The Supreme Court further stated that for purposes of civil liability, seizures must be tested under the 4th Amendment standard, i.e., was the seizure "reasonable" (Graham v Connor)

The Supreme Court suggested several factors for courts and juries to consider when determining whether the officer used excessive or unreasonable force, i.e., the severity of the crime, the immediate threat, and whether the person was resisting arrest or trying to escape. In Lombardo v City of St. Louis, even more factors were created, e.g.,

- relationship between the need for force and the amount of force used;
- extent of the plaintiff's injury;
- effort made by the officer(s) to temper or limit the amount of force;
- severity of the security problem at issue;
- threat reasonably perceived by the officer
- Whether the plaintiff was actively resisting

While extremely intoxicated and out of sight of the victims, Mr. Gagne was alleged to have threatened to shoot them (his girlfriend and his neighbor), but he had not physically harmed anyone. There is video evidence that he was passed out during PA announcements and not formally placed under arrest, and he was clearly seized under the 4th Amendment by being surrounded and contained within his home. A reasonable person would not have believed that they were free to leave. Walking around the interior of his home while carrying guns would not substantiate an imminent threat to officers or citizens outside.

At the initial SWAT team briefing, officers can be heard discussing placement of their sniper - Officer Freeman and "going hot." Going hot generally signifies ready for immediate lethal force. Officer Freeman apparently did not have a body camera, but can be heard, via Officer Widmer's body camera (1758E), saying "I know exactly where I want to go, I can see him with the rifle like, I can put him down as soon as I get up there," i.e., up on the balcony directly across from Mr. Gagne's balcony. (Axon 1758E – 22:31) This statement is

indicative of a predetermined mindset that lethal force had already been authorized against Mr. Gagne. This mindset is further evidenced by Mr. Gagne being shot as soon as he peered through the blinds of the slider door, as well as when he walked by the southwest facing window unarmed.

Pursuant to Deorle v Rutherford, it is objectively unreasonable to use force on an unarmed subject. Kingsley v Hendrickson indicated that the officer's intent does not matter; only that the force used was unreasonable. Plumhoff v Rickard indicates that if an officer is justified in firing, they need not stop until the threat has ended. However, the case also implies that if the threat does stop, or the suspect is rendered incapable of continuing to pose a threat, continued force would not be justified.

**Use of Force by Officer Freeman - Sniper Rounds**

At the time of the shooting, Officer Freeman was positioned to the west of Mr. Gagne's apartment at a distance of approximately 80 feet. His position provided both cover (balcony railing and door frame) and concealment (darkness inside apartment and spotlights directed toward Mr. Gagne's apartment windows), and he was protected by advanced personal protective equipment and a high-powered rifle affixed with optics. SWAT officers receive advanced tactical and firearms training, and they train more than any other police unit, particularly sniper trained officers.

Officer Freeman had set up his sniper rifle on a tripod west of the subject apartment facing the west facing sliding glass doors of the south balcony. According to Officer Freeman's interview with Detective Ingram, et al, he indicated that prior to his arrival, he "heard that a person had fired multiple rounds from an AK-47 and that the subject was

believed to have passed out in the residence." (Ingram Interview, Pg. 2237, and Audio Interview)

**Note**, the evidence does not confirm that Mr. Gagne had fired "multiple rounds" from an AK-47. He was purported to have been heard racking an unknown weapon's slide and firing a single shot.

Once set up across from Mr. Gagne's apartment, Officer Freeman began making observations. He saw Mr. Gagne talking on a cell phone and "believed this was possibly negotiators talking to the suspect…" Mr. Gagne appeared "agitated" and was "walking around with a rifle…" He observed Mr. Gagne "walk over to the slider door and began peeking through the blinds." Officer Freeman said that he "saw that the gun was in his right hand." He believed the suspect was "peeking out at patrol officers down below…" and described Mr. Gagne as having the tactical advantage over the officers below. It was at that time that he took his first shot at Mr. Gagne. Officer Freeman then reiterated to Detective Ingram that "the rifle was in his right hand and his left hand was opening the blinds." (Ingram Report, Pg. 2237; Audio of Ingram Interview w/Officer Freeman)

However, surveillance video from inside Mr. Gagne's home and audio of the negotiator speaking with Mr. Gagne clearly contradict Officer Freeman's account. After cross referencing the audio, surveillance video and radio broadcast timelines before, during and after Officer Freeman's first shot, it is clear that Mr. Cagne had put his rifle down on the kitchen counter before peering out the blinds and being shot by Officer Freeman. In other words, Mr. Gagne did not have the rifle in his right hand (in a low ready position) as the officer described. He was clearly not an imminent threat at that moment and, therefore, the first lethal force used by Officer Freeman was not reasonable. (Surveillance Video, 1:10 –

1:38 / Audio-Visual-Radio Timeline / Axon Timeline Widmer)

Pursuant to body-cam audio, approximately 43 seconds after that first round was fired, Officer Freeman fired his second shot. Officer Freeman said he "saw the suspect use his hand again to look through the blinds again" so he "fired a second time at the suspect's torso." Officer Freeman indicated that after his second shot, Mr. Gagne moved north, deeper into the structure, and out of view. Shortly after that, Officer Freeman reported that Mr. Gagne "fired multiple rounds out the same window," which he described as the window just north of the slider door. He indicated that he could see glass "…leaving the residence." He then "heard a volley of fire from down below."

**Note**, Officer Freeman did not report to Detective Ingram that he observed Mr. Gagne with a weapon or shooting out of the slider door when he fired his second sniper round. This contradicts the Investigative Summary which indicates "Officer Freeman saw Shawn come back at the window with the firearm." Officer Freeman did not say that Mr. Gagne had returned to the slider door with a firearm at all. The "multiple rounds" Officer Freeman reported seeing "out the same window," were in fact rounds fired by his own team.

Officer Widmer had been tasked with providing support to Officer Freeman at his sniper location, but had arrived just after the first sniper shot. As Officer Widmer arrived, you can hear Officer Widmer say "he's still up." You then hear Officer Freeman say "yeah, he's still up" and then "he's punching that window out." You then hear what appears to be Officer Freeman's second shot. (Widmer Body Cam - 22:43:03) Officer Widmer later documented in his report that after he arrived, he "observed him (Mr. Gagne) attempting to look at the officers on the ground level while still holding a rifle. Around this point, I heard Officer Freeman fire once." He also stated that he observed the subject stagger to his feet

and move off to the north of the structure." Officer Widmer then wrote in his supplement that "The subject started shooting his rifle out at police from both sides and he was met with appropriate response of officers firing back at him to stop the threat that was presented to them." (Widmer Supplement)

As mentioned above, however, Officer Freeman did not report seeing Mr. Gagne holding a gun when he fired his second shot either. This contradicts Officer Widmer's account and since Officer Freeman was using optics, he would have had the best view from across the large parking lot. Furthermore, on Officer Widmer's body cam, 27 seconds after Officer Freeman's second shot, you can hear Officer Freeman say "…looks like that gun is still down right there," and then "hands are clear" and "hands are up." These statements are consistent with the surveillance video depicting Mr. Gagne's hands up and walking out of the kitchen less than a minute after the second shot. However, despite having time (approx. 10 seconds), neither Officer Freeman nor Officer Widmer communicated that critical information to their team to inform them that Mr. Gagne appeared to be surrendering. That information would have let the SWAT team know that Mr. Gagne was unarmed and headed toward the front door with his hands up as the negotiator requested. Communicating that critical information would likely have prevented the barrage of shots through the window as Mr. Gagne walked past it unarmed and with his hands raised in the air. Neither officer reported that information to investigators following the incident either, which is extremely telling. (Widmer Body Cam – 1507-1535)

**Use of Force by Officers Thomas, Brown and Navarro**

Officers Thomas, Brown and Navarro were positioned to the southwest of Mr.

Gagne's apartment at a distance of approximately 80 feet. Their positions provided both cover (SUV vehicles) and concealment (darkness, carport and spotlights directed toward apartment windows), and they were protected by advanced personal protective equipment and high-powered rifles affixed with optics and lasers. SWAT officers receive advanced tactical and firearms training, and they train more than any other police unit.

Surveillance video clearly shows Mr. Gagne following the negotiator's instructions to walk out unarmed and with his hands in the air as he walked by the southwest facing window, just north of the slider door, heading toward the front door. He made no attempt to even look out of the window when the barrage of shots was fired from the location in which SWAT Officers Thomas, Brown and Navarro had set up. Numerous rounds went through the window not only striking Mr. Gagne, but also crossing through the apartment and exiting out of the north window dangerously close to the air unit as it rounded the north side of the apartment. Those rounds, which were erroneously attributed to Mr. Gagne, were actually friendly crossfire by the SWAT team. Their rounds created a substantial risk to not only the air unit, but also the officers described in the Investigative Summary as being located "in the direction of three patrol vehicles to the north in Lesueur Circle. The officers in this location are hiding behind cover nearby."

Mr. Gagne was clearly not an imminent risk to officers Thomas, Brown and Navarro at the time they fired, and the officers exercised extremely poor firearms tactics and discipline by not having assigned a designated shooter. Designating a shooter is common police training and practices to help minimize risk (force) and to prevent unnecessary contagious fire by other officers, which appears to have occurred in this case.

**Sergeant Thomas** indicated to Detective Ingram that "he saw some movement from the window to the left of the west facing slider. He also saw movement from the bottom right corner of the sliding door. He thought someone was kneeling down in that corner." He heard "more gunshots from inside the apartment. At that time, he shot 3 to 4 rounds in the bottom right corner of the sliding door in response to the shots." Evidence proves that Sergeant Thomas was actually hearing his own team firing when he discharged his weapon. (Ingram Report, Pgs. 2250-51) Physical evidence clearly proves that Mr. Gagne was not an imminent threat to either Sergeant Thomas or anyone else at that moment and, therefore, Sergeant Thomas' use or attempted use of deadly force was not reasonable or necessary.

**Officer Brown** indicated to Detective Ingram that he also heard "several more shots from inside the apartment." He "saw him (Mr. Gagne) walk up to the window left of the west sliding glass door that faces southwest." He described knowing that "he was going to walk past this window because he knew the stairs were in this location." Officer Brown then reported erroneously that "the suspect stopped and turned toward him." So, "he fired his weapon because he was in fear that the suspect was going to start shooting at himself and the other officers with him." Officer Brown reiterated to Detective Ingram that "the suspect began messing with the blinds" and that "he could see something in the suspects hands but could not make out for sure if it was a gun or not." (Ingram Report, Pgs. 2246-47)

Officer Brown's statement that he knew Mr. Gagne was going to walk by the window is indicative of him preparing to shoot. His statements that Mr. Gagne "stopped and turned toward him" and that he "could see something in the suspect's hands" were simply not

accurate, and his stated belief that Mr. Gagne was going to start shooting was completely speculative. The physical evidence clearly contradicts Officer Brown and proves that Mr. Gagne was not an imminent threat to him or anyone else at that time and, therefore, his lethal force was not reasonable or unnecessary.

**Officer Navarro** indicated to Detective Ingram that he had seen Mr. Gagne at the slider door with "something in his hands" that he believed to be "a rifle based on the length." He then saw Mr. Gagne walk "toward the window left of the west sliding door where he saw the suspect standing." Officer Navarro said he "believed he was going to begin shooting out…" So, "he shot and heard a volley of shots." (Ingram Report, Pgs. 2248-49)

Officer Navarro's observations of Mr. Gagne at the slider door, even if correct, would not justify lethal force at the southwest facing window. Officer Navarro's stated belief that "he was going to begin shooting out…" was speculative and without means. Mr. Gagne was walking by the closed window obstructed by blinds (as opposed to standing still), was effectively blinded by bright spot lights, and was unarmed with his hands up. Physical evidence clearly shows that Mr. Gagne was not an imminent threat to Officer Navarro or anyone else at that time and, therefore, his use of deadly force was not reasonable or necessary.

**Negotiator Communication**

Negotiator Adair had been in phone contact with Mr. Gagne for approximately seven minutes before the first sniper shot. There is evidence that the SWAT team knew that the

negotiator was on the line with Mr. Gagne as some of his communication was being relayed to the team. The negotiator gave Mr. Gagne specific instructions to put his weapon down and walk out the front door with his hands up.

