Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Christopher Gagne, in his capacity as the Personal Representative of the Estate of Shawn Taylor Gagne; Christopher and Suzette Gagne, husband and wife, as the surviving parents of decedent Shawn Gagne,

Plaintiffs,

vs.

City of Mesa, a political subdivision of the State of Arizona; Matthew Harris, in his individual capacity and in his capacity as a police officer; Kyle Thomas, in his individual capacity and in his capacity as a police officer; Shawn Freeman, in his individual capacity and in his capacity as a police officer; Matt Brown, in his individual capacity and in his capacity as a police officer; Kyle Cameron, in his individual capacity and in his capacity as a police officer; Matthew Chuey, in his individual capacity and in his capacity as a police officer; Robert Goodrich, in his individual capacity and in his capacity as a police officer; Alejandro Navarro, in his individual capacity and in his capacity as a police officer; Matthew Adair, in his individual capacity and in his capacity as a police officer; Christopher Orr, in his individual capacity and in his capacity as a police officer; ABC Partnerships I-X;

Case No.: CV-24-01337-PHX-SHD

**PLAINTIFFS' RESPONSE TO DEFENDANTS' *DAUBERT* MOTION REGARDING PLAINTIFFS' POLICE PROCEDURES EXPERT MARK HAFKEY**

(Assigned to the Honorable Sharad H. Desai)

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

XYZ Corporations I-X; John Does I-X and Jane Does I-X,

Defendants.

Plaintiffs, by and through undersigned counsel, respectfully request that the Court deny Defendants' *Daubert* Motion Regarding Plaintiffs' Police Procedures Expert Mark Hafkey (Doc. 137) (the "Motion"). Mr. Hafkey is a retired Phoenix police lieutenant who supervised barricades, taught firearms and defensive tactics, and investigated uses of force. His opinions compare what the Mesa officers did on July 6, 2023 with what police officers are trained to do, and because Plaintiffs will not ask him to instruct the jury on the law or to state a constitutional verdict, much of the Motion is aimed at testimony Plaintiffs do not intend to offer. This Response is supported by the following Memorandum of Points and Authorities and the record.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. BACKGROUND

Mr. Hafkey signed his report on February 20, 2026. Ex. 1 at 30. Exhibit cites in this Response are to the exhibits Defendants attached to the Motion (Doc. 137-2), by Defendants' exhibit number and each document's own page. Mr. Hafkey reviewed the Mesa Police Department report and its supplements, the investigative summary and timelines, the officers' body-camera recordings, the dispatch audio, the air unit video, and the Ring and interior surveillance video from Mr. Gagne's apartment. *Id.* at 2. He then built two timelines that line those recordings up against one another. Exs. 2, 3.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

The timelines record the following sequence. At 10:31 p.m., before he reached his sniper position, Officer Freeman said: "I can put him down as soon as I get up there." Ex. 1 at 14; Ex. 2. He fired his first round at 10:42 p.m. Ex. 2. Seconds later the negotiator radioed, "I'm still on the line with him; he's still talking with me." Ex. 3. Officer Freeman fired again at 10:43:19. Ex. 2. Twenty-eight seconds after that, a body camera recorded him saying, "Looks like that gun is still down right there." *Id.* At 10:44:15 he said, "Hands are clear, Hands are up, he's passing that window." *Id.* The officers on the southwest side opened fire at that moment. *Id.* Mr. Gagne fell down the stairs and yelled "I'm down" six times. Ex. 3. He opened the front door, and within about one second a second group of officers fired. Ex. 1 at 7-8, 23. No weapon was found at the front door or at the southwest window. *Id.* at 8.

Based on the record, Mr. Hafkey offers three opinions. They address whether any exigency required the officers to seize Mr. Gagne when they did, each officer's use of deadly force, and the scene management and communication failures that contributed to the shooting. *Id.* at 4, 9-30. Defendants did not depose Mr. Hafkey in this case, and the Motion relies instead on testimony he gave in a different one. Mot. 7:26-28 n.3.

## II. ARGUMENT

### A. Rule 702 Supports Limits on Particular Testimony, Not Exclusion of the Witness.

Plaintiffs bear the burden of showing by a preponderance of the evidence that Mr. Hafkey's testimony satisfies Rule 702, and "there is no presumption in favor of admission." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025). The question is "whether an expert had sufficient factual grounds on which to draw conclusions," not whether the

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

expert's "hypothesis is correct . . . ." *Hyer v. City & County of Honolulu*, 118 F.4th 1044, 1056 (9th Cir. 2024) (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025-26 (9th Cir. 2022)). Rule 702 "does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Id.* at 1058 (quoting *Elosu*, 26 F.4th at 1026).