In barricade situations such as this case, common police practice is to slow things down by establishing a perimeter with adequate cover and/or concealment, make contact with the suspect, and allow the negotiator time to work, especially when there is no exigency. SWAT teams are often used to accomplish this as they receive specialty training, have specialty equipment and are not subject to normal radio traffic, i.e., they have plenty of time. In accordance with this practice and just after the initial sniper shot, the negotiator transmitted "I'm still on the line with him; he's still talking with me." This is a clear indicator for SWAT team members to stand down. However, none of the shooters in this case heeded the negotiator's transmission.

Surveillance video confirms that while still communicating with the negotiator (Adair), the wounded Mr. Gagne (shot in the face) was walking from the kitchen toward the front door and past the window, just north of the slider door, with his hands up when he was suddenly fired upon by Officers' Thomas, Brown and Navarro. Mr. Gagne immediately tumbled down the stairs leading to the front door and started yelling "I'm down" six times. However, that information was apparently not communicated to officers by the negotiator.

**Use of Force by Officers Harris, Goodrich, Cameron and Chuey**

Sergeant Harris was positioned north-northwest of Mr. Gagne's apartment at a distance of approximately 60 feet. His position provided both cover (vehicle) and concealment (darkness, carport and spotlights directed toward apartment windows).

Officers Goodrich, Cameron and Chuey were positioned northwest of the apartment at a distance of approximately 80-100 feet. Their positions provided both cover (SUV vehicles) and concealment (darkness and spotlights directed toward apartment windows). All officers were protected by advanced personal protective equipment and high-powered rifles affixed with optics. SWAT officers receive advanced tactical and firearms training to shoot with extreme precision, and they train more than any other police unit. With respect to firearms' instruction, Officers are specifically trained to utilize controlled bursts to allow for continual assessment of the threat as opposed to "spraying" or completely emptying a weapon's magazine.

The unarmed and severely wounded Mr. Gagne appeared to struggle to open the front door and was fired upon again with a barrage of gunshots within about one second of revealing himself. One second is the approximate minimum time required for perception-reaction time, i.e., time it takes to observe, identify and then react to a given threat. All of the officers were behind cover and none of them reported seeing a gun. All of the erroneous information about Mr. Gagne allegedly shooting at officers from the apartment likely attributed to the officers' mindset to immediately eliminate him as a threat as opposed to affording him an opportunity to surrender.

Deadly force is controlled by the landmark case of Tennessee v Garner, and non-deadly force is controlled by Graham v Connor. Pursuant to Tennessee v Garner, officers must have PC to believe a suspect poses an immediate threat of death or serious physical injury to the officer or others. Pursuant to Brosseau v Haugen, speculation that a suspect might be a threat to someone is not sufficient. Graham v Connor established an "objective reasonableness" standard for evaluating a use-of-force incident under the facts and

circumstances officers face at the time the force is executed and established factors that officers must consider before applying force, e.g., the severity of the crime, whether they are resisting arrest or if they are trying to escape.

The 9th Circuit has made it abundantly clear in numerous cases that officers, when given time, must provide warnings to suspects before implementing force, particularly deadly force. Officers are trained to give clear commands/warnings to suspects in order to gain compliance and to use only that force necessary to affect an arrest. Officers must give suspects an opportunity to surrender, and deadly force must be a last resort to preserve the sanctity of life. (Kisela v Hughes, Harris v Roderick, Gonzalez v Anaheim, Young v County of Los Angeles, Nelson v Davis, White v Pauly, Bryan v McPherson)

Mr. Gagne was not specifically warned of the officers' intentions to utilize deadly force by the SWAT team or the negotiator before he was sniped. After Mr. Gagne was shot and appearing to surrender, the SWAT team did not give him that opportunity. Based upon statements from the shooters, as well as so many rounds fired at Mr. Gagne while he did not present an imminent threat, the SWAT team appeared to have already decided that lethal force was warranted due to the threats Mr. Gagne had made while on the phone with the negotiator.

**Sgt. Harris** indicated to Detective Ingram that there "had been shots fired out the west window, then out the north window and then out the south window." He believed that Mr. Gagne "had complete disregard for the lives of others outside the apartment and that the suspects actions needed to be stopped immediately." So, when he observed Mr. Gagne wearing a plate carrier (type of ballistic protection), he "believed this was a big problem

because the suspect had escalated from firing his weapon out of obscure places to an open confrontation in the doorway." He also "could hear engagement from other officers." He "saw him (Mr. Gagne) move across the door frame in a way that he believed the subject was concealing himself so that he could keep eyes on the team to his west." He then "deployed his rifle." Sgt. Harris also described seeing "his arms up in the same way that he would if he was holding his rifle" and "saw what he believed was an AR15 magazine." (Ingram Report, Pgs. 2239-41)

There is evidence that Mr. Gagne had not fired out of several windows as Sgt. Harris believed or even one window. Sgt. Harris did not have a clear view of Mr. Gagne, did not see a weapon in Mr. Gagne's hands and could not verify that he was an imminent threat to himself or any other officers at the time he utilized deadly force. Furthermore, Mr. Gagne was surrounded, unable to escape and effectively rendered blind by spotlights. Sgt. Harris did not provide Mr. Gagne with a warning of deadly force or provide him an opportunity to surrender. Sgt. Harris' account of the incident was subjective, speculative and flawed by erroneous information. Sgt. Harris' immediate use of deadly force against Mr. Gagne when he opened the door was not reasonable or necessary.

**Officer Goodrich** indicated to Detective Ingram that at "some point after" the 2nd sniper shot, the suspect fired "…a barrage of shots, possibly 5 rounds." He believed there was an exchange of gunfire between the suspect and officers but could not see Mr. Gagne. He also observed stucco and glass "going off" on the north side, so "he chose to utilize focus fire to provide a distraction to draw the suspects attention away from where he was firing." His fire was concentrated above the front door. After "a lull" in the firing, "the door swung

open very quickly." He observed Mr. Gagne "bladed" in the doorway" and wearing body armor. He said he believed that based upon "the way the suspect's body was orientated, that he was pointing a rifle at them, trying to get shots off." He "saw this as a threat to all the officers present…" and "engaged the suspect by firing again." He further told Detective Ingram that "he thought he saw a rifle in this suspects hand in the low-port position." (Ingram Report, Pgs. 2244-45)

Like Sgt. Harris, Officer Goodrich said he believed that Mr. Gagne was firing out of the north window. He chose to fire diversionary rounds at that time. Although Officer Goodrich said he thought he saw Mr. Gagne holding a rifle at the front door, the physical evidence contradicts his statement. Unlike Sgt. Harris describing Mr. Gagne's hands being up, Officer Goodrich described them as being down holding a rifle. Officer Goodrich did not provide Mr. Gagne with a warning of deadly force or provide him an opportunity to surrender. He too speculated that Mr. Gagne was a threat to all the officers present, so he utilized lethal force. His account of the incident was subjective and flawed by erroneous information. Officer Goodrich's use of immediate deadly force against Mr. Gagne when he opened his door was not reasonable or necessary.

**Officer Cameron** indicated to Detective Ingram that after he heard multiple rounds, he too performed "focused fire" on the apartment (on header above the west facing slider door). He "heard Sgt. Harris state that the subject is shooting out to the north." He saw the "front door open and the suspect standing in the doorway." He too saw the body armor and said that "it looked like the suspect was holding a rifle in his right hand." He attempted to fire at Mr. Gagne but apparently struck his own vehicle's spotlight.

Officer Cameron did not provide Mr. Gagne with a warning of deadly force or provide him an opportunity to surrender. He told Detective Ingram that he “thought the suspect was shooting at them and that was the reason why he fired.” His account of the incident indicating that Mr. Gagne was holding a rifle and shooting at them was simply not correct and speculative. Mr. Gagne was not an imminent threat to Officer Cameron or others, so his attempted use of deadly force against Mr. Gagne was not reasonable.

**Officer Chuey** described to Detective Ingram seeing the (friendly fire) gun shots coming from the northside of the apartments. He said that “he fired at the muzzle flash with his rifle” because “he believed the suspect was shooting at officers from that position.” He then focused his attention back on the front door. He described Mr. Gagne opening the door wearing a plate carrier and standing “like he had a weapon.” So, he fired at Mr. Gagne.

Officer Chuey did not provide Mr. Gagne with any warnings of deadly force or provide him an opportunity to surrender. He too did not see a weapon and merely speculated that Mr. Gagne was armed when he utilized deadly force by unloading his rifle at him. Officer Chuey’s immediate use of deadly force when Mr. Gagne opened his front door was not reasonable or necessary.

**My Opinion(s) Regarding Scene Management and Communication:**

Poor scene management and communication were contributing factors to the excessive force used in this matter.

## Officer to Officer Communication

After the initial sniper shots, Officer Freeman observed that Mr. Gagne's gun was down and his hands were clear and raised up when he started walking north toward the front door. Officer Freeman stated these things out loud to Officer Widmer. Despite having time, neither officer reported that critical information to the team. This was a critical communication error by both officers.

**Note**, snipers are also observers for the rest of the team, and their job is to provide the team with critical fluid observations like this.

## Team Assignments and Positioning

Two groups of three-SWAT-officer teams were positioned on the front perimeter to cover the apartment windows and doors. When positioning teams at a barricade, it is common practice and basic training to make specific team assignments, e.g., designated shooter, observer, less-than-lethal, communicator, etc. Establishing such team assignments avoids confusion and helps prevent excessive or contagious fire situations. I have not seen any evidence that the SWAT supervisors in this case made these designations, which is evidenced by all of the officers in each team firing simultaneously from their fixed positions into the same narrow target areas, i.e., the s/w window and front door. Irrespective that

Mr. Gagne did not present an imminent threat, the sheer number of high-powered rifle rounds into the narrow targets was excessive, particularly for highly trained officers.

Officers Thomas, Brown and Navarro were positioned southwest of the apartment on a clear trajectory to the north-northeast facing slider door and window. In other words, rounds entering through the southwest window had a direct path to exit out of the north-northeast glass, which is exactly what happened. There is evidence that the SWAT team had a working knowledge of the apartment's layout, and they should have realized the crossfire (pass-through) situation when rounds were exiting the north side of the apartment, thereby, placing other officers and the public at unnecessary risk.

**Negotiator to Team Communication**

Negotiators arrived on scene and established communication with Mr. Gagne almost immediately. Supervisors should have had officers stand down during the ongoing negotiation process, which is common practice during a barricade. Mr. Gagne was contained without any hostages, and the SWAT team had plenty of time to negotiate a non-lethal and peaceful resolution. Barricade situations are often resolved peacefully with trained negotiators within a matter of hours.

The negotiator (Adair) was in communication with Mr. Gagne. Mr. Gagne told the negotiator that he had been "hit" by the sniper. The negotiator asked where he was injured and Mr. Gagne responded "in the face." This information was not passed on to the shooting teams. When Mr. Gagne walked by the window unarmed and with his hands up, presumably to surrender pursuant to the negotiator's instructions, he was immediately and unnecessarily fired upon by several officers simultaneously. He then tumbled down the

stairs and yelled six times "I'm down." This information was not passed on to the team either. When Mr. Gagne then opened the front door, presumably still trying to surrender, he was shot at again by several more officers.

Suffice it to say, Mr. Gagne was contained and essentially blinded by powerful lights. The negotiator(s) were in communication with him and had plenty of time to negotiate his surrender. The SWAT team was outfitted with protective gear, adequate weapons, and they maintained both cover and concealment to minimize risk to themselves and protect the public. Despite having several supervisors on scene, multiple tactical and communication errors were made which undoubtedly contributed to the excessive force used to seize (and ultimately kill) Mr. Gagne.

Respectfully given this 20th Day of February, 2026

Ret. Lt. Mark R. Hafkey, M. Ed.