In *Hyer,* the district court there excluded a police practices expert's report in its entirety, in part because it contained legal conclusions, and then granted summary judgment to officers who had shot a man barricaded in his home. The Ninth Circuit reversed, holding that the expert "was qualified to opine" on the officers' failure to use defusing and communication techniques, and that he "could help a jury understand the options available to officers in similar situations to aid them in deciding whether the defendant officers' use of force was reasonable or excessive." *Id.* at 1057, 1059. Although the court had "little doubt" that some statements in the reports were inadmissible, it held that excluding the reports in their entirety was an abuse of discretion. *Id.* at 1059.

Judge Brnovich took the same course in the decision Defendants cite most. In *Krause v. County of Mohave*, the court struck a police practices expert's legal conclusions and his bullet-trajectory opinions, 459 F. Supp. 3d 1258, 1264-66 (D. Ariz. 2020), but it found him "generally qualified as a police practices and use of force expert" and permitted his testimony on "the appropriateness of [Defendants'] conduct in light of both those policies and accepted police practices . . . ." *Id.* at 1271.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**B. Mr. Hafkey's Twenty-Three Years of Police Work Included Barricades and Use-of-Force Investigations.**

Rule 702 "contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). Where testimony rests on professional experience, its reliability "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (quoting *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000)) (emphasis omitted).

Here, Defendants describe Mr. Hafkey's career as "patrol and traffic assignments," Mot. 2:5-6, but their own exhibit shows considerably more. As a patrol officer he "conducted barricades" and "assisted with tactical entries . . . ." Ex. 4 at 2. As a Sergeant he "supervised and secured major crime scenes, pursuits and barricades . . . ." *Id.* As a Lieutenant he "supervised major crime scenes and barricades . . . ." *Id.* at 1. He spent three years as a supervisor in the Organized Crime Bureau. *Id.* at 2. In both supervisory ranks he "conducted police misconduct investigations including use of force and civil rights violations." *Id.* at 1-2. He was certified as a firearms instructor and a defensive tactics instructor, and he completed training in critical incident risk management and use of force. *Id.* at 2-3. As president of the sergeants and lieutenants association he represented officers in misconduct matters and reviewed and interpreted police policy. *Id.* at 1. The Motion does not mention his barricade experience at any point.

Defendants argue that only a former SWAT sniper, operator, or negotiator may address this incident. Mot. 7:23-8:20. There is nothing in Rule 702 that imposes this kind of requirement, and Mr. Hafkey's opinions are not based on sniper craft. Rather than

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

criticizing Officer Freeman's marksmanship, his rifle, or his choice of position, Mr. Hafkey criticizes the decision to fire at a man who was threatening no one at that moment, the failure to report that the man's hands were up, the absence of assigned roles on the perimeter teams, and the failure of supervisors to let a working negotiation continue. Ex. 1 at 16-19, 22, 28-29. A Lieutenant who ran barricade scenes and investigated uses of force has "at least the minimal foundation of knowledge, skill, and experience" to address those subjects. *Hangarter*, 373 F.3d at 1016 (quoting *Thomas*, 42 F.3d at 1269) (emphasis omitted).

Defendant Freeman confirms one of the standards Mr. Hafkey applies. Mr. Hafkey writes that "snipers are also observers for the rest of the team, and their job is to provide the team with critical fluid observations . . . ." Ex. 1 at 28. Officer Freeman agreed under oath that his job as primary sniper was to observe and that relaying what he saw mattered: "it's important that I communicate my observations so that they can make tactical decisions from their advantage points." Ex. 10 at 83:10-84:4.

The years since Mr. Hafkey retired, and his later work for an airline, go to weight, particularly where Defendants identify no change since 2012 in any practice he describes: containing a barricaded subject, giving a negotiator time, assigning roles, relaying observations, and warning before deadly force where there is time. Nor does listening to a body-camera recording require experience wearing one. Mot. 9:7-13. Defendants may explore each of these subjects on cross-examination. *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

### C. The *Obregon* Excerpts Do Not Concern the Opinions Offered Here.

Defendants did not depose Mr. Hafkey in this case, and their attack on his qualifications draws instead on excerpts from a deposition taken in *Obregon v. Lamb*, a different case about a different shooting. Mot. 7:26-28 n.3; Ex. 5. The questions Defendants rely on went to an opinion at issue there, which was whether Mr. Hafkey could determine the sequence of gunshots from a medical examiner's report. Ex. 5 at 25:9-21, 27:13-21, 35:19-22. He offers no opinion about wound paths or autopsy findings here.