# EXHIBIT 2

**Axon Timeline Widmer**

| 1758E - Widmer | Time | Observation | 4931E - Navarro | Time | Observation | 1669C - Harris | Time | Observation |
|---|---|---|---|---|---|---|---|---|
| 02:45 | 22:31:25 | *I know exactly where I want to go, I can see him w/the rifle like, I can* | | | | | | |
| 02:54 | 22:31:34 | *I can put him down as soon as I get up there* | | | | | | |
| 13:56 | 22:42:37 | **1st Shot** | 02:48 | 22:42:38 | **1st Shot** | 12:11 | 22:42:37 | **1st Shot** |
| | | | 02:55 | 22:42:43 | 998 | 12:17 | 22:42:43 | 998 |
| 14:23 | 22:43:02 | Widmer joins Freeman | | | | | | |
| 14:25 | 22:43:04 | *He's still up* | | | | | | |
| 14:35 | 22:43:15 | *He's punching that window out* | | | | | | |
| 14:40 | 22:43:19 | **2nd Shot** | 03:30 | 22:43:20 | **2nd Shot** | 12:53 | 22:43:19 | **2nd Shot** |
| | | | 03:31 | 22:43:21 | **3rd Shot** | 12:55 | 22:43:21 | **3rd Shot** |
| 15:07 | 22:43:47 | *Looks like that gun is still down right there* | | | | | | |
| 15:25 | 22:44:15 | *Hands are clear, Hands are up, he's passing that window (numerous shots)* | 04:26 | 22:44:16 | **Barrage of shots** | 13:49 | 22:44:15 | **Barrage of shots** |
| 15:35 | 22:44:25 | *He's passing that window* (numerous shots) | | | | | | |
| | | | 04:36 | 22:44:26 | Bear Cat kill your headlights | | | |
| | | | | | | 14:05 | 22:44:31 | He's firing out n/s wind |
| | | | 04:45 | 22:44:34 | **Barrage of shots** | 14:07 | 22:44:33 | **Barrage of shots** |
| | | | | | | 14:11 | 22:44:37 | Harris fires |

# EXHIBIT 3

**Audio-Visual-Radio Timelines**

| Audio | Statements | Ring | Ring Video | Air | Air Unit Visual |
|---|---|---|---|---|---|
| 11:11 | *We're not leaving; can't leave because of the incident* | 1:10 | Gagne walking to kitchen | | |
| 11:20 | *What incident?* | 1:19 | Gagne puts gun down | | |
| 11:25 | Blind noises and distant shot noise | 1:24 | Gagne peers thru window, sniper shot heard | | |
| 11:34 | Shawn are you there? Yeah, I'm hit | 1:38 | *Shawn are you there? Yeah, I'm hit* | | |
| 11:40 | *Tactical 998* | | Shadow movements off screen | | |
| 11:43 | *I'm still on the line with him; he's still talking with me* | | Shadow movements off screen | | |
| 11:50-11:52 | *I want you to walk out that door w/your hands up follow all my directions* | 1:52 | **Video Off Approx 45 Seconds** | | |
| 11:58 | *Are you ok; are you injured; yeah, I'm injured* | | | | |
| 12:03 | *Shawn yelling, I said get the fuck away bro* | | | | |
| 12:08 | Shot heard, possibly two, crying | | | | |
| 12:15 | *Drop the weapons, hands…* | | | | |
| 12:25 | *Can you hear me, Shawn? I hear you* | | **2nd Surveillance Video** | | |
| 12:37 | *I need you to put the weapons down, I need you to walk out that door w/your hands up…* | 0:00 | *Walk out that door w/your hands up* | | |
| 12:50 | *Where are you hurt at?* | 0:10 | Glass crashing; *Where are you hurt at?* | 01:26 | Glass falls west facing slider |
| | | | Gagne's hands up walking toward door | | |
| 12:55 | *Can you tell me where you are hurt at?* | 0:15 | *Can you tell me where you are hurt at? In the face…* | | |
| 13:03 | Barrage of shots | 0:22 | Shots coming through window | 01:40 | Shots thru North slider |
| 13:10 | *I'm down, I'm down, I'm down, I'm down* Bear Cat drowns out sound | 0:28 | *I'm down, I'm down, I'm down, I'm down, I'm down, I'm down* | | |

# EXHIBIT 4

# CURRICULUM VITAE

## RETIRED LIEUTENANT MARK RICHARD HAFKEY, M. Ed.

**PO BOX 344**
**Raymond, California 93653**
**602-703-5211**
**Mark.hafkey@gmail.com**

---

**EDUCATION**

- **Northern Arizona University**, Masters - Educational Leadership, GPA 4.0, Summer, 2000
- **Arizona State University**, BS in Political Science / history minor, Cum Laude, Fall, 1993
- **Central Arizona College**, AA degree: Honors – GPA 3.68; Spring, 1989
- **Other College**: completed 31 credit hours in Spanish (advanced speaker)
- **Spanish Immersion** Program in Hermosillo, Sonora, México (4 weeks)

**EMPLOYMENT HISTORY**

**Police Expert Witness Consulting 2016-present**

**Police Expert Witness** – conduct private consultation and offer expert opinions and testimony relating to police policies, practices and procedures for both Plaintiffs and Defendants, e.g.,

- Loentae Kirk v. City of Phoenix, et al (provided written opinions for Plaintiffs)
- James W. Denby v. Lujan, et al (provided written opinions and deposition for Plaintiffs)
- Sorensen v. Babeu and Steele, et al (testified in Pima County Superior Court for Plaintiffs, who were also Defendants in this matter)
- McRae v. Arizona, et al (provided written opinions for Defendants / Attorney General)
- State of Arizona v. Hampton, Sr. (provided opinions for Plaintiff / Pima County Legal Defender)
- Numerous consultations and file reviews which did not extend beyond initial discussions and file reviews of pending civil actions, including two wrongful deaths filed by Plaintiffs

**American Airlines / U.S. Airways / Frontier Airlines 2012-2023**

**Flight Attendant** – trained on Airbus, Boeing, and Embraer aircraft

**Phoenix Police Department (PPD) 1989-2012**

**President** - Phoenix Police Sergeants & Lieutenants Association (PPSLA)
Duties: managed and operated employee association corporation, led elected board, negotiated employee contracts, represented employees in misconduct and other matters, conducted and coordinated law enforcement training seminars, responded to membership issues, lobbied and networked on the local, state, and national level regarding laws and law enforcement concerns & interests, represented police management interests on approximately 30 boards and committees; reviewed, developed, investigated, and interpreted police policy, practices, and procedures

**Lieutenant** - Public Affairs Bureau, Community Relations Bureau, & Squaw Peak Precinct
Duties: worked cooperatively and jointly to provide quality seamless customer service, participated in various community activities and made verbal presentations to groups, led sworn and non-sworn police staff, reviewed and analyzed work and crime statistics and plans to ensure efficient allocation of police manpower, supervised major crime scenes and barricades, maximized utilization of resources and achieved the highest possible productivity, testified as a witness in court in connection with arrests and investigations; demonstrated continuous effort to improve operations; reviewed, developed, interpreted, and enforced police policy, practices, and procedures; conducted police misconduct investigations including use of force and civil rights violations

**Sergeant** - Traffic Bureau, Organized Crime Bureau, Desert Horizon Precinct & Central City Precinct
Duties: participated in community activities, made verbal presentations to groups, and worked cooperatively and jointly to provide quality seamless customer service; supervised sworn and non-sworn police staff, conducted training and presentations, served as a witness in court, investigated complaints or allegations of misconduct against employees of the Police Department, kept informed and aware of persons and places suspected of illegal activity and/or potential for

problems within an assigned area; supervised and secured major crime scenes, pursuits and barricades, administered first aid, arbitrated disputes, and conducted preliminary and follow-up investigations; reviewed, developed, interpreted, and enforced police policy, practices, and procedures; conducted police misconduct investigations including use of force and civil rights violations

**Patrol Officer / Field Training Officer**, South Mountain Precinct
Duties: Served and protected the community, enforced laws, mediated disputes, provided information, investigated crimes, secured crime scenes, conducted barricades, assisted with tactical entries, testified in court, made arrests, trained officers, etc.

**PPD ASSIGNMENT HISTORY**

**Phoenix Police Department**

- President – Phoenix Police Sergeants & Lieutenants Association, 7/2004-2/2012
- Patrol Lieutenant / Area Manager, 1/2002-7/2004
- Motor Supervisor, Traffic Bureau, 9/2000-1/2002
- Administrative / Training / Investigation Supervisor, Organized Crime Bureau, 9/1997-9/2000
- Patrol Sergeant, 11/1995-9/1997
- Patrol Officer / Field Training Officer, South Mountain Precinct, 1989-1995

**PPD DECORATIONS**

**Medals**

- Merit (2X)
- Lifesaving
- Physical Fitness
- Safe Driving
- No Sick Leave Usage

**Commendations**

- Over 30 written commendations while serving the Phoenix Police Department

**PUBLICATIONS**

- *Law Enforcement Matters, Understanding and Attaining a Career as a Police Officer*, 2020
- *Proud to Be Phoenix PD*, Commemorative Edition Magazine, 2011
- *Phoenix Police Sergeants and Lieutenants Association Bars & Stripes* - quarterly Newsletter

**PROFESSIONAL DEVELOPMENT**

**Instructor Certifications**

- Defensive Driving Instructor, 2000
- MCCC Teacher Certification, 1998 (Adjunct Faculty – Phoenix College)
- Drug Recognition Expert (Instructor), 1997
- Firearms Instructor, 1994
- Defense Tactics Instructor, 1994
- General Instructor, 1993

**Courseware Development and Instruction**

- Distinguishing Between Drug Intoxication and Mental Illness
- Drug Awareness, Identification, and Recognition
- Safety Awareness (Internet, work place, personal, social, environmental, etc.)
- Problem Solving
- Conflict Management
- Team Building
- Time Management
- Professional Traffic Stops & Customer Service
- Defensive Driving (personal and for commercial vehicle operators)
- Microsoft Office Software Applications
- Advanced Internet Investigations

**Law Enforcement Certifications and Training**

- Numerous union and police officer rights seminars, 7/2004 -11/2011
- Globalization, Development & It's Unintended Consequences for U.S. Public Safety, 9/2010
- Brand Piracy, the Links to Organized Crime and Terrorism Investigation, 9/2009
- Legal Issues – Interviews and Interrogations, 2/2009
- Advanced Police-Media Relations 12/2007
- Dealing with the Psychological Aftermath of Critical Incidents / Risk Management, 10/2007
- Stress Management in Law Enforcement, 6/2007
- Public Safety and Homeland Security Law and Practices Training Conference, 6/2007
- Psychological Terrorism a Law Enforcement Perspective, 12/2006
- New Patterns of Leadership, 9/2005
- Critical Incident Risk Management for Managers & Supervisors, 8/2005
- Legal Survival for Police Personnel, 8/2005 and Hot Topics in Law (Enforcement), 8/2005
- Future Trends in Crime – Profiling Interpersonal Violence, 1/ 2005
- Leadership for Managers, 9/2004
- Contemporary Issues in Internal Affairs and Use of Force, 4/ 2004 and 3/2007
- Civil Liability Management Workshop, 4/2003
- Legal Issues for Law Enforcement Personnel – Investigations, 3/2003
- Responding to Alien Crimes, 2/2003
- Police-Media Relations, 1/2003
- Advanced Spanish for Law Enforcement, 12/2002
- Enlightened Leadership Principles, 12/2002
- Disaster Response for Aircraft Mishaps & Weapons of Mass Destruction, 11/2002
- Legal Issues for Law Enforcement Personnel Advanced Seminar, 7/2002
- Radar Speed Measurement, 7/2001
- City of Phoenix Police Department Leadership Forum, 3/2001
- Drug Enforcement Bureau Supervisor Seminar, 5/2000
- Phoenix Police Department Spanish Language Certification, 12/1999
- Investigation of Computer Crime, 10/1999
- Panel Interviewing Skills, 2/1997
- Personnel Law for Managers and Supervisors, 11/1996
- Supervisor Development School, 9/1995 and IACP Advanced Supervision Skills, 9/1996
- Detective School/Certification, 8/1994 and AzPOST Interview and Interrogation, 5/1995
- Horizontal Gaze Nystagmus (HGN) and DRE Certification, 5/1991 & 7/1993

**Aviation Certifications and Training**

- Private Pilot, U.S. DOT / FAA Certificate Number 3678344
- Flight Attendant, U.S. DOT / FAA Certificate Number 3625697

**Computer Training**

- Microsoft Office applications, ArcView, PACE, and Advanced Internet Investigations

**Writing Courses**

- Essential Business Writing Skills, 1/1997
- Effective Written Communication, 9/1994
- Writing for Professions, 5/1993
- Grammar Gremlins, 12/1993
- ALEOAC Report Writing, 3/1993
- Sharpening Basic Writing Skills, 11/1992
- Proofamatics, 5/1992

**DUI/Drug Traffic Safety Training:**

- Fourth IACP-DRE Training Conference, June, 1998
- Third IACP-DRE Training Conference, June 14-17, 1997
- DRE Instructor School, June 2-6, 1997