The same excerpts support his qualifications for the opinions he does offer. Mr. Hafkey testified that he supervised detectives, Ex. 5 at 25:1, that as a firearms instructor he went through "quite a bit of ballistic-type training," *id.* at 29:5-15, and that he reviewed many officer-involved shooting reports for accuracy while representing police employees, *id.* at 27:1-12. Other pages of the same transcript, which Defendants filed in *Obregon* but left out here, describe more of that experience and are attached as **Exhibit A**. *See* Fed. R. Civ. P. 32(a)(6) (when a party offers part of a deposition, "any party may itself introduce any other parts"). Mr. Hafkey testified that as a patrol officer, Sergeant, and Lieutenant he went to and managed "lots and lots of homicide scenes," sometimes for hours or days before homicide detectives took over, and that he worked "probably hundreds" of them. **Ex. A** at 75:1-17. He also testified that he responded to "virtually all homicides" involving a police Sergeant or Lieutenant through 2012 in his role as union president. *Id.* at 23:9-14. Nothing in the excerpts Defendants filed concerns barricades or the supervision of tactical scenes.

### D. <u>**Plaintiffs Will Not Offer Legal Conclusions, and the Opinions Do Not Depend on Them.**</u>

An expert may not instruct the jury on the law, and Plaintiffs do not intend to have Mr. Hafkey do so. He will not recite or interpret case law, tell the jury what the Fourth Amendment requires, or testify that any officer's force was "unreasonable under the 4th Amendment." Because the Court will instruct the jury on the law, Defendants' argument that his summaries of *Deorle*, *Scott*, and *Garner* are imprecise is moot. Mot. 10:20-11:20. The report in any event recites the rule Defendants accuse him of ignoring: officers "need not use the least force possible, but they <u>must</u> use objectively reasonable force." Ex. 1 at 13 (emphasis in original).

The remaining testimony is admissible because "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Where a police practices expert measured officers' conduct against their training standards, the en banc Ninth Circuit held that "[a] rational jury could rely upon such evidence in assessing whether the officers' use of force was unreasonable." *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc). The Ninth Circuit has also reversed an order striking a police practices expert whose report was offered to show that an officer's conduct "deviated so far from institutional norms" that a jury could find her reckless or deliberately indifferent. *Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018). The line is whether the witness uses terms that "have a specialized meaning in law" or attempts "to instruct the jury on the law . . . ." *Hyer*, 118 F.4th at 1059 (quoting *United States v. Diaz*, 876 F.3d 1194, 1199 (9th Cir. 2017)).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Defendants contend that the legal conclusions cannot be separated from the rest, Mot. 11:21-12:2, but the court in *Krause* did exactly that when it barred the phrase "not objectively reasonable" and then held that the expert "may opine on whether [the deputy's] use of force or Defendants' conduct was appropriate under the circumstances." 459 F. Supp. 3d at 1264-65 & n.2. Here, each of Mr. Hafkey's officer-by-officer conclusions rests on a stated basis that survives when the constitutional label is removed, that the officer did not see a weapon, gave no warning, fired while the subject's hands were raised, or fired within a second of the door opening. Ex. 1 at 16-27. He may testify that this conduct was inconsistent with police training and accepted practice on the use of deadly force.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**E. <u>The Opinions Rest on Identified Police Practices.</u>**

Defendants argue that the report names no model policy or lesson plan, Mot. 14:9-24, but experience-based testimony does not require one. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (reliability concerns "may focus upon personal knowledge or experience"). "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. The witness must explain how that experience leads to the conclusion reached. *Id.*

Mr. Hafkey gives that explanation by identifying the following practices: (1) in a barricade, officers "slow things down," set a perimeter with cover, make contact, "and allow the negotiator time to work," Ex. 1 at 22; (2) supervisors give each perimeter team specific assignments, such as "designated shooter, observer, less-than-lethal, communicator," to prevent "contagious fire," *id.* at 19, 28; (3) the sniper observes for the

team and reports what he sees, *id.* at 28; (4) officers give commands and warnings before using deadly force when they have time, *id.* at 24; and (5) officers fire controlled bursts "to allow for continual assessment of the threat," *id.* at 23. The fourth practice tracks the Supreme Court's statement that deadly force may be used "if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985).