- Second IACP-DRE Training Conference, May 12-14, 1996
- First IACP-DRE Training Conference, June 10-13, 1995
- Drug Identification Class (by DEA), August 7, 1995
- Mark IV GCI/IR 3000 Operator School, December 2, 1993
- Drug Evaluation and Classification (DRE School), July 20-31, 1993
- Preliminary Training; Drug Evaluation & Classification, June 22-23, 1993
- Drug Screening (Phoenix Police Department), August 12, 1991
- Horizontal Gaze Nystagmus (HGN School), January 29-31, 1991
- DUI Training (Phoenix Police Department), February 23, 1991
- Narcotics Identification (Phoenix Police Department), June 6, 1990
- DUI & Drug Investigation (Academy), September 18; October 23-27, 1989

**PROFESSIONAL MEMBERSHIPS**

**Past or Present Affiliations**

- Association of Professional Flight Attendants - Member
- Police Sergeants and Lieutenants Association (PPSLA) - President
- Arizona Police Association (APA) - Secretary
- National Association of Police Organizations (NAPO) – Area Vice President
- Spanish Toast Masters - Member

**CONSULTING**

**Courseware Development and Instruction**

- Distinguishing between Mental Illness and Drug Intoxication
- Drug Awareness, Identification, and Recognition
- Safety Awareness (Internet, work place, personal, social, environmental, etc.)
- Problem Solving
- Conflict Resolution
- Team Building
- Defensive Driving (personal and commercial vehicle operators)
- Microsoft Office Software Applications

**SPECIALIZED READINGS**

- "Arizona Officers Legal Source Book" by Dale Anderson, Esq. (The Peace Officers Bible)
- "Drug Evaluation and Classification Training," Student Manual, U.S. DOT, et al., 1993 ed.
- "Little Flowers of the Gods," Hightimes, by Richard Evans Schultes and Albert Hofmann, 1987. Study of Psilocybin (Mushrooms).
- "Highanxiety," Consumer Reports, 1993. Study of tranquilizer abuse.
- "Who Takes Xanax, and Why?" Consumer Reports. 1993.
- "Halcion and Prozac," Consumer Reports. 1993. Comparing tranquilizers.
- "Relief without Drugs," Consumer Reports, 1993. Discussing psychotherapy as an alternative.
- Psychedelic Drugs," The Harvard Medical School Mental Health Letter, February, 1990. Overview on effects and reactions.
- "We Should Reject the Disease Concept of Alcoholism," The Harvard Medical School Mental Health Letter, February, 1990.
- "MDA (Methylenedioxyamphetamine) AKA the Love Drug, Psychedelic Speed," by David E. Smith, M.D. and Rick Seymour.
- "LSD Still on Some Minds," L.A. Times, by Harry Nelson, March, 1991.
- "User's Defense of Marijuana Goes up in Smoke," by Sue Rusche.
- "More and More, Marijuana Becoming a Homegrown Crop," Daily News, by Tom Ashbrook, September, 1988.
- "Marinol-Dosing Begins Before Chemotherapy," by Roxane Laboratories, Inc., 1986.
- "The Escalating Problem of Inhalant Abuse," International Inst. for Inhalant Abuse.
- "Brain's Marijuana 'Receptor' is Identified," L.A. Times, by Thomas H. Maugh II, August, 1990.
- "Neurotransmitters," by Sergeant Thomas E. Page, LAPD, 1990.

- "Phoenix Police Department Narcotics Price Survey," Drug Enforcement Bureau.
- "Guide to Dangerous Drugs," Institute for a Drug-Free Workplace, 1994.
- "What Works, Schools without Drugs," U.S. Department of Education, 1987.
- "Drug Identification, CNS-Psychoactive Drugs," U.S. Department of Justice DEA, 1995.
- "The Psychological and Physical Effects of Drug Abuse," U.S. Dept. of Justice DEA, 1995.
- "Tweakers & Bingers, Abuse Patterns among Meth Users," Excerpt from Effects of D-Methamphetamine, National Drug Information Center, by Margaret J. Potter, 1997.

**INTERESTS**

- Aviation
- Foreign language studies
- Boating, fishing, camping, and hunting
- Jogging, hiking, and martial arts
- Mind teaser puzzles and chess

**VOLUNTEER WORK**

- Ramond Museum and Community Center
- Raymond 4H
- Raymond-Knowles Elementary School
- Blue Santa (PPD)
- Franklin Elementary School
- PPSLA Charities
- Toys for Tots

**REFERENCES**

1. Dale Anderson, Esq., LEOTraining.com, 779-255-1298, daa2000@aol.com
2. John Commerford, Esq., Commerford Law, 602-614-7270, commerlaw@gmail.com
3. Jeff Miller, Esq., Miller Weber Kory, 602-648-4045, jeff@mwkfirm.com
4. Michael G. Gaughan, Esq., AZ Attorney General, 602-620-8122, mggaughan@cox.net
5. Sean Woods, Esq., Mills and Woods, 602-480-999-4556, swoods@millsandwoods.com

# EXHIBIT 5

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as pending personal representative of the Estate of Micheal Obregon; Meagan Brady, individually; Meagan Brady on behalf of and as legal guardian and parent of her minor child, MB, Plaintiffs, | ) | NO. 2:24-cv-01510-PHX-KML |
| v. | ) | |
| Mark Lamb and Jane Doe Lamb, husband and wife; Brady Gibson and Jane Doe Gibson, husband and wife; John and Jane Does I-X, Defendants. | ) | |

VIDEO-RECORDED VIDEOCONFERENCED DEPOSITION OF
MARK RICHARD HAFKEY

April 24, 2026
Witness Location: Mariposa, California
9:00 a.m.

REPORTED STENOGRAPHICALLY BY:
ROBIN JASPER, RPR
Certified Reporter
Certificate No. 50286

PREPARED FOR:
ASCII/CONDENSED

(Certified copy)

The court reporter may swear in the witness at this time, please.

MARK RICHARD HAFKEY,

a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. VAN BUREN:

Q. If you will please state your full name for the record, sir.

**A. Mark Richard Hafkey.**

Q. You broke up there a little bit for me, which means you may have for the others. Can you say it one more time.

**A. Mark Richard Hafkey.**

Q. Mr. Hafkey, where are you right now?

**A. I'm in Mariposa, California, County of Mariposa.**

Q. Are you in your home?

**A. Yes.**

Q. Is anyone else in the room with you right now?

**A. No.**

Q. Do you have any written materials with you right now?

this case, correct?
A. Yes, ma'am.
Q. And does Exhibit 1 represent your best and most complete work in this matter?
A. I believe so. When you say best work, again, I would have to speculate as to -- and make that comparison to other work I have done. But I believe it's the best work based on the information I was provided and the questions I was asked to respond to in my opinion.
Q. Towards the bottom of page one of your report, you say that you make yourself available as a police policy, practices and procedures expert witness.
Is that correct?
A. Yes, ma'am.
Q. And you are offering yourself as a police policy, practices and procedures expert here?
A. In part, yes.
Q. What's the other part?
A. Use of force, constitutional law, case law and personal experience.
Q. I want to bring your CV back up. And, again, this is going to be Exhibit 2.
Have you worked for any law enforcement agencies besides the City of Phoenix?
A. Not on salary, no.

Q. What about on a non-salaried basis?

**A. At times, yes. In my work with the Phoenix Police Sergeants and Lieutenants Association, my work with the Arizona Police Association, my work with AZ Cops, my work with the National Association of Police Officers, I have worked with lots of police agencies in my role as a union president.**

Q. I understand. From your CV, Exhibit 2, it looks like you started with Phoenix PD in 1989.

Is that correct?

**A. Yes, ma'am.**

Q. Is that when you went through the academy as well?

**A. Yes.**

Q. And you left Phoenix PD in 2012, correct?

**A. Yes.**

Q. Tell me what you have done in terms of your professional career since leaving Phoenix PD.

**A. Primarily I went to work for several airlines as a crew member and did that for about 10 years in total, and the work that I have done as an expert witness for multiple entities from about 2015 forward. And --**

Q. Have you -- go ahead.

**A. And I have also, I have also done various types of training, mostly pro bono work, for a couple entities.**

And I have built multiple homes and cabins. So I have been doing a handful of construction projects as well.

Q. What entities have you done training for?

A. The training is primarily working with acquaintances on various issues ranging from some computer work, constitutional law work, providing information and guidance on doing research. None of which at this time I have -- there's been no payment for it. So it's pretty much just in an advisory role and helping some of my associates in their work, either as an expert witness or in their current work in the union arena doing training for their employees.

Q. Have you done any training for any police department specifically since 2012?

A. No.

Q. Have you worked as a salaried sworn law enforcement officer since 2012?

A. No.

Q. Looking back on Exhibit 2, we have your roles with Phoenix PD listed on page one and two. And if at any point, sir, you want me to scroll up or down, please let me know.

My question for you is: Did you hold any other roles with Phoenix Police Department besides what's listed on Exhibit 2, your CV? Yes, Exhibit 2.

actually supervised detectives in their roles as well.
Q. Did you ever have the position of a detective?
**A. No.**
Q. Did you ever reconstruct a shooting as part of your duties with Phoenix PD?
**A. No. Except in my preliminary scene response and passing on observations to the -- whatever detectives were eventually assigned the case.**
Q. Did you ever determine the sequence of gunshots in any homicide investigation with Phoenix PD?
**A. In every homicide you respond to, you, you take a look at the evidence that's at the scene. And I would have done that on virtually every case that I was -- that I responded to in terms of my observations.**
**In terms of comparing -- I think what you are asking me is in terms of taking a medical examiner's report and then reconstructing the sequence. Is that what you are asking me?**
Q. Correct, sir.
**A. No, I have never specifically been asked to do that.**
Q. And relatedly, did you ever analyze bullet trajectories when you were with Phoenix PD?
**A. Yes. But those trajectories were always preliminary, because they would have been pre-forensic**

**A. It's part of reviewing a case. What I mentioned earlier, in terms of representing police employees when they are involved in shootings, especially shootings that lead to a homicide, the entire report gets reviewed. And I reviewed many reports to evaluate their accuracy and to make observations as to the investigation, and make sure that all I's were dotted and all T's were crossed in representing my employees.**

**So I was -- I have a lot of experience looking at reports and making sure that those reports are as accurate as possible in my role as a representative for the employees involved.**

Q. But you did not actually take the ME report and determine bullet sequencing yourself in those matters, correct?

**A. No. Again, it's a matter of reviewing what's already been done, for the most part, and making my, my observations of investigations which were completed and then evaluating their accuracy, their validity. Making sure that if there are holes in the investigation, that those holes get addressed after the fact.**

Q. Have you ever received any training or education in forensic pathology?

**A. Very general, nothing very advanced.**

Q. Tell me about the general training that you

make sure that all angles in an investigation are completed and conducted properly.

Q. Have you had any other training or education in ballistics besides what we just talked about?

A. Yes. In my role as a firearms instructor, you go through quite a bit of ballistic-type training to understand calibers of rounds, various firearms, what types of -- from rifles to pistols, different types of pistols. But not, not from a forensic level, if that's what you are asking me. It's more of an identification level. Different rounds make different types of wounds. And there's a lot of general training that firearms instructors go through to understand the types of wounds and the types of damage that particular rounds will cause on a body.

Q. Have you had any training or education in determining bullet trajectories?

A. No.

Q. Did you ever serve with the PSB, the Professional Standards Bureau, with Phoenix PD?

A. I was never assigned to the Professional Standards Bureau, no.

Q. On your CV, Exhibit 2, under Lieutenant, for example, and I'm looking on page one, you say that you "conducted police misconduct investigations, including use

deputy's actions prior to the homicide, not just because of his speed, but because of what he described as valid police work.

And so I was asked to take a look at his actions in how he was observing and driving his vehicle, observing other motorists just preceding that vehicular homicide. And I would have to explain to you exactly what I'm referring to if you want more details of that.

Q. That's fine. Thank you. Looks like you were retained by the defendants in the McRae v. Arizona case. Correct?

A. Yes.

Q. What was the general nature of that case?

A. A protester was forcibly subdued and removed from a public building. I believe it was the Capitol in downtown Phoenix. And I was asked to take a look at -- or respond to their expert's opinion involving how the officers handled the arrest in that case, the use of force issues, and some of the subsequent injuries that were caused in that altercation with the officers taking the subject into custody. Essentially, he was a protester who refused to leave and was placed under arrest and forcibly taken into custody and removed.