He then applies each practice to the record. He found no evidence that any officer on the southwest team was designated as the shooter, and all three fired. Ex. 1 at 19, 28. Officer Freeman said aloud that the gun was down and the hands were up, and he did not put it on the radio. *Id.* at 18, 28. The negotiator reported that Mr. Gagne was still talking to him, and no one stood down. *Id.* at 22, 29. Mr. Gagne was not warned that deadly force was about to be used. *Id.* at 24. Defendants may dispute that these are the governing practices, but that dispute goes to weight once the basis is shown, and Officer Freeman's testimony shows the basis for the sniper's duty to report. Ex. 10 at 83:10-84:4.

**F. <u>Testing the Officers' Accounts Against the Recordings Is Proper Expert Work.</u>**

Defendants characterize the report as narration of video the jury can watch. Mot. 12:5-13:19. The jury will watch the video, and Mr. Hafkey will not tell the jury what Mr. Gagne intended. The record, however, consists of three body cameras, the negotiation recording, the interior video, the air unit video, and radio traffic, all recorded on separate devices. Exs. 2, 3. Mr. Hafkey placed them on one timeline, which is how he determined that Officer Freeman's words "Hands are up" and the southwest team's gunfire occurred at the same moment. Ex. 2. An expert may base an opinion on facts "that the expert has

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

been made aware of or personally observed." Fed. R. Evid. 703. When Mr. Hafkey states those facts, he supplies the foundation Rule 702(b) requires and leaves the jury free to decide whether he has them right.

*Lee v. Andersen* does not help Defendants because the expert there applied what he called "simple observation" to one set of images on one question, whether the decedent had an object in his hand. 616 F.3d 803, 808-09 (8th Cir. 2010). Mr. Hafkey's opinions concern police practice and use the recordings as data, which is what the Ninth Circuit requires in a deadly force case. A court must consider "any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts," and it "may not simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). That rule exists because the person best able to rebut the officers' account is dead. *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014). In *Hyer*, the court held that an expert "was qualified to opine whether the forensic evidence in the record corroborated Defendants' description" of the decedent's posture. 118 F.4th at 1057.

Defendants also object to three sentences they read as comments on the officers' honesty. Mot. 13:20-14:8. Mr. Hafkey will not offer an opinion on whether any officer is truthful, and Plaintiffs will not elicit the phrase "extremely telling." He may identify where an officer's account differs from the recordings, because those differences are facts on which his opinions rest, and the jury will still decide whether to believe the officer.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

### G. Mr. Hafkey Applied the Officers' Perspective and Considered the Whole Encounter.

Defendants' principal argument is that Mr. Hafkey judged the officers by video they never saw. Mot. 14:25-17:14. That argument misreads what the video is offered to prove. Each officer who fired gave an account of what he perceived, and Mr. Hafkey compares those accounts to the video. Officer Freeman reported a rifle in Mr. Gagne's right hand at the blinds. Ex. 1 at 16. Officer Brown reported that Mr. Gagne "stopped and turned toward him" with "something" in his hands. *Id.* at 20. Officer Goodrich reported a rifle in the "low-port position" at the front door. *Id.* at 26. The interior video shows what was there to be perceived, and if the rifle was on the kitchen counter, a reasonable officer watching through a rifle optic from about eighty feet did not see it in Mr. Gagne's hand. *Id.* at 15-16.

The Ninth Circuit addressed this question in *S.R. Nehad v. Browder*, where an officer shot a man holding a pen that the officer said he took for a knife. The plaintiffs' police practices expert opined that officers are trained to recognize what suspects are carrying and that the officer had time to see that the object was a pen. 929 F.3d 1125, 1134 (9th Cir. 2019). The court held that "[w]hether [the officer] reasonably mistook the pen for a knife is therefore a triable question of fact." *Id.* Defendants invoke the allowance for reasonable mistakes, Mot. 11:11-14, but under *Nehad* that allowance frames a question for the jury and does not exclude the expert evidence bearing on it.

The central facts also come from the officers' own words as recorded during the events and involve no hindsight. Officer Freeman said the "gun is still down" and then, as the southwest team fired, that the hands were "clear" and "up." Ex. 2. His use of the word

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

"still" indicates that he had seen the gun down before. The negotiator also told the team by radio that Mr. Gagne was still talking to him. Ex. 3.