Q. Did any of these cases listed on page one of your CV involve officer-involved shootings?

A. Yes.
Q. Which ones?
A. Loentae Kirk and -- actually, I see, I see another case that I'm working on now that's not listed on my CV, that needs to be added. But it's a case I'm actually working on now and it involved a SWAT team shooting and subsequent homicide of a civilian. That case is --
Q. You provided -- go ahead.
A. -- called Gagne, G-A-G-N-E, and it involves the Mesa Police Department.
Q. Okay.
A. So that's one that's not listed, to answer your earlier question. And it involved a police shooting.
Q. Have you provided, have you provided a written opinion in that case yet?
A. Yes, I just recently provided that opinion.
Q. In any of the other cases you have worked on as an expert witness, did you determine bullet sequencing?
A. Yes.
Q. Which cases?
A. That case I just mentioned, Gagne, involved quite a bit of sequencing and trajectory to determine who fired the rounds, where those rounds ended up, things of that nature.

at a medical examiner's report and try to make an opinion regarding the medical examiner's trajectories in that case. But I did have to look at trajectories in determining who fired which rounds, where those rounds ended up, to the best of my ability, to help with my opinion in that case.

Q. In the Gagne case, did you look at a medical examiner's report and give opinions based on that?

A. No. I haven't gotten that far to take a look at the actual medical examiner's report. It was more in determining where those rounds entered certain windows, certain parts of the apartment involved, where they exited. So I had to look at trajectory to determine which officers fired the various rounds into the building. And based on video, based on testimonial, and based on the damage itself, I had to put it all together to determine trajectories. And that case is still ongoing and could end up involving supplemental opinions as well.

Q. But to date, this the only case where you have used an ME report to determine bullet trajectories and sequencing?

A. Yes. Into the body, Laura.

Q. Into the body, yes.

A. Yes.

Q. And I think I know the answer to this, sir, but

have you ever performed an autopsy?
A. No.
Q. Have you ever authored any peer-reviewed publications?
A. No. If I understand what a peer-review publication is, no. I have offered publications on a number of issues involving primarily policies and procedures in my role as president and vice president of various unions, police unions.
Q. And I note that on page two of your CV, Exhibit 2, you list three publications. Correct? Do you see that?
A. I'm looking for it. Sorry. Yes.
Q. Is this the complete list of your publications?
A. It's a complete list in terms of -- it's not a complete list of things that I have published. It's a complete list of items involving -- more specific to law enforcement.
Q. Explain what you mean by that response. I don't understand that.
A. I published other books, Laura, that had nothing to do with law enforcement. I have written other articles, and some, I believe, may have been published, but weren't related to law enforcement.
Q. Okay. Have you ever published anything about

investigating an officer-involved shooting?

**A. I may have in the Phoenix Police Sergeants and Lieutenants Bars and Stripes Newsletter. I wrote articles monthly -- or quarterly, I should say, and some of those may have -- some of the issues may have applied in some of my articles. But I would have to go back through dozens of newsletters and -- to know for sure, you know, to determine for certainty that they were actually articles related to what you are referencing.**

Q. Did you ever publish about reconstructing a shooting?

**A. I'm sorry, I missed that. Did I ever publish articles regarding what?**

Q. Reconstructing a shooting.

**A. No, not that I recall.**

Q. Have you ever published any article about ballistics or bullet trajectories?

**A. No.**

Q. At the bottom of page two, you talk about Courseware Development and Instruction.

Are these all courses that you taught when you were working with Phoenix PD?

**A. Yes. And working for colleges or universities.**

Q. Any other coursework or courses that you have developed or taught that are not listed on your CV?

can't always rely on one piece of the whole investigation.

So you look at statements, you look at the examiner's report, if you have a medical examiner's report. You don't always have them. And then you look at all the crime scene footage and then video, if you have it. And, of course, back in my day there were far less video. Axon videos were fairly new. And so we didn't have the luxury of video, and so we had to do more trajectories because we didn't have the video.

Once video became more prominent, which was in the 2000's -- around 2012, really, when videos were becoming more prominent, body cams, then we didn't have to do so much of the trajectory issues, because we had good video that supported the findings of the investigators. But when you don't have video --

Like in the Obregon case, we have some video, but we don't have enough video to make all the confirmations, so I had to go another step and look at trajectories, which is not something I would probably ever do again even, unless I had to, because I just didn't have enough evidence to make an opinion.

Q. When you were with Phoenix PD and you would review trajectory opinions, was that always in your role as union president, or did you review trajectory opinions in your roles as sergeant and lieutenant?

different in the body positioning. I think the opinion would likely -- could likely be different in terms of the sequence of the shots and whether he was hit in the back first or hit in the front first.

So to answer your question, Laura, I think it's limited. I'm very confident in my trajectories drawing everything together, but I don't doubt you can get another expert to counter just about everything else.

Q. Do you know what the elements of gross negligence are here in Arizona?

**A. Not really. I'm not an attorney. I have read gross negligence in cases, and I think it's -- it lends itself to interpretation of what "gross" means and what the level of the gross negligence means.**

Q. What are the Graham factors?

**A. Oh, Graham verse Connor factors?**

Q. What are the Graham v. Connor factors, yes.

**A. Well, certainly the primary one is the, the severity of the crime. And then Graham looks at, you know, looking at an objective reasonableness and the force applied based on that severity of the crime.**

Q. Do you agree that an officer's use of force should not be viewed with the benefit of 20/20 hindsight?

**A. Boy, that's a loaded question. The courts have -- in one case the judge actually stated that. So,**

CERTIFICATE OF CERTIFIED REPORTER

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction; that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

[X] Review and signature was requested; any changes made by the witness will be attached to the original transcript.

[ ] Review and signature was waived/not requested.

[ ] Review and signature not required.

Dated at Phoenix, Arizona, this 13th day of May, 2026.

/s/ Robin Jasper
ROBIN JASPER, RPR
Certified Reporter
Arizona CR No. 50286

* * * * *

I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

/s/ Pamela A. Griffin
GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005

# EXHIBIT 6

## Narrative Text

**Type** Detective Narrative
**Subject** INVESTIGATION
**Author** P13539 - INGRAM, J. (13539)
**Related Date** Aug-22-2023 14:55

**2023-141208**

On 7/6/2023, at approximately 2315 hours, I received a call from Sgt. Clarke #14173 requesting that I respond to 1233 N. Mesa Drive #2164 reference an officer involved shooting. I arrived on scene at approximately 0015 hours.

**Briefing**
The briefing was given by Sgt. Samons #19185. Sgt. Samons reported that on 7/6/2023 at 2133 hours Mesa Police received a 911 call from Cindy Schramm. Cindy stated her friend Jordan Wirtjess called her and told her that she had been in a domestic violence incident with her boyfriend in their apartment. Jordan's boyfriend was identified as Shawn Gagne. Cindy went to Jordan's apartment and while there, Shawn threatened to kill Cindy. Cindy heard what she believed a handgun slide dropping forward and then a loud bang, believed to be a gunshot. Cindy went home and called police approximately ten minutes later. Jordan told officers that she believed Shawn was drunk and had multiple firearms in the apartment.

Responding officers set up a perimeter with Immediate Action Teams in three locations. There was a north team, a south team and an east team. Officers attempted to contact Shawn and negotiate with him through the phone number that Jordan provided but received no answer. Officers made audible announcements toward the apartment and received no answer. Officers then attempted to receive a response from Shawn by knocking on the door using a bean bag round. There was still no response. Sgt. Samons stated that most of the windows to the unit were all covered with aluminum foil. After some more time went on a bean bag round was shot through one of the windows, again to attempt to get a response from Shawn. After this, officers saw the front door open and Shawn in the doorway holding a rifle down at his side. He then closed the door and went back inside.

Officers then had Jordan call Shawn using her telephone. Jordan spoke with Shawn for some time before police negotiator Adair arrived and began speaking to Shawn using her phone. According to Sgt. Samons, Shawn told the negotiator that the police needed to go away and if he saw them, he would shoot them.

Sgt. Samons stated that SWAT officer Freeman arrived and took up a position with his rifle at apartment #2165, across from Shawn's apartment. Sgt. Samon stated that Shawn presented himself at one of the windows with the rifle and Ofc. Freeman fired a single shot. Sgt. Samons stated that Shawn returned fire through the window at officers. Officers then returned fire toward Shawn several times. Sgt. Samons stated that Shawn was later found down at the front door. Officers were concerned that Shawn was baiting them up to him. Because of this, they deployed a diversionary device as well as used a taser on Shawn as they made a cautious approach. Shawn was then detained in handcuffs and moved from the front door, down the step to an area where medical personnel could assess him. MFMD confirmed that Shawn was deceased at 2341 hours.

Ofc. Freeman told me that when he arrived, Ofc. Chuey told him that the suspect was observed walking around inside the residence with a rifle. At this time Ofc. Freeman stated that he grabbed his sniper pack from his vehicle so that he could deploy in this capacity. Ofc. Freeman told me that he is a primary sniper on the SWAT team and has been trained to carry out that role.

Ofc. Freeman told me that he arrived south of the scene and responded northbound through the parking lot. He stated that he met officers that were set up in the immediate action team behind some patrol cars. He stopped here and assessed the apartment. Ofc. Freeman told me that he could see the suspect in the apartment walking around carrying a rifle that had an optic on it. Ofc. Freeman said that he looked for locations where he could deploy in his role. He saw some balconies and attempted to contact the resident. While he was doing this, he could see the suspect looking out the sliding glass door on the southside of the residence. Ofc. Freeman said that he believed the suspect could see him based on how well lit the area was. He saw the resident come out onto the balcony at unit #2165. He then asked this resident if he could use his balcony and was given permission. He stated that he then entered unit #2165 and set up inside.

Ofc. Freeman stated that when he got to the apartment door, he heard over the radio that the suspect had stated, "if people didn't back off, he would start shooting it out with the police." He also heard that the suspect said, "if he saw any red and blues he would start shooting." Ofc. Freeman stated that because of these statements, he believed that the incident was escalating. Ofc. Freeman stated that he had the residents of the apartment go to the rear and he turned off all the lights. Ofc. Freeman told me that the sliding glass door to the apartment was open and provided him a view across to apartment #2164. He could see the two windows that faced both south and southwest from his elevated position.

Ofc. Freeman told me that at this time he could see the suspect talking on what appeared to him as a cellular phone. He believed this was possibly negotiators talking to the suspect and that the suspect was agitated. A few minutes later he could see the suspect walking around with a rifle that had a sling attachment to it. Ofc. Freeman told me that he observed the suspect walk over to the slider door and began peeking through the blinds. Ofc. Freeman said that he saw that the gun was in the suspect's right hand. He believed the suspect was peeking out at patrol officers down below in the parking lot. Ofc. Freeman stated that this gave the suspect a tactical advantage. Ofc. Freeman told me that this was when he took his first shot. As Ofc. Freeman told me this he was motioning with his hands. I then asked him to explain what his was motioning. Ofc. Freeman said that the rifle was in his right hand and his left hand was opening the blinds. Ofc. Freeman believed that the suspect was looking for where he wanted to shoot at patrol officers. Ofc. Freeman explained that from the suspects elevated position he had a good view of the officer's positions.

I asked Ofc. Freeman to explain what position the suspects gun was in at this time. He told me that the suspect had the gun in his right hand and that it was up but not in the low ready position at this point. Ofc. Freeman stated that this would have been a simple movement for the suspect, and he could begin firing on officers. Ofc. Freeman told me that because he had heard the suspect had already fired a round from his AK-47, he was concerned because he knew what that round can penetrate through vehicles and that the officers would not stand a chance. Ofc. Freeman told me that his first round was aimed at the suspect's head. He told me he was unsure of where he hit the suspect, but that the gun stayed in the same

Sgt. Harris told me that he parked to the south and as he was getting out of his vehicle, he was informed that the subject in the house had opened the door armed with a rifle and had engaged with them verbally before going back inside. After this he informed Sgt. Thomas to respond with additional SWAT personnel. Sgt. Harris stated that he went north through the parking lot pausing where the south immediate action team was located. Sgt. Harris saw that the apartment was illuminated. When he located where the front door was, he and another operator moved to the northwest where another immediate action team.

Sgt. Harris stated that he met with Lt. Santana at the northwest location. Sgt. Harris told me that the BAT, a large, armored vehicle that was currently parked between where the northwest team was located and the apartment, was not in that position during the incident. That vehicle was moved into place later, after the incident was over. Sgt. Harris told me that when he looked at the apartment, he noticed that from this angle the windows to the apartment were obscured by aluminum foil that had been placed over them. He said that he could see a rifle sitting on top of the north balcony. He told me at the time it was sitting on top of a chair. He told me that when the house was later cleared the rifle was knocked over.

Sgt. Harris told me that he did not stay at this location and began to look for another location due to this location leaving the officers exposed. He said that he is familiar with the ammunition that the suspect was reported to have and that the body and other armor the officers had was not rated to protect them from this ammunition. Sgt. Harris then described because of the elevated position the suspect had, this placed them in further danger.