Nor did Mr. Hafkey confine his analysis to a single moment. His report recounts that Mr. Gagne was reported to have fired a round, came to the door with a gun in his hand, "repeatedly threatened to shoot at the police," and said he would kill officers who came inside. Ex. 1 at 4-5. He weighed those facts and concluded that "[w]alking around the interior of his home while carrying guns would not substantiate an imminent threat to officers or citizens outside." *Id.* at 14. *Barnes* does not forbid that conclusion, because while it holds that the inquiry "has no time limit," it adds that "the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review." *Barnes v. Felix*, 605 U.S. 73, 80 (2025). The whole encounter also includes the negotiation under way before the first shot, the negotiator's radio report after it, and Officer Freeman's observations after the second. Exs. 2, 3.

Finally, Defendants argue that Mr. Gagne is out of frame at the instant Mr. Hafkey says he set the rifle down. Mot. 12:19-21. That argument raises a dispute about what the evidence shows, and "[w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. The sufficient-facts requirement "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." *Id.* The Third Amended Complaint alleges that Mr. Gagne laid his rifle on the kitchen counter before the first shot, Doc. 101 ¶¶ 51-52, and Officer Freeman's recorded words corroborate it.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**H. The Crossfire and Reaction-Time Statements Rest on the Recordings and Mr. Hafkey's Training.**

*Krause* excluded opinions that reconstructed bullet paths from autopsy findings without measurements or calculations. 459 F. Supp. 3d at 1266. Mr. Hafkey does not calculate angles or trace wound paths, and his opinion instead concerns sequence and source. When glass left the north side of the apartment, the interior video shows Mr. Gagne walking with his hands up and no weapon while the southwest team fired into the window on the opposite side. Ex. 1 at 7, 19; Ex. 3. Even the transcript Defendants rely on describes his basis as the video, the witness statements, and the damage itself. Ex. 5 at 35:9-17. The Motion itself says only that the officers were "believing that he was shooting from within the apartment." Mot. 6:1-4. A former Sergeant and Lieutenant who supervised major crime scenes can explain that inference, Ex. 4 at 1-2, and the jury can test it against the recordings. If the Court concludes that any part of it calls for forensic training, the remedy is to limit that part, as *Krause* did. 459 F. Supp. 3d at 1271.

The statement that perception and reaction take about one second comes from Mr. Hafkey's training as a certified firearms instructor. Ex. 1 at 23; Ex. 4 at 2. He uses it only to explain that officers who fire within about a second of a door opening have not assessed what is in the doorway, and any challenge to the figure goes to weight.

**I. The Facts Underlying Opinion 1 Bear on the Force Claim.**

Plaintiffs do not assert a separate claim for warrantless entry, and Mr. Hafkey will not testify that the officers needed a warrant or that surrounding the apartment was itself

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

unlawful. The Court therefore need not resolve Defendants' *Brendlin* argument. Mot. 17:21-18:2.

The facts gathered under Opinion 1 remain relevant to Count I. Both reported victims had left the apartment and were safe, Mr. Gagne was alone, and there was no report of anyone injured inside. Ex. 1 at 10-11. He was surrounded and, in Officer Freeman's words, not free to leave. Ex. 10 at 30:6-15. Those facts go to whether anything required the officers to act when they did, and "the availability of alternative methods of capturing or subduing a suspect may be a factor to consider." *Smith*, 394 F.3d at 701. In *Hyer*, the expert's opinions that there was "no rush" to apprehend a barricaded man and that negotiations remained viable were among those the district court erred in excluding. 118 F.4th at 1057-58.

Defendants' Rule 403 argument fails for the same reason, because the prejudice they identify arises from legal conclusions the jury will not hear. Mot. 18:6-8.

## III. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' *Daubert* Motion Regarding Plaintiffs' Police Procedures Expert Mark Hafkey (Doc. 137). In the alternative, Plaintiffs request that the Court limit Mr. Hafkey's testimony only by excluding statements of law and constitutional conclusions, and otherwise permit him to testify to police training, practices, and procedures and their application to the events of July 6, 2023.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**RESPECTFULLY SUBMITTED** this 25th day of November 2026.

**MILLS + WOODS LAW, PLLC**

By *___/s/ Sean A. Woods___*
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Kathleen L. Wieneke
kwieneke@wienekelawgroup.com
lrasmussen@wienekelawgroup.com
Christina Retts
cretts@wienekelawgroup.com
Rebekah K. Browder
rbrowder@wienekelawgroup.com
**WIENEKE LAW GROUP, PLC**
1225 W Washington St., Ste. 313
Tempe, AZ 85288
(602) 715-1868
*Attorneys for Defendants Harris, Navarro, Cameron, Chuey, Goodrich, Freeman, Thomas, Brown, and Cost*

*___/s/ Ben Dangerfield___*