Sgt. Harris told me that he moved east near the north wall. He told me that he continued behind a dumpster but then continued to look for a position that had a better view. He told me he went further east where he located some vehicles under a covered awning. He told me that because the lights were out at the awning, he used the dark to conceal himself behind the vehicles. From this position he could see the front door and also the north balcony. Sgt. Harris then began coordinating resources to different locations on the perimeter.

Sgt. Harris said that he could hear the suspect within the apartment yelling. He stated that negotiators were speaking with him, and he heard them relay that the suspect was saying that if officers did not back up, he would shoot them. He heard negotiators relay that they could hear the subject loading the rifle while he was making these threats. He heard negotiators say that the suspect was upset about seeing the red and blue lights. Sgt. Harris said they attempted to turn off all the red and blue lights to mitigate the aggravation that the suspect was experiencing. He told me that he could not see the suspects movements from his position, but he heard Ofc. Freeman's reports of the suspect moving around inside the unit.

Sgt. Harris told me that he was familiar with these apartments and their layouts. He stated he stayed in this position so he could see through the front door if it were opened allowing him some view inside the apartment.

Sgt. Harris told me that he heard a shot from Ofc. Freeman's position. From his experience he recognized the sound as being from one of the police departments .308 rifles. He told me that he could see a "slight splatter" of glass from the area of the second story west facing window. Sgt. Harris told me that he then heard a burst of a secondary gunshots and saw glass coming out from the inside of the unit. He told me that due to the many lights pointed

Ofc. Crosby #21648 located the following witnesses to the incident. Refer to Ofc. Crosby's report and BWC video for details of his interviews with these witnesses.

Luis Monche
Luis told Ofc. Crosby that he saw the subject (Shawn) pacing back and forth inside his apartment carrying a rifle. Luis heard the shots fired between both the subject and police.

Samara Wickwire
Samara stated she noticed the red and blue lights outside. She noticed police outside with their guns out. She stated she heard officers giving commands for the subject to come outside. Samara stated she could see the subject inside his apartment pacing back and forth carrying a rifle. Samara stated that she saw the first shot go through the patio door. At that time, she stopped watching.

Ryan Guy
Ryan told Ofc. Crosby that he observed the subject pacing back and forth inside the apartment with an AK-47 rifle. Ryan knew it was an AK-47 because he knows guns. Ryan stated he heard the police give the subject warnings to exit the apartment unarmed. Ryan thought that he heard the commands given over the loudspeaker for approximately 20 minutes. Ryan told Ofc. Crosby that he believed the subject had fired his weapon at officers first from inside the apartment. Ryan believed the subject fired several rounds at the officers. He then observed officers as they approached the apartment.

Tamara Rant
Tamara stated Ryan had woken her up. Tamara stated that she saw the subject pacing back and forth inside his apartment carrying a large gun. Tamara heard the first shots and stopped watching.

**911 calls / Radio Traffic review**
I competed a request to receive copies of the 911 calls and radio traffic from this incident. These audio files will be attached to this case. The following are summaries of the audio recordings. Please refer to the entire audio recording for exact details.

Summary of 911 call from Cindy Schramm - 7/6/20230 2133.03 hours
Cindy calls 911 and reports that her neighbor (suspect Shawn Gagne) threatened to "blow her brains out" and then shot a firearm from the patio. Cindy reports that this occurred approximately 10 minutes earlier at apartment 2164. Cindy reported that she was there talking to the suspects girlfriend when he came out the front door and told her to get out of his "fucking area" or he would "blow her fucking brains out." Cindy stated that she was there talking to the suspects girlfriend because they had been fighting. Cindy heard the suspect "load the weapon" then fire it. She did not know if he fired it into the air or at them.

Cindy reported that the suspect was a "severe alcoholic" and that the girlfriend reported that he had fired the gun inside the apartment three times in the last week. Cindy said that the suspect had "tons" of guns in the apartment. Cindy told 911 that the girlfriend left the apartment after the suspect had just been "choking her out." Cindy stated that she believed the weapon that was fired was a handgun but stated that the suspect also possessed other weapons including a "rifle" and an "AR."

Cindy reported that the suspect made threats the other day when he was fighting with the girlfriend. Cindy said that at that time they had been in a physical altercation where the suspected ended up "breaking in her door." Cindy reported that the suspect had fired a weapon in the home on July 4th as well.

Summary of 1st call from Suzette Gagne - 7/6/2023. Entered on CAD at 2239.09 hours
Suzette called Mesa Police Dispatch. She reported that she would like to speak to officers on scene. She said that she wanted to explain what was going on with her son so that police "don't end up shooting him." Suzette gave her son's address as 1233 N. Mesa Drive and later identified her son as Shawn Gagne. She advised that Shawn's fiancé had called her and told her about the police being there. Suzette stated that she and other family members have not been able to contact Shawn. Suzette stated that Shawn was "very depressed."

Summary of 2nd call from Suzette Gagne - 7/6/2023. Entered on CAD at 2351.55 hours
Suzette Gagne calling a 2nd time. Suzette requested a "commanding officer" call her. Suzette wanted to find out what was going on with her son.

Summary of call to Jessica Loper - 7/7/2023. Entered on CAD at 0019.09 hours
Jessica is the resident of apartment #1164, Jessica Loper, who was not at home and was in the hospital. Mesa Police Radio called her to let her know that officers were required to force entry into her apartment to check her welfare.

Summary of 3rd call from Suzette Gagne - 7/7/2023. Entered on CAD at 0854.05 hours
Suzette called inquiring for information about the incident involving her son Shawn Gagne.

Summary of call from Jordan Wirtjess - 7/7/2023. Entered on CAD at 0929.08 hours
Jordan called Mesa Police Dispatch and was asking for a phone call from police when she had permission to return to the apartment. When describing the incident, Jordan stated her boyfriend was involved in a shootout with the police.

**Review of Phone Conversation Audio between Ofc. Adair and Shawn Gagne**
I reviewed the audio of Ofc. Adair's conversation with Shawn Gagne. The following comments are only observations of mine while listening to the audio. Please refer to the audio recording at Evidence.com as well as Ofc. Adair's supplement for complete details.

Ofc. Adair's conversation with Shawn begins at approximately 2232.05 hours as seen in Ofc. Gutierrez' BWC. The file uploaded by Ofc. Adair shows the date as 7/6/2021 at 2309 hours. This is obviously incorrect and appears to be an incorrect timestamp created by the device used for the recording. Many parts of the recording at times are unintelligible.

Ofc. Adair identifies himself as Matthew with the Crisis Team. Shawn responds that he himself is Matthew with the crisis team and says, "You're about to have a fucking crisis if you don't get away from my fucking house. Back the fuck up. Right now. With all your fucking SWAT and all your gear, I don't give a fuck. Get the fuck out of my fucking face before I fucking start dropping shots in them." He continues and says, "Get the fuck out of my fucking house before I fucking start dropping shots in your fucking squad cars."

Ofc. Adair tries to tell Shawn that he is trying to get people moved back. Shawn states, "Shine that laser in my house one more time and I'll fucking unload." "I'll fucking unload on

you, I don't care." Ofc. Adair says that he is working on getting officers moved back. Shawn tells him "You better work faster bro, you better fucking work faster my guy." "I'm gonna fucking start dropping shots." "You guys want to play fucking guns? You guys want to play guns? Let's fucking play guns bro."

Ofc. Adair asks Shawn what is going on. Shawn tells him that he woke up from being asleep and heard police radios in his house. He then asks Ofc. Adair if he would appreciate that happening. Ofc. Adair replies, "I'm sure it's very scary." Shawn states back, "Yeah, yeah, yeah, I'll show you fucking scary bro." Shawn continues to tell Ofc. Adair to move officers back. Ofc. Adair tells him we want everyone to be safe including himself. Shawn replies, "No, I don't give a fuck bro. Come and fucking blow a fucking hole through my fucking head bro."

Ofc. Adair asks Shawn what is going on that is making him not care at all about what happens. Shawn begins yelling to "I said get out. Right now. I just fucking, drop a fucking hole right through your fucking squad car." As Ofc. Adair tries to talk Shawn tells him, "Come to my fucking house and see what fucking happens bro. Bring your fucking SWAT team in here, I don't give a fuck, we'll see what's going, I got fucking, I got AK's, I got fucking AR's bro. I'll fucking blow a fucking hole right through your fucking head. Don't fuck with me bro."

Ofc. Adair and Shawn talk further but many word are not intelligible. Shawn then says, "That doesn't matter bro. You guys are fucking up right now." "I got my fucking shotgun; I got my fucking 12 gauge. I don't give a flying fuck bro. Get the fuck out of my house. Get, get out. Move the fuck out of my vicinity now. If you guys fucking come into my vicinity, there are gonna be casualties, including myself."

Shawn tells Ofc. Adair that he has the right to bear arms and the right to stand in his living room. Ofc. Adair then tells Shawn because of the issue that happened with Jordan and their neighbor, the police cannot leave. Ofc. Adair tells him that he wants to see him come out safely. He then begins asking Shawn to come out with his hands up when Shawn replies, "You aint gonna get me bro. I'm not coming out. I'm not coming out." Ofc. Adair asks him when he is ready, to come out with his hands up and empty. Shawn replies, "I'll fucking die (unintelligible) I ain't coming out no where bro. I got four thirty round fucking clips. If you want to come to my fucking door, I will fucking unload on all your fucking team. Get your fucking ass out of here, go, leave."

Ofc. Adair states something to Shawn that is unintelligible. Shawn replies, "It doesn't matter then. Come in and get me." Ofc. Adair tells Shawn that he doesn't want to have to come in and get him either. Shawn replies, "We'll fucking see. We'll fucking see right now bro. Come and get me. I don't give a fuck. We're coming to shoot right now, homie. Let's go. Let's go." Shawn tells Ofc. Adair to send his team through right now because he is ready. Ofc. Adair tells him that no one wants to see him get hurt. Ofc. Adair asks him again to come out with his hands up and empty. Shawn tells him, "I'm not going to." "Come and fucking get me bro."

Ofc. Adair then tells Ofc. Gutierrez that he can hear Shawn loading magazines in the background. Ofc. Adair asks Shawn what is going on with him and what is keeping him inside. Shawn then yells, "Get the fuck out of my house before I start fucking shooting squads." Ofc. Adair tells Shawn that everyone is back in the parking lot. Shawn then tells Ofc. Adair to turn the lights off "before I fucking start shooting fucking spotlights out." Ofc. Adair asks him if there is someone by his house. Shawn states, "Yeah, they're right there. You guys are right

here."

Ofc. Adair then relays this information to officers that Shawn is threatening to shoot them. Shawn tells ofc. Adair that the police are out in front of his house and that they just want a "trophy." Shawn then states, "I've got m y fucking armor on. I've got m y fucking guns ready." "You guys want a fucking full Iraq war from one person, then you better fucking get right. Shine fucking lights in m y fucking house again, I will fucking start shooting. Put the fucking lasers down now." "If you don't fucking tell a mother fucker to stop fucking shining lights in m y fucking house with lasers, I will fucking start unloading on their squad cars. They better back the fuck up dude. If they don't want to lose their fucking life, then I suggest you get the fuck away."

Ofc. Adair tells Shawn that he is telling officers what he is saying. Shawn says, "I'm asking you to leave, I'm asking you to leave and leave m e alone. I'm a fucking law-abiding citizen, I fucking have m y fucking guns for a God damn fucking reason, then back the fuck off. Ofc. Adair tells Shawn that police are not leaving because of the incident that occurred. Shawn asks what incident. Ofc. Adair begins explaining about the incident earlier when a sound is heard in the background. This is approximately 11 minutes and 21 seconds into the recording. Ofc. Adair asks Shawn if he is there. Shawn says something in reply. Ofc. Adair asks Shawn if he is injured. Shawn replies, "Yeah, I'm injured. (Unintelligible) through m y fucking vest." Shawn then begins yelling, "I said get the fuck away, right now, right now back the fuck up." Several loud bangs are heard in the background. Ofc. Adair continues his commands to Shawn. He then asks Shawn if he can hear him. Shawn replies, "I hear you. I hear you." Ofc. Adair gives further commands. Ofc. Adair asks Shawn a question that is unintelligible. Shawns reply is unintelligible. Ofc. Adair then asks Shawn where he got hit. Several loud bangs, probably gunshots, are heard in the background. This is 13.00 minutes into the recording. After the shots Shawn is heard saying, "I'm down, I'm down, I'm down, I'm down." His voice is in the background and not near the microphone. Immediately after this a loud vehicle can be heard and there is crunch sound on the recording device. Ofc. Adair previously advised that the device fell on the ground and a vehicle ran it over, but it continued to record. Ofc. Adair then begins speaking to Shawn again. No further responses are heard.

**Inspection of Ballistic Vest and Shirt worn by Shawn Gagne during Incident**
On 8/21/2023, at approximately 0930 hours, I obtained ME164258-1 (Ballistic Vest), ME164656 (Shirt) and ME164656-10 (Shorts) for inspection. These items were worn by Shawn Gagne during this incident.

Upon inspecting the vest, I located a defect in the front left shoulder strap of the vest. This hole appears to match up to one of the holes in the shirt. These holes also match one of the entry points identified during the autopsy. While inspecting the vest I also noticed that there was a ballistic plate on the front side only. There were no defects on the plate. A sticker on the inside of the plate showed that it had a ballistic rating of "NIJ Level IIIA."

I did not inspect the shorts, leaving the package sealed. CSS Brannan #22587 took photographs during m y inspection. After I completed the inspection, I resealed the items that were opened and placed them back into MPD Property as Evidence.

**Forensic Request / Reports**

# EXHIBIT 7

## Narrative Text

**Type** Original Narrative
**Related Person** (Suspect #1) GAGNE, SHAWN, T (DOB: Apr-28-1995)
**Subject** GAGNE, SHAWN TAYLOR DOB: 04-28-1995
**Author** P21423 - GUTIERREZ, J. (21423)
**Related Date** Jul-07-2023 4:33

It should be noted during this investigation, I was wearing an on-body camera and the following is a summary of statements and observations made during the investigation and not direct quotes unless noted. Any breaks or lapse of video is due to either speaking with on scene Officers or an unintentional delayed start of the video. The digital video file was downloaded and stored at evidence.com for further information and details.

On July 6th, 2023, at approximately 2135 hours, I was dispatched to 1233 N. Mesa Dr. #2164 in Mesa, AZ reference to a shots fired call. Comments to the call stated the reporting party's neighbor made verbal threats to her, and fired off a round on his patio. Additional comments stated the male threatened to "blow the reporting party's brains out". He was described as a white male in his 30's, stocky with short brown hair and a beard. He was last seen going back into his unit (#2164) and he had no known vehicle access at that time.

Prior to my arrival, several Officers had arrived on scene and set up several containment and immediate action teams in the event the male exited his apartment. Also, assisting Officers K. Newby #22469 and N. Ahumada #25227 were speaking to the reporting party (verbally identified as Cindy Schramm). Officer Newby advised via radio Cindy stated a round was fired off by the male involved, but no injuries were reported. See Officers Newby and Ahumada's supplements for further details.

Additonally, other Officers on scene advised via radio the subject's girlfriend was now on scene on the west side of the building.

Upon arrival, I responded to the west side of the apartment and contacted the subject's girlfriend. She was later identified as Jordan Wirtjes and her identity was verified through her MVD photo. Immediately, I was advised by Sgt. J. George #17283 that Jordan confirmed there had been a shot fired but the male was not suicidal. Jordan informed me her boyfriend (later identified as Shawn Gagne) was not suicidal and did not have any mental issues, but would be confrontational with Officers. Jordan clarified Shawn was now alone inside the apartment and heavily intoxicated from drinking vodka. Jordan advised Shawn had an AR-15 rifle, a "45" handgun and a shotgun. Jordan informed me Shawn had been drinking all day and was supposed to be admitted into rehab the next day for it. Jordan said she believed Shawn was stressed out about rehab and was not sure what triggered him. Initially, when I asked her what happened, she stated she was standing outside talking to Cindy and Shawn was mad because she was still there after she told him she was leaving. Jordan informed me she was never threatened with a gun . When asked is she was in an argument over their dinner. When asked if there were any weapons involved during the incident, she stated there were not. Sgt. George advised Jordan she initially said Shawn shot a round off (meaning a gunshot), to which she responded she was not sure if it was a round, and claimed she just heard a loud noise.

At that time, Officer Newby advised via radio he had established probable cause to arrest Shawn for aggravated assault against Cindy.

It should be noted I did not observe any injuries or signs of trauma on Jordan at that point.

When I asked for further clarification, Jordan advised she left immediately after Shawn was yelling at them while her and Cindy were outside, but said again, Shawn did not have a gun at that time. Jordan stated the incident began after she texted Cindy she could come over, then exited the apartment due to the argument with Shawn. There, as she walked out, she told Cindy they could not be there, so Jordan drove away.

While I spoke to her, Jordan provided me Shawn's phone number.

I then attempted to contact Shawn via telephone multiple times, but got no response.

After, while I stood by Jordan. Shawn contacted Jordan via telephone. There, Jordan was advised to tell Shawn to put the weapons down and exit with his hands empty, but Shawn refused to exit the residence. As she continued to speak to him, assisting Officer M. Adair #18901 arrived and assumed the conversation with Shawn. While he spoke to him, I was able to listen to the conversation and was tasked to broadcast Shawn's comments over radio.

While on the phone, Shawn sounded extremely upset over Police being there. As Officer Adair continued the conversation, Shawn made demands to Officers to back up and move away. He continued ranting and began making threats to shoot Officers if they got close. Shawn continued to say he had AR's, AK's, Shotguns, and other weapons he was willing to use against the SWAT team if they came in. He advised he did not care to die. Shawn was told Police wanted to handle the situation so he could come out of the situation safely, but he continued by saying he was not coming out and would exercise his right to bear arms. As the conversation continued, Officer Adair advised he could hear Shawn loading a weapon. Shawn then said he would shoot anyone that was by his house if they did not move.

Lastly, I spoke to Jordan and asked her to tell me what happened from start to finish. Jordan advised she was inside her apartment with Shawn and no one else, when an argument ensued over what they were going to eat. She stated the argument never escalated into something physical and no weapons were used or displayed at that point. After, she said she made the decision to leave, and as she walked outside, she met with Cindy. There, Jordan advised they both walked downstairs by the apartment while Shawn continued yelling at the door. At that point, Jordan then claimed she did not hear anything but Shawn yelling, and did not see any guns. About ten minutes later, she left the complex and went to a Food City nearby in the intersection of Mesa Dr. and Brown Rd. in Mesa, AZ. While there, she saw multiple Mesa PD patrol cars with lights and sirens activated. Jordan advised she had a bad feeling about the patrol cars heading to the complex, so she returned and met with Officers on scene.

This concluded my involvement in this case.

See all other assisting Officers' supplements for further details.

NFI.

# EXHIBIT 8

## Narrative Text

**Type** Supplemental Narrative
**Author** P22469 - NEWBY, K. (22469)
**Related Date** Jul-07-2023 2:11

It should be noted, during this investigation, I was wearing an on-officer body camera and the following is a summary of statements and observations made during the investigation and not direct quotes unless noted. Any breaks or lapse of video is due to either speaking with on scene Officers or an unintentional delayed start of the video. The digital video file was downloaded and stored at evidence.com for further information and details.

On 07/06/2023, at approximately 2133 hours, I was riding with Officer in Training Ahumada #25227 when we were dispatched to a shots fired call for service located on 1233 N. Mesa Dr. #2164 in Mesa. Call comments indicated a male neighbor made verbal threats then shot a firearm.

Upon arrival, Officer Ahumada made contact with reporting party and victim Cindy Schramm at her apartment located east of the dispatched location at apartment #1152. While Officer Ahumada spoke to Cindy I heard her state tonight she was at the dispatched location to talk to her friend Jordan. Cindy clarified she was at the dispatched location because Jordan's boyfriend Shawn was being aggressive with her and he possibly choked her. Cindy stated while at Jordan's residence, Shawn became verbal with them while they stood outside of the dispatched location on the sidewalk. Cindy stated while being verbal Shawn walked out onto the second story balcony of the dispatched location and made threats to splatter their brains. After making the threat, Cindy stated she heard Shawn rack an unknown style gun while standing on the balcony out of her sight. Cindy stated she became scared and started heading towards her apartment when she heard Shawn shoot his gun in an unknown direction. Cindy clarified she did not know where Shawn shot the gun but she was certain he shot a gun during this incident. Cindy stated when she got back to her apartment she had her boyfriend drive by the dispatched location to retrieve the apartment number so she could call PD.

After hearing Cindy's statements, I voiced what she said over the radio to inform other officers on scene. While voicing the information, I asked Officer Gutierrez #21423 to ask Jordan if she heard the gunshot. Officer Gutierrez advised over the radio that Jordan did hear a loud bang while she was in front of the dispatched location with Cindy during this incident but she was not sure what it was. Based on the facts collected, I determined there was probable cause to arrest Shawn for aggravated assault and I voiced the information over the radio.

After voicing the information over the radio, I remained on the east side containment team and had no further involvement.

NFI

# EXHIBIT 9

## Narrative Text

**Type** Detective Narrative
**Subject** TIMELINE
**Author** P13539 - INGRAM, J. (13539)
**Related Date** Aug-22-2023 15:10

**2023-141208 Timeline**
Times are approximate.

**7/6/2023**

**2133** - 911 call received from Cindy Schramm. (MPD CAD)
**2135** - Officers dispatched. (MPD CAD)
**2137** - 1st officer on scene. (MPD CAD)
**2141.32** - Jordan tells Sgt. George that Gagne fired one round into the air from a .45 (Kelly BWC)
**2149** - Jordan gives Ofc. Gutierrez the phone number to call Gagne. (Gutierrez BWC)
**2216** -Ofc. Gutierrez calls Gagne but no answer. (Gutierrez BWC)
**2217** - Jordan calls Gagne but no answer. (Gutierrez BWC)
**2216** - Ofc. Maldonado begins PA announcements. (Maldonado BWC)
**2219.36** - Beanbag rounds (3) fired at front door. (Freeman #23084 BWC)
**2223.24** - Beanbag rounds (2) fired at front window. (Freeman #23084 BWC)
**2226.23** - Gagne opens the front door with rifle in hand. (Plott BWC)
**2227.10** - Gagne calls Jordan. Initially it is on speaker phone. Shawn asks her why there are "fucking cops" in front of the house. Jordan immediately turns speaker phone off and will not hand the phone to the officer. (Gutierrez BWC)
**2229.32** - Ofc. Adair arrives with Ofc. Gutierrez. (Gutierrez BWC)
**2230.00** - Jordan asks Gagne to come out. He tells her something, she responds, "I don't want them to come in. I want you to come out." (Gutierrez BWC)
**2230.40** - Door handle moving and door opening. (Chuey BWC)
**2230.47** - Door shut. (Chuey BWC)
**2230.53** - Ofc. Adair picks up Jordan's phone. Gagne hangs up. (Gutierrez BWC)
**2231.25** - Ofc. Adair attempts call back using Jordan's phone. (Gutierrez BWC)
**2232.05** - Ofc. Adair begins speaking with Gagne. (Gutierrez BWC)
**2234** - Ofc. Freeman #20207 enters unit 2165. (Plott BWC, Radio)
**2239.16** - Ofc. Adair hears Gagne loading ammunition over the phone. (Gutierrez BWC)
**2242.38** - 1st Shot fired by Ofc. Freeman #20207.
**2243.20** - 1st shot fired by Gagne. (Widmer BWC)
**2243.21** - 2nd shot fired by Ofc. Freeman #20207. (Widmer BWC)
**2244.17** - 3-4 shots fired by Gagne toward the north. (Air Unit video)
**2244.18** - Volley of fire by officers.
**2244.36** - Volley of fire by officers.
**2245** - 4 Ferret (Gas) rounds fired into the apartment.
**2256** - Large Armored vehicle moves toward the front of the apartment providing cover for officers. (Air unit video)
**2309.43** - Diversionary device deployed to elicit response. (Air unit video, Harris BWC)
**2315.49** - First officer enters apartment. (Air unit video, Harris BWC)
**2315.55** - Taser deployed on Gagne. (Harris BWC)
**2317.05** - Sgt. Harris calls for Paramedics to respond to the apartment. (Harris BWC)

**2317.32** - Gagne brought out in front of apartment. (Air unit video)
**2318.17** - Officer removes tactical vest from Gagne. (Air unit video)
**2319** - MFMD arrives at apartment and begins lifesaving measures. (Air unit video, Fire Cad report)
**2341** - Time of Death pronounced. (MPD CAD)

**Investigation Continued.**

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Christopher Gagne, in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne,<br><br>Plaintiffs,<br><br>vs.<br><br>City of Mesa, a political subdivision of the State of Arizona; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and in his capacity as a police officer; Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his individual capacity and in his capacity as a police officer; ABC Partnerships I-X; XYZ Corporations I-X, John Does I-X and Jane Does I-X,<br><br>Defendants. | ) | Case No.<br><br>CV-24-01337-PHX-SHD<br><br>Videoconference Deposition of<br><br>SHAWN FREEMAN<br><br>March 12, 2026<br>9:00 a.m.<br><br>CERTIFIED TRANSCRIPT |

Phoenix, Arizona
March 12, 2026
9:00 a.m.

SHAWN FREEMAN,

called as witness herein, having been first duly sworn by the Court Reporter remotely, was examined and testified as follows:

EXAMINATION

BY MR. WOODS:

Q. I'll start out with saying Mr. Freeman. But what is your current rank?

A. Detective.

Q. You're a detective, okay. I probably will just ask questions. But if I address you, I'll address you as detective. Does that make sense?

A. Yeah, that sounds good. Thank you.

Q. Have you ever had your deposition taken before?

A. No.

Q. Okay. Just, I guess, a couple quick ground rules. The court reporter has to take down what everybody says, so we've got to do our best to not talk over each other.

I don't want to spend a lot of time on it. Where were you born?

A. I was born in Idaho, moved to Arizona as a kid. I pretty much grew up here. Well, I did 09:04:56 grow up here. Graduated from Dobson with MTC, got an associate's in criminal justice, worked for In-N-Out Burger traveling with them for about six-and-a-half years, six years, and then got started in corrections.

09:05:12 In corrections, I became a sort commander for their special operations team, did that for about two years. I was total and private corrections for about five-and-a-half years, worked one year with the Bureau of Prisons. 09:05:26 Excuse me.

I had already tested for the Mesa police department. So when I got hired by Mesa, I left the Bureau of Prisons and I got hired by Mesa in March of 2014. I graduated the police academy in 09:05:42 2014. And from there, got on to Mesa Police Department SWAT team in February of 2019. And I completed a basic SWAT school there, a hostage rescue school, basic sniper school, an advanced sniper school.

09:06:05 I later took over the less lethal

instructor, chemical munitions instructor, light sound diversionary device instructor. I taught hostage rescue, basic building searches to the academy. And I'm also a precision rifle instructor, handgun instructor, and a rifle instructor.

09:06:27

From Mesa SWAT, I left there in -- I believe it was June of '24 and, now, I'm currently assigned to our U.S. Marshals Violent Offender Unit Task Force.

09:06:49

Q. So you were assigned -- when did you become a detective?

A. June -- when I moved over to the Marshals, so that June of '24.

09:07:05

Q. Okay. Do you still do any SWAT-related tasks or anything like that?

A. Yes. I was just brought back to the SWAT team in a part-time capacity to teach and bring experience to some of the newer operators. So lately, I have been teaching newer sergeants on -- or team leaders on the SWAT team and newer operators hostage rescue.

09:07:28

Q. Okay.

A. I also teach them less lethal, chemical munitions and the bangs, flash bangs, LSDDs.

09:07:55

the commission of an investigation. So reasonable suspicion that a crime has been committed.

Arresting someone inside of their home is the same, I believe, that there's probable cause to arrest that person. Depending on circumstances of that arrest, I may have to wait for a search warrant to enter the property and search that for evidence of the crime to further my investigation.

09:22:19

09:22:43 Consequently, the person believed to have committed those crimes would be arrested at that time. There can be an arrest warrant that I can enter a house and arrest somebody on.

Q. Going back to our exhibit. There's a line item here on October 21st, 2022. Do you see that?

09:23:05

A. Yes.

Q. And that's entitled Sniper Instructor School, correct?

09:23:13 A. Yes.

Q. And it was 50 hours; is that right?

A. Yes, sir.

Q. What were you taught in that training?

A. I was taught how to put together and put on a basic sniper school for any student to come

09:23:34

through. So that included how to put together PowerPoint presentations, how to present the material, how to conduct or create drills to get different teaching points across to the students.

09:24:03 I learned different -- there's -- so in optics, there's two different ways of looking through an optic or how they're measured. One of them is milliradian. The other one is MOA, minutes of angle. Those are the only way optics

09:24:29 are created. So I learned the difference in how to use those and how to teach those.

I learned about bullet flight, bullet impacts, different materials. Everything that a base -- a student that didn't know anything how to

09:24:51 get them to be a basic sniper at the end of the school, how to put together a rifle, how to zero it, everything.

Q. Okay. Were you a sniper before that training?

09:25:08 A. I was, yes. In order to get into that school, I had to be a primary sniper for, I believe, it was three years, possibly four years. I was a primary sniper on our full-time SWAT team for about four years.

09:25:23 Q. Okay. And prior to becoming a full-time

sniper, did you go through training to become a sniper?

A. Yes, sir. I attended a basic sniper school in Northern Arizona, and that was a week long. And then, in between there, I attended weekly trainings within our team and surrounding agencies. We trained every Wednesday from about 7:30 to 11:30, 8:30 to 12:30 depending on the time of year.

09:25:39

09:26:00

And then I attended an advanced urban sniper school and that's -- after attending that is when I had met the requirements to become a primary sniper.

Q. All right. On the day -- on July 6, 2023, you fired your weapon, your rifle, twice towards Shawn Gagne. Do I have that right?

09:26:24

A. Yes, sir.

Q. What rifle were you using that day?

A. I was using an Accuracy International, chambered in .308. It's a bolt-action rifle and it had a Nightforce optic on it with a 2.5 to 10 magnification.

09:26:39

Q. You mentioned that there were two different types of optics in use --

A. Yup.

09:27:05

or my team commander, might have more information than what I have as an operator. And based off of that information, they can tell me to shoot somebody.

09:36:46 BY MR. WOODS:

Q. Okay. We -- we already talked about perimeter being established. Was Shawn -- in your opinion, was he contained?

MS. RETTS: Form.

09:37:00 A. For the most part. I don't know what was to the east or behind his apartment. I only know what was on the west side.

BY MR. WOODS:

Q. Was he free to leave?

09:37:18 A. No.

Q. From your position, you could actually see Mr. Gagne, correct?

MS. RETTS: Form.

A. At times. He had covered his windows

09:37:46 with foil or a couple windows with foil, and then he had Acadia blinds in front of one of the sliders that faced -- like the slider patio door to the west, that had Acadia blinds.

One window north of that was open. It

09:38:10 was not covered up. The next window was covered

in foil. So at times, I could see him inside of his apartment.

MR. WOODS: Okay. I'll mark this as number 2.

09:38:40 EXHIBITS:

(Deposition Exhibit No. 2 marked for identification.)

BY MR. WOODS:

Q. Tell me when you see that.

09:38:43 A. Yes.

Q. Okay. So this exhibit is entitled Scene Diagram. At the bottom, it's Bates stamped Mesa, underscore, 002315. Do you see that?

A. Yes, sir.

09:39:01 MR. WOODS: I'm just jotting down notes so I don't forget to submit this as an exhibit to Debra. All right.

BY MR. WOODS:

Q. Have you seen this document before?

09:39:10 A. No, I have not.

Q. Okay. Do you recognize the second page marked 2316? Do you recognize that as being the scene and aerial overview?

A. Yes.

09:39:26 Q. Okay. Have you seen the aerial overview

before?
A. No. Well, I mean, other than Google Maps.
Q. Now, the next page, 2317, has some markings on it, some red markings and blue markings. Do you see that?
A. Yes, sir.
Q. There's a big square towards the top that says "suspect apartment, second floor," correct?
A. Yes, sir.
Q. There's an arrow that points to the front door and then arrows that point to balconies it looks like?
A. Correct.
Q. Okay. And then down towards the bottom, there's a circle that says "sniper," correct?
A. Yes, sir.
Q. So was -- was that your location where it says --
A. Yes, sir.
Q. How did you get to that location?
A. When I arrived on scene, there was a window that -- on the red box, the arrow that says balcony to the far right, there's a window just

09:40:42 left of that that was uncovered.

When I arrived on scene, I saw Mr. Gagne holding an AK-47 in high port with an optic on top of it. Excuse me. When I saw that, I knew I had to get to an elevated position above the patrol officers, because Shawn had the high ground on all of the patrol officers outside.

I initially tried making contact with the resident in that apartment -- I don't recall
09:41:00 the number, but the location that is circled -- and was unable to make contact. So I was trying to go get a ladder to climb up on to his patio, which I carry in my vehicle. Excuse me.

When that resident came out to the patio
09:41:22 to see what was going on, I asked if I could get inside, and he granted me access to his residence and let me in. That is how I entered that apartment.

Q. Okay. And once you entered that
09:41:39 apartment, did you set yourself up as a sniper?

A. I did. I gave the resident instructions to get as far back as he can in his residence and to get low. And I darked out his apartment by turning off his TV and all of his lights, and got
09:42:00 in position to -- with my bolt gun, my sniper

Q. "I then asked him to explain what he was motioning." Do I have that right?
A. Correct.
Q. Those sentences that we just read, are those an accurate summary of what you told the investigator?
A. Yes, they are.
Q. It goes on, "Officer Freeman said that the rifle was in his right hand and his left hand was opening the blinds."
Do I have that right?
A. Yes.
Q. Okay. Is that an accurate summary of what you told the investigator?
A. Yes, it is.
Q. "Officer Freeman believed that the suspect was looking for where he wanted to shoot at patrol officers."
Did I read that right?
A. Yes.
Q. "Officer Freeman explained that from the suspect's elevated position, he had a good view of the officers' positions."
Do I have that right?
A. That is correct.

10:35:56
10:36:14
10:36:20
10:36:40
10:37:07

Q. Okay. So everything we just read, is that -- are those an accurate summary of what you told the investigator?

A. Yes, sir.

Q. Next paragraph. "I asked Officer Freeman to explain what position the suspect's gun was in at this time. He told me that the suspect had the gun in his right hand and that it was up, but not in the low ready position at this point."

Do I have that right?

A. Correct.

Q. Is that an accurate summary of what you told the investigator?

A. Yes, it is.

Q. What's the low ready position?

A. Low ready is a carry position where the muzzle is pointed down towards the ground in a safe direction. And the stock, it would be almost vertical. So the muzzle facing down and the stock of the weapon up by the shooter's face.

Q. Is low ready a position that makes it easy to put the rifle -- or shoot a rifle?

A. Low ready is a position to safely move around, minimizing any kind of property damage and/or injury to another person. So it's a

held of record:)

MR. WOODS: Sorry about that, I had an urgent text from my wife. Okay.

BY MR. WOODS:

10:52:42 Q. What -- did you actually hear the shots coming out the window from Shawn?

A. Yeah. As I had just said, there was a difference in the sound from an unsuppressed rifle versus the suppressed rifles.

10:52:58 Q. Okay. And, again, you were the primary sniper, right?

A. Correct.

Q. And so you had the job to observe, correct?

10:53:14 A. Yes.

Q. Information that you see -- sorry. It's important for you to relay the information you see to your other team members as the primary sniper, correct?

10:53:30 MS. RETTS: Form.

A. Correct.

BY MR. WOODS:

Q. Why is that important?

MS. RETTS: Form.

10:53:35 A. I'm from an elevated position or a

hidden position that they would not be able to see. So it's important that I communicate my observations so that they can make tactical decisions from their advantage points.

10:53:56 BY MR. WOODS:

Q. After you fired your second shot, describe what you saw over the next 60 seconds.

A. Okay. After I fired my second shot, I hear and see those rounds leaving the apartment.
10:54:51 As he moves north, he's out of my view so I can -- I no longer have the ability to observe his location or what he's doing inside.

He -- there's an engagement to the north. And then from my advantage point, I can't
10:55:18 see, but I know there's another engagement at the north that I later learned was the team at the front door. So that -- over the next 60 seconds, I know several more rounds were exchanged.

And then I learned over my radio that he
10:55:39 was down in the front door, and they were going to start working with the canine and a plan to move up to Mr. Gagne and treat him.

Q. Okay. So after your second shot, he went out of your view?

10:56:08 A. Correct.

STATE OF ARIZONA )

COUNTY OF MARICOPA )

BE IT KNOWN the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Court Reporter and Notary Public of the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; notice was provided that the transcript was available for signature by the deponent; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had and adduced upon the taking of said deposition, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto, nor am I in any way interested in the outcome hereof.

DATED at Mesa, Arizona, this 18th day of March 2026.

______________________________
Debra K. Price
Court Reporter
Notary State of Arizona